1
2
3
4
5
6
7

8                          **UNITED STATES DISTRICT COURT**

9                          **SOUTHERN DISTRICT OF CALIFORNIA**

10

11    UNITED STATES OF AMERICA,                    CASE NO. 10CR4246 JM

12                                 Plaintiff,       ORDER CONTINUING MOTION TO
              vs.                                   SUPPRESS FISA WARRANT;
13                                                  DENYING MOTION TO SUPPRESS
                                                    EVIDENCE; DENYING MOTION
14    BASAALY SAEED MOALIN, et al.,                 TO SUPPRESS STATEMENTS

15                                 Defendants.

16          Defendant Basaaly Saeed Moalin ("Moalin") moves to suppress (1) evidence obtained

17    pursuant to a FISA warrant; (2) evidence seized pursuant to a search warrant of his home; and (3)

18    statements made at the time of his arrest.  The Government opposes the motions.  At the time of the

19    hearing on February 9, 2011, the court addressed the majority of the motions filed by all Defendants

20    and indicated that an order on the suppression issues would be forthcoming. For the reasons set forth

21    below, the court continues the motion to suppress the FISA wiretap evidence until after the court

22    conducts a CIPA review, denies the motion to suppress evidence seized from Defendant's home, and

23    denies the motion to suppress statements.

24                                        **BACKGROUND**

25    The Indictment

26          On October 22, 2010 Defendants Moalin, Mohamed Mohamed Mohamud ("Mohamud") and

27    Issa Doreh ("Doreh") were indicted on four counts for (1) conspiracy to provide material support to

28    a foreign terrorist organization in violation of 18 U.S.C. §2339A; (2) Conspiracy to provide material

support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B: (3) Conspiracy to kill in a foreign country, in violation of 18 U.S.C. § 956; and (4) Conspiracy to launder monetary instruments, in violation of 18 U.S.C. § 1956.  On January 11, 2011, the grand jury returned a superseding indictment including the same counts, but adding Ahmed Nasir Taalil Mohamud ("Nasir") as a defendant.

<u>The Government's Proffer</u>

The Government makes the following proffer in its opposition brief:

"As described in the Superseding Indictment, al-Shabaab is a violent and brutal militia group that uses intimidation and violence to undermine Somalia's Transitional Federal Government (TFG) and its supporters. On or about February 26, 2008, the United States Department of State designated al-Shabaab as a Foreign Terrorist Organization (FTO). Until his death by missile strike on May 1, 2008, Aden Hashi Ayrow was one of al-Shabaab's most well-known and infamous leaders.

Prior to their arrests, Moalin was a San Diego-based cab driver, Mohamud was Imam of a San Diego mosque largely serving the Somali community, and Doreh was an employee of the now-defunct Shidaal Express, a money services business that transferred funds to Somalia through the "hawala" system. Nasir was an Anaheim-based cab driver. Beginning on a date unknown, but continuing to at least August 5, 2008, these defendants conspired together–and with others known and unknown– to provide money to al-Shabaab and others engaged in violent attacks on the TFG and its supporters.

Moalin maintained direct telephone contact with Ayrow and coordinated money transfers with him. At Ayrow's urging, the defendants collected money for al-Shabaab and transferred it to Somalia through the Shidaal Express. The defendants routinely used phony sender and/or recipient names to make structured money transfers. Moalin, Mohamud, and Doreh used their considerable connections and influence within the San Diego area and elsewhere (including St. Louis) to collect and transmit the funds. Nasir provided funds from Orange County for inclusion in the transfers to Somalia. The defendants financed al-Shabaab both before and after its formal designation as an FTO.

When Ayrow died in May 2008, the defendants continued to collect funds and transmit them to Somalia to support violence against the TFG and its supporters. First, Moalin sought out new contacts within al-Shabaab, including an individual named Omar Mataan, to maintain the flow of

funds from San Diego to al-Shabaab. Second, the defendants provided funds to an individual named Farah Yare to support other militia fighting alongside al-Shabaab.  The illicit transfers made through the Shidaal Express include at least the following:

| Date: | Amount: |
|---|---|
| 1/1/08 | $1,950 |
| 1/1/08 | $1,950 |
| 2/13/08 | $1,300 |
| 2/13/08 | $700 |
| 4/23/08 | $1,900 |
| 4/23/08 | $1,100 |
| 7/15/08 | $1,250 |
| 7/15/08 | $1,030 |
| 7/23/08 | $1,860 |
| 7/23/08 | $1,650 |
| 8/5/08 | $860 |
| 8/5/08 | $350 |

Also, in early January 2008, Moalin provided Ayrow with use of one of Moalin's properties in Somalia. During a January 3, 2008 telephone call with Ayrow, Moalin provided Ayrow with detailed directions to the house, told him how to get the key, and explained how Ayrow could hide weapons in the attic or yard. Moalin even offered to have trees delivered to the property to place over equipment that Ayrow could bury in the ground. Moalin warned that the property's drawback was that its location and tall trees made it easily identifiable from far away. Ayrow dismissed the concern, observing that the house would only be used at night.

