1                    United States District Court

2                   Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                    Plaintiff,       )
                                     )
6       vs.                          ) Case No. 10-CR-4246 JM
                                     ) Jury Trial/Day 2
7   BASAALY SAEED MOALIN,            ) Tuesday, January 29, 2013
    MOHAMAD MOHAMAD MOHAMUD          )
8   ISSA DOREH,                      ) Volume 2
    AHMED NASIR TAALIL MOHAMUD,      )
9                                    )
                     Defendants.      )
10  _____ )

11

12                Before the Honorable Jeffrey T. Miller
                     United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25                Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:        Laura E. Duffy
                                UNITED STATES ATTORNEY
 3                              William P. Cole
                                Caroline P. Han
 4                              ASSISTANT U.S. ATTORNEYS
                                Steven P. Ward, Trial Attorney
 5                              U.S. DEPARTMENT OF JUSTICE
                                880 Front Street, Suite 6293
 6                              San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
 8                             Alice Fontier, Esq.
                               OFFICE OF JOSHUA L. DRATEL
 9                             2 Wall Street, Third Floor
                               New York, NY  10005
10
     (Mr. M. Mohamud)          Linda Moreno, Esq.
11                             LINDA MORENO, P.A.
                               P.O. Box 10985
12                             Tampa, FL  33679

13   (Mr. Doreh)               Ahmed Ghappour, Esq.
                               LAW OFFICES OF AHMED GHAPPOUR
14                             P.O. Box 20367
                               Seattle, WA  98102
15
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
16                             Janis Roberts, Esq.
                               DURKIN & ROBERTS
17                             2446 N. Clark Street
                               Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1          San Diego, California - Tuesday, January 29, 2013

2          (The following proceedings were had outside the presence

3     of the jury panel.)

4          THE CLERK:  Calling matter 1 on calendar,

5     10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamed Mohamad

6     Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for jury

7     trial.

8          MR. COLE:  Good morning, your Honor.  William Cole,

9     Caroline Han, and Steven Ward for the United States.

10         MR. DRATEL:  Good morning, your Honor.  Joshua

11    Dratel and Alice Fontier for Mr. Moalin.

12         MS. FONTIER:  Good morning, your Honor.

13         MS. MORENO:  Good morning, Judge.  Linda Moreno on

14    behalf of Mr. Mohamud.

15         MR. DURKIN:  Good morning, Judge.  Tom Durkin and

16    Janis Roberts on behalf Ahmed Nasir Taalil Mohamud.

17         THE COURT:  Very good.  Thank you.  From this point

18    forward, I will always appreciate everyone being here in a

19    timely fashion for all sessions of court so we can get

20    started right on the spot; I appreciate your cooperation in

21    that regard.

22         The jurors who are returning, as you probably know,

23    are assembling -- I don't think we need any of the defendants

24    at this point; this is just scheduling -- they're assembling

25    in Courtroom 15 up on the fifth floor.  Roll will be taken up

1   there, making sure we have everyone.  Then we'll have them

2   brought down here and we will proceed to place them in their

3   assigned seats.

4           Good morning, Mr. Ghappour.  I was just indicating

5   to everyone that I really would appreciate everyone being

6   here promptly for each session so we can get started on time

7   and keep the case moving.

8           In any event, hopefully we haven't lost anyone.

9   When the jurors report here -- Mr. Ghappour, I was just

10  indicating they will be taking their assigned seats, and then

11  I'll have some general questions for them, and I will proceed

12  to address each one of them individually.  We'll be working

13  with a 36-pack initially.  And, once again, my part of it

14  will take a significant period of time, and then of course

15  counsel will participate in voir dire as well.

16          If it becomes the case that one of the panel

17  members will be excused for cause or any other reason, then

18  we will substitute for that individual at that time and in

19  the order in which they have been randomized on the list that

20  you all have.  So that's pretty much what the procedure is

21  going to be.  Mr. Dratel, you see -- there's a querulous look

22  on your face.

23          MR. DRATEL:  There is, your Honor.

24          THE COURT:  Okay.

25          MR. DRATEL:  May I just consult with Ms. Moreno for

1    a second?

2              THE COURT:  Sure.

3              MS. MORENO:  I have two questions, two quick

4    questions, your Honor.  Is the voir dire then only going to

5    be aimed at the jurors -- at the panel members in the box?

6              THE COURT:  No, all 36.

7              MS. MORENO:  All 36.  You'll be voir diring all 36?

8              THE COURT:  Right.  We're working with a 36-pack

9    because obviously --

10             MS. MORENO:  That's what I thought.

11             THE COURT:  -- juror number 36 can ultimately be

12   sworn in as a juror, an alternate perhaps --

13             MS. MORENO:  Exactly.

14             THE COURT:  -- as well as anyone else.  So it will

15   be a 36-pack we're working with.

16             MS. MORENO:  And, your Honor, what protocol would

17   you like me to follow in terms of -- after your Honor is done

18   and when it's -- and Mr. Cole is done and I do my voir dire,

19   whenever that occurs, if I feel that on a particular juror I

20   feel I've made the cause record, let's say, can I then

21   approach your Honor -- I mean how do you want me to handle

22   that?

23             THE COURT:  Yes.  First of all, your voir dire will

24   go first before Mr. Cole's, okay, and I assume you're

25   proceeding for yourself or everyone?

1          MS. MORENO:  For everyone.

2          THE COURT:  For everyone as your voir dire.  So

3    you'll go first, Mr. Cole will -- oh, Mr. Ward?  Mr. Ward?

4          MR. WARD:  Yes, your Honor.

5          THE COURT:  I saw Mr. Cole hand off the football,

6    and I didn't know whether it was to you or Ms. Han, okay, so

7    you'll be going after Ms. Moreno.

8          And with respect to cause, after both sides are

9    done with their voir dire -- well, after the Court's voir

10   dire is done and voir dire of counsel, then we'll just have a

11   bit of a session here at the side of the bench if jurors are

12   still in our midst, which is probably unlikely, but outside

13   the presence of the panel, and then challenges for cause can

14   be made then.

15         MS. MORENO:  I guess my question then, your Honor,

16   is --

17         THE COURT:  Not after each one.

18         MS. MORENO:  Not after each one.  Because I won't

19   know then what the Court's ruling is with respect to my

20   record on cause, and I don't want to waste time if I believe

21   I've established my record.

22         THE COURT:  Well, establish your record and ask

23   your questions, and then if you feel that you've got it, then

24   you know, go on to the next one.  I don't know what you're

25   really referring to when --

1          MS. MORENO:  Well, I just -- if I can offer, my

2    experience is usually -- and that's why I asked; I'm glad I

3    did -- is after a juror -- if I believe I've made the cause

4    record, I would challenge that juror for cause either at the

5    bench with your Honor and after each one, not at the end --

6    that's what I'm saying -- because depending upon the

7    configuration, I could go a shorter period of time or a

8    longer period of time.  But if the Court wants me to wait

9    until I'm completely done --

10          THE COURT:  If you would.  I think it just makes

11   for a much better flow.  And I've certainly done it in that

12   fashion for a long, long time, I'll put it that way.

13          MS. MORENO:  I'm open to the new experience, your

14   Honor.  Thank you.

15          MR. COLE:  We just want to mention one thing before

16   our voir dire, which is we've been reflecting since our last

17   hearing on Friday on how to deal with this issue the Court

18   expressed further concern about regarding al-Qaeda, and I

19   know it may come up in voir dire, so I wanted to let counsel

20   know and the Court know that we've decided that we can put on

21   our evidence and our opening without referring to al-Qaeda

22   and that any reference to things in Aden Ayrow's background

23   that he became well-known for can be described without

24   referencing the fact that it was linked to al-Qaeda.  In

25   other words, the event can be described without attributing

1  it as a link to al-Qaeda, and so we won't use the words

2  "al-Qaeda."

3           The only possible complication is if -- we don't

4  know what cross-examination will be and how Mr. Bryden may or

5  may not be impeached as to the reasons he knows something or

6  why he believed something happened.  It could become

7  difficult for him to explain the basis of his opinions and

8  reasons, but in our case we're not going to --

9           THE COURT:  Well, I didn't -- okay.

10          MR. COLE:  I just wanted to -- I've been worried

11  that voir dire might start with people not knowing that.

12          THE COURT:  I didn't want to get into this kind of

13  an issue.

14          MR. COLE:  Sorry.

15          THE COURT:  I appreciate -- no, no, I appreciate

16  your bringing it up as a head's up, and -- the defendants

17  aren't here; I didn't want to get into any of the merits --

18          MR. COLE:  Okay.

19          THE COURT:  -- or substantive issues, not that -- I

20  realize what you're saying; this is not a matter of any great

21  moment, but if we're going to bring up matters like that, I

22  would have the defendants out here.  Up until now it's was

23  just kind of a little bit of procedural --

24          MR. COLE:  I apologize, your Honor.

25          THE COURT:  That's okay.  No need to apologize.  I

1    think you made your point though.  Are there any other

2    matters of that type that need to be addressed?  I just --

3              MR. DURKIN:  Judge, there is an issue, although I

4    was hoping the defendants would be here now to --

5              THE COURT:  Well, then stop.  Let's bring the

6    defendants out.

7              MS. MORENO:  I read Edmonson v. Leesville, your

8    Honor.

9              THE COURT:  Did you see the passage?  It was a

10   novel -- it was a novel thought, I must say, and it really

11   resonated.

12             MS. MORENO:  It was a landmark case.

13             THE COURT:  That opinion came down in '91.  I

14   checked it myself.  You know, the last time I had any

15   reference to that particular passage was when Justice Kennedy

16   was here himself many, many years ago, and he mentioned that

17   case; he mentioned that -- he mentioned that principle -- and

18   I think that's what it is -- and it really kind of touched

19   home.

20             MS. MORENO:  Well, it's -- it was a racial issue.

21             THE COURT:  Oh, I know it was a racial issue.

22             MS. MORENO:  Very interesting.

23             THE COURT:  Yeah, it was a racial issue, but it was

24   within the context of civil litigation.

25             MS. MORENO:  That's right.

```
 1              THE COURT:  Are we bringing these fellows out?

 2              DEPUTY U.S. MARSHAL:  Are you ready?

 3              THE COURT:  Oh, sure, yeah.  Counsel, juror number

 4    70 on the list, Mr. Hoffmann, is a no-show.

 5              THE CLERK:  Your Honor, it's number 71.

 6              THE COURT:  Oh, 71?  Strike that.  Juror 71, Cooper

 7    is a no-show.

 8          MS. FONTIER:  So Hoffmann is here and Cooper is

 9    not; is that correct?

10              THE COURT:  That's correct.  Counsel, prospective

11    juror number 21 was misspelled on the chart that I got.  It

12    should be Cleavenger, not Cleaverger, okay?  Okay.

13        (The defendants entered the courtroom.)

14        (Defendant A. Mohamud is being assisted by a Somali

15    interpreter.)

16              THE COURT:  Very good.  All defendants are present.

17    Good morning, gentlemen.  We are about ready to proceed by

18    bringing our jurors in.  And, Mr. Durkin, you wanted --

19              MR. DURKIN:  Judge, if I could -- Judge, if I could

20    approach, I'd like to tender to you what I've marked Press

21    number 1 with today's date on it.  This is an article from

22    this morning's New York Times regarding a suicide bomber that

23    killed two people -- an al-Shabaab suicide bomber that killed

24    two people at the Somali president's villa, and I would

25    direct you to --
```

 1          THE COURT:  You would what?

 2          MR. DURKIN:  I was going to direct you to a

 3   particular sentence somewhere on here.  I'm sorry, I didn't

 4   highlight it, but it mentions -- let's see -- one, two,

 5   three, four, five, the sixth paragraph down, it mentions that

 6   the attacker is believed to be an operative of the

 7   al-Qaeda-linked al-Shabaab insurgent group.  I just wanted --

 8   we wanted to bring this to your attention.  I'm not --

 9   certainly not suggesting that we ask the jury whether they

10   heard about the suicide bombing, the al-Shabaab suicide

11   bombing, but it is a concern that could keep raising its

12   head, I assume, throughout the case.  I guess maybe just some

13   question about, you know, has anybody read any -- you know,

14   I'd defer to the Court as to how to handle it.

15          THE COURT:  Right.  Well, you know, as in most

16   high-profile cases or cases that are going to get a lot of

17   attention from the media on an ongoing basis -- and we've

18   certainly had those -- I think all you can do really is

19   periodically admonish the jurors not to expose themselves to

20   any news reporting of any type having anything to do with the

21   case or any subject connected with the case.  And as you

22   know, now with what's been going on in Mali and then what

23   more or less bled into Algeria, there's been more discussion

24   in the news lately about insurgent groups and terrorist

25   activities, and that's gaining some international prominence

1    at this point.  True, it doesn't involve Somalia, but it's

2    the kind of thing that I would and have already brought up

3    with the potential jurors, that they are not to expose

4    themselves to any newspaper articles or reporting of any kind

5    related to any alleged terrorist activity.  I'll certainly

6    continue to do that.  I'll key on what's happening in Africa;

7    I mean I'll make general references to Africa, not just

8    Somalia.  I'm sure that there are some people in this group

9    that are aware of what's going on and has been going on

10   within the last few weeks and that event specifically in Mali

11   and Algeria.  So I think that's the best we can do.

12           It's been my experience that jurors are pretty good

13   following that kind of an admonition.  I appreciate you

14   bringing this to my attention.  I did note going through the

15   questionnaires that we did have some New York Times readers,

16   and of course this is picked up by the Associated Press --

17           MR. DURKIN:  Right.

18           THE COURT:  -- so it would be, I assume, reported

19   in a number of different outlets.  The other thing I was

20   struck with -- and perhaps you folks know a little bit more

21   about this than I do -- but I was surprised to hear that our

22   State Department has recognized Somalia within the last week

23   or two.

24           MR. DURKIN:  Yes.

25           THE COURT:  So that's certainly a positive

```
 1    development.  I doubt that more than one or two people in

 2    this group of prospective jurors would be aware of that or

 3    the significance of that.  I mean we're all attuned to it,

 4    but I think generally the general population is not familiar

 5    with those kinds of issues.

 6           I was also happy to see that at least one of our

 7    prospective jurors indicated on the sheet that she didn't

 8    know where the horn of Africa was, she didn't have a clue as

 9    to where the horn of Africa was.  I suppose if you were to

10    have given this group a geography test, there probably

11    wouldn't be more than a few who could identify, without

12    looking at a map, where the horn of Africa is.

13           Okay.  Thank you.  Thank you, Mr. Durkin.  We'll go

14    ahead and bring our jurors up.  I think we're ready to go.  I

15    think we have everybody here.  Gaby, are you going to take

16    role when they get here as to --

17           THE CLERK:  They've taken role in Courtroom 15.

18           THE COURT:  Hopefully we won't lose -- all right.

19    The latest is Ms. Cooper did show, so -- she's number 71, so

20    we have all of the individuals now who were instructed to

21    return today.  Okay.  I think what we can do is we'll seat

22    them in the back, and then when they come in, we'll direct

23    them into their seats.

24           Counsel, please note that when these panel members

25    are taking their seats, 1 through 6 -- now we're just dealing
```

1    in sequential order, not the randomized order -- but the

2    first six jurors who are with us will take seats 1 through 6

3    in the top row; prospective juror number 7 will be in the

4    first seat closest to the front of the courtroom here, bottom

5    row; and then 7 through 12; then the two end seats, top and

6    bottom, will be the alternate positions.  Well, I'm just --

7    for your reference, those individuals will be -- you

8    configured this as it is in our courtroom, didn't you?  Yeah.

9    Okay.  So seat 13 is the last seat in the top row; seat 14 is

10   the last seat in the bottom row.  Then we will start with the

11   two extra seats against the wall on that side of the

12   courtroom; they'll be 15 and 16.  And then Mr. Buckner will

13   be in seat 17, which will be the first seat in front of the

14   bar there facing the front of the courtroom.  And then we'll

15   proceed all the way across with seat 36 presently occupied by

16   a gentleman, and I think that's it.  That's the order, okay?

17   Okay.  Let's get our jurors.

18              THE CLERK:  They're on their way up.

19         (There was a break in the proceedings.)

20              THE COURT:  Good morning again, ladies and

21   gentlemen.  Thank you for your promptness.  I know you've

22   already been assembling in Courtroom 15, which is actually

23   right next to my courtroom, which is Courtroom 16 on the

24   fifth floor, and so you got a little bit of a preview I think

25   of what the courtroom will look like in which we're going to

 1   try this case.  And so I thank you for your promptness this

 2   morning.

 3              Let me again tell you what we're going to be doing

 4   today.  In just a moment or two, I'm going to ask that 36 of

 5   you take assigned seats in the jury box and in the front row

 6   in front of the bar in the back of the courtroom, and at that

 7   point I'm going to ask some general questions of the first 36

 8   of you.

 9              Now, even though I won't be directing my questions

10   to others -- and there will be approximately, oh, a dozen or

11   so of you remaining in the back of the courtroom -- I would

12   ask that all of the panel members who remain in the back of

13   the courtroom behind the bar please listen very carefully to

14   everything we're doing today, all the questions that are

15   asked and the answers that are given.  I will be starting

16   this process, counsel are privileged to participate in it as

17   well, but we want to -- we want to make sure that all of you

18   remaining panel members are tracking with us so that if you

19   are asked to take a seat amongst the first 36 panel members,

20   that is, to join this 36-pack, or the group we're initially

21   working with, that we can hit the ground running with you,

22   that you will have been listening to everything that was said

23   in the courtroom, and if there were any questions or answers

24   or other comments made that caused you any concern or you

25   feel we need to know, then obviously it would be your

 1   obligation to let us know about that concern.  So we

 2   appreciate you keeping close attention to the proceedings as

 3   we proceed.  Okay.  That's pretty much it.

 4          We'll take a midmorning break, about 15 minutes;

 5   sometime between 10:30 and eleven o'clock, we'll break for

 6   about 15 then, then we'll resume and then go the balance of

 7   the morning.  We may go into the noon hour if doing so would

 8   allow us to break at a convenient time, and then we'll break

 9   for lunch after that, after our morning session, and we'll

10   take something on the order of an hour to maybe an hour and

11   15 minutes for our break in the middle of the day, our noon

12   recess, and then pick up about 1:30 -- I'll give you the

13   precise time a little bit later today -- and then we'll go

14   into the afternoon continuing on with the process of jury

15   selection.  And ultimately today is our plan to actually have

16   our jurors identified, the 12 regular jurors and three

17   alternates jurors.  So that is the plan.  Ultimately we would

18   start the case tomorrow with opening statements and then

19   proceed with the evidence thereafter.

20          We all very much appreciate the time you took in

21   filling out these questionnaires.  They help us immensely in

22   focusing our follow-up questions with you, and they really do

23   shorten the process for today.  I think it's likely that one

24   or more questions will be directed to each of you.  There may

25   be a few of you who are not asked any questions; if that be

1    the case for anyone, please do not feel as though you're

2    being ignored or disrespected in any way.  It's just that

3    there were no questions that needed to be directed to you.

4           So I think that's -- I think that's pretty much it.

5    I think the next in order of business, ladies and gentlemen,

6    is to call you and to have you take your assigned seats, your

7    designated seats, the first 36 of you.  This has been a

8    randomized list, by the way; we proceed with a randomized

9    list when we're calling each of you to take these seats.  So

10   Mr. Bilse or Bilse -- how do you pronounce your name, sir?

11          PROSPECTIVE JUROR:  Bilse.

12          THE COURT:  Mr. Bilse, if you'd come forward,

13   please, and take the first seat in the top row closest to the

14   front of the courtroom.  Ms. Farkas, yes, if you'd come

15   forward, please -- you're the next prospective juror -- and

16   take your seat next to Mr. Bilse.  Mr. Wease next.  Ms. Lee

17   will be taking seat number 4.  Ms. Young and Mr. Channell, if

18   you'd come forward, please.  Okay.  We have seats 1 through 6

19   occupied now.

20          Ms. Faith, if you'd please come forward and start

21   the bottom row here, the seat closest to the front of the

22   courtroom.  Thank you.  Ms. Flores, if you'd come forward and

23   take the seat next to Ms. Faith.  Mr. Sciacqua -- I hope

24   that's a correct pronunciation.  It is?  All right, sir.  If

25   you'd come forward, take the ninth seat there.  Mr. Johnson

1    would be next.  Ms. Meza, next.  Ms. Lopez would be taking

2    the 12th seat, Ms. Meza first and then Ms. Lopez.  Thank you.

3              And then Ms. Smith, if you would please come

4    forward.  Ms. Smith, I'd like you to take the seat in the top

5    row there, the vacant seat in the top row in the jury box.

6    And then Ms. Salinas, please, the bottom row, vacant seat in

7    the bottom row.  Thank you.  Mr. Tyndall.  Mr. Tyndall, may I

8    ask you to take -- there are two seats against the wall here

9    in front of the bar.  Take the one closest to the jury box,

10   please.  And Mr. Breier, if you would come forward and take

11   the seat just next to Mr. Tyndall.

12             Mr. Buckner, would you please take the first seat

13   facing the front of the courtroom right against the wall

14   there.  Ms. Murguia -- I'm sorry, Gustavo Murguia.  I do

15   apologize.  You know, I'll tell you why.  I think I owe you

16   an explanation.  One of my colleagues on the Ninth Circuit is

17   named Mary Murguia, and -- she's not even from California,

18   but I just associate the name Murguia with Mary Murguia and

19   her twin sister.  And I'm sure that's a very inadequate

20   explanation that you're not going to appreciate, but it's the

21   best I can do under these circumstances.

22             Ms. Free, if you would come forward, please.  Mr.

23   Bristow next.  Ms. Cleavenger.  Ms. Freni.  Mr. Roubidoux.

24   Ms. Delaney.  Ms. Hernandez.  Ms. Ramirez.  Ms. Fierro.  Ms.

25   Fierro, may I ask you to take the first seat across the aisle

1    there.  That's it right there.  Thank you.  Ms. Stahl.  Mr.

2    Crowell.  Mr. Brenzel.  Mr. Dominguez.  Mr. Merkin.

3    Mr. Evans.  Mr. Mapanao.

4              PROSPECTIVE JUROR:  May I talk to you a minute,

5    Judge?

6              THE COURT:  Well, Mr. Mapanao, I'm going to ask

7    that you take your seat for now, and then we'll have a

8    chance.  Thank you, sir.  Mr. Adams.  And Ms. Clark.  Okay.

9    Mr. Mapanao, you need to see me; is that true?

10             PROSPECTIVE JUROR:  Yes, your Honor.

11             THE COURT:  Hold on just right where you are,

12   please.  Counsel, would you please come forward.

13        (Following is a sidebar conference.)

14             PROSPECTIVE JUROR:  Sorry, I should have told you

15   this yesterday.  I had my -- I have a medical issue.  My wife

16   gets a kidney transplant and is legally blind and --

17             THE COURT:  Would you like me to read this?

18             PROSPECTIVE JUROR:  Yes, sir, I have all kind of

19   appointment.

20             THE COURT:  Okay.  Hold on.  Let me just take a

21   look at this.  Are you saying --

22             PROSPECTIVE JUROR:  And the other one is the

23   nephrologist.

24             THE COURT:  Nephrology?

25             PROSPECTIVE JUROR:  Nephrology, getting a kidney

 1    transplant.

 2            THE COURT:  Is she scheduled for it?

 3            PROSPECTIVE JUROR:  2001.

 4            THE COURT:  Oh, she already had it.  Is she having

 5    trouble?

 6            PROSPECTIVE JUROR:  No, just the eyes.  She become

 7    blind, become blind, and that's where the -- where the

 8    medical issue is.

 9            THE COURT:  Apparently she has an impaired visual

10    field.  Does she have glaucoma?  Does she --

11            PROSPECTIVE JUROR:  Yes.  No, it's not.  It's -- it

12    has something to do with the medicine, the CHAMPUS medicine.

13            THE COURT:  Are you her caregiver?

14            PROSPECTIVE JUROR:  Yes, I am the only one in the

15    house.

16            THE COURT:  Do you work as well?

17            PROSPECTIVE JUROR:  I'm retired.

18            THE COURT:  You're retired, so you're --

19            PROSPECTIVE JUROR:  I should have said that when I

20    turn in my paper.  I'm 70 years old and I'm diabetic.

21            THE COURT:  Okay.  I'm going to excuse you,

22    Mr. Mapanao and thank you for bringing this to our --

23            PROSPECTIVE JUROR:  I sure appreciate that.

24            THE COURT:  -- to our attention.  And I wish you

25    and your wife the best.  And we'll call somebody else to --

1            PROSPECTIVE JUROR:  She should be -- she just

2    didn't like it when I came home yesterday and I told her I

3    wish could get away with it; I like to stay.

4            THE COURT:  You want to get out of the house for a

5    little while?

6            PROSPECTIVE JUROR:  Sure.  Thanks a lot.

7            THE COURT:  All right, sir.  Thank you.  All right.

8            MR. DRATEL:  Are you going to consolidate the

9    people in the back so they can --

10           THE COURT:  It doesn't make any difference.

11           MR. DRATEL:  Well, it does to us in the sense --

12   not going to know who they are, it's very difficult to

13   determine the strikes if they don't get -- you know, when you

14   get --

15           THE COURT:  I don't understand what you're saying

16   here.

17           MR. DRATEL:  In other words, if they answer

18   questions --

19           THE COURT:  No, no, no, they're not -- I'm not

20   having -- they're not going to respond at all at this point.

21   The only time they'll say anything is if they're called into

22   the box.  If I'm asking a general question, it's only of the

23   first 36.

24           MR. DRATEL:  If they're called into the box, they

25   can be number 36 or they can be --

```
 1              THE COURT:  Well, it depends who they're

 2   substituting for.  Okay.

 3              MR. DRATEL:  Okay.  That makes a big difference in

 4   terms of our ability to then voir dire when they come in the

 5   box.

 6              THE COURT:  No, not really.  Why does it --

 7              MR. DRATEL:  Because if they're juror number 1,

 8   then we have to know whether to exercise a strike or not.  If

 9   they come in at the end and the process is over, we have not

10   voir dired them at all and don't know --

11              THE COURT:  You'll have an opportunity -- you'll

12   have an opportunity to voir dire them at some point.  It's

13   not as --

14              MR. DRATEL:  Okay.

15              THE COURT:  How else could you exercise your

16   strikes if you didn't --

17              MS. MORENO:  Exactly.

18              THE COURT:  Trust me.  Trust me.

19              MR. DRATEL:  Okay.

20              MS. MORENO:  Thank you, your Honor.

21         (Sidebar conference concludes.)

22              THE COURT:  Okay.  Mr. Mapanao, ladies and

23   gentlemen, has been excused for a significant and justifiable

24   reason, and so we're going to call the next individual on the

25   randomized list to substitute for Mr. Mapanao.
```

1                THE CLERK:  Ms. Alise.

2                THE COURT:  Ms. Alise, if would you would please

3     take the seat vacated by Mr. Mapanao.  Okay.  Ladies and

4     gentlemen, once again, I'm going to proceed at this point by

5     asking general questions only of the first 36 of you who have

6     taken your assigned seats, what we call -- what I refer to as

7     a 36-pack.

8                Now, these questions are not directed to any of the

9     remaining members of the jury panel, as I've already

10    explained, but as I've already explained, please listen very

11    carefully to what we're doing because if your name is called

12    to substitute for someone, just as what happened with Mr.

13    Mapanao, then we need to make sure that you've been tracking

14    with us and you know what our questions have reference to,

15    you know what the areas of concern are.  And so we'll proceed

16    at this point.  Once again, questions just directed to the

17    first 36 of you in your assigned seats.

18                I'm going to start off with that question I asked

19    two or three times yesterday.  It's really the most

20    significant question I can ask you, ladies and gentlemen.

21    Each side is entitled to have a fair and unbiased jury in

22    this case, and if for any reason you now think that you

23    cannot be a fair and unbiased juror in this matter, I would

24    like you to raise your hand.  I see no hands raised in the

25    jury box, I see no hands raised on either side of the

1    courtroom in the front row.  Okay.  Very well.

2           You know, going through the -- going through the

3    questionnaires and looking at the individual responses was

4    certainly informative, and it obviously and predictably is

5    the case that many of you have had some contact with the

6    government, the United States government, in the past or

7    perhaps even presently through the military or through

8    employment.  I'll be asking these questions individually of

9    you or of most of you as I address you individually, but if

10   there is anyone here who because of their association or

11   connection with the United States government, past or

12   present, either in a military context or a civilian

13   employment context or for any other reason who feels that he

14   or she is leaning to one side or the other, specifically

15   would favor the government in this case because of that

16   affiliation, because of that connection, would you please

17   raise your hand if anyone feels that.  Anyone in the jury

18   box?  I see no hands raised.  And in the back of the

19   courtroom?  When I say the back of the courtroom, I'm meaning

20   for those of you seated in your assigned seats in front of

21   the bar here.  I see no hands raised.

22          And we'll be proceeding this way, ladies and

23   gentlemen.  In effect, if you do not give me an affirmative

24   response by raising your hand, each and every one of you is

25   communicating individually to me that your response is

1    negative, and so it allows us to proceed much more

2    expeditiously.

3         That opens up another more general question, which

4    is this:  If any of you have ever had a particularly positive

5    experience with the United States government or any agency of

6    the United States government or such a negative experience

7    with the government or any agency of the government such that

8    you could be influenced by that in this case, would you

9    please raise your hand.  I've already mentioned the

10   employment context, the military context.  Perhaps you've had

11   a bit of a run-in with the IRS at some point in the past,

12   you've been unfairly audited; you've been stopped at a border

13   patrol checkpoint and treated unreasonably; or there have

14   been -- there's been some immensely positive experience that

15   you've had; anything either particularly positive or negative

16   that could influence you in this case?  If so, would you

17   please raise your hand at the present time.  Anyone in the

18   jury box who would have an affirmative response either way on

19   that?  I see no hands.  How about in the back of the

20   courtroom for those of you in your assigned seats in front of

21   the bar?  I see no hands raised.  Okay.

22        A subject I touched on yesterday, ladies and

23   gentlemen, involved the credibility or believability of

24   witnesses, and you are the judges of the credibility or

25   believability of witnesses who testify in this case.  I

1    indicated to you that there were several standards or

2    criteria by which you would be evaluating the credibility,

3    believability, of witnesses' testimony; I listed them off for

4    you in general terms:  The manner in which a witness

5    testifies, the character and quality of that testimony, the

6    demeanor, the attitude of the witness while testifying, any

7    prior inconsistent statements that might have been made by a

8    witness that comes into evidence, any prior consistent

9    statements that might have come in to evidence, and, you

10   know, anything that bears upon the reasonableness, the

11   credibility of witnesses beyond that is certainly something

12   you could take into account.  I also mentioned to you that

13   this -- this list of factors, these criteria, apply to all

14   witnesses, all witnesses, whether someone's affiliated with

15   one side or the other or not, whether someone's in law

16   enforcement or not, whether someone's an expert witness or

17   not; you apply the same standards.  You may weigh them

18   differently ultimately, but you apply the same standards.

19          Now, focusing on the law enforcement part of this,

20   as I was going, you know, through the questionnaires and

21   based on prior experience having dealt with literally many

22   hundreds of juries over the past, it is the case that some

23   people feel that a law enforcement officer's testimony is

24   entitled to greater weight than the testimony of nonlaw

25   enforcement officers or nongovernmental witnesses simply

1   because of their position in law enforcement or affiliated

2   with a particular governmental agency, and I think there were

3   a few people -- I think there were a few people who indicated

4   on their questionnaire responses that they might fall into

5   that category, that they would be giving a law enforcement

6   officer -- well, let's just get it down to this case,

7   specifics to this case -- perhaps an FBI agent, the testimony

8   of such a person greater weight simply because of that

9   person's occupation.

10          If there is anyone here who feels that that is

11  their position on this question -- hold on -- I'll get to

12  you.  I see you.  If there's anyone here who feels that a law

13  enforcement officer's testimony is more credible simply

14  because of the fact that they're in law enforcement, would

15  you please raise your hand.  In the jury box?  I see no hands

16  raised.  Okay.  We did have -- we did have someone raise his

17  hand.  Sir, would you state your last name, please?

18          PROSPECTIVE JUROR:  Roubidoux.

19          THE COURT:  All right.  Mr. Roubidoux, I think I

20  saw that on your questionnaire as well.  That is your feeling

21  apparently?

22          PROSPECTIVE JUROR:  Yes, it is.

23          THE COURT:  Okay.  Is there anyone else who feels

24  as Mr. Roubidoux does, simply because someone is in law

25  enforcement, they're more inherently truthful?  I see no

```
1    other hands raised.  Are you in law enforcement?
2                PROSPECTIVE JUROR:  No, sir.  I'm a state employee.
3                THE COURT:  Sorry?
4                PROSPECTIVE JUROR:  I'm a state employee.  I work
5    with the law enforcement on a daily --
6                THE COURT:  Are you the Caltrans worker.
7                PROSPECTIVE JUROR:  Yes, sir.
8                THE COURT:  All right.  So you're the Caltrans.
9    You know, you had an interesting response in your
10   questionnaire; you indicated that you work with Caltrans, and
11   obviously we all know that law enforcement in the form of the
12   California Highway Patrol will provide some support for
13   Caltrans as Caltrans workers are in the field sometimes; I'm
14   sure you appreciate that support.  You indicated in your
15   questionnaire that their instructions, their directives to
16   you have proven to be reliable.
17               PROSPECTIVE JUROR:  That's correct.
18               THE COURT:  And which is certainly understandable
19   because they're out there to offer protection and all.  Is it
20   a result of that experience and your working with the
21   California Highway Patrol that you feel law enforcement
22   officers generally are more truthful than nonlaw enforcement
23   officers?
24               PROSPECTIVE JUROR:  Besides that I have good
25   friends that's a deputy sheriff here in San Diego.
```

1              THE COURT:  Okay.  And so you've not been in law

2    enforcement yourself?

3              PROSPECTIVE JUROR:  That's correct.

4              THE COURT:  But as you sit here right now, do you

5    feel that as a group, law enforcement officers would be more

6    likely to tell the truth than you or me or any of the

7    attorneys --

8              PROSPECTIVE JUROR:  Yes, sir.

9              THE COURT:  -- in this -- okay.  Well, I'm not

10   going to take any more time with you, Mr. Roubidoux.  You've

11   got a very, very firm position there.  And, ladies and

12   gentlemen, it just is the case -- and I'm glad to be able to

13   use Mr. Roubidoux as an example -- it just is the case that

14   we will from time to time encounter someone who has this

15   feeling that elevates law enforcement to such a level that

16   they think that when they take the stand and testify, that's

17   it, that's gospel.  And we can't start with that premise.  As

18   one of your number put it -- one of the best answers I've

19   ever seen in connection with that question on the

20   questionnaire, question 50 -- the answer of the individual

21   was if that were the case, if law enforcement officers were

22   more truthful than other people, then why would we need

23   juries?  And I thought about that, and I thought it was an

24   enlightened response.

25              Mr. Roubidoux, I really do thank you for your

1    candor.  And you do -- you do important and dangerous work

2    out there and stay safe.  I'm going to excuse you for cause

3    and thank you for your time and service.

