1                United States District Court

2               Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                    Plaintiff,      )
                                     )
6       vs.                          ) Case No. 10-CR-4246 JM
                                     ) Jury Trial/Day 3
7   BASAALY SAEED MOALIN,            ) Wednesday, January 30, 2013
    MOHAMAD MOHAMAD MOHAMUD          )
8   ISSA DOREH,                      ) Volume 3
    AHMED NASIR TAALIL MOHAMUD,      )
9                                    )
                     Defendants.     )
10  _____ )

11

12             Before the Honorable Jeffrey T. Miller
                  United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25
               Record produced by stenographic reporter

```
1   Appearances

2   For the Government:        Laura E. Duffy
                               UNITED STATES ATTORNEY
3                              William P. Cole
                               Caroline P. Han
4                              ASSISTANT U.S. ATTORNEYS
                               Steven P. Ward, Trial Attorney
5                              U.S. DEPARTMENT OF JUSTICE
                               880 Front Street, Suite 6293
6                              San Diego, CA  92101

7   For the Defendants:
    (Mr. Moalin)               Joshua L. Dratel, Esq.
8                              Alice Fontier, Esq.
                               OFFICE OF JOSHUA L. DRATEL
9                              2 Wall Street, Third Floor
                               New York, NY  10005
10
    (Mr. M. Mohamud)           Linda Moreno, Esq.
11                             LINDA MORENO, P.A.
                               P.O. Box 10985
12                             Tampa, FL  33679

13  (Mr. Doreh)                Ahmed Ghappour, Esq.
                               LAW OFFICES OF AHMED GHAPPOUR
14                             P.O. Box 20367
                               Seattle, WA  98102
15
    (Mr. A. Mohamud)           Thomas A. Durkin, Esq.
16                             Janis Roberts, Esq.
                               DURKIN & ROBERTS
17                             2446 N. Clark Street
                               Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1          San Diego, California - Wednesday, January 30, 2013

2          (Defendant Mr. A. Mohamud is being assisted by a Somali

3    interpreter.)

4          (The following proceedings were had outside the presence

5    of the jury.)

6              THE COURT:  We're just a few minutes before nine

7    o'clock here, and I think we're still waiting on one juror.

8    May I see counsel, please, at the side of the bench before we

9    proceed further.

10         (Following is a sidebar conference.)

11             THE COURT:  Gather around, folks.  It's been

12   brought to my attention that the Somali community is in the

13   back of the courtroom; they're wearing orange ribbons.  You

14   see those?

15             MR. DRATEL:  I saw one person.

16             MS. MORENO:  I saw a couple.

17             THE COURT:  Well, I see several of them; looks like

18   almost everybody in the courtroom's got the orange ribbons.

19   They come off.  They come off.  There's Supreme Court

20   authority directly on point.  It was badges in that case,

21   badges that the victims -- it comes off.  So, please, at the

22   first opportunity respectfully ask members of the Somali

23   community take off the orange ribbons.

24             MS. MORENO:  I'll take care of it, your Honor.

25             MR. DURKIN:  You seem upset.  I hope you don't

1    think we had something to do with it.

2          THE COURT:  Oh, no, no, no.  And I'm not upset.  We

3    just need to get this clarified.  We're trying to do a lot

4    for the Somali community, but that's really over the line.  I

5    would have thought that counsel, being aware of what the U.S.

6    Supreme Court has ruled in this area, would have suggested

7    somebody to remove these things.

8          I've dealt with this issue in so many different

9    areas and in different ways.  I had a case a few years back

10   where one of the prosecutor -- Mr. Cole, you may recall

11   this -- who was wearing lapel pins emblematic of law

12   enforcement, and I asked him to remove the lapel pins at the

13   request of defense counsel.  So this is a kind of thing that

14   should be done.

15         MR. DURKIN:  Judge, so the record is clear, what

16   we're talking about are orange ribbons that look like those

17   yellow ribbons for support our troops, military.

18         THE COURT:  Yes.

19         MR. DURKIN:  There identical to that.  They're just

20   a ribbon in a V, like an upside down V.

21         THE COURT:  Yes.  And they're very, very apparent

22   against the, you know, dress of the individuals.  They're

23   statements of support or statements of solidarity, however

24   you want to phrase it.  They're here.  They're going to be

25   here and in significant numbers, and their presence is

1    enough, is enough of a display of solidarity and support.  So

2    I appreciate your cooperation.

3            MR. DURKIN:  Well, for the record, I disagree --

4    respectfully I disagree.  I don't think that they're

5    offensive, I don't think that they make a statement.  And so

6    the record's clear, when you mentioned that -- whether we

7    should have had them take them off, they just brought them in

8    a couple minutes ago --

9            THE COURT:  That's fine.

10           MR. DURKIN:  -- and we didn't have any idea.  We

11   had nothing to do with it.  But I'm just uncomfortable

12   ordering people to do that, and I would, frankly, prefer that

13   you do it.  It hate to be difficult, but --

14           MS. ROBERTS:  I would rather this be handled

15   discreetly rather than --

16           THE COURT:  That's fine.  Well, deal with it

17   discreetly.  I think all defense counsel are in agreement

18   that these ribbons should come off apparently with the

19   exception of Mr. Durkin.  I'm sure the government feels the

20   same way.

21           MR. DRATEL:  Well, I just want to say I'm familiar

22   with the Supreme Court case that the Court's talking about,

23   which is a capital case where it was prejudicial to the jury

24   to see the victims' families or other supporters of the

25   person who was actually killed with posters of that person on

1    their chest and --

2            THE COURT:  The badges, yeah.

3            MR. DRATEL:  Yes.  And I think this is different.

4    We'll do what the Court asked us to do, but I do think it's

5    demonstrably different.

6            THE COURT:  I appreciate that.  I appreciate that.

7    If it's necessary -- if you'd like me to make a statement to

8    them at some point just indicating how important it is, for

9    example, not to engage in that kind of activity, which is in

10   a sense a form of communication with anyone who may see those

11   things, including jurors, if you'd like me to make further

12   statements appreciating their presence, their support, and

13   all of that and within that context just make some statement

14   regarding the ribbons, I'm happy to do that.  I'll take my

15   cue from you on that.

16           MR. DRATEL:  Thank you, your Honor.

17           MS. MORENO:  Thank you, your Honor.

18       (Sidebar conference concludes.)

19           THE COURT:  Counsel, continuing on with just a few

20   administrative matters before we proceed further now that

21   we've set up the audio, the audio feed that was done pursuant

22   to the request of the defense.  And I'm happy to have been

23   able to do that, Ms. Moreno -- I think you were the laboring

24   oar on this one -- happy to have been able to do that on

25   pretty short notice.

 1          I've been reminded by our IT people that in order

 2     for the system to work best and for the audio feed to be

 3     effectively transmitted into the courtroom next door for

 4     those overflow spectators that it certainly would help if

 5     people spoke into microphones.  If you're away from a

 6     microphone, then the feed may be impaired a bit, so I'd

 7     advise everyone that to the extent you're interested in

 8     supporting that audio feed that you speak into the

 9     microphones.

10          MS. MORENO:  And, your Honor, if I may on behalf

11     the community, the community is very grateful for the efforts

12     of the Court to accommodate them.

13          THE COURT:  Very good.  Well, we're pleased to see

14     everyone here; of course they're welcome.  And so I think if

15     counsel are ready to proceed, we'll bring the jury in.  I'm

16     going to proceed with -- you know, you've all heard my

17     general instructions.  These are the general instruction I've

18     been giving for many, many years over many, many trials, and

19     I cover just about all of the subjects that are contained in

20     the first section of the Ninth Circuit model instructions.

21          I'm going to instruct the jury -- both sides have

22     submitted the Series 1 pattern instructions from the Ninth

23     Circuit in criminal cases, and I'll do that at this point.

24     There were a few extra instructions I think that were

25     submitted by Mr. Ghappour, out-of-circuit instructions or

1   and/or a special instruction.  I'll decline those because I

2   think the Ninth Circuit instructions handle those these

3   subjects adequately.  If counsel --

4           MR. DURKIN:  Just one issue.  As you recall, I

5   raised the issue of the death of my client's daughter and the

6   psychiatrist visit.  I was informed on Sunday night by his --

7   I think it's the unit manager, Mr. Richmond.  As you

8   suggested, I sent the email to the MCC.  Mr. Richmond called

9   me; he said that it has been started.  I just spoke to my

10   client.  He has not seen him yet, but I'm reporting that I

11   expect that that will happen today hopefully.

12           THE COURT:  Very good.  Thank you.  Okay.  If

13   there's nothing further then, we'll bring the jury in and

14   have them seated and proceed with these instructions and

15   opening statements.  Okay.

16       (The jury entered the courtroom.)

17           THE COURT:  Okay.  In the last two seats in the top

18   row, we should have Mr. Brenzel and Mr. Adams.  Very good.

19   And then we're going to have Ms. Clark -- Ms. Clark, if

20   you'd -- good morning, Ms. Clark.  Are you able to see there?

21           ALTERNATE JUROR CLARK:  Yes.

22           THE COURT:  Okay.  Very good.  All right.  Good

23   morning, ladies and gentlemen.  Thank you for your

24   promptness.  Let me tell you -- please, ladies and gentlemen,

25   be seated.  Let me tell you what we're going to be doing

1    right now.  I gave you a little bit of a preview last night

2    before we broke, so now we're in the business of the trial

3    itself.  I'm going to swear you as a jury -- we are going to

4    swear you as the jury in this matter in just a moment.  Then

5    I'm going to give you some instructions; they're preliminary

6    instructions.  But as I actually read the formal instructions

7    that apply in a preliminary fashion, you'll know -- you'll

8    understand that these are very familiar.  Basically I've

9    covered just about every subject that you're going to be

10   hearing right now with one or two possible exceptions.

11          So after -- after we deal with these instructions,

12   we'll hear the opening statements of counsel.  Let me tell

13   you right now that underneath your seats you have -- okay.

14   We're going to pass out these notebooks then.  They're not

15   under your seats -- we're going to pass them out to you at

16   this point.  Very good.  And the subject of notetaking is

17   addressed in these instructions, but let me address them in

18   my own way because this is the first time we've actually had

19   an opportunity to discuss the notetaking process.

20          As I mentioned yesterday, you're expected to take

21   notes but you're certainly not required to take notes.  Notes

22   are for your own personal use in refreshing your recollection

23   of the testimony once you're deliberating on the case, so,

24   once again, your personal use and for that purpose.  Now, if

25   you decide not to take notes, then that's perfectly

1   appropriate; that's your decision.  Don't be influenced by

2   the fact that other people may be taking notes.

3          With respect to the actual physical taking of

4   notes, remember this, that you are the judges of the

5   credibility, the believability of witnesses who will be

6   testifying in this case, and if you see your role as madly

7   scribbling down every word that you're going to hear, you may

8   deprive yourselves of the opportunity to make necessary

9   observations related to the demeanor, the manner of witnesses

10  while testifying, and that may impact credibility,

11  believability, so don't deprive yourselves of a meaningful

12  opportunity to assess the believability even though you will

13  be taking notes, those of you who will.  I think that's

14  pretty much all I wanted to say on notetaking.

15         We've already talked about the hours we're going to

16  be keeping, when our breaks are, the importance of being

17  prompt always for each session of court, taking your breaks

18  outside, remembering the admonition, and matters of that

19  type.  So with that, unless there are any questions at this

20  point, I will ask each and every one of you to stand to be

21  sworn as jurors in this case.

22         THE CLERK:  Please raise your right hand.  Ladies

23  and gentlemen of the jury, you, and each of you, do solemnly

24  swear you will well and truly try the cause now before the

25  Court and a true verdict therein render according to the

1   evidence.  If so, please say yes.

2       (The jurors answered in the affirmative.)

3       THE COURT:  All right.  Thank you, ladies and

4   gentlemen.  Please be seated.  And as I indicated, I'd like

5   to take just a few minutes at this point to formally read to

6   you the instructions that have been prepared for this time,

7   this particular point of the trial.

8       Ladies and gentlemen, you are now the jury in this

9   case, and I want to take a few minutes to tell you something

10  about your duties as jurors and to give you some preliminary

11  instructions.  At the end of the trial, I will give you more

12  detailed written instructions that will control your

13  deliberations.

14      When you deliberate, it will be your duty to weigh

15  and evaluate all the evidence received in the case and in

16  that process to decide the facts.  To the facts as you find

17  them you will apply the law as I give it to you, whether you

18  agree with it or not.

19      You must decide the case solely on the evidence and

20  the law before you and must not be influenced by any personal

21  likes or dislikes, opinions, prejudices, or sympathy.

22      Please do not take anything I may say or do during

23  the trial as indicating what I think of the evidence or what

24  your verdict should be; that is entirely up to you.

25      This is a criminal case brought by the United

1   States government.  The government charges each defendant

2   with, one, conspiracy to provide material support to

3   terrorists in violation of federal law; conspiracy to provide

4   material support to a foreign terrorist organization in

5   violation of federal law; and conspiracy to launder money

6   instruments in violation of federal law.  The government also

7   charges defendants Moalin, Mohamud, and Doreh with providing

8   and attempting to provide material support to a foreign

9   terrorist organization in violation of federal law.  Finally,

10  the government charges defendant Moalin with providing and

11  attempting to provide material support to terrorists in

12  violation of federal law.

13          The charges against the defendants are contained in

14  the indictment, and the indictment, as I've told you before,

15  simply charges the -- describes the charges the government

16  brings against the defendants.  The indictment is not

17  evidence and does not prove anything.  The defendants have

18  pleaded not guilty to the charges and are presumed innocent

19  unless and until the government proves the defendants guilty

20  beyond a reasonable doubt.  In addition, the defendants have

21  the right to remain silent and never have to prove innocence

22  or to present any evidence.

23          The evidence you are to consider in deciding what

24  the facts are consists of, one, the sworn testimony of the

25  witnesses; two, the exhibits which are received in evidence;

1    and three, any facts to which the parties agree.

2           The following things are not evidence and you must

3    not consider them as evidence in deciding the facts of this

4    case:  One, statements and arguments of the attorneys, not

5    evidence; questions and objections of the attorneys, not

6    evidence; testimony that I instruct you to disregard, not

7    evidence; and anything that you may see or hear when the

8    court is not in session even if what you see or hear is done

9    or said by one of the parties or by one of the witnesses.

10          Evidence may be direct or circumstantial.  Direct

11   evidence is direct proof of a fact such as testimony by a

12   witness about what that witness personally saw or heard or

13   did.  Circumstantial evidence is indirect evidence, that is,

14   proof of one or more facts from which one can find another

15   fact.  You are to consider both direct and circumstantial

16   evidence.  Either can be used to prove any fact.  The law

17   makes no distinction between the weight to be given to either

18   direct or circumstantial evidence.  It is for you to decide

19   how much weight to give to any evidence.

20          There are rules of evidence that control what can

21   be received in evidence.  When a lawyer asks a question or

22   offers an exhibit in evidence and a lawyer on the other side

23   thinks that it is not permitted by the rules of evidence,

24   that lawyer may object.  If I overrule the objection, the

25   question may be answered or the exhibit received; if I

1    sustain the objection, the question cannot be answered or the

2    exhibit cannot be received.  Whenever I sustain an objection

3    to a question, you must ignore the question and must not

4    guess what the answer would have been.

5         Sometimes I may order that evidence be stricken

6    from the record and that you disregard or ignore the

7    evidence; that means that when you are dealing with the case,

8    you must not consider the evidence that I have told you to

9    disregard.

10        In deciding the facts in this case, you may have to

11   decide which testimony to believe and which testimony not to

12   believe.  You may believe everything a witness says or part

13   of it or none of it.

14        In considering the witness's testimony, you may

15   take into account, one, the witness's opportunity and ability

16   to see or hear or know the things testified to; two, the

17   witness's memory; three, the witness's manner while

18   testifying; four, the witness's interest in the outcome of

19   the case, if any; five, the witness's bias or prejudice, in

20   any; six, whether other evidence contradicted the witness's

21   testimony; seven, the reasonableness of the witness's

22   testimony in light of all the evidence; and eight, any other

23   factors that bear on believability.

24        The weight of the evidence as to a fact does not

25   necessarily depend on the number of witnesses who testify

1   about it.

2           I will now say a few words about your conduct as

3   jurors.  I've made this admonition several times, ladies and

4   gentlemen, but I'll give you to you in formal form at this

5   point.  First, keep an open mind throughout the trial and do

6   not decide what the verdict should be until you and your

7   fellow jurors have completed your deliberations at the end of

8   the case.

9           Second, because you must decide this case based on

10  the evidence received in the case and on my instructions as

11  to the law that applies, you must not be exposed to any other

12  information about the case or to the issues it involves

13  during the course of your jury duty.  Thus, until the end of

14  the case or unless I tell you otherwise, do not communicate

15  with anyone in any way and do not let anyone else communicate

16  with you in any way about the merits of the case or anything

17  to do with it.  This includes discussing the case in person,

18  in writing, by phone, or electronic means via email, text

19  messaging, or any Internet chat room, blog, website, or other

20  feature.  This applies to communicating with your fellow

21  jurors until I give you the case for deliberation.  And it

22  applies to communicating with everyone else, including your

23  family members, your employer, the media or press, and the

24  people involved in the trial, although you may notify your

25  family and your employer that you have been seated as a juror

1    in the case.  But if you are asked or approached in any way

2    about your jury service or anything about this case, then you

3    must respond that you have been ordered not to discuss the

4    matter and to report the contact to the Court.

5            Because you will receive all the evidence and legal

6    instruction you properly may consider to return a verdict, do

7    not read, watch, or listen to any news or media accounts or

8    commentary about the case or anything to do with it.  Do not

9    do any research such as consulting dictionaries, searching

10   the Internet, or using other reference materials, and do not

11   make any investigation or in any other way try to learn about

12   the case on your own.

13           The law requires these restrictions to ensure the

14   parties have a fair trial based on the same evidence and that

15   each party has had an opportunity to address.  A juror who

16   violates these restrictions jeopardizes the fairness of these

17   proceedings, and a mistrial could result that would require

18   the entire trial process to start over.

19           If any juror is exposed to any outside information,

20   please notify the Court immediately.  At the end of the

21   trial, you will have to make your decision based on what you

22   recall of the evidence.  You will not have a written

23   transcript of the trial.  I urge you to pay close attention

24   to the testimony as it is given.

25           If you wish to take notes to help you remember the

1    evidence, you may do so.  I've certainly just referred to

2    this particular instruction regarding the taking of notes,

3    and I'll say no further on that.

4            The next phase of the trial will now begin.  First,

5    each side may make an opening statement.  An opening

6    statement is not evidence; it is simply an outline to help

7    you understand what that party expects the evidence will

8    show.  A party is not required to make an opening statement.

9            The government will then present evidence and

10   counsel for the defendant may cross-examine.  Then if the

11   defendant or defendants choose to offer evidence, counsel for

12   the government may cross-examine.

13           After the evidence has been presented, I will

14   instruct you on the law that applies to the case, and the

15   attorneys will make closing arguments.  After that you will

16   go to the jury room to deliberate on your verdict.

17           Although the defendants are being tried together,

18   you must give separate consideration to each defendant, and

19   in doing so you must determine which evidence applies to each

20   defendant, disregarding any evidence admitted solely against

21   some defendant or some defendants.  The fact that you may

22   find one defendant -- one of the defendants guilty or not

23   guilty should not control your verdict as to any other

24   defendant.

25           Also, ladies and gentlemen, I wanted to make

1    reference to the use of the Somali interpreters in this case

2    I'm sure it's been apparent to you over the course of the

3    last few days that we do have Somali gentlemen performing

4    this very important function for one of the defendants, one

5    or more of the defendants, let me put it that way.  It may be

6    that the interpreters will be of assistance to us during the

7    live testimony, some of the live testimony, during the course

8    of the trial.

9          It would be improbable if any of you understand the

10   Somali language, but if you do or understand any particular

11   words, you must set aside any understanding you might have,

12   and you must always be controlled by the English translation

13   of any of the Somali language that may be employed during the

14   course of the trial.

15         We certainly greatly appreciate the very important

16   service of the Somali interpreters in this case.  And please

17   do not draw any negative inferences of any kind whatsoever as

18   a result of one or more individuals requiring the need for a

19   Somali interpreter during the course of the trial.

20         That really does conclude what I wanted to convey

21   to you at this point.  We've reached the point where the

22   government may present its opening statement at this time.

23   And Mr. Cole I assume or -- Ms. Han, are you ready?

24         MS. HAN:  Yes, your Honor.

25         THE COURT:  Okay.

1          MS. HAN:  Now is the time to finance the jihad.

2   Now is the time to finance the jihad.  That is what one

3   al-Shabaab leader, Aden Hashi Ayrow, who you'll hear referred

4   to in the calls and using the names Sheikalow and Majadhub,

5   that is what he told defendant Basaaly Moalin in April of

6   2008.  And it was Aden Ayrow and al-Shabaab during the time

7   related to the indictment who were engaged in a battle to

8   overthrow the Transitional Federal Government of Somalia.

9          The Transitional Federal Government of Somalia was

10  internationally supported, including by the United States,

11  and al-Shabaab, including Aden Ayrow, were attempting to

12  overthrow them and use fear and intimidation with the

13  population of Somalia.  And those are the people that the

14  defendants -- Basaaly Saeed Moalin, Mohamad Mohamad Mohamud,

15  Issa Doreh, and Ahmed Nasir Taalil Mohamud -- those are the

16  people that the defendants were supporting.

17         So let's talk a little bit more about that

18  organization, al-Shabaab.  Al-Shabaab literally means, in

19  Arabic, the youth and also has other aliases as you can see

20  on this screen.  Al-Shabaab is an entity that goes back to

21  the 2000s whose leaders within that organization have ties to

22  foreign terrorists and have received training abroad.  It's

23  an organization that is well-organized, that knows how to use

24  the media and the Internet to get its message across.  But

25  it's also an organization that does what it says it's going

1   to do; it engages in brutal tactics to impose intimidation

2   and fear in Somalia.  And so let's talk about what it is that

3   al-Shabaab was capable of doing and what it did and what it

4   publicized and was well-publicized both in and outside of

5   Somalia and what you'll hear in the evidence in the case

6   itself that the defendants actually talked about events

7   that --

8            MR. DRATEL:  Your Honor, it's not evidence.

9            THE COURT:  I'm sorry?

10           MR. DRATEL:  The visual's not in evidence.  It's

11   still up there.  She's not talking about it now.

12           THE COURT:  I'm sorry.  I'm having a hard time --

13           MR. DRATEL:  Saying it's not in evidence.  She's

14   moved on beyond -- I mean these --

15           THE COURT:  The objection is overruled.

16           MR. DRATEL:  Thank you, your Honor.

17           MS. HAN:  And you will hear in the phone calls

18   themselves that the government intends to present in our case

19   that the defendants themselves talked about what al-Shabaab

20   was capable of and what they were doing and what they were

21   known for doing.

22           So let's look at what it was that they were known

23   for doing and what they did, what the money could buy, what

24   the defendants' money could buy.  One, assassinations,

25   assassinations of civilians; two, beheadings, a hallmark of

1   al-Shabaab's tactics; three, suicide bombings, another

2   hallmark of al-Shabaab's tactics within Somalia; and use of

3   weapons, including, one, rocket-propelled grenades,

4   landmines, and improvised explosive devices.

5          And who are these people?  Who are the defendants

6   who would buy this, who would go to these hired gunmen and

7   buy this?  One, Basaaly Moalin; two, Mohamad Mohamad Mohamud;

8   three, Issa Doreh; and four, Ahmed Nasir Taalil Mohamud.

9   Let's take one each at a time.

10          First, Basaaly Saeed Moalin.  In the phone calls

11   he's referred to by his own name, Basaaly, and is sometimes

12   referred to by Basal.  You'll learn in this case that he was

13   the direct connection to Aden Ayrow, the al-Shabaab leader

14   who told him it was time to finance the jihad.

15          Next, Mohamad Mohamad Mohamud, who in the phone

16   calls uses Mohamad Khadar and Sheik Mohamad so please keep

17   those aliases in mind as you listen to the phone calls.  His

18   role in this conspiracy is that he was the imam, or religious

19   leader, at a local mosque here in City Heights at the

20   al-Ansar mosque.  And as a result of being the religious

21   leader, he was able to reach out to the religious youth and

22   fundraise from them.

23          Next, Issa Doreh.  In the phone calls he's referred

24   to by Issa but is sometimes also referred to by Sheik Issa.

25   His role is that he was employed at the Shidaal Express.  The

1    Shidaal Express is a hawala, which is nothing more than a

2    Western Union type of company, a money -- money transmitting

3    company, and it was the company that the defendants used to

4    send their money to al-Shabaab.

5            And finally, Ahmed Nasir Taalil Mohamud, referred

6    to in the phone calls as Ahmed Nasir.  Ahmed Nasir, unlike

7    the other defendants, was not based in San Diego and was

8    based in Anaheim, and, as a result, provided the Orange

9    County connection for the fundraising.

10           And so while the defendants were fundraising here

11   in San Diego for what was happening in Somalia, they were

12   fundraising the fighting -- for the fighting in Somalia, a

13   country that is approximately 10,000 miles away.  Somalia is

14   a country that's in the northeast corner of Africa, in the

15   Horn of Africa, as you heard described during voir dire.

16   It's a country that's slightly smaller than the state of

17   Texas, and prior to the 1960s was a British and Italian

18   colony.  And unfortunately since the 1990s, it has been

19   embroiled in an unstable environment; it has not had a stable

20   government since the 1990s, and it is there where Aden Ayrow

21   was based.

22           Aden Hashi Ayrow, who in the phone calls you'll

23   hear uses the names Sheikalow and Majadhub, which is very

24   important, in the phone calls he's referred to by two

25   separate names, Sheikalow and Majadhub.  Aden Hashi Ayrow was

```
 1   a rock star in al-Shabaab and among terrorists generally.  He
 2   was a rock star in al-Shabaab in Somalia for several things.
 3   First, because he was trained in Afghanistan and could then
 4   share his training with others; second, because he was
 5   harbored -- he had harbored foreign terrorists; and finally,
 6   because he himself was involved with several assassinations
 7   including of a Somali peace activist.
 8          And while he was in Somalia, back in San Diego the
 9   fundraising was ongoing, and it is with that fundraising that
10   the defendants knowing -- that the defendants knowingly
11   engaged in a conspiracy to provide material support to
12   terrorists and a conspiracy to provide material support to
13   al-Shabaab, a foreign terrorist organization, and a
14   conspiracy to launder money.
15          And this is how it would work.  Aden Ayrow,
16   al-Shabaab leader, rock star in al-Shabaab and in Somalia,
17   both inside and outside of Somalia, would talk to Basaaly --
18   again, the main connection to Aden Ayrow -- who would then
19   reach out to Sheik Mohamad, Issa Doreh, Ahmed Nasir and
20   Hassan; Hassan was a cab driver based in St. Louis.  And then
21   these defendants would fundraise and then send their money to
22   Aden Ayrow.  And this continued on in January and February
23   and April of 2008, and it continued until May 1st, 2008.  And
24   on May 1st, 2008, that's a largely significant event in this
25   case because it's on that date that Aden Ayrow was killed in
```

1   a U.S. missile strike in Dhusa Mareeb, Somalia, and it is

2   huge news that he has died.  And you'll hear in the phone

3   calls that the -- that there are a number of phone calls on

4   that date going back and forth in the early morning hours of

5   Somalia time just after it's happened.  It's a significant

6   event that's widely reported and which the defendants

7   themselves discuss.

8           And so after he dies, they are looking for a new

9   contact, and so because they are not deterred by the death of

10  Aden Ayrow, they are not deterred, they want to continue to

11  support the fighting and the brutal tactics in which

12  al-Shabaab was engaged, and so they find Mahad Karate and

13  Farah Yare.  Mahad Karate was an -- is an operational figure

14  in al-Shabaab and Mahad Karate put Basaaly in touch with Omar

15  Mataan, and so the fundraising continued.

16          Now that the connection was made, Ayrow had died,

17  they made new connections with Mahad Karate and Omar Mataan

18  for al-Shabaab and for another man named Farah Yare, another

19  man who you'll hear tells the defendants about a

20  rocket-propelled grenade costs them $270 in the ongoing

21  fighting.  So the fundraising continues.  These defendants

22  continue to fundraise even after Ayrow's death.  They

23  continue to fundraise, and the money gets sent to Omar Mataan

24  and Farah Yare in July of 2008.

25          And all along when Ayrow was alive and certainly

1   when these defendants were receiving money, all along the

2   defendants are getting reports and are talking about what it

3   is that's going on in Somalia, the brutal tactics in which

4   al-Shabaab is engaged.

5          For example, in December of 2007 Basaaly spoke to

6   Ahmed Nasir.  In speaking about the Ethiopians and -- in

7   speaking about what al-Shabaab was doing to the Ethiopians,

8   he told them, Now these men cut the throats of 60

9   lice-infested just within this month, and he told them

10  that -- told him that the day after Aden Ayrow had called him

11  and told him that they needed money, they needed money to

12  support the fighting.

13         In January of 2008 Aden Ayrow is talking to

14  Basaaly, trying to encourage him to send him money and also

15  talking about his accomplishments, about how great al-Shabaab

16  is doing, and he tells him, The other day we planted a

17  landmine for Abdi Qaybdiid -- a Transitional Federal

18  Government official -- who was traveling on that road; he was

19  almost hit.

