1                    United States District Court

2                 Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                    Plaintiff,       )
                                      )
6       vs.                           ) Case No. 10-CR-4246 JM
                                      ) Jury Trial/Day 5
7    BASAALY SAEED MOALIN,            ) Monday, February 4, 2013
     MOHAMAD MOHAMAD MOHAMUD          )
8    ISSA DOREH,                      ) Volume 5
     AHMED NASIR TAALIL MOHAMUD,      )
9                                     )
                     Defendants.      )
10   _____)

11

12                 Before the Honorable Jeffrey T. Miller
                     United States District Judge

13

14

15

16

17

18

19

20   Official Interpreters:   Ayderus Ali, CCI
                              Fanik Jama, CCI
21

22   Official Court Reporter: Debra M. Henson, CSR, RPR
                              U.S. Courthouse
                              221 W. Broadway, Suite 5190
23                            San Diego, CA  92101
                              (619) 238-4538
24

25               Record produced by stenographic reporter

```
1   Appearances

2   For the Government:         Laura E. Duffy
                                UNITED STATES ATTORNEY
3                               William P. Cole
                                Caroline P. Han
4                               ASSISTANT U.S. ATTORNEYS
                                Steven P. Ward, Trial Attorney
5                               U.S. DEPARTMENT OF JUSTICE
                                880 Front Street, Suite 6293
6                               San Diego, CA  92101

7   For the Defendants:
    (Mr. Moalin)                Joshua L. Dratel, Esq.
8                               Alice Fontier, Esq.
                                OFFICE OF JOSHUA L. DRATEL
9                               2 Wall Street, Third Floor
                                New York, NY  10005
10
    (Mr. M. Mohamud)            Linda Moreno, Esq.
11                              LINDA MORENO, P.A.
                                P.O. Box 10985
12                              Tampa, FL  33679

13  (Mr. Doreh)                 Ahmed Ghappour, Esq.
                                LAW OFFICES OF AHMED GHAPPOUR
14                              P.O. Box 20367
                                Seattle, WA  98102
15
    (Mr. A. Mohamud)            Thomas A. Durkin, Esq.
16                              Janis Roberts, Esq.
                                DURKIN & ROBERTS
17                              2446 N. Clark Street
                                Chicago, IL  60614
18

19

20

21

22

23

24

25
```

 1          San Diego, California - Monday, February 4, 2013

 2          (Defendant A. Mohamud is being assisted by a Somali

 3  interpreter.)

 4              THE COURT:  Good morning, everyone.  I hope you all

 5  had a good weekend.  From time to time I may sound like I'm

 6  croaking a little bit; I apologize for that.  Bear with me.

 7  I'll try to speak up.  And let the record reflect that all

 8  jurors are present, the parties and counsel are present as

 9  well.  And we are ready to resume with the direct examination

10  of the witness we had on the stand on Friday.  Ms. Homfeld,

11  are you ready to proceed?

12              THE WITNESS:  Yes, I am.

13              THE COURT:  All right.  Very good.

14          MR. WARD:  Thank you.

15                      Victoria Homfeld

16  was previously called by the government, sworn, and continued

17  to testify as follows:

18                  Direct Examination, cont'd

19          BY MR. WARD:  Q.  Good morning, Ms. Homfeld.

20  A.  Good morning.

21  Q.  When we left off on Friday, we were talking about your

22  assistance in a search warrant that was executed at Shidaal

23  Express, and you were talking about Government's Exhibit 46,

24  which is in evidence, which is the screen shot which is the

25  screen shot of the page of the Amal Commercial Brokerage

1    Service server website.  And I believe you had indicated that

2    there's an option in the top center for exporting an Excel

3    spreadsheet; is that correct?

4    A.  That's correct.

5    Q.  Okay.  And can you indicate for the jury where that is in

6    your picture in Government's 46.

7    A.  It's right there.

8    Q.  Okay.  And did you use that option when you did what

9    you've described as a live capture?

10   A.  Yes, I did.

11   Q.  And can you describe what you did next in order to

12   download an Excel spreadsheet of the remittance list for the

13   dates July 1st 2007 through April 9, 2009.

14   A.  After I pressed the Excel spreadsheet, it gives you the

15   option to save the file, and I saved it on my staging media.

16   Q.  And when you say staging media, is that anything more

17   than like a hard drive that's attached to the computer?

18   A.  That's correct.

19   Q.  Okay.  And after you saved it to the staging media, what

20   did you do with the file that you had exported from the

21   computer?

22   A.  I also saved it as a CSV file.

23   Q.  Okay.  And what's the relationship between the CSV file

24   and an Excel spreadsheet?

25   A.  They're basically the same.  You can bring both files

1    into Microsoft Excel.  A CSV file is basically exporting

2    information from a database file, and it shows the different

3    fields.  It's in plain text.

4    Q.  Okay.  Now, after you had exported both the Excel

5    spreadsheet and the CSV file, what did you do?

6    A.  After I did command from the command window, I brought

7    one up on the subject machine and ran a network statistics to

8    it to give me IP addresses and open ports.

9    Q.  Okay.  Focusing specifically on what you did to protect

10   this file against alteration, can you explain to the jury

11   what you did after it was on the attached hard drive.

12   A.  Certainly.  Once I saved both files, the CSV file and

13   Excel spreadsheet, I created an image using software that I

14   had attached to the thumb drive, which was attached to the

15   subject machine, ran my imaging software and did a custom

16   content of the two files and the other file which had the

17   network statistics on it.

18           Once I do an image of that, it creates a hash

19   value, which is like a digital fingerprint; it's a

20   mathematical logarithm.  And that verifies that nothing has

21   been changed on those two or three files that I made the

22   image on.

23   Q.  Okay.  So the hash value is kind of a security code; is

24   that correct?

25   A.  Correct.

1   Q.  All right.  And did you then leave the Shidaal Express

2   premises?

3   A.  Yes, I did.

4   Q.  And what did you do with the files that had been stored

5   on the attached hard drive after you left the -- after you

6   left the Shidaal premises?

7   A.  I proceeded back to the RCFL lab and put the staging

8   media into my personal safe, locked it up, and then left for

9   the day.  When I came back the next day is when I created the

10  report and made the archive CD, which we keep in our evidence

11  facility, and made a results CD also.

12  Q.  And when you say results CD, handing you what's been

13  marked for identification as Government's Exhibit 52, I'd ask

14  you if you recognize Government's 52 as the results CD.

15  A.  Yes, I do.  It has my name and initials on it.

16      (Exhibit No. 52 identified.)

17  Q.  Okay.  And is that the disk that contains the file of the

18  records from the Amal Commercial Brokerage server --

19  A.  Yes, it is.

20  Q.  -- account for Shidaal Express?

21  A.  Yes, that's correct.

22  Q.  And once you created this results disk, did you check it

23  to see if it had the same hash value as the files that were

24  exported to the hard drive on site at Shidaal Express?

25  A.  Yes, I did, and they did match.

1    Q.  And you said you affixed your initials to the -- to the

2    disk.  What did you do with the disk after you had finished

3    processing it and affixing your initials to it?

4    A.  I checked it in to the evidence facility that we have,

5    and we hold it there until the case agent comes and picks up

6    any original evidence he had submitted or any results that

7    were produced.

8    Q.  Okay.  Did you subsequently provide -- did you

9    subsequently provide Government's 52 to the FBI agent?

10   A.  Yes, we did.

11   Q.  Did you have any further role with -- outside of

12   preparing for your testimony today -- with the data that you

13   had collected from Shidaal Express that day?

14   A.  Not that day, no.

15           MR. WARD:  And I'd offer Government's 52, your

16   Honor.

17           THE COURT:  Government's 52 is admitted.

18      (Exhibit No. 52 admitted.)

19           BY MR. WARD:  Q.  Just a couple of other questions

20   Ms. Homfeld.  I think you indicated that there's a case

21   number on the disk itself; is that true?

22   A.  That's correct.  I have the --

23   Q.  And --

24   A.  I'm sorry.  I have the RCFL case number and the agency

25   case number.

1    Q.   Okay.  And is that case number -- could you read it to

2    me, please.

3    A.   The RCFL case number --

4    Q.   Yes.

5    A.   -- is 09-0114-A-01.

6    Q.   And is that number also the number that you used to

7    identify the exile spread -- excuse me -- Excel spreadsheet

8    that's contained on Government's 52?

9    A.   Yes, I did use that.

10   Q.   And outside of court, preparing for your testimony today,

11   did you sit down at a computer and take a look at

12   Government's 52?

13   A.   Yes, I did.

14   Q.   And did you determine whether or not the records run from

15   that date range of July 1st of 2007 to April 9, 2009?

16   A.   Yes, I did.

17              MR. WARD:  No further questions, your Honor.

18              THE COURT:  Cross-examination?  Mr. Ghappour?

19                     Cross-Examination

20              BY MR. GHAPPOUR:  Q.  Ms. Homfeld --

21   A.   Good morning.

22   Q.   -- good morning.  Let me take you back to April 8 of

23   2009.  That morning were you briefed?

24   A.   Yes, I was.  When we arrived at the Safari Market, we

25   were met by the case agent, Mr. Kaiser, and he proceeded to

1    explain the search authority that he had and what he wanted

2    accomplished.

3    Q.  And so in the context of that briefing, you understood

4    the system, Shidaal system was used to transmit money,

5    correct?

6    A.  Correct.

7    Q.  And that system is web-based you testified, correct?

8    A.  That's correct.

9    Q.  And it's basically a database, right?

10   A.  Pretty much so, yes.

11   Q.  Web-based?

12   A.  Web-based.

13   Q.  And the user logs in?

14   A.  Correct.

15   Q.  And they can perform a variety of functions, correct?

16   A.  Correct.

17   Q.  They can transmit money?

18   A.  I believe so.  I did not see that happen, but yes.

19   Q.  And they can print reports, correct?

20   A.  Correct.

21   Q.  And you were directed to obtain a report from that

22   system?

23   A.  Correct.

24   Q.  But you couldn't log in on your own, correct?

25   A.  That's correct.

1    Q.   Someone had to log you in?

2    A.   Yes.

3    Q.   Because you didn't have a user name?

4    A.   That's correct.

5    Q.   Or a password?

6    A.   That's correct.

7    Q.   And when you were logged in, you didn't capture the user

8    name or the password?

9    A.   No, I did not.

10             MR. GHAPPOUR:  Your Honor, I'd like to show the

11   witness what's been marked as Defendant's Exhibit U.

12             BY MR. GHAPPOUR:  Q.  Ms. Homfeld, is that the

13   person that logged you in?

14   A.   I believe so, yes.

15   Q.   But it wasn't Mr. Doreh, was it?  Mr. Doreh, would you

16   stand up for a second.

17   A.   Not that I recall.

18   Q.   It was the gentleman in the picture?

19             MR. GHAPPOUR:  Your Honor, I'd like to move this

20   into evidence as Defendant's Exhibit U.

21             MR. WARD:  No objection, your Honor.

22             THE COURT:  Exhibit U is admitted.

23        (Exhibit No. U identified and admitted.)

24             BY MR. GHAPPOUR:  Q.  And let's talk about the

25   remittance list.  The remittance list you created is

1    basically a list of transactions, correct?

2    A.  Correct.

3    Q.  And you created it from the page that's been marked as

4    exhibit -- Government's Exhibit 46, which I'll show it to you

5    just now.  You know what?  Scratch that.  So the remittance

6    list is basically a list of transactions, correct?

7    A.  Correct.

8    Q.  And you have the option to restrict that list?

9    A.  There was a date range, yes.

10   Q.  You can use a date range, and you can restrict it by

11   sender's city as well, correct?

12   A.  I only did it by the date range.

13   Q.  And there's an option to restrict it by user ID, correct?

14   A.  I didn't see that.

15   Q.  So where I'm pointing with my finger over here denotes

16   the ability to restrict by user ID, correct?

17   A.  Is that what it says, user ID, up there?

18   Q.  I believe so.  Do you recognize it as saying user ID?

19   A.  Yes, I do.

20   Q.  And you testified that you were directed to create a

21   report between July of 2007 and April of 2009, correct?

22   A.  Correct.

23   Q.  But your list didn't capture everything for each

24   transaction?

25   A.  I only did it through the date range because that's what

1    I was -- the request was for.

2    Q.  And based on that list, you couldn't tell whether the

3    data was accurate, could you?

4    A.  When I did the report, it gives you records between those

5    date ranges, and that's what I pulled out was the records.

6    Q.  And those records presumably reflect the transactions,

7    correct?

8    A.  Correct.

9    Q.  But you couldn't tell whether or not they reflected an

10   actual transaction accurately, could you?

11   A.  All I did was create the report from the program that's

12   there on the web server, and it produces a report.

13   Q.  And so there was no way to find out whether the

14   transaction was actually transmit?

15   A.  Depending on what the fields are there by the different

16   titles from the report, I'm just pulling out from the date

17   range.

18   Q.  And so you couldn't tell whether somebody actually

19   received the transaction?

20   A.  No, I don't think so.

21   Q.  Whether someone actual picked it up and who picked it up?

22   A.  No.

23   Q.  And you can't tell or you couldn't tell whether the data

24   was entered contemporaneously?

25   A.  No.

1   Q.  And you couldn't tell who entered the transaction?

2   A.  That's correct.

3   Q.  Only that they needed access to the system.  And the only

4   person you were sure had access to the system was the

5   individual that logged you in, correct?

6   A.  Correct.

7   Q.  And that wasn't Mr. Doreh, was it --

8   A.  Is that --

9   Q.  -- the gentleman that stood up earlier?

10  A.  No.

11  Q.  And you identified that gentleman as -- how would you

12  describe him?

13  A.  The two case agents, Mr. Lovely and Mr. Kaiser, had him

14  come over with -- once he logged into the web address, and

15  then used his user name and password.

16  Q.  Was he under arrest at the time?

17  A.  Not that I was aware of.

18  Q.  He was a suspect though, correct?

19  A.  Correct.

20          MR. WARD:  Objection, relevance.

21          THE COURT:  The objection is sustained.  The jury

22  is admonished to disregard the answer that came in, which was

23  an affirmative answer as to whether he was a suspect.

24  Disregard that at this time, please.  Thank you.

25          BY MR. GHAPPOUR:  Q.  And the Excel spreadsheet

1    that you created is sortable, correct?

2    A.   Correct.

3    Q.   You can sort it by field?

4    A.   Correct.

5    Q.   You could sort it by the sender name?

6    A.   If that was one of the fields that were listed, yes, you

7    would be able to.

8    Q.   I am now showing you what's been marked as Defendant's

9    Exhibit V for identification, and this has been stipulated to

10   as a version of the Excel spreadsheet that you created sorted

11   by sender name; is that correct?

12             MR. GHAPPOUR:  Your Honor, I'd like to now admit

13   this into evidence if possible.

14             THE COURT:  Is there a stipulation?

15             MR. COLE:  Yes.

16             THE COURT:  Okay.  That's fine.  Exhibit V as in

17   Victor is admitted.

18        (Exhibit No. V identified and admitted.)

19             BY MR. GHAPPOUR:  Q.  And so column D reflects the

20   sender of transactions, correct?

21   A.   I don't see a title up there saying sender.

22   Q.   Do entries appear to be names?

23   A.   Yes, they do.

24   Q.   And the entries in column E appear to be phone numbers,

25   correct?

1    A.  Appears to be, yes.

2    Q.  And can you read the name at -- seven rows down.

3    A.  No, I cannot read that right now.

4    Q.  So you've got a screen just next to you, by the way, I've

5    just been informed.

6    A.  Thank you.

7    Q.  Can you read the third name down?

8    A.  My pronunciation will be not very well.  Abdirizak

9    Abdullah Hussein.

10   Q.  And could you read out the number, please.

11   A.  I'm sorry, what?

12   Q.  Could you read out the number.

13   A.  The phone number?

14   Q.  Yes.

15   A.  Looks like (619) 674-4048.

16   Q.  And would you mind telling me the difference between --

17   would you agree that the name on the row just above that is

18   the same?

19   A.  Are you talking about the second one from the top?

20   Q.  Yes.

21   A.  That's a different name it looks like, would be Hasan

22   instead of Hussein.

23   Q.  And would you agree the number is the same?

24   A.  Yes, it is.

25   Q.  So it's a different name but the same number, correct?

1    A.   Correct.

2             MR. GHAPPOUR:  Nothing further, your Honor.

3             THE COURT:  Anything further from the defense?

4             MS. FONTIER:  No, your Honor.

5             THE COURT:  Any redirect?

6             MR. WARD:  Nothing, your Honor.  May the witness be

7    excused?

8             THE COURT:  All right.  You are excused, Ms.

9    Homfeld.

10            THE WITNESS:  Thank you.

11            THE COURT:  The government may call its next

12   witness.

13            MR. COLE:  Your Honor, the United States calls

14   Colleen Reding.

15            THE CLERK:  Can you please raise your right hand.

16   Do you solemnly swear that the evidence you shall give in the

17   cause now before the Court shall be the truth, the whole

18   truth, and nothing but the truth?

19            THE WITNESS:  I do.

20                        Colleen Reding

21   was called by the government and testified as follows:

22            THE CLERK:  Can you please state and spell your

23   first and last name for the record.

24            THE WITNESS:  Colleen Reding, C-o-l-l-e-e-n,

25   Reding, R-e-d-i-n-g.

1                    Direct Examination

2            BY MR. COLE:  Q.  Good morning, Ms. Reding.  What

3    do you do for a living?

4    A.  I work for the Federal Bureau of Investigation as a staff

5    operations specialist.

6    Q.  And how long have you worked for the FBI?

7    A.  Two and a half years.

8    Q.  And before that what were you doing?

9    A.  I was graduating from college at Georgetown University.

10   Q.  And what is a staff operations specialist?

11   A.  It's a tactical analyst providing investigative support.

12   Q.  And I'm going to show you what have been marked and

13   admitted as Government's Exhibit 52 and 53 and have you take

14   a look at those.  Starting with Government's Exhibit 52, do

15   you recognize that?

16   A.  Yes, I do.

17   Q.  And how do you recognize that?

18   A.  I have it initialed right here.

19   Q.  And was that a disk that you examined in connection with

20   this case?

21   A.  Yes.

22   Q.  And how about Government's Exhibit 53; do you recognize

23   that?

24   A.  Yes, I do.

25   Q.  Is that the purple disk?

1    A.   Yes.

2    Q.   How do you recognize it?

3    A.   I initialed this as well.

4    Q.   And was that a disk you also examined in connection with

5    this case?

6    A.   Yes.

7    Q.   Now, do you recall as you sit here today taking the

8    purple disk, Exhibit 53, do you recall whether that contained

9    a spreadsheet of Shidaal Express transactions?

10   A.   Yes, it did.

11   Q.   And do you recall approximately the time frame covered by

12   those spreadsheets?

13   A.   Sure.  This disk went from March 2008 to November of

14   2009.

15   Q.   And with respect to Government's Exhibit 52, did that

16   also contain an Excel spreadsheet of Shidaal transactions?

17   A.   Yes, it did.

18   Q.   And do you recall approximately the date range covered by

19   that spreadsheet?

20   A.   This went from July of 2007 until April of 2009.

21   Q.   Would it be fair to say then that both disks overlapped

22   for some period, but both disks also had a period not covered

23   by the others?

24   A.   That's correct.

25   Q.   And I'd like to show you what's been marked as

1    Government's Exhibit 39; do you recognize that?

2    A.   Yes, I do.

3    Q.   And does that chart contain a summary of certain

4    information that you found on -- upon your review of

5    Government's Exhibits 52 and 53?

6    A.   Yes.

7         (Exhibit No. 39 identified.)

8    Q.   And did you assure in helping to prepare that chart that

9    any information on that chart in fact appeared on the --

10   either Government's Exhibits 53 or 52?

11   A.   Yes.

12   Q.   Now, let me -- I'm sorry, Ms. Reding.  You're going to

13   have to see it.  The first four transaction lines, those are

14   for dates in January and February of 2008?

15   A.   Right.

16   Q.   And so those transaction lines, did those appear only on

17   Exhibit 52?

18   A.   Exactly, only on Exhibit 52.

19   Q.   And the remaining lines on that chart, did those appear

20   on both exhibit -- excuse me.  Did transaction information

21   pertaining to the transactions on the remaining lines appear

22   in both 53 and 52.

23   A.   Yes, on both 52 and 53.

24   Q.   Now, let me ask you, did Exhibit 52 contain more

25   information, more cells, more columns of information about

1    each transaction than Exhibit 53?

2    A.  Yes, it did.

3    Q.  But to the extent you were able to cross-check any

4    transaction referenced on both exhibits -- let's take, for

5    example -- well, excuse me.

6          MR. COLE:  Your Honor, at this time we'd like to

7    move Exhibit 39 into evidence as a 1006.

8          THE COURT:  All right.  Exhibit 39 is admitted.

9          BY MR. COLE:  Q.  Ms. Reding, I believe you

10   testified that Government's Exhibit 53 -- what we'll call the

11   white disk -- that spreadsheet was more comprehensive in the

12   number of columns of information as to each transaction?

13   A.  Fifty-two is the white disk --

14   Q.  Oh, I'm sorry.

15   A.  -- and that's more comprehensive, yes.

16   Q.  Okay.  And so looking at Government's Exhibit 39, we were

17   talking about the first four rows, which are for transactions

18   in January and February of 2008; is that right?

19   A.  Correct.

20   Q.  And those appear only on the disk marked Government's

21   Exhibit 52?

22   A.  Correct.

23   Q.  And I believe you testified that the purple disk, 53,

24   picks up -- it begins in March of '08?

25   A.  Exactly.

1   Q.  So looking at the columns below --

2               MR. COLE:  If we could, Ms. Alejandre, zoom in on

3   the bottom half from April 2003 (sic) to the bottom, yes.

4               BY MR. COLE:  Q.  Information regarding those

5   transactions appears on both disks?

6   A.  Correct.

7   Q.  Now, let me ask you, to the extent that Government's

8   Exhibit 53, the purple disk -- to the extent that that disk

9   contains information about those transactions, did you check

10  to make sure that that information matched the same

11  information on Government's Exhibit 52?

12  A.  Yes, I did.

13  Q.  And did it always match?

14  A.  It did match.

15  Q.  And did you go through each of these columns carefully to

16  check that?

17  A.  Yes, multiple times.

18               MR. COLE:  Nothing further, your Honor.

19               THE COURT:  Cross-examination?  Mr. Ghappour, do

20  you have any further cross-examination?

21               MS. FONTIER:  May we have just one moment, your

22  Honor?

23               THE COURT:  Sure.

24               MS. FONTIER:  Your Honor, we have nothing.

25               THE COURT:  May this witness be excused?

```
 1              MR. COLE:  Yes, your Honor.  Thank you.

 2              THE COURT:  Thank you, Ms. Reding.  You are

 3     excused.

 4              MR. WARD:  Your Honor, before calling the

 5     government's next witness, I have a testimonial stipulation

 6     I'd like to read at this point.

 7              THE COURT:  This is a stipulation as to testimony

 8     or fact?

 9              MR. WARD:  It's a stipulation as to testimony, your

10     Honor.

11              THE COURT:  All right.  Okay.  Ladies and gentlemen

12     of the jury, counsel is about to read a stipulated

13     testimony -- not stipulating to the accuracy of the testimony

14     but just that if a certain person -- this revolves around a

15     certain person, witness, if called; is that correct, Mr.

16     Ward?

17              MR. WARD:  That's correct, your Honor.

18              THE COURT:  That if a certain person were called to

19     testify in the case, the testimony would be as follows.  You

20     are to treat that testimony as if it had been given here in

21     court.  Would you like to read it slowly.

22              MR. WARD:  Yes, your Honor.

23              THE COURT:  Okay.

24              MR. WARD:  If Catherine Klein -- that's

25     C-a-t-h-e-r-i-n-e  K-l-e-i-n -- were called as a witness, she
```

1  would testify, A, that she's employed by the FBI, San Diego
2  field office, as an electronic surveillance operations
3  technician and held that position during 2000 to 2008; B,
4  that her job responsibilities are to receive, store, and
5  secure electronic evidence, including recordings of audio
6  calls; C, that she removed from the Red Wolf system at the
7  San Diego field office of the FBI magnetic optical disks for
8  telephone number (619) 278-1189 for calls between
9  December 20, 2007 and May 31, 2008 and September 30, 2008 to
10 October 17, 2008; D, that when she removed each magnetic
11 optical disk, she placed it in an evidence envelope, sealed
12 it with evidence tape to make take it tamperproof, and stored
13 it in the electronic evidence room at the San Diego field
14 office of the FBI with other magnetic optical disks for
15 telephone number (619) 278-1189.
16      If Christine Monzon -- C-h-r-i-s-t-i-n-e
17 M-o-n-z-o-n -- were called as a witness, she would testify,
18 A, that she's employed by the FBI, San Diego field office, as
19 an electronics surveillance operations technician and held
20 that position during 2007 to 2008; B, that her job
21 responsibilities are to receive, store, and secure all forms
22 of electronic evidence, including recordings of audio calls;
23 C, that she removed from the Red Wolf system at the San Diego
24 field office of the FBI a magnetic optical disk for telephone
25 number (619) 278-1189 for calls dated between November 20,

1    2008 and November 23, 2008 and that when she removed that

2    magnetic optical disk, she placed it in an evidence envelope,

3    sealed it with evidence tape to make it tamperproof, and

4    stored it in the electronic evidence room at the San Diego

5    field office of the FBI with other magnetic optical disks for

6    telephone number (619) 278-1189.

7              If Christine Martinez -- C-h-r-i-s-t-i-n-e

8    M-a-r-t-i-n-e-z -- were called as a witness, she would

9    testify, A, that she is employed by the FBI, San Diego field

10   office, as an electronics surveillance operations technician

11   and held that position during 2007 to 2008; that her job

12   responsibilities were to receive, store, and secure

13   electronic evidence, including recordings of audio calls; C,

14   that she removed from the Red Wolf system at the San Diego

15   field office of the FBI a magnetic optical disk for telephone

16   number (619) 278-1189 for calls dated between October 17,

17   2008 and November 20, 2008; that when she removed that

18   magnetic optical disk, she placed it in an evidence envelope,

19   sealed in with evidence tape to make it tamperproof, and

20   stored it in the electronic evidence room at the San Diego

21   office of the FBI with other magnetic optical disks for

22   telephone number (619) 278-1189.

23             If Tammy Reis -- T-a-m-m-y  R-e-i-s -- were called

24   as a witness, she would testify, A, that she's employed by

25   the FBI, San Diego field office, as an electronic

1    surveillance operations technician and has held that position

2    since 2007; that her job responsibilities are to receive,

3    store, and secure all forms of electronic evidence, including

4    recordings of audio calls; that she removed from the Red Wolf

5    system at the San Diego field office of the FBI magnetic

6    optical disks for telephone number (619) 278-1189 for calls

7    dated between May 31, 2008 and September 30, 2008; that when

8    she removed each magnetic optical disk, she placed it in an

9    evidence envelope, sealed it with evidence tape to make it

10   tamperproof, and stored it in the evidence room at the San

11   Diego field office of the FBI with other magnetic optical

12   disks for telephone number (619) 278-1189; E, that no one

13   opened any of the envelopes containing the magnetic optical

14   disks for telephone number (619) 278-1189 between the time

15   they were stored in the electronic evidence room and

16   December 14 when she signed them out to Special Agent Colby

17   O'Very.

18            Your Honor, with that the government calls Liban

19   Abdirahman.

20            THE CLERK:  Can you please raise your right hand.

21   Do you solemnly swear that the evidence you shall give in the

22   cause now before the Court shall be the truth, the whole

23   truth, and nothing but the truth?

24            THE WITNESS:  I do.

25                    Liban Haji Abdirahman

1    was called by the government and testified as follows:

2              THE CLERK:  Can you please state and spell your

3    first and last name for the record.

