1                  United States District Court

2                Southern District of California

3

4   UNITED STATES OF AMERICA,        )
                                     )
5                   Plaintiff,       )
                                     )
6      vs.                           ) Case No. 10-CR-4246 JM
                                     ) Jury Trial/Day 6
7   BASAALY SAEED MOALIN,            ) Tuesday, February 5, 2013
    MOHAMAD MOHAMAD MOHAMUD          )
8   ISSA DOREH,                      ) Volume 6
    AHMED NASIR TAALIL MOHAMUD,      )
9                                    )
                    Defendants.      )
10  _____ )

11

12              Before the Honorable Jeffrey T. Miller
                    United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21

22  Official Court Reporter: Debra M. Henson, CSR, RPR
                             U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25              Record produced by stenographic reporter

1    Appearances

2    For the Government:       Laura E. Duffy
                               UNITED STATES ATTORNEY
3                              William P. Cole
                               Caroline P. Han
4                              ASSISTANT U.S. ATTORNEYS
                               Steven P. Ward, Trial Attorney
5                              U.S. DEPARTMENT OF JUSTICE
                               880 Front Street, Suite 6293
6                              San Diego, CA  92101

7    For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
8                              Alice Fontier, Esq.
                               OFFICE OF JOSHUA L. DRATEL
9                              2 Wall Street, Third Floor
                               New York, NY  10005
10
     (Mr. M. Mohamud)          Linda Moreno, Esq.
11                             LINDA MORENO, P.A.
                               P.O. Box 10985
12                             Tampa, FL  33679

13   (Mr. Doreh)               Ahmed Ghappour, Esq.
                               LAW OFFICES OF AHMED GHAPPOUR
14                             P.O. Box 20367
                               Seattle, WA  98102
15
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
16                             Janis Roberts, Esq.
                               DURKIN & ROBERTS
17                             2446 N. Clark Street
                               Chicago, IL  60614
18

19

20

21

22

23

24

25

1          San Diego, California - Tuesday, February 5, 2013

2          (Defendant A. Mohamud is being assisted by a Somali

3     interpreter.)

4          (Unreported bench conference between the Court and

5           counsel out of the hearing of the jury.)

6          (There was a break in the proceedings.)

7               THE COURT:  Good morning, ladies and gentlemen.

8     Good to see everyone.  All jurors are present, counsel and

9     the parties are present, and we are ready to continue with

10    the direct examination of Agent O'Very.

11              MR. COLE:  Thank you, your Honor.

12                        Colby O'Very

13    called by the government, was previously sworn and continued

14    to testify as follows:

15                   Direct Examination, cont'd

16              BY MR. COLE:  Q.  Now, Agent O'Very, if we could

17    just get back to where we were yesterday -- oh, I'm sorry.

18    Now, just to get us back where we left off, Agent O'Very, we

19    had listened to a call on December 21 with Sheikalow.  That

20    was Government's Exhibit 120; is that right?

21    A.  Yes, sir.

22    Q.  And in that call there was discussion of money needed for

23    rations in Bay and Bakool?

24              MR. DRATEL:  Objection, your Honor.

25              THE WITNESS:  Yes, sir.

1    MR. DRATEL:  Asked and answered.

2    THE COURT:  It's just preliminary just to set where

3    we were yesterday.

4    BY MR. COLE:  Q.  Now, let's go then to

5    Government's Exhibit 123 -- excuse me -- 122.  And what's the

6    date of this call, Agent O'Very?

7    A.  December 22, 2007.

8    Q.  Is this with defendant Basaaly Moalin and Ahmed Nasir

9    Taalil Mohamud?

10   A.  Yes, sir.

11   Q.  And there was an initial portion of this call in which

12   they greet each other?

13   A.  Yes, sir.

14   MR. COLE:  Let's play clip 1, Ms. Alejandre.

15   (The audio recording was played.)

16   BY MR. COLE:  Q.  And later in that conversation,

17   Agent O'Very, was there discussion of young men firing the

18   bullets?

19   A.  Yes, sir.

20   MR. COLE:  Let's play clip 2 --

21   (The audio recording was played.)

22   BY MR. COLE:  Q. Now, Agent O'Very, there was

23   reference to Bur Hakaba at -- on page 2 of that Government's

24   Exhibit 122; is that right?

25   A.  Yes, sir.

1    Q.  And if we could look at Government's Exhibit 2.

2              MR. COLE:  If we could zoom in on --

3              MR. DRATEL:  Objection, leading.

4              THE COURT:  The objection is overruled.

5              BY MR. COLE:  Q.  Well, Agent O'Very, could you --

6              MR. COLE:  If we could zoom in on the bottom

7    portion of the map, the bottom half of the map.

8              BY MR. COLE:  Q.  Can you indicate to the jury

9    where Bur Hakaba is located on the map.  Is that in the Bay

10   region?

11   A.  Yes, that is correct.

12   Q.  If we could turn to Government's Exhibit 123.

13             MR. DRATEL:  Your Honor, 106 objection.

14             THE COURT:  The Court and counsel have already had

15   a discussion about the protocol of 106 additions, if any;

16   we'll deal with that later.

17             MR. DRATEL:  Thank you, your Honor.  Just making it

18   for the record.

19             BY MR. COLE:  Q.  Now, that last phone call was on

20   December 22.  Let's go to December 28, 2007, Government's

21   Exhibit 123.  Agent O'Very, was this call between Basaaly

22   Moalin and Issa Doreh?

23   A.  Yes, sir.

24   Q.  And, again, there was an initial clip where there's a

25   greeting?

1    A.  That's correct.

2              MR. COLE:  Let's play that first clip.

3         (The audio recording was played.)

4              BY MR. COLE:  Q.  And later in the conversation in

5    Government's Exhibit 123, was there discussion that the men

6    requested that we throw something to them for this month?

7    A.  Yes.

8              MR. COLE:  If we could play that next clip.

9         (The audio recording was played.)

10             BY MR. COLE:  Q.  Let's turn to Government's

11   Exhibit 124.  Now, after the call we just heard, Agent

12   O'Very, was there a call several hours later that same day

13   with defendant Basaaly Moalin and defendant Mohamad Mohamad

14   Mohamud?

15   A.  Yes, sir.

16   Q.  And in that call was there a discussion that the men had

17   been crying out to me over the phone?

18   A.  Yes, sir.

19             MR. COLE:  Let's play this clip.

20        (The audio recording was played.)

21             MS. MORENO:  Respectfully, your Honor, I'd lodge a

22   106 objection to this conversation.

23             THE COURT:  I didn't hear you, counsel.

24             MS. MORENO:  There would be a 106 objection to this

25   conversation.

1           THE COURT:  You don't need to make any objections

2    unless you feel you need to, all right?  I'm going to --

3           MS. MORENO:  For the record.

4           THE COURT:  Well, there's -- okay.  I'll be going

5    over the 106 submissions later on and we'll have a discussion

6    on the record outside the presence of the jury.  If you feel

7    you must make an objection, you certainly may; I think it's

8    unnecessary, but you'll preserve all of your 106 issues

9    without limitation from this point forward.

10          MS. MORENO:  Thank you, your Honor.

11          THE COURT:  There will be an opportunity to address

12   all of those, okay?

13          MS. MORENO:  Thank you.

14          THE COURT:  Thank you.  Would you repeat the last

15   couple of questions, Mr. Cole?

16          MR. COLE:  I think I -- I don't think I even had

17   one pending.  I think that call just finished playing and

18   there was the objection.

19          THE COURT:  Okay.  You're proceeding to 124 then?

20          MR. COLE:  Actually to 125 now.

21          THE COURT:  Okay.  Thank you.

22          BY MR. COLE:  Q.  So if you could turn to 125,

23   Agent O'Very.  We're still on the date of December 28, 2007?

24   A.  Yes, sir.

25   Q.  And was there just an initial greeting or an initial

1    portion on this transcript where there's a reference to the

2    name of the person being addressed?

3    A.  Yes, sir.

4            MR. COLE:  And if we could just play that clip.

5        (The audio recording was played.)

6            BY MR. COLE:  Q.  And was there later in the

7    conversation, after they began speaking, a conversation about

8    someone pulling out of a region?

9    A.  Yes, sir.

10           MR. COLE:  Play the next clip.

11       (The audio recording was played.)

12           BY MR. COLE:  Q.  Now, Agent O'Very, if you could

13   turn to Government's Exhibit 126.  We're now going to

14   December 29, 2007.  Was there a conversation between

15   defendant Basaaly Moalin and an individual identified as

16   Najib?

17   A.  Yes, sir.

18   Q.  And in that would be discussed Abdi Qeybdiid having been

19   targeted with a bomb?

20   A.  That is correct.

21           MR. COLE:  If we could play that.

22       (The audio recording was played.)

23           BY MR. COLE:  Q.  Now, Agent O'Very, turning to

24   Government's Exhibit 127, the conversation on the same day,

25   December 29, 2007, did Basaaly Moalin and defendant Ahmed

1   Nasir Taalil Mohamud again -- or discuss Abdi Qeybdiid?

2   A.  Yes, sir.

3           MR. COLE:  If we could play the next call.

4       (The audio recording was played.)

5           BY MR. COLE:  Q.  If we could turn to Government's

6   Exhibit 128.  Was this, Agent O'Very, a call on the next day

7   December 30, 2007?

8   A.  Yes, sir.

9   Q.  And in this conversation does Basaaly Moalin make

10  reference to Aden Ayrow?

11  A.  Yes, sir, that's correct.

12          MR. COLE:  Could you play this call.

13      (The audio recording was played.)

14          MR. COLE:  One moment.

15          BY MR. COLE:  Q.  Now, on January 1st, 2008, was

16  there a phone call between defendant Basaaly Moalin and

17  someone identified as Hassan?

18  A.  Yes, sir.

19  Q.  And in that call was there discussion of the young ones

20  on -- if you'll look at 11:11 on page 2.

21  A.  Yes, sir.

22          MR. COLE:  If you could play this.

23      (The audio recording was played.)

24          MR. DRATEL:  If I could have my 801 (d)(2)(E)

25  objection on this call.  I'll put it on the record later, but

1    I referred to it --

2             MR. DURKIN:  I have one for a separate reason as

3    well, Judge.

4             THE COURT:  You want to make clear what you're --

5             MR. DURKIN:  It's an 801 (d)(2)(E).

6             THE COURT:  Okay.  But the call number, the exhibit

7    number.

8             MR. DRATEL:  It's 129, your Honor.

9             THE COURT:  Thank you.

10        (The audio recording was played.)

11            BY MR. COLE:  Q.  Now, later that same day on

12   January 1st -- or looking at -- I should say looking at

13   Government's Exhibit 130, was there a phone call with

14   Sheikalow and defendant Basaaly Moalin?

15   A.  Yes, sir.

16   Q.  And Sheikalow, that was the same person in the very first

17   call -- the same name in the very first call we played,

18   Government's Exhibit 120?

19   A.  Yes, sir.

20   Q.  And if we could -- in that conversation was there

21   discussion about an amount being sent to Sheikalow?  On the

22   bottom of page 1.

23   A.  Yes, sir.

24            MR. COLE:  If we could play that.

25        (The audio recording was played.)

1          BY MR. COLE:   Q.   Agent O'Very, what was the name

2     reference; was it Yusuf Mohamed Ali as the reference in that

3     part we listened to?

4     A.   That is correct.

5     Q.   And after they discussed an amount sent in the name of

6     Yusuf Mohamed Ali, was there later discussion in this

7     conversation about giving the non-Muslims a holiday to

8     remember?

9     A.   Yes, sir.

10         (The audio recording was played.)

11         BY MR. COLE:   Q.   And if we could look down, in the

12    conversation, Agent O'Very, do they continue to discuss the

13    reliberation and Shabaab needing each other?

14    A.   Yes, sir.

15         MR. COLE:   Could you play the next clip.

16         (The audio recording was played.)

17         MR. COLE:   And if we could play the third clip.

18         (The audio recording was played.)

19         BY MR. COLE:   Q.   And, Agent O'Very, at the

20    conclusion of this transcript in Government's Exhibit 130,

21    what does Basaaly tell Sheikalow to convey to the youth?

22    A.   Says convey my greetings to the youth.

23         MR. COLE:   And if we could play that.

24         (The audio recording was played.)

25         BY MR. COLE:   Q.   Now, Agent O'Very, turning to

1   Government's Exhibit 131, we just listened to a call with

2   Sheikalow.  Was there another call with Sheikalow on

3   January 3rd of 2008?

4   A.  Yes, sir.

5   Q.  And was there discussion in the first portion of this

6   transcript of fighting taking place in Adaado?  Look at page

7   2.

8           MR. DRATEL:  Objection, your Honor; leading.

9           THE COURT:  The objection is overruled.

10          THE WITNESS:  Yes, sir.

11          MR. COLE:  If we could play just the first portion.

12      (The audio recording was played.)

13          BY MR. COLE:  Q.  Now, Agent O'Very, after this

14   discussion about the fighting in Adaado and reference to

15   Abdullahi Yusuf, did Basaaly Moalin go on to discuss his

16   house with Sheikalow?

17   A.  Yes, sir.

18          MR. COLE:  If we could play the next portion.

19      (The audio recording was played.)

20          BY MR. COLE:  Q.  Now, Agent O'Very, after this

21   discussion about directions to a house, does Basaaly Moalin

22   go on to talk about hiding stuff there?

23   A.  Yes, sir.

24          MR. COLE:  Can you play the next one.

25      (The audio recording was played.)

1              BY MR. COLE:  Q.  Now, Agent O'Very, after this

2    discussion of hiding things in the ground at this house, did

3    they go on later in the call to talk about, again, it being

4    easily identifiable from far away?

5    A.  Yes, sir.

6              MR. COLE:  Can you play that.

7         (The audio recording was played.)

8              BY MR. COLE:  Q.  Now, Agent O'Very, if we can go

9    back, what again was the date and time of the call we just

10   listened to?

11   A.  That was January 3, 2008 at 9:54 UTC.

12   Q.  And if we could look at the next exhibit, 132, was --

13   does this transcript -- was this the same date?

14   A.  Yes, sir.

15   Q.  And at 10:20 UTC?

16   A.  Yes, sir.

17   Q.  And so less than an hour -- within the hour of the

18   previous call?

19   A.  That's correct.

20             MR. COLE:  If we could play this call/clip.

21        (The audio recording was played.)

22             BY MR. COLE:  Q.  Now, Agent O'Very, after Basaaly

23   said I was talking to the man who was in charge of the youth,

24   he referred to Abdullahi Yusuf's men; is that right?

25   A.  Yes, sir.

1    Q.  Now, looking back to Government's Exhibit 131, the call

2    with Sheikalow, on page 3 was there in fact a discussion of

3    men loyal to Abdullahi Yusuf?

4    A.  Yes, sir.

5    Q.  And if we could look at Government's Exhibit 133.

6    Turning to January 8 of 2008, Agent O'Very, was there a call

7    between defendant Moalin and Ahmed Nasir Taalil Mohamud,

8    regarding eight tax collectors being killed?

9    A.  Yes, sir.

10           MR. COLE:  If we could play that.

11      (The audio recording was played.)

12           BY MR. COLE:  Q.  And, Agent O'Very, was there a

13   later portion on that transcript where Basaaly Moalin refers

14   to the other party on the call?

15   A.  Yes, sir.

16           MR. COLE:  Would you play that last.

17      (The audio recording was played.)

18           BY MR. COLE:  Q.  Now, turning to Government's

19   Exhibit 134, what is the date on this transcript, Agent

20   O'Very?

21   A.  January 15, 2008.

22   Q.  And the transcript identifies the speakers as who?

23   A.  Basaaly and Abdulkadir.

24   Q.  And was there -- was this conversation -- did this

25   conversation involve a discussion of people being shot coming

1   out of mosques?

2   A.  Yes, sir.

3          MR. COLE:  If we could play this.

4       (The audio recording was played.)

5          BY MR. COLE:  Q.  Now --

6          MR. DRATEL:  Your Honor, I have an 801 (d)(2)(E)

7   objection to that.

8          MR. COLE:  If we can go --

9          THE COURT:  I'll make no ruling.

10          BY MR. COLE:  Q.  If we can go to Government's

11  Exhibit 135, what is the date on this transcript, Agent

12  O'Very?

13  A.  January 18, 2008.

14  Q.  And on this transcript is there discussion of fundraisers

15  taking place for those who behead the enemy?

16  A.  Yes, sir.

17          MR. COLE:  If you could play this.

18       (The audio recording was played.)

19          BY MR. COLE:  Q.  If we could --

20          MR. DRATEL:  Your Honor, that one as well, 801

21  (d)(2)(E).

22          BY MR. COLE:  Q.  If we could turn to Government's

23  136.  Agent O'Very, what is the date of this call on the

24  transcript?

25  A.  January 20, 2008.

1   Q.  And the speakers on this page are identified as who?

2   A.  Basaaly and Sheikalow.

3   Q.  And the last conversation that we heard with Sheikalow

4   was on January 3, Government's Exhibit 131; is that right?

5   A.  Yes, sir.

6           MR. COLE:  And if we could just play the first

7   clip.

8       (The audio recording was played.)

9           BY MR. COLE:  Q.  Now, Agent O'Very, after greeting

10  each other, was there a point later in this call where

11  Sheikalow tells Basaaly that we, the Shabaab, have a

12  political section, a military section, and a missionary

13  section?

14  A.  Yes, sir.

15          MR. COLE:  Let's play that.

16      (The audio recording was played.)

17          BY MR. COLE:  Q.  Agent O'Very, after Sheikalow

18  said we, the Shabaab, have a political section, a military

19  section, and a missionary section, was there a later

20  discussion about the jihad we are waging?

21  A.  Yes, sir.

22          MR. COLE:  If we could continue playing.

23      (The audio recording was played.)

24          BY MR. COLE:  Q.  Now, after Sheikalow discussed

25  men blowing themselves up and killing 300 to 400 Ethiopians,

1  did he go on to discuss the landmine attack against Abdi

2  Qeybdiid?

3  A.  Yes, sir.

4     (The audio recording was played.)

5       BY MR. COLE:  Q.  Now, Agent O'Very, after

6  describing we planted a landmine for Abdi Qeybdiid, later in

7  the call did Sheikalow ask or instruct Basaaly what to tell

8  Sheik Mohamad?

9  A.  Yes, sir.

10       MR. COLE:  And if we could play that next part.

11     (The audio recording was played.)

12       BY MR. COLE:  Q.  Now, Agent O'Very, what's the

13  date on the next transcripts, Government's Exhibit 137?

14  A.  January 21, 2008.

15  Q.  And what time is listed on that transcript?

16  A.  That's 0058 or 12:58 a.m.

17       MR. DRATEL:  Your Honor, I have an 801 (d)(2)(E)

18  objection.

19       BY MR. COLE:  Q.  And now, Agent O'Very, the last

20  call we listened to with Sheikalow, we just listened to, was

21  January 20; is that right?

22  A.  Yes, sir.

23  Q.  And the time on this call is Universal Time?

24  A.  Yes, sir.

25  Q.  And so in San Diego at the time of this call, as listed

1   on the transcript, would it still have been the 20th of

2   January?

3   A.  Yes, sir.

4   Q.  So the same date of the previous phone call?

5   A.  Yes, sir.

6           MR. COLE:  If we could play Government's Exhibit

7   137.

8       (The audio recording was played.)

9           BY MR. COLE:  Q.  Agent O'Very, after that call

10  concluded with Hassan telling Basaaly it's not nice to spell

11  out everything like you're spelling out, was there a call on

12  February 2, as listed on the transcript, between Basaaly and

13  Sheikalow?

14  A.  Yes, sir.

15          MR. COLE:  And if we could play the first portion.

16      (The audio recording was played.)

17          BY MR. COLE:  Q.  Now, Agent O'Very, later in this

18  conversation after having Sheikalow inquiring whether Basaaly

19  had seen the sheik, did they go on to discuss an ambush?

20  A.  Yes, sir.

21          MR. COLE:  If you could play that next portion.

22      (The audio recording was played.)

23          BY MR. COLE:  Q.  Now, Agent O'Very, that call was

24  on February 2 of 2008.  Was there another call the next day

25  on -- well, let's look at Government's Exhibit 139.  What is

1    the date on that phone call?

2    A.   February 3, 2008.

3    Q.   And the speakers?

4    A.   This is Basaaly and Sheikalow.

5    Q.   And in this call does Sheikalow again ask whether Basaaly

6    had reached someone?

7    A.   Yes, sir.

8    Q.   And was that Sheik Mohamad?

9    A.   Yes, sir.

10              MR. COLE:   If we could play that.

11         (The audio recording was played.)

12              BY MR. COLE:   Q.   So, Agent O'Very, at page 2 of

13   that transcript, at 11:10 and 11:12, did it say we need money

14   man, provide some, please?

15   A.   Yes, sir.

16   Q.   And at 11:22 you were running late with the stuff, send

17   some and something will happen?

18   A.   Yes, sir.

19   Q.   And what was the response?

20   A.   Yes, we will do our best.

21   Q.   And if we could now turn to Government's Exhibit 140.

22   What's the date on this transcript, Agent O'Very?

23   A.   February 9, 2008.

24   Q.   And who are -- on the transcript who is identified as the

25   speakers?

1    A.   Basaaly and Issa.

2    Q.   And does this conversation involve two that were sent to

3    Dhunkaal?

4    A.   Yes, sir.

5    Q.   And for the record, D-h-u-n-k-a-a-l is the spelling of

6    Dhunkaal?

7    A.   Yes, sir.

8             MR. COLE:   And if we could play this.

9        (The audio recording was played.)

10            BY MR. COLE:   Q.   Now, looking -- after this

11   discussion of Dhunkaal and the two that were sent, let's go

12   to Government's Exhibit 141.

13            THE COURT:   Before we get to 141, are you at

14   convenient breaking time, Mr. Cole?

15            MR. COLE:   Sure.

16            THE COURT:   Ladies and gentlemen, we'll take our

17   midmorning recess at this time.   It may be a few minutes

18   longer than usual, let's say 20 minutes, and we'll be with

19   you at that point or very shortly thereafter.   Remember the

20   admonition not to discuss the case or make any decisions at

21   this time.   Thank you.

22        (The jury left the courtroom.)

