1                     United States District Court

2                   Southern District of California

3

4    UNITED STATES OF AMERICA,        )
                                      )
5                     Plaintiff,      )
                                      )
6       vs.                           ) Case No. 10-CR-4246 JM
                                      ) Jury Trial/Day 10
7    BASAALY SAEED MOALIN,            ) Monday, February 11, 2013
     MOHAMAD MOHAMAD MOHAMUD          )
8    ISSA DOREH,                      ) Volume 10
     AHMED NASIR TAALIL MOHAMUD,      )
9                                     )
                      Defendants.     )
10   _____  )

11

12              Before the Honorable Jeffrey T. Miller
                   United States District Judge

13

14

15

16

17

18

19

20   Official Interpreters:   Ayderus Ali, CCI
                              Fanik Jama, CCI
21
     Official Court Reporter: Debra M. Henson, CSR, RPR
22                            U.S. Courthouse
                              221 W. Broadway, Suite 5190
23                            San Diego, CA  92101
                              (619) 238-4538
24

25            Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:        Laura E. Duffy
                                UNITED STATES ATTORNEY
 3                              William P. Cole
                                Caroline P. Han
 4                              ASSISTANT U.S. ATTORNEYS
                                Steven P. Ward, Trial Attorney
 5                              U.S. DEPARTMENT OF JUSTICE
                                880 Front Street, Suite 6293
 6                              San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)              Joshua L. Dratel, Esq.
 8                              Alice Fontier, Esq.
                                OFFICE OF JOSHUA L. DRATEL
 9                              2 Wall Street, Third Floor
                                New York, NY  10005
10
     (Mr. M. Mohamud)          Linda Moreno, Esq.
11                              LINDA MORENO, P.A.
                                P.O. Box 10985
12                              Tampa, FL  33679

13   (Mr. Doreh)               Ahmed Ghappour, Esq.
                                LAW OFFICES OF AHMED GHAPPOUR
14                              P.O. Box 20367
                                Seattle, WA  98102
15
     (Mr. A. Mohamud)          Thomas A. Durkin, Esq.
16                              Janis Roberts, Esq.
                                DURKIN & ROBERTS
17                              2446 N. Clark Street
                                Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1              San Diego, California - Monday, February 11, 2013

2         (Defendant A. Mohamud is being assisted by a Somali

3    interpreter.)

4              THE COURT:  Good morning, everyone.  Everybody have

5    a decent weekend?

6              MR. COLE:  Yes.

7              THE COURT:  Very good.

8              MR. DURKIN:  Just a minor -- I'd like to introduce

9    to you Josh Sherman from our office.

10             THE COURT:  Very good.

11             MR. DURKIN:  He'll be here the next few days.

12             THE COURT:  Very good.  Welcome.  Mr. Cole, did you

13   wish to be heard?

14             MR. COLE:  Yes, briefly, your Honor.  The defense

15   was good enough to send us over the weekend some Section 3500

16   information on a witness I believe they're going to call this

17   morning.  Might be their first witness, I'm not sure.

18             MS. FONTIER:  It is.

19             MR. COLE:  It is their first witness.  Her name is

20   Halima Ibrahim or Halima Yare.  I have the one-page -- it's

21   actually just half a page -- summary that the defense gave

22   us.  If I could just hand up one to the Court.

23             THE COURT:  Okay.

24             MR. COLE:  And the reason I wanted to address it

25   with the Court is I thought it was going to be the first

1    witness and we'd have no chance to address it otherwise than

2    now.  The government's position is that -- now, this -- I

3    can't say for certain that this is exactly what she'll

4    testify to; this is just the 3500 material that was

5    provided -- but certainly the fact referenced -- why don't I

6    give the Court a second to read it I guess.  I'm sorry.

7              THE COURT:  Thank you.

8              MR. DURKIN:  Got an extra copy?

9              THE COURT:  Okay.

10             MR. COLE:  So this is the government's concern.  If

11   Ms. Ibrahim is going to testify, you know, during the time

12   period relevant to this case about something specific going

13   on with ILEYS, that may be one thing, to the extent she's

14   going to link funding from Mr. Moalin to ILEYS during that

15   period.  But certainly when it gets to what happened after

16   Moalin's arrest and the impact that had on -- supposedly on

17   orphans, the Court already excluded that same type of

18   information from the depositions.

19             And then also this event in 2009 where she -- some

20   type of conference over some kidnapped aid workers, that's

21   all outside the time period in the indictment; that would

22   just been a specific instance of good conduct that would be

23   inadmissible character evidence.  And so we wanted to raise

24   that with the Court before she testifies.

25             THE COURT:  Okay.  Who'd like to be -- Mr. Dratel?

1              MR. DRATEL:  Well, your Honor, Ms. Fontier will be

2     handling that.  I'll give her the floor if I may, your Honor.

3              THE COURT:  Okay.

4              MS. FONTIER:  Good morning, your Honor.  Your

5     Honor, we are calling Ms. Ibrahim as a fact witness.  We do

6     not intend to offer character evidence through her.  She will

7     be testifying about the events from her personal knowledge

8     while she was in the Galgaduud region in 2007 through -- I

9     mean she's -- well, obviously she's here today -- but she's

10    living there presently, so she does have knowledge that is

11    relevant to the period of the indictment about, you know, the

12    events on the ground, what was done with specific funding

13    ILEYS, her own organization.

14             To the extent that we would offer or seek to admit

15    testimony regarding the 2009 conference that was organized by

16    Ms. Ibrahim and Mr. Moalin in opposition to al-Shabaab,

17    there's two things on that.  One is that the indictment does

18    not end prior to that; the indictment says up to and at least

19    November of 2008.  And, in addition, the evidence will be

20    offered pursuant to 404 (b) to show his intent.

21             THE COURT:  Well, okay.  Ms. Fontier, I share

22    Mr. Cole's concerns, and, frankly, I think he identified the

23    area you can get into, that is, her personal involvement with

24    this organization in 2007-2008, what she personally observed

25    regarding Mr. Moalin's activity with that and linking

1   whatever his efforts were, including supporting the group

2   monetarily.  But in terms of the effect his arrest has had on

3   other people, that would be irrelevant under 403.  I think

4   you can understand that would be completely inappropriate.

5           MS. FONTIER:  I didn't intend to go into that.

6           THE COURT:  And with respect to the 2009

7   conference, I would agree that the probative value of that is

8   de minimis; I don't see any probative value of that.  I mean

9   if you want to ask one -- a question as to whether the

10  organization still exists, that's fine, but to get into

11  conference activities in '09 and other activities not

12  personally involving Mr. Moalin I think would be

13  inappropriate.

14          MS. FONTIER:  Your Honor, if I may, Mr. Moalin was

15  personally involved.  Mr. Moalin traveled to Galgaduud and to

16  Kenya.  He met with the organizations that he had been

17  supporting, IIDA, as well as ILEYS.  For the record, IIDA is

18  I-I-D-A.  He met with Ms. Ibrahim in his continued and

19  ongoing support --

20          THE COURT:  You're referring --

21          MS. FONTIER:  -- in 2009 --

22          THE COURT:  May I interrupt you for just a moment?

23  You're referring to this individual as Ms. Ibrahim, but I see

24  Halima Yare in --

25          MS. FONTIER:  Yes, your Honor.  Yeah, just like

1    Farah Yare, is a nickname.  It means "young" or "short."  Her

2    name, her official name a Halima Ibrahim.  What is before

3    your Honor and what was provided to the government are the

4    notes that I took when I interviewed her in Mogadishu in

5    June, so those are the comprehensive notes and not what I

6    would intend to elicit through her testimony here today.

7              THE COURT:  Okay.

8              MS. FONTIER:  But it is Ms. Ibrahim.  Your Honor,

9    Mr. Moalin met with her.  He supported her, her organization,

10   as well as ILEYS beginning in 2007 and continuing on through

11   the date of his arrest.  I don't need to go into the arrest,

12   I wouldn't go into the effects what occurred after her (sic)

13   arrest, but the conference is a product of his continuing

14   support throughout the indictment period, and I do think that

15   it goes to demonstrate his intent during the -- what is set

16   forth in the indictment.

17             THE COURT:  What demonstrates his intent was his

18   activity during '07 and '08, during the relevant period of

19   time and his personal involvement there.  What happened after

20   that, as I've already indicated, I think with the conference

21   and other activities and other good works, I would -- I would

22   limit.

23             So you've got the -- you've got the parameter here,

24   and I'm growing to trust that you'll cleave to that area, and

25   it's a significant area that has been identified as

1  appropriate.  It's got to be -- it's got -- it's your

2  client's personal involvement, his commitment to this

3  organization, and it's not limited to funding; if there were

4  other things he was doing during that period of time, that's

5  fine, as long as it comes in through the personal knowledge

6  of the witness and it's confined to the period in question,

7  the general period in question, which is both before and

8  after the certification of al-Shabaab obviously, but not

9  after the -- in other words, getting into the activities of

10  the organization after that, as I said, is not relevant.

11            MS. FONTIER:  And, your Honor, just for the record

12  I do -- would like to respectfully disagree.  I do think that

13  the fact that in 2009 because of Mr. Moalin's ongoing support

14  and his activities, the fact that he was listed by al-Shabaab

15  as a target for death by them is very probative of the

16  ultimate facts at issue here as to whether he supported

17  al-Shabaab.

18            THE COURT:  Well, where is that in here?

19            MS. FONTIER:  Your Honor, that -- I don't know that

20  that's in the notes, I don't recall, but that is --

21            THE COURT:  I don't see that.

22            MS. FONTIER:  -- why the conference will be

23  discussed.

24            THE COURT:  Pardon me?

25            MS. FONTIER:  The reason that I would bring up that

1   conference and why it was discussed is to show that -- the

2   purpose of the conference was to address the kidnapping --

3                THE COURT:  The last --

4                MS. FONTIER:  -- by al-Shabaab that occurred in

5   2009 --

6                THE COURT:  The last three --

7                MS. FONTIER:  -- and the organizers of this

8   conference -- sorry, your Honor.

9                THE COURT:  The last three lines you have are,

10  Following the conference Shabaab announced on the radio that

11  the organizers of the conference were, quote, against

12  al-Shabaab, end quote.  This witness apparently understood

13  that to mean that Shabaab had made her and Mr. Moalin a

14  target and called for their death.  She is still a Shabaab

15  target.

16               That's her supposition.  It comes in as a

17  conclusion, speculation.  And furthermore, it relates to

18  the -- to that period of time that is not relevant.  But

19  you've made your record on that, okay?

20               MS. FONTIER:  Yes, your Honor.

21               THE COURT:  Okay.  I've indicated what you can get

22  into, and it's fairly substantial.  Mr. Cole, do you have any

23  further objections?

24               MR. COLE:  No, your Honor.  Thank you.

25               THE COURT:  All right.  How many witnesses do we

 1   have this morning?

 2           MS. FONTIER:  Two.

 3           MR. DRATEL:  Probably two, your Honor.

 4           MS. FONTIER:  Sorry, your Honor.  Could I --

 5           THE COURT:  We're bringing the jury now.

 6           MS. FONTIER:  Yes.  May I just take one minute to

 7   discuss the parameters of Ms. Ibrahim's testimony to make

 8   sure she doesn't volunteer anything outside of that?

 9           THE COURT:  Yes.  And be very careful about that as

10   well.  I don't want to have to strike answers or anything of

11   that nature because that doesn't particularly look good.

12           MS. FONTIER:  Right.

13           THE COURT:  Why don't you take a minute -- where is

14   she, in the courtroom right now?

15           MS. FONTIER:  She's just in the hall.  I'll meet

16   with her very briefly and just discuss the rulings.

17           THE COURT:  Okay.  Very good.  Mr. Dratel, these

18   would be relatively short witnesses.

19           MR. DRATEL:  No, no.  I think -- I don't know how

20   long Ms. Ibrahim will be, and then we have the linguist,

21   which will take probably -- you know, between direct and

22   cross, probably a couple of hours is my guess.  And then we'd

23   resume the depositions if we have time today.

24           THE COURT:  Okay.

25           MR. DRATEL:  I think the -- just my own thinking on

1    the witnesses will take us somewhere into the afternoon.  I'm

2    not sure how long.

3              THE COURT:  Okay.  We're going to modify the

4    schedule a little bit.  We'll go until about 12:30 before we

5    take our noon recess, then we'll recess from approximately

6    12:30 to two o'clock.  Every Monday we have a judges' meeting

7    from 1:00 to 2:00, so we will resume at two o'clock this

8    afternoon.

9              MR. DRATEL:  Thank you, your Honor.

10         (The jury entered the courtroom.)

11             THE COURT:  May I see counsel here at the side of

12   the bench.  We don't need the reporter.

13         (Unreported bench conference between the Court and

14            counsel out of the hearing of the jury.)

15             THE COURT:  Good morning, ladies and gentlemen.

16   Hope you all had a good weekend.  Thank you for your

17   promptness.  We were discussing some scheduling issues over

18   here.  We're going to modify today's schedule just a little

19   bit.  We're going to go until about 12:30 today and then

20   we'll break at 12:30 for our noon recess and then resume at

21   two o'clock.  Every Monday the judges of this Court have a

22   meeting from 1:00 to 2:00, and so that's the reason for

23   modifying that schedule just a bit.  And then we'll stop at

24   our normal recess time this afternoon.

25             Okay.  I think we're ready for the defense to call

1    a witness at this time.  Ms. Fontier?

2            MS. FONTIER:  Thank you, your Honor.  Your Honor,

3    at this time the defense would call Halima Ibrahim.

4            THE CLERK:  Can you please raise your right hand.

5    Do you solemnly swear that the evidence you shall give in the

6    cause now before the Court shall be the truth, the whole

7    truth, and nothing but the truth?

8            THE WITNESS:  I do.

9                        Halima Ismail Ibrahim

10   was called by the defense and testified as follows:

11           THE CLERK:  Can you please state and spell your

12   first and last name for the record.

13           THE WITNESS:  Halima, H-a-l-i-m-a, Ismail,

14   I-s-m-a-i-l, Ibrahim, I-b-r-a-h-i-m.

15           MS. FONTIER:  Thank you, your Honor.

16                      Direct Examination

17           BY MS. FONTIER:  Q.  Good morning, Ms. Ibrahim.

18   A.  Good morning.

19   Q.  Ms. Ibrahim, do you know Basaaly Moalin?

20   A.  Yes, I know him.

21   Q.  How do you know Mr. Moalin?

22   A.  I am work -- I work in Galgaduud region, exactly in Dhusa

23   Mareeb and Guraceel, and I know through his work about an

24   orphanage school.

25   Q.  And if I may, just to make sure we're clear -- it's

1   always a fun thing with this.  Now, when you say the

2   Galgaduud region, can you see the map that's on the screen?

3   A.   Yes.

4   Q.   What is -- People's Exhibit 2, is that the Galgaduud

5   region that you're --

6   A.   It is Galgaduud region, and it is in central region in

7   Somalia.  The capital is called Dhusa Mareeb.

8   Q.   If you wouldn't mind just speaking a little into the mike

9   just to make sure that the jury can hear.

10  A.   Okay.  Galgaduud is in -- it is in the map.  It's in the

11  center of Somalia.  It's part of the central regions.  The

12  capital is Dhusa Mareeb, of the region.

13  Q.   Is that what is --

14  A.   Yes, that's where you are pointing now.

15  Q.   Thank you.

16          THE COURT:  Ms. Ibrahim, if you could, could you

17  wait until Ms. Fontier finishes her question before you begin

18  your answer because when two people are speaking over one

19  another, it's difficult for the court reporter to take

20  everything down.  And she'll wait for you to complete your

21  answer, okay?

22          THE WITNESS:  All right.

23          THE COURT:  Thank you.

24          BY MS. FONTIER:  Q.  Ms. Ibrahim, you said you know

25  Basaaly Moalin because you work in the Galgaduud region; is

1    that correct?

2    A.  Yes.

3    Q.  All right.  And how long have you worked in that region?

4    A.  Since 2007.

5    Q.  And have you personally met Mr. Moalin?

6    A.  Yes, I met with him in Nairobi.

7    Q.  Now, prior to personally meeting him, did you have other

8    interactions with him?

9    A.  No.

10   Q.  So did you ever speak to him on the phone prior to

11   meeting him?

12   A.  Yes, before I met, I speak with the phone as soon as I

13   knew that he was one of the people sponsoring the orphanage

14   school.  The orphanage school was only for boys, and my

15   organization is an organization who works with woman, who

16   empower with the woman, and who educationally empower the

17   woman.  And in the region there were a lot --

18            THE COURT:  Ms. Ibrahim, I'm going to stop you at

19   this point because the question was did you speak to him on

20   the phone before you met him.  So please listen carefully to

21   the question --

22            THE WITNESS:  Yes.

23            THE COURT:  -- and just answer the question

24   that's --

25            THE WITNESS:  Yes, I did.

1                    THE COURT:  Thank you.

2                    MS. FONTIER:  Okay.

3                    BY MS. FONTIER:  Q.  So I will back you up a little

4    bit so we can I think get to where you were going.  Let me

5    just start at the very beginning.  Where were you born?

6    A.  I born in Mogadishu, Somalia.

7    Q.  And did you live there your entire life?

8    A.  Yes, all my entire life.

9    Q.  And were you also educated in Somalia?

10   A.  Yes.

11   Q.  Now, where do you currently live?

12   A.  In -- I live and my family, we live in Minneapolis,

13   Minnesota, but for the last five years, I live in Dhusa

14   Mareeb and Guraceel.

15   Q.  Okay.  So now when -- how far did you go in school -- how

16   far did you go in school?

17   A.  Until an M.S., master degree.

18   Q.  And did you earn your master's degree in Somalia as well?

19   A.  No, I earn it in Italy.

20   Q.  So you went to Italy for college at some point?

21   A.  For graduate study.

22   Q.  And after you -- sorry.  What is your degree in?

23   A.  Agriculture, agriculture economy.

24   Q.  So after you graduated from the university in Italy, did

25   you return to Somalia?

1  A.  Yes, I returned to Somalia.

2  Q.  And what were you doing at that point?  What were you

3  doing for work?

4  A.  When I finish in the school of agriculture, the new --

5  the University of Somalia was newly formed, and they were

6  forming professors and assistant professors, and anyone who

7  had high grade was getting scholarship to be a professor at

8  the university.  So when I came back, I started being

9  assistant professor until I became full.

10  Q.  And when you became a professor, what were you teaching?

11  A.  I was teaching in rural development and agriculture

12  economy.

13  Q.  And how long have you were a professor at the University

14  of Somalia?

15  A.  From '83 to '90.

16  Q.  To 1990?

17  A.  1990, yes.  After that the war broke, the civil war.

18  Q.  So were you working even though after the war started --

19  sorry.  Were you working after the war started in 1990?

20  A.  Before the war started, ten professional Somali women, we

21  started forming a woman organization because we have seen the

22  difficult that woman were facing, so we form it, the

23  organization, and when the war broke, we continued working

24  with the organization.

25  Q.  What was the name of that organization that you formed?

1    A.   IIDA, Women Development organization.

2    Q.   And can you just spell IIDA?

3    A.   I-I-D-A.

4    Q.   Does that mean anything in particular?

5    A.   It means when a girl born in the eighth day, Eid is the

6    Ramadan, the day of the -- the day of the bellegrenich

7    (phonetic).  Usually we call -- we gave the name of Iida, so

8    the organization was a fiesta for the Somali woman, so we

9    gave -- we call them -- we call IIDA.

10   Q.   And as -- what is the -- just the general mission of

11   IIDA?

12   A.   Empower woman politically, educationally, and

13   economically, and support children.

14   Q.   And is that organization, does it still exist now?

15   A.   Yes.  It's a powerful organization and exists.

16   Q.   And are you still directly involved with that, with IIDA?

17   A.   I am one of the founder of the organization, and I am

18   responsible in Galgaduud region for the organization.

19   Q.   Now, going back again to -- I guess you said it was the

20   early '90s when the civil war began, what were -- what was

21   the goal of IIDA at that point?

22                MR. COLE:  Objection, your Honor; relevance.

23                THE COURT:  Sustained.

24                BY MS. FONTIER:  Q.  Now -- sorry.  After you --

25   sorry.  After you formed IIDA, how long were you involved

1    with that organization after its creation?

2    A.   I was -- I was working with the organization and being

3    active since 1995.  But although I was with the organization,

4    I started working with United Nation.

5    Q.   And what did you do with the United Nations?

6              MR. COLE:  Objection, your Honor; relevance.

7              THE COURT:  Overruled.

8              THE WITNESS:  And it was in -- when UNISOM, UNITEF

9    came to Somalia, and Operation Restore Hope, and UNISOM, they

10   need -- they were doing reconciliation for the clans who

11   fought and they needed a Somali, one who is -- who has

12   experience, so I was working with the political division of

13   UNISOM.

14   Q.   So as part of your work with IIDA, you were asked to work

15   in conjunction with UNISOM; is that what you're saying?

16   A.   Yes, yes.

17   Q.   And through that work did you have -- did you work with

18   other international organizations in Somalia?

19   A.   Yes, we work with UNICEF, WFB, UNBB, US-8, and several

20   organization -- Life and Peace, which is an institution,

21   Sweden institution.  We work a lot of organizations.

22   Q.   Just stepping aside for a moment, I believe you stated

23   that your family is in Minnesota; is that correct?

24   A.   Uh-huh.

25   Q.   When did your family move to the United States?

1    A.  1996.

2    Q.  And did you come with them as well?

3    A.  I came before them, 1995.  I seek asylum, I was granted,

4    and then I sponsored through the family reunion program.

5    Q.  So when you say you sought asylum, was that to become a

6    United States citizen?

7                MR. COLE:  Objection, relevance.

8                THE COURT:  The objection is sustained.

9                BY MS. FONTIER:  Q.  And when were you given asylum

10   to be in the United States?

11   A.  1995.

12   Q.  And why was that?

13               MR. COLE:  Objection, relevance.

14               THE COURT:  Overruled.

15               THE WITNESS:  Because in -- I was -- because of

16   working with United Nations and the country was a civil war,

17   and anyone who works with -- with UN was condemned, was to be

18   killed, and I was working with them, and there was also

19   Washington Post interview me, and I did talk about what is

20   happening and what the warlord doing in our country and the

21   civil war and then I was the declare -- how do I say -- I was

22   condemned in -- they say Halima has to be killed, so I

23   couldn't stay.  And in the other hand, there was a war, civil

24   war, that I couldn't do anything.  My husband and I, we talk,

25   and we decided to give opportunity to our kids and to save

1   our lives.

2           BY MS. FONTIER:   Q.   Now, so you began living in

3   the United States in about 1996 you said?

4   A.   Myself is 1995.

5   Q.   '95.

6   A.   And my family, my husband and my children, 1996.

7   Q.   Now, despite the fact that you were not in Somalia, did

8   you remain active in the politics or the -- did you remain

9   active in Somalia?

10  A.   I concentrated myself and the education of my kids at the

11  beginning, and then when the -- when the Ethiopian started --

12  Ethiopian military started to invade to Somalia, then I

13  became active, political active.

14  Q.   If I may just -- we'll come back to that.   But if -- was

15  your organization IIDA still functioning in Somalia despite

16  the fact that you were in the United States?

17  A.   Yes, yes, very strong.

18  Q.   And were you in communication and participating with that

19  organization while you were in the United States?

20  A.   Yes, I was even representing them to the international

21  conferences.

22  Q.   So you would -- am I correct and you're saying that you

23  would travel internationally --

24  A.   Yes.

25  Q.   And represent IIDA --

1    A.   Yes.

2    Q.   -- on behalf of the activities in Somalia?

3    A.   Yes.

4    Q.   Okay.  And the first Transitional Federal Government,

5    which Abdullahi Yusuf was the president of, did you have --

6    you and your organization, did you have any role in creation

7    of that government?

8    A.   As I told you, the mission of the organization was to

9    empower political the woman, and we know that the majority of

10   Somali woman and what we believe is if Somalia is saved, it

11   is the woman because Somali woman are very strong and they

12   work hard and they save the country, and we work with the

13   constitution group who were preparing the constitution and we

14   wanted to --

15            MR. COLE:  Objection, your Honor; nonresponsive,

16   move to strike.

