1               United States District Court

2              Southern District of California

3

4   UNITED STATES OF AMERICA,     )
                                  )
5                   Plaintiff,    )
                                  )
6      vs.                        ) Case No. 10-CR-4246 JM
                                  ) Jury Trial/Day 15
7   BASAALY SAEED MOALIN,         ) Tuesday, February 19, 2013
    MOHAMAD MOHAMAD MOHAMUD        )
8   ISSA DOREH,                   ) Volume 13
    AHMED NASIR TAALIL MOHAMUD,   )
9                                 )
                    Defendants.   )
10  _____)

11

                  Before the Honorable Jeffrey T. Miller
12                    United States District Judge

13

14

15

16

17

18

19

20  Official Interpreters:   Ayderus Ali, CCI
                             Fanik Jama, CCI
21
    Official Court Reporter: Debra M. Henson, CSR, RPR
22                           U.S. Courthouse
                             221 W. Broadway, Suite 5190
23                           San Diego, CA  92101
                             (619) 238-4538
24

25            Record produced by stenographic reporter

```
1   Appearances

2   For the Government:        Laura E. Duffy
                               UNITED STATES ATTORNEY
3                              William P. Cole
                               Caroline P. Han
4                              ASSISTANT U.S. ATTORNEYS
                               Steven P. Ward, Trial Attorney
5                              U.S. DEPARTMENT OF JUSTICE
                               880 Front Street, Suite 6293
6                              San Diego, CA  92101

7   For the Defendants:
    (Mr. Moalin)               Joshua L. Dratel, Esq.
8                              Alice Fontier, Esq.
                               OFFICE OF JOSHUA L. DRATEL
9                              2 Wall Street, Third Floor
                               New York, NY  10005
10
    (Mr. M. Mohamud)           Linda Moreno, Esq.
11                             LINDA MORENO, P.A.
                               P.O. Box 10985
12                             Tampa, FL  33679

13  (Mr. Doreh)                Ahmed Ghappour, Esq.
                               LAW OFFICES OF AHMED GHAPPOUR
14                             P.O. Box 20367
                               Seattle, WA  98102
15
    (Mr. A. Mohamud)           Thomas A. Durkin, Esq.
16                             Janis Roberts, Esq.
                               DURKIN & ROBERTS
17                             2446 N. Clark Street
                               Chicago, IL  60614
18

19

20

21

22

23

24

25
```

1        San Diego, California - Tuesday, February 19, 2013

2        (Defendant A. Mohamud is being assisted by a Somali

3   interpreter.)

4        (The following proceedings were outside the presence of

5   the jury.)

6            THE COURT:  Good morning, everyone.  We have a

7   couple of minor matters today.  Okay.  Well, one of them

8   disappeared.  We were having a little bit of an issue setting

9   up the remote so that audio could get piped in, but that's

10  been resolved.  And then I understand we only have one

11  interpreter today, so his day is a going to be a long day --

12  good morning -- and so I understand we'll take a few more

13  breaks during the day, maybe breaking every hour for about

14  ten minutes; would that help you?

15           THE INTERPRETER:  Your Honor, I would suggest that

16  we do the same way that we usually do before.  In case it's

17  too hard for me, I will --

18           THE COURT:  Would you?

19           THE INTERPRETER:  Yes, I will ask for a break.

20           THE COURT:  Thank you.

21           THE INTERPRETER:  I don't want to disrupt anything.

22  I want things to go the way we were going before.

23           THE COURT:  Okay.  Very good.  Thank you.

24  Appreciate all your fine work in this case.

25           Okay.  You all have your instructions, verdict

1    forms?  And I think we're ready to go.  We'll get the jury in

2    here in just a minute or two.  Hope you all had a good

3    weekend.

4            (There was a break in the proceedings.)

5            (Following is a sidebar conference.)

6            THE COURT:  We're outside the presence of all

7    jurors.  I received a note from one of the jurors,

8    Ms. Boggess; it reads as follows:  On February 19 -- which is

9    this morning; this happened just a few minutes ago -- while

10   riding in the elevator, a Somali woman commented that I was a

11   juror, she then said, quote, I hope you are going to deliver

12   justice, end quote.

13           I'm going to talk to Ms. Boggess to see if she's

14   been affected by this particular contact.  I don't think it

15   would be helpful to have all the attorneys present; you may

16   just want to have one or two attorneys present rather than

17   overloading her, but I'd like to ask her if she feels in any

18   way affected by this.

19           MR. DRATEL:  I would just ask whether she's

20   communicated with any other jurors about it.

21           MS. MORENO:  Right.

22           THE COURT:  So that's where things are right now.

23   Okay?  All right.  I'll call you back in just a moment.

24   Would you get her, please.

25           (Brief pause in the proceedings.)

1           THE COURT:  Mr. Dratel and Ms. Moreno?  Where's Mr.

2    Dratel?

3           MS. MORENO:  I'm going to represent Mr. Dratel.

4           THE COURT:  All right.  Thank you.

5       (Juror Boggess approached sidebar.)

6           THE COURT:  Ms. Boggess, how are you this morning?

7           JUROR BOGGESS:  I'm fine.  Thank you.

8           THE COURT:  Good, good.  I received this note that

9    you -- by the way, this note is -- will be Court Exhibit next

10   in order, Court Exhibit next in order.

11          THE COURT:  So you wrote this note.  It was

12   communicated to me, it was given to me; it reads, On

13   February 19 while riding in the elevator, a Somali woman

14   commented that I was a juror.  She then said, I hope you're

15   going to deliver justice, end quote.  And then you've signed

16   this.  Is that all that was said?

17          JUROR BOGGESS:  That's all.  That's it.

18          THE COURT:  Okay.  Did you say anything to her?

19          JUROR BOGGESS:  I did not say anything.

20          THE COURT:  Okay.  Do you feel that that particular

21   comment has in any way affected you?

22          JUROR BOGGESS:  I do not feel that way.  I just

23   felt the need to have to tell it, but I don't feel that it

24   affected me.

25          THE COURT:  Because it was -- you were -- in a

1     sense it was a contact by a third party?

2               JUROR BOGGESS:  Right.

3               THE COURT:  Okay.  That was a very wise thing that

4     you did, but you're sure you feel fine about that?

5               JUROR BOGGESS:  I'm positive.

6               THE COURT:  You can maintain your fairness and

7     impartiality --

8               JUROR BOGGESS:  Yes.

9               THE COURT:  -- in this matter?  Did you happen to

10    talk anyone else about that?

11              JUROR BOGGESS:  Yes, I talked to -- to one other

12    juror and asked her what she thought I should do, and we both

13    agreed that I should say something.

14              THE COURT:  Okay.

15              JUROR BOGGESS:  And that's the extent of it.

16              THE COURT:  Do you know who the other juror is?

17              JUROR BOGGESS:  Bridget, the one whose husband is a

18    lawyer.

19              THE COURT:  Ms. Freni.  Okay.  Okay.  Well, why

20    don't you rejoin your other jurors.  We'll get going shortly.

21    Did you have the feeling that this was just an innocent

22    comment that was made by someone who --

23              JUROR BOGGESS:  I do.  I do.  I mean it wasn't

24    malicious or anything.  It was just an innocent comment, and

25    I just felt that I needed to tell you.

1              THE COURT:  Very good.  Well, I'm glad you did.

2    And you didn't mention it to anyone else other than Ms.

3    Freni?

4              JUROR BOGGESS:  No, I did not.

5              THE COURT:  Okay.  I'll ask you to rejoin your

6    fellow jurors, and we'll have Ms. Freni come back here.

7    Thank you very much.

8              MS. MORENO:  Can you ask the juror not to discuss

9    this with any other juror?

10        (Juror Boggess left sidebar; Juror Freni approached

11   sidebar.)

12             THE COURT:  Good morning, Ms. Freni.

13             JUROR FRENI:  Good morning.

14             THE COURT:  Gaby, can you get Ms. Boggess?  Just

15   have her waiting -- just have her waiting in the back, okay?

16   Good morning, Ms. Freni.  How are you?

17             JUROR FRENI:  Good morning.

18             THE COURT:  Ms. Boggess indicated that she had --

19   that a spectator had made a comment to her and that she

20   mentioned that to you and asked you what your opinion, what

21   she should do and you mentioned that you thought she should

22   bring that to the attention of the Court, which is absolutely

23   the right thing to advise.

24             JUROR FRENI:  Good.

25             THE COURT:  What did she tell you?

1          JUROR FRENI:  She just made the comment that she

2   was in the elevator, and she said that one of the Somali

3   women had said oh, you're a juror, and she said she didn't

4   look, she just was looking at the elevator and that whoever

5   it was said I hope you -- I hope you know how to serve

6   justice or something like that.

7          THE COURT:  Okay.  And that's all that was said?

8          JUROR FRENI:  That's all she told me.

9          THE COURT:  When she mentioned this to you, did she

10  mention it to any other jurors?

11         JUROR FRENI:  No, that I saw.  I was with her.

12         THE COURT:  Have you mentioned it to any other

13  jurors?

14         JUROR FRENI:  Doug and Robert were sitting there,

15  and they wanted to know what was happening, and I didn't say;

16  I just said something that she needed to talk to the judge

17  about.

18         THE COURT:  You didn't mention anything to --

19         JUROR FRENI:  No.

20         THE COURT:  -- any other jurors?  Did she mention

21  it to --

22         JUROR FRENI:  As far as I know --

23         THE COURT:  -- anyone else?

24         JUROR FRENI:  -- no, but I was with her most of the

25  morning.

1          THE COURT:  Okay.  If I ask you not to say anything

2     to anyone else, would you be able to abide by that?

3          JUROR FRENI:  Of course.

4          THE COURT:  Do you feel as though you've been

5     affected indirectly by this individual making that statement

6     to a fellow juror?

7          JUROR FRENI:  No.

8          THE COURT:  You feel you can maintain your

9     impartiality and fairness?

10         JUROR FRENI:  Absolutely.  And I asked her, I said

11    did she say anything mean or anything, and she said she

12    didn't look and that didn't -- you know, I said it's right in

13    the book that if anything happens, just to make sure and

14    report.  But it didn't seem like it was --

15         THE COURT:  Okay.  All right.

16      (Juror Boggess approached sidebar.)

17         THE COURT:  Ms. Boggess, I just wanted to make sure

18    that you hadn't mentioned this to anyone else.

19         JUROR BOGGESS:  No.

20         THE COURT:  I'll ask you not to mention it to

21    anyone else --

22         JUROR BOGGESS:  Sure.

23         THE COURT:  -- and certainly don't discuss it

24    between yourselves, the two of you.  It's at this point

25    really a nonissue as far as I'm concerned.

1              JUROR BOGGESS:  Okay.

2              THE COURT:  I just wanted to make sure what the

3    contact was, what had been said, that it was contained, and

4    that no one was affected by it.

5              JUROR BOGGESS:  Okay.

6              THE COURT:  Okay?  Are you ready to go?

7              JUROR BOGGESS:  We are.

8              THE COURT:  You all have a good weekend?

9              JUROR BOGGESS:  We did.  Thank you.

10             JUROR FRENI:  Healthy now I hope.

11             THE COURT:  Feeling better?  You're probably doing

12   a little bit better than I am, but I think we'll get through

13   the day.

14             MS. MORENO:  Thank you very much.

15             THE COURT:  Okay.  Why don't you join your fellow

16   jurors.

17             MS. MORENO:  May I confer with counsel and just

18   explain -- share with them what happened and see if they want

19   to put anything on the record?

20             THE COURT:  Sure.

21         (Brief pause in the proceedings.)

22             MS. MORENO:  Thank you, your Honor.  I just wanted

23   to put on the record that I did confer with all counsel; I

24   shared what the jurors told us, and we're going to pass on

25   making any sort of motion to strike the juror on any ground

```
 1    whatsoever.  So we're fine with the jury.
 2              THE COURT:  Okay.  Mr. Cole?
 3              MR. COLE:  Nothing further, your Honor.  We're
 4    fine.
 5              THE COURT:  Okay.  I think we're --
 6              MS. MORENO:  Just wanted to put it on the record.
 7              THE COURT:  Thank you very much.  Appreciate that.
 8    I think we're ready to go.  And I think we've gotten over all
 9    the glitches and little minor contretemps and ready to pursue
10    the instructions and argument, okay?
11              MS. MORENO:  Thank you, your Honor.
12         (Sidebar conference concludes.)
13              THE COURT:  A very good morning, ladies and
14    gentlemen.  Everyone is here.  I hope your weekend was
15    pleasant.  We had a couple of matters that we needed to
16    discuss outside your presence, and we also appreciated the
17    additional time because we've been working to transmit the
18    audio of proceedings in this courtroom to the courtroom next
19    door; if in fact there are people who are unable to find
20    seating in this courtroom, at least they can listen to the
21    proceedings next door.
22              So we're going to proceed, as I indicated last
23    week, with the jury instructions, and that will be the first
24    thing.  It will take me approximately a half hour to read
25    them or to charge you with the law that applies in this case,
```

1    and then you will hear the arguments from the attorneys.

2    Now, I think those arguments will go just about the entire

3    day, give or take, and we'll endeavor to finish up everything

4    today even though we're getting a little bit of a late start.

5            The first thing are the instructions, however, and

6    it's a very important part of the case, ladies and gentlemen,

7    when you're given the law that pertains, and we lock the

8    courtroom doors at this time, and we ask for a minimum of

9    movement in the courtroom so that you can concentrate on what

10   we are about to do at this time.  As soon as the instructions

11   have been given to you, then we will unlock the doors and

12   proceed further.

13           I'm going to diverge a little bit from my normal

14   practice in instructing a jury.  Typically I do not provide a

15   set of instructions for each individual juror as I'm reading

16   them, but I'm going to do that in this case.  First of all,

17   you've all been trained so well during the evidentiary

18   portion of the case, following transcripts and all as you're

19   hearing audio that I think that you're pretty much acclimated

20   to that particular procedure.  Also, I think it would be

21   helpful as I go through the law to have you follow me.

22           Now, please don't jump ahead in the instructions

23   once you receive your individual set, and if you find that

24   it's easier for you just to listen rather than following

25   along, then by all means just put down the written

1    instructions you will have and then just listen to the
2    instructions as I am reading them to you.  And as I say, this
3    is going to take approximately a half hour.  Bear with me.
4    I'm still working on getting over what I had earlier during
5    the course of the trial, so we will proceed.

6            I'll ask Gaby to pass out your individuals copies
7    of the jury instructions, and then we'll proceed with the
8    instructions.  Thank you.  I will say that all counsel have
9    concurred with this procedure of allowing you to follow along
10   if you wish to do so in the written instructions.  They're
11   your instructions; you can place your name on them, you can
12   certainly mark -- make any marks you wish to make as we
13   proceed.

14           Ladies and gentlemen of the jury, now that you have
15   heard all the evidence, it is my duty to instruct you on the
16   law which applies to this case.  A copy of these instructions
17   will be available in the jury room for you to consult.
18   Obviously you're each going to have your own set of jury
19   instructions from this point forward.

20           It is your duty to weigh and evaluate all the
21   evidence received in the case and in that process to decide
22   the facts.  It is also your duty to apply the law as I give
23   it to you to the facts as you find them, whether you agree
24   with the law or not.  You must decide the case solely on the
25   evidence and the law and must not be influenced by any

1    personal likes or dislikes, opinions, prejudices, or

2    sympathy.  You will recall that you took an oath to do so at

3    the beginning of the case.

4           You must follow all of the instructions and not

5    single out some and ignore others.  They are all equally

6    important.  Please do not read into these instructions or

7    into anything I may have said or done any suggestion as to

8    what verdict you should return; that is a matter entirely up

9    to you.

10          And I'm going to stop at this point because there's

11   someone who's having good bit of difficulty in the back the

12   middle of a coughing spell.  I'm going to ask her to leave

13   the courtroom at this point, and she can return; I hope she's

14   well.  And we'll secure those doors once again.  Thank you.

15          All right, ladies and gentlemen, continuing on.

16   The defendants are accused in an indictment with multiple

17   counts of criminal conduct.  Count 1 charges each defendant

18   with conspiracy to provide material support to terrorists in

19   violation of Title 18 of the United States Code Section

20   2339A; Count 2 charges each defendant with conspiracy to

21   provide material support to a foreign terrorist organization

22   in violation of Title 18 United States Code Section 2339B;

23   Count 3 charges each defendant with conspiracy to launder

24   monetary instruments in violation of Title 18 of the United

25   States Code Section 1956 (a)(2)(A) and (H); Count 4 charges

1    defendant Basaaly Saeed Moalin with providing and attempting

2    to provide material support to terrorists in violation of

3    Title 18 of the United States Code Section 2339A; and Count 5

4    charges defendants Basaaly Saeed Moalin, Mohamad Mohamad

5    Mohamud, and Issa Doreh with providing and attempting to

6    provide material support to a foreign terrorist organization

7    in violation of 18 USC Section 2339B.

8              The indictment is not evidence.  The defendants

9    have pleaded not guilty to the charges.  The defendants are

10   presumed to be innocent unless and until the government

11   proves the defendants guilty beyond a reasonable doubt.  In

12   addition, the defendants do not have to testify or present

13   any evidence to prove innocence.  The government has the

14   burden of proving every element of the charges beyond a

15   reasonable doubt.

16             A defendant in a criminal case has a constitutional

17   right not to testify.  You may not draw any inference of any

18   kind from the fact that a defendant did not testify.

19             Proof beyond a reasonable doubt is proof that

20   leaves you firmly convinced that the defendant is guilty.  It

21   is not required that the government prove guilt beyond all

22   possible doubt.  A reasonable doubt is a doubt based upon

23   reason and common sense and is not based purely on

24   speculation.  It may arise from a careful and impartial

25   consideration of all the evidence or from lack of evidence.

1        If after a careful and impartial consideration of

2   all the evidence you are not convinced beyond a reasonable

3   doubt that a defendant is guilty, it is your duty to find

4   that defendant not guilty; on the other hand, if after a

5   careful and impartial consideration of all the evidence you

6   are convinced beyond a reasonable doubt that a defendant is

7   guilty, it is your duty to find that defendant guilty.

8        The evidence from which you are to consider in

9   deciding what the facts are consists of, one, the sworn

10  testimony of any witness; and two, the exhibits received in

11  evidence; and three, any facts as to which the parties have

12  agreed.

13        In reaching your verdict, you may consider only the

14  testimony and exhibits received into evidence.  The following

15  things are not evidence and you may not consider them in

16  deciding what the facts are.  One:  Questions, statements,

17  objections, and arguments by the lawyers are not evidence.

18  The lawyers are not witnesses.  Although you must consider a

19  lawyer's questions to understand the answers of a witness,

20  the lawyers' questions are not evidence.  Similarly, what the

21  lawyers have said in their opening statements, will say in

22  their closing arguments and at other times is intended to

23  help you interpret the evidence, but it is not evidence.  If

24  the facts as you remember them differ from the way the

25  lawyers have stated them, your memory of them controls.

1              Any testimony that I have excluded, stricken, or
2    instructed you to disregard is not evidence.  In addition,
3    some evidence was received only for a limited purpose.  When
4    I have instructed you to consider certain evidence in a
5    limited way, you must do so.
6              Three:  Anything that you may have seen or heard
7    when the court was not in session is not evidence.  You are
8    to decide the case solely on the evidence received at the
9    trial.
10             Evidence may be direct or circumstantial.  Direct
11   evidence is direct proof of a fact such as testimony by a
12   witness about what that witness personally saw or heard or
13   did.  Circumstantial evidence is indirect evidence, that is,
14   it is proof of one or more facts from which you could find
15   another fact.  You are to consider both direct and
16   circumstantial evidence.  Either can be used to prove any
17   fact.  The law makes no distinction between the weight to be
18   given to either direct or circumstantial evidence.  It is for
19   you to decide how much weight to give to any evidence.
20             In deciding the facts in this case, you may have to
21   decide which testimony to believe and which testimony not to
22   believe.  You may believe everything a witness says or part
23   of it or none of it.  In considering the testimony of any
24   witness, you may take into account, one, the witness's
25   opportunity and ability to see or hear or know the things

1    testified to; two, the witness's memory; three, the witness's
2    manner while testifying; four, the witness's interest in the
3    outcome of the case, if any; five, the witness's bias or
4    prejudice, if any; six, whether other evidence contradicted
5    the witness's testimony; seven, the reasonableness of the
6    witness's testimony in light of all the evidence; and eight,
7    any other factors that bear on believability.
8            The weight of the evidence as to a fact does not
9    necessarily depend on the number of witnesses who testify.
10   What is important is how believable the witnesses were and
11   how much weight you think their testimony deserves.
12           The parties have agreed to certain facts that have
13   been stated to you.  You should therefore treat these facts
14   as having been proved.
15           You are here only to determine whether the
16   defendants are guilty or not guilty of the charges in the
17   indictment.  The defendants are not on trial for any conduct
18   or offense not charged in the indictment.
19           A separate crime is charged against one or more of
20   the defendants in each count.  The charges have been joined
21   for trial.  You must decide the case of each defendant on
22   each crime charged against that defendant separately.  Your
23   verdict on any count as to any defendant should not control
24   your verdict on any other count or as to any other defendant.
25           All the instructions apply to each defendant and to

1   each count unless a specific instruction states that it

2   applies only to a specific defendant or specific count.

3         The Somali language has been used during this

4   trial.  The evidence you are to consider is only that

5   provided through the official court interpreters.  Although

6   one or more of you may know Somali words, it is important

7   that all jurors consider the same evidence.  Therefore you

8   must accept the evidence presented in the English

9   interpretation and disregard any different meaning.

10        Transcripts of the recordings in the Somali

11  language have been admitted into evidence.  The transcripts

12  are English-language translations of the recordings.  Whether

13  a transcript is an accurate translation in whole or in part

14  is for you to decide.  In considering whether a transcript

15  accurately depicts the words spoken in a conversation, you

16  should consider the testimony presented to you regarding how

17  and by whom the transcript was made.  You may consider the

18  knowledge, training, and experience of the translator as well

19  as the nature of the conversation and the reasonableness of

20  the translation in light of all the evidence in the case.

21        It is important that all jurors consider the same

22  evidence.  Therefore, you must not rely in any way on any

23  knowledge you may have of the Somali language spoken on the

24  recording.  Your consideration of the transcript must be

25  based on the evidence in the case.

1          You have heard testimony that a defendant made a

2    statement.  It is for you to decide, one, whether the

3    defendant made the statement, and two, if so, how much weight

4    to give to it.  In making those decisions, you should

5    consider all the evidence about the statement, including the

6    circumstances under which the defendant may have made it.

7          You have heard testimony from persons who because

8    of education or experience were permitted to state opinions

9    and the reasons for their opinions.  Such testimony should be

10   judged just like any other testimony.  You may accept it or

11   reject it and give it as much weight as you think it deserves

12   considering the witness's education and experience, the

13   reasons given for the opinion, and all the other evidence in

14   the case.

15         During the trial certain charts and summaries were

16   shown to you in order to help explain the evidence in the

17   case.  These charts and summaries were not admitted in

18   evidence and will not go into the jury room with you.  They

19   are not themselves evidence or proof of any facts.  If they

20   do not correctly reflect the facts or figures shown by the

21   evidence in the case, you should disregard these charts and

22   summaries and determine the facts from the underlying

23   evidence.

24         Certain charts and summaries have been admitted in

25   evidence.  Charts and summaries are only as good as the

1    underlying supporting material.  You should therefore give

2    them only such weight as you think the underlying material

3    deserves.

4         Each defendant is charged in Count 1 of the

5    indictment with conspiring to providing material support to

6    terrorists in violation of Section 2339A (a) of Title 18 of

7    the United States Code.  In order for the defendant you are

8    considering to be found guilty of that charge, the government

9    must prove each of the following elements beyond a reasonable

10   doubt.  One:  Beginning on a date unknown and continuing to

11   on or about August 5, 2008, there was an agreement between

12   two or more persons to provide material support or resources

13   knowing or intending that the material support or resources

14   were to be used in preparation for or to carry out, A, the

15   killing of persons in a foreign country, or B, the use of a

16   weapon of mass destruction outside of the United States, with

17   all of you agreeing on either A or B or both.

18        Two:  The defendant became a member of the

19   conspiracy knowing of its unlawful object and intending to

20   help accomplish it.

21        A conspiracy is a kind of criminal partnership, and

22   agreement of two or more persons to commit one or more

23   crimes.  The crime of conspiracy is the agreement to do

24   something unlawful.  It does not matter whether the crime

25   agreed upon was committed.  For a conspiracy to have existed,

1    it is not necessary that the conspirators made a formal

2    agreement or that they agreed on every detail of the

3    conspiracy.  It is not enough, however, that they simply met,

4    discussed matters of common interest, acted in similar ways,

5    or perhaps helped one another.  You must find that there was

6    a plan to commit at least one of the crimes alleged in the

7    indictment as an object of the conspiracy with all of you

8    agreeing as to the particular crime which the conspirators

9    agreed to commit.

10          One becomes a member of a conspiracy by willfully

11   participating in the unlawful plan with the intent to advance

12   or further some object or purpose of the conspiracy, even

13   though the person does not have full knowledge of all the

14   details of the conspiracy.  Furthermore, one who willfully

15   joins an existing conspiracy is as responsible for it as the

16   originators.  On the other hand, one who has no knowledge of

17   a conspiracy but happens to act in a way which furthers some

18   object or purpose of the conspiracy does not thereby become a

19   conspirator.  Similarly, a person does not become a

20   conspirator merely by associating with one or more persons

21   who are conspirators nor merely by knowing that a conspiracy

22   exists.

23          A conspiracy may continue for a long period of time

24   and may include the performance of many transactions.  It is

25   not necessary that all members of the conspiracy join in at

1   the same time, and one may become a member of a conspiracy

2   without full knowledge of all the details of the unlawful

3   scheme or the names, identities, or locations of all the

4   other members.

5          Even though a defendant did not directly conspire

6   with other defendants in the overall scheme, the defendant

7   has in effect agreed to participate in the conspiracy if the

8   government proves each of the following beyond a reasonable

9   doubt.  One:  The defendant directly conspired with one or

10  more conspirators to carry out at least one of the objects of

11  the conspiracy; two, the defendant knew or had reason to know

12  that other conspirators were involved with those with whom

13  the defendant directly conspired; and three, the defendant

14  had reason to believe that whatever benefits the defendant

15  might get from the conspiracy were probably dependent upon

16  the success of the entire venture.

17         It is not a defense that a person's participation

18  in the conspiracy was minor or for a short period of time.

19         Proof that people simply met together from time to

20  time and talked about common interests such as political

21  views or religious beliefs or engaged in similar conduct is

22  not enough to establish a criminal agreement.  Such

23  association or speech, standing alone, is protected by the

24  First Amendment.  However, forming an agreement to engage in

25  criminal activity in contrast with talking about religious or

1  political beliefs or events is not protected speech.

2  Moreover, in determining whether the government has proven

3  its case beyond a reasonable doubt, you may consider speech

4  for whatever evidentiary value you find it deserves.

5         A conspiracy to kill persons in a foreign country

6  means an agreement between two or more persons to commit an

7  act or acts outside the United States that would constitute

8  murder if committed in the United States with one of the

9  conspirators committing at least one act within the

10  jurisdiction of the United States to effect the object of the

11  conspiracy.

12         "Murder" means unlawful killing with malice

13  aforethought.  "Malice aforethought" means an intent at the

14  time of the killing willfully to take the life of a human

15  being or an intent willfully to act in callous and wanton

16  disregard of the consequences of one's acts to human life.

17         "A conspiracy to use a weapon of mass destruction

18  outside the United States" means an agreement between two or

19  more persons, including at least one citizen of the United

20  States, to use a weapon of mass destruction outside the

21  United States without lawful authority.

22         "Weapon of mass destruction" means any explosive or

23  incendiary bomb, grenade, mine, or similar device or any

24  weapon, other than a shotgun, that can expel a projectile by

25  action of an explosive or propellant and with a barrel bore

1    more than one-half inch in diameter.

2              "Provide" means to make available, furnish, or

3    supply.

4              "Material support or resources" means any property,

5    tangible or intangible, or service, including currency or

6    monetary instruments or financial securities, financial

7    services, or other physical assets.

8              An act is done knowingly if the defendant is aware

9    of the act and does not act through ignorance, mistake, or

10   accident.  The government is not required to prove that the

11   defendant knew that his acts or omissions were unlawful.  You

12   may consider evidence of the defendant's words, acts, or

13   omissions along with all the other evidence in deciding

14   whether the defendant acted knowingly.

15             Each defendant is charged in Count 2 of the

16   indictment with conspiring to commit the offense of providing

17   material support to a foreign terrorist organization in

18   violation of Section 2339B (a)(1) of Title 18 of the United

19   States Code.  In order for the defendant you are considering

20   to be found guilty of that charge, the government must prove

21   each of the following elements beyond a reasonable doubt:

22   One, after March 18, 2008 and continuing to on or about

23   August 5, 2008, there was an agreement between two or more

24   persons to commit the offense of providing material support

25   or resources to the designated foreign terrorist organization

1    al-Shabaab; two, the defendant became a member of the

2    conspiracy knowing of its unlawful object and intending to

3    help accomplish it; and three, at least one or more of the

4    following conditions was met:  A, the offense occurred in

5    whole or in part within with United States; or B, the offense

6    occurred in or affected interstate or foreign commerce, with

7    all of you agreeing on either A or B or both.

8               To assist you in determining whether the government

9    has proved that the defendant you are considering became a

10   member of the conspiracy knowing of its unlawful object and

11   intending to help accomplish it, as alleged in Count 2, you

12   are advised that the offense of providing material support to

13   a foreign terrorist organization has the following elements:

14   One, the defendant knowingly provided material support or

15   resources to al-Shabaab; two, al-Shabaab previously had been

16   designated as a foreign terrorist organization; three, the

17   defendant knew that at least one of the following conditions

18   existed:  A, that al-Shabaab had been designated as a foreign

19   terrorist organization; or B, that al-Shabaab had engaged or

20   was engaging in terrorist activity; or C, that al-Shabaab had

21   engaged or was engaging in terrorism, with all of you

22   unanimously agreeing on at least one of these conditions.

23   Recall, however, that Count 2 of the indictment charges a

24   conspiracy.  The government need not prove that the object

25   offense was actually committed.

1        The defendants are charged in Count 3 of the

2    indictment with conspiracy to launder monetary instruments in

3    violation of Section 1956 (a)(2)(A) of Title 18 of the United

4    States Code.  In order for the defendant you are considering

5    to be found guilty of that charge, the government must prove

6    each of the following elements beyond a reasonable doubt:

7    First, beginning on a date unknown and continuing to on or

8    about August 5, 2008, there was an agreement between two or

9    more persons to transfer or transmit money or funds from a

10   place in the United States to a place outside the United

11   States with the intent to promote the carrying on of one or

12   more of the following specified unlawful activities:  A,

13   providing material support or resources to the designated

14   foreign terrorist organization al-Shabaab in violation of

15   2339B (a)(1) of Title 18 of the United States Code; or B,

16   conspiracy to kill persons in a foreign country in violation

17   of Section 956 of Title 18 of the United States Code; or C,

18   providing material support or resources to terrorists in

19   violation of Section 2339A (a) of Title 18, with all of you

20   agreeing unanimously on at least one of these specified

21   unlawful activities, and, second, the defendant became or

22   defendants became members of the conspiracy knowing of its

23   unlawful purpose and intending to help accomplish it.

24        That should be singular defendant there to "the

25   defendant became a member of the conspiracy knowing of its

1   unlawful purpose and intending to help accomplish it."

2          Defendant Basaaly Moalin is charged in Count 4 of

3   the indictment with providing material support to terrorists

4   in violation of section 2339A (a) of Title 18 of the United

5   States Code.  In order for the defendant to be found guilty

6   of that charge, the government must prove each of the

7   following elements beyond a reasonable doubt:  One, on or

8   about January 3, 2008, the defendant provided material

9   support or resources, namely a house in Somalia; and two, the

10  defendant did so knowing or intending that the material

11  support or resources were to be used in preparation for or in

12  carrying out a conspiracy to kill persons in a foreign

13  country.  The phrase "conspiracy to kill persons in a foreign

14  country" has the same meaning as defined in instruction

15  number 20.

16          If you find beyond a reasonable doubt that

17  defendant Basaaly Moalin provided material support or

18  resources in preparation for or to carry out a conspiracy to

19  kill persons in a foreign country or to use a weapon of mass

20  destruction outside the United States, then you do not need

21  to consider the question of attempt.  If, however, you do not

22  find that the government has proved beyond a reasonable doubt

23  each of the elements of the offense of providing material

24  support or resources in Count 4, then you should consider

25  whether the government has proven that defendant Basaaly

1    Moalin attempted to do so.

2           In order for defendant Basaaly Moalin to be found

3    guilty of attempt, the government must prove each of the

4    following elements beyond a reasonable doubt:  On or about

5    January 3, 2008, defendant Basaaly Moalin intended to provide

6    material support or resources, namely, a house, knowing or

7    intending it was to be used in preparation for or to carry

8    out a conspiracy to kill persons in a foreign country; two,

9    defendant Basaaly Moalin did something that was a substantial

10   step toward committing the crime.

11          Mere preparation is not a substantial step toward

12   committing the crime.  To constitute a substantial step, a

13   defendant's act or actions must demonstrate that the crime

14   will take place unless interrupted by independent

15   circumstances.

16          Defendants Basaaly Moalin, Mohamad Mohamad Mohamud,

17   and Issa Doreh are each charged in Count 5 with providing

18   material support or resources, namely, currency, to a

19   designated foreign terrorist organization, al-Shabaab.  In

20   order for the defendant you are considering to be found

21   guilty of that charge, the government must prove each of the

22   five elements beyond -- I think that should be -- let me see.

23   I think it should be "following" rather than "five."  Agreed,

24   counsel?

25          MS. MORENO:  Yes, your Honor.

1           THE COURT:  Yeah.  See that word "five" there,

2    ladies and gentlemen, on the bottom line of the first

3    paragraph on page 48?  Strike "five" and replace it with the

4    word "following," please.

5           I will reread that paragraph.  Defendants Basaaly

6    Moalin, Mohamad Mohamad Mohamud, and Issa Doreh are each

7    charged in Count 5 with providing material support or

8    resources, namely, currency, to a designated foreign

9    terrorist organization, al-Shabaab.  In order for the

10   defendant you are considering to be found guilty of that

11   charge, the government must prove each of the following

12   elements beyond a reasonable doubt:  One, on or about

13   April 23, 2008, the defendant knowingly provided material

14   support or resources to al-Shabaab; two, al-Shabaab

15   previously had been designated as a foreign terrorist

16   organization; three, the defendant knew that one or more of

17   the following conditions existed; A, that al-Shabaab had been

18   designated as a foreign terrorist organization; or B, that

19   al-Shabaab had engaged or was engaging in terrorist activity;

20   or C, that al-Shabaab had engaged or was engaging in

21   terrorism with all of you unanimously agreeing on at least

22   one of these conditions; and four, that one or more of the

23   following conditions was met:  A, the offense occurred in

24   whole or in part within the United States; or B, the offense

25   occurred in or affected interstate or foreign commerce with

1   all of you agreeing on either A or B or both.

2          If you should find beyond a reasonable doubt that

3   the defendants charged in Count 5 committed the offense of

4   providing material support or resources to the designated

5   foreign terrorist organization al-Shabaab, then you do not

6   need to consider the question of attempt.  If, however, you

7   do not find that the government has proved beyond a

8   reasonable doubt each of the elements of the offense

9   providing material support or resources in Count 5, then you

10  should consider whether the government has proven that the

11  defendant attempted to do so.

12         In order for a defendant you are considering to be

13  found guilty of attempt to provide material support or

14  resources to a foreign terrorist organization, the government

15  must prove each of the following elements beyond a reasonable

16  doubt:  One, on or about April 23, 2008, defendants intended

17  to knowingly provide material support or resources to the

18  designated foreign terrorist organization al-Shabaab; two,

19  al-Shabaab previously had been designated as a foreign

20  terrorist organization; three, the defendants knew that one

21  or more of the following conditions existed:  A, that

22  al-Shabaab had been designated as a foreign terrorist

23  organization; or that al-Shabaab had engaged or was engaging

24  in terrorist activity; or C, that al-Shabaab had engaged in

25  or was engaging in terrorism with all of you unanimously

1    agreeing on at least one of these conditions; and four, the

2    defendants did something that was a substantial step toward

3    committing the crime; and five, that one or more of the

4    following conditions is met:  A, the offense occurred in

5    whole or in part within the United States; or B, the offense

6    occurred in or affected interstate or foreign commerce with

7    all of you agreeing as to A or B or both.