The audio recordings are rife with discussions of violence and terrorist attacks. For example, on January 20, 2008, Ayrow told Moalin that "we planted a land mine for Abdi Qaybdid [a pro-government militia leader] who was traveling on that road; he was almost hit." Ayrow also described an attack against Somalia's Prime Minister and Deputy Prime Minister, stating: "As soon as they arrived at the Presidential palace, we hit them with 12 mortar shells." The two continued to

1  talk, and Moalin stated: "God is great. God is great. It is something to be thankful of the fact that you

2  are capable to deny them the opening of new offices and to work as a functioning government."

3  During this same call, Ayrow instructed Moalin to tell defendant Mohamud that "he must let us know

4  the amount of money we can expect every month, even if it is one hundred dollars." Ayrow stated:

5  "[W]e want to support the insurgent with it. Whatever he can afford."

6          Later, when the conspirators grew concerned that law enforcement may be onto them, Moalin

7  told Nasir that "we will lay low for awhile." The following exchange ensued:

8          Nasir:  Like say, stop the talking.

9          Moalin:        No but we will lay low of course.

10                        We can still support the orphans and – you know? – people in need and –

11         Nasir:  Yes.

12         Moalin:        –we will conduct our actions along that method; we will go under that pretense

13                        now.

14         Nasir:  Yes, we are helping the poor.  They do not know it is

15                        bullets; that is the way it is, you know?

16         Moalin:        Sure."

17  (Oppo. at pp. 3:19 - 7:8).

18  **Moalin's Motions**

19  Suppress Evidence, FISA Wiretap

20          Defendant argues that the electronic surveillance conducted by the Government  pursuant to

21  the Foreign Intelligence Surveillance Act ("FISA") violates the First and Fourth Amendments.  As

22  indicated at the time of oral argument, this motion is premature until the court conducts a pretrial

23  review and/or conference pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C.

24  App. III §2.  This motion is continued until after the CIPA pretrial conference.  Defendant may renew

25  the motion at that time.

26  Suppress Evidence, Search of Defendant's Residence

27          Defendant moves to suppress all evidence seized during the search of his home on November

28  1, 2010 on the ground of staleness.  While acknowledging that the warrant "may have been valid" in

10cr4246

1 | December 2008, Defendant contends that the information contained in the warrant was stale by

2 | November 2010 and therefore not supported by probable cause.

3 | A warrant is valid if supported by probable cause, that is, a "fair probability that contraband

4 | or evidence of a crime will be found in a particular place." Illinois v. Gate, 462 U.S. 213, 238 (1983).

5 | "Probable cause is a fluid concept - - turning on the assessment of probabilities in particular factual

6 | contexts - - not readily, or even usefully, reduced to a neat set of legal rules." Id. The affidavit of

7 | Special Agent Kaiser sets forth extensive facts establishing probable cause to believe that evidence

8 | was likely to be found in Moalin's apartment. (Gov't Exh. 5). The evidence specified in the affidavit

9 | was of a nature likely to be kept for long periods of time. The evidence related to donors, contacts,

10 | receipts of hawala transactions, a "contact book" containing names and telephone numbers "Moalin

11 | did not want on his cell phone [presumably because he did not want authorities to find the contact

12 | information on the phone when he entered or exited the United States," (Id. ¶61), and electronically

13 | stored information. The agent declared, based on his training, experience, and belief, that the items

14 | sought were likely kept in an individual's home and for long periods of time. (Id,¶62). These

15 | inferences as to the time, place, and manner of retention of such information, drawn by the agent,

16 | were, and are, entirely reasonable.

17 | The facts identified in the affidavit are sufficient to show that the records and other evidence

18 | sought by the search warrant were probably on the premises on November 1, 2010, even though the

19 | facts identified in the affidavit were largely based on a 2007-2008 investigation. In United States v.