4                   THE CLERK:  Mr. Michael Todd.

5                   THE COURT:  Mr. Todd, if you'd come forward and

6    take the seat just vacated by Mr. Roubidoux there, we would

7    appreciate it.  Mr. Todd, you've heard what I've had to say

8    thus far?

9                   PROSPECTIVE JUROR:  Yes.

10                   THE COURT:  Can you be a fair and impartial juror

11   if selected in this case?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  Okay.  I've got as far as the question

14   relating to credibility of witnesses and law enforcement

15   officers.  Would you use the same standards for all witnesses

16   regardless of whether they're law enforcement or not?

17                   PROSPECTIVE JUROR:  Yes, I would.

18                   THE COURT:  Okay.  Mr. Tyndall?

19                   PROSPECTIVE JUROR:  Far as I know.

20                   THE COURT:  I'm going to get that microphone over

21   there to you so everyone can hear you.

22                   PROSPECTIVE JUROR:  As far as I remember, my

23   response was "not always," but now I'm trying to think what I

24   meant.

25                   THE COURT:  Yeah, I was trying to figure that out

1   as well.

2          PROSPECTIVE JUROR:  When I say there's no

3   credibility, can you say it one more time so I --

4          THE COURT:  Believability.

5          PROSPECTIVE JUROR:  Believability.  In terms in

6   terms of a law enforcement issue --

7          THE COURT:  No, no.  What I'm --

8          PROSPECTIVE JUROR:  I got confused.

9          THE COURT:  Let me try explain.  There will be

10  witnesses called to testify in this case.

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Some of them will be affiliated with

13  law enforcement --

14         PROSPECTIVE JUROR:  Okay.

15         THE COURT:  -- federal law enforcement --

16         PROSPECTIVE JUROR:  Okay.

17         THE COURT:  -- such as one or more FBI agents.  And

18  there may be other people as well who are affiliated with one

19  law enforcement agency or another.  If a law enforcement

20  officer takes the stand and begins to testify on a contested

21  issue, something that's in dispute ultimately where the

22  evidence is disputed --

23         PROSPECTIVE JUROR:  In relationship to the

24  enforcement of the issue.

25         THE COURT:  Does it relate to enforcement of the

1    issue?

2           PROSPECTIVE JUROR:  That's the law enforcement

3    officer's or duty.  In other words -- I guess that's where I

4    got confused.  If he was questioned about the enforcement

5    policy or issue that he was involved with, he's trained more

6    highly than a person that isn't --

7           THE COURT:  Well, no, no.  You raise a very -- you

8    raise a very valid point.  You raise a very valid point.

9    Because one of the criteria for assessing the believability

10   of a witness, whether that witness is a law enforcement

11   officer, whether that witness is an expert perhaps in law

12   enforcement or in some other area not involving law

13   enforcement, is the ability of the witness to see or hear or

14   know the things testified to.  So, for example, taking it to

15   a case having nothing to do with the facts of this case, if

16   you have a law enforcement officer, a traffic officer, who's

17   trained to investigate traffic accidents, and this case isn't

18   a criminal case, it's a civil case involving an automobile

19   accident and a claim for damages, and you have an officer

20   take the stand who was responsible for investigating the

21   accident, and that officer has made certain conclusions

22   regarding the accident, and those conclusions are disputed by

23   the testimony of someone who does not have the training of a

24   law enforcement officer, a traffic investigator --

25           PROSPECTIVE JUROR:  Mean a person on the street

1   that observed it.

2          THE COURT:  Exactly.  Then that's a case where as

3   you're being instructed on the credibility of witnesses,

4   including the factor you're to take into account the ability

5   of that officer to see or hear or know the things testified

6   to, i.e., training, and that officer's also an expert witness

7   with specialized training and you're instructed that you can

8   take into account that witness's testimony regarding the

9   experience and the training that the individual has received,

10  then what you're going to do is you're going to weigh those

11  particular criteria against -- or for each of those two

12  witnesses, the law enforcement officer and the pedestrian

13  standing on the street, and those are going to be plus

14  factors for the investigating officer.  You may still

15  disagree with the conclusions of the investigating officer,

16  but at least you're taking that training, that experience,

17  the ability to see or hear or know into account in an

18  appropriate way.  Do you understand what I'm saying?

19         PROSPECTIVE JUROR:  Yes, but that particular case

20  was put in front of us, at that point in time we can make a

21  decision who's more credible.

22         THE COURT:  Absolutely.  That's your job.

23         PROSPECTIVE JUROR:  Right.

24         THE COURT:  So my question is to you, Mr. Tyndall,

25  and to all the other prospective jurors here, if you're

1   approaching this case with the mindset that people in law

2   enforcement are just more inherently truthful than people who

3   are not in law enforcement --

4            PROSPECTIVE JUROR:  I believe my response was "not

5   always."

6            THE COURT:  Your response was "not always."  But my

7   question to you is do you believe that; do you believe that

8   people in law enforcement are more truthful than people who

9   are not in law enforcement?

10           PROSPECTIVE JUROR:  Well, if you put it that way, I

11  would have -- I would have to say no, taking it from a human

12  nature standpoint.  In other words, you know, a credible

13  witness may tend to twist it, a credible law enforcement

14  officer may have not observed or may not remembered what he

15  saw and went ahead and said something anyway.  I guess on

16  behalf of that, I would have to say no.

17           THE COURT:  You're really struggling with it,

18  aren't you?

19           PROSPECTIVE JUROR:  Yeah, I --

20           THE COURT:  I know it's hard for you to get to that

21  point of neutrality, isn't it?

22           PROSPECTIVE JUROR:  That's why I wanted to -- why I

23  put "not always" because I was a little confused about -- and

24  that's what I was leaving in the area of no, not all of them

25  tell the truth.

 1              THE COURT:  You know, some of these questions in

 2     the questionnaire, you know, they're very, very broadly based

 3     questions and they're not intended to elicit finely spun -- a

 4     finely spun analysis as to all possible scenarios that could

 5     arise.  They're general questions, and if you give a general

 6     answer, you're giving a general answer but knowing that there

 7     would be so many variations on that answer depending upon the

 8     circumstances, and many of you answered that question in that

 9     vein.  But, Mr. Tyndall, if you're really straining, if

10     you've elevated law enforcement to a point where --

11              PROSPECTIVE JUROR:  No, I have not, no.

12              THE COURT:  Let me finish what I was going to say.

13     -- where it's going to be difficult for you to look at a law

14     enforcement officer and not give that testimony extra weight

15     simply because of that person's position, that person's

16     status as law enforcement, then we need to know that.  If you

17     can look at the law enforcement officer as any other witness,

18     just as truthful or nontruthful as any other witness

19     potentially, and judge the believability of the -- of the

20     testimony on the factors that you'll be instructed about,

21     then that's fine, then you can remain with us here.  But I

22     can't spend too much more time on this.  We're spending a lot

23     of time on this issue just with you, so you search your own

24     thought process or heart or let us know right now if you feel

25     that you can abide by that or you just feel that for whatever

1    reason, you're struggling with this -- with this principle.

2            PROSPECTIVE JUROR:  Well, I would at this point in

3    time accept the requirement, whatever, that I have to be

4    equal of those of that situation.  I wasn't sure if I had to

5    be.  I thought an expert witness -- I never been on a jury,

6    so I really don't know -- an expert witness versus the guy on

7    the street.  I mean am I being biased towards the expert

8    witness or the guy on the street?  I guess if you had asked

9    me that way, yeah, I would probably, you know, say it again.

10   But there again, it would depend on the evidence on both

11   sides, and then I can evaluate it.

12           THE COURT:  Is there anyone else here who's

13   struggling with this issue as Mr. Tyndall is?  If so, would

14   you raise your hand.  This is something we just have to, you

15   know, discuss and then move on.  Typically, ladies and

16   gentlemen, I present the question as I presented it.  I

17   usually do it in two parts:  Is there anyone here who feels

18   law enforcement officers are inherently more believable than

19   other people, than the rest of us, and the vast majority of

20   people say no, and they can fairly judge the ability of a law

21   enforcement officer to testify as other people would.  There

22   are people, however, encountered from time to time who feel

23   that law enforcement officers, that's it, they're more

24   truthful than the rest of us, and I'm going to give their

25   testimony extra weight regardless of what it might be.

1    Sometimes that comes because of a connection between that

2    person and law enforcement; usually that person has been in

3    law enforcement or is the spouse of someone in law

4    enforcement, they've been around law enforcement, and it's

5    difficult for them to treat law enforcement officers as they

6    would anyone else.  That's just the first side of it.

7              The other side I typically ask is is there anyone

8    here who feels that law enforcement officers are less

9    truthful than other people because of perhaps a bad

10   experience they've had with law enforcement, and you can plug

11   in any number of scenarios there, and every once in a while,

12   somebody will raise a hand and say that's me, I was falsely

13   arrested and, you know, or somebody, I was subject to a

14   circumstance where a law enforcement officer was less than

15   truthful, and I can't get that out of my mind.  Okay.  Thank

16   you for your candor, you're not -- this is not a case that

17   you should be sitting on.  So that's the second part of what

18   I typically explore with prospective jurors.

19             Mr. Tyndall, I'm going to excuse you because I

20   don't want you to struggle with this one.  It seems as though

21   you are.  I get the impression that it's going to be

22   difficult for you to follow the Court's instructions on this

23   particular issue.  I thank you for your time and service.

24   I'm going to ask that you return to the jury lounge at this

25   time.

1              We will call Ms. Boggess or Boggess.  If you'd come

2    forward, please, Ms. Boggess.  Thank you.  Okay.  Ms.

3    Boggess, you've heard all of my instructions and the

4    questions I've asked so far?

5              PROSPECTIVE JUROR:  Yes, I have heard them.

6              THE COURT:  Can you be a fair and impartial juror

7    if selected?

8              PROSPECTIVE JUROR:  Yes, I believe I can be a fair

9    and impartial juror.

10             THE COURT:  Okay.  You've seen us spend a lot of

11   time on this issue involving credibility of law enforcement

12   officers.  Would you be able to judge the credibility,

13   believability, of a law enforcement officer's testimony as

14   you would for any other witness?

15             PROSPECTIVE JUROR:  Yes, I believe I would be able

16   to do that.

17             THE COURT:  Okay.  Let me get back to this issue

18   then and -- with the rest of the prospective jurors seated in

19   their assigned seats.  If there is anyone here who feels

20   that -- that law enforcement officers, including federal law

21   enforcement officers, people associated with the FBI and

22   other such agencies, are inherently more truthful or less

23   truthful than others who are not in law enforcement, would

24   you please raise your hand at the present time.  Anyone in

25   the jury box feel that way, please let me see your hand.  And

1    I see no hands.  Anyone in the front row of the bar on my

2    right side?  I see no hands.  On the left side I see no

3    hands.  All right.  Very good.  We'll move away from this

4    subject, but if anyone feels upon further reflection that

5    this particular area may be a problem, then please let me

6    know.  Okay.

7            I wanted to raise an issue that I'll be raising

8    from time to time, I touched upon it yesterday, and it

9    involves media accounts, news accounts of this case, although

10   I think that won't be an issue in the case; there may be an

11   article or two during the course of the trial.  Obviously

12   you've been instructed that you must not expose yourself to

13   any such article or information, extraneous information.

14   I've also requested that you isolate yourselves from all

15   media reporting, news reporting of any kind having anything

16   to do with the political situation in any of the African

17   countries.  I know that we've seen or been made aware of

18   certain events happening in Mali and Algeria and a few other

19   north African countries.  Somalia may be in the news from

20   time to time.  It's very important that we not expose

21   ourselves to any reporting on any of these issues having to

22   do with political upheaval or action taking place, activities

23   taking place in any of the African countries; I'll just take

24   it to that entire continent.  You see a newspaper when --

25   you're flipping through the newspaper and you begin to see a

1    headline that may have something to do with this case, don't

2    read it.  Set it aside if you want to see it later after the

3    case is over.  If you're watching television or you're -- you

4    click on an Internet story having something to do with a

5    subject that is even remotely connected to this case, turn

6    the channel or don't click on the link or whatever it happens

7    to be.

8            If there is anyone here who feels that he or she

9    would not be able to follow that instruction, would you

10   please raise your hand at the present time.  I see no hands

11   raised.

12           I would -- I would rely on each and every juror in

13   this case that if something did come to their attention

14   inadvertently -- if, for example, they were reading an

15   account of an issue, an event, a situation and you got

16   partway into it, I would rely on you to, as I say, set it

17   aside.  But if in fact something came to your attention

18   inadvertently that you simply did not have any opportunity to

19   ignore, I would ask that you advise -- you advise me if

20   you're a juror on this case so that at least I could address

21   it with counsel and we could make sure that it would have no

22   effect on you sitting -- continuing to sit as a fair and

23   impartial juror.  Okay.

24           I want to bring up another general principle,

25   sympathy, prejudice, public opinion, possible punishment;

1   those are things that you may not consider in determining

2   whether the defendants, or any of the defendants, are guilty

3   or not guilty of the charges in this case.  Sympathy,

4   prejudice, public opinion, possible punishment.  Set them

5   aside.  Do not be influenced by them in any way.

6          If there is anyone here who feels that he or she

7   could be influenced, would consider sympathy, prejudice,

8   public opinion, and possible punishment, would you please

9   raise your hand at this time.  I see no hands raised.  Okay.

10         What I'd like to do is turn to the questionnaires

11  at this point.  I'll have a few other general questions for

12  you as we go through this process, ladies and gentlemen, and

13  I'll reserve those for a little bit until I can get a little

14  bit more of an appreciation for each of you and how you might

15  have responded on these questionnaires, so it's about time we

16  started this process.

17         Mr. Bilse, let me -- Bilse let's start with you,

18  sir.  We'll get that microphone to you.  All right, Mr.

19  Bilse.  Sir, how long have you been a traffic engineer for

20  the City of Carlsbad?

21         PROSPECTIVE JUROR:  Five years.

22         THE COURT:  Okay.  Do you supervise any people

23  there?

24         PROSPECTIVE JUROR:  Yes, sir.

25         THE COURT:  Approximately how many?

1           PROSPECTIVE JUROR:  Three.

2           THE COURT:  Okay.  Have you been in traffic

3    engineering and traffic planning basically your whole life,

4    so to speak, except for the time you were in aerospace?

5           PROSPECTIVE JUROR:  Yes, sir.

6           THE COURT:  Okay.  And your spouse or significant

7    other is an urban planner, and just a little more information

8    about that, sir.

9           PROSPECTIVE JUROR:  She does environmental impact

10   reports for land development.

11          THE COURT:  Okay.  Very good.  You indicated that

12   you had a -- you were a victim of crime at some point in the

13   past, and someone was apprehended in connection with that

14   matter.  You came into contact I assume with law enforcement

15   individuals in connection with that case at some point?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Was that -- was that contact a positive

18   contact for you?

19          PROSPECTIVE JUROR:  It was neutral I guess.  It was

20   very quick.

21          THE COURT:  Okay.  Anything about that contact with

22   law enforcement that would incline you to favor one side or

23   the other in this case?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Okay.  Thank you.  If you could pass

1   the microphone to Ms. Farkas.  Ms. Farkas, I was looking at

2   that part of the questionnaire which relates to your views of

3   the Muslim or Islamic faith, and I had the impression that

4   your primary concern was what some people at a very early age

5   may be taught in some particular schools.  Does that -- does

6   that color your thinking generally about the entire Muslim or

7   Islamic faith?

8          PROSPECTIVE JUROR:  No, your Honor.

9          THE COURT:  What did you have reference to?  Were

10  you talking about schools where -- where kids are instructed

11  in Wahhabism or --

12         PROSPECTIVE JUROR:  Certain facets in the Muslim

13  faith, they do instruct children that --

14         THE COURT:  Well, you're generalizing once again

15  that --

16         PROSPECTIVE JUROR:  I'm generalizing.

17         THE COURT:  Yeah, there may be a particular

18  group --

19         PROSPECTIVE JUROR:  Right.

20         THE COURT:  That will instruct kids in a

21  particular -- but do you extend that to the entire faith?

22         PROSPECTIVE JUROR:  No, of course not.  I think

23  generally Muslims are good people, but I am very fearful that

24  a certain facet of them can be trained that way and that they

25  believe that Americans are bad, and that's my fear about

1   that.

2           THE COURT:  Okay.  And you feel that the answers

3   you gave that -- at least to the extent that you were

4   critical -- were answers that were reserved just for that

5   relatively small --

6           PROSPECTIVE JUROR:  Right.

7           THE COURT:  -- percentage or small group --

8           PROSPECTIVE JUROR:  Correct.

9           THE COURT:  -- that teach things that you're not --

10  that you have difficulty with?

11          PROSPECTIVE JUROR:  Correct.

12          THE COURT:  All right.  You seem to have

13  substantial contacts with Muslims; in going through the

14  questionnaire, you've had contact in organizations and you

15  socialize with them as well.  Is that correct?

16          PROSPECTIVE JUROR:  Correct.

17          THE COURT:  All right.  And is there any particular

18  reason that you've come into contact with Muslims in

19  different contexts?

20          PROSPECTIVE JUROR:  Well, San Diego is a very

21  versatile area and has a lot of different people, and as far

22  as, you know, my dry cleaner, taxi drivers, people just

23  generally.  And I like different people, I like cultural

24  people, and I like to communicate with them, and I like to

25  find out where they're -- what they're about and what their,

1   you know, their families are about, and I like to talk to

2   them.

3          THE COURT:  Okay.

4          PROSPECTIVE JUROR:  And I find them interesting,

5   and so that's why I get to know them.  And I've traveled

6   quite a bit, so --

7          THE COURT:  Do you have any doubt as to your

8   ability to be completely fair in this case?

9          PROSPECTIVE JUROR:  No, not at all.

10         THE COURT:  You indicated that you think that in

11  connection with the United States's response to terrorism

12  that -- that the United States is being far too fair; what do

13  you mean by that?

14         PROSPECTIVE JUROR:  Well, I think we need to be a

15  little tougher.  I think that they -- they let a lot of

16  people get away with a lot of things.

17         THE COURT:  Who is they?

18         PROSPECTIVE JUROR:  The government, yes, sir.

19         THE COURT:  The government?  And what do you --

20  flesh that out for me a little bit in terms of --

21         PROSPECTIVE JUROR:  Well, of course I'm not in a

22  position to do that because I'm not in a position to be

23  anyone that's going to take care of anything that way, but I

24  think a lot of Americans feel that we need to be a little

25  stronger in our positions.  That's just a personal opinion.

```
 1              THE COURT:  Stronger in what types of positions?

 2              PROSPECTIVE JUROR:  Well, maybe in immigration,

 3    maybe in not giving in to any demands, just being a little

 4    tougher all the way around.

 5              THE COURT:  So politically you're talking about

 6    conservative positions --

 7              PROSPECTIVE JUROR:  Yes, sir.

 8              THE COURT:  -- such as immigration and others?

 9              PROSPECTIVE JUROR:  Yes, sir.

10              THE COURT:  And when you say we're being far too

11    fair, I still -- most people would say that that's a good

12    thing, being as fair as you possibly can; but you seem to

13    feel that we're just being, what, too docile or too tolerant

14    of certain things or --

15              PROSPECTIVE JUROR:  Uh-huh.

16              THE COURT:  Yes?

17              PROSPECTIVE JUROR:  Uh-huh.

18              THE COURT:  You have to answer audibly yes or no.

19              PROSPECTIVE JUROR:  Yes, sir.

20              THE COURT:  But would any of those feelings, any of

21    those feelings you might have with respect to political

22    issues of the day in any way affect your thinking in a case

23    such as this?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  Are you clear about that?
```

 1            PROSPECTIVE JUROR:  Yes, sir.

 2            THE COURT:  All right.  You feel, once again, even

 3    though we've been talking about these things and you --

 4    politically you're -- you have some criticism of the

 5    government, that none of that criticism, none of those

 6    feelings would in any way impair you in this case.

 7            PROSPECTIVE JUROR:  I don't believe so.

 8            THE COURT:  Okay.  All right.  Thank you, Ms.

 9    Farkas.  Mr. Wease?

10            PROSPECTIVE JUROR:  Yes.

11            THE COURT:  Good morning to you, sir.

12            PROSPECTIVE JUROR:  Good morning.

13            THE COURT:  Once again, on your responses to this

14    one particular area, you seem to be neutral on the Muslim or

15    Islamic faith, but, once again, you have strong feelings

16    about radicalists and extremists.  And so the question I

17    would ask you would be the same question I had for

18    Ms. Farkas:  Whatever your views on radical elements of

19    Islam, could you fairly judge the evidence in this case?  The

20    charges in this case are very discrete charges; the charges

21    are that these gentlemen, and each of them, provided material

22    support to terrorists, a foreign terrorist organization,

23    and/or conspired to do so.  The organization is al-Shabaab,

24    as I mentioned yesterday.  The fact that al-Shabaab is a

25    foreign terrorist organization and certified as such is not

1    even in dispute in this case.  The question is whether or not

2    the government can prove that material support by the

3    defendants were provided to this organization.  That gets us

4    away from concerns I think Ms. Farkas had, concerns you may

5    have about what is taught in some small percentage of schools

6    and what some radical extremists actually do.  Can you

7    separate the two in your mind?

8            PROSPECTIVE JUROR:  Yes, I'm sure I can.

9            THE COURT:  Okay.  No doubts about that?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  On prior jury service, you indicated

12   that you were frustrated because during deliberations some

13   jurors in your mind didn't follow the instructions of the

14   Court and no verdict was reached as a result.

15           PROSPECTIVE JUROR:  That's correct.

16           THE COURT:  That can be frustrating.  That can be

17   frustrating.  My question for you is this:  Because you had a

18   frustrating experience in another case and because that jury

19   was not able to reach a verdict in that case, would you rush

20   to judgment in this case just to reach a verdict --

21           PROSPECTIVE JUROR:  No, sir.

22           THE COURT:  -- and to avoid the jury not being able

23   to reach a decision?

24           PROSPECTIVE JUROR:  No.

25           THE COURT:  You'd take as much time as it

 1   reasonably took to reach a verdict if you're a member of this

 2   jury.

 3            PROSPECTIVE JUROR:  Yes, I would.

 4            THE COURT:  All right.  Thank you, Mr. Wease.

 5   Ms. Lee?

 6            PROSPECTIVE JUROR:  Yes.

 7            THE COURT:  Good morning.

 8            PROSPECTIVE JUROR:  Good morning.

 9            THE COURT:  Ms. Lee, I don't think I have any

10   questions for you.  Are you terribly disappointed?

11            PROSPECTIVE JUROR:  I had one addition.

12            THE COURT:  Please.

13            PROSPECTIVE JUROR:  I was resting last night --

14            THE COURT:  Could you speak up a little?  Why don't

15   we get the microphone over to you.

16            PROSPECTIVE JUROR:  One addition.  We're talking

17   about organizations in the questionnaire.  Can I address

18   that?

19            THE COURT:  Yes.  You've got California Teachers

20   Association.

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  California Teachers?

23            PROSPECTIVE JUROR:  Yes.  Within my job as a

24   teacher we do fundraising, and we were doing a coin drive and

25   a gala fundraising, and it was for a country in Africa,

1   Growing Liberia's Children.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  That's the only thing that I

4   had thought of as an organization that I had --

5          THE COURT:  Do you recall what country?

6          PROSPECTIVE JUROR:  Liberia.

7          THE COURT:  I'm sorry.

8          PROSPECTIVE JUROR:  Liberia, Africa.

9          THE COURT:  Okay.  When's the last time you did

10  teach, Ms. Lee?

11         PROSPECTIVE JUROR:  Six months ago.

12         THE COURT:  And what courses, what level and

13  courses?

14         PROSPECTIVE JUROR:  I taught kindergarten for ten

15  years.

16         THE COURT:  And are you between jobs right now?

17         PROSPECTIVE JUROR:  I am between jobs.

18         THE COURT:  Okay.  Thank you, Ms. Lee.

19         PROSPECTIVE JUROR:  Thank you.

20         THE COURT:  And Ms. Young, good morning.

21         PROSPECTIVE JUROR:  Good morning, sir.

22         THE COURT:  What did you do for Sav-On Drugs before

23  you retired?

24         PROSPECTIVE JUROR:  I was a district cosmetic

25  coordinator.  I oversaw 25 stores, the cosmetic departments.

```
 1              THE COURT:  Okay.  Did you have people assisting
 2   you or did you supervise others in that regard?
 3              PROSPECTIVE JUROR:  Yes, I did.
 4              THE COURT:  How many did you supervise?
 5              PROSPECTIVE JUROR:  Well, 25.
 6              THE COURT:  Twenty-five people?  Okay.  And for how
 7   long did you work in that capacity?
 8              PROSPECTIVE JUROR:  About ten years --
 9              THE COURT:  Okay.
10              PROSPECTIVE JUROR:  -- maybe that.
11              THE COURT:  All right.  Your spouse is a field
12   mechanic, and he's still working?
13              PROSPECTIVE JUROR:  No, he's retired also.
14              THE COURT:  Retired as well?  And what kind of work
15   did he do?  I mean working for what kind of a --
16              PROSPECTIVE JUROR:  SDG&E.
17              THE COURT:  SDG&E.  Okay.
18              PROSPECTIVE JUROR:  All the trucks and --
19              THE COURT:  All right.  Very good.  Thank you,
20   Ms. Young.  Mr. Channell?
21              PROSPECTIVE JUROR:  Good morning, sir.
22              THE COURT:  Good morning.  You're currently DOD; is
23   that correct?
24              PROSPECTIVE JUROR:  Yes, sir.
25              THE COURT:  Okay.  And where are you working
```

1   specifically?

2          PROSPECTIVE JUROR:  NLF, Imperial Beach.

3          THE COURT:  How long have you been with the

4   Department of Defense?

5          PROSPECTIVE JUROR:  Twelve years.

6          THE COURT:  And so the question that I asked

7   previously about identifying with the government would

8   certainly pertain to you.  Do you feel as a result of being

9   employed by the government, working generally in the area of

10  defense that you would be inclined to favor the government in

11  this case?

12         PROSPECTIVE JUROR:  No.  I also spent ten years in

13  the military too, so I've seen a lot of stuff, and there's

14  extremists on both ends.  So I'm pretty fair as it is.  I've

15  seen a lot, so --

16         THE COURT:  Okay.  Setting aside what you've seen,

17  would your employment with the government in and of itself or

18  your past military experience just incline you to favor the

19  government?  Do you feel some kind of an affinity for the

20  government because you work for the government at this time

21  and you have this military background?

22         PROSPECTIVE JUROR:  No, sir.

23         THE COURT:  Okay.  When you say you've seen a lot,

24  what are you referring to?

25         PROSPECTIVE JUROR:  Well, I've had a couple of

1    deployments; I've been to the Persian Gulf a couple of times,

2    I was actually deployed to Jordan, actually been to Somalia.

3    There's a lot of good people out there, and sometimes they

4    just kind of get overtaken by bad people.

5              THE COURT:  Okay.  Any of those experiences, any of

6    that exposure in any area that could influence you in this

7    case?

8              PROSPECTIVE JUROR:  No, your Honor.

9              THE COURT:  If you're on this jury, could you

10   resist the temptation of talking about that experience if

11   you're deliberating with the jury and all of a sudden

12   somebody asks you well --

13             PROSPECTIVE JUROR:  Yes, sir.

14             THE COURT:  -- I remember you were in Somalia, you

15   were in Jordan, you've had contact with Muslims; what

16   happened there?  Would you be able to say wait a minute, you

17   know, the Court told us we can't --

18             PROSPECTIVE JUROR:  Yes, sir.

19             THE COURT:  -- that's extraneous information, I

20   can't bring that into deliberations?

21             PROSPECTIVE JUROR:  Yes, sir, I could.

22             THE COURT:  All right.  And you feel you can be

23   completely fair in this case?

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  All right.

 1          PROSPECTIVE JUROR:  That's one thing I've always

 2  believed in is being fair.

 3          THE COURT:  All right, Mr. Channell.  Thank you,

 4  sir.  If you'd pass the microphone down to Ms. Faith, we'll

 5  hear from her.  Could you give us a little bit more

 6  information, Ms. Faith -- good morning to you.

 7          PROSPECTIVE JUROR:  Good morning.

 8          THE COURT:  -- what you did as a resource developer

 9  for Urban Corps of San Diego.

10          PROSPECTIVE JUROR:  Well, Urban Corps works with

11  underprivileged and at-risk students between 18 and 25 who've

12  dropped out of high school, and a number of our students were

13  either from Iraq, we had a few from Somalia, and my job there

14  was to help them find employment primarily.

15          THE COURT:  These are young people for the most

16  part?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  You indicated in your questionnaire

19  that some of the people that you had worked with or had

20  contact with were Somalis.

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  And these were Somali youth?

23          PROSPECTIVE JUROR:  Yes, under 25.

24          THE COURT:  Approximately how many?

25          PROSPECTIVE JUROR:  Not that many, maybe a handful,

 1   five or six.

 2           THE COURT:  Did you personally interact?

 3           PROSPECTIVE JUROR:  Yes.

 4           THE COURT:  And was that experience a positive

 5   experience for you?

 6           PROSPECTIVE JUROR:  Yes, it was.

 7           THE COURT:  Anything about that particular

 8   experience that could in any way incline you to favor one

 9   side or the other in this case?

10           PROSPECTIVE JUROR:  I don't think so, no.

11           THE COURT:  Okay.  Are you clear about that?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  Okay.  You know, as I was going through

14   your questionnaire last night, I came upon your response to

15   question 19, and if you don't mind, I'm going to read it

16   because I think this was a -- I think this was a wonderful

17   response.

18           The question was do you have an opinion whether

19   Muslims are more violent than non-Muslims, and your answer

20   was "Tough question."  That's how you started out.  "The

21   press has certainly covered recent violence in Muslim

22   countries, but on an individual basis, I don't think they are

23   more violent."

24           So basically what you're saying is forget the

25   labels, forget the groups, people are people, yes, there's

1    coverage of what's happening with perhaps certain extremists

2    or radical groups or organizations, but people need to be

3    judged for who they are.  Is that essentially what you --

4            PROSPECTIVE JUROR:  Absolutely.

5            THE COURT:  -- as a subtext of your answer.  Well,

6    I certainly appreciate that answer, and I think -- I think

7    that will be it, Ms. Faith.  I don't have any further

8    questions of you at this time.  Thank you.

9            Ms. Flores, I really don't have any questions of

10   you at this time.  Anything you'd like to add?

11           PROSPECTIVE JUROR:  No, sir.

12           THE COURT:  Anything that you've heard us discuss

13   this morning that causes you any concern or poses any

14   questions for you in any way?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Okay.  Thank you, Ms. Flores.  Mr.

17   Sciacqua?

18           PROSPECTIVE JUROR:  Good morning, your Honor.

19           THE COURT:  Good morning, sir.  I know you're

20   retired, and after your military career you indicated you

21   were an educator in the San Diego community.  Can you tell us

22   what you did in that regard.

23           PROSPECTIVE JUROR:  For the city college I was

24   helping foreigners, immigrants, learn math and teaching them

25   English terms about math because it's very -- the English

1    language is a very confusing.  And many of my students were

2    from Somalia, which was good in the sense that I could

3    practice, keep up my Italian with them because they,

4    unfortunately, were under Mussolini for a few years or their

5    grandparents or parents were, and we also had a lot of

6    Vietnamese students and some --

7              THE COURT:  So you were working with Somalis who

8    spoke Italian?

9              PROSPECTIVE JUROR:  Yes.  And also some of the

10   Vietnamese spoke French --

11             THE COURT:  I see.

12             PROSPECTIVE JUROR:  -- the older, because it was

13   French Indochina.

14             THE COURT:  Right.  I would assume they were older.

15   But how many Somali individuals did you have this kind of

16   contact with?

17             PROSPECTIVE JUROR:  Oh, I really -- it's just a

18   guess.  We had a class about 30 students all together, and

19   maybe -- sometimes there would be four or five individuals

20   from Somalia in that class, and then the next year there may

21   be none, so -- because it varied.

22             THE COURT:  Okay.  And the contacts were

23   instructive, were positive I'm assuming?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Any problems associated with any of

1    your relationships with anyone of Somali descent that could

2    in any way be problematic for you?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Okay.  Do you have legal training,

5    training in the law?

6              PROSPECTIVE JUROR:  I took legal courses -- I was a

7    line officer, and in the early -- in the '50s, I took classes

8    because the JAG for the Navy had not been expanded, so as a

9    line officer I was required to do court work, and I was

10   defense counsel on a special courts marshal.

11             THE COURT:  I saw that, yes, you were -- on how

12   many cases were you defense counsel?

13             PROSPECTIVE JUROR:  Well, I was actually -- let's

14   see.  I was defense three or four times, and I was trial

15   counsel, which is the prosecutor's side, once and on the

16   board once, on the --

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  -- all for special courts.

19             THE COURT:  Okay.  All right.  Very good, sir.  And

20   you feel you could set aside whatever past legal experience

21   you've had in the Uniform Code of Military Justice and --

22             PROSPECTIVE JUROR:  Well, it's different because

23   I've also worked at the superior court as a juror.

24             THE COURT:  As a what now?

25             PROSPECTIVE JUROR:  In the jury across the street

1   at the superior courts.

2           THE COURT:  You worked at --

3           PROSPECTIVE JUROR:  I was selected.

4           THE COURT:  Oh, you've had prior jury experience,

5   yeah.  All right, sir.  Thank you.

6           PROSPECTIVE JUROR:  Thank you.

7           THE COURT:  Mr. Johnson?

8           PROSPECTIVE JUROR:  Yes.  Good morning, your Honor.

9           THE COURT:  Good morning.  I assume that you are

10  a -- you hold a supervisor position with --

11          PROSPECTIVE JUROR:  The Sharpell (phonetic) plant,

12  sir.

13          THE COURT:  Yes.

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  Okay.  How many people are you

16  supervising at the present time, sir?

17          PROSPECTIVE JUROR:  There's 18 people, sir.

18          THE COURT:  How long have you been working in that

19  capacity?

20          PROSPECTIVE JUROR:  Three years, sir.

21          THE COURT:  All right.  And you're also a licensed

22  minister at your church?

23          PROSPECTIVE JUROR:  Yes, sir.

24          THE COURT:  Okay.  Do you believe that any of the

25  teachings of the church or any of your religious studies or

 1   philosophy could in any way influence you in this case, sir?

 2              PROSPECTIVE JUROR:  Could you repeat that again,

 3   sir.

 4              THE COURT:  Yes.  I'm basically asking you do you

 5   feel that any of the teachings of the church or any of the

 6   religious principles to which you adhere could in any way

 7   impose a burden on you in being fair and impartial in this

 8   case?

 9              PROSPECTIVE JUROR:  No, sir.  No, sir.  No, your

10   Honor.

11              THE COURT:  Okay.  I realize you're not of the

12   Muslim faith obviously; that is apparent here from your

13   questionnaire.  You're indicating that you believe the Muslim

14   or Islamic faiths are free choice for anyone to practice,

15   everyone has a right to practice the faith they want.

16              PROSPECTIVE JUROR:  Yes, your Honor.

17              THE COURT:  Would you hold it against anyone, any

18   of these defendants, for not embracing the religious

19   principles and teachings that you embrace as a minister?