20         And finally in January of 2008, in addition to

21  sending money to Aden Ayrow and al-Shabaab, on January 3rd of

22  2008, you'll hear in the phone calls that Basaaly offered his

23  house to al-Shabaab, and in talking about his house, he tells

24  them, I mean the bad thing about the house is the fact that

25  it is an easily identifiable house, it can easily be

1  identified as the big house with the Shawri trees, you know.

2  And Ayrow responds, No one would know.  How could anyone know

3  if the house is only used during the nights?  And as you

4  listen to the phone calls and you listen to the calls with

5  Aden Ayrow using the name Sheikalow and Majadhub, keep that

6  in mind because that's what Ayrow needed, a rock star among

7  terrorists in Somalia; he needed secrecy.

8         You are running late with the stuff.  Send some and

9  something will happen.  Another thing that Aden Ayrow told

10  Basaaly.  And indeed they did send stuff; they sent money, as

11  we discussed, in January, February, April, and July and

12  August of 2008.  And this is what they got for their money.

13  What their money bought was attempted assassinations of

14  Transitional Federal Government officials with landmines and

15  mortars, the use of rocket-propelled grenades and improvised

16  explosive devices, and civilians being killed outside of

17  mosques, houses of worship, and suicide bombers killing

18  hundreds.  That is what their money bought, and that is what

19  you will hear in the phone calls, that that is what their

20  money bought and that they were well aware of what they were

21  buying.  And, finally, the shelling of the presidential

22  palace.

23         And they took pride in their work, of what they

24  bought, what their money -- the value of their money and what

25  they bought.  And that's exemplified in a conversation

1    between Basaaly and Issa.  In that conversation Basaaly is so

2    proud of what he says -- is so proud of what they'd been

3    doing that he says, We are not less worthy than the guys

4    fighting.  They're not less worthy than the guys fighting.

5    And Issa agrees, saying Yes, that's it, it's said that it

6    takes an equal effort to make a knife whether one makes the

7    handle part, hammers the iron, or bakes it in the fire.

8           And although they were proud of their work, they

9    also understood the illegal nature of what they were doing

10   and that they were supporting these brutal tactics, and that

11   is exemplified in this -- in this statement from defendant

12   Sheik Mohamad to Hassan in St. Louis.  Well, he says, well,

13   phones are problematic.  And you should just think about

14   that; think about the way that you listen to your -- you use

15   your phone.  And as you're listening to the evidence in this

16   case, you should consider all of the times that the

17   defendants chide each other for being too open on the calls

18   or make fun of each other for being too coded.  That's

19   something that you should keep in mind.

20          And you should also keep in mind the other signs of

21   deception that will be in the evidence presented in our case,

22   specifically their use of the Shidaal Express.  As we talked

23   about, the Shidaal Express was a hawala; it was a money

24   transmitting company that -- where Issa Doreh was employed.

25   And it was a hawala that they sent their money to al-Shabaab,

1   specifically at this hawala where Issa Doreh was employed.

2           And their code words.  As I discussed, on the phone

3   calls they will often talk about sending money saying that

4   they sent $3,000 and saying that they sent three stones.

5   That's something to consider as well as you listen to the

6   evidence and that their understanding of what they were

7   doing, that they were buying that violence that al-Shabaab

8   was engaged in, and those brutal tactics.

9           Next, their use of fake names.  You'll learn that

10  Shidaal Express, even though it was a -- it was a little bit

11  different than Western Union, it was in a money-remitting

12  business that also was licensed, and it kept records, and

13  that in those records they used fake names when they sent the

14  money; they used fake names as senders, and they also used

15  fake names for the recipients.  On the recipients it's never

16  going to say Aden Ayrow is the recipient, but you'll hear

17  Sheikalow and Majadhub -- Aden Ayrow -- talking about having

18  received that money.

19          Additionally, they used fake phone numbers.  Again,

20  in the Shidaal Express records you'll see that there are fake

21  phone numbers, and you'll hear later through telephone

22  evidence that those fake phone numbers are attributed to

23  unwitting people who had nothing at all to do with the

24  defendants, and some of them are just completely made-up

25  numbers.

1            Additionally, as we talked about, their telephone

2   use and that in addition to being deceptive on their

3   telephone -- on their phone calls using coded conversation,

4   you should also consider their unusual nature of using the

5   telephone.  So, for example, one of the defendants called in

6   to somebody else and then listened to a radio broadcast on

7   it.  And they also often had conference calls with people

8   back in Somalia.  And knowing what they were doing, knowing

9   that they could be detected and that it was -- it was a

10  dangerous and potentially -- it was a dangerous thing that

11  they were buying, the work, the violence that al-Shabaab was

12  engaged in, they talked about that.  And Basaaly and Ahmed

13  Nasir talked about that.

14           Specifically Basaaly told Ahmed Nasir, We will

15  conduct our actions along that method, we will go under that

16  pretense now.  And Ahmed Nasir responded, Yes, we are helping

17  the poor.  They do not know it is bullets.  That is the way

18  it is, you know.  And Basaaly replied, sure, that they

19  understood, that they understood that they would go under the

20  pretense of helping the poor but were instead buying that

21  violence, al-Shabaab's violence in which it was engaged.

22           And we know all this because, as we talked about in

23  voir dire, their phone calls were being intercepted; they

24  were being wiretapped.  And so in the defendants' own words

25  you'll get to hear what it is that they knew, that they knew

1   what al-Shabaab was doing, and they knew that they were

2   buying and -- they knew what they were buying and they --

3   they were fundraising in order to support al-Shabaab, and

4   that once that fundraising was done, they were sending their

5   money to al-Shabaab.

6           And you'll also see -- you'll also hear as we

7   present the calls, you'll hear the Somali audio.  And so

8   while you don't understand Somali, you'll get to understand

9   their reactions, you'll get to hear their reactions.  And as

10  they talk about the brutality and violence that al-Shabaab's

11  engaged in, you'll hear some of the defendants laughing about

12  that.  So you'll get to see their emotions and so those

13  statements that you see in the English language will not be

14  out of context.

15          Additionally, as we present the evidence to you,

16  you will listen to the audio, and there will be a scrolling

17  transcript, an example of which is above, and in that

18  scrolling transcript you'll get to read the English up on the

19  screen.  But if that's too far for you, you will also have a

20  binder, and in that binder you'll find the same transcripts.

21  And so up on the screen or here in your binder, you will be

22  able to read the same.  And so you will be able to read --

23  so, for example, in this July 18 call between Ahmed Nasir and

24  Basaaly, you too will be able to read and understand where

25  Basaaly tells him No, but he will lay low of course and we

1   will go under that pretense now.  And Ahmed Nasir responds,

2   Yes, we are helping the poor.  They do not know it is

3   bullets.  And so you have that choice; you can either look in

4   your binder or look on the screen as the audio scrolls.

5           And you'll also notice, as you look at the verbatim

6   transcripts or at the English translations of the phone

7   calls, that there's a phonetic spelling.  You'll notice that

8   sometimes the same word -- for example, Mogadishu -- will be

9   spelled in two different ways, and we'll have testimony from

10  a Somali linguist who will explain to you that the English

11  translation of Somali is phonetic, explaining that.

12          In addition to listening -- to hearing evidence

13  from the Somali linguist, you'll hear other evidence.  First

14  you'll hear evidence from Matthew Bryden.  Mr. Bryden has a

15  long experience in Somalia for approximately 25 years.  He

16  most recently worked at the United Nations and was the head

17  of a monitoring group on Eritrea and Somalia.  And he will

18  provide a context and background on Somalia and will give you

19  context so that you understand the phone calls when we

20  present them in this case.

21          You'll also hear from FBI witnesses.  Those FBI

22  witnesses will talk about how they gathered evidence.

23  They'll also talk about their review of financial records and

24  those review of financial records.  And you'll also hear

25  about telephone records, telephone records that will connect

1    these defendants to the phone numbers that they were using

2    when they were talking on the phone calls that will -- that

3    will be presented in our case.

4          And you will also see the financial records.  We

5    talked a little bit about Shidaal Express and how they kept

6    records and how they maintained a database.  You'll get to

7    see those records with the transactions that show that the

8    defendants were using fake names and phone numbers to send

9    their money to al-Shabaab.

10          And finally, as we talked about, you'll also hear

11   from the Somali linguist.  And all of this evidence will

12   prove to you that the defendants knowingly conspired to

13   support al-Shabaab, a designated foreign terrorist

14   organization, and other terrorists and to launder money.  And

15   if there is any -- if there's any doubt in your mind that

16   perhaps the defendants were confused and when they sent that

17   money to Somalia that they were supporting charity or

18   something else, a good cause, I'll leave you with this quote

19   from Basaaly:  Another amount that have been sent to those

20   who behead the enemy.  That is the other fundraisers taking

21   place.

22          And so that helps you understand the true nature of

23   the money that the defendants were sending, that they were

24   knowingly sending money to al-Shabaab knowing what al-Shabaab

25   was engaged in and knowing what they were buying.  And so

1   we'd ask you now to listen to the evidence.  At the close of

2   our case, Mr. Cole will come back and discuss the evidence

3   and we'll ask you to find the defendants guilty.  Thank you.

4             THE COURT:  Are you ready, Mr. Dratel?

5             MR. DRATEL:  Yes.  I was just curious as to -- I

6   guess it's not movable or not?

7             THE COURT:  Would you like a lectern?  And we have

8   if -- if you'd like a lectern, and if you'd like a portable

9   mike, you can use that, Mr. Dratel.

10            MR. DRATEL:  Yes.

11            THE COURT:  Would you like -- there's a portable

12  lectern over there as well; it may be a little more stable

13  for you.  Or you can -- it's your choice.

14            MR. DRATEL:  Good morning.  My name is Joshua,

15  Dratel, and I represent Basaaly Moalin, along with Alice

16  Fontier.  I think the evidence will show you that this is a

17  fascinating case about part of the world that many people

18  don't pay attention to, but a part of the world where there

19  are real human beings struggling to stay safe, to stay alive,

20  to keep their children alive, to keep their children safe, to

21  feed their children.

22            Imagine a year of your telephone calls recorded,

23  every single one, 24/7/365 literally.  Now imagine that

24  someone took those calls and reduced them to snippets, not

25  even the complete calls but snippets, 80 calls over the time

1  of a year, and said that's what you're about, that's your

2  intention, that's who you are.  Eighty snippets from a year's

3  worth of conversation, cherry-picking it to deprive it of

4  context.  Warning you that if you're going to judge that,

5  which you're going to be asked to by the government here, to

6  assume the entire photo of a jigsaw puzzle from a piece here

7  and a piece here and a piece here, not filling in anything.

8  You'll get context but not from the government.

9          There's no dispute in this case as to certain

10  facts.  Somalia has been in conflict, armed conflict, for

11  over two decades.  It is a place of severe deprivation, a

12  place of severe humanitarian crisis, cycles of drought and

13  famine, as serious as any we've seen in our time.

14          THE COURT:  Mr. Dratel, I hate to interrupt you,

15  but I'm getting an indication from the interpreter you need

16  to speak up --

17          MR. DRATEL:  Oh, sure.

18          THE INTERPRETER:  Thank you.

19          THE COURT:  -- so would be appreciated.  Okay.

20  Thank you.

21          MR. DRATEL:  I apologize.  Is this better?  I'll

22  move the microphone higher, so maybe I don't have to -- I

23  don't want to yell at you.  No dispute as to certain facts.

24  The Ethiopians invaded Somalia in 2006, stayed through 2008

25  into 2009.  You may hear other words for it for when a

1    foreign government sends troops to occupy your town.  You may

2    hear other words for it.  The evidence will show you what it

3    was.  And the evidence will show that the resistance to this

4    Ethiopian invasion, which was not the first time that

5    Ethiopia had invaded Somalia in modern times, that the

6    resistance to the Ethiopian invasion was widespread.

7            It's not about al-Shabaab versus Ethiopians, or

8    al-Shabaab versus the Transitional Federal Government.

9    You'll hear a lot more about that.  This is not a

10   black-and-white issue.  This is -- this has a lot of factions

11   and a lot of elements to it, but there's historic antagonism

12   between Ethiopia and Somalia, who share a large border.

13           No dispute that Basaaly Moalin, a cab driver in San

14   Diego, came to the United States and obtained his citizenship

15   in 2002; that he was gravely and deeply concerned about

16   Somalia; that he was gravely and deeply concerned for a

17   number of reasons.  He's Somali.  He cares about his people.

18   He cares about his country.  And another reason, his family

19   is still there; his wife and children live there now.  They

20   lived there during the time we're talking about in this case,

21   and they live there now.

22           And there's no dispute -- there will be no

23   dispute -- you'll hear evidence that he was essentially

24   starved for information about Somalia on a daily basis,

25   trying to make contact in Somalia to find out what was

1   happening.  And many of these conversations that you'll hear

2   are political discourse and political in nature, lot of raw

3   political venting, lot of passion, full of boasting and

4   bravado, frustration at being so far away and trying to help

5   in any we that he could.

6          You'll hear criticism of the TFG, the Transitional

7   Federal Government.  You'll also hear in the evidence that he

8   is not alone in criticizing the Transitional Federal

9   Government.  You will hear a lot about the Transitional

10  Federal Government and where criticism comes from, a lot of

11  quarters you may not expect hearing the government's opening.

12         You'll hear evidence that sometimes Mr. Moalin

13  would call just to get news, just to hear radio broadcasts

14  from Somalia to be connected.  This is what Somalis talked

15  about.  There are Somalis all over the world who had to leave

16  their country due to the conflict there, due to the danger

17  there, and they want to know what's happening.  They're in

18  contact with people in Somalia all the time.  There are

19  people whose jobs in Somalia are just setting up phone calls

20  between what's called the diaspora community, the community

21  outside Somalia, and the people still in Somalia, their

22  families, their friends, their countrymen.  It's what anyone

23  would want to do in that situation if they cared, and he

24  cares deeply.

25         There will be no dispute that Mr. Moalin sent money

1    to Somalia through the hawala.  And just if it wasn't clear,

2    a hawala is a money exchange.  They don't have banks in

3    Somalia, they don't have credit unions.  They don't have a

4    functioning financial system nationally.  They don't have a

5    functioning national system on any level.  And what you do is

6    you send money -- it's a trust system essentially; it's based

7    on trust.  You deposit money here, someone has a

8    corresponding account over there, provides the money to the

9    person, the person that you've designated to receive it.  And

10   it's trust between the two hawala merchants, one here and one

11   overseas that makes the system work because once they

12   reconcile accounts, if the can't reconcile accounts, it's a

13   problem.  They don't actually transfer the money like in

14   wires or things that we would normally consider when -- that

15   we're used to.  We're used to so many things that are lacking

16   in Somalia, that we take for granted every day and how we

17   operate.  And you have to put that aside when you listen

18   about a country that's really a primitive state in many ways.

19          No dispute the money was sent in installments, and

20   there were various names that were used.  And you'll hear why

21   but not for any illegal reason on Mr. Moalin's part.

22          The issues in this case -- you'll hear the evidence

23   that the issues in this case are whether Mr. Moalin ever

24   provided money or material support to terrorists or to

25   al-Shabaab, whether he supported a conspiracy to kill people

1    in Somalia.  Question is what was his objective and what was

2    his intent?  What was his knowledge?  What was his objective?

3    What was his intent?  Those are elements, essential elements,

4    of these offenses the government has charged.  Was it to

5    provide material support to terrorists?  Was it to provide

6    material support to al-Shabaab?  To support a conspiracy to

7    kill?  Or was it to provide relief from drought and famine in

8    his country?  To help orphans and others devastated by two

9    decades of war and chaos to individuals and institutions

10   looking to provide aid to the population?  To provide a

11   functioning local government that could operate in the area

12   that Mr. Moalin comes from in the Galgaduud region, Guraceel

13   in particular.  You'll hear these names.  You may see them

14   spelled differently because of the Somali transliteration,

15   but it doesn't matter how you pronounce or see them.  You'll

16   get used to that.  Galgaduud is the larger region; Guraceel

17   is the particular region, Dhusa Mareeb, which you saw on the

18   screen, a little north of Guraceel, is another place within

19   the larger Galgaduud area.

20           The money was sent to individuals and institutions

21   involved in self-protection in Galgaduud, in Guraceel,  in

22   Dhusa Mareeb, involved in self-defense, whether it's against

23   Ethiopians, al-Shabaab, random bandits that roamed, armed

24   thugs and gangs that found havens in anarchy that exist in

25   Somalia, that's existed for two decades.

1          The evidence will show that Mr. Moalin did not give

2    money or other material support to terrorists or al-Shabaab,

3    that he did not intend to do so.  The government's case is

4    built on a couple really just a couple of fundamental

5    allegations, couple of fundamental elements.  One is an

6    interpretation of the tapes -- and I'm not talking about

7    language interpretation only; I'm talking about meaning,

8    context, intent interpretation.

9          You won't hear from anybody on the witness stand on

10   those conversations saying this is what we meant, this is

11   what this meant.  You'll hear from someone else, not part of

12   the conversation, try to tell you what it meant, if anybody

13   can tell you at all what they meant.  And that interpretation

14   of the tapes that you basically heard from the government in

15   its opening statement will be contrasted by all the other

16   evidence you'll hear.  Mr. Moalin's charitable works, what he

17   provided to people in Somalia, for orphans, for drought

18   relief, for other types of humanitarian relief, his alignment

19   with persons and organizations opposed to al-Shabaab.

20         Six witnesses who were there in Somalia, not only

21   were there, they're still there.  We had to go overseas, and

22   you'll see them on depositions, on video, six witnesses who

23   knew what was going on, participants in the conversations not

24   from the government.  You'll hear from one witness who had

25   the very same conversations that the government claims were

1    with Aden Ayrow, had the very same conversations with

2    Mr. Moalin; he testified to that.

3              THE COURT:  Once again, I think we're having a

4    little difficulty --

5              MR. DRATEL:  Oh, sorry.  Okay.

6              THE COURT:  Okay.

7              MR. DRATEL:  There's a witness you'll hear from who

8    had the very same conversations that Mr. Moalin had that the

9    government says were with Aden Ayrow, and this person will

10   say I had those conversations with Mr. Moalin on these very

11   same subject matters.  And what's his name?  Sheikalow.  It

12   may be pronounced differently by different people, but

13   Sheikalow, the same name they say is the alias for Aden

14   Ayrow.

15             You'll hear about Farah Yare, one of the people who

16   the government says replaced Ayrow as a destination for money

17   for Mr. Moalin.  You'll hear about Farah Yare.  He is opposed

18   to al-Shabaab.  He's not a member of al-Shabaab.  He's

19   opposed by al-Shabaab.

20             Now, in addition to the interpretation of the

21   tapes, you'll hear some disputes about what the tapes

22   actually say with respect to translations from the Somali to

23   the English.  And I'm asking you to withhold judgment as to

24   what anything means even in terms of the actual translation

25   until you've heard all the evidence because there will be

1    some contested translations.

2            Other government witnesses.  FBI agents will talk

3    about technical issues; custodians of records will talk about

4    technical issues.  You may hear from the owner of the -- of

5    the hawala, the Shidaal hawala.  Heard a lot about that;

6    didn't hear a lot about him.  You may hear from him as a

7    government witness.  He ran the hawala that was used to

8    transfer the money.  Turns out, unbeknownst to Mr. Moalin or

9    any of the other defendants in this case, he's a massive

10   swindler, had a massive multimillion dollar Ponzi scheme

11   executed on other Somalis in the United States, a nationwide

12   Ponzi scheme to defraud investors of millions of dollars.

13   Caught in that case, he had to work it off.  He'll work it

14   off here.  You'll hear about the stakes for him, the

15   incentives for him, what's his -- why he's helping the

16   government in this case.  So when you hear his testimony, if

17   you hear his testimony -- because I didn't hear about him in

18   opening statement -- think of the source, think of his motive

19   and his interest when you examine his testimony.  Think of

20   whether someone who has swindled his own people so

21   intentionally and so dramatically can be believed talking

22   about Mr. Moalin and the other defendants, who really are

23   merely his next Somali victims.

24           The other linchpin of the government's case is Aden

25   Ayrow because the government cannot establish that it was

1    Aden Ayrow on those telephone calls as Sheikalow.  There is a

2    real Sheikalow, still alive and you'll see him on the video.

3            During these telephone calls Sheikalow never calls

4    himself Aden Ayrow.  He's never identified as Aden Ayrow by

5    others.  In all the millions of Somalis, this has to be Aden

6    Ayrow for the government's case to survive.  You'll see the

7    evidence.

8            For example, the house.  Talk about the use of the

9    house.  Sheikalow testified that he used Moalin's house.  And

10   who's Sheikalow?  He was a police commissioner for Guraceel

11   in Galgaduud.  Needed material -- money for material to

12   outfit his police force.  And you'll hear why he wasn't

13   available after May.  Why at the same time that Ayrow was

14   killed, that he has to flee Somalia -- that he has to flee

15   Guraceel and he doesn't have a phone anymore; Mr. Moalin

16   can't get in touch with him anymore.  And you'll hear why a

17   police commissioner would need money to support his police

18   force because there's no government there to provide that

19   kind of support, those resources; it's from the diaspora

20   community that it comes.  He'll tell you about how money was

21   transfered from Mr. Moalin for the benefit of the entire

22   local administrative council of Guraceel for all sorts of

23   civic projects going on there.

24           Now, after all the evidence I'll come back and sum

25   up, reevaluate the evidence as it comes in for a closing

 1   argument.  And just ask you obviously to keep all these

 2   factors in mind when you hear the evidence because obviously

 3   the government gets to go first and put on its witnesses and

 4   then we cross-examine.  And so just -- I think you'll be, as

 5   I said, fascinated by the case, and I appreciate all your

 6   attention, and thank you for your service.

 7           THE COURT:  Ms. Moreno?

 8           MS. MORENO:  Thank you, your Honor.  I'm just going

 9   to hold it.  Before I walk over there, my name is Linda

10   Moreno, and I represent Mr. Mohamud.  Good morning.  May it

11   please the Court, the evidence in this case -- is that

12   okay? -- will show that my client, Mr. Mohamud, did not

13   support terrorism, did not support terrorists, did not

14   launder money, did not believe in violence, was against

15   al-Shabaab.

16           The evidence will show you that there was no

17   conspiracy.  There was a community, a community of Somalis

18   who believed and cared about the people they left behind in

19   Somalia.  And as you've heard, from Mr. Dratel and a bit from

20   Ms. Han, Somalia in a way is a witness in this case as well.

21           Now, the government's case and their evidence, I

22   believe the evidence will show you, cannot be trusted, and it

23   cannot be trusted because their presentation is unreliable,

24   it's inaccurate, and it's edited out of any true meaning of

25   what was being discussed.  And the evidence I believe is

1    going to compel you to answer three questions three

2    questions.  Before I get to those questions, let me tell you

3    just a bit about Mr. Mohamud.

4         He's a family man.  He worked as an imam at the

5    local mosque, a photograph of which you saw, and that mosque

6    tends to the needs of the Somali community, the diaspora,

7    those people who left, fled their country.

8         Now, he was born in Somalia but a part of Somalia

9    that is now currently known as Somaliland, which is at the

10   very top, and Mr. Mohamud is not from the same region as the

11   other gentlemen in this case.  I anticipate that the evidence

12   will show -- through the government's expert there'll be

13   discussions about clans and regions, and Mr. Mohamud is from

14   a completely different place, not where this strife was

15   taking place.

16        Be that as it may, at one point in his life, you

17   will learn that he lived in a refugee camp and that he came

18   to America to escape the violence, not to support it, not to

19   support it.

20        You'll hear that he has family, a mother, sisters

21   in Somalia today and that he helped support them.  And

22   support is not like support as we know it because, as you've

23   heard in remarks before and you will learn in this case, that

24   Somalia is a country that's crouching towards catastrophe, a

25   place where there's no real working systems, no banking

1    system.

2           Now, there's no dispute that the bulk of the

3    evidence that the government will present are phone calls,

4    they're phone calls, the tale of the tape.  And you're going

5    to have to discern and understand what is really being

6    discussed on the tapes in order to properly decide this case

7    because you're judges of the facts.

8           You will never hear in the government's case my

9    client, Mr. Mohamud, ever encouraging violence, espousing

10   violence, expressing lawlessness; you're not going to hear

11   that.  You're going to hear the contrary, and you're going to

12   hear it when the entire part of the conversation is played.

13          When you look at the evidence, you're going to have

14   to ask yourself these three questions.  Says who?  Who is

15   claiming the particular position?  What does it mean?  What

16   does the evidence mean?  What do the calls mean?  And is that

17   everything?  And those are the three questions that I believe

18   the evidence will require you to answer.

19          Now, you will hear in this case that out of nearly

20   2,000 calls, there are about 11 with my client's voice on

21   them.  And I think that the first call I anticipate you'll

22   hear with my client takes place in December of 2007, and I'm

23   going to talk a little bit about that call because I believe

24   it is representative of the problems with what the

25   government's case has and, I dare say, the lack of integrity.

1          The government I anticipate will characterize the

2     first call and quote my client, who's speaking to Mr. Moalin,

3     as saying, quote, that he's completing the task pertaining to

4     the men.  What does that mean?  You won't know; you won't

5     know what that means.  But if you listen to the rest of the

6     conversation, it goes like this, and this is a quote from the

7     transcript.  I don't have a screen, so I'm just going to read

8     it to you.

9          The rest of the conversation my client says, in

10    general, not aimed at Mr. Moalin but he's making a comment:

11    Speaking senselessly does not help.  These guys, the youth,

12    they slaughter anyone they capture, and that is not good

13    policy to begin with.  Not good policy to begin with.

14         What else does he say?  He preaches unity.  He

15    says, and I quote, what we need is unity.  Unity's important.

16    That is what is needed.  There must be cooperation for the

17    future of the country.

18         He's not talking about America; he's talking about

19    Somalia.

20         And he ends up in the conversation by saying, the

21    country is for all of us, all the scholars, the uneducated,

22    and the general public.  If you limit yourself to a few

23    individuals or group, you will end up a failure.

24         So now you have the competing versions.  You have a

25    fragment of the call that the government I anticipate will

1   play you where they lift some phrase and say he's completing

2   the task, and then you'll hear the whole call I anticipate,

3   and he's talking about something that is not only benign but

4   is laudable.  Their fragment, which is two pages out of an 11

5   page transcript, is misleading, it's inaccurate, and it's

6   just unfair.

7        This is just one example to illustrate the

8   government's case cannot be trusted, that the evidence they

9   present is flawed.  And by the way, when Ms. Han alluded in

10  her opening to the call that they describe as deception, with

11  my client as one of the speakers, and there is some quote

12  about phones are problematic, so their interpretation that

13  they will argue to you is that this is about deception; if

14  you hear the rest of the conversation, you will know that my

15  client never knew, never met the other person on the other

16  end of the phone, Mr. Hassan.

17       Now, is that all that my client discussed on the

18  phone?  Absolutely not.  There was passionate discussions

19  about the dynamic situation in Somalia, about the civil war.

20  I believe that the evidence will show you expressing

21  frustration and political opinions is not material support of

22  terrorism; talking about the occupation of your country by a

23  foreign power, as passionate venting as it might be, is not

24  material support of terrorists.

25       The other piece in this case, I think the central

1    heart of the case is Somalia.  You're going to hear a lot

2    about Somalia.  This is where my client came from, and this

3    is what he's talking about in the handful of calls.

4              You're going to hear from the government's

5    expert -- the government's expert will tell you this -- that

6    during the relevant period of time in this case, it is the

7    worse drought in Somalia 60 years, in 60 years, a place where

8    my client still has family.

9              You'll hear from the government's expert about the

10   decades of armed conflict and the civil war, the lack of a

11   functioning government, disintegration of any kind of a

12   health system, crouching towards catastrophe, unthinkable

13   famine.  The government's expert will tell you this.

14             You're going to learn about poverty that's

15   unthinkable in this beautiful community.  You're going to

16   hear statistics that are appalling, heartbreaking,

17   incomprehensible.  Twenty-nine thousand children under the

18   age of five dying within three months.  A drought, a drought,

19   my client and others are talking about in these calls in this

20   case.  It's hard to get past that.

21             Now, those who were fortunate enough to escape the

22   poverty and the famine felt an obligation to help those that

23   remained behind, and in this category falls my client.  This

24   is what my client was talking about, and this is what he was

25   responding to in the calls:  Lists of orphans, difficulty in

1    getting information into a place and funds to help orphans,

2    to a place where there's a raging civil war, where people are

3    on the move, continuously displaced by war and famine.

4    You'll hear the calls.  That's most of the government's case.

5              I too wondered why Ms. Han didn't discuss Mr. Ahmed

6    in her opening, the fraudster, the predator against his own

7    community.  We'll see.  We'll see if he makes an appearance.

8    But I want to end by saying to you you have to decide each

9    case individually; his Honor will so instruct you.  You must

10   consider my client separately and individually.

11             I believe the evidence is going to show you in

12   these handful of calls that what he was talking about, what

13   he was interested in, what he believed in was trying to build

14   a civil society, engaging in humanitarian relief.  In this

15   case the government has mixed politics with crime.  It's not

16   material support of terrorism, it's not money laundering.

17             The tale of the tape.  Not fragments, not edited

18   pieces to present a misleading portrait.  The three questions

19   you'll have to answer:  Says who?  What does it mean?  And is

20   that everything?  And I believe you will find at the end of

21   this case that my client is not guilty.  Thank you.