4              THE WITNESS:  My first name is Liban, L-i-b-a-n,

5    Haji, H-a-j-i, Abdirahman, A-b-d-i-r-a-h-m-a-n.

6                        Direct Examination

7              BY MR. WARD:  Q.  Good morning, Mr. Abdirahman.

8    A.  Good morning.

9    Q.  Where do you work, sir?

10   A.  I work for the FBI.

11   Q.  And what part of the FBI?  Is there a particular office

12   you work for?

13   A.  Yes, I work for the Language Services Section.

14   Q.  And where is that located, Mr. Abdirahman?

15   A.  That's located at FBI headquarters in Washington, DC.

16   Q.  And what's your position within the Language Services

17   Section of the FBI?

18   A.  I'm a language analyst.

19   Q.  And what does a language analyst do?

20   A.  I do translations and interpretation --

21   Q.  Okay.

22   A.  -- in a foreign language to English.

23   Q.  And is there any particular language that you focus on?

24   A.  Yeah.  I'm certified in three languages, and they are

25   Somali, Italian, and Swedish.

1  Q.  Okay.  Now, you indicated that you do both interpretation

2  and translation.  Can you tell the ladies and gentlemen of

3  the jury what the difference is.

4  A.  A translation consists in translating a document or an

5  audio from a foreign language to English, and interpretation

6  is when you interpreter for two people, one speaking English

7  and the other one speaking a foreign language.

8  Q.  Now, in your job is there -- do you focus more on

9  translation or interpretation?

10 A.  In our -- in my job I spend most of my time doing

11 translations.

12 Q.  And can you give us a rough percentage?

13 A.  Probably 85, 87 percent of my time.

14 Q.  And how long have you been a language analyst at the FBI

15 Language Services Section?

16 A.  I have been a language analyst for four years, but before

17 that, I was a contract linguist with the FBI at the same

18 office doing the same job for about three years and six

19 months.

20 Q.  And when you say contract, does that mean you worked for

21 another company?

22 A.  I worked for another company who provides contract

23 linguists to the FBI.

24 Q.  And your experience during those three years is -- was it

25 similar to what you're currently doing for the FBI?

1  A.  Yes, I've been doing the same job for about seven years

2  and a half.

3  Q.  All right.  Mr. Abdirahman, where were you born?

4  A.  I was born in Somalia.

5  Q.  And where did you live in Somalia?

6  A.  I live most of my life in Somalia, in Mogadishu, the

7  capital of Somalia.

8  Q.  And did there come a time when you left Somalia to -- for

9  school?

10  A.  Yeah.  When I was in middle school, I was sent by my

11  family to boarding school in Italy, where I completed middle

12  and high school and university.

13  Q.  Roughly how many years were you in Italy?

14  A.  I lived in Italy for about 12 years as a student.

15  Q.  As a student?  Okay.  And while you were in Italy, did

16  you become proficient in the Italian language?

17  A.  Yes, actually -- yes.  You can say that when I went back

18  to Somalia, I spoke only Italian; I had to relearn Somali.

19  Q.  Okay.  Approximately when did you return to Somalia?

20  A.  I returned to Somalia in 1969.

21  Q.  In 1969?

22  A.  Yes.

23  Q.  And when you were in Somalia, were you speaking Somali on

24  a daily basis?

25  A.  Yes.

1   Q.   And how many years did you remain in Somalia?

2   A.   I remained in Somalia from '69 to the -- until the civil

3   war started in the late 1990s.

4   Q.   In the late 19 --

5   A.   In late 1990.

6   Q.   I'm sorry.  I didn't understand you, Mr. Abdirahman.  In

7   the late --

8   A.   1990.

9   Q.   1990, thank you.  And when you left Somalia, where did

10   you go to?

11   A.   When I left Somalia, I went back to Europe and lived a

12   few years in Sweden.

13   Q.   And while you were in -- while you were in Sweden, did

14   you become proficient in the Swedish language?

15   A.   Yes, I did.

16   Q.   How many years did you live in Sweden, sir?

17   A.   Six years.

18   Q.   And while in Sweden did you have any experience

19   translating Somali to Swedish?

20   A.   Yeah.  While I was in Sweden, I work as a freelance -- a

21   linguist, doing interpretation mostly and translation from

22   Somali to Swedish and from Swedish to Somali.

23   Q.   Okay.  And for how long was that?

24   A.   I did that -- I work as a linguist for about three years.

25   Q.   Okay.  Now, after -- after you left Sweden, where did you

1   go to?

2   A.   I came to the USA.

3   Q.   And approximately when was that, Mr. Abdirahman?

4   A.   1995.

5   Q.   And after you arrived in the United States, when did you

6   begin translating Somali into English?

7   A.   I began in May 2005.

8   Q.   May of 2005?

9   A.   Yes.

10  Q.   What did you do in the meantime?

11  A.   I worked for a telecommunication company that doesn't

12  exist any more, MCI.

13  Q.   Okay.  And in 2005, is that when you began working for

14  the company that contracted with the FBI?

15  A.   Yes.

16  Q.   All right.  Did you subsequently leave that company

17  and -- well, you've told us that you subsequently left the

18  company, but did you have -- and were hired by the FBI; is

19  that correct?

20  A.   Was offered a permanent position by the FBI.

21  Q.   Okay.

22  A.   So I stayed in my office doing the same job but as an FBI

23  employee.

24  Q.   Okay.  Now, prior being offered that job, was there any

25  kind of qualification testing that the FBI administered that

1   you had to pass?

2   A.   Yes.   In order to be a -- to work for the FBI as a

3   linguist, you have to pass a battery tests given by the FBI.

4   Q.   I'm sorry.   What's the -- you have to pass this

5   qualification test?

6   A.   Yes.

7   Q.   What's the qualification test?

8   A.   Consisting several days testing, consisting a verbatim

9   translation from Somali to English, a comprehension test, and

10  then you have to be tested in English; you do a -- you have

11  to write an essay in English and do an interview in both

12  languages, English and Somali.

13  Q.   Okay.   You mentioned verbatim translation; could you

14  explain to the jury what you mean when you use that term.

15  A.   Verbatim translation is almost word-by-word translation

16  from one language to the other.   A verbatim translation

17  consists in translating everything that has been said without

18  omitting or adding anything.

19  Q.   Okay.   Now, as a result of your qualification testing,

20  were you -- did you qualify at a level that brought you to

21  your current position?

22  A.   Yes, I qualified as a full linguist.

23  Q.   Okay.   What's the other qualification level?

24  A.   Depending on the score, you may work for the FBI as a

25  monitor.

1   Q.   Okay.

2   A.   And that consisting just monitoring a -- audio

3   conversations, but you are not qualified to do a verbatim

4   translation or to do interpretation.

5   Q.   And, Mr. Abdirahman, did you testify that you had -- you

6   have the certification to do the review of other people's

7   translation work?

8   A.   Yes, I am a qualified language quality reviewer --

9   Q.   Okay.

10  A.   -- within Language Services.

11  Q.   Within the Language Services Section of the FBI?

12  A.   Yes.

13  Q.   Is there a separate certification program for the members

14  of the Language Services Section who testify in court?

15  A.   Yes, you have to go to a two-week training and then pass

16  an exam in order to qualify for a -- to become a language

17  quality reviewer.

18  Q.   Okay.  Well, is that the same program that certifies you

19  to come testify in --

20  A.   Yes.

21  Q.   -- court?

22  A.   Yes.

23  Q.   And have you testified in this specific area of the

24  verbatim translation of Somali phone calls into English

25  before?

1  A.  Yes.

2  Q.  And when was that, sir?

3  A.  The last time was last year, last fall, in Minneapolis.

4  Q.  In 2012?

5  A.  2012.

6  Q.  And if I were to say October 2012, does that help you

7  remember?

8  A.  Yeah, I think it was in October.

9  Q.  And prior to that did you testify in another occasion in

10  Minneapolis?

11  A.  Yes, I did.

12  Q.  Okay.  Was that about a year earlier?

13  A.  I believe so.

14  Q.  Now, sir, do you speak Somali around the home now?

15  A.  Yes, that's my -- that's my language.

16  Q.  Okay.  And how many Somali speakers are there in the

17  Language Services Section of the FBI?

18  A.  I believe -- I'm not sure -- that there are 14 or 15

19  Somali linguists at the FBI.

20  Q.  And when you're at work with them on a regular basis, do

21  you speak Somali there too?

22  A.  Yes.

23        MR. WARD:  Your Honor, I'd offer Mr. Abdirahman as

24  an expert in the verbatim translation of Somali to English.

25        THE COURT:  You may proceed.  There's no need to

1    tender the expert.

2              MR. WARD:  Thank you, your Honor.

3              BY MR. WARD:  Q.  Mr. Abdirahman, do your duties at

4    the Language Services Section require you to keep up on

5    Somali culture and news?

6    A.  Yes.

7    Q.  Now, you haven't returned to Somalia since you left in

8    1990, have you, sir?

9    A.  No, I haven't.

10   Q.  So how is it that you keep up on Somali news and Somali

11   culture?

12   A.  I live in a Somali community in my area, and I follow the

13   news from Somalia from the Internet news or from the radio.

14   Q.  Okay.  And where's your community located?

15   A.  Virginia, northern Virginia.

16   Q.  Okay.  And can you give the jury some examples of the

17   types of media or Internet websites that you visit.

18   A.  Yeah.

19             MR. DURKIN:  Excuse me.  I'm going to object on

20   relevance.

21             THE COURT:  The objection is overruled.  You may

22   answer.

23             THE WITNESS:  Yeah, I usually read the articles on

24   BBC website as well as listen to Internet radio from the BBC,

25   I visit regularly a Somali -- couple of Somali websites like

1   hiraan.com and --

2   Q.  Can you spell that for us?

3   A.  Hiraan.com, h-i-r-a-a-n dot com.  It's a Somali website

4   which -- with daily news of events in Somalia.

5   Q.  Okay.  You mentioned -- did you mention a radio station?

6   A.  Yes, through the Internet I listen to Radio Shabelle,

7   Radio Shabelle --

8   Q.  Okay.

9   A.  -- spelled S-h-a-b-e-l-l-e, and I follow events in

10  Somalia through that radio.

11  Q.  Okay.  Now, Radio Shabelle, is that -- you know, is that

12  by streaming the audio on a computer?

13  A.  Yes.

14  Q.  Okay.  In your experience do others in the Somali

15  community keep up on news and culture the same way?

16  A.  Yes, yes.  There are several Somali websites available in

17  the Internet.

18  Q.  Okay.  Mr. Abdirahman, you speak Swedish, you speak

19  Italian, and you speak English, and Somali.  Can you describe

20  for the jury any particular challenge there is in your job of

21  doing a verbatim translation.

22  A.  Yeah, the challenge is, as I say, verbatim translation

23  consisting a -- conveying in the English language what was

24  said in a foreign language exactly as it was said without

25  adding or omitting anything, so it's very challenging,

1   especially in the case of the Somali language.

2   Q.  And why is the Somali language particularly challenging?

3   A.  Because Somali language is fundamentally different from

4   the English language.

5   Q.  Can you explain to the jury some of the those fundamental

6   differences.

7   A.  I mean the simplest example I can give is -- like the

8   syntax is completely different.  For example, in English,

9   simple sentence will have a subject, a verb, and an object in

10  that order.  In Somali there is no order; any of those three

11  can be in any point in that order; it doesn't change the

12  meaning of the sentence.

13  Q.  Okay.  Now, other than -- other than syntax, are there

14  other challenges in translating the Somali language?

15  A.  Yes.  Another difference is the culture.  The Somali

16  culture is very different from the English or western culture

17  in general.  The Somali language -- I mean a word might have

18  different meaning depending in the context of the sentence it

19  was used, so -- I mean it's very challenging, and a linguist

20  must be careful because, as I say, in a verbatim translation

21  a linguist must convey the message as it was intended in the

22  original language.

23  Q.  Okay.  How long has the Somali actually been a written

24  language?

25  A.  Somali has not been written until 1972.

1   Q.  And are the spellings of, you know, Somali words

2   standardized?

3   A.  No.

4   Q.  And can you explain to the jury why that -- why that is.

5   A.  As I say, Somalia didn't have a written language until

6   1972, and at that time since there was no Somali alphabet, it

7   was decided to adopt the Latin alphabet, reason being most

8   Somalis at the time spoke either English or Italian or

9   Arabic, and most of the modern world uses the same Latin

10  alphabet, so that's the reason it was chosen.  And the

11  spelling is not standard -- standardized because of the same

12  reason, because people -- the older generation went to

13  school, either English school or Italian school, which means

14  that they had a different -- they spell names and other

15  location names or proper names differently because of these

16  two languages that people spoke.  For example, in northern

17  Somalia people spoke English; in southern Somalia people

18  spoke Italian.  So the spelling reflects the education.

19  Q.  All right.  Mr. Abdirahman, if I could have Government's

20  Exhibit 3, which is in evidence, and -- you'll be to able to

21  see it here but you'll also be able to see it on your monitor

22  too.  And can we blow up the section that shows the town

23  Dhusa Mareeb.  You were talking about, Mr. Abdirahman,

24  spelling in location -- of location names not being

25  standardized.  Do you see in Government's 3 how Dhusa Mareeb

1   is spelled there?

2   A.   Yes, I do.

3   Q.   Okay.   In the -- in your translation duties you don't

4   spell it that way though, do you?

5   A.   No.

6   Q.   Okay.   And how do you spell it?

7   A.   This is a composite name, so I spelled it as two

8   different names, Dhusa and Mareeb.

9   Q.   But it's still a reference to the same city?

10   A.   It's the same city.

11   Q.   Okay.   And on Government's Exhibit 2, which is in

12   evidence, again can we blow up the section that has the city

13   of Dhusa Mareeb.   Can you see that?

14   A.   Yes.

15   Q.   It's a third spelling of Dhusa Mareeb?

16   A.   Yes, and it's the same location.

17   Q.   But it's --

18   A.   Same city.

19   Q.   Okay.   And outside of court in preparing for your

20   testimony, did we also have a conversation about the town

21   called Guraceel?

22   A.   Yes.

23   Q.   How many different ways do you know of to spell Guraceel?

24   A.   I have seen several ways.

25   Q.   Okay.

1    A.  But the most common are spelled like G-u-r-a-c-e-e-l or

2    G-u-r-i-c-e-e-l.

3    Q.  Okay.  And how do you spell it when you prepare

4    transcripts?

5    A.  G-u-r-a-c-e-e-l.

6    Q.  But it always refers to the same city?

7    A.  It's the same city --

8    Q.  Okay.

9    A.  -- same town.

10   Q.  Now, you indicated that the Somali language has adopted

11   the Latin alphabet, but are there peculiar letters that are

12   for sounds that we don't have in English?

13   A.  Yeah, there are letters in the Latin alphabet that don't

14   have a correspondent sound in Somali like, for example, an X;

15   so those letter I used for sounds that are in the Somali

16   language but not in the English language.

17   Q.  Okay.

18   A.  So we have certain letters that represent sounds in the

19   Somali language or combination of letters.  For example, as I

20   just mentioned, the X is pronounced "ha" in Somali, which is

21   used like in my name, Haji, spelled with X in Somali.

22   Q.  Okay.  And --

23   A.  And the C is a sound that in Somali was like "ka" like

24   Guraceel --

25   Q.  Let me stop you for just a minute.  Let's go back to the

1    X and the X sound.  So do you sometimes see the word

2    "hawala," referring to a money remittance --

3    A.  Yes.

4    Q.  -- in Somali?

5    A.  Yes.

6    Q.  How is that spelled?

7    A.  With the H.

8    Q.  I'm sorry?

9    A.  Hawala, with a H, h-a-w-a-l-a.

10   Q.  Is it also spelled though with the X?

11   A.  I haven't seen it.

12   Q.  Okay.

13   A.  Might be.

14   Q.  How about with -- you were talking about the C.

15   A.  The C, for example, my name Abdi -- my last name,

16   Abdirahman, in Somali is spelled C-a-b-d-i-r, then x-m-a-n.

17   So my last name has both the C and the X, which are

18   particular sound of the Somali language, Abdirahman.

19   Q.  Okay.  Again, on Government's Exhibit 3, which is in

20   evidence, if we could take a look at the -- to the north of

21   the map and the city of Adaado -- can we just blow that up.

22   Starts with a C.  Now, Mr. Abdirahman, the city of Adaado

23   there starts with a C -- am I pronouncing that correctly?

24   A.  Yeah, that's Adaado.  I don't think you can pronounce it

25   correctly.

1   Q.  Exactly.  But when you translate it, do you write it and

2   drop the C and start it with an A?

3   A.  Yeah, you kind of use the regular English phonetics to

4   write the name normally.

5   Q.  Okay.  Mr. Abdirahman, are there dialects of Somali?

6   A.  Somali has -- I mean the country of Somali has one

7   language, but of course there are regional differences.

8   Q.  Okay.  Well, is there a particular name for the standard

9   Somali language?

10  A.  No, no, it's -- the standard Somali language actually has

11  been -- is the language spoken in the central region of

12  Somalia.

13  Q.  Okay.  There are only regional differences, no dialects?

14  A.  There is one dialect that maybe most Somalis might have a

15  problem understanding if they're not from that region, and

16  that dialect is call Maay.

17  Q.  And where -- where is the Maay dialect spoken?

18  A.  Maay dialect is spoken in the region of Bay, Middle

19  Shabelle.

20  Q.  Okay.  So were there any dialect issues in the case --

21  this case that you worked on here?

22  A.  No.

23  Q.  Now, Mr. Abdirahman, what percentage of your time at the

24  Language Services community is devoted to working wiretap

25  cases in the Somali language?

1  A.  I mean you might say most of my time is dedicated to wire

2  monitoring, yeah.

3  Q.  Can you give us a percentage?

4  A.  Again, 85, 90 percent maybe.

5  Q.  Okay.  Can you give us an idea of how many of these cases

6  you've worked on?

7           MS. FONTIER:  Objection, relevance.

8           THE COURT:  The objection is overruled.  You may

9  give a number.

10           THE WITNESS:  I don't have an exact number, but I

11  mean many, many, many cases.

12           BY MR. WARD:  Q.  Okay.  And when a wiretap is

13  ongoing in the Somali language, what's the role of someone

14  like you who works at the Language Services Section?

15  A.  So when I -- I've been -- when I'm assigned a new case,

16  the first thing is I contact the case agent, who give me the

17  basis of what --

18           MS. MORENO:  Excuse me.  I'm sorry, your Honor.

19  I'm having trouble hearing the witness.

20           THE COURT:  All right, sir.  If you could speak up

21  a little bit into the microphone.  Thank you.

22           BY MR. WARD:  Q.  Okay.  Let me reask the question.

23  When a wiretap is ongoing, is it part of your job to listen

24  to those calls?

25  A.  Yes.

1   Q.  And do you -- when you listen to them, do you prepare

2   summary translations?

3           MS. FONTIER:  Objection, leading.

4           THE COURT:  The objection is overruled.

5           THE WITNESS:  Yes, I do.

6           BY MR. WARD:  Q.  Okay.  And we've talked a little

7   bit about verbatim translations.  What's the difference

8   between a verbatim translation and a summary translation?

9   A.  Summary translation is a linguist's own summary of the

10  content of the -- of the -- in audio.  So the linguist listen

11  to the audio and then writes a brief summary of the content

12  with all the details.

13  Q.  Okay.  Do you recall were you -- when were you first

14  assigned to the -- this wiretap case?

15  A.  I don't remember the exact month, but it was the end of

16  2007.

17  Q.  And what was the telephone number that was being

18  intercepted?

19  A.  (619)278-1189.

20  Q.  And is there evidence in this case that that's the

21  telephone number for the defendant Basaaly Saeed Moalin?

22          MS. FONTIER:  Objection; calls for facts not in

23  evidence.

24          THE COURT:  You're talking -- you're talking about

25  foundation, lack of foundation?

 1              MS. FONTIER:  Foundation, speculation.

 2              THE COURT:  The objection is sustained on the basis

 3      of foundation.

 4              BY MR. WARD:  Q.  Handing you what's been marked

 5      for identification as Government's Exhibit 1, Mr. Abdirahman,

 6      is that a passport application, a certified public record,

 7      for Basaaly Saeed Moalin?

 8              THE COURT:  What's the exhibit number, please?

 9              MS. MORENO:  One.

10              MR. WARD:  Exhibit 1, your Honor.  I'm sorry.

11              THE WITNESS:  Yeah, it appears so.  Yeah, I think

12      so.

13              MR. WARD:  I would offer the two pages of

14      Government's Exhibit 1, which are the passport application

15      without the certification.

16              THE COURT:  The first two pages of Exhibit 1,

17      admitted.

18          (Exhibit No. 1-A identified and admitted.)

19              MR. WARD:  I'm sorry, your Honor.  I'm confused.

20      The Court --

21              BY MR. WARD:  Q.  Is the first page -- does that

22      have the raised gold seal?

23      A.  Yes.

24              THE COURT:  Which pages are you offering?

25              MR. WARD:  I'm sorry, your Honor.  I need to look

1    at the exhibit.  I apologize to the Court and counsel.  Okay.

2    Your Honor, I'd withdraw Government's 1 and offer -- we

3    prepared an independent exhibit, Government's 1-A.

4               THE COURT:  Okay.  The defense has seen it?

5               MR. WARD:  It's the --

6               THE COURT:  First two pages.  Is 1-A the first two

7    pages of the application?

8               MR. WARD:  1-A is the first page and second page of

9    the application.

10              THE COURT:  Okay.

11              MR. WARD:  Okay.  If we could publish Government's

12   1-A, please.

13              THE COURT:  I assume there's no objection to 1-A.

14              MS. FONTIER:  No, your Honor.

15              THE COURT:  Okay.  1-A is admitted as it has been

16   described.

17              BY MR. WARD:  Q.  Okay.  And if we could just

18   capture the name at the top.  And, Mr. Abdirahman, does that

19   bear the name of the defendant Basaaly Saeed Moalin?

20   A.  Yes, it does.

21   Q.  And that's in block 1?

22   A.  Yes.

23   Q.  Continuing down to block 16, on the right-hand side, is

24   there an indication of a telephone number there?

25   A.  Yes, there's a telephone number.

1   Q.   Okay.  Can you read that telephone number.

2   A.   (619)278-1189.

3   Q.   And on page 2 of Government's 1-A, block 23, is it signed

4   under oath?  Go up just a little bit further.

5   A.   Yes.

6   Q.   Okay.  Does it appear to bear a signature there?

7   A.   Yes.

8   Q.   And is there a date down below it of November 9, 2006?

9   A.   Yeah.  November 9, 2006, yes.

10  Q.   Okay.  If you could set aside Government's Exhibit 1, and

11  handing you what's been marked for identification as

12  Government's Exhibit 6, I'll ask you if you can identify that

13  as a certified copy of a -- of record of Basaaly Moalin's

14  taxicab driver ID application?

15  A.   Yes.

16       (Exhibit No. 6 identified.)

17           MR. WARD:  I'd offer that as a certified public

18  record, your Honor.

19           MS. FONTIER:  Objection, relevance.

20           THE COURT:  The objection is overruled.

21       (Exhibit No. 6 admitted.)

22           MR. WARD:  And would you publish Government's 6 to

23  the jury, please.

24           BY MR. WARD:  Q.  Now, on the second page of

25  Government's 6, in the upper right-hand side, if we could

1  blow that up, and while I'm looking at the side, it says

2  Basaaly S. Moalin?

3  A.  Yes.

4  Q.  Okay.  Is that on the right-hand side, and does it have

5  that same telephone number we've been talking about?

6  A.  Yes.

7  Q.  (619)278-1189?

8  A.  Yes.

9  Q.  And on the -- down below that is there also an indication

10  that this form has been signed under perjury, under the

11  penalty of perjury?

12  A.  Yes.

13  Q.  And does it bear a signature?

14  A.  Yes.

15  Q.  And to the right-hand side, can you read the date,

16  Mr. Abdirahman.

17  A.  It's June 3, 2008.

18  Q.  Okay.  If you could set that aside.  Now, in your work on

19  this wiretap case, Mr. Abdirahman, did there come a time when

20  you were asked as part of your job to prepare verbatim

21  translations for calls that were intercepted in this case?

22  A.  Yes.

23  Q.  And can you describe the process that you go through at

24  the Language Services Unit when preparing verbatim

25  transcripts of audio calls.

1   A.   Yes.   A linguist is assigned to do the verbatim

2   translation, and then another linguist must do --

3   Q.   Let me stop you there for a minute.   So what does the

4   linguist do who prepares the initial verbatim translation?

5   A.   Listen to the audio that contains the original language

6   and do a verbatim translation of the content of the audio to

7   the target language, which is English in this case.

8   Q.   Okay.   After he's completed, does he prepare a transcript

9   of a conversation?

10   A.   Yeah.   We call it a translation.

11   Q.   Okay.

12   A.   Since transcript is describing what's been said.

13   Translation is translating from one language to another.

14   Q.   Okay.   Then we should call it a translation?

15   A.   Translation.

16   Q.   Okay.   What happens to the translation, which is a

17   document, right?

18   A.   Yes.

19   Q.   Okay.

20   A.   So once a translation has been done of the audio --

21   Q.   Okay.

22   A.   -- another linguist within the section is assigned to do

23   a peer review.

24   Q.   Peer review?

25   A.   Peer review of that translation.

1  Q.  Okay.  What happens --

2  A.  That means -- sorry.

3  Q.  Okay.  What did the peer reviewer do?

4  A.  The peer reviewer review the translation for accuracy and

5  for the English writing quality.

6  Q.  Okay.  Does the peer reviewer rely on the translation

7  that's being presented to him or does he go back and listen

8  to the audio?

9  A.  The peer reviewer must listen to the audio in order to

10  verify that the translation is accurate.

11  Q.  After that process is complete, is there a single

12  translation that's then presented?

13  A.  A single translation is then presented --

14  Q.  It's --

15  A.  -- as a final product.

16  Q.  Okay.  It's presented to whom though?

17  A.  To the supervisor of that -- project manager.

18  Q.  Okay.  Well, is there an individual called a quality

19  reviewer that's involved in this process?

20  A.  Not at this point.  This point --

21  Q.  Okay.

22  A.  -- we have the original linguist that has done the

23  translation and a second linguist that has reviewed it, so we

24  have like two set of eyes, let's say two people --

25  Q.  Okay.  And then --

1  A.  -- looking at the same translation, making sure

2  everything's accurate.

3  Q.  Okay.

4  A.  But the translation is not yet ready to leave the FBI

5  yet.

6  Q.  Okay.  What's the next step in the process then?

7  A.  The next step to be taken to allow this translation to

8  leave the FBI Language Services Section is a quality --

9  language quality review --

10  Q.  Okay.

11  A.  -- which must be done by a certified language quality

12  reviewer.

13  Q.  And that's a certification that you hold?

14  A.  Yes.

15  Q.  Okay.  Now, what's the scope of the quality reviewer's

16  job in this process?

17  A.  Same as the peer reviewer, making sure that the

18  translation is accurate verbatim translation of the original

19  either document or audio and that the quality of the English

20  writing is good.

21  Q.  Okay.  Now, were you the quality reviewer in this case in

22  the preparation of the verbatim translations that would be

23  introduced in this case?

24  A.  Yes, I was.

25  Q.  Okay.  Now, in this whole process of preparing a

 1  translation, the peer review, and the quality review, do you

 2  discuss with other members of the Somali section in the

 3  Language Services the proper way to convey a Somali meaning

 4  in English?

 5  A.  Yes.  In all three step I just described, we work as a

 6  team.  Although everybody got different assignment, we always

 7  consult each other to make sure that we come with the best

 8  translation that conveys the same message as was intended in

 9  the original language.

10  Q.  Okay.  Now, once the verbatims have gone through each of

11  these steps, what do you do with the verbatim translation?