23            THE COURT:   All right.   We are outside the presence

24   of the jury.   Just a couple points we need to cover at this

25   time -- and we may not be able to cover all that needs to be

1    discussed outside the presence of the jury.

2           The record should reflect that just a few minutes

3    before the jury came in this morning, I asked to see counsel,

4    and the court reporter was not present.  It was my intention

5    just to at that point bring counsel up to date on their 106,

6    their Rule 106 submissions.

7           As was clear from yesterday's proceedings, I had

8    asked counsel to submit their Rule 106 proceedings in some

9    kind of an acceptable format so that I could see what their

10   submissions were vis-a-vis the excerpted calls that the

11   government was going to present and has been presenting.  And

12   also it was my intention to compliment Ms. Roberts and Mr.

13   Durkin in the manner in which they had submitted their 106

14   submission; that was late yesterday afternoon.  I did have an

15   opportunity to review those submissions and finish just

16   before the nine o'clock start time today.

17          It was also my intention just to advise counsel

18   that for whatever reason, including some logistical problems

19   they may have had that put a tremendous burden on me to

20   review all of these materials, these 106 submissions, and to

21   have rulings ready for the playing of these excerpted calls.

22   It was my understanding that we'd reached some kind of

23   agreement yesterday that I would have the Rule 106 decisions

24   ready at some point and that at a later point in time, if

25   calls needed to be replayed with 106 material inserted, that

1    that would be the best way to do it, a seamless way to do it.

2    It was basically -- so it was just a meeting to let counsel

3    know where I was on a bit of a daunting task here.  I've got

4    about 3 inches of materials I'm trying to go through right

5    now.

6          At the end of that part of the discussion, Mr.

7    Dratel indicated that it would be his request to have Rule

8    106 material come in right now -- not to wait but to have

9    this witness confronted on cross-examination with Rule 106

10   proffers.

11         I explained to Mr. Dratel that would really burden

12   the proceedings, break down the proceedings, and that is not

13   the way in my view it should be done.  I indicated I would

14   make rulings as soon as possible and provide the defense an

15   opportunity to replay any tapes or conversations they wished

16   to replay.

17         Mr. Dratel, you then objected and stated that

18   the -- essentially the Rule 106 material should be dealt with

19   on an ad hoc basis, cross-examining the witness.  In my view,

20   this would be impractical, and I would not have an

21   opportunity in advance to rule on 106 issues.  I believe the

22   Court has inherent power to order the presentation of

23   evidence for purposes of fairness and efficiency and to

24   eliminate undue delay.  In my view, this would severely

25   hamper the government's efficient presentation of this

1    material, and this would just be an unacceptable breakdown in

2    the continuity of the -- of the trial.

3              So that's pretty much what occurred.  I wanted to

4    give counsel at this point an opportunity to elaborate or

5    correct any characterization of the earlier concern.  Mr.

6    Dratel?

7              MR. DRATEL:  Thank you, your Honor.  My proposal,

8    if it can be done obviously at this point -- I understand the

9    Court's inherent authority, and we acknowledge that

10   obviously.

11             THE COURT:  As well as the understanding we reached

12   last night, I hope, as to how this would be done.

13             MR. DRATEL:  Well, your Honor, we did submit ours

14   early this morning.  We have about -- I guess about ten

15   calls, some of which were reached this morning, some of which

16   we won't reach till this afternoon, if we get there at all

17   this afternoon.  I don't even know how far we're going to get

18   in --

19             THE COURT:  From the pace of this -- pardon the

20   interruption, but from the pace of this, it may well be that

21   what you have anticipated, cross-examination of this witness

22   while this witness is on the stand before he's excused may

23   well proceed.  If I have an opportunity to go through a

24   number of these over the noon hour, I'll do that and provide

25   rulings.  And it may be that this afternoon or at the end of

1    these tapes being played the first time around, you'll have

2    an opportunity before the witness leaves the stand.

3            MR. DRATEL:  And, your Honor -- yeah.  And also

4    just even if -- I mean just trying to figure out where we are

5    in the process and how long it's going to take, my proposal

6    was also that if this witness ends in the midafternoon, that

7    we break until tomorrow morning for cross-examination to give

8    the Court an opportunity to look at the 106 because it's our

9    position that the 106s need to come in as quickly as possible

10   for purposes of correcting misleading -- I mean there was one

11   that they broke off in midsentence.

12           THE COURT:  Well, let me say this, Mr. Dratel; this

13   may -- this may provide some comfort to you.  After having

14   gone through the 106 submissions submitted by Mr. Dratel,

15   there are in fact some places where 106 material will come

16   in.  And I think that the best way to do that is in the most

17   efficient way to do that, and -- I have your objection in

18   mind; I think I understand your concern.  But at this

19   particular point in time, to allow 106 -- proffered 106

20   material to come in in my view is going to break down the

21   proceedings for the reasons I've indicated.  I will say that

22   even though there are some 106 submissions proffered by

23   defendant Nasir that will be permitted, some won't be

24   permitted as well, so --

25           MR. DRATEL:  But, your Honor, I just ask the Court

1    to I guess keep it all in mind about where we are in the

2    proceedings in terms of where the Court is with respect to

3    cross-examination; that's all I'm asking the Court to do.

4                THE COURT:  Okay.

5                MR. DURKIN:  Excuse me, Judge.  Can I --

6                THE COURT:  On this point, Mr. Dratel -- excuse me,

7    Mr. Durkin?

8                MR. DURKIN:  Your Honor --

9                MR. DRATEL:  Yeah, actually could we do that off

10   the record as well?  I just want to put the 801 (d)(2)(E)

11   objections on the record if I may, your Honor.

12               THE COURT:  Well, the 801 (d)(2)(E) objections are

13   on the record.  I've made --

14               MR. DRATEL:  Well, I mean just to explain them so

15   that it's clear because I made an explanation at side bar

16   very quick.

17               THE COURT:  Yes, it was at that point that I think

18   that I ended that sidebar because we were starting to get

19   into a few substantive areas, and I was just merely at that

20   point trying to advise counsel where I was in the 106

21   submissions and thanking Mr. Durkin -- well, probably not Mr.

22   Durkin, Ms. Roberts -- I would thank you for that; I don't

23   want Mr. Durkin to get carried away.

24               MS. ROBERTS:  Thank you, Judge.

25               MR. DURKIN:  I give her all the credit.

1          THE COURT:  Okay.

2          MR. DRATEL:  Your Honor, all I just meant to say

3    that I our objection is based on the fact that there has not

4    been a sufficient showing that any of those other parties on

5    the -- and on the conversations that we have identified --

6          THE COURT:  I've got 129, 134, 135, and 137.

7          MR. DRATEL:  Right, so far, and we'll continue to

8    mark them, you know, as they come up --

9          THE COURT:  Yes.

10         MR. DRATEL:  -- but the point being they have not

11   made a sufficient showing of other co-conspirators.  All of

12   their statements are hearsay.  We believe there's no other

13   basis --

14         THE COURT:  Look, look.  Keep in mind.  Just keep

15   this in mind.  The mere fact that there's a conversation

16   between one of the defendants -- well, typically I guess most

17   of these conversations have involved your client speaking

18   with a third party -- doesn't take this out of the 801

19   (d)(2)(E) realm.  For example, looking at 137, I'm going to

20   overrule that objection because it appears the reasonable

21   interpretation is that defendant Moalin is passing on

22   Sheikalow's request for support; that is the reasonable

23   inference.  And this also provides context for Exhibit 138,

24   which is a conversation between defendant Moalin and

25   Sheikalow, as well as Exhibit 139.  So 137 I think is

1    reasonably interpreted to be a conversation and to contain

2    statements that are made during and in furtherance of the

3    alleged conspiracy, so 137 is overruled.

4            I'll make note on the other -- on the other tapes

5    and give counsel an opportunity to -- to have those

6    eliminated if any of those calls are deemed not to be 801

7    (d)(2)(E) material.

8            MR. DRATEL:  If, your Honor, I could just punch

9    out, on Exhibit 137, there's no other evidence that the other

10   parties to the conversation is a co-conspirator, and

11   therefore all of that person's statements are hearsay

12   regardless of whether Mr. Moalin's part of the conversation

13   were to come in or not.  Thank you.

14           THE COURT:  Okay.

15           MR. GHAPPOUR:  Your Honor, if I could just join

16   that objection.  I don't want to interrupt during --

17           THE COURT:  Which objection, Mr. Ghappour?

18           MR. GHAPPOUR:  The 801 (d)(2)(E).

19           THE COURT:  On what call?

20           MR. GHAPPOUR:  On exhibits 179 and 184.

21           THE COURT:  On --

22           MR. GHAPPOUR:  On 179 and 184.

23           THE COURT:  Oh, in advance you want to --

24           MR. GHAPPOUR:  Yes.

25           THE COURT:  -- you want to lodge these?  Once

1     again?

2             MR. GHAPPOUR:  They're 179 and 184.

3             THE COURT:  Okay.  So you don't need to make

4     objections at that time.

5             MR. DRATEL:  Your Honor, I would actually enumerate

6     the ones as well if you'd prefer me to do it --

7             THE COURT:  All right.  Go ahead.

8             MR. DRATEL:  So 168, 175, 177, 178, 179, 180, 184,

9     and 190.

10            MS. MORENO:  And, your Honor, on behalf of

11    Mr. Mohamud we would join those 801 (d)(2)(E) objections with

12    respect to those specific conversations.

13            THE COURT:  Which ones?

14            MS. MORENO:  The ones that have been enumerated.

15    For instance --

16            THE COURT:  Well, they don't involve your -- do any

17    of those involve your client?

18            MS. MORENO:  No, but it is a conspiracy --

19            THE COURT:  Okay.

20            MS. MORENO:  -- so they do --

21            THE COURT:  Okay.

22            MS. MORENO:  -- involve my client.

23            THE COURT:  And you've gone over those

24    independently or you're just joining in the objection at this

25    point?

```
 1              MS. MORENO:  About every conversation in the case.
 2    I'm not sure what your Honor is asking.
 3              THE COURT:  I'm asking you are you joining in
 4    the -- each of the objections made by Mr. Dratel --
 5              MS. MORENO:  Yes, your Honor.
 6              THE COURT:  -- with respect to the exhibits he just
 7    mentioned?
 8              MS. MORENO:  Yes, your Honor.
 9              THE COURT:  Okay.  That's all I wanted.
10              MS. MORENO:  Thank you.
11              MR. DRATEL:  And, your Honor, just --
12              THE COURT:  Go ahead, Mr. Dratel?
13              MR. DRATEL:  Just -- I don't know if -- just make
14    it clear that we for Mr. Moalin are joining in the Rule 106
15    submissions of the co-defendants because they all obviously
16    involve Mr. Moalin on the call as well even though they're
17    being made by other counsel because they involve their
18    clients; we'd join them as well.
19              THE COURT:  Mr. Durkin?
20              MR. DURKIN:  Judge, I want to join in the
21    objections that Mr. Dratel's just enumerated on the calls --
22    involving all those calls he just enumerated.  As I
23    understand it, they involve this Yusuf's, also known as
24    Hassan.  And Yusuf pled guilty to a similar conspiracy -- I
25    noted it in a footnote in our trial memo -- it's a very --
```

1    almost identically described conspiracy in which Mr. Moalin I

2    believe is named as an unindicted co-conspirator.  The reason

3    I have a separate objection to anything with respect to these

4    Yusuf calls involving our client is, for his purposes of this

5    conspiracy, the government knows that they interviewed Mr.

6    Yusuf, and Yusuf told them specifically that he was surprised

7    that our client had anything to do with this.  And.

8             THE COURT:  Well, that's not a proper basis for an

9    objection, so --

10            MR. DURKIN:  Well --

11            THE COURT:  -- I won't even consider that.

12            MR. DURKIN:  -- your Honor --

13            THE COURT:  I'm going to look at these -- I'm going

14   to look at these exhibits just straight up and determine

15   whether or not these -- these objections are well-taken.  I'm

16   not going --

17            MR. DURKIN:  Judge --

18            THE COURT:  -- I'm not going to concern myself with

19   other cases or what your characterization of the evidence

20   might be.  I know that a lot of your objections thus far have

21   been predicated on the basis that you feel there's not too

22   much evidence regarding your client.

23            MR. DURKIN:  May I just --

24            THE COURT:  I understand.

25            MR. DURKIN:  Could I just finish so I can try to

1    tie it up?  I understand that that's not an admissible piece

2    of evidence right now, but what I -- this goes back to my

3    request for a pretrial hearing or a written proffer regarding

4    the existence of the conspiracy.  And I understand Ninth

5    Circuit law doesn't support it, but --

6              THE COURT:  Okay.  Mr. Durkin, you're going to be

7    given an opportunity to discuss this later.  I want to give

8    everyone an opportunity to just for a few minutes break here.

9    We're in the middle of the morning.  We may do this at the

10   side of the bench at some later point in time or after

11   today's proceedings --

12             MR. DURKIN:  Could I --

13             THE COURT:  -- but I don't want to unduly delay

14   this for the jury.

15             MR. DURKIN:  Could I also -- then just reserve that

16   issue, but could I also raise one other issue regarding 106?

17   We have not decided yet, for our client, to put on a case, so

18   that --

19             THE COURT:  Well, that would not -- I don't want to

20   hear that at this point.

21             MR. DURKIN:  But what I --

22             THE COURT:  No, no, that's not a proper objection.

23   That's argument.  I'll hear that later, but you --

24             MR. DURKIN:  No, no, no, Judge.  You need to --

25   it's --

1           THE COURT:  Mr. Durkin -- Mr. Durkin, you will be

2   given an opportunity to be heard but not right now.  We need

3   to take a recess; we need to take ten minutes now.  We're

4   going to finish our recess at this point, bring the jury back

5   in, and then proceed.  Thank you.

6       (There was a break in the proceedings.)

7           THE COURT:  Okay.  Thank you for your patience,

8   ladies and gentlemen.  We have everyone present, and we will

9   be continuing on.  Mr. Cole?

10          MR. COLE:  Thank you, your Honor.

11          BY MR. COLE:  Q.  Agent O'Very, just to pick up

12  where we left off before the break, we had just listened to

13  Government's Exhibit 140, February 9, 2008; do you recall

14  that?

15  A.  Yes, sir.

16  Q.  And at 4:14 on that transcript it's dated, that you sent

17  with Mohamad, is that what Mohamad Khadar was holding?  Yes,

18  did it go through?  Yes, we have sent it.  Do you recall

19  that?

20  A.  Yes, sir.

21  Q.  Now, was there a call -- well, let's turn to Exhibit 141.

22  And what's the date on this call?

23  A.  February 10, 2008.

24  Q.  So the next date after February 9?

25  A.  Yes.

1    Q.  And was this another phone call with -- excuse me.   In

2    this phone call is there a reference to Sheikalow on page 1?

3    A.  Yes, sir.

4              MR. COLE:  Can we play that.

5         (The audio recording was played.)

6              BY MR. COLE:  Q.  Now, if we can go to Government's

7    Exhibit 142, what's the date on this transcript?

8    A.  February 13, 2008.

9    Q.  And the speakers?

10   A.  Basaaly and Sheik Mohamad.

11             MR. COLE:  And if we could play the first clip.

12        (The audio recording was played.)

13             BY MR. COLE:  Q.  Agent O'Very, at 48 seconds on

14   that first page, what was the name referenced there?

15   A.  Majadhub.

16   Q.  And later in this conversation on this transcript, there

17   was the discussion of whether -- feedback on whether or not

18   he received what Dhunkaal had sent to him?

19   A.  Yes, sir.

20             MR. COLE:  If we could play this next clip.

21        (The audio recording was played.)

22             BY MR. COLE:  Q.  And if we could turn to

23   Government's Exhibit 143.  What's the date on this next

24   exhibit?

25   A.  February 14, 2008.

1    Q.  Valentine's Day?

2    A.  Yes.

3    Q.  And was this a conversation between Basaaly and

4    Sheikalow, as indicated on the transcript?

5    A.  Yes, sir.

6    Q.  And was there discussion in this conversation again about

7    Dhunkaal?

8    A.  Yes, sir.

9           MR. COLE:  Let's listen to this.

10        (The audio recording was played.)

11           BY MR. COLE:  Q.  Now, if we could turn to

12    Government's Exhibit 39, previously admitted --

13           MR. COLE:  And if we could highlight the two lines,

14    the two rows for February.

15           BY MR. COLE:  Q.  Now, Agent O'Very, in the call we

16    just listened to, if you look at page 1 of Government's

17    Exhibit 143 at 49 seconds, what does it say there?

18    A.  It says Thank God.  Did you receive Dhunkaal's --

19    Dhunkaal's stuff?

20    Q.  And at :56 does it say Dhunkaal is asking whether you

21    received two pieces?

22    A.  Yes, sir.

23    Q.  And looking at page 2, line 1:17 to 1:19, what does it

24    say there?

25    A.  Yes.  Did you use the name Yusuf Mohamed Ali as the

1    receiver?

2    Q.   And at line 1:29 do they discuss the amount is 2,000?

3    A.   Yes, sir.

4    Q.   Now, I want to take a look at Government's Exhibit 39.

5    Do you see the two rows there that are highlighted on the

6    screen?

7    A.   Yes, sir.

8    Q.   And the sender name, what is the sender name in those two

9    rows?

10   A.   Dhunkaal Warfaa.

11   Q.   And the receiver name?

12   A.   The receiver name is Yusuf Mohamed Ali.

13   Q.   And what is the amount of each of those two transactions

14   individually?

15   A.   $1300 from one and $700 for the other.

16   Q.   And $1300 and $700, how much does that total?

17   A.   Two thousand.

18   Q.   And if we could look back at Government's Exhibit --

19   excuse me -- 140 briefly, at line 4:14 and 4:16, can you read

20   that?

21   A.   That you sent with Mohamad, is that what Mohamad Khadar

22   was holding?

23   Q.   And down at 4:31, does Issa say no, no, the Dhunkaal one?

24   A.   Yes, sir.

25   Q.   And Issa says, at 4:35, yes, two.

1   A.   Yes, sir.

2   Q.   And then if we could look at Government's Exhibit 142

3   briefly, this was a conversation between Basaaly and Sheik

4   Mohamad; is that right?

5   A.   Yes, sir.

6   Q.   And if we can go to page 2, lines 5:04 and 5:05, does it

7   state, I told him to ask the man for a feedback on whether or

8   not he received what Dhunkaal had sent to him.

9   A.   Yes, sir.

10   Q.   Now, if we can go to Government's Exhibit 144, what's the

11   date on this transcript?

12   A.   February 17, 2008.

13            MR. COLE:   And if we could play this.

14        (The audio recording was played.)

15            MR. COLE:   And if I could -- if we could see

16   Government's Exhibit 39 again.   The two rows that we're

17   looking at, if we could highlight those, February, once

18   again.

19            BY MR. COLE:   Q.   What city is listed next to the

20   name Yusuf Mohamed Ali in both of those transactions?

21   A.   Dhusa Mareeb.

22   Q.   If we could turn to Exhibit 145, and what's the date on

23   this transcript?

24   A.   February 26, 2008.

25   Q.   And the transcript identifies the speakers as who?

1    A.   Basaaly Saeed Moalin and an unidentified male.

2    Q.   Let me show you -- are we looking at the same --

3              MR. COLE:  Sorry.  May I approach?

4              THE WITNESS:  Exhibit 145?

5              MR. COLE:  One moment, your Honor.

6              THE COURT:  Okay.

7              MR. COLE:  Your Honor, I'm approaching -- appears

8    that particular binder -- I think my binder is wrong.  I'm

9    sorry, your Honor.  Never mind.  Apologies for that.

10             BY MR. COLE:  Q.  So it's identified as Basaaly and

11   an unidentified male.  And if --

12             MR. COLE:  I'm sorry, your Honor.  I just wanted to

13   clarify something with counsel.

14             BY MR. COLE:  Q.  Okay.  The speakers are

15   identified as Basaaly and an unidentified male?

16   A.   Yes, sir.

17             MR. COLE:  If we could play that.

18        (The audio recording was played.)

19             BY MR. COLE:  Q.  And, Agent O'Very, later in this

20   conversation does Basaaly and the other speaker, who I'll

21   make reference to again in a moment, do they have a

22   discussion about a phone number for someone named Aden?

23   A.   Yes, sir.

24             MR. COLE:  If we could play that.

25        (The audio recording was played.)

1          BY MR. COLE:   Q.   Now, Agent O'Very, if you could

2    look at line 5:57 and continuing down from there -- could you

3    read from 5:57 to 6:08.

4    A.   Sure.   Whose name is -- is the phone number at which you

5    contact the professor -- is it the one that -- that -- that

6    ends with 5-7?   Are you referring to teacher Aden?   Yes.

7    Q.   And at page 3, 6:28 to 6:33, could you read that, those

8    lines.

9    A.   He calls me from numerous ones that belong into him.   But

10   the last one -- currently he has one that ends with 5-7.

11   Q.   Now, let's look back at Government's Exhibit 143, which

12   we listened to a few moments ago, and was this the call we

13   listened to a few moments ago where Basaaly Moalin was

14   speaking to Sheikalow?

15   A.   Yes, sir.

16   Q.   And the phone number there indicated above the date, what

17   are the last two digits of that phone number?

18   A.   Five-seven.

19          MR. COLE:   Your Honor, with respect to Government's

20   Exhibit 145, the parties are in agreement and have a

21   stipulation that the other speaker on that call, who's

22   identified as the unidentified male, is in fact named

23   Abdirahman, A-b-d-i-r-a-h-m-a-n, and the transcript should

24   have reflected that, and we wanted to state that on the

25   record is that other speaker is Abdirahman.

1          THE COURT:  That's the stipulation, counsel?

2          MR. DRATEL:  Yes.

3          THE COURT:  Okay.  You seem to have full agreement

4   there.

5          BY MR. COLE:  Q.  Now, if we can turn to

6   Exhibit 146, and what's the date on this transcript, Agent

7   O'Very?

8   A.  March 6, 2008.

9   Q.  And is this another phone call, as identified in the

10  transcript, between Basaaly Moalin and Sheikalow?

11  A.  Yes, sir.

12         MR. COLE:  Let's play this call.

13     (The audio recording was played.)