17            THE COURT:  The objection is sustained.  The answer

18   is stricken, ladies and gentlemen; you are admonished to

19   disregard the answer.

20            BY MS. FONTIER:  Q.  So did IIDA have, and yourself

21   as part of IIDA, have any role in the creation of the

22   constitution of the Transitional Federal Government?

23   A.   Yes.

24   Q.   And what was that role?

25   A.   The role of the woman, how the woman be part of the

1    parliament.

2    Q.  And were you effective in influencing the creation -- the

3    first constitution?

4    A.  Yes, we --

5              MR. COLE:  Objection, your Honor; relevance.

6              THE COURT:  Yes, the objection sustained.

7              BY MS. FONTIER:  Q.  Now, again, you said you were

8    living in the United States when the Ethiopians invaded

9    Somalia I believe is what you said; is that correct?

10   A.  Yes.

11   Q.  And when was that?

12   A.  2006.

13   Q.  And I believe you also stated that that invasion by

14   Ethiopia led you to become politically active again in

15   Somalia, correct?

16   A.  Yes.

17   Q.  So starting in 2006 then what role did you take in

18   politics in Somalia?

19             MR. COLE:  Objection, your Honor; relevance.

20             THE COURT:  The objection is sustained.

21             BY MS. FONTIER:  Q.  Now, after the -- were you

22   opposed to the invasion of Somalia by Ethiopia?

23   A.  Yes.

24   Q.  Now, was your -- even though you had supported and worked

25   with the TFG, were you still opposed to the Ethiopian

1    invasion?

2    A.  Yes because that was not our principal.  Ethiopia, it's a

3    neighbor country, but cannot invade our country.  It's -- we

4    are -- we are sovereign country.  Imagine you here in San

5    Diego --

6              MR. COLE:  Objection, your Honor; irrelevant, move

7    to strike.

8              THE COURT:  Once again -- and pardon the

9    interruption, Ms. Ibrahim -- the objection is sustained.  The

10   motion to strike is granted.  It was not my understanding

11   that we'd be into this area with this witness, who was called

12   for a specific reason.  If we could limit the examination to

13   that.

14             MS. FONTIER:  One moment, your Honor.

15             BY MS. FONTIER:  Q.  So, Ms. Ibrahim, did there

16   come a point when you returned to Somalia?

17   A.  Can you say it again, please.

18   Q.  When was that that you returned to live in Somalia?

19   A.  2007.

20   Q.  And do you remember the date on that?

21   A.  I believe it was October 2007.

22   Q.  And why did you return to Somalia?

23   A.  First of all, my children were grown up, the last one

24   is -- was finishing high school; the others, they went

25   through college and university.  And I sit with my husband

1  and we said we don't have anything about -- talking about

2  Galgaduud region, no one is going on, United Nations is not

3  there, no one is not supporting that people, and I am -- I

4  can help or you can help, one of us has to go back.  And he

5  said I'm not, I'm not so couraged to go to the bullets, if

6  you want, you can go and I will support you and I will keep

7  the kids, and I decided to go back to help.

8  Q.  So that was in, again, October of 2007 you decided to

9  move back to Galgaduud?

10 A.  Yes.

11 Q.  And is it fair to say that you wanted to return to that

12 region because you felt that there was no support for that

13 area?

14 A.  Yes, I felt that they were neglected, and I wanted to

15 open the eyes of international community for that region.

16 Q.  And just -- when you were living in the United States,

17 how would you get your news about Somalia?

18 A.  Through the media, all the local, and websites of --

19 Somali websites, the BBC, and Reuters and all the -- all the

20 kind of media, every day, every day, every morning before I

21 go to work because of the accounts, because of the invasion,

22 I was reading the news.

23 Q.  And so are you saying that you would not hear -- did you

24 hear anything specific about Galgaduud or was it that you

25 didn't hear any information?

1    A.   I didn't hear --

2              MR. COLE:   Objection, your Honor; relevance.

3              THE COURT:   The objection is overruled.   The

4    witness may briefly relate to whatever she might have heard

5    in these reports to cause her to return to the Galgaduud

6    region.   You may answer that, ma'am.

7              THE WITNESS:   Yeah, I returned because there was no

8    news, and I was talking even people who live -- who live

9    there that they were getting drought, they was hungry, there

10   was no education, and no one was going there.

11             BY MS. FONTIER:   Q.   So when you went to the

12   Galgaduud region in October of 2007, who was in control of

13   that area at the time?

14   A.   When I went there, in the control was an administration

15   elected and chosen by the clan, the clans who lives there.

16   Q.   So when you first arrived, did you meet with anyone from

17   the local administration?

18   A.   You cannot start working or do something without meeting

19   with them, without getting their permission, and I met with

20   the local staff, local administration, and I meet also the

21   elders.   We have an ugas, an elder, and you have to meet with

22   them and explain what you are doing.

23   Q.   Can you us just explain what the term "ugas" means.

24   A.   Ugas is someone symbolic.   It's like a king of the clan.

25   Q.   But it's just a tribal position of leadership; is that

1    correct?

2    A.  Yes, a very respected tribal leadership, and it doesn't

3    came for election, it comes from heredity; his father was the

4    king, the son will be that.

5    Q.  And so when you arrived, you met with the elders of the

6    administration; is that correct?

7    A.  Yes.  First I started with the elders, and then I met

8    with the administration.

9    Q.  One moment, please.  Ms. Ibrahim, I'm going to hand you

10   what is in evidence as Defense Exhibit D.  If you could just

11   take a moment to review that document.  Have you reviewed the

12   document?

13   A.  Yes, I know the document.  I have seen.

14   Q.  You know -- you've seen this actual document before?

15   A.  Yeah, yeah.

16   Q.  And then can you just state very briefly what it is.

17   A.  When I went there, there was a administration committee,

18   and then they wanted to form -- because this committee was

19   only in Dhusa Mareeb and Guraceel, but Galgaduud region is

20   seven districts, so they decided to all come together, the

21   seven districts, so every district has to come with their

22   administration.  So the Dhusa Mareeb and Guraceel people,

23   they came again together to -- to have a clear document of

24   the nomination of the administration, so they nominate the

25   chair of the administration, and the chair has to come up

1    with the other committee of the administration.  And the

2    third -- this third person are the elders of the subclans,

3    and the first one is Guled Hassan, which is the ugas of the

4    clan.

5    Q.  So this -- what's in evidence as defense Exhibit D is a

6    document, a statement that was created by the elders of the

7    Ayr clan in the local administration.  And are these the

8    people that you're saying that you met with when you first

9    went there?

10   A.  Yes, yes.

11   Q.  And you recognize some of the names at least that are

12   listed on pages 2 and 3 of this document?

13   A.  Yes, I know all of them, all of the teddies (phonetic).

14   Q.  Okay.  Thank you.  Now, after you met with the elders,

15   did you have to meet with any other members of the local

16   administration before you could begin working?

17   A.  Yes.

18   Q.  And who did you meet with?

19   A.  I met with Hussein, which is the governor, like the

20   governor, I met Farah Shido, I met Abukar, I met Ahmed Nurre,

21   who has been killed, three months go by.

22   Q.  Sorry to hear that.  But the first two names that you

23   mentioned, you said Farah?

24   A.  Yes.

25   Q.  What was his last name?

1    A.  We call him Farah Yare, so I don't know the last.

2    Q.  That's fine.  That's the name he commonly goes by is

3    Farah Yare?

4    A.  Yeah, Farah Yare.

5    Q.  And when you met with him, was that -- in what capacity

6    was he working when you met with him?

7    A.  He was very involved with the administration, and he was

8    also the former committee of -- against the drought and he

9    was the chair of that committee.

10   Q.  And the second name I think you mentioned was Abukar.  Do

11   you know his last name or does he have a nickname?

12   A.  He has a nickname, and he's Abukar Suryare.

13   Q.  And what was his role in the local administration?  Why

14   did you meet with him?

15   A.  He is the chair of the committee of economy and -- and --

16   what do you call -- cultural something like that.

17          THE COURT:  May I ask the witness to repeat the

18   name?  Someone was coughing in the courtroom, and I didn't

19   get the full name, Abukar --

20          THE WITNESS:  Abukar is his name, and he has a

21   famous --

22          THE COURT:  What's the --

23          THE WITNESS:  Suryare, Abukar Suryare.

24          THE COURT:  How do you spell that, please, the last

25   name.

1          THE WITNESS:  It's not a last name, it's a

2   nickname.

3          THE COURT:  Okay.  That's what I didn't get.  How

4   would you spell the nickname, please.

5          BY MS. FONTIER:  Q.  S-u-r-y-a-r-e.  Is that

6   correct?

7   A.  Yes.

8          THE COURT:  Thank you.

9          BY MS. FONTIER:  Q.  And do you know Abukar

10  Suryare's actual last name or do you know just him as Abukar

11  Suryare?

12  A.  Abukar Suryare.  The problem of Somalis is they give

13  everyone a nickname, and nickname covers the names; so you

14  don't recall the other names, you just recall the nickname.

15  Even myself, if you go to Somalia and if you say Halima

16  Ismail Ibrahim, no one will recognize me, but if you say

17  Halima Yare, everybody will recognize me.

18  Q.  So your nickname is Halima Yare?

19  A.  Yes.

20  Q.  And is that the same -- similar nickname as Farah Yare?

21  A.  Yes.

22  Q.  And does Yare -- does that mean anything?

23  A.  Yare is little.  I was in the school and I was the

24  youngest of the class, so they called me Halima Yare, Halima

25  the Little.

1   Q.  And that name just sticks with you for the rest of your

2   life?

3   A.  Yes.  Although now I'm about 50 years old, they still

4   call me Halima Yare.

5   Q.  Okay.  Now, when you -- so through your work in the

6   Galgaduud region, did you work with Farah Yare and Abukar

7   Suryare?

8   A.  Yes, very close, because they were the local

9   administration, and in the other hand, we had a big problem,

10  we had a drought; for three years did not rain, and in that

11  area the economy is based on livestock, and the livestock,

12  they need to grass, and it doesn't rain.  So when you don't

13  have livestock, there is starvation, especially the kids and

14  woman, and it was three years consecutive that we had a

15  drought.  So I was close and were doing fundraising, and we

16  were calling the diaspora all the night all together to send

17  us money.

18  Q.  So now, you said you were fundraising and calling the

19  diaspora.  Is that -- are those separate things or were you

20  calling the diaspora for the purpose of fundraising?

21  A.  I was calling for the purpose of fundraising because we

22  needed water.  There was no water in that area, and to do

23  water tracking is very expensive because people, they don't

24  leave one place, they scatter it because they are nomadic

25  people.  You have to go where they are and provide water.

1    Q.  And was Basaaly Moalin one of the people that was

2    contacted?

3    A.  Yeah, he was -- he was, yeah.

4    Q.  And to your knowledge did Mr. Moalin provide financial

5    support to you and the local administration?

6              MR. COLE:  Objection, foundation.

7              THE COURT:  The objection is sustained.

8              BY MS. FONTIER:  Q.  You testified that you were --

9    contacted the diaspora and Mr. Moalin in particular; is that

10   correct?

11   A.  Yes.

12   Q.  And do you know if he provided support to the

13   administration?

14   A.  Yes.  All the people that we were talking, they were

15   telling us we will send money or we will not send money.  He

16   was the one who was coming and saying we will support the

17   community, and he was the one who was encouraging the

18   diaspora.

19   Q.  Now, from your own observations, when funds were received

20   from -- sorry.  If you can just back up and clarify which

21   period of time we're talking about here when you were working

22   with the local administration.

23   A.  I'm talking 2007 up to 2009.

24   Q.  So focusing on -- so you arrived in October of 2007, so

25   focusing on the end of 2007 through 2008 then, does that time

1   frame include when you and the local administration, Farah

2   Yare, Abukar Suryare, were contacting diaspora, including

3   Basaaly Moalin?

4   A.   Yes.

5   Q.   And from your own observations, when you would receive

6   funds from Mr. Moalin, and the diaspora in general, what was

7   done with that money?

8   A.   The money was going to the committee, and the committee

9   were distributing the different villages for water and food

10   and medicine.  My part especial was the medicine because I --

11   I get support from WHO giving us medicine, and we were doing

12   a mobile clinic, mobile clinic, we're going up there.  Where

13   they give the water and food, we were giving the medicine.

14   So I was involved with, I was part of the committee.

15   Q.   And you -- again, Farah Yare, was also part of those

16   committees; is that correct?

17   A.   He was the chairperson of the committee.

18   Q.   Like to show you a photograph, and I'm going to show you

19   a photograph that was previously marked as Defense Exhibit I.

20            THE COURT:  Is that in evidence, Ms. Fontier?

21            MS. FONTIER:  No, your Honor.

22            BY MS. FONTIER:  Q.  Do you recognize who's

23   pictured in that photograph?

24   A.   Yes.

25   Q.   And who is it?

1    A.   Farah, Farah Yare.

2         (Exhibit No. I identified.)

3    Q.   And in the time frame that we're talking about, 2007 and

4    2008, is that an accurate depiction of what Farah Yare looked

5    like at that time?

6    A.   Yes.

7    Q.   And how do you recognize him?

8    A.   Because I worked with him closely.  We were -- we were in

9    a meeting together, we were planning together.  Yes, I know

10   him very well.

11             MS. FONTIER:  And, your Honor, I would ask that

12   Defense Exhibit I be moved into evidence at this time.

13             MR. COLE:  Objection, your Honor; irrelevant, 403.

14   Your Honor previously excluded this exhibit.

15             MS. FONTIER:  I believe the prior exclusion was

16   foundational.

17             THE COURT:  Would you retrieve that photograph.

18             MS. FONTIER:  Yes, your Honor.

19             THE COURT:  Thank you.  The objection is overruled.

20   Exhibit I is admitted.

21         (Exhibit No. I admitted.)

22             MS. FONTIER:  May I publish to the jury then?

23             THE COURT:  Yes.

24             BY MS. FONTIER:  Q.  So I know you said the

25   nickname means young, but I assume the man is Farah Yare; is

1  that correct?

2  A.  Yes.

3  Q.  And, again, he was -- you worked with him in his capacity

4  as the --

5             THE COURT:  It's been answered.

6             MS. FONTIER:  Yes, your Honor.

7             BY MS. FONTIER:  Q.  Sorry.  One moment.  Now,

8  after you met with the local administration, were you allowed

9  to set up -- were you allowed to start working -- was your

10 organization IIDA allowed to start operating in the Galgaduud

11 region?

12 A.  Yes.

13 Q.  And what specifically did you do in 2007 and 2008 with

14 IIDA?

15 A.  When I was there, I have seen that there was no hospital,

16 there was no drinking water, health drinking water, and there

17 was no -- the education was very weak.  And before me -- I'm

18 not sure, but it was like six months before me, there was

19 another organization, another people who went there, an

20 organization called ILEYS, and they were involved with only

21 the education.  They went every village, every district.  I

22 met with them, and that's why I met with them again, Abukar

23 Suryare and --

24 Q.  Let me just slow you down for a second.  So you said you

25 met with ILEYS; is that correct?

1   A.  ILEYS.

2   Q.  And Abukar Suryare, who you previously had mentioned, you

3   met with him regarding ILEYS as well?

4   A.  Yes.

5   Q.  Okay.  And, again, what did you know ILEYS to be?

6   A.  As I say, they were there before me, around six months I

7   think, and they were concentrating education, to support the

8   education because there was no schools.  And there was a

9   culture in the region to not send the kids to school until

10  they finish the Koranic.  But by the time they finish

11  Koranic, they are 14 years old or 15 years old or 13, and

12  it's late, too late to go to school.  The girls of the 15,

13  they may go to get married; boys they will join the

14  activities, the illegal activities which is exist in like

15  pirates or like other things like killing.  That was a

16  culture.

17  Q.  So did you then work as part -- with your organization,

18  IIDA, in cooperation with ILEYS?

19  A.  Yes, we -- I sit with them and we plan it, and I take the

20  responsibility to fundraise and support and through UNICEF we

21  got support; 84 teachers were supported with -- were given

22  incentives, and we builded schools in several area.

23  Q.  IIDA through support from UNICEF actually built physical

24  schools.  And was that in the Galgaduud region?

25  A.  Yes, in Galgaduud region.

1    Q.  And did you reach out to the diaspora for support as

2    well?

3    A.  Yes.

4    Q.  And did you contact Basaaly Moalin?

5    A.  Yes.  When I heard that he supporting orphanage for the

6    boys, I call him and I asked to support girl orphanage,

7    orphanage for the girls, and he agreed.  And he told me when

8    you came to Minnesota, please come to us and we'll have a

9    meeting and then we will do a fundraising for that school.

10   Q.  So when you contacted Mr. Moalin seeking support for

11   IIDA, the girls schools that you were creating, he agreed to

12   support you?

13   A.  Yes.

14   Q.  And did he ever -- did he give you any other type of

15   support in 2007 and 2008?  Did you -- sorry.  Other than

16   money did you use any of his property or anything else?

17   A.  Yes.  He has a house in Guraceel.  At that time -- it was

18   2008 -- and the house was empty because his family went to --

19   somewhere, I don't know.  And I talk to a guy who is -- who

20   was responsible for his property, and he said we have to talk

21   to Basal.  We call him and we asked it if he can leave us for

22   five -- four days because I had a delegation and an American

23   organization called Mercy Corps were coming to our area, and

24   there was no good hotels and he really volunteered and he

25   gave us and we use his property for four nights.

1    Q.  If you can see the screen, what is on the screen as

2    Defense Exhibit A, is that the house that you're describing?

3    A.  Yeah.

4    Q.  And that -- again, you said you used the house or you

5    sought permission to use the house to allow the United States

6    organization Mercy Corps to stay there; is that correct?

7    A.  Yes.

8    Q.  And Basaaly gave you permission for that?

9    A.  It is a nonprofit organization, and I ask it, and he gave

10   us the permission to use the premises.

11   Q.  And again that was in 2008; is that correct?

12   A.  2008, yes.

13   Q.  Now, during 2008 while you were living in the Galgaduud

14   region, was there any further -- sorry.  Did the Ethiopians

15   invade that region again?

16   A.  Yes.

17   Q.  And were you present when that occurred?

18   A.  Yes, I was present.

19   Q.  And if you can just -- what happened when the Ethiopians

20   came in?

21   A.  All the community organized themselves, the nomadic

22   people, anyone has weapon because everybody -- every Somali

23   person has a weapon, a gun.  Everyone took their gun and they

24   fought against the Ethiopians coming to their place.

25   Q.  And from what you saw when the Ethiopians first -- or

1  when they came back into Galgaduud, were they firing upon

2  civilians or was it a targeted battle?

3  A.  No, they don't -- they don't care.  They fire, they threw

4  the fire everywhere.  Innocent people were dying, woman and

5  children, elderly people.  And when they came, all the people

6  evacuate, and they went from the bush.  Then they organized

7  themselves and the man -- they took their guns and they

8  fought against it.

9  Q.  Where did -- where did you go when this occurred?

10  A.  We go the village outside, under the trees.  We went out

11  of the city.

12  Q.  And how long did you have to stay out of the Galgaduud

13  region while this fighting was occurring in 2008?

14  A.  I remember that when they came into Dhusa Mareeb and

15  Guraceel, at that time I was in Dhusa -- first they started

16  in Guraceel and then they came to Dhusa Mareeb.  I was in the

17  bush three days until they have been kicked out.

18  Q.  And do you know who actually fought against the

19  Ethiopians?  Was -- any of the leaders.  I'm sorry.

20  A.  Anybody, everybody, but the lead was the administration

21  and the elders.

22  Q.  And that's the administration and the elders that you

23  described before?

24  A.  Yes.

25  Q.  And Farah Yare was part of that administration, correct?

1  A.  He was -- he was very active.  He was part of the

2  administration.

3  Q.  And this fighting that occurred in 2008 from what you

4  observed, was it in defense against an invasion?

5            MR. COLE:  Objection; calls for conclusion, your

6  Honor.

7            THE COURT:  The objection is sustained.

8            BY MS. FONTIER:  Q.  How long were the Ethiopians

9  in Galgaduud region at that time during that invasion?

10  A.  I think was 15 days.  They went back soon because people

11  fought against them.

12  Q.  And then after the Ethiopians were pushed back out, was

13  it the same local administration that was controlling the

14  area again?

15  A.  Yes.

16  Q.  Now, were you -- are you familiar with al-Shabaab?

17  A.  Yes.

18  Q.  And if you can just from your interactions with them,

19  your observations, what is their general ideology?

20  A.  Their general ideology is to -- how do I say -- to

21  make -- to fight against the -- anyone who doesn't obey them,

22  to kill them, to terrorize anyone who is not obeying them,

23  anyone who is following their ideology.

24  Q.  All right.  And now as -- sorry.  The goal of IIDA is to

25  promote the empowerment and political involvement of women;

1    is that correct?

2    A.  Yes.

3    Q.  And is that something that al-Shabaab supports?

4    A.  One of the biggest pillars of al-Shabaab, ideology of

5    al-Shabaab is to not support woman, to not educate woman, to

6    not give opportunity woman.

7    Q.  And -- sorry.  And as far as the education of girls, is

8    that something that al-Shabaab would support or oppose?

9              MR. COLE:  Objection, your Honor; time frame and

10   relevance.

11             THE COURT:  The objection is overruled.  You may

12   answer that, ma'am.

13             THE WITNESS:  Can you say it again, the question,

14   please.

15             BY MS. FONTIER:  Q.  The education of girls, is

16   that something that al-Shabaab supported or opposed?

17   A.  They are not supporting, and they are not supporting any

18   education that they are not leading them.

19             THE COURT:  I think you better limit it as to time.

20   I thought you'd do that.  At least limit it to the time

21   frame.

22             BY MS. FONTIER:  Q.  In 2007 and 2008, was

23   al-Shabaab -- sorry.  Let me back up.  In 2007 and 2008, was

24   al-Shabaab in the Galgaduud region?

25   A.  They were, but they were not powerful.

1    Q.  And from your work with the local administration, do you

2    know if al-Shabaab was in support of or opposed to the local

3    administration?

4              MR. COLE:  Objection.

5              THE WITNESS:  They were again --

6              THE COURT:  Hold on.  Hold on for just a moment.  I

7    need to get the objection resolved.  I'm sorry, Mr. Cole?

8              MR. COLE:  Objection; foundation, hearsay.

9              THE COURT:  The objection is sustained on the basis

10   of foundation.  If you can establish the foundation better.

11             MS. FONTIER:  Yes, your Honor.

12             BY MS. FONTIER:  Q.  So, again, in 2007 and 2008,

13   you were in the Galgaduud region and working with the local

14   administration; is that correct?

15   A.  Yes.

16   Q.  And you also said that al-Shabaab was in that area,

17   correct?

18   A.  Yes.

19   Q.  And did the al-Shabaab, were they part of the local

20   administration?

21   A.  No.

22   Q.  And did you and the local administration have to interact

23   in any way with al-Shabaab?

24   A.  No.  They don't want us.

25   Q.  So is it fair to say then that al-Shabaab was opposed to

1    the local administration?

2    A.   Yes.

3    Q.   So, now, IIDA, the -- again, your organization, which you

4    built schools for girls in the Galgaduud region in 2007 and

5    2008, correct?

6    A.   Yes.

7    Q.   And was al-Shabaab opposed to those schools?

8    A.   IIDA -- as an idea, yes, but they didn't have the power

9    to stop that.  But they put me the list of the people that

10   they are killing because I did these schools.

11   Q.   Now, during that same time period, 2007 to 2008, you were

12   in contact with Basaaly Moalin again, you said, correct?

13   A.   Yes.

14   Q.   And Basaaly Moalin was supporting you and your

15   organization, correct?

16   A.   Yes.

17   Q.   Now, were you present in the Galgaduud region on May 1st

18   of 2008?

19   A.   Yes.

20   Q.   And from your -- were you then present when Aden Ayrow

21   was killed?