8            Mere preparation is not a substantial step toward

9    committing the crime.  To constitute a substantial step, a

10   defendant's act or actions must demonstrate that the crime

11   will take place unless interrupted by independent

12   circumstances.

13           A defendant may be found guilty of providing

14   material support to the designated foreign terrorist

15   organization al-Shabaab or attempting to do so as charged in

16   Count 5 of the indictment even if the defendant personally

17   did not commit the act or acts constituting the crime or the

18   attempt but aided and abetted in its commission.

19           In order for the defendant you are considering to

20   be found guilty of aiding and abetting, the government must

21   prove each of following elements beyond a reasonable doubt:

22   One, on or about April 23, 2008, the crime of providing

23   material support or resources to a foreign terrorist

24   organization or attempting to do so was committed by someone;

25   two, the defendant knowingly and intentionally aided,

1    counseled, commanded, induced, or procured that person to

2    commit each element of providing material support to a

3    foreign terrorist organization or attempting to do so; and

4    three, the defendant acted before the crime was completed

5    with all of you unanimously agreeing that the defendant aided

6    and abetted the completion of -- of material support or the

7    attempt to do so or both.

8            It is not enough that the defendant merely

9    associated with the person committing the crime or

10   unknowingly or unintentionally did things that were helpful

11   to that person or was present at the scene of the crime.  The

12   evidence must show beyond a reasonable doubt that the

13   defendant acted with the knowledge and intention of helping

14   that person commit the crime of providing material support to

15   a foreign terrorist organization.  The government is not

16   required to prove precisely which defendant actually

17   committed the crime and which defendant aided and abetted.

18           For Counts 2, 3, and 5, there are several other

19   terms I must define for you.  The term "foreign terrorist

20   organization" has a particular meaning.  In order for an

21   organization to qualify as a foreign terrorist organization,

22   it must have been designated as such by the Secretary of

23   State through a process established by law.  I instruct you

24   that on February 26, 2008, the United States Secretary of

25   State designated al-Shabaab as a foreign terrorist

1    organization and that this designation became legally

2    effective on March 18, 2008 when the designation was

3    published.  I further instruct you that al-Shabaab's

4    designation as a foreign terrorist organization has remained

5    continuously in effect since that time.

6           The term "terrorist activity" is defined as any

7    activity which is unlawful under the laws of the place it was

8    committed or which, if it had been committed in the United

9    States, would be unlawful under the laws of the United States

10   or any particular state and which involves any of the

11   following:  One, the seizing or detaining and threatening to

12   kill, injure, or continue to detain another individual in

13   order to compel a third person, including a governmental

14   organization, to do or abstain from doing any act as an

15   explicit or implicit condition for the release of the

16   individual seized or detained; two, an assassination; three,

17   the use of any explosive, firearm, or other weapon or

18   dangerous device other than for mere personal monetary gain

19   with the intent to endanger directly or indirectly the safety

20   of one or more individuals or to cause substantial damage to

21   property; or four, a threat, attempt, or conspiracy to do any

22   of the above acts.

23          To engage in terrorist activity means in an

24   individual capacity or as a member of an organization, one,

25   to commit or incite under circumstances indicating an

1    intention to cause death or serious bodily injury a terrorist

2    activity; two, to prepare or plan a terrorist activity;

3    three, to gather information on potential targets for

4    terrorist activity; or four, to solicit funds for other

5    things of value for a terrorist activity or a designated

6    terrorist organization.  The government need only prove at

7    least one type of terrorist activity with all of you

8    unanimously agreeing as to that activity.

9          The term "terrorism" means a premeditated

10   politically motivated violence perpetrated against

11   noncombatants targeted by subnational groups or clandestine

12   agents.

13         The indictment charges that the offenses alleged

14   were committed on or about a certain date.  Although it is

15   necessary for the government to prove beyond a reasonable

16   doubt that the offenses were committed on a date reasonably

17   near the date alleged in the indictment, it is not necessary

18   for the government to prove the offenses were committed

19   precisely on the date charged.

20         It is the theory of the defendants as to Counts 1

21   and 3 that each defendant only intended to aid persons in

22   need in Somalia and never intended to provide material

23   support to murder anyone or provide material support for the

24   use of weapons of mass destruction without lawful authority.

25         It is the defendants' theory of the case that the

1  government has not proved beyond a reasonable doubt that each

2  defendant intended to provide material support to murder in

3  Somalia or to use a weapon of mass destruction without lawful

4  authority.  Each defendant contends he intended only to aid

5  others.  Under this theory of defense, each defendant

6  contends he lacked the specific intent required to commit the

7  offense charged in Counts 1 and 3.

8          It is the theory of defendants as to Count 2 that

9  they only intended to aid persons in need in Somalia and

10  never conspired to knowingly or intentionally provide

11  material support to al-Shabaab.  It is the defendants' theory

12  of the case that the government has not proved beyond a

13  reasonable doubt that the defendants conspired to knowingly

14  or intentionally providing material support to al-Shabaab.

15  Each defendant contends that he intended only to aid others.

16  Under this theory of defense, each defendant contends he

17  lacked the knowledge or intent required to commit the offense

18  charged in Count 2.

19          It is Mr. Moalin's contention with respect to Count

20  4 that the government has not proved beyond a reasonable

21  doubt that he had either the knowledge or intent to provide

22  material support in the form of his house to al-Shabaab and

23  that he did not in fact provide his house to al-Shabaab.

24          It is the theory of defendants Moalin, Mohamud, and

25  Doreh as to Count 5 that each of them only intended to aid

 1   persons in need in Somalia, never knowingly or intentionally

 2   providing material support to al-Shabaab and, in fact, did

 3   not provide material support to al-Shabaab.  It is the

 4   defendants' theory of the case that the government has not

 5   proved beyond a reasonable doubt that the defendants

 6   knowingly or intentionally provided material support to

 7   al-Shabaab.  Each defendant contends that he intended only to

 8   aid others.  Under this theory of defense, each of the

 9   defendants, Moalin, Mohamud, and Doreh, contends he lacked

10   the knowledge or intent required to commit the offense

11   charged in Count 5.

12          Ladies and gentlemen, that concludes the

13   substantive instructions relating to the individual charges

14   in this case and also general principles regarding evidence

15   and other similar matters of that type.  There is a handful

16   of jury instructions at the end beginning with the

17   instruction entitled Duty to Deliberate, which I will give to

18   you at the end of the arguments, after all the arguments.  So

19   for now you have been instructed on the law that pertains to

20   this case, and we will continue on with the instructions at

21   the end of the day.  I would ask our interpreter if he would

22   appreciate a short break at this time.

23          THE INTERPRETER:  Yes.  Thank you.

24          THE COURT:  You would.  Ladies and gentlemen, let's

25   take a short recess, and I'd like to have everyone back in

```
 1   their seats in ten minutes.  So remember the admonition -- it
 2   applies now as forcefully as it has throughout the entire
 3   trial -- and please be prepared to enter the courtroom again
 4   in ten minutes.  Thank you.
 5          (There was a break in the proceedings.)
 6          (Following is a sidebar conference.)
 7              MR. DRATEL:  Your Honor, I just wanted to restate
 8   our objections to the charge, after the charge, just in --
 9              THE COURT:  Just to preserve your --
10              MR. DRATEL:  Yes, exactly.
11              THE COURT:  You don't need to do that here.  So
12   basically what you want to do is just preserve the objections
13   you had made earlier, which -- all of which were noted on the
14   record.
15              MR. DRATEL:  Yes.  Thank you, your Honor.
16              THE COURT:  William, how long do you think you'll
17   be?
18              MR. COLE:  I'm going to try to keep it under an
19   hour ten, hour and 15.
20              THE COURT:  That's going to take us to about 11:30.
21   Mr. Dratel, are you going --
22              MR. DRATEL:  Yes.
23              THE COURT:  -- to do yours?  How long do you think
24   you'll --
25              MR. DRATEL:  I'm not going more than an hour, so if
```

1    I can go right after Mr. Cole, maybe take a little bit later

2    lunch break, that would be great.

3             THE COURT:  Okay.  We'll see if --

4             MR. COLE:  Yes, and I'll try to keep -- can't time

5    it exactly, but I'll try to keep it down.

6             MR. DRATEL:  Yeah, me to.  I know where I am.

7        (Sidebar conference concludes.)

8             THE COURT:  Okay.  Everyone is present.  Ladies and

9    gentlemen, we'll proceed with the final arguments at this

10   time.  The government will both open and close the arguments,

11   and after Mr. Cole presents his opening argument, Mr. Dratel

12   will present his argument on behalf of his client, defendant

13   Moalin, and then we may break for lunch following those two

14   arguments -- it will probably take us into the noon hour,

15   12:30 or so, give or take, we'll break for lunch, and then

16   hear balance of the arguments after lunch.  Mr. Cole?

17            MR. COLE:  Thank you, your Honor.  Good morning.

18   Ladies and gentlemen, they say that a picture is worth a

19   thousand words.  But this particular picture does not do

20   justice to al-Shabaab.  This picture does not show the

21   suicide bombings; it doesn't show the beheadings, thankfully;

22   it doesn't show the look on the face of a Somali citizen

23   who's just received a night letter from al-Shabaab; it

24   doesn't show the look on the face of a Burundian peacekeeper

25   sent there by AfriCom -- excuse me -- by the African Union to

1    try to give some chance to a fledgling central government.

2    You have forgotten more about Somalia by this time than most

3    people will ever know.  But one thing emerges:  Al-Shabaab,

4    they're terrorists, they're killers.

5              Aden Ayrow, one of the chief terrorists in

6    al-Shabaab.  Trained in Afghanistan.  Came back to Somalia

7    where he harbored foreign terrorists -- not Somali

8    terrorists, foreign terrorists -- who had carried out

9    bombings in Mombasa.  He's hunted, Aden Ayrow.  He goes to

10   the Italian cemetery, where he exhumes the bodies in the

11   cemetery, establishes a radical jihadist center, the

12   Salahudin Center, begins to build his reputation as an

13   infamous, wanted terrorist.  Eventually killed on May 1st,

14   2008 by the United States in a missile strike.

15             What's remarkable is that all these tactics of

16   al-Shabaab you heard about, that Mr. Bryden testified about,

17   each one of these suicide bombings, assassinations, killings

18   outside mosques, IEDs, improvised explosive devices, mortar

19   attacks on civilian officials, ambush, attacks on

20   peacekeepers, all of these tactics, you heard about them not

21   only from Mr. Bryden but you heard them on the audio calls;

22   in the audio calls in this case you heard all these

23   discussed.

24             Basaaly Moalin was on the phone with Aden Ayrow,

25   personally on the phone with this internationally infamous

1    terrorist leader.  And you heard in this case at the very

2    outset, the defense said oh, I mean come on, the government

3    just picked some calls, they listened to his phone for hours

4    and hours.  Who has even one phone call with a terrorist

5    leader, even one?  The defendant Basaaly Moalin had many.

6          Now, I am going to review with you all the bread

7    crumbs -- really not bread crumbs -- all the neon lights that

8    point to the inescapable conclusion that this Sheikalow, the

9    Majadhub, on the phone with Basaaly Moalin, that was Aden

10   Ayrow.  And Moalin, Basaaly Moalin, was funding al-Shabaab on

11   those phone calls and conspired with other defendants to do

12   so.  But first we're going to start with establishing

13   Sheikalow and Majadhub, Aden Ayrow.  And I encourage you -- I

14   put exhibit numbers down; you don't need to flip through the

15   books because I put on the screen the parts I'm going to

16   review.  You may find the exhibit numbers useful, but I'm

17   going to move through this relatively quickly just to keep

18   this thing rolling.

19         We start off December 20, '07.  We need the sum of

20   2,000 -- no, 3,000 and 160, and it's needed for Bay and

21   Bakool as their rations for these ten days.  Leave it to me.

22   I will take care of that issue swiftly with him -- we learned

23   later who "him" is; that's Sheik Mohamed, defendant

24   Mohamud -- and with the Saleban cleric whom you talked to by

25   the name of Sheik Issa.

1            And where is Bay and Bakool, ladies and gentlemen?

2    Bay and Bakool are two regions in Somalia, separated entirely

3    by another region, by two other regions, from Galgaduud.

4    Right in the very first part of this, you learned this is not

5    all about the Galgaduud region, this is not all about some

6    effort by the clan in Guraceel.  He needs -- he needs money

7    for the forces in Bay and Bakool.  That's where Baidoa is,

8    that's where Bur Hakaba is, and that's where Matthew Bryden

9    told you that Roobow had his large group of al-Shabaab

10   forces.

11           And Basaaly now goes to work; Basaaly Moalin goes

12   to work.  He reaches out the next day.  The area you see --

13   to Sheik Issa, Issa Doreh -- the area you see, around

14   Baidoa -- again, Bay and Bakool -- the places where the

15   fighting are going on.  One dollar a day per man is what we

16   need for our forces stationed around.

17           Issa -- and what does Sheik Issa say right away?

18   Did you tell Sheik Mohamed?  We will do our best, I will tell

19   Mohamad.

20           The next day he's reporting this out again, I

21   believe in this case to Ahmed Nasir:  The men who belong to

22   the youth who are firing the bullets.  Money is needed for

23   forces there in Bur Hakaba.  These men cut the throats of 60

24   lice-infested just within this month and destroyed up to five

25   vehicles.  Money is needed for all those forces doing that

1    job.

2              That's where the money's needed.  Is that about

3    schools?  Is that about drought relief?  Absolutely not.  You

4    don't cut the throats of people at school.

5              Exhibit 130.  January 1st.  He's back on the phone

6    with Ayrow again, back on the phone with Aden Ayrow,

7    Sheikalow.  And Basaaly Moalin's letting him know hey, we

8    delivered, it's a small amount we sent you, the place of

9    Amal -- and you'll remember that Amal is the Dubai mothership

10   that the Shidaal Express was part of; so the Amal is the

11   hawala system.  It's the place of Amal, Yusuf, Yusuf Mohamed

12   Ali.  Aden Ayrow:  It's a big deal, God willing, it's a big

13   deal.

14             It's a big deal because what may seem like a small

15   amount of money to you, or here, it's not a small amount of

16   money in Somali.  He's already said that a dollar a day is

17   enough to support a soldier, an al-Shabaab soldier, in

18   Somalia.  And what we have on the Exhibit 39 -- there you

19   have it.  January 1st, two transactions to Yusuf Mohamed Ali

20   in Bur Hakaba -- that's the market, that's the huge

21   bazaar/market in Mogadishu.  In Mogadishu two transactions

22   totaling almost $4,000 is sent, Yusuf Mohamed Ali.  Right

23   away he delivers to Aden Ayrow.  And of course the

24   transaction's split in two, as the transactions always are,

25   because they don't want to have to have recordkeeping for

1  these transactions; they don't want the United States

2  government to know that they're funding it.

3          Now, after he tells Ayrow that the money has been

4  delivered, they again go on to celebrate and talk about

5  what's being accomplished.  And Aden Ayrow said -- Basaaly

6  Moalin said -- Exhibit 130 -- these days you did your job

7  very well.  Aden Ayrow:  Yes, these two nights we gave the

8  non-Muslims a holiday to remember.  And Basaaly:  If these

9  men were Somalis who have a place to run to or know people

10 who can help them, they would have run, but the problem is

11 they have to die because they don't know where to run to.

12 And Ayrow, in the spirit:  Yeah, even the Burundians were

13 attacked the other night.

14         And who were the Burundians?  Peacekeepers.

15 Burundian peacekeepers sent to help shore up the TFG, which

16 the United Nations, the African Union, and the United States

17 was trying to help build some capacity so that perhaps there

18 can be once again a functioning central government in

19 Somalia.

20         Now, how does Basaaly begin the call?  Convey my

21 greetings to the youth.  Of course al-Shabaab means the

22 youth.

23         Exhibit 131, couple days later, January 3.  Now,

24 sometimes there are -- these calls sometimes get really

25 intense about what's going on in Somalia, and it's very

1  difficult for you to track and follow.  But the very

2  beginning of this phone call is kept in for a particular

3  reason because at the beginning of the call, Ayrow is telling

4  him about very heavy fighting taking place involving men who

5  are loyal to Abdullahi Yusuf.  And here's one of those neon

6  lights, one of those bread crumbs that shows you that this is

7  Aden Ayrow and they're talking about Shabaab because minutes

8  after he ends the call with Ayrow, he has a call --

9  Exhibit 132 -- and what does he tell the person?  Hey, right

10  now I was talking to the man who's in charge of the youth.

11  Do you know what he told me?  He told me the fighting that

12  took place was between Abdullahi Yusuf's men and a group of

13  men who belong to the youth.

14         Now, on that same phone call, Exhibit 131 I believe

15  it is, on January 3 of 2008 -- this is a very important phone

16  call; I encourage you to spend time with it in the jury room.

17  You will recall that Basaaly Moalin gives Aden Ayrow detailed

18  instructions to his house, and he has to use landmarks

19  because as Matthew Bryden testified, Somalia does not have

20  street signs with addresses like we do here, and so you use

21  landmarks, and Matthew Bryden explained that the landmarks

22  being used, the Warshaddaha Road -- I'm probably

23  mispronouncing that -- Huriwa on the Ex-Control side, the

24  Huriwa side next to Ex-Control.  Matthew Bryden explained

25  they're talking about this section on the upper -- I guess it

1   would be upper left-hand -- right-hand corner of the map, the

2   Huriwa side next to Ex-Control.  That's where the house was

3   that Basaaly Moalin was leading Aden Ayrow to.  And here's

4   what he tells him about the house:  You can use it for

5   anything you want, I mean if you want to hide stuff in there.

6   It has water and everything.  However, the house is an easy

7   target.  I mean it has trees, so it can be easily identified.

8   I mean if they find out that something is going on there, I

9   mean the bad thing about this house is the fact that it is an

10  easily identifiable house.  Well, why is that a bad thing if

11  what you're doing is helping the schools and orphans?

12          And does Ayrow respond?  No one will know.  How

13  could anyone know if the house is only used during the

14  nights?  And Basaaly goes on:  This is what you can do.

15  After you bury your stuff deep in the ground, you would then

16  plant the trees on top, you know?  This is what I can do.  I

17  will have my brother send some trees, which are wrapped in

18  plastic, to be delivered there.  The stuff will be buried

19  underneath.  It has an attic.  I used to store things like

20  documents and weapons up there.  And the young man will

21  supply you with the key.

22          Okay.  And what's interesting about this is you

23  jump way forward to Exhibit 189, it's sort of like warning --

24  warning your teenager that bad things can happen, there's

25  consequences.  Well, you jump forward to July 21st, several

 1    months later, and Basaaly reports -- I think it's to

 2    Hassan -- he reports:  Well, I don't have much news with

 3    regard to Mogadishu even though it has a direct effect on me

 4    because these men -- those men attacked my home yesterday.

 5    The fact they were coming was known ahead of time, so the

 6    young boys -- code for al-Shabaab -- who were there pulled

 7    out of the place.  So, eh, anyways they inflicted a very big

 8    loss on them.  First they killed four men in the first group,

 9    and later they killed two from the group that came back to

10    attack them.  Oh, it was Ali, I'm sorry -- and Ali said was

11    this done by the Somalis?  At first it was the Somalis, and

12    later the Ethiopians launched the attack.

13            And if you read that exhibit -- and I believe it's

14    Exhibit 190 that follows -- there's two conversations about

15    the attack on his house, and it's very easy to understand

16    that what he's talking about is that his home in Mogadishu,

17    where the youth were staying, was attacked by

18    counterterrorism forces coming to root out al-Shabaab,

19    Somalis, TFG.  And then when they were driven back by

20    Shabaab, they went and got the Ethiopians to come help them.

21    And he explained that in both of these two phone calls.

22            And something else about the house -- and I'm going

23    to talk more about this later -- but the defense wants you to

24    believe that Sheikalow was that guy, Hassan Guled, at the

25    deposition in Djibouti and not Aden Ayrow.  And they say

1    well, Sheikalow was the police chief in Guraceel and he used

2    Basaaly's house for some events.  This house is in Mogadishu,

3    not Guraceel, a one- to two-day drive away.  And the house in

4    Somalia that Basaaly Moalin built, Defense Exhibit C, you

5    have the deed for it, you also have the translation for the

6    deed.  I, Maheed Hassan Gulo (phonetic), who owned vacant

7    land in Guraceel City, attest in here that I sold the land to

8    Sharif Abdi -- who's an agent for Basaaly, Basaaly Saeed --

9    because that from today -- it's March 25, 2008 -- the

10   ownership of that land belongs to Basaaly Saeed.

11          The land was a dirt lot in January, it was vacant

12   land in January of '08, in Guraceel.  It was months later

13   that Basaaly bought the land and built the property on it.

14   So that house in Guraceel is a complete distraction, nothing

15   to do with the house provided in Mogadishu to Aden Ayrow.

16   And that man, Hassan Guled, who they passed off as Sheikalow,

17   absolutely had nothing to do with Mogadishu; he said his

18   operations were only in the Galgaduud region.

19          We go to a call, January 20, 2008, another very

20   important phone call, Exhibit 136.  In this call Basaaly

21   Moalin is having a discussion with Aden Ayrow, and he's

22   trying to -- he does this in several calls, and you'll see

23   this in several calls -- Basaaly Moalin's trying to play both

24   sides.  He wants -- here's what he wants.  Basaaly Moalin

25   wants al-Shabaab to kill, destroy, bomb, terminate the TFG

1    and the Ethiopians and the Burundians and the peacekeepers

2    while letting the clan back in the hometown have their own

3    administration and rule the roost.  And he's trying to

4    balance those two things because he knows that al-Shabaab's

5    ready to do the job on the TFG, but they're also kind of

6    wanting to get involved in the local politics back home; and

7    that causes problems because the local clan, they want

8    al-Shabaab to stay outside doing the fighting but leave the

9    business of governing the town to the local clan, and that

10   causes some conflict, and you see that in the depositions,

11   you see it in the phone calls.  Basaaly Moalin thinks he's

12   the great mediator and he's going to kind of somehow balance

13   these two -- these two issues, and he has conversations with

14   Ayrow about that quite a bit and with others.

15           And here Aden Ayrow tells him:  Well, we were

16   involved in the politics.  Do you know that in Islam politics

17   and military go together?  Where is it mentioned that secular

18   politics and military are separate?  What are you talking

19   about?  And Basaaly says well, I understand.  Islam has its

20   own political principles.  Yes.  Islam has its own political

21   principles.  There is no place on earth where secular

22   politics and Islam military go together.  Islam is the only

23   one where the fighter, the politician, and the missionary

24   must all come together in a single unit.  Uh-huh.  One thing

25   though -- And we, the Shabaab, have a political section, a

1   military section, and a missionary section.  We have all

2   that.

3          Okay.  Another sign, clue that this is Aden Ayrow.

4   And I want to pause here for a second and switch over to the

5   Elmo again.  You know, the defense went around and around a

6   little bit about the translations in this case and suggested

7   that our translations were not accurate or something.  And I

8   want to show you what happened on Exhibit 136.  As you'll

9   recall, the left-hand column is the transcription of the

10  actual Somali words by Abdi Elmi, by the linguist who came

11  and testified for the defense.  The middle column is how the

12  government's translator translated the passage.  And the far

13  right column is how the defense linguist, Mr. Elmi,

14  translated.  And something funny happened along the way.

15         In the left-hand column the word "Shabaab-ka" --

16  it's right there -- shows up.  Perhaps the most important,

17  explosive word in the case, no pun intended, and the one that

18  actually anyone can see, even someone who doesn't speak

19  Somali can look up and see "Shabaab."  And the government's

20  translation is carried over.  In the defense translation it's

21  gone; it doesn't show up at all.  And Mr. Elmi, when

22  questioned about that by Mr. Ward, he says well, I didn't

23  think in that context they were talking about Shabaab.  Well,

24  how about the word "Shabaab?"  It's there.  Don't you have to

25  translate it as something?  Don't you have to put that as

1   something in the English?  And he says well, I guess that was

2   a mistake, I guess it was a mistake.

3           Then later, same column, you look over in the

4   left-hand column, the transcription of the Somali, the word

5   "Shabaab" down towards the bottom stands out.  It's an Arabic

6   word; it's not Somali.  You don't have to be Somali to know

7   the word "Shabaab."  It's Arabic, and there it is.  And it's

8   in our translation, the government's translation.

9           If we talk about the Murusade subclan, the entire

10  Murusade subclan is Shabaab.  If you go to the defense

11  translation, gone, doesn't show up at all.  The word is

12  completely dropped.  Doesn't carry over the Arabic word,

13  which should just carry over because it's Arabic, it's not

14  Somali; it ought to just carry over in English.  Not only

15  doesn't carry over, doesn't even translate it in English as

16  youth.  Just gone.

17          Does it again in the same transcript.  He

18  transcribes on the right- and the left-hand side,

19  "Shabaab-ka," right there, left-hand side.  Now, this was a

20  part of a transcript that they put in that we had not used in

21  our case.  In their defense translation, "Shabaab" is gone,

22  doesn't show up.  A remarkable penchant for leaving the word

23  "Shabaab" out of the translations, and it's a word that no

24  one else in the case had trouble saying.  The witnesses in

25  Djibouti didn't stumble over the word "Shabaab," the

1    defense -- everyone knows the word "Shabaab."  But their

2    translator drops it repeatedly from the transcripts and in

3    very key places because if the word "Shabaab" is translated

4    there like it should be, if it's carried over like it should

5    be, it says we, the Shabaab, we, the Shabaab, the person

6    Basaaly Moalin's speaking to, Aden Ayrow.

7            And he goes on in that same phone call:  The jihad

8    we are waging -- oh, and on that score, Mr. Ward asked the

9    linguist well, don't you look at the context, don't you go

10   like look, right up here, they're talking about, you know?

11   No, no, no, no, I don't connect the dots, I just -- I don't

12   connect the dots on the calls, I just look at this one area.

13   That was his answer.  It's your job to connect the dots;

14   that's what jurors do.

15           The jihad we are waging.  Sheik Hassan Dahir and

16   Sheik Sharif are living in big houses in Asmara.  However, we

17   sacrifice our most precious belonging, our lives.  There are

18   so many men who are blowing themselves up, I mean.  I

19   understand.  And killing three to four hundred Ethiopians.  I

20   understand.

21           Imagine those words coming out of the mouth of

22   Hassan Guled, that nice guy in the white garb who testified.

23   He was like everyone's favorite uncle.  He never talked about

24   blowing anybody up.  He denied ever having any conversation

25   like that at all because it was Aden Ayrow on the call.

1          Same call:  The other day we planted a land mine

2   for Abdi Qeybdiid, who was traveling on that road; he was

3   almost hit.

4          Who was Abdi Qeybdiid?  Police commissioner in

5   Mogadishu, okay?  Not in Guraceel, not in the Galgaduud

6   region, police commissioner in Mogadishu.

7          And Basaaly says what's the latest news.  You guys

8   did a great job.  Nur Adde and Abdisalan have arrived today.

9   As soon as they arrived at the presidential palace, we hit

10  them with 12 mortar shells.  Villa Somalia is still smoking.

11  We promise such welcome to new prime minister.  God is great.

12  God is great.  It is something to be thankful of, the fact

13  that you are capable to deny them the opening of new offices

14  and to work as a functioning government.

15         What does that have to do with education or the

16  ILEYS Foundation?  What does that have to do with drought

17  relief?  Nothing.  It has to do with attempting to

18  assassinate the prime minister of the TFG.  And what did

19  Mr. Bryden tell you? Nur Adde, his background, secretary

20  general of the Muslim affiliate of the Red Cross, involved

21  for years in humanitarian efforts in Somalia, accepted

22  position as the second prime minister of the TFG -- I mean

23  you think you could get a life insurance policy for that

24  job -- steps up to the plate and becomes the prime minister,

25  and that's who they we were trying to shell with mortars.

1  And the deputy prime minister?  Ahmed Abdisalan.  Matthew

2  Bryden testified, co-founder and director of the Center for

3  Research and Dialog, part of the Wartorn Societies Project, a

4  project that tried to find a way to stop this nation from

5  falling back into continual civil war.  He stepped to the

6  plate, becomes the deputy prime minister of the TFG; even

7  though at one point he had been a critic of the TFG, he

8  decided to become part of the solution, joined the TFG, and

9  when he arrived at Villa Somalia, al-Shabaab tries to shell

10 them with mortars.  And there is the Villa Somalia.  Not in

11 Guraceel, not in the Galgaduud region, in Mogadishu.

12         And after he regales -- after Aden Ayrow regales

13 Basaaly Moalin with these feats, with the violence, with the

14 attacks, with the attempted assassinations, he puts the

15 squeeze:  What I want from you is to find the sheik.  Okay,

16 that's what he wants.  Okay, tell Sheik Mohamad -- defendant

17 Mohamad Mohamad Mohamud -- tell Sheik Mohamad today is the

18 21st -- you got to remember the issue with the universal time

19 clock -- today's the 21st.  Yes.  He must let us know the

20 amount of money we can expect every month, even if it's $100.

21 God willing.  We want to support the insurgent with it.

22         Not the schools, not the drought.  We want to

23 support the insurgent with it.

24         Basaaly Moalin next day, or later that day, perhaps

25 because of this whole universal time clock:  The gentleman

1    called me this morning -- he's speaking to Hassan -- the

2    gentleman called me this morning, he said we will fight, we

3    will use what you give us for bullets, so don't hold anything

4    back.  He uses different names.  Each time he calls from a

5    different phone.

6         And then Hassan -- and you will get the flavor --

7    you already have got the flavor; you'll get it more as you

8    look at the binder.  Hassan, his friend from St. Louis, he

9    speaks in triple code.  He's a very fearful person.  He hates

10   the fact that Basaaly Moalin speaks so freely on the phone.

11   And he says since we can understand things, it is not nice to

12   spell out everything like you are spelling out.

13        That's consciousness of guilt.  And, in fact, they

14   do deliver more money.  You will find in the middle of

15   February -- which we'll talk about this more a little

16   later -- but in the middle of February '08, they send $2,000

17   over to Aden Ayrow in Somalia.  And he talks with Aden Ayrow

18   on the phone, and Basaaly Moalin said:  Dhunkaal -- that's

19   the code word for the money going to Aden Ayrow -- Dhunkaal

20   is asking whether you received two pieces.  Did you use the

21   name Yusuf Mohamed Ali as the receiver?

22        That was the name he used, if you recall, in

23   January, Yusuf Mohamed Ali.  Yes, Yusuf Mohamed Ali.  Is it

24   2,000?  Yes.  And you'll find it broken down in two

25   transactions on the Shidaal record, two transactions from

1    Dhunkaal to Yusuf Mohamed Ali.

2           Now, here is a really important code/clue for you

3    to crack.  Exhibit 145.  Basaaly Moalin is speaking to Abu

4    Rahman, and it says -- he's talking again about he's

5    trying -- in this call you'll see he's trying to encourage

6    Abu Rahman to -- don't turn the people against the Shabaab.

7    He's saying, you know, they're not all bad, don't -- you

8    know, just be careful, I know there's this conflict between

9    the local administration and al-Shabaab in Guraceel, but

10   don't -- there's an important place for al-Shabaab is

11   basically what Basaaly Moalin is lobbying Abu Rahman about.

12   And as they discuss this issue, Basaaly says the phone number

13   at which you contact the professor, is it the one that --

14   that ends with 5-7?  And Abu Rahman says, are you referring

15   to teacher Aden?  Aden Ayrow.  Are you referring to teacher

16   Aden?  Yes.  He calls me from numerous ones that belong to

17   him, but the last one -- currently he has the one that ends

18   with 5-7.  And Abu Rahman says, I can't say which cell phone

19   he's currently carrying.  In fact, I don't know any of his

20   phone numbers.  I only received a call from him.  What I'm

21   trying to say is I know that this man cannot carry a specific

22   phone that is known to be his at all.

23          Well, why not?  Because he's a terrorist leader.

24   He has to have operational security, OPSEC, and so he has to

25   constantly change phones, use code names, and be careful.

1    He's hunted.

2              And currently he has the one that ends 5-7.  If you

3    go back to the last phone call in your binder, before that

4    call -- that was Exhibit 145 -- if you go back to the last

5    phone call, two calls previously, the last call in your

6    binder between Basaaly and Sheikalow, it's the number ending

7    in 5-7, okay.  Sheikalow is Aden.

8              In March 2008 the U.S. publishes the designation of

9    al-Shabaab as a foreign terrorist organization, and Basaaly

10   Moalin knows about it immediately.  You heard the Somali

11   diaspora loves to keep in very close watch on the news to

12   know what's going on in Somalia, which is fine, which is

13   great.  And, in fact, within the -- by March 19 he already

14   knows all about the designation, and he's explaining it in

15   Exhibit 147 to another person.  He says:  The American spy

16   agency has added al-Shabaab group to the terrorist list.  The

17   Americans can do an economic embargo to anyone it desires.

18   And, he goes on to say, they listed names, Aden, the

19   religious scholar, okay.  So in the designation when it's

20   published, he actually knows not only is al-Shabaab

21   designated, but they specifically mention Aden Ayrow in the

22   designation.

23             And the very next day after that, he listens to

24   Muqtar Roobow on the radio, or over the phone.  You remember

25   that; there was a transcript.  He listens to Muqtar Roobow,

1    the spokesperson for al-Shabaab, who says we're happy to hear

2    the Americans have added us to the list of international

3    terrorist organizations, as you said.  We thank God.

4            So he's well aware.  And you would think that might

5    slow him down like, ah, you know what, this is -- the United

6    States has declared a complete economic embargo, complete, no

7    money to al-Shabaab whatsoever for any reason, might slow him

8    down?  No.  Not long after that he's gotten on the phone with

9    Aden Ayrow, and what is Aden Ayrow saying?  Tell, Sheik

10   Mohamad -- Mohamad Mohamad Mohamud -- tell Sheik Mohamad

11   we're waiting for news from him -- him? -- and news from you.

12           Then in April, just a couple weeks later, another

13   very important phone call.  I urge you to take a look at

14   Exhibit 150.  It is time to finance the jihad.  Okay.  And

15   this call is interesting because there had been a little bit

16   of a gap.  There was the transfer in February and now here we

17   are into April.  There had been a little bit of a gap, and

18   Basaaly was explaining to Ayrow in this call, well, you know

19   what, we've had a lot of demands on us because there was also

20   a drought going on -- making clear there's more than one

21   thing going on.  The United States's case has never claimed

22   that the only thing that these men were involved in was

23   funding terrorists or that the only thing they ever sent

24   money to/for was for terrorists.  No.  Of course they sent to

25   Somalia for other reasons as well.  Of course they had other

1    interests.  This isn't a cartoon; this is real life.  The

2    point though is that they funded terrorism, not that they

3    also from time to time helped people in need.  That's a red

4    herring; we'll talk more about that later.

5              But here he says, well, you know, there's a lot

6    going on, we have some other demands on us because of the

7    drought.  And in this call Ayrow says:  Hey, man, the

8    drought's over, the water tanks are full -- it hasn't

9    rained -- so it is the time to finance the jihad.  I am now

10   in Dhusa Mareeb, and the Ethiopians are in Adaado.  I

11   understand.  I was told that they are only a few men, so why

12   do you not prepare to finish them off?  What is finish them

13   off?  We know what that means.  We will try, God willing.

14             And then Basaaly goes on to give Ayrow advice on

15   military tactics, and he says:  What they can do is send

16   airplanes.  They could send airplanes once they have your

17   position, so be ready.  Although you cannot do much about big

18   high-speed planes, you can prepare for helicopters.  They

19   would never come back if you destroy one.

20             And Ayrow's response:  Ethiopia doesn't have

21   helicopters.  How can we destroy them?  We don't have any.

22             The Ethiopian helicopters are not a threat, but the

23   Americans are.

24             Yes.  Therefore get ready for that.  Get ready for

25   that.

1           And then you remember in this phone call Basaaly

2    Moalin passes the phone.  He's at dinner with someone named

3    Sheik Mohamud -- not Sheik Mohamed, not the defendant; he's

4    at dinner with the deputy imam.  And he says hey, I'm going

5    to put you on the phone with the deputy imam.  So this other

6    guy gets on the phone with Ayrow, and Ayrow immediately hits

7    him with propaganda:  Why do you not come and join the jihad?