20 | Greany, 929 F.2d 523 (9th Cir. 1991) the Ninth Circuit noted that issues of "[s]taleness must be

21 | evaluated in light of the particular facts of the case and the nature of the criminal activity and property

22 | sought." Id. at 525. There, the defendant challenged the search warrant for his home where the bulk

23 | of the evidence relied upon was about 1 ½ to 2 years old. An informant told law enforcement that,

24 | while doing a remodel of defendant's home about 1 ½ to 2 years earlier, he heard a conversation

25 | involving defendant about growing marijuana in the remodeled portion of the home. The Ninth

26 | Circuit noted that this lapse of time was not stale because "[o]ne may properly infer that equipment

27 | acquired to accomplish the crime and records of the criminal activity will be kept for some period of

28 | time." Id.

1    The court also rejects Defendant's argument that his change of residence in May 2010

2 somehow undermines the magistrate's determination that relevant evidence would probably be found

3 in his apartment. There is no indication that Defendant's alleged funding activities were dependent

4 upon and limited to Defendant residing in a particular location. The types of activities referred to in

5 the affidavit are not related to covenants of real property, but human affairs - records of which may

6 repose in one's home regardless of its location. Simply put, the sought after evidence is the type one

7 would move from location to location, and not leave behind or destroy.

8    Viewing the search warrant affidavit in context of the investigation and the dictates of the

9 Fourth Amendment, the court rejects Defendant's staleness argument and denies the motion to

10 suppress evidence.

11 Suppress Evidence, Post-Arrest Statements

12    On October 31, 2010, Moalin was arrested at the San Diego International Airport. Moalin was

13 provided with his Miranda warnings and made statements to federal officers. Moalin argues that all

14 statements must be suppressed because he was never informed that he had been indicted on October

15 22, 2010. Defendant concludes that this failure to disclose that he was indicted somehow invalidates

16 the warrant.

17    At the outset, the court notes that Defendant does not challenge the fact that he received the

18 Miranda advisements and voluntarily waived those rights. The fact that Moalin was not advised of

19 the existence of the indictment at the time of his arrest does not render his consent involuntary. In US

20 v. Charria, 919 F.2d 842 (2d Cir. 1990), the Second Circuit rejected the notion that an accused must

21 be informed of the indictment in order to validly waive Miranda:

22       Once an accused understands that he is under arrest and, after receiving the Miranda
         warnings, understands his right to remain silent, the potential consequences of
23       speaking, and his right to counsel, including during interrogation, he is fully apprised
         of the information needed to make a knowing waiver of the Sixth Amendment right;
24       providing him with the information that he is also under indictment, the desirability of
         which is debatable, is not constitutionally required. Id. at 848 (internal citation
25       omitted); see also Karr, 742 F.2d 493, 496 (9th Cir. 1984) ("Miranda warnings suffice
         for waiver of the Sixth Amendment.").
26

27 Id. at 848. Here, Defendant was provided with his Miranda advisements and voluntarily waived those

28 advisements. Nothing more is required. The fact that Defendant was not informed that he had been

1   indicted on October 22, 2010 does not provide a ground for suppression.

2          Defendant argues that the "Sixth Amendment right to counsel is violated whenever an agent

3   of the Government deliberately elicits incriminating statements from an indicted defendant in the

4   absence of counsel." United States v. Kimball, 884 F.2d 1274, 1278 (9th Cir. 1989).  This general

5   statement is taken out of context.  The issue in Kimball did not involve whether, in order to waive

6   Sixth Amendment rights, the accused must be informed that he is under indictment.  Rather, the

7   defendant there was arrested, obtained counsel, and indicted on various money laundering charges.

8   He was detained without bail pending trial.  Several months after his arrest, and while detained in

9   custody, two DEA agents interrogated him outside the presence of his counsel and without providing

10  the Miranda advisements.  The court had little difficulty in concluding that the interrogation violated

11  the Sixth Amendment.  Here, the sequence of events provides that Defendant was arrested and he was

12  advised that he could remain silent and/or  consult with an attorney.[1]  At this point, Defendant

13  voluntarily waived his Sixth Amendment right to counsel and no Massiah Sixth Amendment violation

14  occurred.  The motion to suppress statements is denied.

15         In sum, the court continues the motion to suppress the FISA wiretap evidence until after the

16  CIPA pretrial hearing, denies the motion to suppress evidence, and denies the motion to suppress

17  statements.

18         **IT IS SO ORDERED.**

19  DATED:  February 17, 2012

20  _____

21                                              Hon. Jeffrey T. Miller
                                                United States District Judge

22  cc:            All parties

28  _____

        [1] At the time of his arrest, Defendant did not have counsel nor did he request one.