20              PROSPECTIVE JUROR:  No, sir.

21              THE COURT:  Okay.  I was interested with the law

22   enforcement contacts that you've had in the past,

23   particularly -- well, it started pretty early, and I think

24   most of us, many of us can relate to that kind of an early

25   contact with law enforcement.  And there was another

1    circumstance, not perhaps law-enforcement centered, but was

2    pretty difficult for you as you relate that.  Your younger

3    brother has -- that was in a spot of trouble; that's

4    reflected here.  Any of your contact with law enforcement in

5    the past that could in any way influence your thinking, your

6    attitude in this case?

7              PROSPECTIVE JUROR:  No, sir.

8              THE COURT:  Do you think your brother-in-law was

9    fairly treated by the criminal justice system?

10             PROSPECTIVE JUROR:  Yes, sir.

11             THE COURT:  All right.  The family seemed to accept

12   what occurred and --

13             PROSPECTIVE JUROR:  Absolutely, yes, sir.

14             THE COURT:  -- felt?  Okay.  All right.  Thank you,

15   Mr. Johnson.  Ms. Meza?

16             PROSPECTIVE JUROR:  Good morning, your Honor.

17             THE COURT:  Good morning.  Ms. Meza, I don't think

18   I need to follow up with you at this particular point in

19   time; I don't have any questions for you.  Anything that

20   you've heard so far this morning that raises any concern for

21   you?  Anything that you'd like to volunteer that would be

22   responsive to the areas of questioning thus far?

23             PROSPECTIVE JUROR:  Not so far.

24             THE COURT:  Okay, Ms. Meza.  Thank you.  Ms. Lopez,

25   good morning.

1             PROSPECTIVE JUROR:  Good morning.

2             THE COURT:  How was your -- how was your husband

3    employed.  I'm sorry for your loss.  How he was employed?

4             PROSPECTIVE JUROR:  He was -- when I met him, he

5    was in sales.

6             THE COURT:  And --

7             PROSPECTIVE JUROR:  He was -- served in the DEA

8    when he was in his 20s.  I met him when he was 44.

9             THE COURT:  Okay.  Did he ever talk to you about

10   his earlier employment in the DEA?

11            PROSPECTIVE JUROR:  Not really.

12            THE COURT:  Do you know how long he had been in the

13   DEA?

14            PROSPECTIVE JUROR:  I think it was just about two

15   or three years after -- he'd come out of the Vietnam War and

16   then went into the DEA.

17            THE COURT:  Okay.  I want to compliment you.  You

18   were the one that had responded to that question on

19   credibility of law enforcement officers.  The question was

20   "Would you always believe a law enforcement officer over

21   other witnesses?"  Your answer was, "If I did, jurors would

22   not be needed," one of the more novel responses I've seen to

23   that question over many years.  Okay, Ms. Lopez.  Thank you.

24            Ms. Smith is next, right behind you there.  Thanks.

25   Ms. Smith, can I get a little bit more information from you

1    about your current occupation.

2              PROSPECTIVE JUROR:  I work for an international

3    society for computational --

4              THE COURT:  Is that microphone working?  Why don't

5    you bump it a little bit and see --

6              PROSPECTIVE JUROR:  I can talk loud.

7              THE COURT:  That's kind of par for the course for

8    this microphone.  You going to switch batteries, Gaby?  You

9    should keep a couple in your pocket.

10             PROSPECTIVE JUROR:  Okay.

11             THE COURT:  Okay.  So ISCB.

12             PROSPECTIVE JUROR:  International Society for

13   Computational Biology, but all do I is the admin support for

14   it.

15             THE COURT:  What kind of a group is it?

16             PROSPECTIVE JUROR:  It's a scientific group that

17   deals with computational biology.  We're based out of UCSD is

18   where our home office is.  We've got 3,000 members around the

19   world, and I just do admin support for it and run reports and

20   that for my supervisor.

21             THE COURT:  Okay.  And your husband is a project

22   manager?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  And could you tell us a little more

25   about that, please.

1           PROSPECTIVE JUROR:  He works for SAIC, and the

2    project he works on is a security program for the government.

3    I don't know exactly what it is, but it's some type of

4    security.  And he was in the Navy for over 22 years.

5           THE COURT:  Okay.  So you got the prior military in

6    the family, got SAIC, government contractor work, you've got

7    your husband working on a project related to that type of

8    work.  Anything about all of that inclines you to favor one

9    side or the other in this case?

10          PROSPECTIVE JUROR:  No, sir.

11          THE COURT:  Do you feel you have an affinity for

12   the government because it's played a prominent part of your

13   husband's life and --

14          PROSPECTIVE JUROR:  And my life.

15          THE COURT:  -- and your life as well by proxy, yes.

16          PROSPECTIVE JUROR:  No.  I feel that -- I know I

17   can be fair and that the government has helped us in our

18   career while he was in the military, but it's not -- I don't

19   think it would be something that would influence my opinion

20   at all.

21          THE COURT:  Okay.  In your -- in your response to

22   the area entitled "Personal beliefs," you indicate some

23   concern about certain acts taken in the name of God.  Is it

24   your view that the entire Muslim faith itself stands for

25   killing in the name of God?

```
 1          PROSPECTIVE JUROR:  Absolutely not.  I mean I don't
 2   know any Muslims personally, but I know that there are good
 3   people out there, but they're -- you just hear a lot.
 4          THE COURT:  Right.
 5          PROSPECTIVE JUROR:  -- in the news regarding, you
 6   know, killing in the name of God and --
 7          THE COURT:  Yes.
 8          PROSPECTIVE JUROR:  And I'm not a religious person,
 9   but I can't imagine killing someone in the name of your God;
10   that doesn't make sense to me.
11          THE COURT:  Or otherwise.
12          PROSPECTIVE JUROR:  Well, or otherwise, sure.
13   You're right.  You're right.  Absolutely.  I didn't mean to
14   infer that.
15          THE COURT:  I know that you're weren't suggesting
16   that.  But, you know, many people will say well, you know,
17   there are good people out there, but I think that there needs
18   to be an acceptance of the proposition that a vast, vast,
19   vast majority of people who embrace the Muslim faith are
20   people of peace and that if you can't embrace that, if you
21   have a view that the faith is predicated upon violence or
22   other problematic principles, then that needs to be discussed
23   obviously.  So is it your view that there are just a few
24   people out there, a few good people that --
25          PROSPECTIVE JUROR:  Oh, no, no, no.
```

```
 1              THE COURT:  -- or do you have concerns about the

 2    faith generally?

 3              PROSPECTIVE JUROR:  No.  I think that the news

 4    brings out those -- the bad ones, that the -- we only hear

 5    about those incidents that are bad and just in general the

 6    news is bad about everything, you know, I mean you don't hear

 7    about those good people.  It's very seldom.  You know,

 8    sometimes on the news you'll see something about -- they'll

 9    do a -- this is our good report for the day, and you hear one

10    little --

11              THE COURT:  Right.

12              PROSPECTIVE JUROR:  -- you know, bit of news.  But

13    no, I'm a believer that the majority of people in this world

14    are good, and there's -- it's just the few that make it bad

15    for everyone.

16              THE COURT:  Thank you, Ms. Smith.  Ms. Salinas,

17    good morning.

18              PROSPECTIVE JUROR:  Good morning.

19              THE COURT:  You're a high school teacher.  I'd be

20    interested in knowing what courses you teach.

21              PROSPECTIVE JUROR:  I teach English 12 for seniors,

22    AP literature for seniors, and also yearbook.

23              THE COURT:  AP literature.

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  That's pretty impressive.  And how long
```

1    have you been teaching at that level?

2              PROSPECTIVE JUROR:  This is my seventh year.

3              THE COURT:  Okay.  And where are you teaching,

4    Sweetwater Union; is that --

5              PROSPECTIVE JUROR:  The school I teach is Olympian

6    High School; it's part of the Sweetwater Union School

7    District.

8              THE COURT:  Very good.  And your significant other

9    is in sales involving what types of products or services?

10             PROSPECTIVE JUROR:  He's my boyfriend, and he works

11   at a retail store where they buy and sell used music and

12   videos.

13             THE COURT:  Okay.  Very good.  Thank you, Ms.

14   Salinas.  Okay.  Why don't we do this.  Let's take our

15   midmorning recess at this point, and before you leave, ladies

16   and gentlemen, just let me say this.  First of all, for those

17   of you in assigned seats, please know where you're seated

18   because when you come back, you'll be taking those same

19   seats.

20             Couple of other things I'd like to mention for the

21   first time around here.  I mentioned the admonition to you,

22   but I'm going to give you the admonition at this point; of

23   course it applies at all times.  Please do not discuss this

24   case amongst yourselves or with anyone else or allow

25   yourselves to form or express any opinions on the case until

 1  you are a juror and the jury has retired to deliberate, then

 2  and only then.

 3          And then finally, we always appreciate you promptly

 4  returning following a recess.  When we take a 15-minute

 5  recess, please be outside waiting for us.  We will call you

 6  in for each new session of court.  And I think that's it.

 7  We'll see you in 15 minutes.

 8      (The jury left the courtroom.)

 9          THE COURT:  Okay.  Feel free to -- we'll give these

10  gentlemen a break.  And if you want to use the facilities,

11  you certainly may.

12      (There was a break in the proceedings.)

13          THE COURT:  Okay.  Thank you, ladies and gentlemen.

14  And, Ms. Boggess, we're going to resume with you, so we'll

15  get that microphone over to you.  Good morning --

16          PROSPECTIVE JUROR:  Good morning.

17          THE COURT:  -- Ms. Boggess.  Well, as I went

18  through your questionnaire, my leading impression was you

19  must have one of the most coveted jobs in the entire country

20  as being a supervisor at Costco.

21          PROSPECTIVE JUROR:  I don't know if you'd go that

22  far.

23          THE COURT:  You get that a lot, do you?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Twenty years.  That's wonderful.  I

1  don't have any other -- I imagine you're supervising people

2  there.

3          PROSPECTIVE JUROR:  Yeah, a lot of different kinds

4  of people, and I have an open mind of things.  I supervise a

5  hundred different people at any given time, I work with a lot

6  of different kinds of people, and that's given me an open

7  mind too.

8          THE COURT:  How many people do you supervise at any

9  given point in time?

10          PROSPECTIVE JUROR:  Probably 50 in a day; that's on

11  the front end, so probably about 50 employees there a day.

12          THE COURT:  Okay.  Well, thank you --

13          PROSPECTIVE JUROR:  Thank you.

14          THE COURT:  -- Ms. Boggess.  Okay.  Mr. Breier?

15          PROSPECTIVE JUROR:  Yes, your Honor.

16          THE COURT:  Yes.  Good morning.  You've got a

17  number of relatives employed -- or some relatives employed by

18  government.  Anything about -- anything about family

19  connection to government employment that could in any way

20  influence you in this case?

21          PROSPECTIVE JUROR:  No, your Honor.

22          THE COURT:  Okay.  Don't feel any connection with

23  the government in this case?

24          PROSPECTIVE JUROR:  No, not at all.

25          THE COURT:  Okay.  All right.  I didn't have any

1    other questions of you, Mr. Breier.  Thank you, sir.  Okay.

2    Mr. Buckner, good morning.

3            PROSPECTIVE JUROR:  Good morning.

4            THE COURT:  In connection with your employment at

5    Solar Turbines, are you in a supervisorial capacity as well,

6    sir?

7            PROSPECTIVE JUROR:  In human resources I support

8    the managers and vice-presidents at our location.

9            THE COURT:  Okay.  As a senior principal are you

10   overseeing other people at the company?

11           PROSPECTIVE JUROR:  Yes, I guess you could say

12   that, yes.

13           THE COURT:  Approximately --

14           PROSPECTIVE JUROR:  I have no direct reports.  I'm

15   more of an individual contributor.

16           THE COURT:  How long have you been with Solar

17   Turbines?

18           PROSPECTIVE JUROR:  Forty-three years.

19           THE COURT:  And going over some of the jury

20   experience you've had, you've had the -- you sat on a civil

21   case basically back in '96, and this would probably be the

22   appropriate time to talk about the differences in burdens of

23   proof in civil cases as opposed to criminal cases.

24           Now, that was a while back.  You may not recall

25   that the burden of proof in that case was a preponderance of

1   the evidence.  Does that phrase ring familiar to you?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Okay.  And for those of you, just to

4   remind you, in civil cases the burden of proof, that is, the

5   standard of persuasion which must be carried by the party

6   with that burden is a preponderance of the evidence.  So if

7   this were a civil case, a traffic accident or a contract

8   dispute, the plaintiff would have the obligation to establish

9   by a preponderance of the evidence or that evidence that

10  merely outweighs opposing evidence and thus has a greater

11  probability of truth; that's the standard we see in civil

12  cases.

13          In criminal cases of course the burden of proof is

14  a much higher burden; it's on the government, as has already

15  been explained to you, it's proof beyond a reasonable doubt,

16  proof that leaves the jury firmly convinced that a defendant

17  is guilty of a charge.  You do understand the difference in

18  that I'm sure, Mr. Buckner.

19          PROSPECTIVE JUROR:  Yes, I do.

20          THE COURT:  Okay, sir.  And was that in superior

21  court here in San Diego?

22          PROSPECTIVE JUROR:  Yes, it was.

23          THE COURT:  All right.  Across the street?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Okay.  Okay.  Thank you, Mr. Buckner.

 1  Mr. Murguia?

 2              PROSPECTIVE JUROR:  Yes, sir.

 3              THE COURT:  Good morning, sir, again.

 4              PROSPECTIVE JUROR:  Good morning.

 5              THE COURT:  How long have you been a facility

 6  engineer at the hotel?

 7              PROSPECTIVE JUROR:  A little less than a year.

 8              THE COURT:  And before that you had all these other

 9  positions, as a fabricator, a plumber, working shipyards,

10  sales, and as a merchandiser; is that correct, sir?

11              PROSPECTIVE JUROR:  Yes, sir.

12              THE COURT:  I believe that's the only question I

13  had for you, Mr. Murguia.  Thank you, sir.  Ms. Free, good

14  morning.

15              PROSPECTIVE JUROR:  Good morning, your Honor.

16              THE COURT:  Would you be a little more specific

17  about your son's experiences in Africa, specifically in

18  Uganda, where he was for five months.  You indicated that he

19  was there working with children, he was with an NGO, a

20  nongovernmental organization.  Could you be -- give us a

21  little bit more information on that.

22              PROSPECTIVE JUROR:  Sure.  He is a videographer,

23  and he went to film the children and adults who are involved

24  in the Invisible Children NGO in their daily lives and their

25  cottage industries that are set up to support themselves and

1  further education, of rebuilding of schools that have been --

2  and homes where children have been displaced.

3            THE COURT:  Was that the name of -- is that the

4  name of the NGO, Invisible Children?

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  And how would the -- the product of

7  your son's efforts, any film, be utilized?  I assume he was

8  filming for a purpose.

9            PROSPECTIVE JUROR:  They're hoping to release a

10  documentary.  They've already been working on it ten years,

11  and they're just enhancing the original footage.  They just

12  keep adding to it.  They're trying to keep the film to an

13  hour.  I have no idea.  It's already been ten years.  I don't

14  know how much longer it's going to be.  He is no longer, as

15  of November, working for them.

16            THE COURT:  Okay.

17            PROSPECTIVE JUROR:  He has a different job now.

18            THE COURT:  Okay.  The NGO, was it sponsored by a

19  particular group or organization; do you know?

20            PROSPECTIVE JUROR:  It is its own -- it's a -- it's

21  its own nonprofit.

22            THE COURT:  Okay.  Does it --

23            PROSPECTIVE JUROR:  I don't know how to explain it.

24            THE COURT:  Does it work with governmental

25  agencies, U.S. governmental agencies?

 1          PROSPECTIVE JUROR:  No, not that I know of.  I mean

 2     just these three young men went to Africa and didn't like

 3     what they saw and decided to make a documentary ten years

 4     ago, and they're still adding footage.

 5          THE COURT:  Okay.  And it was all in Uganda?

 6          PROSPECTIVE JUROR:  Correct.

 7          THE COURT:  He would explain to you what the

 8     experience was like, I assume, from time to time?

 9          PROSPECTIVE JUROR:  Well, he -- they released

10     little bits of their film kind of like teasers, so we would

11     see that along with anybody else who is familiar with the

12     organization.

13          THE COURT:  Okay.  Anything about what your son did

14     in connection with those efforts -- and they seem to be very

15     laudatory efforts -- or any information he gave you about

16     that experience or his observations of Ugandan society or

17     children in need that could in any way influence you in this

18     case?

19          PROSPECTIVE JUROR:  I don't believe so.  It's very

20     insulated to this one group of, you know, people that live

21     there and, you know, what their daily lives, what they're

22     experiencing.  It's pretty -- it's a pretty tight-knit group

23     actually, you know.

24          THE COURT:  Okay.  With respect to credibility or

25     believability of law enforcement officers who may testify, I

 1   took it from your response that you could judge law

 2   enforcement officers and their credibility as you would any

 3   other witness who was not involved in law enforcement.  Is

 4   that what your intention was when you indicated "always" with

 5   a question mark and them "probably but would take all

 6   evidence into consideration"?

 7              PROSPECTIVE JUROR:  Yes, your Honor.

 8              THE COURT:  Okay.  You spent quite a bit of time on

 9   that this morning I know; I just wanted to be sure you didn't

10   have any concerns along those lines.  Thank you --

11              PROSPECTIVE JUROR:  Thank you, your Honor.

12              THE COURT:  -- Ms. Free.  Okay.  Mr. Bristow, we

13   have you next.

14              PROSPECTIVE JUROR:  Good morning, your Honor.

15              THE COURT:  Good morning, sir.  And you've been

16   with Qualcomm for how long, sir?

17              PROSPECTIVE JUROR:  Twelve years.

18              THE COURT:  And before that, any other employment

19   that we should be aware of?  That would have been you right

20   out of high school if you --

21              PROSPECTIVE JUROR:  Yeah.  I had a couple jobs in

22   high or actually one job after high school.

23              THE COURT:  Yeah, yeah.  You and Ms. Boggess are --

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  -- pretty nice.

```
 1              PROSPECTIVE JUROR:  We do well.

 2              THE COURT:  Anything about that contact with law

 3    enforcement in 2010 that could in any way influence you in

 4    this case?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  As far as you were concerned, was there

 7    fair treatment --

 8              PROSPECTIVE JUROR:  They treated me fairly.

 9              THE COURT:  Okay.  All right, sir.  Thank you,

10    Mr. Bristow.

11              PROSPECTIVE JUROR:  Thank you.

12              THE COURT:  And Ms. Cleavenger.

13              PROSPECTIVE JUROR:  Good morning.

14              THE COURT:  Good morning.  You're -- you're living

15    with another individual at this point.  I was just curious as

16    to what that individual does for an occupation, if anything.

17              PROSPECTIVE JUROR:  He is a busboy at his family

18    restaurant.

19              THE COURT:  Okay.  Thank you.  And, Ms. Cleavenger,

20    I don't have any other questions for you.  Thank you.  Ms.

21    Freni, good morning.

22              PROSPECTIVE JUROR:  Good morning, your Honor.

23              THE COURT:  First of all, in response to the

24    question concerning political identification, you didn't mark

25    anything, not even "none of the above."  I just want to make
```

```
 1   sure that question wasn't missed by you, the question that

 2   asks people whether they identify with Christian

 3   conservatives, traditional conservatives, libertarians,

 4   moderates, liberal/progressives, or independents.

 5              PROSPECTIVE JUROR:  I must have missed the

 6   question.

 7              THE COURT:  I'm sorry?

 8              PROSPECTIVE JUROR:  And I didn't mark anything?

 9              THE COURT:  And you didn't mark "none of the

10   above," no.

11              PROSPECTIVE JUROR:  Then I just skipped it by

12   accident.

13              THE COURT:  Okay.

14              PROSPECTIVE JUROR:  Can you give me the choices

15   again?  Sorry.

16              THE COURT:  Sure.  We have Christian conservatives

17   traditional conservatives, Libertarians, moderates,

18   liberals/progressives -- stop me when I get to --

19              PROSPECTIVE JUROR:  I would say a little bit of all

20   of them.

21              THE COURT:  Well, we don't have all of the above.

22   That's what you were looking for.  And independents.

23              PROSPECTIVE JUROR:  I'm sorry.

24              THE COURT:  Okay.  That's fine.  We'll go on to

25   something else if you don't have any strong identification
```

1    with any of those.

2            PROSPECTIVE JUROR:  No, neither way.

3            THE COURT:  Sure, sure.  Okay.  So you're keeping

4    the books for your father --

5            PROSPECTIVE JUROR:  Yes.

6            THE COURT:  -- who had a very interesting job.

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  And he was working in that service,

9    with the U.S. Secret Service, for how long?

10           PROSPECTIVE JUROR:  Oh, gosh.  Probably 1960 to

11   about 1972.

12           THE COURT:  Okay.  Always in the presidential

13   guard?

14           PROSPECTIVE JUROR:  When we moved to San Diego, he

15   worked with the Treasury here, and also when Nixon would come

16   to San Clemente he would --

17           THE COURT:  Spring into action?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  And your husband is an attorney?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  And tell us a little bit about what his

22   practice has been and what it is now at the present time.

23           PROSPECTIVE JUROR:  He's a civil trial attorney.

24   He does business, real estate, some elder abuse cases.

25           THE COURT:  That's here in the San Diego area?

```
1              PROSPECTIVE JUROR:  Yes.

2              THE COURT:  Is he with a firm or by himself?

3              PROSPECTIVE JUROR:  He has his own firm.

4              THE COURT:  Okay.  And has he ever practiced

5     criminal law in the past?  Was he affiliated with a

6     prosecutorial office or a defense attorney?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Okay.  It's always been in the civil

9     arena; is that correct?

10             PROSPECTIVE JUROR:  Yes, sir.

11             THE COURT:  Is he a trial lawyer?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Your father's business now is

14    consisting of what so that you're helping him?

15             PROSPECTIVE JUROR:  He's a private lender, real

16    estate lender.  He lives in Florida now, but he has some

17    loans here in California as well as Indiana and Florida; so I

18    keep all of the loan ledgers and basically all of his books

19    from his purchases and get his books ready for taxes each

20    year.

21             THE COURT:  Okay.  Do you work with your husband at

22    all?  Even though he's got a firm, his own firm, you

23    indicated, do you assist him as well?

24             PROSPECTIVE JUROR:  I do some of the accounting,

25    yes, on just online.  I don't go to the office; I'm able to
```

 1    just sign onto his server, so I do the payroll and reconcile

 2    the accounts.

 3              THE COURT:  Okay.  He doesn't have you appear for

 4    him in depositions and -- no?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  Okay.  Very good.

 7              PROSPECTIVE JUROR:  He has an assistant.

 8              THE COURT:  This would be John Freni, would it not?

 9              PROSPECTIVE JUROR:  Yes, your Honor.

10              THE COURT:  Okay.  He's known to many of us.  Thank

11    you, Ms. Freni.

12              PROSPECTIVE JUROR:  Thank you.

13              THE COURT:  All right.  Let's see.  Mr. Todd, you

14    are next up.  Mr. Todd, good morning.

15              PROSPECTIVE JUROR:  Good morning.

16              THE COURT:  I know you recently substituted in, and

17    I did have an opportunity to go over your questionnaire, I

18    want you to know that, but I really don't have any questions

19    for you, sir.  Just checking one more time.  No.  Mr. Todd,

20    anything you'd like to -- any thoughts you may have or

21    questions or concerns relative to what we're doing here,

22    nature of the case, following any of the instructions?

23              PROSPECTIVE JUROR:  Not really.  Not really.

24              THE COURT:  Okay.  All right.  Very good.  Thank

25    you.  Ms. Delaney, good morning.

```
 1              PROSPECTIVE JUROR:  Good morning.

 2              THE COURT:  In terms of your prior jury service,

 3    you did have -- you did sit on a case which in all

 4    probability took place in this courthouse.

 5              PROSPECTIVE JUROR:  Yes.

 6              THE COURT:  And that was back in the what, 2001

 7    or --

 8              PROSPECTIVE JUROR:  2009.

 9              THE COURT:  2009?

10              PROSPECTIVE JUROR:  Yeah, in that ballpark.  I

11    don't know the exact year.

12              THE COURT:  Okay.  And was that particular

13    experience acceptable for you?

14              PROSPECTIVE JUROR:  Yes.

15              THE COURT:  Okay.  Do you see anyone here in the

16    courtroom who was associated with that earlier case?  And by

17    here I'm referring basically to --

18              PROSPECTIVE JUROR:  The attorneys.

19              THE COURT:  -- the government's counsel table.

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Okay.  Very good.  All right.  Thank

22    you, Ms. Delaney.  And then we go to Ms. Hernandez.  Good

23    morning.

24              PROSPECTIVE JUROR:  Good morning.

25              THE COURT:  What types of cases do you work on as a
```

1    county case worker?

2           PROSPECTIVE JUROR:  I work with public assistance,

3    providing public assistance.

4           THE COURT:  I see you bobbing and weaving there,

5    yeah.

6           PROSPECTIVE JUROR:  Medi-Cal, food stamps, cash

7    aid.

8           THE COURT:  How many case files do you work on at

9    any given point in time?

10          PROSPECTIVE JUROR:  In a week -- I mean it could be

11   25 cases in a week, sometimes more, sometimes less.  Just

12   depends on the time of the month.

13          THE COURT:  Are you out of the office a good deal

14   of the time?

15          PROSPECTIVE JUROR:  No, we work in the office --

16          THE COURT:  In the office and --

17          PROSPECTIVE JUROR:  -- interviewing clients when

18   they come in to apply for assistance.

19          THE COURT:  So you don't do home visits or that

20   kind of thing?

21          PROSPECTIVE JUROR:  (Shakes head)

22          THE COURT:  Okay.  You probably see a pretty good

23   mix of people I would think.

24          PROSPECTIVE JUROR:  Yes, I do.

25          THE COURT:  Okay.  Have you seen any members of the

1    Somali community that you can recall?

2              PROSPECTIVE JUROR:  I don't believe so, no.

3              THE COURT:  Okay.  How long have you been doing

4    this now?

5              PROSPECTIVE JUROR:  I have been doing this for a

6    year.

7              THE COURT:  Okay.  And before that you were a loan

8    underwriter and working in banking?

9              PROSPECTIVE JUROR:  Yes, sir.

10             THE COURT:  Very good.  I did want to ask you about

11   that circumstance involving your brother where he was --

12   where he was a victim and your stepbrother, who was not the

13   victim --

14             PROSPECTIVE JUROR:  Right.

15             THE COURT:  -- in a separate matter.  As far as you

16   were concerned, did the criminal justice system work in those

17   cases?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  But --

20             PROSPECTIVE JUROR:  I mean I feel that -- yes.  In

21   one there was really know way to find the people, so they --

22             THE COURT:  This is your brother.

23             PROSPECTIVE JUROR:  My brother.  And my stepbrother

24   committed a crime and that's the punishment.

25             THE COURT:  You think he was fairly treated?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Nothing about the family or within the

3   family that you're aware of that was critical about the

4   response or how your brother-in-law was treated?

5           PROSPECTIVE JUROR:  No.

6           THE COURT:  Okay.  All right.  Thank you,

7   Ms. Hernandez.  Ms. Ramirez, good morning.

8           PROSPECTIVE JUROR:  Good morning.

9           THE COURT:  Is your position at your company as a

10  financial planner, an advisor, a broker; what do you do

11  there?

12          PROSPECTIVE JUROR:  I work for the brokers.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR:  No, I'm more on the client

15  service side; I'm called a client associate.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR:  Client assistant.

18          THE COURT:  What kinds of things do you do there?

19          PROSPECTIVE JUROR:  I do things like update cost

20  basis for taxes, I prepare performance reports on portfolios,

21  I order replacement Visa cards, move funds between accounts.

22          THE COURT:  Sounds like you do an awful lot.

23  Updating cost basis for tax purposes, is that oftentimes a

24  difficult and challenging task?

25          PROSPECTIVE JUROR:  Very much so.  With the law

1    changes, yes.

2              THE COURT:  What you do if you just don't have

3    sufficient information?

4              PROSPECTIVE JUROR:  We usually have the

5    information.  It's the hoops you go through to make changes

6    because say someone received a stock as a gift or something

7    like that -- it's just the data entry of it is the cumbersome

8    part.

9              THE COURT:  Thank you, Ms. Ramirez.  Okay.  Ms.

10   Fierro?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  Good morning.

13             PROSPECTIVE JUROR:  Good morning.

14             THE COURT:  Could you tell me a little bit about

15   what your son does in New York in the profession.

16             PROSPECTIVE JUROR:  Yes, he's a corporate lawyer.

17   He works for the Sidley Austin law firm, and he doesn't do

18   trials; he does a lot of contracts.  I don't know.  He says

19   he works with a lot of money.  I don't really know too much

20   about it.  I'm just amazed he's there.

21             THE COURT:  He does transactional work at --

22             PROSPECTIVE JUROR:  Yes, I guess.

23             THE COURT:  -- I assume.  Okay.  And did he ever

24   practice criminal law; do you know?

25             PROSPECTIVE JUROR:  No, he did not.  He went to

1    Berkeley Law.

2            THE COURT:  Okay.  And are there any other

3    attorneys in the family?

4            PROSPECTIVE JUROR:  No.  He's the first one in our

5    family who got there.  Very proud of him.

6            THE COURT:  Very good.  Okay.  Thank you, Ms.

7    Fierro.  Ms. Stahl?

8            PROSPECTIVE JUROR:  Good morning.

9            THE COURT:  Good morning.  I went through your

10   questionnaire, and at this point I don't think I have any

11   questions of you.  Anything -- anything that's been said this

12   morning in the courtroom or yesterday that causes you any

13   concern about your ability to be a fair and impartial juror

14   in this case?

15           PROSPECTIVE JUROR:  No, your Honor.

16           THE COURT:  Okay.  All right, Ms. Stahl.  Thank

17   you.  Mr. Crowell, good morning.

18           PROSPECTIVE JUROR:  Good morning.

19           THE COURT:  When it came to the personal beliefs

20   section, I just wanted to explore with you a little bit of

21   that as I have with some of your fellow panel members.  When

22   it came to the question about Islamic teachings or doctrine

23   that might be personally offensive to you, you indicated

24   "some doctrine is against my beliefs," and I just wanted to

25   give you a chance to talk about that a little bit, whether

1    that's a concern you have across the board about the entire

2    Islamic faith or whether it was of a more limited nature.

3              PROSPECTIVE JUROR:  Probably more of a limited

4    nature.  You know, there's just aspects, you know, between

5    who comes first -- country, family, religion all that.  I

6    think it's a little different in this culture.

7              THE COURT:  Anything about your understanding of

8    the Islamic faith or its teachings that would make it

9    difficult for you to sit as a fair and impartial juror in

10   this case?

11             PROSPECTIVE JUROR:  No, it would not.

12             THE COURT:  As I mentioned previously, the issues

13   in this case are going to be pretty discrete; they're pretty

14   well-defined.  You know, the charges in the case are

15   providing material support or conspiring to provide material

16   support to terrorists or a terrorist organization, and

17   whether that was done or wasn't done, nobody -- nobody is

18   trying to portray al-Shabaab in a positive light; the

19   question is whether or not there was support, and that's, as

20   I say, a pretty discrete, you know, defined question

21   ultimately.  So if there are -- if you have some general --

22   not some general but some specific concerns about Islamic

23   teaching, which I'm still not completely sure of, and would

24   any of those teachings color your thinking on the obligation

25   you have to judge the evidence fairly and to look at these

 1  discrete, very discrete issues in this case?

 2          PROSPECTIVE JUROR:  No, I don't believe so.

 3          THE COURT:  Okay.  All right, sir.  Thank you, Mr.

 4  Crowell.  Okay.  Mr. Brenzel?

 5          PROSPECTIVE JUROR:  Yes.

 6          THE COURT:  Mr. Brenzel, I don't think I have any

 7  questions of you either at this point, but I would ask you

 8  whether there is anything you'd like to volunteer, any

 9  concerns you may have, any doubts you may have about your

10  ability to be fair and impartial based upon what you've been

11  hearing the last few days.

12          PROSPECTIVE JUROR:  No, nothing.

13          THE COURT:  Okay.  Thank you, sir.  Mr. Dominguez?

14          PROSPECTIVE JUROR:  Good morning.

15          THE COURT:  Good morning.  Were you -- you had your

16  own -- you're a contractor I assume.

17          PROSPECTIVE JUROR:  General building contractor.

18          THE COURT:  General contractor, licensed general

19  contractor.

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  And I assume that the company's still

22  active, that when you put down unemployed, that threw me a

23  little bit --

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  -- because you're the company.

 1              PROSPECTIVE JUROR:  I'm no longer licensed.  I let

 2   it expire.

 3              THE COURT:  You let it expire.

 4              PROSPECTIVE JUROR:  I dissolved the corporation.

 5              THE COURT:  Got you.  Okay.  When did that happen,

 6   sir?

 7              PROSPECTIVE JUROR:  It happened in 2010.

 8              THE COURT:  And pretty recently.  What's been

 9   happening since then?

10              PROSPECTIVE JUROR:  Just been, you know, doing odd

11   jobs, taking it easy.

12              THE COURT:  Okay.  How long were you in building or

13   doing contracting work?

14              PROSPECTIVE JUROR:  Officially since I was 18, but,

15   you know, before that with my dad.

16              THE COURT:  When did you first get your license?

17              PROSPECTIVE JUROR:  I became licensed in '97.

18              THE COURT:  Were you working as an RMO or an RME on

19   his license and then took that over or --

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Okay.  Got your own license then?

22              PROSPECTIVE JUROR:  Correct.

23              THE COURT:  Okay.  All right.  Thank you.  Thank

24   you, Mr. Dominguez.  Mr. Merkin?

25              PROSPECTIVE JUROR:  Yes, sir.

```
 1              THE COURT:  Good morning, sir.
 2              PROSPECTIVE JUROR:  Good morning.
 3              THE COURT:  Can you tell me what your background
 4   has been in legal practice.
 5              PROSPECTIVE JUROR:  Well, I'll try to make it
 6   short, but I was --
 7              THE COURT:  Is that microphone out again?
 8              PROSPECTIVE JUROR:  No.
 9              THE COURT:  No?  That's good.
10              PROSPECTIVE JUROR:  I'll hold it closer.  When I
11   got out of law school, I went into the Army, Judge Advocate
12   General Corps, and in that capacity they sent me to Germany,
13   and my job was trying or defending general courts martial; I
14   did that for almost three years.  Then I came -- went back to
15   El Paso, Texas, where I spent most of my career, and I
16   practiced law there, general civil law, but it turned into a
17   trial practice, and I practiced there from 19 -- early 1957 I
18   guess it was until 1989, when I retired and came out here.
19   But I was involved in -- in civil litigation, primarily in
20   trial work.
21              THE COURT:  Okay.  Did you ever practice criminal
22   law?
23              PROSPECTIVE JUROR:  Yes, I did, sir.
24              THE COURT:  When was that?
25              PROSPECTIVE JUROR:  Well, first of course in the
```

1   JAG Corps.

2           THE COURT:  Yeah, sure.  But aside from that.

3           PROSPECTIVE JUROR:  And then early in my career, I

4   handled a number of criminal cases, but my practice veered

5   more and more towards civil practice.  And I would say that

6   my criminal practice was not more than 5 percent of my work,

7   but occasionally I would do some criminal work for a client

8   that I had or a new one.