22             THE COURT:  Ladies and gentlemen of the jury, we'll

23   take our midmorning recess now.  Remember, it's 15 minutes,

24   and then we'll have you back.  Please assemble outside the

25   courtroom doors.  We'll call you in in 15.  Remember the

1    admonition not to discuss the case amongst yourselves or with

2    anyone else or allow yourselves to form or express any

3    opinions on the case until it has been submitted to you.

4    Thank you.  You can leave your notebooks right there on the

5    seat.

6         (There was a break in the proceedings.)

7         (Following is a sidebar conference.)

8              THE COURT:  Come on in closer, counsel.  We're

9    still waiting for Mr. Johnson -- not too close because I

10   think there may be -- I think I might be fighting off what's

11   been going around.  We're waiting for Mr. Johnson.  Couple of

12   things.  I've been informed that the microphones pick up

13   everything, so --

14             MR. DRATEL:  Oh, at the table.

15             THE COURT:  -- if you're talking -- yeah.  If

16   you're talking to your clients, you need to push away so that

17   they don't hear any of your confidential communications.

18   Still waiting?  Okay.

19             MR. DURKIN:  If we hold the button down, does that

20   shut the microphone off?

21             THE COURT:  Yes.  It should, yes.  But you got to

22   remember to either push away or hold the button down.

23   Opening statements.  I didn't interrupt.  I'm concerned about

24   a couple of comments I heard.  I don't think it's appropriate

25   for either side to refer to the other side as lacking

 1   integrity or providing a dishonest case, so I want to nip

 2   that in the bud.  I wasn't going to say anything, but I'm

 3   concerned about that.  That's a slippery slope, and I just

 4   don't want things to get out of hand when it comes to that.

 5          Ultimately if you want to talk about the case

 6   itself -- not about the party but about the case itself --

 7   the state of the evidence lacking integrity, that's

 8   something, but please don't -- please don't be pejorative

 9   when it comes to --

10          MS. MORENO:  Your Honor, just if I may, in my notes

11   clearly I said the prosecution's case is a unreliable and

12   untrustworthy.  I referred to their case, I referred to the

13   tapes, and I referred to the evidence.  I would never, and I

14   don't believe I did, make any personal --

15          THE COURT:  As I say, it's a slippery slope.  And

16   what all of a sudden caught me a little bit and got me

17   interested is when you prefaced your statement, the first

18   statement, with "dare I say," and then there was --

19          MS. MORENO:  Oh, lacks integrity.

20          THE COURT:  -- lack of integrity, yeah.  So just be

21   careful.

22          MS. MORENO:  I understand.  I appreciate it.

23          THE COURT:  I just don't want things to get out of

24   hand on that score.  Mr. Ghappour, are you ready to go?

25          MR. GHAPPOUR:  I will refer to a fraud, but

 1    that's -- but that will be one of the witnesses if that's

 2    okay.

 3            THE COURT:  Yeah.  Well, remember this is opening

 4    statement, it's not argument.  That's okay.  You feel -- if

 5    you feel it's appropriate, go ahead.  I assume that Mr.

 6    Durkin, you're going to give an opening statement as well at

 7    this time.

 8            MR. DURKIN:  I wasn't going to, and I'm not sure

 9    that I will.

10            THE COURT:  All right.  You let us know what you'd

11    like to do, okay?  Very good.  Thank you.

12        (Sidebar conference concludes.)

13            THE COURT:  Okay.  We have all jurors present and

14    we are ready to proceed.  Mr. Ghappour, would you like to

15    proceed?

16            MR. GHAPPOUR:  Yes, your Honor.  I think I need a

17    microphone.

18            THE COURT:  Would you like that lapel mike?

19            MR. GHAPPOUR:  Good morning, everyone.  My name is

20    Ahmed Ghappour, and I represent Issa Doreh.  Mr. Doreh?  Issa

21    Doreh is not guilty.  The evidence is going to show you that

22    Issa Doreh never supported terrorism, never committed a

23    crime, and never sent a nickel to al-Shabaab or any other

24    terrorist group.  He's here because he works at the Shidaal,

25    because of a handful of phone calls, and because of a fraud.

1              Over the course of this trial, you're going to

2    learn about Mr. Doreh.  You're going to learn that he's an

3    American citizen, a husband and father of six, that he came

4    out to the United States decades ago, in 1988, that he left

5    Somalia well before the very existence of al-Shabaab.

6              Now, you've heard a bit about the Somali conflict

7    both from Mr. Dratel and Ms. Moreno, and you will continue to

8    hear about that conflict.  But suffice to say the life that

9    Mr. Doreh left behind was a difficult one.  It was one that

10   took his mother, her life, and five of his brothers.  It's

11   one, the evidence will show, it was a life that left his

12   family stuck between natural disaster, warlords, and endless

13   conflict.

14             Mr. Doreh came here to the United States as a UN

15   refugee.  He became a citizen in 1994 and lived a simple and

16   upstanding life.  You see, Mr. Doreh wasn't interested in

17   cheating the system; he was interested in working with it.

18   And for his family he emphasized education, and nothing made

19   him happier than when his eldest daughter graduated from San

20   Diego State University.

21             And so you can imagine that even though he didn't

22   get his dream job -- because he always wanted to be a

23   professional -- he was still grateful for the opportunities

24   given to his wife and children, and the freedoms that this

25   country gave him he did not take for granted.  He voted, he

1    paid taxes, he respected the authorities.  And so you can

2    imagine his surprise when the government accused him of

3    providing support to al-Shabaab, an organization that is

4    opposed to education, that subjugates women, that terrorizes

5    intellectuals and businessmen and anyone that stands in their

6    way.  You see, Mr. Doreh did not support al-Shabaab because

7    he did not believe in al-Shabaab.  It stood against

8    everything that he urged his community and his family to be.

9          Now, the government in its opening statement told

10   you that you will hear a lot of evidence, a fair amount of

11   evidence.  But this case will demonstrate to you a lot about

12   the quantity (sic) and the quantity (sic) of evidence, and I

13   submit to you that this evidence in this case against my

14   client will be neither of quantity (sic) or quantity (sic).

15   The important thing the government has to prove, what it

16   really has to prove, particularly with respect to Mr. Doreh,

17   to each and every one of you, is that he knew and intended to

18   send money to al-Shabaab and that he agreed with the other

19   defendants to do so.  And on one occasion the government will

20   have to prove that in April 2008 he actually sent money to

21   al-Shabaab.  The government will also have to prove that Mr.

22   Doreh intended to send money to support a murder overseas in

23   Somalia and the use of a weapon of mass destruction.

24          Now, the vast majority of the government -- of the

25   government's evidence is going to be phone calls, and the

 1  government had a wiretap on Mr. Moalin, and that wiretap

 2  produced thousands -- nearly 2,000 calls.  And they had

 3  wiretaps on others.  It didn't have a wiretap on Mr. Doreh.

 4  And of these thousands of calls, only a handful -- just about

 5  ten -- are being used against Mr. Doreh.  And of these ten

 6  calls, the government has selected slices, excerpts, clips,

 7  to use against Mr. Doreh.  And I'm confident that when you

 8  listen to these calls and if you consider the evidence in its

 9  context, you will come to the inevitable conclusion that Mr.

10  Doreh did not support al-Shabaab.  He didn't support them by

11  sending money, he didn't even support them with his words.

12         Now, what the calls will tell you, what the

13  evidence will show is that when Mr. Doreh heard news of the

14  humanitarian crisis in Somalia, he responded; he responded

15  along with his community here in San Diego and along with

16  Somalis and humanitarians across the world.

17         The evidence will also show you through these calls

18  that on a number of occasions, he did in fact speak to

19  Mr. Moalin and others about the situation in Somalia.  About

20  the Ethiopian invasion of Somalia, about the fighting that

21  ensued in Somalia, about rumors regarding the Ethiopian

22  withdrawal from Somalia because the reality is that from 2006

23  until the end of 2008, Somalia was a country without a

24  functioning centralized government, it was under invasion by

25  Ethiopia, and that invasion and those invaders brutalized

1    civilians, helpless civilians stuck between an invading

2    country, natural disaster, and warlords.  And in a country

3    where self-sufficiency was nearly impossible and where the

4    international NGOs were run out, there was no other resource

5    than the Somali diaspora.  Somalis living abroad, thousands

6    of them across the whole world sent money to Somalia, and

7    they sent money using hawalas, money exchanges, just like the

8    Shidaal Express because there was no other way; there was no

9    Western Union, and there was no Red Cross.  There was no

10   banking system, no credit union, nothing, a primitive

11   economic system and a people held hostage.

12            And so I think it's reasonable that when Mr. Doreh

13   talked about the situation when he spoke of the invading

14   Ethiopian forces, he was emotional.  His response, as you

15   will hear on these calls, was nothing short of reasonable.

16            The other thing that these calls will show you, the

17   evidence will show you in this case, is that he did work at

18   the Shidaal.  Ms. Han said this case, his role was that he

19   worked at the Shidaal.  He did field calls at the Shidaal

20   from Mr. Moalin inquiring about the status of transfers,

21   whether a transfer had gone out, whether money was received.

22   But the calls will also show you that Mr. Doreh could not

23   have been al-Shabaab's man at the Shidaal, and the reason is

24   that he wasn't authorized, he wasn't authorized to conduct

25   transactions, and he couldn't even check the status of a

1    transaction unless someone was there keyed into the computer

2    that he could appear behind.  And on this point I ask you to

3    look at a series of calls that will be provided on April 23;

4    it was a very important date because this is the date

5    relating to the allegation of the one transfer, the funds

6    that went to al-Shabaab.  It's also an important date because

7    the calls on this date reflect that Mr. Doreh could not have

8    sent any money, and so it doesn't make any sense that he

9    would be al-Shabaab's man at the Shidaal.

10           Now, here's what the evidence won't show.  It won't

11   show Mr. Doreh stating a single word against the United

12   States.  In fact, some of the calls, if you listen to them

13   carefully, have Mr. Doreh happy about the fact that the State

14   Department was critical of the Ethiopians and hopeful that

15   that would lead to their withdrawal.

16           The calls won't show you and you won't hear on the

17   calls a single word uttered by Mr. Doreh in support of

18   al-Shabaab, about sending a penny to al-Shabaab.  You won't

19   even hear the word "al-Shabaab."  You won't hear Aden Ayrow,

20   you won't hear Sheikalow, you won't hear Majadhub, not a

21   word.  And not a call about intimidating civilians, not a

22   call about assassinations that he supports.

23           Now, the government will also call -- I'm sorry.

24   Strike that.  You may hear from a gentleman named Mohamud

25   Abdi Ahmed.  He was the owner of the Shidaal.  And now you've

1    heard a little bit about this guy from Mr. Dratel and Ms.

2    Moreno.  You'll hear a lot more if he takes the witness

3    stand, and if he testifies, think about where that testimony

4    comes from and think about what's at stake for him.  And I

5    urge you to keep a few things in mind.

6            The evidence will show that Mr. Abdi Ahmed is the

7    one that conducted the July transactions in this case.  The

8    evidence will show that Mr. Abdi Ahmed has pled guilty to a

9    fraud relating to the hawala, related to the Shidaal that he

10   owned.  The evidence will show that he was a Ponzi schemer

11   and ran a Ponzi scheme so massive that he faces serious jail

12   time.  He's trying to work off that jail time.  Because

13   unlike Mr. Doreh, Mr. Abdi Ahmed was interested in cheating

14   the system.  In fact, he's never done anything but cheat the

15   system.  He lied on his immigration papers.  He held himself

16   out to the Somali community as an expert investor, took their

17   money, millions of dollars nationwide.  He lied to them, and

18   he used Mr. Doreh to gain trust from them.  The evidence will

19   show that he kept him at the Shidaal for the purpose of

20   gaining trust from the community because Mr. Doreh was an

21   elder; he was a white beard, as the Somalis say.  And in the

22   meantime, while Mr. Abdi Ahmed stole millions of dollars from

23   the community, Mr. Doreh was making between $8 and $10 an

24   hour.

25            The Shidaal manager, who conducted a few other of

1   the transfers, specifically those related to April 23, was

2   also receiving money from Mr. Abdi Ahmed.  Mr. Doreh had

3   nothing to do with the Ponzi scheme; he was one of its

4   victims.  And Mr. Abdi Ahmed used Mr. Doreh to perpetuate a

5   fraud against his community, and now he's using him to get

6   out of trouble.  And after this trial is over I'm confident

7   that you will find my client innocent.  Thank you.

8           THE COURT:  Anything further?

9           MR. DURKIN:  I believe I'll say something, Judge.

10          THE COURT:  All right.

11          MR. DURKIN:  I feel like Beyonce at the

12   inauguration, trying to get wired up here.  I won't do any

13   lip syncing.  Actually I wasn't going to say anything at all

14   because, as the judge told you, we're not obligated to say

15   anything, and, frankly, I was going to defer because this is

16   an odd time of the case; this is the time of the case where

17   we're just giving what's called opening statements.  It's not

18   called opening argument.  We don't get to argue until the

19   case is over, and the judge will instruct you that what the

20   lawyers say isn't evidence.  I think he's already told you

21   that you can only make your decisions based on what you hear

22   from the witness stand and all the documents.  So it's an

23   awkward time for a lawyer to try to tell you what he thinks

24   the evidence is going to show because, frankly, I don't know

25   how on god's green earth the government thinks that their

1    evidence, based on my view of the evidence, is going to even

2    show you what my client is doing in this case, much less

3    whether he is a -- guilt of anything.

4            I think the evidence -- the most the evidence is

5    going to show you is that my client -- stand up -- is a cab

6    driver from Somalia.  He came here as a refugee -- you can

7    sit down.  He won a lottery in Cairo.  The evidence is going

8    to show you that he came from Somalia to get away from what

9    Ms. Han described as this embroiled unstable controversy

10   that's going on in Somalia.  That's putting it mildly.  I

11   think the evidence is going to show you that what's been

12   going on in Somalia for some 20 years now, if not for

13   centuries, is nothing short of a civil war.  And it's a real

14   civil war, and it's an ugly one, and the evidence will show

15   you that.  And no one here disputes that.  That's not part of

16   this case, and it's not really even going to be in dispute.

17   But that's why I want to talk about some of the evidence,

18   particularly some of the evidence that Ms. Han highlighted to

19   you because I have a different view of some of that evidence.

20           And by the way, Ms. Han showed you this picture.  I

21   believe the government's going to introduce this picture in

22   evidence for the sole purpose of showing you who Aden Ayrow

23   is.  They claim there's a guy named Aden Ayrow on the tape.

24   There's no dispute that Aden Ayrow is a leader of al-Shabaab

25   no question about that.  Nobody disputes that.  And they're

1    going to introduce this picture to show you that.  Whether

2    that's really Aden Ayrow on the tape, as Mr. Dratel told you,

3    is a whole 'nother question and -- that I'm not about to get

4    in the middle of, but the point of it is they're going to

5    show you this picture.

6           Now, this is why I want to thank you for what we

7    did yesterday because what we did yesterday may be, as far as

8    my cab-driver client is concerned, the most important thing

9    that happened.  And I know it's embarrassing to have to stand

10   there and answer all those personal questions and all, some

11   people were -- had to say things that I'm sure they weren't

12   comfortable with, but we have to rely on that, so I thank

13   you.  My noncitizen client thanks you for the opportunity to

14   have a fair jury, and I thank you for that because you're

15   going to have to get beyond some rough stuff here that's

16   really not in dispute.

17          Go ahead and look there.  This is ugly.  There's no

18   dispute.  This type of evidence is ugly.  I don't like it, my

19   client doesn't like it, no one else likes it, and I don't

20   think it really has much to do with the case.  But that's for

21   you to decide later.  You can see.  But I want to make sure

22   that nobody's frightened by Mr. Ayrow, whoever he is, and

23   those guys behind him because it frightens me, and I would be

24   frightened.  I understand allegations of terrorism frighten

25   people, but I think this evidence will show you that this is

1   a case about roughly $8,500 to this Texas-size country which

2   is 10,000 miles away.  And it's going to be about whether or

3   not this cab driver had the intent to fund this.

4          Ms. Han says their evidence is going to show you

5   what the money can buy, and if this doesn't scare the bejesus

6   out of anybody, I don't know what would.  She tells you that

7   their evidence is going to show that.  I disagree; I don't

8   think their evidence is going to show one iota that this

9   money was going to be used for assassinations, beheadings,

10  suicide bombings, rockets, landmines, anything else.  We'll

11  see.  Maybe I'm wrong, but we'll see.

12         She also says -- with confidence, I might add, more

13  than I would have based on what I think the evidence is, but

14  we'll see -- what the money bought.  I submit to you that the

15  government's going to have a hard time showing you this money

16  even got to Somalia, much less that it was used to buy any of

17  this stuff, attempted assassinations of TFG officials with

18  landmines and mortars, use of RPGs, civilians, you know.

19         Now, make no mistake about it, those things happen

20  in Somalia.  They're going to have an expert right away, soon

21  as I'm done, first guy on the witness stand, a guy by the

22  name of Bryden, who's lived over there, and he's an expert.

23  He's going to tell you all those things happened, but he's

24  not going to be able to tell you one bit that a dime of this

25  money, even if they can prove it got there, which I don't

1   think they can do -- wait till you see these Shidaal records,

2   just as an aside.  They talk about these records that are

3   going to get put in by this goof Ahmed, their trained-seal

4   witness, who's going to come and say this is what was really

5   going on, the guy that ran the Ponzi scheme.  I don't think

6   they're even going to show -- be able to prove based on those

7   records that that money got to Somalia.  But more

8   importantly, I am very confident that you'll have a

9   disagreement with the evidence with respect to what this

10  money bought.  If they can show you that, I'll eat my hat.

11          Just like I don't want you to be frightened by this

12  piece of evidence for whatever purpose.  I'm sorry.  This

13  doesn't show up well here.  Hard to read.  But this, again,

14  we'll see how relevant this evidence is or see what you think

15  of this evidence, whether it has anything to do with anything

16  about the fact that Ayrow was trained in Afghanistan, okay?

17  I guess that means that somehow Ayrow's superbad, whoever

18  Ayrow is, or this is Ayrow, or whatever.  Again, it's the

19  same kind of thing, like fear.  But you promised us and we're

20  relying on the fact that you're not going to be moved by

21  that.

22          But the reality is -- and, again, we'll get to see

23  who's right when we're all said and done -- but the reality

24  of this situation is is that none of this has anything to do

25  with all this fear.  There are a bunch of -- there's like six

1   or eight transfers that will have no connection whatsoever to

2   any of that.  That's what I think the evidence is going to

3   show.  Maybe I'm wrong.  But regardless of what it shows,

4   it's not going to show that this guy had anything whatsoever

5   to do with it, to funding terrorism activity.  Just like he

6   didn't have anything to do with any conspiracy.  I don't

7   think they're going to prove any conspiracy.  That's just my

8   view of the evidence.

9          But the evidence is going to show you my client

10  didn't even meet two of these people until he got arrested,

11  and the only evidence -- there's going to be no evidence that

12  my client knows Mr. Ayrow, or whoever it is, none whatsoever.

13  He knew Mr. Moalin from when he was a cab driver in St.

14  Louis, which is where he went shortly after he got the

15  greatest thing that ever happened to him, which was winning a

16  lottery in Cairo.

17         He got to Cairo to get out of this civil war.  He

18  got to Cairo because he has three children in Afghan -- in

19  Somalia.  He got there, the evidence will show you, so he

20  could try to find away to ultimately someday get them out of

21  Somalia, so he could get them out of the madness that he

22  happened to be born into, a madness that, fortunately, we

23  don't have to deal with except when we politically get

24  involved in things.  It's a madness that's beyond my

25  comprehension.

1              You will hear some of this evidence that will make

2    your head spin in terms of what Bryden's going to talk about.

3    But the one thing I'm sure that evidence will do is that it

4    will convince you as to why he had the good sense to come to

5    Cairo, and then he got into a lottery to come to this

6    country, and he won.  It was the luckiest day of his life.

7    That's what this evidence is going to show you.  That's all I

8    think.  Thank you.

9              THE COURT:  The government may call its first

10   witness.

11             MS. HAN:  Your Honor, the United States calls

12   Matthew Bryden.

13             THE CLERK:  Could you please raise your right hand.

14   Do you solemnly swear the evidence you shall give in the

15   cause now before the Court shall be the truth, the whole

16   truth, and nothing but the truth?

17             THE WITNESS:  I do.

18                        Matthew Bryden

19   was called by the government and testified as follows:

20             THE CLERK:  Could you please state and spell your

21   first and last name for the record.

22             THE WITNESS:  Matthew, M-a-t-t-h-e-w, Bryden,

23   B-r-y-d-e-n.

24             MR. COLE:  Your Honor, may I approach?

25             THE COURT:  Certainly.

1          MS. HAN:  Thank you, your Honor.

2                    Direct Examination

3          BY MS. HAN:  Q.  Good morning, Mr. Bryden.

4   A.  Good morning.

5   Q.  We're going to start off, and I'd like you to tell us a

6   little bit about your education, please.

7   A.  I'm educated in Canada, first in secondary school, Upper

8   Canada College in Toronto, and then in McGill University in

9   Montreal, where I obtained a joint honors degree in history

10  and political science, and subsequently studied at King's

11  College London for a master's and then a doctorate, but I've

12  suspended my studies for the time being.

13  Q.  And what was your master's and doctorate in?

14  A.  It was in more studies, and my thesis is on contemporary

15  jihadist groups in Somalia.

16  Q.  And what do you mean by the word "jihadist"?

17  A.  A militant Islamist armed group.

18  Q.  And in addition to your education, what languages do you

19  speak other than English?

20  A.  French and Somali.

21  Q.  And after completing your college and -- or your college

22  education, what was your first employment that you had?

23  A.  Well, initially with the Canadian armed forces as a

24  reserve infantry officer for two years following college; and

25  then I traveled to East Africa and worked for a nongovernment

1   organization for the UN High Commissioner for Refugees in

2   Somalia.

3   Q.  Could I just you stop you there?  What is a

4   nongovernmental -- nongovernment organization?

5   A.  It's a nonprofit organization, a charitable one in this

6   case -- it was CARE International -- that was working in

7   refugee camps.

8   Q.  And you said that you were working for the UN High

9   Commissioner on Refugees, right?

10  A.  Yes, that's right.

11  Q.  Okay.  And what is that?

12  A.  That's the United Nations High Commissioner for Refugees.

13  It's the part of the United Nations system that supports

14  refugees, manages refugee camps and the eventual resettlement

15  or reintegration of refugees when they go home or settle

16  abroad.

17  Q.  And just to get really basic, what's the United Nations?

18  A.  The United Nations is the world body that brings together

19  I believe all or almost all the governments of the world

20  around -- and it's organized around a number of different

21  agencies:  A secretariat, which is the main political body of

22  the United Nations; a general assembly, which represents all

23  of the members; and then specialized agencies that do

24  different kinds of work like supporting refugees, like

25  developmental activities, peacekeeping operations, and so on.

1   Q.  And when you were talking about nongovernmental

2   organizations, are they sometime referred to as NGOs?

3   A.  That's right.

4   Q.  And the organization that you were working for, is it

5   sometimes referred to as -- it's called CARE, right?

6   A.  Right.

7   Q.  Okay.  And what work were you doing for CARE?

8   A.  At that time I was a refugee registration officer, which

9   meant that I worked in the refugee camps.  At that time there

10  were mainly -- there were people from Ethiopia of Somali

11  origin who were refugees in Somalia, and the UN was trying to

12  close the camps either by settling people inside Somalia or

13  sending them home to Ethiopia; and so my job was to talk to

14  the families and find out what their preference was, to

15  register it, register their children so that we knew how many

16  in each family were going to settle or to return home.

17          MR. DRATEL:  Your Honor, can we get a time frame

18  for this?

19          THE COURT:  Sure.  I think that would be helpful.

20          BY MS. HAN:  Q.During what approximately time

21  period are we talking about?

22  A.  This was January to March 1990.

23  Q.  And what was your next work experience after that?

24  A.  After that, still with the United Nations but for a

25  different office, the United Nations Development Program, and

1  I was with a part of that program called the Emergency Unit

2  for Somalia.  I was an emergency coordination officer, and my

3  job was to oversee and coordinate the activities of various

4  agencies, again helping refugees in northwestern Somalia

5  where there was an armed conflict.

6  Q.  And what is the United Nations Development Program?

7  A.  The UN Development Program is one of the largest

8  departments of the United Nations, and as its name says, it

9  is involved mainly in developmental activities, supporting

10 education, governance, administration, trying to build

11 capacity in countries all over the world.  But it also had at

12 the time an emergency responsibility to -- to assist in the

13 civil conflict in Somalia, people who were war-affected.

14 Q.  And where were you based when you did that work?

15 A.  Well, the headquarters was Mogadishu, and -- the capital

16 of Somalia, and I was also deployed to northern Somalia

17 mainly in the towns of Berbera and Borama in the northwest,

18 and I moved between them.

19 Q.  And when you were working for CARE, where were you

20 located?

21 A.  In the town of Luuq in southwestern Somalia.

22 Q.  And what was your next work experience?

23 A.  After the United Nations I joined Medecins Sans

24 Frontieres, or Doctors Without Borders, and I became the

25 director or the coordinator of their activities first in

 1  northwest Somalia and then in Mogadishu.

 2  Q.  And were you also --

 3          THE COURT:  Excuse me for just a moment.  As we

 4  proceed, I think it would be helpful if you gave us the

 5  approximate dates of each of these affiliations.  I think

 6  your testimony is going to be spanning some decades here.  I

 7  know that it will assist counsel, as has already been

 8  indicated.  And if I can also ask you to spell the names of

 9  any particular cities or areas where you spent time.  You're

10  going to have to do it sooner or later for the benefit of the

11  court reporter, so if it's not too disruptive, we would

12  appreciate you being able to do that.

13          THE WITNESS:  All right, your Honor.

14          THE COURT:  Thank you, sir.

15          BY MS. HAN:  Q.  So I guess first we were talking

16  about -- I think of the towns we discussed, we talked about

17  Mogadishu; is that right?

18  A.  That's right.

19  Q.  And is Mogadishu the capital of Somalia?

20  A.  Yes, it is.

21  Q.  And how do you spell Mogadishu?

22  A.  In English, M-o-g-a-d-i-s-h-u.

23  Q.  And you said that you were in Berbera and another

24  location as well as in Mogadishu when you were working with I

25  believe the UN Development Program; is that correct?

1    A.   That's right.

2    Q.   And can you please spell Berbera and the other location

3    as well?

4    A.   Berbera is B-e-r-b-e-r-a, and Borama would be

5    B-o-r-a-m-a.

6    Q.   And during approximately what time period were you

7    working for the United Nations Development Program?

8    A.   That was 1990, March to December.

9    Q.   And when you were working with Doctors Without Borders,

10   approximately what time period was that?

11   A.   That was 1991 again, February '91 until August '92.

12   Q.   And you testified that you were also based in Mogadishu

13   during that time period; is that right?

14   A.   The latter part of that time period, June-July '92.

15   Q.   And then what was your next work experience?

16   A.   Then I was engaged as special advisor to the Canadian

17   ambassador on Somali affairs with responsibility to provide

18   advice on political, humanitarian, and military issues.

19   Q.   And during what time period was that?

20   A.   That was August '92 until August-September '93, one year.

21   Q.   Where were you based during that time period?

22   A.   There I was based at the Canadian High Commission or the

23   Canadian Embassy in Nairobi but traveling most of my time in

24   Somalia.

25   Q.   And is Nairobi the capital of the neighbor country,

1  Kenya?

2  A.  Yes, it is.

3  Q.  And then what was -- what was your next work experience?

4  A.  I went briefly to Afghanistan, again with Doctors Without

5  Borders, for four months and then returned to the Horn of

6  Africa, and I worked in the neighboring country, Ethiopia, as

7  a specialist field officer for the United Nations again, and

8  I was responsible principally for the Somali region, the part

9  of Ethiopia inhabited by Somalis, and also the Afar region,

10  which is adjacent to the Somali region.

11  Q.  And what was your next work experience?  I'm sorry.  What

12  time period about did that cover?

13  A.  That was 1994 until 1996.

14  Q.  And after that what was your next work experience?

15  A.  I worked -- I returned to Kenya, Nairobi, where I was --

16  worked -- I worked as a consultant for the European

17  Commission, providing advice on governance in Somalia.  That

18  was a very brief assignment, three months.  And I was then

19  recruited to establish and to lead something called the

20  War-Torn Societies Project in Somalia.

21  Q.  And can you please describe what the War-Torn Societies

22  Project was.

23  A.  The War-Torn Societies Project was a research program

24  conducted under the auspices partly of the United Nations,

25  the UN Research Institute for Social Development, and the

1    Geneva Graduate Institute of International Studies.  And it

2    was a program looking at post-war reconstruction and peace

3    building, how a country could -- and a society could put it

4    back together without falling back into the civil war, which

5    is a pattern we saw in the 1990s in many countries, recurring

6    civil wars.  Over time it evolved into an organization that

7    today is called Interpeace.  And during the time that I

8    headed that program, we also established three Somali

9    research institutions.