12  A.  I don't understand that question.

13  Q.  Okay.  After the quality reviewer has done his review,

14  what happens next?

15  A.  The translation goes to the requester, in this case the

16  U.S. Attorney's Office.

17  Q.  Here in San Diego?

18  A.  Here in San Diego.

19  Q.  Okay.  Now, is that the last time any linguist from the

20  Language Services Section looks at those verbatim

21  translations?

22  A.  No, it's not.

23  Q.  And, Mr. Abdirahman, have you yourself reviewed the calls

24  that are on the government's exhibit list in this case again?

25  A.  Yes, I reviewed them again, some of them several times,

1   maybe some of them at least one more time in preparation for

2   trial.

3   Q.  Okay.

4            THE COURT:  Are you at a convenient breaking time?

5            MR. WARD:  I certainly am, your Honor.

6            THE COURT:  All right.  Ladies and gentlemen, we'll

7   take our 15-minute recess this morning.  Please remember the

8   admonition not to discuss the case or make any decisions at

9   this time.  Thank you.

10           (There was a break in the proceedings.)

11           (The following proceedings were outside the presence of

12   the jury.)

13           THE COURT:  Ms. Han, did you have something you

14   wanted to talk about?

15           MS. HAN:  Your Honor, this morning we had submitted

16   a couple of items for in-camera review, and we anticipate

17   that the Court's review of that would be necessary to be

18   completed before cross-examination of the witness that's

19   currently on the stand.

20           THE COURT:  How much longer will this witness be on

21   the stand?

22           MR. COLE:  We just talked with counsel, and what

23   we're proposing to do is finish direct and then, if the

24   Court's amenable, break -- I think we have about another

25   hour -- break for lunch, and their cross could start after

 1   lunch unless -- or we can -- if that's not amenable, we just
 2   need a ruling on that for their cross to start.
 3             THE COURT:  A ruling on what now?
 4             MR. COLE:  The two items that you had requested we
 5   submit to you in camera in a order that was issued I think on
 6   the 30th.  They relate to this witness's testimony, and you
 7   wanted to see a couple of things.
 8             THE COURT:  So it's the in-camera rather than the
 9   106.
10             MR. COLE:  Right, it's not the 106.
11             MS. HAN:  Yes, your Honor.
12             THE COURT:  Okay.  Well, that sounds like a pretty
13   good plan.  Why don't we proceed that way.
14             MR. DRATEL:  Thank you, your Honor.
15             THE COURT:  Okay.  We'll get our jury in.
16        (The jury entered the courtroom.)
17             THE COURT:  Ladies and gentlemen, please be seated.
18   Thank you.  We have all our jurors present.  We're ready to
19   proceed further.  Mr. Ward?
20             MR. WARD:  Thank you, your Honor.
21             BY MR. WARD:  Q.  Mr. Abdirahman, before the break
22   you testified in response to my question that you hadn't
23   returned to Somalia since you left in 1990.  I take it, sir,
24   that you've never gone back to Somalia to live?
25   A.  I don't think I will ever go back.

1   Q.  I understand that, but did you have an occasion to be in

2   the Mogadishu airport for a matter of hours at some point?

3   A.  At one -- at the beginning of last year, 2012, I stopped

4   at Mogadishu Airport for a few hours.

5   Q.  Okay.  Now, Mr. Abdirahman, I want to talk some about the

6   translations that are on the government's exhibit list.

7   Approaching and handing you what's the white binder, which is

8   labeled Transcripts of Exhibits 120 through 199, and I'm also

9   handing you a stack of disks marked for identification

10  Government's 100 through 118.  Do you have those documents in

11  front of you, sir?

12  A.  Excuse me?

13  Q.  Can you take a look at those and I ask you to see if you

14  recognize them.

15          THE COURT:  What were the transcript numbers?

16          MR. WARD:  The transcript numbers, your Honor, are

17  120 through 199.  That's how the -- that's how the binder is

18  labeled.

19          THE COURT:  These are exhibit numbers?

20          MR. WARD:  Yes, your Honor.

21          THE COURT:  Okay.  Is it stipulated the court

22  reporter is relieved of any duties to report the translations

23  as they will be on the disk and apparently played for the

24  jury?

25          MR. WARD:  That's agreeable.

1            THE COURT:  Is that stipulated, counsel?  I think

2    we had that understanding before.  The court reporter will be

3    relieved of any obligations of court reporting the actual

4    English translations as they come in on these exhibits.

5            MS. FONTIER:  Yes, your Honor.

6            MS. MORENO:  Yes.

7            THE COURT:  Okay.  We are in agreement.  Thank you.

8            BY MR. WARD:  Q.  All right.  Mr. Abdirahman, I

9    notice that you were going through Government's Exhibits 100

10   through 118.  Have you finished your review of those?

11   A.  Yes.

12   Q.  Okay.  And can you tell the ladies and gentlemen of the

13   jury what 100 through 118 are.

14   A.  These are the CDs with the audio from which the

15   translations have been done.

16      (Exhibit Nos. 100-118 identified.)

17   Q.  Okay.  And when you say the translations, are you

18   referring to the documents that are in the white binder

19   labeled 120, Government's Exhibits 120 through Government's

20   Exhibit 199?

21   A.  Yes, I am.

22   Q.  And can you -- by reference to the documents in the white

23   binder, can you identify for the jury what the range is of

24   the audio calls that you translated by reference to the white

25   binder?

1   A.   The range is December 21, 2007 to July 24, 2008.

2   Q.   Okay.  Now, with respect to Government's Exhibits 100

3   through 118, the audio disks, did you -- outside of court and

4   preparing for your testimony today, did you check those audio

5   disks to ensure that they contained the audio for the calls

6   from which you prepared the translations that are in the

7   white binder?

8   A.   Yes, I did.

9   Q.   Okay.  And with respect to Government's Exhibits 120

10   through 176, and Government's 178 through 199, do they

11   contain the audio for --

12   A.   Yes.

13   Q.   -- for -- I'm sorry.  Let me ask the question.  Do they

14   contain the audio from which you prepared the translations?

15   A.   You mean these CDs, right?

16   Q.   Yes.

17   A.   Yes, they do.

18   Q.   Okay.  And did you also check those CDs to see if the

19   call data is properly reflected on Government's Exhibits 120

20   through 176 and 178 through 199?

21   A.   Yes, I did.

22   Q.   And do they match?

23   A.   Yes, they do.

24   Q.   Now, I notice that each of those disks, Government's 100

25   through 118, contain the initials; are those your initials?

1    A.  Yes, they are.

2    Q.  And did you place them there after you completed the

3    check regarding the call data?

4    A.  I placed my initial on each CD after I reviewed the

5    content, yes.

6    Q.  Okay.  And that included the audio and the other data?

7    A.  Yes.

8           MR. WARD:  I'd offer the disks, your Honor, in

9    evidence as the Government's 100 through Government's 118.

10          MS. FONTIER:  Your Honor, no objection to this

11   foundation.  I would like to reserve on the right to object

12   to certain calls as to the content.

13          THE COURT:  Okay.  Well, you'll reserve objections,

14   individual objections, and it may be that you'll reserve them

15   until a later point in time after they've been played, the

16   audio has been played.  And if you need to address any

17   particular issue, you'll have an opportunity.

18          MS. FONTIER:  Thank you, your Honor.

19          THE COURT:  Is that understood --

20          THE WITNESS:  Yes.

21          THE COURT:  -- counsel?

22          MR. WARD:  Yes, your Honor.

23          THE COURT:  Okay.

24       (Exhibits 100-118 admitted.)

25          BY MR. WARD:  Q.  Now, Mr. Abdirahman, we won't be

1  playing calls today, so if you could just set the -- if you

2  could just set the audio disks aside.

3          THE COURT:  All right.  So 100 through 118 are

4  admitted --

5          MR. WARD:  Thank you, your Honor.

6          THE COURT:  -- with defense reserving individual

7  objections as they may come up.  And then you're offering 120

8  to 199 as well?

9          MR. WARD:  Your Honor, at this point I would

10 offer -- I want to make sure I have the numbers correctly --

11 it could be 120 through 176 --

12         THE COURT:  And then 178 through 199.

13         MR. WARD:  -- then 178 through 199, your Honor.

14         THE COURT:  Okay.  They will be admitted as well

15 with the same proviso.

16     (Exhibit Nos. 120-176, 178-199 admitted.)

17         MR. WARD:  Your Honor, at this point, although we

18 won't be playing calls, the witness would be testifying to

19 orient the jury -- we'd ask to -- from what the transcripts

20 contain and how to read them, and we'd ask that we be allowed

21 to publish the transcripts, a binder; we have one for each of

22 the jurors.

23         THE COURT:  Okay.  So you're not playing --

24         MR. WARD:  We would not play any audio, but because

25 of the way the witness prepared the transcripts, he'd go

1   through and orient, you know, how they were prepared and how

2   to read them.

3            THE COURT:  Okay.  Yes, transcripts I think would

4   be helpful under these conditions.  And they're all tabbed I

5   assume.

6            MR. WARD:  Your Honor, yes, they are --

7            THE COURT:  They're tabbed.

8            MR. WARD:  -- they are tabbed.  Your Honor, there

9   is the one call or transcript which has not been admitted;

10  that's Exhibit 177.

11           THE COURT:  Yes.

12           MR. WARD:  Can we just ask the jury not to turn to

13  that call?

14           MS. FONTIER:  Your Honor, can we just also just

15  instruct the jury to only look at the calls as --

16           THE COURT:  I will.  Let me do it this way.  I know

17  what your concern is.  Let's get them distributed first.  All

18  right.  Ladies and gentlemen, before you open them up, I want

19  to mention a few things to you.  I'll wait until you all have

20  them there.

21           First of all, apparently we won't be looking at

22  Exhibit 177 right now; that may be possible or that may

23  happen at a later time.  In any event, these are

24  translations, they're English translations purportedly of

25  calls, and you are going to be able to follow the testimony

1    of the witness, the linguist here, and so please don't go

2    ahead to any other exhibits or calls, just stay on the

3    translation that is being discussed by the linguist in his

4    testimony so everybody is tracking at the same time with all

5    of the same exhibits.

6         Now, these exhibits may or may not actually be

7    available for you when you're deliberating on this case at a

8    later time.  Sometimes they are, sometimes they're not.  That

9    really is dependent upon the particulars of a case.  So after

10   we are done with the work, after Mr. Abdirahman has gone

11   through what he needs to go through, then we'll be taking

12   those binders away from you; they may go back to you at some

13   point in time, but then you'll be closing the binders and

14   we'll be on to another subject I assume.  Okay.  Anything

15   further, counsel?

16        MS. FONTIER:  No.  Thank you, your Honor.

17        THE COURT:  Okay.  All right.

18        BY MR. WARD:  Q.  Mr. Abdirahman, taking

19   Government's Exhibit 120, the very first transcript, do you

20   have that in front of you?

21   A.  Yes, I do.

22   Q.  Okay.  I notice at the top and then down along the sides,

23   you have the speakers identified in your transcripts.  Can

24   you tell the jury generally what you look for in order to

25   identify a speaker in the -- either in the "from" and "to" at

1    the top of your transcripts or down the side as they

2    converse.

3    A.   Yeah, I have two ways to identify the speakers of a call.

4    The -- one of the ways is a self-identification, I mean when

5    the speakers address each other by name.

6    Q.   Okay.  And in Government's Exhibit 120, at 0404, is that

7    an example of a self-identification --

8    A.   Yes --

9    Q.   -- for --

10   A.   -- it is.

11   Q.   Let me finish the question.  Is it a self-identification

12   for Sheikalow?

13   A.   Yes, it is.

14   Q.   Okay.  And based on that were you able to enter him as

15   the speaker in the "from" line?

16   A.   The speaker -- I mean the two names that appear in the

17   header, and then the one that says "from" and "to," that's

18   another issue.  I mean --

19   Q.   Right, my question --

20   A.   You ask me if I --

21   Q.   Right.

22   A.   -- can identify the speakers.

23          THE COURT:  You referred to the "from" name.  Are

24   you talking about the "name" column?  Is that what you're

25   referring to?

1              MR. WARD:  Sure, on the left-hand side.

2              THE WITNESS:  The name column the left-hand side in

3     this case are taken from a self-identification by the

4     speakers themselves.

5              BY MR. WARD:  Q.  Okay.  And in that same line

6     where Sheikalow says "Hey, Basal," is Basal a nickname in the

7     course of listening to these calls you tied to the defendant

8     Basaaly Saeed Moalin?

9     A.  Yeah, Basal the same as Basaaly, yes.

10    Q.  And on the left-hand side, the digits there on the

11    left-hand column, can you explain to the jury what those are.

12    A.  Those are time stamps that the system used here that the

13    entire preparation generates.

14    Q.  Okay.  And is it fair to say that in your testimony we'll

15    be referring to them just to direct people's attention to the

16    lines of the transcript?

17    A.  Yes.

18    Q.  And up at the top, is there information as to the date

19    and the time of the telephone call?

20    A.  Yes.

21    Q.  Now, did you have a self-identification for the defendant

22    Issa Doreh?  Directing your attention to Government's Exhibit

23    121.

24    A.  Yes, I do.

25    Q.  And at 000017 does the defendant Basaaly Moalin greet

1    Issa Doreh as Sheik Issa?

2    A.   Yes, he does.

3    Q.   And was that a self-identification?

4    A.   Yes, that's what I mean by self-identification.

5    Q.   Okay.  And in the course of your listening to the calls,

6    Mr. Abdirahman, did the speakers give a nickname to the

7    defendant Issa Doreh?  Directing your attention to government

8    exhibit -- I'm sorry?

9    A.   Yeah.  I'm sorry.

10   Q.   Go ahead if you have your answer.

11   A.   Yeah, I know in certain instances he has been called Issa

12   Doreh or Issa Dhere.

13   Q.   And can you spell Dhere for me, please.

14   A.   D-h-e-r-e.

15   Q.   Okay.  And is that a Somali word?

16   A.   That's a nickname for a tall person.

17   Q.   Okay.  And is that -- is the call that contains that at

18   Government's Exhibit 135?

19   A.   Yes, it is.

20   Q.   Okay.  That's 000531, Issa Dhere, Sheik Issa, okay?

21   A.   Yes.

22   Q.   And with respect to -- let's just go to Government's

23   Exhibit 122 then.  Is that an example of a

24   self-identification?  This is a call between the defendant

25   Basaaly Saeed Moalin and the defendant Ahmed Nasir Taalil

1    Mohamud.  Is there an example of self-identification for the

2    defendant Ahmed Nasir Taalil Mohamud?

3    A.  Yes.

4    Q.  And that's at 000016?

5    A.  Yes, it is.

6    Q.  Okay.  Turning to Government's Exhibit 124, do you have

7    that in front of you?

8    A.  Yes.

9    Q.  And is there a self-identification of the defendant

10   Mohamad Mohamad Mohamud?

11   A.  Yes.

12   Q.  And can you point that out in the line of the transcript

13   to the jury?

14   A.  It's at 000015.

15   Q.  Okay.  And they use the name Sheik Mohamad?

16   A.  The name Sheik Mohamad is being used, yes.

17   Q.  Okay.  And is that how you identified Sheik Mohamad as

18   being a speaker in the left-hand column of your calls?

19   A.  Yes.

20   Q.  All right.  Now, is there -- in the calls that you

21   reviewed, is there a nickname that's used to address the

22   defendant Mohamad Mohamad Mohamud?

23   A.  Yes.

24   Q.  And what's that nickname?

25   A.  Mohamad Khadar.

1    Q.   Okay.  And can you spell Khadar?

2    A.   K-h-a-d-a-r.

3    Q.   And directing your attention to Government's Exhibit 140,

4    that's a transcript for a February 9 call, and it's between

5    the defendant Issa Doreh and the defendant Basaaly Saeed

6    Moalin; is that correct?

7    A.   Yes.

8    Q.   Okay.  And at 000414, is there a reference to Mohamad

9    Khadar there?

10   A.   Yes, there is.

11   Q.   And further along at Government's Exhibit 80, is there a

12   similar reference to Sheik Mohamad as being -- 180; that is

13   000317?

14   A.   Yes.

15   Q.   Is that another reference to the defendant Mohamad

16   Mohamad Mohamud?

17   A.   Yes, it is.

18   Q.   Now, in a couple of calls, Sheik Mohamad, the defendant

19   Mohamad Mohamad Mohamud, refers to Basaaly Saeed Moalin as

20   sheik; do you remember these calls?

21   A.   Yeah.

22   Q.   And is there anything significant to that,

23   Mr. Abdirahman?

24            MS. MORENO:  Objection; no foundation.

25            THE COURT:  The objection's overruled.

```
 1                 THE WITNESS:  Well, no.  It's in the Somali culture
 2      sometimes to use -- to misuse, let's say -- titles.  And
 3      "sheik" is a title for a religious scholar.
 4                 BY MR. WARD:  Q.  But he's not a religious scholar?
 5      A.  I don't believe so.
 6                 MS. MORENO:  Objection.
 7                 THE COURT:  The objection is sustained; the answer
 8      is stricken; the jury is admonished to disregard it, that is,
 9      the reference to is he a religious scholar, the answer being
10      I don't think so.  You're admonished to disregard that at
11      this time.
12                 BY MR. WARD:  Q.  Okay.  With respect to
13      Government's Exhibit 155, if we just go there --
14                 THE COURT:  155, counsel?
15                 MR. WARD:  I'm sorry, 155, your Honor.
16                 THE COURT:  Thank you.
17                 BY MR. WARD:  Q.  Do you see at 000108 on page 2
18      Sheik Mohamad's talking to the defendant Basaaly Saeed
19      Moalin, says No, sheik, we can't give him a specific date.
20      A.  Can you repeat the time stamp, please.
21      Q.  I'm sorry.  It's on page 2, 000108.
22      A.  Yes, I see that.
23      Q.  Okay.
24      A.  What was the question?
25      Q.  The question is do you see where Sheik Mohamad,
```

1  addressing the defendant Basaaly Saeed Moalin, says, No,

2  sheik, we can't give him a specific date.

3  A.  Yes, I see it.

4  Q.  Okay.  Do you have an opinion as to whether or not the

5  speaker is being ironic?

6           MS. MORENO:  Objection --

7           MS. FONTIER:  Objection.

8           MS. MORENO:  -- no foundation.

9           MR. WARD:  Okay.

10          THE COURT:  The objection is sustained.

11          BY MR. WARD:  Q.  Okay.  Now, we talked about all

12  these self-identifications of each of the defendants, and

13  what I wanted to ask you though is what if there isn't a

14  self-identification in the call that you're listening to; is

15  there another way in which you in your job can identify the

16  speakers?

17  A.  Yes, there is.

18  Q.  And how is that?

19  A.  That's voice recognition.  Since I usually work the same

20  cases every day for several hours, and with the

21  self-identification, in time I can recognize the voices of

22  the speakers in the call.

23  Q.  Okay.

24  A.  So that a way to identify the speakers.

25  Q.  All right.  And for each of the transcripts that are in

1   evidence from the government's exhibit list, did you have

2   either a self-identification in one or more calls or did you

3   recognize the voice prior to identifying that individual as a

4   speaker?

5   A.   Yes.

6   Q.   So all the "Basaalys" refer to the defendant Basaaly

7   Saeed Moalin?

8   A.   Yes.

9   Q.   Okay.

10  A.   There are a few instances where there is no

11  self-identification and I cannot recognize the voices, so I

12  use an acronym in those cases.

13  Q.   Well, let's set those aside for a minute, and we'll get

14  to those.   So when you enter in your transcript Sheik Issa as

15  a speaker, is it either because you had a self-identification

16  or you recognized his voice in the call?

17  A.   Yes.

18  Q.   And with respect to Sheik Mohamad, would your answer be

19  the same?

20  A.   Yes.

21  Q.   And with respect to the defendant Ahmed Nasir Taalil

22  Mohamud, would your answer be the same there too?

23  A.   Yes, it would be the same.

24  Q.   And, Mr. Abdirahman, with respect to Government's

25  Exhibits 122 and 127, I noticed that the telephone number

1    that's in the header -- you see the telephone number there,

2    (206)574-8916?

3    A.   Yes, I do.

4    Q.   Okay.  And in 127 is it the same telephone number?

5    A.   Yes, it is.

6    Q.   Okay.  And later on in those calls, you've identified

7    the -- one of the speakers as Ahmed Nasir Taalil Mohamud; is

8    that correct?

9    A.   That's correct.

10   Q.   And later on in Government's Exhibit 195 and 196, you've

11   identified the speaker there again as the defendant Ahmed

12   Nasir Taalil Mohamud?

13   A.   Yes.

14   Q.   Okay.  But do you see the different telephone number up

15   there, (714)400-1464?

16   A.   Yes, I do.

17   Q.   Okay.  And the same thing with Government's 196, is it

18   (714)400-1464?

19   A.   Yes.

20   Q.   And was the voice on 122 and 127, the 206 number, the

21   same as it was for the 714 number --

22   A.   Yes, it is.

23   Q.   -- when you identified it as the defendant Ahmed Nasir

24   Taalil Mohamud?

25   A.   Yes.

1   Q.  Now, you indicated that sometimes there -- you're not

2   actually able to identify the voice.  And how is it that you

3   identify those speakers?

4   A.  In those cases I don't have a name for the speaker, so I

5   would use "Unidentified Male" if it's a male speaker, or

6   "Unidentified Female" if it's a female speaker.

7   Q.  Okay.  But I noticed you haven't written that in the

8   identification; you just abbreviate it as "U.M."

9   A.  UM or UF.

10  Q.  Okay.  As we go through, we'll try and point one of those

11  out to the -- point one of those out to the jury.  Mr.

12  Abdirahman, there's a number of other abbreviations that I'm

13  seeing as we go through some of these transcripts.  For

14  instance, the capital letters "OV" in brackets, what does

15  that mean?

16  A.  That means "Overlapping Voices," and we use those when we

17  have the two speakers speaking on top of each other.

18  Q.  Okay.  And when we come to an example of that, I'll point

19  it out.  How about the capital letters in brackets "UI"?

20  A.  "Unintelligible."

21  Q.  Okay.  Is there an example of that at Government's

22  Exhibit 121?

23  A.  Yes, at 000359.

24  Q.  Okay.  And down at 000405 is there an indication OV, that

25  the speakers were talking over each other?

1    A.  Which exhibit, please?

2    Q.  Same exhibit, bottom of the page, 000405.  The letters OV

3    are there, right?

4    A.  I'm looking.  I'm looking at the wrong --

5    Q.  Sorry, Exhibit 121.

6    A.  121.

7    Q.  Sure.  Do you see that?

8    A.  121 --

9    Q.  Right.

10   A.  Zero --

11   Q.  Go to page 4, the bottom, 000405.

12   A.  Yes, I see.

13   Q.  Okay.  And is that the reference where people are talking

14   over each other, overlapping voices?

15   A.  Yes, the speakers start talking while the other didn't

16   finish speaking.

17   Q.  Okay.  Do you also use an annotation in your transcripts

18   of the capital letters "SC" in brackets?

19   A.  Yes.

20   Q.  What does that mean, Mr. Abdirahman?

21   A.  It's a short for "Simultaneous Conversation."

22   Q.  Okay.  And what's actually going on there?

23   A.  That's when one of the two speakers in the call is

24   talking to someone else on the side, so it's having a

25   simultaneous conversation with another person while speaking

1   on the phone with one.

2   Q.  Okay.  Now, in the header we'd indicated that there's a

3   time of the telephone call, and we are right here in

4   Government's Exhibit 122; that's a December 22, 2007 call.

5   That's a call between the defendant Basaaly Saeed Moalin and

6   the defendant Ahmed Nasir, and it says the time is 01:41:32

7   UTC.  Can you explain to the jury what "UTC" means.

8   A.  UTC stands for Universal Time Clock.

9   Q.  And does that just come off of the call data disk?

10  A.  That comes -- the system generates that number.

11  Q.  Okay.  What's the difference in time between the

12  Universal Time Clock and Somalia?

13  A.  The Universal Time Clock refers to the time on the

14  Greenwich median.

15  Q.  Greenwich Mean Time?

16  A.  Greenwich.

17  Q.  Okay.

18  A.  So Somalia -- I think it's a three-hour difference I

19  believe.

20  Q.  Okay.  Somalia's three hours ahead of Greenwich Mean

21  Time?

22  A.  I believe so.

23  Q.  And how the -- about here in San Diego; what's the

24  difference between Greenwich Mean Time and San Diego time?

25  A.  I think it's eight or nine depending if there is the

1   times we are on, time saving, light saving time --

2   Q.  Daylight Saving Time?

3   A.  -- or not.  I'm sorry.

4   Q.  Okay.  Now, in these transcripts -- going to Government's

5   Exhibit 130, and at the time stamp 000825, which is -- it's

6   at page 4 -- do you have that in front of you, Mr.

7   Abdirahman?

8   A.  Yes, I do.

9   Q.  At that line Basaaly says, Today's youth, the

10  reliberation, the Shabaab, and the public, when you -- when

11  you recorded "shabaab" in your transcripts, what was the word

12  that the speaker actually spoke?

13  A.  "Shabaab" was the exact word spoken on the call.  It's

14  not translated because that's not Somali; that's Arabic.

15  Q.  Okay.  And so the speaker said an Arabic word?

16  A.  "Shabaab."

17  Q.  In the course of your job, have you learned -- in the

18  course of your job, have you learned what the Arabic word

19  "shabaab" means?

20  A.  Yes, I do.

21  Q.  And what does it mean?

22  A.  The youth.

23  Q.  Okay.  And is that short for al-Shabaab?

24  A.  Yes, it is.

25  Q.  And what's the difference between referring to the

1  organization as Shabaab and al-Shabaab?

2  A.  Al-Shabaab is -- "al" is the article in Arabic, so

3  al-Shabaab means the Shabaab.  Shabaab means just Shabaab

4  without the article.

5  Q.  Okay.

6  A.  So there's no difference practically.

7  Q.  Now, in some of the -- in some of the calls, did the

8  speaker actually speak a Somali word "shabaabka," s-h-a --

9  A.  Again, the word --

10 Q.  --b-a-b-k-a?

11         THE REPORTER:  Wait, wait.  Excuse me.  Would you

12 say that again, please.

13         BY MR. WARD:  Q.  Did they sometimes say Shabaabka,

14 with a k-a at the end of it?

15 A.  Yes.

16 Q.  Okay.  Now, can you explain how that relates to the

17 testimony you just gave here?

18 A.  Again, the word is still the Arabic word "Shabaab."  The

19 k-a at the end denotes the article in Somali.  So the word --

20 the Arabic word is being like kind of summarized Somali.

21 It's like saying a shabaab in Arabic and then applying the

22 Somali article "Ka."

23 Q.  All right.  Now, if your transcript reflects Shabaab or

24 al-Shabaab -- withdraw that question.  Did you follow the

25 same practice throughout your transcripts when you recorded

1  "Shabaab" in the transcripts you've brought here today?

2  A.  Yes.

3  Q.  Is there another word in the transcripts that are in

4  evidence today that the speakers used to refer to al-Shabaab?

5  A.  Yes.

6  Q.  And what's that word, Mr. Abdirahman?

7  A.  That's the Somali translation of "al-Shabaab," which is

8  "dhallinyarada."

9  Q.  And can you spell that, please.

10  A.  It's d-h-a-l-l-i-n-y-a-r-a-d-a.

11  Q.  And I want to get to an example in a minute, but -- okay.

12  Now, what I've put in front of you, just for demonstrative

13  purposes and to help the court reporter, is a piece of paper

14  that has in the center -- is that the word you just spoke and

15  spelled for the court reporter?

16  A.  Yes, it is.

17  Q.  And is that the word that we're talking about as used by

18  the speakers to refer to al-Shabaab?