14         BY MR. COLE:  Q.  Now, Agent O'Very, on that call,

15  at the first page of the transcript at :44, does Basaaly tell

16  Sheikalow, Yes, man, you changed your phone?

17  A.  Yes, sir.

18  Q.  And what are the last two digits now on the phone number

19  listed above the date on this transcript?

20  A.  Four-two.

21  Q.  And if we could turn back to Government's Exhibit 145,

22  the call we just listened to, looking at 6:49 to 6:54, and

23  starting with "right now," could you read from "But right

24  now" to the end of that section.

25  A.  But right now I -- I mean -- what I am trying to say is I

1  know that this man cannot carry a specific phone that is

2  known to be his at all.

3  Q.  And so Sheikalow's phone changed from the call on the

4  13th to the one on March 6?

5  A.  Yes, sir.

6  Q.  And if we could turn to Government's Exhibit 147 --

7           MR. COLE:  Your Honor, at this time the United

8  States would ask the Court -- would request that the Court

9  take judicial notice of the fact that on February 26, 2008,

10 the United States Secretary of State designated al-Shabaab,

11 AKA al-Shabaab, also known as Shabaab, also known as The

12 Youth, also known as Mujahidin al-Shabaab Movement, also

13 known as Mujahidin Youth Movement as a foreign terrorist

14 organization; that the designation was published in the

15 Federal Register on March 18, 2008; and that the designation

16 has remained in effect since that time.

17           THE COURT:  In the absence of objection and given

18 prior statements of counsel, the request is granted.

19           BY MR. COLE:  Q.  And so what's the date on this

20 next call, Government's Exhibit 147?

21 A.  March 19, 2008.

22 Q.  And in this call does Basaaly Moalin discuss al-Shabaab's

23 designation as a terrorist organization?

24 A.  Yes, sir.

25           MR. COLE:  And if we could play this.

1           (The audio recording was played.)

2                BY MR. COLE:   Q.   Now, Agent O'Very, what was the

3      name listed at 28:47 on page 2 of this transcript?

4      A.   Aden, the religious scholar.

5      Q.   Aden, the religious scholar.   Can we turn back to

6      Government's Exhibit 145?   Do you recall we were reviewing

7      this exhibit earlier, 145, talking about the last number

8      having ended with 5-7?

9      A.   Yes, sir.

10     Q.   And if we could look at page 2 of Government's Exhibit

11     145, can you read what is the name at 6:05 on that

12     transcript.

13     A.   Teacher Aden.

14     Q.   And if we could turn to the next call in order,

15     Government's Exhibit 148, what's the date on this call?

16     A.   March 20, 2008.

17     Q.   So that's just the day after the last transcript we

18     listened to?

19     A.   Yes, sir.

20                MR. COLE:   If we could play this.

21          (The audio recording was played.)

22                BY MR. COLE:   Q.   Now, after that -- can we turn to

23     Government's Exhibit 149?   And what's the date on this

24     transcript?

25     A.   March 30, 2008.

1   Q.  And the transcript identifies the speakers as who?

2   A.  Basaaly and Sheikalow.

3          MR. COLE:  If we can play the first clip.

4      (The audio recording was played.)

5          BY MR. COLE:  Q.  Now, after greeting each other,

6   as they just did, if you look at page 2 of the transcript at

7   line 1:25 to 1:26, can you read 1:25 to 1:26, which is

8   something Sheikalow was saying to Basaaly.

9   A.  Sure.  Tell Sheik Mohamad that we are awaiting news from

10  him and news from you.

11         MR. COLE:  If we could play that clip now.

12     (The audio recording was played.)

13         BY MR. COLE:  Q.  Turning to Government's Exhibit

14  150, did Basaaly Moalin have another phone call with

15  Sheikalow?

16  A.  Yes, sir.

17  Q.  And the date?

18  A.  April 12, 2008.

19  Q.  And in this call do they discuss that the rain has come

20  and the drought is over?

21  A.  Yes, sir.

22  Q.  And if you could look at page 2, 1:56 to 1:57, could you

23  read what's there.

24  A.  Very much so.  The help for the drought is over, so now

25  it is the time to finance the jihad.

1          MR. COLE:  If we could play this clip.

2       (The audio recording was played.)

3          MR. COLE:  Could you pause there.

4          BY MR. COLE:  Q.  Agent O'Very, if we could look at

5  line 3:19 through 3:30 on page 3 of this transcript we're

6  listening to.  Starting at So be ready, can you read 3:19

7  through 3:30.

8  A.  Sure.  So be ready.  Although you cannot do much about

9  big, high-speed planes, you can prepare for helicopters.

10  They would never come back if you destroy one.

11  Q.  And can you read the line at -- on the next page at 3:42

12  through 3:44.

13  A.  The Ethiopian helicopters are not a threat but the

14  Americans' are.

15  Q.  And at line 4:03 to 4:06, does Basaaly say, Therefore, be

16  prepared for that scenario.  Sheikalow, please do not take

17  what I am telling you lightly?

18  A.  Yes, sir.

19          MR. COLE:  If we could continue on in the call.

20       (The audio recording was played.)

21          MR. COLE:  If we can pause here.  Your Honor, we're

22  about ready to come to a passage in this transcript starting

23  at 4:58 where there's a reference to Sheik Mohamud -- not

24  Sheik Mohamad but Sheik Mohamud -- and the parties are in

25  agreement and stipulate that this person being referred to

1   here in this call and speaking later in the call is a Sheik

2   Mohamud; it is not the defendant Mohamad Mohamad Mohamud, and

3   we want to make that clear.

4           THE COURT:  Okay.  It's always nice to get the

5   assent of counsel on the record so that when appropriate, I

6   can advise the jury.  So I assume everyone is in agreement.

7           MS. MORENO:  So stipulated.

8           THE COURT:  Okay.  Well, ladies and gentlemen,

9   that's a point you should make note of at this time.  With

10  respect to this particular transcript, page 4 of 8 -- and

11  we're talking about Exhibit 150, the conversation that took

12  place on April 12.  The reference there at lines 4:58 to 5:03

13  is a Sheik Mohamud, and that is not a reference to defendant

14  Mohamud in this case.

15          MR. COLE:  Okay.  If we can continue.

16       (The audio recording was played.)

17          BY MR. COLE:  Q.  Now, Agent O'Very, if we can turn

18  to the next exhibit, 151, what's the date of this transcript?

19  A.  April 12, 2008.

20  Q.  And is this the same date as the transcript we just

21  listened to or we just -- we just viewed?

22  A.  Yes, sir.

23  Q.  And was this next call -- what's the time on the

24  transcript for 151?

25  A.  5:10.

1    Q.  And was that within an hour of the time on the transcript
2    on 150 that we just were listening to?
3    A.  Yes, sir.
4              MR. COLE:  And if we could play --
5              BY MR. COLE:  Q.  And this call is between Basaaly
6    and someone identified as Abdulle on the transcript?
7    A.  On Exhibit 151?
8    Q.  Right.
9    A.  Again, on mine it shows up as unidentified male.
10             MR. COLE:  Apologies, your Honor.  The parties
11   stipulate that the other speaker is Abdulle A-b-d-u-l-l-e;
12   it's currently identified as "unidentified male" in the
13   binder.
14             THE COURT:  Right, in mine as well.  So if the
15   jurors would like to make that correction.  On page 1 of the
16   Exhibit 151, the individual who earlier was identified as
17   well unidentified, UM, is now Abdulle, A-b-d-u-l-l-e.  Is
18   that the correct spelling, counsel?
19             MR. COLE:  I'm sorry, your Honor.
20             THE COURT:  A-b-d-u-l-l-e, is that the correct --
21             MR. COLE:  Yes, yes.  And my apologies.  That is a
22   mistake on the United States's part, your Honor.
23             THE COURT:  Please.
24             MR. COLE:  If we could continue -- well, if we
25   could look then at this transcript 151 between Moalin and --

1  Basaaly Moalin and Abdulle, if we could play this call.

2         (The audio recording was played.)

3             BY MR. COLE:  Q.  And, Agent O'Very, if we can go

4  back to page 1 of this transcript at 4:28 where -- do you see

5  where it indicates that Basaaly says, quote, he is asking us

6  to go into our pockets.  And can you read from 4:31 to 4:52.

7  A.  Sure.  I understand.  That is Sheikalow.  Yes.  I

8  understand.  So people -- what we want for these men, if they

9  are to eliminate those men.  Yes.  We must send someone to

10 talk to the people.  We can find 30 men who can pay small

11 amounts.

12 Q.  If we can turn to Exhibit 152 now, what's the date on

13 this transcript?

14 A.  April 12, 2008.

15 Q.  And does the transcript identity the speakers as Basaaly

16 and Sheikalow?

17 A.  Yes, sir.

18 Q.  And just to refer back, on Exhibit 150 there was another

19 conversation between Basaaly and Sheikalow on April 12; is

20 that right?

21 A.  Yes, sir.

22 Q.  So this is a second conversation with Sheikalow on that

23 same date?

24 A.  Yes, sir.

25             MR. COLE:  Go ahead and play it.

1           (The audio recording was played.)

2               MR. COLE:  And if we could pause there.

3               BY MR. COLE:  Q.  Agent O'Very, do they go on to

4   discuss at this point advice that Basaaly Moalin has for

5   Sheikalow on how to attack men in Adaado?

6   A.  Yes, sir.

7               MR. COLE:  If we could continue playing.

8           (The audio recording was played.)

9               MR. COLE:  Now, if we could just pause there for a

10  moment.

11              BY MR. COLE:  Q.  Agent O'Very, if I could direct

12  your attention to page 6 of this transcript at 10:01.

13  A.  Yes, sir.

14  Q.  Could you read from 10:01 to 10:27.

15  A.  Sure.  Brother, there are things to do every morning and

16  every day.  Now that I am talking to you, there are so many

17  soldiers who are ready, but people have no money really.  I

18  don't think if it is possible that 200 men will have bullets

19  to shoot at the enemy they can see.  I understand.  There

20  could be hundred -- hundred of things and the finance is zero

21  if you want the truth.  I understand.  Thank God no problem,

22  but if we had bullets for this enemy, we would have destroyed

23  them.

24              MR. COLE:  Can you continue to play the clip.

25              THE COURT:  In the future I think it would be

1  advisable if there's any reading to have the individual

2  parties to the conversation identified by the witness.

3          MR. COLE:  Thank you, your Honor.

4          THE COURT:  Up to now that hasn't been happening,

5  so from this point forward, I think it should.

6          MR. COLE:  Yes, your Honor.

7      (The audio recording was played.)

8          MR. COLE:  And if we could play --

9          BY MR. COLE:  Q.  If we could turn to Government's

10  Exhibit 153 -- now, the date on that last call we just

11  listened to, was -- was that April 12, 2008?

12  A.  Yes, sir.

13  Q.  And so was there a call at Government's Exhibit 153 that

14  lists the same date on the transcript, April 12?

15  A.  Yes, sir.

16  Q.  And are the speakers identified on the transcript as

17  Basaaly and Sheik Mohamad?

18  A.  Yes, sir.

19          MR. COLE:  And if we could play just the first

20  portion.

21      (The audio recording was played.)

22          BY MR. COLE:  Q.  And so after the greeting later

23  in the call -- if we could look at 1:22 on page 1, could you

24  read from 1:22 to 1:40 and this time identify the speaker.

25  A.  Sure.  Basaaly:  I received repeated calls from the young

1   man these days.  Sheik Mohamad:  Right.  Basaaly:  He asked

2   where we are.  He does not have anything to throw at them.

3   He is saying that the men are close to him.

4           MR. COLE:  If we could play that.

5       (The audio recording was played.)

6           THE COURT:  May we stop for just a moment, please.

7   This is a call from defendant Moalin and it indicates the

8   call is to Mohamad Mohamad Mohamud?

9           MR. COLE:  Yes.

10          THE COURT:  Okay.  Now, for clarification is that

11  defendant Mohamud or is that another person?

12          MR. COLE:  Defendant Mohamud, yes.  Sheik Mohamad

13  defendant Mohamud, not the Sheik Mohamud that was referred to

14  in the call that you gave an instruction to the jury on,

15  which I can --

16          THE COURT:  I think that clarification needed to be

17  made because there was earlier a Sheik Mohamud who was

18  identified in a prior call who was not defendant Mohamud.

19  This is defendant Mohamud here.

20          MR. COLE:  Yes.

21          THE COURT:  Okay.

22      (The audio recording was played.)

23          BY MR. COLE:  Q.  Now, Agent O'Very, if we could

24  look at page 2 of this transcript we just -- this call we

25  just listened to, do you see at two minutes and 13 seconds on

1   the transcript?

2   A.   Yes, sir.

3   Q.   And can you read there the speaker and then what is said

4   at 2:13 to 2:21.

5   A.   Sure.   Basaaly:   He called me, so I passed the phone to

6   him as we were talking about matters.

7   Q.   And that's referencing above to passing the phone to

8   someone named Moalin Mohamud?

9   A.   Yes, sir.

10  Q.   If we could look back at Government's Exhibit 150, at

11  page 4 of 150, and was this a phone call that's -- a phone

12  conversation between Basaaly and Sheikalow?

13  A.   Yes, sir.

14  Q.   And if you could look at 4:58 to 5:03 of page 4, could

15  you read 4:58 to 5:03.

16  A.   Yes, sir.   This is Sheikalow speaking:   You did not join

17  the jihad and now you started building a mosque.   Basaaly:

18  You are right.   This is Sheik Mohamud.   I will pass the phone

19  to Sheik Mohamud, okay?

20  Q.   And so after this discussion of passing the phone to

21  Sheik Mohamud in Government's Exhibit 150 and Government's

22  Exhibit 153 in which Basaaly Moalin is speaking to defendant

23  Mohamad Mohamad Mohamud, can you look at -- I apologize.   One

24  second.   Look at page 2 of that transcript, Government's

25  Exhibit 153, lines 2:37 to 2:42, and could you read 2:37 to

1    2:42.

2    A.  Yes, sir.  Sheik Mohamad:  Moalin Mohamud is a good man.

3    Definitely it is best that this thing does not become public,

4    you know.

5            MR. COLE:  And, your Honor, we're at Exhibit 154,

6    and I can continue or if this is a convenient break, that

7    will be fine as well.

8            THE COURT:  Okay, ladies and gentlemen.  We'll take

9    our noon recess at this time and resume at 1:30.  Please

10   remember the admonition not to discuss the case or make any

11   decisions at this time.  Thank you.

12       (The jury left the courtroom.)

13           THE COURT:  We're outside the presence of jurors.

14   Counsel, I think we'll be able to deal with several of these

15   objections at the end of the day, toward -- I don't know if

16   you'll finish this afternoon with these transcripts, but --

17           MR. COLE:  Your Honor, one thing we let counsel

18   know is that we -- what with we plan to do if it's all right

19   with the Court is go a little bit longer after lunch, maybe

20   for about 20 or 30 minutes in transcripts, take a break from

21   that, have Agent O'Very off the stand, bring Mr. Bryden back

22   briefly to talk briefly about some specific context for some

23   transcripts, and then come back on and play the rest of the

24   calls.

25           THE COURT:  Okay.  Well --

1        MR. COLE:  Just to give you a head's up --

2        THE COURT:  Yeah.

3        MR. COLE:  -- where we are.

4        THE COURT:  It sure seems like before

5   cross-examination begins, we'll have an opportunity to have

6   the objections addressed.

7        MR. DRATEL:  Thank you, your Honor.

8        MS. FONTIER:  Thank you very much, your Honor.

9      (There was a break in the proceedings.)

10        THE COURT:  Good afternoon, everyone.  Let the

11   record reflect all jurors are present, counsel, and the

12   parties as well.  Continuing on.  Okay, Mr. Cole?

13        MR. COLE:  Thank you, your Honor.

14        BY MR. COLE:  Q.  Agent O'Very, before the lunch

15   break I believe the last exhibit that we'd reviewed was

16   Government's Exhibit 153; do you recall that?

17   A.  Yes, sir.

18   Q.  And just to pick up where we left off before we go to

19   154, this was a phone call between defendant Mohamad Mohamud

20   and Basaaly Moalin?

21   A.  Yes, sir.

22   Q.  And to get us back in to where we left off, could you

23   just on page 1 identify the speakers; read 1:22 through 1:41.

24   A.  Yes, sir.  Basaaly:  I receive repeated calls from the

25   young man these days.  Sheik Mohamad:  Right.  Basaaly:  He

1    asked where we are.  He does not have anything to throw at

2    them.  He is saying that the men are close to him.  Sheik

3    Mohamad:  Yes.

4    Q.  Now, let's turn to Government Exhibit 154, and what is

5    the date on this transcript?

6    A.  April 14, 2008.

7    Q.  And the speakers are identified as Sheikalow and Basaaly?

8    A.  Yes, sir.

9    Q.  Okay.

10       (The audio recording was played.)

11   Q.  Now, if we could turn to Government's Exhibit 155.  That

12   last call was dated April 14.  What's the date of this call?

13   A.  April 17, 2008.

14   Q.  And the speakers are identified on the transcript as

15   Sheik Mohamad and Basaaly?

16   A.  Yes, sir.

17            MR. COLE:  And if we could play this.

18       (The audio recording was played.)

19            BY MR. COLE:  Q.  Now, Agent O'Very, later on in

20   the call, on page 4 of this exhibit, is there a part at 5:07

21   where Basaaly states:  Thirty people or 20 that you trust

22   will be enough.  You tell them to pay this much, something

23   they can afford.

24   A.  Yes, sir.

25            MR. COLE:  Let's play that -- let's publish that

1   portion.

2          (The audio recording was played.)

3              BY MR. COLE:  Q.  If we can turn to Government's

4   Exhibit 156.  And what is the date on this transcript?

5   A.  April 21, 2008.

6   Q.  And are the speakers identified as Basaaly, Issa, and

7   Najib?

8   A.  Yes, sir.

9              MR. COLE:  If we could play this for the jury.

10         (The audio recording was played.)

11             BY MR. COLE:  Q.  Agent O'Very, if you could turn

12  to Exhibit 157.  What is the date on that transcript?

13  A.  April 23, 2008.

14  Q.  And are the speakers identified on the transcript as

15  Basaaly and Abdirizak?

16  A.  Yes, sir.

17             MR. COLE:  And I'd like to publish this portion and

18  then turn to Exhibit 39.  Let's go ahead and publish this.

19         (The audio recording was played.)

20             BY MR. COLE:  Q.  Now, Agent O'Very, if we can look

21  at page 2 of this transcript, Government's Exhibit 157, at

22  about 1:19 on the transcript, after the long pause, can you

23  read from the -- from that pause to the end, identifying the

24  speakers.

25  A.  Yes, sir.  Abdirizak:  Man, Dhunkaal has not taken the

1    money that was sent to him yet, all right?  Basaaly:

2    Dhunkaal?  When was it the one for Dhunkaal?  What was the

3    date?  Abdirizak:  The one -- I am talking about the men.

4    Basaaly:  Yes, I know, yes.  Abdirizak:  That last one, the

5    last 3,000.  Basaaly:  Yes.  Abdirizak:  He didn't receive

6    the last three.  Basaaly:  Yes.

7              MR. COLE:  Now, if we could look at Government's

8    Exhibit 39, previously admitted, and if we could highlight on

9    the two rows in April.

10             BY MR. COLE:  Q.  And, Agent O'Very, do you see the

11   two rows dated April 23, 2008?

12   A.  Yes, sir.

13   Q.  And in the recipient name column, do you see the name

14   Dhunkaal in both of those lines?

15   A.  Yes, sir.

16   Q.  And the amount in the top line is how much?

17   A.  $1,900.

18   Q.  And the amount in the second line?

19   A.  $1,100.

20   Q.  And what is the sum of 1900 and 1100?

21   A.  $3,000.

22   Q.  If we could turn to Government's Exhibit 158, and let me

23   just ask you before we do that, 157, that was a call on

24   April 23; is that right?

25   A.  Yes, sir.

1   Q.   And 158, what is the date on this transcript?

2   A.   April 23, 2008.

3   Q.   So the same day?

4   A.   Yes, sir.

5   Q.   And, in fact, if we could look at the time of those two

6   calls, the time on government's exhibit -- the time on

7   Government's Exhibit 157, on the transcript, is 18:04?

8   A.   Yes.

9   Q.   And what is the time on the next transcript, Government's

10  Exhibit 158?

11  A.   18:10.

12  Q.   So, according to these two transcripts, within minutes?

13  A.   Yes, sir.

14  Q.   And who are the speakers identified on this transcript?

15  A.   Basaaly and Sheik Mohamad.

16          MR. COLE:  If we could publish this.

17       (The audio recording was played.)

18          BY MR. COLE:  Q.  Let's turn to Government's

19  Exhibit 159.  Again, was this another call, 159, where the

20  transcript indicates the date of the call was April 23, 2008?

21  A.   Yes, sir.

22  Q.   And what's the time indicated on the transcript?

23  A.   18:19.

24  Q.   So this is, again, minutes after the call we just

25  listened to?

1    A.  Yes, sir.

2    Q.  And who are the speakers identified on this transcript?

3    A.  Basaaly Moalin and Issa Doreh.

4           MR. COLE:  If we could publish this.

5         (The audio recording was played.)

6           BY MR. COLE:  Q.  Agent O'Very, the last line of

7    that transcript is, Basaaly:  Okay.  I will call you back?

8    A.  Yes, sir.

9    Q.  And so after this discussion with confusion over the name

10   of use for the transaction, was there a call moments later

11   again on April 23 at Exhibit 160?

12   A.  Yes, sir.

13   Q.  And the speakers identified on that transcript are who?

14   A.  Basaaly and Issa.

15          MR. COLE:  And if we could publish this.

16        (The audio recording was played.)

17          MR. COLE:  We can pause there.

18          BY MR. COLE:  Q.  Now, Agent O'Very, there's a lot

19   of discussion in this transcript about what exact names were

20   used for the transaction, all right?

21          MR. COLE:  If we can look at Government's Exhibit

22   39 again.

23          BY MR. COLE:  Q.  Now, taking a look again at

24   Government's Exhibit 39, which has been previously

25   admitted -- if we can first look at Government's Exhibit 160,

1    the call we're in the middle of listening to, at line -- at

2    about 2:36 on page 4 and -- actually going to 2:33, can you

3    read from 2:33 to 2:38, identifying the speakers as you go.