22   A.   Yes, I was in Dhusa Mareeb that night, that morning.

23   Q.   And did that occur in Dhusa Mareeb?

24   A.   Yes.

25   Q.   And from what you observed -- did you stay in the area --

1    sorry -- after he was killed?

2    A.   Yes.

3    Q.   And from your own observations, what was -- was there any

4    reaction by al-Shabaab to that killing?

5    A.   The -- for me when the bomb destroyed the house, after

6    two minutes, someone from al-Shabaab that I knew called me

7    and he said you have to run away now, you are from America

8    and you came here for that purpose, to kill Ayrow, so please

9    run away now, otherwise you will be killed as soon as

10   possible.  And I said no, I'm not running, and I haven't done

11   anything, and I will stay.  They did not have a big power,

12   but yes, they did reactions, they killed people, but luckily

13   what people say is they found their sources, their sources.

14   Q.   And did -- was the local administration affected by that?

15   A.   Yes.

16   Q.   And did people from the local administration have to

17   leave Galgaduud?

18   A.   At that time?

19   Q.   Yes.

20   A.   No.

21   Q.   Okay.  And following that event though, within the next

22   few months, did everyone in the local administration stay

23   there or did people leave that area?

24   A.   Al-Shabaab became more powerful, and they attacked the

25   administration, and the administration has to leave.  Some of

1    them has been killed, some of them they escape, they left.

2    Even myself, I left.

3    Q.  Do you know if Abukar Suryare left the area?

4    A.  He left.  We went together to the bushes, and then we

5    went to up north.

6    Q.  So you were with him when he left?

7    A.  Yeah, we were a lot of people.

8    Q.  Was Farah Yare with you at that time?

9    A.  Farah Yare, Hussein, most of them, those who survived,

10   yes.

11   Q.  And now did you eventually return to the Galgaduud

12   region?

13   A.  Yes, I returned.

14   Q.  When was that?

15   A.  When in the area we had another group of -- religious

16   group who call Sunna Wal Jamaa, they organized themselves

17   because the fighting started with a school, Koranic school.

18   Al-Shabaab went to took over all the schools, and Sunna Wal

19   Jamaa, and they said no, you are not taking our schools, so

20   the fighting started and they organized themselves, and then

21   the whole community came together and they kick out

22   al-Shabaab, and that's the time I went back.  And the power

23   took the Sunna Wal Jamaa another new administration.

24   Q.  So are you familiar with the people that are leading the

25   al-Suuna Wal Jamaa administration that's in Galgaduud that

1  came in to power in the end of 2008?

2  A.  Yes.

3  Q.  Okay.  And who are some of the leaders of al-Suuna in

4  that area?

5          MR. COLE:  Objection, relevance.

6          THE COURT:  Overruled.  You're talking about '08

7  now --

8          MS. FONTIER:  Yes.

9          THE COURT:  -- right after the -- yeah.  The

10  objection is overruled.

11          THE WITNESS:  Heifo, Sheik Heifo is the leader in

12  al-Suuna Wal Jamaa in the region, and it's not only Guraceel

13  and Dhusa Mareeb, it is the whole region, all the clans in

14  the region, several districts.

15  Q.  Are you familiar with someone named Sheik Abdulrahman

16  Geedow Qorow?

17  A.  Yes, he is the mayor of Dhusa Mareeb; he is one of them.

18  Q.  When you say one of them, who do you mean?

19  A.  One of Sunna Wal Jamaa.  He's one of the leaders of Sunna

20  Wal Jamaa.

21  Q.  And is he someone that fought against al-Shabaab?

22  A.  He is against al-Shabaab.  He was part of the committee

23  of the drought; he was the vice chairman of Farah, of the

24  draft of the committee, and he is -- yeah, he's number one

25  fighting against al-Shabaab.

1   Q.  And are you familiar with someone named Osman Issa Nuur?

2   A.  Yeah, we call him Tar.  He's the mayor of Guraceel, and

3   he's one of Sunna Wal Jamaa.

4   Q.  And did Osman Issa Nuur also fight against al-Shabaab?

5   A.  Yes, he fought -- he fights and three times they attack

6   him by bomb his house, his cars, he was victim for three

7   times but luckily he survived.

8   Q.  Now, after -- when you returned to Guraceel, did Abukar

9   Suryare come back with you?

10  A.  No.

11  Q.  Were the -- when you returned -- again this is in -- near

12  the end of 2008 -- were the ILEYS schools still functioning?

13  A.  Yes, they are still functioning and still we are

14  supporting them.

15  Q.  And after you returned to Galgaduud, did you have any

16  contact with Mr. Moalin regarding the ILEYS schools?

17          MR. COLE:  Objection, relevance.

18          THE COURT:  The objection is overruled.

19          THE WITNESS:  Yes --

20          THE COURT:  Be specific as to time, please.

21          BY MS. FONTIER:  Q.In end of 2008.

22  A.  Yes, he called me and he asked me if I can took over the

23  orphanage school for the boys, and I told him I will assist,

24  I will see how things are going, I will support; but since

25  ILEYS is running and since other people are running, I don't

1    want to take it over because I don't want to create conflict

2    between -- between us.

3    Q.  But in the end of 2008, Basaaly Moalin contacted you to

4    continue supporting the orphanages of ILEYS; is that correct?

5    A.  Yes.

6    Q.  And -- one moment, please.  So from over -- sorry.  You

7    testified that over time your work is with -- through IIDA in

8    the Galgaduud region was opposed by al-Shabaab, correct?

9    A.  Yes.

10   Q.  But during that same period, 2007 through 2008, you

11   consistently had the support of Basaaly Moalin; is that

12   correct?

13   A.  Yes.

14          MS. FONTIER:  I have nothing further, your Honor.

15          THE COURT:  Cross-examination?

16          MR. COLE:  Thank you, your Honor.

17                    Cross-Examination

18          BY MR. COLE:  Q.  Good morning.

19   A.  Good morning, sir.

20   Q.  Do you know the other defendants in this case?  Do you

21   know Mr. Mohamad Mohamad Mohamud?  Do you know him?

22   A.  No.

23   Q.  Do you know Mr. Issa Doreh?

24   A.  Yes, I have seen that guy.

25   Q.  Do you know -- what do you know about him?

1    A.  We don't -- we never had any --

2              MR. GHAPPOUR:  Objection, your Honor; foundation.

3              THE COURT:  Well --

4              THE WITNESS:  I recognize --

5              THE COURT:  Hold on.  Once again, please, if

6    there's an objection, just hold on your answer so I can rule

7    on that.  The objection to the last question is sustained.

8              BY MR. COLE:  Q.  Well, you said you've seen that

9    man before.

10   A.  I recognize the face, yes.

11   Q.  Have you ever -- but you don't recall any conversations

12   with him?

13   A.  No.

14   Q.  How about Mr. Ahmed Nasir Taalil Mohamud; do you know

15   him?

16   A.  No.

17   Q.  So I take it it's safe to say that you don't know

18   anything about what phone conversations Mr. Moalin has had

19   with Mr. Mohamud, right?

20   A.  No.

21   Q.  And you don't know about any phone conversations that

22   Mr. Moalin has had with Mr. Issa Doreh, right?

23   A.  How do I know?  No.

24   Q.  Right.  And the same thing, you don't know about any

25   phone conversations that Mr. Moalin has had with Mr. Ahmed

1  Nasir Taalil Mohamud, right?

2  A.  No.

3  Q.  And you also don't know about any phone conversations

4  that Mr. Moalin has had with Aden Ayrow, do you?

5  A.  No, I don't have.

6  Q.  And you said that you spoke with Basaaly Moalin -- how

7  many times in 2007 did you personally speak with Basaaly

8  Moalin?

9  A.  I can't count, five, ten, I don't know, but I talk

10  several times with him.

11  Q.  And those conversations were always about the topic of

12  orphanages, right?

13  A.  Fundraising, yes.

14  Q.  And Mr. Moalin was a good fundraiser, wasn't he?

15  A.  He was supporting that school, yes, that orphanage.

16  Q.  And he was effective.  When it came to raising money for

17  something he was interested in, he was effective, wasn't he?

18          MS. FONTIER:  Objection.

19          THE WITNESS:  I am effective also when --

20          THE COURT:  Hold on.  There's an objection.

21  Please, ground.

22          MS. FONTIER:  Something he's interested in,

23  vague --

24          THE COURT:  The objection is --

25          MS. FONTIER:  -- speculative.

1          THE COURT:  The objection is overruled.  You may

2     answer that if you are able to.

3          THE WITNESS:  Your Honor, excuse me if I talk

4     because I came from Somalia, and we are not accustomed to

5     this --

6          THE COURT:  I know.  It's --

7          THE WITNESS:  -- in the courts.

8          THE COURT:  I certainly understand.

9          THE WITNESS:  Excuse me?

10         THE COURT:  Yes.

11         THE WITNESS:  And when you are -- when you are

12    supporting your people, when you see people who are dying,

13    who doesn't have food, I remember when I went back to

14    Galgaduud, when I see --

15         MR. COLE:  I'm sorry to interrupt, ma'am, but my

16    question was just this.

17         MS. FONTIER:  Objection, your Honor.

18         THE WITNESS:  Let me finish --

19         THE COURT:  Hold on.  Hold on.  The answer is

20    nonresponsive.  So, Ms. Ibrahim, let me remind you just to

21    listen to the question carefully and answer the question.

22    This is cross-examination and counsel is entitled to have

23    responsive answers.  Would you repeat your question, Mr.

24    Cole.

25         BY MR. COLE:  Q.  Yes.  When you were reaching out

1    to Basaaly Moalin for fundraising for the orphans, he

2    delivered; that's -- he delivered funds, right?

3    A.  Yes, he supported this school, yes.

4    Q.  And you testified earlier that he reached out to others

5    and collected funds from other people and sent them on; is

6    that right?

7    A.  I didn't say that.

8    Q.  Oh, I'm sorry.  I might have misunderstood.  All the

9    money came from his pocket personally?

10              MS. FONTIER:  Objection, speculation.

11              THE COURT:  Overruled.  You may answer.

12              THE WITNESS:  We were -- can I answer or --

13              THE COURT:  Yes, you may.

14              THE WITNESS:  -- just say yes or no?

15              THE COURT:  Yes, you may.

16              THE WITNESS:  When we -- it was us who was calling

17    the diaspora and asking them to support us, to deliver our

18    message because our people, our kids are dying and we need

19    your support.  And he was not the only one.  Most of them,

20    they were responding.

21              BY MR. COLE:  Q.  Yes.  And you testified that

22    Mr. Moalin not only responded but he helped organize the

23    response; isn't that right?

24    A.  I don't know what he did when he was here, but he was not

25    the only one who was responding.  Everywhere in America, in

1   Europe our people were responding, and they were supporting

2   us.

3   Q.  And when you testified -- you testified earlier that

4   Mr. Moalin let you use his home in Guraceel for about four or

5   five days in 2008; do you recall that?

6   A.  Yes.

7   Q.  When was that in 2008?

8   A.  I don't exactly -- I can't say because I was not writing.

9   I didn't know that it will help me and someone will ask me

10  the dates of.

11  Q.  I'm just asking for your best recollection; was it --

12  A.  It was -- I think it was mid 2008.  I don't recall.

13  Q.  Mid 2008?

14  A.  Maybe, but it was 2008.  If I go back to my document, I

15  can find out when it was.

16  Q.  Well, do you recall -- you recall the picture you were

17  shown of Mr. Moalin's home?

18  A.  Yes.

19  Q.  That house was not even built until 2008, right?

20  A.  I don't know when it was built, but I stayed at his

21  house.

22  Q.  Were you aware that that was bought as a dirt lot --

23              MS. FONTIER:  Objection.

24              THE WITNESS:  What?

25              BY MR. COLE:  Q.Were you aware that was purchased

1    as a dirt lot in March of 2008?

2              THE COURT:  Is there an objection to that?

3              MS. FONTIER:  Yes, speculation --

4              THE COURT:  No.

5              MS. FONTIER:  -- relevance, foundation.

6              THE COURT:  Overruled on each ground.  Did you

7    understand the question?  Do you have any knowledge that the

8    property was purchased as a dirt lot?  If you have no

9    knowledge of that --

10             THE WITNESS:  What is dirt lot?

11             BY MR. COLE:  Q.Vacant lot.  A new house was needed

12   to be built on that property; were you aware of that?

13   A.  I don't know.

14   Q.  And you said that in 2007-2008 that for most of that time

15   period, al-Shabaab was not, in your words, very powerful in

16   the Galgaduud region, right?

17   A.  When they had that -- people in that area, they formed

18   their own administration, they came because they are against

19   a system.

20   Q.  I understand.

21   A.  So they went to destroy them.  But they were there.

22   Ayrow, who was the leader, was there; they were there.

23   Q.  And that's right.  Ayrow himself came to the Galgaduud

24   region to get involved in whether or not the local

25   administration would be established, right?

1    A.  No, Ayrow came --

2             MS. FONTIER:  Objection.

3             THE WITNESS:  -- to destroy that administration.

4    He was against the administration.

5             BY MR. COLE:  Q.He was against the administration,

6    right?

7    A.  Yes.

8    Q.  And people like Basaaly Moalin -- well, let me ask you

9    this question.  Many people wanted al-Shabaab to stay outside

10   and away from the Guraceel area so that the local

11   administration can function while al-Shabaab stayed outside;

12   is that right?

13   A.  No, no.

14            MS. FONTIER:  Objection, speculation.

15            THE WITNESS:  It's not right.

16            THE COURT:  The objection is overruled.

17            THE WITNESS:  It's not right, that question.

18   Al-Shabaab came to destroy the administration.  They didn't

19   want.  Their target was to kill the chairperson of the

20   administration, to kill Abukar, to kill Farah.  They didn't

21   want us.

22            BY MR. COLE:  Q.  And when was that?

23   A.  2007.  End of 2007 they came.

24   Q.  Al-Shabaab came to Guraceel?

25   A.  Ayrow came to Dhusa Mareeb, Guraceel, Elbur, and --

1    and -- what do you call -- all that area, Bu'aale, they came

2    to not -- to make not function the administration.

3    Q.  But you stated that the administration continued anyways,

4    right?

5    A.  Continues, yeah, because the community were supporting

6    the administration.

7    Q.  And you said that at some point the Ethiopians came back

8    to the Galgaduud region at some point in 2008, right?

9    A.  Yes.

10   Q.  And was that -- when was that in 2008?

11   A.  I think early 2008.

12   Q.  Were you present in the Galgaduud region in the middle

13   part of 2008, like July of 2008?

14   A.  The whole 2008, yes.  I came only one time here.  Was

15   summer.  My daughter was graduating and then I stayed 15 days

16   and I went back, yes.

17   Q.  And were you present then in the middle of 2008 when the

18   Ethiopians were present, in July of 2008?

19   A.  When they came back, yes.

20   Q.  And in July of 2008 when the Ethiopians were present,

21   were you present when Farah Yare's men destroyed a local

22   bakery for providing bread to the Ethiopians?

23              MS. FONTIER:  Objection, foundation.

24              THE COURT:  The objection is overruled.  You may

25   answer that if you're able to.

1          THE WITNESS:  That is not true.

2          BY MR. COLE:  Q.  So nobody ever destroyed a local

3  bakery there for supplying bread to the Ethiopians?

4  A.  Where?  Where exactly?

5  Q.  In the Galgaduud region.

6  A.  Galgaduud where?  Galgaduud is very big.  It's the most

7  largest region in Somalia.

8  Q.  And you said that at some point at the end of 2008,

9  al-Shabaab came back to the region and drove out the

10  administration?

11  A.  They stayed in the region, they didn't came back, but

12  they became more powerful, and then they destroyed the

13  administration.

14  Q.  And you said that was the end of 2008?

15  A.  It was 2008, yes, 2008 -- no, no, 2009.

16  Q.  Okay.  So they came back in 2009 and drove out the

17  administration?

18  A.  If I correct you, they did not came back; they --

19  Q.  I'm sorry.

20  A.  -- stayed and they became powerful.

21  Q.  I'm sorry.  You're right.  So when they became more

22  powerful in 2009, they were able to drive out the local

23  administration?

24  A.  After the killing of Ayrow, they came from other regions

25  to -- to revenge, and they were saying the administration set

1   up this, the killing of Ayrow.

2   Q.  And you said that Osman Issa Nuur's home was attacked by

3   al-Shabaab several times?

4   A.  Yes.

5   Q.  And that also was in 2009?

6   A.  Yes.

7   Q.  And again, ma'am, your dealings with Mr. Moalin were

8   about orphanages and schools, right?

9   A.  And the drought.

10  Q.  And the drought.

11  A.  Yes.

12  Q.  And that was the extent of your dealings with Mr. Moalin,

13  right?

14  A.  Yes.

15  Q.  And if he had other interests or other projects he was

16  involved in, you weren't involved with those other projects,

17  right?

18  A.  If they are projects who are -- which is helping the

19  community, which is supporting the people who are dying,

20  which is giving education people who needs education, which

21  is giving medicine people who need medicine.  It is very

22  different over there.  People are dying, they are hungry,

23  they don't have food in their refrigerator in like here, but

24  over there they are eating grass.  So if he helping the

25  community, yes, I will support.

1   Q.  I'm sorry.  That wasn't my question.  Your dealings with

2   Mr. Moalin were limited to what you personally were involved

3   with, which was helping orphanages --

4   A.  Humanitarian.

5   Q.  -- drought, and humanitarian efforts; is that right?

6   A.  Yes.

7   Q.  Is that right?

8   A.  Yes.

9   Q.  You didn't deal with him with things unrelated to

10  humanitarian relief?

11  A.  I don't think -- I don't believe that he will do

12  something --

13  Q.  That's not my question.  Did you have any involvement

14  with him with projects apart from humanitarian relief?

15  A.  Our project is humanitarian.

16          MR. COLE:  Nothing further, your Honor.

17          THE COURT:  Any further questions?

18          MS. FONTIER:  No.  Thank you, your Honor.

19          THE COURT:  All right.  Thank you, Ms. Ibrahim.

20  You are excused at this time.

21          THE WITNESS:  Thank you very much.

22          THE COURT:  Okay.  You may call your next witness.

23  We'll get started with the next witness before we take our

24  midmorning break.

25          MR. DRATEL:  Okay, your Honor.  Thank you.

```
 1              THE COURT:  Actually if it's convenient, we can do
 2   that now; it's already 10:30.
 3              MR. DRATEL:  Yes.
 4              THE COURT:  Okay.  Ladies and gentlemen, let's take
 5   our midmorning recess.  Remember, we'll go till sometime
 6   between 12:20 and 12:30 before we take our noon recess.  But
 7   remember the admonition, 15 minutes, and we'll resume then.
 8         (There was a break in the proceedings.)
 9              THE COURT:  We have everyone present.  Mr. Dratel?
10              MR. DRATEL:  The defense calls Abdi Elmi.
11              THE CLERK:  Can you please raise your right hand.
12   Do you solemnly swear that the evidence you shall give in the
13   cause now before the Court shall be the truth, the whole
14   truth, and nothing but the truth?
15              THE WITNESS:  I do.
16                        Abdi Elmi
17   was called by the defense and testified as follows:
18              THE CLERK:  Can you please state and spell your
19   first and last name for the record.
20              THE WITNESS:  Abdi Elmi, A-b-d-i  E-l-m-i.
21                     Direct Examination
22              BY MR. DRATEL:  Q.  Good morning, Mr. Elmi.
23   A.  Good morning.
24   Q.  Where were you born?
25   A.  I was born in Mogadishu, Somalia.
```

1   Q.  And what level of education did you achieve in Somalia?

2   A.  In Somalia I completed my first degree, bachelor in

3   accounting.

4   Q.  And where was that?

5   A.  It was in Mogadishu, in Somalia.

6   Q.  And what was the name of the institution?

7   A.  It was Somalia Institute of Development Administration

8   and Management.

9   Q.  And was that an English-language college?

10  A.  Yes.

11  Q.  And how long did you live in Somalia, until when?

12  A.  I left from Somalia in 1991.

13  Q.  And prior to 1991 were you employed in Somalia?

14  A.  Yes.

15  Q.  And what was your employment?

16  A.  I employed in two places; I was a media writer for the

17  Somali national newspaper, which is called October Somali

18  Style, October Style I mean.  And I was also working in the

19  bank as a bank officer.

20  Q.  And is that a government-owned media organ?

21  A.  In Somalia, we had one newspaper, one TV, and centralized

22  national news agency.

23  Q.  And that was before 1991?

24  A.  That before 1991, yes.

25  Q.  And how did you -- was there a time when your -- the

1    nature of your employment as a media writer changed before

2    1991?

3    A.   Yes.

4    Q.   And when was that?

5    A.   When I started as a media writer, I started as a

6    freelance media writer in 1983, and I used to write articles

7    from -- in Somali but mainly translation from foreign media,

8    from English to Somalia.  And in 1984, it had been that the

9    government was not able to keep freelance writers because we

10   used to get pay on what we write, not a salary.  In 1994, the

11   government decided to lower the cost, so they decided to hire

12   their own writers, and I was one of those hired for the

13   newspaper.

14   Q.   And how many were there total who were hired?

15   A.   We were 12.

16   Q.   And after you left Somalia in 1991, how did you -- how

17   were you employed initially?

18   A.   After I left Somalia, I involved -- I continued involve

19   in media, and I was a media consultant for radio called the

20   Voice of Peace run by the UNICEF, United Nations Children's

21   Fund, under the United Nations.  And the main message was

22   conveying peace to the Somali community and also some kind of

23   awareness, health-related issues.

24   Q.   And after Voice of Peace, did you continue to work in the

25   area of Africa and the Middle East?

1   A.   Yes, I extensive worked in the Middle East.   I employed

2   by one special -- I was employed by WHO.

3   Q.   Which is?

4   A.   World Health Organization.

5   Q.   And who sponsors that?

6   A.   United Nations.   I work also in Yemen, I work in Saudi

7   Arabia, I work in different places in the Middle East and

8   east Africa.

9   Q.   Okay.   Was there a time when you came to the United

10  States?

11  A.   Yes, I came to United States in 2001.

12  Q.   Okay.   And how were you employed initially in the United

13  States?

14  A.   When I came to United States in 2001, as everybody who

15  experienced in that area, I started working in an assembly

16  line for few weeks, probably few months.   Then I got job at

17  Aligna Health System because of my accounting background and

18  my experience in the health systems.   I was hired as a lab --

19  special lab billing specialist; I was accounting side of the

20  lab billing the patients.

21  Q.   And did you decide to continue your education at that

22  point?

23  A.   Yes.   Immediately as I was hired, I learned during

24  orientation what's called tuition reimbursement, and within

25  two weeks of my employment, I begin a masters program in

1    health and human service.

2    Q.  And did you complete that?

3    A.  Yes, I did.

4    Q.  And when did you complete that program?

5    A.  I completed in - I graduated January 2004, but I

6    completed the program December 2003.

7    Q.  And you have a master's in what subject?

8    A.  In health and human service administration.

9    Q.  And from what institution?

10   A.  I graduated -- I got my degree from St. Mary's University

11   in Minneapolis, Minnesota.

12   Q.  And did you -- when was your -- did you get involved in

13   the business of interpreting?

14   A.  Yes.

15   Q.  What was the first experience in that regard?

16   A.  Actually when I did my graduation, when I graduated this

17   school, I started my own business as a diverse training

18   person, I started my own business, A.G. and Associates LLC,

19   and I started drafting and offering training for the state

20   and federal government employees who might be interested in

21   my training.

22   Q.  That was in English, right?

23   A.  That was in English, right.

24   Q.  For English-speaking persons?

25   A.  For English-speaking persons.  And I -- I market and

1   offer it -- actually about four training in which all of them

2   were continuing education approved by the State of Minnesota.

3   Q.  So, in other words, people would get credit for taking

4   your training courses on diversity?