8    He mocks the deputy imam for building a mosque in America.

9    He says:  You're building mosques in America, you ought to be

10   over here fighting the jihad with me.  And, he says, why

11   don't you come over and do your part in killing non-Muslims.

12   There's a severe financial shortage.  The reason why the

13   operation is not progressing is lack of money.

14          And what does the deputy imam say?  Well, hey, we

15   spoke to other brothers a few times, brothers like Abu

16   Mansoor and Fuad, and we did as much as we could.

17          Well, who are those brothers?  Abu Mansoor, Muqtar

18   Roobow, Fuad Shongole.  And what did Matthew Bryden tell us

19   about Fuad Shongole?  Next to Roobow, Shongole was the most

20   prominent al-Shabaab speaker during fundraising forums.  He

21   was a senior member of al-Shabaab and a member of the shura.

22   And again, this call -- this isn't Hassan Guled, the guy who

23   testified from Djibouti in the white gown.  This isn't Hassan

24   Guled.  He -- his brothers aren't Abu Mansoor or Fuad

25   Shongole, and he never talked about killing people, joining

1    the jihad.  This is Aden Ayrow.

2           And Basaaly Moalin has his typical response.  That

3    very day he's on the phone with another associate.  Right,

4    the very day he has a call from Aden Ayrow asking to finance

5    the jihad, he says:  We have to eat those men for breakfast

6    before they leave.  These are the Ethiopians who Basaaly

7    Moalin said there's just a few of them, why don't you finish

8    them off in Adaado.  We have to eat them for breakfast before

9    they leave.  Well, why?  They're leaving.  Why do we got to

10   eat them for breakfast if they're leaving?

11          He's asking us to go into our pockets.  I

12   understand.  That's Sheikalow.  He's always asking us to go

13   into our pockets.  So people -- what we want for those men --

14   if they're going to eliminate those men -- we must send

15   someone to talk to the people.  We can find 30 men who can

16   pay small amounts.

17          And then he speaks the very day -- speaks again on

18   that same day to Aden Ayrow.  The men are in Adaado, do you

19   understand?  They are hiding from us, they're not in a safe

20   place, and they're afraid.  Imagine what that must have been

21   like for those men.  There are so many soldiers who are

22   ready, but people have no money really.  I don't think it is

23   possible that 200 men will have bullets to shoot at the enemy

24   they can see.  I understand.  There could be hundreds of

25   things, and the finance is zero if you want the truth.

1          Well, they deliver.  After a series of Keystone

2    Cop-like phone calls where defendant Moalin, defendant

3    Mohamud, and defendant Doreh talk around about trying to

4    figure what name they'd use for the transaction -- and you'll

5    see that between about December, excuse me, April 23 to

6    April 25; there's a series of phone calls, and it's like

7    who's on first, do we use this name, I can't remember if

8    that's the sender name, the receiver name, or that was the

9    name we used last time.  Because they used fake names, they

10   confused themselves when they use fake names to fund

11   terrorists.  Then finally on the 25th they got it straight,

12   and he talks to Aden Ayrow, and Aden Ayrow says what's going

13   on, I received 1900 from the place.  And Basaaly says:  It

14   was only 1900?  And shortly thereafter he speaks with -- that

15   same day -- Exhibit 164, the next exhibit -- he speaks to

16   Sheik Mohamad:  I have heard from Majadhub.  Yes.

17         Now, you'll notice that Sheik Mohamad doesn't say

18   Majadhub, who is that.  Majadhub?  Huh.  No, he knows exactly

19   who he's talking about.

20         He told me how many stones did we send him.  And

21   Sheik Mohamad knows:  It was three stones.  Yes.  Naturally

22   they sent it in installments I believe.  What did he say?

23   Two stones minus one.  Yes.

24         Meaning 1900.  Two stones, 2,000, minus one,

25   meaning 1900.  And if you look at the transaction records

 1   from the Shidaal Express, you will find the two transactions
 2   in April, split up, 1900 and 1100, equaling 3,000, and just
 3   as Sheik Mohamad said.  And it goes to Dhusa Mareeb, which is
 4   where Aden Ayrow said in the earlier phone call he was; he
 5   was in Dhusa Mareeb.
 6            Another very important call that I'd urge you to
 7   consider when you're back in the jury room, 167.  April 27,
 8   2008.  And this is where -- and I've only just summarized
 9   parts of it here; it goes on for quite a while.  This is
10   where Basaaly Moalin and the defendant Mohamad Mohamad
11   Mohamud yuck it up about the different code names used by
12   Ayrow.  And Basaaly thinks it's funny because he called
13   asking for Ayrow and he used the name Sheikalow, and that
14   confused the guy on the other end of the phone who picked up
15   at the place where Ayrow was, and it took them a while to
16   straighten it out, but what they figured out was well, did
17   you tell them Majadhub?  Basaaly:  I did not tell him that.
18   First I asked the man who answered to put Sheikalow on the
19   phone, you know.  Sheik Mohamad thinks that's funny.  He's
20   laughing.  So I told him -- naturally we didn't understand
21   each other.  Each group uses a different code.
22            That call makes very clear that Sheikalow and
23   Majadhub are the same person.  Other calls we're going to
24   look at make the same point.
25            Now, on May 1st, 2008, the day, not in dispute,

 1   that Aden Ayrow was killed by a missile strike, Hassan, who
 2   loves speaking in code, says:  There's a rumor that birds
 3   target the house where Sheikalow, Small Legs, used to stay
 4   one hour ago.  Basaaly:  Planes?  How can birds target it?
 5   It's nighttime.  Are you saying that birds cannot launch
 6   something from the sky?  Where do you live?
 7          The next, Exhibit 170.  Now Basaaly Moalin is
 8   speaking with Sheik Mohamad, or Mohamad Mohamad Mohamud.
 9   Naturally, I think you heard what happened.  Now, this is the
10   very day.  This is -- this shows you how quickly word travels
11   back from Somalia:
12          Naturally, I think you heard what happened.  Man, I
13   am sitting in front of it and looking at it now -- so he's
14   sitting in front of the news.  How did it happen?  Man,
15   mainly the news is that even Majadhub is among them.
16          And again, here Sheik Mohamad doesn't say Majadhub,
17   who's that.  He knows exactly who Majadhub is.  He just had
18   the call where they know him as Sheikalow and Majadhub.
19          Mainly the news is that even Majadhub is among
20   them.  The people who are gone.  Yes.  They said that Roobow
21   -- Muqtar Roobow, Abu Mansoor, the spokesperson for
22   al-Shabaab -- they said that Roobow has just announced it
23   now.  Before he was missing, but now Roobow has announced
24   that he is among them.
25          And Ms. Moreno asked the witness:  Now, on May 1st

 1    there's a conversation, Exhibit 170, with Mr. Mohamud, and

 2    that's about the death of this guy Aden Ayrow, correct?  Yes,

 3    ma'am.

 4            Now on May 4, a few days later, this finally

 5    perhaps got Basaaly Moalin's attention for a few moments.

 6    And he's living here in the U.S., Aden Ayrow's just been

 7    killed in a missile strike.  He's been on the phone to Aden

 8    Ayrow, and he says to this man Beefaq:  Because of the new

 9    situation, I have stopped the calls to all those places.  It

10    is alert.  And later in the call -- Beefaq's his cousin -- I

11    don't know, but I think my thing is under surveillance at

12    this time.  And Basaaly Moalin:  Man, it is necessary to

13    believe the technology, you know?  I have many people in this

14    town who are against me and who would even pass on my number,

15    you know.

16            Now, this gets back to a couple things.  Who has a

17    conversation like that even one time?  I mean snippets?

18    That's what was said, that the government was giving you

19    snippets.  Who has a snippet like that?  Someone who's

20    funding a terrorist.  And there was a mention in one of the

21    examinations about possibly -- one of the defense counsel

22    raised the specter that possibly some of the calls were

23    ironic.  There was never any more later to ever connect up

24    any -- any irony in any of the calls.  But that's ironic.

25    That's irony right there:  Man, it's necessary to believe the

1   technology, as his call was being intercepted by the United

2   States.

3          With Ayrow gone, things shift into a second phase.

4   The defendants don't want to stop their activities, so they

5   move to trying to find a new link, trying to find a new

6   connection to replace Aden Ayrow.  On May 5 -- excuse me --

7   on May 8 Basaaly Moalin speaks to an individual, looking for

8   the new connection to replace Ayrow.  And he says:  We used

9   to set a periodic target amount to the local community, the

10  mosques.  If the man -- Aden Ayrow -- we used to deal with is

11  gone -- I mean that the assistance and the work that we were

12  performing, we want it not to stop.  And later in the call he

13  says who he's looking for.  Basaaly Moalin doesn't think

14  small.  He says man -- here's who he's looking for to make

15  contact with -- man, the man's name is Muqtar, and he has

16  other names.  He's a man from Isaaq tribe, he is from the

17  Arab family of the Isaaq clan, Arab.  He was his superior; do

18  you understand?  Tell him that we are looking for him.

19         Well, who is that?  Muqtar Abdirahman Abu Zubeyr,

20  al-Shabaab's emir, of the Isaaq clan, Arab subclan.  And so

21  that code has been cracked; Matthew Bryden testified that

22  Muqtar is a name used for Abu Zubeyr, who is the emir of

23  al-Shabaab, Isaaq clan, Arab subclan.  With Ayrow -- and he

24  was -- because he was the emir, he's described by Basaaly as

25  Ayrow's superior in that call right there.  He was Ayrow's

1    superior.  We're looking for him.  And he then embarks on a
2    series of phone calls also with Hassan because Hassan is also
3    still desirous of funding al-Shabaab and the fighting, and so
4    Hassan and Basaaly have a series of calls in June and July,
5    and you'll find them in your binder.  And they're heavily
6    coded.  Hassan is so scared of being caught, he's using words
7    like "donkeys" and "brushwood" and "oil" and VIN numbers
8    instead of bank account.  And in these heavily coded calls,
9    they are talking about how to keep the funding going.  And he
10   says:  You are a fearful man.  You can't explain anything to
11   anyone.  You make references about birds and stuff.  You're
12   going to die only once, so give people straight information,
13   man.  Man, you are not accountable with anything.  You don't
14   even know where you are.  You talk as you wish, you don't
15   know what you should hide and what you should not, so I am
16   not going to be like you.
17           I would submit to you, ladies and gentlemen, that
18   that call has nothing to do with drought relief or helping
19   orphans because if you're helping orphans or you're building
20   schools, and that's all you're doing, you spread the word,
21   you don't hide it.  You get more people to come help.  Just
22   like they said, they -- the witness who came in said they
23   were spreading the word, Abdisalan Guled, Halima Ibrahim,
24   they were all spreading the word.  You don't hide that.
25   They're talking like this because they knew what they're

1   doing is illegal and they're funding terrorists.

2         What we want, we want your things to reach whoever

3   can inflict pain to them.  Our objective is to cause pain to

4   these men, that is it.  And Hassan says:  Very much so.  Then

5   slingshot it is.  That is his code.  Slingshot it is.  Not a

6   very thin -- it's kind of a thinly veiled code.  And if you

7   need, his ten is ready, God willing.  And Basaaly says, the

8   young guys inflict more pain.  We -- I am very confident in

9   the young guys with whatever I give.

10        And then Basaaly gets ahold of a guy named Kay.

11  He's still looking for a good connection, an easy way to make

12  sure the money is getting to al-Shabaab.  And Kay tells him

13  who he's going to connect with him; Kay says:  I'm going to

14  connect you to a guy named Mahad Karate.  And he describes a

15  guy who used to go with Sheik Hassan and the guy who died,

16  okay, Ayrow, who was a teacher and who used to teach at the

17  Italian cemetery.

18        Well, you know what the Italian cemetery is; it's

19  where the bodies were exhumed and the radical center was

20  established.

21        The guy by the name of Mahad, Mahad Karate.  And it

22  will later be established in the call, Kay tells Basaaly that

23  you have to set up a code word for operational security so

24  that Basaaly can connect with Mahad Karate.  You know, it's

25  kind of like in the old movies from the '70s, the spy movies,

1   where you sit on the park bench with somebody and you have to

2   say some silly expression like "the pearl is in the river,"

3   and then the person next to you knows you're okay to talk to.

4   So they set up a little -- they set up a little name.

5           So a name that they agreed upon, you know, he will

6   tell you that name, and when he tells you that name -- well,

7   if you want, if you want, you can name me; I am called

8   Dhunkaal.  Do you understand?

9           And, you know, you don't have to do that when you

10  give money to the Red Cross, you don't have to do that when

11  you give money to a school, you don't have to do that when

12  you give money to charity.  You don't have to use code names.

13          And who is Mahad Karate?  Matthew Bryden testified

14  that Mahad Karate was an operational commander in al-Shabaab.

15  He was generally described as someone responsible for

16  targeted killings and assassinations, a senior figure in the

17  amniyat.  The amniyat was that intelligence wing that would

18  do counter-counterterrorism, attack the people attacking the

19  terrorists.  And in 2008 after the killing of Aden Hashi

20  Ayrow, Mahad Karate was one of the Shabaab leaders, and then

21  he emerged as the next generation of senior commanders.  And

22  that fits like a glove because after Aden Ayrow's death,

23  Basaaly Moalin was trying to get ahold and connect with Mahad

24  Karate with a code name.  And they did do that, and the code

25  name was used -- Exhibit 187 -- a man by the name Dhunkaal is

1   on the line.  Mahad Karate, I understand.  Okay.  I can talk

2   to this guy.  And later on in the call:  I can hear you,

3   Mahad.  Tell me the name.  Yes.  It is Omer Mataan.  So Mahad

4   Karate says Omer Mataan -- blesses Omer Mataan -- he's the

5   man who you will send the money to.

6            Well, who is Omer Mataan?  Well, we can ask Abukar

7   Dahir Mohamed, also known as Abukar Suryare, the witness who

8   had the longest deposition that we listened to or we watched.

9   He testified in the deposition.  Who is Omer Mataan?  He is

10  one of the al-Shabaab forces.  And I asked him, was Omer

11  Mataan part of the ILEYS Foundation?  No.  Was Omer Mataan

12  ever part of the drought relief committee?  No.  Was Omer

13  Mataan ever part of Hassan Yare's security forces?  He wasn't

14  one of them.  He was one of the al-Shabaab forces.  And you

15  will find the money going to Omer Mataan in July, $2,000

16  broken into two transactions on the spreadsheet.

17           And then toward the end of July -- oh, by the way,

18  you'll find that the second transaction, the 350 that wraps

19  up the 2,000, obviously in 2008 -- so you have that

20  on-or-about date in the indictment, on or about August 5,

21  2008, okay?  And on July 18, Exhibit 196:  Man, we are

22  closely watched.  We will lay low for a while, God willing.

23  We will not abandon it because of them, but we will lay low,

24  God willing.

25           And who's he speaking to?  He's speaking to the

1    defendant Ahmed Nasir Taalil Mohamud.  And Ahmed Nasir's like

2    saying, you know, stop talking.  No, but we will lay low of

3    course, we can still support the orphans and, you know,

4    people in need and.  Yes.  We will conduct our actions along

5    that method.  We will go under that pretense now.  Yes, we

6    are helping the poor.  They do not know it is bullets.  That

7    is the way it is, you know.

8              There's no competing transcript in evidence for

9    that call.  That's the transcript.  We will go under that

10   pretense now.  Yes, we're helping the poor.  They do not know

11   it is bullets.  That is the way it is, you know.

12             And but for the fact the calls were being

13   intercepted, perhaps they would have been able to go on that

14   pretense.  Perhaps they'd be able to come into this courtroom

15   and say we are just helping people, we're just aiding other

16   people, orphans, drought relief, that's all.  It was a

17   pretense that would be carried out and carried forward.  This

18   is a red herring.

19             Now, there really is no such thing as red herring

20   in nature.  What happens is you take a fish and you brine it

21   in a heavy solution, and it turns the flesh red, and it gives

22   the fish a very strong odor, very pungent odor.  And it's

23   said that in the old days in England, when you were training

24   a hound to follow a scent and you wanted to teach the hound

25   that only the stick with the scent it's supposed to follow,

1  that you could run a red herring across the trail and see if

2  the hounds would divert and follow the red herring.  And if

3  the hound diverts and loses the original scent and follows

4  the red herring, that hound isn't ready, it's not trained

5  well enough yet.  That of course has now become an expression

6  for something irrelevant injected into a process to try to

7  distract somebody from the truth.  And there were several red

8  herrings in this case.  We've already talked about some of

9  them.  I want to talk more about Hassan Guled.

10           The defense wants you to believe that the Sheikalow

11  on the phone -- Aden Ayrow, Majadhub, killed on May 1 -- oh,

12  and by the way, there's never another phone call with

13  Sheikalow after May 1st, never another phone call from

14  Majadhub, never another phone call with Aden Ayrow after May

15  1st.  But they want you to believe that that's Hassan Guled,

16  or at least suggest that, or at least cause some confusion.

17  And this is what he said.  Nothing that he said jibed with

18  what you heard Aden Ayrow, Sheikalow, say on the phone.

19           Hassan Guled said he only operated in the Galgaduud

20  region, never outside Galgaduud.  Never attacked Ethiopians.

21  In fact, Hassan Guled was one of the nicest guys you'd ever

22  meet.  And I think, you know, he really was.  He said -- he

23  said the Ethiopians came to Guraceel twice -- this is what he

24  said about the Ethiopians in the depositions:  They came

25  twice.  The first time they came, they were our allies --

1   those were his words -- they were our allies, no fighting

2   whatsoever, said they were just passing through, they were

3   transients.  The second time they came, al-Shabaab attacked

4   the Ethiopians, and fighting lasted for less than one day.

5   Now, you're going to hear oh, the Ethiopians were terrible,

6   the Ethiopians this and that.  That is what Hassan Guled, who

7   was represented to you to be the police chief, the security,

8   clan security guy in Galgaduud.  He, there the whole time,

9   responsible for security, he said when the Ethiopians came

10  the first time, we were allies; came the second time and

11  al-Shabaab attacked them; and then they countered, they

12  countered with attack against al-Shabaab.  But he says

13  himself, me, Hassan Guled, never attacked any of the

14  Ethiopians, never led anybody to attack Ethiopians, never

15  conducted ambushes, never involved in suicide bombings.  In

16  other words, he is not the guy on the phone with Basaaly

17  Moalin.  Never involved with planting landmines.  He said I

18  never raised jihad.  And I asked him, did you ever use the

19  word "jihad"?  I never raised jihad, I never called anyone a

20  jihad, never asked the diaspora to support jihad, never

21  discussed shooting down any American or Ethiopian aircraft to

22  Basaaly Moalin.  And couldn't recall anybody -- couldn't

23  recall anybody named Sheik Mohamad in -- back in Basaaly's

24  community in the United States.  None of that jibes at all

25  with the person on the phone with Basaaly Moalin, who's Aden

1   Ayrow.  He, every time he picked up the phone almost, was

2   asking for Sheik Mohamad, did you find the sheik, tell the

3   sheik, tell Sheik Mohamad.

4           Second red herring, charity.  I've already talked a

5   lot about that.  I'm going to cover it very quickly again in

6   another way.  You will find, as you look at the calls, that

7   there are always transitions, that when they're talking

8   about -- actually talking about schools or actually talking

9   about drought relief, that they transition to the other thing

10  as well.  There's more than one thing going on, just as the

11  government stated to you earlier.  There is no element of the

12  jury instructions that's going to say if you find them

13  guilty, you have to find they never gave money to charity.

14  No, they can give all the money they want to charity, and

15  hopefully they did and hopefully they will in the future.

16  Irrelevant.  And they'd transition about the other thing,

17  another amount sent to those who behead the enemy; that is

18  the other fundraisers taking place.

19          In Exhibit 140, talking to Sheik Issa Doreh.  Yes,

20  we sent it.  Was it the one for the youth, I mean the

21  orphans, or was the other?  No, no, no, the Dhunkaal one.

22          And of course, as we already talked about, we'll go

23  into that pretense now:  We're helping the poor.  They don't

24  know it's bullets.

25          I want to talk to you briefly about -- about the

1    elements of the charges in this case.  Now, you'll have the

2    jury instructions; they control.  My little slides are just

3    summaries as I talk here.  If there's anything different in

4    what I say about what the instructions say, you got to follow

5    the instructions, but I'm going to quickly go through the

6    charges with you.

7              We're going to start with Count 5, in reverse

8    order.  Count 5 is providing material support to a foreign

9    terrorist organization.  This is giving money to al-Shabaab

10   after it's been designated, okay.  And the thing about that

11   is under the law, once it's been designated, you cannot give

12   money to al-Shabaab for anything, any purpose, any intent.

13   It doesn't matter if you want al-Shabaab to lay flowers on

14   the land.  Illegal.  You cannot give money to a designated

15   terrorist organization.

16             And the defendant provided material support to

17   al-Shabaab.  Al-Shabaab was designated.  Okay.  Basaaly

18   Moalin provided money to al-Shabaab.  We've already

19   established that.  Al-Shabaab was designated.  That is

20   crystal clear.  It's in the instructions.  Defendant knew

21   that al-Shabaab was designated.  Well, Basaaly Moalin

22   listened to -- told somebody else the day after it happened.

23   And he also listened to Muqtar Roobow on the phone, on the

24   phone praising the designation.  He also knew -- by the way,

25   you only have to find one.  The defendant only has to know

1   that they were designated or that they were engaged in

2   terrorist activity or they were engaged in terrorism.

3   Basaaly Moalin knew all three, and the phone calls leading up

4   to this were replete, the landmines, assassination attempts,

5   shelling the presidential palace.

6         And then jurisdiction.  And jurisdiction in this

7   case is a very simple matter in this case because these guys

8   were here in the United States while they were engaging in

9   this conspiracy, so there is not a problem there with

10  jurisdiction.

11        And Count 2 is the conspiracy, okay.  Count 2 is

12  the conspiracy to provide material support to a foreign --

13  designated foreign terrorist organization, and that

14  conspiracy covers much more than Count 5.  Count 5 is just a

15  substantive, completed offense.  They provided this money on

16  or about this time.  Count 2 is the whole enchilada; it's the

17  conspiracy from March 18, 2008 forward; all the activity and

18  efforts and agreement and conspiring is covered by Count 2

19  because it's a conspiracy case.  And there you have to find

20  an agreement between two or more persons to commit the crime.

21  Defendant joined the conspiracy knowing of its unlawful

22  object and intending to help accomplish it.

23        Defendant Moalin was in the conspiracy as soon as

24  he started conspiring with Aden Ayrow and when he conspired

25  with Mahad Karate, when he conspired with Omer Mataan.  So he

1   was in the conspiracy from the outset.  And I'm going to talk

2   to you in a minute about when each of the other defendants

3   joined the conspiracy and were all in the conspiracy.  So

4   once a conspiracy exists, somebody only has to have a minor

5   connection; even a minor connection with the conspiracy when

6   you join makes you a conspirator, okay.  And you can join at

7   different times, you can be involved for different periods.

8   Doesn't matter.

9           Count 4 is providing material support to

10  terrorists.  Now, I want to explain the key difference there.

11  It's also a crime -- regardless of designation, regardless of

12  whether an individual organization has been designated as a

13  terrorist organization, it's a crime to give money with the

14  knowing or intending that it would be used to do certain

15  things.  If it would be used in preparation for a conspiracy

16  to kill in a foreign country or a conspiracy to use a weapon

17  of mass destruction outside the United States, it's a crime.

18  And so this count involves the house, the house being the

19  material support or resource being provided to al-Shabaab, to

20  Aden Ayrow.  And if you look at the phone calls, it is

21  crystal clear that Basaaly Moalin knows and intends that

22  al-Shabaab -- he knows what al-Shabaab is about; he knows

23  what they do; he knows what their -- what their existence is.

24  It's to kill and attack and destroy the TFG and its

25  supporters, the Burundian peacekeepers, the Ethiopians, the

1    civilians, anyone who stands in its way.  And he gives the

2    house to Aden Ayrow so that he can bury stuff in the ground,

3    use it at night, hide their -- have a place to stage

4    al-Shabaab's activities and have a safe house.  And so

5    Basaaly Moalin is guilty on Count 4.

6          And weapons of mass destruction, ladies and

7    gentlemen, not exactly the way it's used in the news, okay.

8    You think weapons of mass destruction, you think a nuclear

9    weapon.  As you heard the judge read, a weapon of mass

10   destruction means a bomb, an explosive, okay, a landmine.

11         So Count 1 is the conspiracy.  That was Count 4;

12   that's just Basaaly Moalin providing the house.  Count 1 is

13   the conspiracy to provide material support to terrorists.

14   And so it covers -- because it is not tied to a formal

15   designation as a terrorist organization, Count 1 also covers

16   those transactions before March 18; it covers the January

17   transfer, it covers the February transfer.  It covers the

18   whole case from December to the end when these defendants

19   conspired together to fund this death and destruction and

20   killing.

21         And a conspiracy to launder monetary instruments,

22   Count 3, that just means essentially -- and, again, follow

23   the Court's instructions in full, but in summary it's just

24   transmitting money from a place in the United States to a

25   place outside.  The law says that if you -- you can't -- you

 1   can't promote a criminal action by transferring money outside
 2   the -- from the U.S. outside of the U.S.  If you do that to
 3   promote a crime, that's money laundering.
 4          Now, Sheik Mohamad Mohamad Mohamud.  I want to talk
 5   to you about his connection to the conspiracy.  He is
 6   actually the power broker, okay, and that comes out clear
 7   through the calls.  I will take the very first call out of
 8   the box:  I will take care of the issue swiftly with him and
 9   with the Saleban clan cleric.
10          And what does Ayrow say in Exhibit 136?  What I
11   want from you is to find the sheik, okay?  Tell Sheik Mohamad
12   he must let us know the amount of money.
13          Ayrow calls back.  Did you -- do you have anything?
14   Did you -- did you see the sheik?  The month is almost -- did
15   you reach the scholar?  Huh?  The scholar?  You mean Sheik
16   Mohamad?  Yes.  You running late with the stuff.  Send some
17   and something will happen.  I received a call from Majadhub,
18   Ayrow.  Well, it is good.  I think Dhunkaal is able to get
19   the stuff there.  Tell Sheik Mohamad we are awaiting news
20   from him and news from you.
21          I mean with Basaaly Moalin on the phone, Ayrow
22   wants Sheik Mohamad, and the reason he wants Sheik Mohamad is
23   because Mohamad has the clout.  And this is what Basaaly
24   Moalin tells Sheik Mohamad right after that April 12 call
25   with Ayrow where Ayrow says we need to finance the jihad.  He

 1  said I received calls from the young man these days.  He

 2  asked where we are.  He does not have anything to throw at

 3  them.  He is saying that the men are close to him.  Yes.

 4  Not -- not young men, who are you talking about?  Yes.

 5           And then later in the call, Sheik Mohamad:

 6  Definitely it is best that this thing does not become public,

 7  you know.  Well, why is that?  It is public.  It's a public

 8  proceeding now.  Why wouldn't you want to be public?  If

 9  you're helping the poor, helping drought relief, you want

10  more people to know.

11           And Exhibit 155, this is Basaaly Moalin to Sheik

12  Mohamad, trying to raise the money to support the jihad.  If

13  you call them and say come to me, no one will refuse your

14  request.  And here's where you understand why Sheik Mohamad

15  was so important.  If you call them and say come to me, no

16  one will refuse your request.  On Friday the mosque.  Right.

17  Tell them I need you, I need you, I need you.  Keep those

18  individuals you need behind.  Right.  Thirty people or 20

19  that you trust would be enough -- because he's the imam --

20  keep the ones behind.  No one will refuse your request.

21           Now, on April 23 -- this is right during that

22  series of calls where they're funding the money, the money

23  that's the subject of Count 5, the $3,000 in April 2008.

24  Right there.  Sheik Mohamad:  Did Majadhub call you?  He

25  knows the code; we've already established that.  He knows

1   exactly who they're the talking about.  They're talking about

2   Aden Ayrow; Sheik Mohamad knows that.  Did Majadhub call you?

3   And what do they talk about?  Did Dhunkaal go?  Sheik Mohamad

4   reports:  Dhunkaal left.  Dhunkaal left.  "Dhunkaal left" was

5   the money leaving to Somalia, Dhunkaal being the name they

6   used.

7              And then of course we've already reviewed the call

8   on April 27 where Mohamad, Sheik Mohamad and Basaaly are

9   joking about the different code names they use and how even

10  the guy watching Aden Ayrow's place is confused.  And Sheik

11  Mohamad later in that call, this is where he tells him

12  they're happy, they're feeling pleased with themselves in

13  this phone call that they've sent the money to Ayrow.

14             And what does Sheik Mohamad say?  So what I want

15  from you is to tell me the total he received, God willing.  I

16  want to let the men who live in a far place know, and you

17  can't ask them many things over the phone, you know.  Always

18  careful, always cautious, always reminding people that the

19  phones are dangerous.  That's Sheik Mohamad.

20             And then Hassan asks -- later in July Hassan asks

21  Basaaly:  You know Mohamad Khadar, right?  He's one of your

22  best men, right?  Yes, of course.  Why not?  He's on the

23  front line.  He's one of the men that -- Leave me alone.

24  Cuts him off.  Leave me alone.  Leave me alone.  I told you I

25  got what I wanted to know from you.  Don't go into details,

1    man.

2            And then July 8 when now Hassan himself is on the

3    phone with Sheik Mohamad, and all that series of calls is all

4    talking about the slingshot operations and funding the

5    fighting.  And Sheik Mohamad says to Hassan:  Well, phones

6    are problematic, so whatever us guys have, handle it that

7    way.  And Hassan says that is right.  Finally someone who

8    speaks Hassan's language.  Phones problematic?  Let's talk in

9    code.  And the code they're talking about there in that call?

10   Very early you will see it's Hassan asking for a VIN number

11   of a car, which is later provided as a bank account number

12   for money that he sent to Basaaly Moalin.

13           Let's talk about Issa Doreh.  Again, the very first

14   call:  I will take care of the issue swiftly -- this is what

15   Basaaly Moalin tells Ayrow -- the Saleban clan cleric, whom

16   you talked to, okay.  So Ayrow has spoken directly to Sheik

17   Issa.  Then he does, he does take care of the matter swiftly.

18   The very next call, within minutes, within minutes he calls

19   Sheik Issa after talking to Ayrow, said:  The cleric just

20   called me.  Okay.  He doesn't say which cleric.  He knows.

21   They understand.  The cleric whom you spoke with the other

22   day.  Yes.  He told me he needs a very small amount of money.

23   The place where the fighting are going on, one dollar a day

24   per man is what we need for our forces stationed around.

25           And then in April 23 when they send out $3,000,

1   Basaaly calls Sheik Issa:  I told Sheik Mohamad that, without

2   confirming the name, since we both agreed Dhunkaal, hello, we

3   use the name that was used before as the sender.  Okay.  He

4   called me and said that we used the name before as the sender

5   and asked if we should use it.  I told him to use it.

6          Issa Doreh is right in the middle of the

7   transaction.  He knows that before the name "Dhunkaal" was

8   the sender name, and now when you read the April 23, he knows

9   that they switched it and used it as the receiver name.  When

10  you read that whole call, you'll see they're talking about

11  who is the receiver, what name do we use for the receiver.

12  And the person who knows is Issa Doreh, and he knows the name

13  they used before, and he knows the name they used now.

14          Hmmm, the man Ayrow, it was sent to him.  The man,

15  it was sent to him that way, you know.  Was it not Dhunkaal

16  Mohamed Yusuf?  We sent it to Bakara.  Can it be changed to

17  Dhusa Mareeb?  He said that he is there.  Oh, is he in Dhusa

18  Mareeb?

19          Again, there's no question.  He, who's he?  They

20  know exactly who they're talking about.  And Issa says

21  Bakara, because you'll notice the February 1st transaction in

22  January they sent to Bakara, and so he sent it to Bakara

23  again.  And Basaaly Moalin is informing him what Ayrow had

24  told Basaaly, which is that he's going to Dhusa Mareeb.

25          And then the very -- couple days later Basaaly is

1   reporting back to Aden Ayrow:  I was aware that you were in

2   the north, so I asked the group to readdress it.  You know,

3   that group helps us with, ahem, I mean they do not charge us

4   the fee they normally charge people.  That is how they help

5   us.  The head of the place is the man who spoke to you, Sheik

6   Issa Doreh.  You know him, do you not? Yes.  Yes.  He is the

7   administrator, and he helps us with that much.  He takes his

8   part in the operation, but he helps us with that much.

9          And then Hassan in a call in Exhibit 175, Hassan

10  established a code.  Now that Ayrow's gone, Hassan says,

11  speaking to Basaaly, man, the Koran disciples of Majadhub

12  became orphans, you know?

13         Okay.  We know that Majadhub is Ayrow.  So the

14  Koran disciples of Majadhub became orphans.  In other words,

15  the fighters, who are al-Shabaab's crew, had been orphaned by

16  the loss of their leader.  And then later that code is picked

17  up in a call with Sheik Issa:  So maybe it's better for me if

18  you give me the VIN number of a car so I can load it just

19  like before.  And Sheik Issa:  Okay.  Let me hand the phone

20  to Basaal so he can give it, the class leader, the man who is

21  in charge of the Koran school.  Hold on, you know, we wanted

22  to send it through the same channel we use to send to the

23  other places.  He knows about the channels.  He knows the

24  code.

25         Let's talk about Ahmed Nasir.  Ahmed Nasir is one

1    of the very early phone calls after Ayrow asked for money the

2    first time.  The next day Basaaly Moalin is explaining to

3    Ahmed Nasir are they getting -- that that -- he's explaining

4    what I showed you earlier, that 60 lice-infested had been

5    killed, the forces need money, the guys firing the bullets,

6    they need money.  He said that in this call.  And then Ahmed

7    Nasir in the same call says:  Are they going to use

8    operationally or is it for the living expenses?  Their

9    monthly, their monthly living expenses.  Their weapons and

10   those things, they have those now.  And later in the call:

11   That is good news.  Things are going good.  Let them also

12   experience the pain.  Hey, man, I will look for that thing.

13   If I get word of it, you just wait for us.  In other words,

14   I'm out, going to beat the streets and try to find some

15   money.

16            And a few days later, Basaaly Moalin's reporting

17   back:  Right now a structure's created for it.  Some will

18   fight against the police, some will fight against the tax

19   collectors, some who, you know, fight against the upper

20   administration.  It is a very good phase.  Right.  You can

21   sense that from the fact that, you know, several, up to eight

22   tax collectors were killed the other day.  Right.  That's a

23   good phase.  I mean don't like the IRS, but eight tax

24   collectors were killed the other day?  That's a good phase?

25            Exhibit 183.  This is an important phone call for

1  Ahmed Nasir.  I urge you to take a look at this call, 183.

2  This is where they're listening to Muqtar Roobow on the

3  phone.  He's speaking on a radio program, and he's explaining

4  some Shabaab tactics and attacks that have taken place and

5  how they killed some people.  And Roobow said there will be

6  no cease fire as long as God's enemies are in this country

7  and their puppets, the apostates, claim leadership.  And

8  "apostates" is the word they use for people who they don't

9  think are real Muslims.  All praise to God that no Muslims

10  were wounded, while the non-Muslims and apostates were

11  decimated.

12        And Basaaly:  Hey, Ahmed Nasir -- same phone call.

13  Hey, Ahmed Nasir, hopefully, brother, soon we want to talk to

14  the man who was just speaking.  They want to talk to Roobow.

15  And Ahmed Nasir says:  Why don't you connect me too tonight,

16  my friend.  I will put my phone on mute.  Get money from the

17  man.  Ugas, who's also on the phone, says whoa, whoa, whoa,

18  whoa.  Get money from the man before you connect him, before

19  you connect Ahmed Nasir, get the money from the man first.

20  What?  Yes, I got it from him.  This man is doing his job.

21  He is coming, God willing.

22        Later in the call Nasir says I'm holding patiently

23  until you get Roobow on the line.  And they go on to a

24  discussion:  I have 300 in my pocket now.  Basaaly's asking

25  Ahmed Nasir for a report.  Early in the call Ugas said:  Hey,

1    man, where's the money, this guy needs to bring the money.

2    And now Basaaly's asking Ahmed Nasir how you doing with the

3    fundraising, how's it going.  I have 300 in my pocket now,

4    and two others said they would give it to me tomorrow or the

5    day after tomorrow.  The lease of the taxi is due on Mondays,

6    you know.  They asked me to wait because they must pay the

7    lease tomorrow.  So he's hitting up his fellow taxi drivers,

8    and their lease is due on the taxis, so they're a little

9    tight for cash, and so he's asking for a little more time to

10   get the money together.