9           THE COURT:  So it wasn't ever the pure practice of

10  law or a practice where you had a substantial percentage of

11  your practice devoted to criminal law except maybe in the

12  very beginning there.

13          PROSPECTIVE JUROR:  That's correct, sir.

14          THE COURT:  But after that, after that beginning,

15  then you'd handle criminal matters as they might pop up for

16  your civil clients and that was never any more than about

17  five --

18          PROSPECTIVE JUROR:  Essentially few and far

19  between.

20          THE COURT:  But for that period of time when you

21  were concentrating on criminal --

22          PROSPECTIVE JUROR:  Yes --

23          THE COURT:  -- first in --

24          PROSPECTIVE JUROR:  -- somewhat.

25          THE COURT:  -- civilian practice, how long was that

1    period?

2             PROSPECTIVE JUROR:  Well, I would say that my

3    criminal work was probably essentially maybe 40 or 50 percent

4    in my earlier career, and that must have been over a period

5    of two or three years.

6             THE COURT:  What kinds of matters did you handle,

7    everything or did you specialize?

8             PROSPECTIVE JUROR:  I never handled a capital case,

9    but if you named anything else, there's a pretty fair chance

10   that I was involved in it.

11            THE COURT:  And it would have been defense work.

12            PROSPECTIVE JUROR:  That was defense work, sir,

13   yes.

14            THE COURT:  Okay.  And where -- that was in El

15   Paso?

16            PROSPECTIVE JUROR:  Yes, sir.

17            THE COURT:  All right.  Did you practice law in

18   California at any point?

19            PROSPECTIVE JUROR:  No.  I'm an arbitrator out here

20   with the American Arbitration Association and for the

21   Financial Industry Resources Authority, FINRA.

22            THE COURT:  And how often are you in arbitration?

23   What percentage of your time right now is devoted to

24   arbitration?

25            PROSPECTIVE JUROR:  Between 5 and 10 percent, sir.

1          THE COURT:  Okay.  If you're on the jury, could you

2    cast aside all of your legal education and experience and

3    just confine -- confine yourself to the evidence in this case

4    and the law ultimately that's provided?

5          PROSPECTIVE JUROR:  I am who I am, but I really,

6    truly believe that I'm a disciplined person, and I can base

7    my judgment on what I hear and nothing more.

8          THE COURT:  All right, sir.  Thank you, Mr. Merkin.

9    Mr. Evans?

10          PROSPECTIVE JUROR:  Good morning, sir.

11          THE COURT:  Good morning.  I needed to clarify a

12    couple of responses in the personal belief section of the --

13    of the questionnaire where you indicate your view of the

14    Muslim or Islamic faith as being a peaceful faith except for

15    extremists and followers.  Then a little farther down,

16    indicating or including a reference to Muslim extremists.

17    The question I would have for you is the question I had for a

18    few of your fellow panel members.  Are you -- in terms of the

19    references to extremists or violence, are you limiting that

20    to a -- to a specific and small group of individuals and/or

21    organizations or are you more or less applying that generally

22    to the Muslim or Islamic faith?

23          PROSPECTIVE JUROR:  No, I meant a small number.

24    It's a very few.  The -- no, religion -- no -- has that

25    extremist view in which it's -- how can I explain it?  I

 1   guess, it's from -- like the other person that said from the

 2   news you get a small percentage of the bad news, and it's not

 3   the whole faith, it's just a small percentage that has that

 4   extremist view that, you know, we can't help but hear about,

 5   so --

 6            THE COURT:  All right, sir.  Thank you, Mr. Evans.

 7   Ms. Alise?

 8            PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  I am looking for your questionnaire

10   because I know you -- I know you came in a bit late.

11            PROSPECTIVE JUROR:  I did?

12            THE COURT:  No, no.  I mean you were seated late,

13   were you not?  You took over for Mr. Mapanao.

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  So I am -- if you'd give me just a

16   moment --

17            PROSPECTIVE JUROR:  Would you like me to sing?

18            THE COURT:  We would appreciate it, and --

19            PROSPECTIVE JUROR:  Yes, yes.

20            THE COURT:  From the sound of it, I --

21            PROSPECTIVE JUROR:  Zip-a-dee-doo-dah --

22            THE COURT:  -- think you can entertain us as well.

23   I'll be with you very shortly, I promise.

24            PROSPECTIVE JUROR:  -- zip-a-dee-ay.

25            THE COURT:  I did have an opportunity to review

 1    your questionnaire, and after all of that, I must say I
 2    really don't have any questions.
 3                PROSPECTIVE JUROR:  Well, let me just thank you for
 4    your sense of humor.
 5                THE COURT:  Okay.  Thank you.  Thank you, Ms.
 6    Alise.  Okay.  Mr. Adams?
 7                PROSPECTIVE JUROR:  Yes, sir.
 8                THE COURT:  And I don't have any follow-up
 9    questions for you as well.  You indicated that you knew
10    somebody in the horn -- well, in Kenya, which is -- which
11    neighbors -- I believe neighbors Somalia, and --
12                PROSPECTIVE JUROR:  I believe so, yes.
13                THE COURT:  -- anything about that particular
14    friendship or information that you might have gained from
15    that part of the world and knowing this gentleman most of
16    your life that could in any way influence you in this case?
17                PROSPECTIVE JUROR:  Not really.  He moved here when
18    he was about 20 I believe, and I believe he's 55 now, and
19    he's just tried to assimilate himself to the U.S.  And he was
20    a citizen when I met him.
21                THE COURT:  Okay.  Very good.  Thank you.  Thank
22    you, Mr. Adams.  Okay.  Ms. Clark, you're the person
23    everybody's been waiting to hear from.
24                PROSPECTIVE JUROR:  Good morning.
25                THE COURT:  Good morning.  And, you know, the

1    question I had for you relates to the question about law

2    enforcement, question number 50, would you always believe a

3    law enforcement officer over other witnesses.  And you

4    indicated yes.  And I wanted to explore that with you.  I

5    didn't know whether you answered that in error, that you

6    meant no, but then I saw that your father-in-law is CHP, and

7    I thought maybe there was a family -- just a family

8    connection or influence there that would cause you to say

9    that.  So would you just explain a little bit, please.

10               PROSPECTIVE JUROR:  I don't -- didn't mean so much

11   greater, would give it greater importance or it would be more

12   truthful; but I thought that everybody that goes up there,

13   you know, says their oath too, saying the truth, and so I

14   think that, you know, they do tell the truth, I hope so, and

15   I feel that I believe that everybody up there will tell the

16   truth, their own truth, and it's up to us to decide whether

17   that truth --

18               THE COURT:  Well, do you think law enforcement

19   officers are more truthful than people who are not in law

20   enforcement?

21               PROSPECTIVE JUROR:  No.

22               THE COURT:  Okay.  So I shouldn't be concerned at

23   all or counsel shouldn't be concerned at all that you checked

24   "yes" on your questionnaire?

25               PROSPECTIVE JUROR:  No, not more truthful.  I'm

1    assuming each person that takes the oath --

2              THE COURT:  Oh, I see.  By "yes" you meant --

3              PROSPECTIVE JUROR:  -- is going to say --

4              THE COURT:  Go ahead.

5              PROSPECTIVE JUROR:  No.  -- is going to say the

6    truth, and that's our duty to judge that.

7              THE COURT:  It is your responsibility as judges of

8    the facts to determine the believability of witnesses.  And

9    as I stated previously and more than once, you do that by,

10   you know, making observations, just relying on your common

11   sense, looking at the manner of the individual testifying,

12   the quality and character of testimony, and all the other

13   things.  And nobody should start with an advantage over

14   anyone else by having a jury thinking that before they even

15   take the stand that they're more truthful than other

16   witnesses who testify.  Do you agree with that?

17             PROSPECTIVE JUROR:  Absolutely.

18             THE COURT:  Okay.  All right.  Very good.  Then

19   we'll retrieve that microphone from you.  I'm just -- I'm

20   going to wrap things up for myself here in just a -- in just

21   a minute or two, and then you're going to hear from counsel.

22   Each side has a limited period of time, ladies and gentlemen,

23   within which to follow up and ask any questions they -- that

24   are appropriate and fair, and they'll begin that in just a

25   few minutes, but I wanted to end on this note.

1              Yesterday, once again, I spent quite a bit of time

2     talking about the presumption of innocence, a bedrock

3     constitutional principle, and I tried to explain to everyone,

4     I tried to convey the very, very important principle that

5     these constitutional principles matter, they have meaning,

6     they're not just sayings, they're not just words.  And I

7     mentioned some of the consequences or applications of the

8     presumption of innocence, that is, that a defendant is

9     presumed innocent until and unless the contrary is proven,

10    until and unless the burden on the government is carried.

11    And I just want to emphasize a few of those things at this

12    point.

13             A defendant in a criminal case, in any criminal

14    case, never carries the burden of proving anything.  A

15    defendant in a criminal case has no responsibility to put on

16    a case, to call witnesses, to introduce evidence, to

17    cross-examine witnesses called by the government, even to

18    make an opening statement or to make a closing argument at

19    the end of the case.  None of this is imposed upon a

20    defendant because of these principles that I'm just

21    discussing.

22             And I spoke at some length about the constitutional

23    right for a defendant not to testify, to decide not to

24    testify.  And I mentioned that you cannot hold that against

25    any defendant who might exercise that constitutional right.

1   You may not draw any negative inferences from a defendant

2   deciding not to testify.  You may not discuss that in

3   deliberations.  You may not consider that as a factor in your

4   deliberations.

5           If there is anyone here who has any difficulty

6   accepting any of these principles, would you please raise

7   your hand at the present time.  I see no hands raised.

8           If there's anyone here who would be inclined to

9   hold it against a defendant or draw negative inferences if a

10  defendant decided not to testify, would you please raise your

11  hand.

12          PROSPECTIVE JUROR:  I have a question about that.

13          THE COURT:  Yes, yes, Mr. Bilse?

14          PROSPECTIVE JUROR:  If there's a gap that could

15  have been explained if a defendant had testified, how -- how

16  would we take that then?

17          THE COURT:  If there is a gap in the evidence, then

18  that's not the responsibility of the defendant to fill that

19  in.

20          PROSPECTIVE JUROR:  Say there's an explanation that

21  could have been --

22          THE COURT:  I'm sorry?

23          PROSPECTIVE JUROR:  -- maybe not a gap in the

24  evidence but an issue that could have been resolved --

25          THE COURT:  If --

1          PROSPECTIVE JUROR:  -- if a defendant had spoken

2     and just that lack, it just remains a blank, a gap.

3          THE COURT:  Well, it may well be a failure of proof

4     on the part of the government to fill in that gap.  It's the

5     government's responsibility to present evidence on all of the

6     elements of a charge.  Each charge is going to have certain

7     parts to it, certain what we call elements to -- of a crime,

8     and it's the government's responsibility to introduce

9     evidence sufficient to convince a jury beyond a reasonable

10    doubt that each of those elements have been met.  So if

11    there's a gap in the evidence -- and I'm speaking very

12    generally because you're speaking very generally -- if

13    there's a gap in the evidence, you certainly may not say

14    well, gee, it might have been easy for the defendant to

15    answer this if the defendant had taken the stand.  No, you

16    can't do that.

17          First of all -- first of all, you're -- you're not

18    just speculating at that point, you're already discussing it,

19    you're discussing it with other jurors in your hypothetical

20    situation, in the scenario that you're -- you can't do that.

21          PROSPECTIVE JUROR:  But flipping it to say well,

22    the evidence was A, B, C, D that a person was at a certain

23    point and there was some evidence that they were there and if

24    there's nothing to refute that, then -- and a defendant could

25    have come up to speak to that point, you know, you take it

1   just as evidence and that's it then?

2          THE COURT:  You look at the evidence that has been

3   brought out during the course of the trial.  You cannot --

4   you cannot hold it -- in other words, in your hypothetical

5   situation, you seem to be saying, you know, there's evidence

6   that a defendant could have provided, an explanation -- let's

7   take it away from -- let's take it away from this case

8   entirely and talk about, you know, a case where we're dealing

9   with a -- I don't know -- a burglary, okay.  And all of the

10  evidence points -- not all of the evidence but, you know, a

11  substantial amount of evidence points to a defendant in a

12  particular case.  And the issue, you know, the real issue is

13  identity, who did it, did this defendant do it or was it

14  someone else.  And you'd think it would be really easy if

15  this defendant had an alibi, a so-called alibi and take the

16  stand and tell everybody where he was at that particular

17  point in time.  The defendant in that case would have

18  absolutely no obligation to do that.  You would have to look

19  at the evidence produced by the government in that case and

20  decide on the basis of all the evidence whether the

21  government has proven by evidence beyond a reasonable doubt

22  that the particular defendant in that case was the guy.

23          PROSPECTIVE JUROR:  Good explanation.

24          THE COURT:  And there would never be any obligation

25  on the part of a defendant to take the stand and explain

1   where he was at the time the offense was committed.

2            PROSPECTIVE JUROR:  Okay.

3            THE COURT:  Do you understand?  Do you accept that

4   though?  I mean that's the important thing.

5            PROSPECTIVE JUROR:  Yes, I do, yes.

6            THE COURT:  You know, what you raise, Mr. Bilse, is

7   a very human reaction:  Gee, you know, I'd be curious, I'd be

8   curious to know what a defendant might say if he did take the

9   stand and testify.  But that's exactly the exercise you

10  cannot engage in because in a sense you're violating -- and

11  this is important for you to understand -- you're violating a

12  defendant's constitutional right when you do that, when you

13  hold a defendant's decision against him where that decision

14  has been not to testify.

15           PROSPECTIVE JUROR:  That's what I was kind of

16  worried about.

17           THE COURT:  Okay.  But I'm going to keep this -- I

18  know that horse is sitting in the well right now and he's

19  pretty battered, but I'm going to beat a little bit more on

20  it because it's really -- it's really important.

21           You know, many of you would raise your hands saying

22  yeah, you'd be curious about what a defendant might have to

23  say if called to the stand, but you've got to cast aside that

24  curiosity; you cannot speculate what the testimony might have

25  been, you can't consider it, you can't discuss it.  You'd

1    insist on the exact same thing, the exact same constitutional

2    protection if you were the one who was charged with an

3    offense and the government had its burden to prove you guilty

4    or a loved one guilty; you'd embrace that constitutional

5    principle.  And so we all have a right to expect that it's

6    going to be honored in this and every other case.

7          So does anyone else have any concerns about these

8    last principles I've been discussing?  If so, raise your

9    hand, please.  If you feel that if you don't hear from a

10   defendant, or any of them, that this is going to influence

11   you, probably influence you, could very possibly influence

12   you, that you might be tempted to discuss it in the jury

13   deliberation room if you're on the jury, now's the time to

14   raise your hand and let us know.  All right.  I see no hands.

15         Okay.  Let me -- we're going to start with the

16   attorneys here.  Well, actually we're pretty close to noon.

17   I'm going to ask counsel -- perhaps rather than having Ms.

18   Moreno start and then interrupt her 10 or 15 minutes into it,

19   why don't we take our noon recess at this time.  We will

20   resume -- at 1:15 I'm going to ask that you be outside the

21   courtroom doors so we can bring you in.  Each side -- hold

22   on, ladies and gentlemen.  Each side is going to have that

23   opportunity.  They are limited in time.  We've spent almost

24   two days on this already, and we will have our jurors

25   identified by the end of the day, by the close of business

 1   today; that's our goal, and so we do appreciate you promptly

 2   being back here.

 3          Remember the admonition not to discuss the case or

 4   make any decisions at this time.  Remember where you're

 5   seated.  Enjoy your time off.  We'll see you at 1:15.

 6      (The jury panel left the courtroom.)

 7          THE COURT:  Okay.  We're outside the presence of

 8   all jurors.  Ms. Moreno, are you planning on taking your --

 9   all of your allotted time, do you think you will or -- I'm

10   not asking for a commitment, I'm just trying to get --

11          MS. MORENO:  No, no, I'm trying to give my best

12   estimate, your Honor.  I think, depending upon the dynamic,

13   maybe 40, 45 minutes.

14          THE COURT:  Okay.  Mr. Cole?  I'm sorry.  Mr. Ward?

15          MR. GHAPPOUR:  Your Honor, I think it would be like

16   15 or 20 minutes.

17          THE COURT:  Okay.  I know they've been through an

18   awful lot; it's been pretty -- we have kind of an awful lot

19   of information here already.  The reason I ask, Ms. Fontier

20   did inquire yesterday as to the possibility of going over

21   these deposition issues, getting rulings on those.  I'd love

22   to be able to do that for counsel today.  I've got to be out

23   of here at a fairly decent hour late this afternoon, and -- I

24   mean I can't hang with you to until 7:00 or 8:00 to get this

25   stuff done, so I want to do it, want to give Ms. Fontier a

1  chance to get her stuff -- and the government as well -- get

2  -- you know, know what's coming in and what's not coming in.

3  So to the extent we can be expeditious in going through the

4  rest of the voir dire, getting our jurors identified, letting

5  the rest go, then getting to our deposition issues, that

6  would serve us well.

7          MS. MORENO:  I'll do my best, your Honor.

8          THE COURT:  Okay.  We'll see you at 1:15.

9          MS. FONTIER:  Thank you, your Honor.

10     (There was a break in the proceedings.)

11          THE COURT:  Good afternoon, ladies and gentlemen.

12  We're going to continue now.  Now is the opportunity for

13  counsel to participate in this process.  They each have some

14  time to ask you follow-up questions, perhaps a few questions

15  of their own.  I can assure you they have no purpose in

16  unduly prying into your personal affairs or embarrassing you.

17  They're just merely trying to elicit a little more

18  information that might bear upon your ability to be fair and

19  impartial in this case.  And so we will first proceed with

20  Ms. Moreno.

21          MS. MORENO:  Thank you, your Honor.  Good

22  afternoon, ladies and gentlemen.  I'm going to stand here so

23  I can see everyone.  Can everyone hear me?  Okay.  After 30

24  years of being a lawyer, I should think that I should know

25  how to project my voice, but if anyone has any problems

1   hearing what I'm saying, please let me know.

2           My name is Linda Moreno, and I have the privilege

3   of representing Mr. Mohamud.  I will be asking a few of you

4   some more questions, not all of you; I won't be talking to

5   all of you.  I'm going to try to do this as expeditiously as

6   possible, but what I need from you, what's important is that

7   you -- we have a real dialog, that you tell me what your

8   thoughts are in the particular questions that I'm going to go

9   into because only you know what's really in your heart, and

10  we are all here entitled to know on this day, in this

11  courtroom, what is in your heart with respect to certain

12  questions.

13          So as his Honor told you, I have no intention to

14  embarrass you or to be unduly intrusive, but -- but my -- the

15  gentlemen here have a right to know, just as you would, if

16  this is the right case for -- for you to sit on.  There are

17  no right or wrong answers here; nothing that you say is

18  wrong.  We're just looking for honesty, for candor, for you

19  to tell us how you really feel.

20          And the other thing about this process is any of

21  you who hear a juror say something that you want to comment

22  on or something that I've said, just raise your hand because

23  I want it to be a collaborative, dynamic process as much as

24  possible.  All right?  We know the ground rules.

25          So with that said, I understand that speaking in

1   front of a bunch of strangers, especially in front of a bunch

2   of strange lawyers, is not an easy thing to do, but it's my

3   job to ask you to please do that.  So as I said, I'm not

4   going to speak to everyone, and really I'm going to focus my

5   inquire on either answers you gave to his Honor or some

6   answers that you gave in the questionnaire.  And so I'd like

7   to start with Ms. Farkas.  Good afternoon.

8              PROSPECTIVE JUROR:  Good afternoon.

9              MS. MORENO:  Can you hear me?

10             PROSPECTIVE JUROR:  I can hear you very well.

11             MS. MORENO:  Thank you.  All right.

12             THE COURT:  Excuse me.  If either of the

13  interpreters has any difficulty hearing -- because I know Ms.

14  Moreno may have her back to you -- please let me know; raise

15  your hand or stand up or --

16             THE INTERPRETER:  Thank you, your Honor.  We

17  appreciate it.

18             THE COURT:  -- and we'll let her know, sir.  Thank

19  you.

20             MS. MORENO:  Thank you.  There you are.  So when

21  you got the questionnaire -- and this is to everyone -- when

22  you got the questionnaire, Ms. Farkas, you knew that it was

23  important to be as candid as possible in the questionnaire?

24             PROSPECTIVE JUROR:  Yes.

25             MS. MORENO:  Is that fair?

```
 1            PROSPECTIVE JUROR:  Yes, it is.

 2            MS. MORENO:  And the reason you knew that, well,

 3    one you signed an oath to be truthful, correct?

 4            PROSPECTIVE JUROR:  Correct.

 5            MS. MORENO:  And, in fact, you gave us some very

 6    interesting answers to some of the questions, so I need to

 7    explore a little bit of that with you, all right?  I think

 8    that in one of the questions -- and I'm going to refresh your

 9    recollection --

10            THE COURT:  Ms. Moreno, excuse me.  We have one

11    juror who's having difficulty hearing you.

12            PROSPECTIVE JUROR:  When you're facing that way, I

13    can't hear you.

14            THE COURT:  It's a big courtroom, Ms. Alise We're

15    happy to give you a lapel mike.

16            MS. MORENO:  That could be dangerous, your Honor,

17    but I'll take it.

18            THE COURT:  Use the lectern.  You can maybe move

19    one of those mikes around a little bit.

20            MS. MORENO:  You can now hear me.  I won't be

21    singing for you though; I'm not going there.  All right.

22    Down to the really serious business here -- and this is for

23    us extremely serious -- you were asked in the questionnaire

24    "Do you have any experiences, feelings, impressions, or

25    beliefs about the United States's response to terrorism that
```

1   would make it difficult for you to listen with an open mind

2   and render a verdict based solely on the evidence presented

3   in court and the judge's legal instructions?"  And you

4   checked "Yes," and you said "I think we are being far too

5   fair in most cases."  And I'm assuming that you -- you really

6   thought about that answer; is that fair?

7           PROSPECTIVE JUROR:  It's fair.

8           MS. MORENO:  Okay.  And, in fact, his Honor did

9   question you a little bit about that, and I was writing

10  notes, and you said -- you used words like you -- and

11  remember what I said, there are no wrong answers.  And I can

12  tell that you're an opinionated person like we all are, and

13  I'm not asking you to defend your opinions, I'm just asking

14  you how you feel about them, all right?  So you said -- you

15  used words like "too tolerant"  I think when you were talking

16  to the Court, that a lot of Americans feel the need to be

17  stronger, not giving in to demands --

18          PROSPECTIVE JUROR:  Uh-huh.

19          MS. MORENO:  -- and what we need to know -- and of

20  course we all want to be perceived as being fair --

21          PROSPECTIVE JUROR:  Of course.

22          MS. MORENO:  -- but we're not.  We are in some

23  situations; would you agree?

24          PROSPECTIVE JUROR:  Of course.

25          MS. MORENO:  And in other situations we're not

1    because we are flawed human beings, and so some cases would

2    be good for some jurors and other cases would not.  And would

3    you agree with me that in a case that has charges that are

4    related to terrorism, this is a very -- can be a very

5    emotional issue for jurors.  And it does -- and listen

6    because I'm going to be asking other jurors about this -- and

7    it does inspire strong feelings; would you agree with me?

8              PROSPECTIVE JUROR:  I would agree.

9              MS. MORENO:  When you wrote your questionnaire, you

10   expressed strong feelings; is that fair?

11             PROSPECTIVE JUROR:  Fair.

12             MS. MORENO:  And when his Honor was questioning

13   you, you -- you continued, and you talked about how in your

14   view we're a little perhaps too tolerant about what's going

15   on in the area of terrorism?

16             PROSPECTIVE JUROR:  Correct.

17             MS. MORENO:  I take you back to the question

18   because you were asked "Would it make it difficult for you to

19   listen with an open mind on this case," and you said "Yes."

20   And I don't think your opinion has changed, has it, from an

21   hour ago or two hours ago; is that fair?

22             PROSPECTIVE JUROR:  Maybe I jumped on that a little

23   too fast.  I feel I can judge this fairly as a juror in this

24   particular case.  Not that I'm backtracking, I just feel that

25   so often when we hear things through the media, and what we

1   see has to do with extremist Muslims, that it brings us to a

2   boil on the surface, and that makes us feel extreme emotion.

3   To me, this isn't about extremists, but I believe my feelings

4   here would be fair.  When I was filling out the

5   questionnaire, of course I was thinking of extremists, and

6   all Muslims of course are not extremists.

7                MS. MORENO:  May I ask you though, but in --

8                PROSPECTIVE JUROR:  Of course.

9                MS. MORENO:  -- in some of these questions you were

10   just asked about Muslims, you weren't asked about extremists;

11   do you remember that?

12               PROSPECTIVE JUROR:  Yes.

13               MS. MORENO:  And in your response -- for instance,

14   you were asked what's your view, if any, of the Muslim or

15   Islamic faith, and what you said was "I think most are good

16   people, but they don't feel women are equal to men."

17               PROSPECTIVE JUROR:  Correct.

18               MS. MORENO:  So who is the they in that sentence?

19               PROSPECTIVE JUROR:  Muslims generally.

20               MS. MORENO:  Muslims generally?

21               PROSPECTIVE JUROR:  Correct.

22               MS. MORENO:  And so that's a perception that you

23   have?

24               PROSPECTIVE JUROR:  Yes, right.

25               MS. MORENO:  All right.  And you know that all of

1   the gentlemen seated at this table are all Muslim?

2              PROSPECTIVE JUROR:  Yes.

3              MS. MORENO:  And so I guess you have a variety of

4   opinions -- by the way, which may be shared by others, which

5   is perfectly fine --

6              PROSPECTIVE JUROR:  Right.

7              MS. MORENO:  -- because I don't think you know any

8   Muslims, do you?

9              PROSPECTIVE JUROR:  I do.

10             MS. MORENO:  Oh, you do.  That's right.  How is it

11  that you have contact with them again?

12             PROSPECTIVE JUROR:  Through some business and just

13  generally through vendors that I deal with.

14             MS. MORENO:  Oh, that's right.  Cab drivers you

15  said, et cetera?

16             PROSPECTIVE JUROR:  Uh-huh.

17             MS. MORENO:  Okay.  And you also put socially.  How

18  is that?  Do you have any friends who are Muslims?

19             PROSPECTIVE JUROR:  Friends of friends, not close

20  friends of mine.

21             MS. MORENO:  Okay.  In question 18, the next

22  question, you were asked "Is there anything about Islamic

23  teachings or doctrine that is personally offensive to you?"

24             PROSPECTIVE JUROR:  Uh-huh.

25             MS. MORENO:  And you said "Yes," and you said that

1  they can be taught at an early age to hate and that anyone

2  who doesn't agree with their doctrine is an infidel.

3          PROSPECTIVE JUROR:  Uh-huh.

4          MS. MORENO:  Now, in this case I dare say that

5  there will be evidence about Islam and about terrorism,

6  sharia law, his Honor mentioned al-Qaeda yesterday.  How can

7  we feel confident that, given that milieu of what's coming

8  and given your answers, that you really could be fair, that

9  you could put these opinions aside and sort of really you'd

10  have to back away from what you wrote here.

11          PROSPECTIVE JUROR:  Well, as the judge mentioned,

12  you're supposed to judge just what's going on in this

13  courtroom.

14          MS. MORENO:  Right.  That's right.

15          PROSPECTIVE JUROR:  Correct.

16          MS. MORENO:  Yes, that's right, but -- that's

17  absolutely, right.  But some of us can't do that.

18          PROSPECTIVE JUROR:  Well, you have to.

19          MS. MORENO:  Well, and what I'm saying to you is

20  that I think that some people, a lot of people, me included,

21  have strongly held opinions and beliefs.

22          PROSPECTIVE JUROR:  Uh-huh.

23          MS. MORENO:  And it would -- I could not put them

24  aside.  Are you saying you could put your opinions and

25  beliefs aside?

 1          PROSPECTIVE JUROR:  I hope I can.

 2          MS. MORENO:  Well, that's a great answer.  I

 3    appreciate that.  "I hope I can."  So you kind of believe so;

 4    is -- would that be fair?

 5          PROSPECTIVE JUROR:  I believe so.

 6          MS. MORENO:  But what if we asked you, you have to

 7    express an unequivocal commitment?  It's a tough standard,

 8    right?  Do you agree?

 9          PROSPECTIVE JUROR:  I agree.

10          MS. MORENO:  To being fair?

11          PROSPECTIVE JUROR:  I agree.

12          MS. MORENO:  And I think that that's what the law

13    requires.  Given your answers -- and I hope you don't think

14    I'm picking on you because --

15          PROSPECTIVE JUROR:  No, not at all.

16          MS. MORENO:  -- please forgive me.  I'm just --

17    it's important that we do this, and soon I'll be going on and

18    torturing someone else.

19          PROSPECTIVE JUROR:  No, I don't, I don't find it

20    torture at all.

21          MS. MORENO:  I appreciate that.  I appreciate that.

22    But can you really tell us that you could do that and have an

23    unequivocal commitment to being fair?

24          PROSPECTIVE JUROR:  Well, the only way I can base

25    it is I hope that someone could do that if I was in their

1    position.

2              MS. MORENO:  I think that's a terrific answer, but

3    it sort of begs the question because to say that you hope you

4    could do it -- I think what I need to know is -- and if you

5    can't do it and if I'm not being fair, please tell me -- but

6    I don't think you can tell us unequivocally that you could be

7    fair given -- given -- given some, you know, widely held

8    opinions and beliefs about terrorism and et cetera in this

9    country and Islam.

10             PROSPECTIVE JUROR:  Well, ma'am, if you feel you

11   know me better than I do, so be it.

12             MS. MORENO:  No --

13             PROSPECTIVE JUROR:  I just feel that I could do it.

14             MS. MORENO:  Okay.

15             PROSPECTIVE JUROR:  Okay.

16             MS. MORENO:  All right.  Thank you.

17             PROSPECTIVE JUROR:  You're welcome.

18             MS. MORENO:  Mr. Breier, hi.

19             PROSPECTIVE JUROR:  Hi.

20             MS. MORENO:  You're next.  Mr. Breier, thank you

21   for your -- you have your mike?

22             PROSPECTIVE JUROR:  Yes, ma'am.

23             MS. MORENO:  Thank you for your service to our

24   country, Mr. Breier.

25             PROSPECTIVE JUROR:  Thank you.

 1                 MS. MORENO:  I have some questions to ask you which

 2     I think if you were sitting in my client's position you would

 3     want me to ask, and that is --

 4                 PROSPECTIVE JUROR:  Sure.

 5                 MS. MORENO:  -- you have what I call the trifecta

 6     of radio listening hosts, and that would be Rush Limbaugh,

 7     Sean Hannity, and Roger Hedgecock; is that fair?

 8                 PROSPECTIVE JUROR:  That's fair.

 9                 MS. MORENO:  Okay.  Now, is it fair to say that Mr.

10     Limbaugh and Mr. Hannity are conservative voices in our

11     democracy, and they also have very strong negative opinions

12     about Islam; is that fair?

13                 PROSPECTIVE JUROR:  That's fair.

14                 MS. MORENO:  Okay.  Mr. Hedgecock I don't know as

15     much, but he is also a conservative voice, correct?

16                 PROSPECTIVE JUROR:  Yes, yes.

17                 MS. MORENO:  But certainly Mr. Limbaugh has been

18     quite incendiary about his comments regarding Muslims,

19     correct?

20                 PROSPECTIVE JUROR:  Correct.

21                 MS. MORENO:  And Mr. Hannity has also been quite

22     vocal about Islam and in a very negative way; is that fair?

23                 PROSPECTIVE JUROR:  Yes.

24                 MS. MORENO:  And so I guess my obvious question to

25     you is how does that impact your view?

 1              PROSPECTIVE JUROR:  I don't think it impacts it at

 2      all.  I listen to talk radio, and conservative hosts pretty

 3      much all that's on.  I do have Sirius talk radio.  I like to

 4      listen to both sides of an opinion, so that's why I watch a

 5      lot of CNN and I also watch Fox, but really radio-wise,

 6      that's -- that's pretty much what's on in my car when I'm

 7      driving.  There's also a good mix of sports talk radio in

 8      that too.

 9              MS. MORENO:  So when you hear Rush Limbaugh talk

10      about Imam Obama, right, in referring to our president --

11              PROSPECTIVE JUROR:  Okay.

12              MS. MORENO:  -- and that he's a Muslim -- I mean

13      you've heard him say things like that.

14              PROSPECTIVE JUROR:  I have, yeah, and I think it's

15      a pretty ridiculous statement.

16              MS. MORENO:  Right.  You think that's ridiculous?

17              PROSPECTIVE JUROR:  I do.

18              MS. MORENO:  And his statements about Muslims in

19      general and the Quran in general?

20              PROSPECTIVE JUROR:  I -- yeah, I disagree with that

21      point of view --

22              MS. MORENO:  But you --

23              PROSPECTIVE JUROR:  -- mostly.  I agree with their

24      point of view maybe from a more financial side of things and

25      spending things, but socially and a lot of issues I'm very

1   opposite side of.

2          MS. MORENO:  Well, but I see you don't -- you

3   didn't list Rachel Maddow in your listening choices or Jon

4   Stewart or the regular liberal lineup.

5          PROSPECTIVE JUROR:  Well, it's hard to find those

6   on the radio.  San Diego has a lot of conservative talk

7   radio; that just happens to be the stations that I get.

8          MS. MORENO:  I guess what I need to know, sir, if

9   you were sitting at that table and a juror, you, being -- and

10  I think you've identified yourself as a Libertarian, a

11  moderate, an independent -- but there was a potential juror

12  who -- whose choices of listening reflected very poorly on

13  your faith, let's say, how could we be comfortable with that?

14  I mean what -- do you understand what I'm asking?

15         PROSPECTIVE JUROR:  I understand what you're

16  asking.  I mean the perception would be out there; I admit to

17  that.  But I don't know what else I can say.  I'm very -- I

18  think I'm well-rounded with the media outlets that I look at.

19  I do occasionally look at -- watch Rachel Maddow on MSNBC,

20  but I'd say I lean more to the right, so that's primarily why

21  I more gravitated towards the -- those stations.

22         MS. MORENO:  Why do you think you would be a good

23  juror in this kind of a case?

24         PROSPECTIVE JUROR:  I think I'm incredibly

25  impartial because I do listen to both sides of every

1    argument, I never take anything at face value.  That's why I

2    listen to such -- I do listen to a wide variety of stations.

3              MS. MORENO:  And is there some life experiences

4    that have formed your opinion that you're -- you listen to

5    both sides?

6              PROSPECTIVE JUROR:  It's just kind of who I've

7    always been.  I don't know.  I've always tried to hear both

8    sides of a story.

9              MS. MORENO:  Okay.  What do you -- what's your view

10   on sharia law?

11             PROSPECTIVE JUROR:  I don't know enough about it to

12   be honest with you.  When I hear things about implementing

13   sharia in the United States, I think we have a constitution,

14   and that's what we should go by.  But outside of the United

15   States I don't have an opinion.

16             MS. MORENO:  Okay.  And do you know anything about

17   sharia law?