10   Q.  And then -- I'm sorry.  What time period does that cover?

11   A.  That is from 1996 until 2003.

12   Q.  And where were you based during that time?

13   A.  First in Nairobi, Kenya, and then in Hargeysa in

14   northwestern Somalia.

15   Q.  And how do you spell Hargeysa?

16   A.  H-a-r-g-e-y-s-a.

17   Q.  That brings us I guess to 2003; is that correct?

18   A.  That's correct.

19   Q.  And what was your next work experience?

20   A.  I then worked with the International Crisis Group, which

21   is a research and advocacy organization based in Belgium.

22   And it studies conflicts -- writes about conflicts around the

23   world, conflicts and other kinds of crises, and recommends

24   solutions and lobbies diplomatic community decision makers as

25   to how to address these issues.

1  Q.  At the International Crisis Group did you write reports

2  about the work that you did?

3  A.  I did.  I was first the lead analyst on Somalia and then

4  director for the Horn of Africa, and I was the principal

5  author of reports on Somalia and Ethiopia and Eritrea.

6  Q.  Let me stop you there.  When you said you were the lead

7  analyst, what does that mean?

8  A.  We had other researchers on the ground that we would --

9  we would engage from time to time or who would collect

10  information and do research, which they would then send to

11  the lead analyst, the lead analyst would synthesize the

12  information and produce the report.

13  Q.  And did you yourself also do research on the ground?

14  A.  Yes, I did.

15  Q.  And on what topics?

16  A.  On a range of topics.  I think the first was on

17  counterterrorism in Somalia, a failed state, and how that

18  could be addressed in a country without a functioning

19  government.  I also prepared documents on the conflict --

20  there was a war between Ethiopia and Eritrea that still

21  hadn't been resolved.  I produced two reports on Islamist

22  movements in Somalia, one specifically relating to an

23  extremist group in Mogadishu and another looking more broadly

24  at the entire spectrum of Islamist organizations in Somalia.

25  And then a number of papers on the political process, the

1    peace process, attempting to reestablish a government for

2    Somalia.

3    Q.  And as part of your other work that you testified about,

4    did you also write other reports?

5    A.  Yes, I did.

6    Q.  And what were those -- what topics were covered in those

7    reports?

8    A.  For the International Crisis Group or more generally?

9    Q.  More generally.

10   A.  More generally, I've written many reports and articles on

11   a whole range of issues from -- mainly dealing with politics

12   and security in Somalia and the Horn of Africa in various

13   aspects at various times.

14   Q.  And for those reports have you also done on-the-ground

15   research?

16   A.  Yes, I have.

17   Q.  And when we use that term, "on-the-ground research," what

18   do you mean by that?

19   A.  It means working in the country.  The topic of the

20   research and the paper that I'm working on, it means meeting

21   primary sources, secondary sources, it means observing events

22   firsthand.  So doing -- doing the primary research myself.

23   Q.  And you had said that some of the work that you did --

24   you've done was on sort of the instability of the government

25   in Somalia.  During the time period that you were doing this

1  work, I'm assuming that instability still existed in Somalia,

2  correct?

3  A.   That -- that's right.  Until very recently Somalia wasn't

4  considered to have a stable, functioning government, so

5  during this entire period from 1991 until really this year,

6  Somalia -- and, in fact, today still -- Somalia is unstable.

7  Q.   And yet you were traveling into and out of Somalia and

8  living in Somalia?

9  A.   That's right.

10  Q.   Okay.  And so after your work at the International Crisis

11  Group, what was the next place that you worked?

12  A.   After the International Crisis Group, I worked for an

13  organization, a company called Development Alternatives,

14  Incorporated based in Bethesda, and I was contracted to work

15  for the U.S. Agency for International Development, but in

16  fact my terms of reference were to assist the U.S. Embassy in

17  Nairobi, principally the defense attache's office, in dealing

18  with Somali affairs.

19  Q.   And what time periods does that cover?

20  A.   That was 2007.

21  Q.   And when you said you were working at the development --

22  the -- is it known as the DAI?

23  A.   DAI.

24  Q.   And so that based's here in Bethesda, Maryland?

25  A.   That's right.

1   Q.   Okay.  But you were -- where were you physically located

2   when you were doing that work?

3   A.   I was based in Nairobi, Kenya, so that I could work with

4   the officials at the embassy whom I was tasked to assist.

5   Q.   And you testified about work for the Canadian government

6   and also the U.S. government and the United Nations.  Have

7   you done any other sort of -- any other work for governments

8   or the United Nations that we haven't talked about?

9   A.   Yes.  Well, the European Commission was -- is of course

10  the organization for the European government, who I worked

11  with briefly.  I've done work for the British government,

12  mainly analysis on Somali affairs as well.  I have been

13  commissioned to write papers or to advise various other

14  governments, European governments mainly, Sweden, Denmark,

15  Norway.  And for the United Nations I've also done short

16  consulting -- brief consultancies in the past, for the UN

17  Office of coordinate -- for the Coordination of Humanitarian

18  Affairs and others, and then subsequent to the U.S.

19  government, I worked for the United Nations Monitoring Group

20  on Somalia.

21  Q.   And can you talk a little bit about what the monitoring

22  group is.

23  A.   The monitoring group is a -- it's an independent body

24  that reports to the United Nations Security Council.  The

25  members are appointed by the Secretary General of the United

1    Nations.  And during the time that I served with the

2    monitoring group, which was 2008 until 2012, the mandate

3    changed.  Its mandate is defined by the UN Security Council.

4    We began monitoring an arms embargo on Somalia, but over the

5    course of four years, the Security Council enlarged our

6    responsibilities to cover all manner of threats to peace and

7    security in Somalia, the arms embargo still that obtained in

8    Somalia, any obstruction of humanitarian assistance, any

9    violations of applicable international humanitarian law, a

10   ban on the export of Somalia charcoal, and any financing for

11   any group that was in violation of this sanctioned regime.

12   Q.  So among the topics that you covered, would the terrorist

13   group al-Shabaab be covered among the topics that you

14   covered?

15   A.  Yes.

16   Q.  And what was your role in the monitoring group?

17   A.  I was the coordinator, which is like the chairman of the

18   group.

19   Q.  And where were you based when you were working with the

20   monitoring group?

21   A.  Again, it's based in Nairobi, Kenya, with frequent travel

22   to Somalia.

23   Q.  How frequent was your travel to Somalia during that time

24   period, 2008 to 2012?

25   A.  I would visit Somalia every few months.  My

1  responsibilities kept me often in Nairobi, but as a team,

2  which grew from four to eight people, we would probably visit

3  Somalia a couple of dozen times during the course of each

4  year.

5  Q.  And going back to talk about your work that you've done

6  over the last 20, 25 years that you've described, as part of

7  your work, have you -- you testified -- have any of your

8  reports the topics of which have been related to al-Shabaab?

9  A.  Yes.

10 Q.  And as part of your work, have you interviewed al-Shabaab

11 members?

12 A.  Yes, I have.

13 Q.  And have you interviewed other jihadists as well?

14 A.  Yes, I have.

15 Q.  And have you testified in federal court before?

16 A.  Yes, on two occasions.

17 Q.  And when and where was that?

18 A.  That was in Minneapolis on both occasions, in about

19 October 2011 and then again this year, a few months ago.

20 Q.  And were you compensated for your work as a witness in

21 those cases?

22 A.  The second one, not the first.

23 Q.  And why was that?

24 A.  During the first trial I was working for the United

25 Nations and could not accept any other compensation.

1    Q.  And even though you did not receive compensation, the

2    United States did pay for your travel and hotel stay related

3    to the first case as well, right?

4    A.  That's right.

5    Q.  And are you being compensated for this case here?

6    A.  Yes, I am.

7         MS. HAN:  Your Honor, the United States offers

8    Mr. Bryden --

9         THE COURT:  There's is no need to tender the

10   witness, counsel.  You may continue.

11        MS. HAN:  Thank you, your Honor.

12        BY MS. HAN:  Q.  So we talked a lot about the

13   country of Somalia, and I wanted to start off by showing you

14   Government's Exhibit 2 actually or start off by showing

15   you --

16        MS. HAN:  Your Honor, may I approach?

17        THE COURT:  Yes, you have continuing permission

18   for -- you and all counsel -- as necessary with exhibits.

19   Please feel free.

20        BY MS. HAN:  Q.  I'm showing you Government's

21   Exhibits 2, 3, 4, and 5.  Starting with Government's Exhibit

22   2 for identification, what is that?

23   A.  That is a map of Somalia and adjacent parts of the Horn

24   of Africa.

25        (Exhibit No. 2 identified.)

1   Q.  And what is Government's Exhibit 3 for identification?

2   A.  That is a map of Galgaduud region in central Somalia.

3       (Exhibit No. 3 identified.)

4   Q.  And what about Government's Exhibit 4 for identification?

5   A.  A map of Mogadishu.

6       (Exhibit No. 4 identified.)

7   Q.  And finally Government's Exhibit 5?

8   A.  A map of Africa.

9       (Exhibit No. 5 identified.)

10          MS. HAN:  Your Honor, the United States moves in

11  Government's Exhibit 2, 3, 4, and 5.

12          THE COURT:  Exhibits 2 through 5 are admitted at

13  this time.

14      (Exhibit Nos. 2-5 admitted.)

15          BY MS. HAN:  Q.Okay.  First starting with

16  Government's Exhibit 2, you said that Government's Exhibit 2

17  is a map of Somalia?

18  A.  Yes.

19  Q.  Okay.  And we talked about the capital of Somalia, so can

20  you please indicate with this pointer where Mogadishu is, the

21  capital of Somalia?

22  A.  There.

23  Q.  And you had testified that you resided in Mogadishu at

24  various points over the last 20 years?

25  A.  Yes.

1   Q.  And you had also testified that you resided in other

2   parts of Somalia.  Could you please indicate -- and one of

3   them I believe was in Hargeysa; is that right?

4   A.  That's right.

5   Q.  Okay.  And where is that?

6   A.  It's here.  That's Hargeysa.

7   Q.  And so that is in the northwest corner of Somalia?

8   A.  That's right.

9   Q.  Okay.  And Mogadishu was in the southeast corner?

10   A.  That's right.

11   Q.  And what other locations have you lived in?

12   A.  Luuq here, this region, Gedo region.

13   Q.  Which is in the southwestern --

14   A.  Southwest.

15   Q.  -- region?

16   A.  Borama in the northwest, and then briefly in many other

17   locations, Berbera, which is here, and then -- yes, briefly

18   in most other parts of the country as well.

19   Q.  Okay.  And can you talk a little bit about the -- what

20   approximately the population is in Somalia.

21   A.  There are no accurate figures since there hasn't been a

22   census for several decades.  Most estimates are between eight

23   and ten million people.

24   Q.  And in addition to the Somalis that live in Somalia, are

25   there also Somalis who live outside of Somalia?

1   A.  Yes, there are.  First there are the Somali -- ethnic

2   Somalis in neighboring countries, in Djibouti, Ethiopia, and

3   Kenya; then there are several hundred thousand Somalis living

4   as refugees in those neighboring countries; and then there

5   are an estimated three million Somalis living abroad as

6   members of what's commonly referred to as the diaspora.

7   Q.  All right.  You used -- mentioned three countries,

8   Djibouti, Ethiopia, and Kenya.  So looking at Government's

9   Exhibit 2, could you please show the jurors where Djibouti

10  is.

11  A.  Djibouti is here.

12  Q.  So that would be the northwest part of the entirety of

13  the map?

14  A.  That's right.

15  Q.  And where is Ethiopia?

16  A.  Here.

17  Q.  In the section that says "Ethiopia"?

18  A.  That's right.

19  Q.  Okay.  And finally, can you please show for the jurors

20  where Kenya is.

21  A.  Here.

22  Q.  Okay.  Down south on the map where it also indicates

23  "Kenya"?

24  A.  Yes.

25  Q.  Okay.  And you used a phrase called the -- you used a

1    phrase, "diaspora"?

2    A.   Yes.

3    Q.   What do you mean by that phrase?

4    A.   People of Somali origin who have left Somalia and are

5    living either permanently or temporarily as naturalized

6    members or as citizens of foreign countries.

7    Q.   And can you talk a little bit about the economic activity

8    in Somalia.

9    A.   The economic -- the economy of Somalia, it's, first of

10   all, a poor country.  It has a very dry climate, and so most

11   Somalis -- the main part of the economy is based on nomadic

12   pastoralism, raising of livestock, and the export of those

13   livestock, sheep, goats camels, to the Gulf States, Saudi

14   Arabia, the United Arab Emirates, Yemen.

15        There is a part of Somalia, the southwestern part,

16   here, is more fertile and gets more rainfall, and so there's

17   some agropastoralism, some cultivation, farming, mainly

18   grains like sorghum and maize.

19        And down in the far southwest here in the riparian

20   areas, there's also produce of citrus fruits, bananas,

21   although the export of that produce really dwindled a few

22   years ago so it's no longer a major export.  But those are

23   the -- those are the primary economic activities.

24        There's also transit trade, trade that comes in

25   through Somalia through the major ports up in the northwest

1   here between Berbera and Ethiopia, and then down here,

2   Kismaayo into Kenya.  That trade also has great value for

3   Somalia and also the revenues from the ports and airports

4   that it generates.

5           And, lastly, remittances, so money sent back by

6   Somalis in the diaspora, family members sending money back to

7   either their own family members or sometimes for projects

8   like building a school or a hospital.

9   Q.  And you talked about remittances.  How -- well, let me

10  ask you this:  Does Somalia have a formal banking system?

11  A.  No, it doesn't.

12  Q.  And so how would someone send money back to Somalia?

13  A.  Well, there are a number of money transfer companies,

14  which are relatively formal Somali enterprises that move --

15  move money; you go and give them your cash, and it will be

16  delivered in Somalia almost immediately.  And then also the

17  more informal system of what are known as hawalas; the same

18  principle, but you pay money in one place and it's delivered

19  in the country -- in the destination almost immediately, but

20  it's less formal.  It can be done through a businessman,

21  through a small office, through a business that has other

22  interests in Somalia but also agrees to move your money for

23  you.

24  Q.  And -- but among hawalas, there are more professional

25  money transmitting companies, right?

1  A.   That's correct.

2  Q.   Okay.  And among those -- what are some of the names of

3  those?

4  A.   Some of the biggest -- the biggest is known as

5  Dahabshiil.  There's also Amal, Qaran, Global, Galaxy Star.

6  The biggest would be Dahabshiil, Amal, and Qaran.

7  Q.   Okay.  So let's start with Dahabshiil, could you please

8  spell that.

9  A.   D-a-h-a-b-s-h-i-i-l.

10  Q.   And how do you spell Amal?

11  A.   A-m-a-l.

12  Q.   And you also said that there was one called Qaran, right?

13  A.   Qaran, yeah.

14  Q.   And how do you spell that?

15  A.   Q-a-r-a-n.

16  Q.   And in addition to those hawalas, are the Olympic and

17  Tawakal companies also hawalas?

18  A.   Yes, they are.

19  Q.   And can you please spell Tawakal.

20  A.   T-a-w-a-k-a-l.

21  Q.   And so going back to the map, if I could just have you

22  point out a couple of towns on the map, please.  First,

23  with -- if you would point out where Dhusa Mareeb is.

24  A.   Here.

25  Q.   And what region is that?

1   A.   That's in Galgaduud region.

2   Q.   Approximately in the middle of the map?

3   A.   Yes.

4   Q.   Okay.  And could you also point out where Adaado is.

5   A.   Here.

6   Q.   Okay.  Is that -- what state is that?

7   A.   That's in Mudug region.

8   Q.   And Mudug is M-u-d --

9   A.   -- d-u-g.

10  Q.   Okay.  A bit north of the Galgaduud region; is that

11  correct?

12  A.   That's correct.

13  Q.   Okay.  And in talking about Somalia, are you familiar

14  with the clan system in Somalia?

15  A.   Yes, I am.

16  Q.   And what is the clan system?

17  A.   Well, Somalia society is generally described as a

18  segmentary lineage system.  Clans are like big families.

19  There are -- the count varies, but politically we currently

20  speak of four major families and then a number of smaller

21  ones; some would say there are five or six major families.

22  And each of those families then subdivides into subclans,

23  which then divide again down to groups of several hundred --

24  several hundred people or several thousand at the bottom of

25  the pyramid.  So it's -- and each clan is really like an

1   extended family, and every Somali would know the clan to
2   which he or she belongs, but also is related to another clan
3   through their mother and other clans through marriage.
4   Q.  So would it be common for people of the same clans to say
5   that they are related to each other even though they're not
6   related by marriage or by blood?
7   A.  Yes.
8   Q.  Okay.  And moving on to Government's Exhibit 4, which is
9   the map of Mogadishu -- so with the map of Mogadishu, could
10  you please show the jurors where -- or let me ask you this
11  first:  What is the Bakara Market?
12  A.  The Bakara Market is the largest market in Mogadishu, the
13  largest in Somalia.  It's actually less of a market than a
14  neighborhood, a big neighborhood, several dozen city blocks.
15  Part of it -- it's evolved a lot in the last 20 years since
16  the war started, but part of it is very built-up -- it's got
17  the tallest buildings in the city now -- where the biggest
18  companies -- the hawalas, the remittance companies, the
19  telecommunications companies -- have their headquarters.  So
20  quite modern and, as I said, built-up.

21          Part of Bakara is an open-air market, small shops
22  stands, kiosks selling just about anything you can imagine,
23  including at one time the most famous weapons market in
24  Somalia but no longer the case.  And also it's the center of
25  the money exchange market in Somalia.  The Somali currency is

1    regulated through merchants in Bakara Market; the rate is set

2    every day there.  So it's a vast space which just about every

3    economic activity in Somalia you can imagine is somehow

4    represented there.

5    Q.  And how do you spell Bakara?

6    A.  B-a-k-a-r-a, although you may also see it ending in h-a

7    when it's referred to with the article, Bakarah.

8    Q.  And on the map could you please show the jurors where the

9    Bakara Market is.

10   A.  Pretty much in the center here.

11   Q.  And is there anywhere on the map that you're actually

12   pointing for the record?

13   A.  Near the Hawl-Wedeg label.

14   Q.  Okay.  And in Mogadishu as well are you familiar with an

15   area called Ex-Control?

16   A.  Yes, I am.

17   Q.  And what is Ex-Control?

18   A.  Ex-Control I've actually heard used to refer to two

19   places, one most commonly here, the -- also known as K-7 --

20   the checkpoint at the -- on the road to Afgooye, which is to

21   the west/northwest, the last checkpoint of Mogadishu city

22   limit; but also Ex-Control here on the road to -- the north

23   end of the city on the road to Jowhar to the north.

24   Q.  And how do you spell Ex-Control?

25   A.  E-x hyphen Control, C-o-n-t-r-o-l.

1   Q.  And what's the derivation of the name?

2   A.  That it's the -- it's the control, it's the checkpoint as

3   you leave the city.  In Somali we spell it with a K, not a C.

4   Q.  And is one of those Ex-Controls on the Huriwa side?

5   A.  Yes, it is.  That's the one in the north part of the city

6   there.

7   Q.  Can you just do that again?  That would be in the north

8   part of the city up there?

9   A.  Yeah.  And that's Huriwa label there, Huriwa section of

10  the city.

11  Q.  Okay.  And the Huriwa neighborhood is spelled

12  H-u-r-i-w-a?

13  A.  Yes, although I would add that in recent years people

14  have taken to naming it Heliwaa, but it's the same area, and

15  it's spelled obviously differently, H-e-l-i-w-a-a.

16  Q.  And then also in Mogadishu are you familiar with an

17  area -- or I guess outside of Mogadishu -- called Ceelaasha

18  Biyaha?

19  A.  Yes, Ceelaasha Biyaha.

20  Q.  Okay.  Can you spell that, please.

21  A.  Well, the Somali spelling would be C-e-e-l-a-a-s-h-a,

22  then the second word, B-i-y-a-h-a.

23  Q.  And that C at the beginning of Ceelaasha is silent; is

24  that correct?

25  A.  It would be an apostrophe, an "ah" sound.

1   Q.  And what is that?

2   A.  It means the water wells, and it's a pumping station on

3   the Afgooye Road which provides water for the city.

4   Q.  I'm sorry?

5   A.  That provides water for the -- provided water in the past

6   for Mogadishu.

7   Q.  And is it also a neighborhood now?

8   A.  It's also become a neighborhood, particularly for people

9   who were displaced from Mogadishu during the fighting.

10  Q.  And you indicated on the map that it's on the left side

11  of the map?

12  A.  Yes, this direction.

13  Q.  Okay.  And you also -- when you were describing its

14  location, you used the term or a location called Afgooye; is

15  that right?

16  A.  That's correct.

17  Q.  What is that?

18  A.  Afgooye is a town to the west of Mogadishu.  It's the

19  next major town, and it's just across the boundary in another

20  region called lower Shabeellaha region.  It's not on this

21  map.

22  Q.  And how do you spell Afgooye?

23  A.  A-f-g-o-o-y-e.

24  Q.  And within Mogadishu are you familiar with the location

25  called Villa Somalia?

1    A.  Yes, I am.

2    Q.  And what is Villa Somalia?

3    A.  Villa Somalia is the presidential compound where the

4    presidency is located when there's a president.

5    Q.  And Villa Somalia sounds like an Italian name, right?

6    A.  That's correct.

7    Q.  Why is it called Villa Somalia?

8    A.  Because Somalia was an Italian colony for -- for many

9    years, and many of the names in and around Mogadishu,

10   particularly in southern Somalia, are borrowed from Italian.

11   Q.  I'm showing you Government's Exhibit 20.

12          MS. FONTIER:  What number did you say?

13          MS. HAN:  Twenty.

14          BY MS. HAN:  Q.  Mr. Bryden, what is Government's

15   Exhibit 20?

16   A.  That is a picture of one of the main buildings in Villa

17   Somalia.

18      (Exhibit No. 20 identified.)

19   Q.  And you've been there before?  You've seen it?

20   A.  Yes, I have.

21          MS. HAN:  Okay.  Government's offering Government's

22   Exhibit 20 in evidence.

23          THE COURT:  Exhibit 20 is admitted.

24      (Exhibit No. 20 admitted.)

25          MS. HAN:  If we could publish it to the jury.

1    Okay.

2              BY MS. HAN:   Q.   And looking at Government's

3    Exhibit 20, there's some writing in the top right corner of

4    it; is that right?

5    A.   Right.

6    Q.   Okay.  Is that in Somali?

7    A.   Yes, it is.

8    Q.   And what does it say there in the top right corner?

9    A.   It says "Madaxtooyada Soomaaliya ama Villa Somalia,"

10   which means the presidency of Somalia or Villa Somalia,

11   either name.

12   Q.   Okay.  And I am now going to show you Government's

13   Exhibit 28.  Mr. Bryden, what is Government's Exhibit 28?

14   A.   This is a time line of the conflict in Somalia.

15        (Exhibit No. 28 identified.)

16   Q.   And did you aid in the preparation of that time line?

17   A.   Yes, I did.

18   Q.   And would it help in your testimony in talking about the

19   conflict in Somalia to the jurors?

20   A.   Yes, it would.

21             MS. HAN:   The United States offers Government's

22   Exhibit 28 in evidence.

23             THE COURT:   Exhibit 28 is admitted.

24        (Exhibit No. 28 admitted.)

25             BY MS. HAN:   Q.   Okay.  So you had testified about

1  Somalia having been a former colony; is that correct?

2  A.  Yes.

3  Q.  Okay.  And it was a colony of what countries?

4  A.  Of Italy and Great Britain.

5          THE COURT:  Why don't we break at this point.  It's

6  12 straight up here, I think we're moving into a new bit of

7  examination, so, ladies and gentlemen, we will break for our

8  noon recess and resume promptly at 1:30.  Please give

9  yourselves a little extra time and gather outside the

10  courtroom doors a little before 1:30 and we'll start then.

11  Remember the admonition.  Thank you.

12          (There was a break in the proceedings.)

13          THE COURT:  Good afternoon, ladies and gentlemen.

14  Everyone is present, and we are ready to proceed with the

15  direct examination of Mr. Bryden, who's still under oath.

16  Ms. Han?

17          MS. HAN:  Thank you, your Honor.

18          BY MS. HAN:  Q.  Mr. Bryden, I think we were with

19  Exhibit 28 before the lunch hour, so do you have Exhibit 28

20  there --

21  A.  I do.

22  Q.  -- in front of you?  Okay.  And you were -- I believe

23  that we left off and you had testified about Somali having

24  been a British and Italian colony; is that right?

25  A.  Yes.

1   Q.  Okay.  And I am showing you Government's Exhibit 2 in

2   another format, just on this board.

3           THE COURT:  Has that been marked separately?

4           MS. HAN:  I don't believe so, your Honor.  We will

5   do so.

6           THE COURT:  Exhibit 2 is the photograph.  Would you

7   like to mark this Exhibit 2-A, the blowup.

8           MS. HAN:  Yes, your Honor.  Thank you.

9           THE COURT:  All right.  We'll get a tag and do that

10  if you'd like.  Is that being offered as an exhibit at this

11  time or demonstrative purposes?

12          MS. HAN:  Just for demonstrative purposes, your

13  Honor.  It's the same as Exhibit 2 but merely in a different

14  format.

15          THE COURT:  All right.

16      (Exhibit No. 2-A identified.)

17          BY MS. HAN:  Q.  So, Mr. Bryden, if you can come

18  down and show the jurors the regions of Somalia that were a

19  British colony and the regions that were Italian colony.

20  A.  Yes.  This part of Somalia, the northwest, up to this

21  boundary here, was all a British protectorate rather than a

22  colony, which meant that there weren't many British nationals

23  actually living there; it was just administered.

24  Q.  And can I just stop you there?  You said it was this

25  northwest area, and the boundary that you indicated was the

1  boundary between the states of Sanaag, S-a-n-a-a-g, and Bari;

2  is that right?

3  A.  The boundary between Sanaag to the west and Bari to the

4  east.

5          THE COURT:  Mr. Bryden, I'm going to ask you to

6  stand on the other side of that exhibit, please, and slightly

7  behind it so that counsel can see what you're pointing to as

8  well.  And just make sure that all jurors -- you're not

9  impairing the vision of any of our jurors.  Please keep your

10  voice up for the benefit of the interpreters.

11          THE WITNESS:  Yes, your Honor.

12          THE COURT:  All right.  Thank you.

13          THE WITNESS:  So the boundary divides the Sanaag to

14  the west, Bari to the east, and then Sool to the west and

15  Bari and Nugaal regions to the east.

16          BY MS. HAN:  Q.  And you said the northwest portion

17  was a British protectorate; is that right?

18  A.  That's right.

19  Q.  And what do you mean by protectorate?

20  A.  It was not a colony in the sense that the British didn't

21  colonize, didn't send British nationals to live there and

22  populate it.  They kept a very small administration; I think

23  at maximum there were about 200 British administrators and

24  military officers there.

25          The Italian part of Somalia was this part from Bari

1   region in the north to the boundary with Kenya in the

2   southwest; all of that was an Italian colony, and that meant

3   that there were many more Italians there to farm, to

4   establish light industries, to -- and to administer Italian

5   Somaliland.

6   Q.  Okay.  Thank you, Mr. Bryden.  And, Mr. Bryden, then in

7   1960 the Republic of Somalia formed; is that correct?

8   A.  That's correct.  The two -- the two colonial territories

9   received independence a few days apart and united on

10  July 1st, 1960.

11  Q.  And is that indicated on Government's Exhibit 28, the

12  time line that's on the screen?

13  A.  That's correct.

14  Q.  And -- okay.  I'll keep talking while I move this.  Okay.

15  And who was the president of that government?

16  A.  Well, the -- the first president was Aden Abdullah Osman

17  in 1960.

18  Q.  Okay.  And then thereafter there was a President

19  Shermarke; is that correct?

20  A.  That's correct.

21  Q.  And then he was assassinated -- and he was assassinated;

22  is that right?

23  A.  He was assassinated in 1969.

24  Q.  And what occurred -- what occurred when he was

25  assassinated in terms of governance?

1    A.  Well, there was a brief power vacuum, and then the

2    military launched a coup and seized power, and General

3    Muhammad Siad Barre emerged as the new president of Somalia,

4    a military president.

5    Q.  And is that indicated also on Government's Exhibit 28

6    under the 1969 section?

7    A.  Yes, it is.

8    Q.  Can you talk briefly about Muhammad Siad Barre.

9    A.  He was -- he was a military officer from the south.  He

10   had received some encouragement in his coup from the Soviet

11   Union and established quickly what he called scientific

12   socialism as the basis of his government, and he ruled as

13   a -- not officially as a military officer; he did try to put

14   a civilian face on the government part of the way through his

15   rule, setting up the Somali Revolutionary Socialist Party,

16   but essentially his government remained a military

17   dictatorship for 21 years.

18   Q.  Until when?

19   A.  Until 1991.

20   Q.  And that's indicated on the time line in Government's

21   Exhibit 28 as well?

22   A.  That's right.

23   Q.  And what happened in 1991?

24   A.  In 1991 Siad Barre was overthrown.  He had -- his

25   government had been facing rebel -- rebellions in various

1    parts of the country since the late 1970s, and during the

2    1980s these rebellions, the rebel groups, multiplied; there

3    were more of them, they became more active, and as his

4    government became weaker, finally in 1989-1990, rebel forces

5    moved from central Somalia to Mogadishu, and in Mogadishu in

6    December, the end of December 1990, uprising started in the

7    capital, and the following month he was pushed out of the

8    capital.  And he and his forces kept fighting for another

9    year until they were definitively expelled from southern

10   Somalia, and he died in exile.

11   Q.  And after his forces stopped fighting, what was the

12   status of the government in Mogadishu, if any?