19  A.  Yes.

20  Q.  And what's the rest -- what are the other words?

21  A.  That's the full official name in Somali for al-Shabaab.

22  Q.  Okay.  And could you say that for us?

23  A.  Haragada Dhallinyarada Mujahedinta.

24  Q.  Okay.  Now, in Government's Exhibit 122 -- top of page 2

25  at 000854.

1              MS. FONTIER:  I'm sorry?

2              MR. WARD:  122.

3              BY MR. WARD:  Q.  Do you see where you've

4    translated the Somali as "the youth who are firing the

5    bullets"?

6    A.  You say exhibit 000851?

7    Q.  54.

8    A.  54.  Yes I see.

9    Q.  Okay.  What word did the speaker use when you translated

10   that as "the youth"?

11   A.  "Dhallinyarada."

12   Q.  And that's the word that's in bold on the Elmo right now?

13   A.  Yes.

14   Q.  Okay.  And does that refer to al-Shabaab, the

15   organization?

16              MS. FONTIER:  Objection.

17              BY MR. WARD:  Q.  Do you have an opinion as to

18   whether or not that refers to al-Shabaab as an organization?

19              THE COURT:  This has already been --

20              MS. FONTIER:  Objection.

21              THE COURT:  This has already been asked and

22   answered I don't know how many times.  Well, is it the word

23   "organization"?  The objection is sustained until you lay a

24   foundation and specifically give some context to

25   "organization" if this witness is able to do so.

1          BY MR. WARD:  Q.  Well, Mr. Abdirahman, does the

2    Somali word "dhallinyarada," does that refer to people of

3    young age --

4    A.  Yes.

5    Q.  -- in general?

6    A.  Yes.

7    Q.  Okay.  Now, on the other hand, is it also part of the

8    full name of al-Shabaab, the organization, as you previously

9    testified?

10   A.  Yes.

11          MR. DURKIN:  Asked and answered.

12          THE COURT:  Okay.  Do you have another question you

13   haven't already asked or hasn't been answered?

14          MR. WARD:  I have nothing further, your Honor.

15          THE COURT:  At this time?

16          MR. WARD:  Not on that.

17          THE COURT:  Okay.

18          BY MR. WARD:  Q.  Going to Government's Exhibit

19   128, do you have that in front of you, Mr. Abdirahman?

20   A.  Yes.

21   Q.  At 000536 on the first page, this is a conversation

22   between the defendant Basaaly Saeed Moalin and another party

23   who you were not able to identify; is that correct?

24   A.  That's correct.

25   Q.  So you entered "UM" at the top?

1   A.   Yes.

2   Q.   Okay.  And at 00 -- at 000536 the UM says, Right now

3   these youth, are these youth currently saying, by the way, is

4   Aden Ayrow their leader?

5   A.   Yes.

6   Q.   What word did the speaker use that you translated as

7   "youth" on that page of Government's Exhibit 128?

8   A.   The word "dhallinyarada" was used.

9   Q.   Okay.  And that's the same word we've been talking about.

10  Turning to Government's Exhibit 132, do you have that in

11  front of you?

12  A.   Yes, I do.

13  Q.   And in the center of the page -- now, this is a

14  conversation between the defendant Basaaly Saeed Moalin and

15  another unidentified male, and at 000027 does he say, I was

16  talking to the man who was in charge of the youth?

17  A.   Yes.

18  Q.   He told me that fighting took place in that place was

19  between Abdullahi Yusuf's men and a group of men who belonged

20  to the youth.

21  A.   Yes, I see it.

22  Q.   In those two instances where your transcript reads

23  "youth," what was the Somali word that was used there?

24  A.   "Dhallinyarada."

25  Q.   Referring to al-Shabaab?

1   A.  Yes.

2              MS. FONTIER:  Objection.

3              BY MR. WARD:  Q.  Government's Exhibit 136.

4              THE COURT:  Who's made the objection, and what's

5   the basis for the objection, please?

6              MS. FONTIER:  Foundation and asked and answered.

7              THE COURT:  The objection is overruled on each

8   ground.

9              BY MR. WARD:  Q.  Okay.  Turning to Government's

10  Exhibit 136, on page 4 of that transcript at 003007, the

11  speaker you've identified as Sheikalow, he says, And we, the

12  Shabaab, have a political section, a military section, and a

13  missionary section, we have all that.

14  A.  Yes, I see it.

15  Q.  And there though was the word that was used the Arabic

16  "shabaab"?

17  A.  Yes.

18  Q.  Okay.  And then at Government's Exhibit 186, this is a

19  conversation between the defendant Ahmed Nasir Taalil Mohamud

20  and the defendant Basaaly Saeed Moalin -- do you have that in

21  front of you, Mr. Abdirahman?

22  A.  Yes.

23  Q.  This is on July 10, and at 000634 does the defendant

24  Basaaly Moalin say, We're going to divide 5,000 between what

25  you call the men, the men from the youth.  Do you see that?

1    A.   Yes.

2    Q.   And when you translated in your -- this transcript and

3    put the word "youth," what was the word that Basaaly Saeed

4    Moalin used?

5    A.   "Dhallinyarada."

6    Q.   Now, Mr. Abdirahman, in the calls that you reviewed and

7    prepared translations for, are there -- are there other

8    references that the speakers use to refer to al-Shabaab?

9    A.   Yes.

10   Q.   And turning to Government's Exhibit 178 -- and let's see.

11   There is a June 17 call between Basaaly Saeed Moalin and a

12   man named Mohamad Abdi Yusuf, also known as Hassan.   In this

13   transcript how did the speakers refer to the organization

14   al-Shabaab at page 5 at 001154?

15              MS. FONTIER:   Objection as to the organization.

16              THE COURT:   The objection is overruled at this

17   point.

18              BY MR. WARD:   Q.   Are you at page 5, Mr.

19   Abdirahman?

20   A.   Yes.

21   Q.   How do you -- when you translate this as "young guys,"

22   what was the underlying word in Somali that the speakers

23   spoke?

24   A.   The Somali word used was "yaryarka."

25   Q.   And can you spell that for the record.

1   A.  Y-a-r-k-a -- actually I'm sorry -- y-a-r-y-a-r-k-a.

2   Q.  Are there other places in the transcripts where -- I'm

3   sorry?

4   A.  I just want to make sure that I got that spelling right,

5   y-a-r-y-a-r-k-a.

6   Q.  Okay.  And are there other places in these transcripts

7   where you translated the Somali word "yaryarka" --

8   A.  Yes.

9   Q.  -- to "young guys"?

10  A.  Yes.

11  Q.  Now, in the exhibit right before, exhibit -- okay --

12  withdraw that question.  Okay.  Turning to Government's

13  Exhibit 183, do you have that in front of you, Mr.

14  Abdirahman?

15  A.  Yes, I do.

16  Q.  And --

17          MR. DURKIN:  Excuse me, Mr. Ward.  What --

18          MR. WARD:  I'm sorry.  I dropped my voice.  I have

19  183.

20          BY MR. WARD:  Q.  This is a call on July 8, and it

21  says that Ahmed Nasir Taalil Mohamud and Basaaly Saeed Moalin

22  and a gentleman named Ugas are on the phone, but right at the

23  top it says "Radio Shabelle" in brackets; do you see that?

24  A.  Yes, I do.

25  Q.  What's going on in this conversation?

1   A.  That's actually a radio broadcast that the people on the

2   call are listening to on the phone.

3   Q.  Okay.  And is Radio Shabelle the --

4   A.  That's a Somali radio by the name Radio Shabelle.

5   Q.  Okay.  And you referred to that earlier in your

6   testimony?

7   A.  Yes.

8   Q.  And do the calls that are in evidence today also show

9   that there's another code name for the speaker that you

10  identified as Sheikalow?

11  A.  Yes.

12          MS. FONTIER:  Objection as to code name.

13          THE COURT:  The objection's sustained.

14          BY MR. WARD:  Q.  What's the name that the speakers

15  use to refer to the gentleman also known as Sheikalow?

16  A.  Sometimes when talking among them, they use the nickname

17  Majadhub.

18  Q.  Can you spell that, please.

19  A.  M-a-j-a-d-h-u-u-b.

20  Q.  Okay.  And turning to Government's Exhibit 167, do you

21  have that in front of you?

22  A.  Not yet.  Hold on.

23  Q.  Okay.

24  A.  167?

25  Q.  167.

1    A.  Yes, I have it.

2    Q.  Okay.  Is there an indication on the first page that this

3    is a call between the defendant Mohamad Mohamad Mohamud and

4    Basaaly Saeed Moalin; is that correct?

5    A.  That's correct.

6    Q.  Okay.  And I'm at 0303.  Does Sheik Mohamad ask, Hey, did

7    you hear from the man Majadhub?

8    A.  Yes.

9    Q.  And then does Basaaly respond, The man Majadhub, a few

10   nights ago.  I called him last night and said, you know, we

11   use the name Sheikalow, you know.  And does he continue on

12   and say, I called back and said pass me Majadhub?

13   A.  Yes, I see.

14   Q.  And at the top of the next page, page 2, at 0340, does

15   the defendant Basaaly Saeed Moalin say, So when he laughed, I

16   said man, listen, we didn't understand each other since

17   everyone uses codes.  Is that correct?

18   A.  Yeah.

19   Q.  And is he referring to the code name that some of the

20   speakers use to refer to Sheikalow?

21   A.  Yes.

22   Q.  And are there a number of other references where you've

23   just left the name "Majadhub" in the transcripts that you've

24   brought here today?

25   A.  It's whenever the word "Majadhub" was used, yes.

1   Q.  Okay.  So when the speakers spoke "Majadhub," you didn't

2   translate it?  What's it mean in Somali?

3   A.  Means small limbs.

4   Q.  Small limbs?  Okay.

5           MR. WARD:  Your Honor, I just want to check my

6   notes.

7           BY MR. WARD:  Q.  Now, we've talked a lot about

8   telephone calls from the number (619)278-1189.  Did you also

9   listen to a couple of phone calls between the defendant

10  Basaaly Saeed Moalin and Mohamad Abdi Yusuf at a St. Louis

11  telephone number?

12  A.  Yes.

13  Q.  And are those at Government's Exhibit 179?  And do you

14  have that in front of you?

15  A.  Yes, I do.

16  Q.  And for the record that's a call between Mohamad Abdi

17  Yusuf, also known as Hassan, and the defendant Sheik Issa

18  Doreh; is that correct?

19  A.  That's correct.

20  Q.  And then on Government's Exhibit 184, is that -- do you

21  have that in front of you?

22  A.  Yes.

23  Q.  Is that a July 8 call where the speakers include the

24  defendant Issa Doreh, Basaaly Saeed Moalin, and Mohamad Abdi

25  Yusuf?

1   A.   Yes.

2   Q.   And when you identified -- and, again, that's from a St.

3   Louis telephone number?

4   A.   Yes.

5   Q.   And when you identified Mohamad Abdi Yusuf as a speaker,

6   did you, as in the other calls, recognize his voice?

7   A.   Yes.

8           MR. WARD:  Your Honor, I have no further questions

9   but ask that the witness be subject to recall for one

10  particular exhibit which we did not move to admit.

11          THE COURT:  Okay.  Counsel, do you wish to

12  cross-examine the witness on the areas covered at this point

13  or defer that?

14          MR. DRATEL:  Your Honor, we'd prefer to do it the

15  way we discussed at the break.

16          THE COURT:  That's fine.  All right, sir.  You're

17  excused at this time.  You'll be recalled at a later time.

18  Thank you.

19          MS. FONTIER:  Your Honor, I'm sorry.  What we

20  indicated I thought earlier was that we were going to break

21  at this point and then cross-examine him after the break, not

22  at the later time.

23          THE COURT:  Well, after the break is a later time.

24          MS. FONTIER:  I just want to make sure that he's

25  going to be back after lunch.

 1          THE COURT:  Oh, sure, yeah.  I think that's the

 2   understanding, but thank you for clarifying that.  We'll see

 3   you soon.  Ladies and gentlemen, it's about 20 to 12:00 right

 4   now.  We're going to break because it's -- it would help us

 5   become a little bit more efficient at this particular point

 6   in time if we did that, and so we will -- let's see.  Why

 7   don't we try resuming at 1:15.  We'll break now until 1:15.

 8   Remember the admonition not to discuss the case or make any

 9   decisions at this time.  Thank you.

10       (The jury left the courtroom.)

11          THE COURT:  Okay.  We have all counsel present.

12   I'm going over the materials now, so let's meet back here at

13   one o'clock.  The jury's coming back at 1:15.  Meet back here

14   at one o'clock, and I'll give you the rulings on those two

15   items that reference was made to for the in-camera

16   inspection.  I've gone over them superficially, I will tell

17   you this, just be a bit of a head's up.  I don't think there

18   is anything to disclose, nothing to provide.  But I'm going

19   to go over them a little bit more carefully.  If that

20   changes, I'll certainly let you know.

21          MR. DRATEL:  Thank you, your Honor.

22          THE COURT:  Okay.  Thanks.  When are the tapes

23   going to be played?

24          MR. COLE:  When this witness is finished being

25   cross-examined, the next witness, we'll play the tapes.  So

 1  whenever cross-examination -- whenever this witness is

 2  finished will be the next slot when we play the tapes.

 3          THE COURT:  Okay.  Thank you.

 4      (There was a break in the proceedings.)

 5      (The following proceedings were outside the presence of

 6  the jury.)

 7          THE COURT:  Good afternoon, counsel.  I had a

 8  chance to go over in detail the submissions.  Let the record

 9  reflect all counsel and defendants are present.  I went over

10  all the material that was submitted for an in-camera

11  inspection pursuant to my last discovery order.

12          MR. DURKIN:  I'm sorry, Judge.  Can you maybe raise

13  the microphone up?  We can't hear you.

14          THE COURT:  Okay.  Sorry about that.  I reviewed

15  all the materials that have been submitted in camera to me

16  following my last order, and there is nothing additional that

17  needs to be provided.  I'll say no more, but there's just

18  nothing more; there's no Brady, there's no Jencks, there's

19  nothing that needs to be provided.  I'm going to sign an

20  order later this afternoon.  Just wanted to let you know just

21  as soon as possible in the event that was significant for

22  your cross-examination of the current witness.

23          So we're going to start up in a few minutes.  And

24  what -- what's the plan for the rest of the day?  Tell me

25  what we have on tap for the next couple of days; that would

1    be helpful.

2              MR. COLE:  Okay.  One last couple -- one or two

3    questions to the current witness to deal with Exhibit 177,

4    which we had skipped over.  And then cross-examination.  Then

5    we will call Colby O'Very and play the audiotapes, the clips,

6    and --

7              THE COURT:  This is going to be with your Sanctions

8    program?

9              MR. COLE:  Yes, your Honor.

10             THE COURT:  Okay.  How long does that take?

11             MR. COLE:  That's a good question.  It will take

12   the -- we're assuming it will take the rest of the afternoon

13   and then probably part of the morning, a good part of the

14   morning as well.  Then we have recalling Mr. Bryden to

15   testify just briefly about some of the specific audio calls.

16   And then we have a handful of telephone company employees to

17   talk about lack of subscriber information for certain phone

18   numbers, and those telephone employees will be -- may or may

19   not be before or after Mr. Bryden depending on when they

20   arrive at court.

21             THE COURT:  And after that?

22             MR. COLE:  After that we will be resting.

23             THE COURT:  So that takes us -- let's see --

24   today's Monday, Tuesday, Wednesday.

25             MR. COLE:  I think there's no question, unless

1   cross-examination is longer than we think or something else

2   comes up, we think we'll definitely be done on Wednesday with

3   our case.

4            THE COURT:  Wednesday.  Well, hopefully that's of

5   value to you by way of scheduling and all, counsel.  Have

6   your stuff ready to go.  I assume you're going to do --

7   you're going to do quite a bit of deposition work here; am I

8   correct?

9            MS. FONTIER:  Yes, your Honor.  I think -- I mean I

10  think that seems like an ambitious dream of the government

11  perhaps.  I would be very surprised if we're actually done on

12  Wednesday.  And we certainly -- in discussing with our

13  witnesses that are not on video, their schedules, we didn't

14  anticipate the government really being done until probably

15  Friday of this week, but we can certainly readjust that with

16  what the government has just said.

17           THE COURT:  If you would.  Keep counsel in the

18  loop, Mr. Cole, so that we don't have any down time.  We

19  obviously -- I don't know what the order of evidence is going

20  to be, but you can certainly -- if it had been your plan to

21  do depositions in the beginning, that's going to take some

22  time I would think.

23           MS. FONTIER:  It certainly will, your Honor.  And,

24  your Honor, the reason that I just raised this as even a

25  potential issue is that two of the people that we may be

```
 1   calling are traveling from Somalia or from Africa in that

 2   region if they're not in Somalia at the moment, so we're not

 3   that flexible as far as scheduling.  We certainly -- even if

 4   we put them on a plane today, they wouldn't be here until

 5   Wednesday, so there will be a little bit --

 6           THE COURT:  But you've got a good day to a day and

 7   a half of deposition material?

 8           MS. FONTIER:  Certainly, yes, your Honor.

 9           THE COURT:  Okay.

10           MS. FONTIER:  It also just means that I need to put

11   a fire under the video editor, which was not quite -- was not

12   lit as hot as it may need to be.

13           THE COURT:  Well, if you need me to help you

14   lighting the fire, let me know what I can do.  But I think

15   the timing really helps; I think it's of great assistance to

16   you to know when the government might be done.  So I would --

17   I would at least plan on having your first live witnesses

18   here Friday, for Friday, assuming that your deposition

19   testimony is going to go a day and that you'll start out with

20   that.  If you can get witnesses here sooner and you want to

21   start with them, then fine, you know, you can do that as

22   well.  I do appreciate the head's up from the government.

23           MR. COLE:  The only other thing, your Honor, is to

24   keep the schedule moving as well, we need to see your Honor

25   about the one Section 5 issue, but the next step is we have
```

1   to meet with Mr. Dratel or other representatives of the

2   defense to just hammer out specifically what we need to see

3   you about.  And so we're hoping we can meet with Mr. Dratel

4   after court today if it works for him or tomorrow morning

5   before court and then we could have time sometime this week

6   to see you because I'm sure that's in the background.

7          THE COURT:  I'm hoping to stop a little early

8   anyway.  I'd like to go up and get checked out.  I've got a

9   tentative schedule later -- an appointment later in the

10  afternoon, so that will be a little bit of a help as well.

11  Yes?

12         MR. DURKIN:  Judge, are we going to talk about the

13  106 issues before the tapes get played?

14         THE COURT:  No, I don't think we're going to have a

15  chance to do that.  The jury is here.  I just got the 106

16  stuff last night or this morning first thing.

17         MR. DURKIN:  Maybe this would just make things

18  easier, at least from our standpoint.  I have copies of our

19  translator's translations for a number of calls that we've

20  discussed with the government, and I have them color-coded.

21  For example, they're in -- what the government is playing is

22  in yellow, and the green is what is not being played.  And

23  then there's blue for what we've asked the government to

24  play.  I'd like you to at least take a look at those so you

25  can see the context that we're talking about.  I think the

1   colors really help.

2            THE COURT:  How many individual calls are we

3   talking about where you -- I mean keep in mind that in all

4   probability -- this is without even seeing what you've got --

5   in all probability you're probably talking about an 803 issue

6   rather than a 106 unless it's something that's so intertwined

7   that if it were to be left out, it would be misleading.  Let

8   me ask you this.  How many calls, how many intercepts --

9            MR. DURKIN:  Eight.

10           THE COURT:  Eight all together?

11           MR. DURKIN:  Yes.

12           THE COURT:  Okay.

13           MR. DURKIN:  I think if you just look at them,

14   you'll at least see --

15           THE COURT:  Have you shown --

16           MR. DURKIN:  The colors -- the government has a

17   set.

18           THE COURT:  Are there issues here?  Do we need to

19   resolve these or in fairness should we --

20           MR. WARD:  Yesterday was the first we had notice of

21   any additional portion of a call the government -- or that

22   the defendants wanted to play other than a representation

23   that there was a 106 issue.  One of the transcripts I

24   received for the first time yesterday, and we haven't had a

25   chance to have a translator look at it.

1             THE COURT:  Okay.  Have you met and conferred

2    though?

3             MR. WARD:  We sure did.

4             MR. DURKIN:  We did.  We've met and conferred

5    several times.  We've had a lot of telephone contact, we had

6    a personal meeting yesterday.  The reason I want you to look

7    at these, Judge, is I think you will be quite surprised when

8    you see how limited the government's snippets are of these

9    conversations, and you may be -- I think if you just see

10   these, you'll see my point.

11            THE COURT:  All right.  Well, why don't you do

12   this.  Have they been filed?  Have they been filed?  Because

13   if you're submitting something, we need to have a record of

14   it, have they been electronically filed?

15            MR. DURKIN:  I could --

16            THE COURT:  Bear with me here because we need to do

17   this in an orderly way.  May I ask -- I appreciate the

18   courtesy copies, but I assume that you have an original

19   somewhere or you can print out an original and have those

20   electronically filed so that we have a complete record on

21   this.

22            MR. DURKIN:  The only thing I'm hesitating about is

23   we've had trouble finding color copiers, and I can -- I'm not

24   quite sure if we PDF for the electronic filing, whether the

25   colors will come through.

1              THE COURT:  Okay.  Why don't you bring those

2      forward, Mr. Durkin.  I'll -- you know, I probably won't get

3      a chance to look at those until tonight.  You say there are

4      eight calls here all together --

5              MR. DURKIN:  Yes.

6              THE COURT:  -- that are affected?

7              MR. DURKIN:  What I can do, Judge, is I will try to

8      make a set.  I'll see if I can get it PDF'd in color and file

9      it.  I'll mark those -- and I'll also get exhibit numbers for

10     them; I'll make it like --

11             THE COURT:  We'll make it part of the record

12     somehow; that's the important thing.  We may have to just

13     introduce it as a court exhibit.

14             MR. DURKIN:  So that you know, because of the color

15     copier problems, there might be the comment or two in the

16     margins that I'll delete that my -- our partner might have

17     written a comment in one or two areas; I'd ask you to ignore

18     those.  Those aren't pertinent to what we're talking about,

19     but I think they'll give you a pretty good idea of the issue.

20             THE COURT:  Okay.  And you have these color-coded?

21             MR. DURKIN:  Yes.  Again, the yellow is what the

22     government's going to play, the green is what's not being

23     played, and the blue is what we've asked to be included under

24     106.

25             THE COURT:  So you're requesting the blue be played

1    but without reference to the green?

2                MR. DURKIN:  Yes.

3                THE COURT:  Okay.

4                MR. DURKIN:  Ms. Roberts tells me that we do have

5    PDFs, Judge, that are in color without the comments, so I'll

6    get those filed today.

7                THE COURT:  Okay.

8                MR. DRATEL:  Your Honor, we have -- that's for

9    Mr. Durkin's client, Mr. Taalil Mohamud.  We have our own as

10   well of 106.  Just so the Court understands what we're

11   talking about, we're not talking about -- I mean for our

12   purposes, for our 106, we're talking about within the same

13   conversation where the government starts at point A, goes to

14   point B, then resumes at point E and goes to point whatever;

15   and we're talking about stuff that might be at the beginning

16   of the conversation, in the middle, or thereafter.  So we

17   believe contextual, it's a classic 106 type of situation.

18               THE COURT:  Well, you better get those things to me

19   right away.  And the other thing is this:  As I started to

20   say, it's conceivable that a proffered bit of a call would

21   not qualify under 106, or at least what I interpret 106 to

22   be, but could come in under 803 (3).  I can envision that

23   very easily.

24               MR. DRATEL:  And I understand, your Honor, that the

25   Court has to exercise that discretion in the course of making

1   its decision.  It's just that for our purposes I guess and

2   cognizant of the Court's I think generally appropriate

3   direction that the parties be permitted to try their case,

4   obviously we think Rule 106 is designed to make sure that in

5   doing so it doesn't present something to the jury that's, you

6   know, seamlessly misleading as opposed to -- I think I guess

7   what I'm trying to say is that a party that edits material in

8   the way that the government has does so at their peril with

9   respect to their own presentation because 106 does exist as a

10  matter of fairness, and I think also subsumed within that in

11  the context of a criminal case is some measure of due process

12  for the purpose of allowing it to get in front of the jury at

13  a time when it has the most meaning for the jury.

14          The other thing I just wanted to -- what we've

15  proposed earlier -- and I don't know where we are on this in

16  terms of timing; I don't know how long the cross is going to

17  be of Mr. Abdirahman, I don't know how long redirect will

18  be -- I don't know if we start right in with calls with the

19  agent or whether they have some prefatory stuff that's going

20  to take some time before they play the calls, but what I

21  suggest earlier, which was that perhaps if we come to a point

22  this afternoon where we perhaps could excuse the jury for the

23  day and work this out ahead of schedule so that the Court has

24  an opportunity make -- rather than just completely on the fly

25  some considered judgments on these, I think that might be a

1   better practice.

2          THE COURT:  Well, I never -- I never like to do

3   things on the fly, but you have hoisted me so far up into the

4   stratosphere at this point given the timing of some of these

5   filings, I may have to fly just to survive.  Look, the jury

6   is waiting for us.  All I'm saying is get your stuff to me.

7   Ms. Moreno?

8          MS. MORENO:  Yes, your Honor.  I just wanted to

9   also augment -- I was very mindful of what the Court's

10   guidance was earlier on the distinction between the rule of

11   completeness and the 803 (3) issues.  I only have four

12   rule-of-completeness calls, again, within the same

13   conversation that the government is playing -- that the

14   government has a verbatim of.  No surprise.  The government

15   and I have been back and forth on these for weeks and weeks

16   on these issues, so I don't believe there's any prejudice to

17   the government.  We would like an opportunity as well to

18   present those rule-of-completeness calls.

19          THE COURT:  Okay.  In any event, Mr. Cole, Mr.

20   Ward, Ms. Han, one or all of you, or some of you will be

21   getting together with Mr. Dratel and perhaps one or two other

22   defense counsel today on the Section 5 issues.  So you really

23   do need some time I think to kind of work things out, if you

24   can, amongst yourselves.  Okay.  If there's nothing else

25   then, we'll bring our jury in and continue on.

 1          (The jury entered the courtroom.)

 2              THE COURT:  Please be seated, ladies and gentlemen.

 3   Thank you.  Ladies and gentlemen of the jury, thank you for

 4   your promptness.  We are ready to continue on.

 5              BY MR. WARD:  Q.  Good afternoon, Mr. Abdirahman.

 6   A.  Good afternoon.

 7   Q.  Before we broke for lunch, we were finished talking about

 8   your transcripts, but I want to hand you what's been marked

 9   for identification as Government's Exhibit 177 and ask you if

10   you recognize that as another transcript that you prepared --

11   A.  Yes, I do.

12   Q.  -- which relates to the audio that's been admitted in

13   evidence.  And over the lunch hour, did I ask you to go back

14   and verify whether or not the header information on

15   Government's 177 corresponded to the related audio disk?

16   A.  Yes.

17   Q.  And did you make that change?

18   A.  Yes.

19              MR. WARD:  I'd offer 177, your Honor.

20              MS. FONTIER:  Your Honor, again no objection to the

21   foundation but reserving as to the content.

22              THE COURT:  177 is admitted, as have the others.

23          (Exhibit No. 177 admitted.)

24              BY MR. WARD:  Q.  And have you placed 177 in that

25   binder there, Mr. Abdirahman?

1    A.  I am trying to.

2    Q.  Okay.  If you could do that and remove the other one.

3            MR. WARD:  I have no further questions.

4            THE COURT:  Cross-examination?

5            MS. FONTIER:  Yes, your Honor.  One moment.  Thank

6    you, your Honor.

7                         Cross-Examination

8            BY MS. FONTIER:  Q.  Good afternoon, Mr.

9    Abdirahman.

10   A.  Good afternoon.

11   Q.  You said you've worked with the FBI for about seven

12   years, correct?