4    A.   Yes, sir.   Issa:   And the person who sent it is -- is

5    Abdiweli Ahmed.   Basaaly:   Abdiweli Ahmed, okay.   I

6    understand.   I understand.   I understand.   I understand you

7    very well, you know.

8    Q.   Now, if you can look, Agent O'Very, at Government's

9    Exhibit 39 next to the transaction -- the first transaction

10   dated April 23, 2008 --

11   A.   Yes, sir.

12   Q.   -- what is the name listed there for sender?

13   A.   Abdiweli Ahmed.

14   Q.   And the name listed as the receiver?

15   A.   Dhunkaal Mohamed Yusuf.

16        MR. COLE:   And let's switch back to the call then

17   where we left off and continue publishing.

18      (The audio recording was played.)

19        BY MR. COLE:   Q.   Okay.   Looking back at

20   Government's Exhibit 39, looking at the same transaction we

21   were discussing a moment ago, April 23, 2008, Abdiwelli Ahmed

22   is sender and Dhunkaal Mohamed Yusuf is receiver, what is the

23   receiver city listed on Exhibit 39?

24   A.   Dhusa Mareeb.

25   Q.   And the transaction right below it, what's the city

1   location?

2   A.   Dhusa Mareeb.

3   Q.   And -- and Government's Exhibit 160, page 5 at about

4   2:56, can you read that portion from 2:56 to 2:57.

5   A.   Sure.  Basaaly:  Can it be changed to Dhusa Mareeb?  He

6   said that he is there.

7   Q.   Let's now turn to Government's Exhibit 161, and what is

8   the date on this transcript?

9   A.   April 24, 2008.

10  Q.   Are the speakers on the transcript identified as Basaaly

11  and Sheikalow?

12  A.   Yes, sir.

13           MR. COLE:  If we could publish this.

14       (The audio recording was played.)

15           BY MR. COLE:  Q.  Agent O'Very, I want to look at

16  Government's Exhibit 39 again, but before we do, on this

17  Exhibit 161 can I focus your attention to page 2 at 1:29 to

18  1:40 and ask if you could read that portion.

19  A.   Yes, sir.  Basaaly:  It is Mohamed.  Ahem.  It is

20  three -- it is three bundles.  You will say it was sent from

21  San Diego.

22  Q.   And then down below at about 1:50 to 1:55, does it

23  indicate, quote -- and this is again Basaaly speaking -- they

24  will break it because they do not want to show that the

25  transfer was one.  Do you see that?

1    A.  Yes, sir.

2    Q.  If we could look at Government's Exhibit 39 now again and

3    focus on the two transactions that are identified as occurred

4    in April and the date-in column, I believe you testified

5    earlier that those two transactions total 3,000?

6    A.  Yes, sir.

7    Q.  If we could turn to Government's Exhibit 162 -- well,

8    before we do that, the date on Government's Exhibit 161 was

9    April 24?

10   A.  Yes, sir.

11   Q.  What's the date on Government's Exhibit 162?

12   A.  April 24, 2008.

13   Q.  And the speakers are identified as who?

14   A.  Basaaly and Sheik Mohamad.

15           MR. COLE:  And if we could publish this.

16      (The audio recording was played.)

17           BY MR. COLE:  Q.  Now, if we could turn to

18   Government's Exhibit 163, the date on the transcript is the

19   date of April 25, 2008; is that right?

20   A.  Yes, sir.

21   Q.  And the speakers are identified as Basaaly and Sheikalow?

22   A.  Yes, sir.

23           MR. COLE:  And if we could publish this.

24      (The audio recording was played.)

25           BY MR. COLE:  Q.  Agent O'Very, there at the end of

1   the passage we just listened to where Sheikalow says, quote,

2   what is going on, I received 1900 from the place -- do you

3   see that?

4   A.  Yes, sir.

5   Q.  If we could look back at Government's Exhibit 39.  And

6   again, what is the amount of the first line, the first

7   transaction dated in April?

8   A.  $1900.

9   Q.  If we can now turn to Government's Exhibit 164.  Now,

10  this call on 164, is it dated April 25, 2008?

11  A.  Yes, sir.

12  Q.  And is that the same date that's on the transcript we

13  just reviewed?

14  A.  Yes, sir.

15  Q.  And according to the time stamps on those two

16  transcripts, is this call on 164 within the hour of the last

17  call?

18  A.  Yes, sir.

19  Q.  And who are the speakers identified on Government's

20  Exhibit 164 on the transcripts?

21  A.  Basaaly Moalin and Sheik Mohamad.

22  Q.  And was there an initial greeting?

23  A.  Yes, sir.

24          MR. COLE:  If we could listen to the greeting.

25       (The audio recording was played.)

1           MR. COLE:  And if we could now play -- publish the

2    remainder of this transcript.

3         (The audio recording was played.)

4           BY MR. COLE:  Q.  Now, turning to Government's

5    Exhibit 165, was there another call dated on the transcript

6    April 25, 2008?

7    A.  Yes, sir.

8    Q.  Was this call identified as between Basaaly and

9    Sheikalow?

10   A.  Yes, sir.

11          MR. COLE:  And if we could publish that.

12        (The audio recording was played.)

13          BY MR. COLE:  Q.  If we could turn to Government's

14   Exhibit 166.  Again, is this exhibit also dated April 25,

15   2008?

16   A.  Yes, sir.

17   Q.  And the speakers are identified as who?

18   A.  Abdirizak and Basaaly.

19          MR. COLE:  If we could publish.

20        (The audio recording was played.)

21          BY MR. COLE:  Q.  If we could turn to Government's

22   Exhibit 167.  Now, we're finally off April 25.  What's the

23   date on this transcript?

24   A.  April 27, 2008.

25   Q.  And the speakers are identified as who?

1   A.   Basaaly and Sheik Mohamad.

2   Q.   And in this call do Basaaly and Sheik Mohamad discuss the

3   names Majadhub and Sheikalow?

4   A.   Yes, sir.

5        MR. COLE:   If we could publish.

6        (The audio recording was played.)

7        BY MR. COLE:   Q.   And just two quick questions

8   about this transcript, Agent O'Very.   If we could look back

9   at page 3 at about at 5:17 through 5:24, could you read this

10  portion, identifying the speaker.

11  A.   Sure.   Sheik Mohamad:   So what I want from you is to tell

12  me the total he received.   God willing, I want to let the men

13  who live in a far place know, and you can't ask many things

14  over the phone, you know.

15  Q.   Now, if we could turn to Government's Exhibit 168, what's

16  the date of this call?

17  A.   May 1st, 2008.

18  Q.   And the speakers are identified as Basaaly and Hassan on

19  the transcript?

20  A.   Yes, sir.

21       MR. COLE:   And if we could publish this -- excuse

22  me.   I'm sorry.

23       BY MR. COLE:   Q.   Before we do that, let me ask you

24  this question.   Exhibits -- if you could look at briefly at

25  Exhibits 169, 170, 171, those three exhibits, Agent O'Very.

1   Are each of those exhibits dated May 1st, 2008?

2   A.   Yes, sir.

3   Q.   And do they all discuss a strike or bombing in Somalia?

4   A.   Yes, sir.

5   Q.   Okay.

6             MR. COLE:   If we can first publish 168.

7        (The audio recording was played.)

8             BY MR. COLE:   Q.   If we could turn to Exhibit 169,

9   and if we could -- well, this is also dated May 1st, 2008,

10  Agent O'Very?

11  A.   Yes.

12            MR. COLE:   And if we could publish this exhibit.

13       (The audio recording was played.)

14            BY MR. COLE:   Q.   Now, Agent O'Very, at line 6:01

15  to 6:05 on this transcript, do you see where it says airplane

16  dropped -- again, the speaker is an unidentified male --

17  airplane dropped one missile on a house of three bedrooms

18  thought to be inhabited by the main man.  Do you see that?

19  A.   Yes, sir.

20  Q.   And the next exhibit, 170, is there further discussion of

21  an event that had just happened?

22  A.   Yes, sir.

23  Q.   And if we could -- well, let me ask you this.  The

24  speakers on Exhibit 170 are identified as who on the

25  transcript?

1    A.   Basaaly Moalin and Sheik Mohamad.

2    Q.   And do they discuss in this -- on this transcript

3    something announced by Roobow?

4    A.   Yes, sir.

5            MR. COLE:   If we could publish.

6        (The audio recording was played.)

7            BY MR. COLE:   Q.   Now, Agent O'Very, did you see

8    the reference on this exhibit at about 26 seconds to

9    Majadhub?

10   A.   Yes, sir.

11   Q.   And was that the same name discussed between Basaaly

12   Moalin and Sheik Mohamad, defendant Mohamad Mohamad Mohamud,

13   in Government's Exhibit 167?

14   A.   Yes, sir.

15           MR. COLE:   If we could play one more call at

16   May 1st, Government's Exhibit 171.

17           BY MR. COLE:   Q.   And, Agent O'Very, on the

18   transcript are the speakers identified as Basaaly and Issa?

19   A.   Yes.

20           MR. COLE:   If we could publish this.

21       (The audio recording was played.)

22           MR. COLE:   Your Honor, at this point we would

23   request permission to temporarily excuse Mr. O'Very from the

24   witness stand and recall Matthew Bryden, who testified

25   previously.

 1          THE COURT:  How long do you anticipate Mr. Bryden's
 2   testimony will be, both direct and cross?
 3          MS. HAN:  Your Honor, I'm not sure about
 4   cross-examination.  I think his direct would be about 25
 5   minutes to an hour.
 6          THE COURT:  Okay.  Very good.  All right, Agent
 7   O'Very, we will release you at this time obviously subject to
 8   recall.
 9          THE WITNESS:  Thank you, sir.
10          THE COURT:  Well, it's -- why don't we take our
11   midafternoon recess; this seems to be a pretty good time to
12   do it.  Ladies and gentlemen, 15 minutes, and remember the
13   admonition.  Thank you.
14       (There was a break in the proceedings.)
15          THE COURT:  Okay.  Everyone is present.
16   Mr. Bryden, you have been previously sworn, and you're still
17   under oath.
18          THE WITNESS:  Yes, your Honor.
19          THE COURT:  All right.  Thank you.
20                    Matthew Bryden
21   was recalled by the government and, having been previously
22   sworn, testified as follows:
23                 Direct Examination
24          BY MS. HAN:  Q.  Good afternoon, Mr. Bryden.
25   A.  Good afternoon.

1    Q.  I wanted to start off by referring you to Government's

2    Exhibit 122 in the binder in front of you.  If you could

3    refer to that, please.

4    A.  Okay.

5    Q.  And specifically I wanted to refer you to a section

6    between time stamps 0902 to 0916; do you see that there?

7    A.  Yes, I do.

8    Q.  Okay.  And do you see there where at 0902 Basaaly states,

9    Money is needed for the forces there in Bur Hakaba.  And then

10   Ahmed Nasir responds, Right.  And Basaaly then states, Their

11   salary for this month, and et cetera, is indeterminate, they

12   said.  They are the -- the strongest men after those in

13   Mogadishu are these men.

14          Who are those men that Ahmed Nasir and Basaaly are

15   talking about?  Who are they?

16          MR. DRATEL:  Objection, your Honor.

17          BY MS. HAN:  Q.  What is your opinion about who

18   those men --

19          MS. HAN:  I apologize, your Honor.

20          THE COURT:  Hold on.  There's a pending objection.

21   I was just trying to catch up.  I think I've caught up.  Just

22   refer my attention if you would to --

23          MS. HAN:  Your Honor, it's between 902 --

24          THE COURT:  It's on page 2.

25          MS. HAN:  Yes, page 2 between 9:02 and 9:15.

1           THE COURT:  Well, the objection is sustained.  It's
2   calling for a conclusion on the part of the witness -- on the
3   part of the witness as to who other people were referring to.
4   "This is the strongest men" reference, is that what you have
5   reference to?
6           MS. HAN:  Your Honor, before that where it says
7   money is needed for the forces there in Bur Hakaba.
8           THE COURT:  Okay, forces.  Okay.  Absent some
9   further foundation, I will sustain the objection.
10          MS. HAN:  That's fine, your Honor.  I'll move on.
11          BY MS. HAN:  Q.  Mr. Bryden, I'm showing you
12  Government's Exhibit 25-B, already in evidence.
13          MS. HAN:  If I could have Ms. Alejandre publish
14  25-B.
15          BY MS. HAN:  Q.  Mr. Bryden, who is in Government's
16  Exhibit 25-B?
17  A.  That's Mukhtar Roobow, also known as Abu Mansoor.
18  Q.  And what was his role -- what is his role in
19  al-Shabaab -- or what was his role in al-Shabaab in 2007 and
20  2008?
21  A.  He was a senior member of al-Shabaab, a member of the
22  shura, and the spokesman.
23  Q.  And did he also have an operational figure?  Was he also
24  an operational figure?
25          MR. DRATEL:  Your Honor, are we going to go over

1    his direct, his first direct, or -- I mean this is

2    repetitive.

3              THE COURT:  Well, it is.  These questions have been

4    asked and answered.  Well, at least the question with respect

5    to Mr. Roobow.  So be careful not to just merely repeat

6    things that have already been examined or delved into on

7    direct examination, original direct examination.  But if you

8    need to ask a prefatory question just to orient people that

9    might have already been asked, that's okay.

10             MS. HAN:  Thank you, your Honor.  I think I'll

11   withdraw the question.

12             BY MS. HAN:  Q.  Did Roobow also have forces that

13   he was responsible for?

14   A.  Yes, he did.

15   Q.  And where were they based?

16   A.  They operated in Bay region between Bur Hakaba,

17   Dhiinsoor, Dinoone (phonetic), those areas around Baidoa and

18   to the mainly -- well, throughout Bay and Bakool region.

19   Q.  And using Government's Exhibit 25-B, could you please

20   write Roobow's name and the other names that he was known by

21   on that, please.  If you could do that on the top there with

22   the Sharpie that's there.  Thank you.

23   A.  Okay.

24   Q.  So I next wanted to refer you to Exhibit 127, please.

25   Are you there, Mr. Bryden?

1    A.  Yes.

2    Q.  Okay.  And can I refer you to 01:55 where Basaaly is

3    saying, The only news is that the spokesperson for the

4    Banadir Regional Administration was eliminated last night,

5    yesterday.  You understand?

6    A.  Yes.

7    Q.  Can I refer you to that section.  First, what is the

8    Banadir region?

9    A.  The Banadir region is the region around Mogadishu.  It's

10   Mogadishu and its environs.

11   Q.  And what is the regional administration?  What is the

12   Banadir Regional Administration?

13   A.  Well, at the time it was a regional administration, but

14   it's essentially a municipal administration running the

15   affairs of the town.  And at that time it was under the -- it

16   was established by the Transitional Federal Government and

17   headed by Mohamad Dhere.

18   Q.  And in the call, as we talked about, there's a reference

19   to the spokesperson for the Banadir Regional Administration;

20   who was that person?

21   A.  The spokesperson was the person who issued statements on

22   behalf of the administration.  I believe at the time it was

23   an individual known as Mohamed Muhyadiinali.

24   Q.  And is that spelled M-o-h-m-e-d-m-u-h-y-a-d-i-i-n-a-l-i?

25   A.  That was three words, yes.

1    Q.  Yes.  Okay.  All right.  I'd like to refer you next to

2    Exhibit 129, please.  Are you there, Mr. Bryden?

3    A.  Yes, I am.

4    Q.  Okay.  At Exhibit 129 I wanted to refer you to lines

5    10:21 through 10:33 where Hassan is telling Basaaly, I told a

6    man who is over there to -- a well-known respected man who on

7    top of that is not affiliated with Gar Guduud and Sharif but

8    instead affiliated with the others.  Do you see that there?

9    A.  Yes, I do.

10   Q.  What does Gar Guduud mean?

11   A.  Red Beard.

12   Q.  And who is Sharif there?

13   A.  Sheik Sharif, Sheik Sharif Sheik Ahmed.

14   Q.  And the person Gar Guduud, who is that a reference to?

15   A.  In --

16        MR. DRATEL:  Object, your Honor, in terms of just a

17   conclusion on the part of what someone else is saying.

18        THE COURT:  Well, the testimony has already come in

19   with respect to who this individual is.  He's known as Red

20   Beard.  The pending question -- repeat the question, Ms. Han,

21   please.  Is it -- who is Gar Guduud?

22        MS. HAN:  Your Honor, if I could withdraw that

23   question.

24        THE COURT:  Okay.

25        BY MS. HAN:  Q.  I wanted to show you, Mr. Bryden,

1    Government's Exhibit 28-E and have Ms. Alejandre publish

2    that.  And specifically I wanted to refer you to the photo

3    that's above the June to July 2006 section of 28-E.  Do you

4    see that there?

5    A.  Yes, I do.

6    Q.  And who is that a photo of?

7    A.  The lower photo?

8    Q.  The photo above -- the lower photo, yes, right before the

9    section that says June to July 2006.

10   A.  That's Hassan Dahir Aweys.

11   Q.  Did he also -- does he also have a red beard in that

12   photograph?

13             MR. DRATEL:  Objection, your Honor; leading.

14             THE COURT:  Sustained.

15             BY MS. HAN:  Q.  The nickname Red Beard, is that

16   used to refer to Hassan Dahir Aweys?

17   A.  It's one of his nicknames, yes.

18   Q.  Okay.  Additionally, in this phone call in Exhibit 129, I

19   wanted to refer you to 11 -- to 11:09 through 11:11.  Are you

20   there?

21   A.  Yes, I am.

22   Q.  Okay.  And do you see the area where it says -- where

23   Hassan's telling Basaaly, I am telling you a man who does not

24   actually belong to al-Sharif's men and instead belongs to the

25   other men, the young one.  Do you see that?

1  A.  Yes, I do.

2  Q.  Are they also talking about Sheik Sharif there?

3       MR. DRATEL:  Objection, your Honor, just as to what

4  they're talking about.  He can say certain things, but he

5  can't say who they mean to talk about.

6       THE COURT:  The objection is sustained.  Are you

7  now referring to al-Sharif's men?

8       MS. HAN:  Yes, your Honor.

9       THE COURT:  I'll sustain the objection to the

10  question in the question's present form.

11       BY MS. HAN:  Q.  Okay.  So we've talked about

12  Hassan Dahir Aweys and Sheik Sharif, right?

13  A.  Yes.

14  Q.  And can you refresh the jury's memory on who they were in

15  2007 and 2008.

16  A.  In 2007 and '8, they were among the leaders of the

17  Alliance for the Reliberation of Somalia, which is an

18  opposition group to the Transitional Federal Government based

19  in Asmara, Eritrea, which was one of the groups as well

20  involved in fighting on the ground.

21  Q.  And what was al-Shabaab's position as opposed to the

22  reliberation group, the ARS?

23  A.  They were distinct from the ARS initially and considered

24  them to be less committed to the armed struggle.  And then

25  when the ARS began to entertain the prospect of peace talks

1    with the Transitional Federal Government, they -- Shabaab

2    openly denounced the wing of the ARS that entered into dialog

3    with the government.

4    Q.   And can I refer you to Government's Exhibit 178 at

5    Section 10:29.

6    A.   Yes.

7    Q.   Do you see there at 10:29 where Basaaly is telling

8    Hassan, Omar is from the elder group, right?  Do you see that

9    there?

10   A.   Yes, I do.

11   Q.   And was the ARS also referred to as "the elder group" as

12   opposed to al-Shabaab, the youth?

13   A.   Yes, it was.

14   Q.   And was the ARS willing to negotiate with the Ethiopians?

15   A.   Not directly with the Ethiopians, no.

16   Q.   They were -- were they willing to negotiate for a

17   reconciliation, generally speaking?

18   A.   Part of the ARS was.

19   Q.   And was al-Shabaab willing to do so?

20   A.   No.

21   Q.   I next wanted to refer you to Exhibit 130.

22   A.   Okay.

23   Q.   Specifically to the time 5:25 through 5:29.

24   A.   Yes.

25   Q.   Do you see where --

 1              THE COURT:  Hold on, counsel.  If you hear pages
 2    turning still, that means not everybody is there.  So we're
 3    at 130.  And where's the reference now, the internal
 4    reference?
 5              MS. HAN:  It's on page 3, your Honor, at 5:25
 6    through 5:29.
 7              THE COURT:  Okay.  Thank you.
 8              BY MS. HAN:  Q.  And do you see at 5:25 through
 9    5:29 where Sheikalow is telling Basaaly, Even the groups
10    called Burundians were attacked the other night?
11    A.  Yes, I do.
12    Q.  And where is Burundi?
13    A.  Burundi is in central Africa.
14    Q.  And what was Burundi's role in Somalia at the time of
15    this call in early 2008?
16    A.  Burundi was one of the two nations at the time that had
17    provided a contingent of forces to the African Union Peace
18    Support Operation, AMISOM.
19    Q.  Okay.  And moving on to another section further down on
20    the page on page 3 at 5:40 through 5:57 --
21    A.  Yes.
22    Q.  -- are you familiar with a person named Farah Garam Garam
23    F-a-r-a-h  G-a-r-a-m  G-a-r-a-m?
24    A.  Yes, I am.
25    Q.  And who is that person?

1   A.   He was the -- considered a deputy to a militia leader, a

2   faction leader known as Mohamed Qonyare Afra.  He was from

3   the group who had been associated with counterterrorism

4   efforts that I referred to in previous testimony.

5   Q.   Is he now deceased?

6   A.   Yes, he is.

7   Q.   And is he -- and how is it that he died?

8               MR. DRATEL:  Objection, relevance.

9               THE COURT:  The objection is overruled subject to a

10  motion to strike.

11              THE WITNESS:  He was --

12              MR. DRATEL:  Your Honor, may we get a time frame

13  for that so we can --

14              THE COURT:  I think that's forthcoming in the

15  answer; I just have a feeling it is.  Go ahead and answer the

16  question, sir.

17              THE WITNESS:  He was assassinated.  He was killed.

18              BY MS. HAN:  Q.  Okay.  And turning to the --

19              MR. DRATEL:  Your Honor, when?

20              BY MS. HAN:  Q.  And when was that?

21  A.   In the end of December 2007 to the best of my

22  recollection.