5   A.  That's correct.

6   Q.  And so then did you get involved in interpreting?

7   A.  Yes.  In -- I believe it was end of 2006, state of

8   Minnesota were planning to have defendant rights statement

9   for the court system in Minnesota.  I was invited to

10  voice-over record the statement by the State of Minnesota

11  courts, and I did that statement.  And as of now, every

12  morning it plays in the court system in Minnesota.

13  Q.  And did you have any other initial interpreting

14  experience with respect to documents?

15  A.  Yes.

16  Q.  Could you explain that.

17  A.  When I was asked to record this statement, the defendant

18  rights statement, and I look at the material that I want to

19  record my voice, I rejected because the quality of the

20  translation.  At that time the State of Minnesota have

21  completed -- has completed about 50,000 words project which

22  part of it was the defendant rights statement.  And after

23  negotiation and reviewing back with the Somali native

24  speakers who work for the court system, I was allowed to do

25  my own translation.  I did my own translation and my

1   recording, then the Court realized that the whole project

2   needed to be reviewed, and I was contracted to look the whole

3   project.

4   Q.  And that's for essentially translating for Somali to --

5   A.  That's correct.

6   Q.  -- defendants who only spoke Somali?

7             THE COURT:  Hold on, sir.  Would you allow counsel

8   to finish the question before you begin your answer.  That

9   way we can have an accurate record of what's being said

10  here --

11            THE WITNESS:  Sure, your Honor.

12            THE COURT:  -- and he'll certainly permit you to

13  finish your answer before the next question comes.  Thank

14  you, sir.

15            BY MR. DRATEL:  Q.  So that was essentially

16  creating a Somali version of those statements for defendants

17  who only spoke Somali in the Minnesota courts?

18  A.  Yeah, not only the -- it was a project to complete of 27

19  forms I believe for the Court that the Somali speakers would

20  use for the court system.

21  Q.  And did you have other initial interpreting experience

22  for any other organizations?

23  A.  Yes.  In 2004 I was -- I was involved with a project for

24  the American Red Cross.  The project was about HIV prevention

25  or AIDS prevention, for awareness for the Somali-speaking

1    community.

2    Q.  And did you complete that project?

3    A.  Yes, I did.

4    Q.  And where was that project -- the materials that were

5    created by you in Somali for that project, where were they

6    distributed?

7    A.  The project was initially started and intended for the

8    Somalis in Minnesota, but later I learned that the project

9    was used internationally.

10   Q.  And that was a translating project, right?

11   A.  That's correct.

12   Q.  And so just to distinguish between translating and

13   interpreting, could you distinguish for us those two things.

14   A.  Translation is when you -- when someone translate a

15   written document into written, it has got a source language

16   and a target language.  But interpreting is mainly oral

17   interpreting.

18   Q.  So -- and okay.  So in terms of translating, did you then

19   engage with another organization for purposes of translating

20   documents?

21   A.  Yes.

22   Q.  Can you tell us what that organization was.

23   A.  In 2007 I received a call from U.S. Department of State,

24   and I was asked if I can translate manual that's intended for

25   the law enforcement in Somalia.

1   Q.   And how many words was that manual?

2   A.   That was about 180,000.

3   Q.   Okay.  And what was -- the purpose was law enforcement

4   and anything else?

5   A.   The purpose of the training was counterterrorism as an --

6   and training for the Somali officers.

7   Q.   So you translated for the U.S. Department of State a

8   180,000 word training manual for Somalis involved in

9   counterterrorism/law enforcement?

10  A.   Yes, but not only -- not only that, I have done several

11  times.  I'm now working on the fifth such translation

12  project.

13  Q.   Okay.

14  A.   And then --

15  Q.   So you updated it -- I'm sorry.  I didn't mean to

16  interrupt.  I apologize.  You've updated that project?

17  A.   No, it's a completely different training.

18  Q.   Okay.  And did you have further contact with the U.S.

19  State Department?

20  A.   Yes.  After I completed that translation material, not

21  only that, every time I translate a training material, I'm

22  also invited to come and offer the training as an interpreter

23  when the training is offered.

24  Q.   And how did you do that?

25  A.   I traveled to overseas for the assignments.

1   Q.   Where in particular?

2   A.   I traveled in 2009 in Ethiopia, Addis Ababa, and in --

3   last year, June, last year, May and June, I was in -- the

4   middle of May and June, I was in Nairobi, Kenya.

5   Q.   And was that part of the training --

6   A.   Nairobi, Kenya.

7   Q.   And what kind of training was that?  And by the way, that

8   was interpreting, right, and not translating?  That was --

9   A.   That was interpreting, yes.

10  Q.   -- oral --

11  A.   There, yes.

12  Q.   -- oral interpreting the speakers, right?

13  A.   Yes.

14  Q.   And what was subject matter for the Department of State?

15  A.   I have done so far -- I translated for the State

16  Department so far five training.  So whenever they're

17  offering one of the training, I travel with them and I do

18  offer -- I do interpret for officials.

19  Q.   Okay.  And did you have to show any proficiency with the

20  State Department in order to continue working with them as a

21  contract employee?

22  A.   The State Department, they have -- offer tests that

23  unless you pass the tests, they will not offer you -- or you

24  cannot work with them.  In this instance, the translation, I

25  was tested, and interpreting also I got tested by the State

1    Department standards.

2    Q.  So you passed the test with the State Department?

3    A.  Yes, I did.

4    Q.  Okay.  And they continued to use you as a contract

5    employee?

6    A.  Yes.

7    Q.  Had anyone else passed the exam in Somali for the State

8    Department at the time you passed it?

9    A.  For the translation, so far to my knowledge, I'm the only

10   person who's doing the translation for the State Department.

11   There is a time that we had a person whom I helped with, but

12   for interpreting I think we are as of now four, but we are

13   not same level because the interpreting has got different

14   levels.

15   Q.  Were you the first for the State Department for

16   interpreting?

17   A.  No, we were two actually, two of us.

18   Q.  Okay.  And what other conferences did you -- were there

19   other conferences that you worked for the State Department

20   overseas?  Like to talk about one, NDI?

21   A.  The NDI training, which is National Democratic Institute,

22   was offered in Washington.  It was a Somali parliamentarian

23   delegation who came here to visit United States, and I

24   accompanied them and we were traveling and meeting U.S.

25   officials.

1   Q.  And you did oral interpreting for that, right?

2   A.  Yes, I did.

3           MR. DRATEL:  Do we know what exhibit we're up to

4   for the defense?

5           THE COURT:  Are you maintaining a list there,

6   hopefully?

7           MR. DRATEL:  Trying but with everybody putting

8   stuff in, it's not easy.

9           THE CLERK:  M.

10          MR. DRATEL:  MM.

11          THE CLERK:  M.

12          BY MR. DRATEL:  Q.  Mr. Elmi, I'm going to show you

13  what's been marked as Exhibit MM, Defendant's MM, Mary Mary,

14  and ask you if you recognize that.  Do you recognize that?

15  A.  Yes.

16  Q.  Is it a photograph?  Is it a photograph?

17  A.  Yes.

18     (Exhibit No. MM identified.)

19  Q.  And are you in the photograph?

20  A.  Yes.

21  Q.  And what is it a photograph of?

22  A.  This is a dinner attended by former U.S. Embassy in

23  Ethiopia, David Shinn, and I was interpreting for the Somali

24  parliamentarian delegation who attended the dinner.

25  Q.  Okay.  Where was that dinner held?

1    A.   In Washington, DC.

2         MR. DRATEL:  And I would move it in evidence, your

3    Honor.

4         THE COURT:  Exhibit --

5         MR. WARD:  No objection, your Honor.

6         THE COURT:  Exhibit MM is admitted.

7      (Exhibit No. MM admitted.)

8         MR. DRATEL:  I'm going to, if I could, put it on

9    the Elmo.

10        BY MR. DRATEL:  Q.  Okay.  Mr. Elmi, are you the

11   person on the far left?

12   A.   That's right.

13   Q.   And the person on the far right, can you identify him?

14   A.   That's Shinn, Mr. Shinn.

15   Q.   And who was Mr. Shinn at the time?

16   A.   Mr. Shinn, at that time he was in Washington, I don't

17   know his title, but he met with the Somali parliamentarian

18   delegation.

19   Q.   Had he been previously at a position with the U.S. State

20   Department?

21   A.   Yeah, I think he was U.S. Ambassador in Ethiopia.

22   Q.   And this is the conference with the parliamentarians from

23   Somalia?

24   A.   Yes, this was the dinner that --

25   Q.   This is the dinner.  And do you see the wires coming out

1    there, see --

2    A.  Yes.

3    Q.  -- the person next to you?  Are they wearing a headset?

4    A.  They are wearing a headset, yeah, listening what I'm

5    interpreting.

6    Q.  So as people are -- you're simultaneously interpreting

7    for all the guests who speak Somali?

8    A.  That's correct.

9    Q.  Thank you.  Now, have you done other oral interpreting

10   work for the State Department?

11   A.  Yes.

12   Q.  And can you give us an example, a recent example.

13   A.  During the election, Somali election in 19 -- in

14   September last year, 2012, I was continuously interpreting

15   over the phone; U.S. officials wants to speak to the Somali

16   leaders or Somali leaders to speak to U.S. officials.

17   Q.  And any official, any U.S. official in particular, any

18   conversation in particular?

19   A.  Yeah, I did interpret for U.S. Undersecretary speaking --

20   for African affairs speaking to President Sharif, as I

21   interpret for -- former U.S. Secretary of State Mrs. Clinton

22   speaking to Somali president, to Mr. Sharif, Sheik Sharif.

23   Q.  So when Hilary Clinton spoke to Sheik Sharif, she was the

24   Secretary of State at the time?

25   A.  Yes.

1    Q.  Okay.  And you were the person interpreting for her to

2    understand what the president of Somalia, Sheik Sharif, was

3    saying?

4    A.  Yes.

5    Q.  About how many written words per year do you translate,

6    you know, average since you began doing this full time?

7    A.  It depends.  In a given year it can be between 250,000 to

8    half a million.  It depends the project size that I receive.

9    Q.  And how -- why do you keep track of words that you

10   translate?

11   A.  Because I am paid per word.

12   Q.  Are you being paid by the word here in this case?

13   A.  No.  This case, no.

14   Q.  How are you being paid in this case?

15   A.  Hourly basis.

16   Q.  And does that come out to essentially -- withdrawn.  Does

17   that come out to less than per word?

18   A.  Yes.

19   Q.  And for your time in San Diego testifying, are you being

20   paid by the hour or some other method?

21   A.  We settled on a day basis.

22   Q.  And so what have you currently billed so far on this case

23   to the defense?

24   A.  I think last time I spoke to my accountant, it was like

25   about -- close to 40,000.

1   Q.   Okay.  And you've been performing translations of

2   telephone conversations for the defense, right, and documents

3   as well?

4   A.   Yes.

5   Q.   Have you ever worked for the department of -- withdrawn.

6   Have you ever worked at any projects from the Department of

7   Defense?

8   A.   Not directly.

9   Q.   Indirectly?

10   A.   Yes.

11   Q.   Could you explain, please.

12   A.   I am a certified language tester by ACTFL, American

13   Council of Teaching Foreign Languages; I'm one of their

14   language testers.  And ACTFL was contracted in 2010 to write

15   and draft a combat interpreting program or curriculum

16   development for many languages, including Somali.

17   Q.   So that was combat -- for the Department of Defense a

18   combat interpreter manual?

19   A.   Yes, under DLI, Defense Language Institute.

20   Q.   And did you complete that project?

21   A.   Yes.

22   Q.   Now, with respect to -- have you worked in the court

23   system in the United States?

24   A.   Yes.

25   Q.   What kind of testing have you had and passed in your

1  career as an interpreter?

2  A.  For the court system, as of now I'm the only

3  Court-certified Somali interpreter in Minnesota and

4  nationwide.

5  Q.  Okay.  And by certified what do you mean?  Tell us about

6  the tests that you have passed that others have not.

7  A.  In Minnesota, and most of the states, they have got

8  different levels of interpreting, and mostly are either

9  registered or certified.  In Somali language we have only one

10 person certified, and that's me for the entire state.

11 Q.  And -- and what particular exam that separates you as a

12 Certified Somali Interpreter from the others who are either

13 registered or something below that?

14 A.  The exam is administered by National Court Services, and

15 not only Somali, they administer all the tests for the

16 languages.  And they are the ones who give the title whether

17 your certified after you pass the test.

18 Q.  And is it an oral exam?

19 A.  It's an oral exam, yes.

20 Q.  And -- and does that certification apply just in

21 Minnesota or does it extend beyond Minnesota?

22 A.  The National Court Services consists of 40 states, but

23 each and every state after you pass the state has their own

24 requirement.  For instance, in my case I tried to certify

25 myself to the states where there is the largest Somali

1    population, and now I'm certified seven states.

2    Q.   Before the courts, to work in the courts?

3    A.   To work in the courts, yes.

4    Q.   And also does -- does the testing for interpreting in

5    court, does that also include an ethics exam?

6    A.   Ethics exam is for all regardless if you are certified or

7    not.  Ethics, you have to take the course in ethics and after

8    completing the test -- you sit a test for the ethics part,

9    and then after completing the test, you are eligible to sit

10   for a certification test.

11   Q.   So you had to pass the ethics exam to get to the

12   certification exam?

13   A.   I did.

14   Q.   And do you work in the Minnesota state courts?

15   A.   Yes.

16   Q.   On what -- how frequently?

17   A.   If I'm in the country or if I'm available for the State

18   of Minnesota, I'm in court every day.

19   Q.   Okay.  Do you do trials there as well?

20   A.   I do trials, yes.

21   Q.   About how many trials a year do you do in Minnesota as an

22   interpreter?

23   A.   I did not track down last year, but I remember in 2010 I

24   did 28 trials.

25   Q.   And have you worked in other states as well, the states

1    where you've gotten certification?

2    A.  Yes.

3    Q.  And have you worked in trials in those states as well?

4    A.  Yes.

5    Q.  Have you worked in federal court?

6    A.  Yes.

7    Q.  Have you worked as an interpreter in federal court?

8    A.  Yes.

9    Q.  One or more than one or --

10   A.  I work more than one.

11   Q.  And have you ever testified in a federal case?

12   A.  Yes.

13   Q.  And where was that?

14   A.  In Indiana, Indianapolis.

15   Q.  In a criminal case?

16   A.  Yes.

17   Q.  And who did you testify for?

18   A.  I testified for the government.

19   Q.  The United States government?

20   A.  Yes.

21   Q.  The Department of Justice?

22   A.  Yes.

23   Q.  The same people who employ the prosecutors?

24   A.  Yes.

25   Q.  And did you -- what services did you perform in that case

1    before you testified?

2    A.  I reviewed and translated the material, wiretap material

3    for cap (phonetic) case.

4    Q.  So you listened to wiretaps, conversations, telephone

5    conversations in Somali and translated them into English for

6    the government?

7    A.  Yes.

8    Q.  In a prosecution in Indiana?

9    A.  Yes.

10   Q.  Now, were you contacted by the court system here to work

11   as an interpreter in this case?

12   A.  Yes.

13   Q.  And did you accept that engagement?

14   A.  No.

15   Q.  Why not?

16   A.  Because I'm part of the case; it's conflict of interest.

17   Q.  Now, with respect to eligibility to work in the federal

18   courts as an interpreter -- and what I mean is an in-court

19   interpreter -- is there -- are there any requirements in

20   terms of certification or other testing?

21   A.  When I go to the federal courts, interpret for the

22   federal courts, I'm always paid to the certified level

23   because federal courts do not recognize the state

24   certification, but they recognize if you have State

25   Department's documentation indicating that you are eligible

1    to interpret for them.

2    Q.   So your State Department certification essentially is

3    enough to get you into all federal courts?

4    A.   Yeah, it gets me to a qualified level, yes.

5    Q.   So I wanted to talk about the interpreting process.

6    A.   Sure.

7    Q.   Particularly with audio, telephone calls like you did for

8    the government in that case in Indiana and like you did here

9    for the defense.  How would you describe that process in

10   brief?

11   A.   The process is you have to listen, understand, and then

12   you have to write in a form that's understandable to the

13   English reader without omitting or adding the content

14   anything.

15   Q.   Now, can you -- we'll talk about Somali because obviously

16   that's what you're interpreting.  Can you translate it word

17   for word?

18   A.   No.

19   Q.   Why not?

20   A.   Because the construction of the Somali language and the

21   English language doesn't match.  For an instance, if you say

22   in English the white cat or blue building, and if you put the

23   same in Somali, saying that blue building as it is, no one

24   will understand.

25   Q.   Is the structure of a sentence different in Somali?

1   A.   Yes.

2   Q.   And obviously the same is true in reverse, translating

3   from Somali back to English?

4   A.   Yes.

5   Q.   And in terms of interpreting audio, is there a convention

6   for the amount of time it takes to do interpretation of a

7   particular passage let's say?

8   A.   For example, when I receive an audio and I want to quote

9   it or the way I normally charge is one minute of audio, it

10  takes one hour to transcribe, translate, proofread, and make

11  it ready.

12  Q.   And is it more difficult, more time-consuming to create a

13  transcript from scratch, let's say, than to review a

14  preexisting transcript?

15  A.   Yes.

16  Q.   So what's your objective when you're doing a

17  interpretation of audio as in this case and in the case in

18  Indiana for the government?

19  A.   It's just to convey the meaning, the concept, without

20  losing -- without omitting, adding anything, just convey the

21  concept as it is.

22  Q.   I'm going to place this stack of papers before you, Mr.

23  Elmi.

24              THE COURT:  Do they need to be marked, Mr. Dratel?

25              MR. DRATEL:  I'm going to read them because they're

1   marked.

2           THE COURT:  They're already marked with some

3   designation?

4           MR. DRATEL:  Yes, exactly.

5           THE COURT:  Okay.  Thank you.

6           BY MR. DRATEL:  Q.  So do you recognize what I've

7   placed before you, this stack of papers?  If you want to look

8   through it, go ahead just to familiarize yourself.

9   A.  Yes.

10          MR. DRATEL:  Okay.  And I'm going to read what

11  they've been marked as, Your Honor, if I may.  I could do it

12  once when I move them in.  That may be save us a little time

13  if that's okay, but I'll be happy to read them for

14  identification purposes.

15          THE COURT:  Whatever is easiest for the jury to

16  follow along, Mr. Dratel.  Whether it takes a little extra

17  time or not, that's not the important thing; I just want to

18  do this for the benefit of the jury.

19          MR. DRATEL:  Okay.  Right.

20          BY MR. DRATEL:  Q.  Do you recognize them?

21  A.  Yes.

22  Q.  And what are they?

23  A.  These are the material that I transcribed personally.

24  Q.  Okay.  Are there transcripts -- are these transcripts

25  that you prepared?

1    A.   Yes.

2    Q.   And are they in a little different form than the way that

3    you provided them to the defense?

4    A.   Yes.

5    Q.   And the Somali has been eliminated, the Somali

6    transliteration; is that --

7    A.   Yes.

8    Q.   When you provided it, you provided it with English and

9    Somali, right?

10   A.   Yeah.  When I translate it, I always use what's called a

11   three-column format, which I have the Somali and I translated

12   into the English, yes.

13   Q.   Okay.  So -- and the Somali is -- has been eliminated

14   from those transcripts, right?

15   A.   That's correct.

16   Q.   And are those transcripts that you prepared complete and

17   true and accurate reflections of the conversations that those

18   transcripts reflect?

19   A.   Yes.

20   Q.   Okay.

21           MR. DRATEL:  Your Honor, I would move the following

22   exhibits in evidence:  Defendant's TT, that's as in Thomas

23   Thomas, TT -- and all these will be TT, so I'll make it

24   easier to go through them.  123, 124, 126, 128, 130, 131,

25   134, 135, 136, 141, 143, 155, 167-A, 167-B, 169-A, 169-B,

1    then TT, still on TT, 123 -- sorry, I already did 123 -- 121,

2    my apologies, 121, 140.  140-A, 148-A, 156, 171, 196-A, 198.

3              THE COURT:  Was that 176-A before 198?

4              MR. DRATEL:  Yes, your Honor, 196-A, 196.  I'll

5    slow down, your Honor.  Still on TT-124.

6              THE COURT:  You already have --

7              MR. DRATEL:  I already have 124 in?  We put -- we

8    have TT-162 as well.  And then we have Defense Exhibit M as

9    in Mary, MMM-1, and MMM-2.

10             THE COURT:  Was that -- is that the list?

11             MR. DRATEL:  No, I just have a few more, just --

12             THE COURT:  TT-130 might have already be admitted

13   on a --

14             MR. DRATEL:  Okay.

15             THE COURT:  -- previous occasion.

16             MR. DRATEL:  Yeah, I think in some form but not the

17   foundation, so this is a formal foundation.

18             THE COURT:  Okay.

19             MR. DRATEL:  Thank you, your Honor.  This is the

20   last group.  Defense Exhibit A, as in Apple, N as in Nancy

21   1-T, AN-122-T, AN-125-T, AN-127-T, AN-186-T, and if I may

22   have a second -- and there's one that's by stipulation, your

23   Honor, because it's not Mr. Elmi's, it's AN-2-T by

24   stipulation with the government because it's a government

25   transcript.

 1              THE COURT:  Does that do it for the AN series?

 2              MR. DRATEL:  One more.  Oh, I'm sorry.  AN-3 is the

 3    .wav audio files for the AN series; that's a disk.

 4              THE COURT:  I'm going to have you repeat the AN

 5    series slowly if you would, please, because --

 6              MR. DRATEL:  Sure.

 7              THE COURT:  -- aside from the -- well, first of

 8    all, I'm going over the TT transcripts just to make sure, and

 9    follow along, please.  So we have these TT transcripts

10    proffered at this time; we have 123, 124, 126, 128, 130, 131,

11    134, 135, 136, 141, 143, 155, 167-A, 167-B, 169-A and -B,

12    121, 140, 140-A, 148-A, 156, 171, 176-A, 198, and 162.

13              MR. DRATEL:  Your Honor, the third to the last one

14    that you mentioned I think you had as 176-A; it's 196-A.

15              THE COURT:  Thank you.  And all of those

16    transcripts have the designation TT before them; is that

17    correct, counsel?

18              MR. DRATEL:  Yes.

19              THE COURT:  Okay.  You are proffering those at this

20    time?

21              MR. DRATEL:  Yes, your Honor.

22              THE COURT:  Any objection?

23              MR. WARD:  Your Honor, there is no foundation

24    objection.  As to the foundation, we'll reserve our

25    objections for anything except for the AN series for later.

1    The AN series I don't think there are any evidentiary

2    objections to either.  So for the TT -- then Defense Exhibits

3    MMM-1 and MMM-2, we just want to reserve evidentiary

4    objections.

5              THE COURT:  All right.  Those exhibits that I just

6    mentioned are admitted conditionally at this time with the

7    government reserving.  With respect to the next group of

8    exhibits, I have MMM-1 and -2; is that correct?

9              MR. DRATEL:  That's correct, your Honor.

10             THE COURT:  All right.  And let's take it from

11   there then, MMM-1 and -2.

12             MR. DRATEL:  Right.  And then making sure then we

13   move to the AN series, your Honor.

14             THE COURT:  And start over on that, please.

15             MR. DRATEL:  Sure.  AN-1-T.

16             THE COURT:  The T comes after, at the end of the

17   exhibits on these?

18             MR. DRATEL:  Yes, on these T will come after.

19             THE COURT:  AN-1-T.

20             MR. DRATEL:  AN-122-T.

21             THE COURT:  All right.

22             MR. DRATEL:  AN-125-T, AN-127-T, AN-186-T.  AN-2-T

23   is the one that's a government translation coming in by

24   stipulation.

25             THE COURT:  AN-186-T.

1          MR. DRATEL:  AN-186-T, then there's an AN-2-T.

2   Then AN-3 is the audio, the .wav audio files.

3          THE COURT:  AN-2-T.

4          MR. DRATEL:  AN-3, AN-3.

5          THE COURT:  Is that it?

6          MR. DRATEL:  That's it, your Honor.

7          THE COURT:  Okay.  There's no objection to AN-2-T

8   coming in?  Well, is there any objection to any of these

9   additional exhibits coming in?