11          And then Basaaly tells him two days later, reports

12   back:  First of all, we have raised the sum of about 10,000,

13   I mean we've collected in total, including from the mosque.

14   Right.  We've sent 5,000 as emergency to the men involved in

15   the fighting in the Galgaduud region.  Right.  And we're

16   going to divide 5,000 between what you call the men from the

17   youth and the other men, what you call them?  Jabiso.  And

18   Matthew Bryden testified that Jabiso was another insurgent

19   group fighting in Somalia.

20          Ladies and gentlemen, by the way, on the topic of

21   red herrings, there's a couple more out there, minor ones,

22   but they're out there.  You're not going to find any element

23   in those jury instructions that talks about whether somebody

24   had won a lottery in Cairo.  You aren't going to find any

25   instructions in there about whether somebody has family in

1    Somalia or has children.  That's all about sympathy and

2    trying to pull at someone's heart strings.  You all took an

3    oath to apply the facts to the law and not to be swayed by

4    sympathy.  That's a red herring.

5           You also heard a lot of talk in opening statements

6    by various defense counsel about some guy named Mohamud

7    Ahmed, and they all hit on that:  The government's case is

8    built on some guy named Mohamud Ahmed, he's a criminal, he's

9    an informant, he's a liar, he's going to victimize somebody

10   in this trial.  What was that?  He never testified.  He never

11   was presented to you as somebody to rely on.  He never came

12   forward and testified in any way, nor is the case built upon

13   him.  Red herring.

14          And finally, all those witnesses who came and

15   testified about charity from London, from Somalia, from

16   Djibouti via TV, so to speak.  None of them, not a single one

17   ever pointed to -- Dhunkaal transaction to Ayrow, those ones

18   that went to Yusuf Mohamed Ali, the Bakara Market, or the

19   ones that went to Dhusa Mareeb in February, all the ones we

20   just reviewed, not one single one of them ever got one of

21   those transactions and said oh, yeah, that was for a charity,

22   oh yeah, I know who got that money, oh, I know who received

23   that.  Not a single one because they couldn't.  All they

24   could do is create this overall general cloud and fog that

25   people were also helping orphans.  It's a red herring.

1          I'll have a chance to speak to you again after the

2    defense closing arguments, and at that time I'll ask you to

3    return a verdict of guilty on all counts.  Thank you.

4          THE COURT:  All right.  Ladies and gentlemen,

5    we'll -- just relax where you are for a moment.  I would like

6    to talk to counsel just on timing issues and see whether we

7    take our noon recess a little early or a bit later.  So if

8    you'd just hold for a moment.  Counsel, may I see you,

9    please.

10         (Following is a sidebar conference.)

11         THE COURT:  It's 11:30 now.  If we break now, bring

12   them back at quarter to 12:00 -- that's a bit tough.  We can

13   break now for an early lunch and come back at 12:30, 12:40.

14   Is that --

15         MR. DRATEL:  Yeah, yes, and then -- we want to

16   finish today?

17         THE COURT:  Yes, if --

18         MR. DRATEL:  That's --

19         THE COURT:  -- that's reasonable, within reason.  I

20   don't want to take them into the evening, but if we can, we

21   will.  You think you'd need to push beyond 4:30?

22         MR. DRATEL:  Right, no.  So if we come back at

23   12:40, we can --

24         THE COURT:  That's fine.  Okay.  We'll do that.

25         (Sidebar conference concludes.)

1            THE COURT:  Okay, ladies and gentlemen.  We're

2     going to break now, take an early noon recess.  It's 11:30

3     now.  We'll resume at 12:40, twenty minutes to 1:00, and

4     we'll go through the afternoon, we'll hear defense arguments,

5     and hopefully we'll be able to hear from the government as

6     rebuttal argument.  So that's probably a better plan than to

7     go for another hour, another hour and a quarter without

8     getting any kind of a sustained break.  It'll also be of

9     assistance to the interpreter as well.  Okay.  Remember the

10    admonition not to discuss the case or make any decisions at

11    this point.  We'll see you at 20 to 1:00, 12:40.  Thank you.

12         (There was a break in the proceedings.)

13            THE COURT:  All right.  Good afternoon, everyone.

14    Are we ready to proceed?  Everyone is present.  Mr. Dratel,

15    are you ready to proceed?

16            MR. DRATEL:  I am, your Honor.

17            THE COURT:  Please.

18            MR. DRATEL:  Thank you.  Good afternoon.  Thank

19    you, everyone, for your service and for the attention that

20    you've paid to the case.  I know you've mostly -- most of you

21    or all of you have taken notes at some time or another, so

22    I'm not going to go chapter and verse too much because I know

23    that you have notes, but this is somewhat about context and

24    themes as well as particular pieces of evidence.  And in that

25    context I want to go back to where we started, to my opening

1  statement and the government's opening statement to a certain

2  extent where I said we will give you the context.  The

3  government will give you 80 snippets of conversations, and we

4  will give you the context.

5       In fact, no government witnesses knew anything

6  about what happened in Guraceel or in San Diego, 2007, 2008,

7  tapes and custodians an and expert.  No one from Somalia.

8  It's not that difficult to find.  We brought eight people

9  from Somalia who had personal knowledge of the events in 2007

10  and 2008, personal knowledge of Mr. Moalin.

11       I told you also that there would be real people in

12  this case, and you saw real people on the witness stand, saw

13  real people and photographs and the work that was done in

14  Guraceel in 2007 and 2008 and the work that Basaaly Moalin

15  did for them in raising and sending money to Somalia and the

16  people who benefited from that work.

17       I told you there would be no evidence to identify

18  Aden Ayrow as the voice of Sheikalow on those calls, and you

19  did not hear a single witness say that.  And I'll get into

20  that more in detail as I go through my closing.

21       One thing I was mistaken about.  We did not see

22  Mohamud Ahmed, the owner of the Shidaal, where all this money

23  passed through.  Didn't hear from him, and I think you heard

24  why and a little bit about him that was from the witness

25  stand when Agent O'Very acknowledged that Mohamud Ahmed had

1  been arrested, convicted of a massive, multimillion dollar

2  Ponzi scheme where he preyed on other Somalis who were

3  investors in his Shidaal.

4       I think the government's case, I also said, would

5  be like a jigsaw puzzle with only a couple of pieces and

6  asking you to assume a whole picture from a couple of pieces

7  disparate here, there instead of the whole jigsaw puzzle.  I

8  think it's still the same.  Eighty snippets over a year's

9  worth of conversations.  And even those tiny number of

10 conversations whittled down further by editing -- and I'll

11 get into that -- so that they're entirely stripped of context

12 in many instances.

13      It's also like you had a magazine article and you

14 flipped out a word here, a letter here and a word here and a

15 letter here and you came up with a ransom note and then you

16 said that's what the article's about.  That's what 80

17 snippets does from a year's worth of conversations.

18      Going to start with a government witness, someone

19 who knows a lot about Somalia, Matthew Bryden, an expert,

20 someone whom was a valuable resource for the government as a

21 witness.  But I think what's more interesting is what the

22 government did not ask him.

23      Mr. Bryden, as he said, was chairman of a

24 monitoring group that included within it's purview al-Shabaab

25 and monitoring al-Shabaab.  He was even targeted by

1    al-Shabaab and had to negotiate with them to get back into

2    Somalia.  He also worked with the U.S. government and even

3    for the U.S. government at times with law enforcement,

4    intelligence, diplomatic community from the U.S.  USAID --

5    that's United States Aid for International Development --

6    Agency for International Development, Department of Justice,

7    Department of Defense, Department of the Treasury.  Lot of

8    contacts.  Lot of knowledge.

9          What didn't they ask Mr. Bryden?  Did they ask him

10   do you know if Aden Ayrow has a nickname?  You ever heard him

11   called Sheikalow?  You ever heard him called Majadhub?

12   Didn't even ask him those questions.

13         Talked about monitoring websites and chat rooms

14   where al-Shabaab business is discussed, where al-Shabaab

15   raises money.  Was he asked about those with respect to any

16   evidence in this case that Mr. Moalin had ever been on?

17   Nothing introduced.  You heard from the government's

18   linguist.  They had all of Mr. Moalin's emails captured as

19   well, and chats.  Nothing.

20         Nothing about phone fundraising by al-Shabaab.

21   Nothing really about fundraising by al-Shabaab except in

22   those chat rooms.  Think they would have asked Mr. Bryden:

23   Was there a financial shortfall for al-Shabaab in 2007 and

24   2008 that they needed to call a taxi driver in San Diego and

25   ask for a hundred dollars a month?  They didn't ask

1   Mr. Bryden that.  He would know if there was a shortfall

2   financially for al-Shabaab; that was his job to monitor

3   al-Shabaab.

4          He said it was a self-fulfilling -- self-sustaining

5   criminal organization that levied its own taxes illegally,

6   that created -- that just took food and money when they felt

7   like it.  I bet they needed to raise money from Basaaly

8   Moalin.

9          So we hear about tax collectors and things like

10  that.  Remember Bryden's testimony.  Also remember the

11  testimony of Najib Mohamed, the first deposition witness we

12  played, the guy who ran the call center.  In some of his

13  calls, he talked about extortion, roadblocks, tax collecting,

14  extortion.  It's not as simple as it sounds in the

15  government's very, very narrow context for its version of

16  events.  Nothing about where Aden Ayrow was at certain times,

17  where he was in the first half of 2008.  Mr. Bryden might

18  have known that.

19         The calls themselves establish that Sheikalow is

20  not Aden Ayrow and Aden Ayrow is not Sheikalow.  It's

21  essential to the government's case obviously to have to even

22  put it in the transcript, to say Ayrow every time even though

23  it never says Ayrow there; they have to put Ayrow instead of

24  Sheikalow when they put it up on closing.  They want you to

25  assume that.

1           Said that a picture is a thousand -- worth a

2    thousand words, and that's right.  That's why they put up a

3    photo.  They don't have the audio evidence to connect Aden

4    Ayrow's voice on those conversations to Sheikalow, having

5    conversations with Mr. Moalin.  This case is not about a

6    photo.  This case is about audio for the government, and

7    that's all they have; that's their whole case.

8           It started with a wrong conclusion.  As you heard

9    from the government's linguist, Agent Kaiser told him oh,

10   yeah, Sheikalow is a slurred versus of Sheik Ayrow, and

11   that's why it's an AKA, it's an alias for Aden Ayrow.  Wrong.

12   And when you start with a conclusion that wrong one month

13   into the investigation, it was just confirmation bias.  Even

14   though the linguist said he concluded that it was Ayrow on

15   those calls, there was no basis.  He was never asked why.

16   Government didn't say can you tell us the basis for your

17   conclusion.  I think you know why he concluded that.  Because

18   he was told that by the case agent, who directed him in the

19   case.  They didn't ask Bryden about that, about conclusions

20   about what was on those calls.

21          Confirmation bias is a tendency of people to favor

22   information that confirms their beliefs or hypotheses.  It

23   happens when they gather or remember information selectively

24   or interpret in it a biased way.  And once started down that

25   path, they did not deviate.  Yet there is no evidence in this

1    record that Aden Ayrow ever used Sheikalow as a nickname or

2    even Majadhub.

3         Majadhub is interesting.  In the indictment it's

4    translated as "slim limbs," l-i-m-b-s.  In his testimony the

5    government's linguist called it "small limbs" at page 61 of

6    his testimony.  And then in Government's 168, a tape, it's

7    translated as "small legs."  So which is it?  Tells you

8    something about translations from the government's side of

9    translating Somali whether you can rely on it beyond a

10   reasonable doubt when that's all the government has.  There's

11   no evidence, whether it's "slim limbs" or "small limbs" it

12   describes Ayrow or anything about it.  Just confirmation

13   bias.

14        Then there's this whole thing about "the youth" and

15   the -- if you look at the transcripts -- and I'm just going

16   to give you a couple of examples -- the man is all over the

17   place just the same.  Government's 121 at 3:35:  The men in

18   the Bay region.  Not the youth in the Bay region, the men in

19   the Bay region.  At Government's 123 and 124 and 134 and 156,

20   Basaaly says, at 16:37, the men are pleading for money.

21   Who's pleading?  It's Sheikalow pleading because you know

22   from those calls that he's pleading for money.  Government's

23   167, page 4, the men, at 186 at 6:24, at 187 at 33:12, money

24   allocated for the men in Galgaduud.  You can take snippets of

25   conversations to make them anything you want them to be, but

1    you have to take the whole context.

2           Within the conversations themselves Sheikalow never

3    identifies himself as Aden Ayrow.  No one calls him Ayrow on

4    the calls or Aden.  No one identifies Sheikalow as Aden

5    Ayrow, any witness; no witness does that.  No witness says

6    that's his voice.  All the comparisons you would think of

7    they could do, what's available on the Internet?  Ask

8    yourself what that means.

9           No witness said those are his phone numbers.  No

10   witness says that Basaaly Moalin said he was talking to Aden

11   Ayrow.  No verification of Ayrow's movements or where he was

12   during certain periods of time.  And then you saw Sheikalow

13   himself on the video.  He testified that he had many of the

14   same conversations as Basaaly, but he couldn't remember all

15   of them; they're five years ago.  He was not confronted on

16   cross-examination about that, was he, to say you're not

17   Sheikalow.  Who are you?  Nothing.  He called him a good guy

18   this morning.  Think about that.  Instead, what the

19   cross-examination was was essentially just asking him if he

20   remembered isolated pieces of conversations five years ago,

21   conversations that were about things that other people did,

22   reporting news and things like that.

23          There's more about these conversations that tell

24   you it's not Aden Ayrow.  October 2007, the very period of

25   time that this case starts, the evidence in this case starts,

1  right then.  Bryden wrote to USAID and testified here that

2  Somalis were sending money back to Somalia, the diaspora's

3  sending back to Somalia between 500 million and a billion

4  dollars a year.  We're talking about $8,500 total here.  The

5  government didn't mention Farah Yare in its opening, by the

6  way, so if you take out his 5,000, it's down to 3500.  And

7  I'll talk about Farah Yare more.  That's page 31 of Mr.

8  Bryden's testimony on January 31.  I did a little pie chart,

9  like 8500 out of a billion, but it didn't make any sense;

10 even 8500 out of 500 million.  You get the point.  You can

11 see it for yourself in your own head.

12        Opening statement the government said Aden Ayrow is

13 a rock star.  Well, a rock star begging the taxi driver from

14 San Diego for money.  A rock star needs a thousand dollars.

15 A rock star.  According to Bryden, when al-Shabaab can

16 pillage and rob at will from the populace, a rock star is

17 taking advice from Basaaly Moalin on military tactics.

18        Government never established it was Aden Ayrow;

19 they just jumped to that conclusion.  Didn't bring anyone to

20 say Basaaly Moalin was in contact with Aden Ayrow.  We

21 brought you eight people who were mortal enemies of Aden

22 Ayrow from Somalia, people who were chased out of Guraceel by

23 al-Shabaab.  That's the contrast.  Whether it's Abukar or

24 Sheikalow or Geedow Qorow, Osman Nuur, Halima Ibrahim, all of

25 them, real people, not phantoms based on confirmation bias or

1    preordained conclusion.

2            And that important stipulation that was the last

3    piece of evidence, which I'll get into in more detail in a

4    minute, the government agrees that it's a fact that the ILEYS

5    Foundation and the local administration of Guraceel and

6    al-Shabaab were opposing forces, including people we've heard

7    in this case, Abukar Suryare and Farah Yare.

8            Now, let's talk about some of the tapes as well

9    Government Exhibit 120 at 6:49, first tape.  What are they

10   talking about, Basaaly and Sheikalow?  They're talking about

11   ILEYS Foundation and the Iftin School.  There's a slide --

12   here, you can see this, at 6:49.  The Iftin School with

13   ILEYS, Basaaly says.  That's a conversation he's going to

14   have with Aden Ayrow, who's dedicated to the destruction of

15   ILEYS and the local administrative council in Guraceel, in

16   Galgaduud?

17           And then they talk about it more at 4:36 to 5:38

18   when Basaaly says, We are paying for the schooling or taking

19   care of them, we want to take care of the people wherever

20   they are located, whether they are orphans or disabled.  It's

21   a conversation the government claims with Aden Ayrow, the

22   first conversation.

23           Then Government Exhibit 130 at 8:25.  It says

24   Basaaly -- talking to Sheikalow -- says today it is you, the

25   reliberation, the Shabaab, and the public, all of you need

1    each other.

2           If it's Aden Ayrow, why is it you, not Shabaab?

3    And, you know, the linguist, the government's linguist, when

4    he made that transcript, put a semicolon between "you" and

5    "the reliberation."  I assure you, there is no semicolon

6    spoken by Basaaly Moalin in that conversation.  That's put

7    there to try to separate "you" from "the reliberation"

8    because he's not talking to Shabaab.

9           Again, at 8:59 Basaaly tells Sheikalow:  And

10   Shabaab receives its biggest support there.  Doesn't say you

11   receive your big.  Shabaab is a third party in this

12   conversation.  He's not talking to Shabaab.

13          Government 131, most of that conversation's about

14   the house.  Now, it's interesting.  You saw photos of the

15   house in Guraceel.  Those are in evidence, Mr. Moalin's

16   house.  Did you see a photo of the house in Mogadishu?

17   Government couldn't get a photo of the house in Mogadishu.

18   Mr. Cole says, putting some theory -- never in evidence,

19   never even a hint of evidence -- that somehow the attack on

20   Mr. Moalin's house in July of 2008 was by counterterrorism

21   forces.  They could find the house, but the government

22   couldn't get a photo to show you that house.  There are

23   explicit directions in the record in that conversation to

24   find that house.  Where is that house?  And, you know, it's

25   interesting also, the attack was in July or the -- June and

1    July of 2008.  It's one of the last tapes; it's like 189 and

2    190.  Where was the Ethiopian army in that period?  In

3    Guraceel.  In Galgaduud.  There's no evidence they were in

4    Mogadishu at that time.

5           Now, also 131's very important in this context

6    about what people say and who they are.  At 10:39 Sheikalow

7    says who cares, it's -- we're just going to use it at night,

8    who's going to know?  That's supposed to be Aden Ayrow.

9    Bryden at page 78 of his testimony, said that Aden Ayrow

10   three years earlier, 2004, had a house that was attacked at

11   night by a U.S.-sponsored militia acting as a

12   counterterrorism force that looked for terrorists and found

13   his brother-in-law instead.  At night.  You think Aden Ayrow,

14   this sophisticated terrorist, this rock star, is going to

15   forget that?  Who cares, at night no one will know.  He knows

16   what can happen at night; he'd already been victimized at

17   night.

18          33:21, same, Government's Exhibit 131.  Quote, how

19   can we sit -- this is Sheikalow speaking -- how can we sit

20   with someone who's looking for us, killing us, and claiming

21   he's fighting terrorists.  Now, that's a person who's saying

22   he's not a terrorist.  He's saying -- he's claiming he's not

23   saying I'm not a terrorist and they're looking for me, said

24   they're claiming they're fighting terrorists but they're

25   really looking for me.  Contrast that with Government Exhibit

1   148, which Mr.Cole used this morning about Roobow, Shabaab.

2   I'm proud to be called a terrorist by the United States.

3   Very different message in those two conversations.

4        Same call 131, 33:31.  This is Sheikalow speaking.

5   I prefer Abdullahi Yusuf because he is a powerful man who is

6   working with the Ethiopians and not with them.  Can you

7   imagine Aden Ayrow saying that ever, that he's with Abdullahi

8   Yusuf, the president of the TFG at the time?  He wouldn't.

9   It's not Aden Ayrow.

10       40:40:  We want to support the insurgent with it --

11   meaning the money -- not Shabaab, the insurgency, which, as

12   we know, is a very broad insurgency, not al-Shabaab, not the

13   youth, not dhallinyarada.  Nothing.  That's the government's

14   transcript, 131.  All that -- all that material's from the

15   government transcript.

16       Government Exhibit 139 at 11:10.  We need money,

17   man, provide some, please.  He's begging for money.  That's

18   no rock star.  That's not Aden Ayrow.  It's Sheikalow.

19       Government 143.  There's is also a defense one,

20   TT-143.  If you look at the stuff that we put in, that we had

21   to put in, that the government edited out, there's a slide.

22   This is Basaaly to Sheikalow:  Man, I need to know about

23   orphan things, the thing you send us, there's a lack of

24   funding.  In the old days there was a man who sends us

25   complicated numbers.  I send back email.  Talks about helping

1   our needy people, orphans, suffering children, relatives.

2   You don't get into trouble, so we need clear information.  I

3   told him three things I need, family size, children, their

4   telephone number, and where to find them.

5          We had to bring that out.  You have a conversation

6   like that with Aden Ayrow from what you know about him?

7   Never.  Now, is that context that the government provided or

8   a ransom note for that conversation?  They took that out of

9   their version.

10          Government Exhibit 145, 6:33.  Talks about a number

11  ending in 57, while on the previous call, Aden Ayrow gave him

12  a number ending in 39.  Not only that, that conversation is

13  with Abdulrahman Geedow Qorow, Mr. Moalin's brother.  He's

14  the head of al-Sunna Wal Jamaa, the sworn enemy of

15  al-Shabaab.  He's a Sufi, who Shabaab wants to eliminate as

16  being non-Muslim, as being apostates; you heard Mr. Bryden

17  say that.  Think he'd talk to Aden Ayrow?  No.  But he did

18  say in his deposition, which you saw on video, that there is

19  a Professor Aden.  It said Teacher Aden Ayrow in their -- in

20  their transcript.  Now, went back in Djibouti and was

21  Professor Aden, and he said yes, I know a Professor Aden, and

22  he pulled out his phone and said you want me to call him

23  right now?  He's still alive.  Not Aden Ayrow.

24          Government continues to strip context through its

25  editing, stuff we had to add.  Now again, Mr. Moalin -- you

1    heard the government's linguist say that Mr. Moalin -- that

2    the 80 -- that the even 80 full conversations was maybe not

3    even a equivalent to one day of Mr. Moalin's phone calls, and

4    they had it up for a year, that wire.

5            He also reviewed videos and emails and chats, and

6    nothing in the record, anything about that, substantiates

7    anything about Aden Ayrow or helping al-Shabaab or any intent

8    to do so.  He was -- the linguist, the government linguist

9    said he was going to be inclusive so as not to miss anything.

10   But you saw all those asterisks, and it's still there in your

11   book of transcripts.

12           One from this morning, one from the opening.

13   Remember how the opening began, the government's opening?

14   Now it is the time to finance the jihad, Government's 150.

15   It's still editing because what he showed you on the screen

16   was dot, dot, dot, it is time to finance the jihad.  He left

17   out the "now."  Now, why did he leave out the "now"?  He left

18   out the "now" because it's April 12, and no one's financed

19   jihad yet.

20           In this same conversation, Sheikalow says, You did

21   not join the jihad and now you start building a mosque.  He

22   didn't join the jihad.  Now, even jihad -- Bryden defined

23   jihad, quote, in this context armed struggle against foreign

24   occupying power and a non-Muslim power in this case; that's

25   at page 127 of his direct testimony of January 30.  Sheikalow

1   was asked in the deposition, what's your definition of jihad.

2   He said it is decided that the courts, the Union of Courts,

3   had to wage a war against the Ethiopians.  That's at tape 15,

4   page 8.  And at 1:50 Basaaly starts off the conversation,

5   saying, at 1:04, I doing well except the drought and the

6   difficulties people are facing and the fighting, which

7   affected me financially and mentally.  Then he's asked, now

8   to finance the jihad.  Nothing has been done since then and

9   it's April.  We're four and a half months into the calls in

10  this case, and that's why they took out the "now."

11          Government's 128, TT-128.  We have slide for that

12  as well.  They cut Basaaly off in mid-sentence.  They have to

13  compare the two transcripts to see, so what they do -- the

14  transcripts are different.  At one point they have the other

15  party speaking after Basaaly finished, but in the

16  government's they have him being interrupted by the other

17  party.  They cut him off in mid-sentence.  And what does he

18  say afterwards?  He tells the unidentified male in that

19  conversation that -- that basically they told Shabaab -- that

20  the locals told Shabaab to go somewhere else, we don't need

21  you.  Mid-sentence, cut him off.  Is that context or a ransom

22  note?  It's page 3 of TT-128 as well.

23          Government's 141.  Again, this is stuff we added.

24  The entire beginning of the conversation with Sahal

25  discussing orphans, Basaaly and Sahal discussing orphans.

1    Now, Sahal is important too because you go back 120, the

2    first tape, the first conversation, that's in evidence from

3    the government, which is Basaaly and Sheikalow.  They talk

4    about Sahal.  He's the orphan guy.  The government doesn't

5    put that in its 141.  We have to put it in.

6            Now, Sheikalow in his deposition on the video talks

7    about Sahal.  He knows him.  I don't know what's next for the

8    government on rebuttal.  There's two Sheikalows maybe, both

9    of whom know Sahal and who work with him in orphan work?  Is

10    that context or a ransom note?

11            Government's 144.  That's another one they cut off

12    in the middle when Basaaly's talking about Aden Ayrow as Aden

13    Ayrow -- not as anybody else, as Aden Ayrow, uses his name.

14    He's asked about him, and the -- first says your friend --

15    and again, you can't see jokes, you can't see sarcasm, and I

16    ask you to think about your own conversations for a year and

17    think if someone were translating them from English to

18    another language on the cold paper and couldn't tell whether

19    you were literal or not.  Everything you said was taking

20    down.  Think about that when you're going to judge that

21    beyond a reasonable doubt.

22            But in this one, if you go down the page, they're

23    talking about Ayrow.  He said Basaaly -- about two-thirds of

24    the way -- he's talking about Ayrow -- he is even beyond

25    identifying himself as a Somali.  He identifies himself as a

1    Muslim.  That is where he stands.

2            It's contemptuous.  This is disparaging.  That the

3    government took out.  They give you the first half of the

4    page, first page of the conversation, then decided it didn't

5    need to give you that part.

6            This is Government's 155.  Basaaly, in the part

7    that we put in in TT-155, says we don't care for those who

8    have political or clan agenda.  Our intention is to provide

9    help.

10           That's not al-Shabaab's intention; we know that.

11   It's to destroy, to destroy the local administration of

12   Guraceel, to destroy the aid groups, destroy everybody.  But

13   the government cut that out in between two sections.  You

14   look at that conversation.  There's a section before from the

15   government and there is a action after, and this section that

16   we put in is about half a page, but they actually decided to

17   take it out.  They made the affirmative decision to take out

18   that sentence.  Think what that means.  Context or a ransom

19   note?

20           Now, they also did it with Matt Bryden.  I'm not

21   saying that -- just in terms of question and answers.

22   Witnesses only answer questions.  They asked Bryden about

23   Abdi Qeybdiid, who's a police commissioner.  Then it turns

24   out the guy's a warlord, he was apprehended by the U.S.

25   during the Black Hawk Down incident.  Well, maybe he's not so

1    clean.  They parade these guys in photos in suits and ties to

2    try to make you think they're something they're not when

3    they're a group of warlords running the country, which is

4    what Bryden told you, that the TFG was Abdullahi Yusuf, a

5    former warlord, and there's his warlord cronies.  In fact,

6    Mr. Bryden acknowledged that he had written about -- about --

7    excuse me -- about Abdullahi Yusuf, that he had a reputation

8    as a dictator and lived up to it; and he acknowledged that in

9    his January 31 testimony at page 54.

10           Now, he talked about Ethiopian forces in Somalia.

11   This is another bit of context adjusted.  And how did the

12   Ethiopian forces -- this is direct exam by the government --

13   And how did the Ethiopian forces end up in Somalia?  Answer:

14   They were invited by President Yusuf.  Then on

15   cross-examination:  Did you write an op-ed piece that said

16   Yusuf's original appeal for 25,000 foreign troops was widely

17   perceived as an act of ventriloquism engineered from Addis

18   Ababa -- which is the capital of Ethiopia -- and aimed at

19   putting Ethiopian boots on the ground in Somalia?  Answer:

20   Yes, I did.  Question:  So in fact invitation is really a

21   formal word, right?  Answer:  Yes.

22           Now, is this government fiction that they have to

23   have you buy?  You heard it this morning, which is that if

24   you're against the TFG, if you're against Ethiopia, you're a

25   terrorist, you're al-Shabaab.  We know that's not true.  From

1   whom?  From Matthew Bryden and all eight witnesses who

2   testified here on video or here from Somalia.

3          Well, let's talk about Bryden first.  He said that

4   one of the problems with the central government in Somalia

5   was that -- the essentially predatory nature of the state in

6   Somali history, and that in Somalia, Ethiopia, and Kenya, the

7   post-colonial state had been a primary source of insecurity

8   and an instrument of violence against the Somali community.

9          Now, what about opposition?  Limited to al-Shabaab?

10  Limited to terrorists?  No.  This is Bryden:  Opposition to

11  the Ethiopian-backed TFG expressed itself almost immediately

12  after the TFG's inception in 2004.  He wrote that in

13  October 2007 to USAID in a confidential memorandum, the

14  United States government.  And he said that today,

15  October 2007, through a violent insurgency that involves a

16  broad range of opposition forces motivated by clan,

17  nationalist, and Islamist agendas.  Same.  That's in his

18  cross at 54.  It's January 31.

19         He also said that he had written in the same

20  document, he testified that he'd written:  Under present

21  circumstances all TFG security forces are perceived by

22  opposition groups as hostile.

23         And what about the Ethiopian invasion?  He said the

24  Ethiopian intervention in Somalia has triggered a persistent

25  and escalating insurgency.  Ethiopian intervention in Somalia

1   has degenerated into a violent and costly occupation.  He

2   also said Ethiopia accentuates the threat of terrorism in

3   order to stir international, especially American, support.

4          There's also historic antagonism between Somalis --

5   between Somalia and Ethiopia, and he acknowledged that as

6   well on page 66.  He also said the Islamist activists are a

7   diverse community characterized more by competition and

8   contradiction than cooperation, making a broad-based

9   conspiracy implausible.

10         He also talked about friction within the TFG

11  itself.  The president and the prime minister had competing

12  militias, and he predicted assassinations.  So I asked him:

13  So it wasn't simply al-Shabaab versus the TFG, right?  Right.

14  It was really everyone against the TFG to a certain extent

15  for their own reasons?  Answer:  It was a very broad-based

16  insurgency, yes.  And yesterday you acknowledged that there

17  was criticism of the TFG, right?  Correct.  Question:  In

18  fact, you've been among the most vocal critics of the TFG?

19  Answer:  That's probably fair.  That's Matt Bryden,

20  government expert.  And he testified that the opposition

21  included Islamists who were not Shabaab and that was

22  resistance much broader than al-Shabaab and even elements of

23  the TFG itself.  And this Ethiopian occupation is the two

24  years we're taking about, 2007 and 2008.  He said that too at

25  page 61.

1            So opposition to the TFG or the Ethiopians doesn't

2    mean that Sheikalow is Aden Ayrow, doesn't mean that he's a

3    terrorist.  He could have been any one of a million or more

4    Somalis expressing the very same opinions.  It's a government

5    fiction.

6            Now, even just talking about that, by the way, is

7    not a crime.  You heard the judge's First Amendment

8    instruction.  I won't go into it; you have the instruction.

9    But speech is protected; that's one of the things we value

10   here.  That's instruction number 20.

11           Now, humanitarian need in Somalia.  Didn't hear

12   much about that this morning, but it's clear that it's acute.

13   Mr. Bryden said that he had written that in the Horn of

14   Africa is one of the poorest and most conflict-prone regions

15   in the world.  And he also acknowledged there was a drought

16   from 2006 to 2008.  And the armed conflict that afflicted

17   Somalia from the fall of the Barre government in 1991 through

18   the time period of this case created a lot of orphans, lot of

19   people dying from conflict, from deprivation, from famine.

20   And the children are the most vulnerable under those

21   circumstances.

22           So think about the situation on the ground in

23   Galgaduud, 2007-2008.  You heard about it from people who

24   were there, who are still there.  Abukar Suryare, Abukar

25   Dahir Mohamed, about setting up a local administrative

1   council.  You saw the documents with fingerprints and

2   signatures.  About how the Ethiopians came, about al-Shabaab

3   came, and the local administrative council had to flee.

4           You heard from Halima Ibrahim.  You saw her on the

5   witness stand.  You heard her talk about her interaction with

6   Farah Yare and Abukar, the work that she did in Galgaduud,

7   2007-2008, the work that was needed.  That why she went to

8   Galgaduud from Minnesota; she went back there.  Her husband

9   didn't want to go; she had to go.  She talked about the ILEYS

10  Foundation, the work they did, the work that she did with

11  them in Galgaduud in 2007 and 2008.

12          You heard from Abdisalam Guled, the gentleman who

13  was here, came from London to testify.  Halima came from

14  Somalia to testify for the defense.  But he started ILEYS

15  with other diaspora elements in London and other places,

16  Scandinavia, because Galgaduud was neglected.  He's light or

17  vision, ILEYS.  That's what they were trying to provided, not

18  what al-Shabaab was trying to provide.

19          The situation in Galgaduud, the anarchy, the

20  danger, the need for a local administrative council.  He

21  recruited Abukar and Farah Yare to get involved in Galgaduud.

22  Talked about schools, drought relief, all of those projects.

23  You saw photos of them:  Defendants' KK, I, PP, QQ, RR, all

24  photos of ILEYS work.  You saw Farah Yare himself in

25  photographs, including three screenshots from Guled's -- from

1    Abdisalam Guled's documentary, UU, VV, and WW, where he's

2    holding up the book that shows money and where it's going,

3    Dhusa Mareeb, to Guraceel, places in Galgaduud.  Guled told

4    you that he was on emails with Mr. Moalin.  Mr. Moalin

5    received those same emails.  One of them's in evidence, the

6    header.  You see they're all there, with the photos and all

7    the attachments.  Why?  For accountability, so that people

8    know what they're giving money for.

9          They talked about -- said that they needed police.

10   And you know that Sheikalow was a police commissioner.  You

11   heard from him himself, including definitely against

12   al-Shabaab and that the diaspora was a primary source of

13   funding ILEYS; that you heard firsthand.  You didn't hear

14   anything about funding of al-Shabaab, no one said yeah, that

15   it's funded by the diaspora, not even Bryden, and it isn't.

16         Now, Abukar also told you about a meeting in the

17   spring of 2008 that he and Farah Yare and others had with

18   Aden Ayrow trying to convince him, please leave us alone,

19   we're trying to get this thing off the ground here, can you

20   just take your group somewhere else.  And Ayrow said no.

21         Now, you saw the need for local administrative

22   council, for ILEYS and what ILEYS did.  You saw all that.

23   Now, ILEYS is mentioned in Government's Exhibit 120 -- we

24   showed that first -- where there's talking between Sheikalow

25   and Basaaly Moalin; there's a conversation where ILEYS comes

1    up.  But ILEYS also comes up in conversations between

2    Mr. Moalin and Ahmed Nasir, bookending that first Government

3    120.  It's a conversation that occurs before that was put in

4    by the defense, by Mr. Ahmed Nasir, and one after also put in

5    by Mr. Nasir, and they talk about ILEYS.  Specifically

6    Basaaly spelled out the website; he says go look there.  And

7    the first call it's not up, but then he corrects it later on

8    and says this is what they're fighting about.  How do you

9    discuss ILEYS with Aden Ayrow, who's dedicated to the

10   destruction of it?  Is that context when you put on that 120

11   and not the call before it and the call after it about ILEYS?

12   Is that context or a ransom note?

13            Saw Government's -- and 122-T, the -- AN-122-T and

14   AN-1-T are the two calls with Ahmed Nasir.  Government's -- I

15   mean Defense F, which is an orphan form that went out to

16   Basaaly Moalin and others, and Guled testified about it that

17   he received it as well.  And these documents setting up ILEYS

18   were for accountability purposes; they're very important.

19   Even the government's linguist in his testimony, from

20   September 23, 2008, that late into the process -- remember,

21   this is after all the conduct and he'd been listening for

22   almost a year to Mr. Moalin's calls day by day -- when he's

23   asked by Agent Kaiser about Habar Gidir, the larger clan,

24   plans for a post-TFG world, he says, the sessions have been

25   about improving the condition of Galgaduud region thus far,

1    and that's what he reported back in September of 2008, not

2    about al-Shabaab.  Of building, not destroying.