18             PROSPECTIVE JUROR:  I don't know much at all, no.

19             MS. MORENO:  Okay.  And so if the government, if

20   the prosecutor in this case mentions discusses brings

21   evidence of sharia into this case, what kind of an effect

22   would that have on you?

23             THE COURT:  Well, I hope you're not asking him to

24   prejudge the --

25             MS. MORENO:  No, your Honor.

1              PROSPECTIVE JUROR:  Like I said, I don't really

2     have much -- I don't know many facts of sharia law, so I

3     would just have to take the evidence, what's presented to me

4     and go off that.

5              MS. MORENO:  Okay.  Is there anything else we

6     should know about you, Mr. Breier, that would be helpful --

7              PROSPECTIVE JUROR:  That will --

8              MS. MORENO:  -- in assisting us in making a fair

9     determination for our clients?

10             PROSPECTIVE JUROR:  I don't -- I don't know.  I

11    can't think of anything, no.

12             MS. MORENO:  Okay.  Thank you.  Sorry.  I'm getting

13    miked up.  Ms. Stahl, Elizabeth -- there you are.  Hi.

14             PROSPECTIVE JUROR:  Hello.

15             MS. MORENO:  I just want to ask you a few

16    questions.  In your answers I think you self-identified as a

17    Christian conservative; is that fair?

18             PROSPECTIVE JUROR:  Yes.

19             MS. MORENO:  Would that be fair?

20             PROSPECTIVE JUROR:  Conservative.

21             MS. MORENO:  I think you checked the --

22             PROSPECTIVE JUROR:  Christian, I checked Christian

23    conservative.

24             MS. MORENO:  And why did you do that?

25             PROSPECTIVE JUROR:  Because I'm a Christian --

1          MS. MORENO:  Okay.

2          PROSPECTIVE JUROR:  -- And I'm a conservative.

3          MS. MORENO:  Okay.  I mean how obvious is that,

4     right?  I guess what I -- what we need to know is you also

5     talked about the places where you get your news --

6          PROSPECTIVE JUROR:  Yes.

7          MS. MORENO:  -- and the only place that you

8     indicated was Fox News.

9          PROSPECTIVE JUROR:  My husband watches that all the

10    time, so that's what I watch.

11         MS. MORENO:  Okay.  And then you were asked what

12    station and shows do you listen to, and you indicated Bill

13    O'Reilly.

14         PROSPECTIVE JUROR:  My husband.

15         MS. MORENO:  All right.  Well, what do you watch?

16    That's what we need to know.

17         PROSPECTIVE JUROR:  I watch -- we don't really

18    watch much TV.

19         MS. MORENO:  Okay.

20         PROSPECTIVE JUROR:  But I like The Closer --

21         MS. MORENO:  Me too.

22         PROSPECTIVE JUROR:  -- until she left.

23         THE COURT:  Well, we're not asking for general --

24         MS. MORENO:  Right.

25         THE COURT:  -- Television here or entertainment.  I

1    think the question --

2              PROSPECTIVE JUROR:  I like criminals or murders or

3    detectives.

4              MS. MORENO:  Okay.  You indicated that you had had

5    personal contact with Muslims; you said in school.

6              PROSPECTIVE JUROR:  It was a travel agent school.

7    I don't really know if she was Muslim.  She was from

8    Afghanistan, so I don't know, Muslim, Afghanistan, and she

9    wasn't in my class.

10             MS. MORENO:  All right.

11             PROSPECTIVE JUROR:  And I also forgot -- I think I

12   had a neighbor, but he moved --

13             MS. MORENO:  Okay.

14             PROSPECTIVE JUROR:  But we weren't -- just hi.

15             MS. MORENO:  Did she cover?

16             PROSPECTIVE JUROR:  Excuse me?

17             MS. MORENO:  Do you know if --

18             PROSPECTIVE JUROR:  Well, the husband -- it was the

19   husband.  Oh, in my travel agent class?

20             MS. MORENO:  Yes, ma'am.

21             PROSPECTIVE JUROR:  Yes, she did.

22             MS. MORENO:  All right.  Do you have any particular

23   view of -- you may see in this case -- if you're picked to

24   sit on this jury, you may see in this case either witnesses

25   or audience members, females, who dress modestly and cover

1  wearing a head scarf.  Would that affect your view of your

2  ability to be fair and impartial in this case?

3          PROSPECTIVE JUROR:  Not at all.

4          MS. MORENO:  What kind of reaction would you have

5  to that?

6          PROSPECTIVE JUROR:  To affect me?

7          MS. MORENO:  Uh-huh.

8          PROSPECTIVE JUROR:  If they didn't have anything on

9  or something.

10          MS. MORENO:  If they were naked.  Help me.  Okay.

11          THE COURT:  You know what they say:  The hole's

12  pretty deep, and you have the shovel in your hand.

13          MS. MORENO:  Moving on.  All right.  Ms. Smith,

14  Susan Smith.  Hi.  How are you?

15          PROSPECTIVE JUROR:  I'm good.

16          MS. MORENO:  All right.  So I need to go back to

17  one of the answers that you wrote in the questionnaire.  And

18  I hope you can appreciate that I'm not --

19          PROSPECTIVE JUROR:  Absolutely.

20          MS. MORENO:  Berating it.  Is it all right if I ask

21  you about that?

22          PROSPECTIVE JUROR:  Oh, absolutely.

23          MS. MORENO:  Okay.  So you were asked what's your

24  view of the Muslim or Islamic faith, and you wrote "Concerns

25  about killing in the name of their god."  And then you were

1   asked "How did you come to that view?"  And you said "Life."

2             PROSPECTIVE JUROR:  Correct.

3             MS. MORENO:  So what did you mean?  What life

4   experience has brought you --

5             PROSPECTIVE JUROR:  Oh, right.  Sorry.  Go ahead.

6             MS. MORENO:  No, no.

7             PROSPECTIVE JUROR:  Not my life, just when the --

8   his Honor was asking, it has to do with the news that is

9   broadcast, that there are so many times when there is a

10  terrorist attack on some place that it turns out or the news

11  reports that it has been -- had something to do with the name

12  of Mohammad.  I'm not -- I don't know the religion, and as I

13  stated earlier, I'm not a religious person, but doing

14  something that I would consider most of the world thinking is

15  a bad thing in the name of a god, whatever that god is,

16  doesn't make sense to me.

17            MS. MORENO:  Thank you for that answer.  Do you

18  have an opinion or a view or is it your impression that

19  Muslims have a different god than Christians?  And I ask you

20  this because you wrote "their god," so that's why I'm asking.

21            PROSPECTIVE JUROR:  And, honest, I don't know

22  because, again, I'm not -- I'm not a religious person, so I

23  don't know -- I hear -- and, again, this is just what I

24  hear -- is that their god is Mohammad, and I don't even know

25  if that's Muslim or if that's a different religion, to be

1  honest.  And so they're calling -- they've got a name for

2  their god as compared to god that is more recognizable in

3  regards to the Christian religion.

4       MS. MORENO:  Okay.  Let me just switch gears a

5  little bit and just ask you about your answer regarding

6  believing a law enforcement officer over other witnesses.

7  You answered "No," and then you said "Depends on

8  circumstances.  I would hope every law enforcement officer's

9  honest, but can't say I always believe them."  So is it fair

10 to say from that answer that you don't automatically believe

11 a law enforcement officer over any other -- any other

12 witness?

13      PROSPECTIVE JUROR:  No, I -- again, it would

14 depend -- I mean it would depend on what they're answering

15 the question to.  If they -- I would think that they're as

16 honest as anybody else, and I would think that anybody else

17 up there that's sworn to tell the truth is telling the truth.

18 But I don't think one is more prominently honest than the

19 other.  I think --

20      MS. MORENO:  Okay.

21      PROSPECTIVE JUROR:  -- they're all the same.

22      MS. MORENO:  Okay.  All right.  Thank you.  Juror

23 number 8, Lupe Flores.  Hi.  I wanted to explore a couple of

24 your answers --

25      PROSPECTIVE JUROR:  Okay.

1             MS. MORENO:  -- on this same question that I've

2    been asking others about.  You were asked, "Is there anything

3    about Islamic teachings or doctrine that you're aware of that

4    is personally offensive to you" --

5             PROSPECTIVE JUROR:  Uh-huh.

6             MS. MORENO:  -- and you said "Yes."  And then you

7    wrote "Not really personally because I know there are

8    extremists.  I believe that they have a right to their faith

9    and beliefs, but harming anyone is offensive, whatever."

10   That doesn't explain so well --

11            PROSPECTIVE JUROR:  That was --

12            MS. MORENO:  Okay.  So you were working your way

13   through it, right?

14            PROSPECTIVE JUROR:  When I answered -- wait a

15   minute.  Let me answer you.  Is it -- me personally --

16   offensive to me.  And as I said in the other questions, I

17   believe that -- I mean I know that all religions have harmed,

18   have -- so -- and it was really a tough one and it was also

19   tough -- really tough for me to on the spot formulate an

20   answer and express it with clarity.

21            MS. MORENO:  You indicated on -- again, about if

22   you believe that Muslims generally support terrorist acts

23   carried out in the name of their religion, you didn't say yes

24   or no, but what you said was "Not generally, but some do."

25   What did you mean by that?

1              PROSPECTIVE JUROR:  Right.  Well, I think that

2    there are small groups that do, and I've lived long enough to

3    know that -- you know, I remember when I would hear the same

4    sorts of things in the news about Protestants and Catholics

5    in Ireland and England, and so I think just like there's

6    small factions there that I've heard the same things in the

7    news currently and more recently in -- not -- as I say, not

8    as a general, not as a whole.

9              MS. MORENO:  So I guess what we need to know, now

10   that you've heard the indictment that his Honor read

11   yesterday and you know that the gentleman at the table are

12   all Muslim and they're being charged in various counts with

13   terrorism-related charges, and given what is widely shared --

14   many people have similar impressions -- tell us about your

15   ability to be fair and impartial in this kind of a case.

16             PROSPECTIVE JUROR:  Well, I don't think that their

17   religion has anything to do with what the charges are and

18   those being proven.  I mean it's did this criteria -- was

19   this criteria met --

20             MS. MORENO:  Okay.

21             PROSPECTIVE JUROR:  -- or not is what I'm going to

22   be answering to, not the fact that they're Muslim and the

23   criteria -- I mean that's not going to be weighed.

24             MS. MORENO:  Okay.  All right.  Thank you so much.

25   Juror number 29, Michael Crowell.  Hi.  So I like this

1    question 4 because it asks jurors to choose who they identify

2    with politically, and you put moderate and you put

3    traditional conservatives.  One juror put all of them, which

4    I'm still trying to get through, but --

5             PROSPECTIVE JUROR:  I think on certain issues I'm

6    more of a moderate, and then on probably more of a business

7    and finance, it's more of a conservative.

8             MS. MORENO:  Okay.  I think in your response to his

9    Honor's colloquy earlier -- and he was touching upon some of

10   these issues -- I think you talked about family, religion,

11   and culture; do you remember that answer?

12            PROSPECTIVE JUROR:  Yes.

13            MS. MORENO:  What -- can you expand on that a

14   little bit for us?

15            PROSPECTIVE JUROR:  Well, just some of the, you

16   know, things I've read about it, it's more the -- it's more

17   of a cultural thing probably than a religion, but typically

18   your family is number 1, and then your village or perhaps but

19   definitely your country is sort of your last, you know,

20   belief that you're -- you hold your beliefs last to your

21   country.

22            MS. MORENO:  Are you talking about in the context

23   of a person who is Muslim?

24            PROSPECTIVE JUROR:  Or people that come from that

25   culture.  Muslim is more prominent.

1          MS. MORENO:  I'm sorry.  From like Somali or

2     African culture; is that what --

3          PROSPECTIVE JUROR:  Yes.

4          MS. MORENO:  And I think his Honor asked you if

5     given your answers, what you wrote, if any of that would

6     impact your ability to be fair and impartial, and I think you

7     said that you didn't believe so; is that fair?

8          PROSPECTIVE JUROR:  That's fair, yes.

9          MS. MORENO:  I mean is there any hesitation in your

10    mind; do you have any --

11         PROSPECTIVE JUROR:  No.  I think I just have a --

12    hopefully a better understanding of what some of the cultural

13    issues are there.

14         MS. MORENO:  You have a better understanding?

15         PROSPECTIVE JUROR:  I think I do.

16         MS. MORENO:  And tell us why.

17         PROSPECTIVE JUROR:  Just from reading the news,

18    keeping abreast of issues, that type of thing.

19         MS. MORENO:  And with that understanding, is there

20    anything that we should -- we, the defense -- should be

21    concerned about or should know with the opinions that you

22    hold now after -- after of a reading and --

23         PROSPECTIVE JUROR:  I don't believe so, but that's

24    my opinion.

25         MS. MORENO:  No, and it's only your opinion that

1  matters because only you can tell us how you really think and

2  feel.  All right.  Thank you, sir.  Juror number 36, Monica

3  Clark.

4          PROSPECTIVE JUROR:  Yes, ma'am.

5          MS. MORENO:  Hi.  I think his -- when his Honor was

6  talking to you, he asked you the question about your answer

7  to the question about law enforcement officers.

8          PROSPECTIVE JUROR:  Yes.

9          MS. MORENO:  And I was listening very intently to

10  your answer, and I think what you said was -- and correct me

11  if I'm wrong -- they do tell the truth, the witness takes the

12  oath to tell the truth, and they tell their truth; do you

13  remember?

14          PROSPECTIVE JUROR:  Not quite -- what I meant is

15  when you are sworn in, you are obligated, you're supposed to

16  tell the truth.

17          MS. MORENO:  Right.

18          PROSPECTIVE JUROR:  It's at least what our system

19  is based on.  I don't think that policemen tell a better

20  truth or anything like that or more truthful or whatever.

21          MS. MORENO:  Okay.  So can you accept the scenario

22  that perhaps a law enforcement officer, an FBI agent, can get

23  on the stand, take the oath to tell the truth and not do

24  that?

25          PROSPECTIVE JUROR:  That's why I said I don't think

1  they tell a better truth or more truth.  I just think that

2  they are supposed to, they are sworn to tell the truth.

3          MS. MORENO:  Right.  Would you have any problems

4  judging the credibility of an FBI agent or a law enforcement

5  officer -- I mean and if you felt they were lying --

6          PROSPECTIVE JUROR:  No, that's our -- I think

7  that's what we are supposed to be doing.

8          MS. MORENO:  Okay.  And do you have any hesitation

9  or any problems with about that?

10          PROSPECTIVE JUROR:  No, ma'am.

11          MS. MORENO:  Okay.  Is there anything else that we

12  should know about you with respect to the questions that I've

13  been asking other jurors?

14          PROSPECTIVE JUROR:  No, ma'am.

15          MS. MORENO:  Okay.  Thank you.  Juror number 30,

16  Roger Brenzel.  Hi, Mr. Brenzel.  You had prior jury

17  experience; is that right?

18          PROSPECTIVE JUROR:  Yes, I was on one trial.

19          MS. MORENO:  Sorry?

20          PROSPECTIVE JUROR:  I was actually on two trials.

21  I don't remember the first one I was on; I was an alternate,

22  wasn't part of the jury deliberation.

23          MS. MORENO:  You weren't part of the deliberation?

24          PROSPECTIVE JUROR:  No.

25          MS. MORENO:  Do you remember what kind of case that

1   was?

2          PROSPECTIVE JUROR:  It was so long ago, I don't

3   remember.

4          MS. MORENO:  And the second trial?

5          PROSPECTIVE JUROR:  What kind of case it was?

6          MS. MORENO:  Yes.

7          PROSPECTIVE JUROR:  It had to do with an inmate

8   that had died at one of the detention facilities, local ones,

9   and they were trying to prove that the sheriffs either

10  contributed to it or killed him or whatever, and they

11  couldn't prove it.  I'm not -- we didn't see it, the jury

12  didn't.

13         MS. MORENO:  Okay.  Was there anything about that

14  experience that is now inspiring you to serve yet again on

15  another trial or do you want to run out of here?

16         PROSPECTIVE JUROR:  A little bit of both.

17         MS. MORENO:  Thank you.  I appreciate -- I

18  appreciate the answer.  Tell us about that.

19         PROSPECTIVE JUROR:  What, about running out or

20  staying?  I find it interesting, but I'm not a very social

21  person, and it's just -- I'm kind of an introvert.

22         MS. MORENO:  All right.  But the principle -- that

23  brings up an interesting point.  If you're picked on a jury,

24  you understand that part of your duties would be to

25  deliberate with other jurors?

1              PROSPECTIVE JUROR:  Yes.

2              MS. MORENO:  And my sense is now you've done that

3    once already; is that right?

4              PROSPECTIVE JUROR:  Yes, we did.

5              MS. MORENO:  Okay.  And you could do that easily --

6              PROSPECTIVE JUROR:  Oh, yes.

7              MS. MORENO:  -- correct?

8              PROSPECTIVE JUROR:  Yes.

9              MS. MORENO:  Is there anything else we should know

10   about you?

11             PROSPECTIVE JUROR:  I don't think so, no.

12             MS. MORENO:  -- that my client, any of these

13   gentlemen, should know about you, sir?

14             PROSPECTIVE JUROR:  No.

15             MS. MORENO:  Do you think you can be fair and

16   impartial?

17             PROSPECTIVE JUROR:  Yes.

18             MS. MORENO:  Is there any question in your mind?

19             PROSPECTIVE JUROR:  No.

20             MS. MORENO:  Thank you.  Alice Young.  Sorry to be

21   skipping around.  Hi.  Okay.  How are you?

22             PROSPECTIVE JUROR:  Good.  How are you?

23             MS. MORENO:  I'm good.  I have my microphone and

24   I'm all right.  You answered a particular -- I'm going to ask

25   you about some of your answers in the questionnaire.  You

 1   were asked if you knew any of the trial participants in this

 2   case, and names were listed, and you said if I have, I've

 3   forgotten.  So I don't think you know or have remembered --

 4              PROSPECTIVE JUROR:  No, I do not.

 5              MS. MORENO:  -- any media about this case; is that

 6   correct?

 7              PROSPECTIVE JUROR:  Correct.

 8              MS. MORENO:  Is that correct?  I'm sorry.

 9              PROSPECTIVE JUROR:  Yes.

10              MS. MORENO:  Okay.  And then you were asked if you

11   saw, read, or heard anything about this case, what was your

12   personal reaction to it, and you indicated "Very sad to see

13   these things happening in our country."  Do you remember

14   writing that?

15              PROSPECTIVE JUROR:  Yeah.  What was the question

16   again?

17              MS. MORENO:  I'll restate it.  You were asked if

18   you saw, read, or heard anything about this case, what was

19   your personal reaction to it -- that was the question -- and

20   you wrote "Very sad to see these things happening in our

21   country."

22              PROSPECTIVE JUROR:  Yeah.

23              MS. MORENO:  Okay.  So the question was asking you

24   about this case, and you talked about these things happening

25   in our country which make you sad.

```
 1              PROSPECTIVE JUROR:  Right.

 2              MS. MORENO:  So what were you --

 3              PROSPECTIVE JUROR:  Which is what you hear on the

 4    news.

 5              MS. MORENO:  Okay.  And what things do you hear on

 6    the news that you're referring to?

 7              PROSPECTIVE JUROR:  Well, just all the killings

 8    going on, you know, around the country, and, you know, like

 9    9-11, those type of things.

10              MS. MORENO:  Okay.  Is there -- do you -- when you

11    brought up 9-11 just now, was there a -- besides how it

12    affected all of us --

13              PROSPECTIVE JUROR:  Yes.

14              MS. MORENO:  -- in this country, was there another

15    more personal connection --

16              PROSPECTIVE JUROR:  No.

17              MS. MORENO:  -- that you had to it?

18              PROSPECTIVE JUROR:  No.

19              MS. MORENO:  Okay.  And do you know any Muslims?

20              PROSPECTIVE JUROR:  No.

21              MS. MORENO:  What have you been thinking -- sitting

22    here and listening to the indictment and these charges and

23    al-Qaeda references that may come in, sharia law, terrorism,

24    al-Shabaab, what have you been thinking?

25              PROSPECTIVE JUROR:  Well, you know, like I said, I
```

1   hate to see these things happening, you know, to our country,

2   but I think I can, you know, be honest.

3           MS. MORENO:  Okay.  And there's no doubt; remember,

4   there's no right or wrong answers --

5           PROSPECTIVE JUROR:  No.

6           MS. MORENO:  -- it's just, as you say, just being

7   honest?

8           PROSPECTIVE JUROR:  Right.

9           MS. MORENO:  But I guess what we need to know is in

10  this case we're not talking about 9-11.

11          PROSPECTIVE JUROR:  No, I know that.  I know that.

12          MS. MORENO:  Okay.  Is there something about though

13  this case that troubles you in a sense just hearing the

14  charges in the indictment?

15          PROSPECTIVE JUROR:  Yeah, maybe it does.

16          MS. MORENO:  Okay.  I really I know how hard this

17  is; it's very hard --

18          PROSPECTIVE JUROR:  Yes.

19          MS. MORENO:  And jurors are so courageous.  So

20  please share with us what you're thinking.

21          PROSPECTIVE JUROR:  Well, I would hope that I could

22  be -- listen to both sides of the story and, you know, be

23  fair.

24          MS. MORENO:  Okay.  So -- and I'm sure his Honor

25  will so instruct, but in a criminal case, you may not hear,

1    quote, both sides of the story.

2              PROSPECTIVE JUROR:  Uh-huh.

3              MS. MORENO:  So you may not hear anything from the

4    defense because the burden of proof is only and always with

5    the government, okay?

6              PROSPECTIVE JUROR:  Uh-huh.

7              MS. MORENO:  Now, would that be difficult for you

8    to accept because you'd want to hear what the defense has to

9    say?

10             PROSPECTIVE JUROR:  Yeah.

11             MS. MORENO:  Okay.  And lots of people feel that

12   way, all right, and I really appreciate you letting me talk

13   to you about this.  But is it fair to say that if you didn't

14   hear anything from the defense, that that would be difficult

15   for you to put aside?

16             PROSPECTIVE JUROR:  Probably.

17             MS. MORENO:  Okay.  And so jumping back a little

18   bit, with respect to the charges in the case and the things

19   that you've heard referenced or alluded to, can you really

20   tell us that you could be completely fair and impartial in

21   this case?

22             PROSPECTIVE JUROR:  Well, like I said, I hope that

23   I could, you know, because I mean I don't know them from

24   Adam.

25             MS. MORENO:  Of course.  Of course.  But you

 1   understand that in order to be able to sit --

 2               PROSPECTIVE JUROR:  Right, I understand.

 3               MS. MORENO:  -- you have to have an unequivocal

 4   commitment to be fair and impartial.  I guess what I'm

 5   hearing -- and you tell me if I'm wrong -- you don't have

 6   that kind of commitment?

 7               PROSPECTIVE JUROR:  Well, I thought I did when I

 8   came in to all this.

 9               MS. MORENO:  Okay.  And I guess what I need to know

10   is -- so your mind has changed now; would that be fair?

11               PROSPECTIVE JUROR:  Yeah, I guess so.

12               MS. MORENO:  I really appreciate your candor.

13               THE COURT:  If you would hold on, counsel, for just

14   a moment.  Ma'am, we don't -- we don't want you to feel

15   you've got to agree with counsel or disagree with counsel.

16   Her questions are important.  Up until this particular point

17   in time, you've indicated that you can be fair and impartial,

18   that you can base your decision in this case on the evidence,

19   that you accept the constitutional principles I spent quite a

20   bit of time explaining to you and others.  And so I don't

21   want -- if your -- if your mind has changed or upon further

22   reflection, listening to the questions of counsel, you have

23   some doubt as to whether you can be fair and impartial, you

24   have some doubt as to whether or not you can set aside some

25   of those -- some of those feelings that you might have that

1    were reflected in a few of the responses to the

2    questionnaire, then you should tell us.  But don't feel you

3    need to agree with counsel just because of the way she's

4    framing questions or just because of the way the government

5    may be framing questions at a later point in time.  You need

6    to kind of dig down deeply right now and give us your final

7    feeling, your decision as to whether you can be fair and

8    impartial based on what you -- based on what you've been

9    instructed, based on your -- how you know yourself to be,

10    based on everything you've heard in the courtroom.

11        PROSPECTIVE JUROR:  Yeah, I think I could be fair

12    and impartial.

13        THE COURT:  Well, Ms. Moreno's going to -- not

14    going to be happy, particularly with that last answer, and

15    she's going to think well, wait a minute, that you're

16    agreeing with whoever --

17        PROSPECTIVE JUROR:  I think I could.

18        THE COURT:  -- that you're agreeing with whoever

19    happens to be speaking --

20        PROSPECTIVE JUROR:  Yes.

21        THE COURT:  -- at the time.  But I don't want -- I

22    don't want you to feel -- I don't want anyone to feel that

23    they're being led down a primrose path by anybody here, by me

24    or any of the attorneys that may be talking to you.  This is

25    important stuff.  It's important to both sides.  Everybody is

1   entitled to have a fair trial and get a fair shake in terms

2   of the consideration of the evidence and all of that.  So if

3   you're having doubts now about your ability to be completely

4   fair and impartial, tell us.  It's your duty to tell us.  If

5   you're -- if you're ready to make a commitment to be fair and

6   impartial, tell us; if you have any doubt about your ability

7   to fairly sit on the case, tell us that and then we won't

8   take up any more of your time at this point.

9             PROSPECTIVE JUROR:  Well, I'm not sure now, so --

10            THE COURT:  You're just thoroughly confused at this

11   point?

12            PROSPECTIVE JUROR:  I'm confused.

13            THE COURT:  All right.  I'm going to -- I'm going

14   to excuse you, Ms. Young.  I think it's unfortunate the way

15   that -- the way that some of this went for you if in fact you

16   felt an obligation to agree with anyone here.  But if you

17   feel in your heart of hearts that this is not an appropriate

18   case for you, you can't be fair and impartial because of

19   what's happened in the country -- sad things have happened in

20   the country that you made reference to -- then this is not a

21   good case for to you sit on.

22            I'll excuse you for cause.  I'll ask that you just

23   put the microphone down there on the seat.  We'll call

24   somebody else.  We have other jurors.  We'll call somebody

25   else, and then we'll continue on.  And I want to thank you

1    for your time and service.  If you could go back to the jury

2    lounge, they'll have further information about your immediate

3    future.  But I'm going to ask you to go back there.  Okay.  I

4    believe Mr. Rodriguez is next, Gaby.

5             THE CLERK:  Ryan Rodriguez.

6             THE COURT:  Good afternoon, Mr. Rodriguez.  If

7    you'd take a seat there.  Ms. Moreno, I'm just going to take

8    a minute here, so you can remain right there where you are.

9    I know you've got very limited time now, and I'm going to ask

10   Mr. Rodriguez just a few things here.  Mr. Rodriguez, have

11   you heard all of my instructions and the questions that I and

12   counsel have asked so far?

13            PROSPECTIVE JUROR:  Yes, your Honor.

14            THE COURT:  Okay.  Can you be and fair and

15   impartial if selected on this case?

16            PROSPECTIVE JUROR:  Yes, sir.

17            THE COURT:  Have any doubt about that?

18            PROSPECTIVE JUROR:  No, sir.

19            THE COURT:  Okay.  You've heard the areas of

20   concern that I've certainly emphasized, the areas of

21   constitutional and the presumption of innocence and all of

22   the all of the rights that emanate out from that presumption

23   of innocence, including a defendant in a criminal case has an

24   absolute right to decide not to testify and that that can

25   never be construed negatively against a defendant.  You know

1    what some of the -- some of the issues are that we've

2    discussed.  We've talked about the ability of jurors to

3    assess the believability, the credibility, of witnesses by

4    the same standards they would use for all other witnesses,

5    that no one should take the stand with a leg up simply

6    because of the position they hold, whether in law enforcement

7    or not, expert witness or not, someone affiliated with one

8    side of the case or the other.  Can you apply those

9    principles as well?

10              PROSPECTIVE JUROR:  Yes, sir, I can.

11              THE COURT:  Okay.  I'm just going to go through --

12    I'm going to go through your questionnaire here.  You

13    indicated that you've been with the Auto Club, and a question

14    I had was for how long.

15              PROSPECTIVE JUROR:  Six years.

16              THE COURT:  And has it always been in adjusting

17    claims, sir?

18              PROSPECTIVE JUROR:  Yes, sir.

19              THE COURT:  Okay.  And before that?

20              PROSPECTIVE JUROR:  I was in college, food server.

21              THE COURT:  Okay.  In connection with that matter

22    in 1995, did you feel as though you were fairly handled by

23    the justice system?

24              PROSPECTIVE JUROR:  Yes, sir.

25              THE COURT:  Okay.  All right.  Ms. Moreno, if you'd

1    please continue.  And the time really is limited for you at

2    this point.  Thank you.

3            MS. MORENO:  Thank you, sir.  Mr. Rodriguez, let me

4    just quickly -- I have one question for you --

5            PROSPECTIVE JUROR:  Okay.

6            MS. MORENO:  -- with respect to an answer you gave

7    on your questionnaire regarding whether you would believe law

8    enforcement over other witnesses -- and I'm sure you've been

9    listening to the answers -- and you said -- you said "No,"

10   you said "No," and then you said "There are always two sides

11   to every story.  I like to hear and see people as they

12   explain themselves."  Okay.  So remember the discussion I was

13   asking a few minutes ago about the fact that in a criminal

14   case the burden sits with the government --

15           PROSPECTIVE JUROR:  Yes.

16           MS. MORENO:  -- and the defense has no obligation

17   to tell any story, right?  What do you think about that?

18           PROSPECTIVE JUROR:  I understand that.  I

19   understand the judicial system.

20           MS. MORENO:  Okay.  How is it that you understand

21   the judicial system?  Do you have prior jury experience?

22           PROSPECTIVE JUROR:  No.  I've taken some criminal

23   classes through my college education.

24           MS. MORENO:  Okay.  To be what, a defense lawyer?

25           PROSPECTIVE JUROR:  No, not to be on the legal

1  side.  More towards just to learn about the criminalistics,

2  criminal law --

3          MS. MORENO:  Okay.  All right.

4          PROSPECTIVE JUROR:  -- not a lawyer.

5          MS. MORENO:  So when you -- just so I'm clear on

6  your position on the obligation of the government -- don't

7  give it back yet.  Oh, it doesn't work?  Okay.  Sorry.  I can

8  hear you.  Can you hear me?

9          PROSPECTIVE JUROR:  Yes.

10         MS. MORENO:  Would it be difficult for you to

11 accept -- if you're picked as a juror and you hear nothing

12 from the defense -- no evidence, no witnesses, nothing -- you

13 hear only from the government, would it be difficult for you

14 to accept that the defense doesn't have to tell you anything

15 or produce any evidence or any witnesses?

16         PROSPECTIVE JUROR:  Not at all.

17         MS. MORENO:  It's counterintuitive though, isn't

18 it?

19         PROSPECTIVE JUROR:  No.

20         MS. MORENO:  So you have no problems with that?

21         PROSPECTIVE JUROR:  Not at all.

22         MS. MORENO:  Just have a couple more, your Honor.

23         THE COURT:  Okay.

24         MS. MORENO:  Cody (sic) Buckner, juror number 17?

25         PROSPECTIVE JUROR:  Corey.

1              MS. MORENO:  Corey.  I'm so sorry, sir.  Hi.  You

2    had indicated in the questionnaire that you had -- it asks,

3    "Have you had personal contact with people who are Muslims or

4    of Somali descent," and you said "Yes."  And then you -- and

5    then you were asked "In what context?"  And you said "In

6    place of worship."  Do you remember?

7              PROSPECTIVE JUROR:  I think I said in the

8    workplace.

9              MS. MORENO:  May I show him his --

10             THE COURT:  Okay, sure.

11             MS. MORENO:  May I approach him, your Honor?  Would

12   you like to see your answer or would accept my

13   representation?

14             PROSPECTIVE JUROR:  Well, I'm not sure what the

15   question -- the answer to the question --

16             MS. MORENO:  All right.  So I'll ask it again.  You

17   were asked "Have you had personal contact with people who are

18   Muslims or of Somali descent?"  And you said "Yes."

19             PROSPECTIVE JUROR:  Yes.

20             MS. MORENO:  And then it says "If yes, in what

21   context?"  And you were given a number of choices:  In the

22   family, in the neighborhood, in organizations, through work

23   business, in place of worship, in school, and other.  And you

24   checked "In place of worship."

25             PROSPECTIVE JUROR:  Well, that was probably a

1    mistake.  I meant in the workplace.

2            MS. MORENO:  Okay.  Oh, you meant in the workplace?

3            PROSPECTIVE JUROR:  Yes.

4            MS. MORENO:  Okay.  Can you -- can you expand on

5    that?

6            PROSPECTIVE JUROR:  Yes.  One of the ladies that's

7    in human resources is from Turkey, and she and I work closely

8    together.

9            MS. MORENO:  You work closely with her?

10           PROSPECTIVE JUROR:  Yes.

11           MS. MORENO:  Okay.  And is she Muslim?

12           PROSPECTIVE JUROR:  I believe she is, yes.

13           MS. MORENO:  Does she cover?

14           PROSPECTIVE JUROR:  No, she does not.

15           MS. MORENO:  Okay.  All right.  Is there anything

16   about that experience that would affect your ability to be

17   fair and impartial?

18           PROSPECTIVE JUROR:  None whatsoever.

19           MS. MORENO:  All right.  What is -- what is Rod and

20   Gun Club?

21           PROSPECTIVE JUROR:  South Bay Rod and Gun Club?

22   It's a shooting range down in Dulzura.

23           MS. MORENO:  Just a quick moment, your Honor.  Oh,

24   you also -- we asked if you've had any training or taken any

25   courses or seminars, and you checked "Religion."  What can

1   you tell us about that?

2          PROSPECTIVE JUROR:  Well, in our church we have

3   Bible studies.

4          MS. MORENO:  Okay.  All right.  So that's what you

5   were referring to?

6          PROSPECTIVE JUROR:  Yes.

7          MS. MORENO:  Thank you.  Juror number 11, Ron Meza.

8   No?  Am I wrong?

9          MS. FONTIER:  Rosa Meza.

10          MS. MORENO:  Rosa Meza.  I'm so sorry.  So sorry.

11   Ms. Meza, in your questionnaire you were asked if -- "Do you

12   have an opinion whether Muslims are more violent than

13   non-Muslims," and you checked both yes and no, and then you

14   wrote, "Not necessary more violent but consequences of their

15   belief."  Can you just expand on that for us.

16          PROSPECTIVE JUROR:  I think what I meant there,

17   it's not personally not all of them, some of them have belief

18   because of their religion, but it doesn't mean that all of

19   them.  I think it's, you know, what happens, it's like a

20   consequence of what they believe.  I mean they have a reason

21   they have -- they do it because of something their god or

22   whatever, so it's a consequence of their beliefs.

23          MS. MORENO:  I'm just trying to understand what you

24   mean by that.