13   A.  Well, initially there was no government in January '91.

14   Within a couple of months --

15           MR. DURKIN:  Excuse me.  January what year?

16           MS. HAN:  1991.

17           MR. DURKIN:  Thank you.

18           THE WITNESS:  But the rebel movement that had

19   entered the capital, the United Somali Congress, had declared

20   a government, and one wing of it in particular -- there were

21   two factions within that -- that movement -- they declared a

22   transitional government, and in July '91, that government

23   received some recognition from some other states, but it

24   didn't last very long.

25           BY MS. HAN:  Q.  And who was in control of

1   Mogadishu in 1991 after Barre was deposed?

2   A.  Well, that was the United Somali Congress, but as I said,

3   there were two wings, and so the chairman of the congress,

4   who became the president of the interim government, was Ali

5   Mahdi Mohamad, who was a businessman.  But the forces on the

6   ground -- probably the largest part of the forces -- were

7   controlled by General Mohammed Farah Aideed, the military

8   leader of the United Somali Congress, and these two wings of

9   the movement divided and started fighting amongst themselves.

10  Q.  So if I understand you correctly, the two people who sort

11  of who were the heads of the groups who were fighting in

12  Mogadishu over the city were Mr. Mohamad, Ali Mahdi Mohamad,

13  and General Aideed; is that right?

14  A.  That's right.

15  Q.  And the United Somali Congress, what was it -- what was

16  its composition in terms of clan?

17  A.  It was mainly from the Hawiye clan.

18  Q.  And all of the fighting that occurred -- that was

19  occurring in Mogadishu at that time, did it create crisis

20  throughout -- in Mogadishu and throughout other parts of

21  Somalia in terms of humanitarian issues?

22  A.  It did.  Fighting broke out I believe in November 1991

23  that led to the deaths of an estimated 30,000 people in

24  Mogadishu alone and the displacement of hundreds of thousands

25  of others.  But there was also fighting between the United

1   Somali Congress and other factions and even between other

2   factions in southern Somalia, and it was that fighting both

3   within the USC and between the USC and other groups,

4   including General Muhammad Siad Barre's forces, that led to

5   famine conditions across much of southwest Somalia, that and

6   the drought; the fighting and the drought combined created a

7   terrible famine.

8   Q.  And if we could move to the second page of Government's

9   Exhibit 28.  And did that cause there to be an international

10  response to the famine that was going on in Somalia?

11  A.  It did.  The international community became involved in

12  early 1992 as the famine became apparent, as news leaked out

13  of the famine.  The United States supported a UN operation

14  called Provide Relief to fly food into Somalia, but it

15  quickly became apparent that that wasn't going to be

16  sufficient, and the UN and the U.S. separately started to

17  consider sending military forces to open humanitarian

18  channels so that food and other supplies could be delivered.

19  Q.  And did the United States actually do that, send forces

20  in?

21  A.  In December 1992, yes.

22  Q.  And what was the name of that operation?

23  A.  That was the Unified Task Force or UNITAF; that was -- it

24  was called Operation Restore Hope, and it included over

25  30,000 forces mainly from the United States but also from

1  other governments.

2  Q.  And did it have any other -- was it condoned at all by --

3  or was there any sort of endorsement from the United Nations

4  as well?

5  A.  Yes, it was authorized by the United Nations Security

6  Council.

7  Q.  And when did that occur?

8  A.  That was December 1992.  And it was superseded in 1993 by

9  United Nations missions.

10  Q.  And that is reflected on Government's Exhibit 28 in 1992

11  and 1993?

12  A.  That's correct.

13  Q.  And so can you talk about what -- when the United or the

14  United Nations -- or the United States entered in 1992 what

15  its mission was as opposed to what the UN forces were doing

16  when they went in in 1993.

17  A.  This was a topic of some debate.  The United States very

18  clearly wanted to limit its mission to humanitarian

19  intervention and just providing space for supplies to be

20  delivered and for aid agencies to operate.  The UN was

21  seeking a much broader mandate for the mission to restore

22  peace and security and allow a government, a functioning

23  government, to be established.  So the United States resisted

24  that, and it was only when the U.S. handed over to a UN

25  mission, leaving many of its forces on the ground of course.

1    At that point the UN then embarked on what would have been a

2    state-building or a nation-building exercise.

3    Q.  And are you familiar with an incident that's sometimes

4    referred to as the Black Hawk Down incident?

5            MR. DRATEL:  Objection, your Honor.

6            MS. MORENO:  Judge --

7            MR. DRATEL:  Relevance, 403.

8            THE COURT:  Well, it's part of the chronology here.

9    The objection is overruled.  You may answer, sir.

10           THE WITNESS:  Yes, I am familiar with it.

11           BY MS. HAN:  Q.  Could you please describe that for

12   the jurors.

13   A.  Well, in 1993 the UN forces had a role of making --

14   assuring that all of the Somali militias kept their arms in

15   various cantonments under supervision, and in one episode, a

16   UN patrol that was monitoring General Aideed's weapons and

17   ammunition was attacked by his forces and --

18   Q.  Can I just stop you right there?  The UN forces -- what

19   was the composition of the UN forces?

20   A.  Well, at that time they were still mainly American

21   forces, but the patrol I'm referring to in this case was

22   Pakistani.  There were also Canadian, Indians, Bangladeshis,

23   eventually Zimbabweans; it became a very broad multinational

24   force.  A Turkish general was commanding the force.

25   Q.  Okay.  Please continue.

1  A.  The -- the Pakistani patrol was attacked.  I believe 25

2  Pakistani soldiers were killed and mutilated by Aideed's

3  forces.  The UN then literally put a price on Aideed's head,

4  calling for his arrest, and so a state of conflict existed

5  between the UN and General Aideed's forces, his clan

6  militias.  And in October of that year, the UN received

7  information where -- believed that some of Aideed's closest

8  aides were -- were at a given location, and United

9  States/American forces tried to apprehend them.  When they

10  did, they were encircled and attacked by Aideed's militia.

11  Q.  Could I stop you right there?  So what I understand is

12  that there was a ransom out for --

13       MR. DRATEL:  Object, your Honor.  Just recapping

14  that event.

15       THE COURT:  Recapping -- well, I think that the

16  recap is prefatory to another question.  Why don't you hold

17  off -- just reserve for a moment if you would, Mr. Dratel.

18  Go ahead and ask your question.

19       BY MS. HAN:  Q.  So what I understand is that there

20  was -- the United Nations had a ransom out for General

21  Aideed; is that correct?

22  A.  That's correct.

23  Q.  And that was in response to the attack on the Pakistani

24  UN forces?

25  A.  That's correct.

1  Q.  Okay.  And then -- I'm sorry.  What was the -- what

2  occurred after that?

3          MR. DRATEL:  I would object, your Honor, as 403,

4  relevance at this point.

5          THE COURT:  The objection's overruled.  It's part

6  of the chronology, part of chronology of the conflict, but we

7  certainly don't need to dwell on it, sir, so just don't give

8  any undue time to it, let's just move through this area and

9  get the chronology down and then get to more pertinent parts

10  of the testimony.

11          MS. HAN:  Yes, your Honor.

12          THE WITNESS:  Well, 18 American soldiers were

13  killed, several dozen injured, an estimated 1,000 Somalis

14  were casualties of that clash, and it was the event that led

15  the United States government to withdraw its forces the

16  following year.

17          BY MS. HAN:  Q.  And were you in Somalia in this

18  time period that we've been talking about, 1992 and 1993?

19  A.  I was.

20  Q.  During what time periods?

21  A.  From 1992 I was present in Somalia fully until the month

22  of August, and then I was visiting regularly.  When I joined

23  the Canadian Embassy, I started to come and go, spending a

24  lot of time there until August '93 when I went briefly to

25  Afghanistan.

1    Q.  And were you in Mogadishu itself?

2    A.  I was in and out of Mogadishu itself until August '93.

3    Q.  And you testified that the United States then decided to

4    pull out of Somalia?

5    A.  That's correct.

6    Q.  And when did that occur?

7    A.  That was I believe April 1994.

8    Q.  And did the UN also decide to pull out its forces?

9    A.  One year later, yes.

10   Q.  And what led to the United Nations pulling out its

11   forces?

12   A.  Well, I think many of the same reasons that led the U.S.

13   to withdraw its forces, but the UN wanted to leave behind

14   some kind of peace accord that might have the hope of

15   becoming functional, might establish a functional government,

16   and so the UN secured I would say very hasty and superficial

17   agreements from the warlords on the ground and, having

18   obtained their signatures, said their mission was completed

19   and withdrew.

20   Q.  You've used a term, "warlords"; what do you mean by that?

21   A.  Warlords are faction leaders, militia commanders, usually

22   heading clan-based militias at that time, but increasingly

23   they also came to control ports and airports and started to

24   make money from controlling economic infrastructure.

25   Q.  And then after that, in 1995, after the United Nations

1  decided to pull out of Somalia, is there a stable government

2  in Somalia?

3  A.   No.

4  Q.   And then at some point, were efforts made to establish a

5  stable government in the form of a Transitional National

6  Government?

7  A.   Yes, in 2000.

8  Q.   And thereafter were there additional efforts in 2004 with

9  the establishment of the Transitional Federal Government?

10 A.   That's correct.

11 Q.   And when in 2004 did that occur?

12 A.   That was in August 2004 the Transitional Federal

13 Government was established in Kenya.

14 Q.   And who was the president of that?

15 A.   Colonel Abdullahi Yusuf Ahmed was the president.

16 Q.   And what was his background?

17 A.   He was a former military officer, a colonel in the Somali

18 armed forces.  He -- he had fought in the Ugandan war against

19 Ethiopia, which I think we skipped over, in 1977-78.  But he

20 was among several officers who were disillusioned by events

21 at that time, and he was part of a group that tried to

22 overthrow the Somali government in 1978.  And he became the

23 leader then of an opposition faction called the Somali

24 Salvation Democratic Front, or the SSDF, which fought against

25 the Barre regime until its overthrow.

1           Abdullahi Yusuf didn't get to fight all of that

2   time because he was arrested by the Ethiopian government,

3   which was supporting his group, and he was in jail for six

4   years.  He then returned to Somalia in the early '90s and

5   became a faction leader.  He was the military -- the chief of

6   the military forces of the SSDF, and in 1998 he became the

7   first president of Puntland, which was an administration

8   established in northeast Somalia.

9   Q.  Can I stop you there?  Going back to Government's Exhibit

10  2 -- I think I'll just hold it up this time so we don't have

11  to move the easel -- can I ask you to come down and show us

12  where that region is.

13  A.  So Puntland is this part of northeast Somalia.  It

14  includes the regions of the north parts of Mudug north of the

15  town of Galcaio, the region of Nugaal, Bari, and then the

16  eastern part of Sanaag, and most of Sool region here and a

17  small part of Togdheer.

18  Q.  Thank you.  And at the time that the Transitional Federal

19  Government was established in 2004, where was it located?

20  A.  It was first located in Nairobi, Kenya.

21  Q.  And why was that?

22  A.  Because the president, the leadership, considered

23  Mogadishu to be insecure and actually hostile, and he didn't

24  want to base his government in Mogadishu.

25  Q.  What was going on in Mogadishu at that time?

1  A.  It was the base of what remained of the previous

2  government, the Transitional National Government, but it was

3  basically without real administration, real authority, and it

4  was contested by various clan militias and some -- some other

5  emerging militia structures at the time, so it was -- it was

6  a kind of no man's land.  And President Yusuf, immediately

7  after he was appointed, called for the deployment of 20,000

8  foreign troops to deliver his government back into Somalia.

9  That was his initial condition for taking his government

10  home.

11  Q.  And obviously in addition to President Yusuf, there were

12  other members of the Transitional Federal Government; is that

13  right?

14  A.  That's right.

15  Q.  Okay.  Both in -- at that time in 2004 and then later in

16  2007 and 2008, the time period related to the indictment?

17  A.  That's right.  There were -- there was a prime minister,

18  who was the nominal head of government, and there were

19  ministers, and these changed several times during the

20  Transitional Federal Government's tenure.

21  Q.  Okay.  I'm showing you Government's Exhibits 22, 23, and

22  24, and while I do so, looking at Government's Exhibit 28, is

23  there a section there in August of 2004 that denotes when the

24  Transitional Federal Government was established?

25  A.  Yes, there is.

1   Q.  And there's also a photo of a gentleman next to that

2   bubble; is that right?

3   A.  That's right.

4   Q.  Okay.  And who is that?

5   A.  That is Abdullahi Yusuf Ahmed, the president of the

6   Transitional Federal Government.

7   Q.  I'm showing you Government's Exhibit 23, 23, and 24.  Do

8   you know who all of those people are?

9   A.  Yes, I do.

10  Q.  Okay.  Just taking Government's Exhibit 22, just tell me

11  who's that.

12  A.  That is Abdi Hasan Awale, or Abdi Qeybdiid.  He was --

13  Q.  Can I stop you there?

14  A.  Yes.

15      (Exhibit No. 22 identified.)

16  Q.  Okay.  And Government's Exhibit 23, who is that?

17  A.  Nuur Hassan Hussein, also known as Nuur Adde.

18      (Exhibit No. 23 identified.)

19  Q.  And in Government's Exhibit 24, who is that?

20  A.  Ahmed Abdiselan.

21      (Exhibit No. 24 identified.)

22          MS. HAN:  Okay.  The government offers Exhibits 22

23  through 24.

24          MR. DRATEL:  No objection.

25          THE COURT:  22 through 24 are admitted.

1          (Exhibit Nos. 22-24 admitted.)

2              BY MS. HAN:   Q.   Taking Government's Exhibit 22

3    first -- I'm sorry.   You said that is who in Government's

4    Exhibit 22?

5    A.   Abdi Qeybdiid.

6    Q.   Okay.   And can you do us a favor and spell that for us?

7    A.   Abdi, A-b-d-i, and Qeybdiid would be Q-e-y-b-d-i-i-d.

8    Q.   And, Mr. Bryden, who is Abdi Qeybdiid?

9    A.   He was a senior aide to General Aideed, a member of the

10   United Somali Congress in the early 1990s.   He went on to

11   become a -- the police commissioner of the Transitional

12   Federal Government and later on joined the Galmudug

13   administration, which is another authority in central

14   Somalia.

15   Q.   And was Mr. Qeybdiid the police commissioner in 2007 and

16   2008?

17   A.   Yes, he was.

18   Q.   Okay.   And moving on to Government's Exhibit 23,

19   Mr. Bryden, can you please tell the jurors who that is.

20   A.   It's Nuur Hassan Hussein, Nuur Adde.   He was --

21   Q.   Can I stop you there?

22   A.   Yes.

23   Q.   Can you please spell that, please?

24   A.   Nuur, N-u-u-r, Adde would be A-d-d-e in English.

25   Q.   Okay.   And you said that his name is Nuur Hassan Hussein?

1    A.   Hussein.

2    Q.   Okay.  But he's known as Nuur Adde?

3    A.   Adde is a nickname.

4    Q.   Okay.  And can you talk a little bit about that in Somali

5    culture in terms of the use of nicknames.

6    A.   Yes.  Many Somalis will have a nickname.  It can be a

7    nickname that's given to the individual describing something

8    about them, or it may be a nickname that's inherited and

9    handed down through the family from grandfather/father, and

10   they can -- they can literally be anything.  But Adde in this

11   case means both white and also honest or straightforward.

12   Q.   And are the nicknames sometimes literal like someone who

13   was short might be called Shorty?

14   A.   That's right.

15   Q.   Okay.  And are they also sometimes ironic?  Someone who's

16   really big might be called Tiny, for example?

17   A.   That's correct.

18   Q.   And who is Nuur Adde?

19   A.   Nuur Adde was the -- I believe his title was secretary

20   general of the Somali Red Crescent Society for many years.

21   The Red Crescent Society is the Muslim affiliate of the Red

22   Cross, the Federation of the Red Cross, the Red Crescent

23   Society, and therefore he was involved in humanitarian

24   efforts for many years in Somalia before being appointed the

25   prime minister of the transitional -- second prime minister

1    of the Transitional Federal Government.

2    Q.   And was that in the time period of 2007 and 2008?

3    A.   That's -- that's right, 2008 I believe.

4    Q.   Okay.  And next moving to Government's Exhibit 24, can

5    you please tell the jurors who that is.

6    A.   Yes, that's Ahmed Abdiselan Aden.  He's a Canadian --

7    Q.   Sorry.  Can you stop you there and you can spell that,

8    please?

9    A.   Ahmed is A-h-m-e-d, Abdiselan, A-b-d-i-s-e-l-a-n, and I

10   believe his third name is Aden, A-d-e-n.

11   Q.   And who is he?

12   A.   He is a Canadian Somali.  He returned to Mogadishu in the

13   1990s and he set up a radio station, a media outlet called

14   HornAfrik, which was sort of a groundbreaking effort; there

15   was nothing like it at the time, he and two partners.

16              He then became a co-founder and director of a

17   center, a research institute called the Center for Research

18   and Dialog, which is one of the three institutes I mentioned

19   that we established under the auspices of the War-Torn

20   Societies Project.  He then -- he became involved in politics

21   after the establishment of the Transitional National

22   Government in 2000, 2001 and was considered initially an

23   anti-TFG politician, but he was then subsequently appointed

24   as deputy prime minister and minister of national security in

25   the TFG.

1   Q.  And is this in the time period of 2007 and 2008?

2   A.  Yes.

3   Q.  And these three individuals that you've testified about,

4   do you know them from your work in Somalia?

5   A.  Yes, I do.

6   Q.  Okay.  So we were talking about -- going back to

7   Government's Exhibit 28, we were talking about the

8   Transitional Federal Government being in Kenya.  Can you tell

9   us until when they remained in Kenya.

10  A.  Until 2005, for one year.

11  Q.  And what occurred at that time period?

12  A.  At that time essentially the Kenyan government made it

13  clear that they wanted the Somali government to go back to

14  Somalia and held a ceremony to celebrate their return to

15  Somalia.  And the government then, really having no choice

16  but still resisting the option of going back to Mogadishu,

17  established itself in the town of Jowhar to the north of

18  Mogadishu.

19  Q.  And were circumstances in Mogadishu similar to how you

20  described them in 2004 in terms of being somewhat lawless?

21  A.  Yes.

22  Q.  And you said that they went -- that the -- in 2005 they

23  moved into Somalia.  What town did they go into in Somalia?

24  A.  Jowhar.

25  Q.  And in what part of Somalia is Jowhar?

1   A.   Jowhar is the capital of middle Shabelle region, which is

2   just to the north of Mogadishu, I think about 90 miles to the

3   north.

4   Q.   And Jowhar is spelled phonetically J-o-w-h-a r?

5   A.   Correct.

6   Q.   And Shabelle is spelled S-h-a-b-e-l-l-e; is that right?

7   A.   That's right.

8   Q.   Okay.  And in what -- you said that they moved in in

9   2005?

10  A.   Yes.

11  Q.   Okay.  And how long did they stay in the Jowhar area?

12  A.   Almost a year, until 2006, when they relocated, in the

13  first half of 2006, to the town of Baidoa.

14  Q.   Okay.  And so the jurors understand their -- the

15  Transitional Federal Government's movement in Somalia, could

16  you please come down and show them where these towns are.  So

17  looking at Government's Exhibit 2-A, just the same as

18  Government's Exhibit 2, could you please show the jurors

19  where Jowhar is.

20  A.   Jowhar is here -- it's spelled differently on this map --

21  just to the north of Mogadishu.

22  Q.   Okay.  So in 2004 when the government was formed, it was

23  in Kenya; is that right?

24  A.   That would be here.

25  Q.   And then in 2005 it moved to Jowhar?

1   A.   Yes.

2   Q.   And then in 2006 it moved to what town?  I'm sorry.

3   A.   Baidoa, here.

4   Q.   And then it's the middle of the map?

5   A.   Yes.

6   Q.   It's indicated I believe by Baidoa there?

7   A.   Yes.

8   Q.   And Baidoa is B-a-i-d-o-a?

9   A.   That's one of the spellings, yes.

10  Q.   Okay.  And in Jowhar and Baidoa, what was the size of the

11  Transitional Federal Government?

12  A.   That's a question I really couldn't answer.  In theory

13  there were several dozen ministers -- it was a large

14  government in name -- and there was also a parliament of I

15  believe about 250 parliamentarians.  Now, not all of those

16  people went back to Somalia.  Many of them were opportunistic

17  politicians who had no real desire to go back and build

18  institutions, and so the number that actually went to Somalia

19  was smaller than the paper establishment.

20  Q.   And who was -- what was the setup for security for the

21  Transitional Federal Government, for -- for example, the

22  department of defense for the Transitional Federal

23  Government?

24  A.   Well, these were -- they said that they had a military

25  and police force; in reality, these were basically clan

1    militias.  President Yusuf brought many of his -- his

2    militias down from the north, from Puntland, and used them as

3    the core of a kind of presidential guard or military.  And in

4    Baidoa in particular, the Transitional Federal Government

5    received protection from Ethiopian forces, which was allied

6    with President Yusuf.

7    Q.  And how did the Ethiopian forces end up in Somalia?

8    A.  They were invited by President Yusuf.

9    Q.  And approximately when did that occur?

10   A.  In 2005, although the original appeal was his 2004 appeal

11   for 20,000 troops, which he made from Ethiopia.

12   Q.  And you had said that in Baidoa -- that the Transitional

13   Federal Government moved to Baidoa in approximately 2006; is

14   that correct?

15   A.  That's right.

16   Q.  Okay.  And what's going on in the early part of -- well,

17   let me ask you this:  Approximately when in 2006?

18   A.  That was second -- I believe the second quarter of 2006,

19   April or May.  The -- they were -- the TFG, the Transitional

20   Federal Government, was being threatened by opposition

21   leaders based in Mogadishu and felt increasingly insecure in

22   Jowhar and so relocated to Baidoa.

23   Q.  And so can I actually have you -- so was -- so they

24   were -- originally they were in Jowhar, which is closer to

25   Mogadishu, and then retreated to another area; is that what

1    your --

2    A.   That's right.

3    Q.   -- testimony is?  Okay.  Thank you.  And what is

4    happening in Mogadishu at that time period?

5    A.   Well, at that time the Transitional Federal Government

6    and parliament had split into two, at least two parts, and

7    one of the things -- one of the issues they split over was

8    the call for foreign troops, and specifically the desire to

9    have neighboring countries, including Ethiopia, the

10   president's desire to have them come and support the

11   government.  And so some of the ministers, some of the

12   parliamentarians, including the speaker of parliament, had

13   left -- left essentially the TFG; they'd gone to Mogadishu

14   where they'd set up a sort of opposition caucus, and so they

15   had -- they used Mogadishu as a base.

16   Q.   And what was -- at that time period what was the

17   international response to the Transitional Federal

18   Government?

19   A.   The international -- the international community in

20   principle welcomed the establishment of a federal -- of a new

21   government, an interim government.

22            MR. DURKIN:  Judge, can we have a better foundation

23   for what the international community means?

24            MS. HAN:  Your Honor, I can do that.

25            THE COURT:  Well, if the objection is the

1   question's ambiguous, would you please restate the question

2   with some specificity.

3           MS. HAN:  Yes, your Honor.

4           BY MS. HAN:  Q.  So starting -- you testified

5   earlier about the United Nations, right?

6   A.  Yes.

7   Q.  Okay.  And in the United Nations, what was the reaction

8   to the establishment of the Transitional Federal Government?

9   A.  The United Nations welcomed the establishment of the TFG

10  and accepted its representatives as the official

11  representatives of Somalia to the United Nations.

12  Q.  And in speaking about the United States specifically,

13  what was the United States's response to the Transitional

14  Federal Government at that time period?

15  A.  The U.S. also publicly welcomed its establishment and

16  provided, through USAID, support, indirect support, usually

17  channeled through the United Nations or through NGOs, to

18  assist the Transitional Federal Government in developing its

19  capacity and expanding its authority.

20  Q.  So you keep using that term "developing capacity"; what

21  do you mean by that?

22  A.  Well, what I mean is basically that when we talk about

23  institutions in Somalia like a government, like ministries or

24  a police force or a military, these names may be misleading.

25  The fact that there is a government with ministers does not

1    mean there are functioning ministries, there are even

2    buildings, that there -- that anyone shows up for work.  And

3    so when the Transitional Federal Government was established,

4    it was basically a government in name only and it wasn't even

5    inside the country.  So one of the first tasks was to get it

6    physically located somewhere and donor governments buying

7    things like office furniture and computers and printers so

8    that it could start to do the basic work of government and

9    then taking government officials on training courses to other

10   countries where they could learn the basics of governance.

11   The same with military officers, same with police officers,

12   and just starting everything from scratch.

13   Q.  And both the United States and the United Nations

14   participated in that support that you just testified about?

15   A.  That's right.

16   Q.  Okay.  And so I think that brings us -- we were talking

17   about the spring of 2006 where there were rival militias in

18   Mogadishu.  At that time was the government still -- the

19   government of the Transitional Federal Government still in

20   the Baidoa area?

21   A.  In 2006, yes.

22   Q.  Yes.  And moving on through the summer of 2006 in

23   Government's Exhibit 28, in June and -- and July of 2006,

24   what is going on in Mogadishu at that time period as

25   reflected in Government's Exhibit 28?

1    A.  Well, what is -- what is happening in mid 2006 is that

2    Mogadishu is taken over by the Union of Islamic Courts.  And

3    the background to that goes back a number of years to when

4    the courts were first established as individual courts.

5    Q.  Okay.  Can we stop there.  What is the Union of Islamic

6    Courts?

7    A.  Sorry?

8    Q.  What is the Union of Islamic Courts?

9    A.  Well, it was the -- it was an umbrella organization for

10   courts in Mogadishu and other parts of southern Somalia, but

11   mainly Mogadishu, that practiced Islamic law, sharia law.

12   Q.  And when you say that it was a court, can you explain

13   further what you mean by that?

14   A.  Well, the courts -- there have been Islamic courts in

15   Somalia in ones and twos since the early 1990s, and -- but

16   this trend increased in the early 2000s, and what basically

17   they were was courts that were usually affiliated with a

18   subclan and the area that it controlled, and it would be

19   physically a building, a large building, a compound, in which

20   you would find the chairman of the court and possibly several

21   other judges, a militia commander because the court, instead

22   of police, had its own militia, again usually from the same

23   subclan, and they would be based in that court compound, and

24   sometimes there would also be a detention, a few big rooms

25   working as a jail either at the court or nearby.  And the

1    courts typically also had kind a supervisory committee of

2    businesspeople or eminent personalities from the clan who

3    ensured that it received some money from the business

4    community to pay for the militia, that it put fuel into the

5    vehicles that the militia were using and basically underwrote

6    the functions of the court.

7    Q.  And how many courts were there?

8    A.  Well, the number grew from a handful, three or four in

9    1998, to over -- initially over a dozen in 2006, and then

10   they continued to grow.

11   Q.  And can you talk a little bit more about the police or

12   militia that accompanied the courts and what the setup was of

13   that militias -- with those militias?

14   A.  Well, each court would have a militia that responded to

15   the direction of the court leadership, the chairman of the

16   court or whatever committee managed the court's affairs.  And

17   the militia would basically function as a kind of police

18   force.  If a crime was committed, they would, you know, they

19   would pursue it.  I wouldn't say they'd do much in the way of

20   investigation, but often someone would be identified as a

21   suspect, and they would -- they would detain the person and

22   bring them to court and guard detainees while they were

23   there.  And these militias -- these are militias, they're not

24   in police uniform, they're not in military uniform; they

25   might wear -- at that time the courts had a distinctive red

1   'immama, or head cloth, that their militia liked to wear, and

2   they would be carrying assault weapon, assault rifle, and

3   rocket-propelled grenades and other light weapons, and their

4   vehicles were what was known as technical vehicles; they

5   would be pickup trucks or four-wheel-drive vehicles with the

6   tops cut off and a heavy machine gun mounted on the back.

7   And that was -- that was how they imposed order in their

8   areas.

9   Q.   Okay.  Can I just stop you there?  You testified about a

10  technical; what is technical?

11  A.   A technical is the name given in Somalia to a

12  four-wheel-drive vehicle, or sometimes even a bigger truck,

13  that has been mounted with a heavy crew-served weapon and is

14  used for combat.

15  Q.   And you also testified about other weapons that they had;

16  what were the other weapons that they had?

17  A.   Well, typically Somali militia, Somali infantry, are

18  lightly armed, so Kalashnikov-patterned assault rifles, RPG 7

19  rocket-propelled grenades, PKM machine guns; and then moving

20  up to the crew-served weapons, 12.7 millimeter heavy machine

21  guns mounted on a truck; and the bigger -- the bigger weapons

22  would be 23 and 37 millimeter antiaircraft cannons mounted on

23  vehicles.

24  Q.   Okay.  And so I'm showing you Government's Exhibit 13 and

25  27.  And what is Government's Exhibit 13?