13   A.  About seven years and six months.

14   Q.  Okay.  Some of that you worked just as a consultant and

15   then you were actually hired full time by the FBI; is that

16   correct?

17   A.  That's correct.

18   Q.  And your primary job there you said is translating?

19   A.  Yes.

20   Q.  You also do some interpreting?

21   A.  Yes.

22   Q.  And the translating, again, is when you listen to audio

23   or translate written work, correct?

24   A.  Correct.

25   Q.  And prior to working at the FBI, you worked at a phone

1  company?

2  A.  I worked for MCI that was later bought by Verizon.

3  Q.  And you were not a Somali translator for MCI, correct?

4  A.  No, I was not.

5  Q.  You worked as an accountant?

6  A.  That's correct.

7  Q.  Now, prior to becoming a consultant with the FBI, you

8  didn't receive any -- you didn't study linguistics at school;

9  is that correct?

10  A.  That's somewhat correct.  I work as a linguist before in

11  my life, first in Somalia and later in Sweden, and I attended

12  several courses for linguist.

13  Q.  But you don't have a degree in linguistics?

14  A.  No.

15  Q.  And you don't have -- you didn't -- you don't have a

16  degree in the Somali language either?

17  A.  No.

18  Q.  But you said you are certified.  The certificates that

19  you received were internal FBI certificates, correct?

20  A.  That's correct.

21  Q.  And the first was just the general linguistics

22  certificate, correct?

23  A.  That's correct.

24  Q.  And you said what you did for that was to take a few

25  tests, correct?

1   A.   Correct.

2   Q.   Your English was tested and -- sorry, yes?

3   A.   My English was tested.

4   Q.   And your Somali was also tested?

5   A.   That's correct.

6   Q.   And you had to do a sample verbatim translation; is that

7   correct?

8   A.   That's correct.

9   Q.   And then the FBI gave you a certificate?

10   A.   Yes.

11   Q.   Now, that is the test that any linguist working for the

12   FBI would have to take, correct?

13   A.   Yes.  No, no one can work as a linguist for the FBI

14   without taking those -- taking and passing those tests, yes.

15   Q.   And so once you took those tests, you were certified by

16   the FBI?

17   A.   Correct, yes.

18   Q.   They didn't give you additional training particular to

19   translating the Somali language, correct?

20   A.   That's correct.  They gave me -- we go to training all

21   the time to improve our skills as linguists in general.

22   Q.   All right.  But not as -- just a linguist in general but

23   not particular to translating Somali to English, correct?

24   A.   No, that's correct.

25   Q.   And now you said you grew up speaking -- once you went to

1    middle school, you spoke Italian, correct?

2    A.   While I was in boarding school in Italy, yes.

3    Q.   And so when you were born in Mogadishu, you spoke Somali

4    as a child, then you spoke Somali.  And did you also speak

5    Italian then?

6    A.   Yes.

7    Q.   When did you learn English?

8    A.   I learned English in high school.

9    Q.   So, now, the certifications that you received, you also

10   took a -- you got another certification to work as a quality

11   control reviewer; is that correct?

12   A.   That's correct.

13   Q.   And that's also an internal FBI certification, correct?

14   A.   That's correct.

15   Q.   And, again, is that the same?  It's general for

16   linguistics and not particular to Somali?

17   A.   That's correct.

18   Q.   Now, you're not a court-certified translator, correct?

19   A.   No, I'm not.

20   Q.   So you're not certified to, say, translate for one of the

21   defendants here in court; is that correct?

22   A.   That's correct.

23   Q.   Now, speaking of this case, you said you were assigned in

24   the end of 2007; is that right?

25   A.   That's right.

1  Q.  So you've been working on this case since the end of

2  2007?

3  A.  That's correct.

4  Q.  And now I believe you said your role was primarily as the

5  quality control reviewer; is that correct?

6  A.  No, that's not correct.

7  Q.  And can you -- so did you also work as someone who

8  monitored the calls?

9  A.  I was -- I was one of the linguists assigned to this case

10  from the start, but as the quality control reviewer, I came

11  in when preparing for this trial.

12  Q.  Okay.  So originally your role was just as a linguist who

13  is monitoring the calls as they come in?

14  A.  Right.

15  Q.  All right.  And so you then would literally sit and

16  listen to the phone calls as they were happening; is that

17  right?

18  A.  That's right.

19  Q.  All right.  And then you would make some summaries of

20  those calls?

21  A.  Going back to the previous question.  I'm sorry.

22  Q.  Go ahead.

23  A.  I was not listening to the phone calls as they came in.

24  I would listen to the phone calls that had been recorded and

25  then uploaded to our system, so they were not like live

1    calls.

2    Q.   So --

3    A.   Just make it clear.

4    Q.   -- in general how much time would pass between the actual

5    phone call being made and you listening to them?

6    A.   I would say 24, 48 hours at least.  In some cases even

7    more.

8    Q.   Okay.  But generally within a day or two of the real-time

9    call, you were listening on the -- were listening to a

10   recording of that call?

11   A.   That's correct.

12   Q.   And, now, the phone calls that came in to you were every

13   single phone call that was recorded, correct?

14   A.   Correct.

15   Q.   And part of what your job was was to sort through those

16   calls, correct?

17   A.   Correct.

18   Q.   Decide which were pertinent calls?

19   A.   Decide which calls contained information relevant to the

20   investigation and which calls were not.

21   Q.   I'm going to come back to that point in a moment, but if

22   we can, just talking about the calls then, so then as a

23   monitor on this case, you listened to thousands of calls; is

24   that correct?  And this was -- sorry, you have to answer out

25   loud.

1    A.   Yeah, probably.  If not for one case, thousands of calls

2    for several cases maybe.

3    Q.   Okay.  And the phone number you said was -- you testified

4    that it was assigned to Mr. Moalin, correct?

5    A.   I know that when I was assigned to the case, that was the

6    phone number listed as the phone being intercepted.

7    Q.   So when you were listening to this phone call, you

8    would -- or this phone number, you would hear, again, every

9    call that was made during the course of a day?

10   A.   Made or received.

11   Q.   Or received.  So anytime that Mr. Moalin was speaking on

12   the phone, whether he initiated the call or whether he got

13   called by somebody, you received a recording of it?

14   A.   I cannot answer that question hundred percent.  All I

15   know is I came to the office, I log onto the system, I have

16   phone calls that had been recorded -- intercepted, recorded,

17   and then loaded to my system so I could monitor.

18   Q.   So in this case, on any given day you received multiple

19   phone calls associated with the phone number that was being

20   wiretapped, correct?

21   A.   Correct.

22   Q.   Sometimes you would receive 20 or 30 phone calls that

23   were made in a day, correct?

24   A.   More often much more than that.

25   Q.   More than 30 calls in any given day?

1    A.   Yes.

2    Q.   And this wiretap that you were monitoring was recording

3    phone calls 24 hours a day, correct?

4    A.   Again, I cannot answer the question directly because I

5    was not involved in the interception of the calls.  All I can

6    answer is about the calls being uploaded to the system that I

7    could access.

8    Q.   Okay.  Fair enough.  So the phone calls that you were

9    given to review were often more than 30 phone calls in a

10   single day; is that -- that's what you said, right?

11   A.   Right.

12   Q.   So I think what you have in front of you is the

13   Government's Exhibits 120 through 199, the transcripts; is

14   that correct?

15   A.   That's correct.

16   Q.   So that would be 79 phone calls, right?

17   A.   Yes.

18   Q.   So, fair to say that 79 phone calls is not the full range

19   of phone calls that you monitored from the end of

20   December 2007 through the end of 2008, correct?

21   A.   Correct.

22   Q.   It's in fact not even an equivalent to three days' worth

23   of phone calls?

24   A.   Maybe not even one day of phone calls.

25   Q.   Okay.  So it's a very small portion then of the phone

1    calls that you monitored in this case?

2    A.   Yes.

3    Q.   All right.  And, now, those transcripts that we have, you

4    assisted the government in preparing those, correct?

5    A.   Correct.

6    Q.   What is in these transcripts in 120 through 199 is not

7    the full, verbatim translation of any given call, is it?

8    A.   There might be some calls that are complete and some

9    calls that only a portion of the conversation had been

10   translated.

11   Q.   All right.  Let's -- if you can, if you don't mind

12   looking, just open to the first page, Government's Exhibit

13   120 if you don't mind.

14   A.   Yes.

15   Q.   So if we're looking at the column on the left, the

16   numbers, what you said is the time stamp, this starts at 356,

17   correct?

18   A.   Correct.

19   Q.   Am I then correct in understanding that what is written

20   here is three minutes and 56 seconds into the phone call?

21   A.   Correct.

22   Q.   All right.  And so, again, if you flip through this --

23   sorry, we can -- skipping that one, but if you can go to --

24   go to the next call, Government's Exhibit 121, if you turn to

25   the last page, page 5 on that, there's a series of stars at

1  the bottom of the translation.  What does that indicate?  Do

2  you see the stars, the asterisks at the bottom?

3  A.  I do.  I -- I'm not sure because it might be that the

4  call was over, it might be that this is just a portion of the

5  call.  I'm not familiar with that.

6  Q.  Okay.  Going to the next exhibit, Exhibit 122, page 1.

7  If you look at the bottom, the last numbered line here is

8  0031, correct?

9  A.  Uh-huh.

10  Q.  And then there are a series of asterisks under that?

11  A.  Uh-huh.

12  Q.  And then turning to the next page, the translation

13  continues at 851; is that correct?

14  A.  That's correct.

15  Q.  So would those stars indicate that between 31 seconds

16  into the call and eight minutes and 51 seconds into the call,

17  that portion was deleted?

18  A.  Not really.  Just the first -- from the beginning to

19  000031 was translated verbatim, and then the verbatim

20  translation restarted at 0851.

21  Q.  Okay.  So --

22  A.  So there is a portion of the call in between that has not

23  been translated verbatim.

24  Q.  And so maybe the choice of words was incorrect, but it's

25  fair to say that from 32 seconds into the call to eight

1    minutes and 50 seconds into the call, that portion of the

2    translation has been omitted from what is being presented to

3    the jury; is that correct?

4    A.   Again, I think maybe the word choice is not correct.  Let

5    me tell you what I think.

6    Q.   Please.

7    A.   This first person has been translated verbatim because it

8    contains the self-identification of the speakers of the call.

9    Then the portion in the middle didn't contain any information

10   relevant to the case, so it has not been translated verbatim.

11   Q.   Let me stop you there for a second.  Did you make the

12   decision as to these translations about which portions were

13   relevant and which were not?

14   A.   In part.

15   Q.   And who else assisted you in making those decisions?

16   A.   Of course the team of the people who are preparing the

17   case, the case agent, and then the lawyers.

18   Q.   So when -- these lawyers that are sitting here, correct?

19   A.   Correct.

20   Q.   And also the case agent, is that Mr. Michael Kaiser,

21   who's sitting behind them?

22   A.   Right.

23   Q.   So that is the team that made the decision as to what was

24   relevant?

25   A.   And myself as the linguist because I understood what was

1    said in that portion and could determine it was not relevant

2    to the investigation.

3    Q.   Okay.  We're going to come back to this as well in a

4    moment, but I want to just go back to the calls, the numbers

5    of calls.  Again, you said you listened to tens of calls in

6    any given day, thousands of calls over the course of a year,

7    correct?

8    A.   Correct.

9    Q.   And while you're monitoring these, you have to listen to

10   the entire call to decide if it is relevant or not, correct?

11   A.   Correct.

12   Q.   And so you listened to thousands of Mr. Moalin's phone

13   conversations in the course of a year, yes?

14   A.   Yes.

15   Q.   And in those -- in the course of those conversations,

16   Mr. Moalin spoke to his wife, who lives in Somalia,

17   regularly, correct?

18   A.   Correct.

19   Q.   He spoke to her almost every day?

20             MR. WARD:  Objection, relevance.

21             THE COURT:  Overruled at least at this point.

22             THE WITNESS:  I'm not sure.  I don't think it was

23   every day.

24             BY MS. FONTIER:  Q.  But he spoke to her regularly?

25   A.   He spoke to her.

1  Q.  And he spoke to his children, who were there as well?

2  A.  Yes.

3  Q.  And his wife and children -- sorry, withdrawn.  Now, in

4  the course of listening to those phone calls, you learned some

5  information about them, correct, about his wife and children?

6           MR. WARD:  Objection, relevance.

7           THE COURT:  Sustained.

8           BY MS. FONTIER:  Q.  Now, Mr. Moalin spoke to many

9  different people over the course of the year, correct?

10  A.  Correct.

11  Q.  He spoke to many different people in Somalia over the

12  course of the year, correct?

13  A.  Correct.

14  Q.  And, now, you said one of the things that you would do

15  is -- when you were making these transcripts was to try to

16  identify the speakers, right?

17  A.  Right.

18  Q.  And so you would often -- you would identify them by

19  either self-identification, saying like, for example, hi,

20  this is Alice, if I were speaking, or Mr. Moalin, if he's

21  talking, calling that person by name, correct?

22  A.  Correct.

23  Q.  So the actual name that is said?

24  A.  Uh-huh.

25  Q.  And then after you had learned someone's name and maybe

1    heard them talking regularly, you could recognize their

2    voices in some cases, correct?

3    A.  Correct.

4    Q.  So that's the way that the names got into these

5    transcripts, correct?

6    A.  Correct.

7    Q.  Now, again, you said Mr. Moalin -- Mr. Moalin when he was

8    calling would call for and get news about Somalia, correct?

9    A.  Correct.

10   Q.  Sometimes he would listen to the radio over the phone?

11   A.  Correct.

12   Q.  And he was always often asking for news about the war

13   between Somalia and Ethiopia?

14   A.  Correct.

15   Q.  He was asking for news about the drought?

16   A.  Correct.

17   Q.  News about the famine?

18   A.  Yes.

19   Q.  He was regularly concerned about the safety of people in

20   Somalia?

21   A.  What people?  I mean specify which people.

22   Q.  He was concerned about his family.

23   A.  Of course.

24            MR. WARD:  Objection, hearsay.

25            THE COURT:  The objection is overruled.

1          BY MS. FONTIER:  Q.  He was concerned about people

2     in the Galgaduud region?

3     A.  Yes.

4     Q.  Also through listening to his phone calls you learned

5     also that Mr. Moalin was building a house in Somalia,

6     correct?

7     A.  Correct.

8     Q.  He was building that house in Guraceel, correct?

9     A.  Correct.

10    Q.  And, again, I think we've seen the map a few times, but

11    is Guraceel to your knowledge in the Galgaduud region?

12    A.  Yes.

13    Q.  And Mr. Moalin spoke to people about building that house?

14          MR. WARD:  Objection, hearsay.

15          THE COURT:  No, the objection is overruled.

16          THE WITNESS:  Yes.

17          BY MS. FONTIER:  Q.  And he spoke to people about

18    sending money for the purpose of building that house,

19    correct?

20    A.  Correct.

21    Q.  And if you recall, one of the people that he spoke to

22    about that was someone who went by the name of Sharif Qorey;

23    is that correct?

24    A.  I remember the name Sharif, yes.

25    Q.  He also spoke to someone named Abukar Suryare about that;

1   is that correct?

2   A.   I don't recall a conversation where the defendant spoke

3   to Abukar Suryare about the house.

4   Q.   But you do recall conversations in which Mr. Moalin spoke

5   to Abukar Suryare?

6   A.   Yes.

7   Q.   And just for ease of the court reporter, am I spelling

8   Mister -- this name correctly, Abukar is A-b-u-k-a-r, and his

9   second name, which again I believe is a nickname, but I'll

10   get into that, is S-u-y-a-r-e, Suyare; is that correct?

11   A.   Repeat the last one.

12   Q.   Suyare, S-u-y-a-r-e.

13   A.   There's an R in between.

14   Q.   Would you spell it, please, for the court reporter.

15   A.   S-u-r-y-a-r-e.

16   Q.   And what does that word "Suryare," in Somali, what does

17   that mean?

18   A.   Small neck.

19   Q.   And "Qorey," does that also -- is that also --

20   A.   It's also referred to the neck, yes.

21   Q.   And can you spell that word for us.

22   A.   Q-o-r-e-y.

23   Q.   So Sharif Qorey would be a nickname, correct?

24   A.   Sharif, no, that could be a name.  But Qorey is a

25   nickname.

1   Q.   Okay.  And so the two names that I've just said, Sharif

2   Qorey, Abukar Suryare, is that common in the Somali language

3   to give people nicknames?

4   A.   Yes, very common.

5   Q.   So would it -- is it fair to say that most people have a

6   nickname?

7   A.   Most Somalis do.

8   Q.   Most Somalis.  And most Somalis just go by that name, is

9   that correct, the nickname?

10  A.   Among their friends and family.

11  Q.   And is it also common in -- amongst Somalis to have more

12  than one nickname?

13  A.   Don't believe so, no, not to my knowledge.

14  Q.   Now, in the course of Mr. Moalin's phone conversations,

15  he also talked with people in Somalia about political issues;

16  is that correct?

17  A.   Correct.

18  Q.   And he talked about the local administration in

19  Galgaduud?

20  A.   Yes.

21  Q.   He talked about supporting that administration?

22  A.   Yes.

23  Q.   And, in fact, he talked about sending money to support

24  that administration; is that correct?

25  A.   I don't recall that.

1  Q.  Now, is it fair to say that over the year of listening to

2  Mr. Moalin's every phone call, you learned quite a deal about

3  him, quite a good deal about him.  You learned a lot about

4  Mr. Moalin in the course of 2007 to 2008; is that fair to

5  say?

6  A.  I don't know what you mean, learned a lot.

7  Q.  Would you say you -- sorry.  Withdrawn then.

8  A.  Yeah, just be more specific, please.

9  Q.  Now, let me just back up a little bit, and we'll come

10  back to this.  In -- I believe on direct you said that your

11  first step in -- when you're assigned to the case is to meet

12  with the case agent; is that right?

13  A.  To speak to the case agent.

14  Q.  To speak to him.

15  A.  Not necessarily meet physically.

16  Q.  But before you ever start to listen to any of the calls,

17  you speak to the case agent?

18  A.  Other linguists might go by it differently, but I prefer

19  to talk directly to the agent in charge of the investigation

20  to find out what's relevant to the investigation and what's

21  not.

22  Q.  Okay.  I'm asking you specifically about what you did.

23  A.  Yes.

24  Q.  It was you -- before you listened to calls, you spoke to

25  the case agent, right?

1    A.  I may have started listening to the call, but eventually

2    I contacted the case agent.

3    Q.  Okay.  But early on in the -- in your assignment on this,

4    you spoke to the case agent?

5    A.  Yes.

6    Q.  That case agent was Michael Kaiser, correct?

7    A.  Yes.

8    Q.  And you spoke to him about the goals of the

9    investigation, right?

10   A.  What's relevant, what information should I look for and

11   report.

12   Q.  All right.  So Agent Kaiser informed you what would be

13   relevant?

14   A.  Yes, which will be relevant to the investigation, yes.

15   Q.  All right.  And that is -- he's explaining to you then

16   what you should be listening for, correct?

17   A.  Correct.

18   Q.  So you were looking for information, and when you say

19   relevant, again, that's so that you can narrow down the calls

20   to those that are pertinent, correct?

21   A.  Yeah because, as I say, there's hundreds of calls, and

22   the majority of those calls are not pertinent to case; some

23   are personal, some are private, some are irrelevant to the

24   case, so only those calls relevant to the case I would write

25   something about.

1   Q.  And the way that you decide that is guided by the

2   information that you get from Agent Kaiser, correct?

3   A.  Correct.

4   Q.  All right.  So now in this case you were looking for

5   support for al-Shabaab, correct?

6   A.  Correct.

7   Q.  And with that in mind, you listened to all of his

8   conversations, correct?

9   A.  Correct.

10  Q.  And you would then write summaries of those that you

11  believed were pertinent or relevant to that topic?

12  A.  Yes.

13  Q.  Now, in order to do that -- sorry, withdrawn.  When

14  you're listening as the monitor, you want to be

15  overinclusive, correct?  You want to provide -- you obviously

16  don't understand that.  I'll try to explain.  You don't want

17  to miss a call that might be relevant; you try to give the

18  agent as much as possible that could be relevant, correct?

19  A.  Correct.

20  Q.  And so when you're listening to calls, you're not just

21  listening for the words "al-Shabaab," correct?

22  A.  Correct.

23  Q.  You are providing summaries of everything that is about

24  fighting, correct?

25  A.  Correct.

1    Q.   Everything about fundraising, correct?

2    A.   Correct.

3    Q.   Anything about money transfers?

4    A.   Correct.

5    Q.   Any sort of news reports about the political and

6    fighting, the war situation that was occurring, you included

7    those as well?

8    A.   Not necessarily.

9    Q.   But you would sometimes?

10   A.   If it's a open source media, then it's irrelevant to the

11   case because anybody can listen to those.

12   Q.   But you did provide -- well, let me stop you for a moment

13   on that point.  The government in its direct of you pointed

14   you to a call which was a recording of Radio Shabelle,

15   correct?

16   A.   I remember that very well.

17   Q.   And, now, you're saying that that is a pertinent,

18   relevant call, correct?

19   A.   Yes, it was a requested to do because of the content of

20   that specific radio broadcast.

21   Q.   Okay.  But Radio Shabelle is a public radio broadcast,

22   correct?

23   A.   Correct.

24   Q.   In fact, you said you listen to it.

25   A.   Correct.

1  Q.  And many people in the Somali community listen to it?

2  A.  Correct.

3  Q.  That is one of the main sources, that and the BBC, where

4  you get your news about Somalia, correct?

5  A.  Correct.

6  Q.  All right.  So in some instances you felt that public

7  newscasts were pertinent to the case?

8  A.  In a few instances, yes, because of the subject of those

9  particular broadcasts.

10 Q.  Now -- so also then under the broad umbrella of relevant

11 and pertinent calls, you also supplied summaries that were

12 information about the war, correct, when there was

13 conversations relating to the war?

14 A.  Yeah.

15 Q.  And that would be the war between Ethiopia and Somalia,

16 correct?

17 A.  Correct.

18         MR. WARD:  Objection; misstates the evidence.

19         THE COURT:  Hold on.  I don't know that it does.  I

20 don't know that there's been any evidence on this point from

21 this witness.  I'll overrule the objection.  You may answer

22 the question, sir.

23         THE WITNESS:  As you say, I was trying to be

24 inclusive, not to miss anything, so certain conversation

25 about fightings and the consequences of the fighting, yeah, I

1   was writing summaries about those, yes.

2           BY MS. FONTIER:  Q.  And, again, you were trying to

3   be inclusive because this information was going to the case

4   agent who was investigating this matter, correct?

5   A.  Correct.

6   Q.  And Mr. Kaiser does not speak Somali, right?

7   A.  No.

8   Q.  So if he had a recording of 70 phone calls from one day,

9   he couldn't really do anything with it without your

10  assistance, correct?

11  A.  Correct.

12  Q.  And so now in that -- again, in the umbrella of calls

13  that you found were relevant, you included anytime there was

14  a conversation about sending support or money to Somalia,

15  correct?

16  A.  Correct.

17  Q.  Even when that conversation was about drought relief,

18  right?

19  A.  Right.

20  Q.  And when that conversation was about supporting orphans,

21  you also included that in your summaries, correct?

22  A.  Right.

23  Q.  And now you included of course the conversations that

24  included the word "Shabaab" or "al-Shabaab," correct?

25  A.  Correct.

1    Q.  And, now, there was -- so this word that I'm pointing

2    to -- I'm absolutely not going to pronounce it correctly, but

3    "dhallinyarada," this word means "youth" in Somali, correct?

4    A.  "The youth."

5    Q.  "The youth"?

6    A.  Yes.

7    Q.  How would you say "youth" without "the"?

8    A.  "Dhallinyara."

9    Q.  Okay.  So without the d-a at the end?

10   A.  Uh-huh.

11   Q.  And so in this -- again, the umbrella of calls when you

12   were trying to be inclusive, you submitted summaries whenever

13   Mr. Moalin or the other speakers would use the word "youth"

14   in Somali, correct?

15   A.  Whenever I thought that the -- the word was used in a

16   context that indicated that the subject of the conversation

17   was that organization called "dhallinyarada."

18   Q.  But there were many conversations in which the Somali

19   word for "youth" or "young ones" was used, correct?

20   A.  Yeah, correct.

21   Q.  Now -- and I'm going to come back to this as well, but to

22   be clear, the word "shabaab" is an Arabic word, correct?

23   A.  Correct.

24   Q.  So when someone is -- a Somali speaker is speaking and

25   they want to talk about young people, they need -- they use

1   this word, correct, the "dhallinyarada"?

2   A.  Yes.

3   Q.  Okay.  Thank you.  Now, while this wiretap was running

4   over the course of a year, you communicated regularly with

5   Agent Kaiser, correct?

6   A.  Correct.

7   Q.  You sent him summaries of these pertinent calls that

8   we've been discussing?

9   A.  Not directly, but I just listened to a call, generate a

10  brief summary of the contents of the call, and just save it

11  into the system.

12  Q.  And then agent --

13  A.  And the agent would access the system and retrieve the

14  summaries.

15  Q.  Okay.  Perfect.  So the summaries that you were

16  generating were available to Agent Kaiser?

17  A.  Correct.

18  Q.  And Agent Kaiser would ask you questions about those

19  summaries in some instances, correct?

20  A.  Correct.

21  Q.  He would also ask for full translations of some calls

22  based on the summary, correct?

23  A.  In certain cases.

24  Q.  And you would speak on the phone sometimes?

25  A.  Maybe sometimes.

1   Q.  He would also email you, correct?

2   A.  Correct.

3   Q.  And you would respond to his emails?

4   A.  Correct.

5   Q.  And in some instances he was asking you for more than

6   just the literal translation of words, he was asking your

7   opinion on meanings of conversations, correct?

8   A.  Correct.

9   Q.  And he also asked you questions about Somalia in general,

10  correct?

11  A.  Correct.

12  Q.  He asked you about certain people in Somalia?

13  A.  Now, I don't -- I don't remember every conversation and

14  every email that we exchange, so I'm not sure.

15  Q.  All right.  And so -- that's fine.  But you also -- when

16  he would ask you, you would provide your opinion to the best

17  of your knowledge, correct?

18  A.  Correct.

19  Q.  And you tried to be as accurate and truthful with Mr.

20  Kaiser as you could?

21  A.  Of course.

22  Q.  Now, after ten months of listening to Mr. Moalin's calls,

23  so calls -- so going to October of 2008, you had gotten to

24  know -- somewhat gotten to know Mr. Moalin based on his

25  calls, correct?

1    A.  Correct.

2    Q.  And because you had been listening to so many of his

3    phone calls, you were asked your opinion of Mr. Moalin's

4    personality at that point, weren't you?

5    A.  Yes.

6    Q.  I'm going to show you or hand to you what has been marked

7    as Defendants' Exhibit W.

8            MS. FONTIER:  It's been shown to the government,

9    your Honor.

10           BY MS. FONTIER:  Q.  If you could just look to --

11   that's a three-page document, correct?

12   A.  Yes.

13   Q.  Okay.  Now, looking at that -- obviously there are many

14   redactions that were -- that are on this copy which I've

15   handed to you, correct?

16   A.  Correct.

17           MS. FONTIER:  And just for the record, those are

18   redactions that were in the copy that were -- was given to

19   the defense.

20           BY MS. FONTIER:  Q.  Now, these -- this three-page

21   document, what -- do you recognize what it is?

22   A.  Yes.

23   Q.  And what is it?

24   A.  It's an --

25           MR. WARD:  Objection, relevance.

 1              THE COURT:  Do you have an extra copy of it there?

 2              MS. FONTIER:  It's the document that we were

 3      discussing right before we came back in, but yes, I have a

 4      copy.