23  Q.   Okay.  And so turning back to Exhibit 130 on January 1st

24  of 2008, do you see the section there at 5:40 through 5:57?

25  A.   Yes, I do.

1    Q.  Okay.  So you see that section where Basaaly states, The

2    other thing, the men, the men called, the bad guy, Garam

3    Garam, and the other filthy one.  And Sheikalow says, The

4    spokesman?  And Basaaly says, Yes, the way the mission was

5    conducted.  And Sheikalow responds, They did it well.  And

6    Basaaly then states, Yes, the mission was amazing, the damage

7    inflicted to those men.  Do you see that there?

8    A.  Yes, I do.

9    Q.  Okay.  And moving on to Government's Exhibit 131, please.

10   A.  Yes.

11          MS. HAN:  I'm going to ask Ms. Alejandre to put up

12   Government's Exhibit 4.

13          BY MS. HAN:  Q.  And while she's doing that, I

14   wanted to ask you about whether or not there -- there's the

15   use -- the standard use of addresses in Mogadishu.

16   A.  No, no.  Addresses in Mogadishu are generally made in

17   reference to a known landmark.  There are some roads whose

18   names are known, but there are -- most of the city, you'd

19   have to explain through reference to landmarks how to find a

20   place.

21   Q.  And can I refer you to the 7:44, the time stamp 7:44 on

22   page 3 of Government's Exhibit 131.

23   A.  Yes.

24   Q.  Okay.  And do you see where at 7:44 Basaaly states, Look,

25   do you know where my house is located?

1  A.  Yes.

2  Q.  Sheikalow, do you know where my house is located?

3  A.  Yes, I do.

4  Q.  Okay.  And down below that at 7:53, do you see where

5  Sheikalow states, It is located at Ex on the Huriwa side?

6  A.  Yes, I do.

7  Q.  And do you see how they continue to talk about the

8  location, onto the next page where they talk about, at

9  8:26 -- I'm sorry, 8:24 -- where Sheikalow states, Where is

10  it located, the one that is located at the Central?  And

11  Basaaly says, At the Warshaddaha Road?

12  A.  Yes.

13  Q.  Okay.  And using Government's Exhibit 4, could you please

14  use your pointer there and point out the area of Mogadishu

15  that Basaaly and Sheikalow are talking about where Basaaly's

16  home is.

17  A.  This is the area referred to as Ex or Ex-Control.  This

18  is Huriwa, Huriwa neighborhood, and Warshaddaha Road is this

19  one, so the area we're talking about is here.

20  Q.  Okay.  So in the area on the map on Government's Exhibit

21  4 where it says -- we're in that area where I believe it's

22  marked Huriwa on the map, and we're on the left side of that

23  Huriwa section; is that right?

24  A.  That's correct.

25  Q.  Okay.  And then could you also -- and then I believe you

1    talked about the Warshaddaha Road?

2    A.   Yes, this -- this one.

3    Q.   Okay.  And so it is a road that runs sort of diagonal

4    throughout the city; is that right?

5    A.   That's correct.

6    Q.   Okay.  All right.  I'd next like to refer you to

7    Government's Exhibit 133.

8    A.   Yes.

9    Q.   Specifically I wanted to show you -- refer to you to 1:39

10   through 1:47 where Ahmed Nasir is saying to Basaaly, So you

11   are saying that it had no plan and structure.  And Basaaly

12   then responds, Yes, right now a structure is created for it,

13   some who fight against the police, some who fight against the

14   tax collectors, some who, you know, fight against the upper

15   administration.  What is the -- what was the upper

16   administration?

17   A.   That would be the senior officials of the Transitional

18   Federal Government.

19          MR. DRATEL:  Objection, your Honor, just saying

20   what that is.

21          THE COURT:  Well, the objection should have come

22   before the answer.

23          MR. DRATEL:  I move to strike.

24          THE COURT:  The objection is overruled.

25          BY MS. HAN:  Q.  And then down below -- in your

1   testimony last week, you talked about al-Shabaab's structure?

2   A.   Yes.

3   Q.   And you also talked about an entity within al-Shabaab

4   called amniyat?

5   A.   That's correct.

6   Q.   And what was -- what is amniyat within al-Shabaab?

7   A.   Amniyat's function was -- is intelligence and

8   counterintelligence, and it's the division of al-Shabaab

9   tasked with targeted killings.

10  Q.   Okay.  And down below do you see the section at 1:51

11  where Basaaly is telling Ahmed Nasir that there are some who

12  carry out attacks against the camps and some who, you know,

13  solve the issue regarding the logistics between the groups?

14  A.   Yes, I do.

15  Q.   And turning to the next page, at 2:01 do you also see the

16  section where Ahmed Nasir is telling Basaaly, Every group is

17  told to send its own experts and, you know, information

18  gatherers to its own area?

19  A.   Yes, I do.

20  Q.   Okay.  And next I wanted to refer you to Government's

21  Exhibit 136.

22  A.   Okay.

23  Q.   Before I do that, I wanted to show you Government's

24  Exhibits 23 and 24, already in evidence.  So, Mr. Bryden,

25  Government's Exhibit 23, who is that again?

1    A.   That's Nuur Hassan Hussein, or Nuur Adde.

2    Q.   And can you write his name on Government's Exhibit 23.

3    A.   Okay.

4    Q.   And turning to Government's Exhibit 24, who is that?

5    A.   That is Ahmed Abdiselan.

6    Q.   And can you also write his name on his photograph,

7    please.

8    A.   Okay.

9    Q.   And I want to refer you now to the section of the call on

10   page 8 between 41:25 and 41:35.

11   A.   Okay.

12   Q.   Do you see there at 41:25 where Sheikalow is telling

13   Basaaly, Nuur Adde and Ahmed Abdiselan have arrived today.

14   And Basaaly then responds, Did they arrive in town?

15        Those are the two individuals in Government's

16   Exhibit 23 and 24, right?

17   A.   That's correct.

18   Q.   And do you see down below where Sheikalow then states, As

19   soon as they arrived at the presidential palace, we hit them

20   with 12 mortar shells, they fled to Qaran, Villa Somalia is

21   still smoking?

22   A.   Yes.

23   Q.   Okay.  I next wanted to --

24        MR. DRATEL:  Objection, your Honor.  Move to

25   strike.  That was not a question.  It was --

1           THE COURT:  Well, it is a question, but it is --

2   all the witness is doing at this point is indicating he's

3   seen a certain part of the transcript, which is nothing more

4   than reading what's already in evidence.  The motion to

5   strike is granted.

6           BY MS. HAN:  Q.  Mr. Bryden, I next wanted to show

7   you Government's Exhibit 183 -- I'm sorry -- Government's

8   Exhibit 18, and also refer you to Government's Exhibit 173.

9           MS. HAN:  And if I could have Ms. Alejandre put up

10  Government's Exhibit 18.  I'm sorry.  One moment, your Honor.

11          BY MS. HAN:  Q.  Mr. Bryden, who is in Government's

12  Exhibit 18?

13  A.  That's Ahmed Abdi al-Mohamad Godane, the emir of

14  al-Shabaab.

15  Q.  And in addition to going by Ahmed Abdi al-Mohamad, did he

16  also have other -- does he also have other nicknames?

17  A.  Yes, Mukhtar, Mukhtar Abdirahman Abu Zubeyr.

18  Q.  And what is his tribal affiliation?

19  A.  He's a member of the Isaaq clan and specifically of the

20  Arab subclan.

21  Q.  Sorry.  What was the last part that you said?

22  A.  The subclan Arab of the Isaaq.

23  Q.  And is Arab spelled A-r-a-b?

24  A.  Yes.

25  Q.  And is Isaaq spelled I-s-a-a-q?

1    A.   That's right.

2    Q.   All right.  I next wanted to refer you to Government's

3    Exhibit 178.  Actually, Mr. Bryden, on Government's Exhibit

4    18, could you write Abu Zubeyr's name and his aliases as well

5    before we move on.

6    A.   Okay.

7    Q.   And I next wanted to show you Government's Exhibit 26.

8    Mr. Bryden, who is in Government's Exhibit 26?

9    A.   That's Fuad Mohamed Qalaf or Fuad Shongole.

10   Q.   And what was his role in al-Shabaab?

11   A.   He was a senior figure, a member of the shura, and

12   commander of operational forces.

13   Q.   And turning specifically to Government's Exhibit 178, do

14   you see a reference in Government's Exhibit 178 to a person

15   named Shongole?

16   A.   Yes, I do.

17   Q.   And what line is that?

18          MR. DRATEL:  Object, your Honor; same basis.

19          THE COURT:  Well, this may be preliminary.  The

20   objection is overruled.

21          THE WITNESS:  That's line 3:27.

22          BY MS. HAN:  Q.  And I believe that last week you'd

23   also testified about Fuad Shongole in the context of his

24   other work I believe.  Other than being an operational

25   figure, I believe that you also talked about his fundraising;

1   is that correct?

2   A.   I did.   He served as a -- as a -- to solicit funds,

3   mobilize support over Internet forums.

4           MR. DRATEL:   Your Honor, I move to strike the

5   previous question and answer.   It was not preliminary to

6   anything.

7           THE COURT:   I'm sorry.   I didn't get that at the --

8           MR. DRATEL:   Move to strike the previous question

9   and answer because it was not preliminary to anything.   This

10  was a separate question.   This is a separate question.   It

11  has nothing to do with the transcript.

12          THE COURT:   Do you have any other questions on this

13  particular individual --

14          MS. HAN:   On Mr. Shongole, no.

15          THE COURT:   -- of this witness?

16          MS. HAN:   I just wanted to -- Mr. Bryden to write

17  his name on Government's Exhibit 26.

18          THE COURT:   The objection is sustained.   The motion

19  is granted.   The jury is admonished to disregard the last

20  question and answer as cumulative, asked and answered.

21  Remember the sauce rule, please.

22          MS. HAN:   I apologize, your Honor.

23          BY MS. HAN:   Q.   If I could ask -- refer you to

24  Exhibit 181, please, and specifically if I can refer you to

25  4:35 through 4:51.

1   A.  Yes.

2   Q.  Do you see where Kay is saying, Hey -- I'm sorry.  Above

3   that Basaaly is saying, Now there is only a guy, there are

4   many Karate.  Which Karate is it, man?  And below that Kay

5   responds, Hey, a guy who was arrested in Nairobi, brought to

6   Ethiopia, who escaped from Ethiopia, came here, and used to

7   go with Sheik Hassan and the guy who died who was a teacher

8   and used to teach at the Italian cemetery, a guy by the name

9   of Mahad, Mahad Karate.  Have you seen that guy?  Do you see

10  that section?

11  A.  Yes, I do.

12  Q.  Okay.  And in that section they make a reference to the

13  Italian cemetery?

14  A.  Yes.

15  Q.  What is the Italian cemetery?

16          MR. DRATEL:  Objection, your Honor.  It's what

17  they're referring to.

18          THE COURT:  The objection is overruled on that

19  ground.

20          THE WITNESS:  The Italian cemetery was the place I

21  referred to in previous testimony.  It was a colonial-era

22  cemetery from the period of Italian colonial rule.  And in

23  December 2005/January 2006, it was occupied by Aden Hashi

24  Ayrow and forces loyal to him.  They disinterred the remains,

25  and they established a center on the grounds of the Italian

1    cemetery, a base and a mosque.

2    Q.  I next wanted to refer you to Exhibit 182.

3              THE COURT:  You meant to make the objection on the

4    ground that it had been asked and answered --

5              MR. DRATEL:  That is --

6              THE COURT:  -- rather than the Italian cemetery is

7    the Italian cemetery?

8              MR. DRATEL:  Well, no, in terms of -- two things.

9    One is asked and answered.  I didn't know that was going to

10   be that answer; that was precisely the same as it was in the

11   first direct.  But also because he's being asked to conclude

12   about what they were referring to as well.  So both of those,

13   your Honor.

14             THE COURT:  Well, I didn't think the second ground

15   was part of the question.  Once again, counsel, Mr. Bryden

16   testified at length as to the Italian cemetery, what happened

17   to the -- at the Italian cemetery, what that -- what effect

18   that had on certain people and groups, and so that has been

19   asked and answered.  So I'll ask you not to have the witness

20   just refer to a part of a transcript now and use that as a

21   basis for repeating prior testimony.  If there's something

22   new to add, if there's value added here in a particular

23   question, that's fine, but just to have the evidence repeated

24   is something we're trying to avoid in the interest of time.

25             MS. HAN:  Of course, your Honor.

1           BY MS. HAN:  Q.  Mr. Bryden, I believe -- did we

2   move on to Government's Exhibit 182?  Are you now at Exhibit

3   182?

4   A.  Yes.

5   Q.  Okay.  And do you see that at the top of the call on

6   page 1, do you see the date at the top of the call?

7   A.  Yes, I do.

8   Q.  Okay.  And is that date July 2, 2008?

9   A.  Yes, it is.

10  Q.  And in early July of 2008, was there fighting going on in

11  Matabaan between --

12          MR. DRATEL:  Objection, your Honor; leading.  I

13  mean I know I'd like to hear his answer, but --

14          THE COURT:  The objection is overruled.  Would you

15  please state your question in full.  You started to --

16          MS. HAN:  Yes, your Honor.

17          THE COURT:  -- close to it.

18          JUROR NO. 9:  Mine starts at page 4 of 7.

19          THE COURT:  Whoa.  Who's speaking?

20          JUROR NO. 9:  I'm sorry.

21          THE COURT:  Okay.  Please, Ms. Freni -- that's

22  okay.

23          JUROR NO. 9:  She looked at me, and --

24          THE COURT:  If you have no -- anytime I see

25  interaction between a juror and any attorney in the case, I

1   get a little concerned.  So if you do have a question though

2   or something was unclear, feel free to raise your hand,

3   direct your question to me, and I'll be happy to assist you

4   in that regard.  I appreciate your request for clarification.

5   Mr. Cole?

6           MR. COLE:  Your Honor, I think the reference was an

7   indication that she had pages missing from her binder.

8           THE COURT:  Is that the --

9           JUROR NO. 9:  Yes, Exhibit 182, mine starts at page

10  number 4.  I have 4, 5, and 6 of 7 only.

11          THE COURT:  Well, we'll get you those pages.  Do

12  you have extra copies at this point?

13          MR. COLE:  I'm just showing counsel now, your

14  Honor.

15          THE COURT:  Okay.  And I invite any juror who for

16  any reason may have missed a page or doesn't have a page or

17  more in their binders, raise your hand, let me know, get my

18  attention in some way, and we'll get that material to you.

19  Would you give it to the CRD, please.  Ready to go?  Thanks,

20  Ms. Freni.

21          MS. HAN:  Thank you, your Honor.

22          BY MS. HAN:  Q.  Mr. Bryden, I believe my question

23  was in early July 2008, was there fighting going on in the

24  Matabaan region of Somalia?

25  A.  Yes, there was.

1          MS. HAN:  Okay.  And if we could put up

2   Government's Exhibit 4 -- I apologize -- Government's Exhibit

3   2.  I apologize, Ms. Alejandre.

4          BY MS. HAN:  Q.  Mr. Bryden, looking at

5   Government's Exhibit 2, what is -- where is Matabaan, using

6   your pointer?

7   A.  It's here between -- just north of Beledweyne and to the

8   southwest of Dhusa Mareeb.

9   Q.  And who was fighting in Matabaan in early July 2008?

10  A.  There was fighting between Ethiopian forces and

11  al-Shabaab and some fighters from other groups.

12  Q.  And did those other groups include a group called Jabiso?

13  A.  Yes, they did.

14  Q.  And I wanted to refer you specifically to a portion in

15  the call at 10:42 through 10:53, but before we get there, I

16  wanted to ask you if you're familiar with a person named

17  Asporo?

18  A.  Yes, I am.

19  Q.  Who is Asporo?

20  A.  Asporo -- I believe his full name was Abdullahi Ahmed

21  Asporo.  He was a Somali Canadian.  He was a senior manager

22  at a money transfer company known as al-Barakat, and then

23  al-Barakat was closed down, and Asporo then reemerged as one

24  of the leading figures within the Islamic courts.

25  Q.  And was Asporo's death a significant event that was

1   widely publicized?

2   A.  Yes, it was, both in Somalia and in Canada.

3   Q.  And I next wanted to refer you to Government's Exhibit

4   183.

5   A.  Yes.

6   Q.  So at Government's Exhibit 183, I wanted to refer you to

7   the section between 7:53 and 8:16.  Beginning first with at

8   7:53, Roobow states, The conference is about the attacks that

9   our troops waged last night against the camps of Ethiopians

10  as well as those of the apostates, attacks that God made

11  successful for us and disastrous for the enemy.

12          Roobow uses a term there, "apostate."  What's the

13  meaning of the word "apostate"?

14          MR. DRATEL:  Objection, your Honor.  It's a word in

15  the dictionary.

16          THE COURT:  Well, the objection is overruled.  You

17  may answer that, sir.

18          THE WITNESS:  That would be someone who has

19  renounced the Islamic faith.

20          BY MS. HAN:  Q.  And then right below that, Roobow

21  states, The mujahedin waged an attack in the middle of the

22  night against the headquarters of the apostate government

23  headed by Abdullahi and the Tigrean troops of Meles Zenawi in

24  Baidoa.

25          They use a term there, "mujahedin," that I don't

1    believe that you defined last week.  What does that term

2    mean?

3    A.  "Mujahedin" is a term that members of the Islamist

4    factions in Somalia use to refer to their fighters.

5    Q.  And then Roobow also uses the term, The Tigrean troops of

6    Meles Zenawi.  So Meles is M-e-l-e-s  Z-e-n-a-w-i.  Who is

7    Meles Zenawi?

8    A.  Meles Zenawi was at the time prime minister of Ethiopia.

9    Q.  And the word -- the phrase "Tigrean troops," the word

10   "Tigrean" what is that a reference to?

11   A.  It's Tigrean --

12           MR. DRATEL:  Objection, your Honor, as to what it's

13   a reference to.

14           BY MS. HAN:  Q.  What does that mean, Tigrean?

15           MR. DRATEL:  It's asking --

16           THE COURT:  Hold on.  If there's an objection, just

17   give me a moment to rule on it.

18           MS. HAN:  Yes, your Honor.

19           MR. DRATEL:  Just asking for a conclusion on the

20   part of the witness as to someone else's conversation.

21           THE COURT:  Your question is what?

22           MS. HAN:  What is Tigrean on line 8:10.

23           THE COURT:  The objection is overruled.  You may

24   answer that.

25           THE WITNESS:  Tigrean refers to the region of Tigre

1    in northern Ethiopia, which is where Meles Zenawi is from and

2    the -- the ruling party in Ethiopia, the Ethiopian

3    People's -- EPRDF -- Revolutionary Democratic Front, is

4    anchored in the Tigrean People's Liberation Front; that's the

5    core of the ruling party.  So the party's from Tigre.

6         MS. HAN:  Okay.  One moment, your Honor.  I have no

7    further questions.

8         THE COURT:  Cross-examination on any of these

9    matters?

10        MR. DRATEL:  Yes, your Honor.

11                      Cross-Examination

12        BY MR. DRATEL:  Q.  Good afternoon, Mr. Bryden.

13   A.  Good afternoon.

14   Q.  You were asked about fighting in the 2007-2008 period in

15   Somalia, right?

16   A.  That's correct.

17   Q.  Just a little bit of background.  There's a broad

18   insurgency against both Ethiopia and the TFG, correct?

19        MS. HAN:  Objection; outside the scope of direct.

20        THE COURT:  The objection is sustained unless it's

21   limited to that one reference, that was fighting in the

22   Matabaan region.

23        MR. DRATEL:  Well, your Honor, there's also Bur

24   Hakaba and -- is how it started out, and the --

25        THE COURT:  If it's related in any way to the

1   fighting in the Matabaan region, then please, go ahead.  But

2   if it's not, then --

3           MR. DRATEL:  But he was also asked about forces in

4   Bur Hakaba.  It was first call, Exhibit 122.

5           THE COURT:  If it's related to any of the areas

6   that the witness has testified about today --

7           MR. DRATEL:  Right.

8           BY MR. DRATEL:  Q.  So there were -- in -- in these

9   areas that you've talked about today, a lot of these groups

10  are active, correct, militarily?

11          MS. HAN:  Objection, vague.

12          THE COURT:  Overruled.

13          THE WITNESS:  Several groups but in different

14  areas.  Some groups -- some areas -- some groups would have

15  been specifically associated with some areas, and then there

16  were some areas where you would find different groups working

17  together.

18          BY MR. DRATEL:  Q.  But even if one area was

19  identified with a particular group, didn't exclude another

20  group from operating in there at a particular time or

21  particular day?

22  A.  It didn't exclude it, it's just that some groups for

23  various reasons mainly confined themselves to certain areas.

24  Q.  And with respect to these groups in these areas, they

25  were fighting against Ethiopians on one level, right?

1   A.   Correct.

2   Q.   They were fighting in some instances against each other,

3   correct?

4   A.   I don't -- there may have been some incidents but between

5   the Islamist factions and except for another part of the

6   country, Kismaayo, it didn't happen very often.

7   Q.   I don't mean just the Islamist factions, but let's say

8   Islamist and local militias or warlord militias in these

9   areas.

10          MS. HAN:   Objection; outside the scope of direct.

11          THE COURT:   I'm sorry?

12          MS. HAN:   Outside the scope of direct.

13          THE COURT:   No, counsel is confining himself to

14   those areas or those conflicts that the witness talked about

15   on direct examination.   Mr. Bryden, you understand that to be

16   the scope, the limitation of any questions related to

17   fighting at this point?

18          THE WITNESS:   I do, your Honor.

19          THE COURT:   Okay.

20          THE WITNESS:   That's correct to the extent that the

21   forces of the Transitional Federal Government were

22   essentially militias often headed by faction leaders.

23          BY MR. DRATEL:   Q.   And you were asked about

24   Government's Exhibit 129, a tape, a transcript.   And if I --

25   you read it, 11:55, 11:66 -- I'm sorry.   Withdraw.   You read

1   up to 11:06 to 11:11, and I'll just go down a little bit

2   further in that same conversation and talk -- you see at

3   11:37 to 11:45, right?