10          MR. WARD:  I misspoke earlier with respect to any

11  AN series or with respect to the MMM-1 or MMM-2.  There's no

12  objection.

13          THE COURT:  There's no objection?

14          MR. WARD:  There's no objection.

15          THE COURT:  At all?

16          MR. WARD:  At all.

17          THE COURT:  With respect to --

18          MR. WARD:  With respect to the last seven or eight

19  that were listed.  Your Honor, I think we're fine right now.

20          THE COURT:  I'll just mark down fine then.  Okay.

21          MR. WARD:  Your Honor, we have no objection with

22  respect to the MMM or the AN series.

23          THE COURT:  Okay.

24          MR. WARD:  And we have only a handful of documents

25  within the TT series that we have any evidentiary objection

1  to, but rather than take the Court and jury's time at this

2  point --

3           THE COURT:  That's fine.  That's fine.  So the

4  MMM-1 and -2 as well as the AN series would be admitted at

5  this time.  Then I understand you're reserving objections to

6  a few of the TT transcripts, which will be discussed at a

7  later time, but there's no question regarding foundation on

8  these?

9           MR. WARD:  That's correct, your Honor.

10           THE COURT:  Okay.  I think I have it.  All right.

11  Mr. Dratel?

12           MR. DRATEL:  Thank you, your Honor.

13     (Exhibit Nos. TT-121, TT-123, TT-124, TT-126, TT-128,
   TT-134, TT-136, TT-141, TT-143, TT-156, TT-167-A, TT-167-B,
14  TT-169-A, TT-169-B, TT-162, TT-148-A, TT-156, TT-171,
   TT-196-A, TT-198, MMM-1, MMM-2, AN-1-T, AN-2-T, AN-3,
15  AN-122-T, AN-125-T, AN-127-T, AN-186-T identified and
   admitted.)

16           BY MR. DRATEL:  Q.  Mr. Elmi, is it fair to say

17  that you were able to spend more time on the earlier --

18  earlier -- withdrawn.  Is it fair to say you were able to

19  spend more time on the transcripts that were requested

20  earlier in this process than the ones that have been

21  requested more recently?

22  A.  Yes.

23  Q.  And is it fair to say that the lawyers, the defense

24  lawyers, have continued to make requests for you to

25  transcribe certain telephone calls during the course of the

1    pretrial preparation in this case?

2    A.  Yes.

3    Q.  And is it fair to say in some of the more recent

4    transcripts, there might be some English words misspelled?

5    A.  Yes.

6    Q.  And there might be a word or two missing in the course of

7    some of those translations?

8    A.  Yes.

9    Q.  But regardless of that, is it your opinion and conclusion

10   that they accurately, truly, and fairly fully reflect what's

11   in those conversations?

12   A.  Yes.

13   Q.  Now, I just want to talk about a couple of things in the

14   translations.  If you could look at what's marked as -- two

15   of them; one is government's exhibit -- I'm sorry.  I need

16   the government's book.  If you could look for 162, TT-162,

17   and also look at -- I'll open it for you -- Government's 162.

18   Let me take this back.  I'll give you this binder for 162,

19   which is the one that's actually in evidence.

20             THE COURT:  May I see counsel for just a moment.

21        (Following is a sidebar conference.)

22             THE COURT:  If I haven't already -- I don't need

23   all counsel here.  It's okay.  If I haven't already, I'm

24   going to let the jury know that they can mark on their own

25   copies of transcripts; I may have already mentioned that to

 1    them.  Are you going to have a booklet --

 2              MR. DRATEL:  Yes.

 3              THE COURT:  -- a separate booklet?

 4              MR. DRATEL:  Yes.  What we're going to do is we

 5    have a separate book, and we are going to propose either --

 6    that the jury can either have it separately or triple hole

 7    punch it, and we can put it in a binder that exists already.

 8    We did it on our own papers.

 9              THE COURT:  Are they going to be in binders of some

10    kind?

11              MR. DRATEL:  No.

12              THE COURT:  Because really, we got a lot of paper

13    going to the jury.

14              MR. DRATEL:  I know.  I know.  Well, I'd be happy

15    if they put it in this binder where they belong because we've

16    tabbed them.

17              THE COURT:  Are they three-hole punched?

18              MR. DRATEL:  Yes, yes.

19              THE COURT:  Any objection to that?

20              MR. COLE:  No.  We'd certainly prefer they have

21    their own binder.

22              THE COURT:  Okay.  No, that's a reasonable

23    request --

24              MR. DRATEL:  Okay.  Well, actually --

25              THE COURT:  -- if you want to bind them.  How are

1   you going to show that the -- your version of a transcript?

2   Are you going to put on it Elmo or -- for purposes of

3   examining a witness?

4          MR. DRATEL:  I'm going to put it on Elmo.  I'm

5   going to put first the government's and then the defense

6   because all we're going to do with this witness is just maybe

7   a dozen a specific discrepancies.  I'm not going to publish

8   the transcripts in whole with him, just to sort of talk about

9   some of the disputes in translation.  That's all I'm going to

10  do is probably about a half dozen of them.  Not so much to --

11  just explaining certain words, you know, and how they're

12  interpreted.  It's going to be very narrow in that regard.

13         THE COURT:  Okay.  So for any Somali words, you may

14  want to spell yourself a Somali word or a grouping of

15  words --

16         MR. DRATEL:  Right.

17         THE COURT:  -- just to maintain the accuracy of the

18  record I think.  However you feel is easiest for you.  I'm

19  concerned about the record, I'm concerned about the jury.

20         MR. DRATEL:  I'll have the witness do it or I'll do

21  it myself.

22         THE COURT:  Okay.  On the few -- you said you were

23  reserving objections to few of the TT series.

24         MR. WARD:  Right, your Honor.  We actually have a

25  filing with your Honor this morning that -- I think it's

 1    only.

 2                MR. COLE:  Five.

 3                MR. WARD:  -- five.

 4                THE COURT:  How long have you had these?

 5                MR. WARD:  Three of them arrived last night, your

 6    Honor.

 7                THE COURT:  Okay.

 8                MR. COLE:  We narrowed it down.  You asked us to

 9    try to narrow this down, and we've got it down to five of the

10    TT series that we're --

11                THE COURT:  -- reserving on?

12                MR. COLE:  Right.

13                THE COURT:  Were you planning on going over any of

14    those now?

15                MR. DRATEL:  No, no.  The stuff we're doing right

16    now is stuff that's in the government transcripts, so it's

17    really about contested certain translations or explaining the

18    specific word.

19                THE COURT:  All right.  I appreciate the

20    explanation.  How much longer do you think you'll be with

21    this witness?

22                MR. DRATEL:  Twenty minutes maybe.

23                THE COURT:  And you're going to do the cross, Mr.

24    Ward?

25                MR. WARD:  I'll do some cross, your Honor.

```
 1            MR. DRATEL:  It should be sooner.  We'll see.

 2            THE COURT:  I'm not rushing anyone.  That's fine.

 3   Just trying to get an idea.  Okay.  Thank you.

 4        (Sidebar conference concludes.)

 5            THE COURT:  All right, ladies and gentlemen.

 6   Pardon the interruption here, but I did want to discuss with

 7   Mr. Dratel and counsel for the government what to expect by

 8   way of process now.

 9            One thing I wanted to mention to you is feel

10   free -- if I haven't already mentioned this, feel free to

11   make notes in these transcripts, your copies of the

12   transcripts.  They're your copies from now until the end of

13   the case.  And so feel free.  There may be some references or

14   cross-references going back and forth, so you can mark these

15   up as you wish.  Okay.  All right.  Mr. Dratel, we're on

16   162-T or T?

17            MR. DRATEL:  Right now we're on the Government's

18   162.

19            THE COURT:  Very good.

20            BY MR. DRATEL:  Q.If you look at page 3 of the

21   government's transcript, Mr. Elmi, and look down towards the

22   bottom of the page at 2:45, where Basaaly -- and I'll put

23   this on the Elmo, trying not to do -- see where it says --

24   Basaaly says, quote, we needed it for some operation.  That's

25   the part that's highlighted; unfortunately, it doesn't really
```

1    come through here.  But is that what it says, for some

2    operations, the action now, we will be able to do something?

3    A.   Uh-huh.

4    Q.   That's what the government's translation says, right?

5    A.   Yes.

6    Q.   And can you tell us what your translation in 162 -- what

7    your translation says with respect to 162 there for that

8    particular statement by Mr. Moalin?

9    A.   Do I have my translation?

10   Q.   Yeah, I'm sorry.  Oh, you mean with the Somali?  You want

11   to see it?  Hang on.  And is that your three-column version

12   that you were talking about?

13   A.   Yes.

14   Q.   One column is the speakers, one column English --

15   A.   Yes.

16           MR. DRATEL:  Yeah, I'll mark that as Defendants'

17   OO, please, and --

18           THE COURT:  What's being marked as --

19           MR. DRATEL:  It's a transcript with the Somali in

20   it that Mr. Elmi --

21      (Exhibit No. OO identified.)

22           BY MR. DRATEL:  Q.You prepared that, right?

23   A.   Yes, I did.

24   Q.   Okay.  And what is your translation of that same block

25   there?

1    A.  In Somali -- in English it says, he said it was badly

2    needed and it will boost our moral.

3    Q.  Okay.  So, now, that doesn't have the word "operation" in

4    your -- right?

5    A.  Yes.

6    Q.  Is there a word in Somali for "operation"?

7    A.  Yes.

8    Q.  And what is that word?

9    A.  It's "hawgal."

10   Q.  And how do you spell that?

11   A.  H-a-w-g-a-l.

12   Q.  And is that word in that -- in the Somali, is that word

13   in that section, in that passage?

14   A.  In the Somali section, no.

15   Q.  So your translation, your interpretation is that word

16   "operation" in Somali is not present there?

17   A.  The reason we selected for writing in three columns,

18   writing for Somali, then translating from Somali to English,

19   is just to exactly reflect what it says in Somali.

20   Q.  Okay.  Thank you.  And I want to ask you about another

21   term that appears sometimes in the transcripts.  The term is

22   "martyrdom."  And can you tell us what kind of meaning that

23   has in Somali.

24   A.  In Somali the word "martyrdom" has two meanings mainly;

25   it can come in two ways.  It can be either -- it's used

1   politically or it's used individual capacity.  For an

2   instance, back 1970, '60s, or, probably, early '80s when we

3   are -- government, our government, was in fight with

4   Ethiopia, anyone who dies in that fight, our Somali soldiers,

5   we referred to them as a martyrdom.  And if you look on the

6   other, personal capacity, if a person defending his house, if

7   a robbery comes to your house and you are defending your

8   house, your family, the dignity of your family, that's when,

9   if the person dies in that situation, we always refer to him

10  as a martyrdom because he died defending his own dignity, his

11  own family.

12  Q.  So it has a broad context and meaning in Somali?

13  A.  Yes.

14  Q.  Historical as well?

15  A.  Historical, yes.

16  Q.  I want to go to Government's 136 and TT-136.  And on

17  page 4 -- you see page 4 at 30:07, right?

18  A.  Yes.

19  Q.  And it says -- Sheikalow is saying and we, the Shabaab,

20  have a political section, a military section, and a

21  missionary section, we have all that.  And that's what the

22  government's translation says, right?

23  A.  Yes.

24  Q.  And if you could look at your -- if you could look at

25  TT-136, it has some additional pieces in it, so -- it's on a

1    different page.  Okay.  Okay.  If you look at what your

2    translation says --

3    A.  I don't have that, 136.

4    Q.  Okay.  I'll give you with the Somali.  You want to see it

5    with -- okay.  We'll mark this as Defendant's PP for

6    identification.

7              THE COURT:  Double --

8              MR. DRATEL:  Double P.

9              THE COURT:  Double P.

10         (Exhibit No. PP identified.)

11             BY MR. DRATEL:  Q.  The term he see -- the term in

12   the Somali, Shabaabku?

13   A.  Yes.

14   Q.  So what does that mean?

15   A.  The word "shabaab" is an Arabic word, and in Somali it's

16   "dhallinyare"; means youth.

17   Q.  Okay.  And what's shabbaabku?

18   A.  It's referring to -- because the speaker here says we,

19   our shabaab, our youth.

20   Q.  And is it al-Shabaab, the organization that he's

21   referring to in your opinion as an interpreter interpreting

22   these conversations?

23   A.  No.

24   Q.  Okay.  Why not?

25   A.  Because everywhere when it's referring to al-Shabaab,

1   it's written with the word "Al", a-l, al-Shabaab.  But here

2   in this context the word it's used as "youth."

3   Q.  And is "shabaabku" something that existed as a word

4   before al-Shabaab existed as an organization?

5   A.  Yes.  Long time back home we had not exactly as Shabaab

6   in Arabic word, but the word "dhallinyare," it's commonly

7   used as -- historically, for example, in 1950s we had Somali

8   Youth League -- it's called SYL -- who fought for the

9   independence in Somalia peacefully from 1950s.

10  Q.  And is "shabaabku" kind of a Somali -- Somaliized version

11  of the word "shabaab"?

12  A.  Yes.

13  Q.  Okay.  But in your opinion it does not refer in this

14  section to al-Shabaab, the organization?

15  A.  No.

16  Q.  And is that more of a proper name, so to speak,

17  al-Shabaab?

18  A.  Yes.

19  Q.  And in your experience and your opinion as an

20  interpreter, that al-Shabaab is referred to by Somalis as

21  al-Shabaab --

22  A.  Yes.

23  Q.  -- and not as "shabaabku"?

24  A.  No.

25  Q.  And does the addition of an article at the end, that ku,

1   that k-u at the end of shabaab, does that change it to

2   al-Shabaab?

3   A.   That is referring to possessive because before that the

4   speaker says "we"; it's referring back to as a possessive,

5   our youth.

6   Q.   And when you see the word "youth" in -- when you hear the

7   word "youth" in the conversations and you put it in the

8   transcript, do you capitalize it at all?

9   A.   No.

10  Q.   And I want to refer you to Government's 186.  Do you see

11  where in 6:34 there "youth" is capitalized, right?

12  A.   Yes.

13  Q.   So in your version you would not capitalize "youth"?

14  A.   No, that's a mistake.

15  Q.   Okay.  And there's also a -- you mentioned the word for

16  youth in Somali is also "dhallinyare," right?

17  A.   Dhallinyare, yes.

18  Q.   And if I could spell it -- and tell me if I'm accurate --

19  d-h-a-l-l-i-n-y-a-r-a-d-a for -- that's a plural, right?

20  A.   Yeah.  It should be only one L though.

21  Q.   Oh, okay.  One L.  So dhallinyare being singular,

22  dhallinyarada, plural?

23  A.   When you say dhallinyare, then you are also pluralize.

24  Q.   Okay.

25  A.   But when you say "dhallinyarada," means you are referring

 1  to somebody -- it's like referring to "dhallinyarada," that

 2  you know each other.

 3  Q.  Okay.  So there's a familiarity involvement in that?

 4  A.  Yes.

 5  Q.  And that word existed long before al-Shabaab, right?

 6  A.  Yes.

 7  Q.  And, in fact, you talked about the Somali Youth League in

 8  the war of independence back in the '50s and leading to

 9  independence in 1960?

10  A.  Yes.

11  Q.  And what was the -- Somali Youth League, what was the

12  Somali name for that?  If you can do it slowly so we can hear

13  it.

14  A.  Ururka dhallinyarada soomaaliyeed.

15  Q.  So the middle word there is "dhallinyarada"?

16  A.  Yes.

17          THE REPORTER:  Excuse me.  Would you say the first

18  word, please.

19          THE WITNESS:  Ururka, u-r-u-r-k-a.  Dhallinyarad,

20  d-h-a-l-i-n-y-a-r-a-d, Soomaaliyeed, S-o-o-m-a-a-l-i-y-e-e-d.

21          BY MR. DRATEL:  Q.Are you familiar with the term

22  "gall"?

23  A.  Gall, yes.

24  Q.  And what does that mean in -- g-a-l-l, right?  Is that --

25  A.  Yes.

1   Q.   What does that mean in Somali?

2   A.   The word "gall," it can be translated into the context

3   it's used.  For instance, when you see a mother who's going

4   to the welfare and want to take one of her children to the

5   welfare so they can interpret for her with the people in the

6   office, she might say can you, my children, can you come with

7   me so you can translate for me with the "gall."

8   Q.   And you're talking about in Minnesota now --

9   A.   In Minnesota.

10  Q.   -- right?  Okay.

11  A.   Which means can you translate for me with the western or

12  the white man or the white person because they don't speak

13  that.

14  Q.   And -- but in the context of the telephone calls, when

15  they're talking about Ethiopia and Ethiopian army, what does

16  the term mean?

17  A.   The way I translate it is when they -- whenever I hear

18  "gall" in this context, my translation was that it's a

19  foreign invaded our country.

20  Q.   And could that include Ethiopian soldiers who in fact are

21  Muslims?

22  A.   It's possible.

23  Q.   Are there Ethiopian soldiers who are Muslim?

24  A.   I'm not exactly aware, but I know the largest

25  population -- the largest ethnic group in Ethiopia are

1    Oromas, which is 50 percent of the population, and they

2    are -- they are -- I think it's 50 to 45, as they say

3    statistically, and they are Muslims, 50 percent of them.  Of

4    course members of them can be in the army.

5    Q.   And there are also Somalis in Ethiopia as well?

6    A.   Yes.

7    Q.   And they're all Muslim?

8    A.   Yes.

9    Q.   And they can be in the army as well?

10   A.   Yes.

11   Q.   And Oromo is O-r-o-m-o, right?

12   A.   Yes.

13   Q.   Okay.  Showing you -- it's a -- more as a demonstrative,

14   as Defendants' QQ, which is -- just ask you to read that

15   yourself.

16              THE COURT:  We're going to have to keep the

17   computer.

18              MR. DRATEL:  Yes.  What?  No.

19              MR. COLE:  Objection, your Honor.

20              MR. DRATEL:  And the iPad too?

21              THE COURT:  Well, if you're -- it's got to be

22   preserved somehow for the record.

23              MR. DRATEL:  Yes.

24              THE COURT:  I don't know how you're intending on

25   doing that, but I assume you can work together on that.

1             MR. DRATEL:  I neglected to print it, your Honor.

2    My apologies.

3             THE COURT:  All right.

4        (Exhibit No. QQ identified.)

5             BY MR. DRATEL:  Q.  So is that an example of

6    "dhallinyarada" in another context or context of how it's

7    used in Somali?

8    A.  Yes.

9    Q.  Okay.  And as a demonstrative, I'm just going to put this

10   here.  Not sure what it's --

11            MS. MORENO:  The light.

12            BY MR. DRATEL:  Q.Okay.  And I'm going to point.

13   That's "dhallinyarada," right?

14   A.  Yes, "dhallinyarada," yes.

15   Q.  And what does this refer to?  If you could -- if you want

16   to read the whole thing, that's fine, to demonstrate what the

17   context is here.

18   A.  The context here is water supply project built in

19   cooperation between Tallowadag youth union and Somali

20   diaspora in Aalborg, Denmark.

21   Q.  So that "dhallinyarada" refers to a youth group --

22   A.  Yes.

23   Q.  -- in Guraceel, is it?

24   A.  It doesn't say Guraceel, but the group's name is called

25   Tallowadag, T-a-l-l-o-w-a-d-a-g.

1    Q.   Okay.  And the line above, does that refer to Guraceel?

2    A.   Yes, yes, the word "Guraceel" is there.

3    Q.   Now, we just talked about context.  And what is the

4    relationship between context and what you do as an

5    interpreter or a translator?

6    A.   As a translator you have the responsibility to translate

7    the content without losing the meaning or adding anything or

8    omitting some of the words; so you have the full

9    responsibility to do so.

10   Q.   And why is it that you feel that responsibility?

11   A.   Because you take -- personally I take oath that I will be

12   translate accurately to the best of my knowledge.

13           MR. DRATEL:  I have nothing further, your Honor.

14           THE COURT:  Cross-examination?

15                    Cross-Examination

16           BY MR. WARD:  Q.  Good afternoon -- or excuse me --

17   good morning, Mr. Elmi, for about another four minutes.  I

18   just have a few questions over some of the translations that

19   you prepared.  And I guess let's start with Government's

20   Exhibit 162 just for a minute.

21           Now, you were asked on direct examination whether

22   your translation in what is TT-162, whether or not the

23   speaker, Basaaly Moalin, said, and I quote, he said it was

24   badly needed and will boost our morals.

25   A.   Yes.

1    Q.  As part of your duty as a translator, I take it you're

2    trying to convey the meaning of certain Somali words that

3    don't necessarily translate directly into English, and you

4    made the decision -- what does this conversation that they're

5    having right now have to do with their morals?

6    A.  If you look the word that he used there, it is the word

7    ragamin (phonetic).  Ragamin means manhood.

8    Q.  I'm sorry.  What does it mean?

9    A.  It's a manhood.

10   Q.  Sure.  Oh, really?  Manhood?

11   A.  Yes.

12   Q.  Okay.

13   A.  So this context, the manhood has nothing to do because

14   manhood is different, different context.  So my translation

15   was based on it will boost our morals.  It represents, that

16   the way he said, it will -- it will -- it will increase our

17   manhood.

18   Q.  But you just told me that manhood doesn't fit there so

19   you just didn't translate it that way?

20   A.  But I have to translate the way it matches with the

21   context it's used.

22   Q.  Okay.

23   A.  When I am translating something, I'm not literal

24   translating word for word; I'm translating how the word can

25   fit into the context.

1    Q.  Okay.  And what's the context of this conversation?

2    A.  The context here is that it will boost our moral.

3    Q.  The context of the conversation, Mr. Elmi, it's a

4    conversation about money, isn't it?

5    A.  The word "money" is not there.

6    Q.  Why don't you go ahead and reread the rest of the

7    transcript.  The speakers there are having a conversation

8    about money, and at the point where you translate that he

9    said it was badly needed and will boost our morals, isn't it

10   in fact what's happening is that now that we have the money,

11   we're going to be able to do something, be like men.  Isn't

12   that the context we're talking about?

13   A.  Sir, my job is not to connect the dots.  My job is to

14   translate the material that's there.

15   Q.  Well, I'll ask you to review the transcript and tell me

16   whether or not that isn't a conversation about money.

17   A.  The word "money" is not there, sir.

18   Q.  Sir, you haven't actually even looked at the Exhibit

19   TT-162.

20   A.  It's in front --

21   Q.  I'd ask you to do that.

22   A.  Can you --

23   Q.  Okay.  Have you had a chance to take a look at your

24   transcript?

25   A.  Would you please provide me the Somali so that I can look

1    at it, the Somali-English.

2    Q.  I'm sorry.  I only have pages 5 and 7.  I see --

3         MR. DRATEL:  Your Honor, if he wants him to read

4    the conversation, we should give him a transcript that he

5    prepared as opposed to showing him the --

6         MR. WARD:  I was planning on doing that.  That's

7    one actually isn't complete.

8         THE COURT:  I think what the witness was asking for

9    the original Somali.  But why don't we give him everything.

10   Why don't we give him a transcript with the Somali and then

11   he has access to the government's transcript.  So just get

12   all those materials before this gentleman.

13        MR. DRATEL:  Okay.  Your Honor, may I give him a

14   copy of the Somali version?

15        THE COURT:  Sure.  Do you have everything you need

16   now, Mr. Elmi?

17        THE WITNESS:  Yes, I do, your Honor.

18        THE COURT:  All right.  Mr. Ward, why don't you

19   proceed then.

20        MR. WARD:  Okay.

21        THE COURT:  Do you need time to review that, sir?

22        THE WITNESS:  I see it.

23        BY MR. WARD:  Q.  Have you had a chance to take a

24   look at that?

25   A.  Yes.

1  Q.  Okay.  And do you see at the top of -- I have page 3 on

2  your transcript.  You translated it as "I told him that a

3  number has issued for him."  Is that correct?

4  A.  Could you repeat that, sir.

5  Q.  Do you see at the top of page 3 of your transcript with

6  the Somali where you say "I told him that a number has issued

7  for him."  Is that correct?