3         Now, Farah Yare, the government's conclusion I

4    guess giving up on him, not mention him in his opening, his

5    closing.  Now, he gets another chance, but really, there are

6    specific transactions that go to Farah Yare.  He did not

7    mention it.  Think of how wrong the government's case is with

8    Farah Yare that they don't only even close on him.  Think how

9    about wrong it is and think about how you can have confidence

10   in the rest of that case.  You can't, certainly not beyond a

11   reasonable doubt.

12        Reasonable doubt.  The important decision for

13   affairs in your own life.  The judge's charge is the judge's

14   charge, but -- and that's what you go by.  But think about

15   that.  You heard about Farah Yare.  I'm going to talk a

16   little bit about him.  Halima talked about him.  You saw

17   photos of him.  They're he is.  Doing the work of al-Shabaab?

18   I think not.  Abukar talked about him.  Abdulrahman Geedow

19   Qorow talked about him.  It was easy for us to find eight

20   people who knew him and the work that he did, the great work

21   that he did there.  The government couldn't present a single

22   person who said anything bad about him with all the

23   government resources available.

24        We had to put -- we had to put in a call, 167-A,

25   which is a call that Basaaly has with Abukar about the fact

1    that Farah Yare is the treasurer collecting the finance for

2    the drought relief.  And Abdulrahman Geedow Qorey's name

3    comes up in there too because he's at that chair.

4           167-B, another -- another defense exhibit that we

5    put in from March 30, March 30, 2008.  Basaaly said that he'd

6    just sent money to Farah Yare for drought relief after

7    speaking with Abukar.  Government's theory in its opening was

8    that Farah Yare was somehow a replacement once Sheikalow was

9    no longer available to send money to after May 1st, 2008.

10   This is March of 2008.  Farah Yare is already getting money

11   from Moalin.  Puts the lie to that theory.  Government's

12   still editing.  No one's edited out Farah Yare.

13          Government's Exhibit 182, Farah Yare explaining the

14   conflict, the combat.  Doesn't mean he was in it.  He said we

15   like a sports fan says we.  We did this or we did that.

16   Doesn't really matter because -- it's like ILEYS.  Doesn't

17   mean he dug a well if he says we dug wells.  He's an

18   administrator.  Even in that conversation at 4:42:24, he says

19   the young ones fought separately who weren't in our control.

20   That's about Shabaab, it's not in his control; it's a

21   separate organization.  Talks about the Ethiopians explicitly

22   as the opposition there; that's at 9:17:17.

23          Now, I'd like to juxtapose the al-Shabaab

24   philosophy, stated by Mr. Cole and the government throughout,

25   and Basaaly Moalin.  Let's compare.  Mr. Guled testified

1    here, who's the national security advisor to the president of

2    Somalia, in charge of their counterterrorism unit.  Think he

3    knows a thing or two about al-Shabaab?  He started the ILEYS

4    Foundation.  He said I also came here to -- for the State

5    Department tour of the border in San Diego -- do you remember

6    that? -- a documentary film maker, preserving what has gone

7    on in Somalia, master's degree.  He said that he knew Basaaly

8    Moalin was a supporter of ILEYS, and he also said that he

9    never met during that time period -- because we limited it to

10   that time period -- never met someone who could be -- who --

11   he never met someone who was for both ILEYS and al-Shabaab.

12   You notice they didn't ask Bryden that question, whether you

13   could support both because you can't.  You can't, on the one

14   hand, finance the building of schools and, on the other hand,

15   finance their destruction.

16         But, you know, he said -- he said that in a prosaic

17   way because I asked him in a prosaic way.  I thought

18   Sheikalow in his deposition on video was much more poetic

19   when asked about whether Aden Ayrow was involved in orphan

20   care; he said how could he be involved in orphan care when

21   he's killing the fathers that make the orphans.

22         Don't take our word for it.  Don't take the

23   witness's word for it.  How about the government linguist?

24   Remember that personality profile he filled out in October of

25   2008, everything is done, Mr. Moalin's life goals, quote to

1    be successful in Somali politics and become a wealthy
2    businessman with many children, to develop and enhance his
3    home region in Somalia.  Nothing about al-Shabaab.  He wasn't
4    asked about -- he wasn't asked about criminal activity.  No.
5    He was asked about life goals.  Nothing about -- this guy
6    they've been investigating for a year.  Nothing about
7    al-Shabaab there.  What stresses him out?  Finances and not
8    being able to build his dream home.  Nothing about al-Shabaab
9    or worried about the legal ramifications of what he's doing.
10   That's not surprising.  They're opposite from what al-Shabaab
11   does.  That's why it's not there.
12         What's he bothered by?  The suffering and
13   destruction in Somalia caused by both the fighting and the
14   drought.  That's someone who's for al-Shabaab?  Provided
15   support to al-Shabaab?  He's competitive.  He would try to
16   outshine others in supporting his home region of Galgaduud.
17   He's egotistical, he has a high opinion of himself.  Despite
18   a limited education, he pretended to know everything, and he
19   has a tendency to boast.  And we get into some of that then.
20   And, again, remember, just think about if your conversations
21   were taken in another language literally without any tone,
22   context, whatever.  There's nothing about al-Shabaab there in
23   any of those answers.
24         And about boasting, the Roobow calls -- not Roobow
25   calls, but the Roobow -- the Muqtar Roobow calls that they

1   talked about where he's on the -- said, get Roobow on the

2   phone.  Really?  Linguist was asked by the government back

3   during the investigation, what about these calls with Roobow?

4   There is nothing to sustain that Mr. Moalin spoke personally

5   with Roobow.  Sometimes appears too frank about this; that's

6   what the government's linguist wrote.

7            There's more.  The stipulation that I read into

8   evidence at the end of the case; this is what it says.  You

9   want to know about the incompatibility of al-Shabaab and

10  ILEYS, the incompatibility of the Galgaduud local

11  administrative council and al-Shabaab?  You cannot live in

12  both those worlds.  The parties stipulate and agree that in

13  early to mid 2008, one, money collected for the Ayr subclan

14  was given to individuals, including Abukar Suryare, AKA

15  Abukar Mohamed, and Farah Yare, who were associated with the

16  ILEYS charity; two, money collected by men in Guraceel on

17  behalf of the Ayr subclan was given to a group that was not

18  al-Shabaab; three, there was a dispute between al-Shabaab,

19  the Ayr clan, and ILEYS over the administration of the

20  Galgaduud regions; four, members of the ILEYS charity and the

21  Ayr subclan, including Abukar Suryare, were opposed to

22  al-Shabaab.  Fact.  Stipulation.  Fact.  Not an

23  interpretation of a conversation.  Not a theory.  Fact.

24  Incontrovertible fact.

25            Remember, those people came here voluntarily to

1    testify for the defense.  Take it whether they -- what

2    they -- their experience with Mr. Moalin.  And the government

3    will say oh, they didn't hear the phone conversations.  It's

4    the government's phone conversations that ended, not Ayrow,

5    so you have to start with that.  They have to prove that

6    first, and they haven't.

7            That was the only cross-examination of all the

8    witnesses.  It wasn't about what they knew.  It's just about

9    phone conversations.  The government's decided to pull out

10   this ransom note and show it up to somebody else and say did

11   you know that?  I asked Mr. Bryden, in Somalia what are the

12   options in a situation if a child is malnourished.  Here's

13   what he wrote:  Put it into context is that al-Shabaab --

14   part of what was happening was that al-Shabaab was also

15   levying its own taxes on families, taking food, taking money.

16   So that was the option.  In a sense, there were very few.  If

17   you had money, it could be taken away from you.  If you grew

18   food, it could be taken away from you.  So you could ask for

19   more money, you could ask relatives to send it to you.  If

20   you were lucky, you got to keep it, all of it.  If you were

21   unlucky, then you had to pay some of it to the militias in

22   your area.  Question:  But it wasn't coming from the TFG?

23   Answer:  It wasn't.  No one else was in a position to provide

24   assistance to people in those areas.  That's January 31 at

25   page 118.

1          You cannot live in both those worlds.  You cannot

2     finance the building and the destruction at the same time.

3     And you hear anything from at that paragraph that's

4     consistent with what Basaaly Moalin was doing with ILEYS

5     Foundation, with these witnesses, what all the witnesses were

6     doing in Galgaduud during that time period and what he was

7     financing there?  They came 10,000 miles and went to

8     Djibouti.

9          Another thing about al-Shabaab principles.  Sufis.

10    You heard about Sufis.  Sufi is a branch of Islam.

11    Traditionally most Somalis are Sufis -- that's a quote from

12    Mr. Bryden's testimony.  And al-Shabaab does not tolerate

13    Sufis or Sufism?  Correct.  And it does not tolerate Sufism

14    practice?  Correct.  And essentially is at war with Sufis and

15    Sufism?  Yes.  They're looking to eradicate it from Somalia?

16    I believe so.  Violently if necessary?  Yes.  That's Mr.

17    Bryden at 77 and 78.  Well, Abdulrahman Geedow Qorow, Osman

18    Nuur, al-Sunna Wal Jamaa, Sufis, at war with al-Shabaab.  Mr.

19    Moalin's wife is Sufi.

20         Now, the Asmara peace process in the middle of

21    2008.  There are negotiations to end the conflict with the

22    TFG, get the Ethiopians out in some organized way.  Abukar is

23    there, Abdisalam Guled is there.  Abukar is reporting, which

24    I'll get to in a minute, but you see al-Shabaab totally

25    against it.  And Bryden is -- it's fair to say that

1   al-Shabaab is distinct and not a part of that effort of

2   reconciliation, relief effort, right?  That's right.  Well,

3   we'll listen to -- we'll hear about what Basaaly says about

4   it.

5           Now, these witnesses, Halima Ibrahim, she works for

6   the UN, she has her NGO for women -- she worked on the Somali

7   constitution for the TFG.  She reached out to Basaaly because

8   of his support in Galgaduud for education.  She knew he was

9   associated with ILEYS.  He supported co-ed schools.  Co-ed

10  schools.  You imagine al-Shabaab?  Antithetical.  She used

11  his house for a U.S. delegation for four nights.  An

12  al-Shabaab supporter does that?

13          Al-Shabaab was against the local administrative

14  council; you heard her say that, you heard others.  She had

15  to run and hide in the bushes, she and Abukar and Farah Yare,

16  chased out by al-Shabaab until al-Sunna Wal Jamaa came back

17  and kicked out al-Shabaab.

18          Basaaly asked her, a woman, to take over the

19  orphanage for him.  Halima Ibrahim, marked for death by the

20  warlords in the '90s because of her work for women, marked

21  for death by al-Shabaab 2007-2008 for her work in Galgaduud

22  on behalf of the local population.  Always supported by

23  Basaaly Moalin.  Those are irreconcilable concepts,

24  supporting Halima, supporting al-Shabaab.

25          Now, let's look at Basaaly on the tapes.  This

1    again is something we had to put in in TT-124.  There's talk

2    about unity, there's talk about Somalia being for everyone,

3    from scholars to the uneducated public.  And I think

4    Mr. Mohamud said that and Basaaly agreed.  Again,

5    antithetical with al-Shabaab.

6          You heard Geedow Qorow in his deposition where he

7    called al-Shabaab a mafia, said they're against

8    intellectuals, they're against education.  131 again, TT-131

9    where we added where Basaaly's says to Sheikalow, The most

10   important is what the local people support.  TT-134 where we

11   had to put in, Basaaly:  We have intellectuals and elders and

12   can set up our own forces.  He criticized al-Shabaab.  He and

13   Abdulkadir, a conversation with a gentlemen named Abdulkadir.

14   Abdulkadir says at one point, you know, they're going to

15   shoot me and they're going to shoot you for talking like

16   this; he's talking about al-Shabaab.  Said they're going to

17   put five bullets; that's what he says a couple of times.

18         TT-135, added.  Basaaly says the money was

19   allocated to the famine and he will check on whether people

20   have met their pledges.  Government took that out.  We had to

21   put in -- all this stuff I'm telling you, government -- we

22   had to put in.

23         167-A, a tape we had to put in all together, no

24   government transcript at all, and I talked about that one

25   before, about discussion of drought, drought relief and Farah

1    Yare and emails and Abukar and Basaaly.  Those are not

2    al-Shabaab activities.  Those are Basaaly Moalin's

3    activities.

4              Now, Government Exhibit 167, which is when Aden

5    Ayrow was killed.  Let's look at Basaaly's reaction.  Last

6    line, Sheik Issa says, Yes, that was his destiny, everyone

7    will die in his time.  Basaaly:  Yes.  It is not a problem.

8              Government's Exhibit 191.  Very long conversation

9    with Farah Yare.  Basaaly says he spoke to Abukar about the

10   negotiations going on in Asmara and the talks are proceeding

11   well.  At 27:13 he says diplomacy is good.  That is not an

12   al-Shabaab ideal.  Then Farah Yare reports on the

13   negotiation -- I'm sorry, Djibouti, not Asmara.  It's

14   Asmara-approved, but it's in Djibouti.  Guled testified on

15   that as well that he met Abukar there, and he talks about how

16   the negotiations are going well.

17             First the committee -- this is going from the

18   middle.  First the committee of the nine will discuss the

19   issue, and if they agree, Islamic scholars will give their

20   support and encourage negotiations.  If an agreement has not

21   been reached, the Islamic scholars will take over the matter

22   and issue rulings on all the issues.  I think I made it, that

23   issue, clear.

24             What is Basaaly's reaction to negotiated settlement

25   going on in Djibouti?  Very well.  Great.  Not al-Shabaab's

1    reaction.  They denounced all this.

2          Farah Yare mentions Sheik Sharif signing the

3    agreement.  He was the person became president the following

4    year when this negotiation was concluded.  He's the person

5    who was on the phone with Hillary Clinton and Abdi Elmi, the

6    defense linguist.

7          Now, the government makes -- says this is like

8    codes and secret.  Let's talk about that.  They used the Amal

9    hawala, one of the largest, Mr. Bryden said, not one of the

10   underground, informal ones that Bryden said were available,

11   one, DAX, here with -- with licenses and compliance officers.

12   Used Farah Yare's real name, used Omer Mataan's real name for

13   those transfers.  If they're hiding something, not a very

14   good code.

15         Let's talk about Omer Mataan for a second.  It's

16   clear that Basaaly did not know Omer Mataan or who he was.

17   And if you look at Government's 178 at 10:29, he asks, so

18   Omer is from the elder group, right?  Hassan:  Yes, he's from

19   the elder group.  The elder group is not Shabaab.  Elder

20   group is the opposition to al-Shabaab, which Basaaly doesn't

21   know if he's al-Shabaab.

22         Government's 181 at 4:15.  Mr. Moalin clearly does

23   not know who Mahad Karate is.  There's a long section there

24   where he's just -- he's totally confused because he knows

25   someone else by the name Karate, and he has to be told --

1    who? -- about Mahad Karate.  He does not know who he is.

2            Government's 187, 37:06.  Again, Mr. Moalin does

3    not know Omer Mataan.  And Government's 188, conversation

4    between Omer Mataan and Basaaly, at 1:59.  He say so what are

5    you doing, how are you spending your time.  He says I'm with

6    the reliberation boys in the forest.  The reliberation boys,

7    not the al-Shabaab.  The reliberation, the Asmara group

8    people.  No knowledge, no intent.  No other witnesses.

9    Another thing they didn't ask Mr. Bryden as to whether he

10   knew who Omer Mataan was.

11           Now, the government -- and as for the additional

12   transfers, we'll talk about that later with Sheikalow because

13   those are about Sheikalow; he talked about that in his

14   deposition.

15           Now, with respect to Hassan, he didn't stop him

16   from being paranoid, but Basaaly's not -- Basaaly doesn't

17   have consciousness of guilt (whispering) talking in code

18   (whispering) not talking like that.  He doesn't fear that

19   because he's not doing anything wrong.  He says at :59,

20   Government's 177, so give people straight information, man,

21   he tells Hassan.  He let -- every time Hassan comes up with

22   yah-dee-dah, don't say that, he laughs.  Hassan asked him

23   about eavesdropping at 180, 36:20.  Basaaly:  I know it, yes.

24   Asks why he still talks openly.  He's not doing anything

25   wrong, that's why.  You don't have to.  But Hassan --

1    whatever he has to hide, who knows.  You didn't see him here.

2              At 184, 3:38, Hassan, more paranoia.  Basaaly

3    laughs in response.  At 167, one that the government uses

4    with -- between Basaaly and Sheik Mohamud, Sheik Mohamad,

5    they're laughing.  If you remember, I went over it with

6    O'Very; there were like nine or 11 passages where they're

7    laughing about codes, people want to use codes, everybody

8    uses codes, nobody knows who they're talking to, how to talk

9    to people.  It's not something that he took seriously.

10             Now, I'm going to talk a little bit about

11   translation.  Match those credentials.  Abdi Elmi.  Defense

12   linguist.  Good enough for Hillary Clinton.  Good enough for

13   ambassadors.  Good enough to be asked in this case to be an

14   interpreter in the court.  Good enough to work for the

15   government in Indiana doing the same exact thing, translating

16   wiretap conversations and then testifying about it on the

17   witness stand.  Court experience.  He's the only certified

18   Somali interpreter in the U.S.  Seven states he's also

19   separately certified.  Federal court.  No interest in the

20   outcome.  Doesn't have superiors to please with conclusions.

21   He's worked for the government in the exact same capacity and

22   many other capacities, with the State Department ongoing.  He

23   did it the same way here, as he said, that he did it for the

24   government in Indiana.

25             Government linguist.  Not a certified translator,

1    court-certified.  Has not been to Somalia except for an

2    airport stop since 1990.  Working on this case since 2007,

3    the government linguist, but after five years had a change of

4    transcripts in the middle of the trial about the youth and

5    capitalize it, change it to young guys.  He acknowledged that

6    even after five years, the defense sent a translation, he had

7    to make corrections.  He said they weren't substantive,

8    minor, it didn't change the content.  Well, we have errors on

9    both sides then that don't change the content.

10          The word shabaabka, shabaabku.  Mr. Elmi said what

11   it means and why he said it.  It wasn't al-Shabaab because of

12   the article at the end that's possessive, our youth.  Did the

13   government's linguist explain why he thought it was Shabaab?

14   No because he thinks, sees -- they see Shabaab everywhere.

15   It's confirmation bias.  There's no explanation.

16   Cross-examination, "dhallinyarada" youth.  The linguist, the

17   government's linguist acknowledges yeah, it means youth

18   generally, but I'm going to decide to put -- where I think it

19   means al-Shabaab because this is a -- case is about

20   al-Shabaab from the government's point of view.  Of course

21   confirmation bias that every Shabaab or "dhallinyarada" means

22   al-Shabaab.

23          Now, 136-S -- and let me put it on the Elmo for you

24   because Mr. Cole went there, said that Shabaab was not in the

25   translation, and I showed on the redirect with Mr. Elmi that

1    it is just on the page before because, if you remember, you

2    can't construct the sentences linear the same way.  So here,

3    the bottom of page 17, their argument is we lost everything

4    because of support of al-Shabaab.  Now, on the next page is

5    the Somali al-Shabaab.  And then the cross-examination of Mr.

6    Elmi, he was trying to say something about the formal name of

7    al-Shabaab.  Well, what's in the transcript?  It's not the

8    formal name of al-Shabaab.  And I showed that on redirect

9    too.  And even if it's two professionals disagreeing, that's

10   not a -- that's not beyond a reasonable doubt, that's for

11   sure.

12         Now, Sheikalow.  Say that he's -- yes.  Do you know

13   him by any other names?  Yes, Sheikalow.  You saw the

14   deposition.  By the way, Yare is one of his others, which

15   means small.  Maybe like Majadhub.  He had been a fundraiser

16   for the Islamic courts; he was well known in that capacity.

17   Talked about the nature of threats to the region when he took

18   over as police commissioner.  He talked about the Ethiopians.

19   And Mr. Cole would like to confine it to a conversation -- to

20   that testimony and leave out everyone else and all the other

21   context.  And also he doesn't put in the part -- leaves out

22   the part where Sheikalow and the other witnesses talk about

23   the Ethiopians shelling the town of Guraceel indiscriminately

24   so that everybody had to leave.  It's in the conversations.

25   Farah Yare describes it.

1          He talks about the impact of Aden Ayrow's death on

2    himself and the police force, and he talks about being

3    threatened by al-Shabaab and that they attacked Guraceel, the

4    police tried to resist, were defeated, and fled and that

5    there's a fundamental change in their communication methods.

6    And this is all about why he can't reach Sheikalow anymore.

7    Because he left.  He never went back to Guraceel.  They

8    ditched their phones because al-Shabaab knew the numbers;

9    this is what he testified to.  They went to walkie-talkies

10   instead.  He got texts and calls from al-Shabaab.  This is

11   right after Aden Ayrow was killed, he says.  And that's tape

12   15 at 29:30.

13          Government's Exhibit 181.  Basaaly at 3:18 talks

14   about changing the -- they changed the telephone system.

15   182, Farah Yare at 3:39:07, chief's phone was off when he

16   went to the countryside.  Government 187 at 34:47, changed

17   phone numbers for security reasons.

18          Now, the range in the conversation that Sheikalow

19   testified that he had with Mr. Moalin just from memory are

20   consistent with the tapes.  He talks about Sahal and orphans.

21   He knew him.  He put him in touch with Basaaly.  ILEYS and

22   the drought committee and the recipient of hawala money from

23   the diaspora.  It's all in his testimony about the

24   conversations he had with Basaaly.  The hawala discussion

25   during cross-examination is totally consistent.  He says

1   sometimes I -- I think I gave Basaaly the names, I never

2   picked it up, I'd given him other names to -- to send to.

3   These are those original ones with Sheikalow where Hassan

4   Guled was the recipient because he's giving other names

5   because he's not picking it up himself, and he gave those

6   names to Basaaly.

7           He was also asked once did Basaaly ever tell you to

8   leave Guraceel, and he says yes, in fact, he did --

9   page 20 -- and there's a section where he says yeah, he

10  thought I wasn't effective against al-Shabaab, so he told me

11  if you're not going to be effective, get out.  Never talked

12  about shooting down American helicopters.  They just want to

13  mischaracterize that and continue with that.

14          The cross-examination, there's really only about a

15  handful of calls and things about them that he doesn't

16  remember.  It's really about Bay and Bakool and these

17  helicopters.  And think about your conversations from five

18  years ago.  Think about your memory of them.  Not something

19  you do but something you talked about with someone else that

20  you heard on the news or you read in the newspaper or that

21  someone else told you because that's what that is.  Because

22  Sheikalow's not individually involved in that.  He's

23  reporting.  He also said people like Basaaly, and Basaaly in

24  particular as well, wanted news, they were hungry for news;

25  Bryden said hungry for news.  So would you remember that five

1    years later, every subject matter in a host of these kinds of

2    conversations?  Again, it's a we.  We won the Super Bowl.  We

3    did this.  We did that.

4           Now, Najib talks the same way.  There's no question

5    that Najib was sitting in his call center putting people

6    together on calls and not out there saying we did this or we

7    did that, talking like he was a combatant when it's clear he

8    wasn't.  It's clear from his deposition.

9           I won't get another chance to speak to you like Mr.

10   Cole, so I'm going to ask you to take up the responsibility

11   for asking questions to yourself when you deliberate with

12   each other about the reasonable doubt in this case.

13   Mr. Bryden's testimony itself.  The fact that they can't ID

14   that voice as Aden Ayrow.  There are no witnesses for the

15   government, just an expert from the stone ages and 80 calls,

16   edited calls, from a year's worth of calls that we had to put

17   in context over and over again.  Eight fact witnesses, there

18   at the time you heard testify that you cannot live in both of

19   those worlds, you cannot build and destroy the same thing.

20          Basaaly Moalin's work was antithetical to

21   al-Shabaab.  Co-ed schools.  The work for the -- for the

22   council.  That stipulation that you saw is a fact.  Can't be

23   for and against the same thing.  No knowledge.  No intent.

24   No support for al-Shabaab.

25          Government wants you to seize on words here or

1    there or a phrase here or there, pick -- cherry-picked from a

2    host of conversations, selectively edited, and wants you to

3    convict.  I submit you cannot convict on that kind of

4    evidence.  It is too important.  It is too important to

5    Mr. Moalin.  It is too important for the system.  It's too

6    important to you as jurors.  It's too important to all of us.

7    It's unAmerican.  You're Americans, following the law, doing

8    your duty in this case.

9            This was a terrorism case.  Take that out of your

10   head, those photos that were used to inflame you and distract

11   you away from the fact that the government has not given you

12   a case beyond a reasonable doubt.  The only evidence in this

13   case from the eight witnesses who testified, uncontroverted

14   by the government, stipulation, everything.

15           In the opening the government said you can see what

16   Basaaly Moalin's money bought.  The only evidence of what it

17   brought came from the defense:  The schools, the healthcare,

18   the water projects, the local government, law and order in

19   Galgaduud.  The photos, the people approved them.

20           I submit to you the only verdict that makes sense

21   in this case that the evidence dictates is not guilty on all

22   counts.  Thanks very much.

23           THE COURT:  Ladies and gentlemen, we'll take a

24   ten-minute recess at this time, resume at ten after 2:00,

25   yeah, ten after 2:00.  Remember the admonition.  Thank you.

```
 1        (There was a break in the proceedings.)

 2        (Following is a sidebar conference.)

 3            THE COURT:  I'm going to try and get you all

 4   finished up today.  I don't know if I can do it -- we can't

 5   go beyond five o'clock, just wanted you to know that I'm

 6   happy to take short breaks any time it's better for counsel

 7   to do that.

 8            I wanted to cut something off at the pass.  There

 9   was a reference in Mr. Dratel's argument toward the end

10   either expressly or impliedly stating that what the

11   government had done here by bringing the transcripts in and

12   unediting and all was unAmerican.

13            MR. DRATEL:  I didn't mean -- I only meant to

14   convict on that evidence; that's what I --

15            THE COURT:  Well, but it followed the other

16   exactly, the reference, the context -- once again, getting

17   back to context -- was that transcripts had been

18   cherry-picked I believe was your word.  So I want to cut that

19   off at the pass.  That's clearly improper.  I want you to

20   know that I'm not going to sit there and allow that to happen

21   again without a strong admonition from the bench.  I could

22   see Mr. Cole reacted to it; he didn't object at the time, but

23   I could tell that it didn't set well with him.  And the

24   problem -- one of the problems is that opens up the door to

25   the government coming back and making statements to
```

```
 1    rehabilitate that kind of misstatement, to respond to that
 2    kind of a statement, which changes the entire flavor of the
 3    argument.  I don't want to go there.  Ninth Circuit law
 4    provides that the government can respond to that kind of a
 5    pejorative term or implication.  I just don't want anyone
 6    else to go there, so --
 7              MR. DRATEL:  It was not my intention, I don't think
 8    I said it that way.  I was talking about you cannot convict
 9    on that kind of evidence, it's unAmerican to convict on that,
10    it's a question of reasonable doubt.  That was what I said,
11    so -- I'm sorry if you --
12              THE COURT:  Even that is not appropriate, as I'm
13    sure you can understand.  So be careful.  Just be careful
14    when it comes to summarizing that kind of -- any kind of
15    tactic, strategy, or effort on the part of the opposition in
16    terms, loaded terms like that.
17              MR. DRATEL:  Okay.
18              THE COURT:  That's all I'm asking.
19              MR. DRATEL:  Your Honor, may I make a suggestion
20    for terms of management, time management?  When Ms. Moreno
21    and Mr. Ghappour sum up, that will be about an hour, take
22    another short break, if necessary, and then Mr. Durkin and
23    the rebuttal, and we can get it all in.
24              THE COURT:  That's more or less what I was
25    thinking.  I think the next recess -- I more or less figured
```

 1    that you'd be --

 2              MS. MORENO:  Thirty minutes.

 3              THE COURT:  -- something on the order of a half

 4    hour at least.

 5              MS. MORENO:  That's right.

 6              THE COURT:  That would be a good time, to take just

 7    another short break and then let Mr. Durkin finish up --

 8              MR. DURKIN:  I'll only be about five minutes.

 9              THE COURT:  -- and then --

10              MR. COLE:  I'll just take whatever.

11              MR. DURKIN:  Judge, we want to get it done today.

12              MR. COLE:  I do have at least a little bit.  If he

13    goes to 5:00 --

14              MR. DURKIN:  How about five to 5:00?

15              THE COURT:  Okay.  Thank you.

16         (Sidebar conference concludes.)

17              THE COURT:  Okay, ladies and gentlemen.  Just

18    timing issues here at the side of the bench.  All right.

19    We're ready for Ms. Moreno to proceed?

20              MS. MORENO:  Thank you, your Honor.  I am miked up,

21    so I hope that everyone can hear me.  I want to thank you for

22    your patience and your attentiveness and your hard work in

23    this case and your sacrifices; we know that you've made

24    sacrifices to be here.  And we hope that you, when this

25    experience is over, that you're going to regard this as an

1    important investment, one that I'm sure you're going to

2    remember for the rest of your life.

3          I need -- I'm going to touch on a few things that

4    Mr. Dratel touched on because they're important with respect

5    to my client, but I'm not going to go over in depth any of

6    the topics that he did; I don't believe that's necessary.

7    But what is important is that I need to put my client,

8    Mr. Mohamud, in context here.  And you've heard a lot about

9    context, and context is not a red herring.  Context is not

10   dead fish.  Context is what gives meaning and the truth to

11   what is being said.

12         I'm going to venture a guess that when all of us

13   were away these last five days, that none of us lacked for

14   any of the life's fundamentals, that we all had food, we all

15   had water, that when we left here, we did not go back and bed

16   down in a refugee camp.  What I'm positive is that none of us

17   went searching for a cup of water.  And I'm also sure that

18   nobody had to flee their home because of an imminent attack,

19   as we heard from Halima Ibrahim when she was fleeing the

20   Ethiopian invasion.  And the reason I know that, the reason I

21   know that that didn't happen here is because we are here,

22   because we are in America, and we cannot export the reality

23   of this beautiful community in San Diego, this community in

24   San Diego, California, to Somalia.

25         Somalia bears witness in this case.  Somalia is a

1    witness in this case.  Matthew Bryden discussed Somalia as a

2    no man's land, the government's expert, as you've heard now

3    many times.

4              Mr. Abdisalam Guled, the former head of the

5    Department on Counterterrorism for the Transitional Federal

6    Government, the TFG.  And I know this is a lot of history and

7    a lot of political lessons going on here, but what's ironic

8    here is that Mr. Guled testified on behalf of Mr. Moalin, and

9    the government claims, Ms. Han claimed in her opening that in

10   fact my client, along with everyone else, was supporting the

11   violent overflow of the TFG.

12             Now, he told you, Mr. Guled told you when he was

13   talking about Galgaduud, he told you he was asked if there

14   was a particular need -- and I'm not going to have slides;

15   once in a while I'll have something on the Elmo because I'm

16   pretty old school so bear with me -- and what he said was

17   there was nothing in place.  When I say nothing, there was no

18   water, no hospitals, no security.  There was nothing in

19   place.  And he was asked well, did the government of Somalia

20   provide or did the Ethiopian troops provide or the government

21   of Ethiopia provide for the people there.  And he said no.

22   February 13, 2013.  That's what he said.  That's what he

23   described.  And he was an eyewitness.  And what that meant,

24   what that means is that this is a no man's land.  It means

25   you're on your own.  This is a place where children were --

1   maybe still are -- denied any kind of childhood by any

2   recognizable standard to Americans, by any standard to

3   Americans.

4           Matthew Bryden, as Mr. Dratel discussed, talked at

5   great length about the droughts and the famine and -- and he

6   was asked if this had a peculiar negative impact on

7   children's nourishment, and he said yes.  And did it create a

8   lot of orphans?  The "it" here, the "it" is the war, is the

9   drought, is the famine, is the conflict.  That's the "it."

10  And he said yes.  January 31, that's what he said.

11          Now, Somalia -- maybe some of you knew about

12  Somalia -- I think some of you expressed that in jury

13  selection -- but maybe many people did not know about Somalia

14  because it's not covered in the west.  But Mr. Mohamud, my

15  client, like many people in the diaspora, he knew about the

16  suffering, he knew about what was going on there, in part

17  because he has family there, and I'm going to talk about that

18  in a minute.  And to this day Somalia remains unstable.  It

19  is that need that my client was responding to, that need, not

20  a red herring, not al-Shabaab, not terrorism.  He was

21  responding, like many in the diaspora were responding, to

22  that need.

23          Now, when I spoke to you three weeks ago -- I hope

24  this works -- I asked you that there were three questions --

25  remember that? -- three questions I wanted you to keep in

1   mind when you were looking at the evidence in this case.  And

2   says who, what does it mean, and is that everything.  Now you

3   know why I asked you that.  Now you know why, because of the

4   kind of evidence in this case.  That's why I asked you to

5   keep that in mind.  As you can see now, there was a good

6   reason for that.  This case virtually, for the government,

7   based on entirely highly edited conversations and not, I

8   contend, a single percipient witness, not a salient witness

9   did the government bring forward.  You have to look at the

10  content and the character of the government's case.

11          You know, like, for example, my client is an imam,

12  and you would think, according to Ms. Han in her opening

13  statement, and Mr. Cole, my client is actually involved in

14  the funding of beheadings.  That's what they said.  Now, you

15  would think that they could find someone in the community to

16  come forward and tell you yes, I heard him preaching a

17  radical violent agenda.  That never happened.  There is no

18  witness like that.  You know why?  Because it doesn't exist

19  because that's not his agenda.

20          You could have heard someone tell you with their

21  own ears I know, I know about Mr. Mohamud.  He supports

22  al-Shabaab, he supports funding assassinations and

23  beheadings.  He has a radical and violent agenda.  It's

24  nonsense.  Of course not.  There's no witness that would come

25  forward and perjure themselves in such a fashion.

1          Now, Mr. Mohamud himself was not wiretapped, but he

2     was picked up in conversation with Mr. Moalin.  There were 11

3     calls where my client is a speaker, from December 2007 to

4     July 2008, and not one of those calls show that he supported

5     al-Shabaab.  But what they do show, what they clearly show in

6     many of them is that he wanted to act responsibly about where

7     money was sent -- and we're going to talk about that -- and

8     they show his ongoing frustration at the incompleteness of

9     orphans lists to be sponsored.

10         What do they also show?  Do they show that he's

11    involved or listening to -- with the Farah Yare call that Mr.

12    Dratel talked about, listening to an account from the

13    resistance at the front, which, by the way, is not coded at

14    all.  You would think that if people are going to be coding,

15    they're going to code about weapons and violence and fighting

16    and troops.  None of that call is coded.  Take a look at that

17    call.

18         Was he participating in that, listening to that?

19    Of course he was.  Like all Somalis were.  And you heard an

20    instruction about protected speech, that such speech and

21    association alone is protected speech.  And that in order to

22    find that there was an agreement, a conspiracy, a criminal

23    agreement, that's not protected speech.  And when you're

24    looking at this speech, when you're looking at these calls to

25    determine if indeed it would fall under that penumbra of the

1   First Amendment and protected speech, it's up to you to

2   decide what kind of value you give these calls.  And the

3   value is important because of the context.

4   I'd also remind you that I speak for Mr. Mohamud

5   alone, and there's a jury instruction that applies that tells

6   you that when you decide the case as to Mr. Mohamud, you must

7   do it on each crime charged separately, jury instruction

8   number 11.

9   Now, for the most part I told you what I thought

10  the evidence would show in this case, and I think I was -- I

11  was right.  Ms. Han told you on January 30 what she thought

12  the evidence would show and she told you that my client,

13  along with others, bought assassinations of civilians,

14  beheadings, suicide bombings, rocket-propelled grenades,

15  landmines, and improvised explosive devices; that's what she

16  said they would show.  They showed no such thing in this

17  case.  Says who?  What does it mean?

18  So let's see if the evidence, the real evidence,

19  not what we lawyers say, which is not evidence, shows that

20  Mr. Mohamud really endorsed such an ideology, and we can

21  begin with the very first conversation, December 28, 2007.

22  And this is very important because this tells you what

23  Mr. Mohamud's intent was.  And, as with almost all of the

24  calls in this case, of course the government highly edited

25  that conversation, only admitted two pages and did not admit

1    the rest.  And here it is.  Here's what I put into evidence.

2    I'm going to read it to you, where Mr. Mohamud says, These

3    guys, the youth, they slaughter anyone they capture, and that

4    is not good policy to begin with.

5           Now, the government has made much of "the youth" is

6    al-Shabaab.  Mr. Mohamud is condemning that action.  He says

7    whatever the case, we need unity, he says, unity is important

8    and that is what is needed.  And then he says, you know, you

9    can be with anyone without taking their beliefs and

10   principles.  And you remember Islamic courts have a different

11   agenda but work together in a way.  That's not an al-Shabaab

12   principle of existence, that you can be with someone and not

13   take their beliefs and principles.  Al-Shabaab is about

14   al-Shabaab, and you heard about it from Ms. Ibrahim, and you

15   also heard about it from Matthew Bryden.