25          PROSPECTIVE JUROR:  Yeah, me too.  I don't think

```
 1   because they're Muslim they're violent.  I think it would be
 2   like any other religion, any other ethnicity.  They have
 3   their beliefs or their customs or whatever that makes them do
 4   things but not because the person.  I don't know if you know
 5   what I mean.
 6           MS. MORENO:  Okay.  All right.  I appreciate your
 7   answer.  I just -- one final question.  You asked if you had
 8   personal contact with Muslims, and you said "No," and then
 9   you checked "In school."
10           PROSPECTIVE JUROR:  Oh.
11           MS. MORENO:  Do you --
12           PROSPECTIVE JUROR:  No.
13           MS. MORENO:  Have you had any contact --
14           PROSPECTIVE JUROR:  In college.
15           MS. MORENO:  -- or experience with Muslims or
16   Somalis?
17           PROSPECTIVE JUROR:  I think he was Muslim.  He was
18   a student.  We went to school together, but he was a class
19   that we have, a business class.
20           MS. MORENO:  Thank you.  Thank you so much.  May I
21   have a brief moment, your Honor, very brief?  I want to thank
22   the panel members very much.  Very difficult.  We really
23   appreciate your candor.  This is very important.
24           THE COURT:  Ms. Moreno, would you hold up just a
25   moment?
```

1           MS. MORENO:  Yes.

2           THE COURT:  Ms. Meza, I was a little confused by

3  one of your more recent answers to a question posed by Ms.

4  Moreno.  I don't know if you said this or not.  Did you say

5  that Muslims are violent or all Muslims are violent?  It's a

6  part --

7           PROSPECTIVE JUROR:  No.

8           THE COURT:  Okay.  I may have missed the few words

9  you might have said, to say all Muslims are violent and then

10  you proceeded with the answer, and I think you tried to

11  say --

12           PROSPECTIVE JUROR:  Maybe I said it as a negative

13  or a positive, I don't know.

14           THE COURT:  Okay.  All right.

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Just tell me what your views are on

17  that once again.

18           PROSPECTIVE JUROR:  I think I even got myself

19  confused with the answer that I gave.  I don't think they're

20  more violent than anybody else.

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  That was the question?

23           THE COURT:  Yeah, that's the question I'm asking

24  you about, yeah.  Then I just misinterpreted what you said.

25  You were equating them to other people, other religions.  You

1    were saying they're similar, not all people are violent in

2    one religion or another religion; is that what you were --

3           PROSPECTIVE JUROR:  Yes, since -- the question was

4    confusing because it was specifically to Muslims.

5           MS. MORENO:  Yes.

6           PROSPECTIVE JUROR:  So it's not that I think

7    they're violent, but what we see on TV and what the news and

8    all that, it happens to be like terrorists.  It's not because

9    they're Muslim.  I mean it's not because they're violent,

10   maybe because their religion.

11          MS. MORENO:  Okay.

12          PROSPECTIVE JUROR:  It's a consequence of what

13   there --

14          THE COURT:  would it be fair to say --

15          PROSPECTIVE JUROR:  It's not the person.

16          THE COURT:  Would it be fair to say -- I think what

17   you're saying is what you see on TV in some of these

18   instances, they're extremists --

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  -- and they're acting in ways that are

21   violent and terrible and perhaps in other ways, but it's not

22   a function, it's not the result of what their religion is,

23   they are extremists who happened to be Muslim rather than

24   they're doing what they're doing because they're Muslim?

25          PROSPECTIVE JUROR:  Not violent because they're

1    Muslim but because of what we see on TV, which means yes.

2              THE COURT:  Okay.  What you see on TV, the images

3    of what you see on TV and evidence of terrorist acts, whether

4    they're here or in any part of the world, could they

5    influence you in any way in this case in your determination

6    of the evidence?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  Are you sure about that?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Are you prepared to give both sides a

11   fair trial in this case?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Can you --

14             PROSPECTIVE JUROR:  If you hear both sides.

15             THE COURT:  Well --

16             PROSPECTIVE JUROR:  If not, we'll deal with one.

17             THE COURT:  No, no, no.  You don't need to hear

18   both sides.  You need to give both sides -- I mean the

19   government's entitled to be fairly heard as well; the

20   government's entitled to have their evidence fairly

21   considered.

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  The defense is entitled to take

24   whatever evidence comes out in the course of the trial,

25   whether it's all from the government, part from the

1   government, part from the defense -- even though they have no

2   obligation to present evidence, the defense is entitled to

3   have jurors fairly consider the evidence.  Both sides are

4   entitled to have jurors fairly consider the evidence in the

5   case regardless of what side that evidence may come from.  Do

6   you feel you can do that?

7            PROSPECTIVE JUROR:  Of course.

8            THE COURT:  Okay.  Thank you.  Okay.  Mr. Ward, why

9   don't we get started with you.  Perhaps we can finish up with

10   you before we take our afternoon recess.

11            MR. WARD:  Thank you, your Honor.  I'm not sure

12   this is going to be any better, but I was going to try and do

13   from the lectern.  Is it okay if I push the microphone this

14   way?

15            THE COURT:  Sure.

16            MR. WARD:  Thank you.  Ladies and gentlemen, thank

17   you for continuing to bear with us during this process.  And

18   what I'm going to do for the next maybe 10, 15 minutes is

19   just ask you four general questions that it would be good if

20   everybody could pay attention to, and then I might have some

21   follow-up questions on those four general questions, and in a

22   couple instances have a -- some follow-up questions to jurors

23   on -- or prospective jurors -- from their questionnaires.

24            So let me get started with the general questions.

25   And just to let you know, you've heard a lot about the FBI,

1   the Federal Bureau of Investigation, just during the process

2   of jury selection.  Well, they're the federal agency that

3   investigates federal crimes of terrorism, which is why

4   they're involved in this case.  And what I need to know from

5   each of you is whether or not you've had any experiences or

6   feelings, opinions, or impressions from whatever source it

7   might be about the way the FBI conducts terrorism

8   investigations that might make it difficult for you to be

9   fair to either the government or to the defendants.  So does

10  anybody have some strong feeling one way or the other about

11  the FBI's involvement in terrorism cases?

12       (No verbal response.)

13          MR. WARD:  Okay.  This next question is just a

14  little bit different than what was on your questionnaire, and

15  it just deals with anybody who's had training in the law.  So

16  my question is have you, a family member, or even a close

17  friend had any kind of training in the law, law school or law

18  enforcement.  Yes, ma'am.  It's Ms. Freni.

19          PROSPECTIVE JUROR:  My husband.

20          MR. WARD:  Right.  Okay.  Thank you.  And sure.

21  Yes, sir?

22          PROSPECTIVE JUROR:  I'm an attorney.

23          MR. WARD:  Right, that was -- and then we have a

24  question here, a response here.

25          PROSPECTIVE JUROR:  My son.

 1              MR. WARD:  Right, we heard about that.  And I'm

 2    sorry.  That's right.  Ms. Stahl.

 3              PROSPECTIVE JUROR:  My niece.  She works in

 4    probation.

 5              MR. WARD:  Okay.  Thank you.

 6              THE REPORTER:  I didn't hear that.  I'm sorry.

 7              MR. WARD:  Okay.  Can you go ahead and --

 8              PROSPECTIVE JUROR:  My father-in-law.

 9              MR. WARD:  And that is Ms. Clark?

10              PROSPECTIVE JUROR:  Yes.

11              MR. WARD:  -- juror number 36.  Maybe I should

12    rephrase this.  Other than -- the question that we asked is a

13    little bit broader than the question that was on the

14    questionnaire so that you've already responded as to someone

15    who's had training in the law -- for instance, you know,

16    Ms. Freni's response -- then I don't need to hear further

17    from you.  With that amendment, Mr. Bilse, do you still have

18    a yes answer?

19              PROSPECTIVE JUROR:  I may not have put down that my

20    old roommate became an officer.

21              MR. WARD:  A police officer?

22              PROSPECTIVE JUROR:  Yeah.

23              MR. WARD:  With what agency?

24              PROSPECTIVE JUROR:  Santa Barbara Sheriff.

25              MR. WARD:  Okay.  Anything about that that would

1    affect your ability to be fair?

2              PROSPECTIVE JUROR:  No, no.

3              MR. WARD:  Okay.  To either side?

4              PROSPECTIVE JUROR:  Correct.

5              MR. WARD:  Okay.  And right next to Mr. Bilse, Ms.

6    Farkas, with that amendment?

7              PROSPECTIVE JUROR:  No change.

8              MR. WARD:  Okay.  I apologize.  I probably should

9    have narrowed the question.  Okay.  I want to ask a question

10   that's actually more about the logistics of the trial.   In

11   this case a lot of the evidence is going to be recordings of

12   telephone calls, and they're predominantly -- they are almost

13   entirely in Somali.  And you'll have some aids; you'll have a

14   binder of transcripts, and we'll have -- we'll have a way of

15   projecting the transcript upon a screen so you can follow

16   along with an English translation.  But knowing that, does

17   anybody believe that they would have difficulty either

18   reading the transcripts, okay, either in a binder in front of

19   them or on a monitor, or following along with that kind of

20   evidence?  Sure.  I'm sorry.  That's Ms. Cleavenger, right?

21             PROSPECTIVE JUROR:  Yes.

22             MR. WARD:  Sure.  Go ahead and tell me.

23             PROSPECTIVE JUROR:  I don't know.  I -- it would be

24   hard for me to like know what -- what you guys are talking

25   about, so --

1              MR. WARD:  Right.  But if I were -- and maybe I

2    didn't make this clear.  The audio will be in the foreign

3    language; it will be in Somali.  We will give you a

4    transcript of an English translation of the Somali, so you'll

5    be following along on a script either in a binder that you'll

6    have in front of you or on a monitor or screen with the

7    English.  So do you still have some concerns about your

8    ability to follow along in the evidence knowing that you'll

9    have the English?

10             PROSPECTIVE JUROR:  Yeah, I think so because -- I

11   mean it's -- I still don't know about much stuff, so it's

12   hard for me to like translate stuff.

13             THE COURT:  Well, I'm having a hard time

14   understanding what you're saying, Ms. Cleavenger.  You won't

15   have to translate anything.  The audio, what you'll hear, is

16   a conversation taking place in Somali, which I assume is a

17   language you do not understand.

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  But at the same time -- is there a

20   rolling transcript, Mr. Ward?  Is there a -- this is a

21   Sanctions-based program, is it not?

22             MR. WARD:  Yes, it would be, your Honor.

23             THE COURT:  So you'll hear some sound, but you'll

24   see the English on the screen that corresponds to the

25   language that is -- the foreign language that you're hearing.

1    So you're basically not trying to decipher what the Somali

2    language is saying, you're reading -- merely reading the

3    English translation of that.  Now, the question for you is

4    would you have a difficult time -- would it be difficult or

5    impossible for you to do that?

6                PROSPECTIVE JUROR:  Yeah because some words are --

7    like I don't understand some of the words.

8                THE COURT:  Like what?  What don't you think you'd

9    understand?

10               PROSPECTIVE JUROR:  Well, like for the

11   questionnaire, some of it was confusing to me.

12               THE COURT:  The what now?

13               PROSPECTIVE JUROR:  The questionnaire was -- some

14   of it was really confusing to me.

15               THE COURT:  Okay.  Can be a little bit more

16   helpful?  Would you like to see a copy of the questionnaire

17   and you can tell us what was confusing to you; that might be

18   helpful to you just so that we know this is perhaps not the

19   kind of case for you.  We can just elaborate a little bit.

20   Here, Mr. Ward, this is a generic --

21               MS. HAN:  I got one, your Honor.

22               THE COURT:  All right.

23               PROSPECTIVE JUROR:  Well, like some of the big

24   words, I -- to me it's hard for me to like understand what

25   they are.  That's just how I've been pretty much my whole

1     life.

2              THE COURT:  Okay.  Let me get your questionnaire

3     out and see if I can -- counsel, just in the interest of

4     time -- I've got yours now.  Thank you.  You've got some

5     college education?

6              PROSPECTIVE JUROR:  Yeah, some.

7              THE COURT:  Okay.  You are -- I assume you

8     graduated high school.

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  And how much college did you take?

11             PROSPECTIVE JUROR:  Just one year.

12             THE COURT:  Okay.  You just took some general

13    courses?

14             PROSPECTIVE JUROR:  Yes.

15             THE COURT:  Okay.  Just so that I have a general

16    idea so that I can make an informed decision, I'm going to

17    have your own questionnaire, a copy of your own questionnaire

18    shown to you, and if you could just indicate what questions

19    or words you had difficulty with.  I certainly don't want to

20    embarrass you, but this would give me a better idea.

21             PROSPECTIVE JUROR:  I have -- I understood like

22    most like all the questions.  I just -- like big words and

23    stuff that you're saying and stuff like that I -- like I

24    don't understand some of them.

25             THE COURT:  Okay.

1            PROSPECTIVE JUROR:  That's just my --

2            THE COURT:  Ms. Cleavenger, let me just kind of

3    shift the conversation a little bit.  I've been talking about

4    some concepts during jury selection in this case like the

5    presumption of innocence, those kinds of things.  Have you

6    been understanding what I've been talking about when I've --

7            PROSPECTIVE JUROR:  Well, some of them, not -- like

8    most of them I have but not all of them.

9            THE COURT:  Okay.  Anything in particular that I

10   may have been talking about or Ms. Moreno may have been

11   talking about that gave you difficulty like after a question

12   or after a statement, you thought to yourself I don't have a

13   clue as to what that means?

14           PROSPECTIVE JUROR:  Some of them, yeah.

15           THE COURT:  Okay.  All right.  Ms. Cleavenger, what

16   I'm going to do is I'm going to dismiss you from this trial.

17   I very much appreciate your candor in this regard; it's

18   important.  I hope I didn't embarrass you; that certainly

19   wasn't our purpose here.

20           PROSPECTIVE JUROR:  Okay.

21           THE COURT:  But if you feel that it would just

22   present some kind of a problem for you to follow an English

23   rolling script of corresponding Somali language that's being

24   spoken, I don't want to make this too difficult for anyone,

25   and it's important that we have a jury consisting of 12

1   people, not 11 -- or 11 people that understand and

2   somebody --

3             PROSPECTIVE JUROR:  I understand.

4             THE COURT:  -- that's just not able to follow.  So

5   I'll ask that you return to the jury lounge at this point.

6             PROSPECTIVE JUROR:  Okay.

7             THE COURT:  And the clerks over there will have

8   further information for you I'm sure.  We very much

9   appreciate your time and service.  Thank you.

10            PROSPECTIVE JUROR:  Thank you.

11            THE COURT:  And if you'd stand down for just a

12  moment, Mr. Ward, we're going to fill for Ms. Cleavenger.

13  And I'm going to ask Ms. Ross to come forward.  And good

14  afternoon, Ms. Ross.  Thank you for your patience.  And I

15  would first start by asking you whether or not you have heard

16  all of my instructions thus far and the questions that I and

17  the attorneys have raised.

18            PROSPECTIVE JUROR:  Yes, I've heard everything.

19            THE COURT:  Okay.  Can you be a fair and impartial

20  juror in this case?

21            PROSPECTIVE JUROR:  I think I could be.

22            THE COURT:  But --

23            PROSPECTIVE JUROR:  You know, I look forward to

24  hearing evidence.  I'm kind of -- I think two -- just after

25  two days, it's -- I think it came up with a question about

```
 1   the FBI.

 2                THE COURT:  Yes.

 3                PROSPECTIVE JUROR:  And I just wanted to say that

 4   while I took everything at face value 20 years ago, I

 5   recently actually started to question things that are

 6   happening in our government, and I've read a lot about it

 7   lately, and I just -- this has just been coming into my mind

 8   after listening to everybody, and -- so I wanted to be open

 9   about that and say I would really, really love to hear facts

10   and evidence on all these issues.

11                THE COURT:  Okay.  Well, let's get a little bit

12   more basic before we get into that one area that you just

13   mentioned.

14                PROSPECTIVE JUROR:  Okay.

15                THE COURT:  You've been hearing the kinds of

16   questions that I've been asking over the course of two days

17   and Ms. Moreno asked for an hour.  Hearing all of that,

18   hearing the instructions, being advised of the basic

19   principles in this case, the constitutional principles that

20   apply, can you be fair and impartial?

21                PROSPECTIVE JUROR:  Yes, I believe I could be fair.

22   I'm a strict constitutionalist.

23                THE COURT:  I'm sorry?

24                PROSPECTIVE JUROR:  I would say I'm a strict

25   constitutionalist.
```

1            THE COURT:  A strict constitutionalist.  I don't

2     know what that means.

3            PROSPECTIVE JUROR:  Kind of.  What is it?  I guess

4     I've been -- recently my eyes have been opened about the

5     United States Constitution, and I believe strongly in freedom

6     of speech.

7            THE COURT:  All right.  Is there a particular event

8     that has opened your eyes?  You seem to have had an epiphany

9     lately.  What is there that's happened that you feel has

10    shifted your thinking for you?  Could you talk about it?

11           PROSPECTIVE JUROR:  Yeah, I'm trying to gather my

12    thoughts.  I think it's been the war.  I've -- I guess that

13    could sum it up.  If anyone knows the beliefs of Ron Paul,

14    I've been following a lot of his.

15           THE COURT:  So you consider yourself to be a

16    Libertarian, and that's reflected on your questionnaire.

17           PROSPECTIVE JUROR:  Yes.  And I think -- I guess

18    it's just been a change in my attitude from how I felt 20

19    years ago.

20           THE COURT:  Okay.

21           PROSPECTIVE JUROR:  And so I guess I've just

22    been -- I've kind of been concerned with if we're -- you

23    know, I don't believe we're hearing the truth about

24    everything on the mainstream media.

25           THE COURT:  Okay.

1            PROSPECTIVE JUROR:  So that's -- I guess that has

2   been an epiphany to me perhaps four to eight years ago.

3            THE COURT:  All right.  Well, all of those things

4   are fine.  We've certainly been exposed to an awful lot in

5   the media.  We have all types of media espousing on all types

6   of issues.  You embrace the beliefs I think, as you phrase

7   them, of Ron Paul.  We know that he ran for the Republican

8   nomination this last time around for president of the United

9   States.  We know he's a Libertarian.  We knows he's against

10  all foreign wars and foreign military activity the government

11  is currently involved with.

12           PROSPECTIVE JUROR:  Yes, sir.

13           THE COURT:  His position is end them now, bring all

14  the troops home, close down all our military bases all over

15  the world, and basically just get out of the way.

16           PROSPECTIVE JUROR:  Yes, sir.

17           THE COURT:  All right.  That's all well and good.

18           PROSPECTIVE JUROR:  Okay.

19           THE COURT:  That doesn't disqualify you from being

20  a member of this jury.  What I want to know is whether or not

21  you can set aside your political philosophy, your leanings,

22  who you might embrace, whether you feel that our activity in

23  the Middle East and in other places is just or unjust; can

24  you decide this case having heard the charges based on the

25  evidence and not be influenced by these other considerations?

1   If you feel you would be unduly influenced, that it would --

2   it would incline you to favor one side or the other, then

3   this is not a proper case for you.

4          PROSPECTIVE JUROR:  No, I don't think I would favor

5   one side over another.

6          THE COURT:  Okay.  I asked a lot of questions

7   there.  You don't think you'd favor one side or the other.

8   Can you fairly consider the evidence, give both sides a fair

9   shake in that regard?

10          PROSPECTIVE JUROR:  Yeah, I would look forward to

11   doing that.

12          THE COURT:  You feel that you can keep out all of

13   these considerations that we've been -- you've been thinking

14   about politically recently that have come to mind?  Can you

15   set those aside?  This is not a case about them.

16          PROSPECTIVE JUROR:  Yeah, I think I could set them

17   aside.  I think it's been the whole process of trying to

18   express who we are in this -- in this venue that it's made me

19   think of all of these positions, you know.

20          THE COURT:  Sure.

21          PROSPECTIVE JUROR:  But I actually never -- don't

22   really sit and think about it that often.

23          THE COURT:  And we spent a good deal of time on the

24   importance of being able to judge the believability of all

25   witnesses who testify by the same standards, that no one

1    should take the stand here with a leg up in the mind of the

2    jury, with the jury thinking this person is more inclined to

3    tell the truth, is inherently more truthful than anyone else

4    because of the job that individual has.  The other side of

5    that coin is that no one should feel that if somebody takes

6    the stand, they're less likely to be truthful simply because

7    of their position.

8              You'll be hearing from certain witnesses called by

9    the government who are from governmental agencies,

10   particularly the FBI.  Would your recent feelings and

11   thoughts concerning the politics that you've been referring

12   to influence you in your ability when it comes to assessing

13   the believability of witnesses?

14             PROSPECTIVE JUROR:  I think not.  I don't really

15   know anything about the FBI.  I have heard negative things

16   about the CIA, however, but I think that I would, you know,

17   give everybody the right to speak, and then I would have to

18   evaluate based on what I hear and, you know.

19             THE COURT:  Would you follow the law in this case?

20             PROSPECTIVE JUROR:  Oh, absolutely, yeah.  I'm that

21   type of person definitely.

22             THE COURT:  Okay.  Is there any reason you can

23   think of why you should not be on this jury?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Okay.

1            PROSPECTIVE JUROR:  No, I can't.

2            THE COURT:  Just going through your questionnaire

3    here briefly.  Have you worked outside the home?  I know

4    you're a homemaker at the present time, you had training in

5    computer science.  Have you worked outside the home in the

6    past?  I assume so.

7            PROSPECTIVE JUROR:  Yeah, before I had children, I

8    worked at IBM as an assistant systems engineer.

9            THE COURT:  Okay.  Have you supervised other people

10   in the workplace?

11           PROSPECTIVE JUROR:  No.  Well, only as a homemaker.

12   I was always a coach in rec leagues and things, so I guess --

13           THE COURT:  Volleyball?

14           PROSPECTIVE JUROR:  Yes, and basketball.

15           THE COURT:  Okay.  All right.  Ms. Moreno, why

16   don't you proceed if you have any particular questions --

17           MS. MORENO:  I do.

18           THE COURT:  -- for Ms. Ross.

19           MS. MORENO:  May it please the Court?

20           THE COURT:  Briefly, please.

21           MS. MORENO:  Hi.  You were asked -- you were asked

22   if there was anything about Islamic teachings or doctrine

23   that was personally offensive to you, and you said "Yes."

24   Then you said "I've heard people say that they want to kill

25   the infidel.  I've also heard that this is not true, so I

1   guess there have been many different forms of Islamic

2   teaching."

3            PROSPECTIVE JUROR:  Yeah.  You know, I think I

4   misread the question because I don't -- I didn't pay

5   attention to the "personally offensive" part.

6            MS. MORENO:  Okay.

7            PROSPECTIVE JUROR:  So I would say I made a mistake

8   in saying yes because I'm not easily offended really by

9   anything.

10           MS. MORENO:  Okay.

11           PROSPECTIVE JUROR:  You know, like I really don't

12   know that much about Islam other than just what I've heard

13   and, you know -- I mean I'm 53 years old and I read a lot.

14   I've heard a lot of things.

15           MS. MORENO:  You indicated that you were asked if

16   you had personal contact with Muslims, and you didn't say yes

17   or no, but then the next question is if yes, in what context,

18   and you wrote -- you checked in "in school," and then you put

19   "not sure," and then you checked "other," and you said "just

20   out in public, i.e., airports."  What did you mean by that?

21           PROSPECTIVE JUROR:  You know, I wanted to just be

22   as truthful as possible, and I don't believe I know anyone

23   personally Islamic, but I think I -- I know someone who's

24   Persian, and then I think I assumed they were Islamic and

25   later found out they were Christian.

1           And then as far as school, I rethought that.  I had

2    a religious studies teacher, and I believe he was Indian or

3    Pakistani, so I don't know what his religious faith was.

4           MS. MORENO:  Okay.

5           PROSPECTIVE JUROR:  So I was just trying to think

6    of anything, in vain.

7           MS. MORENO:  Well, I appreciate that.

8           PROSPECTIVE JUROR:  I do know -- also I know

9    someone who's from Egypt and I don't know their faith.  I

10   don't know what it is.

11          MS. MORENO:  Okay.  You were asked if you followed

12   any criminal cases involving allegations of terrorism or

13   support of terrorism, and you checked "no," and then you

14   wrote, "I have been wondering if we know the whole truth

15   about 9-11."  Do you want to expand on that?

16          PROSPECTIVE JUROR:  What did I say no to?

17          MS. MORENO:  I'm sorry.  You were asked if you

18   followed any criminal cases involving allegations of

19   terrorism or support of terrorism; that was the question.

20          PROSPECTIVE JUROR:  Oh, I guess it would be yes,

21   right?  The answer should have been yes?

22          MS. MORENO:  Right.

23          PROSPECTIVE JUROR:  I guess I didn't -- I'm not

24   sure what it means to follow a criminal case.  I've just been

25   reading a lot of things in the past say four years just

```
 1    because I've gotten -- gotten concerned with the war and --
 2              MS. MORENO:  So let me ask you this.  In answer to
 3    his Honor's questions -- I was listening very intently, and
 4    you said that -- that you looked -- you looked forward to
 5    hearing both sides, and so I need to visit that with you for
 6    a little because in a criminal case, it may well be that you
 7    don't hear both sides, that you only hear the government's
 8    case because they have the burden of proof, okay?
 9              PROSPECTIVE JUROR:  Uh-huh.
10              MS. MORENO:  And the law says that you cannot
11    consider the fact if the defense puts on no evidence, nobody
12    testifies.  Do you think you could do that?
13              PROSPECTIVE JUROR:  Do what?  Consider what?
14              MS. MORENO:  Do you think that you could not
15    consider the fact that the defense would not put on any
16    evidence as the law would require you to do.  If you can't,
17    you can't.
18              PROSPECTIVE JUROR:  No, I could do that, no
19    problem.
20              MS. MORENO:  You wouldn't have any problem?
21              PROSPECTIVE JUROR:  No.  In fact, I didn't realize
22    that the law requires you to do that.  I mean my only
23    experience has been on TV shows, you know, Perry Mason, where
24    the person who's guilty always get up and confesses to
25    everything, so --
```

```
 1              THE COURT:  Ms. Moreno, I'm going to ask that you
 2    conclude this, and we'll get Mr. Ward back up and --
 3              MS. MORENO:  Thank you.
 4              THE COURT:   Mr. Ward, would you please continue
 5    with your examination.
 6              MR. WARD:  Let's see.  I'm done with my general
 7    questions, and I wanted to do follow-ups with three
 8    prospective jurors.  Juror number 15, it's Ms. Boggess,
 9    right?
10              PROSPECTIVE JUROR:  Boggess.
11              MR. WARD:  Boggess, right.  On your questionnaire
12    there was a response about serving on a -- previously on a
13    jury.
14              PROSPECTIVE JUROR:  Yes.
15              MR. WARD:  And what I wanted to ask you about that
16    was whether there was anything about that experience,
17    positive or negative, without telling me the result, that you
18    feel might affect your ability to judge this case fairly.
19              PROSPECTIVE JUROR:  No, I didn't have any -- it
20    didn't finish, so I didn't have any positive or negative
21    feelings.
22              MR. WARD:  Oh, I understand it didn't finish.
23              PROSPECTIVE JUROR:  Yeah.  So it barely had
24    started, so I didn't have any, you know -- I mean it was a
25    little disappointing that we went through all this and
```

1  nothing came of it.  But I didn't have any positive or

2  negative feeling.

3          MR. WARD:  Okay.  So if I understand you correctly,

4  you did not deliberate.

5          PROSPECTIVE JUROR:  We did not.

6          MR. WARD:  Okay. Great.  If we could pass the

7  microphone to juror number 24, Ms. Delaney, right?

8          PROSPECTIVE JUROR:  Yes.

9          MR. WARD:  So, Ms. Delaney, can you just tell us a

10 little bit about what you did at Planned Parenthood and how

11 long you were there.

12         PROSPECTIVE JUROR:  I worked for ten years as an

13 assistant manager.  And in the very beginning of my

14 employment there, I was a -- they had a different term, but

15 it was a medical assistant, and I progressed to an assistant

16 manager, management position.

17         MR. WARD:  Okay.  And besides that time, that job

18 at Planned Parenthood, who I understand you're not working

19 right now --

20         PROSPECTIVE JUROR:  Right.

21         MR. WARD:  How were you employed before you went to

22 Planned Parenthood?

23         PROSPECTIVE JUROR:  I worked for a place called

24 Epic Resorts, which was -- it had a travel arm; it was

25 selling and renting rental weeks at resort properties

1   timeshare.

2           MR. WARD:  So I noticed on your educational

3   background that you have an MS in clinical psychology?

4           PROSPECTIVE JUROR:  Yes.

5           MR. WARD:  Do you ever do any graduate or --

6           PROSPECTIVE JUROR:  I have a master's degree in

7   clinical psychology.

8           MR. WARD:  Sure.

9           PROSPECTIVE JUROR:  I came out to California to do

10  a Ph.D program but I did not complete that.

11          MR. WARD:  Okay.  Then did you go from the Ph.D

12  program into the travel service?

13          PROSPECTIVE JUROR:  Yes, crisis of conscience.  It

14  was time to shift gears.

15          MR. WARD:  And juror number 40, Ms. Fierro.

16          PROSPECTIVE JUROR:  Yes.

17          MR. WARD:  Ms. Fierro, I apologize.  Give me just a

18  minute and I'll get caught up to the question in your

19  questionnaire.  Oh, on question -- the question number 51 --

20  this was the question about there may be evidence in the case

21  consisting of tape-recorded telephone conversations using

22  electronic devices, and your response was "I believe it would

23  depend" -- the question was whether or not you can fairly

24  consider that evidence along with the other evidence in the

25  case, and your response is that I believe it would depend

1   upon the evidence presented at trial.

2          I think I know what that means, but can you explain

3   to me a little bit more --

4          PROSPECTIVE JUROR:  Well, my belief is not

5   everything that's recorded is legal, so depending on the

6   trial and what's presented to me is whether I'm going to

7   decide whether one way or another.

8          MR. WARD:  Okay.  Well, if it was presented to you

9   and the Court instructed you that it had been admitted as

10   evidence, could you fairly consider that evidence along with

11   any of the other evidence committed at trial?

12          PROSPECTIVE JUROR:  I would consider it as

13   evidence, but then again I would have to sit with the jury to

14   decide whether it was appropriate or not appropriate.

15          MR. WARD:  Well, when you say appropriate or not

16   appropriate, would you -- would you -- is there anything in

17   particular about tape-recorded conversations that would give

18   you trouble on fairly judging the case either for the

19   government or the defendants?

20          PROSPECTIVE JUROR:  Well, again, if it's done

21   legally and you can prove that it was done legally and it

22   comes forward that it's done legally, I would take it into

23   consideration.

24          MR. WARD:  Okay.

25          THE COURT:  Mr. Ward, let me step in here, please.

1  It's not the function of the jury to decide whether evidence

2  that comes in in the form of recorded telephone calls is

3  legal evidence.  It's evidence.  If it's coming in, if it's

4  coming in, it's evidence to be duly considered by the jury.

5  If it were not evidence, as you term it to be, legal

6  evidence, then it would not be coming in.

7             PROSPECTIVE JUROR:  Okay.

8             THE COURT:  All right.  Can you accept that

9  principle?  It's not the function of the jury to determine

10  the legality of evidence in the form of wiretap intercepts or

11  recorded conversations; that's the point I want to make with

12  you at this time.  And if you have any difficulty accepting

13  that, then we need to know that.  But if you can accept that

14  principle and then fairly consider all the evidence in the

15  case, giving what weight to the evidence you find is

16  deserving, then that's basically what the responsibility of

17  the jury is.

18             PROSPECTIVE JUROR:  Yes, I believe I can do that.

19             THE COURT:  Okay.

20             MR. WARD:  Your Honor, I have nothing further.

21             THE COURT:  Okay.  All right.  Ladies and

22  gentlemen, we are going to take a break at this point.  It's

23  three o'clock, and I and the attorneys are going to spend

24  some time discussing a few matters properly discussed outside

25  your presence, so we're going to take a bit of an extended

 1   recess at this time, and we're going to take it -- well, it's

 2   three o'clock now -- we're going to take it to at least 3:30

 3   for your purposes, and we'll see you back here at 3:30.

 4   Hopefully we can get you in at that time or as soon

 5   thereafter as possible.  Remember the admonition, and we will

 6   see you shortly.  Thank you.

 7        (The jury left the courtroom.).

 8             THE COURT:  Okay.  All right.  We are outside the

 9   presence of all jurors.  Any challenges for cause, Mr. Ward

10   or Mr. Cole?

11             MR. WARD:  None from the government, your Honor.

12             THE COURT:  Any challenges for cause from the

13   defense?

14             MS. MORENO:  Yes, yes, your Honor.

15             THE COURT:  All right, Ms. Moreno.  Please.

16             MS. MORENO:  Your Honor, I believe with respect to

17   juror number 2, Ms. Farkas, she never gave an unequivocal

18   committal to being fair -- I'm trying to see my notes -- so

19   she talked -- I mean, you know, your Honor --

20             THE COURT:  Her testimony is fresh in my mind, Ms.

21   Moreno, so -- but make any record you'd like to make.

22             MS. MORENO:  All right.  So I think she wasn't

23   being candid, your Honor, and I think what she said in her

24   questionnaire was a candid response and that was that, as she

25   talked about -- I don't have the questionnaire --

 1          THE COURT:  Well, I went in to this -- you're

 2     looking at 18 -- 17 and 18.  She thinks most are good people,

 3     that they don't feel women are equal to men; 18 is that --

 4     that was 17; 18, that they can be taught at an early age to

 5     hate and that anyone who doesn't agree with their doctrine is

 6     an infidel.

 7          I spent quite a bit of time with her at least

 8     getting her to elaborate a little bit, and I think it was

 9     pretty clear after the time I spent with her that she wasn't

10     referring to Muslims in general, that she was referring to

11     those elements that preach hate, whether in a madrassa,

12     whether they're proponents of Wahhabism, which she may or may

13     not have heard of, but she agreed I think in general terms

14     that that's what she had reference to.  She indicated she had

15     substantial contact with Muslims in different -- in different

16     circumstances.  And then I know you spent quite a bit of time

17     with her and I know what you were anticipating you'd get from

18     her, but I don't think you ever got it.  I think she did make

19     a commitment, and she made a commitment in one of two ways in

20     my view looking at how she was expressing herself, her body

21     language and all the rest of it.  She said that she hoped

22     that if she were in the shoes of -- in essence what she was

23     saying is that if she were in the shoes of one of the

24     defendants here, she would be judged by the same frame of

25     mind she has.  And then just as important was the fact that

1  frankly I think she became a little antagonistic at the end;

2  she took umbrage with you.

3          MS. MORENO:  Yes, she did.

4          THE COURT:  And I think they took umbrage at your

5  suggestion that she could not be fair, that this was not a

6  firm commitment she was making.  So I would deny your request

7  to excuse Ms. Farkas for cause.

8          MS. MORENO:  I would also just proffer for the

9  record her answer to question number 27, that it would make

10 it difficult for her to listen with an open mind and render a

11 verdict in this case, in this case.  And I believe she was

12 not being candid with the Court.  I agree with your Honor's

13 perception that she got antagonistic, and so I would -- I

14 would submit the cause challenge on her.

15         THE COURT:  I think you're going to have to use one

16 of your many peremptory challenges directed in her direction

17 then, Ms. Moreno.