1   A.   That is a technical vehicle; it's a pickup truck with --

2   Q.   Can I stop you there?

3   A.   Yes.

4        (Exhibit No. 13 identified.)

5   Q.   And then turning to Government's Exhibit 27, what is

6   that?

7   A.   That is a group of militia carrying what looks like a RPG

8   7, rocket-propelled grenade.

9        (Exhibit No. 27 identified.)

10  Q.   So turning -- if we could publish to the jury Government

11  Exhibit 13 --

12           MS. HAN:   I apologize.   Your Honor, the

13  government's offering Government's Exhibit 13 and 27.

14           MS. MORENO:   May we have a moment, your Honor?

15           THE COURT:   Sure.

16           MR. DRATEL:   May I voir dire, your Honor.

17           THE COURT:   I'm sorry?

18           MR. DRATEL:   May I have a brief voir dire?

19           THE COURT:   On 27?

20           MR. DRATEL:   Yes.

21           THE COURT:   Okay.

22                    Voir Dire Examination

23           BY MR. DRATEL:   Q.   Good afternoon, Mr. Bryden.   Do

24  you have 27 in front of you?

25  A.   I do, sir.

1    Q.  Can you tell the identity of that militia?

2    A.  I can -- I can certainly take an educated guess.

3    Q.  Guess.  Okay.

4         THE COURT:  That's cross-examination.  I think the

5    exhibit is just being offered as illustrative of a militia.

6    Is there any objection to the exhibit on that ground?

7         MR. DRATEL:  No.

8         THE COURT:  Okay.  Exhibit 27 is admitted.

9    Exhibit 13, was there any objection to Exhibit 13?

10        MR. DRATEL:  The technical?  No, your Honor.

11        THE COURT:  All right.  Exhibit 13 is admitted.

12   You may certainly cross-examine later on 27 if you feel that

13   there's any indication of knowledge as to a particular

14   militia identified here.

15        (Exhibit Nos. 13, 27 admitted.)

16               Direct Examination, cont'd

17        BY MS. HAN:  Q.  And so Government's Exhibit 13, is

18   that a technical?

19   A.  Yes, it is.

20   Q.  And what is the derivation of that term, "technical"?

21   A.  Well, there are a lot of stories about how the term came

22   to be; I don't think any of them's authoritative.  The one

23   that seems the most plausible to me is that it referred to --

24   the term "technical" was adapted into the Somali language in

25   the workshop and that these vehicles had to be taken to a

1    workshop to have the guns mounted on them.  There's also a

2    story that aid agencies used to pay for the weapons and the

3    ammunition and place it under technical expenses, but the

4    term was being used long before aid agencies did that, so --

5    Q.  And turning next to Government's Exhibit 27, what is

6    distinct about the rocket-propelled grenade, if you can talk

7    about that --

8    A.  Well --

9    Q.  -- as a weapon?

10   A.  As a weapon it's got a range of 200 to 300 yards, and

11   that's generally high explosive, an antitank warhead there.

12   And it's carried by -- carried by a single fighter, so -- but

13   it's very common in Somalia.  And it's used both -- well,

14   against vehicles but also as a -- what might be called a

15   bunker buster; it's used against militia or fighters in

16   dug-in positions.

17   Q.  I'm sorry.  What was the last part of your answer?

18   A.  It's used against fighters in dug-in positions, behind

19   walls, in trenches.

20   Q.  Okay.  And going back to talk about the courts, was there

21   any one leader of the courts?  Was there any one leader of

22   the courts?

23   A.  They were -- they had a collective leadership.  There was

24   someone who was called the chairman of the Islamic courts,

25   yes.

1   Q.   And who was chairman of the Islamic courts?

2   A.   That was Sheik Sharif Sheik Ahmed.

3   Q.   And you say that there was a collective council, can you

4   talk a little bit about that collective council, what the

5   composition of the collective council was.

6   A.   Well, like many organizations, many Somali organizations

7   aren't very hierarchical with orders being given from the

8   top.  Leadership is often quite collective and consultative.

9   The courts had several bodies; there was the shura, the main

10  body, which never actually met but which had I think close to

11  a hundred -- a hundred members in theory.  And then within

12  the shura there was the executive committee, and the

13  executive committee was much smaller, and it included the

14  ministers or secretaries of the courts, secretary of defense,

15  education, and so on, and that I think was in the region of

16  18.  Then there was also a standing committee of the shura,

17  which was a more secretive body; it was about 12, maybe 14

18  members whose names were never really publicly acknowledged.

19  And that was the formal organization of the courts.

20  Q.   And are you familiar with a person named Sheik Hassan

21  Dahir Aweys?

22  A.   Yes.

23  Q.   And who is he?

24  A.   Hassan Dahir Aweys is one of the most prominent Islamist

25  leaders in Somalia.  He is a former military officer, and he

1  was involved in Somalia's first jihadist movement, which was

2  known as al-Itihaad al-Islam, and he was a --

3  Q.  Can I stop you there?

4  A.  Yes.

5  Q.  So you used the term "Islamist"; what do you mean by

6  that?

7  A.  Political -- politically active organization that is

8  based on -- or promotes a version of Islam as part of its

9  political agenda or military agenda.

10  Q.  And you said that he was a part of the -- of al-Itihaad;

11  is that right?

12  A.  That's right.

13  Q.  What is al-Itihaad al-Islam?

14  A.  Al-Itihaad al-Islam, or AIAI, was the first armed

15  Islamist organization to emerge in Somalia after the fall of

16  Siad Barre.  It was actually formed before, it was formed in

17  1980, so when Barre fell, it emerged as an armed faction, and

18  it tried to capture parts of Somalia and establish an Islam

19  state, an Islamic emirate, but it failed.

20         Aweys, Hassan Dahir Aweys, was its vice-chairman,

21  and he was also the leader of its military wing.  And after

22  its collapse -- it was defeated basically by the Ethiopian

23  army in '96 and '97 -- Hassan Dahir Aweys then involved

24  himself in the establishment of the Islamic courts and in

25  1998 -- between '98 and 2000, he became more active again in

1   Mogadishu, and he eventually emerged as a behind-the-scenes

2   leader of the Islamic courts, the Islamic Courts Union.

3   Q.   Okay.  And turning to Government's Exhibit 28, in the

4   June through July 2006, if I could direct you to the

5   photograph there, who is that that's in the photograph there?

6   A.   That is Sheik Hassan Dahir Aweys.

7   Q.   And just so the jury understands, what is the

8   relationship, if any, of the Transitional Federal Government

9   and the Islamic Courts Union?

10  A.   Well, they were -- they were adversaries.  When the

11  Islamic courts emerged in Mogadishu, that was seen as a

12  direct challenge to -- to the Transitional Federal

13  Government, and as the court expanded their authority across

14  southern Somalia, this led to direct confrontation and then

15  the outbreak of fighting between the two.

16  Q.   And then in the summer of 2006, did the Islamic Courts

17  Union take over Mogadishu?

18  A.   Yes, it did.

19  Q.   And that's reflected on Government's Exhibit 28 there.

20  Do you see that there?  In what time period is that

21  reflected?

22  A.   In June-July 2006.

23  Q.   And at the time that the Islamic Courts Union took over

24  Mogadishu, where was the Transitional Federal Government?

25  A.   Well, initially -- well, in -- by that time, the time

1   they took over Mogadishu, the Transitional Federal Government

2   would have been in Baidoa.

3   Q.  And is there a time at which there begin to be peace

4   talks between the Islamic Courts Union and the Transitional

5   Federal Government?

6   A.  Yes, in the second half of 2006 after the courts had

7   taken control of Mogadishu.

8   Q.  And how successful are those talks?

9   A.  They were not successful.

10  Q.  What occurred next?

11  A.  What occurred next was some clashes just outside Baidoa

12  threatening the Transitional Federal Government and Ethiopian

13  forces intervening in force, large scale, across the border

14  into southern Somalia.

15  Q.  And what is the courts' reaction then?

16  A.  Well, the courts suffered immediately.  The Ethiopian

17  offensive was very fast.  Immediately the courts suffered a

18  series of defeats in central Somalia, and in Mogadishu the

19  courts, in part at the request of the local leadership in

20  Mogadishu, disbanded themselves and left the city.

21  Q.  I'm sorry.  Can you repeat that last part.

22  A.  They disbanded themselves and they left -- they left the

23  capital, they left the city.

24  Q.  So when they were defeated, the Islamic Courts Union

25  entity dissolved itself; is that correct?

1   A.   That's correct.

2   Q.   And where did it -- what did it dissolve itself into?

3   A.   Well, it went underground, and it emerged several weeks,

4   a couple of months later as part of a broad-based and complex

5   insurgency against the Ethiopian intervention and against the

6   Transitional Federal Government.

7   Q.   So after the Ethiopians defeated the Islamic Courts

8   Union, what happens to the Transitional Federal Government?

9   A.   The Transitional Federal Government was delivered back

10  into Mogadishu by the Ethiopian military and established

11  itself in Mogadishu.

12  Q.   And when is that?  What time period are we talking about?

13  A.   We're talking about early 2007, February of 2007.

14  Q.   And in 2007, throughout that year, is that also the year

15  that al-Shabaab emerges as its own entity?

16  A.   Yes.  And first I should correct myself.  I think it's

17  January that they returned to Mogadishu, but then -- yes,

18  then al-Shabaab emerged as its own entity.

19  Q.   And -- and can you talk about -- going back to the last

20  slide, can you talk about the connection or -- actually if we

21  could go back -- all right.  We'll leave it there.  Can you

22  talk about the connection between al-Shabaab and the Islamic

23  Courts Union; can you talk about that connection?

24  A.   Yes.  Al-Shabaab preexisted; it was formed before the

25  Islamic Courts Union.  But its history was tied up with the

1   individual Islamic courts.  Al-Shabaab's origins -- it's a

2   very secretive organization and there's much about it that

3   isn't known, but what is clear is that some of its key

4   leaders had either served with or been influenced by

5   al-Itihaad.  When Itihaad dissolved, some of its members then

6   were looking for a new way to organize themselves.

7            In the early 2000s, in association with some of the

8   individual Islamic courts in Mogadishu, a militia group began

9   to emerge that didn't actually have a name.  It wasn't -- it

10  was very much an underground militia network at the time that

11  was particularly associated with the first three of the

12  Islamic courts, so a minority of those that existed in

13  Mogadishu.  And one of the most prominent members of that

14  group was someone called Aden Hashi Ayrow.

15  Q.  Can I stop you there?

16  A.  Yes.

17  Q.  What was the name of that court or what courts was that

18  militia associated with?

19  A.  Well, the three courts that were most associated with

20  this emerging militant group were Ifka Halan, which was a

21  court associated with the Habar Gidir, Ayr subclan of the

22  Hawiye and headed by Sheik Hassan Dahir Aweys.  Also the

23  court of Circolo, which was associated with Habar Gidir,

24  Suleyman subclan.

25  Q.  Can I stop you there?  Starting first with the Ifka Halan

1   court, can you please spell that?

2   A.   I-f-k-a, then H-a-l-a-n, and sometimes spelled with an E

3   at the end.

4   Q.   And you also testified about the clan that it was most

5   associated with; what clan is that?

6   A.   Habar Gidir, Ayr.

7   Q.   And how do you spell Habar Gidir?

8   A.   H-a-b-a-r; second word is G-i-d-i-r; and the third word

9   would be A-y-r.

10   Q.   And just so we understand, the actual larger clan that

11   pertains to Habar Gidir and Ayr is called Hawiye; is that

12   right?

13   A.   Hawiye, yes.

14   Q.   Okay.  So there's a larger clan of Hawiye, and then the

15   subclan is Habar Gidir; is that correct?

16   A.   That's correct.

17   Q.   And then the sub subclan is called Ayr; is that right?

18   A.   That's right.

19   Q.   Okay.  And Ayr is spelled -- I'm sorry -- how?

20   A.   Well, it should begin with a C and an apostrophe, and

21   then A-y-r.

22   Q.   Okay.  Thank you.  And so you were talking about this

23   militia and its association to these courts, and there is the

24   Ifka Halan court.  And what's the next court?

25   A.   Circolo.

1  Q.  And how is that spelled?

2  A.  There are different spellings.  C-i-r-c-o-l-o is the

3  original Italian I think.

4  Q.  And there was another court as well, the third court?

5  A.  Yes, Warshadda 'aanaha, or milk factory, and that was

6  associated with the Duduble clan.

7  Q.  Okay.  And can you -- the Warshadda 'aanaha, can you

8  please spell that?

9  A.  W-a-r-s-h-a-d-d-a, and then the second word would be an

10  apostrophe a-a-n-a-h-a.

11  Q.  And it was associated with what clan?

12  A.  The Duduble.

13  Q.  And Duduble is spelled how?

14  A.  D-u-d-u-b-l-e.

15  Q.  And in addition to being -- this militia being associated

16  with these courts, what was generally the composition of the

17  militia; who was a member of this militia --

18  A.  Well, these --

19  Q.  -- or this militant -- these militant groups?

20  A.  Well, these three courts were considered the most

21  hardline and their militias were -- they're fairly early on

22  described as jihadist, that they had this very militant

23  extreme version of Islam and sharia.  And there were other

24  courts, but they were not considered to have the same

25  orientation.

1  Q.  And what do you mean by that, that they were extreme?

2  A.  Well, they -- at the time the -- particularly Ifka Halan,

3  was associated with Hassan Dahir Aweys, who was already

4  perceived as a militant, then perhaps imposing a more

5  rigorous, puritanical version of sharia law within the

6  courts.

7  Q.  Let me stop you there.  What do you mean by sharia law?

8  A.  Islamic law.

9  Q.  I'm sorry.  Continue.

10  A.  And, in particular, Aden Hashi Ayrow's network, which was

11  based in Ifka Halan court but had members from the other two,

12  was known at the time to be protecting members of another

13  foreign extremist group and to have been involved in the

14  killing of aid workers in the northwest part of the country

15  and was, by 2005, quite openly, first of all, involved in a

16  campaign against groups who were involved in

17  counterterrorism, and perhaps most -- most visibly in early

18  2005, Ayrow's group seized control of an Italian colonial-era

19  cemetery -- so a cemetery established before 1960 -- and it

20  disinterred all the bodies in the cemetery and offered to

21  sell them back to the Italian government, and established a

22  center, training center and mosque and sort of a military

23  base on the grounds of the Italian cemetery.  And that --

24  that earned them a reputation in Mogadishu and more widely as

25  a very extreme group.

1   Q.  Okay.  So you've talked about Aden Ayrow.  Is he in the

2   slide there, Government Exhibit 28?

3   A.  Yes, he is.

4   Q.  Okay.  And in addition, I'm showing you Government's

5   Exhibit 21, and is Government's Exhibit 21 another -- or a

6   photograph as well of Aden Ayrow?

7   A.  Yes, it is.

8       (Exhibit No. 21 identified.)

9           MS. HAN:  Okay.  The United States offers

10  Government's Exhibit 21.

11          THE COURT:  Exhibit 21 is admitted.

12      (Exhibit No. 21 admitted.)

13          BY MS. HAN:  Q.  So let's talk about Aden Ayrow.

14  When did -- approximately when did Aden Ayrow join the Ifka

15  Halan court?

16  A.  He joined -- he joined the court in about 2002 or '3

17  after returning from training abroad.

18  Q.  And when he -- when he returned in 2002 and 2003, what

19  was his role in the Ifka Halan court?  Did he have any

20  leadership role?

21  A.  He was trainer, he was a military trainer, but he wasn't

22  yet commander of the militia.

23  Q.  What did he train in?  What did he train others in?

24  A.  Small arms and small unit tactics.

25  Q.  And where is it that he received this training that he

1  shared with others?

2  A.  In Afghanistan.

3  Q.  And you had talked about this group -- that this group of

4  militants within the -- I guess which expanded beyond the

5  Ifka Halan court to the three courts, right?

6  A.  Right.

7  Q.  And you talked about its efforts to harbor foreign

8  terrorists?

9  A.  Yes.

10  Q.  Okay.  And are you familiar with the attacks that

11  occurred in Mombasa in 2002?

12  A.  Yes, I am.

13  Q.  Okay.  And if we could just bring up the 2002 through

14  2004 slide of Government's Exhibit 28.  And those attacks,

15  when did they occur?

16  A.  They occurred in November 2002.

17  Q.  And is that reflected on Government's Exhibit 28, this

18  screen that's currently up?

19  A.  Yes, it is.

20  Q.  Okay.  And can you briefly describe those attacks.

21  A.  There were -- there were two attacks.  They were almost

22  simultaneous.  One was -- took place at the Paradise Hotel in

23  a town called Kikambala just to the north of Mombasa, which

24  is on the Kenya coast; it's a tourist area, and the Paradise

25  Hotel was routinely frequented by Israeli tourists to the

 1   Kenya coast.  And at the time of the attack, there was a

 2   busload of Israeli tourists who were disembarking at the

 3   hotel.  As they did so -- and there was a kind of welcome

 4   committee of the staff, Kenyan staff from the hotel, a

 5   four-wheel-drive vehicle with two occupants drove through a

 6   barrier into the courtyard of the hotel and exploded and

 7   killed a number of tourists and the Kenyan staff.

 8            At almost the same time, an Israeli charter

 9   airline, Arkia Airlines, had a flight leaving Mombasa

10   Airport, and -- I believe the destination was Tel Aviv -- and

11   two SAM-7, or Strela 2, surface-to-air missiles were fired at

12   the aircraft.  Neither one of them hit the target.  And the

13   members of both teams, those who weren't killed in the

14   suicide explosion but those who organized it and carried out

15   the attack on the airliner, then fled to Somalia, where they

16   were -- they were harbored by this group associated with Aden

17   Hashi Ayrow.

18   Q.  And those attacks occurred in November of 2002?

19   A.  That's right.

20   Q.  And the attacks occurred -- I'm sorry -- it was on a

21   hotel and also on a -- an --

22   A.  On an aircraft --

23   Q.  On an aircraft?

24   A.  -- passenger aircraft.

25   Q.  Both of which were Israeli in nature or were owned by

1   Israel?

2              MR. DRATEL:  Objection, your Honor; asked and

3   answered.

4              THE COURT:  Sustained.

5              BY MS. HAN:  Q.  And when those foreign terrorists,

6   after they completed the attacks, you said that they fled to

7   Somalia?

8   A.  That's correct.

9   Q.  Okay.  And in Somalia you said that they were --

10             MR. DRATEL:  Objection, your Honor --

11             BY MS. HAN:  Q.  -- harbored by this group?

12             MR. DRATEL:  -- asked and answered.

13             BY MS. HAN:  Q.  Were there attempts to -- were

14  there -- what is your understanding about that link between

15  the --

16             THE COURT:  I'm sorry?

17             MS. HAN:  Your Honor, there is an objection, so --

18             THE COURT:  I thought it was withdrawn.

19             MR. DRATEL:  Yes.

20             THE COURT:  It was withdrawn.

21             MS. HAN:  Okay.  Well --

22             THE COURT:  You were just using that as -- but many

23  of the questions are now being asked and answered more than

24  once, so if you would please be careful about that.

25             MS. HAN:  Yes, your Honor.

```
1              THE COURT:  Thank you.
2              BY MS. HAN:   Q.  And so the group fled in 2002
3    after the attacks?
4    A.  Yes.
5    Q.  Okay.  And then later in 2004, was there an attempt to
6    locate these individuals in Somalia?
7    A.  Even earlier.  Almost immediately there was an attempt.
8    Immediately there was an investigation, there was a pursuit
9    of the suspects.  It was known very quickly that they had
10   gone to Somalia, and during the course of 2003, '4 and up
11   until very recently, there were international efforts to
12   apprehend them.
13   Q.  And speaking specifically about the incident in August of
14   2004 that's reflected on the time line there, can you speak
15   specifically about that incident and the attempt to find the
16   foreign terrorists.
17   A.  Yes.  In August 2004, Aden Hashi Ayrow's house, one of
18   the places that he was staying in Mogadishu, was attacked by
19   a Somali militia.  The militia was supported by -- it was one
20   of several militias supported by the United States government
21   looking for these foreign terrorists.  And this particular
22   one was headed by a warlord militia leader known as Mohamad
23   Qonyara Afra (phonetic).  His militia couldn't operate in
24   that part of Mogadishu, so he had subcontracted the operation
25   to another militia, and they -- they conducted surveillance
```

1   on Ayrow's house, and they attacked it at night.

2           Now, the objective of that operation was -- there

3   were several people they were after.  One in particular was a

4   Sudanese who was a member of this foreign terrorist group.

5   And although they failed to capture him, that raid did

6   capture some others, including someone who was wanted for

7   involvement in the killing of aid workers near Hargeysa in

8   the north of the country the previous year.

9           MR. DURKIN:  Judge, may we be heard briefly?

10          THE COURT:  Well, is there an objection?  You can

11  just state the objection and the grounds for --

12          MR. DURKIN:  Like a limiting instruction.

13          THE COURT:  Well --

14          MR. DURKIN:  This has gone beyond what I had

15  anticipated.

16          THE COURT:  Well, that's -- I'm going to overrule

17  the objection.  And when we have an opportunity at the break,

18  we can discuss the issue.

19          BY MS. HAN:  Q.  And after his house was raided,

20  what did Ayrow do?

21  A.  Well, he was very angry.  He had been attacked by

22  militia; in fact, the subcontracted militia that I have

23  mentioned was from his clan.  The militia commander was a

24  Habar Gidir, Ayr.

25          MR. DRATEL:  Your Honor, I'm going to object.  I'll

1    discuss it when we have a chance.

2              THE COURT:  All right.

3              THE WITNESS:  Ayrow accused the elders of the clan

4    of not providing protection for him, not standing in

5    solidarity with him, so he relocated himself, established his

6    base at the Italian cemetery for his own protection.

7              BY MS. HAN:  Q.  Okay.  And the name of the base

8    that he established at the Italian cemetery, what was the

9    name of it?

10   A.  It became known as Markasa Salahudin, the Salahudin Base,

11   or center.

12   Q.  I'm sorry?

13   A.  Salahudin Center.

14   Q.  And Salahudin is S-a-l-a-h-u-d-i-n; is that right?

15   A.  That will do.

16   Q.  And the Salahudin Center, where was it located?

17   A.  In the northern part of the city in the Huriwa

18   neighborhood.

19   Q.  All right.  I'm sorry.  In what part?

20   A.  Huriwa, right -- very close to the Ifka Halan court.

21   Q.  And where the -- this incident that you talked about the

22   setting up -- or the desecration of the Italian cemetery and

23   the setting up the Salahudin Center, was it widely reported

24   in Somalia?

25   A.  Yes, it was.

1   Q.  And was it also widely reported outside of Somalia?

2   A.  Fairly widely.  The desecration of the cemetery attracted

3   significant attention.

4   Q.  And can you talk a little bit about that?

5   A.  Just that to the degree that the international media

6   covers Somalia, this was one of the events that was covered.

7   In the Somali media it received much more coverage because it

8   was denounced by various individuals in Mogadishu, it was

9   denounced by other parts of the Islamic courts, and so it

10  generated quite a lot of attention and would have been picked

11  up -- it was picked up by local radios but also websites.

12  Q.  And this group of militants that Ayrow -- would you say

13  that he was a leader within that group of militants?

14  A.  Yes, he was very clearly a leader, and he became the

15  leader both of the Salahudin group, the militia that

16  collected there, but also, several months later, the

17  commander of the Ifka Halan court militia.

18  Q.  And approximately how many people would be in that

19  militia?

20  A.  A couple of hundred.  These are not large fighting

21  groups.

22  Q.  And is that for the Ifka Halan -- the Ifka Halan militia?

23  A.  Ifka Halan militia started out at 80 but it was probably

24  more in the -- it grew to the order of 200 to 300, plus then

25  a smaller number at the Markasa Salahudin.

1    Q.   Okay.  And just for the jury to understand, these

2    groups -- there is sometimes overlap in these two groups, but

3    they're separate groups, they're two different entities

4    although there's overlap --

5    A.   There is overlap.

6    Q.   -- of the personnel.

7    A.   Yes, there is.

8    Q.   Okay.  What else was this group, this group of militants

9    that Ayrow was a leader of, what else were they involved in?

10   A.   Well, at that time there was more than one militia leader

11   that was being sponsored by the U.S. government to hunt for

12   foreign terrorists; there were a number of them.  And Ayrow's

13   militia was involved in a countercampaign identifying,

14   hunting, and killing members of this counterterrorism effort.

15          His militia were also involved in the killing of a

16   Somali peace activist in 2005, and this was -- this was

17   widely perceived in Mogadishu at the time as a kind of -- as

18   a campaign against Somali intellectual civil society, to

19   intimidate them.

20   Q.   Can I stop you there?  The Somali peace activist, what

21   was his name?

22   A.   Abdulkadir Yahya.

23   Q.   And when you say he was a peace activist, what do you

24   mean by that?

25   A.   Yahya was -- he was just that.  He was one of the most

1    outspoken voices in Mogadishu for peace.  He was someone who

2    was widely respected and very well-connected to all sides of

3    the conflict, all factions, not just in Mogadishu but

4    increasingly beyond.  He was one of the co-directors together

5    with Ahmed Abdiselan and another of the Center for Research

6    and Dialog, the research institute that I've mentioned.  And

7    he was a regular participant in international and national

8    conferences, peace talks, constantly trying to bring people

9    together to restore peace to Mogadishu in particular and

10   Somalia more generally.

11   Q.  And when -- when was he killed?

12   A.  In July 2005.

13   Q.  And -- I'm sorry -- I cut you off before.  What was the

14   Somali -- the reaction in Somalia to his murder?

15   A.  It was outrage, universal outrage and condemnation, and

16   not just in Somalia.  If I'm not mistaken, the UN Secretary

17   General, there was a presidential statement from the Security

18   Council condemning his death.  He was a very widely known

19   figure.

20   Q.  And --

21          MR. DURKIN:  I have the same objection.

22          THE COURT:  Okay.

23          BY MS. HAN:  Q.  And did this militia that Ayrow

24   was a head of, were they involved in other killings as well

25   or that Ayrow was a leader in, were they involved in other

1   killings as well?

2   A.  Well, they were involved -- as I said, there were four

3   aid workers killed in the north, in Somaliland, there was

4   Abdulkadir Yahya.  There were at least a dozen of these

5   people associated with the counterterrorism effort killings

6   that I investigated.  I'm sure there were others, but I only

7   know of those.  And then there were at least three other

8   foreigners killed during the course of 2005-6.  One

9   journalist and -- two journalists and one aid worker were

10  killed in Mogadishu by militia associated with Ayrow.

11  Q.  And did that have an impact on the presence of

12  nongovernmental organizations in Somalia?  Did all of these

13  killings contribute to -- was there any impact as result of

14  that?

15  A.  Yes, there was a -- there was a state of fear among

16  foreign organizations.  Mogadishu was already a dangerous

17  place, so there weren't a lot of organizations there.  But

18  both within the aid community and also among journalists, the

19  security measures were reviewed, restrictions were tightened.

20  It became much harder for workers from international

21  organizations to obtain permission to travel to parts of

22  Somalia, particularly those parts where killings had taken

23  place.  And so yes, there was a -- there was a chilling

24  effect on international agencies dealing with Somalia.

25  Q.  And those --

 1          THE COURT:  Any time you're at a convenient

 2  breaking point, let us know.

 3          MS. HAN:  This is fine, your Honor.

 4          THE COURT:  Okay.  Ladies and gentlemen, we'll take

 5  our midafternoon recess and then resume in approximately 15

 6  minutes.  Please remember the admonition.  And we'll see you

 7  in a little bit.  Thank you.  Counsel, you want to be seen

 8  over here.

 9      (Following is a sidebar conference.)

10          THE COURT:  Okay.  Either or one of you who'd like

11  to speak, it's your --

12          MR. DURKIN:  Judge, this is why I filed my motion

13  for a severance, and I renew it again.  I don't -- this is so

14  far beyond what I anticipated, the scope of this.  I don't

15  know what it's coming in for; I guess it's for background.

16          THE COURT:  Well, I can think of two or three

17  reasons -- well, I don't want to tee it up for one side or

18  the other in this case but I can certainly see a couple of

19  purposes.  And there's a fine line; I do -- I do recognize

20  that.

21          MR. DURKIN:  Can I --

22          THE COURT:  The fact that you -- it may go beyond

23  what you had anticipated, I don't know that that's a proper

24  ground for an objection.

25          MR. DURKIN:  Can I explain?

1           THE COURT:  Sure.

2           MR. DURKIN:  Here's the problem I have.  My guy is

3    not on a call with Ayrow, not one call with Ayrow.  His only

4    connection to this whole conspiracy is via Moalin, and there

5    is no call where they're on the phone together.  And this is

6    what I feared.  I just don't understand.  I thought this

7    evidence was coming in for the purpose of giving some type of

8    background to al-Shabaab so that people would be on notice,

9    but this is getting so prejudicial it seems to me.  To be

10   talking about bombings at airports and international outrage,

11   and it's -- if this isn't 403, then I don't understand what

12   it's --

13          THE COURT:  Okay.  Well, you stated your objection,

14   403.  So let's let the government -- did you have something,

15   Mr. Dratel?

16          MR. DRATEL:  No, different, separate objection.

17          MR. GHAPPOUR:  I want to join that also.

18          MS. MORENO:  Join also.

19          MR. DRATEL:  I have a separate objection.

20          THE COURT:  Related to this?

21          MR. DRATEL:  Not related to the 403 aspect.

22          THE COURT:  All right.  Let's deal with the 403.

23   Who'd like to speak to that?

24          MS. HAN:  Mr. Cole will start.

25          MR. COLE:  The Mombasa stuff we're done with, the

1    airport, the hotel; that was in every filing we made on this

2    issue explaining what we would say about that subject is that

3    it was -- it happened, the people fled to Somalia where they

4    were harbored by Ayrow, and his house was attacked.  That's

5    what we've said from the beginning we were going to do.