 5              THE COURT:  Let me see counsel for just a moment

 6      here at the side of the bench.  I can see all or just you,

 7      Ms. Fontier.

 8              MS. FONTIER:  I'll bring my support, your Honor.

 9          (Following is a sidebar conference.)

10              THE COURT:  I assume we're not going to introduce

11      this exhibit.  You're going to ask him some questions about

12      it.  What is in the exhibit?  Is that a correct --

13              MS. FONTIER:  Yes.  Sorry, your Honor.

14              THE COURT:  No, I just want to make sure that

15      you're not going to try to get the document in itself.

16              MS. FONTIER:  No, I'm just going to ask him

17      questions about it based on his opinion.

18              THE COURT:  Okay.  And the basis of the objection

19      is relevance.  And it's a little bit putting the cart before

20      the horse.  I understand that -- I mean this is a witness who

21      really didn't get into these types of issues, but is he being

22      called back at any point in time or this is it?

23              MR. WARD:  We're not planning --

24              THE COURT:  Okay.  So if -- you tell me what the

25      relevance is.

1          MS. FONTIER:  Your Honor, it goes to -- ultimately

2   there's going to be an argument about his -- these

3   translations and his, you know, bias and what was

4   particularly, you know, what was, you know, his bias in his

5   translations and what -- where our linguist disagrees with

6   him.  And this is I think an internal document which shows

7   his actual beliefs and his bias as was influenced by the

8   agent in the other translations.

9          THE COURT:  Where specifically is the bias located

10  here?

11         MR. DRATEL:  Your Honor, in your order Thursday you

12  said that this was evidence of bias.

13         THE COURT:  I know, I know, but I'm asking you

14  where is the bias in here.

15         MS. FONTIER:  Your Honor, I think that this goes to

16  show his actual opinions and what he believed.  I can ask him

17  these questions without referring to the document if you

18  prefer, but it goes to show his opinion as to what Mr. Moalin

19  was doing, what was happening, and I think after having met

20  with agents, it discredits some of the testimony or -- well,

21  there won't be testimony, but some of his interpretations in

22  the final versions.

23         THE COURT:  So your position is this guy really has

24  it in for your client, he wants to dirty him up.

25         MS. FONTIER:  No, I think Agent Kaiser does.

1          MR. COLE:  So just to be clear, his opinion of

2     Mr. Moalin's character is relevant to this man's opinion?

3          THE COURT:  No, but I don't know what you're going

4     to elicit here.  That's why I asked for you to be a little

5     bit more specific.  I can see -- I can see where something I

6     see in here can relate to that, but what exactly are you

7     referring to here?  Help me out here so that I can better

8     understand the objection.

9          MS. FONTIER:  I mean he's talking -- after

10    listening to his calls for ten months, he's asked about what

11    his, like, goals are, and he doesn't ever say his goal is to

12    support Shabaab, his goal to --

13         MR. DRATEL:  -- hurt people.

14         MS. FONTIER:  -- in fact, his goal is to develop

15    and enhance his home region in Somalia, which, you know,

16    really goes against -- but what it does is show that these

17    conversations, when taken out of context in the snippets that

18    are shown to the government, are contrary to what the bigger

19    picture is when you actually listen to thousands of calls.

20         MR. DRATEL:  Also it says he's boastful and he

21    exaggerates.

22         THE COURT:  Tends to exaggerate.

23         MS. FONTIER:  Which will come -- I'm going to ask a

24    specific question about a specific call based on that, like

25    the boasting and the other personality traits.

1              THE COURT:  Okay.  I'll overrule the objection.

2   The questions are okay.

3         (Sidebar conference concludes.)

4         (Exhibit No. W identified.)

5              BY MS. FONTIER:  Q.  So, Mr. Abdirahman, now, going

6   back to October of 2008, you had been listening to Mr.

7   Moalin's calls every day for about ten months, correct?

8   A.  Yes.

9   Q.  And based on what you had learned on those calls, it was

10  your opinion that in October of 2008, one of Mr. Moalin's

11  life goals was to be successful in Somali politics and become

12  a wealthy businessman with many children and that his goal

13  was to develop and enhance his home region in Somalia,

14  correct?

15  A.  Correct.

16  Q.  And also you indicated -- well, it was your opinion in

17  October of 2008 that things that stressed him were finances

18  and not being able to build his dream home, correct?

19  A.  Correct.

20  Q.  And that he wasn't able to support his many projects in

21  his home region; is that right?

22  A.  Right.

23  Q.  By home region, are you referring to his home area in

24  Somalia?

25  A.  Yes.

1   Q.  And what region of Somalia was that?

2   A.  Galgaduud region.

3   Q.  And so also your opinion of his personality after

4   listening to him for ten months was that he was bothered by

5   the suffering and destruction in Somalia caused by both the

6   fighting and the drought, correct?

7   A.  Correct.

8   Q.  And, now, talking about just his personality, after

9   listening to him every day for ten months, it was your

10  opinion that Mr. Moalin would try to outshine others in

11  supporting his home region, right?

12  A.  Right.

13  Q.  And, again, that's supporting the Galgaduud region,

14  right?

15  A.  Right.

16  Q.  And also perhaps, not quite as positively, you felt that

17  Mr. Moalin had a very high opinion of himself, right?

18  A.  Yes.

19  Q.  And that despite a limited education, he pretended to

20  know everything; is that correct?

21  A.  Yes.

22  Q.  And that you also felt that Mr. Moalin had a tendency to

23  boast; is that correct?

24  A.  Correct.

25  Q.  Now, I want to talk to you about -- sorry -- some

1    conversations that you had with Agent Kaiser again, okay.  In

2    September of 2008 Agent Kaiser asked your opinion -- sorry,

3    withdrawn.  Let me first say, what is -- what is Habar Gidir?

4    And I'm probably saying that completely incorrectly again.

5    A.  It's a subclan.

6    Q.  You say it's a subclan?

7    A.  Yeah.  It's a clan actually, yes.  Habar Gidir is a clan.

8    Q.  And if you can just -- what is the -- if it's a subclan,

9    what is the larger clan that it's a part of, that Habar

10   Gidir?

11   A.  Habar Gidir is a clan, and it belongs to the family clan

12   called Hawiye.

13   Q.  Now, based on your listening to the phone calls of

14   Mr. Moalin, do you know which clan Mr. Moalin is in?

15   A.  As I say, he's Hawiye, Habar Gidir, and Ayr subclan.

16   Q.  So from big to small it's Hawiye, Habar Gidir, and Ayr,

17   correct?

18   A.  Correct.

19   Q.  Okay.  So in September -- in September of 2008 Agent

20   Kaiser asked you your opinion about some Habar Gidir clan

21   activity.  Do you remember this question that you had with

22   Agent Kaiser?

23   A.  I had too many conversations with Agent Kaiser.  I can't

24   remember every one.

25   Q.  Would it refresh your recollection to review the emails?

1    A.  Yes, of course.

2              MS. FONTIER:  Would you like me to mark everything

3    I hand him or --

4              THE COURT:  I'm sorry.  The question related to

5    what now?

6              MS. FONTIER:  I was just going to refresh his

7    recollection, but if you want them marked --

8              THE COURT:  You can mark it for identification.  It

9    doesn't come in through you, but if the government ultimately

10   wants the email in, they would be the one to introduce it if

11   it's just being used to refresh memory.

12             MS. FONTIER:  Okay.

13             BY MS. FONTIER:  Q.  I'm showing you -- I'll just

14   pass to you to refresh your recollection what's been marked

15   as Defense Exhibit Y if you could, and of course because it's

16   a printout of emails, you sort of have to start at the back

17   and read up.

18             MS. FONTIER:  That for the record is to be remarked

19   as Defense Exhibit BB.  I believe we already have a Y.

20             THE COURT:  It's BB.

21             MS. FONTIER:  Double B, Bravo Bravo.

22             THE COURT:  Double Bravo.

23        (Exhibit No. BB identified.)

24             BY MS. FONTIER:  Q.  Just look up when you have

25   reviewed that email.  Now, after you've reviewed the email,

1   is your recollection refreshed as to the conversation between

2   you and Mr. Kaiser?

3   A.  Yes.

4   Q.  And so in September, specifically September 23 of 2008,

5   Agent Kaiser was requesting your opinion based on information

6   you learned from Mr. Moalin's calls about Habar Gidir

7   activity and whether they were trying to set up a homeland in

8   Somalia and if they were supporting the insurgency or if it's

9   one and the same, looking forward to post-TFG; is that

10  correct?  He asked you those questions?

11  A.  Yes, that's correct.

12  Q.  So, again, September 23, 2008, it was your opinion based

13  on what you learned from listening to Mr. Moalin's calls that

14  conversations relating to Habar Gidir activity were

15  administration-related.  The sessions have been about

16  improving the condition of Galgaduud region thus far.  The

17  people participating in the calls have only expressed support

18  for regional development and not anti-TFG.  But they are

19  aware of the political infighting within the TFG and don't

20  hold out hope of stability in Somalia.  That was your opinion

21  in September -- on September 23 of 2008, correct?

22  A.  That was my opinion in regard to several call in

23  question, not about all the case calls.

24  Q.  All right.  Now, I want to move to -- now, again, you

25  said when I asked you earlier about Defense Exhibit W that it

1    was your opinion that Mr. Moalin had a tendency to boast; is

2    that correct?

3    A.   Yes.

4    Q.   Now, the government went through a few of the markings

5    that you put in the verbatim translation, like you would note

6    when people were talking over each other, and in some

7    instances you would note when someone laughed; is that

8    correct?

9    A.   Of course.

10   Q.   Because that's what you heard on the calls, correct?

11   A.   Yes, yes.

12   Q.   But there's no marker in these verbatims for when someone

13   is being sarcastic, correct?

14   A.   Correct.

15   Q.   There's also no indication that a conversation might be

16   ironic, correct?

17   A.   Correct.

18   Q.   There's no indication in these translations that someone

19   is boasting, correct?

20   A.   Correct.

21   Q.   Theres's no indication in these translations that someone

22   is joking, correct?

23   A.   Correct.

24   Q.   It's just black and white on paper of the words that were

25   said, correct?

1   A.   Correct.  And let me explain why.  I have to explain

2   because that is just one of the requirements in a verbatim

3   translation to add the linguist opinion and the impression

4   about what's being said.

5   Q.   Correct.

6   A.   It has to be just what's being said and how it's been

7   said.  You cannot put your own opinion, this guy is joking,

8   this is boasting, this is, you know, sarcastic.  You can't.

9   That's not verbatim translation --

10  Q.   So --

11  A.   -- that's an interpretation of a conversation, and an FBI

12  linguist is not allowed to do that.

13  Q.   Understood.  So what is in the books that the jury is

14  holding is black and white print of the words that were said?

15  A.   The words and how they were said without adding any

16  opinion, without omitting any detail, even a cough or a laugh

17  or a noise.

18  Q.   Now -- so if someone were boasting on a call and that

19  were your opinion, that would not be indicated in the

20  translation that the jury has?

21  A.   Not in the verbatim translation.

22  Q.   If you can take -- you still have the translations,

23  correct?  If you can look at Government Exhibit 176.  Give

24  everyone a moment, including myself.  Are you on page 1

25  there?

1    A.   Yes.

2    Q.   The first line of this, someone named Najib is speaking

3    about -- how do you say this name, Rabow or Roobow?

4    A.   Roobow.

5    Q.   Roobow?

6    A.   Uh-huh.

7    Q.   All right.  So Najib is speaking about Roobow, right?

8    A.   Uh-huh.

9    Q.   And --

10            THE COURT:  Excuse me, counsel, just for a second.

11   Every once in a while I let it go, but you need to answer yes

12   or no rather than uh-huh --

13            THE WITNESS:  Sorry.

14            THE COURT:  -- or huh-uh.  I hate to tell a

15   linguist that, but it does make for a better record.

16            THE WITNESS:  Thank you, your Honor.

17            THE COURT:  You're welcome.

18            BY MS. FONTIER:  Q.  So, now, looking down a few

19   lines where it's indicated 252, Basaaly speaking, he says,

20   He's my boss.  And that's in reference to Roobow, correct?

21   A.   Yes.

22   Q.   Now, after this conversation, which is dated June 2,

23   2008, Agent Kaiser asked you about that conversation,

24   correct?

25   A.   As I say, I cannot recall all the conversation I had with

1    Agent Kaiser.

2    Q.  Again, would it refresh your recollection to review the

3    emails?

4    A.  Yes, please.

5    Q.  Going to give you the June 30 ones.  And the same thing,

6    you have to read them in reverse order.  Now, Agent Kaiser

7    asked you about this conversation, the June 2 call in which

8    Basaaly Moalin refers to Roobow as his boss, correct?

9    A.  Correct.

10   Q.  And it was your response that while that was the literal

11   words that were said, what you believed and your opinion was

12   that he was saying, quote, He's my man, correct?

13   A.  Correct.

14   Q.  Now, you were trying to explain in English the meaning of

15   the actual words, correct --

16   A.  Correct.

17   Q.  -- not just the literal translation.  So "He's my man" is

18   very different than saying like "This is my boss," correct?

19   A.  Correct.

20   Q.  It's a vague expression of support rather than part of an

21   organizational structure, correct?

22   A.  Correct.

23   Q.  And that's an example of boasting or irony that would not

24   be indicated in the translation, correct?

25   A.  Correct.

1  Q.  Sorry.  One second.  I want to go now to -- now, in the

2  conversations that you listened to with Mr. Moalin, there

3  were conversations about security forces, correct?

4  A.  As I say, thousands of call.  I don't recall all the

5  calls.  You have to show me something again to refresh my

6  memory.

7  Q.  Okay.  No problem.  One moment.  There is -- let me

8  just -- if you'd give me one moment.  I want to refer you to

9  a call -- sorry, I don't have it at my fingertips.  Let me --

10  sorry.  I'll pull up the call, but let me start by showing

11  you the email, which I believe will refresh your recollection

12  as well.  I'm sorry.  This is the -- it's May 20.  Sorry.  It

13  will be just one moment.

14          THE COURT:  What are we waiting for, Ms. Fontier?

15          MS. FONTIER:  I may not need to, but if I have the

16  verbatim in front of me, I was going to refer him to an

17  actual call.

18          THE COURT:  Somebody else can retrieve it for you,

19  that's fine.  Why don't you move --

20          MS. FONTIER:  Yes.

21          THE COURT:  -- on.  Thank you.

22          BY MS. FONTIER:  Q.  I may not have the actual

23  call, but referring to the email exchange between yourself

24  and Agent Kaiser, Agent Kaiser asked you about security

25  forces in Somalia, correct?

1   A.   Yeah.

2   Q.   And when he was asking you about that, it was because

3   that had been discussed in the phone calls, correct?

4   A.   Correct.

5   Q.   And referred to those as security forces that were

6   created by the businessmen, correct?

7   A.   I don't know.  This email doesn't mention businessmen.

8   Oh, it does.  It does, yeah.

9   Q.   So now these security forces that were discussed on the

10  phone calls, those are, again, forces that are I think by --

11  sorry, withdrawn.  These are security forces that are on the

12  ground in Somalia, correct?

13  A.   I don't know.  I mean I was just writing about the call,

14  what was being said in the call, so I don't know if that

15  reflects the reality or not.

16  Q.   But when asked your opinion about these security forces,

17  it was your opinion that what was being discussed was

18  security forces, the Jowhar businessmen created the security

19  forces.  I believe Najib said they are modeled after security

20  forces in Mogadishu Bakara Market to ensure security in

21  Jowhar until the hole left by the departure of the TFG

22  troops.  There's no mention in the call about being loyal to

23  the TFG or to the insurgents or fighting the Ethiopians.

24  A.   Okay.

25  Q.   So, again, based on that is it fair to say that these --

1    there was discussion about private security forces?

2                MR. WARD:  Objection, foundation.  What call?

3                THE COURT:  The objection is sustained.

4                BY MS. FONTIER:  Q.  Based on these emails though,

5    there is -- it's fair to say that there were discussions in

6    the calls by Mr. Moalin about security forces in Somalia,

7    correct?

8    A.  Yeah.  I mean the other part in the conversation was

9    telling him about security forces being -- I mean established

10   in that town by businessmen to protect their interests, yes.

11   Q.  And those security forces wore specific uniforms,

12   correct, and you were asked about the uniforms?

13   A.  Yes.

14   Q.  And it was your opinion that the black pants and green

15   shirt with a star were probably a symbol of Islam and showed

16   a tendency of the entire Somali civilian population to

17   support the UIC, correct?

18   A.  At the time most Somalis supported the UIC, yes.

19   Q.  And that time, again, was 2007 and 2008, correct?

20   A.  Correct.  And if you see the email, that's -- I am

21   explaining about the different flags, but the issue of the

22   uniform of the security forces is not clear in the call, as

23   you can see in the email.  Then I just put my opinion about

24   those two different flags.

25   Q.  And your opinion of the black pants and green shirt with

1    the star, again, was the support for the UIC, correct?

2    A.   Correct.

3    Q.   And, again, UIC stands for what?

4    A.   Union of Islamic Courts.

5    Q.   And the union -- withdrawn.  Now, I want to go back to

6    one point.  We had -- and the government showed you this call

7    in direct, which was the portion of the call where the radio,

8    Radio Shabelle is being listened to and Roobow is speaking on

9    the radio.  Do you recall that portion of your direct?

10   A.   Yes.

11   Q.   Okay.  And then following those calls in May of 2008,

12   Agent Kaiser asked you if Roobow had actually -- if Basaaly

13   had actually spoken to Roobow, correct?

14   A.   I cannot recall.

15   Q.   I'm going to show you another email.  This is May 2.

16          THE COURT:  Has it been marked?

17          MS. FONTIER:  No.

18          THE COURT:  Double C?

19          MS. FONTIER:  Double C, your Honor.

20          THE WITNESS:  Yes.

21      (Exhibit No. CC identified.)

22          BY MS. FONTIER:  Q.  So in a phone call, Basaaly

23   claimed that he spoke to Mukhtar Roobow, correct?

24   A.   Correct.

25   Q.   And Agent Kaiser asked your opinion or wanted to know if

1   that had actually happened, correct?

2   A.  Correct.

3   Q.  And -- again, this is in May of 2008 -- your response

4   was, as for Basaaly's statement that he spoke personally with

5   Roobow, we do not have any calls that sustain that claim, so

6   I cannot give you any explanation for that statement.

7   Basaaly, however, sometimes appears to brag about things.

8   That was your response, correct?

9   A.  Yes.

10  Q.  So when -- Mr. Moalin's words that are in black and white

11  in the transcripts are not always accurate, correct?

12  A.  I don't know about that.  I cannot answer about the

13  accuracy of -- of his words.

14  Q.  Well, you were listening to every single -- well, you

15  were listening to his calls day in and day out, correct?

16  A.  Correct.

17  Q.  And in this instance Mr. Moalin said that he spoke to

18  Roobow, and that was not accurate, correct?

19  A.  Are you asking for my opinion whether he spoke with

20  Roobow or not?

21  Q.  I'm asking whether you heard a phone call --

22  A.  No.  As I say -- answer in Agent Kaiser's email, we don't

23  have such a call.

24  Q.  So fair to say then when Basaaly said that he had spoken

25  to Roobow, that was not an accurate statement, correct?

1  A.  Again, I cannot say anything about the accuracy or

2  inaccuracy of his statement.

3  Q.  But you can --

4  A.  I can only translate what he said.  It's not my job to

5  determine whether it's accurate or not.

6  Q.  There was no call between Basaaly Moalin and Roobow,

7  correct?

8           THE COURT:  This is about the third or fourth time

9  this question has been answered.  I think the witness has

10  answered that he heard no such call on this line.

11           MS. FONTIER:  Okay.  I'll move on, your Honor.

12           THE COURT:  Okay.

13           BY MS. FONTIER:  Q.  Now, in your meetings and

14  discussions with Agent Kaiser, again, your purpose in here

15  was to find calls perhaps relevant to the investigation is

16  what you said, right?

17  A.  Yes.

18  Q.  And, again, this investigation was looking for support

19  for al-Shabaab, correct?

20  A.  Correct.

21  Q.  And are you familiar with the name Aden Ayrow?

22  A.  Yes.

23  Q.  And to your knowledge is it -- was Aden Ayrow one of the

24  leaders of al-Shabaab in 2007 and going into 2008?

25  A.  Yes.

1    Q.   Before his death in May of 2008, correct?

2    A.   Correct.

3    Q.   Okay.  So in the time that you were working on this case

4    prior to May 1st of 2008, you were asked by Agent Kaiser to

5    look for information about Aden Ayrow as well, correct?

6    A.   About Aden Ayrow?

7    Q.   Yes.

8    A.   Yes.

9    Q.   So any calls that mentioned his name were pertinent, they

10   were relevant, correct?

11   A.   Yes.

12   Q.   They would be summarized and perhaps later translated,

13   correct?

14   A.   Correct.

15   Q.   Now, if -- and now, in January of 2008, specifically

16   January 24, 2008, Agent Kaiser contacted you asking specific

17   questions about Aden Ayrow, correct?

18   A.   Again, I cannot recall off the top of my head.

19   Q.   I will -- this is defense -- what has been marked as

20   Defense Exhibit DD as in Delta.  January 24.  If you would

21   generally just review these emails and let me know if it

22   refreshes your recollection.  Now, after having reviewed

23   that, do you recall in January, January 24 of 2008, Agent

24   Kaiser requesting specific information from you about Aden

25   Ayrow?

1   A.  Yes.

2       (Exhibit No. DD identified.)

3   Q.  And he was requesting -- he wanted to know whether Aden

4   Ayrow was -- had called Basaaly Moalin, correct?

5   A.  Correct.

6   Q.  And he also was -- said he was interested in getting

7   real-time location and phone number information for him,

8   right?

9   A.  Correct.

10  Q.  And when you -- you responded to him by saying that the

11  only call that went through is a -- something that Basaaly

12  told Sheikalow that he has been trying to call him and to

13  pick up the phone.  You then also added a line that says,

14  Someone told me that Sheikalow might be an AKA for Ayrow,

15  please advise if that's true.  Correct?

16  A.  Correct.

17  Q.  And it was -- the response was, by Agent Kaiser, That's

18  correct, it's a slurred-together version of Sheik Ayrow.

19  Correct?

20  A.  Correct.

21  Q.  That was the information you got to indicate that

22  Sheikalow, who you had been listening to on the calls, might

23  be Aden Ayrow, correct?

24  A.  Not because of the answer of Agent Kaiser because that's

25  actually not correct.  Sheikalow is not a slurred version of

1    Sheik Ayrow.  It doesn't have nothing to do with Sheik Ayrow.

2    Sheikalow is --

3    Q.  Let me --

4    A.  -- a nickname.

5    Q.  Let me stop you there.  Are you familiar with the

6    Sheekhaal tribe?

7    A.  Yes.

8    Q.  And does Sheikalow mean of the Sheekhaal?

9    A.  Yes.

10   Q.  Now, I want to move on.  Want to talk a little bit more

11   just about the Somali language.  Again, you said you were

12   born there and then moved to Italy when you were young,

13   correct?

14   A.  Yeah, yes.

15   Q.  So when you -- and you were in Italy until you graduated

16   from college, correct?

17   A.  Correct.

18   Q.  I think you said on direct that when you moved back to

19   Somalia as an adult after college, you had to relearn Somali?

20   A.  Yes.

21   Q.  And where were you living at that time?

22   A.  You mean in Somalia?

23   Q.  Yes.

24   A.  Mogadishu.

25   Q.  And you lived in Mogadishu then for several years; is

1    that correct?

2    A.  Correct.

3    Q.  But you left in -- was it 1989?  Is that correct?

4    A.  Correct.

5    Q.  When you left Somalia in 1989, you went to Sweden?

6    A.  I'm sorry, 1990.

7    Q.  1990?

8    A.  End of 1990.

9    Q.  Okay.  So -- and correct me if I'm wrong -- but when --

10   in 1990 that was just towards the end of Siad Barre's

11   presidency, correct?

12   A.  Correct.

13   Q.  And so you have not been back to Somalia but for a few

14   hours at the airport since 1990, correct?

15   A.  Correct.

16   Q.  Fair to say that much in Somalia, particularly with the

17   politics, has changed since 1990?

18   A.  Yes.

19   Q.  There was the creation and subsequent fall of the TNG,

20   the Transitional National Government; is that correct?

21   A.  Correct.

22   Q.  There was the creation and subsequent fall of the TFG,

23   the Transitional Federal Government, for which Abdullahi

24   Yusuf was the president, correct?

25   A.  Correct.

1   Q.  There was the creation of Sheik Sharif's presidency, the

2   second TFG, correct?

3   A.  Correct.

4   Q.  And during that period of time, 2006 to 2008, when you

5   were not living there, Ethiopia invaded Somalia, correct?

6   A.  Correct.

7   Q.  And that war also came to an end in the time that you've

8   been gone, correct?

9   A.  Correct.

10  Q.  And also during that time, there were various power

11  struggles between -- certain warlords would rise in power,

12  correct --

13  A.  Correct.

14  Q.  -- and also fall out of power.  And then also the UIC,

15  again, the Union of Islamic Courts, that came into -- well,

16  withdrawn.  It rose in power during the time that you've been

17  gone, 1990 to the present, correct?

18  A.  Correct.

19  Q.  And for some portion of time, the UIC was controlling

20  Mogadishu, correct?

21  A.  Correct.

22  Q.  And as you stated earlier, they were generally supported

23  by the Somali people, correct?

24  A.  Correct.

25  Q.  And, in fact, Sheik Sharif, who became president, was one

1  of the leaders of the UIC, correct?

2  A.  Correct.

3  Q.  And now during that period of time, from 1990 to really

4  the present, in the time that you've been gone, there's never

5  been an overarching stable federal government in Somalia,

6  correct?

7  A.  Correct.

8  Q.  Now, so all of those things happened while you were

9  living here, correct?

10  A.  Correct.

11  Q.  And you got news about those things by listening to the

12  radio, right?

13  A.  Yes.

14  Q.  You listened to the BBC and Radio Shabelle?

15  A.  Yes.

16  Q.  You read on the Internet?

17  A.  Yes.

18  Q.  You talked to your community members, other Somalis,

19  correct?

20  A.  Correct.

21  Q.  So you learned information about Somalia the same way

22  every other person who's interested in Somalia living in

23  America would, correct?

24  A.  Correct.

25  Q.  You don't have any sort of special knowledge about the

1   situation in Somalia, right?

2   A.   I have good knowledge about the situation in Somalia.

3   Q.   And that's, again, just based on what you've learned by

4   Internet and radio and listening to the news, correct?

5   A.   Correct.

6   Q.   Now, the -- and so when you're testifying here, again,

7   obviously as a translator, that's based on your ability to

8   speak and read Somali, correct?

9   A.   Correct.

10   Q.   And your ability to speak and read English, correct?

11   A.   Correct.

12   Q.   Now, Somali, the language, again, you said it has at

13   least two separate or different dialects; is that correct?

14   A.   Somali is one language, but there is one dialect that can

15   give other Somalis from other regions a little problem in

16   understanding.   But it's the same language.

17   Q.   And is Somali also -- are there different regional

18   accents that wouldn't count as perhaps a different dialect

19   but a different accent?

20   A.   Yes.

21   Q.   And that -- would that maybe be equivalent to, you know,

22   the difference between somebody speaking English here in San

23   Diego versus someone from Alabama with a southern twang?   Is

24   that sort of the difference; it's just an accent in the way

25   of speaking?

1   A.  I don't know how English is spoken in Alabama.  I'm

2   sorry.  But I can tell you all Somali -- most Somali

3   understand each other perfectly; some Somali might have

4   problem understanding people speaking the Maay dialect.

5   Q.  And your dialect is what?

6   A.  My dialect --

7   Q.  Are you saying Maay as the name of the dialect or your

8   own dialect?