4   A.   Yes, I do.

5   Q.   Says the Bay area, the Jubbada, the Shabelle, and Hiraan?

6   A.   Yes.

7   Q.   Those are all areas of Somalia?

8   A.   Yes, they are.

9   Q.   And are those all areas where Ethiopian troops were

10  present during this time period?

11  A.   All -- I'm not clear on which date they left the Jubbas,

12  but broadly speaking during this time period, yes.

13  Q.   Now, some of the -- you were asked about conversations

14  and people talking about things in conversations, and for the

15  most part it's fair to say that what's in those conversations

16  is available and open source information, right?   For

17  example, the Garam Garam assassination, on public, right?

18  A.   That's correct.

19  Q.   And he'd been a warlord, right?

20  A.   He'd been a deputy to a warlord, yes.

21  Q.   And warlords had popularity issues in Somalia in 2007 and

22  2008 among a fair section of the populace, right?

23  A.   A lot of people didn't like warlords.

24  Q.   And you were asked about -- there was one section of a

25  tape -- of a transcript you were asked about Ethiopians being

1   killed.  And is "gallo" a term that is used for Ethiopians

2   among Somali -- that Somalis use to describe Ethiopians?

3   A.  It's used to describe -- it means infidels.  It's used to

4   describe non-Muslims.

5   Q.  But is it also used to describe Ethiopians in particular?

6   A.  No, not in particular.

7   Q.  And while all this is going on in these areas that we're

8   talking about today in terms of fighting and militarization

9   and occupation by the Ethiopians or by militias and fighting

10  between various factions, there is also still a humanitarian

11  crisis going on in many of these areas as well, right?

12  A.  That's correct.  That's also linked to the violence.

13  Q.  Yes.  And you were asked about the ARS, right, during

14  this time period?

15  A.  Yes.

16  Q.  And is it fair to say that with respect to the ARS --

17  withdrawn.  We'll start with sort of reconciliation issues as

18  a whole you were asked about, right, in terms of negotiation

19  with Ethiopians, negotiation with TFG, attempts in that

20  regard.  There were a lot of different alliances over time;

21  is that fair to say?

22  A.  Yes.

23  Q.  And there was a lot of splintering over time; is that

24  fair to say?

25  A.  Yes.

1   Q.  Even among the ARS itself, there was splintering over

2   time --

3   A.  Yes.

4   Q.  -- from the outset with respect to some people agreeing

5   to do some things and some people not agreeing?

6   A.  That's correct.

7   Q.  But it's fair to say that al-Shabaab was distinct and not

8   a part of that effort really ever, right?

9   A.  That's right.

10  Q.  And the al-Shabaab's position versus the TFG was always

11  categorical opposition, right?

12  A.  That's right.

13  Q.  Same with respect to its position as to Abdullahi Yusuf,

14  the president of the TFG?

15  A.  That's right.

16  Q.  Now, you were asked about the emir of al-Shabaab; is that

17  gentleman the emir of al-Shabaab today?

18  A.  Ahmed Abdi Godane?

19  Q.  Yes.

20  A.  Yes, he is.

21  Q.  Al-Shabaab exists today, correct?

22  A.  Yes, it does.

23  Q.  You were asked about apostasy, right --

24  A.  Yes.

25  Q.  -- apostates.  And isn't it true that one of the issues

1    with respect to al-Shabaab in its conflict with other groups

2    in Somalia is its aversion of apostates, right?

3    A.  That's correct.

4    Q.  That they believe that some Muslims are not real Muslims

5    because they don't follow the same rules that al-Shabaab

6    follows, right?

7    A.  That's right.

8    Q.  And, in fact, they think Sufis are apostates, right?

9    A.  I'm not sure I've heard them refer to them that way, but

10   in terms of their ideology, I think that's fair.

11   Q.  And for al-Shabaab the penalty for apostasy is death?

12   A.  That's right.

13   Q.  Now, mujahedin, you were asked about mujahedin, right?

14   A.  Yes.

15   Q.  Isn't origin of -- the modern term "mujahedin," at least

16   since 1979, originated with those in Afghanistan who were

17   fighting the Soviets, right?

18   A.  That's right.  It means someone who's waging jihad, a

19   holy war.

20   Q.  And -- but in terms of since 1979, that was the

21   predominant sort of regeneration of that term; is that fair

22   to say?

23   A.  I believe so.

24   Q.  And you said that the Islamist factions would

25   occasionally describe their fighters as mujahedin, right?

1  A.   Routinely, yes.

2  Q.   Routinely.  And those Islamist factions included more

3  factions than just al-Shabaab, right?

4  A.   That's right.

5  Q.   It was across the entire Islamic spectrum?

6  A.   That's right.

7           MR. DRATEL:  I have nothing further, your Honor.

8           THE COURT:  Any further cross-examination?

9           MS. MORENO:  No, your Honor.

10           MS. HAN:  No.

11           THE COURT:  Thank you, Mr. Bryden.  You are excused

12  subject to recall, or not necessary?

13           MS. HAN:  No, your Honor.

14           THE COURT:  Okay.  Very good.  Thank you, sir.

15  Would you like to continue or address matters outside --

16           MR. COLE:  Whatever your pleasure is, your Honor.

17           THE COURT:  Well, it's your schedule.  I don't know

18  how you're doing.  If you'd like to come to the side of the

19  bench only to discuss timing, I'd be happy to see you here.

20  Ladies and gentlemen, we'll be with you very shortly, okay?

21  Feel free just to relax where you are and spread your legs --

22  oh, dear, no -- stretch your legs.

23      (Following is a sidebar conference.)

24           THE COURT:  (Laughter) This is dangerous, I know,

25  very, very dangerous.  Let me ask what your thoughts are

 1   about scheduling.  I know we had talked a little about

 2   stopping a little early so that we could address some

 3   matters.

 4          MR. COLE:  That's fine.  We have about -- I think,

 5   looking at the binder, I think about 20-odd calls to go with

 6   Colby O'Very.  After that, all we have are very short

 7   five-minute phone company witnesses.  And so if your Honor

 8   wants to stop now --

 9          THE COURT:  So basically you're saying you'll

10   finish tomorrow.

11          MR. COLE:  Tomorrow morning.

12          THE COURT:  Tomorrow morning, Wednesday morning,

13   okay, true to your word.

14          MR. DRATEL:  We'll have cross, obviously, of

15   Mr. O'Very, Agent O'Very.

16          MR. COLE:  That's true.

17          THE COURT:  Yeah, okay.  Are you going to take that

18   long or --

19          MR. DRATEL:  No.  I have to go back and look at

20   what -- I mean the sauce rule.

21          THE COURT:  The sauce rule.  Remember the sauce,

22   that's important, because --

23          MR. DRATEL:  No, no, no.  I was --

24          THE COURT:  Okay.

25          MR. DRATEL:  -- fully cognizant of the sauce rule.

 1            THE COURT:  Okay.  Let's -- Mr. Ward, you're

 2    looking querulous at this point.

 3            MR. WARD:  No, no.  I just couldn't hear, your

 4    Honor.

 5            THE COURT:  Okay.  The sauce rule is pretty

 6    cryptic, but from time to time I like to refer to it.

 7            MR. COLE:  So we're happy to stop today if you want

 8    or call Colby, but we can't finish him today.

 9            THE COURT:  No, no, no.  I just -- I told the jury

10    I'd give them a little bit of a feel for where we are.  So

11    you're going to be ready to go let's say by tomorrow

12    afternoon.

13            MR. DRATEL:  Oh, I don't know about that.

14            THE COURT:  All right, Thursday.

15            MR. DRATEL:  Thursday.

16            THE COURT:  Okay.  So we're looking -- how many

17    days do you anticipate -- have you run the deposition

18    transcripts to --

19            MS. FONTIER:  Well, the final edits are still being

20    done, which is why we're saying we're not positive we'll be

21    able to begin.

22            THE COURT:  What do you think, a couple days?

23            MS. FONTIER:  The depositions are a couple of days,

24    two or three more witnesses, but yeah, I'd say --

25            MR. DRATEL:  Early next week, even late this week.

1    I think early next week.

2             THE COURT:  So we're looking at concluding the

3    evidence by Tuesday or Wednesday.

4             MS. MORENO:  Or if we have a rebuttal case, your

5    Honor.

6             THE COURT:  That's fine, Tuesday --

7             MS. FONTIER:  Wednesday, Thursday, Friday.  Who

8    knows?

9             THE COURT:  So we -- keep in mind that next Friday,

10   a week from Friday, is a down day, so we may actually be

11   getting this case to the jury the beginning of the following

12   week.

13            MR. DRATEL:  The 19th.

14            THE COURT:  The 18th is holiday.  So I'll tell them

15   that's the rough schedule we're working on.  We can knock

16   this down now.  I can go over some matters, legal matters, I

17   have some rulings for you at least on the transcripts.  I've

18   read through all the transcripts and the 801 (d)(2)(E)

19   issues, and then we'll need time -- I'll need time to go over

20   the rest of the 106 issues.  I've got some of those already

21   finished.  So I think that's kind of where we are at this

22   point.

23            MS. FONTIER:  Okay.  Thank you, your Honor.

24            MR. GHAPPOUR:  Your Honor, if I could just join all

25   of the calls related to the 801 (d)(2)(E).

1          THE COURT:  This is substance.  We don't do

2   substance.  All right.

3       (Sidebar conference concludes.)

4          THE COURT:  All right, ladies and gentlemen.  Thank

5   you for your patience.  We are going to stop today.  It's

6   just a few minutes before four o'clock.  We're stopping

7   today.  Today is Tuesday, the 5th.  And I think it's

8   foreseeable -- I'll give you just a general estimate of where

9   we are right now and when we expect to finish and have the

10  case to you; once again, this is just -- this is just a range

11  at this point, an estimate.

12         It looks as though the government will conclude its

13  case-in-chief sometime tomorrow, Wednesday -- exactly when we

14  don't know -- and that the defense will start its case

15  tomorrow, Wednesday, or Thursday, the 7th.

16         Now, the defense case may take several days, and

17  remember, that means that we'll be extending into next week

18  with the evidence, into next week with the evidence.  Next

19  Monday would be the 11th.  And remember that on the 15th,

20  Friday, we're not in session on this case.  So we have four

21  days next week to conclude all of the evidence in the case,

22  which seems pretty likely at this point, concluding the

23  evidence next week, which means that the case should get to

24  you sometime the week of the 18th.  Now, remember,

25  February 18 is a holiday, so we will not be in session on the

1   18th; that's Presidents Day.

2          I think you should anticipate the case being argued

3   and presented to you probably in the range of the 19th and

4   20th of February.  So if I had to guess right now -- and it

5   would only be an educated guess -- the case gets to you about

6   February 20 give or take.  Okay.

7          Mr. Bilse, I'm still aware that you have your

8   commitment on Thursday and that we need to modify the hours a

9   little bit.  That won't affect tomorrow, so tomorrow should

10  be a regular day for us starting at nine o'clock, and then

11  we'll continue on through the day.  So any questions about

12  scheduling at this point that I haven't -- that I haven't

13  addressed?  And please keep in mind this is only an estimate.

14  I've tried to give you the estimate at an appropriate time in

15  the case when we began to develop a little feel for when you

16  might get the case so that you could plan for the remainder

17  of the month.  That is pretty much where we are.

18         All right, ladies and gentlemen.  Remember the

19  admonition not to discuss the case amongst yourselves or with

20  anyone else or allow yourselves to express any opinions on

21  the case until the case has been given to you for your

22  decision.

23         Let me say, make an extra effort to avoid any media

24  accounts of the case, of this case, or any other case

25  involving any of the types of issues that we have in this

1    case.  And I've already defined for you what those subject

2    areas are, the parts of the world obviously.  So do your

3    absolute best to insulate yourself from those types of --

4    those types of reports and extraneous information.  Have a

5    very good evening.  We'll see you tomorrow at nine o'clock.

6         (The jury left the courtroom.)

7              THE COURT:  Okay.  We are outside the presence of

8    jury.  Counsel, would you like a break at this point or we

9    can just launch right --

10             MS. MORENO:  Please.

11             THE COURT:  Would anyone like a break?

12             MR. DRATEL:  Sure.

13             MS. MORENO:  Yes.

14             THE COURT:  Ten minutes?  Would you like to take

15   ten?  Okay.  See you in ten minutes.

16        (There was a break in the proceedings.)

17             THE COURT:  Okay.  Counsel, I reviewed the

18   transcripts that were mentioned jointly by all of you either

19   initially or by reference by joining, and I'm prepared to go

20   ahead and give you the rulings now.  Are you ready?

21             MR. COLE:  Your Honor, are we talking 106 or 801?

22             THE COURT:  The 801 (d)(2)(E).

23             MR. COLE:  Okay.

24             THE COURT:  I don't think argument is required for

25   any of these.  If anyone wishes to argue, you certainly may,

1  but as I say, I'm ready to proceed at this point.  Okay?

2  Ready to go?

3        MR. COLE:  Yes.

4        MR. DRATEL:  Yes.

5        MS. FONTIER:  Please, your Honor.

6        THE COURT:  Okay.  Exhibit 134 -- I guess I'll take

7  these in chronological order.  Exhibit 134 is admissible

8  under 801 (d)(2)(E).  Well, was 801 (sic) even the subject of

9  an objection -- I'm trying to recall now -- or was 137 the

10 first one?

11       MS. FONTIER:  Your Honor, believe that was one that

12 there -- Mr. Dratel gave me the list of objections to when

13 the call was Hassan Yusuf, the first of which was Government

14 Exhibit 129.  I believe he made an oral objection to

15 Government's Exhibit 134, which the person on the other end

16 of the phone is identified as Abdulkadir.

17       THE COURT:  Yeah.  Okay.  That's why -- so the

18 person on the other end of the phone is Abdulkadir, correct?

19       MS. FONTIER:  Correct, your Honor.

20       THE COURT:  Okay.  That's what threw me because I'm

21 looking at the script right now, and I'm seeing references to

22 Ahmed Nasir and Basaaly.  Okay.  That's overruled.

23       Abdulkadir appears to be attempting to dissuade

24 defendant Moalin from supporting the man firing -- firing the

25 bullets.  It does not appear to be an 801 (d)(2)(E) issue,

1   but it does appear to be a statement that is admissible

2   against defendant Moalin and defendant Moalin only, so I

3   would be inclined to give the jury a limiting instruction on

4   that.  Okay.

5           The next one, 135, appears to be appropriate under

6   801 (d)(2)(E).  I would overrule the objection.  A reasonable

7   inference that defendant Moalin is sending a thousand dollars

8   to the unidentified male's, quote, guy, end quote, in

9   addition to another amount, quote, sent to those who behead

10  the enemy, end quote, may be made, and so 135 -- any

11  objection to 135 on the basis that it's not 801 (d)(2)(E)

12  would be overruled.

13          137 I have as overruled.  It's proper under 801

14  (d)(2)(E).  This has already been addressed on the record.

15  Defendant Moalin is passing on Sheikalow's request for

16  support, and that is a reasonable inference that can be drawn

17  from the content, plus it also places Exhibits 138 and 139 in

18  context, and all of these three transcripts are related in

19  that way.  So 137 is proper.

20          Next I have 168, Exhibit 168.  I would -- I would

21  find that that is admissible under 801 (d)(2)(E).  There is a

22  reasonable inference that Hassan is advising defendant Moalin

23  that Sheikalow has been targeted at the house.  This is

24  relevant information conveyed to defendant Moalin on the

25  status of Sheikalow, with whom he has been allegedly

 1   conspiring.

 2          Next we have Exhibit 175, and I wanted to ask

 3   counsel on this one -- this appears to be very cryptic.  So

 4   if you can turn to 175 and talk about the relevance -- well,

 5   talk about -- no.  Maybe, Mr. Cole, this should come from

 6   you, talking about how it falls within 801 (d)(2)(E) and what

 7   the relevance is.

 8          MR. COLE:  Yes, your Honor.  Thank you.  This

 9   call -- just make sure I'm talking about the same one,

10   Exhibit 175.  Our -- the inference that the government will

11   be arguing from this call is that this is an example of

12   Hassan, who, if you look at the body of his work, so to

13   speak, all the Hassan calls, he is the most -- he is the most

14   afraid of phone surveillance and always uses the most heavily

15   coded language in his calls.  And so when he speaks of the

16   Quran disciples of Majadhub became orphans, that means Ayrow

17   -- when Ayrow died, his disciples became orphans.  And they

18   go on to talk about all this heavily coded talk about the

19   donkeys fetch the brushwood and the corn, one of them broke

20   down, he's talking about a vehicle and need for more funding

21   for the fighters.  And so he uses very heavily coded words

22   referring to "schools" and "ink" and "paper."  And you'll see

23   this in future calls or other calls.

24          THE COURT:  Well, I saw that, yeah.

25          MR. COLE:  Yeah.

```
 1              THE COURT:  I've seen that in other calls, the

 2   schools, the papers, the ink, the students, and all of that.

 3   But this one seemed to be unrelated to others and heavily

 4   coded, and I'm aware, at least on these transcripts that

 5   Hassan becomes quite upset with defendant Moalin from time to

 6   time, who wants to speak more directly, and Hassan, at least

 7   as reflected in these, doesn't want that, he wants to speak

 8   in coded terms.  All right.

 9              MR. COLE:  Okay.

10              MR. DRATEL:  Your Honor, may I just be heard on

11   that one?

12              THE COURT:  Sure.

13              MR. DRATEL:  Just that, you know, it's one thing to

14   say a code means something because someone has put it in

15   context, a witness who testified as to previous code that

16   somehow gives us -- this just the government's theory.  It's

17   just totally theoretical.  There's no basis for Mr. Cole's

18   interpretation other than Mr. Cole's interpretation.  So I

19   don't see the connection.

20              THE COURT:  Yeah.  Well, it sounds so crazy, it has

21   to mean something other than what it means literally.  You

22   know, I mean donkeys fetching brushwood?  Okay, donkeys, you

23   two donkeys go over there and get brushwood, whatever that

24   is.

25              MR. DRATEL:  Well, we don't know what it is.
```

1           THE COURT:  Pardon me?

2           MR. DRATEL:  That's the thing, we just have no clue

3    what it is.

4           THE COURT:  Well, then it can't hurt you.

5           MR. DRATEL:  So then --

6           THE COURT:  I think it can be played.  I think it

7    can be played.  It's weird stuff, I mean, you know, and it's

8    so out of character.  That's why I said -- this is the one

9    transcript I'm looking at and I'm -- you can figure out codes

10   for other stuff, you know, ultimately -- ultimately you'll

11   see in some of these transcripts they start out in codes and

12   then they go from code to noncode, and so you know what

13   they're talking about.  But this is -- this is the Twilight

14   Zone, and I'll tell you, if it's the Twilight Zone, your

15   position is hey, how can it hurt me?

16          MR. DRATEL:  I'll tell you how it can hurt me is

17   that he comes up with something in front of the jury in

18   rebuttal that I can't answer.

19          THE COURT:  Well, if he comes up --

20          MR. DRATEL:  If he comes up in rebuttal --

21          THE COURT:  -- with brushwood means this and donkey

22   means that and you're arguing -- he's not going to do that.

23   He's not going to do that.

24          MR. COLE:  It's argument.

25          THE COURT:  Well, you can't substitute your own

1   terms.

2          MR. COLE:  No.  What I mean is -- what I mean is --

3   yeah, I don't -- I'm not going to provide to the jury, you

4   know, the codices to break down the language of Hassan or

5   claim that I can, but where our -- I mean just the first

6   inference, the Quran, it's like -- Majadhub has been referred

7   to many times; the jurors can draw their own inferences as to

8   what that means.

9          THE COURT:  That's true, Majadhub has.  Okay.  So

10  in any event, I'll overrule the objection.  It is part of an

11  ongoing conversation, many conversations between these two

12  participants before and after, from early on till well into

13  the chronology of events here, and so I think you know what

14  the limits would be in argument, Mr. Cole.

15         MR. COLE:  Sure.

16         THE COURT:  And you can't certainly substitute your

17  own -- you're not a code-cracker, and unless you have some

18  evidence in the record as to what this means, then I think

19  you need to be very careful.  Okay.

20         Exhibit 177 is proper.  That's basically Hassan and

21  Mr. Moalin agreeing not to talk in code.  I assume that's

22  basically what that -- what that is, same subject.

23         178, it's proper 801 (d)(2)(E).  This seems deeply

24  coded, but it is reasonable to infer that Mr. Moalin's

25  telling Hassan that he, Moalin, wants the money to reach,

 1    quote, those who cause pain, end quote, i.e., hold the

 2    slingshot.

 3         When I say it's properly -- excuse me.  When I'm

 4    saying that's good, basically I'm finding that a reasonable

 5    inference can be drawn by the jury, that we're dealing with a

 6    statement made by a conspirator made to a conspirator that's

 7    been adopted in the course of the conversation during and in

 8    the furtherance of the conspiracy.  Okay.

 9         We have -- Exhibit 179 is objected to; that's the

10    next one.  And this is a conversation between Hassan and Mr.

11    Doreh, defendant Doreh, and this is about, quote, ink, end

12    quote, quote books, end quote, for students, end quote.  It's

13    coded but a reasonable inference can be drawn that it

14    involves providing support for alleged terrorists.

15         Exhibit 180 is proper under 801 (d)(2)(E).  It's

16    admissible under that exception.  And this is between

17    Mr. Hassan and defendant Moalin.  It's a status update, but

18    also Hassan is becoming upset at Mr. Moalin because

19    Mr. Moalin goes into details on the phone, believing or

20    assuming that eavesdropping is going on, so that's the

21    transcript that I had earlier reference to where there's a

22    bit of a fallout on this issue of using code or not using

23    code.

24         Next is Exhibit 184.  Now, that's a conversation we

25    -- the first three defendants in this case are together and

1    they're with -- on a conversation with Hassan.  It's coded --

2    well, let me just leave it there rather than falling into the

3    trap of creating my own code or telling you how much I know.

4    It's just probably pretty insignificant.

5              MR. DURKIN:  Judge, is that admissible against my

6    client?