8  A.  Yes.

9  Q.  Okay.  And by that do you understand that to mean a

10  conversation about money?

11  A.  With due respect, sir, the reason we put in a columns and

12  rows is to match exactly the row and row, not previous rows

13  connected to the other one.  And my job is not to connect the

14  dots.  My job is to translate what matches everything with

15  each row.

16  Q.  So you can't tell me what the context of this

17  conversation is then, can you?

18  A.  I already mentioned it there, sir.  I already mention --

19  Q.  There's no question.  Can you tell me what the context of

20  this conversation is.

21  A.  Yes -- no, not reflect exactly the answer of this

22  sentence, but if you want me to answer, I will.

23  Q.  Okay.  Notwithstanding that, you did testify that because

24  this word meant "manhood", you decided it didn't fit and you

25  disregarded it?

1          MR. DRATEL:  Objection, your Honor; argumentative.

2          THE COURT:  Sustained.

3          BY MR. WARD:  Q.Did you say that "manhood" would

4   not fit in this context and therefore you did not translate

5   it?

6   A.  No.

7   Q.  Then what did you say?

8   A.  What I said is the word "manhood," if somebody says I can

9   eat horse, I cannot translate as it is.  I'm feeling hungry,

10  I can eat horse, if somebody says, it doesn't mean that you

11  will technically eat horse; it represents that I'm very

12  hungry.

13  Q.  Certainly.  So you're telling us this is an idiom?

14  A.  This is not idiom but exactly the word, how it is -- the

15  word is put there is I have to find exact meaning -- convey

16  the exact meaning without losing the content.

17  Q.  Okay.  The content which you cannot identify for the jury

18  what that is right now?

19  A.  The content -- the speaker said here "this will help

20  with -- will boost our morals," and that's exactly what I

21  translated.

22  Q.  Okay.  All right.  Sir, let's go to Exhibit 136, TT-136.

23  Now, this was the -- this was the conversation where you

24  indicated that in your translation the word "shabaabku"

25  didn't refer to al-Shabaab; do you recall that on direct

1    examination?

2    A.  Yes.

3    Q.  Okay.  And you testified that it refers to -- I believe

4    you said "youth" or "young people"; is that correct?

5    A.  Yes.

6    Q.  Okay.  And in order to convey an accurate meaning of all

7    the Somali words that were spoken, don't you still have to

8    try and translate "shabaabku" regardless of what you feel

9    that it stands for?

10   A.  Yes.

11   Q.  Okay.  And in your Somali, where does that appear in the

12   statement that you made -- excuse me -- in the English?

13   A.  That's not included there, sir, and it's a mistake.

14   Q.  It's not included there, right here?

15   A.  Yes, it's not included.

16   Q.  Okay.  It's not included, and you made a mistake?

17   A.  Yes.

18   Q.  Okay.  So since it reads, "for instance, we have

19   civilians, military forces as well as scholars who teach the

20   religion, we have all units" --

21            MR. DRATEL:  Objection, your Honor.  There's

22   handwriting on this.  I don't know what that is.  I object to

23   it.

24            THE COURT:  No, it was self-explanatory what

25   counsel is doing.

1          BY MR. WARD:  Q.  Okay.  So it's a mistake.  Now,

2   keeping in mind that one of the things you want to do is

3   translate based on the context of a conversation --

4   A.  That's correct.

5   Q.  -- and provide an accurate meaning --

6   A.  That's correct.

7   Q.  -- to the reader of the English, how would you change

8   that translation?

9   A.  I did not change, but if you take the oath I took, it

10  says I will translate accurately to the best of my knowledge.

11  I'm a human being, I can make mistakes.

12  Q.  Oh, okay.  My question was though how would you translate

13  it now?

14  A.  If I have the opportunity now?

15  Q.  Right.

16  A.  I would put "youth."

17  Q.  I'm sorry?

18  A.  I would make it we comma our youth have civilians.

19  Q.  I see.  Now, again, is the content of this conversation

20  important to you, Mr. Elmi?

21  A.  Yes.

22  Q.  Okay.  And do you need a copy of your Somali to see

23  what's going on in this conversation?

24  A.  I can see from this screen.

25  Q.  Do you see up above that the conversation that Sheikalow

1   and Basaaly Moalin are talking about Islam and politics and

2   the military all being joined together as one?

3   A.   Yes.

4   Q.   Okay.  That's the content of the conversation?

5   A.   But I'm going back to my point earlier, sir.  I'm not

6   going -- bringing dots together.  I have to translate row by

7   row.  I have to exactly translate what they say.  If they

8   were talking about something different and they're talking

9   something different on next column, I shouldn't go back and

10  say why they out of topic.  My job is to manage what this

11  speaker said.

12  Q.   Okay.  Are you telling me then that you don't consider

13  the content or the context of the conversation?

14  A.   I do.

15  Q.   You do?

16  A.   I do.

17  Q.   But not in this instance?

18  A.   Here there's mistake, that word is missing from there.

19  But the content of the conversation, it's the same as the

20  speaker said, my translation.

21  Q.   Okay.  Well, sir, you also said something about how when

22  Somalis say "shabaab," they're not referring to al-Shabaab.

23  Do you recall that testimony on direct?

24  A.   Every time the word "shabaab" doesn't refer to

25  al-Shabaab.

1    Q.  That's actually not my question, sir.  You did testify on

2    direct that when the Somalis say "shabaab," they are not

3    referring to the terrorist organization al-Shabaab.  Do you

4    recall that testimony?

5    A.  It depends on the context it's used, sir.

6    Q.  It depends upon the context in which it's used.  But let

7    me direct you to your testimony -- your translation on

8    page 18 if you would, sir.  Do you still have it up there in

9    the Somali?  That's okay.  Now, on the right-hand column

10   that's your transcription of the Somali, the spoker -- excuse

11   me -- the speaker said -- he's identified as Sheikalow.  And

12   you see where I've circled the word "Shabaab"?

13   A.  Yes.

14   Q.  Okay.  And do you see how in the left-hand side --

15   A.  Yes.

16   Q.  -- you've translated that to the English "as long

17   al-Shabaab is effective and governing."

18   A.  Yes.

19   Q.  Okay.  So in that case when a Somali speaker said the

20   word "shabaab," you translated it to be referring to the

21   terrorist organization al-Shabaab?

22   A.  But in this context, yes.

23   Q.  So the context was important?

24            MR. DRATEL:  Objection.

25            MR. WARD:  Now --

1              THE COURT:  Hold on, sir.  Hold on, sir.  There's

2    an objection.  I need to rule.  It's overruled.  Go ahead.

3              BY MR. WARD:  Q.  Now, this is the exact same

4    conversation we were just talking about not a minute ago,

5    right, about a page later in your transcript -- we were on

6    page 17.  Now we're on page 18.

7    A.  Yes.

8    Q.  So in that context --

9    A.  Yes.  My job is to translate the words in their context.

10   Q.  Okay.  Now, one of the other things we've been talking

11   about is making sure that -- I apologize, Mr. Elmi.  Now, Mr.

12   Elmi, with respect to the same call, 136, there's actually a

13   spot just up above where we were talking where you actually

14   set the code for everybody so that in your Somali, your

15   translation, which starts on page -- sorry -- starts -- let

16   me ask the question this way.  Do you see up on page 18 three

17   lines down on the right-hand side?

18             THE COURT:  The jury doesn't have a copy of

19   page 18, whatever you're referring to.  I know they're going

20   through their notes --

21             MR. WARD:  Exactly.

22             THE COURT:  -- but obviously there were only nine

23   pages in the book they have, so this relates to something

24   they don't have right now.

25             MR. WARD:  Right.

1          BY MR. WARD:  Q.Mr. Elmi, this is your original

2    Somali; is that correct?

3    A.  Yes.

4    Q.  Okay.  And do you see the part that I've indicated here,

5    "nimankaan dhalinyarada al shabaab"?  Do you see that?  I may

6    have mispronounced it.  But it's on the third line.

7    A.  Yes.

8    Q.  Okay.  That's your transcription of what the Somali

9    speaker in this conversation says; is that correct?

10   A.  Yes.

11   Q.  Okay.  And when you translated it, you wrote in TT-136

12   that it -- that it -- you're in the middle of the work and we

13   were outsiders, we know how the people think and what they

14   are demanding, especially how our clan Ayr and in general

15   Habar Gidir are feeling.  Their argument is we lost

16   everything because of support al-Shabaab.

17          Now, I can read the rest of it, but where -- where

18   is the rest of this phrase, "nimankaan dhalinyarada al

19   shabaab" in your translation?

20   A.  I'll answer that question if you show me a page ahead of

21   this page.  It depends.

22   Q.  The page ahead of that page?

23   A.  Yes.

24   Q.  That's a fair question.

25   A.  Can we go back to the other page?

1    Q.  I'm sorry?

2    A.  Can we go back to the previous page?

3    Q.  We can certainly go back to the previous page.

4            THE COURT:  You're now back to page 16?

5            MR. WARD:  I'm back about on 18.

6            THE COURT:  I think the witness -- it would be

7    helpful if there are references to page numbers.

8            MR. WARD:  Thank you, your Honor.

9            THE WITNESS:  Yes, the word "shabaab" is not there;

10   it's not included.

11           BY MR. WARD:  Q.  Now, one of the other things that

12   I wanted to ask you about is your testimony about the word

13   "dhallinyarada," d-h-a-l-i-n-y-a-r-a-d-a.  Setting aside how

14   you translated this, when you -- when a Somali speaker here

15   is saying "nimankaan dhalinyarada al shabaab," what's the

16   meaning you're trying to convey to the reader of the English?

17   A.  It's -- if you want me to translate now, it says "those

18   al-Shabaab youth."

19   Q.  Right.  Those shabaab youth?

20   A.  Those al-Shabaab youth.

21   Q.  Right.  Isn't he actually saying these men, the youth,

22   al-Shabaab?

23   A.  That's what I said.

24   Q.  Thank you.  And we know that because the common name for

25   the organization in Somalia is haragada dhallinyarada

1    mujahedinta, correct?

2    A.  Would you repeat that.

3    Q.  Haragada dhallinyarada mujahedinta.

4    A.  I have no knowledge of that.

5    Q.  You've never heard that before?

6    A.  Might be in the news.

7    Q.  Okay.  So you're telling me though that you've never

8    heard the Somali name for the formal organization, for the

9    terrorist organization --

10              MR. DRATEL:  Objection.

11              THE WITNESS:  That's not --

12              MR. DRATEL:  Objection to the characterization;

13   he's characterizing something.

14              THE COURT:  The objection is sustained because of

15   the use of the word "formal," but you can ask the question,

16   counsel, without the reference to that.

17              BY MR. WARD:  Q.  Well, is there a Somali -- is

18   there a name for the organization in Somali?

19   A.  My job is to translate.  My job is not to teacher this,

20   that this organization is or is not.  You can ask me anything

21   related to a translation, the job I did.

22   Q.  Okay.  Sir, wouldn't it be important to your translation

23   to convey to English readers what these people in Somalia

24   were saying?  Wouldn't it be important to know how Somalia

25   referred to an organization?

1   A.  It's important to know to accurately translate the

2   context and the content I am translating.

3   Q.  Okay.  But you didn't know it in this instance is what

4   you're telling us.

5   A.  Would you repeat that question?

6   Q.  You didn't know enough about this organization in this

7   instance to tell us that.

8   A.  I hear the news the same as you hear, but there is no way

9   I can speak for the organization or say something about it.

10  My job as a translator is to translate what I hear

11  accurately, put it in a text format.

12  Q.  Okay.  Let's go on a little bit further in this call.

13  Now, could I have a copy of Government's 136 please.  Okay.

14  Now, Mr. Elmi, I'm not sure if you can read that, but there

15  is also a monitor up there too.  But at the top the

16  translation reads "Whom are the people we are living with?

17  If we talk about the Murusade subclan, the entire Murusade

18  subclan is Shabaab.  There is not one of them who is with the

19  reliberation front."

20          Now, that's what the government's translator said.

21  Now, in TT-136 you wrote, "Now, the jihad that we are waging,

22  do you know who are the people in our surroundings area?  For

23  instance, Murusade clan fully supports our mission.  No

24  single person from Murusade clan is a member of the

25  reliberation group." But again, if I were to hand you your

1    Somali transcription, at page 19, do you see three lines from

2    the bottom of that block?

3    A.   Yes.

4    Q.   The word "Shabaab"?

5    A.   Uh-huh.

6    Q.   You didn't translate that anywhere in the block where you

7    gave the jury the English translation; is that correct?

8    A.   Let me read it, sir.  What's your question?

9    Q.   My question was the word "Shabaab" was spoken by the

10   Somali speaker.

11   A.   Yes.

12   Q.   You transcribed it.  You did not translate that anywhere

13   in the English that you brought to the jury here today?

14   A.   That's correct.

15   Q.   Like to talk a little bit about government -- or excuse

16   me -- TT-140.  Okay.  Now, on Government's Exhibit -- excuse

17   me -- TT-140 --

18        THE COURT:  Why don't we do this.  Why don't we

19   take our noon recess, give you a little bit more time, Mr.

20   Ward, to get the last of your references --

21        MR. WARD:  I appreciate it, your Honor.

22        THE COURT:  -- I think it might be of assistance

23   for everyone.  Ladies and gentlemen, we'll break now.  We are

24   going to resume at two o'clock, remember, two o'clock.

25   Remember the admonition not to discuss the case or make any

1    decisions at this time.  Thank you.

2         (The jury left the courtroom.)

3              THE COURT:  Okay.  Everyone's present.  Mr. Ward?

4              MR. WARD:  Thank you, your Honor.

5              BY MR. WARD:  Q.  Mr. Elmi, before we broke for

6    lunch, we talked a little bit about the context in which the

7    words are used; do you recall that?

8    A.  Yes, I do.

9    Q.  Okay.  And you agreed that context was important?

10   A.  Yes.

11   Q.  Okay.  And we also talked a little bit about this -- this

12   word in Somali "dhalinyarada," right,

13   d-h-a-l-i-n-y-a-r-a-d-a?

14   A.  Yes.

15   Q.  Okay.  Directing you to TT-128, if I could -- I'll put it

16   up on the Elmo.  I apologize, it's a little difficult to read

17   with the color on it.  If you need to, I can approach, give

18   you a copy of it or maybe you can find it there in the book.

19   Is there a clean copy up there without any highlighting on

20   it, sir?

21   A.  Yes.

22   Q.  Okay.  I see you're in the government's exhibits.  Could

23   I actually get you to look at the ones with the blue here.

24   Here's what we'll do.  Is there a TT-128 in this stack?

25   Okay.  Just so the record is clear, do you see the defense

1    Exhibit TT-128?

2    A.  Yes.

3    Q.  Okay.  I was going to go ahead and put that up on the

4    Elmo if you don't mind, and then I have a question for you.

5    Okay.  This is page 2 of TT-128.  And about dead center of

6    the page, do you see where you translated "What about the

7    youth?  What are they saying?"  You see that there?

8    A.  Yes.

9    Q.  Okay.  And it also reads "Is Ayrow their commander?"  Is

10   that correct?

11   A.  Yes.

12   Q.  And, sir, I want to take a look and see what the Somali

13   was that you translated to come up with that.  Do you

14   recognize that as page 6 of your translation with the Somali

15   for Government's TT-128?

16   A.  Yes.

17   Q.  And there your transcript of what the Somali speaker

18   said, he used the word "dhallinyarada," right?

19   A.  Could you point to this one?

20   Q.  Sure.  You see on my thumb where -- I guess that's my

21   pointer?

22   A.  Yes.

23   Q.  Okay.  He actually used that a second time down here too?

24   A.  Yes.

25   Q.  Okay.  So at least with respect to this block right here,

1   where you wrote "What about the youth, what are they saying,"

2   the context is pretty clear; they're talking about Aden Hashi

3   Ayrow, right?

4           MR. DRATEL:  I would object to the nature of the

5   question, sort of conflating two issues.

6           THE COURT:  The objection is overruled.  You may

7   answer that.

8           THE WITNESS:  Could you repeat the question.

9           BY MR. WARD:  Q.  When you look at that box where

10  you wrote those two lines, "What about the youth, what are

11  they saying, is Ayrow their commander," there's some context

12  there, isn't there?

13  A.  Yes.

14  Q.  Now, on Government's Exhibit 140 -- if I could have

15  government -- the first page of Government's Exhibit 140.

16  Okay.  Now, right here in the center on Government's 140, do

17  you see where it reads -- it says Basaaly:  Eh, eh, was it

18  the one for the youth, there's some ellipses, I mean the

19  orphans or was the other?  Do you see that?

20  A.  Yes, I do.

21  Q.  Now, in the transcript that you prepared, you translated

22  that same section too, didn't you, Mr. Elmi?

23  A.  I don't recall.  I have spent a lot of hours for the

24  translation, and unless I see, I can't answer that question.

25  Q.  Okay.  Well, let me see if this helps at all.  I'm going

1    to put up on the Elmo page 4.  And do you recognize right

2    where my finger is if that's your translation or your

3    transcription of -- the spoken Somali on the right-hand side

4    and then your translation for the benefit of the jury today

5    that appears in TT-128.  Do you see that?

6    A.  Yes.

7    Q.  I'm sorry, TT-140.  Okay.  And on the right-hand side,

8    would you agree with me that the Somali speaker used the word

9    "dhallinyarada"?

10   A.  Yes.

11   Q.  And on the left-hand side in the English transcript that

12   you prepared for the jury here today, it does not mention

13   anything about "youth," does it?

14   A.  You want me to answer that question, sir?

15   Q.  Yes, I do, sir.

16   A.  Here is that -- is the point.  Even though the word

17   "dhallinyarada" is not included in the English translation,

18   but the context is complete.

19   Q.  The context is complete?

20   A.  Yes.  It's complete.  If you read the Somali and if you

21   compare it to the English, even though the word

22   "dhallinyarada" is not included, I admit that's a mistake I

23   made personally, but still the context is complete,

24   holistically translated.

25   Q.  So you made a mistake in not putting down

1  "dhallinyarada," not trying to translate that in the English

2  you brought here today in TT-140?

3  A.  But that did not alter or change the context of the

4  conversation.

5              MR. WARD:  No further questions.

6              THE COURT:  Anything further?

7              MR. DRATEL:  Yes, your Honor.  I'll let Mr. Ward

8  clear his space for a second.

9              MR. WARD:  Oh, I'm sorry, your Honor.  I have one

10  thing I wanted to do before I passed the witness.  And I

11  talked with counsel about this.  Could I ask that, you know,

12  we admit Government's 136-S, which is pages 17, 18, and 19 of

13  the Somali transcription for the transcript that relates to

14  TT-136.

15              MR. DRATEL:  No objection, your Honor.

16              THE COURT:  What is it designated now?

17              MR. WARD:  It's designated as 136-S for Somali,

18  your Honor.

19              THE COURT:  Okay.  136-S is admitted.

20         (Exhibit No. 136-S identified and admitted.)
                        Redirect Examination
21              BY MR. DRATEL:  Q.  Good afternoon.  That last

22  question about that particular -- that was up there -- if we

23  could have 140 back up there, the one page that was shown

24  about the context, you said that the context was correct?

25  A.  Yes.

1    Q.  Can you explain?  You weren't given an opportunity to

2    explain.  If you could explain.

3    A.  When you translate something -- for example, yes, it's a

4    mistake that the word "dhallinyarada" is not included in the

5    translation, but the word "dhallinyarada," it comes with the

6    orphans.  The speaker said, "dhallinyarada agoonta,"

7    Youth-orphans.  As soon as orphanage is there -- I'm not

8    denying that it's a mistake that the word is missing, but at

9    the same time, it's still -- it's the same context.  It did

10   not change at all.

11   Q.  So the word "agoonta" is orphan?

12   A.  Yes.

13   Q.  Thank you.  When did you start working on translations

14   from the defense?

15   A.  I think first time I got it was sometime April last year.

16   Q.  April of 2012?

17   A.  Yes.

18   Q.  So that's about eight months ago, eight, nine months ago,

19   right?

20   A.  Yes.

21   Q.  And you had demands from all the attorneys at this table

22   to translate conversations, right?

23   A.  Yes.

24           MR. WARD:  Objection; outside the scope.

25           THE COURT:  The objection is overruled.

1              BY MR. DRATEL:  Q.  From all the attorneys at this

2     table, right?

3     A.  Yes.

4     Q.  And what would you say the volume of hours in

5     translating, interpreting, the demands that were made by all

6     the attorneys here for particular conversations?

7     A.  It was two phase actually.  The first time of the project

8     it was recommended that I review it, and the second phase,

9     which is started I believe early January this year, it was a

10    lot of requests coming within a short period of time,

11    sometime coming.

12    Q.  And want to talk to you about a couple of questions that

13    were asked of you on -- particularly with respect to 136-S

14    that was just put into evidence.  And do you recall that you

15    were asked about -- on page 18, looking at the Somali, about

16    this reference to al-Shabaab, right?

17    A.  Yes.

18    Q.  Yeah, this reference to al-Shabaab.  Do you see that

19    right there by my forefinger?

20    A.  Yes.

21    Q.  Okay.  And you were asked does it appear on the block of

22    English, right?

23    A.  Yes.

24    Q.  And it doesn't appear on this particular page, right?

25    A.  Yes.

1    Q.  Now, if we go back one page, to page 17 of the same
2    document, 136, you see where it says al-Shabaab, right?
3    A.  Yes.
4    Q.  And is there any other mention of al-Shabaab in the
5    Somali on this block, right?  None?
6    A.  None.
7    Q.  And, in fact, it's the same sentence because the last
8    word on this page is "separate," and then the first word on
9    the next page is "themselves, from ourselves," right?  So
10   it's the same block, it's just broken up -- I'm sorry --
11   broken up by the pages, right?
12   A.  If you give me the opportunity just to explain it to the
13   jury.
14   Q.  Sure.
15   A.  In Somali it's very common that you start -- you started
16   it from back translation, as I said before.  Somebody might
17   say a complete sentence, and that's because of the way it
18   is -- the way English is built is completely different than
19   the way it's built in Somali, sentences.
20   Q.  So even though the Somali reference to al-Shabaab appears
21   on page 18 at that part of the Somali block, when you
22   translate it to English, when you interpret it and you
23   restructure the sentence so that it makes sense in English,
24   it shows up here, right?
25   A.  I think it would be -- help me if you can put the last

1  page and the first page in one screen so that we can see -- I

2  can see the pages together if you don't mind.

3  Q.  If I can, I will.

4  A.  Yes.

5  Q.  I'm not sure if it will all fit.

6  A.  No, no, no, not that way.

7  Q.  No.  I see -- just -- I'm sorry.

8  A.  Thank you.

9  Q.  There it is.

10 A.  Okay.  Let me explain this.  If you look -- it's one row,

11 the whole conversation, because there's only one speaker,

12 which is Basaaly; there is no second speaker on the second

13 row.  So it tells me that this conversation, it's only one

14 person speaks, and it's not -- whether it's included in the

15 middle or in the last, it's completely covered.

16 Q.  Right.  Okay.  And I wanted to ask you, you were asked

17 about in the same conversation also on 136-S, on page 18, you

18 were -- about this reference to "dhallinyarada al-Shabaab,"

19 right?

20 A.  Yes.

21 Q.  Now, you were asked about the formal name, right?

22 A.  Yes.

23 Q.  What does "nimankaan" mean, the word before

24 "dhallinyarada"?

25 A.  "Nimankaan" means "these men."

1   Q.  And I want to show you what the government used as a

2   demonstrative -- withdrawn.  But so that doesn't say anything

3   about organization or a name, right?  Just says "these men"?

4   A.  No, just "these men," yes.

5   Q.  And that's not to say -- and that's not what is in that

6   transcript, right, those three words?

7   A.  No.

8   Q.  The word after and the word before "dhallinyarada" are

9   different, right?

10  A.  Yes.

11  Q.  Just to show it again --

12  A.  Yeah, yes.

13  Q.  Right.  Do you have any interest in the outcome of this

14  case?