16          And then he goes on to say, There must be

17   cooperation for the future of the country.  Foreigners will

18   leave, but cooperation is necessary.  And the country is for

19   all of us.  It is for all, those scholars and uneducated, the

20   general public.  If you limit to -- yourself to a few

21   individuals or group, you will end up a failure.

22          That's what he said.  It's not what the government

23   wanted you to read, but that's what he said, and that's what

24   his intent was.  And that is completely contravened by

25   everything we now have learned about al-Shabaab.

1            Now, al-Shabaab didn't believe in unity.  They
2   certainly believed in taking other people's beliefs.  They
3   took other people's food; Mr. Dratel talked about that.
4   Mr. Bryden said that -- in response to a question about in
5   Somalia what are the options in a situation with a child who
6   is malnourished, and Mr. Bryden said, on January 31, well,
7   there aren't really any options.  Al-Shabaab, part of what
8   was happening with al-Shabaab, it was levying its own taxes
9   on the family, taking food, taking money, in the sense there
10  were very few options.  You think that's a agenda that
11  Mr. Mohamud endorsed?  Of course not.
12           So let's see what other evidence in the case there
13  is about Mr. Mohamud.  Well, Concepcion Flores was the
14  immigration officer.  Remember her?  And she came forward and
15  she showed you -- and it was -- it's in evidence -- the
16  application form that Mr. Mohamud filled out.  And I have to
17  footnote this here for a moment.  What we know in this case
18  is that the calls end sometime in 2008; that's in the record
19  before you.
20           What we also know is that the interview with my
21  client took place in October of 2010.  I'm sure it's in your
22  notes.  It's certainly in the record.  There was -- one of
23  the lawyers in this case talked about the fact that his
24  client was in this case as an afterthought.  I think that was
25  a very interesting and significant point because I just think

1   you should ask yourself:  So from 2008 until 2010, did the

2   government really think that Mr. Mohamud was so dangerous,

3   was someone who was funding beheadings and terrorism, that

4   they left him out on the street?  Ask yourself that question.

5   I think the evidence suggests that the case itself is --

6   lacks a certain amount of integrity.  I'm talking about the

7   evidence.

8            Now, I had Ms. Flores go through certain documents,

9   remember, to point out some material facts, and one of them

10  was that he was a refugee from Borama, and I had Mr. Bryden

11  come down and point to you.  And the significance of that is

12  that he's in the north; he's not from Guraceel.  We talked

13  about clans with Mr. Bryden.  And Mr. Mohamud is not Hawiye.

14  You've heard so much about the Hawiye clan, the Hawiye clan.

15  Mr. Mohamud is not Hawiye.  He's Gadabursi, Mr. Bryden

16  testified.  And in this immigration application, Mr. Mohamud

17  talked about -- and this is important -- he talks about how

18  he sends money through the hawala.  To who?  To his family in

19  Somalia.  And who is his family?  Sisters, mother,

20  mother-in-law, and a brother.  And you'll be able to see that

21  in the evidence; think it's Government Exhibit 29 and 9.

22           And why is that important?  Because the government

23  would have you believe that this is someone who sends money

24  to the women in his family, that he supports them, and at the

25  same time supports an organization that Ms. Ibrahim told you

1    has a pillar of their philosophy not to support women.  That

2    is a pillar; that is how she described it.  Don't take my

3    word for it.  Take hers.  And the government will tell you

4    you can have both of those concepts, you can believe both of

5    those things at the same time.  We don't think so.  We think

6    that defies common sense.

7            Now, he also said that he had lived in a refugee

8    camp and that he was grateful to America for taking him and

9    his family in; that's in the record.

10           Let's discuss a sample of the important calls which

11   actually involve my client.  As you know -- and I think

12   Mr. Cole mentioned it today; he alluded to one conversation;

13   I think it's Exhibit 150, that does not have anything to do

14   with my client but the gentleman on there, his name is

15   Mohamud, not my client.  So please be mindful of that as

16   you're going through the transcripts.

17           And it's important that also -- when you look at

18   these conversations, Mr. Mohamud is on, as I said, I believe

19   11 of them; he's a speaker or -- in some of them he's

20   listening mainly, he says just a couple of things.

21   Mr. Mohamud is actually discussed more than he's discussing

22   anything, and you need to be careful about that because, as

23   we know, certain representations were made, and I believe the

24   evidence bears it out by Mr. Moalin that Sheik Mohamad had

25   said this or had said that, and we know that sometimes

1   Mr. Moalin has a tendency to exaggerate.  And what I would

2   say to you is if you see that in a call, see if there is a

3   call the night before or the day before or days before that

4   support that contention, and I submit to you that that is not

5   true.

6          February 9, 2008, I entered a conversation, and

7   it's about basically -- and this is between Mr. Moalin and my

8   client, and it's a frustration about what?  Orphan lists.

9   That's what it's about.  And the frustration is that money

10  was sent without knowing the exact destination.  My client

11  says, And we appear irresponsible.  And nobody had collected

12  what was sent.  And I think you're going to hear a little bit

13  more in detail about transactions from one of the other

14  lawyers in this case.  And my client says you know what, we

15  need a second list of phone numbers, that's what we need.

16  Ones with -- that have contact information, relatives,

17  grandfathers, uncles.  The government would have you believe

18  that he's talking about the grandfathers or uncles of

19  al-Shabaab militia.  Of course not.  They're talking about

20  sending money to those in need.  So that conversation is all

21  about the list of orphans and how to get money there.

22         Then on February 13, 2008, Government's Exhibit

23  142 -- and I'm not saying TT-128 or TT-1.  You know, when I'm

24  talking about a conversation, I'm talking about the whole

25  thing.  I would ask you to look at everything.  That means

1   not only their exhibit book but our exhibit books as well.

2   And there in that conversation -- again, about orphans --

3   orphans are orphans and they need help from everybody.  And

4   Mr. Moalin says to my client something like they're

5   complaining that they are livestock herders, livestock

6   herders, and in a place where they can't find a

7   communication.

8           Livestock herders are al-Shabaab?  When orphans are

9   discussed in these conversations, it's not code for anything,

10  not code for anything.

11          Now, what we know -- why is this important about

12  where the money is going?  Because Matthew Bryden told you

13  that the biggest problem -- when I asked him what about the

14  malnutrition for children and the drought in this particular

15  time period, he said actually the bigger problem is

16  displacement.  What is displacement?  People are traveling

17  all over the place, right?  We know that.  We know that.

18  Matthew Bryden said, on January 31, when heavy fighting

19  began, I believe the estimates were about 700,000 people left

20  the city, and they went along the road.  And I said you mean

21  like a refugee camp.  He said camp is organized.  This was

22  just people fleeing and settling along the road.  That's a

23  problem if you're trying to help people and get money to them

24  and try to get contact information from them.

25          And then he said several hundred thousand people

1   found themselves along that stretch of road.  And I asked him

2   for how long a period, and he actually said, on January 31,

3   some are still there.  Some are still there.  That's what he

4   said.

5          Mr. Dratel referenced Exhibit 143, very important

6   call.  Again, all about the children and family size and

7   location.  And then he says, The mosque administration -- and

8   this is not a call with me, this is a call between Mr. Moalin

9   and Sheikalow, who -- by the way, my client never spoke to

10  Sheikalow and he certainly never spoke to Aden Ayrow -- and

11  he said that the mosque administration said if you guys can't

12  correct the information, we're going to send the application

13  out as it is.  That's a direct reference to the calls before

14  involving my client, a direct reference.  This is not about

15  al-Shabaab.

16          February 22, 2008, MM-2.  I put in a conversation

17  between Mr. Moalin and my client, and what is it?  It's a

18  call where my client is trying to get into Mr. Moalin's email

19  account, and it's the orphan account.  Why?  To try to

20  resolve this.

21          Now, two months later, two months later, there's a

22  series of calls in April.  The government wants you to

23  presume what's being discussed in all of these calls.  And I

24  guess what I'm going to say -- because the government makes

25  much of coded language, I'm going to stress it again -- that

1    the coded language, you would think, would be something that

2    would be used, utilized, when there are conversations about

3    weapons and violence and war.  We don't see that anywhere in

4    this -- in this case.

5            In some of these conversations in April,

6    Exhibit 153, the government points to the fact that my client

7    is saying oh, Moalin Mohamud is a good man, it's best this

8    thing doesn't become public, because the government wants you

9    to believe that becoming public, my client saying that shows

10   his intent to support al-Shabaab.  They just want you to make

11   that leap.  What does this mean?  Is that all there is?  Does

12   this have anything to do with clans, different interest

13   groups, different objectives?  Government just wants you to

14   guess.

15           And Exhibit 155, where my client says something

16   about we have not forgotten the men; that's what the

17   government put in, the men, and you've heard about the men in

18   this case.

19           Now, the -- Mr. Cole says that my client is the guy

20   with clout.  That's interesting.  He's the guy with clout.

21   Now, he is on 11 calls.  In this call, Exhibit 158, there's a

22   discussion about someone, Dhunkaal left, and there's a

23   particular name attached to the account maybe, my client

24   says.  And then we find out later through subsequent calls

25   that my client had the complete wrong information, completely

1    wrong; he had it totally wrong.  What clout is the government

2    talking about here?  Where is this clout?  They just say

3    these highly charged words, these characterizations, and

4    you're supposed to fill in the blanks.  The evidence doesn't

5    fill in the blanks.

6            There's a call in July, Exhibit 182.  This is the

7    long conversation that I've talked, and I -- I think it's a

8    very interesting and important call.  It's a conversation

9    from Farah Yare, who, as Mr. Dratel pointed out that Mr. Cole

10   never mentioned.  Of course he's on the Government's Exhibit

11   39, or whatever that is, four times.  And the only thing my

12   client says in this call, because it's like a conference call

13   and there are people listening in, and the only thing my

14   client says -- asks about is Jabiso.  And we heard from

15   Mr. Bryden that Jabiso was definitely not al-Shabaab.

16           Mr. Dratel spoke at length about the identity of

17   the speaker in this case, and I believe the government has

18   hung its whole case on the identity of the speaker.  They are

19   all in that the speaker to Mr. Moalin is Aden Ayrow.  And you

20   heard that of course the expert on Somalia that could have

21   told you wasn't asked.  But I have a different question that

22   I think you should ask yourselves about that, and it's this.

23   You know, why didn't the government just get a voice print?

24   Why didn't they take Mr. Aden Ayrow/Sheikalow's voice from

25   those hundreds and hundreds of conversations that they have

1    and compare it to the rock star, international terrorist,

2    Aden Ayrow, whose voice could be accessed on the web and send

3    it down to Quantico and give you the results?  That would

4    take care of a lot.  And they didn't do that.  They didn't do

5    that because they can't control the science.  They didn't do

6    that because they didn't control the outcome.  And they

7    didn't do that because they were afraid of the result.

8            The linguist told you oh, I have the opinion,

9    it's -- absolutely it's Aden Ayrow.  Did he tell you what he

10   based the opinion on?  Absolutely not.  But his job depends

11   of course on the FBI.  Mr. Bryden wasn't willing to do that.

12   I suggest you should repudiate all of that testimony.

13           You're going to be instructed as to the credibility

14   of witnesses, and this is fair, right?  We all meet people

15   and we say to ourselves I wouldn't believe a word out of his

16   mouth, or gosh, this person seems very credible, and you use

17   your common sense.  But certainly you're going to use -- and

18   I think it's jury instruction number 8 -- if they had an

19   interest in the outcome, if there was a bias or prejudice, if

20   the evidence was contradicted by other witnesses' testimony.

21   All three apply to the FBI linguist.  The government's case

22   does not make sense.

23           Now, so one other thing, I have to add my comment

24   that I think Mr. Cole described Mr. Ayrow, someone who needs

25   operational security, an internationally infamous terrorist.

1    And I have to say, and he's calling someone he's never met in

2    San Diego, in America, and talking about issues that you

3    would think that this rock star would not be sharing with a

4    stranger.  Makes no sense.  What does make sense, what does

5    make sense is that this police commissioner from this

6    besieged district, as he testified in the deposition, that

7    he's talking to lots of people in the diaspora about raising

8    funds for what?  For security, for safety, for defense.

9    Mr. Guled, as Mr. Dratel said, you think he'd recognize a

10   terrorist if he saw one?  I think so.

11          Now, all these people that you heard from -- Ms.

12   Ibrahim, Mr. Guled, the others, video depositions -- they all

13   -- they all apparently thought it was reasonable to interact,

14   work with, endorse Mr. Moalin, that he was acting lawfully.

15   So if it was reasonable for Mr. Guled, the expert on

16   counterterrorism, don't you think it's reasonable for my

17   client to do as well?

18          Now, Halima Ibrahim told you that she left her home

19   in America, and she went back to the no man's land, to the

20   madness of Somalia.  And I thought why would someone do that?

21   Why would someone leave the safety of their home, the food,

22   the shelter, the things that we fought for, we've worked for

23   as Americans, and we take for granted?  Why would someone do

24   that?  And she did it because it's home.  Because home is

25   universal.  Home is a universal language we all speak, and we

1   all speak it from all religions and all cultures.

2   Mr. Mohamud spoke that language.

3          I'm going to conclude, and I want to say if I -- I

4   was one of the lawyers who got to speak, had the privilege of

5   speaking with you during jury selection, and if I offended

6   anyone, probed too much, please forgive me.  Do not hold it

7   against my client; you can hold it against me, but please

8   don't hold it against my client.  But this was important

9   because we had to know that in a case, in a post-9/11 America

10  where you're sitting in judgment of people accused of

11  terrorism, that you would be fair, that you wouldn't lessen

12  the burden of proof just because it's a terrorism case.

13         President Obama was looking for inspirational

14  things -- I always do this in trials; how do I end, you know?

15  -- and his -- he said what makes us exceptional, what makes

16  us American is our allegiance to an idea articulated in a

17  declaration two centuries ago.  We all know what that idea

18  is.  And yes, when I sit down, Mr. Cole's going to get a

19  chance to give a rebuttal, and that's the way it should be

20  because he's got the burden of proof, and he has to prove

21  every charge beyond every reasonable doubt against

22  Mr. Mohamud.  And when he's doing that, I want you to ask

23  those questions that I've posed.  When he's talking about

24  conversations, is he talking about the whole conversation?

25  Do you interpret the conversation, the meaning of it, the

1    plain meaning of it, the way Mr. Cole does?

2            I'm asking you to be courageous and look beyond the

3    rhetoric of beheadings and assassinations, IEDs, and violence

4    that my client never endorsed, didn't discuss, had nothing to

5    do with, and use your common sense in this case.  Use your

6    common sense and your sense of justice.

7            On behalf of Mr. Mohamud, I submit that the

8    evidence tells you, compels you, and justice requires you to

9    return a verdict of not guilty on every single count against

10   him.  Thank you.

11           THE COURT:  Mr. Ghappour, you may proceed when you

12   are ready.

13           MR. GHAPPOUR:  Thank you, your Honor.  Should have

14   stuck to the old-school approach technologies.  Good

15   afternoon.  Hope you can hear me.  At the start of this case,

16   I stood before you and I told you that Mr. Doreh was

17   innocent, and three weeks later I'm here to tell you the same

18   thing.  I told that you he was here because he worked at the

19   Shidaal.  The government agreed, and nothing is changed.

20           Now, Mr. Cole is right that this whole thing

21   started on December 20/December 21 with the call between

22   Sheikalow and Basaaly Moalin, and on that call there was talk

23   about fundraising for orphans, there was talk about

24   fundraising for a school called ILEYS, there was a mention of

25   a gentleman called Sahal, who ran an orphanage, and there was

1   also talk about money needed for rations, for fighters.  And

2   it's true that moments later Mr. Moalin called Issa Doreh.

3   And on that call we discover that he woke up Mr. Doreh, and

4   in the four minutes that ensued, he talked about $3,600

5   needed for the Baidoa area, he talked about Sheik Mohamad

6   having been told something, talked about a dollar a day for

7   troops, he talked about wanting to shore up the matter with

8   the cleric and the other clerics, and he asked Issa to tell

9   Sheik Mohamad about that, but we're not sure what that is

10  because so many things were mentioned all in the span of five

11  minutes at 11:30 at night having been woken up.  And if we

12  put ourselves in the mindset of Mr. Doreh, I don't think

13  anything has actually been beyond a reasonable doubt

14  understood at this point.

15          The only thing that Mr. Doreh says of any

16  significance is we'll do our best, and if I see Sheik Mohamad

17  tomorrow, I'll let him know.  That call is really confusing,

18  and I had to read it just a few times just to get these

19  bullet points down, to be honest.  But it does tell us that

20  there was money; there was a mention of $4,000 that Sheik

21  Mohamad had raised and had promised to somebody.  And till

22  now we don't really know enough.

23          And so few days later on December 28, there was a

24  call between Mr. Doreh and Mr. Moalin, and on that call

25  Mr. Moalin asked Mr. Doreh again to check in with Sheik

1   Mohamad about the fundraising efforts.  And Issa said, again,

2   that if he saw him at the mosque, he'd let him know.  And

3   there was also talk in the portion that the government didn't

4   introduce into evidence about the issue -- and this follows

5   this conversation that they just had -- and the issue, is it

6   appears to be, has to do with fundraising and has to do with

7   orphans.  Still, there's nothing definitive, there's nothing

8   we can say for sure about what they're talking about.

9          Now, the same day Mr. Moalin calls Sheik Mohamad --

10  this is Exhibit 124 -- and he says -- Sheik Mohamad says

11  yeah, we're going to do something about the guys tomorrow.

12  This is December 28.  And presumably he's talking about this

13  money, the $4,000 mentioned on the first and second calls.

14  Now, the part that the government didn't introduce also has

15  Sheik Mohamad is imploring al-Shabaab -- and that's on the

16  bottom of the slide there, and that's on Exhibit TT-124

17  introduced by the defense.

18         On January 1st money is sent, and, notably, the

19  government introduces no calls related to the Shidaal

20  mechanics of that transfer; this is the only transfer that

21  nothing is really introduced from the Shidaal.  The money is

22  sent, sent to a place called Bakara Market in Mogadishu, and

23  the transfer consisted of two transactions totaling $4,000,

24  which presumably is the same amount of money that was

25  discussed on the December 21st call.

1            Now, the government's story is that that money was

2       sent to Aden Ayrow, something about Bay and Bakool, and that

3       Aden Ayrow was using this -- this alias of Sheikalow.  And

4       the government points to a series of calls, Exhibits 130 and

5       131, where Sheikalow and Mr. Moalin talk about $3,000, not

6       $4,000; they talk about $3,000.  Initially Mr. Moalin says

7       hey, you know, I think I sent you $3300, and then the next

8       call Sheikalow says I received $3,000, that is the number.

9       He says I received $3,000.  That is the number.

10           But something isn't right here because according to

11      the records $4,000 was sent and according to the callback on

12      the 21st, $4,000 is what Sheik Mohamad had with him to send

13      to the men.  Could it be that Mr. Moalin and Sheikalow were

14      talking about a different set of transactions?  Possibly.

15           A series of calls in February explains everything.

16      On February 9 Sheik Mohamad complains to Mr. Moalin, and he

17      says the money that they sent has not been picked up, the

18      money they sent on the 1st of the month.  On the Valentine's

19      Day call, February 14, Basaaly Moalin talks to Sheikalow, and

20      he said the money we sent last month, I'm getting complaints

21      because nobody's picked it up.  Now, notably, these were on

22      portions the government has not introduced.

23           And on February 18 it all crystalizes, and this is

24      a call between Basaaly Moalin and the guy called Sahal, who

25      in the first call, the first call, was mentioned by Sheikalow

1    as the guy that runs the orphanage, and in this call,

2    introduced by the defendants, Issa Doreh calls him, and he's

3    introduced to Sahal as the guy that runs the orphanage.  Keep

4    in mind that Issa Doreh throughout these calls has never

5    spoken to Sheikalow, and the first person he talks to who's

6    not sitting at this table is Sahal, who runs the orphanage,

7    and he tells him Sahal, I'm sorry, me and Sheik Mohamad made

8    a mistake, we were confused, we sent the money to Bakool --

9    -- sorry -- we sent the money to Bakara, to Bakara Market.

10   We made a mistake, he sent the money, the same money that

11   Basaaly Moalin referred to early on on the 21st, the $4,000,

12   we sent it by mistake to Bakara Market.  And then they go on

13   and they talk about trying to set up some sort of program in

14   order to deliver aid to orphans.  And this is a long call.

15           Specifically in this call -- and I have all the

16   transcripts noted here for you, this whole line leading up to

17   this call -- we know that $4,000 were raised by Sheik Mohamad

18   and the clerics, the mosque council.  We know that they were

19   transfered, and included one of those transfers was a

20   Dhunkaal transaction.  We know that the money was for support

21   of orphans, at least from the mindset of Mr. Doreh and

22   Mr. Moalin because they're talking to a guy that's telling

23   them hey, I run the orphanage.  And on this call we learn

24   that there are other contributions that they could donate

25   through their fundraising efforts; we learn that they can

1   donate it to orphans, to the injured, to those killed by the

2   Ethiopians, to burials.  And in this call Sheik Issa and

3   Sahal, who also works at a Shidaal, discuss how to earmark

4   funds for charity; they talk about recipient names and they

5   talk about sender names.  And so this first call, this first

6   set of transactions, is not to al-Shabaab.  It could not have

7   been to al-Shabaab, and Issa Doreh could not have contributed

8   in any way that would have violated any of the charges in --

9   charges in this case.  Excuse me.

10          And while we're at it, let me ask you this.  If the

11   government -- if the government alleges that this money was

12   really set to go to Bay and Bakool, why they didn't just send

13   it there?  There's a lot of offices in Bay and Bakool.  Why

14   would you send it to Bakara Market?  It doesn't make any

15   sense.

16          Now, notably, on this one call on February 18, Issa

17   is introduced as the guy that basically hooks things up at

18   the Shidaal.  And by hooks things up, we know the guy that's

19   in charge of the Shidaal?  What he means to say -- and you

20   get this throughout the context of the conversation -- is

21   that he gets the fees waived; he gets fees waived because

22   it's going towards charity.  He is the guy that gets the fees

23   waived, and we've heard from Abdisalam Guled that when you

24   send money to charity through the hawala system, they waive

25   your fees.  If it's a registered charity, they waive the fees

1   entirely, and if you tell them it's for charity, they waive

2   some of the fees.  So Mr. Doreh was the guy that spoke to the

3   bosses -- Mohamud Abdi Ahmed and Abdirizak -- telling them

4   this money's for charity.  It's Dhunkaal, man.

5           So this second transaction on February 9, or the

6   early February transaction, all we know about this

7   transaction, at least with respect to Mr. Doreh, is that

8   there's a phone call on February 9.  Mr. Moalin calls Mr.

9   Doreh, he asks him hey, did the $2,000 go through, Mr. Doreh

10  says yes, it went through.  There's no discussion with where

11  it's going, no discussion about funding terrorism, no

12  discussion about killing people.  Just asks him has the money

13  been sent, and he says yeah.  He's at work.  That's what he

14  does; he picks up the phone.

15          Now, the next transactions, these April

16  transactions, this is where we learn what Mr. Doreh's real

17  role at the Shidaal is, or lack thereof, and it could not be

18  made more crystal clear than the calls on April 23.  And Mr.

19  Cole is right, there are a series of phone calls here, and

20  they are a bit confusing.  And on the 23rd, the first call in

21  the series, is with a guy called Abdirizak.  Abdirizak says I

22  was the one who approved the money last night.  There's a

23  question mark at the end; I'm not sure if it's meant to be

24  there.  He doesn't say Mr. Doreh approved any transactions,

25  and we learn in the next call that Mr. Doreh cannot approve

1    transactions, he can't conduct transactions.

2            In any case, the next call, and the next couple of

3    calls actually, we learn that there's a lot of confusion, and

4    Mr. Doreh's confusion is because he doesn't have access to

5    the database of the Shidaal.  In the initial call from

6    Mr. Moalin to Mr. Doreh, Mr. Doreh says I can't tell you who

7    the sender was, I don't have access, wait till the guy that

8    sent the money comes back, and that's Abdirizak.  And so then

9    in that call, we get the status of the transfer because

10   Abdirizak has come back; the manager has come back.  He's got

11   access to the web page, to the database.  We learned from

12   Donnah Locsin, who's a witness, that you need a password to

13   enter the database, the website.  And we learned also from

14   the government's forensic witness, who's a computer expert,

15   that she had to have somebody log her in.  So Mr. Doreh said

16   clearly to Mr. Moalin I can't log in.  Because his confusion

17   wasn't because he didn't have access to the Shidaal -- sorry.

18   It wasn't because he was engaged in some sort of conspiracy,

19   it was because he didn't have access to the database.

20           And in this call -- and I'm not sure if it's here

21   because I can't really see my slide from back here -- but

22   there's some talk about, you know, usually the sender is

23   Dhunkaal.  Dhunkaal should be the sender because in

24   Mr. Doreh's mind, this is earmarked funds.  Dhunkaal mean

25   charity.  It's as simple as that.

1          So from the April transactions there is absolutely

2     no evidence that Mr. Doreh -- thank you; I appreciate that --

3     there's absolutely no evidence that Mr. Doreh knew of any

4     money going to al-Shabaab.  There's no evidence that Mr.

5     Doreh knew of any money going towards any bad purpose.  As a

6     matter of fact, I'm going to ask you to look at these calls,

7     look at every single one and see if there's anything that has

8     been conveyed that does not require two or three inferences.

9     Mr. Doreh's only showing of any clear intent or knowledge

10    throughout, and until this day, is that he wants to

11    contribute to funding orphans, that he wants to contribute to

12    those injured and killed, and to burial, if any.

13         Now, I want to remind what the government alleges

14    Mr. Doreh's role in the alleged conspiracy is, is that he was

15    employed at the Shidaal Express.  So I ask you what did he

16    do.  They say that he faked numbers, he faked names, he broke

17    transactions up into smaller amounts; Ms. Han said this in

18    her opening, and Mr. Cole mentioned a couple of these today.

19    But what we learned from the evidence is that the Shidaal

20    manager could do these things and in fact did do these

21    things.  We learned from the evidence that there were at

22    least 31 calls between Mr. Moalin and Abdi Aziz Hussen, also

23    known as Abdirizak, and that Abdirizak was the one that

24    conducted the $1900 transaction on April 23.  This is the

25    only transaction alleged by the government, this and the one

1    after, to have been the substantive Count 5 in this

2    indictment; in other words, this is the only transaction that

3    the government actually says made it to al-Shabaab after

4    their designation date, and it was conducted by Abdirizak.

5    And on the same day those confused calls where Mr. Doreh's

6    like I don't know because I don't have access, the same day

7    he's alleged to have transfered money to al-Shabaab, it is

8    crystal clear on those tapes that he has no idea.

9              And again, I want to point out what Mr. Doreh did

10   do.  Here -- here Mr. Doreh's saying hey, it's a done deal, I

11   instructed him to pay, I told him either give some money or

12   pay the services of the money.  This is a July 8 call,

13   Exhibit 185.  He's referring to a conversation that he had

14   with the Shidaal owner saying either he waive the fees or pay

15   some money because we can't be donating to charity without

16   having a waiver on the fees, and you know that this money is

17   going to charity because I'm collecting it, this is what I'm

18   doing.  There was no indication to the contrary in this whole

19   case against Mr. Doreh.

20             And here he we heard from Abdisalam Guled, who said

21   if it was a recognized charity which had an account with

22   hawala normally, they didn't charge it because the charity

23   had an account.  And even if it's not a recognized charity,

24   they would still waive partial fees.  It's right there.

25             Now, I going to talk about the Farah Yare

1  transactions, but instead I'm just going to read you the

2  parts of our stipulation that I think do away with them in

3  this case.  Money collected for the Ayr subclan was given to

4  individuals, including Abukar Suryare, who you saw in the

5  deposition, and Farah Yare, who were associated with the

6  ILEYS charity.  Money collected for those men on behalf of

7  the Ayr subclan was given to a group that was not al-Shabaab,

8  and there was a dispute in fact between al-Shabaab and the

9  men who ran ILEYS.  This is a fact.  It was a fact that the

10 government and the defense have stipulated in this case.  So

11 these transactions, I'm just going to skip over them.

12         Let's talk about the Omer Mataan transactions.

13 What was Mr. Doreh's role in these transactions?  There was

14 no conversation between Mr. Doreh and Mr. Moalin about Omer

15 Mataan.  Nothing.  There was no indication that Mr. Doreh

16 sent this money or had anything to do with these transfers.

17 To the contrary, Government Exhibit 194 is a conversation

18 between Mohamud Abdi Ahmed, the owner of the Shidaal, and

19 Basaaly Moalin, and Basaaly asks him hey, is Abdirizak

20 around -- because he's the guy that sends money -- and

21 Mohamud says no, he's back on the 23rd.  Okay.  Well, have

22 you received the money from Yesmin.  Yesmin's somebody that

23 works at the Shidaal.  Not have you received the money from

24 Issa Doreh, I told Issa Doreh to send money to al-Shabaab,

25 and so he's giving it to you through Yesmin.  There's no

1    evidence of anything even close to that.  And so Yesmin gave

2    him the $2,000, and that was the money that was transfered to

3    Omer Mataan.

4         Now, the government inserts Exhibit 198 in there,

5    and that call, which I thought -- I was very surprised by

6    that call because basically Basaaly is asking Mr. Doreh hey,

7    has the money gone through, and it doesn't appear to make

8    sense because at least it would imply that he's talking about

9    the Omer Mataan funds, right?  But we inserted this call,

10   Defense Exhibit TT-196-A, and in that call Basaaly is asking

11   Mr. Doreh whether money he sent to his family has gone

12   through, and he's saying that Mohamud Abdi Ahmed has held on

13   to this money and it's not gone through.  And so the next

14   day, when he asked him about the stuff reaching the children,

15   he's talking about money that's supposed to go to his family.

16        Later on in the same call on 198, he tells them

17   yeah, you know, I sent two cartons to the men in -- in Dhusa

18   Mareeb.  Two cartons.  He doesn't say hey, will you help me

19   send this money.  He says I sent it, I just wanted you to

20   know.  That's all that he says.  There's no agreement.

21   There's no contribution by Mr. Doreh, nothing.  And

22   conspiracy is the existence of an agreement.  There's no

23   agreement to do something unlawful in the 12 calls that the

24   government offers against Mr. Doreh.  There's no agreement to

25   do anything related to a conspiracy, to murder in Somalia, or

1   to use weapons of mass destruction, there's no knowledge on

2   Mr. Doreh's part about anything related to al-Shabaab.  The

3   word "al-Shabaab" does not come out in any of these

4   conversations.  You would have to infer it upon inference and

5   inference and inference to result -- to reach that

6   conclusion.

7          Now, here's what a conspiracy isn't.  It's not

8   enough that these people just met, discussed matters of

9   common interest.  It's not enough that they acted in similar

10  ways or helped each other.  It's not enough that they just

11  associated with each other.  It's not enough to even know

12  that a conspiracy exists if you don't contribute.  So even in

13  the last call, that Omer Mataan call, where he's -- where

14  Mr. Moalin tells Issa Doreh, you know, I've sent $2,000, so

15  long as nothing happens after that, there is no conspiracy.

16  Even if you believe that by telling Mr. Doreh that I sent

17  $2,000 to some guys, that that equates with knowledge of this

18  alleged conspiracy, you cannot find that Mr. Doreh was a

19  member of that conspiracy because there was no agreement, and

20  there has been no agreement, and these transactions and those

21  12 calls prove nothing against Mr. Doreh.

22          I am confident that once you review the evidence,

23  you will come back with an acquittal on all counts, and in

24  doing so, I ask you to ask yourselves for every transaction

25  where did it go and to whom and, more importantly, what did

1    Mr. Doreh know.  Where did it go and what did Mr. Doreh know

2    and what did he intend.  For each call is al-Shabaab

3    mentioned?  And what does -- if it is -- because it's not --

4    and what does Mr. Doreh say or reply to any statement that

5    changes the intent as stated in that February 18 call that is

6    related to that first transaction of $4,000.  Thank you.

7            THE COURT:  Ladies and gentlemen, we'll take

8    another ten-minute recess at this time.  Please remember the

9    admonition.  Thank you.

10           (There was a break in the proceedings.)

11           THE COURT:  All right.  Everyone is present.  Mr.

12   Durkin, you may proceed when you're ready.

13           MR. DURKIN:  Thanks, Judge.  Allow me to

14   reintroduce myself.  My name is Durkin, and I represent this

15   kid here, Ahmed Nasir we'll call him; it's Ahmed Nasir Taalil

16   Mohamud.  And the reason I feel compelled to reintroduce

17   myself is I've done something that I've never done in a

18   courtroom before:  I have not opened my mouth since the

19   second day of the trial.  And trust me if you don't think

20   that's difficult to do for someone like me, probably any

21   lawyer.  I can't even imagine a case where I have not opened

22   my mouth since the second day of trial, in a three- or

23   four-week -- feels like four years in some ways to me.

24           But the other reason I want you to know that I

25   represent only him is that for our purposes, just me, my wife

1    and partner, and Mr. Ahmed, I want you to try to think that
2    we are the only people in the room right now because this
3    instruction, as the judge read to you today insofar as we're
4    concerned is the most important instruction -- not that
5    they're all not important; they all are, trust me -- but for
6    us, in this case, this is important to us because it would be
7    easy -- and this is not to say that I don't agree with my
8    colleagues on all kinds of things or I don't agree with their
9    arguments or anything else.  I do.  There's been some
10   tremendous arguments beforehand.  I had this much all already
11   to talk about, and as life would have it, half of them stole
12   all my lines.  So what do I get to do?  So I'm just going to
13   kind of hunt and peck so we can all get out of here because
14   it hasn't escaped my attention as well that it's 3:30, and I
15   know what it's like to be at a dinner party or anywhere else
16   where there's been speaker after speaker, and at this last
17   guy you want to say get the hook, get him out of here, we've
18   heard enough.  But this is the only chance I get to talk
19   about this kid.  This is his only chance.  And that's why I
20   go back to what I said in my opening when I thanked you for
21   sitting through that painful process of answering all those
22   questions because I had to rely, and so did Ms. Roberts, that
23   you would follow these instructions and that you would give
24   us separate consideration, and that's all I'm asking for.
25   And I submit to you, based on this evidence, if you do, you

1    will have no other alternatives but to find him not guilty.

2    I'm not talking about innocent or anything else.  We only

3    talk in these courtrooms about guilt and not guilt.  You're

4    either guilty or you're not guilty.

5          But there's one other real critical -- not that all

6    the instructions aren't important -- but you're also going to

7    get another very important instruction -- and read them all

8    together -- but reasonable doubt.  Judge read this one to you

9    today.  Proof beyond a reasonable doubt is proof that leaves

10   you firmly convinced that the defendant is guilty.  Not

11   required they prove him guilty beyond all possible doubt --

12   I'm not asking you that -- just a reasonable doubt.  And

13   reasonable doubt is a doubt based upon reason and common

14   sense and not based purely on speculation.

15         If after careful and impartial consideration of all

16   the evidence you are not convinced beyond a reasonable doubt

17   that a defendant is guilty, it is your duty to find that

18   defendant not guilty.

19         And, again, I go back to early on, thank you for

20   going through all that process and thank you for being

21   willing to say you can do that and that you will follow your

22   oath because if you do, based on the evidence I've seen in

23   this courtroom, there's not much of a choice but to find him

24   not guilty unless you want to say that somebody in San Diego

25   or Anaheim or California who mentions bullets in Somalia

1    therefore must be intending to fund the terrorist

2    organization al-Shabaab or he must be intending to fund

3    terrorism.  And I submit to you, based on the evidence you've

4    heard in this courtroom, that by simply using the term

5    "bullets," which he does use both in the December 22 call and

6    another one in July, July 18 I think, the word "bullets" are

7    used.  But I submit to you that the term "bullets" in this

8    case based on the testimony you've heard, that bullets in

9    Somalia is like ice to Eskimos.  Everybody had bullets in

10   Somalia.  Everybody's not al-Shabaab.  All those militias are

11   not al-Shabaab.  And that's what the government wants you to

12   lump together.  And I don't mean that critically of them but

13   I think -- I only mean it in the sense of that's how they

14   view this evidence.