18         MR. DRATEL:  Your Honor, may I have just one second

19 about -- and I agree that she did take on her, but I thought

20 it was because she was being asked to make a commitment, and

21 it never got -- she never said yes, I can make an unequivocal

22 commitment; she said well, I hope I can or I hope someone, if

23 it were doing it for me, could do that, not that she was

24 saying that she would be the right juror for this case.  I

25 think her resistance and her coming back with an answer that

1    said "if you know me better than I do" is not the same as

2    saying yes, I can unequivocally do it.  She never got there.

3              THE COURT:  Okay.  Any further challenges, Ms.

4    Moreno?

5              MS. MORENO:  Your Honor, with respect to Ms. Ross,

6    one of the last jurors --

7              THE COURT:  Yes.

8              MS. MORENO:  -- I wanted to inquire into her

9    answers on question 17; I did not have the ability to do so.

10   And this was where she answered the question about her view

11   of the Islamic faith, that she indicated -- first she said

12   that all people are free to worship the God of their choice,

13   then she said that my faith does teach that they do not

14   follow the one true God that I believe in.  This saddens me.

15   I believe that was an area that cause could have been

16   developed.

17             THE COURT:  Well, okay.  As I say, she answered my

18   questions.  We went into the business that we've gone in with

19   so many of the jurors generally and individually about

20   credibility, and time does become a bit of a constraint here.

21   I think she satisfied me that she would be fair and

22   impartial.  And if you're challenging her for cause, I'm

23   going to deny the request to remove her for cause.

24             MS. MORENO:  Would the Court allow me to develop

25   the cause challenge on her?

1           THE COURT:  I think you did.  I mean I think you

2    questioned her, and I -- you know, we're at the point now

3    where we've got to get our -- select our jurors in this case.

4    Ms. Ross is a bit of a loose cannon on the deck; I'll give

5    you that.  And it may be that if both sides want to stipulate

6    to remove her for cause, I'm happy to do that, but that --

7    what that's going to do is diminish slightly our chances of

8    getting three alternates, and it's going to reduce the number

9    of challenges, peremptory challenges, back to 7 and 12.  I'm

10   happy -- I'm happy to have both sides stipulate for her

11   removal, but it may have -- it may have some consequences

12   here.  I'll try to impanel three juror -- three alternates,

13   but it may not be possible.

14           MR. COLE:  We're fine stipulating to removing her

15   for cause.

16           THE COURT:  Okay.  I assume that's agreeable, Ms.

17   Moreno.

18           MR. DURKIN:  She's all right with me, Judge.

19           MS. MORENO:  He doesn't want to stipulate, so we're

20   not --

21           MR. DURKIN:  I like her.  I mean I don't disagree

22   that she's a loose cannon on the deck of life, but --

23           THE COURT:  You like loose cannons.

24           MR. DURKIN:  I do.  Been called one a few times.

25           THE COURT:  I'm sorry?

 1              MR. DURKIN:  I said I've been called one a few

 2    times.

 3              THE COURT:  Okay.

 4              MS. MORENO:  Okay.

 5              THE COURT:  All right.  Well, you know what?  I

 6    don't think you need to worry about it.

 7              MS. MORENO:  Exactly.

 8              THE COURT:  In any event, any other challenges for

 9    cause, Ms. Moreno?

10              MS. MORENO:  No, your Honor.  How long can we --

11              THE COURT:  Let's do this.  Let's do this.  Well,

12    it shouldn't take a while.  It's a deselection process.  You

13    know who you need to get off.  I don't want to prolong this

14    too long.  I know that we're working under a little pressure

15    because I do want to give Ms. Fontier an opportunity to get

16    her rulings on deposition transcripts.

17              MS. FONTIER:  I would rather take as much time as

18    Ms. Moreno needs.

19              THE COURT:  Okay.  Let's do this --

20              MS. FONTIER:  We can deal with the depositions

21    another time.

22              THE COURT:  It's time for a break.  Let's take ten

23    minutes, okay?  That's going to get us back here at 20 after

24    3:00.  Let's get you that time -- if you don't want to take

25    all that time -- plus another 20 minutes.  You got a half

1   hour to work on your strikes.  Each side is going to get a

2   strike sheet at this point.  Identify your strikes.  At this

3   point it's 8 and 13, okay, if you wish to, exercise that many

4   peremptory challenges.  I'd like to get the jury back in here

5   about a quarter to 4:00.  As soon as you're done with your

6   strikes, please let Gaby know.  I'll come down, we'll

7   correlate your strikes.  If there are any constitutional

8   questions we'll go over those, and then we'll bring the

9   entire panel back in, seat them in the back, and then call

10  the first 12 unchallenged jurors as the jurors to be seated,

11  and then two -- at least two, hopefully three alternates, and

12  then we'll call it at that point.  And then we'll swear them

13  tomorrow, and hopefully we'll have some time for Ms. Fontier.

14  Okay?  Good.

15          MS. FONTIER:  Thank you, your Honor.

16      (There was a break in the proceedings.)

17          THE COURT:  Do we have all counsel here?  Ms.

18  Moreno?

19          MS. MORENO:  Yes.

20          THE COURT:  Pursuant to your request, we have

21  arranged to have audio transmitted from Courtroom 16 into

22  Courtroom 15; I'm happy to report that.

23          MS. MORENO:  Thank you so much.

24          THE COURT:  And there will be 38 additional seats.

25          MS. MORENO:  Great.

1              THE COURT:  Members of the community, the Somali

2    community, are welcome to be seated behind the bar in

3    Courtroom 15 on a first come/first served basis.  It would be

4    nice if people would cooperate if there are more and they

5    could rotate in and out.  Of course, that would be in

6    addition to seating, available seating, in Courtroom 16.

7    There will be security in there.  I will certainly appreciate

8    any efforts that all of you can undertake to help maintain

9    order and decorum in the halls always and to have distance,

10   respectable distance, between the jurors in the case and

11   supporters, as you have termed them yourself in the past.  So

12   that would be very helpful.  And I think that's -- that's

13   some news I wanted to give you.

14             MS. MORENO:  We're very grateful, your Honor.

15             THE COURT:  Sure.

16             MS. MORENO:  We're emailing one of the

17   leaders/liaison to the community right now.  And I'm sure

18   that they're going to be very, very grateful.  And I'll try

19   to personally speak to them, someone, sometime tonight.

20             THE COURT:  All right.  Okay.  Very good.  Okay.

21   We're outside the presence of jurors.  Looking at this strike

22   sheets here.  Okay.  The first -- you have your copies as

23   well I'm sure, counsel, so we can get started here.

24             The first 12 unchallenged jurors will comprise the

25   jury here.  Mr. Bilse is unchallenged; he will be juror

 1   number 1.  Farkas is challenged by the defense.  The third

 2   juror, Mr. Wease, has been challenged by the defense.  The

 3   fourth juror, Ms. Lee, has been challenged by the government.

 4   The fifth juror, Mr. Rodriguez, has been challenged by the

 5   defense.  The sixth juror, Mr. Channell, is unchallenged and

 6   shall be juror number 2.  Please follow along with me,

 7   counsel, because if I'm inaccurate here in any way, you can

 8   let me know.

 9           The seventh juror, Ms. Faith, is unchallenged by

10   either party; she will be juror number 3.  The eighth juror,

11   Ms. Flores, is challenged by the defense.  Ninth juror,

12   Mr. Sciacqua, is unchallenged, and he will be juror number 4.

13           The tenth juror is unchallenged, that is, Mr.

14   Johnson; he'll be juror number 5.  The 11th juror is

15   unchallenged and will be -- that's Ms. Meza -- juror number

16   6.  Ms. Lopez is unchallenged by either side; she'll be juror

17   number 7.

18           You know, counsel, nobody mentioned it, but let me

19   ask at this point.  Are there any constitutional challenges

20   to the strikes in this case by either side?

21           MR. COLE:  Not by the government, your Honor.

22           THE COURT:  All right.

23           MS. MORENO:  Not for the defense, your Honor.

24           THE COURT:  All right.  Continuing on, number 13,

25   Ms. Smith, has been challenged by the defense.  Juror number

1    14, Ms. Salinas, has been challenged by the government.

2    Juror number 15, Ms. Boggess, is unchallenged; she will be

3    juror number 8.

4            Juror 16, Mr. Breier, challenged by the defense.

5    Juror number 17, Mr. Buckner, challenged by the defense.

6    Juror number 18, Ms. Murguia, challenged by the defense.

7    Juror number 19, Ms. Free, challenged by the government.

8    Juror number 20, Mr. Bristow, challenged by the government.

9    Juror number 21, Ms. Ross, challenged by the government and

10   the government only.

11           Juror number 22, Ms. Freni, is unchallenged; she

12   will be juror number 9.  Juror number 23 challenged by the

13   defense.  Juror number 24 -- 23 is Mr. Todd.  Juror number

14   24, Ms. Delaney, challenged -- unchallenged; juror number 10

15   she will become.  Juror number 25, Miriam Hernandez,

16   challenged by the defense.  Juror number 26, Ms. Ramirez,

17   unchallenged; she will be the 11th juror.  Juror number 27,

18   Ms. Fierro, unchallenged by either side; she'll be juror

19   number 12.  That is your jury.

20           And then juror 28, Ms. Stahl, challenged by the

21   defense.  Juror number 29, Mr. Crowell, challenged by the

22   defense.  Juror number 30, Mr. Brenzel, unchallenged; he will

23   be alternate number 1.

24           Juror number 31, Ms. Dominguez, challenged by the

25   government.  Juror number 32, Mr. Merkin, challenged by the

1    government.  Juror number 33, Ms. Evans -- excuse me --

2    Mr. Evans, challenged by the defense.  Juror number 34,

3    Ms. Alise, challenged by the government.  Juror number 35,

4    Mr. Adams, unchallenged; he will be alternate number 2.

5    Juror 36, Ms. Clark, unchallenged; alternate number 3.

6            So those are our jurors and our alternates.  Are we

7    in agreement, counsel, that it's a correct recitation of

8    names?

9            MS. MORENO:  Yes, your Honor.

10           MR. COLE:  Yes, your Honor.

11           THE COURT:  Okay.  Very good.  What I would like to

12   do at this point is to bring everyone in, have them seated in

13   the back of the courtroom, and we will -- I will call the

14   jurors to be seated in the box.  And we'll put one extra seat

15   up against the wall there, Gaby, near the jury deliberation

16   room for the alternate juror once we're calling them and

17   having them come forward, okay.  Then I'll just -- I'll

18   advise the individuals that they are the jurors selected for

19   the case as well as the alternates.  I'll give them -- I'll

20   have them report back here at nine o'clock tomorrow for

21   opening statements, give them a few further admonitions, and

22   then that will be it; I'll let them go and have them report

23   directly to Courtroom 16 tomorrow morning at 9 a.m. for

24   preliminary instructions and opening statements.  Anything

25   further before we bring we bring these folks back in?  Mr.

1   Cole?

2            MR. COLE:  No.  Thank you, your Honor.

3            THE COURT:  Okay.  Anyone from the defense?

4   Ms. Moreno?

5            MS. MORENO:  Thank you.  No, your Honor.

6            THE COURT:  Okay.  Very good.

7        (The prospective jurors entered the courtroom.)

8            THE COURT:  All right.  First of all, ladies and

9   gentlemen, thank you for your patience.  I'm just trying to

10  get a few loose ends tied up here.  For those of you who left

11  personal items in the jury box -- and I think there are just

12  a few of you -- could you come forward, please, and secure

13  the personal items and then -- and then return to your seats.

14  I should have asked you to do that earlier.  Sorry about

15  that.

16            All right.  Ladies and gentlemen, let me tell you

17  what we've been doing the last 45 minutes or so.  Each side

18  is privileged to exercise a certain number of peremptory

19  challenges.  I know that those of you with prior jury service

20  in all probability recall what that process is about.  We

21  thought that would be better done outside your presence, and

22  so counsel were able to once again review all of the

23  information they've elicited in the form of the

24  questionnaires, your answers to interrogatories, your

25  backgrounds, and all the rest of it, and we've basically made

1    the decisions as to who will sit as jurors in this case.

2             If you do not sit as a juror, if you are not

3    impaneled in this case, please do not take that personally;

4    please do not feel rejected in any way, shape, or form.  The

5    attorneys in their wisdom and based on a limited amount of

6    information made considered decisions as to who is

7    appropriate to sit on the case.  So that's pretty much it.

8    Don't speculate or exercise conjecture as to why and

9    wherefore most of you will not be sitting on the case because

10   we only select 12 jurors and three alternates, and so I'm

11   going to ask those individuals who will comprise the jury to

12   come forward as I call names, and there will be three

13   alternate jurors as well.  I will tell you that alternates

14   are very important.  This case is expected to go something on

15   the order of three weeks -- and you all know that, you've all

16   been time-screened -- and we're coming through a pretty

17   difficult season with the flu and other illness it seems, and

18   so we always appreciate having alternate jurors.  And of

19   course alternates are here for all sessions of court, and

20   I'll have more to say about that.  But in any event, 15 names

21   are going to be called at this time out of approximately 50

22   of you, and so these are the names.  I'll ask you to come

23   forward and take the seats that will be assigned to you.

24            Mr. Bilse, if you come forward, please, juror

25   number 1, and once again take the first seat, the one that

1   you had occupied the entire day.  Thank you.  Juror number 2,

2   Mr. Channell, please come forward.  Juror number 3, Ms.

3   Faith.  Juror number 4, Mr. Sciacqua.  Juror number 5, Mr.

4   Johnson.  Juror number 6, Ms. Meza.  Juror number 7,

5   Ms. Lopez.  Ms. Lopez, if you'd take the first seat here in

6   the front row.

7          Juror number 8, Ms. Boggess, please come forward.

8   Juror number 9, Ms. Freni.  Juror number 10, Ms. Delaney.

9   Juror number 11, Mr. Ramirez -- I'm sorry.  Did I do it

10  again?  I did it again.  Ms. Ramirez, if you'd come forward

11  please, with apologies.  Juror number 12, Ms. Fierro.

12         Okay.  Our first alternate juror, Mr. Brenzel, if

13  you'd come forward, please, and take the vacant seat in the

14  top row there.  Alternate number 2, Mr. Adams.  Alternate

15  number 3, Ms. Clark.  Ms. Clark, if you'd like, you can come

16  around and sit in this seat right here next to Mr. Bilse in

17  that little stand for the moment.

18         All right.  To the remaining members of the panel,

19  I want to thank you sincerely for your time, your patience,

20  your patience with us, with the questionnaire, with your

21  promptness, your willingness to serve on this case; it is

22  truly appreciated.  And on behalf of all of the U.S. District

23  judges here in the Southern District of California, I thank

24  you; I thank you for your time, your service, and your

25  commitment.

1          It's interesting.  Having gone through the
2    questionnaires, there were several of you with prior jury
3    experience, perhaps not as many as I typically see on a jury
4    panel, and I was thinking as I was going over the
5    questionnaires that it is my sincere hope that before your
6    tour of duty is up, this time here with us, that each and
7    every one of you will have the opportunity, the privilege, to
8    sit on a jury.  I think you will find it educational,
9    rewarding, and ultimately unforgettable.  And so I leave you
10   with those thoughts.
11          I ask that you -- actually it's not -- well, we may
12   have an update on some -- okay.  I was going to say that you
13   were going to remain on call, but I've been asked to ask you
14   to call after 6 p.m. for further instruction.  We do have
15   trials going out this week, next week, and thereafter, so
16   you'll be given further information as to whether you're on
17   call or to otherwise report.  It is not necessary for you to
18   return to the jury lounge at this time.  So, again, thank
19   you, and perhaps I'll see you on another case at some point.
20          (The excused panel members left the courtroom.)
21          THE COURT:  Okay.  We're in the presence of our
22   jurors.  Congratulations to each and every one of you.  We
23   look forward to working with you.  If somebody could pull
24   that door closed in the back of the courtroom.  Thank you.
25   I'm not going to swear you as the jury in this case right

 1   now; I'm going to leave that for tomorrow morning.  But let

 2   me give you some advice and some information.  If we were in

 3   my courtroom right now, I'd ask you to bend down -- reach

 4   down under your seats for your notebooks, and I'd have some

 5   instructions for you that you could easily write down.   I

 6   don't think we have notebooks here, do we, Gaby?

 7                 THE CLERK:  No.

 8                 THE COURT:  Okay.  But in any event, let me talk

 9   about a few housekeeping matters that I know you're very

10   interested in.  First of all, we're going to start at 9 a.m.

11   tomorrow morning, and we're going to conduct this trial in

12   the courtroom I occupy, which is Courtroom 16.  Remember, you

13   assembled in Courtroom 15 on the fifth floor today?  Well,

14   Courtroom 16 is one courtroom down at the end of the hall,

15   and that will be our courtroom for the duration of this

16   trial.  So really all you need to remember, first off, is

17   Courtroom 16, fifth floor, tomorrow at 9 a.m.  I urge you to

18   be here early, and we will begin just as promptly as we are

19   able to.

20                 I understand that there may be a substantial number

21   of supporters from the Somali community here on behalf of

22   each of these gentlemen who are the defendants in this case.

23   That is perfectly appropriate, and we welcome them.  As a

24   matter of fact, we are going to endeavor to create an audio

25   feed for the audio in our courtroom during the trial that can

1   be fed into the courtroom right next door, Courtroom 15,

2   which is where you were this morning, that is currently not

3   occupied, and so we're hoping that we'll be able to serve

4   some members of the community in that sense who won't be able

5   to find room in our courtroom.  Our courtroom is much smaller

6   than this -- you're going to see that tomorrow -- a limited

7   number of seats, about 36, 38 -- 36 seats in the back of the

8   courtroom for the public and spectators and that kind of

9   thing.  So there will be a lot of people here milling around

10  and that's fine.

11           Remember that you will be jurors on this case.

12  Always try to insulate yourself from any conversation you may

13  overhear about this case, be it coming from spectators or

14  anyone else associated with the trial.  Always find a nice

15  quiet place for you to take recesses and more or less be out

16  of the way.

17           When you report at let's say 8:45, at least for

18  tomorrow until you get your bearings and we can get you

19  situated and find a rhythm in the case, as I say, you'll be

20  brought in just as soon as possible and we'll get going.

21  I'll have some preliminary instructions for you.  The first

22  thing I'll do is swear you, and I'll have some preliminary

23  instructions for you, and then you will hear the opening

24  statements from attorneys.  The government proceeds first in

25  every phase of the case; because of the burden of proof, they

 1   have the privilege of proceeding partly because of the

 2   tradition of the sequence of events.  Keep in mind the

 3   defense is under no obligation to make an opening statement;

 4   they may decline making an opening statement or defer the

 5   making of an opening statement to a later point in time.

 6   Then after the opening statements that are to be given, we

 7   will proceed with the evidence in the case.

 8            Our trial hours -- and you'll get all of this again

 9   tomorrow and you can write some of this down; if you can

10   write it down now, that's fine.  Our trial hours are from

11   Monday through -- this going to vary a little bit -- Monday

12   through Friday, trial days Monday through Friday, 9:00 to

13   12:00 and 1:30 to 4:30.  That being said, the first and third

14   Fridays of this month -- this coming Friday, February 1st,

15   and then February 15 -- we will not be in trial.  These are

16   calendar days that I have for other cases; I'll be hearing

17   many other matters in the courtroom, so the courtroom just

18   isn't available for trial.  So we will not be in session this

19   coming Friday, the 1st, and two weeks after that, Friday, the

20   15th.  I know, Mr. Bilse.  I'll get with you in just a

21   moment.  And then we have a holiday, Presidents Day, which is

22   the --

23            THE CLERK:  It's the 18th.

24            THE COURT:  Monday, the 18th, so we'll be -- we

25   won't be in session on that day as well.  So there you have

1    three days off.  So that takes care of pretty much the time,

2    9:00 to 12:00, 1:30 to 4:30, a midmorning recess of 15

3    minutes, a midafternoon recess of 15 minutes, and your noon

4    recess is from 12:00 to 1:30.  That may seem a little bit

5    extravagant, but I want to tell you that the attorneys and I

6    appreciate that kind of time during the middle of the day.

7    There are a lot of moving parts to a trial like this; it's

8    more or less the tip of the iceberg that you're seeing, but

9    it takes coordination for a lot of people, and that kind of

10   time during the middle of the day is very helpful.  If we

11   need to go beyond 4:30 a bit to finish up a witness or to

12   accommodate a convenient break in the testimony, we'll do

13   that.  But typically those will be the hours that we'll keep.

14        If an emergency arises, we always want you to call

15   us and to let us know whatever that situation might be,

16   illness which is going to prevent you from coming in or some,

17   other emergent circumstance.  You can always leave a message

18   with Gaby at her extension, which is area code 619 -- are you

19   going to give them cards?  Okay.  Have they been handed out?

20   Why don't we hand those cards out.  If anything comes up,

21   don't hesitate to give us a call, please, and then we'll act

22   upon it as soon as we can.  Okay.

23        Always wear those badges when you're in and about

24   the courthouse.  They readily identify you as jurors, and

25   they help insulate you from any conversation you should not

 1  be privy to.  If you're a block from the courthouse in the

 2  morning and realize that you've forgotten your badge, don't

 3  go back and get it; we've got extras, so keep on coming.

 4          Parking.  We're going to get a parking validation

 5  machine here, at least the first couple of days.  I don't

 6  think we're going have it for the duration of the trial, but

 7  at least for the first couple of days while you're getting

 8  situated and all of that, we'll have -- we'll be able to

 9  validate parking for you right in the courtroom, Courtroom

10  16.  Mr. Bilse, you had a scheduling matter you wanted to

11  discuss?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR:  I have a presentation I have to

15  do at a luncheon next Thursday, and my boss was going to sub

16  it.  He cannot do that, so it's probably a couple of hours

17  next Thursday at lunchtime.

18          THE COURT:  Well, can he sub for you?

19          PROSPECTIVE JUROR:  He can't.

20          THE COURT:  Oh, he cannot do that.

21          PROSPECTIVE JUROR:  He cannot.  I have to make

22  that.  And there's about 60 people that are paying to come

23  and listen to me, so it's kind of hard to get out of that.

24          THE COURT:  And this is going to be this coming

25  Thursday or a week from Thursday.

1        PROSPECTIVE JUROR:  A week from Thursday.

2        THE COURT:  From 12:00 to 2:00 did you say?

3        PROSPECTIVE JUROR:  It's in Mission Hills and it's

4   a lunch, so it's from 12:00 to 1:00, but, you know, traveling

5   there and back, I'm not sure how long that would take from

6   here.

7        THE COURT:  Okay.  Well, we'll work around that.

8   We'll -- if we need to stop a little bit early to get you

9   there -- do you need to be there at 12:00 on the spot?

10        PROSPECTIVE JUROR:  I don't have to set it up, so

11   I'll try to make it as minimal as possible.

12        THE COURT:  Okay.  And then get back here just as

13   quickly as you can?

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  Okay.  Well, any of you have any

16   questions before we let you go for this evening and ask that

17   you return tomorrow morning?  I'll have more to tell you

18   about tomorrow morning, but -- you've been taking in an awful

19   lot the last couple of days, and I think we've hit the

20   saturation point.  Remember the admonition; it's so very

21   important.  You may not discuss this case amongst yourselves

22   or with anyone else or allow yourselves to form or express

23   any opinions until the case has been submitted to you.

24        It's also very important that you remember you're

25   not to conduct any independent investigation or inquiry into

1    the facts or the law, into any of the participants in this

2    case, into any subject matter that has anything to do with

3    this trial.  So as I said before -- yes, Mr. Johnson?

4              PROSPECTIVE JUROR:  Sorry, sir.  Quick question.

5              THE COURT:  Yes, sir.

6              PROSPECTIVE JUROR:  You say we're not supposed to

7    discuss anything, but you mentioned notepads, materials.  So

8    will we be leaving the materials that we take, any type of

9    notes or anything here?

10             THE COURT:  Yes, yes.  You'll be given notebooks.

11   You'll be -- you'll be expected to take notes.  You're not

12   required to take notes, but you're expected to take notes,

13   and I'll have more to say about the notetaking process

14   tomorrow.  You'll be leaving your notebooks here in the

15   courtroom -- not in this courtroom but in Courtroom 16 --

16   each night.  They'll be secure; don't have to worry about

17   that.  You don't take them home with you.  And you take notes

18   by -- not electronically but the old-fashioned way, writing

19   in your notebooks.  Does that answer your question?

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  Okay.  Very good.  So where was I?

22             THE REPORTER:  Don't discuss anything.

23             THE COURT:  Oh, yeah, independent investigation or

24   inquiries.  I think I covered that.  Like I said, you know,

25   anything that you may see in a newspaper or article or on TV

 1    or the Internet having anything to do with the this case

 2    conceivably, or any subject connected with the case, just

 3    don't expose yourself to it.  All right.

 4              Thank you for your time, your patience.  We look

 5    forward to working with you on this case.  We'll see you

 6    tomorrow morning at 8:45, Courtroom 15, then you'll be

 7    brought over one courtroom.  We'll see you then.  Courtroom

 8    16?  Okay.  Why don't you assemble outside Courtroom 16 or in

 9    some other area.  It may be that we'll have people in

10    Courtroom 15 tomorrow.  So just assemble outside the

11    courtroom before nine o'clock or in some other location close

12    to our courtroom.  We'll get you in as soon as we can and get

13    started.  Okay.  Have a very good evening.  We'll see you

14    tomorrow morning.

15        (The prospective jury left the courtroom.)

16              THE COURT:  Okay.  We are outside the presence of

17    all jurors.  Counsel, are you ready to proceed with

18    deposition rulings?

19              MS. FONTIER:  If I may just collect the notebook

20    again.

21              THE COURT:  This will be a little bit of a tedious

22    process.  Do you wish to have your clients here?  They're

23    perfectly -- it's perfectly acceptable to have them.

24              MS. FONTIER:  Mr. Moalin would like to stay, your

25    Honor.

```
 1              THE COURT:  Everyone staying?
 2              MR. GHAPPOUR:  Yes, your Honor.
 3              MS. MORENO:  Yes, your Honor.
 4              THE COURT:  I had to go back and forth a little
 5    bit.  I was working with different pleadings and not -- and I
 6    think the defense objections were not set forth in a -- in a
 7    separate pleading or paper.  I think the -- when we reached
 8    out to see if one was forthcoming, I think we were advised --
 9    I was advised that the objections are right in the
10    transcripts themselves and wouldn't be the subject of a
11    separate pleading.  The government did set forth a separate
12    filed -- a pleading entitled United States Objections to
13    Defense Depositions and Response to Defense Objections.  And
14    then there was a joint statement of responses and bases for
15    objections in testimony -- in deposition testimony filed by
16    the defense.  So I was going back -- I was actually juggling
17    three different sources of objections or responses to
18    objections, looking at these two filings and then looking at
19    the deposition transcripts.  So work with me on this.  If I
20    miss something, let me know.  I think -- I think I'll be
21    pretty thorough here, but don't hesitate to let me know if
22    I've overlooked something.  Okay.
23              I'm dealing with tape 1 now.  There was a -- I saw
24    somewhere that there was an objection by the government to
25    lines 9 through 14 on page 10.
```

 1             MR. COLE:  I think that their page numbering was

 2     off on that particular one because page 10 --

 3             THE COURT:  I didn't see it.

 4             MR. COLE:  Our first objection is on page 11.

 5             THE COURT:  Yeah, I didn't see anything highlighted

 6     on page 10, but somewhere I picked up there was an objection

 7     from the government to lines 9 through 14.  So if there's no

 8     objection, then there will be no ruling on page 10.  Page 11.

 9             MS. FONTIER:  So just to be clear then when -- the

10     government's just saying that they're withdrawing their

11     objections that they made then, yes?  I mean it doesn't

12     matter.  It's -- there is an objection right now to --

13             THE COURT:  I don't know where I got that.  I'd

14     rather not go through all the individual filings, but --

15             MS. FONTIER:  Okay, your Honor.  Page 11.

16             THE COURT:  The diagram was on page 10 that there

17     was an objection to lines 9 through 14.  If there was an

18     objection, it's withdrawn.  Page 11, the government is

19     objecting to lines 5 through 11.  That objection is

20     sustained.  The deponent is not being asked what was said,

21     only whether Mr. Moalin's comments were critical.  It calls

22     for speculation, lacks foundation as to what is critical.  It

23     may be hearsay, but it's sustained on those other grounds.

24             With respect to the government's objection at lines

25     20 to 23, same ruling.

1          The next objection from the government, that comes

2     at page 21, line 15 to page 23, line 20.  The objection is

3     sustained on the basis of -- as hearsay.

4          MS. FONTIER:  Sorry, your Honor.  How far did we

5     go?

6          THE COURT:  Page 21-15 through 23-20.

7          MS. FONTIER:  That entire two pages?

8          THE COURT:  Yes.

9          MS. FONTIER:  Okay.

10         MR. COLE:  Your Honor, let me note on that one, in

11    fairness we appreciate the ruling.  We are going to play some

12    part of that call, and so as I sit here right now, I don't

13    have the portion, and so I just want to note that for the

14    Court in case this, you know, at that point the defense is

15    going to --

16         THE COURT:  Well, I may open up the door then --

17         MR. COLE:  Right.

18         THE COURT:   -- Into everything coming in, but as

19    of this point --

20         MR. COLE:  Yes.

21         THE COURT:  -- the objection would be sustained.  I

22    have a further note on this, that it's sustained on grounds

23    asserted by the government; it also -- that was hearsay -- it

24    also lacks foundation as to the conclusion the U.S.

25    government was overflying Mogadishu.

1          MS. FONTIER:  So, your Honor, for purposes of

2     editing these tapes when things such as this which are

3     hearsay because the call isn't yet in evidence, I don't know

4     how to deal with that as far as the tape.  I mean we can

5     leave it in I guess and then at some point skip -- I'm not

6     entirely sure how to do it, so tell me how we're going to do

7     this.

8          THE COURT:  Well, I think you really need to

9     consider spending some quality time together so you can

10    really work on this.  Everything has been telescoped down.

11    This is not a statement that's critical of anyone here, but

12    that's just what is happened.  And so I know you've been

13    under a lot of pressure, both sides have been under a lot of

14    pressure, and things were getting to one another late for

15    reasons that are already a matter of record and obviously

16    getting to me late.  But we're at the point now where the

17    rubber meets the road, and this jury is coming in to begin

18    the evidence tomorrow.  So I know you've got many attorneys

19    here, and you're going to have to create a division of labor

20    where perhaps one or a couple of you are going to have to sit

21    down with one of the attorneys from the government and really

22    work this out.  Burn the midnight oil, do whatever you need

23    to do.  I can't advise you as to what the best approach --

24          MS. FONTIER:  Okay.

25          THE COURT:  -- would be, but you're going to need

1  to do something that's going to bring about as seamless a

2  presentation of the testimony as possible --

3          MS. FONTIER:  Yes, your Honor.

4          THE COURT:  -- once you've got these rulings.

5  So --

6          MS. FONTIER:  Your Honor, was there some portion

7  from pages 21 through 23 that regardless of if the tape is

8  played it will still not be admissible because your Honor had

9  mentioned some other cases.  Or if this -- if the tape is

10 played, this is admissible.

11         THE COURT:  Well, all I can do is rule upon the

12 objections and the grounds asserted for the objections.

13         MS. FONTIER:  Okay.

14         THE COURT:  In this one particular instance, I --

15 with a hope it would be of assistance to the parties -- even

16 went beyond the hearsay objection, letting you know that this

17 testimony was without foundation and there was a conclusion

18 insofar as there was speculation about the U.S. government

19 overflying Mogadishu.  So I'm trying to be helpful.  If you

20 all agree that some of this is coming in, then you're doing

21 so in light of the objection having been sustained.  I hope

22 we don't get bogged down --

23         MR. COLE:  No, no.  I don't plan on -- your Honor,

24 I -- we like the Court's ruling.  I just -- since they took

25 the deposition -- it's only going to come up maybe once or

1    twice because I think they took the calls only once or twice

2    during the whole deposition.  But since they took them

3    before, you know, this case happened -- their case happened

4    out of order, so to speak.  It may be confusing once or

5    twice.  But we'll talk to defense counsel.

6           THE COURT:  Okay.  Okay.  So I think that was it

7    for tape 1.  I'm just making sure that I don't see any

8    defense objections here.

9           MS. FONTIER:  No, your Honor.

10          THE COURT:  Still on -- okay.  We're on tape 2.

11    Going through tape 2, the first objection is page 13.  This

12    is a defense objection.  It's highlighted in green.  It is

13    overruled.  If that's still an objection, its overruled.  I

14    had -- I had the impression that some of these objections

15    would be withdrawn in light of other testimony coming in that

16    was unobjected to.  I don't know if you've gone back and

17    looked at that through the same lens --

18          MS. FONTIER:  Your Honor, as to that particular

19    objection I don't know why it wasn't withdrawn.  It may have

20    just have been somewhere in the confusion of trying to

21    color-code these properly, and I don't think that was an

22    objection that we needed you to sustain.

23          THE COURT:  All right.  Well, I'll go through --

24    I've made the rulings, I'll give you what those rulings are,

25    and then hopefully that will be helpful for you in putting

1    together your tapes.  So that one was overruled if it wasn't

2    withdrawn.

3            The next objection I have is from the defense.

4    It's page 16, line 25 through page 17, line 2.  That

5    objection is overruled, but I also note -- it's overruled on

6    the ground asserted, but I also note that it's unintelligible

7    in part.  I just didn't really understand what was being

8    communicated there.  But in any event, that objection is

9    overruled.

10           I think next, page 21, a defense objection.  This

11   objection is sustained.  It is to the testimony set forth at

12   page 21, line 21 through 26.  Lack of foundation.

13           I was a little unclear -- the next is page 22, tape

14   3 -- tape 2, excuse me.  Lines -- I see green marking lines

15   21 through 27.  I was a little unclear as to whether this

16   was -- I have a question mark by it.  Was this even -- was

17   this being pursued, Ms. Fontier?

18           MS. FONTIER:  Let me ask Mr. Dratel what the source

19   of this objection was.

20           THE COURT:  It just didn't -- it goes -- it goes

21   over to the first two lines of page 23, but it just doesn't

22   seem to add anything.  It's the kind of thing that could be

23   eliminated I think.

24           MS. FONTIER:  There's certainly colloquy that needs

25   to be eliminated, but I don't know if there was an objection

1    that --

2              MR. DRATEL:  That's withdrawn, your Honor.

3              THE COURT:  Okay.  Next, I have on page 25, still

4    on tape 2, lines -- lines 3 through 7, sustained on hearsay,

5    lack of foundation, carrying over to lines 11 through 15.  So

6    the defense objection there is sustained.

7              Next we're on to tape 3.  The government's

8    objection -- I'm looking now at page 6; this is tape 3, page

9    6, lines 4 through 10.  The government's objection is

10   sustained on the basis of hearsay as well as lack of

11   foundation.

12             Next, objection from the government, page 11, line

13   25 -- actually 26 -- through page 12, line 15.  The

14   government's objection is overruled upon the condition that

15   the word "charity" is stricken.  It is without foundation and

16   definition.  And what remains is defendant Moalin's sending

17   money to people identified by Abdi as "poor."  So I guess the

18   takeaway on that is that the word "charity" is stricken.