6    That's what we did.  We're past it now.  And we have to

7    explain why Ayrow mattered and why people would know that

8    Ayrow mattered and why Moalin or anyone else would know that.

9    The objection about Mr. Ahmed Nasir not having spoken to

10   Ayrow, in the government's estimation it's just not an

11   evidentiary objection.  If he was talking to Moalin, Moalin

12   was talking to Ayrow, then Ayrow's important, and that's what

13   we have to talk about to explain.  Our argument would be that

14   Ahmed Nasir was part of the same conspiracy that Moalin was

15   part of, which is with Ayrow.  That's my response.

16            MR. DURKIN:  But my point on that, Judge -- and

17   this is why I asked for the hearing and why I proffer on my

18   client's connection to the conspiracy.  It's -- I understand

19   if there's -- if they've already proven that my guy is a

20   member of this conspiracy, then it's a different issue.  But

21   I'm just afraid my guy is going to get lumped into this

22   conspiracy because this is all so bad.

23            I just don't understand why they have to go into

24   this kind of detail.  What I'm asking for, what I asked for

25   in front of the jury is I'd like a limiting instruction that

1   says this is only being offered for a specific purpose.

2          THE COURT:  Okay.  We need to get this decided.  I

3   think I understand the basis of your objection; it's under

4   403.  You'd like a limiting instruction.  I'm going to

5   overrule the objection on 403 grounds.  I can think of two or

6   three different purposes for this testimony.  First of all,

7   the government's just started its case.  I think your

8   concern, although I understand the nature of it, goes more to

9   a failure of proof, and ultimately it's the stuff of Rule 29

10  if you feel the case hasn't been sufficiently connected to

11  your guy to allow a reasonable jury to reach a guilty

12  verdict.

13         With respect to the purposes though, first of all,

14  this guy's showing his stuff right now.  Obviously he's very,

15  very conversant with the history of Somalia; he's laid out

16  his education, he's laid out his experience, his writings,

17  his areas of interest, and he's permitted to do so.  Now you

18  get into the individual chronology of events and

19  personalities and all, and still a purpose of that is to show

20  exactly how familiar he is with all of this.  And then you

21  get into the point of public knowledge, what was common

22  knowledge, especially for those people who were wanting to

23  stay in tune with what was going on back home, Somalis out in

24  the diaspora, what their state of general knowledge was.  If

25  in fact we have some guy who's perceived nationally and

1    within Somalia and internationally as such an outlaw, such a

2    bad guy -- which, by the way, no one disputes as I listened

3    to the opening statements and all the rest of what I've

4    heard -- then it does go generally to a state of knowledge.

5           We're not -- keep in mind we're not getting into

6    these events with any kind of gruesome detail; you're not

7    seeing photographs coming in, you're not seeing any of these

8    circumstances dwelled upon.  The chronology is fairly drawn

9    out because apparently there's so much to it, and Ayrow was

10   involved in so many different things over a period of time.

11   And, once again, I don't think that's in dispute.

12          So I'm going to overrule the objection on 403, and

13   I'm not going to give a limiting instruction at this time.

14   It's simply too early for me.  I've got to hear more evidence

15   to determine whether or not a limiting instruction will be

16   appropriate.

17          MR. DRATEL:  Your Honor -- and this is a problem

18   with what I would call investigative experts -- Mr. Bryden

19   would have access to law enforcement intelligence, other

20   sources, U.S. government, other governments, UN.  He's not

21   just talking about the specific acts and specific things

22   about Ayrow and Ayrow's group.  It's very -- it's not clear

23   the source of his information, and I have a Crawford

24   objection on that because it could very well be from

25   apprehended persons who give custodial statements, and that's

1    the basis -- he's talked about interviewing over a hundred

2    jihadists, and so I don't know the circumstances of that.

3    It's a big problem.

4            THE COURT:  I don't think Crawford applies to this

5    kind of a context.  You can certainly on cross-examination

6    get into areas and distinguish if you can what was generally

7    known, number one, in -- amongst the Somali population or

8    certain segments of the Somali population, what was generally

9    known among those who would investigate, whose interest was

10   in Somalia during this period of time, who had

11   responsibilities for -- NGOs as well as governments -- to

12   engage in peacekeeping activity, to rally the troops, to

13   become familiar with what was going on.  This was this man's

14   job.

15           MR. DRATEL:  I'm not talking about familiarity, I'm

16   talk about the source.  So in other words if he -- if he --

17   because we don't know where this information --

18           THE COURT:  Well, give me an example of one

19   incident that you think may not have happened.

20           MR. DRATEL:  Okay.  Well, not may not have

21   happened, no.  It's this -- it's Ayrow's organization

22   harbored terrorists in Somalia, the source of that

23   information.

24           THE COURT:  This is after the Paradise Hotel in

25   Mombasa?

 1              MR. DRATEL:  Right.  The source of information is

 2   what exactly?  I believe that it's partly based on his

 3   investigation, which probably includes custodial statements

 4   by persons that have been shared with him by either

 5   government or he took himself are -- is a Crawford violation.

 6   And it's not my -- I don't think it's my responsibility on

 7   cross to find that out.  That's a preliminary issue that has

 8   to be resolved.

 9              THE COURT:  Okay.  I'll overrule the objection for

10   now.  You'll reserve that point.  Let me allow you to enjoy

11   at least part of your --

12              MS. MORENO:  Five minutes, yes, your Honor.

13              MR. DURKIN:  Just housekeeping.  Can I -- as long

14   as Ms. Roberts stays, can I sneak out the back --

15              THE COURT:  You can sneak out.  You can even sleep.

16              MS. MORENO:  No, he can't.

17              MR. DURKIN:  I was thinking about that.  Did you

18   see me nodding off?  Is that what you saw?

19              MS. ROBERTS:  No, he can't, Judge.  No, he can't.

20              THE COURT:  All right.

21         (There was a break in the proceedings.)

22              THE COURT:  Mr. Dratel, you needed to discuss

23   something?

24              MR. DRATEL:  Yes, your Honor.  Exhibit 54, which is

25   coming up imminently, my understanding it is -- they're a

1   bunch of screen shots I guess in Somalia, so -- Ms. Han did

2   give me a sense of what they were, and it's something we

3   received a couple days ago, which is a tribute video

4   apparently to Mr. Ayrow, and apparently Mr. Bryden is

5   prepared to interpret it from the stand for the first time

6   for us.

7            THE COURT:  He's what now?

8            MR. DRATEL:  He's going to interpret the Somali

9   from the stand, but my principal objection is it has zero

10  relevance, and it's pure 403.  There is nothing connecting

11  this tribute video to Mr. Ayrow to any defendant, any tape,

12  any document, anything in this case.  It's after he's dead --

13           THE COURT:  Well, let's see what the proffer here

14  is, okay, and then we'll hear objection.

15           MS. HAN:  Your Honor, Government's Exhibit 54 is

16  from the alqimmah website, alqimmah website being a jihadist

17  website.  Mr. Bryden would testify about it being a jihadist

18  website and the significance of Mr. Ayrow's, Aden Ayrow's

19  death on May 1st and that it was so significant that tribute

20  videos were made.  It's not being offered for the truth of

21  the matter asserted.  He in fact doesn't have to read the

22  text at all.  It's just as an example of a tribute video to

23  demonstrate the notoriety and the importance, the

24  significance of Aden Ayrow's death on May 1st, 2008.

25           MR. DRATEL:  Your Honor, they have --

1          THE COURT:  Excuse me.  Who was this prepared by?

2          MS. HAN:  It was found online.

3          THE COURT:  It was just found online.  And what

4   does the text say, if you can summarize?  You're probably

5   aware of what it says.

6          MS. HAN:  Generally, your Honor, without having

7   perfect Somali of course, my understanding is that it says

8   that -- it merely says this is a tribute to Aden Hashi Ayrow,

9   who died on May 1st, 2008, and was killed in Dhusa Mareeb by

10  the enemy.  And under it it lists the name of this website,

11  alqimmah.net.  The second page is merely a poem and his name

12  at the top and his photograph.

13         THE COURT:  Well, do we know how popular this

14  website was?

15         MS. HAN:  Mr. Bryden can offer testimony on that.

16         THE COURT:  And what's your anticipation of it?

17         MS. HAN:  That it was significant as a jihadist

18  website.

19         THE COURT:  As a jihadist website.

20         MS. HAN:  Yes.  I believe also, more specifically,

21  as an al-Shabaab website.

22         MR. DRATEL:  Your Honor, their theory, that this is

23  discussed on a telephone conversation with the client, not

24  watched by anybody on video, we don't even know when this was

25  made.

1          MS. HAN:  Your Honor, on that date there were a

2     couple of phone calls that were -- that discussed it; couple

3     of people said I'm looking at it right now, I heard about it.

4          THE COURT:  Couple of --

5          MR. DRATEL:  The only conversation --

6          MS. HAN:  No, no, we're not saying that they're

7     looking at this right now, but we're saying it was certainly

8     a mechanism by which people both in Somalia and outside of

9     Somalia would have learned about Mr. Ayrow's death.

10          THE COURT:  Okay.  I'm going to sustain the

11     objection under 403, although nothing has been articulated in

12     terms of under the rules of -- Federal Rules of Evidence.

13     Under 403 I just don't see the probative value of this

14     particular exhibit outweighing any possible prejudicial

15     effect.  I don't know that the prejudicial effect would be

16     great, but I know we're going to be spending some time now on

17     this if in fact this would come in, and I don't want to

18     unduly spend time on issues like this.  The witness is

19     certainly free to testify as to what the nationwide knowledge

20     was based upon his experience and expertise and knowledge in

21     this area, but I don't -- I don't think we need this kind of

22     photographic support.  By and large, I've tried to keep, as

23     you know -- and I think both sides have understood the wisdom

24     of this -- keep photographs of certain types of events or

25     circumstances -- this isn't really a photograph, a gruesome

1   photograph, for example, but it's just falling into that same

2   general category of unnecessary photographs or physical

3   depictions of certain propositions.  So I'll sustain the

4   objection.  Was there anything else we needed to discuss

5   before we bring the jury in?

6          MR. DRATEL:  No, your Honor.  Thank you.

7          THE COURT:  Okay.  Let's get our jury in.

8      (The jury entered the courtroom.)

9          THE COURT:  Ladies and gentlemen, welcome back.

10  Thank you.  Thank you for your patience.  I know we've gone a

11  little bit over the allotted period of time for the recess.

12  That may occur from time to time.  Really, the attorneys,

13  both sides, have been very good in being able to anticipate

14  potential problems so that we can discuss matters outside

15  your presence that need to be addressed outside your

16  presence, but every once in a while, we do need to chat about

17  something, and so we'll always have you back in here just as

18  soon as we can.  I'm not anticipating any lengthy delays, but

19  we would never ask you to wait without an explanation as to

20  why you have been asked to wait or are waiting.  So with that

21  we'll continue on with the direct examination of Mr. Bryden,

22  who's still under oath.  Okay.  Ms. Han?

23         MS. HAN:  Thank you, your Honor.

24         BY MS. HAN:  Q.  Mr. Bryden, when we last left off,

25  we were talking about Aden Ayrow.  Aden Ayrow later became a

1  member of what became the entity -- did he later become a

2  member of al-Shabaab?

3  A.  Yes, he did.

4  Q.  And al-Shabaab -- when did al-Shabaab become its own

5  entity?

6  A.  Well, al-Shabaab was its own entity without that name --

7  even before the Islamic courts came to power in Mogadishu,

8  that militia network was already an entity and operating, and

9  I'm among those who described it as an entity as early as

10  2005.

11        The actual use of the name "al-Shabaab" started to

12  take place during the course of 2006 when the Islamic courts

13  came to power.  And it initially functioned as a distinct

14  component of the Islamic courts.  The Islamic courts was an

15  umbrella.  There were many different aspects to it, different

16  groups that came together when it took control in Mogadishu;

17  Shabaab -- al-Shabaab was one of them.  And it was recognized

18  within the Islamic courts as a distinct entity because each

19  of these entities was given a number of seats in the grand

20  shura, the assembly of the Islamic courts.  So Shabaab was

21  specifically given a number of seats.  But it wasn't until

22  Ethiopia intervened -- and there were very clear differences

23  of opinion between parts of what had been the Islamic courts

24  and other insurgent groups and al-Shabaab -- that it started

25  to define itself as a distinct militia, a force in opposition

1  in some ways to the other forces that were also fighting the

2  Ethiopians.

3  Q.  And what was distinct about al-Shabaab?

4  A.  What was distinct about al-Shabaab was its methods.

5  Al-Shabaab used types of violence, also types of propaganda

6  that other groups in Somalia either simply didn't use or

7  certainly would only have done so on occasion.

8  Q.  Okay.  Before we get into that, can you talk about where

9  the term "al-Shabaab," what does that mean?

10 A.  It means "The Youth."

11 Q.  And in what language?

12 A.  In Arabic.

13 Q.  And are there other terms that are used to refer to

14 al-Shabaab other than The Youth?

15 A.  There are.  That's its official name; at least that's

16 part of its official name.  There are many terms that are

17 used by Somalis when they're talking about al-Shabaab to

18 refer to the group.

19 Q.  Okay.  And is one of those phrases "The Young Ones"?

20 A.  Also "the youth," the Somali term "dhallinyarada" means

21 "the youth," and it's often used by Somalis when they're

22 referring to al-Shabaab instead of using the Arabic.

23 Q.  And you talked about al-Shabaab's -- well, first let's

24 talk about -- we've talked about Aden Ayrow as a figure in

25 al-Shabaab.  Can you talk about -- are you familiar with a

1  person named Abu Zubeyr?

2  A.   Yes, I am.

3  Q.   And who is Abu Zubeyr?

4  A.   Abu Zubeyr is -- his full name is I believe Mukhtar

5  Abdirahman Abu Zubeyr, and it's not his real name; it's a --

6  an assumed name for an individual whose real name is Ahmad

7  Abdi al-Mohamud Godane, and he is currently -- he carries the

8  title of emir, or leader, of al-Shabaab.

9  Q.   Okay.  You said a lot of things there.  Okay.  First, how

10 do we spell Abu Zubeyr?

11 A.   A-b-u  Z-u-b-e-y-r.

12 Q.   And what does the name "Abu Zubeyr" mean?

13 A.   It's a -- it's a kunya.  It's -- again, it's a nickname,

14 and it would mean the father of Zubeyr.

15 Q.   And you used the word "kunya."  What does the word

16 "kunya" mean?

17 A.   It's an Arabic term for nickname.  Al-Shabaab -- or maybe

18 I should say militant Islamist groups in Somalia in general

19 have in recent years adopted this practice of taking an

20 Arabic nickname, a kunya, for their leaders and for their

21 fighters.  And it's often -- it can actually literally mean

22 that this is the father of so and so in the name of one of

23 the children, but it can also be a reference to one of the

24 companions of the prophet Mohammed that they are borrowing in

25 a historical reference, religious reference.

1   Q.  Thank you.  I'm showing you Government's Exhibit 18.  Can

2   you tell me who the person is in Government's Exhibit 18?

3   A.  That is Abu Zubeyr or also known as Godane.

4      (Exhibit No. 18 identified.)

5          MS. HAN:  Okay.  The United States offers

6   Government Exhibit 18.

7          THE COURT:  Exhibit 18 is admitted.

8      (Exhibit No. 18 admitted.)

9          BY MS. HAN:  Q.  Can you talk a little bit about

10  Abu Zubeyr and his background, please.

11  A.  Abu Zubeyr is believed to be relatively young, in his

12  late 30s now, mid to late 30s.  He is from northern Somalia;

13  he's from -- his family's from the town of Hargeysa.  And

14  he's a member of the Isaaq clan, the subclan known as Harab

15  of the Isaaq clan.

16  Q.  Can I stop you there?

17  A.  Yes.

18  Q.  You said he was from Hargeysa?

19  A.  Yes.

20  Q.  And that's located in the northern part of Somalia?

21  A.  That's right.

22  Q.  Okay.  And you said he's a member of the Isaaq clan?

23  A.  Yes.

24  Q.  Can you please spell Isaaq?

25  A.  I-s-a-a-q.

1    Q.  Okay.  I'm sorry.  Continue.

2           THE COURT:  Before you do, Ms. Han, may I interrupt

3    for a just a moment?  I know earlier you were pretty

4    conscientious about creating a time line here for certain

5    individuals or groups.  The last we heard I think was a

6    general period of July of '05.  Now we're hearing about Abu

7    Zubeyr, and I don't know whether it's present -- present

8    circumstances or this is historical.  It might help if you

9    could continue on with the chronology, giving us dates when

10   appropriate.

11          MS. HAN:  Yes, your Honor.

12          BY MS. HAN:  Q.  So -- I'm sorry -- could you

13   continue with your answer about Abu Zubeyr.

14   A.  Abu Zubeyr is also reported to have been a member of

15   al-Itihaad and to have trained in Afghanistan.

16   Q.  And can I stop you there?  During approximately what time

17   period?

18   A.  Itihaad fought until 1996, so prior to 1996, or 1997

19   rather.  In Afghanistan there was a cohort of Somali

20   militants who went and trained in Afghanistan typically

21   between about 2000 and 2002, and he's believed to have

22   traveled at about that time, about the same time as Aden

23   Hashi Ayrow.

24          He is also educated, trained as I believe an

25   accountant and he has worked as an accountant in at least one

1    Somali business.  In about 2003 he appears to have been

2    recruited by another senior al-Shabaab figure and brought

3    into -- into the group, and by -- he was then -- they were

4    both accused of involvement in the killing of aid workers in

5    Somaliland in 2003-4.

6             MR. DRATEL:  Your Honor, renew my objection that I

7    made during the recess.

8             THE COURT:  Okay.

9             THE WITNESS:  And both then traveled to southern

10   Somalia, to Mogadishu, where they associated themselves with

11   Aden Hashi Ayrow and became part of that founding group of

12   al-Shabaab.

13            BY MS. HAN:  Q.  And in 2007 and 2008, what was his

14   role in al-Shabaab?

15   A.  He was -- in 2007 he was a little-known fighter/leader

16   within the movement, but in early 2008 I believe he was -- he

17   was named emir.

18   Q.  And by the word "emir," what do you mean by that?

19   A.  That's the name they've given their commander or leader,

20   but in reality it's not clear that Godane was in fact -- had

21   the authority of a sole commander and that al-Shabaab

22   actually continued to operate with a collective leadership.

23   He had been given that title principally as an honorific and

24   for his operational leadership.

25   Q.  And so can you -- can you talk a little about -- what was

1    the -- was there a name that was assigned to the collective

2    leadership?

3    A.   The shura.

4    Q.   And does the word "shura" mean anything?

5    A.   Council.

6    Q.   And how did -- how did it work, or how does it work?

7    A.   Well, the Shabaab shura, the senior leadership shura,

8    is -- it includes the senior leaders of the movement, and the

9    senior leaders typically have more than one hat, more than

10   one responsibility.  To a certain extent the shura is

11   supposed to reflect the fact that al-Shabaab doesn't want to

12   be tied to the notion of clan, which they see as part of the

13   Somali problem.  So it's a multi-clan group, and it's

14   supposed to have some kind of balance between the main clans

15   of Somalia, and it does.  But then each of the leaders is

16   representing not only their clan, as it were, but also the

17   regions from which that clan may come.  And some of those

18   leaders have a kind of operational responsibility for that

19   region and oversee Shabaab operations in that region, and

20   then at the same time they may have a specific title like the

21   leader, chief of their defense group or of their intelligence

22   group or of their social affairs group.  So multiple titles,

23   multiple functions for the leaders within the shura.

24   Q.   And in addition to having the shura councilmen with there

25   leadership roles, is there also another structure or some

1   structure to al-Shabaab itself?

2   A.  Well, yes.  They've become increasingly structured over

3   time, particularly as they -- between 2007-2008 they were

4   forced to as they were operating across a very large area and

5   they needed better organization.  And they particularly --

6   they've organized themselves into at least four main

7   branches; there is a military branch, the fighting force,

8   which they refer to as "jaysh al-usra."

9   Q.  Can you spell that?  I'm sorry.

10  A.  J-a-y-s-h  a-l hyphen u-s-r-a, the army of hardship.

11  They have a kind of police force, more of a morality police

12  but also for keeping order, which they call the "jaysh

13  al-hesba."

14  Q.  And you'll have to spell that.

15  A.  Jaysh, j-a-y-s-h, and then a-l hyphen h-e-s-b-a.  And

16  then there is the amniyat, a-m-n-i-y-a-t or -d.  The amniyat

17  is their internal security and their intelligence service.

18          And then they have a -- they also have a wing

19  devoted to "da'wa," d-a apostrophe w-a, which is

20  proselytizing outreach, propagation of the faith.  And, in

21  fact, I should have added they have -- they also have an

22  office of social affairs, which is -- principally manages

23  things like assistance, relief assistance, aid resources, and

24  has been described really as probably the main hindrance to

25  the delivery of any kind of humanitarian assistance in

1    Shabaab-controlled areas.

2    Q.   And do they also have a political section?

3    A.   Well, the political leadership is not distinct from the

4    rest; the shura itself is a kind of collective political

5    leadership.

6    Q.   And within -- I don't know where it would be within the

7    units that you've described, but do they also have a media

8    section or a media unit?

9    A.   Yes, they do, which would be part of their "da'wa"

10   branch.

11   Q.   And what -- and you mentioned that this structure started

12   to develop in 2007 and 2008?

13   A.   That's right.

14   Q.   Okay.  And in 2007 and 2008, who was the spokesperson of

15   al-Shabaab?

16   A.   Mukhtar Roobow, who also went by the kunya Abu Mansoor.

17   Q.   Okay.  And can you please spell Mukhtar Roobow?

18   A.   Mukhtar is M-u-k-h-t-a-r, Roobow is R-o-o-b-o-w.

19   Q.   And you testified that he went by a nickname, Abu

20   Mansoor; is that right?

21   A.   That's right.

22   Q.   And that would mean --

23   A.   Father of Mansoor.

24   Q.   And can you talk a little bit -- I'm sorry.  I'm showing

25   you Government's Exhibits 25-A and 25-C.  Do you recognize

1    the individual in 25-A and 25-C -- I guess in 25-A it being

2    the main individual as well as in 25-C?

3    A.   Yes, I do.

4    Q.   Okay.  And who is that?

5    A.   That is Mukhtar Roobow.

6         (Exhibit Nos. 25-A, 25-C identified.)

7              MS. HAN:  Your Honor, the government offers

8    Exhibits 25-A and 25-C.

9              MR. DRATEL:  No objection.

10             THE COURT:  25-A and -B (sic) are admitted.

11             MR. DURKIN:  Judge, I have an objection.  I think

12   it goes well beyond what it's being offered for.  I think it

13   could be redacted.

14             THE COURT:  Well, I thought there was no objection;

15   that's why I indicated admitted.  On 25 -- the objection as

16   to 25-A is sustained on 403 grounds.  There's no objection to

17   25-B I assume.

18             MS. HAN:  I'm sorry.  It's 25-C, your Honor.

19             THE COURT:  25-C?

20             MS. HAN:  Yes, your Honor.

21             THE COURT:  25-A was not offered?

22             MS. HAN:  Yes, your Honor, 25-A and -C were

23   offered.

24             THE COURT:  25-A and -C.  Excuse me.  I thought -B

25   was the second one.  What about 25-B; is that the same

1   person?

2   　　　　　MS. HAN:  Yes, your Honor.

3   　　　　　THE COURT:  Okay.  25-B is admitted, unless there's

4   some independent value to either -A or -C over and above just

5   mere identification.  But at this point 25-B is admitted.  I

6   assume there's no objection to 25-B.

7   　　　　　MR. DRATEL:  No objection.

8   　　　(Exhibit No. 25-B identified and admitted.)

9   　　　　　BY MS. HAN:  Q.  I'm showing you then 25-B, and

10  since it's been admitted into evidence, I will publish 25-B.

11  And is Roobow the person that is in the lower half of the

12  photograph?

13  A.  Yes.

14  Q.  Okay.  And can you talk a little bit about his works as a

15  media spokesperson.

16  A.  He was the first public face of al-Shabaab.  He was a

17  senior member of the group, a member of the shura as well,

18  and therefore also responsible for military operations in

19  part of Somalia.  His -- but in his media role, he became --

20  until 2009, from 2007 to 2009 he was the public face of

21  al-Shabaab.  He gave interviews like the one pictured here to

22  the media in Mogadishu.  But he was also very active online;

23  al-Shabaab had many different ways of reaching its audience,

24  and using chat rooms and forums online were among them.

25  Mukhtar Roobow was one of several al-Shabaab figures who was

1    very prominent and regularly participated in these forums or

2    chat rooms, providing updates on the military situation and

3    trying to mobilize support, financial support, moral support

4    for al-Shabaab.

5    Q.  So you said that he had an operational role where he was

6    responsible for a region as well, is that right, in addition

7    to his media role?

8    A.  That's right.

9    Q.  And what region is that?

10   A.  He is from Bay and Bakool region, or Bay region, but Bay

11   and Bakool tend to be taken together in southwest Somalia, to

12   the west of Mogadishu.

13   Q.  And after what -- in relation to what kind of events did

14   they -- did he hold press conferences or speak to the media?

15   A.  Well, he -- he would hold press conferences anytime that

16   al-Shabaab wanted to claim a victory or deny a report from

17   the Transitional Federal Government or another.  He gave

18   al-Shabaab's responses to international events, actions of

19   foreign governments vis-a-vis Somalia or condemnations of

20   al-Shabaab from foreign governments or organizations

21   explaining the organization's position, and at times he

22   appeared in propaganda videos, including several taken on the

23   battlefield.

24   Q.  And are you familiar with al-Shabaab or al-Shabaab's

25   designation as a foreign terrorist organization by the United

1   States?

2   A.  Yes, I am.

3   Q.  And can that -- was that publicized on March 18, 2008?

4   A.  Yes, it was.

5   Q.  And did Roobow make any statements after al-Shabaab's

6   designation as a foreign terrorist organization?

7                  MR. DRATEL:  Objection, your Honor; hearsay.

8                  THE COURT:  The objection is overruled subject to a

9   motion to strike.  You may proceed.

10                 THE WITNESS:  Roobow did make a statement

11  responding to the designation in which he said that

12  al-Shabaab welcomed the designation and essentially that

13  it -- they wore it as a badge of honor.

14                 MR. DRATEL:  Move to strike, your Honor.

15                 THE COURT:  Motion is denied.

16                 BY MS. HAN:  Q.  You also said that he was involved

17  in fundraising; is that right?

18  A.  That's right.

19  Q.  Okay.  Can you talk a little bit about that.

20  A.  He and other al-Shabaab leaders would participate, as I

21  said, in chat rooms and forums on the Internet, and these

22  forums would typically be organized.  There would be a

23  convener or more than one convener who would make sure people

24  were aware that this event was happening and that a senior

25  figure from al-Shabaab would be participating in the event.

1  And in these forums -- typically there would be an update

2  from these senior leaders, from Roobow himself or one of the

3  others who might be invited to participate, talking about the

4  victories, al-Shabaab's victories on the battlefield and also

5  their need for support.  And then not Roobow per se but the

6  conveners would then -- would often solicit then funding and

7  explain where money was to be sent to, which phone numbers to

8  call and so on.  So that was often the purpose of these

9  briefings from al-Shabaab leadership, to solicit funding.

10 Q.  And how would one join one of these forums?

11 A.  Well, initially they were quite open.  There were a

12 couple that were well-known, one in particular that in my

13 work we used to monitor.  And initially there would be a very

14 superficial screening procedure, who are you.  People were --

15 there was a lot of interest in these forums; there was very

16 wide participation.  Over time, particularly after al-Shabaab

17 gained some notoriety, then participants would have to be

18 invited and introduced by a member, sponsored by another

19 member.

20 Q.  Okay.  And speaking specifically about 2007 and 2008, how

21 would it work during that time period?

22 A.  Oh, by -- I am aware that by 2008 sponsorship was

23 required to enter.  I'm not sure when that practice was first

24 put in place.

25 Q.  And could you call into this forum as well as attend it

1  via the Internet?

2  A.   There were -- there were online conferences, but the

3  Internet allowed much wider participation.

4  Q.   And in addition to holding these forums, did al-Shabaab

5  also have its own websites?

6  A.   Yes, it did.

7  Q.   And in 2007 and 2008, what were those websites?

8  A.   The principal al-Shabaab website, which was considered

9  its official mouthpiece, was kataiib.net.

10  Q.   And how do you spell kataiib?

11  A.   K-a-t-a-i-i-b.

12            MR. DRATEL:  Your Honor, can we get that again?

13  There was some talking over it.

14            THE COURT:  Yes, there was a little bit of a --

15  speaking-over there.  Would you spell that again, sir.