9   A.  No, no, no, Maay dialect is the dialect of Maay, spoken

10  in the Bay region and the Middle Shabelle region.

11  Q.  I think it's fair to say that my Somali is terrible.  So,

12  now, the Somali -- you said it's only been -- it's been a

13  written language since --

14          THE COURT:  When were you planning to stop?  If

15  you're at a convenient breaking point --

16          MS. FONTIER:  Absolutely, your Honor.

17          THE COURT:  We need a 15-minute recess at this

18  point, so, ladies and gentlemen, we'll take it now and resume

19  in 15.  Remember the admonition.  Thank you.

20      (The jury left the courtroom.)

21          THE COURT:  We're outside the presence of the jury.

22  I think cross-examination is going longer than was

23  anticipated.  Many of the questions are being asked and

24  answered now more than once.  I doubt we're going to -- I'm

25  going to have time to get to the 106 stuff this afternoon.  I

1    do want to finish this witness today.  I imagine you're going

2    to be a while on redirect.

3              MR. WARD:  I believe so, your Honor.

4              THE COURT:  All right.  It's important I think to

5    finish him up today if you can do that.  Thank you.

6         (There was a break in the proceedings.)

7              THE COURT:  We're ready to proceed.  Okay.  We have

8    everyone present.  Ms. Fontier?

9              MS. FONTIER:  Thank you, your Honor.

10             BY MS. FONTIER:  Q.  Mr. Abdirahman, I just have a

11   few more questions that I want to ask you.  On your direct

12   you said -- and forgive me, I'm sure I'm not quoting you --

13   but essentially it was very difficult to translate Somali

14   into English?

15   A.  Yes.

16   Q.  And part -- I think you said part of the difficulty was

17   syntax and the order of words; is that correct?

18   A.  That's correct.

19   Q.  And is it -- like any other language, does the context of

20   when someone is speaking matter towards the meaning of the

21   individual words?  If I'm not being clear, is it sometimes

22   that you have to listen to an entire conversation to

23   understand the meaning of the conversation?

24   A.  Sometimes might be necessary.

25   Q.  So it's not just a matter of looking at the individual

1    words in an individual sentence sometimes, correct?

2    A.  Sometimes.

3    Q.  And is it also -- like with other languages, is it -- do

4    people vary the way they talk based on the relationship that

5    they have with a person?  Like might somebody use a

6    different -- a more familiar way of speaking if they're

7    talking to their family versus someone that they work with?

8    A.  I don't really understand the question.  Sorry.

9    Q.  Sorry.  Just so I -- I'm just trying to quite understand

10   whether Somali is similar to English in that the way that

11   people talk will vary depending on who they're talking to.

12   Like if I'm talking to my friend versus the Court, I will use

13   a different sort of word structure.  Is that also true in

14   Somali?

15   A.  You mean like using a formal language versus an informal

16   language?

17   Q.  Exactly.

18   A.  It's less apparent in the Somali language.

19   Q.  Now, in order to understand the meaning of things though,

20   things have to be heard in context; is that fair to say?

21   A.  Yes.

22   Q.  All right.  And when you are translating, it's not a

23   matter of taking -- to do a verbatim translation, you don't

24   just take each word and translate it into English in the

25   order it appears, correct?

1    A.  Correct.

2    Q.  So what you're trying to do is make a verbatim English

3    sentence of the meaning of the Somali sentence, correct?

4    A.  Exactly.

5    Q.  And that goes for the entire conversation, correct?

6    A.  Correct.

7    Q.  And so now -- and, again, these conversations, what's in

8    front of you there, the Government's Exhibits 120 through

9    199, those are snippets of the conversations that you

10   translated, correct?

11   A.  Correct.

12   Q.  I'm sorry.  I'm not sure if I asked you this before, but

13   you listened to Mr. Moalin's calls from December of 2007

14   through the end of 2008, December of 2008; is that correct?

15   A.  Correct.

16   Q.  And what's in the translations -- if you can just look at

17   the first translation; I believe you said it's December 21,

18   2007, correct?

19   A.  Correct.

20   Q.  And the last is July 24 of 2008?

21   A.  The translation in this binder, yes.

22   Q.  Yes.  Okay.  And, now, when you monitored these, again,

23   you would do a summary and then a translation, correct?

24   A.  Not always, not always.  As I say, if the call is

25   completely nonrelevant to the investigation, I don't write

1  summary.  I might write one sentence explaining the content

2  of the call, for example, this is a social conversation, this

3  is a conversation with a family member, just one sentence.  I

4  will write a summary if I think the conversation might

5  contain some relevant information.  It's up to the case agent

6  to decide if it is so or not.

7  Q.  And then in some instances, you would do a verbatim

8  translation, correct?

9  A.  Correct.

10 Q.  And in order to do that, you listened to the call a

11 second time and wrote out the translation, correct?

12 A.  I might listen to the call several times.

13 Q.  In the process of writing that first verbatim

14 translation, you might listen several times?

15 A.  Correct.

16 Q.  And then that translation was submitted to someone else

17 in the FBI in your division for peer review, correct?

18 A.  Correct.

19 Q.  So that person would again listen to the full call at

20 least once and check the translation you had done, correct?

21 A.  That person will listen to the call several times again,

22 and it might take a long time.  Let me just give you an

23 example.  One minute of audio -- to translate one minute of

24 audio might take one hour or more.

25 Q.  All right.  And so when that person -- when they then

1    would review it several times, check your translation, then

2    it was -- that verbatim translation that had been written by

3    you, checked for peer review, was then sent for another level

4    of review with a quality control reviewer, correct?

5    A.  Correct.

6    Q.  And after that person -- the quality control reviewer

7    listened to the calls again, correct?

8    A.  Yes, several times.

9    Q.  All right.  So those are the calls that would then come

10   to the prosecutors, correct, to the government?

11   A.  Correct.

12   Q.  And, now, in the process of preparing, you said, for this

13   testimony that you're giving today, you reviewed the calls

14   again, correct?

15   A.  Correct.

16   Q.  And you also reviewed the transcripts and translations

17   that had been submitted by the defense, correct?

18   A.  Yes.

19   Q.  And in the process of doing that, in some of the

20   translations that had been provided by you that were

21   peer-reviewed and quality-control checked, you made some

22   corrections, correct?

23   A.  Yes.

24   Q.  So even after all of those checks, there were still some

25   errors in those translations, correct?

1    A.  Some minor error that didn't change the content of the

2    translation.

3    Q.  But you made changes based on information you had

4    received, in some cases, from the defense translations,

5    correct?

6    A.  Correct.

7               MS. FONTIER:  One moment, please.

8               BY MS. FONTIER:  Q.  Now, other than listening to

9    the phone calls for translation, did you review any other

10   documents or information related to this case?

11   A.  Document?  What do you mean by document?

12   Q.  Were you given any documents that were in Somali that --

13   by the government to review for the purpose of this case?

14   A.  I might have reviewed some videos, yes.

15   Q.  And were you also provided Mr. Moalin's emails from 2007

16   and 2008 to review?

17   A.  Not during preparation for trial but during the course of

18   the case, yes.

19   Q.  When was that?

20   A.  During the course of the investigation.

21   Q.  When -- were those provided by Agent Kaiser or was there

22   a different way in which you received the emails?

23   A.  As I say, I receive everything through the system.  There

24   is a system where I retrieve the phone calls, the audio

25   session, and there is another system where I retrieve emails

1   or chat session or whatever is provided for that case.

2   Q.  And you reviewed emails of Mr. Moalin's during this

3   investigation?

4   A.  Yes.

5           MS. FONTIER:  I have nothing further at this time,

6   your Honor.

7           THE COURT:  Ms. Moreno?

8           MS. MORENO:  Thank you.

9                   Cross-Examination

10          BY MS. MORENO:  Q.  Good afternoon.

11  A.  Good afternoon.

12  Q.  I just want to ask you a few questions about the

13  conversations that are in the books with the jury and in

14  front of you.  Now, I think you testified earlier about

15  asterisks on the pages; do you remember that?

16  A.  Yes.

17  Q.  I think you said that the asterisks could show that some

18  of the dialog was either left out or the conversation ended;

19  is that fair?

20  A.  Yes.

21  Q.  Now, can you turn to Exhibit 124.  Now, Exhibit 124 is a

22  conversation dated December 28, 2007.  Do you see that, sir?

23  A.  Yes.

24  Q.  And it indicates it's between Mr. Moalin and Mr. Mohamud;

25  do you see that?

1   A.  Yes.

2   Q.  And in that conversation -- that is a two-page

3   conversation, correct?

4   A.  Correct.

5   Q.  And on page 2 there's a series of asterisks, correct?

6   A.  Correct.

7   Q.  Now, you know that the full conversation is 11 pages

8   long; you know that, right?

9   A.  I don't know right now, but -- it's more than two pages,

10  yes.

11  Q.  Well, would it refresh your recollection if I showed you

12  a transcript of the call?

13  A.  Yeah.  I mean I don't doubt it's 11 page or whatever you

14  say.  What I'm saying is that this translation is only

15  partial.

16  Q.  Is only partial.  So you'll accept my representation that

17  the transcript of the full call is 11 pages?

18  A.  Yes.

19  Q.  You'll accept that?

20  A.  Yes.

21  Q.  I appreciate that.  Thank you.

22  A.  You're welcome.

23  Q.  And, in fact, the asterisks in that call, in this

24  December 28, 2007 call, show that it's just a snippet of a

25  conversation; would you agree?

1   A.  Yes, I do.

2   Q.  Okay.  And let's go to page -- to Exhibit 142, please.

3   And Exhibit 142, again, is a conversation with -- between

4   Mr. Moalin and Mr. Mohamud, correct?

5   A.  Correct.

6   Q.  That takes place February 13, 2008, correct?

7   A.  Correct.

8   Q.  Yes.  And you see on the second page, at the end of it,

9   there's a series of asterisks; do you see that?

10  A.  Yes.

11  Q.  And would you accept my representation that the

12  transcript of this call, the full transcript, is really six

13  pages long and not two pages long?  Would you accept that?

14  A.  Yes, I do.

15  Q.  In fact, you know that because you reviewed the

16  transcripts that the defense has been handing over to the

17  government questioning certain -- certain words, et cetera,

18  correct?

19  A.  Correct.

20  Q.  And then finally if you could turn to Exhibit 153.  And

21  that, again, is a conversation between Mr. Moalin and

22  Mr. Mohamud, correct?

23  A.  Correct.

24  Q.  That takes place April 12, 2008?

25  A.  Yes.

1  Q.  And that is a three-page transcript --

2  A.  Yes.

3  Q.  -- right?

4  A.  Yes.

5  Q.  Now, on this, however, there are no asterisks at the end

6  of page 3, right?

7  A.  Right.

8  Q.  However, this is actually a seven-page transcript.  Do

9  you have any reason to doubt that?

10 A.  No.

11 Q.  Would you like me to show it to you or would you accept

12 my --

13 A.  Yeah, I believe you.

14 Q.  Okay.

15 A.  Yes.

16 Q.  So, in fact, in this particular conversation, no one can

17 rely on the fact that there are no asterisks at the end of it

18 because there's more transcript or more conversation.  Do you

19 understand what I'm asking you?

20 A.  Yes.

21 Q.  Meaning that just having asterisks on the page, frankly,

22 does not tell one if there's more of a conversation or if

23 there's more pages to it, et cetera, correct?

24 A.  Correct.

25 Q.  And, in fact, if there's a transcript that has no

1    asterisks on it, there still could be pages more of a

2    conversation that are left out, correct --

3    A.   Correct.

4    Q.   -- just based on these three examples; is that fair?

5    A.   That's fair.

6    Q.   Now, with respect to the verbatims in this case, how many

7    pages of verbatim, if you can guess, were prepared in this

8    case?

9    A.   I don't dare to guess.

10   Q.   Okay.  Would it be thousands of pages of verbatims?

11   A.   I don't believe so.

12   Q.   Okay.

13   A.   It would be less, but I don't -- I can't really give you

14   a number.

15   Q.   And the verbatims -- just so that we're clear, when you

16   talk about verbatim translations -- and you correct me if I'm

17   wrong -- but the transcripts that are in this government

18   exhibit book you say are word-for-word verbatim translations

19   of whatever calls the government has decided to put in the

20   book; is that fair?

21   A.   I say the verbatim translation are exactly what was said

22   in the calls.  I didn't say that entire call has been

23   translated verbatim.

24   Q.   Okay.

25   A.   So some of them might be portion of the call.  I think --

1   I don't know.  I believe I say something like that in direct.

2   Q.  Are there more verbatims that are not included in this

3   book?

4   A.  You mean -- you mean verbatim that have been generated

5   for this investigation?

6   Q.  Yes, sir.

7   A.  Yes.

8   Q.  There are more verbatims?

9   A.  Yes.

10  Q.  Right.  That are not in this book, correct?

11  A.  They are not in the book.

12  Q.  And do you have any sense of how voluminous that is, how

13  much that is?

14  A.  No.

15  Q.  All right.  Thank you.

16  A.  You're welcome.

17          MS. MORENO:  Nothing further.

18          THE COURT:  Anything further?

19          MR. GHAPPOUR:  Nothing further, your Honor.

20          THE COURT:  Mr. Durkin, anything further?

21          MR. DURKIN:  No, Judge.

22          THE COURT:  Okay.  Mr. Ward, you may examine.

23                    Redirect Examination

24          BY MR. WARD:  Q.  Sir, Mr. Abdirahman, Ms. Moreno

25  just asked you a number of questions about the portions of

1    the transcript that appear in Government's Exhibits 120

2    through 199; do you recall that line of questioning?

3    A.   Yes.

4    Q.   Okay.  And, sir, did you have anything to do with what

5    portions were actually selected to be presented in these

6    binders today?  You didn't make that decision, did you?

7    A.   No, except my contribution as a speaker of the language

8    of course.

9    Q.   I understand.

10   A.   And of course being responsible for either doing the

11   initial translation or reviewing them during the course of

12   preparing for trial.

13   Q.   Okay.  But as far as what's in the book and what's not in

14   the book, that wasn't your choice?

15   A.   No.

16   Q.   Okay.  You were asked some questions by Ms. Fontier about

17   some defense transcripts, some proposed alternate transcripts

18   that you reviewed; do you remember that line of questioning?

19   A.   Yes.

20   Q.   Okay.  You indicated to Ms. Fontier that you made some

21   changes in response to some of those -- some of those defense

22   transcripts; is that correct?

23   A.   Correct.

24   Q.   Okay.  Did you also take each and every one of those

25   defense transcripts and review them in detail --

1    A.   Yes.

2    Q.   -- going back to the audio?

3    A.   Yes, I did.

4    Q.   And after that did you provide responses to the defense

5    showing how these were inadequate verbatim translations?

6    A.   Yes, I did.

7    Q.   Can you describe to the jury how -- in your opinion why

8    those defense transcripts were inadequate verbatim

9    translations.

10             MS. MORENO:  Objection; vague, ambiguous.  What

11   transcripts?

12             THE COURT:  Overruled.  You may answer.

13             MS. MORENO:  Relevance.

14             THE COURT:  You may answer, sir.

15             THE WITNESS:  Most of the --

16             BY MR. WARD:  Q.  Go ahead and --

17   A.   Most of translation I reviewed the last few days were not

18   verbatim translation; they were kind of summarized with a lot

19   of input, meaning a lot of opinion from the translator.

20   There were tens and tens of omissions, additions,

21   mistranslation, and the most important omission were

22   important details of proper names of people.  And as I say,

23   it was not -- they were not good verbatim translation.

24   Q.   Okay.  Now --

25             MR. DURKIN:  Judge, excuse me.  I'd like to be

1    heard on this later if I could.

2              THE COURT:  Next question.

3              BY MR. WARD:  Q.  But did you take the time to go

4    through each of the translations sent -- you know, proposed

5    by the defense --

6    A.  Yes, I did.

7    Q.  -- to look and see if there were things that needed to be

8    changed in your transcripts and to assist the defense in

9    developing a verbatim translation?

10   A.  Yes, I did.

11   Q.  And can you think of any particular instance in which you

12   were --

13             THE COURT:  Mr. Ward, I'm going to step in now.  I

14   just wanted to allow some questions to establish the

15   proposition that there have been disagreements on both sides.

16   We're not going to be getting into --

17             MR. WARD:  Thank you, your Honor.

18             THE COURT:  -- defense transcripts.  None have been

19   offered, none have been admitted and are not going to be

20   bootstrapped by the colloquy here.

21             BY MR. WARD:  Q.  Okay.  Mr. Abdirahman, you were

22   asked some questions by Ms. Fontier on cross-examination

23   about a particular -- a particular email in January of 2008;

24   do you recall that line of cross-examination?

25   A.  Yes.

1  Q.  This was the one where we were talking about -- you were

2  talking about with Agent Kaiser whether Sheikalow was a

3  slurred-together version of Sheik Ayrow.

4  A.  Yes, I recall that.

5  Q.  Okay.  Now, of course that was about the first month of

6  the investigation, was it -- was that -- is that correct?

7  A.  That's correct.

8  Q.  And, you know, at that time did you indicate to Special

9  Agent Kaiser that you did not agree with his position?

10 A.  Yes, I did.

11 Q.  Okay.  Since that time and you listened to another 10, 11

12 months' worth of calls and you reviewed the evidence in this

13 case, do you have an opinion as to whether or not the guy you

14 have identified as Sheikalow as the speaker in the

15 transcripts is Aden Hashi Ayrow?

16           MS. FONTIER:  Objection.

17           THE COURT:  Hold on, sir.  Ground?

18           MS. FONTIER:  Calls for an expert opinion.

19           THE COURT:  Well, I'm going to overrule the

20 objection.  The witness has indicated -- this was an area

21 that was opened up on cross, and the witness has indicated

22 two methods he uses to identify individuals.  So the opinion

23 is -- if he has an opinion, he may state it at this point.

24           THE WITNESS:  It was -- it's not my opinion.

25 Actually it came out in the following conversation --

 1                THE COURT:  Sir, you've answered the question.

 2                BY MR. WARD:  Q.  Well, let me ask you this then.

 3    It's not your opinion.  Is there evidence in the case --

 4                MS. FONTIER:  Objection.

 5                THE COURT:  Let's let the question be asked,

 6    please.

 7                BY MR. WARD:  Q.  Actually there was a line of

 8    questioning on cross-examination that Special Agent Kaiser

 9    led you to believe that Sheikalow was Aden Hashi Ayrow; do

10    you recall that?

11    A.  Yes.

12                MS. FONTIER:  Objection, mischaracterizing.

13                THE COURT:  The objection is sustained.  Do you

14    recall generally the subject, the subject that was discussed

15    between you and Agent Cairo (sic), sir, about whether

16    Sheikalow equals Aden Ayrow?  Just yes or no, do you recall

17    that?

18                THE WITNESS:  Yes.

19                THE COURT:  Okay. I think that's what counsel

20    wanted to know, if you recalled that particular conversation

21    with Agent Kaiser and/or the line of questioning in

22    cross-examination.

23                BY MR. WARD:  Q.  My question to you, Mr.

24    Abdirahman, is did you conclude on your own, independent of

25    any suggestion by Agent Kaiser, that the man you identified

1    as Sheikalow in these transcripts was Aden Hashi Ayrow?

2    A.  Yes.

3              MS. FONTIER:  Objection; relevance --

4              THE COURT:  The objection --

5              MS. FONTIER:  -- speculation.

6              THE COURT:  The objection is overruled.

7              THE WITNESS:  Yes.

8              BY MR. WARD:  Q.  So you did conclude that

9    Sheikalow is Aden Hashi Ayrow?

10   A.  Yes.

11   Q.  Mr. Abdirahman, you were also asked a number of questions

12   about your opinions of certain aspects of Mr. Moalin's

13   personality; this was in response to that -- that document

14   that Ms. Fontier showed you wherein she talked at length

15   about the fact that you had listened to all his calls and had

16   been able to form certain opinions; do you recall that line

17   of questioning?

18   A.  Yes.

19   Q.  Well, based on -- based on the calls that you reviewed in

20   this case, did you form an opinion as to whether or not the

21   defendant Basaaly Saeed Moalin was supporting the designated

22   foreign terrorist organization al-Shabaab by funding --

23             MS. FONTIER:  Objection.

24             THE COURT:  State the ground, please.

25             MS. FONTIER:  Again, it calls for an expert

1   opinion, and it's the ultimate question in this case.

2           THE COURT:  It's calling for an improper conclusion

3   as to what the evidence is.  There's a lack of foundation

4   here.  I'll sustain the objection.

5           Mr. Ward, I did have one question for you.  I

6   overruled an objection and allowed your witness to answer the

7   question whether it was his opinion, whether he reached an

8   independent opinion that Sheikalow was Aden Ayrow, and he

9   indicated yes, but I was waiting for the reasons.  You can

10  follow that up, the defense can follow it up.  I tried to --

11  I tried to cabin the analysis by indicating that there were

12  two -- there were two approaches your client used I assume

13  because the opinion was based on that.  You might want to

14  inquire; I know that the defense may inquire.

15          MR. WARD:  Yes, your Honor.

16          THE COURT:  But if it's just -- in other words, if

17  it's just his overall opinion of the state of the evidence,

18  then I would sustain that objection.

19          MR. WARD:  Your Honor, could we be heard at sidebar

20  on this?

21          THE COURT:  Sure.

22          MR. WARD:  Okay.

23          THE COURT:  Ladies and gentlemen, a relatively rare

24  sidebar.  Feel free to relax just amongst yourselves, chat,

25  as long as you don't discuss the case, and we'll be with you

1    just as soon as we can.  Thanks a lot.

2         (Following is a sidebar conference.)

3         THE COURT:  I want to see what you have.  You

4    wanted to be heard?

5         MR. WARD:  Your Honor, on cross-examination Ms.

6    Fontier elicited his opinion on -- based on the calls that he

7    had heard with respect to this, that, and the other thing

8    about Basaaly Moalin's --

9         MR. COLE:  Motivations.

10        MR. WARD:  -- motivations for sending money to

11   Somalia.  The form never asked anything about the case itself

12   that's been charged here, and the witness on the stand has

13   listened to hundreds of calls, and if he was asked for that

14   opinion, which they opened the door for, I think we know what

15   he would say.

16        THE COURT:  Well, isn't that kind of the ultimate

17   issue in this case?  That's not really why this witness has

18   been called.  This happens in so many cases where you drag

19   witnesses away from their area of expertise and where they

20   really should be confined.  Look, the other things are a

21   matter of record.  They're black and white.  And to allow

22   that question at this point based on -- based on the use of

23   the retrospectoscope, in my view, is improper under 403; I

24   think it's unfairly prejudicial.  I think any probative

25   value, especially because he didn't in any way indicate that

1  to be the case in any of the answers to the profile, the

2  personality profile or email, would just create undue

3  prejudice here.  So it's a judgment call.  That's the way

4  it's coming down, you can certainly inquire though, go into

5  why he -- I mean I don't want to lay things out for you, tee

6  anything up, but you can go back into the areas where he made

7  statements about his concern for his country and development

8  of certain projects, his concern over drought and orphans and

9  that kind of thing, but that's -- I mean that kind of a --

10  that kind of a question is so different in character than

11  what you've just asked him that that's -- as I say, on a 403

12  analysis, I'm keeping it out.

13       MR. COLE:  The only thought I had, your Honor, is

14  that -- I understand the Court's ruling, but Ms. Fontier then

15  should not have asked a linguist for opinions.  She set up

16  the whole thing.  He knows more about this guy than anybody.

17  He listened to all the calls.

18       THE COURT:  Well, you know, there were so many

19  questions that she asked that had there been objections, I

20  would have sustained the objections.  It's not my job to --

21  I've gotten a little bit active here in the end, but, you

22  know, I tried to kind of, as I say, cabin the analysis here,

23  but there are some questions that were asked that were

24  objectionable.

25       MR. COLE:  But my only point is that when she asked

1    them, didn't she open the door to he has other -- in other

2    words, she's left the impression that those questions she

3    asked him are the only opinions he has about this whole --

4    the only motivation that Basaaly might have had, and that's

5    the impression that she's left.  I think we --

6            THE COURT:  Well, here's the thing.  You know, in

7    so many of these calls, the witness has testified he actually

8    heard statements of concern about the plight of Somalia and

9    all these other areas that he discussed with counsel on

10   cross-examination.  It doesn't take too much interpretation,

11   it doesn't take too much expert opinion to come up with those

12   observations:  He loves his country, he's concerned about the

13   drought.  Hell, everybody's concerned about the drought,

14   everybody loves their country.  He's motivated in substantial

15   part by, you know, helping kids or orphans, whatever, yeah.

16   Who isn't, you know?  And so those opinions, if you want to

17   call them opinions -- I call them more observations than

18   anything else -- have been laid out.  But this is so

19   fundamentally different.  I mean this is -- just goes beyond

20   the beyond as far as I'm concerned.

21           MR. COLE:  I understand the Court's ruling.  But

22   then if we hear in closing argument that our linguist -- if

23   we hear from defense that our linguist had concluded that his

24   only motivation was to help the country, and said nothing on

25   that form about al-Shabaab and therefore our witness himself

1   testified that that's his motivation, that is misleading,

2   that is utterly misleading because his opinion is 100 percent

3   that this man was supporting Aden Ayrow and al-Shabaab.  And

4   that's why we're trying to clear up the confusion.

5              THE COURT:  Is that the function of a linguist

6   though?

7              MR. COLE:  They shouldn't have asked those

8   questions.

9              THE COURT:  But they were questions of a different

10  type; they were questions that you don't even -- I don't

11  think you would even dispute.  They're in almost neutral

12  areas.

13             MR. COLE:  But I agree, it's what they're going to

14  argue that --

15             THE COURT:  You're anticipating an awful lot.  I

16  mean I don't --

17             MR. COLE:  Okay.

18             THE COURT:  I don't have too much reluctance to

19  step in if I need to step in --

20             MR. COLE:  Okay.

21             THE COURT:  -- in argument and make observations.

22  I mean is that what you anticipate arguing here?

23             MS. FONTIER:  Like that?  No.

24             MR. COLE:  Well, something substantially similar.

25             MS. FONTIER:  We haven't written our closing

 1   argument at this point.

 2           THE COURT:  You haven't written your closing

 3   argument?  No, at this point --

 4           MS. FONTIER:  If my cross was that good, we can

 5   close now.

 6           THE COURT:  You know, here's the thing.  I'll wait

 7   till we're done here.  Here's the thing.  Every time you ask

 8   questions, you know, you think you're killing it, you really

 9   think you're doing a job on cross-examination, and all the

10   time you're potentially opening up doors for redirect, you've

11   always got to keep your eye on the ball.  This is a close --

12   no, this isn't a particularly close call, but I know the

13   theory that you're arguing, and I'm not -- I'm not saying

14   there are other questions that couldn't be asked --

15           MR. COLE:  Okay.

16           THE COURT:  -- related to opinions --

17           MR. COLE:  Your Honor, I'm sorry.  Can we at least

18   then just clarify that the form she's referring to did not

19   ask him on the form for opinions about whether he supported

20   terrorists?

21           THE COURT:  That's fine.  That's not a -- I mean

22   that's a completely different question --

23           MR. COLE:  Okay.

24           THE COURT:  -- than asking hey, you're the Somali

25   expert, essentially is this guy a terrorist in your opinion?

1   That's not -- that's not good.

2              MR. COLE:  Yes.

3              THE COURT:  And the linguist on the other side is

4   not going to be able to answer that question either, this guy

5   is not a terrorist.

6              MR. COLE:  Okay.

7              THE COURT:  Let's go.  We can do this later.

8              MR. DURKIN:  I just want to renew my motion for

9   Rule 14 severance.

10             THE COURT:  Okay.  You renewed it.

11        (Sidebar conference concludes.)