7              THE COURT:  Pardon me?

8              MR. DURKIN:  Is that admissible against my client?

9              THE COURT:  No.  I mean yes, it certainly is.  Any

10   statements of co-conspirators -- if you have five

11   co-conspirators and -- well, in the case here, you know,

12   three of them, alleged co-conspirators, are making a

13   statement to somebody who's another co-conspirator or even an

14   unindicted individual -- doesn't even have to be an

15   unindicted individual, another party -- it's a statement

16   that's attributable to all members of the conspiracy if it's

17   during and in furtherance of the conspiracy.  So no, there's

18   no special instruction here.  So we've got papers -- I won't

19   get into them -- but we have several areas in the transcript

20   that seem coded.

21             And then at page 4, interestingly, Mr. Moalin tells

22   Hassan -- let me get that.  At the top there, page 4/3 at

23   3:30 to 3:34, Mr. Moalin all of a sudden says I will not say,

24   quote, students are so and so, end quote, I will talk direct,

25   you know.  And then Hassan comes back:  Man, I don't like

1  that.  Man, talk to me like the others do.

2         So obviously that -- that's appropriate under 801

3  (d)(2)(E).  This appears to be an overall conversation about

4  tactics and communication regarding material support.

5  There's even a place here in this transcript where although

6  they started out using the word "papers," 20 papers being

7  referred to in many places, at the bottom of page 4, Hassan

8  finally says:  Well, you know the 20 papers are two cartons.

9  So that's -- that's 184.

10        So 185, Exhibit 185, which is between defendant

11 Moalin and defendant Doreh, it appears to be a coded message

12 regarding transfer of money, and that's properly admissible

13 under 801 (d)(2)(E).

14        Exhibit 186.  Once again, this is defendant Moalin

15 with defendant Nasir, this regards money to the youth and

16 others involved in the fighting; it appears to be admissible

17 under 801 (d)(2)(E).

18        MS. FONTIER:  Your Honor, sorry to interject, but I

19 don't believe that we had objected to any of the

20 conversations between the people seated at this table, it was

21 to the people outside of court that there was no evidence

22 that they might be -- or no allegation even that they were

23 co-conspirators.  I think that we had --

24        THE COURT:  What was the --

25        MS. FONTIER:  -- the final one that we had noted

1   was Government's Exhibit 190.

2              THE COURT:  I'm sorry?

3              MS. FONTIER:  I believe the final exhibit that we

4   had objected to was Government's Exhibit 190, which is,

5   again, on Yusuf.

6              THE COURT:  Well, one or more of you objected to

7   185, 186, 187, 188, 189, and everybody joined in everybody

8   else's objections at one point or another.

9              MS. FONTIER:  Sorry, your Honor.  If we may just --

10  we may just be able to --

11             THE COURT:  Well, do you --

12             MS. FONTIER:  We didn't mean to object or, if we

13  did and --

14             THE COURT:  Okay.  Well, as you were reciting

15  everything, I was writing them down.  I think Mister --

16             MS. FONTIER:  May have just gotten carried away,

17  your Honor.

18             THE COURT:  Well, I think Mr. Ghappour -- no,

19  Mr. Ghappour --

20             MR. GHAPPOUR:  Just two, your Honor.

21             THE COURT:  Yeah, he had just 179 and 184, and all

22  of a sudden it was Mr. Dratel who -- you got.

23             MR. DRATEL:  I read the record -- I stopped at

24  one -- well, no.  I mean I had one list that Ms. Fontier

25  prepared for me.

1            THE COURT:  You had 168 --

2            MR. DRATEL:  But it didn't --

3            THE COURT:  All right.  Which ones are you

4  withdrawing?  I had 184 to 190.  Which ones --

5            MR. DRATEL:  Oh, we had the --

6            MS. FONTIER:  We had 184 and 190, which --

7            MR. DRATEL:  You may have heard me say 184 through

8  190 and I didn't -- maybe you misheard because I said 184 and

9  190 were the last ones.

10            THE COURT:  Okay.  So 184 and 190.  You know how

11  much time I spent on 185 through 189?

12            MS. FONTIER:  Sorry, your Honor.

13            MS. MORENO:  I find the Court enlightening in its

14  opinion of the conversations.

15            THE COURT:  Well, I don't have any opinions.  I'm

16  just saying what reasonable minds could infer.

17            MR. DRATEL:  But, your Honor --

18            THE COURT:  That's making an assumption.

19            MR. DRATEL:  Also 129 was the first one, and I

20  don't think we covered that.  That's another Yusuf

21  conversation, which wasn't -- that was one I objected to

22  contemporaneously before reading the list of calls later on.

23            THE COURT:  Okay.  And I didn't rule on that?

24  Would you remind me?  I'll get back to that because I'm going

25  through my own list here, so let me finish that without

1    getting sidetracked here.  So we've got --

2              MR. DRATEL:  190.

3              THE COURT:  So we're going all the way to 190 then?

4    Is that the next one?

5              MR. DRATEL:  Yes, your Honor.

6              THE COURT:  Okay.  So 190, this is between

7    Mr. Moalin and Hassan, and this is -- appears to be a report

8    on Mr. Moalin's lost of -- loss of house, et cetera.  And

9    this kind -- I saw -- 189 and 190 are obviously -- they were

10   together because there were reports on big losses sustained

11   by the, quote, young boys, end quote -- that was in 189 --

12   and then 190, a separate conversation, same individuals and

13   the report on the loss of Mr. Moalin's house, et cetera.  And

14   that's -- those are status reports on what's happening,

15   damage assessment reports, and those are things obviously

16   made during and in the course of an alleged conspiracy

17   dealing with losses, damages, and the like, ongoing

18   communication.  So that's pretty much what I have for you on

19   the transcripts.  Okay.

20             Now let's get to 129.  Okay.  I would find this is

21   admissible under 801 (d)(2)(E).  Once again, pretty coded

22   with references to the young ones -- this is Mr. Hassan

23   making references to the young ones -- and then updated

24   reports on fighting and location of forces and armies.  Yeah,

25   801 (d)(2)(E) would cover this.  Okay.  All right.

1           Next, let me -- I was -- as I said earlier today, I

2    was able to get to the 106 issues with respect to defendant

3    Nasir.  I can cover all of these tomorrow, I can hold off on

4    these -- practically does it -- what -- and you're under no

5    obligation to tell me, obviously, but logistically how are

6    you planning to bring additional 106 material in?  What would

7    you be doing?  Would you have another transcript or --

8           MR. DURKIN:  I thought that maybe I would --

9    assuming I could physically get it done, I thought maybe I'd

10   just use the Elmo and in cross-examination just show it to

11   him, say isn't it a fact that --

12          THE COURT:  But keep in mind this though, that

13   ultimately you're going to have to get that into the proper

14   evidentiary form because in this case, the evidence is the

15   transcripts, and so the jury has to be able to review.

16          MR. DURKIN:  Well, no, I understand, but I was --

17   that's an issue I guess we have to resolve.

18          MR. COLE:  Well, I have a suggestion -- and of

19   course defense may have a much better idea how they want to

20   do it.  We -- if they do it -- we don't have the ability to

21   run their transcripts in our system; they're not synced up,

22   and we don't have the ability.  But if they want to read

23   their transcripts -- and as long as they -- subject to

24   obviously later on their linguist linking them up and laying

25   the foundation for the transcripts themselves in their case,

1    we don't have any problem even though their linguist will not

2    have -- it may be out of order somewhat with their linguist's

3    testimony.  The only thing is that we would want -- I don't

4    know when this will happen, I don't know, based on Court's

5    ruling, if this will happen in our case or theirs.  The only

6    requests we have, to the extent -- if any rulings are --

7    happen in our case, that there be some comment that that

8    transcript being read in our case is -- its being read now

9    for the jury's -- for whatever reason but that it's subject

10   to -- because it's a disputed transcript, it's not our

11   transcript, and it's going to be read in our case -- that's

12   all I'm trying to -- the point I'm trying to make.

13          THE COURT:  Well, mechanically I don't know how you

14   do that because ultimately you're going to need to get the

15   written word to the -- in evidence.  It's the written word,

16   it's written English that is the evidence in this case.

17          MR. COLE:  Well, when I said read, I don't think we

18   have any objection to them admitting their transcripts into

19   evidence because they're going to call a linguist to lay that

20   foundation, and so there will be a -- my understanding is

21   there will be a written transcript for their portions that

22   they will seek to admit.  I assume though that in order to

23   publish it to the jury in the first instance, they would want

24   it read to the jury and not just admitted in paper.  But

25   that's I guess up to defense counsel.

1          MR. DURKIN:  Well, Judge, maybe I'm mistaken, but I

2    know we have some agreement on some of our transcripts.

3    Someone else from our office was doing it, but, for example,

4    I have an email where at least two of our transcripts they

5    agreed with, so --

6          MR. COLE:  Right.  Yeah, there are parts that are

7    much less in dispute than others.  I'm not trying -- some of

8    Mr. Durkin's transcripts are the better ones we think of some

9    of the ones we've seen.  But my only point is our linguist

10   didn't testify to their transcripts, and even if we don't --

11   we may not dispute much of their transcript, but I just

12   assume at some point they're going to put their transcripts

13   in through their linguist is all I'm saying.  And if they --

14   and we're fine with that coming somewhat out of order -- you

15   see that I'm saying, your Honor?  If they wind up using -- if

16   Mr. Durkin uses a transcript in cross-examination in our case

17   that his own linguist hasn't admitted and laid a foundation

18   for, we understand, we're fine with that, but I still assume

19   there'll be some point where their linguist --

20         THE COURT:  Who's putting in your -- who's putting

21   in your transcripts?

22         MR. COLE:  They're already in.  I mean we had our

23   linguist testify how they prepared verbatims, went through

24   it, so they're in.  And I assume their transcripts will be

25   put in by their linguist, I assumed, and --

1           THE COURT:  Laying the foundation.

2           MR. COLE:  That's all I mean.  And we may not --

3     I'm not suggesting that every single transcript, every

4     portion, will be subject to vigorous cross on its accuracy,

5     but --

6           THE COURT:  Who's going to -- who's going to --

7     you've got to get -- you've got to get the transcript

8     material before the jury in a form that they can take it in

9     to the jury room for deliberations because that's the only

10    evidence there is.  And it's going to be -- I think it's fair

11    to say there's going to be material coming in from both

12    sides.

13          MR. COLE:  Yes.

14          THE COURT:  And you can't expect the jury to go in

15    without -- without having heard any English -- without having

16    heard any English --

17          MR. COLE:  Yes.

18          THE COURT:  -- only seeing the rolling English

19    translation of Somali being spoken at a pace they couldn't

20    possibly copy.

21          MR. COLE:  Agree 100 percent.  I think we're all on

22    the same page on that.

23          THE COURT:  Okay.  Good.  I know that was something

24    that was discussed earlier.

25          MR. DRATEL:  And we'll reformat what we presented

1   to the Court in a manner that just had the English

2   translation on it so that it doesn't take as much space and

3   all that.  It's a Word document.

4        THE COURT:  What are you reformatting now?

5        MR. DRATEL:  In other words, some of the stuff we

6   gave to the Court was in three columns -- or two columns, you

7   know, the Somali transliteration, and that's where they

8   provided stuff by the translator.  For purposes of the jury,

9   we can dispense with the Somali and just get it as a

10  transcript if the Court prefers that.  I mean I don't know --

11       THE COURT:  That's fine.

12       MR. DRATEL:  -- what the Court was saying.  If the

13  Court was saying that you think it's better to go to the jury

14  that way, unless --

15       MR. GHAPPOUR:  On behalf of Mr. Doreh, I'd like to

16  reserve the option to present this to the jury -- I'd like to

17  reserve the option to present the transcripts to the jury in

18  the same fashion that I presented it to your Honor this

19  morning, in three columns, so they can compare the government

20  version to the English version -- to the defense version with

21  the Somali in the middle.  There are a lot of key words that

22  are in Somali that you can only see -- you can only see if

23  you're looking at this one transcript.

24       THE COURT:  Okay.  And I haven't even had a chance

25  to go over your submission yet, your 106 submission,

```
 1   Mr. Ghappour, so --

 2            MR. DURKIN:  Did you --

 3            THE COURT:  Hold on, Mr. Durkin, just a moment.

 4   All I want to make sure is that you're thinking about this.

 5   It's really important for you to think about it because

 6   there's going to be additional material coming in from the

 7   defense.  It has to come in in an appropriate written format,

 8   one way or the other.  I understand, Mr. Cole, it can't be

 9   linked up to what you have, but it's got to come in somehow

10   out of fairness to the parties and particularly the jury here

11   so they can work --

12            MR. DURKIN:  Judge, could I -- I'm confused.

13            THE COURT:  Mr. Durkin --

14            MR. DURKIN:  Maybe it's because I didn't directly

15   participate in the conversations.  But if you'll just look

16   at, for example, our 122, the color-coded one --

17            THE COURT:  Okay.

18            MR. DURKIN:  -- that we gave you.  I think it's --

19   it's the Government's 122.  I think it would be --

20            THE COURT:  It's your first one.

21            MR. DURKIN:  -- our first one, A-1 I think.

22            THE COURT:  Yeah.

23            MR. DURKIN:  I was under the impression -- maybe

24   I'm wrong, and I'll show this to the government -- but I

25   thought the marking in red was the only disagreement that we
```

1  had, that the government had with that.

2          THE COURT:  The marking in red?

3          MR. DURKIN:  Do you see the red?  It's on page 9.

4          THE COURT:  Well, I saw red in that one location,

5  yeah.

6          MR. DURKIN:  Right.  But that's not a 106 issue.

7  That's something the government's already playing.  Do you

8  understand?

9          THE COURT:  I don't see any red on page 9.  I see

10  blue or green at the top -- I guess it's blue.

11          MR. DURKIN:  I just --

12          THE COURT:  I don't see any red on page 9.  It's

13  all yellow.  When you say -- when you say in agreement,

14  you're in agreement, that means that's what's come in; is

15  that what you're saying?

16          MR. DURKIN:  Well, yeah.  The yellow -- Judge,

17  maybe I -- maybe, but if I could just -- for example -- I

18  think you can see it from here -- on this transcript I was

19  under the impression that the only disagreement in the

20  translation was over this what's in red, and that's not

21  something we would be admitting through 106.  So I was under

22  the impression that -- for example, if you were going to

23  admit all of what I suggested on page 7, which is in blue,

24  that I was under the impression the government had no quarrel

25  with that translation.  And I've never had this issue come up

1    in a 106 issue.  I've always thought that the government

2    either had their own translation or just accepted ours and

3    took it.  I don't think we should have to put a case on just

4    to put something in under 106.

5              MR. COLE:  Oh, okay.  I'm sorry, your Honor.  I

6    guess --

7              THE COURT:  While you're collecting your thought,

8    Mr. Cole, let me just say what I took away from -- yesterday

9    was it?

10             MR. DURKIN:  Yes.

11             THE COURT:  It was very simple.  You said you were

12   going to get the material to me; yellow was what the

13   government would have introduced as a part of a particular

14   transcript, green was material that was not being played, not

15   requested by either side, and that blue was the material you

16   wanted under 106.

17             MR. DURKIN:  That's correct.

18             THE COURT:  As I went through your submissions,

19   that's all I was looking for.

20             MR. DURKIN:  And that's all you had to do.

21             THE COURT:  Well, I've done that.  But I didn't

22   hear -- in your color-coding you weren't telling me anything

23   about red, although I did see red in one or two places.

24             MR. DURKIN:  Yeah.  The ones I gave you yesterday

25   had some red, but those are those -- that red only applies to

1    things that are in yellow where the government's using them,

2    so it's a fight we don't have to deal with.

3              THE COURT:  Okay.  Then I'll just ignore the red at

4    this point.

5              MR. DURKIN:  Yes, there's no reason -- in fact, I

6    think the ones we sent you last night removed the red, so

7    that may be why -- if you're reading -- if you printed out

8    what we sent last night, that may be why there's no red.

9              MR. COLE:  Your Honor, I think I understand what

10   Mr. Durkin's referring to -- and he'll correct if I'm wrong.

11   Okay.  Your Honor, several weeks ago when we first started

12   getting into discussions with Mr. Durkin about his

13   transcripts, they would send us a transcript -- and this was

14   not talking about -- this wasn't in our mind at the time 106.

15   We said -- were looking at the translations and seeing if --

16   what the level of disagreement was within the translations.

17   We started receiving lots of transcripts from the parties,

18   and we would look for the biggest areas of dispute we could

19   find, we thought there was the most -- you know, the biggest

20   issues.  But the transcripts are almost always different to

21   some extent, and we -- our linguist did not have the time or

22   ability -- I don't think there have been often in every

23   transcript major differences, but our linguist didn't have

24   the time and ability to adopt -- to go through and decide if

25   he would adopt their linguist's interpretation.

1           We tried to point out to them what we assumed were

2    the most material areas of dispute, but we are -- and

3    apologies to Mr. Durkin -- we never thought -- we thought

4    they were -- they were trying to do the same, they wanted us

5    to identify for them major areas of disagreement so they

6    could go back to their linguist.

7           But I think what Mr. Durkin's saying now is that he

8    understood -- and if so, apologies because it wasn't

9    intended -- that we would simply adopt their -- we would

10   simply adopt their translations as our own.  And we never

11   meant to convey that.  I think that there are less problems

12   with Mr. Durkin's translations than a lot of the others, but

13   our linguist never said oh, yeah, this is -- this is

14   something I can testify to, this is something that I've

15   agreed to.

16          I did not know or anticipate that Mr. Durkin's

17   concern would be that he didn't want to put on a case and

18   call a linguist; that was never in our mind that we were

19   going to adopt so he wouldn't have to call a linguist.  That

20   was just not even in our thinking at the time.

21          MR. DURKIN:  I just -- I guess it's my position

22   that I don't think 106 should require me to put on a case.

23   That's all I'm saying.

24          THE COURT:  No, no, I would agree.  No, I

25   understand that.  No, I would agree with that.  But that's a

1    practical -- once again, kind of falls into the realm of how

2    are we going to do this; this is a mechanical problem.

3         MR. DURKIN:  And I think one of the -- I think

4    there's been some mutual understanding.  You may recall about

5    a week ago I said I was surprised to learn that the

6    government didn't have translations for a lot of things that

7    I mistakenly presumed they did, and we got into this

8    discussion about the summaries and the verbatims and so

9    forth.  Frankly, on most of 106, I was expecting, like I've

10   done in any other case I've ever tried, simply using the

11   government's translations and put it in.  And this just an

12   odd situation, at least by my experience -- not that I'm the

13   most experienced in the world, but I've been doing this

14   longer than I care to admit.

15        THE COURT:  But you're saying it didn't happen in

16   this case for whatever reason.

17        MR. DURKIN:  Apparently not.  Apparently the

18   government doesn't like -- do you not believe --

19        MR. COLE:  Well, I think we'd --

20        MR. DURKIN:  I mean I'd take their translations

21   even if they have them.

22        MR. COLE:  Sure.  If there's a 106 -- if there's

23   parts of 106 that we do have transcribed, they're more than

24   welcome to use that part.  We just don't have it all

25   transcribed.  These conversations often go on for very long,

1    and we didn't transcribe all of them.

2              THE COURT:  Okay.  Let's put substance over form --

3              MR. COLE:  Okay.

4              THE COURT:  -- okay -- that's one rule I think we

5    can agree on universally -- and whatever works mechanically,

6    let me know how I can assist you in working together if you

7    can't figure out some kind of a protocol to get this done.  I

8    mean we're really dealing with an issue of fundamental

9    fairness right now, and both sides, as I've said repeatedly,

10   should have a fair opportunity to present their case.  And I

11   know -- I know the government has no interest in unfairly

12   burdening the defense and getting before the jury evidence

13   that is deemed to be admissible -- for example, within the

14   context of this 106, once the Court rules, that's it, and for

15   better or worse.  And just work together at that point --

16             MR. DURKIN:  That's fine.

17             THE COURT:  -- to get it done.  I mean this is a --

18   this is a journey of many, many miles here and we're very,

19   very far down the road, and let's try to remove any final

20   hurdles to get this thing to the finish line.

21             MS. MORENO:  Your Honor, if I may add my voice

22   because I have been working closely with the interpreter, the

23   translator, and we've had the same translator, so the

24   translator for Mr. Durkin is my translator, it's the same

25   gentleman, so we're happy to hear that his transcripts are

1     pretty good.

2              My thought was always that -- I too have had the

3     same experience as Mr. Durkin with respect to presenting 106

4     evidence.  I knew though -- I realized that they did not have

5     verbatim transcripts for all the calls.  So my -- what I had

6     done was turn over to the government the entire translation

7     of a particular call and ask them if they had problems with

8     any of the translations.  It turns out that there's probably

9     two or three pretty material differences that I believe we

10    have, that's it, in terms of -- just in terms of a

11    translation.

12             MR. COLE:  That is -- oh, I'm sorry, I'm sorry.

13             MS. MORENO:  Just for my -- I'm just talking for my

14    client, there's about two or three material differences in

15    translations.  With 106 issues there's about four or five

16    calls, but I was going to wait till the Court ruled, and if

17    the Court would let's say allow my 106 portion, I have the

18    whole call transcribed, and whatever the government and your

19    Honor says can be played, we can edit, we can do whatever,

20    and it would all be in English, and that would be sent to the

21    jury.  I think that's what's fair.  That's what would be in

22    evidence, not just their call, their portion of the call, but

23    whatever your Honor says, this part of the conversation is

24    now admitted into evidence.  I believe fairly that should

25    replace the previous call that did not have that evidence.