15  A.  No.

16  Q.  Did you interpret any of the -- any of the conversations

17  in a way that you designed them to help the defendants?

18  A.  No.

19  Q.  Did you do any of the translations and interpretations in

20  a way designed to hurt the government?

21  A.  No.

22  Q.  Did you do them the same way and by the same standards

23  you did it for the government in that criminal case in

24  Indiana where you testified for the government?

25  A.  Yes, I did.

1  Q.  And any errors that might be contained in the transcripts

2  were unintentional?

3  A.  No.

4  Q.  Were they intentional or unintentional?

5  A.  No, it was not intentional.

6          MR. DRATEL:  Nothing further, your Honor.  Thank

7  you.

8          THE COURT:  Anything further, Mr. Ward?

9                      Recross-Examination

10          BY MR. WARD:  Q.  In 136-S, Mr. Elmi --

11  A.  Yes.

12  Q.  -- if I could just direct your attention, do you see the

13  "oo" there?

14  A.  Yes.

15  Q.  What does that mean in English?

16  A.  It's -- it's a -- I don't know how I can explain to you,

17  but it's like a connector.

18  Q.  Like a conjunction, like or?

19  A.  No, it's not "or."

20  Q.  Well, what kind of a connector?

21  A.  It has no -- by itself it has no meaning in Somali.  The

22  two word o-o.

23  Q.  Yeah, it has no meaning in Somali?

24  A.  It's part of a sentence.  It connects, but it's not "or,"

25  it's not "and."  It's not either.

1    Q.  Okay.  And, again, on redirect you were asked about three

2    lines up where the "Nimankaan dhallinyarada al-Shabaab"; you

3    see that?

4    A.  Yes.

5    Q.  Okay.  And my question to you is did you anywhere

6    translate any English that you brought here today for the

7    jury the term "dhallinyarada" in that one block?

8    A.  Give me a minute.

9    Q.  Sure.  Can you see it at all?

10   A.  The word "dhallinyarada" is not included there, but the

11   context is complete.

12   Q.  The context is complete?

13   A.  Yes.

14   Q.  Sure.  Because it's there right next to al-Shabaab, and

15   that's what it meant in that context; isn't that correct?

16   A.  The context I'm talking is how the row of the sentence is

17   translated into English is complete and correct.

18            MR. WARD:  No further questions, your Honor.

19            MR. DRATEL:  One thing that I forgot to do -- I

20   talked to the government -- is I overlooked one transcript,

21   and I'd just like to put it in front of Mr. Elmi and get it

22   in.

23                   Further Redirect Examination

24            BY MR. DRATEL:  Q.  It's TT-191, and it's just

25   another transcript that you prepared?

1    A.  Yes.

2    Q.  Did you prepare it?

3    A.  Yes, I did.

4            MR. DRATEL:  Okay.  And I will move it in evidence,

5    your Honor.  It's already in as a 106.

6            MR. WARD:  No objection, your Honor.

7            THE COURT:  It is admitted, TT-191.

8            MR. DRATEL:  Thank you, your Honor.  That's all.

9            THE COURT:  Okay.  Thank you, sir.  You are

10   excused, Mr. Elmi.  I assume this witness may be excused.

11           MR. DRATEL:  Yes, your Honor.

12           THE COURT:  Will there be another witness, counsel,

13   or further deposition?

14           MR. DRATEL:  We'll resume Mr. Abukar Suryare's

15   deposition that we broke off on Friday afternoon, and we can

16   finish that one, your Honor.

17           THE COURT:  All right.  Ladies and gentlemen, we're

18   going to continue on with the deposition of Mr. Abukar

19   Suryare, which we stopped on Friday for the purpose of taking

20   a witness at that time.  We'll resume that deposition at this

21   point.

22           MR. COLE:  Your Honor, we just want to let the jury

23   know and your Honor know the reference to 101 is actually 201

24   because of a mistake in numbering.

25           THE COURT:  Okay.  Well, we don't have 201 in

1    evidence, do we?

2                MR. COLE:  It's being referenced for the first time

3    in this deposition.

4                THE COURT:  Okay.

5                MR. COLE:  And -- yes.  Thank you, your Honor.

6    And, your Honor, I might just for ease of reference at this

7    point, there are a handful of exhibits referenced in this

8    deposition I believe.  There's going to be reference to 102,

9    103, and 104, and those are all actually in the 200 series

10   201, 202, 203, and 204, so I don't have to interrupt the

11   deposition to --

12               THE COURT:  Well, are they going to be proffered at

13   some point?

14               MR. COLE:  In the deposition I believe that they're

15   proffered, but only some will be admitted.

16               THE COURT:  Okay.

17       (The video recording was played.)

18               THE COURT:  Let's stop there for our midafternoon

19   recess, please.  Ladies and gentlemen, it's a convenient time

20   to break.  Remember the admonition, 15 minutes, and we'll

21   resume at 3:30.  Thank you.

22       (There was a break in the proceedings.)

23               THE COURT:  Okay.  Ready to continue then --

24   everyone is present I see -- with the -- continuing with the

25   deposition?

1            MS. FONTIER:  Yes, your Honor.

2            THE COURT:  Okay.  Please.

3        (The video recording was played.)

4            MS. FONTIER:  Your Honor, I just need one moment to

5    switch to the next portion of this.  See if I was successful.

6    Sorry, your Honor.  If we may, I just need a couple of

7    minutes.  There was an issue with these two tapes.  I didn't

8    realize this went so far back.

9            THE COURT:  What's a couple of minutes?

10           MS. FONTIER:  I would ask for five.

11           THE COURT:  Do you need any help?  Not that I'm in

12   a position to provide any help, but --

13           MS. FONTIER:  Without going into tons of detail

14   about the technical issues, this is a different camera than

15   the other one, and I need to find where they match up.

16           THE COURT:  I thought you had --

17           MS. FONTIER:  This was already covered; what he's

18   talking about was already covered.

19           THE COURT:  It's overlapping?

20           MS. FONTIER:  It's overlapping.

21           THE COURT:  Don't you have just to fast forward?

22           MS. FONTIER:  Rather than making everyone stare at

23   me, if we can just take a couple of minutes, and I'll find

24   the right place.

25           THE COURT:  Okay.  Why don't we do this, ladies and

1    gentlemen.  We'll take a -- I don't want you sitting there in

2    the jury box.  Let's take a quick recess just so you can move

3    around a little bit.  We'll call you back into the courtroom,

4    okay?  Let's say if you can be ready in five minutes, gather

5    outside in five minutes, and we'll get you in shortly.  Thank

6    you.

7           (There was a break in the proceedings.)

8           THE COURT:  We're outside the presence of all

9    jurors.  Where is Ms. Fontier?  Let's make some use of this

10   time while we're waiting.  Mr. Cole, I received your

11   supplemental memorandum regarding defendants' proposed

12   introduction of initial statements.  I'm glad you filed this

13   today.  I was beginning to go through pleading withdrawal if

14   I hadn't gotten a new stack of paper to review.  But one

15   question I had was the color-coding here.  If you would be so

16   kind as to tell me exactly how this lines up.

17          MR. COLE:  Yeah, your Honor.  That's some

18   color-coding the defense put on the transcripts that they

19   provided us this weekend.  Red indicates what we played, and

20   yellow indicates what they want to play for those

21   transcripts.

22          THE COURT:  Okay.  Let me make a note of that.  So

23   red --

24          MR. COLE:  I'm sorry.  I should have put that in.

25   I apologize.

 1          THE COURT:  I'm sorry.  Red has already been

 2    played.  Yellow is what is proposed.

 3          MR. COLE:  Those are for -- I know that's for the

 4    first three.  The last two transcripts I believe -- I don't

 5    have the pleading in front of me this second --

 6          THE COURT:  Isn't one or more of these absolutely

 7    new, a new transcript?

 8          MR. COLE:  There were two, two I believe that we

 9    received --

10          THE COURT:  Mr. Dratel, chime in here.

11          MR. DRATEL:  Yes.  I didn't have a white file until

12    three days ago.

13          MR. COLE:  No, they're Mr. Ghappour's.

14          THE COURT:  Oh, they're his?

15          MR. GHAPPOUR:  Yeah.  I just received the --

16          THE COURT:  Which ones are new then, Mr. Ghappour?

17          MR. GHAPPOUR:  The last two exhibits.

18          MR. COLE:  The last two on the chart, your Honor.

19          THE COURT:  Four and five?

20          MR. COLE:  Yes.

21          MR. GHAPPOUR:  Yes, your Honor.

22          THE COURT:  So nothing's been played of those two.

23          MR. COLE:  Right.

24          THE COURT:  And you're -- and basically you're

25    objecting to these two only on the basis that they're

1  untimely, Mr. Cole?

2          MR. COLE:  Well, since we were trying -- what we

3  were trying to do is give your Honor something coming in

4  today after trying to confer with the parties, as you

5  requested, on narrowing the issues, and those two came in so

6  late that I didn't even have time to review them before we

7  came into court this morning.

8          THE COURT:  Why don't you -- how about after our

9  session today you can go over those and let me know if

10  they're still in issue.

11          MR. COLE:  Sure.

12          THE COURT:  And then I'll go over -- are you

13  objecting to whatever's in yellow now proposed in the first

14  three transcripts?

15          MR. COLE:  Yes, basically.  Yes, we've narrowed it

16  down to those calls, those three, and then the two that came

17  in late, but that's all.

18          THE COURT:  Okay.  If you could confer then with

19  Mr. Ghappour, that would be appreciated, and let me know

20  tomorrow morning I think is time enough.

21          MR. COLE:  Yes, your Honor.

22          THE COURT:  Okay.  Now, jury instructions.  When

23  are counsel going to meet and confer on jury instructions?

24  We really need to carve out time; it's not going to be jury

25  time, it's going to be evening time, so --

1          MR. COLE:  Are you talking about us with the Court

2   or us together?

3          THE COURT:  No, you all need a session yourselves

4   to whittle down, to reduce the issues, and then get back to

5   me, and then there's going to be another session, and --

6          MR. COLE:  I'm available whenever counsel -- I'm

7   available tonight, tomorrow, whatever evening counsel wants.

8          THE COURT:  Okay.  Well, we need to get something

9   arranged right now so that we get some structure and

10  predictability here.  Keep in mind this.  I know Friday's a

11  down day for the trial because it's a calendar day.  I know

12  you're not going to be available, Mr. Dratel, and I don't

13  know how involved you are in instructions, but I imagine

14  there's pretty good agreement, uniformity, amongst the

15  defense community here on the instructions.

16         MR. DRATEL:  Here's my suggestion:  We meet with

17  the government -- and when I say we, Mr. Ghappour and I and

18  whoever else from the defense team -- will meet with the

19  government tomorrow -- maybe even over lunch we can start --

20  and then after court -- I don't know what they've got, but

21  tomorrow's going to be mostly videos and reading transcripts

22  I think is where we are.

23         THE COURT:  Okay.

24         MR. DRATEL:  So if we meet tomorrow or/and after

25  court tomorrow, and then we can meet with the Court close of

1    the day Wednesday or, you know, maybe if the -- if the -- if
2    we rest Wednesday, we can meet Thursday morning or something
3    like that.  I don't know what -- where we are in that
4    process.  But let's say, same as my projection earlier today,
5    which is either sometime late Wednesday or early Thursday
6    we'll most likely be resting.

7            THE COURT:  Well, I would imagine you're going to
8    need some period of time, that is, counsel need some period
9    of time to meet and confer on jury instructions.  I don't
10   think you're going to do this in an hour, but you're going to
11   need some -- you're saying two --

12           MR. DRATEL:  Two, two and a half.  That's why I say
13   if we start over lunch --

14           THE COURT:  Yeah, I'm not quite that optimistic,
15   maybe I'm unduly pessimistic here, but I think you'll
16   probably need more than a couple hours because -- I hope it's
17   just a couple of hours -- because that'll tell me that you've
18   really whittled this thing down to just a few questions, a
19   few instructions.  And I'd like to meet with you.  Now, as I
20   said, Friday's a calendar day so I'll be pretty much involved
21   on Friday.  But, Mr. Dratel, I didn't know if you were going
22   to be able to delegate your part of this to either Ms.
23   Fontier or someone else.  And then Monday's a holiday, but if
24   we need to come in and work on Monday, then we'll work on
25   Monday.  I'll just arrange to have this part of the

1    courthouse up and running.  But I don't want to create too

2    much of a hiatus for the jury between Thursday and when we

3    continue on with the case, assuming we don't get it to the

4    jury by Thursday afternoon for the start of deliberations.  I

5    mean that would be optimum, if we could get everything done

6    by the close of business on Thursday so they could be

7    deliberating on Friday, but I don't know that that's in the

8    cards.

9                MR. DRATEL:  This Friday?

10               THE COURT:  This Friday.  No, I know next Friday is

11   a -- you know, well, in any event --

12               MR. COLE:  We're ready to go, and we would --

13               THE COURT:  I know, I know.

14               MR. COLE:  -- we'd like to deliberate and get these

15   instructions ready and whenever counsel --

16               THE COURT:  You got a real incentive to start

17   working on the instructions then, so let me -- you said you'd

18   probably work over the noon hour tomorrow or a good part of

19   the noon hour and then pick up in the evening after that.

20   Let me just encourage you to do that, set aside that time.

21   I'll ask all counsel who are involved in the jury

22   instructions to do exactly that.  And then I can meet with

23   you on Wednesday, we can see where we are.  I've got my own

24   draft that I've already put together, but I don't even want

25   to share that with you until I see where you are because you

1    may have some better suggestions on these things.

2              MR. DRATEL:  Your Honor, I don't see how it's

3    possible for us to start something up on Thursday given that

4    we don't know if we're going to rest, given --

5              THE COURT:  I think you're right.  I think you're

6    right.  I think we're going to carry over until next Tuesday

7    because we're going to lose Monday as a date where we could

8    have gotten together and discussed these issues.  But you can

9    see my concern.

10             MR. DRATEL:  I'm not talking about --

11             THE COURT:  Yeah, because the jury's going to be

12   away from the case Friday, Saturday, Sunday, Monday, and then

13   if Tuesday we're still working on jury instructions, that

14   means they wouldn't -- we wouldn't get back with them until

15   next Wednesday; that's a long time.

16             MR. DRATEL:  Your Honor, and I'm confident that we

17   can distill the disagreements for the Court's decision to

18   those particular issues with our two meetings that we can do

19   tomorrow.

20             MR. COLE:  I am too.  I'm sure that will work

21   because once we get together -- I just would like to

22   preserve -- Thursday is an important day still, and if we are

23   done on Wednesday with the defense case, I don't know if even

24   going to have a rebuttal case; we may or may not -- but what

25   happens Thursday?  I mean I think we can close Thursday, and

1    I think if the day's there, we ought to come in be prepared

2    to go forward.

3              THE COURT:  Well, we'll see where we are.

4              MR. COLE:  Okay.

5              MR. DURKIN:  I'd really like to go home, Judge.

6              THE COURT:  When?

7              MR. DURKIN:  I'm able to close on Thursday.  Or I

8    have an idea for you that you can let me go home on Thursday.

9              THE COURT:  I don't know, Mr. Dratel -- excuse

10   me -- Mr. Durkin, no, no, no.

11             MR. DURKIN:  That's the problem.

12             THE COURT:  I'm getting punchy here.  Gosh, does it

13   seem to everyone that this case has been going for two or

14   three months already?

15             MR. DURKIN:  Yes.

16             THE COURT:  Mr. Ghappour?

17             MR. GHAPPOUR:  Yes, your Honor.

18             THE COURT:  Have you been in touch with Ms.

19   Franklin?

20             MR. GHAPPOUR:  Yes, your Honor.  I've informed Ms.

21   Franklin to come to the courthouse towards the end of

22   tomorrow at 4:00 and to keep her client --

23             THE COURT:  Okay.  And that will take -- I'm going

24   to need some in-camera time -- I think you understand that --

25   with Ms. Franklin and her client --

1          MR. GHAPPOUR:  Yes, your Honor.

2          THE COURT:  -- but I'd like you to be standing by.

3          MR. GHAPPOUR:  Absolutely.  And if I do get a

4   confirmation, which I doubt, I will certainly inform your

5   Honor.

6          THE COURT:  Oh, you just left a message on

7   voicemail with her?

8          MR. GHAPPOUR:  In addition to an email.

9          THE COURT:  And no response?

10          MR. GHAPPOUR:  Not yet, but I suspect that I'll get

11   something, hopefully, today?

12          THE COURT:  Would you keep me posted on that

13   because we may have to send someone out for her?

14          MR. GHAPPOUR:  And should I do that through Gaby

15   perhaps or just straight to your email or just in court

16   tomorrow?

17          THE COURT:  You can always stay in touch with Gaby

18   and she'll, you know, let us know right away.

19          MR. GHAPPOUR:  Absolutely.

20          THE COURT:  I'm not being completely facetious

21   about that.  We may need to -- Ms. Franklin's very busy.

22          MR. GHAPPOUR:  I can put that in an email if you'd

23   like.  Just kidding.

24          THE COURT:  You put it in an email what you feel is

25   appropriate to put in an email.

1            MR. GHAPPOUR:  Thank you, your Honor.

2            THE COURT:  I'll leave it at that.  Gaby, let's see

3    if we have -- Ms. Fontier, are you done?

4            MS. FONTIER:  Well --

5            THE COURT:  This is a cable guy five minutes.

6            MS. FONTIER:  There seems to be a smaller problem

7    in that that appears to be the -- it ends in the same place,

8    so.

9            THE COURT:  Well, let me ask you this.  If we were

10   to replay what has already been -- if we were to, you know,

11   play the overlap, do you have any idea how long that period

12   is when two cameras were going?

13           MS. FONTIER:  The problem, your Honor, is that what

14   I believed was going to pick up where this one ended just

15   also ended at the exact same place, so I'm trying to find the

16   next the subsequent portion.

17           THE COURT:  Well, with all due respect to Mr. Cole,

18   now there anything new to be had after we stopped where we

19   did?

20           MR. COLE:  There's been nothing had yet, I can say

21   that.  It actually gets to the only part that is even maybe

22   useful is the next part.  Maybe.  Yeah, the next part is the

23   only part that I even care.  In retrospect, I wish we'd just

24   offered to delete huge portions of these videos --

25           THE COURT:  Believe me -- well, you raised the

1    magic word.  These could have been edited to eliminate just a

2    great deal of this, but I know that you had -- you were on a

3    short, telescoped time schedule here.  So, Ms. Fontier,

4    what's the latest since we last discussed this?

5            MS. FONTIER:  Well, I think I should be able to do

6    this in another two minutes.  I think.

7            THE COURT:  Okay.  We do have an alternative, and

8    that is we could do a responsive reading.  That wouldn't be

9    as -- well, it might be better actually because we could just

10   race through all the objections, and if there's a portion of

11   your cross-examination where you feel you got something

12   there, Mr. Cole, you want to have read or played, you could

13   keep --

14           MR. COLE:  I know exactly where it left off in the

15   transcript, and if we need to read the rest, that's fine with

16   me.

17           MS. FONTIER:  I don't think that we do.  If I can

18   just get this hard drive to play, or connect.

19           MS. MORENO:  I want to play Mr. Cole, your Honor,

20   if we're going to do responsive reading because we know that

21   tone doesn't really matter.

22           THE COURT:  I must say the quality of -- the audio

23   quality of those tapes is very good, in those CDs, or DVDs.

24           MR. COLE:  That worked out really well.  I think

25   the lesson to be learned, for me, is that these aren't civil

1    depositions, okay, but it felt like it when we were there.

2    And it's not -- different purposes.  You know what I'm

3    saying?

4            THE COURT:  Yeah, I do.  Okay.  Debbie, we can go

5    off the record here.

6        (There was a break in the proceedings.)

7        (The following proceedings were outside the presence of

8    the jury.)

9            THE COURT:  Okay.  Let's go back on the record.

10   How many pages of material do you want to read at this point?

11           MS. FONTIER:  It's 30 minutes that are missing.

12           THE COURT:  And was there any redirect, any

13   significant redirect that defense counsel wanted to have come

14   in?

15           MR. COLE:  I think the redirect is very, very

16   brief, and we could probably get through this and read it

17   like in about a quarter of the time.

18           THE COURT:  Okay.  Let's -- look, is everybody on

19   board with that, just reading responsively the about

20   25 percent of what's left?  And if there's any redirect that

21   counsel wish, you can have that.  Any objection to that?

22           MR. DURKIN:  No, Judge.

23           THE COURT:  Hearing no objection, why don't we

24   proceed in that fashion.  Who would you like to have read,

25   Mr. Cole?

1          MR. COLE:  Well, I could need my cross-examination

2   questions --

3          THE COURT:  Sure.

4          MR. COLE:  -- and I could have either counsel for

5   the defense or Mr. Ward just stand next to me and read his

6   responses.

7          THE COURT:  Either way.  Mr. Ward -- if you wish,

8   you could have somebody take the stand and just --

9          MS. FONTIER:  All right.  I'm going to stand next

10  to Mr. Cole and we'll read together since we only have one

11  transcript.

12         THE COURT:  Will there be any redirect?

13         MS. FONTIER:  There's two more short sections of

14  the video which pick up when this breaks for lunch, so

15  there's going to be just one short period of reading that we

16  have lost the video.

17         THE COURT:  Okay.  So we're going to -- this will

18  be Mr. Cole -- the completion of Mr. Cole's cross-examination

19  only -- is that right? -- and then we'll go back to the

20  video.

21         MS. FONTIER:  It doesn't even complete his

22  cross-examination, it's just a section of it, and then it

23  goes back on video to finish his cross-examination and a very

24  brief redirect.

25         THE COURT:  Okay.  Gaby, let's get our jury in.

1    Now, counsel, the understanding will be that the -- the part

2    that's to be read will be reported by the court reporter.

3         (The jury entered the courtroom.)

4              THE COURT:  All right.  Ladies and gentlemen of the

5    jury, as always, thank you for your patience.  This is what

6    we're going to do at this point.  There is a part, a

7    relatively short part of Mr. Cole's cross-examination of

8    Mr. Mohamed that cannot be retrieved right now.  So what we

9    are going to do for that part of the examination is to have

10   Mr. Cole repeat -- read the answers -- excuse me -- the

11   questions that he posed to the witness originally, and Ms.

12   Fontier is going to, in essence, give the responses of

13   Mr. Mohamed at that time.  And then I think we return

14   thereafter for a very short portion of redirect testimony

15   where Ms. Fontier is once again doing the questioning of

16   Mr. Mohamed.  Okay.  So we'll pick up now on this portion

17   that we are not playing for you at this point but reading to

18   you at this time.

19             BY MR. COLE:  Q. You testified yesterday about your

20   involvement with the drought relief committee, correct?

21   A.  Yes.  We were helping that committee.

22   Q.  And the drought relief committee was not armed, right?

23   A.  No.

24   Q.  I'm sorry.  I got a double negative there.  Was the

25   drought relief committee armed?

1    A.  No.

2    Q.  And was the drought relief committee involved in

3    attacking Ethiopian forces?

4    A.  No.

5    Q.  Was the drought relief committee, relief committee,

6    involved in any way in attacking the Transitional Federal

7    Government forces?

8    A.  No.

9    Q.  Was the drought relief committee involved in any way in

10   attacking the presidential palace?

11   A.  No.

12   Q.  Was the drought relief committee involved in any way in

13   planting landmines?

14   A.  No.

15   Q.  Now, going back to ILEYS, you were not the treasurer of

16   ILEYS, were you?

17   A.  No, I wasn't the treasurer, but I was among the committee

18   members who were assisting the ILEYS.

19   Q.  So you were assisting ILEYS in raising money from other

20   members of the community?

21   A.  Yes.

22   Q.  And you helped raise money from the diaspora?

23   A.  Yes.

24   Q.  But you were not personally responsible for how ILEYS

25   funds were spent, right?

1   A.  We used it to coordinate the activities of ILEYS, and it

2   was known how the money was being spent.

3   Q.  Did you spend the money?

4   A.  It -- it was the administrative organ that was spending

5   the money.