15            And one of the most amazing things -- I've seen a

16   lot of things in this case that I've never seen before,

17   but -- and one thing I couldn't agree more with my colleagues

18   is about the lack of a live witness.  I have been doing this

19   for 38 years.  I had the occasion to be a prosecutor just

20   like Mr. Cole and these people, I have never seen a federal

21   criminal case --

22            MR. COLE:  Objection, your Honor.

23            THE COURT:  The objection is sustained.  Ladies and

24   gentlemen, please disregard any reference to this gentleman

25   having been a prosecutor or his personal opinion on that, on

1    the matter or injecting what's happened in other cases into

2    this case; that's not appropriate.  Thank you.

3              MR. DURKIN:  What I'm getting at is my colleagues

4    all mentioned the fact that there were no live witnesses.

5    That's a fact.  That's a piece of evidence you can consider.

6    This is what's known in our business as a tape case, and

7    here's the tapes.  You've got these -- we've been through

8    them enough now that you probably know them by heart --

9    transcripts of Exhibits 120 to 199.  The odd thing about this

10   case, however, is it's not really even a tape case because

11   the tapes, as the instructions told you, are all in Somali,

12   so unless somebody knows Somali, maybe these -- they're

13   helpful to them, but they're not helpful to me or anyone

14   else.  So it's really a transcript case, and that's okay,

15   that's evidence, but it's just a kind of evidence.  And this

16   evidence, vis-a-vis our client, is pretty amazing.

17             What I did was -- because what the evidence is,

18   you'll see here, is there's only eight calls from our client,

19   eight calls from -- there are four calls from December 22

20   through I believe it's January 8 if I'm not mistaken, and

21   then there are no more calls again until July.  So what I

22   did -- and I'm not as technologically savvy as my colleague

23   Mr. Cole here; I was very jealous that I didn't have a

24   clicker.  I can't begin to tell you how old I'm beginning to

25   feel when you have to be able to be a high-tech guy to try a

1    case now.  So maybe that's one of those signs that I ought to

2    retire because I don't know how to use that clicker.  And

3    like Mr. Ghappour?  That was pretty impressive I thought.  I

4    was really impressed.  But I'm sorry, I don't have an Apple

5    or a Mac, and I can't do that kind of stuff.

6            But what I wanted to show you is that if you take

7    out from those dates -- our fourth call is 133 on January 8,

8    you don't hear from our guy again until July -- there it

9    is -- 8, 2008.  So this part of the case doesn't exist for

10   us.  And this is kind of interesting because Mr. Cole

11   today -- and I made a note of it -- said one of the most

12   important calls was -- I think he said number 150.  And he

13   talked about all this time after the designation.  It's a

14   real important fact, don't you think, that this designation

15   would mean something?  Well, it does.  And the designation,

16   as he told you, became publicized on March 18 of 2008.

17   Remember this?  You remember Government Exhibit 28-G?

18   There's the designation, March 18.  Then there's this death

19   of Aden Ayrow.  And there's transactions -- the first

20   transactions that take place after the designation are in

21   April.

22           Now, you've got these two transactions on

23   January 1st, you've got two transactions on February 13, and

24   then you've got two transactions in April.  Well, guess what?

25   Our guy has nothing whatsoever to do with that, and the

1   government concedes that.  And do you know how they concede

2   that?  Because they charge Count 5.  If you look at Count 5,

3   Count 5 charges the three other individuals with material

4   support regarding those transactions.  Like I said, our guy

5   is nowhere to be found.

6          They would have you believe that he joined this

7   conspiracy -- and I am not suggesting that they've proven

8   this conspiracy, trust me -- I'm just trying to ask you to

9   think as this -- this is my case and nobody else's.  I'm not

10  suggesting that they've proven any conspiracy.  But if you

11  just look at this, might it not be a reasonable doubt that

12  someone who's not around and is in the country -- there's no

13  evidence he was anywhere else, and he was in the country --

14  might it be a reasonable doubt that that person isn't around

15  for the most important transaction?  That's my question.  I

16  think that speaks of a reasonable doubt.  I think that's

17  evidence that he didn't join the conspiracy that they have

18  charged.

19         One thing is crystal clear -- and you can look at

20  these tapes, my eight tapes -- our eight tapes I should

21  say -- until you're blue in the face.  The only person that

22  he speaks to on any of these tapes is Mr. Moalin; he doesn't

23  speak to anyone else.  In fact, he never knew anyone else,

24  and that's consistent with the evidence.  There's nowhere on

25  those calls that somehow one of the others is asking for him,

1    and certainly not the big kahuna, the rock star, Sheikalow,

2    whatever he may be or wherever he may be or whatever he may

3    be, had any idea who he was.  You can look at those calls all

4    you want, you can listen to them in Somali, you can look at

5    the transcripts, but it's not going to be there.  Is that

6    determinative?  Maybe not.  Is it a reasonable doubt?  I

7    think so.  And that is what I'm talking about, reasonable

8    doubt.  The case against our client is riddled with

9    reasonable doubt.

10           You want another reasonable doubt to take with you?

11   The government talks about the boys with the bullets, that

12   tape; that's December 22.  And we put in a tape -- and we

13   added to that -- and, again, I'm not being critical here, but

14   I'm simply saying what we added was a little different.  The

15   government tape, transcript -- forgive my high technology,

16   but -- started here on page 1, and it went right into what's

17   now page 4 of our exhibit:  The men, the men who belong to

18   the youth, who are firing the bullets.  That was one of the

19   things Ms. Han -- one of the first things she talked about.

20           Now -- and, again, I'm not being critical, but I'm

21   simply showing you what else got added.  And you can look at

22   this.  I don't want to belabor it because I don't want to

23   keep you, but I want you to look at what they talk about on

24   these two pages.  They're talking about the news, gives it

25   that different context.  In fact, the very last line was

 1    "that's really good news, good news."  In fact, I think you

 2    can look at most any of these calls and see that, for the

 3    most part, all they're talking about is the news.

 4          But just as importantly, the other part that we

 5    add, we added -- and, again, not being critical of the

 6    government; they're free to show you what they want, but so

 7    am I.  That's one of the great things about these cases.

 8    What's good for the goose is sometimes good for the gander,

 9    or whatever it goes.

10          Look at what else they're talking about in the very

11    same tape with the boys with the bullets.  ILEYS, no it's

12    ILEYS, ILEYS dot org.  And you know what the stipulation says

13    about ILEYS, and we know what ILEYS is, and we know that's a

14    charity.  The other reason this is interesting is that, if

15    you bear with me, with my high-tech style, take a look at the

16    other tape we put in from December 20.  This is Defense

17    Exhibit Ahmed Nasir 1-T.  And, again, I'm not being critical,

18    but do you think that maybe you could understand the

19    December 22nd conversation a little better, at least from the

20    mental state of this kid, if you saw this?  And take a look

21    at it because guess what it says?  This is Basaaly.  Now,

22    remember, on the 22nd I told you they were talking about a

23    website, and Mr. Moalin tells Ahmed the website is ILEYS.  So

24    guess what?  Guess what Mr. Moalin is telling Ahmed on the

25    20th?  If God wishes, now we're going to collect it from

1    them.  By the will of God, we're going to open an account.

2    Even better now, I made an application for like a nonprofit

3    organization.  I mean it would allow us the money to come out

4    of the bank account in a legal manner -- and we'll talk about

5    money coming out of a bank account a little later -- and

6    we're going to publicize it and we should make a website.

7    And then they start talking about schools.  And we'll open --

8    we'll open the account.  Now, does that put a little bit of a

9    different light on boys with the bullets?  Does to me.  It's

10   up to you to decide, but it sure seems to change things,

11   particularly -- and this bullets idea is amazing to me

12   because one of the few things I did in this case -- because I

13   had to make it look like I did -- did something -- was talk

14   to Bryden.  You remember -- you may not remember this because

15   it seems like it was so long ago -- but I asked him -- first

16   thing I said to Bryden is do you -- where is it -- well, so

17   much for my high-tech.  The Bryden transcript -- see, that's

18   what happens when you get old.  First thing that goes.  I had

19   that sitting right here.  In any event, I won't be able to

20   read it to you, but I wanted to -- where did it go?  This is

21   troubling.

22            THE COURT:  Mr. Durkin, why don't you take a minute

23   and just see if you can lay your hands on it.

24            MR. DURKIN:  Thanks, Judge.

25            THE COURT:  And in the meantime, ladies and

1   gentlemen, let me make a point about the Bryden transcript

2   because it's been mentioned many times.  Mr. Durkin, go ahead

3   that's fine.  Mr. Dratel mentioned the Bryden transcript, and

4   what he was referring to was a transcript of Mr. Bryden's

5   testimony that was prepared during the course of this trial.

6   Correct, counsel?

7          MR. DRATEL:  Yes.

8          MR. DURKIN:  That's right.

9          THE COURT:  Okay.  And you're not going to have

10  that.  I know that Mr. Dratel was making references to

11  particular pages of Mr. Bryden's testimony as he was

12  testifying here, and he was -- and it was very nice of him to

13  do so because it gave counsel on the other side an

14  opportunity to turn to those pages of the deposition -- of

15  the trial transcript and just verify the citation.  But I

16  wanted to emphasize to you that there are some things that

17  have been mentioned during the course of the trial that

18  actually will not come in as evidence for you.  That

19  transcript is not evidence.  The trial testimony of

20  Mr. Bryden is the evidence here.

21         And another thing, the deposition transcripts that

22  were prepared, that I referred to in telling you what a

23  deposition was, will not be coming into evidence for your

24  evaluation.  The evidence from those depositions that were

25  taken in Djibouti is the English translation of the

1   translators who were -- who were actually interpreting the

2   testimony at that time; that's the evidence.  So I just

3   wanted to take this opportunity while Mr. Durkin was looking

4   for this one citation in Bryden's testimony to tell you that

5   those transcripts don't go in with you.  They were

6   prepared -- for example, the Bryden transcript was prepared

7   for the convenience of counsel in allowing the arguments to

8   come together in a more cogent fashion.  Okay.

9           MR. DURKIN:  Thank you, Judge.  I found it.

10          THE COURT:  Okay.

11          MR. DURKIN:  Or someone found it for me would be

12  better.  But I asked him, Do I assume it would be a correct

13  summary of your testimony saying your opinion about Somalia

14  that's it's a mess?  And he said well, actually, no.  I'm one

15  of the optimists.  But obviously he was agreeing that it's a

16  mess.  And I asked him about the camps, what he called the

17  settlements along the side of the road.  Remember that

18  testimony?  I asked him, I said, Are you telling me -- did I

19  hear you correctly that it was 300 to 600,000 people along

20  the side of a road?  And I said, And that would kind of be

21  like half the population of San Diego moving out up the I-5?

22  And he said well, I don't know how many people there are.

23  And I said will you take my word for it, and he said yeah.

24  Remember that testimony?  I said -- then I asked him what

25  these settlements were like, and he said, There was very

1    little electricity, there was no plumbing.  He said there was
2    everything from some relatively decent structures, a few
3    cinderblock, but for the most part you'd be talking about
4    corrugated iron and plastic tarpaulin handed out by aid
5    agencies and sticks and whatever people would put together.
6    And then I asked him a question about the militia, and this
7    is what I wanted you to think about when you think about the
8    term "bullets" and whether or not there could be a doubt
9    about the term "bullets" not being equated with al-Shabaab.
10   So I said to him, I thought you told us -- maybe I
11   misunderstood.  I thought you told us there were militia
12   inside these settlements and that they sometimes fought with
13   each other.  Well, they are, but they're not linked to the
14   settlements.  These settlements happened in an area that is
15   already inhabited by people and where there was already
16   usually a preexisting militia.  Again, the war's been going
17   on a long time.  But these militia will be linked to
18   different interests, different leader, sometimes different
19   clans, and will compete for control, particularly the things
20   like the road running through the settlement.  How would you
21   define or explain these militia?  What do you mean when you
22   say a militia?  Very heavily armed gang, anywhere between
23   several dozen or several hundred fighters, usually from the
24   same subclan and under control of a leader who is -- who may
25   be a businessperson, a political figure, an ideologue, a clan

1   elder, maybe all these things at once and that these militia

2   may be nominally to provide security, and sometimes they do

3   when there's a threat from another militia, but sometimes

4   they're just -- they're a threat to themselves and their own

5   people.  A lot of ordinary people are fed up with these

6   militia, young men with guns sitting by the side of the road

7   waving down buses demanding money.

8           That's not al-Shabaab, but I suggest that these

9   people use bullets; that's what it sounded like to me.  And I

10  point that out simply to say I think that, based on this

11  evidence, is another reasonable doubt.

12          There is no evidence linking him to al-Shabaab.

13  Simply not there.  You have to make inference upon inference

14  upon inference to get there.  And, again, the government made

15  a very telling concession, it seemed to me.  Mr. Cole said

16  today that -- let me make sure I have my notes so I can get

17  it correctly.  He was talking about this call, 150, which he

18  said was the important call, on April 12, 2008, and he said

19  the U.S. never -- United States never took the position that

20  they didn't also fund other things.  And he said something to

21  the effect like life's not a cartoon.

22          Well, he and I certainly see eye-to-eye on that

23  one; life isn't a cartoon, particularly not if you're from

24  Somalia.  But the relevance of that is is that that's a

25  concession because that's not what Ms. Han said early on.

1    Ms. Han said that all of this evidence will prove to you that

2    the defendants knowingly conspired to support al-Shabaab, a

3    designated foreign terrorist organization, and other

4    terrorists and to launder money.  If there's any doubt, any

5    doubt in your mind that perhaps the defendants were confused

6    and when they sent that money to Somalia, they were

7    supporting charity or something else or good cause, I'll

8    leave you with this quote from Mr. Moalin about beheading the

9    enemy.

10           There was no -- no talk in the opening statement

11   about all the other good things that these people did.

12   Didn't happen.  It happened because of the evidence.  It

13   happened because of all the evidence that was put in here.

14   But going back to my client and his perspective, how could it

15   not be a reasonable doubt that he didn't have the intent.  If

16   they're talking about nonprofit organizations, they're

17   talking about websites, they're talking about ILEYS, that

18   stipulation that you've seen, Court's Exhibit number 4,

19   that's a reasonable doubt unto itself.  They've all told you

20   that; I'm not going to restate it.  Read that.  From my

21   client's perspective, just that, that's a reasonable doubt

22   based on this evidence I submit.

23           There is 50 more things I could say.  There's also

24   one final thing.  The government made a big deal out of a

25   $1005 (sic) deposit that got made.  This was very late in the

1   testimony I believe of Mr. O'Very.  And they showed you --

2   showed you Government Exhibit 40-A, which was a deposit that

3   got made, and then they played some conversations that --

4   between my client and Mr. Moalin about putting a thousand

5   dollars and five cents in.  And no doubt, there it is.  And

6   then, as I recall the testimony -- again, they got very more

7   sophisticated than I can get -- but they used that little

8   cutter that they have, and they were able to zip in and put

9   the yellow line around it, and right after they put this in,

10  they suggested that that thousand dollar and five cent

11  deposit went out on July 23 to the -- it's these two deposits

12  here, one to Omer Mataan; that's what they said.

13          Guess what?  Wrong again because what we submitted

14  to you is Defendant Exhibit Ahmed Nasir 2-T, which is a phone

15  call -- it's in your book -- with Mr. Moalin and Mr.

16  Abdirizak.  This is Nasir -- Ahmed Nasir 2-T.  And if this

17  doesn't create a reasonable doubt, I don't know what will,

18  ever.  This is a call where Mr. Moalin is asking about the

19  thousand dollars from Anaheim, and this is on the 29th of

20  July, six days after that deposit.  The transfer was on the

21  23rd, six days later, Mr. Abdirizak says no, it's here.

22  Mr. Moalin is saying, he told me he sent it, is it there, is

23  it there?  Yes, it has five cents added.  I certainly got it.

24  And it is still sitting in the account on the 29th.  And then

25  you will see that it goes out on the 30th, and you can look

1   at our exhibit, and it goes out to none other -- you can look

2   at our exhibit, Nasir -- Ahmed Nasir 53-S1, and lo and

3   behold, there's the $1,000.05 and it's going out on the 30th,

4   seven days after that transfer that they said went to

5   al-Shabaab, and guess who it goes to?  Sharif Mohamed Abdi

6   Qorey.  You remember him?  Mr. Qorey was the contractor who

7   was building Mr. Moalin's house, who says he got either money

8   for the house or money for charity.

9           So, again, I don't know what else to say short of I

10  submit that that's a reasonable doubt.  Frankly, I think it's

11  pretty conclusive because that's the only money that they can

12  even put in his hand, and it goes either to construct the

13  house or to charity.

14          I'm not asking for a medal, I'm not asking you to

15  do anything but what an ordinary American jury does in every

16  courthouse in every town in every state of this union and in

17  all the federal courts.  It's to simply view the evidence

18  dispassionately.

19          Mr. Cole said something about -- in mentioning

20  going to Egypt and somehow I was looking for sympathy.  I

21  wasn't looking for sympathy.  I'm simply looking for a fair

22  shot.  I will submit to you that the fact that he went to

23  Egypt and came to this country and applied for citizenship --

24  and you can look at that citizenship application too as to

25  how good a guy he is -- that might be evidence that you

1   wouldn't throw it all away.  Look at the citizenship

2   application; it talks about his children and how he's going

3   to want to come here and stay here.  You don't throw that all

4   away if you've been through hell and back, through Cairo to

5   get here.  You don't throw that all away for nonsense.  Yes,

6   maybe you have to help, maybe you're part of the diaspora,

7   but you don't throw that away.  That's another reasonable

8   doubt here.

9         This kid is simply asking for a chance.  He's

10  asking that you view the evidence without any regard for

11  sympathy or fear.  Mr. Cole didn't mind starting out -- he

12  didn't criticize me for talking about sympathy, but he didn't

13  mind talking about fear and talking about beheadings and

14  every other thing.  If you can get beyond that, if you can

15  get beyond the beheadings and all the fear that's been

16  generated -- I'm not saying that it isn't, you know,

17  terrorism isn't a problem or any other thing, but this kid,

18  there is no evidence of proof beyond a reasonable doubt that

19  he had the intent to contribute money to al-Shabaab.  So give

20  him the trial he deserves.  Don't give him a medal.  Just

21  find him not guilty because that's what this evidence

22  demands.  Thank you.

23            THE COURT:  Mr. Cole, you may proceed.

24            MR. COLE:  Thank you, your Honor.

25            THE COURT:  Mr. Durkin, you may have that notebook

1   up there; it may be yours.  I don't know if that's a court

2   exhibit --

3           MR. DURKIN:  Oh, it is.  I'm sorry.

4           THE COURT:  -- or that's your own material.  All

5   right.  Mr. Cole.

6           MR. COLE:  Okay.  We're almost there, a little

7   longer.  Ahmed Nasir, by the way -- excuse me.  I sat too

8   long without speaking.  Ahmed Nasir is almost 37 years old,

9   okay.  He's not a kid.  But the defendants -- you know,

10  there's an old story about Babe Ruth, one of the things he's

11  famous for -- a little dispute about whether it really

12  happened or not -- for calling his own shot.  He put his bat

13  out to center field and then next pitch he hits it, home run

14  to center field, allegedly.  Defendants tried to call their

15  own shot.  In July of '08 they tell you they called their own

16  shot.  This is Basaaly Moalin and Ahmed Nasir speaking

17  together:  We're going to lay low, and we're going to go on

18  the pretense that we're helping the poor, but it's bullets.

19  And now the pitch is here in court, and they're trying to

20  call their own shot, doing exactly what they said they'd do.

21          I'd like to briefly review some of the closing

22  arguments.  Not going to cover everything with you.  Start

23  with Basaaly Moalin.  You know, there was a call in May when

24  he's describing what happened to Aden Ayrow, and he said that

25  a container was dropped on him.  Well, the evidence is like a

1    container dropped on Basaaly Moalin in this case,

2    overwhelming.  He's on all the phone calls, almost every

3    phone call in the case.

4             And there's been, again, as I told you there would

5    be, a lot of talk suggesting the government has tried to hide

6    something from you.  Well, we didn't read you the Boston

7    phone book, that's true, and we didn't play every single

8    phone call ever intercepted.  You know, all this talk that we

9    supposedly cut out the context, the government cut out the

10   context?  You know how many calls we didn't play that they

11   decided to play part of?  Eleven.  They talked about hundreds

12   of calls being -- thousands of calls being intercepted, and

13   we're only giving you 80.  Well, they drummed up 11 more that

14   they wanted to play -- they wanted to play audio from, just

15   to give you a sense that there was no cutting out of the

16   context here in a way that was going to be intentional or

17   unfair.  There was, instead, evidence brought to you that

18   proves beyond a reasonable doubt these gentlemen's guilt.

19            They said there were no witnesses, the government

20   didn't call any witnesses.  That's not true.  We called

21   several -- many witnesses, and we went on for four and a half

22   days.  But in any event, you have the best witnesses, which

23   were the defendants themselves, in the audio calls.  And we

24   can call somebody from London, who -- by the way, obviously

25   Hassan Guled never even met Basaaly Moalin till 2009, after

1    the offense conduct charged in the indictment.  We can call

2    him from London, or you can hear from Basaaly Moalin himself

3    over the phone calls.  You heard these men in their own

4    words, unvarnished, when they thought they could speak

5    freely, when they weren't on trial.  That's what you heard.

6    That's better than any witness because you heard it straight

7    from the horse's mouth, as they say.

8            There was talk about bias, suggestion that the FBI

9    linguist was biased.  Now, you -- he was sitting right there,

10   not very far from you.  You're the judges of the witnesses.

11   I would just ask yourself to ask yourself did he appear

12   biased to you?  Did he appear like an unprofessional

13   gentleman, somebody who was out to get someone?  And read the

14   transcripts.  I'll tell you right now, you read the

15   transcripts and you'll decide who's the better translator.

16   You can hardly get through theirs.  And I'm not trying to be

17   offensive to Mr. Elmi; I'm sure he's a very nice man, and it

18   sounds like the government's used him somewhere else.  But

19   just read the transcripts yourself; you can hardly read them.

20   I mean part of a translation is to understand the English

21   language as well as the one you're translating from.

22           They talked about the fact that our linguist was

23   not court-certified.  Well, he works for the FBI.  He doesn't

24   do court translations.  He is an employee of the FBI.  It's a

25   red herring.

1            Hassan Guled, you can decide for yourselves -- I

2     dwelt on that enough in opening and closing argument --

3     whether Hassan Guled is the Sheikalow on the phone calls, the

4     guy that testified in Djibouti.  It's -- well, I don't want

5     to use too strong a word.  Let you decide for yourselves

6     about that.  But could somebody else -- assume for a

7     minute -- okay, is his nickname Sheikalow?  Who knows?

8     That's what he said.  But everyone there has nicknames.  And

9     how many Yares testified in this case?  His other name's

10    Yare, Farah Shidane's nickname.  Halima Ibrahim said her

11    nickname's Yare.  So the fact they might find somebody who

12    has a nickname Sheikalow and try to pass them off to you as

13    the Sheikalow in the phone calls is -- is just not credible.

14    It's not credible.

15            There was an effort to -- by Mr. Dratel to suggest

16    that no, this is -- it's sort of a subliminal thing, certain

17    subliminal thing.  A billion dollars goes to Somalia maybe.

18    This is just a little bit of money.  Who cares?  What could

19    it matter?  First of all, he got the numbers wrong.  It

20    wasn't 8500.  That's a number he said since the very

21    beginning of the case.  It wasn't 8500.  There was 3,000 --

22    there was nearly 4,000 in January, 2,000 in February, another

23    3,000 in April, 2,000 to Omer Mataan.  That's 10,900 right

24    there.  And there was a house, okay?  There was a house,

25    where you can bury your stuff deep in the ground, trees can

1   be brought over to put on top of them, still in the plastic,

2   make it look like nothing's there.  It's a strange way to

3   support charity if that's what you're doing.

4        The other suggestion that came out repeatedly is a

5   very simplistic view of people and the world, I would submit,

6   which is that people are like robots; they wake up in the

7   morning and they think one thing, they only do one thing.

8   And here the way that's translated is that how could you

9   possibly support any other cause if you support al-Shabaab

10  and al-Shabaab may have ideological differences with that

11  cause.  How can that be?  Well, ladies and gentlemen, I would

12  submit to you the United States did not accuse any of these

13  men of being Lex Luthor.  That's what I meant when I said

14  this isn't a cartoon.  This isn't a Marvel comic strip where

15  the evil genius wakes up and all he does all day is think

16  about killing Superman.  These are people.  They have

17  different interests, different things they're involved in.

18  But in this case what they're charged with is the one they

19  weren't supposed to do, the illegal interest, which is

20  supporting terrorism and al-Shabaab.

21       As I said earlier, there is nothing wrong with

22  supporting charity.  We heard in this case it's part of

23  Islam; you're supposed to support charity.  We heard that

24  even al-Shabaab has a wing that is supposed to support

25  charity.  There's nothing wrong with supporting charity.

1    That's not what they're charged with.  And the notion that

2    Basaaly Moalin could not both support the ILEYS Foundation

3    and support Aden Ayrow and al-Shabaab is very simplistic.

4    You see, he had interests, and he was trying to juggle all of

5    them.

6         He's from the Galgaduud region.  He cares about it,

7    he wants to be a successful businessman there, he wants to

8    build his dream house there, but he also can't stand

9    Abdullahi Yusuf's government, which isn't his clan; he can't

10   stand Abdullahi Yusuf; he can't stand the fact that there's

11   Ethiopians or Burundians there supporting that government.

12   And so while he's building up his little region, he's also

13   attacking the TFG and those who support it.  And that's borne

14   out because what happens in 2009 when Sheik Sharif becomes

15   the leader of the TFG?  See, that all happens after the

16   conduct charged in this case.

17        So when Abdisalam Guled becomes the

18   counterterrorism specialist for the TFG, that's in 2009 when

19   Sheik Sharif's in power.  Guess what clan Sheik Sharif is?

20   Yeah, Basaaly Moalin's.  Suddenly everybody loves the TFG,

21   Okay?  But when it's not him, when it's Abdullahi Yusuf, his

22   clan's out of power, he's all over it.  He wants that man and

23   his supporters dead.

24        And the calls -- as I told you, the calls -- you'll

25   see this -- he is trying to walk the line.  He wants to see

1   his clan, which by the way is Ayrow's clan, okay, he wants to

2   see his clan rise up in the region, Galgaduud, but he also

3   wants to see al-Shabaab play the critical role he knows they

4   can play.

5         And on that score, if you look at Exhibit 134, this

6   perhaps sizes up Basaaly Moalin's mindset at the time.  Who

7   knows?  I don't care about his mindset.  Excuse me.  It

8   doesn't matter what his mindset might have been in 2009 if

9   his clan's back in power.  It doesn't matter what it might

10  have been in 2010 or 2011.  The time period he's charged

11  with, here is his mindset:  Abdulkadir -- Exhibit 134 -- if

12  today these men's actions are what I have seen, that they

13  become terrorist actions.  Basaaly:  Yes.  Whereby the person

14  inside the mosque is killed, whereby the one coming out of

15  there is killed, whereby the one walking in the street is

16  killed, whereby the one doing business is killed, and there

17  is no one left alone in peace.  Uh-huh.  The capital

18  supporting them with, will that take you to heaven or are you

19  asking to go to hell?

20        And what does Basaaly Moalin say?  Well, that has

21  its problems.  But Abdulkadir, let's look at it from another

22  angle.  They're the ones who are firing the most bullets, the

23  most bullets at the enemy.

24        We also know from the witnesses who testified, and

25  I think -- you'll have to rely on your own recollection --

1    Abukar Suryare testified that there are Ayr -- I'm probably

2    saying that wrong -- the Ayr clan, Ayr clan, the clan of

3    Basaaly Moalin, on all sides of the issue, on all sides of

4    every issue, some supporting al-Shabaab, some supporting the

5    TFG, some supporting this, that, and the other.  So the

6    simplistic view that oh, there's a stipulation that says some

7    guys in the Ayr subclan in Guraceel are opposed to

8    al-Shabaab, then how could he be opposed to al-Shabaab or how

9    could he not be opposed to al-Shabaab, that's utterly

10   simplistic.  There are people in churches who criticize their

11   own church leaders that go to church.  There are people who

12   criticize their own political party; they don't change

13   parties.  There are people who criticize their spouse but

14   stay married, including my wife criticizing me sometimes.

15   Okay.  People aren't that simplistic.

16           There was a phone call that Mr. Dratel referred to,

17   again, along this view, trying to set this dichotomy.  He

18   said how can it be Aden Ayrow on the phone call when Aden

19   Ayrow says to Basaaly Moalin "I prefer Abdullahi Yusuf," I

20   prefer him to the reliberation, the ARS.  You read that call,

21   that is exactly what you'd expect Aden Ayrow to say there.

22   What he's saying is Aden Ayrow's a tough guy, okay, he's the

23   leader of a terrorist group, he's a purist, he's a purist.

24   He doesn't believe this clan stuff.  He believes in, you

25   know, this radical form of Islam.  He believes in opposing it

1  by force if necessary.  He believes in uniting the

2  missionary, the fighter, and the politician all together in

3  one.  So what he's saying in that phone call is these guys

4  over in Asmara sit there in their fancy houses, these

5  reliberation guys, the guys who used to be fighters like me

6  who now are flying to Russia and flying to America and trying

7  to broker a peace deal, they're hypocrites.  I'd rather deal

8  with Abdullahi Yusuf.  At least he has the guts to be the

9  leader of the TFG.  That's what he's saying there is he's

10  saying these ARS guys are hypocrites, my men are over here

11  blowing themselves up, 300 or 400 people at a time, while

12  these men's wives live in Egypt and Asmara or whatever, Saudi

13  Arabia, in fancy houses.

14          This issue of charity, briefly.  You look at the

15  very first call in our binder, we absolutely in the very

16  first call made you aware that there's a conversation going

17  on with Sahal.  This Sahal stuff, orphans, it's right there

18  in the first call because, as I told you in the opening

19  closing argument I made earlier today, it is always so

20  obvious that they change topics; it is always so obvious.

21  And if you look at the Sahal calls -- and the defense put one

22  in in their case -- you'll see that Sahal is interested.  He

23  said look, guys, yeah, there's orphans, but there's also

24  martyrs too, and there's barriers.  It's expensive running a

25  terrorist organization, okay.  But you will always be able to

1  find the -- in every conversation they've referred to when

2  they're supposedly talking about charity, you will always

3  find either the conversation just about nothing about what's

4  involved in this case or there's a transition where they say

5  okay, we talked about that, now I'm going to talk about

6  something else.  Happens all the time.  I already went

7  through that with you in the opening closing argument.

8       Mr. Dratel -- Mr. Dratel also criticized the TFG

9  for a while.  He wanted -- he suggested to you that the TFG's

10  rotten, they were bad guys too.  Maybe all this doesn't

11  matter.  Maybe they deserved to have a landmine planted on

12  them.  Maybe they deserved to have the presidential palace

13  shelled.  I guess that was the implication or the possible

14  implication, but that's not how it works.

15       You're not going to see a single jury instruction

16  that says unless you guys decide that the guy had it coming,

17  unless you guys decide that the prime minister should have

18  been assassinated.  See, this isn't a hall of congress.  This

19  is a courthouse.  This isn't where foreign policy is set.

20  This isn't where people decide what the U.S.'s foreign policy

21  should be.  It's not the White House.  It's a court of law,

22  with law and facts.  And if you think -- when there's mention

23  of the First Amendment, if somebody thinks that Abdullahi

24  Yusuf and the TFG has problems, you do what Matt Bryden did;

25  you write about it, you send in an op-ed piece, maybe you

1    tell your congressman.  What you don't do is try to kill

2    them.  What you don't do is fund a private army of your own

3    in a foreign country so you can tip the balance while you're

4    here in the United States.  That's not what you do.

5            There was mention that the linguist somehow -- a

6    suggestion that the linguist who testified from the FBI

7    somehow concluded in September of '08 that all the calls had

8    been about the local administration and not about terrorism,

9    not about Shabaab.  The linguist testified himself he was

10   speaking about the specific sessions at that time frame that

11   he had been listening to, specific sessions, phone calls, he

12   wasn't talking about the whole case, but they want to take

13   that little piece, even though he clarified it and made very

14   clear he was being asked some particular call, phone calls.

15           Farah Yare, what to make of that.  Well, first of

16   all, before I get there, I think it was Mr. Dratel -- it

17   might have been somebody else -- who said that -- who

18   suggested that Aden Ayrow, or Sheikalow, on the phone, didn't

19   know Basaaly Moalin, they don't even know each other, why

20   would he be reaching out to somebody he doesn't even know if

21   he cares about OPSEC, cares about operational security, okay?

22   You read the calls and you figure out pretty soon they know

23   each other.  And you look at Government's Exhibit 146, what

24   does Sheikalow tell him?  Man, I am very good, I'm still in

25   the hometown where you and I grew up but hope to leave soon;

1    and you look at the other calls, he knows -- he's been to his

2    house in Mogadishu before, he tells him where it is, they're

3    talking about that, talking about where they last saw each

4    other.  They don't -- they know each other.  You can tell

5    that on the phone calls.

6              Farah Yare, Exhibit 186.  Here's the point, ladies

7    and gentlemen.  If you read the Farah Yare phone calls --

8    first of all, the government is not alleging that Farah Yare

9    was part of al-Shabaab.  That's -- that's not been said to

10   you in my statements to you, and it's not being said now.

11   However, as you read the evidence, the counterpoint of Farah

12   Yare and his involvement in this makes it very clear they're

13   funding al-Shabaab.

14             Look at Exhibit 186.  This is Basaaly Moalin

15   speaking to Ahmed Nasir:  We have sent 5,000 as emergency to

16   the men involved in fighting in the Galgaduud region, and

17   we're going to divide 5,000 between what you call the men,

18   the men from the youth, and the other men, what you call

19   them, Jabiso.

20             And if you read the Farah Yare phone calls where

21   he's speaking, he is explaining that they are attacking the

22   Ethiopians alongside -- he's talking about the young guys who

23   attacked with him -- and Jabiso was there attacking them, and

24   they're all attacking the Ethiopians together.  And it's

25   clear here that is not just money going to Farah Yare but

money going to the youth as well.  There's 5,000 going to the
Galgaduud region for the men involved in the fighting, as
Farah Yare's describing himself and those who fight with him,
and then 5,000 to be divided between the youth and Jabiso.
Okay.

        And it's interesting that the pictures of Farah
Yare they're showing you by the defense, and hey, look,
hopefully he was helping orphans, that's wonderful because
for heaven's sake, the children need help.  That's no joke.
So hopefully Farah Yare was doing that.  Great.  But all the
calls where he's on the phone, he is describing attacks on
the Ethiopians that are, by the way, very aggressive and not
solicited.  You read the calls, including the one they put
in, the one they put in about Farah Yare, and he tells
exactly what happened.  He says yeah, the Ethiopians came
rolling through and they wanted to talk to the local leaders
like they used to.  We cut them off.  We decided we were
going to cut off the support of the locals from them, and we
were going to attack them, and we attack them from behind.
That was a new tactic for them.  And the youth were there
with, the youth were fighting on one side -- you know, he's
critical of the youth because he thinks their fighters are
better -- the youth kind of cut out on us and that hurt us
and we had to shift our men around.  And he's talking about
cutting off the locals from the Ethiopians.  He said yeah,

1    you know, they asked to talk to the chief, and we said

2    huh-uh, not going to happen this time.

3           Now, link that up with what Hassan Guled said.

4    Hassan Guled said that in '06 when the Ethiopians were in

5    town, they were their allies, they were the locals' allies.

6    And I believe Hassan Guled said your chief -- said to them --

7    or said to the people in Guraceel, your chief is our chief.

8    Okay.  But Farah Yare says no more of that, we're going to

9    cut the locals off from them, we're not going to let the

10   locals give them food, we're not going to let the locals give

11   them goats, we're not going to let the locals give them

12   bread; if you're caught giving them bread, we're going to

13   destroy your bakery, and then we're going to attack them.

14   And Hassan Guled said that's what happened.  Ethiopians came

15   back a second time, they were attacked by al-Shabaab, the

16   fighting lasted for less than a day.  So that gives you a

17   whole different picture.  And again, this is from the

18   words -- the defendants' words themselves and from Farah

19   Yare's mouth himself on the audio calls.

20          Sorry.  Can I talk about Mohamud -- excuse me --

21   Mohamad Mohamad Mohamud for a moment, Sheik Mohamad.  Ms.

22   Moreno suggested that there was a flaw with the government's

23   case because we had not -- I think in her word -- found

24   someone in the community to come and tell you that he gave

25   radical or violent sermons in his mosque.  I would submit to

1   you that makes no sense.  Who -- careful as Sheik Mohamad is

2   in particular, who is going to stand up and talk about

3   beheadings or radical and violent sermons in his mosque?