19             MS. FONTIER:  And so that --

20             THE COURT:  Everything else remains.

21             MS. FONTIER:  Does that carry over then into line

22   6, my follow-up question; is that correct?  Just strike

23   "charity" from my question as well, his answer --

24             THE COURT:  Yeah, any reference to "charity."

25             MS. FONTIER:  Okay.

1            THE COURT:  Next we have an objection by the

2    defense, page 18, lines 9 -- 9 through 13.  That would be

3    overruled.  I think a good many of these objections are --

4    probably would be withdrawn upon further reflection.

5            Next, on page 21, tape 3, an objection, lines 1

6    through 4.  Overruled.  The foundation would be sufficient.

7            Next, on page 25, lines 4 through 12, the defense

8    objection is overruled, especially in light of prior

9    testimony on page 24.  Sometimes there would be testimony

10   that came in unobjected to and then the same or virtually

11   identical testimony would be elicited at a later point in

12   time and there would be an objection.  But in any event, the

13   foundation is sufficient there -- is sufficient -- page 25,

14   lines 4 through 12.

15           MS. FONTIER:  And, your Honor, the objection as to

16   the scope was also overruled?

17           THE COURT:  Yes.  Well, I had -- I noted that the

18   foundation was sufficient.  I think the scope is closely

19   related to that.  The position of the government is the

20   deponent lived and worked in Guraceel and could testify to

21   his own knowledge of the events occurring in this small town,

22   which I would -- I would tend to agree with.

23           MR. COLE:  I also -- we took the position also

24   that, unlike witnesses who are going to be here and subject

25   to recall, this was our only chance to ask the witnesses

1   questions.

2          THE COURT:  Yeah, yeah.  I don't -- I tried not to

3   be overly technical in looking at some of these objections

4   for the reason mentioned by Mr. Cole.  You had one crack at

5   it and you know these folks aren't going to be here.

6          MS. FONTIER:  I understand.

7          THE COURT:  Okay.  Then we're on to -- we're on to

8   tape 4 now.  The first objection, page 1, lines 21 through

9   27, then on to page 2, line 1.  The objection is overruled.

10  This is a defense objection.  Overruled.  And the defense

11  objections on the rest of that page, page 2, would be

12  overruled.  I think that's probably one you would --

13         MS. FONTIER:  These are withdrawn, your Honor.

14         THE COURT:  -- would have been happy to withdraw

15  because --

16         MS. FONTIER:  Those are withdrawn.

17         THE COURT:  I wrote myself a note:  The defense

18  can't be serious on this.

19         MS. FONTIER:  Yeah, those are withdrawn.

20         THE COURT:  Okay.  Those are overruled on page 2.

21  All right.  Next, page 4, first couple of lines there, page

22  4, lines 1 through 3.  Overruled.  Defense objection is

23  overruled.

24         Next, page 5, defense objection to lines 7 through

25  14.  Overruled.  The witness's prior -- just for your

1  information, in my view, the witness's prior testimony laid

2  the foundation for that.  Next, page 9 --

3          MS. FONTIER:  Your Honor, I would withdraw that.

4          THE COURT:  Okay.  On page 9?

5          MS. FONTIER:  Yes.  On 21 through 26?

6          THE COURT:  Yes.

7          MS. FONTIER:  Yes, I would withdraw that objection.

8          THE COURT:  Okay.

9          MR. COLE:  Wait, your Honor.  That was my

10 objection, wasn't it?  Wait a second.

11         MS. FONTIER:  Oh, yeah, it was.  No wonder I

12 withdraw his objection.

13         MR. COLE:  Sorry, your Honor.

14         MS. FONTIER:  I was thinking why would I object to

15 that.

16         MR. COLE:  Page 9 --

17         THE COURT:  Okay.  No, you're right.  Here's my

18 note.

19         MS. FONTIER:  Sorry about that, your Honor.

20         THE COURT:  That's okay.  Nice try.  It's getting

21 late, but here's the ruling on that.

22         MR. COLE:  I actually withdraw it, your Honor.  I

23 didn't insert it in my chart.  I think I looked at it and

24 realized --

25         THE COURT:  Just for your own edification, this is

1   what I had:  This wasn't listed on the government -- in the

2   government's papers, but I would have been inclined to

3   sustain the objection on foundation, plus the answer appears

4   to be nonresponsive.  Look, you're withdrawing it, so that's

5   fine.  Okay.

6          There was an objection on page 17, lines 19 through

7   24.  They weren't color-coded, but I am overruling the

8   government's objection.  Oh, I'm sorry.  I'm ahead of myself.

9   I'm already on tape 5 in your papers.  No.  Strike that.

10  There's no -- no further --

11          MR. COLE:  Tape 5, page 17, your Honor?

12          THE COURT:  No, no.

13          MR. COLE:  Sorry.

14          THE COURT:  Forget the earlier reference.  I was

15  one -- I wasn't correlating the tape -- with your papers with

16  the transcript here.  So on the balance of tape 4 there are

17  no further objections.  Let's go to tape 5.  I think the

18  first objection I'm dealing with is at page 17.  The

19  government has objected to page 17, lines 19 through 24.

20  Overruled.  Basic history and context for defendant Moalin.

21  That's how I see this, and I think it's appropriately

22  admissible.  Once again, we're getting into an area what's

23  sauce for the goose is sauce for the gander.  Where we have

24  context and a little bit of history, whether it's to humanize

25  the defendant, whether it's to provide some kind of a

1    historical/cultural reference for Bryden, we're talking

2    essentially the same kinds of things.  The parties should be

3    given some license to create a little bit of a backdrop here,

4    so this objection would be overruled.

5            Tape 6 -- that was it for tape 5.  We're on to tape

6    6 now.  The government's first objection is page 5, lines 19

7    through 26.  That objection is overruled.  The objection is

8    relevance.  Overruled.  It goes over -- the objection goes

9    over to page 6, line 6.  Same ruling.  Then the next would be

10   page 6, line 15 through lines 28.  Overruled on the same --

11   on the same ground.  Next, page 6 -- excuse me, page -- well,

12   you have two objections there.

13           MR. COLE:  Yes.

14           THE COURT:  Yeah.  There's an overlap of

15   objections.  In any event, the testimony from page 6, line 15

16   through page 7, line 22, all of that is overruled.  Those are

17   government's objections; they're overruled on the grounds

18   asserted.  Then when we get to page 7, line 24 through page

19   8, line 3, the government's objection is sustained on

20   relevance and hearsay.  Okay.

21           Page -- next is page 8, line 22 through page 11,

22   line 10.  I'm inclined to sustain this.  I'll tell you why.

23   If it were coming in here live -- I'm inclined to sustain it

24   on the basis of relevance; that's the ground the government

25   asserted here.  My note here is I'm inclined to sustain it as

1   it relates only to the witness's drought relief work and

2   doesn't involve Mr. Moalin.

3           MS. FONTIER:  So, your Honor, would the picture

4   itself be admissible then?  And just to take out of this the

5   description of Farah Yare, who's one of the people pictured

6   in this copy --

7           THE COURT:  Well, you got me there.  I don't know.

8   I really don't know.  I'm just looking at the testimony

9   itself.  And if any photograph or diagram that was

10  inextricably interwoven here would also be out, but if the

11  diagram or photograph comes in for other purposes or it's

12  stipulated that it can come in because it shows an area of

13  drought relief, for example, is going to be used in

14  connection with other testimony, the other testimony of other

15  witnesses, okay.  I have to leave that to your common sense

16  and your ability to work this out.  But the evidence -- the

17  testimony itself is not relevant.  I would keep it out on 403

18  grounds.

19          MS. FONTIER:  Can I have one moment, please?  Your

20  Honor, I'm slightly confused because there's two different

21  photographs in this list that --

22          THE COURT:  I wasn't even considering the

23  photographs.  I'm considering the testimony.

24          MS. FONTIER:  So strike the portions of the

25  testimony regarding --

1          THE COURT:  The testimony is stricken.  If the

2     photographs come in at a later -- in connection with later

3     testimony by this deponent or other deponents or it comes in

4     through agreement with the parties, that's fine, but --

5          MS. FONTIER:  All right.  Your Honor, I would

6     just --

7          THE COURT:  I can't -- we just don't have the time

8     to argue these.  And, quite frankly, I did these so long ago

9     now that the context of all of this -- I'd have to probably

10    review the entire testimony of a deponent once again to

11    appreciate what your concern here is or what your request is.

12    I'm just giving you rulings on the objections that were made.

13         MS. FONTIER:  Okay.

14         THE COURT:  I would suggest you take down the

15    rulings, and if there's something that gives you so much

16    heartburn you can't proceed, without making a pitch, then

17    we'd look at it at some later time, but I know you need these

18    rulings to --

19         MS. FONTIER:  Well, your Honor, my only concern on

20    this particular portion of the ruling is that these like

21    questions going into this were just to lay a proper

22    foundation for the admission of the photographs so that I

23    could later question the witness about what was in the

24    photographs and --

25         THE COURT:  This witness or another witness?

1          MS. FONTIER:  Both.  The next -- this whole section

2     that we're talking about.

3          THE COURT:  Well, is there any unobjected-to

4     testimony later or is it all objected to on the basis.  Does

5     the photograph come in through any other witness?  Can it

6     come in through any other witness?

7          MS. FONTIER:  I admitted it through this witness,

8     but --

9          MR. COLE:  Yeah, I don't know if they can -- if

10    they have other witnesses that get it in or not at trial, but

11    we object to its relevance here, and we object to --

12         THE COURT:  I don't know if the photograph is

13    independently relevant in connection with other evidence or

14    not, but we do need to move on, so --

15         MS. FONTIER:  All right.

16         THE COURT:  If the photograph is inextricably tied

17    to the testimony and there's no other basis to get it in, I'm

18    sustaining the objection to the testimony on the ground

19    asserted.  You know, it's five o'clock now.  I know the

20    marshals need to get these gentleman back in, so we have a

21    couple of choices now.  We can continue on -- I'm happy to

22    continue on if you want to waive the presence of your clients

23    at this point or we can pick up again early in the morning,

24    before nine o'clock, but I know that that imposes a hardship

25    on the marshals.  I know that every hour -- every hour we

1    advance any proceeding here I'm informed that these gentlemen

2    have to get up an hour earlier, and they're getting up early

3    enough as it is, so I want them to get their rest as well.

4         MS. FONTIER:  Mr. Moalin is definitely choosing to

5    waive his presence for the remainder of this evening.

6         MS. MORENO:  The same for Mr. Mohamud.

7         MR. GHAPPOUR:  Mr. Doreh as well.

8         THE COURT:  Okay.  All counsel have waived the

9    presence of their --

10        MR. DURKIN:  That's right, Judge.

11        THE COURT:  -- clients at this point for the

12   purpose of continuing on.  That will relieve our interpreters

13   as well.  And then we'll just continue on.  Ms. Fontier, I

14   know that you've picked up the laboring oar on this part of

15   the proceedings, that is, deposition testimony.  Other

16   counsel are free to remain if they'd like to hear what the

17   rulings are or they're free to --

18        MR. DURKIN:  That's what I was going to ask, Judge,

19   if we can be excused.

20        THE COURT:  -- free to take your leave.  We'll --

21   and the same goes for the government.  If only one of you

22   wants to remain behind, I'll work with you, continue on with

23   the rulings and go as far as we can.  I've got to leave here

24   within an hour.

25        MS. FONTIER:  Okay.

1            THE COURT:  Are we breaking then for those leaving?

2            MS. FONTIER:  Yes.  Thank you, your Honor.

3            THE COURT:  For those of you leaving, please take

4   all of your articles, take your papers; we won't be back here

5   in this courtroom again.

6            MS. FONTIER:  Your Honor --

7            THE COURT:  That's okay.  No, no, I never like to

8   break in.

9            MS. FONTIER:  You need a big gavel like they have

10  on TV.

11           THE COURT:  Only in movies and television.  Okay.

12  We're going to continue on, and we're going to have Ms.

13  Fontier and Mr. Cole.  You ready to go?

14           MR. COLE:  Ready to go.

15           THE COURT:  Okay.  Mr. Ghappour is leaving.  Okay.

16  Ready to go?  Mr. Dratel, you going to hang in there with us?

17  You are taking off?

18           MR. DRATEL:  I have too much to take care of.  I

19  would love to, but --

20           THE COURT:  Counsel, thank you for all the patience

21  and cooperation in selecting the jury.  I know we were

22  pushing pretty -- at a pretty good pace there over two days,

23  but I appreciate getting this jury selection done on time so

24  that we can work within the schedule.  I think you were all

25  anticipating starting the case on Wednesday, tomorrow.

1          Okay.  Let's get to -- we're still on tape 6, page

2    11, line 27 through page 12, line 3.  The objection is -- the

3    government's objection is sustained on the ground asserted.

4    Page 13, line 20 through page 14, line 5, the objection is

5    sustained on basis of lack of foundation.  Page 16, lines 4

6    to 22.  The objection is sustained on the basis of relevance.

7          MS. FONTIER:  Your Honor, I just want to make a

8    record on that point.

9          THE COURT:  Yes.

10          MS. FONTIER:  Which is this photograph depicts

11    Farah Shidane, Farah Yare, who is called by the government

12    one of the unindicted co-conspirators who we were unable to

13    call as a witness because we could not get safe passage for

14    him.  But I do think that any testimony related to him if

15    he's -- particularly if he's an unindicted co-conspirator is

16    of particular relevance.

17          THE COURT:  Well, okay.  You've made your point on

18    that.  I would sustain the objection on the basis of

19    relevance, 403.  This is to lines 4 through 18.  It's of

20    minimal probative value, and it's also cumulative.  Now, with

21    respect to the testimony on page 16, line 23 through page 18,

22    line 12, this is one of the very few areas where I was going

23    to indicate my tentative thought because I see this as a

24    significant objection -- I mean it's a significant matter,

25    and I'm inclined to sustain this.  Originally the witness's

1   testimony seem to be based on his own knowledge.  Here he

2   admits his information about defendant's work for -- or plans

3   and drought relief were told to him by Shidane and other

4   committee members.

5           Now, you know, the fact that Shidane didn't want to

6   go to Djibouti to get his deposition taken is really a crying

7   shame.  You know, if he had some inordinate fear that he was

8   going to get snapped up, the government I think was on record

9   as indicating they had absolutely no intention of doing that,

10  so Shidane made a decision on his part not to appear for his

11  deposition.  And I just think that if he purposefully

12  unavailed himself of the opportunity to -- to appear for his

13  deposition, then this does not come in, that is, information

14  that he might have provided does not come in through hearsay.

15  That's my inclination here.

16          MS. FONTIER:  And, your Honor, I do have to object

17  to that sort of recitation of the facts.  The government,

18  which we made very clear I think in multiple Rule 15

19  filings/request for safe passage and motioned related to

20  Mr. Shidane.  The government stated, as your Honor said, that

21  they had no intention of arresting him, but they would not

22  put that in a written letter; they wouldn't say we won't

23  arrest him.  And we went back and forth with the government

24  on this issue, just requesting just even a statement, a

25  letter, a simple letter saying they would not affect his

 1    arrest, and when push came to shove, they would not give us

 2    that in writing.

 3              THE COURT:  Okay.

 4              MS. FONTIER:  They wouldn't say it.  So the

 5    issue --

 6              THE COURT:  The issue has been joined.  I want to

 7    give you an opportunity to make your record; I think you're

 8    doing that.  But the issue has been joined, as you correctly

 9    point out in prior motion work here.  I don't know what can

10    be added at this point.  All I can do is say that the

11    government's objection here is well-taken.

12              MS. FONTIER:  Again, your Honor, just for the

13    record, you know, this is -- we believe that he is -- was

14    called a co-conspirator when he in fact is not.  He would

15    have offered exculpatory evidence and was made unavailable

16    because they would not offer him safe passage.

17              THE COURT:  Okay.  Well, let's continue on then.

18    That takes cakes of testimony through page 18, line 12.  Then

19    we have page 18, line 13 through page 22, line 10.  The

20    government's objection is sustained generally on relevance

21    grounds without tying defendant Moalin to any particular

22    project.  That's also an inadequate foundation for the

23    business record exception under 803 (6).  All right.  Tape 7,

24    page 13 --

25              MS. FONTIER:  Sorry, your Honor.  How far did

 1   that --

 2               THE COURT:  For as long as the objection went.

 3               MS. FONTIER:  It goes all the way through page 22?

 4               THE COURT:  Yeah, line 10.  Okay.  We have tape 7

 5   through now, page 13, lines 4 through 10.  The government's

 6   objection is overruled.  Page 17, line 3 through 9.  If

 7   government's objection is withdrawn.

 8               On to tape 8, page 3, lines 21 through 24.  The

 9   government's objection is overruled.  Page 5, line 19 through

10   page 6, line 28.  All of the objections of the government are

11   sustained.  Page 7, line 1 through page 10, lines 12.  The

12   objections are sustained.

13               I think -- the next defense objection, page 13, I

14   think that's one you probably want to withdraw, but if not,

15   the objection is overruled.  Up to you whether or not you

16   want to withdraw that.

17               MS. FONTIER:  Yeah, that's withdrawn, your Honor.

18               THE COURT:  Okay.  I think that -- I think that

19   does it for -- let's see -- page 17.  The objection is

20   overruled.  That may be another one you want to just withdraw

21   some testimony.  You might want to withdraw upon further

22   reflection, but I'm overruling the defense objection there.

23               MS. FONTIER:  Yeah, either way.

24               THE COURT:  Okay.

25               MS. FONTIER:  Overruled or withdraw is fine by me.

1              THE COURT:  Okay.  I'll mark it as withdrawn.

2     Next, page 20, lines 22 through 26.  I think it falls into

3     the same category; it's either withdrawn or overruled, your

4     choice.

5              MS. FONTIER:  Did we skip page 19?

6              THE COURT:  If we did --

7              MS. FONTIER:  Page 19, line --

8              THE COURT:  Yeah, page 19, lines 4 through 15 would

9     be overruled.  As I say, you may want to go through so many

10    of your objections that would appear to be appropriate for

11    withdrawing.  But in any event, I'll give you the rulings

12    now.  Page 20, lines 22 through 26 and on to page 21 through

13    lines 2, 1 and 2.  The objection of the defense is overruled.

14    And same ruling for page 23, lines 8 through 10.

15             Tape 9, page 1.  The objection of the defense at

16    lines 5 through 11 would be overruled, especially in light of

17    the answer.

18             MS. FONTIER:  I believe I withdrew that.

19             THE COURT:  Okay.  Nobody told me.

20             MR. COLE:  I'm sorry.  Tape 9, page 1, 6 through

21    11?

22             THE COURT:  Yes.

23             MR. COLE:  Thank you, your Honor.

24             THE COURT:  That's overruled.  I mean withdrawn

25    apparently.  Okay.  Page 2, lines 12 through 18.  The defense

1    objection would be overruled in light of the responsive

2    answer.  You may want to withdraw that, but the ruling is

3    overruled.

4              MS. FONTIER:  I guess I have a -- this one is not

5    color-coded; that's why I'm confused.  Sorry, this particular

6    tape of mine, but I can work with it.

7              THE COURT:  Okay.  Page 3, defense objection, lines

8    13 through 19, overruled in light of the answer and prior

9    testimony.  Page 6, lines 1 through 19.  The objection is

10   overruled.  This goes to the witness's understanding of

11   al-Shabaab and the threat posed in '07 to '08.  Page 7,

12   lines 6 through 11, overruled.  Page 11, the only objection I

13   see is at lines 10 through 22 in light of the unobjected-to

14   prior testimony.  So if you look to the testimony from lines

15   1 through 9, which came in without objection, and then you

16   look at the testimony, the objected-to the testimony from the

17   defense, lines 11 through 22, it's -- the objection is

18   overruled in light of the unobjected-to prior testimony.

19             MS. FONTIER:  I'm sorry, your Honor.  What page are

20   we on?  I'm totally lost.

21             THE COURT:  Page 11.

22             MS. FONTIER:  Page 11 of tape 9?

23             MR. COLE:  Yes.

24             THE COURT:  Yes.

25             MR. COLE:  It's 11 through 22.

1              MS. FONTIER:  I don't see an objection.

2              THE COURT:  Well, it's color-coded here in green.

3              MS. FONTIER:  I think I must have printed the wrong

4    -- I mean I don't have any objections on this one, so I'm

5    assuming that this type of mine is the wrong color, the

6    wrong --

7              MR. COLE:  The objection was at line 22

8    specifically I think.

9              MS. FONTIER:  Right.  I'm looking at this and I

10   don't even have the word "objection" on here, so that's why

11   I'm concerned now that I'm totally off base here.

12             THE COURT:  Okay.  So objection withdrawn then on

13   page 11?  Well, the objection -- the color-coding I'm looking

14   at is from line 10, the question starting at line 10 and a

15   half there through 22.  The objection is overruled in light

16   of the unobjected-to prior testimony.

17             MR. COLE:  Just to save time, I'll sit next to her

18   with my copy because I --

19             MS. FONTIER:  I just lost --

20             THE COURT:  Okay.

21             MS. FONTIER:  Because this -- we're on a different

22   page totally.

23             THE COURT:  Okay.  Ready?

24             MR. COLE:  Yes.

25             MS. FONTIER:  Yes, your Honor.

 1              THE COURT:  Okay.  Continuing on, now we probably

 2   won't have that problem anymore.  All right.  Here we go

 3   again.  Page 17, I see green, lines 11 through 23.  The

 4   objection is overruled if it's still being pursued.

 5              MS. FONTIER:  It is, your Honor.

 6              THE COURT:  Page 18, lines 19 through 22,

 7   overruled.  Page 19, testimony -- there's an objection to

 8   lines 1 through 4.  Overruled, especially in light of the

 9   answer at line 6.  Page 21, it's overruled in light of other

10   unobjected-to testimony regarding Shongole and also on the

11   basis of relevance and -- on the basis of relevance.

12              Next, page 23, the objection is overruled; that's

13   lines 11 through 16.  Next, page 24, lines 6 through 10, the

14   objection is overruled.  Now we're on to tape 10.  You with

15   me?

16              MS. FONTIER:  Yes.

17              THE COURT:  Tape 10, okay?  Okay.  It starts on

18   page 1, line 24 through page 2, line 14.  Each of the

19   objections would be overruled, the hearsay objections.  Next,

20   we have page 3, I've got lines 3 through 17 in green

21   indicating a defense objection.  It would be overruled.  This

22   testimony concerns -- or the questions inquire into the

23   witness's knowledge and familiarity with Yare, gone into

24   extensively on direct examination, so I don't know -- I don't

25   understand why it would be objected to on cross-examination.

1   Be that as it may.

2           Page 4, the objection is -- this is defense

3   objection -- the objection is sustained to lines -- from

4   lines 2 to 23 in light of the objections and clarifications.

5   Sustained as to lines 2 through 23.  Overruled as to line 24

6   on page 4 through line 5 on page 5.

7           Next, we have page 6, objection to testimony from

8   page 6, line 15 through page 7, line 10.  The defense

9   objection is to -- the objection is overruled.

10           Next, we have on page 10, line 23 through page 11

11   line 5.  The objection is overruled in light of testimony on

12   page 11, particularly at lines 21 and 23.  Turn to page 14,

13   please.

14           MS. FONTIER:  Of --

15           THE COURT:  No, there's no objection there.

16           MS. FONTIER:  Okay.

17           THE COURT:  Okay.  Tape 10, page 20.  The

18   government's objection here is overruled.  The answer is

19   self-limiting as to foundation.  Next, page 21, lines 14

20   through 27 and onto the following page through line 21.  The

21   government's objection is sustained on the basis of

22   relevance.  Okay.  We're on to tape 11.  Page 2 -- you with

23   me?

24           MS. FONTIER:  Yeah, I just want to make --

25           THE COURT:  Tape 11, page 2, line 22 to page 3,

```
 1   line 11.  This is the government's objection.  It is
 2   overruled.  It is overruled.  This provides some context for
 3   defendant's family and witness's knowledge of defendant
 4   Moalin.  That one is overruled.
 5          Next, page 4, lines 10 through 14.  Government's
 6   objection is overruled on the stated ground of relevance and
 7   later testimony clarifies without any objection.  Page 20 --
 8   page 5, lines 14 through 17.  Government's objection is
 9   sustained.
10          Next objection I see would be page 18.  It's a
11   defense objection.  The defense is conceding that these are
12   ill-taken, so the objection is withdrawn.
13          Next, page 19.  Are you on page 19?  I've got
14   defense objections from lines 4 through 12 and 18 through the
15   bottom of the page on to line 1 of page 20.
16          MR. COLE:  I'm sorry, your Honor.  For 18, 19, and
17   20, we were basically just agreeing with their objections.
18          THE COURT:  Okay.
19          MS. FONTIER:  Okay.
20          THE COURT:  Okay.  So sustained.  I was confused
21   about that.
22          MR. COLE:  Sorry.
23          MS. FONTIER:  I'm confused about this as well
24   because is this --
25          THE COURT:  Okay.
```

1           MS. FONTIER:  I'm just -- I just would like if I

2   can look at the government's because I think this version of

3   mine has the names interspersed, so I'm not sure who's

4   talking when.  Okay.  That makes a lot more sense.  My

5   version has my name where Caroline Han's should be, and I

6   didn't think these were the questions I would be asking.  So

7   those are sustained.

8           MR. COLE:  Yes.

9           MS. FONTIER:  Thank you, your Honor.  Ready to go.

10          THE COURT:  Okay.  Page 22, lines 1 through 4.  The

11  defense objection is sustained.  And the term "brag" is

12  ambiguous.  That's what I have in my note.  Okay.

13          What are we to?  Tape 12.  Okay.  First -- the

14  first real substantial objection here, page 7, line 10

15  through page 10, line 7.  Lot of material there, and here's

16  the ruling.  The government's objection to this testimony

17  regarding the orphan center in the Guraceel area in '06, '08

18  is overruled.  The testimony is somewhat confusing, but

19  appears to lay a proper foundation for such an endeavor with

20  some funding from the "diaspora" -- quotes around diaspora --

21  it provides some linkage to the defendant's position that

22  money was sent for purposes other than supporting al-Shabaab.

23  So basically the objection -- the basis for the objection is

24  just too narrow a ground to bar the testimony.  Okay.

25          MR. COLE:  Where did that go into?  Where did that

1   run to, your Honor?

2           THE COURT:  Well, it's your objection from page --

3   this is tape 12, page 7, line 10 --

4           MR. COLE:  Yes.

5           THE COURT:  All the way to page 10, line 7.

6           MR. COLE:  Okay.  Gotcha.  I'm sorry.  That's a

7   yes, your Honor.

8           THE COURT:  Okay.

9           MR. COLE:  "Gotcha" is a little informal.  I

10  apologize.

11          THE COURT:  I'm begging for a little informality at

12  this point.  Anything that will help pass the time.

13          MR. COLE:  Okay.

14          THE COURT:  Okay.  Then we have page 10, line 20

15  through page 11, line 5.  Same ruling, overruled.  Then we

16  have page 11, line 13 through page 12, line 10.  Government's

17  objection is overruled.  Next, we have page 21, lines 1

18  through 17.  Well, before that, before we get to page 21,

19  there's a defense objection, page 18, the defense objection,

20  lines 3 through 22, sustained.  There was a lack of

21  foundation for the question but even the answer was

22  nonresponsive.

23          Page 21, the government is objecting, lines 1

24  through 16 or 17.  The government's objection is sustained.

25  Next, page 22, line 12 through page 23, line 3.  The

1    objections are sustained.  Also there's a hearsay issue, but

2    you've got speculation, foundation, and hearsay is indicated

3    in the government's pleading.

4         Next, page 24.  I think this may be an area where

5    the defense wants to withdraw the objection, but in any

6    event, it's overruled.  This is page 24, line 23 through

7    page 25, line 11.  The area of testimony previous -- this is

8    an area of testimony previously explored by both sides as

9    well as later, so it seemed to be one of those areas -- look

10   at 16 through 18:  Same subject, no objection.  Okay.

11        Here we go.  Tape 13.  I think the first objection

12   is at page 18, lines 4 through 7.  The government's objection

13   is overruled.  This may be received as or considered as

14   information received by the witness.  Next, page 24, lines 2

15   through 11.  I'm going to sustain this.  I didn't see any

16   prior testimony in this witness's testimony with any

17   indication that he handled or directed funds from the

18   diaspora.  The objection is sustained.  And I don't know that

19   his early reference to collecting money and livestock made

20   any reference to the diaspora.  I just think that that was

21   his job amongst the local -- the local folks there, not the

22   diaspora.

23        Okay.  Next we're on to tape 14.  The government's

24   objection, first objection --

25        MS. FONTIER:  What page, your Honor?

1              THE COURT:  Pardon me?

2              MS. FONTIER:  We're on tape 14.

3              THE COURT:  Tape 14.  Turn to page 12, tape 14.

4    This is the first objection I encountered.

5              MS. FONTIER:  Yes.

6              THE COURT:  The government's objection is from

7    lines 15 through 25.  Overruled.  Page 13, the government's

8    objection, lines 5 through 9, overruled.  The government's

9    objection --

10             MR. COLE:  The defense objection?

11             THE COURT:  Excuse me.  No, there is no objection

12   there.  I see no objection.  Page 16, I see no objection.

13             MR. COLE:  Page 16 of tape 14.

14             THE COURT:  Yes.  There was just a note to myself.

15             MR. COLE:  Okay.

16             THE COURT:  Okay.  Next objection, page 21 at lines

17   17 through 25.  It doesn't really seem like an objection to

18   me.  I don't know --

19             MS. FONTIER:  I think it was a --

20   misstates-the-testimony sort of objection, but I think we'll

21   just withdraw it at this point.

22             THE COURT:  Okay.  Same thing -- let's see -- page

23   22, lines 12 through 14.  It's kind of a no harm, no foul.

24             MS. FONTIER:  Yes, your Honor.

25             THE COURT:  Okay.

1          MS. FONTIER:  I mean the objection was to sort of

2     the form of the question and the answer asked him to rephrase

3     the question, so it's withdrawn.

4          THE COURT:  Okay.  Then we have objection on page

5     24, line 20.  This is a defense objection, page 24, line 20

6     through page 25, line 9.  Is that being pursued?  I've got it

7     as overruled.  If you don't want to withdraw it, it's

8     overruled.

9          MS. FONTIER:  Your Honor, I think that those -- I

10    highlighted those because I wasn't sure what was happening

11    because there was the overlap, and it seems the objections

12    may have been to form as Judge Gallo ruled on them.

13         THE COURT:  Well, do you want to withdraw that?

14         MS. FONTIER:  They can be withdrawn, yes.

15         THE COURT:  Okay.  That takes care of tape 14 I

16    believe.  Next we're on to tape 15, page 6.  I have a note

17    here, what is the defendant's objection?  The question was

18    not answered.  And I also have objected to in light of

19    unobjected-to testimony on the next page, particularly at

20    lines 8 through 17.  You want to withdraw that?  It's

21    overruled in any event.  It's up to you.

22         MS. FONTIER:  I'm confused.  I guess it's withdrawn

23    because I don't know what the basis might be.  I'm very

24    confused by that objection too.

25         THE COURT:  Why don't you -- I think it would be

1   better if you just withdrew that.

2           MS. FONTIER:  I'll withdraw that.

3           THE COURT:  Okay.  We're getting there, lady and

4   gentleman.  Okay.  Then we have page 16, line 23 through

5   19 -- actually through page 20, line 1.  The defense

6   objection to this line of questioning is overruled.  But the

7   transcript really needs to be cleaned up.  You've got an

8   awful lot of argument and statements of counsel there.  So

9   the objection is overruled, but please clean that one up.

10  It's got a lot of underbrush in there.

11          Okay.  Next, page 22, lines 12 through 16.

12  Overruled, defense objection overruled.

13          MS. FONTIER:  Sorry, what page, your Honor?

14          THE COURT:  Page 22.

15          MS. FONTIER:  There was issue with page 18 -- so

16  this is page 18 through 20?

17          THE COURT:  Page 16 -- from page 16 -- you got

18  running objections to all the testimony from page 16, line 23

19  all the way to page 18.

20          MS. FONTIER:  That's right.

21          THE COURT:  Excuse me.  All the way to page 20,

22  line 1.  And so I'm overruling the objections there but

23  telling you you really need to clean up the transcript there,

24  the tape.

25          MR. COLE:  It's all attorney discussion.

 1              MS. FONTIER:  Right.  This was a very awkward

 2     portion whether there was -- issues of the interpreter

 3     interpreting a Somali word and we're --

 4              THE COURT:  We're getting there.  Page 22, lines 12

 5     through 16 and lines 24 through 28.  The objection would be

 6     overruled, objections.  And then that went over to -- carried

 7     over to page 23, line 1 and then there's another objection,

 8     page 23, lines 5 through 15, defense objection overruled.

 9     And then finally page 24, line 8 through page 25, line 19.  I

10     have I need further comment from counsel.  I guess I just

11     didn't understand that very well.

12              MR. COLE:  As I understand this one -- Ms. Fontier

13     can tell me if I'm wrong -- this was one where they thought I

14     was going to ask a series of questions based on my

15     understanding of what is said in an audio call that their

16     translator may disagree with that.  And may be the case.  I

17     mean they may have their own translation, but I needed to be

18     able to ask the witness about what we believe the call means

19     and based my examination based on the evidence we're going to

20     offer.  And so that's why I thought -- it's right not an

21     objection.  It's they could have asked the same witness about

22     their view of the translation if they wanted to.

23              THE COURT:  Okay.  Is --

24              MS. FONTIER:  I think that's basically correct,

25     your Honor.  The question that is -- it refers to Hassan

1    Dahir Aweys is -- particularly his name we believe is not in

2    this particular translation; it's a different name that is

3    translated according to our interpreter.  So I mean if

4    this -- this is one of the things we're never going to able

5    to agree on.  What I guess I would suggest is we just take

6    out the portions that are nontestimonial when we're going --

7    Josh is going back and forth --

8              THE COURT:  Can you two work it out, what's going

9    to be cleaned up?

10             MS. FONTIER:  Yes, no problem.

11             MR. COLE:  Sure.

12             THE COURT:  Okay.  I'll indicate the objection is

13   withdrawn but you'll be cleaning that up.  Well, thank you.

14             MR. COLE:  Thanks for staying late, your Honor, and

15   your staff.

16             THE COURT:  And my what?

17             MR. COLE:  And your staff for staying late.

18             THE COURT:  Yes, yes.  You're welcome.  Let me ask

19   you something.  How long do you think opening statements will

20   be tomorrow?

21             MR. COLE:  I think that ours will be less than 30

22   minutes.

23             THE COURT:  Okay.  How about the defense?  Any

24   idea?  Have you discussed this?  Do you know?

25             MS. FONTIER:  Well, given that there are four makes

1    it slightly more difficult, but I think that the longest will

2    probably be 30, 35 minutes, and I think sort of in order,

3    they'll get shorter and shorter.

4                THE COURT:  Okay.  Listen, let's make Judge

5    Gonzalez happy.  She's been very generous, so let's leave no

6    trace, as we say in backpacking.

7            (There was a break in the proceedings for the evening

8    recess.)

1                    Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated January 9, 2014 at San Diego, California.

12                *Debra M. Henson*

13                           /s/ Debra M. Henson  (electronic)
                             Debra M. Henson
14                           Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25