16            THE WITNESS:  K-a-t-a-i-i-b.

17            THE COURT:  B as in Bravo?

18            THE WITNESS:  B as in Bravo.

19            BY MS. HAN:  Q.  And during what time period was

20  kataiib.net an operational website?

21  A.   Certainly through 2007 and into 2008.  At some stage, I'm

22  not -- I don't recall the date -- it changed to kataiib.info,

23  but there were -- the websites -- Shabaab started to use more

24  than one website.  Other websites then picked up their

25  official propaganda and replicated it.  So although kataiib

1  was the official site, first .net, then .info, there were --

2  there was -- there were several others in 2007 and '8, and

3  then eventually alqimmah emerged as probably the foremost

4  al-Shabaab website.

5  Q.  And how do you spell alqimmah?

6  A.  A-l-q-i-m-m-a-h.

7  Q.  And what kinds of information was on the al-Shabaab

8  websites?

9  A.  All kinds of information.  They would -- they would post

10 propaganda concerning their military activities on the

11 battlefield, they -- they would post lectures by prominent

12 sheiks who supported al-Shabaab's cause, they would post

13 articles and opinions by -- by readers.  On occasion they

14 actually did publish statements or writings by al-Shabaab

15 leaders as well; one -- I have one in mind in particular.

16 And yes, then they often had a space for chat between members

17 of the forum or website.

18 Q.  And how would one access these websites in 2007 and 2008?

19 Were they readily available on the Internet?

20 A.  Yes.

21 Q.  Okay.  And -- okay.  And you talked about other websites

22 that would pick up their information; can you talk about what

23 you mean by that?

24 A.  Well, there were many other websites.  At one point there

25 was one known as Abushabaab in 2007-2008.  There was -- there

1    was one, strangely I think, Somali-Swiss; could be mistaken

2    about that.  There were multiple -- now there's --

3    Somali-memo has emerged as another website that propagates

4    al-Shabaab propaganda.  And some of the other Islamist groups

5    in Somalia also had official websites, and they would

6    sometimes carry information from other groups.  Alqimmah in

7    particular also served to carry information from other

8    jihadist groups, non-Somali jihadist groups, and information

9    about wars in Iraq, Afghanistan, elsewhere.

10   Q.  And you talked about I believe these forums that Mukhtar

11   Roobow participated in, these fundraising forums; you talked

12   about those.  Were there other participants other than

13   Mukhtar Roobow?

14   A.  Yes.  The most prominent speakers other than Roobow would

15   have been Fuad Shongole.  He was --

16   Q.  Can I stop you right there?  If I could show you

17   Government's Exhibit 26.  Who is in Government's Exhibit 26?

18   A.  That is Fuad Mohamed Qalaf, who's also known as Fuad

19   Shongole.

20        (Exhibit No. 26 identified.)

21            MS. HAN:  And the United States offers Government

22   Exhibit 26.

23            THE COURT:  Exhibit 26 is admitted.

24        (Exhibit No. 26 admitted.)

25            BY MS. HAN:  Q.  And what -- can you tell us a

1  little bit about Fuad Shongole.

2  A.  Fuad Shongole was a senior member of al-Shabaab and a

3  member of the shura.  Prior to that he resided in Sweden for

4  about ten years, living just outside the capital, Stockholm.

5  He was a businessman and also was a imam at a local mosque.

6  And around 2003 or '4, he started to travel back to Somalia,

7  began to associate with leaders of what became known as

8  al-Shabaab about that time.

9          He -- when the Islamic courts emerged, he was one

10 of the higher-ranking al-Shabaab members in the courts; he

11 was the secretary for education.  And then when the courts

12 were dismantled, he emerged as a key leader of al-Shabaab

13 itself.

14 Q.  And moving to a new topic, you testified that al-Shabaab

15 was distinguished by its tactics; is that right?

16 A.  That's right.

17 Q.  And can you please explain what you mean by that?

18 A.  Well, in particular, al-Shabaab has used techniques --

19 the use of improvised explosive devices is unique to

20 al-Shabaab.

21 Q.  And can I stop you there?  What do you mean by improvised

22 explosive device?

23 A.  Essentially homemade bombs, the use of explosives,

24 remote -- usually remotely detonated against -- well, against

25 foot patrols, vehicles, what have you.  But explosives you

1  often package to look like something else and hidden near a

2  road or a walkway and then remotely detonated when the target

3  passes by.

4  Q.  And in 2007 and 2008, did al-Shabaab use improvised

5  explosive devices?

6  A.  Yes.

7  Q.  And did they also use it before that time period?

8  A.  Yes, they did.

9          MR. DRATEL:  Your Honor, renewing my objection from

10  sidebar.

11          MR. DURKIN:  Mine as well, Judge.

12          THE COURT:  That's fine.

13          BY MS. HAN:  Q.  And in addition to the use --

14          THE COURT:  Tell you what, just so you don't need

15  to be too concerned about this, it's understood you have a

16  continuing objection --

17          MR. DRATEL:  Thank you.

18          THE COURT:  -- concerning any Crawford issues.  I

19  don't see any Crawford issues in any of this.  The objections

20  thus far are overruled, but your failure to -- I shouldn't

21  say your failure -- if you decide not to object, which is

22  fine, it will be understood that you are reserving any

23  Crawford objections.

24          MR. DRATEL:  Thank you, your Honor.  Appreciate

25  that.

1              THE COURT:  If there's something that comes up

2     that's specifically distinct from the type of testimony thus

3     far in terms of quality and you feel you need to lodge

4     another Crawford objection, feel free.

5              MR. DRATEL:  Thank you.

6              MR. DURKIN:  Judge, is that the same on my 403?

7              THE COURT:  Yes.

8              MR. DURKIN:  Thank you.

9              BY MS. HAN:  Q.  And in addition to using

10    improvised explosive devices in 2007 and 2008, did al-Shabaab

11    also use rocket-propelled grenades and landmines?

12    A.  Yes.

13    Q.  And we saw an exhibit of the rocket-propelled grenade.

14    Can you talk about a landmine and how that would work?

15    A.  Well, landmines in Somalia, there are, you know, both

16    antipersonnel and antivehicle, or antitank landmines.  The

17    most commonly used are the antivehicle or antitank landmines,

18    and they're typically used to interdict a roadway where it's

19    believed that an enemy convoy is going to pass.

20              Al-Shabaab early on, as it went through this

21    evolution of its techniques -- tactics, techniques and

22    procedures, or TTPs -- on the battlefield, started to use

23    landmines as improvised explosive devices, so it would take

24    an antitank mine and replace the pressure plate that would

25    normally be triggered by a vehicle driving over it and

1   replace that with a remote-controlled detonator, and then

2   often weld additional fragmentation material -- rebar or

3   bullets, cartridges, and nuts and bolts -- to the outside of

4   the mine to enhance the fragmentation effect, and then use

5   that as an IED.  That was a very early and crude use of the

6   IED.

7   Q.  And how did the use of the remote control device improve

8   it?

9   A.  Well, it makes it more targeted.  Instead of just leaving

10  a mine that anyone could drive over --

11          MR. DRATEL:  Objection, your Honor, as to

12  relevance.

13          THE COURT:  The objection is sustained.

14          BY MS. HAN:  Q.  In addition to the use of the

15  weapons that we -- you've testified about, did al-Shabaab

16  also use suicide bombings?

17  A.  Yes, and that is a variant of the improvised explosive

18  device.  They used two types of suicide bombs, the PBIED, the

19  person-borne improvised explosive device, and the

20  vehicle-borne improvised explosive device.

21  Q.  So can we take the first one, the person-borne improvised

22  explosive device, what do you mean by that?

23  A.  That would be someone strapping on typically a vest

24  loaded with explosive material and -- with a detonator, and

25  then that person would walk into the target venue.  And it

1    would be detonated one of two ways; one is for the bomber

2    himself or herself to trigger the device, and the other is

3    what's commonly referred to as a chicken switch, which means

4    that there is another operator who has the ability to trigger

5    the vest remotely in case the suicide bomber doesn't want to

6    commit suicide and gets cold feet; then through a telephone

7    call or another remote device, the vest can be detonated.

8    Q.  And what do you mean by the vehicle-borne improvised

9    explosive device?

10   A.  That would be a vehicle loaded with explosives, and the

11   driver, and sometimes the passenger as well, would take the

12   vehicle to the target.  And there have been variations on

13   this.  The vehicle could be -- also would be detonated by the

14   driver or passenger or could be remotely detonated if they

15   failed to blow it up.  And there have been variations that

16   Shabaab has used where there have been additional passengers.

17   In one case the additional passengers wore PBIED -- they were

18   people wearing vests -- who got out of the vehicle before it

19   exploded and ran to the target as well.  And in another case,

20   at least one other case, additional passengers were fighters

21   with Kalashnikovs, with assault rifles --

22              MR. DRATEL:  Time frames on this, your Honor.

23              MS. HAN:  Your Honor, that's my next area.

24              THE COURT:  I'm sorry.  Was someone speaking?

25              MR. DRATEL:  Oh, yes.  I'm sorry.  Your Honor, time

1    frames.

2              THE COURT:  Okay.  Sure.

3              MS. HAN:  Yes, your Honor.

4              BY MS. HAN:  Q.  So when did al-Shabaab introduce

5    suicide bombings to Somalia?

6    A.  2006.

7    Q.  And how was that?

8    A.  The first suicide bombing was in Baidoa in late 2006, and

9    it was a vehicle-borne IED, a bomber who tried to drive his

10   car into the vehicle of President Abdullahi Yusuf on the road

11   and detonated the bomb.  He didn't kill the president; he

12   killed the president's brother and a number of other people.

13   Q.  And in 2007 and 2008, did al-Shabaab use suicide

14   bombings?

15   A.  Yes, they did.

16   Q.  And did they use them against Ethiopian forces and other

17   forces allied with the Ethiopians?

18   A.  Yes, they did.

19   Q.  And in addition to the use of suicide bombings, did

20   al-Shabaab also engage in assassinations?

21   A.  Yes.

22   Q.  And who were those -- who were the targets of those

23   assassinations?

24   A.  Well, beyond those that I mentioned, aid workers that I

25   mentioned, in Mogadishu and in southern Somalia in 2007-8,

1    targets were typically government officials of all ranks,

2    junior and senior, and also members -- they killed members of

3    their own group who were considered to be traitors or

4    disloyal to the group.  But the members of the Transitional

5    Federal Government were the primary targets in 2007 and '8.

6    Q.  Did they also kill civilian supporters of the

7    Transitional Federal Government?

8    A.  Yes, they did.

9    Q.  And was that during the 2007 and 2008 time period?

10   A.  Yes.

11   Q.  And, in addition, did they also kill people outside of

12   mosques?

13   A.  Yes, that became a tactic routinely associated with

14   al-Shabaab.

15   Q.  And during what time period?

16   A.  Also from 2007 onwards.

17   Q.  And can you explain -- can you explain the Somali

18   reaction to that particular kind of killings?

19            MR. DRATEL:  Objection, your Honor, to Somali

20   reaction.

21            MS. HAN:  Or the reaction in Somalia generally to

22   that particular --

23            THE COURT:  If there's an objection, let me rule --

24            MS. HAN:  Yes, your Honor.  I apologize.

25            THE COURT:  I guess you're withdrawing the

 1    question.  I think there needs to be a little foundation laid

 2    here.

 3              BY MS. HAN:  Q.  Were those killings outside of

 4    mosques reported in the news inside and outside of Somalia?

 5    A.  Yes, they were.  And I misspoke.  There were -- that

 6    tactic was first being used in about 2004 and '5 by

 7    al-Shabaab.

 8    Q.  And what was -- how was it reported in the news?

 9    A.  It was reported -- as the pattern evolved and the media

10    started to report on it, it was often a topic of debate in

11    the media and online as to -- and it was used by either

12    supporters of the government but also civil society and

13    others who were -- who generally denounced the killing of

14    people either on their way to pray or leaving prayers at the

15    mosque.

16    Q.  And the -- for suicide bombings, did other entities in

17    Somalia engage in suicide bombings?

18    A.  Not that I'm aware of.

19    Q.  And did other entities engage in the killing of people

20    outside of mosques?

21    A.  In that time frame it's impossible to know.  It's

22    impossible to know if all of those killings were carried out

23    by al-Shabaab.  It was very common.  Increasingly, it's

24    become clear more recently that other groups have adopted the

25    tactic.  Back then it was attributed principally to

1  al-Shabaab.

2  Q.  And when you're talking about back then, what time period

3  are you talking about?

4  A.  2007 and '8.

5  Q.  And in addition to suicide bombings and killing people

6  outside of mosques, did al-Shabaab also engage in beheadings?

7  A.  Yes.

8  Q.  And did they use that tactic against aid workers as well

9  or people working with the United Nations?

10  A.  On at least one occasion, yes.

11  Q.  Can you -- and what time period was that?

12  A.  That would have been in 2007.

13  Q.  And what occurred then, briefly?

14          MR. DRATEL:  Objection, your Honor; 403.

15          MS. HAN:  Your Honor, it's withdrawn.

16          BY MS. HAN:  Q.  In addition to the beheadings, did

17  al-Shabaab also engage in acts of intimidation against its

18  target?

19          MR. DURKIN:  Excuse me.  I thought the testimony

20  was there was only one.  I object.

21          THE COURT:  I'm sorry?

22          MR. DURKIN:  Objection, in addition to the

23  beheadings.  I thought I heard him say there was only one.

24          THE COURT:  No, that objection -- that objection --

25  there wasn't any objection to that question.  Mr. Dratel's

1    objection would have been sustained, but before I had a

2    chance to rule, the question was withdrawn.  The affirmative

3    answer with respect to beheadings up until that point are in

4    evidence.

5              BY MS. HAN:  Q.  I believe my question was in

6    addition to the tactics that you've already testified about,

7    did al-Shabaab also engage in acts of intimidation against

8    its targets?

9    A.  Yes, it did.

10   Q.  Can you please describe those.

11   A.  Well, three main forms:  Telephone calls, SMSs, and what

12   were known as night letters, the distribution of pamphlets or

13   leaflets as warnings, all of which generally told people to

14   desist; if they were government officials, that they should

15   leave their jobs or that they shouldn't cooperate with the

16   government; in some cases the warnings could be delivered to

17   someone as simple as a woman who sold tea at a place where

18   government soldiers would routinely gather and that she

19   should no longer sell tea to government soldiers, those kinds

20   of warnings.

21   Q.  And you used a phrase, SMS messages; what do you mean by

22   that?

23   A.  Text messages over a telephone.

24   Q.  That brings us back to approximately 2007 on Government's

25   Exhibit 28.  You testified earlier that the Transitional

1    Federal Government had been set up in Mogadishu in early

2    2007, right?

3    A.  Yes, that's correct.

4    Q.  Why was it called -- why was the term "transitional"

5    assigned to the name of the government?

6    A.  Because this was not considered to be a fully legitimate

7    government.  It was operating without a permanent

8    constitution.  It was based on a transitional charter that

9    was supposed to get Somalia -- it was supposed to undertake a

10   number of tasks:  Putting in place a constitution,

11   establishing institutions, eventually possibly some kind of

12   referendum on the constitution, setting -- putting in place

13   an electoral system and ultimately conducting elections that

14   would bring in the permanent government for Somalia.

15   Q.  And were there criticisms of the Transitional Federal

16   Government?

17   A.  There were multifarious criticisms of the Transitional

18   Federal Government.

19   Q.  And were there -- those criticisms include criticism that

20   the government was corrupt as well as inefficient?

21   A.  Yes.

22   Q.  And in this time period in 2007, was the Transitional

23   Federal Government, was it still supported by the United

24   Nations and the United States?

25   A.  Yes, it was.

1  Q.  And at this time period was there ongoing fighting

2  between the Ethiopians and the Transitional Federal

3  Government and jihadists and other Islamists, including

4  al-Shabaab?

5  A.  Between Ethiopians and the Transitional Federal

6  Government on one side and various insurgent groups,

7  including the Islamists and al-Shabaab, yes.

8  Q.  Okay.  And what was the United Nations's reaction to that

9  fighting, if any?

10  A.  The UN responded in numerous ways.  First, it had a

11  political office for Somalia, which was there to try and work

12  towards a negotiated solution and tried to encourage the

13  Transitional Federal Government to talk to at least some of

14  the opposition; there was a sort of military response, which

15  was to approve an African Union peace -- peacekeeping mission

16  or peace support operation to protect the transitional

17  federal institutions and to try to assist in stabilizing the

18  country; and there was a humanitarian component, aid

19  agencies, UN agencies and their partners, helping civilians

20  affected by the conflict.  Any number of things but intended

21  to get through the transition to a more stable Somalia with a

22  permanent government.

23  Q.  And you testified about the African Union.  What is the

24  African Union?

25  A.  The African Union is a continental body for the African

1   continent that brings together all except one of the states

2   of the African continent I believe.  It's like a regional

3   United Nations.  All of the governments participate.  It has

4   a peace and security council that makes the most important

5   strategic decisions relating to peace and security, and it

6   has increasingly the ability to deploy its own peacekeeping

7   forces to places like Somalia.

8   Q.  And the UN Security Council approved deployment of

9   African Union forces into Somalia in February of 2007?

10  A.  Yes, it did.

11  Q.  Is that reflected on Government's Exhibit 28?

12  A.  Yes, it is.

13  Q.  And later in March of 2007, as indicated on Government's

14  Exhibit 28, did those forces actually arrive in Somalia?

15  A.  Yes.  I believe the lead elements were already there in

16  February.

17  Q.  And what countries contributed forces to that group?

18  A.  Initially Uganda, just Uganda.  Burundi then joined

19  shortly after, and there were a number of countries who

20  contributed individual officers to the headquarters component

21  of the force.

22  Q.  And are you familiar with a group called the Alliance for

23  the Reliberation of Somalia?

24  A.  Yes, I am.

25  Q.  And what is that?

1    A.  The Alliance for the Reliberation of Somalia was an

2    organization formed during the summer of 2007.  It was formed

3    in Eritrea, the capital of Eritrea, Asmara, I think

4    officially declared in September, and it brought together a

5    number of groups opposed to the Transitional Federal

6    Government; it brought together the Islamic courts, the --

7    those members of the Transitional Federal Parliament who

8    disagreed with the government's actions also joined, there

9    were some individual politicians and eminent Somali figures

10   who took part, some members of civil society from Mogadishu

11   joined and elsewhere.  So it was a -- the two main parts were

12   the Islamic courts and part of the Transitional Federal

13   Parliament and then bits and pieces of other opposition

14   figures, opposition groups.

15   Q.  And was it Hassan Dahir Aweys that you testified this

16   afternoon who was connected to the Islamic Courts Union, was

17   he a member of the Alliance for the Reliberation of Somalia?

18   A.  Yes, he was.

19   Q.  And is the Alliance for the Reliberation of Somalia

20   sometimes referred to as the ARS?

21   A.  Yes.

22   Q.  And did the ARS engage in its own fighting against

23   Ethiopian and AMISOM forces?

24   A.  Yes, it did.

25   Q.  And did they fight alongside al-Shabaab?

1   A.   Yes.

2   Q.   And how, if at all, did their tactics differ?

3   A.   They limited themselves to conventional tactics, guerilla

4   tactics, but they didn't employ techniques, suicide bombing

5   for example, or the using of IEDs.

6   Q.   And were they otherwise opposed to al-Shabaab in ways

7   other than -- or were they otherwise separate from al-Shabaab

8   in ways other than their tactics?

9   A.   Well, in -- during the course of 2007 and then in 2008,

10  they politically grew apart.  Al-Shabaab objected to the

11  formation of the ARS on a number of grounds, partly because

12  the ARS kept the word "jihad" out of its charter; there was

13  quite a debate among the membership of the ARS as to whether

14  they should use the term "jihad."  Also because there were

15  secular, non-Islamic members of the ARS.

16  Q.   Can I stop you there?  What do you mean by the word

17  "jihad"?

18  A.   In this context, armed struggle against foreign occupying

19  power and the non-Muslim power in this case.

20  Q.   Okay.  I'm sorry.  Continue.

21  A.   So the -- from the outset al-Shabaab -- there was tension

22  between the ARS and al-Shabaab.  And then the ARS itself

23  fragmented partly over the issue of whether or not to have

24  dialog with the Transitional Federal Government, and the --

25  and al-Shabaab further distanced itself particularly from

1   that wing that entered into dialog with the government.

2   Q.  And other than Hassan Dahir Aweys, was -- were there any

3   other main leaders that ARS was identified with?

4   A.  The leaders at the time when it was formed were Sheik

5   Sharif Sheik Ahmed, the former chairman of the Islamic

6   courts, and Sharif Hassan, who had been the speaker of the

7   Transitional Federal Parliament.

8   Q.  And other than ARS and al-Shabaab, were there other

9   groups that were fighting to overthrow the Transitional

10  Federal Government?

11  A.  Yes, there were.

12  Q.  And was Jabiso one of those groups?

13  A.  Yes.

14  Q.  And what is Jabiso?  And it's J-a-b-i-s-o.

15  A.  That's right, Jabiso.  Jabiso was the Somali Islamic

16  Front, Jabhatul Islamiya, so it became known as Jabiso.  And

17  it was a small force, mainly veterans of al-Itihaad al-Islam.

18  It was often described as the armed wing of -- of an Islamist

19  group in Somalia called I'tisaam, and -- I'tisaam is

20  i'tisaam, I'tisaam Bil Kitaab Wa Sunna -- and the Itihaad is

21  one of the offshoots of -- I'tisaam is one of the offshoots

22  of al-Itihaad -- and was a nonviolent -- is a nonviolent

23  group but briefly had this armed wing, Jabiso, headed by a

24  former military officer, called Abdulkadir Commandos.

25  Q.  And was Jabiso fighting to overthrow the Transitional

1    Federal Government in 2008?

2    A.   Yes, it was.

3    Q.   Was it an entity prior to that?

4    A.   It was formed during the course of 2007.

5    Q.   And did it fight alongside al-Shabaab as well?

6    A.   Yes, it did.

7    Q.   And at the time that al-Shabaab and Jabiso and ARS were

8    fighting to overthrow the Transitional Federal Government,

9    the Ethiopians were supporting the Transitional Federal

10   Government, right?

11   A.   That's right.

12   Q.   Okay.  And as part of their -- as a part of their support

13   and their military that were on the ground, did they also

14   have aerial support?

15   A.   Yes, they did at times, one specific period.

16   Q.   And when was that?

17   A.   That was in early 2007.

18   Q.   And were there any other countries who -- that also had

19   aircraft support during that time period, aerial support?

20   A.   Not combat aircraft, no.  There were -- there was an air

21   bridge capability bringing in logistics to Mogadishu, but

22   combat aircraft were with the Ethiopians only.

23   Q.   If we could move to the next slide on Government's

24   Exhibit 28.  We're almost done here.  You testified about the

25   designation of al-Shabaab as a foreign terrorist

1    organization.  Is that reflected on Government's Exhibit 28?

2    A.  Yes, it is.

3    Q.  Okay.  And turning to May 1st of 2008, what occurred on

4    May 1st, 2008?

5    A.  Aden Hashi Ayrow, together with others, was killed in a

6    missile strike in Dhusa Mareeb in central Somalia.

7    Q.  I'm sorry?

8    A.  Dhusa Mareeb in central Somalia.

9    Q.  And how is Dhusa Mareeb spelled?

10   A.  D-h-u-u-s-a-m-a-r-e-e-b.

11   Q.  And is that in the Galgaduud region in Somalia?

12   A.  Yes, it is.

13   Q.  And was that a U.S. missile strike?

14   A.  Yes, it was.

15   Q.  And what was the reaction in Somalia and outside of

16   Somalia -- can you talk about that? -- to Aden Ayrow's death?

17           MR. DRATEL:  Objection, your Honor, as to just one

18   reaction among --

19           THE COURT:  Yeah.  If you could break that down.

20           BY MS. HAN:  Q.  In the news -- in the news was it

21   reported -- were there reports about public reaction to the

22   death of Aden Ayrow?

23   A.  There were many reports; it was very widely reported.

24   There were official reactions --

25           MR. DRATEL:  Vague in terms of reaction again.

1    News reports about reaction.

2         THE COURT:  I think the witness is going to

3    elaborate.  The objection is overruled.  Would you start with

4    your answer anew, please.

5         THE WITNESS:  There were official reactions that

6    were carried in the media from some of the insurgent groups.

7    The ARS reacted denouncing the strike.  Some Islamic court

8    spokesmen not affiliated with the ARS also denounced the

9    strike publicly.  Al-Shabaab issued an official communique

10   denouncing the strike and acknowledging Aden Ayrow's death.

11   And there was -- there was a great deal of commentary in

12   international media, the British Broadcast Corporation

13   reported on it, al-Jazeera reported on it.  Mainly, on the

14   international side, there was first speculation about the

15   origin of the strike because the U.S. government didn't

16   acknowledge it immediately and also what it would mean for

17   the future of al-Shabaab since such a senior figure had been

18   killed; in fact, two senior figures were killed in this

19   strike.

20        BY MS. HAN:  Q.  And was it also widely reported on

21   the Internet?

22   A.  Yes.  All of these reports -- almost all of them were

23   covered on the Internet.

24   Q.  And was it reported by Somali media in Somalia, inside

25   Somalia?

1    A.   Yes.   And particularly because ARS -- well, ARS broadcast

2    its comments from Asmara.   The Islamic courts and al-Shabaab

3    made their statements inside Somalia.

4    Q.   And was it also reported on Somali websites outside

5    Somalia?

6    A.   Almost everywhere.   This was blanket coverage.   It was

7    such a major event.

8    Q.   And you testified earlier today about the connection that

9    the Somali diaspora has to Somalia, and I believe -- how is

10   it that the Somali diaspora maintains knowledge of what

11   happens in Somalia?

12   A.   Many ways.   I mean the -- there is -- to break it down to

13   three main ways:   One is the telephone, a great deal of

14   telephone communication between people inside and outside the

15   country; the Internet, reading Internet news and then talking

16   about it, meeting and talking about it; radio, particularly

17   the British Broadcasting Corporation and now the Voice of

18   America, Somali Service both are the most widely listened to

19   foreign media services.   And then I would add to that travel;

20   there is a great deal of travel back and forth between

21   members of the diaspora and Somalia, always has been, so

22   there's often firsthand -- people who come back from Somalia

23   will report firsthand the news they've heard or seen.

24          MS. HAN:   All right.   I have no further questions.

25   Thank you.

 1              THE COURT:  Cross-examination?  Would you like to
 2  start at this point or -- it's been a long day.
 3              MR. DRATEL:  I think I'd prefer to start in the
 4  morning.
 5              THE COURT:  That's all right.  We're close enough.
 6  Ladies and gentlemen, we'll break now and resume tomorrow
 7  morning at 9 a.m.  Please remember the admonition not to
 8  discuss the case or make any decisions at this time.  Have a
 9  good evening.  9 a.m. tomorrow morning.  We'll ask you to
10  come into the courtroom when we're ready.  Thank you.
11         (The jury left the courtroom.)
12              THE COURT:  Thank you, counsel.
13         (There was a break in the proceedings for the evening
14  recess.)
15
16
17
18
19
20
21
22
23
24
25

1

I n d e x

Page

2

| | |
|---|---|
| Opening Statement by Ms. Han | 374 - 387 |
| Opening Statement by Mr. Dratel | 388 - 398 |
| Opening Statement by Ms. Moreno | 398 - 404 |
| Opening Statement by Mr. Ghappour | 407 - 414 |
| Opening Statement by Mr. Durkin | 414 - 420 |

Witnesses                                         Page

**Matthew Bryden**

| | |
|---|---|
| Direct Examination by Ms. Han | 421 |
| Voir Dire Examination by Mr. Dratel | 479 |
| Direct Examination, cont'd by Ms. Han | 480 |

3

4

5

6

7

8

E x h i b i t s

9

| Exhibits | Description | For ID | In Evd |
|---|---|---|---|
| 2 | Map (Somalia) | 435 | 436 |
| 3 | Map (Galgaduud) | 436 | 436 |
| 4 | Map (Mogadishu) | 436 | 436 |
| 5 | Map (Africa) | 436 | 436 |
| 20 | Photograph | 447 | 447 |
| 28 | Time line | 448 | 448 |
| 2-A | Enlargement (Ex. 2) | 450 | |
| 22 | Photograph | 465 | 466 |
| 23 | Photograph | 465 | 466 |
| 24 | Photograph | 465 | 466 |
| 13 | Photograph | 479 | 480 |
| 27 | Photograph | 479 | 480 |
| 21 | Photograph | 491 | 491 |
| 18 | Photograph | 516 | 516 |
| 25-A | Photograph | 522 | |
| 25-C | Photograph | 522 | |
| 25-B | Photograph | 523 | 523 |
| 26 | Photograph | 529 | 529 |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Certificate of Reporter

2

3     I hereby certify that I am a duly appointed, qualified, and

4     acting Official Court Reporter for the United States District

5     Court; that the foregoing is a true and correct transcript of

6     the proceedings had in the mentioned cause on the date or

7     dates listed on the title page of the transcript; and that

8     the format used herein complies with the rules and

9     requirements of the United States Judicial Conference.

10

11    Dated January 10, 2014 at San Diego, California.

12
                       *Debra M. Henson*
13                              /s/ Debra M. Henson  (electronic)
                                Debra M. Henson
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25