12             THE COURT:  Thank you for your patience, ladies and

13  gentlemen.  We probably won't go all the way to 4:30 today.

14  There are a couple of things that counsel needed to get

15  together about and all for the sake of moving things along

16  efficiently rather than having you wait either in the jury

17  box or outside.  So we may break it down a little bit before

18  four o'clock.  Okay.  Mr. Ward?

19             BY MR. WARD:  Q.  Now, Mr. Abdirahman, when we were

20  talking about that questionnaire that Ms. Fontier asked you

21  about, you described Mr. Moalin's personality, his life

22  goals, is he competitive.  There were all kinds of questions

23  on that form; do you recall?

24  A.  Yes.

25  Q.  And did the form ask you for any opinion about whether or

1  not he was engaged in criminal conduct?

2  A.  No.

3          MS. FONTIER:  Objection.  It's the same -- calling

4  for a legal conclusion, your Honor.

5          THE COURT:  No, it's just -- no, no.  The objection

6  is overruled.  It's a simple question, did the form ask any

7  such question.

8          BY MR. WARD:  Q.  It's just a yes-or-no answer.

9  A.  No.

10          MR. WARD:  I have no further questions, your Honor.

11          THE COURT:  Anything further of this witness?

12          MS. FONTIER:  I have nothing further, your Honor.

13          MS. MORENO:  No questions.

14          THE COURT:  Mr. Ghappour?

15          MR. GHAPPOUR:  No questions, your Honor.

16          THE COURT:  Mr. Durkin?

17          MR. DURKIN:  No, Judge.

18          THE COURT:  Okay.  Thank you, sir.  You are excused

19  at this time subject to recall -- or not, counsel?

20          MR. WARD:  No, your Honor.

21          THE COURT:  Okay.  Very good, sir.

22          MR. DURKIN:  I would like to reserve the issue on

23  the issue I wanted --

24          THE COURT:  You are excused now, sir.  Thank you.

25          MR. DURKIN:  Sorry, your Honor.

1          THE COURT:  That's all right.  You say you want --

2   I'm sorry.  Did you want to ask questions?

3          MR. DURKIN:  No, no, I want to reserve the right to

4   recall him on a topic that I want to discuss later.  We don't

5   have to do it now.  The government says he'll be around.

6          THE COURT:  All right.  Do you have another witness

7   at this point?

8          MR. COLE:  Yes.  Your Honor, the United States

9   calls Special Agent Colby O'Very.

10          THE CLERK:  Can you please raise your right hand.

11   Do you solemnly swear that the evidence you shall give in the

12   cause now before the Court shall be the truth, the whole

13   truth, and nothing but the truth?

14          THE WITNESS:  I do.

15                         Colby O'Very

16   was called by the government and testified as follows:

17          THE CLERK:  Can you please state and spell your

18   first and last name for the record.

19          THE WITNESS:  Sure.  My name is Colby O'Very.

20   That's C-o-l-b-y  O, apostrophe, V-e-r-y.

21                      Direct Examination

22          BY MR. COLE:  Q.  Good afternoon, Mister -- Special

23   Agent O'Very.  How are you?

24   A.  I'm doing well.  Thank you.

25   Q.  Great.  What do you do for a living?

1   A.   I am a special agent with the FBI.

2   Q.   And how long have you been with the FBI?

3   A.   Approximately three and a half years.

4   Q.   And are you currently assigned to the San Diego field

5   office?

6   A.   Yes, I am.

7   Q.   And I'd like to take you back to November of 2009.  Had

8   you just joined the FBI at that point?

9   A.   Yes, I had just completed my training at the academy and

10  just arrived in San Diego.

11  Q.   Okay.  So I should back up.  When did you actually first

12  join the FBI?

13  A.   I first joined the FBI in June of 2009.

14  Q.   And you came to San Diego after the academy when?

15  A.   In November of 2009.

16  Q.   Well, taking you to November of 2009, do you recall that

17  month being present during a search of the Shidaal Express

18  office on University?

19  A.   Yes.

20  Q.   Was that here in San Diego?

21  A.   Yes.

22  Q.   I'd like to show you what's been marked as Government's

23  Exhibits 17, 36, 34, and 35.  Could you take a look at those.

24  A.   Yes, sir.

25  Q.   Do you recognize those?

1   A.  Yes, I do.

2   Q.  Starting with number 17, what is Government's Exhibit 17?

3   A.  This is a photo of the outside of the Shidaal Express

4   located on University Avenue.

5         (Exhibit No. 17 identified.)

6   Q.  And how do you know that?

7   A.  I know that because I took this photo.

8   Q.  And how about Government's Exhibit 36; what's that?

9   A.  This is a photo I look from just inside the front door.

10  It's of the different teller stations inside the Shidaal

11  Express.

12        (Exhibit No. 36 identified.)

13  Q.  And how about Government's Exhibit 34; what is that?

14  A.  I'm sorry.  So 34, that is the inside of the Shidaal

15  Express; that's a photograph of one of the work stations.

16        (Exhibit No. 34 identified.)

17  Q.  And, finally, Exhibit 35?

18  A.  This is a photograph of a phone list that was posted on

19  the wall right next to one of the work stations.

20        (Exhibit No. 35 identified.)

21           MR. COLE:  Your Honor, the government moves to

22  admit Exhibits 17, 36, 34, and 35.

23           THE COURT:  The exhibits are admitted at this time.

24        (Exhibit Nos. 17, 34, 35, 36 admitted.)

25           MR. COLE:  And if we could, Ms. Alejandre, publish

1    number 17.

2              BY MR. COLE:   Q.   And so you testified this is just

3    the outside of the office that was searched that day?

4    A.   That's correct.

5    Q.   And I think you caught yourself in the photograph in the

6    reflection in that window?

7    A.   Yes, sir.

8    Q.   If we can look at Exhibit 36, was this what you were

9    describing as the view of the teller windows from the

10   customer side of the office?

11   A.   That is correct.

12   Q.   And if we could look at 34, what was this picture again?

13   A.   This is the photograph from inside the Shidaal Express of

14   one of the work stations.

15             MR. COLE:   And, Ms. Alejandre, if you could focus

16   on the center column on the work station there and

17   highlight --

18             BY MR. COLE:   Q.   Does it appear that there was a

19   phone list taped on the wall on the interior of the work

20   station there?

21   A.   Yes, that is correct.

22   Q.   And did you take a close up of that phone list?

23   A.   I did.   That is the photograph in Exhibit 35.

24             MR. COLE:   If we could publish Exhibit 35.   And if

25   we could highlight the phone number for --

1          BY MR. COLE:  Q.  Well, do you see on this

2   Exhibit 35 where it says Issa Doreh?

3   A.  Yes, I do.

4          MR. COLE:  Could you highlight that name and phone

5   number.

6          BY MR. COLE:  Q.  Could you read the phone number

7   for Issa Doreh.

8   A.  Yes.  That's (619)549-3197.

9          MR. COLE:  Your Honor, at this time the government

10  would move into or would seek to admit into evidence

11  government Exhibit 59, which is subscriber information, by

12  Rule 902 (11) declaration previously provided to counsel.

13         THE COURT:  Exhibit 59 is admitted.

14     (Exhibit No. 59 identified and admitted.)

15         MR. COLE:  And the government would also like to

16  admit Government's Exhibit 60, 61, 62, and 63 also as

17  subscriber information by 902 (11) declarations previously

18  provided to the defense.

19         THE COURT:  Please.

20         MR. COLE:  And I will examine the witness, identify

21  each exhibit further for the record.

22         THE COURT:  Okay.  Those exhibits are admitted as

23  well, 60 through 63.

24     (Exhibit Nos. 60-63 identified and admitted.)

25         BY MR. COLE:  Q.  Now, Special Agent O'Very, I'd

1   like to show you Government's Exhibits 59 through 63 that

2   have just been admitted.

3   A.   Okay.

4   Q.   And also Government's Exhibit 55.  And after you've had a

5   chance to look through those exhibits and at 55, I'll ask you

6   some questions.  Have you had a chance to look at those

7   documents?

8   A.   Yes, sir.

9   Q.   Now, let me ask you about Exhibit 55.  Is Exhibit 55 a

10  summary chart summarizing the subscriber information

11  contained in Government's Exhibits 59, 60, 61, 62, and 63?

12  A.   Yes, sir.

13       (Exhibit No. 55 identified.)

14  Q.   And did you check -- prior to coming to court today, did

15  you have an opportunity to check the accuracy of Exhibit 55

16  against the information contained in 59, 60, 61, 62, and 63?

17  A.   Yes, sir.

18       MR. COLE:  Your Honor, the government would move to

19  admit Government's Exhibit 55.

20       MR. DRATEL:  Your Honor, just an objection subject

21  to connection.

22       THE COURT:  I think there was a reference to the

23  use of Exhibits 59 through 63; is that what you're referring

24  to?

25       MR. DRATEL:  Yeah, but also the chart as well

1    subject to connection terms of other issues that need to be

2    decided on an individual basis.

3           THE COURT:  You're saying you'd like to reserve an

4    objection on that?

5           MR. DRATEL:  Yes.

6           THE COURT:  Okay.  Exhibit 55 is admitted at this

7    time.

8       (Exhibit No. 55 admitted.)

9           MR. COLE:  If we could publish 55.

10          BY MR. COLE:  Q.  So the top line of Exhibit 55?

11          MR. COLE:  If we can highlight the top row.

12          BY MR. COLE:  Q.  What is the phone number there,

13   Mr. O'Very?

14   A.  (619)288-0898.

15   Q.  What is the subscriber name for that phone number?

16   A.  Mohamad Mohamud.

17   Q.  And does that -- is that information drawn from

18   Government's Exhibit 59?  If you could check.

19   A.  Yes, that is correct.

20   Q.  If we could go to the next row.  Now, do you see the

21   number (619)549-3198?

22   A.  Yes, sir.

23   Q.  And what is the subscriber name for that phone number?

24   A.  That's Issa Doreh.

25   Q.  And was that the same phone number that we saw a moment

1   ago on the phone list that you photographed at the Shidaal

2   Express, Government's Exhibit 35?

3   A.  Yes, sir, that is correct.

4   Q.  If you can look at the next row.  The phone number is

5   (714)400-1464; is that right?

6   A.  Yes, sir.

7   Q.  And what is the subscriber name?

8   A.  Ahmed Mohamud.

9   Q.  And when was that established?  When was that

10  subscription established?

11  A.  February 19, 2008.

12  Q.  If you can look at the next row.  Is the number

13  (619)573-4253?

14  A.  Yes.

15  Q.  And in this particular case, what is the email associated

16  on the subscriber records with this phone number?

17  A.  The email is masjidalansar at hotmail dot com.

18  Q.  And is that spelled m-a-s-j-i-d-a-l-a-n-s-a-r?

19  A.  Yes, sir.

20  Q.  And the address associated with that phone number?

21  A.  4014 Winona Avenue, San Diego, California, 92105.

22  Q.  And have you yourself -- do you know where the al-Ansar

23  mosque is in San Diego?

24  A.  Yes, sir.

25  Q.  And is it on Winona?

1  A.  Yes, sir.

2  Q.  Okay.  Well, do you see that -- let me clear that table

3  off there for you.  Do you see the binder there in front of

4  you?

5  A.  Yes, sir.

6  Q.  Government's Exhibits 120 through I think 199.  If you

7  could turn to the first exhibit Government's Exhibit 120,

8  what is the date of that call?

9  A.  December 21, 2007.

10  Q.  And if we can play this call.

11          THE COURT:  Okay.  This is the first call that is

12  being played, Mr. Cole?

13          MR. COLE:  Yes, it is.  Do you want us to pause it

14  a moment?

15          THE COURT:  Yeah, if you can just pause it.  Ladies

16  and gentlemen of the jury, I think you've been already

17  briefed on what we're doing at this point; we're going to be

18  a hearing a series of calls, the audio.  You have photographs

19  of the individuals there at the top of the screen, and then

20  basically what you have projected on your screen there is the

21  part of the conversation that you will find in your binder

22  under the tab, and it should correlate.  You have -- you have

23  the choice of looking at it on the screen, seeing it on the

24  screen there, seeing it on one of the monitors in front of

25  you, using your -- using the transcripts in your book,

1    whatever is comfortable for you.  It's my understanding that

2    as Somali, there is -- there will be a correlation between

3    the Somali spoken and the English translation, and the yellow

4    line moves down as the conversation is taking place.  So

5    that's pretty much what the procedure here is for this

6    particular system.  Okay.

7              MR. COLE:  Thank you, your Honor.  If you can play

8    that.

9         (The audio recording was played.)

10             BY MR. COLE:  Q.  Now, Mr. O'Very, in this call,

11   after speaking, as we've just heard, about Sahal and someone

12   allocating something for some families, was there a point in

13   the conversation at about 7:10 on page 3 where the

14   conversation turns to "the other thing"?

15   A.  Yes, sir.

16             MR. DRATEL:  Objection, your Honor.  The

17   conversation speaks for itself.  I don't know if he has any

18   additional knowledge that he'd be able to provide.

19             THE COURT:  I'll allow it; I'll allow it for both

20   sides if you're moving to a different area and there's a

21   neutral question like that to assist the jury.

22             BY MR. COLE:  Q.  I'm sorry.  I'm not sure if we

23   heard your answer, Mr. O'Very -- or Special Agent O'Very.

24   Was there a point where they talk about "the other thing"?

25   A.  Yes, sir.

1              MR. COLE:  If we can continue playing.

2         (The audio recording was played.)

3              BY MR. COLE:  Q.  Now, Special Agent O'Very, I'd

4    like to show you Government's Exhibit 2, which was previously

5    admitted.  Did you hear the passage we just heard about money

6    needed for rations in Bay and Bakool?

7    A.  Yes, sir.

8    Q.  And on Government's Exhibit 2, using the laser pointer

9    there -- not sure where you push it to turn it on --

10             MR. DRATEL:  Objection, your Honor, just with

11   respect to knowledge and other than just it's a map and

12   anybody can point to a map.

13             THE COURT:  Foundation?  You're talking about

14   foundation, lack of foundation?

15             MR. DRATEL:  Yes.

16             THE COURT:  All right.  The objection is sustained.

17   Would you like to lay a foundation for the witness's

18   familiarity?

19             MR. COLE:  Well, this is already in evidence.  I

20   was just going to have him show the location on what's

21   already in evidence and just highlight for the jury, but if

22   that's --

23             THE COURT:  That's it?

24             MR. COLE:  That's it.

25             THE COURT:  You just want him to point to -- okay.

1              BY MR. COLE:  Q.  You can, using that highlighter.

2    A.  Bay and Bakool.

3    Q.  If we could turn to Government Exhibit 21 -- excuse me --

4    121.  Now, Agent O'Very, what was the time -- let me ask you

5    this first.  What was the time of the phone call on

6    Government's Exhibit 120?

7    A.  6:54 UTC.

8    Q.  And that's on December 21?

9    A.  Yes, sir.

10   Q.  Was there a call at Government's Exhibit 121 on the same

11   day moments later at 7:07 UTC?

12   A.  Yes, sir.

13            MR. COLE:  If we could play that.

14            THE COURT:  This is a long call itself as well,

15   five pages?

16            MR. COLE:  It's about four pages.

17            THE COURT:  You want to make this the last one for

18   today and then we'll break?

19            MR. COLE:  Sure.

20            MR. DRATEL:  I don't remember an exhibit number.

21            MR. COLE:  I'm sorry.  It's 121.

22            THE COURT:  Yes.

23            BY MR. COLE:  Q.  And Let me ask you, Agent O'Very,

24   before we play this call, is this a phone call between

25   Basaaly Moalin and Issa Doreh, as indicated on the

1    transcript?

2    A.  Yes, sir.

3        (The audio recording was played.)

4            MR. COLE:  All right, your Honor.  If you'd like to

5    stop there.

6            THE COURT:  Okay.  Thank you, Mr. Cole.  Okay.

7    Ladies and gentlemen, we'll break for this evening and then

8    pick up tomorrow at nine o'clock.  I'm going to try to give

9    you some scheduling information, updated scheduling

10   information, tomorrow on what the estimated length of the

11   trial is, the duration of the trial.  I'll give you a general

12   parameter -- I'll talk to counsel a little bit more -- and I

13   think that's about it.  Thanks for hanging in there with me

14   today; I appreciate that.  You all have a good evening, stay

15   healthy, and we'll see you tomorrow morning at nine o'clock.

16   Thank you.

17       (The jury left the courtroom.)

18           THE COURT:  We're outside the presence of all

19   jurors.  One thing I was looking at here on these 106

20   submissions you gave to me earlier --

21           MR. DURKIN:  Yes, Judge.

22           THE COURT:  -- I don't see them correlated with any

23   particular transcript number.

24           MR. DURKIN:  I can do that tonight, Judge, if you

25   want.

1          THE COURT:  Well, that's -- why don't you do that.

2          MR. DURKIN:  I mean the exhibit --

3          THE COURT:  I mean it's going to make it an awful

4    lot easier if I can go right to the transcripts.  Otherwise,

5    I don't know --

6          MR. DURKIN:  The exhibits aren't dated in

7    chronological order, but I can very easily do that if you --

8          THE COURT:  Yeah, if you could.

9          MR. DURKIN:  If you'll give me that back, I'll do

10   it in two minutes.

11         THE COURT:  Sure, if you have them.

12         MR. DURKIN:  That's fine.

13         THE COURT:  If you have a list, that would be

14   helpful.  Give it to Gaby and --

15         MR. DURKIN:  I have one other issue.

16         THE COURT:  -- hopefully I'll have an opportunity

17   to look at it in the morning.  With respect to Rule 14, I

18   realize -- the Seventh Circuit is probably similar to the

19   Ninth Circuit, which basically holds that at every

20   practicable time you should raise a Rule 14 issue, and so let

21   me put your mind at ease.  You've preserved that for the

22   duration of the trial.  You don't need to bring it up every

23   now and again.  If you want to bring it up just to perfect

24   the record, you can certainly do so at appropriate times

25   during the case.  You really don't need to do that.  I'll

1    just note for the record you've got it preserved.

2              I've got to take off now, counsel, for the reasons

3    I indicated earlier, and I'll try to get back early to go

4    over these things in the morning to see.

5              MR. DURKIN:  There's just -- Judge, just one --

6              THE COURT:  -- if any of them could be worked --

7    Ms. Moreno, you indicated you had a couple.

8              MS. MORENO:  Your Honor, just briefly --

9              THE COURT:  I mean a couple of transcripts that you

10   wanted --

11             MS. MORENO:  Yes, four small ones.

12             THE COURT:  So if you'd give them to Gaby, and

13   she'll stick them on my desk.

14             MS. MORENO:  I did not have the opportunity to

15   color-code them as Mr. Durkin.

16             THE COURT:  Well, it would be very helpful if you

17   could do that.

18             MS. MORENO:  I can do that.

19             THE COURT:  Okay.

20             MR. DURKIN:  Judge, there was one other issue I

21   wanted to raise under 106, which is in the government's

22   motion.  It's regarding a transcript on December 20.  The

23   next call that was coming up is a call of ours on

24   December 22; it's Exhibit 122.  And our position is that the

25   call on the 20th is another written document that is worthy

```
 1    of 106.

 2             THE COURT:  Even though it's a separate call?

 3             MR. DURKIN:  Yes.  And I believe it's attached to

 4    the government's pleading if I'm not mistaken, Exhibit A.

 5    They provided you with those transcripts.  I think it's the

 6    first transcript.  I'll get you a separate copy if you'd

 7    like, but it --

 8             THE COURT:  I may not be able to do this in time

 9    for tomorrow because this stuff is coming to me pretty late.

10    I'll do my best, and I'll be here early to see what awaits.

11             MR. DURKIN:  That's fine.

12             THE COURT:  Okay.

13             MR. DURKIN:  There was only one other issue, Judge,

14    and I can raise it tomorrow --

15             THE COURT:  Appreciate it.

16             MR. DURKIN:  -- if you're in a hurry.  It was about

17    the question regarding the defense transcripts that I'd like

18    to address in the morning.

19             THE COURT:  Okay.  Well, have you talked to -- when

20    you say an issue, just make sure that you talk to your

21    colleagues and the government so that whatever you work out

22    can be worked out.  Meet and confer on everything because

23    things are kind of getting telescoped down now.

24             MR. DURKIN:  Well, this is just -- they asked a

25    question of the linguist about whether there were inaccurate
```

1    defense transcripts, and I believe all the transcripts we've

2    submitted they agreed were accurate but for some minor

3    things, so that's what I wanted to raise.

4            THE COURT:  Okay.  All right.  Have a good evening,

5    everyone.  We'll see you in the morning.

6            MS. FONTIER:  Your Honor, just one question.  All

7    of our -- Mr. Moalin's 106 requests I have done like by my

8    own sort of the color system on the hard copies, but I can

9    photocopy them and drop them off if you want.  Is there any

10   point in trying to rush, get them to you tonight or is it

11   better off to bring them early in the morning?

12           THE COURT:  You can bring them early in the

13   morning, but I don't know that I'll be able to go through --

14   you know, this project is getting larger and larger, so it

15   may be -- it may be that it's at a later time that I'll have

16   to look at these after a run-through, an initial run-through,

17   of the transcripts, the calls the government wants to put on,

18   and then if you want to have something added to a particular

19   call, then at least I will have had some time to do that, and

20   we can run through that again.  From what I'm hearing,

21   there's not a great number of calls that fall into that

22   category, but I don't know.

23           MS. FONTIER:  Probably about 12.

24           THE COURT:  That's a lot of calls when you start

25   adding them up.

 1             MS. FONTIER:  It's not -- I'm sorry.  I didn't mean

 2    to interrupt.

 3             THE COURT:  That's okay.  I've got to leave.  I'll

 4    see you into the morning.  Okay.  Have a good evening.

 5        (There was a break in the proceedings for the evening

 6    recess.)

 7                          I n d e x

 8    Witnesses                                        Page

 9    **Victoria Homfeld**
      Direct Examination, cont'd by Mr. Ward            808
10    Cross-Examination by Mr. Ghappour                 813

11    **Colleen Reding**
      Direct Examination by Mr. Cole                    822
12
      **Liban Haji Abdirahman**
13    Direct Examination by Mr. Ward                    831
      Cross-Examination by Ms. Fontier                  904
14    Cross-Examination by Ms. Moreno                   963
      Redirect Examination by Mr. Ward                  968
15
      **Colby O'Very**
16    Direct Examination by Mr. Cole                    983

17

18

19

20

21

22

23

24

25

```
1                          E x h i b i t s

2      Exhibits           Description              For ID   In Evd
       52                 CD                       811      812
3      U                  Photo                    815      815
       V                  Excel spreadsheet        819      819
4      39                 Chart                    824
       1-A                Passport application     849      849
5      6                  Driver ID (Moalin)       851      851
       100                CD                       860      862
6      101                CD                       860      862
       102                CD                       860      862
7      103                CD                       860      862
       104                CD                       860      862
8      105                CD                       860      862
       106                CD                       860      862
9      107                CD                       860      862
       108                CD                       860      862
10     109                CD                       860      862
       110                CD                       860      862
11     111                CD                       860      862
       112                CD                       860      862
12     113                CD                       860      862
       114                CD                       860      862
13     115                CD                       860      862
       116                CD                       860      862
14     117                CD                       860      862
       118                CD                       860      862
15     120                Transcript               860      863
       121                Transcript               860      863
16     122                Transcript               860      863
       123                Transcript               860      863
17     124                Transcript               860      863
       125                Transcript               860      863
18     126                Transcript               860      863
       127                Transcript               860      863
19     128                Transcript               860      863
       129                Transcript               860      863
20     130                Transcript               860      863
       131                Transcript               860      863
21     132                Transcript               860      863
       133                Transcript               860      863
22     134                Transcript               860      863
       135                Transcript               860      863
23     136                Transcript               860      863
       137                Transcript               860      863
24     138                Transcript               860      863
       139                Transcript               860      863
25     140                Transcript               860      863
       141                Transcript               860      863
```

| | | | | |
|---|---|---|---|---|
| 1 | 142 | Transcript | 860 | 863 |
| | 143 | Transcript | 860 | 863 |
| 2 | 144 | Transcript | 860 | 863 |
| | 145 | Transcript | 860 | 863 |
| 3 | 146 | Transcript | 860 | 863 |
| | 147 | Transcript | 860 | 863 |
| 4 | 148 | Transcript | 860 | 863 |
| | 149 | Transcript | 860 | 863 |
| 5 | 150 | Transcript | 860 | 863 |
| | 151 | Transcript | 860 | 863 |
| 6 | 152 | Transcript | 860 | 863 |
| | 153 | Transcript | 860 | 863 |
| 7 | 154 | Transcript | 860 | 863 |
| | 155 | Transcript | 860 | 863 |
| 8 | 156 | Transcript | 860 | 863 |
| | 157 | Transcript | 860 | 863 |
| 9 | 158 | Transcript | 860 | 863 |
| | 159 | Transcript | 860 | 863 |
| 10 | 160 | Transcript | 860 | 863 |
| | 161 | Transcript | 860 | 863 |
| 11 | 162 | Transcript | 860 | 863 |
| | 163 | Transcript | 860 | 863 |
| 12 | 164 | Transcript | 860 | 863 |
| | 165 | Transcript | 860 | 863 |
| 13 | 166 | Transcript | 860 | 863 |
| | 167 | Transcript | 860 | 863 |
| 14 | 168 | Transcript | 860 | 863 |
| | 169 | Transcript | 860 | 863 |
| 15 | 170 | Transcript | 860 | 863 |
| | 171 | Transcript | 860 | 863 |
| 16 | 172 | Transcript | 860 | 863 |
| | 173 | Transcript | 860 | 863 |
| 17 | 174 | Transcript | 860 | 863 |
| | 175 | Transcript | 860 | 863 |
| 18 | 176 | Transcript | 860 | 863 |
| | 177 | Transcript | 860 | 903 |
| 19 | 178 | Transcript | 860 | 863 |
| | 179 | Transcript | 860 | 863 |
| 20 | 180 | Transcript | 860 | 863 |
| | 181 | Transcript | 860 | 863 |
| 21 | 182 | Transcript | 860 | 863 |
| | 183 | Transcript | 860 | 863 |
| 22 | 184 | Transcript | 860 | 863 |
| | 185 | Transcript | 860 | 863 |
| 23 | 186 | Transcript | 860 | 863 |
| | 187 | Transcript | 860 | 863 |
| 24 | 188 | Transcript | 860 | 863 |
| | 189 | Transcript | 860 | 863 |
| 25 | 190 | Transcript | 860 | 863 |
| | 191 | Transcript | 860 | 863 |

```
 1   192              Transcript                  860   863
     193              Transcript                  860   863
 2   194              Transcript                  860   863
     195              Transcript                  860   863
 3   196              Transcript                  860   863
     197              Transcript                  860   863
 4   198              Transcript                  860   863
     199              Transcript                  860   863
 5   W                Document                    934
     BB               Emails                      937
 6   CC               Email                       946
     DD               Email                       950
 7   17               Photo                       985   985
     36               Photo                       985   985
 8   34               Photo                       985   985
     35               Photo                       985   985
 9   59               Subscriber info             987   987
     60               Subscriber info             987   987
10   61               Subscriber info             987   987
     62               Subscriber info             987   987
11   63               Subscriber info             987   987
     55               Subscriber info (summary)   988   989
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    <u>Certificate of Reporter</u>

2

3   I hereby certify that I am a duly appointed, qualified, and

4   acting Official Court Reporter for the United States District

5   Court; that the foregoing is a true and correct transcript of

6   the proceedings had in the mentioned cause on the date or

7   dates listed on the title page of the transcript; and that

8   the format used herein complies with the rules and

9   requirements of the United States Judicial Conference.

10

11  Dated January 14, 2014 at San Diego, California.

12

13                      /s/ Debra M. Henson  (electronic)
                        Debra M. Henson
14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25