 1    Perhaps I'm wrong, but that's how I would --
 2              THE COURT:  You wouldn't be substituting one
 3    transcript --
 4              MS. MORENO:  Substituting, yes, your Honor.
 5    Whatever your Honor says.  In other words, if you said
 6    instead of the two pages that the government has in Exhibit
 7    120 and I say I think three pages should be played and your
 8    Honor agrees with me, then I think three pages should be
 9    substituted for their two.  This is how I've done it numerous
10    times in the past.
11              THE COURT:  Well, that's fine if you can agree.
12    I'm assuming?
13              MS. MORENO:  Well, it's your Honor's ruling,
14    whatever your Honor says in terms of what's admissible and --
15              THE COURT:  Well, I understand that part.
16              MS. MORENO:  Yes, yes.
17              THE COURT:  But in terms of -- you know, if we're
18    dealing with a transcript -- well, there's -- let's say
19    122 -- I've got in front of me 122.  Mr. Durkin's proffer,
20    I've got that in front of me.  And there will be some
21    material that comes in under 106.
22              Now, I'm assuming that you can get together on the
23    material that's going to come in under 106 and create a new
24    transcript for that.  One way you could do it -- Agent O'Very
25    is going to be here.  I mean, you know, if the defense is

1    concerned about having no one to put --

2            MR. COLE:  Sure.

3            THE COURT:  -- to put this on then -- for example,

4    just dealing with 122 as an exemplar here -- you could come

5    up with a new 122, integrating the 106, have O'Very go back

6    over that, have him point out what has been added to it as

7    submitted by the defense -- he's not going to be

8    cross-examined on it, it's not the government's submission,

9    but at least that part of it is -- it's self-explanatory,

10   it's in evidence.  That may be one -- that may be one way to

11   proceed.

12           MR. COLE:  Your Honor, I think that that's one way

13   to proceed, but I don't think -- I think the way that it

14   would work much more likely -- and I'll explain why the way

15   your Honor just described I don't think will work -- is if we

16   had a transcript -- let's stick with just the example of 122,

17   for example -- if we have our transcript, I believe what

18   should happen is -- this is going to be a case of disputed

19   transcripts in many areas, and that's fine; the jury

20   instructions -- there's instructions for that, and the jury

21   can go back and look at both sets.  And if there is a call

22   that Ms. Moreno might have that goes on for three pages and

23   ours went on for two pages and it's the same call, then they

24   should get our transcript and they should get her transcript

25   and they can decide which portion to believe or disbelieve or

1    which linguist to believe because we've been receiving

2    transcripts up till this weekend; our linguist cannot review

3    those in time.  And the later we get them, I think the harder

4    the linguist has been working and been swamped because

5    they're getting worse and worse.  And we have massive

6    disagreements with the transcripts coming in from Ms. Moreno.

7    And so we can't take in our case and let the jury have the

8    impression those are our translations, but they can certainly

9    have those translations.

10           THE COURT:  Okay.  I didn't know there were massive

11   disagreements.  If there are massive disagreements, then they

12   really shouldn't come in within the context of one exhibit.

13   I thought, as you were -- I thought you said there were just

14   a few agreements and --

15           MS. MORENO:  This is the first I've heard of

16   massive disagreements, your Honor.  I -- I have been dealing

17   with Mr. Ward on these transcripts, and my comments were

18   specific in terms of disputes about translations, material --

19   he says the word is "operation," we say it's "work" or

20   something like that; those are very few.

21           In terms of the 106, I'm not going to say that

22   there are massive objections or disagreements.  I think they

23   don't think it comes in under 106, but in terms of what the

24   transcript says, I think there are like two or three or four,

25   that's it.  But I agree with Mr. Cole actually.  I think both

1   transcripts should come in.  I have no objection to that

2   whatsoever.

3            THE COURT:  Well, then you're going to need to

4   introduce them in one form or another.  I mean you have to --

5   you can't just flip them on the -- slap evidence tags on them

6   and then have them admitted; there's got to be some

7   identification of them.  So have you given that some thought?

8            I agree with Mr. Durkin, I don't think you need to

9   put on a case, a separate case, just to get 106 material in.

10           MR. DRATEL:  Well, I think -- and the way I've done

11  it in the past, your Honor, is that because we've stipulated

12  as to the authenticity of the recordings themselves, there's

13  no real underlying foundation problem with it.  Once the

14  Court rules that something comes in under 106, then it's

15  identified as Defense Exhibit T, whatever, you know,

16  something T-1, T-2 -- we should probably use numbers under T

17  as transcripts; it's easier to remember that way.  And

18  then -- we probably already have a T, but we can start with

19  T-1.  But the point being is then that comes in as an exhibit

20  because there's no real foundation necessary; it's all been

21  laid because it's all part of the same disks.

22           THE COURT:  Well, it may be able you're able to

23  stipulate to that and provide some kind of a statement to the

24  jury --

25           MR. DRATEL:  Yes.

1          THE COURT:  -- a joint statement to the jury, which

2    would be fine; that wouldn't be the defense putting on a

3    case, so to speak.

4          MR. DRATEL:  Right.

5          THE COURT:  Hold on just for a moment.  But if

6    there are massive disagreements, for example, between the 106

7    material that I'm looking at and what the government has as

8    its transcription for the 106 material, then I don't know how

9    that affects the underlying admissibility, if at all.  That's

10   the question.

11         I was going through -- and as I say -- I'll

12   repeat -- I've only gone through Mr. Durkin's submissions.

13   I'm ready to rule but maybe I shouldn't at this point because

14   we're getting so bogged down in some procedural issues -- but

15   I was assuming that these were proper -- these were accurate

16   translations.

17         MR. DRATEL:  We'll have a witness who will say

18   that, so instead of putting them in provisionally pending --

19   as Mr. Cole said, pending the link-up that the linguist, our

20   linguist, will come in and say I translated these, I'm

21   qualified, and this is my translation, so we'll do that,

22   but -- with all these, but --

23         MR. COLE:  Yes.

24         MR. DRATEL:  -- to certain extent in terms of the

25   transcripts from the underlying nature of the calls in terms

1   of foundationally, I don't see it as fundamentally different

2   than introducing a document on cross-examination that has

3   been essentially -- you know, as an exhibit in the sense that

4   you can't you put in an exhibit in the government's case if

5   the witness -- not this witness, but we have a stipulation

6   that says that the calls are in evidence, the calls are

7   authenticated, and then --

8           MR. COLE:  Your Honor.

9           MR. DRATEL:  -- it's not a question of recognition

10  or all of that, it's really just a question of linking up

11  later.

12          MR. COLE:  As I stated, I think that to the extent

13  a defense -- a defendant is putting on a case, I don't think

14  this is an issue because they're going to call their linguist

15  anyways for their own reasons.  And what I was saying to

16  start out with is in our case, if they want to put in their

17  transcript provisionally, linking it up later, put the

18  foundation in, their linguist prepared it -- because your

19  Honor ruled it's 106.

20          The part that your Honor rules is 106 we have no

21  problem with.  It sounds like the only person that's a

22  problem for is Mr. Durkin, who may not be planning to put on

23  a case.  We will talk to Mr. Durkin and see what we can come

24  up with for your Honor.  I think that's the only one who's

25  not putting on a case.  If they're putting on a case anyways

1    and calling a linguist anyways, I think this is not a

2    problem.

3              MR. DRATEL:  Yeah, we have -- we have -- just so

4    the Court understands -- we have other translation issues

5    with what's already in evidence that our linguist is going to

6    testify, so I --

7              THE COURT:  That I understand.

8              MR. DRATEL:  -- don't think that's going to be --

9              MR. COLE:  So I'll work with Mr. Durkin -- we will

10   work -- and we will try to see if there's a solution for him,

11   because I think he's the only one who perhaps is not putting

12   on a case.

13             MR. DURKIN:  And I think we can do that, Judge.

14             THE COURT:  Okay.

15             MR. DURKIN:  For example, I do have an email from

16   Mr. Ward; at least two of our transcripts they've okayed.  So

17   I mean I think we can work this out.

18             THE COURT:  Two of your 106 transcripts?

19             MR. DURKIN:  Yes.

20             MR. COLE:  Not as 106 but just in terms -- well,

21   Mr. Ward, why don't you address that.  Sorry.

22             MR. WARD:  I don't think any of the emails actually

23   address the 106 issue, your Honor, but I do think that as far

24   as, you know, depending upon what the Court's rulings are, it

25   will narrow the issues and we can probably come up with a

1    transcript that could be presented to the jury.

2           MR. DURKIN:  Judge, I'm not trying to be

3    difficult --

4           THE COURT:  No, no, I don't need to see emails.  I

5    accept your representations, that's fine.

6           MR. DURKIN:  I'm not fighting.  I'm like --

7           THE COURT:  Okay.  I don't think you should be

8    concerned about that.

9           MR. DURKIN:  That's fine.  I mean --

10          THE COURT:  Okay.  You know, I was -- I was under

11   the impression this really needed to be rushed, these rulings

12   on these things really needed to be rushed, but as it turns

13   out, they don't need to be rushed because, you know -- Mr.

14   Dratel, did you want to say something?

15          MR. DRATEL:  No, no, go ahead.

16          THE COURT:  Are you agreeing or disagreeing?

17          MR. DRATEL:  I'm anticipating a clarification but

18   I'm willing to --

19          THE COURT:  Well, okay.  So let's -- you've got

20   O'Very on the stand.  I mean he's not really a substantive

21   witness; he's being used as a reader, he's linking up a few

22   things, but in terms of -- he didn't edit any of this, he

23   didn't -- he doesn't have any particularly deep specialized

24   knowledge about the case.  I don't know, frankly, what his

25   role is, what his assigned role was in the case other than to

1    be doing what he's doing.  I know he was present at

2    Shidaal --

3              MR. COLE:  He took some pictures.

4              THE COURT:  -- he took some photographs, and that's

5    it.

6              MR. DURKIN:  When I was a prosecutor, Judge, we

7    used to call him a blank slate.

8              THE COURT:  Okay.  So, you know, he's a convenient

9    guy to be getting these exhibits through.  He's not the kind

10   of guy that you would traditionally see as, you know,

11   cross-examination material on 106.  He's not the officer --

12   he's not the officer who took a confession, for example, and

13   part of the confession comes in on direct and then the 106

14   part, you know, is somewhere out there, whether it's

15   admissible or not, and then all of a sudden the Court decides

16   yes, it's admissible, and then the officer who was involved

17   in obtaining the confession is cross-examined on the 106

18   material, which lays the foundation for that coming in, and

19   that's all in front of the jury.  But this is a different

20   kind of 106, and you can bring this in, you can bring in the

21   106 material in, for example, through your own witnesses,

22   through a linguist; it doesn't have -- it doesn't have

23   cross-examination value.

24             MR. DRATEL:  Your Honor, my only response in regard

25   to that is I would just want to use him in the same way that

1    Mr. Cole used him, as a reader, and even with the 106

2    material as a reader because I find it necessary to correct

3    the nature of what is presented as opposed to what we're

4    presenting to correct that misimpression that goes to the

5    jury about what a phone call is about, its totality, as

6    quickly as possible.  So I can do that tomorrow morning on my

7    cross-examination --

8             THE COURT:  Well, I know it's a timing thing for

9    you, and I know that -- I know that it may not be possible,

10   just given the -- you know, the amount of time.  If I had

11   time, if I had time to go through this, I would be happy to

12   do it.  I don't know that I'm going to have time to do this.

13   And as I say, all I know is I'm looking at three inches of

14   material right now.  I've been through one of the

15   submissions, and --

16            MR. DRATEL:  Your Honor --

17            THE COURT:  -- but I'll hold off.  I know -- first

18   of all, it's five o'clock now, and I know the marshals really

19   do like to, in fairness to each of these gentlemen, get them

20   back so that they can relax, have their meals, and I know

21   they probably have religious activities as well, so it's

22   probably good to bring this part of it to a halt.

23            MR. DRATEL:  Just half a loaf, your Honor, for us

24   is better than none in terms of if you get to half of them

25   and give us some and use it during cross and put the rest in

1    in our case, whatever.  I'm just -- you know, trying to say,

2    like I said, anything that we can use earlier is better.

3         THE COURT:  Well, but you won't even have

4    transcripts prepared, will you?

5         MS. MORENO:  We have -- we have --

6         MS. FONTIER:  Well, your Honor, on that issue, I

7    mean there were documents-based transcripts, so they can be

8    easily -- whatever section is admissible can be easily cut

9    and paste into a separate document, but for purposes -- if we

10   have the rulings -- if it's tomorrow morning or when it might

11   be, if we read it in and then admit the written document at a

12   subsequent point, either in the afternoon or whatever, that

13   corresponds to that, to what was read on the record while

14   omitting everything that is inadmissible, I think that that

15   would be preferable for us.

16        THE COURT:  Okay.  How much longer do you

17   anticipate having Agent O'Very on the stand?

18        MR. COLE:  We have like 20 some-odd calls.  I am

19   guessing an hour, but obviously, you know, we can keep him

20   around.  I think your Honor --

21        THE COURT:  Let's see if we can keep him on call.

22        MR. COLE:  Sure.

23        THE COURT:  This is only Tuesday, so even if we

24   don't get it right away, we might have him recalled within a

25   day --

1           MR. COLE:  Yeah.

2           THE COURT:  -- so it's still current, some of

3    these -- some of these transcripts are still somewhat fresh

4    in the minds of the jurors.  I understand what you're saying,

5    Mr. Dratel, concerning the timing thing.  I don't know how

6    much more I can do between now and nine o'clock tomorrow

7    morning.

8           MR. DRATEL:  No, I understand.  I just think that

9    tapes is going to take -- it's like a formula -- somewhere in

10   the hours --

11          MR. COLE:  Well, I don't mean your cross.

12          MR. DRATEL:  No, no, I just mean your direct.

13          MR. COLE:  Oh, you could be right.  You could be

14   right.

15          MR. DRATEL:  Two minutes a call.

16          MR. COLE:  You could be right.  Okay.  Your Honor,

17   were you going -- so just to be clear so we can get started

18   on this tonight and make some progress tomorrow before we

19   come back to court -- I think you said you have Mr. Durkin's

20   rulings for 106?

21          THE COURT:  Yeah.

22          MR. COLE:  All right.

23          THE COURT:  But I wasn't planning on -- you know,

24   is it really -- do you want to remove the -- you happy to

25   waive your clients' presence at this point?

1           MR. DURKIN:  Sure.

2           THE COURT:  I don't want to impose upon the

3    marshals.  Are you all in agreement with respect to waiving

4    the presence of these gentlemen?

5           MR. DURKIN:  Yes.

6           MS. FONTIER:  Yes, your Honor.

7           THE COURT:  All right.  Okay.  Counsel, I'm getting

8    a question here about overflow, the overflow courtroom.

9    Apparently there's been a request to open that up again.  I

10   don't know how much lead time we need from our technical

11   people.  I am informed that about a dozen people today had

12   asked for that.  You know, there were empty seats in the

13   courtroom the entire time, not many but there were some empty

14   seats in the courtroom behind the bar, probably an average of

15   three or four seats.

16          I'm a little reluctant to open up another courtroom

17   and to put the tech people to the trouble of doing their

18   thing again if we're just going to be doing that for a small

19   group of people, so what I would ask each of you to the

20   extent you have outreach -- I know there's outreach into the

21   community -- just have the people cooperate in making some

22   decent rotations of spectators in and out so everyone has a

23   substantial chance to see the proceedings.

24          If we're getting -- if we're getting 20 or more --

25   if we're getting 20 or more people on an overflow basis, then

1    I'd request that that courtroom get opened up because then

2    most of the seats behind the bar are -- will be occupied.

3    But, you know, we've already done that once, and it wasn't

4    even necessary.

5              MS. MORENO:  I didn't know of this new request,

6    your Honor.

7              THE COURT:  Okay.  Who's the community outreach --

8              MS. MORENO:  Bater (phonetic) Hassan has been the

9    gentleman who's been talking to the community, and I can

10   certainly speak with him.

11             THE COURT:  Okay.  Let me know.  If it seems

12   appropriate to reopen that, I'm informed that they can do

13   that perhaps in a half a day, just get everything -- it may

14   already be plumbed and all they have to do is flip a switch.

15   We'll find out, okay?

16             MS. MORENO:  All right.  Thank you.

17        (The defendants left the courtroom.)

18             THE COURT:  Okay.  Are we ready to proceed?

19             MR. DURKIN:  Yes, Judge.

20             THE COURT:  Very good.  All right.  We have Exhibit

21   122.  The first submission I have is on page 7 of this.  It

22   begins with defendant Nasir saying, what is new from our home

23   country today and yesterday.

24             MR. DURKIN:  That's right.

25             THE COURT:  Everybody with me?

1          MR. COLE:  Yes.

2          THE COURT:  And it extends all the way down through

3     page 7, through page 8, and the very first line on page 9.

4     And this is my impression; this is what the ruling would be,

5     that this is -- this is how I frame it:  It's okay under 106

6     to come in.  I note that the government's excerpt is not

7     misleading but the additional conversation is intertwined

8     with what has been presented and adds context --

9          MR. COLE:  Okay.

10         THE COURT:  -- and I think in fairness it should

11    come in.  So then we have -- the next is on page 10.  It

12    starts with a statement attributed to defendant Nasir:  I

13    will try to get it.  Wait from me.  I will share with you any

14    information I receive.  It extends through the rest of page

15    10, through page 11, and through page 12.  I have that from

16    this point on it is not 106 material or otherwise admissible.

17         I'll just key on the other -- on the 106 from here

18    on out.  So that's Exhibit 122.  Okay.

19         Next, Exhibit 125, page 2, in the middle there in

20    blue starting with There are demonstrations everywhere, and

21    ending with Okay, that is great, anything else?  That is

22    admissible under 106 for the same reason.  I find that

23    nothing the government did here was misleading or distorting,

24    but I think that the material that comes in now is

25    intertwined with what the government has admitted and adds

 1      important context, so that is in, that first excerpt.

 2              Then for the next we go all the way to page --

 3      well, that's it, that's it for that exhibit, 125.  Okay.

 4              Next, Government Exhibit 127, on top of page 2, we

 5      have at the very top of page 2 Mr. Moalin asking Ahmed Nasir,

 6      question mark.  Down to Basaaly responding:  Any crisis, just

 7      wait for me a little bit.  I am going to answer the other

 8      line.

 9              I have that admissible under 106.  Once again, it

10      provides context and is intertwined with the later reference

11      to, quote, chairman, end quote, at page 3.  That's all we had

12      on that transcript.  Okay.

13              Next, on transcript 133, page 7, in the -- this is

14      mid-answer now -- this is part of the second bit of

15      conversation attributed to Basaaly -- or Basaaly -- starts

16      with, I forwarded it to you first.  First did you -- no, I

17      forwarded it to you first.  Did you get the information sent

18      to you?  Down through the -- what is attributed to Basaaly:

19      It was attached.  Did you see the attachment?  This is not

20      106 material; this is not admissible under 106.  That takes

21      care of Exhibit 133.  Next, we have --

22              MR. DURKIN:  Judge, just one.  Last night we went

23      through --

24              THE COURT:  You're withdrawing them?

25              MR. DURKIN:  Yes.  For 106 yes.  Exhibit 183 we'll

1    withdraw.  Thank you anyway.

2              THE COURT:  Okay.

3              MR. DURKIN:  I apologize.

4              THE COURT:  So the last one is Exhibit 186?

5              MS. ROBERTS:  Yes.

6              THE COURT:  It starts on page 2, top of page 2,

7    beginning with hello, down through the rest of that page and

8    all of page 3, all of page 4, all of page 5, and down through

9    on page 6, quote, H Street, okay, okay, no problem, Ahmed.  I

10   have this is not 106 material.

11             MR. DURKIN:  I'm sorry, Judge.  I'm not --

12             THE COURT:  It is not, no.

13             MR. DURKIN:  No, I'm sorry.  Maybe I got the

14   wrong -- is this 186?

15             THE COURT:  186.

16             MR. DURKIN:  So you're saying nowhere on this is

17   there a 106 --

18             THE COURT:  Right.  Yeah, I went through all of it.

19   It's not related to that part -- that part of the transcript

20   that the government played.  And then we have 195.  Do we

21   have a 195?

22             MR. DURKIN:  I think we withdrew --

23             THE COURT:  We don't have 195 or 196.

24             MR. DURKIN:  We went through those as well.

25             THE COURT:  Okay.  So some are in and some aren't.

 1    And then I'll get to the others as I can.  And I think that's

 2    it for this evening.  Anything else we can address where

 3    we --

 4              MS. FONTIER:  No, thank you, your Honor.

 5              MR. DURKIN:  We can do it tomorrow, but I have a --

 6    maybe it's a simple, one-word answer.  Have you made a

 7    finding then that they have made sufficient showing to prove

 8    my client's membership in this conspiracy?

 9              THE COURT:  I don't -- I wait until all the

10    evidence is in.  I wait until all the evidence is in.  If you

11    want to make a Rule 29 motion after all --

12              MR. DURKIN:  No, no.

13              MS. ROBERTS:  No, no, that's not --

14              MR. DURKIN:  Just had something to do with the 801

15    (d)(2), but I asked you whether these were -- you said that

16    one call was only coming in against Mr. Moalin and then you

17    said the others were going to come in.  I thought maybe

18    you -- and I think technically they only come in --

19              THE COURT:  Yeah, there was one that -- yeah, and

20    I'll indicate that to the jury, yeah -- going back to my

21    notes here -- limiting instruction on Exhibit 134.  I

22    didn't -- yes, I didn't see that that was -- that was a

23    statement that was made during and in furtherance of the

24    conspiracy, but it comes in as a -- as independent evidence

25    with respect to Mr. Moalin, okay?  Okay.  Well, thank you,

1    counsel.  We'll see you tomorrow morning at nine o'clock.

2    We're going to continue with O'Very at that time?

3              MR. COLE:  Yes.

4              THE COURT:  All right.

5              MS. FONTIER:  Thank you very much, your Honor.

6              THE COURT:  You're very welcome.

7         (There was a break in the proceedings for the evening

8    recess.)

9                              I n d e x

10   Witnesses                                        Page

11   **Colby O'Very**
     Direct Examination, cont'd by Mr. Cole           1006

12
     **Matthew Bryden**
13   Direct Examination by Ms. Han                    1069
     Cross-Examination by Mr. Dratel                  1095

14

15

16

17

18

19

20

21

22

23

24

25

1                      Certificate of Reporter

2

3   I hereby certify that I am a duly appointed, qualified, and

4   acting Official Court Reporter for the United States District

5   Court; that the foregoing is a true and correct transcript of

6   the proceedings had in the mentioned cause on the date or

7   dates listed on the title page of the transcript; and that

8   the format used herein complies with the rules and

9   requirements of the United States Judicial Conference.

10

11  Dated January 16, 2013 at San Diego, California.

12                 *Debra M. Henson*

13                      /s/ Debra M. Henson  (electronic)
                         Debra M. Henson
14                      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25