6   Q.  And you were not part of that administrative organ?

7   A.  Not the day-to-day administration.

8   Q.  And you were not the treasurer of the drought relief

9   committee?

10  A.  Farah Yare you -- sorry.

11  Q.  Farah Yare you testified was the treasurer of the drought

12  relief committee?

13  A.  Yes.

14  Q.  So you were not personally responsible for spending the

15  money collected by the drought relief committee, correct?

16  A.  The money would go to the drought committee, and they

17  were the ones who were administering it.

18  Q.  And you were not administering those funds, were you?

19  A.  No.

20  Q.  The orphans that were cared for by the ILEYS Foundation,

21  did those orphans need bullets?

22  A.  No.

23  Q.  Did those orphans need shoulder-fired rockets?

24  A.  No.

25  Q.  Have you heard of a weapon on -- excuse me.  You

1    testified earlier today about bazookas that were needed for

2    Hassan Yare's security forces; do you recall that?

3    A.  They already have that weapon, piece of -- you know,

4    weapon.  They are the ones who were, you know, handling it.

5    Q.  So Hassan Yare's security force already bazookas?  When

6    you -- do you remember earlier when you testified about funds

7    that were needed for the security force to operate bazookas?

8    A.  No.  What I talked about is -- are the personnel who were

9    working.

10   Q.  So those personnel were operating bazookas?

11   A.  Yes.

12   Q.  And have you heard of a Somali weapon from -- excuse

13   me -- have you heard of a weapon referred to in Somali as a

14   7?

15   A.  Yes.

16   Q.  And what is a 7?

17   A.  Bazooka.

18   Q.  And the drought relief committee did not need bazookas,

19   right?

20   A.  No.

21   Q.  And did the orphan -- did the orphans have bazookas?

22   A.  No.

23   Q.  And when Farah Yare -- excuse me -- when Hassan Yare's

24   forces had those -- had these bazookas, did they use them to

25   settle disputes between the livestock herders?

1    A.  I did not understand.  Can you clarify?

2    Q.  What did Hassan Yare's forces -- if you know, what did

3    they use the bazookas for?

4    A.  To, you know, intervene in case of disorder and to defend

5    themselves.

6    Q.  So what groups were -- excuse me.  Withdraw that.  Hassan

7    Yare's security forces were protecting the region from what

8    groups?

9    A.  The thieves, robbers, and al-Shabaab.

10   Q.  And I'd like to show you Government's Exhibit 202.  Do

11   you recognize the person in that photograph?

12   A.  It's not clear enough for me to recognize.

13   Q.  Let me show you Government's Exhibit 203.  Do you

14   recognize anyone in that photograph?

15   A.  There is one that I believe is Mukhtar Roobow.  Looks

16   like Mukhtar Roobow.  I do not think that they are government

17   soldiers.

18   Q.  What was the last part?  I'm sorry.

19   A.  Government soldiers.

20   Q.  Those are not government soldiers?

21   A.  No, I do not think that they are government soldiers.

22   Q.  The one who you said looks like Mukhtar Roobow, who is

23   Mukhtar Roobow?

24   A.  He's one of the al-Shabaab leaders.

25   Q.  Was he part of ILEYS?

1    A.   No.

2    Q.   Was he part of the drought relief committee?

3    A.   No.

4    Q.   Was he part of the Hassan Yare's security forces?

5    A.   No.

6    Q.   To your knowledge did Hassan Yare cooperate with Mukhtar

7    Roobow?

8    A.   No.

9    Q.   To your knowledge did Hassan Yare praise Mukhtar Roobow

10   in your presence ever?

11   A.   I don't lead to a place where Mukhtar -- Hassan Yare was

12   praising Mukhtar Roobow.

13   Q.   Well, has Hassan Yare ever told you that he supported

14   Mukhtar Roobow?

15   A.   No.

16            MR. COLE:   And the government moved 203 into

17   evidence.

18            BY MR. COLE:   Q.   And then I'm showing you -- I'm

19   showing you what's been marked as Government's Exhibit 204.

20   Do you recognize the person in that photograph?

21   A.   Looks to me like Aden Ayrow.

22   Q.   And you testified you met Aden Ayrow personally, right?

23   A.   Yes.

24   Q.   Government's Exhibit 109 -- excuse me -- Exhibit 204 into

25   evidence.

1            THE COURT:  Now, have you offered 203?

2            MR. COLE:  Your Honor, they're here.  I wasn't

3    going to publish at this time, but I would offer formally 203

4    and 204 into evidence.

5            THE COURT:  All right.  203 and 204 --

6            MS. FONTIER:  Your Honor, 203 I believe is the same

7    picture as was in either 28-A or -C, which was previously --

8            THE COURT:  Is that the same?

9            MS. FONTIER:  Yeah, previously precluded for 403.

10           THE COURT:  Want to bring it up?  How about 204?

11   Any objection to that?

12           MS. FONTIER:  No, your Honor.

13           THE COURT:  All right.  You're offering 204, Mr.

14   Cole?

15           MR. COLE:  Yes.

16           THE COURT:  Exhibit 204 is admitted.

17        (Exhibit No. 204 identified and admitted.)

18           MR. COLE:  Oh, your Honor?

19           THE COURT:  Yes.

20           MR. COLE:  I have some better prints, a little bit

21   clearer prints of both of these for the record.

22           THE COURT:  Well, okay.  You'll have to put tags on

23   them.

24           MR. COLE:  These are tagged.  I just printed off

25   clearer versions.

1           THE COURT:  I see.  Okay.  See what we have here.

2           MR. COLE:  I believe that Government's Exhibit 203

3   is the same as 25-C, your Honor.

4           THE COURT:  -B came in but -C did not?  Just -B

5   came in.

6           MR. COLE:  Okay.

7           THE COURT:  We already have a photograph I think

8   that's fairly representative, so I'll -- you can withdraw.

9           MR. COLE:  Yes, we withdraw that, your Honor.

10          THE COURT:  -- 204.  Okay.  Continuing on.

11       (Exhibit 204 withdrawn.)

12          BY MR. COLE:  Q.  Aden Ayrow was from your clan,

13   right?

14   A.  Yes.

15   Q.  Did you grow up with Aden Ayrow?

16   A.  No.

17   Q.  Do you know where he grew up?

18   A.  No.

19   Q.  Do you know whether Basaaly Moalin ever spoke to Aden

20   Ayrow?

21   A.  No.

22   Q.  If Basaaly Moalin spoke to Aden Ayrow, you wouldn't know

23   about it, right?

24   A.  I wouldn't know.

25   Q.  And do you know if Basaaly Moalin ever spoke to Mukhtar

1    Roobow?

2    A.   Not to my knowledge.

3    Q.   So if he did, if Basaaly Moalin did ever speak to Mukhtar

4    Roobow, you wouldn't know about it, right?

5    A.   I do not know whether he spoke to him or not.

6    Q.   Do you know a person named Omer Mataan?

7    A.   Yes.

8    Q.   Who is Omer Mataan?

9    A.   He's one of the al-Shabaab forces.

10   Q.   Was Omer Mataan part of the ILEYS Foundation?

11   A.   No.

12   Q.   Was Omer Mataan ever part of the drought relief

13   committee?

14   A.   No.

15   Q.   Was Omer Mataan ever a part of Hassan Yare's security

16   forces?

17   A.   He wasn't one of them.

18   Q.   He was?  I'm sorry?

19   A.   He was not.

20   Q.   Do you know someone named Mahad Karate, Mahad Karate, or

21   K-a-r-a-t-e, Mahad Karate?

22   A.   Yes.

23   Q.   And who is Mahad Karate?

24   A.   He is a member of the al-Shabaab who are causing trouble,

25   you know, in the region, in our region.

1   Q.  And so because he was causing trouble in your region, he

2   was not part of the ILEYS Foundation, right?

3   A.  He wasn't a member of the ILEYS.

4   Q.  And similarly, he was not part of the drought relief

5   committee, was he?

6   A.  No.

7   Q.  And have you heard of someone named Abu Zubeyr?

8   A.  Yes, I did hear.

9   Q.  And he is the emir of al-Shabaab, right?

10  A.  That's how I heard.

11  Q.  And that he is also referred to by the nickname of

12  Godane?

13  A.  Yes, I heard that.

14  Q.  And was he part of the ILEYS Foundation?

15  A.  No.

16  Q.  Was he part of the drought relief committee?

17  A.  No.

18  Q.  Was he part of the Hassan Yare's security forces?

19  A.  No.

20  Q.  Have you heard of an individual named Fuad Shongole?

21  A.  I have heard that name.

22  Q.  Is that also a member of al-Shabaab?

23  A.  That's how I heard it.

24  Q.  And was Fuad Shongole part of the ILEYS Foundation?

25  A.  No.

1  Q.  Was Fuad Shongole part of the drought relief committee?

2  A.  No.

3  Q.  Was Fuad Shongole part of Hassan Yare's security forces?

4  A.  No, he was not a member.

5  Q.  Now, I believe you testified that when you returned to

6  Guraceel in late 2007, the Ethiopians were not at that time,

7  right?

8  A.  Can you clarify?  Is it 2007 or 2008?

9  Q.  I'm sorry.  At the end of 2007 when you returned to the

10  Galgaduud region to participate in relief efforts, were the

11  Ethiopians still in the Galgaduud region?

12  A.  They were there.

13  Q.  Oh, they were still there when you returned in 2007?

14  A.  When I went there, yes, they were still there.

15  Q.  And I believe you testified that there was a time when

16  they were -- they left the Galgaduud region?

17  A.  I came to Galgaduud on two occasions.

18  Q.  Okay.

19  A.  On one occasion myself and my committee member were sent

20  from; that was in October 2007, and the Ethiopians were

21  there.  I stayed for a short while and went to Hargeysa.  I

22  came in January, and they were already gone.

23  Q.  So you came back in January of 2008?

24  A.  Yes.

25  Q.  And at that time the Ethiopians were gone?

1    A.   They were already gone.

2    Q.   And al-Shabaab had done a lot of the fighting against the

3    Ethiopians that caused them to leave the region, right?

4    A.   They was -- there wasn't any outbreak of fighting.   They

5    voluntarily withdrew.

6    Q.   But al-Shabaab was one of the most active groups fighting

7    against the Ethiopians in 2008; isn't that right?

8    A.   They were a part of the fight, you know, resistance.

9    Q.   I believe you testified earlier that there was a time in

10   early 2008 when the Ethiopians had left and the local

11   community was trying to form an elders; do you recall that

12   testimony?

13   A.   Yes.

14   Q.   And I believe you testified that the local clan wanted to

15   form an elders, but al-Shabaab was opposed to that?

16   A.   Yes, they -- they -- they were opposed to it.

17   Q.   Was it your view personally that al-Shabaab should stay

18   out of Guraceel and allow the local administration to take

19   care of its local needs?

20   A.   Yes.

21   Q.   And the individual who you wanted to stay in Guraceel to

22   assist with security forces was Hassan Yare, right?

23   A.   Actually the people who were being helped to set up the

24   local authority was Delgas and his council -- Ugas and his

25   council of elders.

1   Q.  Well -- well, did you ever -- did you ever ask Hassan

2   Yare to leave Galgaduud region?

3   A.  No.

4   Q.  In fact, you supported his security forces by helping to

5   raise funds for those forces, right?

6   A.  Generally the funds were being collected for the whole,

7   you know, local authority and the security force was part of

8   that, you know, services.

9   Q.  No, you personally.  You weren't personally responsible

10  for the security forces, right?

11  A.  No, I wasn't.

12  Q.  But you supported the forces by supporting the

13  administration?

14  A.  Yes.

15  Q.  And did you ever ask the security forces to leave

16  Guraceel?

17  A.  No.

18  Q.  But before we broke for lunch I believe you testified

19  that your opinion was that al-Shabaab should stay outside of

20  Guraceel and allow the local administration to take care of

21  the security in the city; is that right?

22          MS. FONTIER:  Sorry, your Honor.  I believe we have

23  the video of this.  If we can just -- we have the next

24  section on video, and we can just push play from here.

25          THE COURT:  Okay.

1          (The video recording was played.)

2              THE COURT:  Can you stop for just a moment.

3              MR. COLE:  The government is satisfied with the

4     extent of the cross-examination of this witness and ask that

5     we just pick up with the redirect, whatever redirect

6     examination the defense would like on the tape.

7              THE COURT:  How much redirect do we have?

8              MS. FONTIER:  If I recall correctly, it was quite

9     short, but it would be a matter of finding it on the tape.

10             THE COURT:  Why don't we give you the time to do

11    that.  We can let the jury go at this point.

12             MS. FONTIER:  Okay.  That's fine.

13             THE COURT:  Okay.  Ladies and gentlemen, we'll stop

14    for today and then resume tomorrow at 9 a.m.  I'm informed

15    that there'll be more deposition -- videotaped depositions to

16    be played for you, and I think this is probably where we'll

17    take up tomorrow if I'm not mistaken.

18             Okay.  Remember the admonition not to discuss the

19    case amongst yourselves or with anyone else or allow

20    yourselves to form or express any opinions.  Have a very good

21    evening.  We'll see you tomorrow at 9 a.m.  Thank you.

22          (The jury left the courtroom.)

23             THE COURT:  Okay.  Counsel, I'm becoming mildly

24    concerned about the record and perfecting the record.  Do

25    you -- do you have a group of transcripts -- and you seem to

 1   be talking to the defense community now -- do you have a

 2   group of colored-coded transcripts or highlighted transcripts

 3   for the depositions which can be introduced as exhibits to

 4   perfect the record here so that in the event any reviewing

 5   court would need to know what was in these depositions, the

 6   deposition transcripts would be available?  And I guess the

 7   DVDs themselves are available.  It might be helpful, if you

 8   have a copy of the transcripts, to submit them as well.

 9   Backups are always good.

10        Then the last question I had was on this part that

11   was read in and not on a videotape deposition, we need to

12   have that come in in written form to complete the record on

13   the deposition.

14        MS. FONTIER:  Your Honor, we do have -- well, it

15   was one of the projects that got -- kept moving down the list

16   over the weekend -- to burn all of the videos as they have

17   been edited onto DVD and enter these into evidence and

18   obviously to provide a hard copy for the government.  Then we

19   do have the full transcript, which obviously your Honor got a

20   copy of when we went through the objections.  What's the

21   Court's preference?  I think it may be -- it may make sense

22   to enter the entire transcript onto the record with the

23   objections so those are there as well and not edit those to

24   match what's on the videos that we played in court.

25        THE COURT:  That would be one way of doing it, just

1   getting extra copies of the transcripts in together with all

2   the rulings on the objections.  There are a lot of objections

3   and a lot of rulings, and if it were necessary at some point

4   in the future to juxtapose the two, I imagine somebody would

5   be able to figure out exactly what was in and what didn't go

6   in.  Easier way to do it -- I don't want to just make work

7   for you, but an easier way to do it for any reviewing court

8   would be to go over the highlighted deposition, written

9   deposition testimony.  That may take a lot of work on your

10  part, so whatever.  My main concern is perfecting the record.

11  I know you're going to burn your disks and have them come in,

12  and that I guess that does it except for the part that was

13  read into.

14          MR. COLE:  I think the DVDs would be the record,

15  and for the part that was read, we can easily take that one

16  part of the transcript.  If the Court also wants, just for

17  whatever purpose, for the Court's own use or for a reviewing

18  court, to use a courtesy copy of the transcripts to go with

19  the DVDs -- I'm sure we have copies -- we would make -- I

20  mean it is rough, as you know, in reading those transcripts

21  so the video would have to be I guess the real evidence

22  because the transcripts are -- sort of have some roughness

23  and typographical issues, but we could certainly I'm sure

24  work with counsel to have a set there.  It may help somebody

25  in the future who doesn't want to watch the whole video to

1    flip to pages in the transcript.

2              THE COURT:  You're right.  The video portions of

3    the depositions are what is in evidence, and I mean that does

4    make the record there except for the part that was read in.

5    So somehow we're going to have to take care of that.

6              MS. FONTIER:  What was -- sorry.  Just what was --

7    didn't you say that was --

8              THE COURT:  The deposition testimony hasn't been

9    reported; the court reporter was relieved of that obligation.

10              MS. FONTIER:  Right, but the portion that Mr. Cole

11    and I read, did she --

12              THE COURT:  Yes, that was reported.

13              MS. FONTIER:  So that should be a part --

14              THE COURT:  Yeah.

15              MR. COLE:  We could put the video in.  We have the

16    videos.  The videos are marked, so we have, along with what

17    the court reporter --

18              MR. DRATEL:  I was going -- maybe I missed it, but

19    we should have a record of the entire deposition because the

20    video -- and we have that.  So, in other words, should there

21    come a point at which something gets revisited, we at least

22    have the stuff.

23              THE COURT:  Well, I think some thought should be

24    given to that --

25              MR. COLE:  Okay.

 1              THE COURT:  -- doing that.  The other question I

 2    had on exhibits, we've got the government's transcripts

 3    that's in notebook form or binder form, and then we have the

 4    other exhibits in binder form.  There have been a couple of

 5    loose references to exhibits and identifying them.  We can go

 6    through them together at some point, but if I'm a little

 7    unclear about in terms of the status of an exhibit or two, we

 8    can always clean that up toward the end.

 9              The other part -- I think the missing part is

10    getting a fully integrated binder of transcripts that will be

11    offered by the defense.  I know that hasn't been completed

12    yet; there's still some transcripts that need to come in.

13    Mr. Durkin?

14              MR. DURKIN:  Judge, what we're going to do is,

15    okay, we had anticipated putting together a small notebook

16    with our transcripts and a couple of other exhibits that

17    we've agreed, the government has agreed that we can put

18    into --

19              THE COURT:  One with all defense exhibits or just

20    yours?

21              MS. FONTIER:  Well, one notebook for --

22              MR. DURKIN:  Our exhibits are pretty small.

23              THE COURT:  Is everything going to follow that --

24    or you're going to have a separate notebook for your client

25    with transcripts; is that -- some of these transcripts really

1  apply to one or --

2          MR. DRATEL:  Yes, all of them.  Mr. Moalin's

3  basically on all of them.  I think we may have one notebook

4  for the three.  That may be -- I think that's the easiest way

5  for us to do it, going to have one group, one submission, for

6  the first three individuals, and then your client is going to

7  be separate.

8          MR. DURKIN:  That's correct.  I mean we bought the

9  notebooks.  I hate to not do it now.

10          THE COURT:  I wondered what Ms. Roberts has been

11  doing.  She's very busy.  I'm starting to get worried.

12          MR. COLE:  Just so you know, your Honor, you have a

13  binder of all the other exhibits, but for the jury we have --

14  these hanging folders are numbered.  We don't have a -- that

15  was courtesy copy for the Court.

16          THE COURT:  Okay.  Very good.  So let's just keep

17  track.  Be mindful of the status of the exhibits, making sure

18  that everything that needs to be done is done and keeping our

19  eye on the ball in terms of what's easiest for the jury as

20  well.

21          MS. FONTIER:  Your Honor, I think -- just going

22  back to the depositions very quickly -- I think just as an

23  initial step for the Court, we can -- I think the government

24  provided us with CD of the entire videotapes.  Maybe we can

25  burn those -- reburn those CDs and produce for the Court one

 1   copy of the full transcript and then at a later date when

 2   we're not in the middle of all of this, we can also -- I can

 3   meet with some members of the government team and make sure

 4   that we have an agreed-upon -- the edited transcript that was

 5   actually played and videos that were actually played so

 6   they're here and provided to the Court.  We can do the

 7   original full set with no edits.  Is that okay?

 8         THE COURT:  All right.  Very good.  So tomorrow we

 9   have -- we finish up with Mr. Mohamed, then we have what, two

10   more depositions?

11         MS. FONTIER:  We have three more.  Two are shorter

12   than this, the last one.

13         THE COURT:  So we have three all together and two

14   are short.

15         MR. DRATEL:  Think one's an hour and 36 one's an

16   hour and 11, and the third one I'm guessing is somewhere in

17   two-hour range.

18         THE COURT:  So we're going to go all day tomorrow

19   just with deposition testimony.

20         MR. DRATEL:  I think we'll sprinkle in some reading

21   in between if we can to try to -- we'll map it out.

22         THE COURT:  Sprinkle in a little reading

23   transcripts?

24         MR. DRATEL:  I know.

25         THE COURT:  You're doing your best.  I understand

1    that.  Okay.  Then we'll see you at nine o'clock.

2         (There was a break in the proceedings for the evening

3    recess.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         I n d e x

2    Witnesses                                      Page

3    **Halima Ismail Ibrahim**
     Direct Examination by Ms. Fontier            1436
4    Cross-Examination by Mr. Cole                 1471

5    **Abdi Elmi**
     Direct Examination by Mr. Dratel             1483
6    Cross-Examination by Mr. Ward                 1527
     Redirect Examination by Mr. Dratel           1547
7    Recross-Examination by Mr. Ward              1553
     Further Redirect Examination by Mr. Dratel   1554

8
     Abukar Dahir (Suryare) Mohamed               1556

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          E x h i b i t s

2    | Exhibits  | Description      | For ID | In Evd |
     |-----------|------------------|--------|--------|
3    | I         | Photo            | 1457   | 1457   |
     | MM        | Photo            | 1494   | 1495   |
     | TT-121    | Transcript       | 1511   | 1511   |
4    | TT-123    | Transcript       | 1511   | 1511   |
     | TT-124    | Transcript       | 1511   | 1511   |
5    | TT-126    | Transcript       | 1511   | 1511   |
     | TT-128    | Transcript       | 1511   | 1511   |
6    | TT-134    | Transcript       | 1511   | 1511   |
     | TT-136    | Transcript       | 1511   | 1511   |
7    | TT-140    | Transcript       | 1511   | 1511   |
     | TT-140-A  | Transcript       | 1511   | 1511   |
8    | TT-141    | Transcript       | 1511   | 1511   |
     | TT-143    | Transcript       | 1511   | 1511   |
9    | TT-148-A  | Transcript       | 1511   | 1511   |
     | TT-156    | Transcript       | 1511   | 1511   |
10   | TT-162    | Transcript       | 1511   | 1511   |
     | TT-167-A  | Transcript       | 1511   | 1511   |
11   | TT-167-B  | Transcript       | 1511   | 1511   |
     | TT-169-A  | Transcript       | 1511   | 1511   |
12   | TT-169-B  | Transcript       | 1511   | 1511   |
     | TT-171    | Transcript       | 1511   | 1511   |
13   | TT-196-A  | Transcript       | 1511   | 1511   |
     | TT-198    | Transcript       | 1511   | 1511   |
14   | MMM-1     | Transcript       | 1511   | 1511   |
     | MMM-2     | Transcript       | 1511   | 1511   |
15   | AN-1-T    | Transcript       | 1511   | 1511   |
     | AN-2-T    | Transcript       | 1511   | 1511   |
16   | AN-3      | CD               | 1511   | 1511   |
     | AN-122-T  | Transcript       | 1511   | 1511   |
17   | AN-125-T  | Transcript       | 1511   | 1511   |
     | AN-127-T  | Transcript       | 1511   | 1511   |
18   | AN-186-T  | Transcript       | 1511   | 1511   |
     | OO        | Transcript       | 1517   |        |
19   | PP        | Transcript       | 1520   |        |
     | QQ        | Photo            | 1526   |        |
20   | 136-S     | Transcript       | 1547   | 1547   |
     | 204       | Photo - Withdrawn | 1577  | 1577   |
21

22

23

24

25

1          Certificate of Reporter

2   I hereby certify that I am a duly appointed, qualified, and

3   acting Official Court Reporter for the United States District

4   Court; that the foregoing is a true and correct transcript of

5   the proceedings had in the mentioned cause on the date or

6   dates listed on the title page of the transcript; and that

7   the format used herein complies with the rules and

8   requirements of the United States Judicial Conference.

9

10  Dated January 20, 2014 at San Diego, California.

11
                    *Debra M. Henson*
12                          /s/ Debra M. Henson   (electronic)
                            Debra M. Henson
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25