4           I would submit to you that the evidence in this

5   case shows that Sheik Mohamad had a public face and a private

6   face, okay.  That's why Basaaly Moalin said hey, Friday at

7   the mosque, hold back trusted people, not too many, just the

8   ones you need, hold them back, have them stay behind for a

9   private meeting, not the one that everyone else gets to hear

10  in the congregation, hold them back.  Okay, there's a public

11  face and a private face.  Now, we know that because of his

12  constant references to worries about the phones being

13  intercepted and what's said over the phone.

14          Ms. Moreno made reference to the First Amendment.

15  I would submit to you that the First Amendment has nothing to

16  do with this case.  No one is charged here with criticizing

17  someone.  No one is charged here with having strong views

18  about the U.S. government or about any other government.

19  What the defendants are charged with is conspiring to commit

20  crimes and committing crimes.  And the judge told you in the

21  instructions that when that's the question, you can use their

22  speech, the words they say out of their mouth, for any

23  evidentiary purpose you find appropriate in finding their

24  motive, intent, or whether they reached an agreement.

25          And what is an agreement?  What is a conspiracy?

1   Is a conspiracy -- does it require like a document, a

2   contract that's signed, they bring it to the crime, here are

3   the terms, here is how it's going to work?  No.  Does it

4   require a handshake?  No.  A conspiracy is inferred from all

5   of the words and actions of the parties.  The agreement could

6   be informal, it could be implied from conduct.  You know, if

7   I grab one end of a saw and start sawing on a log, those

8   old-fashioned saws, you walk up and grab the other end and

9   start pulling at that other end, we're conspiring to cut that

10  log.  We may have never said a word to each other, but we're

11  conspiring to cut that log.  Okay.

12        And these men all conspired together.  And they

13  don't have to know each other.  Mr. Durkin suggested that his

14  client didn't even know some of the other co-defendants.

15  Obviously he knew Basaaly Moalin; he was talking on the phone

16  with him.  But he suggested he didn't even know the other

17  guys.  Well, the judge told you -- and you'll have this in

18  your packet -- one may become a member of a conspiracy

19  without full knowledge of all the details of the unlawful

20  scheme or the names, identities, or locations of all the

21  members.  And it is not a defense that a person's

22  participation in the conspiracy was minor or for a short

23  period of time.  It is not necessary that all members join at

24  the same time.  And so the fact that Ahmed Nasir may have had

25  a different role or involved at different times or may not

1    have communicated with all the parties is not a defense.

2              MR. DURKIN:  I object to that.  I didn't --

3              THE COURT:  I didn't hear you, Mr. Durkin.

4              MR. DURKIN:  I object to that.  I -- I object to

5    that.

6              THE COURT:  Well, I'll overrule the objection.

7              MR. COLE:  Ms. Moreno referred to the fact that --

8    referred to the fact that there was that one phone call where

9    Sheik Mohamud -- Sheik Mohamad -- excuse me -- Mohamad

10   Mohamad Mohamud, where he said -- he was critical of the

11   fact, said it was bad policy that al-Shabaab slaughters

12   everyone they capture.  Well, that is a bad policy; he's

13   right about that.  But that -- again, going back to that

14   simplistic mindset -- because you criticize one policy of the

15   organization means you're not funding it, that alone, that's

16   too simplistic.  People criticize their own organizations

17   people are funding, the people they're helping, all the time

18   because people have diverse views about the same subject.

19   That is not evidence that he was not doing what the calls

20   themselves show clearly he was.

21              Finally, on -- I think on -- just a couple more

22   things on Sheik Mohamad.  Ms. Moreno suggested that there

23   should have been a voice print analysis of Aden Ayrow.

24   That's -- you know, if you don't have the facts on your side,

25   you go for speculation.  That is asking you to speculate that

1    there is a verified voice print for a man who's been dead

2    since May 1st, 2008 available, that it's verified, that it

3    can be compared.  That's complete speculation.  And if that

4    was the case, if that was the case, they called -- they put

5    on witnesses and -- they put in evidence and put on

6    witnesses.  Anyone on the defense who put on a case -- none

7    of them had to; they didn't have to call any witnesses, put

8    in any evidence, they had no burden to do so --

9              MS. MORENO:  I'm going to object, your Honor.

10             THE COURT:  Yes, the objection is sustained.  I

11   think you're getting very close to burden-shifting there.

12   You can certainly comment on the state of the evidence and

13   what the evidence does or does not contain, but the defense

14   is under no obligation, as you point out.

15             MR. COLE:  The last thing on Mr. Mohamad Mohamad

16   Mohamud and then I'll move on briefly to the other two

17   defendants.  Ms. Moreno suggested it was an interesting word

18   that I used in saying that he's the one that had clout, her

19   client had clout.  I want to show you on that point

20   Government's Exhibit 188.  This is Basaaly Moalin speaking to

21   Mahad Karate, operational commander of al-Shabaab, rose to

22   even greater prominence after Ayrow's death.  This is what

23   Basaaly said to him:  The scholar who is here with me very

24   much wants Abu Zubeyr -- remember, the emir of al-Shabaab,

25   Abu Zubeyr -- the man who -- I mean the man from Isaaq who --

1    I understand.  I understand you very much.  What?  I

2    understand you.  There was a man who was looking for him very

3    much.  They spoke once a few days ago.  He really asked me to

4    look him up.  He knows him.  Tell him that teacher Mohamad,

5    who lives at so and so, is looking for you and he can contact

6    him at my number, God willing.  All right, I'll tell him.  I

7    mean my objective from him -- my main objective from him --

8    meaning Abu Zubeyr -- my main objective from Abu Zubeyr is

9    that if that man is put in contact with the man who is the

10   leader of the local mosques, everything that can be done will

11   be done.

12          Briefly now on Mr. Issa Doreh.  Mr. Doreh -- Mr.

13   Ghappour started out by suggesting that the January

14   transactions were somehow linked to conversations later in

15   February about money not being paid out yet.  He said the

16   January 1st transaction somehow perhaps -- perhaps you could

17   conclude that that is the same money being discussed weeks

18   later, in the next month, about whether money had been paid

19   off for some charitable purpose.  The problem with that is

20   that on Exhibit 39, the very exhibit that he used to show you

21   those transactions, it shows the paid date.  The paid date is

22   on there, on the records.  Those were paid on January 7,

23   2008, the day after they were submitted for transfer.  So

24   that money was paid long before.  And also he said well, they

25   were talking about $3,000 at first in December --

1          MR. GHAPPOUR:  Objection, your Honor.  The

2    government's exhibit, that table, was based on a spreadsheet

3    that the government at sidebar said that they would not

4    submit for the truth of the matter, and I would move for a

5    mistrial.

6          THE COURT:  The objection is overruled.  The motion

7    is denied.

8          MR. COLE:  And the -- he also said that in December

9    that Ayrow was asking for 3,000 and something dollars,

10   Basaaly wound up paying close to 4,000, and that must be

11   reasonable doubt.  And in January -- he paid almost $4,000 in

12   January.  If you look at the calls with Ayrow in the first

13   part of December and then January when he's telling Ayrow,

14   Basaaly's telling Ayrow the money's been paid, he says we

15   almost got it to 4,000, we're going to get it to 4,000,

16   wanted it to be 4,000.  And, in fact, the amount transfered

17   was 3900.

18         One quick statement by Mr. Ghappour I want to

19   correct.  He said that the only transaction that was made to

20   al-Shabaab, that the government alleges was made to

21   al-Shabaab after the March designation was in April.  That's

22   just not true.  April was a transaction that was made.  There

23   was also the money to Omer Mataan that was made in July.  I

24   just want to correct that quickly.

25         He said that Issa Doreh could not even access the

1   database, he couldn't himself send the money in the database
2   and that somehow that was a defense here, somehow that meant
3   he couldn't be a part of the conspiracy.  There is no
4   requirement to be a part of this conspiracy that you can
5   access the database yourself and submit the money.  What's
6   clear is that Issa Doreh was a person of enough importance at
7   Shidaal Express to tell the Shidaal Express people to waive
8   the fee if that's what he wanted to have happen.  And he
9   tells Ayrow -- Basaaly tells Aden Ayrow that himself.  That's
10  what he told Aden Ayrow about Doreh, and I already reviewed
11  that call in the opening close; he said yeah, he's the guy
12  that waives the fee for us.  And that's when Basaaly was
13  speaking to Aden Ayrow.

14          Finally, Mr. Ahmed Nasir.  I'm just going to very
15  briefly mention two things and then I'll sit down.  In July
16  when Ahmed Nasir gets back on the phone, July 8 -- and we
17  already covered this in my earlier comments; it's on the call
18  where Roobow is speaking -- and Ahmed Nasir says hey, man,
19  I'm waiting to get on the phone, connect us up.  And
20  Mr. Bryden testified at length about how al-Shabaab would do
21  its fundraising, how these main fundraisers, Roobow and Fuad
22  Shongole, are two of the most prominent, how people from all
23  over could connect up and listen to these guys, and then they
24  would pass the hat, and how you had to be basically -- by
25  2008 you had to be sponsored basically to get in on it

1    because, again, this is terrorism, and so it's got to be a

2    little about operational security.  And Ahmed Nasir is

3    looking to get in, and Basaaly's even saying yeah, we're

4    hoping to connect up with him, there's some guys in Canada

5    we're trying to connect up with and -- to get in on one of

6    these fundraisers, and Ahmed Nasir is for it; he's like yeah,

7    I'm waiting to connect, just put me on mute and connect me

8    in.  And that's the call I discussed earlier where Ugas says

9    hey, man, get the money from him first, and they go on to

10   have that lengthy conversation about money.

11          The thousand dollars and five cents?  Basaaly

12   Moalin already knows what money's coming from Ahmed Nasir.

13   He has a conversation with him about passing the hat with the

14   cab drivers:  I've got this much so far, I've got more

15   coming.  He knows that he can count on him.  He knows on

16   July 18 that Ahmed Nasir's sitting on a thousand.  It doesn't

17   matter to Basaaly Moalin which thousand dollars is in the pot

18   at one time.  Money's fungible.  Money is fungible.  Once he

19   knows what's coming and what he can count on, he can transmit

20   money even if it's coming out of his own pocket.

21          If you believe that after listening to the Roobow

22   call and after listening to the conversation about passing

23   the hat to the cab drivers, if you believe that the money

24   that was being collected from the cab drivers was for

25   Basaaly's house, his personal house, then that would be --

1    then that's a big issue if you believe that; he's right about

2    that.  But we know what it's about because they're talking

3    about it on the phone.  He wasn't going around to the cab

4    drivers in Anaheim and --

5                MR. DURKIN:  Objection.

6                MR. COLE:  -- collecting money --

7                THE COURT:  Hold on.  Hold on, Mr. Cole.

8                MR. DURKIN:  I said it is either for the house or

9    for charity; that's -- that's exactly what I said.

10               THE COURT:  Okay.  This is argument.

11               MR. COLE:  Well, okay.  In any event, you can look

12   at those calls yourself and reach your own conclusion as you

13   do -- you're the jurors -- as to what the evidence shows.

14               Fire the bullets.  Final comment.  Fire the

15   bullets.  Mr. Durkin suggested that could have been anything,

16   that in early December when -- or late December when Basaaly

17   Moalin reports to Ahmed Nasir the day after talking to Ayrow

18   that the young men who were firing the bullets need money,

19   that that could have been referring to anything.  The problem

20   is it's directly referring to what Ayrow had told Basaaly the

21   day before; that's the problem.  It's directly relaying what

22   had been said the day before.  So you don't have to wonder

23   and question over what was meant there.

24               Ladies and gentlemen, you've been very patient.

25   We're past our 4:30 time.  Thank you for your attentiveness

1   and ask you to return the verdict supported by the

2   evidence -- not by speculation but by the evidence -- which

3   is guilty as to all defendants on all counts.  Thank you for

4   your time.

5           THE COURT:  Okay.  Ladies and gentlemen, that

6   concludes -- that concludes the arguments in the case.  I'm

7   going to provide the remaining instructions for you.  If you

8   wish to follow, that's fine.  I don't think it's necessary;

9   I'm happy to just go ahead and read them to you.

10          When you begin your deliberations, elect one member

11  of the jury as your foreperson, who will preside over the

12  deliberations and speak for you here in court.  You will then

13  discuss the case with your fellow jurors to reach agreement

14  if you can do so.

15          Your verdict, whether guilty or not guilty, must be

16  unanimous.  Each of you must decide the case for yourself but

17  should do so only after you have considered all the evidence,

18  discussed it fully with the other jurors, and listened to the

19  views of your fellow jurors.

20          Do not be afraid to change your opinion if the

21  discussion persuades you that you should, but do not come to

22  a decision simply because other jurors think it is right.  It

23  is important that you attempt to reach a unanimous verdict

24  but of course only if each of you can do so after having made

25  your own conscientious decision.  Do not change an honest

1    belief about the weight and effect of the evidence simply to

2    reach a verdict.

3              Because you must base your verdict only on the

4    evidence received in the case and on these instructions, I

5    remind you that you must not be exposed to any other

6    information about the case or to the issues it involves.

7    Except for discussing the case with your fellow jurors during

8    your deliberations, do not communicate with anyone in any way

9    and do not let anyone else communicate with you in any way

10   about the merits of the case or anything to do with it.  This

11   includes discussing the case in person, in writing, by phone,

12   or electronic means by email, text messaging, or any Internet

13   chat room, blog, website, or other feature.  This applies to

14   communicating with your family members, your employer, the

15   media or press, and the people involved in the trial.

16             If you are asked or approached in any way about

17   your jury service or anything about this case, you must

18   respond that you have been ordered not to discuss the matter

19   and to report the contact to the Court.

20             Do not read, watch, or listen to any news or media

21   accounts or commentary about the case or anything to do with

22   it.  Do not do any research such as consulting dictionaries,

23   searching the Internet, or using other reference materials.

24   And do not make any investigation or in any other way try to

25   learn about the case on your own.

1          The law requires these instructions to ensure the

2     parties have a fair trial based on the same evidence that

3     each party has had an opportunity to address.  A juror who

4     violates these restrictions jeopardizes the fairness of these

5     proceedings, and a mistrial could result that would require

6     the entire trial process to start over.  If any juror is

7     exposed to any outside information, please notify the Court

8     immediately.

9          Some of you have taken notes.  I dare say every

10    single one of you has taken notes during the course of the

11    trial.  Whether or not you took notes, you should reply on

12    your own memory of what was said.  Notes are only to assist

13    your memory.  You should not be overly influenced by your

14    notes or those of your fellow jurors.

15         The punishment provided by law for these charged

16    crimes is for the Court to decide.  You may not consider

17    punishment in deciding whether the government has proved its

18    case against a defendant beyond a reasonable doubt.

19         If it becomes necessary during your deliberations

20    to communicate with me, you may send a note through the

21    bailiffs signed by any one or more of you.  No member of the

22    jury should ever attempt to communicate with me except by a

23    signed writing, and I will respond to the jury concerning the

24    case only in writing or here in open court and on the record.

25    And, by the way, if you do send a note, please make it

1    legible; that's always appreciated.

2           If you send out a question, in all probability I

3    will consult with the lawyers before answering it, which may

4    take some time, so you may certainly continue your

5    deliberations while waiting for the answer to any question.

6           Remember that you are not to tell anyone, including

7    me, how the jury stands numerically or otherwise on any

8    question submitted to you, including the question of the

9    guilt of a defendant, until after you have reached a

10   unanimous verdict or have been discharged.  So if you're

11   sending out a note, please do not anywhere on that note

12   indicate where the jury stands numerically other otherwise;

13   just indicate the question on the note.  And, by the way, I'm

14   not soliciting notes.  If you sent out a note or notes,

15   certainly they will be addressed, but, please, once again,

16   for the third time do not indicate where the jury stands

17   numerically or otherwise.

18          There are a few other matters I do want to address

19   with you right now.  Gaby, can we -- Mr. Dratel, you seem --

20          MR. DRATEL:  Can we just have a 30-second sidebar,

21   your Honor?

22          THE COURT:  Does it have to do with the

23   instructions?

24          MR. DRATEL:  Yes.

25          THE COURT:  Okay.

1          (Following is a sidebar conference.)

2          MR. DRATEL:  Okay.  Based on the rebuttal,

3    particularly two parts, one where he said that people had it

4    coming to them, and then the question of an aggressive war,

5    essentially waging back Farah Yare, I would ask for that

6    self-defense instruction.  I think Mr. Cole went too -- at

7    least one or two with respect to that.

8          THE COURT:  Mr. Cole?

9          MR. COLE:  No, that's not at all -- the reference

10   to Farah Yare, I specifically said the government could not

11   claim it was al-Shabaab.  The conversations with Farah Yare

12   were a counterpoint showing there was money going to the

13   youth because they were talking about 5,000 to Farah Yare,

14   5,000 sent to the youth and Jabiso, and then explaining

15   that -- in their own conversations they explained -- Hassan

16   Guled explained in his deposition that it was al-Shabaab that

17   attacked Ethiopia and that Ethiopia fired back.  That's what

18   I said, and that's has to nothing to do with the

19   self-defense.

20         THE COURT:  I'll deny the motion or the request to

21   have the jury instructed on self-defense.  The evidence in

22   this case falls leagues short of a self-defense instruction.

23         MR. DRATEL:  Thank you, your Honor.

24        (Sidebar conference concludes.)

25         THE COURT:  All right.  Continuing on, ladies and

1    gentlemen.  Gaby, can we -- I'm going to have the verdict
2    form distributed to you.  Let me tell you something about the
3    verdict form.  It really is self-explanatory.  There will be
4    an original verdict form that will be provided in a folder,
5    but I did want each of you to have your own copy of the
6    verdict form in this case, and this will just go to the --
7    for now the -- well, they can go to all jurors, yes, even as
8    well as the alternates.
9          So we have an original verdict form for you, as
10   indicated, and then you all have your own individual form
11   just so that you can more or less keep your own individual
12   record of where you stand on these charges and on the charges
13   with respect to the individual defendants.
14         As I say, it's very, very self-explanatory.  Once
15   you -- once you make your finding, you'll circle the
16   appropriate finding or verdict with respect to a particular
17   defendant on a particular count.  So your verdict, guilty or
18   not guilty, not guilty/guilty, will be indicated by circling
19   one of the alternatives there.
20         Once we get to Count 4 -- you get to Count 4 --
21   there is a note to you, an instruction, as to Count 4.  Count
22   4 now, you'll recall, relates only to Basaaly Saeed Moalin.
23   And you'll place your finding, your verdict, with respect to
24   Count 4 in question 13.  If you -- if your verdict were to be
25   guilty on this particular count, you would not address

1  question 14 regarding attempt; you would next proceed to

2  question 15.  However, if your finding for Mr. Moalin on

3  Count 4 is not guilty of providing material support to

4  terrorists, then you would proceed to answer the next

5  question, 14, which deals with attempting to provide material

6  support to terrorists as charged in Count 4.  Then once you

7  get to Count 5, you'll find the same instruction with respect

8  to each of the three defendants who were named in Count five.

9  You only get to the attempt question if you have found a

10  particular defendant not guilty on the actual completed

11  offense.  As I say, self-explanatory.  I just wanted to point

12  that out for you.

13         I want to talk to you about some administrative

14  matters, housekeeping matters they're sometimes referred to.

15  The hours of your deliberations will be the same as the trial

16  hours that we've kept:  9:00 to 12:00, 1:30 to 4:30 with your

17  customary breaks and recesses.  If you wish to have

18  additional recesses, breaks, please don't hesitate to ask.

19  You can always buzz the bailiffs -- I'm going to be

20  introducing the bailiffs to you shortly -- but you can always

21  buzz the bailiff or bailiffs and ask for additional time.

22         Remember this:  The only time you can deliberate on

23  the case, discuss the case, is when all 12 of you are

24  together around that table in the jury deliberation room,

25  which is right behind you, and discussing the case.  If one

1  or more of you is absent for a moment or not there, not

2  present, then you really may not discuss the case until all

3  12 of you are back together.  The admonition not to discuss

4  the case would then apply, as it does whenever you're not

5  deliberating on the case, all 12 of you.

6          Now, all of the evidence will be shortly gathered,

7  and it's going to be delivered into the jury room.  You're

8  not going to start your deliberations this evening; we're

9  just going to stop in a few moments, and then you'll be on

10 your way, we'll recess for the day, and then you'll be back

11 here at nine o'clock to begin your deliberations.  But all of

12 the evidence will be gathered for you and available in the

13 jury room.

14         Importantly, you'll also have a copy of the exhibit

15 list, and you may use that copy of exhibit list if you're

16 looking for a particular item, and it may well assist you in

17 reaching -- in getting access to that item very quickly.  If

18 something -- I'll say it again -- if something is not in

19 evidence, then you're not going to find it in there.  You

20 will not find the transcript, for example, of Mr. Bryden's

21 testimony during trial, you will not find the deposition

22 transcripts of the individuals who were deposed in Djibouti.

23 So if the matter is in evidence, whether it's a photograph, a

24 document, a transcript, or anything else, it will be

25 delivered to you.

1           I will tell you that during any recess, your cell

2    phones will be -- you'll be relieved of your cell phones.  We

3    cut off all communication with the outside world.  Those cell

4    phones will be available -- well, we'll give them back to you

5    during any recess or break and obviously at the end of the

6    day.

7           Very well.  Let's do this now.  I am really, really

8    fortunate to work with two exceptional law clerks here.  In

9    the Southern District of California, the law clerks who work

10   with the judges also perform the additional responsibility of

11   being bailiffs on a case and assisting the jury in the

12   matters I've been discussing.  Those of you with prior jury

13   service on superior court may recall the uniformed bailiffs,

14   and you'll now see the distinction between bailiffs in the

15   federal system and those who serve that function in the state

16   system.  So we have Randy Rein and Adriana Ahumada, my law

17   clerks, who will be assisting you on this case in the areas I

18   discussed, and I would ask that they be sworn by the

19   courtroom deputy at this time.

20          THE CLERK:  Please raise your right hands.  You,

21   and each of you, do solemnly swear that you will keep this

22   jury in some private and convenient place, that you will not

23   permit any person to speak to or communicate with them, nor

24   do so yourself except by order of the Court or to ask them if

25   they have agreed upon a verdict, and that you will return

1    them into court when they have so agreed or when ordered by

2    the Court?  If so, please say yes.

3          (The bailiffs answered in the affirmative.)

4          THE COURT:  Okay.  Now, I want to say something to

5    our three alternate jurors, Mr. Brenzel, Mr. Adams, and

6    Ms. Clark.  You will not be deliberating with the jury.  I'm

7    going to ask that each of you report back here tomorrow

8    morning at nine o'clock.  I'm going to have an opportunity to

9    talk to counsel -- I may do that here at the side of the

10   bench in just a moment -- about the necessity or the wisdom

11   of having all three of you here during the deliberations of

12   the jury.  It might be appropriate to have, for example, our

13   first alternate here, Mr. Brenzel, and the other two, Mr.

14   Adams and Ms. Clark, on call.  I'll discuss that with counsel

15   and either let you know before you leave today or first thing

16   tomorrow morning.

17         Obviously, to our alternates, you may not discuss

18   this case amongst yourselves or with anyone else or allow

19   yourselves to form or express any opinions on the case until

20   the case has been submitted to you and you're obviously part

21   of the jury or the jury has been discharged.

22         You can leave your materials right on the seats

23   there; they'll be fine right where they are.  And I would

24   like you to be here when and if verdicts are reached; we

25   always try to have our alternates here.  Sometimes it doesn't

1    always work out, but usually it does.  And so do any of the

2    three of you have any questions about what your

3    responsibility is?  As I say, I'll get a little bit more

4    information from counsel.  We've talked about so many things

5    here at the side of the bench, that's one thing we haven't

6    talked about yet.  But any other questions any of the three

7    of you have at this point?  Mr. Brenzel, no.  Mr. Adams, no.

8    Yes, Ms. Clark?

9               ALTERNATE JUROR CLARK:  You said tonight you'd let

10   us know or --

11              THE COURT:  Yeah, I'm going to try to take a minute

12   here to see exactly what the thought process here is, so if

13   the three of you want to remain behind for just a moment

14   after I let the others go, I want to -- I can chat with you

15   about that.  Ms. Delaney, may I ask that you remain behind as

16   well?  Thank you.  Before I proceed further, may I see

17   counsel at the side of the bench just for a moment.

18        (Following is a sidebar conference.)

19              THE COURT:  I would suggest that we have one

20   alternate here and that we have the other two standing by on

21   call so that if we need an additional alternate, that

22   individual can come in quickly.  Any objection to that?

23              MS. MORENO:  No.

24              MR. COLE:  No.

25              THE COURT:  Okay.  I'll have Brenzel remain here

1    and --

2           MR. DRATEL:  One question just about tomorrow

3    morning only because I just wanted to effect -- I think

4    they'll bring the defendants up tomorrow --

5           THE COURT:  I was going to talk to you about that.

6    No, I --

7           MR. DRATEL:  Okay.

8           MS. MORENO:  Yes, your Honor.  Apparently they

9    brought them here on Friday, so if the Court -- I don't know

10   how you would handle that to make sure they're not brought

11   here tomorrow.

12          THE COURT:  I'll take care of that.

13          MS. MORENO:  Okay.

14          THE COURT:  But that raises another question.  If

15   there is a question coming out from the jury, things go a lot

16   more smoothly if I can -- if we can have you on call so that

17   you're all here within ten minutes or so.

18          MS. MORENO:  Sure.

19          THE COURT:  But if we have to wait for your

20   clients, that may take a longer period of time.  If you're

21   willing to waive the appearance of your client for any time

22   we need together to respond to a question --

23          MR. DRATEL:  Oh, yes.

24          THE COURT:  -- that would greatly expedite that.

25          MR. DRATEL:  Sure.

 1              MS. MORENO:  Yes.

 2              MR. COLE:  Are you all willing to waive the

 3     presence of your client for that?

 4              MR. GHAPPOUR:  Yes.

 5              MS. MORENO:  So waived.

 6              MR. DURKIN:  Yes.

 7              THE COURT:  Are you all willing to waive the

 8     presence of your clients for the beginning of each session of

 9     court as the jurors are deliberating?  So basically there

10     will be nobody here in the courtroom.

11              MS. MORENO:  Yes, your Honor.

12              THE COURT:  The bailiffs will be bringing in the

13     jurors and that's it.  I won't even be here.  The jurors --

14              MR. DRATEL:  We won't even be here.

15              THE COURT:  You're not going to be here either.

16     But you all -- as I say, you all need to be on call then.

17              MS. MORENO:  We're very close, Judge.

18              MR. DRATEL:  Yes.

19              THE COURT:  It's pretty standard.  I know you tried

20     a lot of cases.

21              MR. DURKIN:  Yes.

22              THE COURT:  Okay.  The other thing is this.  I

23     received a note from Ms. Delaney.  She's juror number 10,

24     sitting to the right of Ms. Freni, who is number 9.  And she

25     writes Grand Juror orientation appointment at 12:45 p.m.

1  Friday, February 22 -- so this coming Friday obviously,

2  Department of Justice -- so apparently she's been summoned

3  for grand jury duty.  I would be inclined to her know that it

4  has been agreed that she is relieved of any obligation to

5  report for grand jury.

6          MR. DRATEL:  I can't do that.  They can --

7          MS. MORENO:  It's up to them.

8          THE COURT:  Actually this Court -- I used to be the

9  jury judge here for years and I gave the charge for years.

10 But if you're all comfortable with that --

11         MR. DRATEL:  Yes.

12         MS. MORENO:  Yes.

13         THE COURT:  -- I will eliminate Ms. Delaney's

14 concern unless she really wants to serve as a grand juror.

15 I'm going to inquire.

16         MR. DRATEL:  I did once serve on a New York State

17 Grand Jury, and there's no way out.  I had to do afternoons

18 for a month.

19         THE COURT:  It's an 18-month commitment here, one

20 day a week.

21         MR. DURKIN:  Judge, are you going to swear them now

22 so -- we don't have to come tomorrow morning, do we?

23         THE COURT:  They're sworn, yeah.  You scared me

24 there.

25         MR. DURKIN:  I don't know what I was thinking.

1    Told you my mind is the first thing to go.

2              THE COURT:  We've sworn the jury, we've sworn the

3    bailiffs.

4              MR. DURKIN:  I knew somebody got sworn.

5              THE COURT:  Okay.  All right.

6              MR. DRATEL:  I have another motion coming.

7              THE COURT:  Okay.  So that's the way we'll handle

8    it.  I think that's all I wanted to discuss with you.

9         (Sidebar conference concludes.)

10             THE COURT:  Ladies and gentlemen, recall that I

11   mentioned earlier during the course of this trial that if we

12   need alternates to serve, they serve in the order in which

13   they've been selected.  So, Mr. Brenzel, you would be our

14   first alternate if we had to excuse a member of the jury for

15   a significant reason, illness or some kind of emergent

16   circumstance, Mr. Adams, you would be next, and then

17   Ms. Clark.

18             I and the attorneys have discussed the order of

19   things, and we are perfectly satisfied to have you,

20   Mr. Brenzel, here while the jury is deliberating and that

21   it's not necessary at this time to have Mr. Adams present nor

22   Ms. Clark.  So the two of you are excused at this point, but

23   you need to be on call; we have to have a cell phone number,

24   some other contact information for you so that we can

25   literally get you here within 10 or 15 minutes.  Now, you're

1    free to be here; if you wish to be here during the period of

2    time the jury is deliberating, you certainly may.  But, Mr.

3    Adams, would it be your choice to go back to work or to some

4    other activity until we call you or would you want to be here

5    during the deliberations of the jury?

6              ALTERNATE JUROR ADAMS:  Well, my work is about an

7    hour and a half away from here.

8              THE COURT:  So you're -- sounds like you're happy

9    to be here.

10             ALTERNATE JUROR ADAMS:  I -- I can be.

11             THE COURT:  Would you be happy --

12             ALTERNATE JUROR ADAMS:  I'm happy either way.

13             THE COURT:  Do you have some other option?

14             ALTERNATE JUROR ADAMS:  If you would --

15             THE COURT:  An hour and a half is probably too

16   long.

17             ALTERNATE JUROR ADAMS:  So you would expect me to

18   be here in 10 or 15 minutes, then I can't go to work; I would

19   have to be here.

20             THE COURT:  Okay.

21             ALTERNATE JUROR ADAMS:  I would just stay.

22             THE COURT:  Okay.  Let's have you here then, okay,

23   and we'll see how that's working out.  It may be that we can

24   excuse you at some point, but I'll ask you to be here

25   tomorrow, along with Mr. Brenzel, obviously.  And, Ms. Clark,

1    what's your circumstance?

2              ALTERNATE JUROR CLARK:  I'm about 30 to 40 minutes

3    away.

4              THE COURT:  Thirty to 40 minutes away.  Okay.  Why

5    don't we -- is it your desire to return to work or some other

6    activity?

7              ALTERNATE JUROR CLARK:  I'll do what the Court

8    likes.

9              THE COURT:  Do you have any preference?

10             ALTERNATE JUROR CLARK:  No.  No, sir, I don't.

11             THE COURT:  Okay.  Okay.  Well, tell you what.  Why

12   don't we have you here tomorrow then, Ms. Clark, okay.  And

13   if something arises where you change your mind and you feel

14   there's something else you could be doing or some other place

15   you need to be, just let us know, okay?  And you can let the

16   jury commissioner know or you can let Gabriela know, and

17   we'll take it from there, all right?

18             Okay.  So, Ms. Delaney, that leaves you.  And we

19   even discussed your circumstances here.  So you have been

20   basically summoned for jury service of another kind to begin

21   this coming Friday, at least orientation; is that correct?

22             JUROR DELANEY:  Right.  They said is was just going

23   to be 30 minutes, so I thought maybe that would be around the

24   lunch break, so that might not interfere.  I don't know.

25             THE COURT:  Are you a member of a grand jury at

1  this point?

2         JUROR DELANEY:  No.  I think it's just an

3  orientation.  I don't really know what's involved.

4         THE COURT:  Okay.  And it's federal, it's not

5  state?

6         JUROR DELANEY:  They just said Hall of Justice, the

7  building right across the way.

8         THE COURT:  Oh, oh.

9         JUROR DELANEY:  I'm sorry.  I think I put

10  Department of Justice.

11         THE COURT:  Oh, you said Department of Justice,

12  and --

13         JUROR DELANEY:  I apologize.

14         THE COURT:  Well, that's interesting then.  That's

15  superior court, and the grand jury on superior court is not

16  a -- does not typically involve itself in criminal matters;

17  it's more or less a civil watchdog kind of entity.  And I

18  would have no objection to you going over there.  It's during

19  the noon hour, but I want to talk to counsel about that to

20  see if there's any issue.  One thing I want you to be clear

21  about:  Don't give that matter another thought, okay?  This

22  case takes priority, and you should not be concerned about

23  what's going on over there at all.  And if this jury is

24  deliberating on Friday, then it may be necessary to have you

25  excused from any appearance across the street in superior

1    court.  But we'll cross that bridge when we come to it.  I

2    want you to have a clear mind that you're on this case to

3    deliberate for just as long as it takes, okay?

4              JUROR DELANEY:  Okay.

5              THE COURT:  I don't want you rushing to any

6    judgment so that you can be clear by noon on Friday.  Okay?

7    All right.  I think I've covered just about everything I need

8    to cover with you.  I think for the sake of just getting --

9    letting you be on your way for the evening that you can leave

10   all of your -- you can leave all of your notebooks and other

11   notes, your copy of the jury instructions, verdict form right

12   on the seats here, okay?  They'll be fine overnight as they

13   have been so far.  Then tomorrow morning when you come, the

14   bailiffs will escort you into the jury deliberation room, and

15   you can just pick up all your materials at that point.

16             Have you all written your names in your notebooks

17   and on your jury -- copies of the jury instructions?  If you

18   haven't, would you make sure to do that right now just so

19   that we don't get any of these materials mixed up.

20             Okay.  To our alternate jurors then, you're all

21   going to be here for tomorrow in any event.  I'll ask that

22   you return to the jury lounge -- that's in the annex; that's

23   in the other building -- rather than coming here at nine

24   o'clock, so you'll be -- you'll be in the jury lounge waiting

25   for further contact from us and we'll know where you are.

1          Okay.  Any questions before we bid you good evening

2     and see you tomorrow?  Apparently not.  I won't -- none of us

3     will be here, by the way.  It will just be you, and the

4     bailiffs will be assisting you.  I won't be on the bench,

5     none of the participants in this case will be here in the

6     courtroom.  All right.  Ladies and gentlemen, one, have a

7     very good evening.  Remember the admonition not to discuss

8     the case amongst yourselves or with anyone else other than

9     how it has been -- you've been given the green light to do

10    so.  And I think that's it.  Have a good evening.  See you

11    tomorrow at 9 a.m.

12         (The jury left the courtroom.)

13         THE COURT:  Okay.  Counsel, we're outside the

14    present of all jurors.  Have a very good evening.  I'd like

15    to personally thank you for all of the courtesies you've

16    extended to one another and to the Court.  It's been a

17    challenging case I know logistically and otherwise, and I

18    appreciate all that you've done to make this trial

19    manageable.  It's clear to me that you have been doing that

20    for a long, long period of time, and I am very grateful for

21    that, so thanks again.  And stay in touch.

22         (There was a break in the proceedings for the evening

23    recess.)

24

25

1

I n d e x

|                                              | Page        |
|----------------------------------------------|-------------|
| Jury Instructions by the Court               | 1781 - 1805 |
| Closing Argument by Mr. Cole                 | 1807 - 1857 |
| Closing Argument by Mr. Dratel               | 1858 - 1901 |
| Closing Argument by Ms. Moreno               | 1904 - 1923 |
| Closing Argument by Mr. Ghappour             | 1923 - 1936 |
| Closing Argument by Mr. Durkin               | 1936 - 1953 |
| Rebuttal Argument by Mr. Cole                | 1954 - 1977 |
| Concluding Jury Instructions by the Court    | 1977 - 1980 |

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated January 24, 2014 at San Diego, California.

12                    *Debra M. Henson*

13                              /s/ Debra M. Henson  (electronic)
                                Debra M. Henson
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25