UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA


BEFORE HONORABLE JEFFREY T. MILLER, JUDGE PRESIDING

_____
                              )   CASE NO. 10CR4246-JM
UNITED STATES OF AMERICA, )
          PLAINTIFF.   )   SAN DIEGO, CALIFORNIA
                              )
                              )   MONDAY, NOVEMBER 18, 2013
                              )     9:30 A.M. CALENDAR
BASAALY SAEED MOALIN,         )
MOHAMED MOHAMED MOHAMUD,      )
ISSA DOREH,                   )
          DEFENDANTS.   )
_____)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SENTENCING HEARINGS


REPORTED BY:                    LEE ANN PENCE,
                                OFFICIAL COURT REPORTER
                                UNITED STATES COURTHOUSE
                                333 WEST BROADWAY ROOM 1393
                                SAN DIEGO, CALIFORNIA 92101

```
COUNSEL APPEARING:

FOR PLAINTIFF:          LAURA E. DUFFY,
                        UNITED STATES ATTORNEY
                        BY:  WILLIAM P. COLE
                             CAROLINE P. HAN
                        ASSISTANT U.S. ATTORNEYS
                        880 FRONT STREET
                        SAN DIEGO, CALIFORNIA 92101


FOR DEFENDANTS:         JOSHUA L. DRATEL, ESQ.
(MR. MOALIN)            ALICE FONTIER,ESQ.
                        OFFICE OF JOSHUA L. DRATEL
                        2 WALL STREET, THIRD FLOOR
                        NEW YORK, NEW YORK 10005


(MR. MOHAMUD)           LINDA MORENO,ESQ.
                        LINDA MORENO, P.A.
                        P.O. BOX 10985
                        TAMPA, FLORIDA 33679


(MR. DOREH)             AHMED GHAPPOUR, ESQ.
                        LAW OFFICES OF AHMED GHAPPOUR
                        P.O. BOX 20367
                        SEATTLE, WASHINGTON 98102
```

```
 1   SAN DIEGO, CALIFORNIA - MONDAY, NOVEMBER 18, 2013 - 9:30 A.M.
 2                             *   *   *
 3            THE CLERK:  CALLING MATTER 1 ON CALENDAR, 10CR4246,
 4   U.S.A. VERSUS BASAALY SAEED MOALIN, MOHAMED MOHAMED MOHAMUD,
 5   ISSA DOREH; SET FOR SENTENCE WITH PRESENTENCE REPORT.
 6            THE COURT:  COUNSEL, WOULD YOU STATE YOUR
 7   APPEARANCES, PLEASE.
 8            MR. COLE:  YES, YOUR HONOR.  WILLIAM COLE AND
 9   CAROLYN HAN FOR THE UNITED STATES.
10            MR. DRATEL:  GOOD MORNING, YOUR HONOR.  JOSHUA
11   DRATEL FOR BASAALY MOALIN.  WITH ME IS ALICE FONTIER.
12            MS. FONTIER:  GOOD MORNING, YOUR HONOR.
13            THE COURT:  GOOD MORNING.
14            MS. MORENO:  GOOD MORNING, YOUR HONOR.  LINDA MORENO
15   ON BEHALF OF MR. MOHAMED MOHAMED MOHAMUD, WHO IS PRESENT IN
16   CUSTODY.
17            MR. GHAPPOUR:  GOOD MORNING, YOUR HONOR.  AHMED
18   GHAPPOUR ON BEHALF OF MR. ISSA DOREH, WHO IS PRESENT IN
19   CUSTODY.
20            THE COURT:  ALL RIGHT.  GOOD MORNING AGAIN,
21   EVERYONE.
22            I HAVE REQUESTED THE FILING OF AMENDMENT TO THE
23   ORDER DENYING MOTION FOR A NEW TRIAL.  IT IS MY UNDERSTANDING
24   IT HAS BEEN FILED.  AND IT BASICALLY CORRECTS ONE MISSTATEMENT
25   THAT WAS CONTAINED IN THE ORIGINAL ORDER DENYING A MOTION FOR
```

```
 1   NEW TRIAL AT PAGE 7 LINES 15 TO 16.  THAT IS NOT MATERIAL,

 2   OBVIOUSLY, TO ANY SENTENCING MATTERS THIS MORNING.

 3          MR. DRATEL, ARE YOU READY TO PROCEED ON BEHALF OF

 4   MR. MOALIN?

 5          MR. DRATEL:  YES, WE ARE, YOUR HONOR.  JUST ONE

 6   THING IS THAT I GAVE THE COURT DEPUTY -- AND I GAVE A COPY TO

 7   THE GOVERNMENT AS WELL -- A LETTER.

 8          THE COURT:  YES, I HAVE IT.

 9          MR. DRATEL:  THANK YOU, YOUR HONOR.

10          THE COURT:  JUST FOR THE RECORD LET'S IDENTIFY THIS

11   AS A LETTER THAT IS DATED APPARENTLY JULY 6 OF 2011.  IS THAT

12   CORRECT?

13          MR. DRATEL:  CORRECT.

14          THE COURT:  SO THIS IS OVER TWO YEARS OLD.

15          BUT IT IS A LETTER PRESUMABLY TO YOU, MR. DRATEL,

16   FROM VARIOUS LISTED SOMALI PARLIAMENTARIANS, INTELLECTUALS AND

17   TRADITIONAL LEADERS.  IT IS A LETTER OF SUPPORT FOR

18   MR. MOALIN, AND I HAVE READ IT ALONG WITH ALL OF THE OTHER

19   LETTERS.

20          MR. DRATEL:  YES, YOUR HONOR.  AND BECAUSE IT CAME

21   SO LONG AGO, BEFORE TRIAL, WE OVERLOOKED IT IN OUR SENTENCING

22   SUBMISSION WHEN WE COLLECTED LETTERS AFTER THE VERDICT.

23          THE COURT:  UNDERSTOOD.

24          MR. DRATEL:  WE REALIZED, AND MR. MOALIN BROUGHT IT

25   TO OUR ATTENTION AS WELL.
```

NOVEMBER 18, 2013

1           **THE COURT:**  THANK YOU.

2           **MR. DRATEL:**  TO SUPPLEMENT THAT.

3           **THE COURT:**  THANK YOU FOR THE EXPLANATION.

4       YOU ARE READY TO PROCEED, THEN, MR. DRATEL?

5           **MR. DRATEL:**  I AM, YOUR HONOR.

6           **THE COURT:**  MR. MOALIN, ARE YOU READY TO PROCEED

7   WITH SENTENCING THIS MORNING?

8           **DEFENDANT MOALIN:**  YES, YOUR HONOR.

9           **THE COURT:**  SIR, HAVE YOU READ THE PROBATION REPORT

10  AND THE ADDENDUM TO THE PROBATION REPORT, OR HAVE THEY BEEN

11  READ TO YOU?

12          **DEFENDANT MOALIN:**  YES, YOUR HONOR, I READ THEM.

13          **THE COURT:**  YOU READ THEM YOURSELF?

14          **DEFENDANT MOALIN:**  YES.

15          **THE COURT:**  IN ENGLISH?

16          **DEFENDANT MOALIN:**  YES.

17          **THE COURT:**  VERY GOOD.  THANK YOU, MR. MOALIN.  YOU

18  MAY CERTAINLY BE SEATED.  THANK YOU.

19          MR. DRATEL, PLEASE.

20          **MR. DRATEL:**  THANK YOU, YOUR HONOR.

21          YOUR HONOR, JUST AS A -- JUST FOR PURPOSES -- NOT TO

22  TRY TO GO BACK TOO MUCH BUT IN TERMS OF THE GOVERNMENT FILED

23  SOMETHING EX PARTE ON FRIDAY, WE WOULD CONTINUE OUR OBJECTION

24  TO EX PARTE FILINGS.  NOT HAVING TO DO WITH SENTENCING, I

25  THINK IT HAD TO DO WITH THE COURT'S ORDER.

NOVEMBER 18, 2013

6

1           **THE COURT:**  RIGHT.

2           **MR. DRATEL:**  OKAY.

3           SO TO START WITH THE STANDARD, BECAUSE THAT WILL BE

4    THE CONTEXT FOR MY REMARKS, WHICH IS THE PARSIMONY CLAUSE,

5    SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACHIEVE THE

6    PURPOSES OF SENTENCING.

7           AND I DON'T WANT ANYTHING I SAY TODAY, OR MS.

8    FONTIER OR MR. MOALIN SAYS TODAY, TO BE CONSTRUED AS

9    CHALLENGING THE VERDICTS BECAUSE WE ARE NOT DOING THAT.  WE

10   ARE TALKING ABOUT PROPORTIONALITY AND WHERE ALONG THE

11   CONTINUUM CONDUCT FALLS, AND A BALANCE BETWEEN THE CONDUCT FOR

12   WHICH MR. MOALIN HAS BEEN CONVICTED AND THE REST OF HIS LIFE,

13   AND HIS FUTURE, FOR THAT MATTER, AS WELL.  SO THAT'S THE

14   CONTEXT IN WHICH WE TALK ABOUT WHAT WE ARE GOING TO TALK ABOUT

15   TODAY.

16          AND THE COURT, I KNOW -- I AM NOT GOING TO GO

17   THROUGH THE SENTENCING SUBMISSION BECAUSE I KNOW THE COURT HAS

18   READ IT.  BUT JUST TO NOTE THE TESTAMENTS TO THE GOOD WORKS

19   THAT MR. MOALIN HAS DONE THROUGH HIS LIFE FOR THE PEOPLE OF

20   SOMALIA, FOR THE SOMALIS AND HIS COMMUNITY IN SAN DIEGO.  THE

21   EXTRAORDINARY NUMBER OF LETTERS AND SIGNATORIES.

22          WE TRIED TO DO A COUNT, IT IS KIND OF DIFFICULT

23   BECAUSE SOME PEOPLE ARE JUST SIGNATURES, THERE ARE SOME

24   LETTERS, BUT WE ARE TALKING ABOUT OVER 600 PEOPLE FROM HERE

25   AND IN SOMALIA.  THERE COULD HAVE BEEN EVEN MORE, BUT

1   LIMITATIONS ON LANGUAGE AND JUST LOGISTICS PRECLUDED THAT.

2   BUT I THINK 600-PLUS IS A SUFFICIENT NUMBER TO GIVE THE COURT

3   A SENSE OF WHO MR. MOALIN IS AND WHAT PEOPLE THINK OF THE WORK

4   THAT HE HAS DONE IN HIS LIFE.

5           THERE IS ALSO A LETTER FROM GOVERNMENT MINISTERS IN

6   2011 THAT WE JUST PROVIDED TO THE COURT, AND THIS IS TANGIBLE

7   ASSISTANCE TO PEOPLE IN NEED.  THE PAYING FOR SCHOOLING, THE

8   PAYING FOR THE CARE OF ORPHANS, ALL OF THAT TANGIBLE

9   ASSISTANCE.  AND NOT ASSISTANCE THAT IS CERTAINLY NOT

10  CONTRIVED IN THE CONTEXT OF A CRIMINAL CASE, WHICH SOMETIMES

11  YOU SEE CHARITABLE WORKS BEING A RESPONSE TO SOME SORT OF

12  POTENTIAL EXPOSURE.  BUT THIS IS REALLY WHO MR. MOALIN IS.

13          AND WE ASK THE COURT TO BALANCE THE RELATIVELY BRIEF

14  EPISODE OF CRIMINAL CONDUCT AGAINST THIS ENTIRE BODY OF HIS

15  LIFE'S WORK.

16          AND HOW DO WE KNOW THAT IT IS RELATIVELY BRIEF?  WE

17  KNOW FROM ACTUALLY -- AS OPPOSED TO OTHER CASES WHERE YOU MAY

18  NOT HAVE A SENSE OF IT, WE ACTUALLY DO KNOW HERE BECAUSE WE

19  KNOW THAT IN 2003 THE GOVERNMENT INVESTIGATED MR. MOALIN AND

20  FOUND NO CONNECTION TO TERRORISM.

21          AND WE KNOW THAT BETWEEN 2008 AND 2010, THE TIME

22  PERIOD FROM WHEN THE CRIMINAL CONDUCT ENDS AND THE INDICTMENT,

23  THERE IS NO EVIDENCE OF ANY CRIMINAL CONDUCT BY MR. MOALIN OF

24  ANY SORT, EVEN THOUGH HE WAS QUITE CLEARLY ON THE GOVERNMENT'S

25  RADAR DURING THAT ENTIRE PERIOD.

1    IN FACT, AFTER AUGUST OF 2008 THERE IS NOTHING, EVEN

2   THOUGH THE WIRE CONTINUE AFTER THAT.  AND THE SIGNIFICANCE OF

3   2008, AUGUST, IS THE ASMARA AGREEMENT THAT NEGOTIATED THE END

4   OF ETHIOPIAN INTERVENTION IN SOMALIA AND NEGOTIATED NEW

5   ELECTIONS IN SOMALIA.

6    I KNOW THAT THE COURT HAS THE TRANSCRIPT FROM THE

7   NIMA YUSUF CASE THAT HAS BEEN PROVIDED BY OTHER COUNSEL.  AND

8   THE COURT IN THAT SENTENCING I THINK WAS CORRECTLY -- AND WE

9   RAISED THIS ISSUE OURSELVES, CORRECTLY CONCERNED WITH THE SORT

10  OF ONE-SIZE-FITS-ALL CONCEPT OF THE ENHANCEMENTS AND HOW THEY

11  AREN'T NECESSARILY TIED TO A SPECIFIC EMPIRICAL SET OF DATA

12  BUT REALLY JUST A POINT IN SPACE ARBITRARILY PICKED FOR

13  PURPOSES OF THE ENHANCEMENT.  AND THAT THE WORSE OFFENDER,

14  SOMEONE WHO PROVIDED MILLIONS OF DOLLARS FOR SPECIFIC

15  TERRORIST ACTIVITY, WOULD BE NO DIFFERENT THAN THE PERSON WHO

16  PROVIDED A SMALL AMOUNT OF MONEY AND NOT DIRECTED TO TERRORIST

17  ACTIVITY.

18    SO I THINK THAT IS AN IMPORTANT ASPECT.  AND I THINK

19  THAT NOT MAKING THOSE DISTINCTIONS AMONG DEFENDANTS AMONG

20  TYPES OF CONDUCT UNDERMINES SENTENCING AND THE INTEGRITY OF

21  THE ENTIRE SYSTEM OF SENTENCING IN THE SENSE OF

22  INDIVIDUALIZING SENTENCING AND HAVING THE SENTENCE FIT THE

23  OFFENDER AND THE CONDUCT TOGETHER; AGAIN, THE BALANCE OF A

24  LIFE'S WORK AND THE NATURE OF THE CONDUCT.

25    THERE IS NOTHING IN THIS CASE THAT SUGGESTS, OR

1    CERTAINLY PROVES, ANY ENDURING OR PERSISTENT SUPPORT BY

2    MR. MOALIN FOR AL-SHABAAB.  IN FACT, ALL OF THE LETTERS THE

3    COURT HAS SEEN SAY OTHERWISE.

4              THERE WAS SOME POST 2008 CONDUCT THAT WAS NOT

5    ADMITTED AT TRIAL BECAUSE WE WERE CONFINED TO THE TIME FRAME,

6    BUT IT IS CERTAINLY RELEVANT FOR SENTENCING IN THAT ONE OF THE

7    THINGS, THAT MR. MOALIN WAS PUT ON AL-SHABAAB HIT LIST FOR THE

8    CONFERENCE THAT HE ORGANIZED IN KENYA WITH ONE OF THE

9    WITNESSES AT TRIAL, HALIMA ALI.  AND THAT IS SOMETHING THAT IS

10   KNOWN IN THE COMMUNITY IN SOMALIA.  AND THIS IS SOMEONE WHO IS

11   CHARACTERIZED BY AL-SHABAAB AS AN ENEMY.  SO I -- IN THAT

12   CONTEXT I THINK THAT, AGAIN, GOES TO THE QUESTION OF BALANCE

13   AND THE QUESTION OF WHAT IS AN APPROPRIATE SENTENCE AND THE

14   NATURE OF THE CONDUCT AND THE NATURE OF THE PERSON.

15             ALSO ABDISALAM GULED TESTIFIED, AND AGAIN THIS WAS

16   NOT WITHIN THE TIME FRAME OF THE TRIAL SO -- BUT HE CAME TO

17   SAN DIEGO IN 2009 AS PART OF HIS OFFICIAL TRIP.  AND THE ONE

18   PERSON HE WANTED TO MEET HERE -- AND THIS IS A PERSON WHO IS

19   NATIONAL SECURITY ADVISER TO THE PRESIDENT OF SOMALIA.  THE

20   ONE PERSON HE WANTED TO MEET IN SAN DIEGO WAS BASAALY MOALIN,

21   BECAUSE OF WHAT BASAALY MOALIN HAD DONE FOR SOMALIS.  THIS IS

22   A GOVERNMENT OFFICIAL.

23             SO WHILE MR. MOALIN IS CONVICTED OF PROVIDING AID TO

24   A TERRORIST ORGANIZATION, HE IS NEITHER A TERRORIST NOR A

25   TERRORISM SUPPORTER.  I THINK THAT IS CLEAR FROM THE ENTIRE

1    RECORD AND ENTIRE NATURE OF HIS LIFE'S WORK.  AND I THINK THAT

2    IS CRITICAL IN THE CONTEXT OF SENTENCING.

3              AND THE CONTEXT OF THE CONDUCT WE HAVE PROVIDED,

4    OBVIOUSLY -- AND THE COURT IS FAMILIAR.  YOU HEARD FROM

5    MR. BRYDEN AND ALL OF THE OTHER SUBMISSIONS.  THERE IS A

6    CRISIS IN SOMALIA.  THERE IS A CONTINUING CRISIS IN SOMALIA.

7    THERE HAS BEEN A TWO-DECADE CRISIS IN SOMALIA -- NOW MORE THAN

8    TWO DECADES.  AND THERE WERE JUDGMENTS MADE IN THE COURSE OF

9    THAT.  AND I AM NOT HERE TO SAY THAT THE JUDGMENT THAT THE

10   JURY FOUND IT WAS LEGAL, BUT I AM SAYING THAT THE JUDGMENT WAS

11   A JUDGMENT, A QUESTION AND NOT A QUESTION OF SOMEONE'S

12   ORIENTATION AS A WHOLE.  AND WE HAVE VERY COMPLICATED

13   GEOPOLITICAL ISSUES THAT OCCUR IN TODAY'S WORLD THAT ARE

14   EXTRAORDINARILY DIFFICULT TO NAVIGATE.

15             JUST GIVE YOU AN EXAMPLE.  IN SYRIA THE UNITED

16   STATES HAS TAKEN THE POSITION THAT WE ARE GOING TO AID CERTAIN

17   INSURGENT GROUPS.  WE DON'T KNOW WHAT THE FULL NATURE OF THOSE

18   GROUPS ARE, JUST THAT THEY ARE AGAINST THE GOVERNMENT.  AND

19   THAT IS GOING TO BE ENOUGH FOR US TO GIVE THEM MATERIAL

20   MILITARY AID.  THEY MAY INCLUDE ELEMENTS THAT ARE AL QAEDA

21   PEOPLE.  BUT WE HAVE DECIDED THAT THAT IS IN THE NATIONAL

22   INTEREST TO DO SO.

23             AGAIN, MR. MOALIN, THE JURY FOUND, NOT LEGAL BUT HAS

24   TO BE PUT IN A CONTEXT OF THE SITUATION THAT WAS OCCURRING.

25             AND ANOTHER THING ABOUT THE CHARGES AND ABOUT THE

1    CONDUCT IS THERE IS NOTHING AGAINST THE UNITED STATES IN THE

2    CONDUCT AND THE CHARGES, AND MR. MOALIN WILL SPEAK MORE TO

3    THAT HIMSELF.

4         I KNOW THAT GENERAL DETERRENCE IS AN ASPECT OF

5    SENTENCING, AND I KNOW THAT THE GOVERNMENT HAS CITED IT AS A

6    BASIS FOR ITS RECOMMENDATION.  BUT CERTAINLY ALL OF THE OTHER

7    SENTENCES -- AND TWO IN PARTICULAR, THE NIMA YUSUF SENTENCE

8    AND THE MOHAMED YUSUF SENTENCE IN ST. LOUIS -- CERTAINLY

9    INCLUDED GENERAL DETERRENCE AS A COMPONENT.  THE JUDGE, IN

10   EITHER CASE, I DON'T THINK IGNORED GENERAL DETERRENCE.  YET

11   ONE GAVE NIMA YUSUF EIGHT YEARS FOR MONEY TO SOMEONE WHO WAS A

12   SUICIDE BOMBER, AFTER YUSUF SOMEONE WHO -- 140 MONTHS, SOMEONE

13   WHOSE ROLE WAS COMMENSURATE WITH MR. MOALIN'S, JUST IN A

14   DIFFERENT CITY.  AND THOSE DON'T APPROACH THE NUMBER SUGGESTED

15   BY THE GOVERNMENT.  SO GENERAL DETERRENCE WAS PART OF THOSE

16   SENTENCES AS WELL.

17        ANOTHER ASPECT -- I ALSO -- EVEN IF IT WASN'T THERE

18   IS NO REASON WHY MR. MOALIN SHOULD, BY HIMSELF, SHOULDER THE

19   BURDEN OF GENERAL DETERRENCE IN A MANNER THAT OTHERS HAVEN'T.

20   HE IS A HUMAN BEING.  WE ARE SENTENCING HUMAN BEINGS AND NOT

21   PHANTOM DEFENDANTS WHO HAVEN'T EVEN COMMITTED CRIMES YET IN

22   TERMS OF WHAT WAS GOING TO INFLUENCE THEM.  GOING TO HAVE A

23   TANGIBLE IMPACT ON MR. MOALIN AND HIS FAMILY.  I WOULD ASK THE

24   COURT TO CONSIDER THAT IN THAT CONTEXT.

25        ALSO, NIMA YUSUF AND MOHAMUD YUSUF -- NOT RELATED, I

 1    DON'T BELIEVE -- BUT IN CHICAGO -- I MEAN IN ST. LOUIS,

 2    RATHER, AND NIMA YUSUF HERE IN SAN DIEGO BOTH PLEADED GUILTY,

 3    SO THE GENERAL DETERRENCE FACTOR CAN'T BE THAT IT IS A GENERAL

 4    DETERRENCE AGAINST GOING TO TRIAL.  AND CAN'T BE AND SHOULDN'T

 5    BE AND SHOULDN'T BE VIEWED THAT WAY; IN OTHER WORDS, THAT A

 6    SENTENCE IS INCREASED ABOVE THAT BECAUSE THAT WOULD JUST DETER

 7    PEOPLE FROM GOING TO TRIAL, WHICH I THINK WOULD BE, OBVIOUSLY,

 8    INAPPROPRIATE AND I DON'T THINK THAT WOULD BE THE COURT'S

 9    INTENTION.  BUT AT THE SAME TIME THAT WOULD BE THE IMPACT IF

10    THAT WOULD BE THE ONLY DISTINCTION THAT PEOPLE WOULD DRAW FROM

11    THAT.

12              I DON'T KNOW THAT THERE IS ANY EMPIRICAL EVIDENCE

13    THAT HAS EVER ESTABLISHED THE EFFICACY OF GENERAL DETERRENCE

14    OR SPECIFIC AMOUNT OR WHO IT INFLUENCES.  THERE IS A

15    SUFFICIENT MESSAGE THIS CASE HAS ALREADY SENT TO THE

16    COMMUNITY, AND I THINK THE PROOF IS IN THE FACT THAT YOU

17    HAVEN'T HAD, IN SAN DIEGO, ANYTHING APPROACHING THIS IN FIVE

18    YEARS.

19              AND THE MESSAGE HAS BEEN SENT BY TURNING EVERYBODY'S

20    LIFE UPSIDE DOWN, BY THE CUSTODY THAT THEY HAVE ALREADY HAD

21    AND WHATEVER SENTENCE THE COURT SEES FIT TO IMPOSE IN ADDITION

22    TO THE TIME THEY HAVE ALREADY SERVED.  THAT IS SUFFICIENT.

23    NOBODY WANTS TO BE SEPARATED FROM THEIR FAMILY.  NO ONE WANTS

24    TO BE IN A POSITION WHERE THEIR FAMILY IS IN NEED THAT ALL OF

25    THE THINGS THAT THEY PROVIDE TO THEM ARE NO LONGER AVAILABLE

1    BECAUSE THEY ARE IN CUSTODY.  THAT MESSAGE HAS BEEN HEARD.

2              THERE IS NO EVIDENCE THAT PEOPLE DO THE KIND OF

3    COST-BENEFIT ANALYSIS THAT GENERAL DETERRENCE AS A WHOLE SEEMS

4    TO SUGGEST.  BUT JUST AGAIN A COMPARISON -- AND WE PUT THESE

5    CASES IN OUR PAPERS WITH RESPECT TO FINANCIAL INSTITUTIONS AND

6    BANKS THAT HAVE BEEN MULTIPLE OFFENDERS, REPEAT OFFENDERS.

7    THEY DO COST-BENEFIT ANALYSIS.  THAT IS THEIR JOB.  YET,

8    GENERAL DETERRENCE DOESN'T SEEM TO APPLY TO THEM.  THEY DON'T

9    EVEN GET PROSECUTED CRIMINALLY.  THEY PAY THE COST OF DOING

10   BUSINESS AND MOVE ON TO THE NEXT SET OF FINANCIAL MALFEASANCE.

11   BUT THIS IS A HUMAN BEING.

12             AND SO I END WHERE I STARTED, WITH THE PARSIMONY

13   CLAUSE, SUFFICIENT BUT NOT GREATER THAN NECESSARY.  AND I

14   THINK THAT THE BENCHMARKS HERE ARE NIMA YUSUF AND THE YUSUF IN

15   ST. LOUIS FOR THE COURT THAT THAT WOULD BE -- SOMETHING IN

16   THAT RANGE WOULD BE THE APPROPRIATE SENTENCE FOR MR. MOALIN.

17             I DON'T WANT TO ARGUE AGAINST MYSELF IN CASE THE

18   COURT IS THINKING OF GOING LOWER THAN THAT, OBVIOUSLY, BY ALL

19   MEANS.  BUT I UNDERSTAND THAT THERE IS A CERTAIN PROTOCOL

20   HERE, THERE IS A GENERAL SENSE OF RECOMMENDING.  SO I AM -- I

21   DON'T COME FROM A DISTRICT WHERE THAT IS DONE ON ANY BASIS.

22   BUT I AM ASKING THE COURT TO CONSIDER ALL OF THESE FACTORS.

23   CONSIDER THE ENTIRE HUMAN BEING, NOT JUST AT HIS WORST MOMENT

24   OF CRIMINAL CONDUCT BUT ALSO HIS BEST MOMENTS WHICH VASTLY

25   OUTWEIGH IT IN TERMS OF TIME, AND I REALLY BELIEVE ALSO IN

1    IMPACT IN SOMALIA.  LETTERS FROM PEOPLE WHO WERE GOING TO

2    SCHOOL AND LEARNING AND BETTERING THEIR LIVES AND TURNING

3    AROUND A COUNTRY THAT HAS BEEN UNABLE TO TURN ITSELF AROUND OR

4    BE TURNED AROUND BY INTERNATIONAL INTERVENTION FOR A

5    CONSIDERABLE PERIOD OF TIME.

6            THANK YOU.

7            **THE COURT:**  THANK YOU, MR. DRATEL, I APPRECIATE YOUR

8    COMMENTS.

9            **MR. DRATEL:**  MS. FONTIER WILL SPEAK A LITTLE BIT

10   ABOUT MR. MOALIN, JUST SPECIFICALLY SOME OF THE PERSONAL

11   MATTERS, YOUR HONOR, IF SHE MAY.

12           **THE COURT:**  OKAY.

13           **MS. FONTIER:**  YOUR HONOR, I FEEL THAT I AM IN A

14   RATHER DIFFICULT POSITION AT THIS SENTENCING, AND NOT FOR THE

15   USUAL REASONS IN THAT I HAVE TO FIND A WAY TO HUMANIZE MY

16   CLIENT OR TO SAY SOMETHING THAT SEPARATES HIM FROM THIS

17   OFFENSE; BUT RATHER FOR THE EXACT OPPOSITE REASON IN THAT I

18   COULD STAND AT THIS PODIUM FOR THE NEXT THREE HOURS AND TELL

19   YOU THE GREAT THINGS THAT I KNOW ABOUT MR. MOALIN AND THE

20   IMPACT THAT HE HAS HAD ON ME PERSONALLY, THE IMPACT THAT HE

21   HAS HAD ON HIS COMMUNITY HERE IN SAN DIEGO AND IN SOMALIA.

22           WHAT IS DIFFICULT FOR ME IS HOW I AM GOING TO

23   SHORTEN THIS, AND JUST TRY TO IMPRESS UPON YOUR HONOR WHO

24   BASAALY MOHAMED IS, AS A MAN, IN A SHORT PERIOD OF TIME.

25           AND I KNOW YOUR HONOR IS VERY DILIGENT AND HAS READ

1    THE MANY, MANY LETTERS AND OUR NEARLY 70-PAGE SUBMISSION ON

2    BEHALF OF MR. MOALIN, SO I DON'T INTEND TO REPEAT, REALLY, ANY

3    OF WHAT IS IN THAT.  I THINK IT SPEAKS FOR ITSELF.

4            I THINK THE FACT THAT THIS COURTROOM IS FULL, AND

5    HAS BEEN FULL EVERY SINGLE DAY THAT WE HAVE COME TO COURT --

6    REGARDLESS OF WHETHER IT WAS FOR AN ADJOURNMENT OR STATUS

7    CONFERENCE.  THIS COMMUNITY HAS PACKED THIS COURTROOM, WAS IN

8    OVERFLOW COURTROOMS, EVERY SINGLE TIME THIS CASE HAS BEEN ON.

9            WE HAD A COMMUNITY MEETING WHEN WE FIRST CAME ON TO

10   THIS CASE AND THERE WERE HUNDREDS OF PEOPLE AT THE MOSQUE

11   SEEKING TO GIVE THEIR SUPPORT.  SEVERAL PEOPLE ASKED IF THEY

12   COULD -- THIS MORNING ASKED IF THEY WOULD BE ABLE TO SPEAK

13   DIRECTLY TO YOUR HONOR TO SAY HOW THEY FEEL ABOUT MR. MOALIN

14   AND WHAT HE HAS DONE FOR HIM IN THEIR LIVES.  AGAIN, MANY OF

15   THOSE PEOPLE HAVE SUBMITTED LETTERS WHICH YOUR HONOR HAS READ.

16           AND MOST -- MR. MOALIN'S MOTHER IS HERE.

17   MR. MOALIN'S MOTHER IS HERE.  SHE HAS BEEN HERE THROUGHOUT THE

18   TRIAL DESPITE THE FACT SHE DOES NOT SPEAK ENGLISH, SO SHE IS

19   HERE TRULY JUST TO SHOW HER SUPPORT AND TO BE HERE FOR HER

20   SON.  SHE WAS ACTUALLY HOPING TO BE ABLE TO SPEAK THIS MORNING

21   AS WELL.

22           SHE IS OBVIOUSLY ELDERLY.  SHE IS DISABLED.

23   MR. MOALIN CARED FOR HER, BOTH FINANCIALLY, EMOTIONALLY, IN

24   EVERY WAY THAT A SON COULD BEFORE HE WAS ARRESTED.  OBVIOUSLY,

25   HE IS VERY CLOSE TO HER, HE IS CLOSE TO THE REST OF HIS

1  FAMILY.

2          THIS COMMUNITY HAS SUFFERED BECAUSE OF HIS

3  INCARCERATION.  IT IS NOT ONLY MR. MOALIN WHO IS PAYING THE

4  PRICE FOR THIS CASE, IT IS AN ENTIRE COMMUNITY.

5          AND, YOUR HONOR, I THINK, AS I HAVE BEEN PONDERING

6  THIS OVER THE LAST FEW DAYS AND WHAT I WOULD SAY, WHAT

7  OCCURRED TO ME IS WHAT REALLY SYMBOLIZES THE IMPACT THAT

8  MR. MOALIN HAS IS THE TRIP THAT MYSELF AND MR. GHAPPOUR TOOK

9  TO SOMALIA.

10         YOUR HONOR, THAT COUNTRY IS OUT OF THE REALM OF

11  UNDERSTANDING FOR YOUR AVERAGE AMERICAN.  CERTAINLY, EVEN

12  HAVING EDUCATED MYSELF ON THE HISTORY AND THE CONDITIONS AND

13  HAVING SOME SENSE OF WHAT TO EXPECT WHEN I ARRIVED THERE, IT

14  BLEW MY MIND.  IT IS NOT COMPARABLE TO THIS COUNTRY.  IT IS

15  NOT COMPARABLE TO ANY OTHER COUNTRY THAT I HAVE EVER BEEN TO,

16  INCLUDING MANY OTHER THIRD WORLD DEVELOPING NATIONS, POOR

17  NATIONS.  IT STANDS APART BECAUSE OF THE TURMOIL, THE STRIFE,

18  THE WARS THAT HAVE TAKEN SUCH A TOLL.  AND THE FAMINE, THE

19  DROUGHT.  PEOPLE ARE -- PEOPLE DON'T LIVE IN SOMALIA, PEOPLE

20  TRY TO SURVIVE.

21         AND MR. MOALIN KNOWS THAT BECAUSE HE GREW UP THERE.

22  HE WAS A VICTIM OF THE BEGINNING OF THE WAR.  HE WAS SHOT AND

23  LEFT FOR DEAD.  AND GOT TO THIS COUNTRY AS A REFUGEE, ASYLUM

24  SEEKER, AND EARNED HIS CITIZENSHIP AND MADE THE MOST OF THAT.

25         HE HAS BEEN DILIGENTLY EMPLOYED FOR HIS ENTIRE LIFE.

1    AND WORKING AS A TAXI DRIVER HAS MANAGED TO SET ASIDE ENOUGH

2    MONEY THAT HE COULD SUPPORT, FROM HIS WORK, HIS FAMILY IN

3    SOMALIA -- WHICH MR. MOALIN IS GOING TO SPEAK ABOUT HIS FAMILY

4    SO I AM NOT GOING TO GO INTO THAT.

5           BUT IN ADDITION TO THAT, STUDENTS, ORPHANS,

6    PEOPLE -- HE HAS PERSONALLY, FROM HIS OWN MONEY, SUPPORTED --

7    AT THE TIME OF HIS ARREST WAS SUPPORTING 45 STUDENTS.  AND

8    THERE ARE AT LEAST 100 LETTERS THAT WERE SUBMITTED OF PEOPLE

9    THAT HE HELPED GO TO SCHOOL TO OBTAIN THEIR EDUCATION, BECAUSE

10   THAT IS WHAT HE VALUES AND WHAT IS IMPORTANT TO HIM.

11          AND YOU HEARD FROM HALIMA IBRAHIM, WHO IS COMMONLY

12   KNOWN AS HALIMA ALI, HERE AT TRIAL.  SHE FLEW TO THE UNITED

13   STATES FROM SOMALIA IN ORDER TO GIVE HER SUPPORT TO MR. MOALIN

14   AND TO SAY:  I HAD A SCHOOL FOR GIRLS AND MR. MOALIN SUPPORTED

15   ME UNCONDITIONALLY AND FINANCIALLY.

16          SUPPORTING THE EDUCATION OF GIRLS IN SOMALIA IS

17   ANTITHETICAL TO THE BELIEFS, THE IDEOLOGY OF AL-SHABAAB, BUT

18   THAT IS WHO MR. MOALIN IS.  HE IS A PERSON THAT SUPPORTS

19   TOLERANCE, EDUCATION, FREEDOMS.  AND HE DEDICATED HIS LIFE TO

20   HELPING PEOPLE THAT COULDN'T HAVE THE GREAT OPPORTUNITY THAT

21   MR. MOALIN HAD TO COME TO THE UNITED STATES.  HE LIVED VERY

22   SIMPLY HERE IN THE UNITED STATES, SHARING A HOME WITH HIS

23   FAMILY MEMBERS, COUSINS, IN ORDER TO BE ABLE TO TAKE ANY

24   ADDITIONAL MONEY THAT HE HAD AND SUPPORT PEOPLE THAT COULDN'T

25   SURVIVE WITHOUT HIS HELP.  THAT IS THE MAN THAT IS BEFORE YOU,

1    YOUR HONOR.

2         NOW, WHEN WE WENT TO SOMALIA WE WENT TO THE AIRPORT

3    AND WE WENT TO A SECURE FACILITY NEXT TO IT BECAUSE THAT WAS

4    ALL THAT WAS DEEMED SAFE ENOUGH FOR US.  AND WHEN ANYONE THAT

5    WORKED IN THOSE FACILITIES WOULD LEAVE THEY LEFT IN AN ARMORED

6    TRUCK.  IT IS THE KIND OF SITUATION THAT MOGADISHU WAS AT THE

7    TIME WHEN WE WERE THERE.

8         AND, YOUR HONOR, JUST TO GET INTO THE AIRPORT FROM

9    OUTSIDE OF IT, OUT IN MOGADISHU PROPER, THERE ARE FIVE

10   CHECKPOINTS WITH ARMED GUARDS AND GATES.  YOU HAVE TO GO

11   THROUGH THAT JUST TO GET INTO THE AIRPORT.  TO GET TO

12   MOGADISHU FROM GALGUDUUD, FROM THESE CENTRAL REGIONS, YOU

13   CANNOT COME BY ROAD BECAUSE IT WASN'T SAFE ENOUGH.  THERE ARE

14   MINES, THERE ARE CHECKPOINTS RUN BY MILITIAS.  PEOPLE THAT

15   CAME TO SPEAK TO US HAD TO USE THEIR OWN MONEY AND GET ON A

16   FLIGHT WHICH ARE -- FOR LACK OF RESOURCES ARE INHERENTLY

17   UNSAFE.  THEY HAVE A TERRIBLE RECORD OF CRASHING BUT THEY ALSO

18   CAN BE SHOT DOWN.  AND PEOPLE -- MANY, MANY PEOPLE CAME TO

19   SPEAK TO US.  THE DEPOSITIONS THAT YOU SAW HERE WERE JUST A

20   SMALL PORTION OF THE PEOPLE THAT WANTED TO MEET WITH US, AND

21   THAT DID MEET WITH US, IN ORDER TO SAY:  MR. MOALIN HAS HELPED

22   US, LET US NOW HELP HIM.

23        YOUR HONOR, THE PEOPLE THAT CAME TO US WERE MEMBERS

24   OF AHLU SUNA WAA JAMAA, WHICH AS YOU HEARD AT TRIAL AND HAS

25   BEEN SUBMITTED TO YOU, AND MR. BRYDEN TESTIFIED TO, IS A GROUP

 1    THAT IS VERY WELL-KNOWN FOR THEIR OPPOSITION TO AL-SHABAAB.

 2              GOVERNORS FROM THOSE PROVINCES THAT ARE AHLU SUNA

 3    MEMBERS CAME TO SAY MR. MOALIN SUPPORTS US.

 4              ABUKAR MOHAMMED WAS THE MINISTER OF EDUCATION UNDER

 5    SHEIK SHARIF.  HE WAS A KEY MEMBER OF THE GOVERNMENT THAT IS

 6    DESPERATELY TRYING TO FORM SOME SORT OF STABILITY IN THAT

 7    COUNTRY.  HE CAME TO SAY:  MR. MOALIN SUPPORTED ME, HAS ALWAYS

 8    SUPPORTED ME.

 9              FARAH YARE WHO -- FARAH SHIDANE, ALSO, IS HIS FORMAL

10    NAME.  LEADER OF THE DROUGHT COMMISSION.  HE WAS HERE -- OR HE

11    CAME TO US TO TESTIFY ON BEHALF OF MR. MOALIN.

12              AND, YOUR HONOR, THESE PEOPLE THAT ARE MR. MOALIN'S

13    PEOPLE, THAT HE SUPPORTED AND THAT SUPPORT HIM, HAVE BEEN

14    WORKING DILIGENTLY IN THAT COUNTRY TO MAKE IT BETTER, TO THE

15    POINT WHERE SINCE THE TIME OF TRIAL, FARAH YARE HAS BEEN

16    KILLED.  HE WAS IN THE STREET IN MOGADISHU AND HE WAS GUNNED

17    DOWN BY AL-SHABAAB.  BECAUSE OF THAT INCIDENT AND AL-SHABAAB

18    FORCING THEIR WAY BACK INTO MOGADISHU, ABUKAR MOHAMMED IS NO

19    LONGER WORKING WITH THE GOVERNMENT, HE HAS HAD TO FLEE TO

20    HOLLAND.

21              THESE ARE ONGOING PROBLEMS, AND THE PEOPLE THAT MR.

22    MOALIN SUPPORTED ARE THE PEOPLE THAT ARE DESPERATELY TRYING,

23    GIVING THEIR LIVES TO TRY TO MAKE SOMALIA A BETTER COUNTRY.

24              AND THE FACT THAT THEY WENT THROUGH SO MUCH TO COME

25    AND SUPPORT HIM SPEAKS MORE THAN ANYTHING THAT I CAN SAY OR

1   ANYTHING THAT ANYONE CAN SAY TO THE FACT OF WHO THIS MAN IS.

2           AND, YOUR HONOR, AGAIN, I AM NOT GOING TO GO ON FOR

3   MUCH LONGER.  I THINK THAT THE PAPERS ARE CLEAR.  THE SUPPORT

4   IS OBVIOUS.

5           BUT I WILL SAY, YOUR HONOR, THAT I MAY NOT HAVE THE

6   EXPERIENCE OF SOME OF MY COLLEAGUES OR THIS COURT, BUT IN THE

7   LAST 10 YEARS OF PRACTICING I HAVE PROBABLY STOOD UP NEXT TO

8   AT LEAST 1,000 PEOPLE AND SAID SOMETHING AT SENTENCING, SAID

9   SOMETHING ON THEIR BEHALF.  BUT I HAVE NEVER BEEN MORE PROUD

10  TO SAY THAT I AM SPEAKING ON BEHALF OF SOMEONE.  I AM SO PROUD

11  AND SO HONORED TO HAVE HAD THE OPPORTUNITY TO SPEAK ON BEHALF

12  OF BASAALY MOALIN.  HE IS A REMARKABLE HUMAN BEING.

13          AND I DO ASK THAT YOUR HONOR CONSIDER NOT JUST HIS

14  CONVICTION, BUT THIS MAN, WHO THIS MAN IS, WHAT HE HAS DONE

15  FOR COUNTLESS PEOPLE.  HE HAS LITERALLY BEEN RESPONSIBLE FOR

16  THE SURVIVAL OF NUMEROUS MANY, MANY PEOPLE IN SOMALIA, AND HE

17  MEANS THE WORLD TO THIS COMMUNITY.  AND I ASK YOU TO CONSIDER

18  THAT, YOUR HONOR.

19          **THE COURT:**  THANK YOU, MS. FONTIER.

20          MR. MOALIN, YOU DO HAVE AN OPPORTUNITY TO MAKE ANY

21  STATEMENT YOU WISH TO MAKE AT THIS TIME.

22          **MS. FONTIER:**  DO YOU WANT HIM AT THE PODIUM?

23          **THE COURT:**  HE CAN SIT RIGHT THERE.  JUST PULL A

24  MICROPHONE UP.

25          MAKE YOURSELF COMFORTABLE, MR. MOALIN.  YOU CAN

1  STAND OR YOU CAN BE SEATED, EITHER WAY.  PLEASE BE SEATED IF

2  IT IS MORE COMFORTABLE FOR YOU.

3          **DEFENDANT MOALIN:**  THANK YOU, YOUR HONOR.

4          FIRST, BEFORE I SAY ANYTHING, I WOULD LIKE TO SAY

5  THANKS BY GOD WHO GIVES TO ME THIS OPPORTUNITY TO TALK TO YOU.

6          THE SECOND I WOULD LIKE TO THANK YOU, YOUR HONOR, TO

7  BE MY JUDGE.  AND I WOULD THANKS ALSO MY LAWYERS, DATEL AND

8  ALICE FONTIER, TO WORK VERY HARD, TRIED TO SEE THE FACTS.

9  THEY WENT BACK TO SOMALIA, WHERE SHE DESCRIBED RIGHT NOW IT IS

10 NOT SAFE, TO SEE.  ALSO I WOULD LIKE TO SAY THANKS FOR MY

11 COMMUNITY, SOMALIA COMMUNITY, FOR SUPPORTING ME AND STAND FOR

12 ME.  THEY KNOW WHO I AM.  I WANT TO SAY MY FAMILY, MY MOM AND

13 MY BROTHER AND SISTER, WHO IS HERE EVERY DAY.

14         FOR THAT I WOULD LIKE TO TALK ABOUT MY BACKGROUND,

15 MY FAMILY.  I HAVE FIVE KID.  I AM 36 YEARS OLD.  AND MY

16 FIVE -- AND I HAVE MY FIVE KID.  MY WIFE, SINCE I HAVE BEEN

17 ARRESTED, SHE GET SICK.  AND SHE GET A VERY DANGEROUS DISEASE,

18 WHICH IS CALLED BREAST CANCER.  I COULDN'T SUPPORT HER BECAUSE

19 I WAS ARRESTED.  MY FAMILY TRIED TO SUPPORT HER BECAUSE

20 SOMALIA, THEY DON'T HAVE ANY TECHNOLOGY TO DIAGNOSE HER AND

21 FOUND OUT WHAT KIND OF DISEASE SHE HAVE.  THEY SEND HER TO

22 MALAYSIA, AND SHE DIAGNOSED THERE AND SHE GET THERAPY AND SHE

23 GET -- SHE BE THERE ABOUT ALMOST ONE YEAR.

24         I WAS WORRIED ABOUT A LOT MY KID, WHAT IS GOING TO

25 HAPPEN TO THEM BECAUSE I AM NOT THERE.

1          **THE COURT:**  MR. MOALIN, I READ YOUR WIFE'S LETTER.

2          **DEFENDANT MOALIN:**  THANK YOU.

3          **THE COURT:**  SHE INDICATED THAT SHE WAS SUFFERING

4   FROM BREAST CANCER AT THIS TIME.  THERE WAS NO INDICATION,

5   HOWEVER, THAT SHE WAS RECEIVING TREATMENT.  YOU SAY SHE IS

6   RECEIVING TREATMENT?

7          **DEFENDANT MOALIN:**  YES.

8          **THE COURT:**  I ASSUME THE PROGNOSIS, THE FUTURE IS

9   BETTER FOR HER?

10         **DEFENDANT MOALIN:**  I HOPE SHE IS.  BUT I WORRY

11  ABOUT HER A LOT.  LIKE SHE SAID, YOU KNOW, BECAUSE WE NEVER

12  KNEW THAT DISEASE COMING BACK, AND I DON'T KNOW HOW LONG FREE.

13  I WORRY ABOUT A LOT ABOUT MY KID.

14         I WAS -- I WANT TO TELL YOU WHAT HAPPENED TO ME WHEN

15  I WAS -- LIKE ALICE AND DRATEL ALSO EXPLAIN TO YOU.

16         1992, WHEN CIVIL WAR BROKE OUT IN SOMALIA, THE

17  MILITIA ATTACK OUR HOUSE.  AND I GIVE SEVERAL BULLETS IN MY

18  STOMACH AND MY HAND, YOU CAN SEE.  MY FAMILY, THEY LEFT ME AS

19  DEAD.  LATER MY NEIGHBOR FOUNDED ME.  I WAS STILL ALIVE.  HE

20  TAKE ME TO THE HOSPITAL, I BEEN IN THREE MONTHS IN THE

21  HOSPITAL.  I REUNITE TO MY FAMILY -- REUNITE WITH MY FAMILY IN

22  REFUGEE CAMP IN KENYA.  I WAS LUCKY WHEN I WAS -- IMMIGRATION

23  GRANTED ME U.S. TO BE HERE.

24         **THE COURT:**  ON THAT ISSUE, JUST THE TIMING OF IT.

25  AS I READ THE LETTERS, READ THROUGH ALL OF THE MATERIALS --

1    AND I DID READ EVERYTHING THAT WAS SUBMITTED.

2              **DEFENDANT MOALIN:**  THANK YOU, YOUR HONOR.

3              **THE COURT:**  I THOUGHT YOUR FAMILY FLED, LEFT YOU

4    BEHIND BECAUSE THEY THOUGHT YOU WERE DEAD.  AND THEN AFTER

5    THAT SOME SOLDIERS OR TERRORISTS APPEARED, WHATEVER, ARMED

6    INDIVIDUALS, AND SHOT YOU TWO OR THREE TIMES.

7              **DEFENDANT MOALIN:**  EXACTLY.

8              **THE COURT:**  AND THEN LEFT.  YOU DIDN'T MENTION THAT

9    AS YOU WERE DESCRIBING THINGS, THAT YOU WERE SHOT.

10             **DEFENDANT MOALIN:**  EXCUSE ME, YOUR HONOR, BUT THIS

11   IS NOT MY FIRST LANGUAGE.  AND ALSO I AM KIND OF, LIKE, HAVING

12   A LOT OF PROBLEM, SO I WOULD LIKE TO PATIENT WITH ME A LITTLE

13   BIT AND TRY TO UNDERSTAND MY WORD.  AND I APPRECIATE YOU SEE

14   ALL THIS INFORMATION.  AND THANKS, YOUR HONOR.

15             AND COUPLE TIMES ALSO NOT ONLY THAT, I USED TO HAVE

16   HEART DISEASE, TOO.  I DON'T KNOW BASICALLY THE NAME BUT MY

17   DOCTOR TOLD ME A VALVE.  I USED TO HAVE BACK HOME IN SOMALIA.

18   ALWAYS WHEN I GET SICK THEY USED TO TAKE ME TO THE HOSPITAL,

19   THE FAMILY -- AND I WOULD LATER HAVE THAT TECHNOLOGY AND THEY

20   NEVER FOUND WHAT KIND OF PROBLEM I HAVE.

21             **THE COURT:**  YOU KNOW WHAT KIND OF PROBLEM YOU HAD,

22   YOU HAD SOME FORM OF ARRHYTHMIA, AND YOU HAD A PROCEDURE AND

23   THAT CORRECTED THE ARRHYTHMIA.

24             **DEFENDANT MOALIN:**  YES.  AND I GET OKAY, SENDING ME

25   HOME.  WHEN I GET TO UNITED STATES, 1996, AFTER SECOND --

```
 1    AFTER THREE WEEKS, COUPLE WEEKS, THE PAIN COMING BACK, AND I
 2    CALL 911.  AMBULANCE COME TO ME AND TOOK ME TO THE HOSPITAL.
 3    I WAS LUCKY.  THE DOCTOR TOLD ME WE KNOW THIS KIND OF PROBLEM,
 4    YOU ARE LUCKY YOU BE HERE BECAUSE BEFORE THEY OPEN THE PEOPLE,
 5    RIGHT NOW WE HAVE THE TECHNOLOGY, WE HAVE THE LASER TO USE AND
 6    YOU WOULD BE OKAY.  TAKE ME THREE MONTHS.  I GET SURGERY
 7    ALVARADO HOSPITAL AND MERCY HOSPITAL IN SAN DIEGO.  AFTER THAT
 8    I WAS OKAY.
 9              I WAS SO PROUD TO BE AMERICA, THAT IS WHY I LOVE
10    AMERICA.  I BEEN SUCCESSFUL.  I USED TO BE UNEMPLOYED WHEN I
11    WAS IN SOMALIA.  I GET A NICE JOB IN AMERICA.  NEVER THOUGHT
12    ANYTHING BAD OF AMERICA, I LOVE AMERICA.  AND I NEVER SAY
13    ANYTHING BAD AMERICA, AND I AM NOT GOING TO.
14              SO JUDGE, YOU HEARD MY LAWYER AND YOU HEAR ME, AND
15    YOU UNDERSTAND THE SITUATION.  AND ALSO WHEN I GET HEALTHY AND
16    GET MY WORK, I KNOW ALL THOSE KID WHAT THEY ARE GOING THROUGH,
17    AND I DON'T WANT TO HAPPEN TO THEM TO HAPPEN ME.  I TRIED TO
18    HELP THEM OUT, SENDING THEM TO SCHOOL, TRY HELPING ALL OF
19    THOSE KIDS TO GO TO STRAIGHT TO SCHOOL.
20              ALSO I SUPPORT EDUCATION.  THAT IS YOU ALREADY SEEN
21    ILYAS, WHICH HAS A BIG BRANCH TODAY.  I AM ONE OF THE PEOPLE
22    WHO FOUND THAT, STARTED THESE SCHOOL.  AND TODAY THEY HAVE A
23    DAILY ATTENDANCE TO SCHOOL IN SOMALIA.
24              YOUR HONOR, I AM SUPPORTED EDUCATION, I AGAINST
25    VIOLENCE.  I SUPPORT THE RELIGIOUS TOLERANCE.  I SUPPORT
```

1   EDUCATION OF GIRLS AND BOYS AND WOMAN.  I LIKE EVERYBODY TO BE

2   ABLE TO HAVE THE OPPORTUNITY LIKE I HAVE.  AND ALL THOSE

3   PEOPLE, THEY ARE STILL DEPENDING ME FINANCIALLY, THEY DEPEND

4   ON ME FINANCIALLY, AND I WOULD LIKE TO SUPPORT THEM, AND THEY

5   WAITING ME.  SO I ASK YOU, YOUR HONOR, TO CONSIDER WHAT YOU

6   SEE, AND WHAT YOU SEE FROM ME.

7           AND ALSO, JUDGE, I OPPOSE SHABAAB, WHAT HE DOING TO

8   MY PEOPLE.  THEY KILL A LOT OF PEOPLE, EDUCATED, FROM MY

9   PEOPLE, MY TRIBE AND DEPORTED TO SOMALIA PEOPLE.  AND I

10  DON'T -- I DO NOT BELIEVE HOW THEY ARE DOING AND I DON'T LIKE

11  WHAT THEY ARE DOING IN SOMALIA.  THEY ONLY BECAME MY FRIEND,

12  THE ONE YOU SEE ALREADY SPEAK TO HERE, AND THEY ALREADY PUT ME

13  TO KILL ME WHEN I ORGANIZE THEM TO AGAINST AL-SHABAAB THEY PUT

14  MY HEAD TO KILL ME.  WHEN I LET THEM TO STAY MY HOUSE AS THE

15  SUVY [PH.], I LET THEM TO STAY, THEY ARE AGAINST THEM.  ALL

16  THAT I NEEDED TO CONSIDER, JUDGE.

17          I WOULD LIKE TO SAY A LOT OF THING ABOUT ME, BUT I

18  AM KIND OF LIKE A LITTLE BIT NERVOUS.  SO THANK YOU VERY MUCH,

19  YOUR HONOR, TO LISTEN TO ME AND GIVE ME THIS OPPORTUNITY TO

20  LISTEN TO ME.  THANK YOU VERY MUCH, YOUR HONOR.

21          **THE COURT:**  THANK YOU, MR. MOALIN.

22          MR. COLE.

23          **MR. COLE:**  THANK YOU, YOUR HONOR.

24          THIS IS AN UNUSUAL SENTENCING HEARING.  I DON'T MEAN

25  UNUSUAL IN WHAT HAS OCCURRED, BUT COUNSELS' AND DEFENSE

1    COMMENTS HAVE BEEN WELL RECEIVED, OF COURSE, BUT JUST THE

2    NATURE OF THE OFFENSE.  A LOT OF CASES ARE SENTENCED IN THIS

3    COURTHOUSE, AND THIS IS AN OUTLIER FOR SURE, FOR ME AT LEAST,

4    IN TERMS OF A SENTENCING HEARING.  I THINK I ONLY WANT TO

5    EMPHASIZE A FEW POINTS, YOUR HONOR IS SO FAMILIAR WITH THE

6    CASE, THE TRIAL AND THE SENTENCING PAPERS.

7              I THINK THE FIRST POINT I WANT TO EMPHASIZE, YOUR

8    HONOR, IS THAT MR. MOALIN'S OFFENSE WAS, IN THE UNITED STATES'

9    MIND, PARTICULARLY WILLFUL.  AND WHAT I MEAN BY THAT IS, YOUR

10   HONOR MIGHT RECALL THAT IN MARCH OF 2008, WHEN THE UNITED

11   STATES PUBLICLY ANNOUNCED THE DESIGNATION OF AL-SHABAAB AS A

12   FOREIGN TERRORIST ORGANIZATION, MR. MOALIN KNEW ABOUT IT

13   IMMEDIATELY.  WE PLAYED AT TRIAL PHONE CALLS ABOUT THAT.  HE

14   KNEW RIGHT AWAY THAT AL-SHABAAB HAD BEEN DESIGNATED.  I AM

15   SURE HE KNEW ABOUT IT LONG BEFORE YOU OR I SAW THE

16   SIGNIFICANCE OF THAT NEWS OR EVEN HEARD THE NEWS.

17             HE LISTENED TO MUKHTAR ROBOW STATE THAT WE ARE HAPPY

18   TO HEAR THAT THE AMERICANS ADDED US TO THE LIST OF THE

19   NATIONAL TERRORIST ORGANIZATIONS.  DESPITE THAT TYPE OF CLEAR

20   DIRECT KNOWLEDGE, MR. MOALIN WILLFULLY DECIDED TO FUND

21   AL-SHABAAB, TO CONTINUE FUNDING THEM.

22             THEN IN MAY, ON MAY 1ST WHEN ADEN AYROW IS KILLED IN

23   THE U.S. MISSILE STRIKE, HE PAUSES BRIEFLY BECAUSE HE IS

24   WORRIED ABOUT SURVEILLANCE.  THAT IS HOW AWARE HE IS, THAT IS

25   HOW WILLFUL HIS CONDUCT IS.  MR. MOALIN IS WORRIED THAT HIS

1   OWN PHONE MAY BE MONITORED.  THERE WAS A LOT OF IRONY, OF

2   COURSE, AT THE TIME IN THAT.  SO HE PAUSES BRIEFLY, THINKING

3   THE CALLS ARE GOING TO BE ON WHAT HE SAYS IS ALERT DURING

4   THESE DAYS FOLLOWING THE STRIKE.  AND THEN WITHIN DAYS HE IS

5   OUT LOOKING FOR ABU ZUBEYR, GOING UP THE CHAIN IN AL-SHABAAB.

6   IT IS A VERY WILLFUL OFFENSE IN THAT CONTEXT.

7          AND THIS WAS ALL UNDERTAKEN BY SOMEONE WHO AT THE

8   TIME WHO WAS A UNITED STATES CITIZEN, HAD BEEN FOR QUITE SOME

9   TIME.

10          NOW, THERE WERE A LOT OF -- IT IS TRUE THAT POLITICS

11  MAKE VERY STRANGE BEDFELLOWS, AND PROBABLY SOME OF THE

12  STRANGEST BEDFELLOWS IN SOMALIA BECAUSE THE POLITICS ARE SO

13  CONFUSED THERE AND SO SHIFTING CONSTANTLY.  AND IT COULD VERY

14  WELL BE THAT DOWN THE ROAD MR. MOALIN HIMSELF CAME TO REGRET

15  HIS SUPPORT OF AL-SHABAAB.  AND I DON'T MEAN JUST BECAUSE HE

16  WAS CHARGED WITH IT, I MEAN HE COULD HAVE COME TO REGRET IT ON

17  HIS OWN LATER AS GROUNDS IN SOMALIA SHIFTED AGAIN.

18          BUT THAT REALLY ISN'T THE POINT.  THE POINT ISN'T

19  WHAT HE THOUGHT ABOUT AL-SHABAAB LATER, IT IS WHAT HE THOUGHT

20  WHEN HE KNEW THAT THE UNITED STATES HAD DESIGNATED AL-SHABAAB

21  AS A FOREIGN TERRORIST ORGANIZATION.  AND HE WILLFULLY DECIDED

22  TO MAKE THE CHOICE, EVEN AT THE RISK OF SURVEILLANCE, TO FUND

23  THE ORGANIZATION.

24          AND THE CONSEQUENCES, OF COURSE, HAVE BEEN TRAGIC.

25  I DON'T MEAN JUST HIS SUPPORT OF AL-SHABAAB, BUT IN GENERAL

1    AL-SHABAAB -- THE U.S. GOT IT RIGHT.  CAN'T ALWAYS SAY THAT

2    ABOUT U.S. FOREIGN POLICY, BUT THE POINT IS IS THAT WHEN THE

3    U.S. SETS A POLICY AND THE STATE DEPARTMENT MAKES A

4    DESIGNATION, WE AS U.S. CITIZENS DON'T DECIDE TO DISAGREE.

5            AND THEY GOT IT RIGHT.  THE SAME ABU ZUBEYR WHO HE

6    WAS LOOKING TO MAKE CONTACT WITH IS NOW -- JUST A MONTH OR SO

7    AGO THE NAVY SEALS WERE -- PEOPLE THOUGHT IT MUST BE HIM THAT

8    THE NAVY SEALS WERE AFTER WHEN THEY MADE AN INCURSION IN

9    SOMALIA.  IN THE NEWS, IT WAS A BIG DEAL.

10           I THINK THAT DISTINGUISHES HIM FROM NIMA YUSUF.

11   NIMA YUSUF WAS A YOUNG WOMEN, YOUR HONOR, WHO PROVIDED LESS

12   THAN $2,000 TO A GROUP OF YOUNG MEN.  THESE YOUNG MEN WERE NOT

13   ADEN AYROW.  SHE WASN'T TRYING TO REACH ABU ZUBEYR TO FUND

14   HIM.  SHE WAS PROVIDING FUNDS TO A GROUP OF YOUNG

15   SOMALI-AMERICAN MEN WHO SHE, IN SOME CASES, MAY HAVE HAD A

16   CRUSH ON, IN OTHER CASES HAD PREEXISTING RELATIONSHIPS WITH.

17   AND HAD LEFT THE UNITED STATES TO GO FIGHT FOR AL-SHABAAB IN

18   SOMALIA.

19           HER OFFENSE WAS SERIOUS, BUT I WOULD SUBMIT THAT IT

20   IS DISTINGUISHABLE FROM MR. MOALIN'S.  MR. MOALIN IS A PERSON

21   OF CERTAIN PRIVILEGE.  HE HAD BEEN LIVING IN THE UNITED STATES

22   SINCE 1996.  HE OWNED A HOME IN MOGADISHU.  HE HAD THE

23   RESOURCES TO BUILD ANOTHER LARGE COMPOUND IN GURIEEL.  HE HAD

24   ACCESS TO LEADERS OF AL-SHABAAB.

25           HE WASN'T -- WE ARE NOT TALKING ABOUT 18 OR

1    19-YEAR-OLD YOUNG MEN WHO WERE GOING TO GO, UNFORTUNATELY,

2    LOSE THEIR LIVES, LIKELY, IN SOMALIA.  HE WAS REACHING OUT FOR

3    THE LEADERSHIP AND HE HAD AN ABILITY, WITHIN HIS COMMUNITY, AS

4    INDICATED PERHAPS BY THE LETTERS THEMSELVES, HE HAD GREAT

5    INFLUENCE IN HIS OWN COMMUNITY.  HE COULD INFLUENCE MANY.  SO

6    I THINK HE IS DISTINGUISHABLE FROM NIMA YUSUF.

7              I THINK HE IS DISTINGUISHABLE FROM MOHAMED YUSUF AS

8    WELL IN A COUPLE OF PARTICULARS.

9              YOU KNOW, WHEN YOU LOOK AT SIMILARLY-SITUATED

10   DEFENDANTS AS PART OF THE 3553(A) FACTORS OFTEN YOU -- IT IS

11   HARD BECAUSE YOU HAVE A ONE-DEFENDANT CASE AND YOU HAVE TO TRY

12   TO LOOK ACROSS THE DISTRICT OR THE COUNTRY FOR SOME CASE THAT

13   IS SOMEWHAT SIMILAR.  HERE MOHAMED YUSUF WAS ESSENTIALLY A

14   CO-CONSPIRATOR, HE JUST HAPPENED TO BE PROSECUTED IN ST.

15   LOUIS.  HE WAS ON THE PHONE.  THE JURY AND YOUR HONOR HEARD

16   MANY PHONE CALLS WITH SHEIKH HASSAN.

17             AND HE -- WHEN HE WAS APPREHENDED IN ST. LOUIS

18   AROUND THE SAME TIME AS THESE DEFENDANTS, HE PLED GUILTY AND

19   WAS SENTENCED TO 140 MONTHS IN CUSTODY.  SO HE NOT ONLY

20   ACCEPTED RESPONSIBILITY, WHICH DISTINGUISHES HIM FROM

21   MR. MOALIN, BUT HE WAS CONVICTED, ULTIMATELY, OF PROVIDING

22   ABOUT $5,000.  AND MR. MOALIN NOT ONLY ORGANIZED AND PROVIDED

23   MORE MONEY, BUT HE ALSO PROVIDED THE HOME IN MOGADISHU TO

24   AL-SHABAAB.

25             AND AS I MENTIONED IN THE SENTENCING MEMORANDA, THE

1    HOME WHERE THERE IS A GUN BATTLE LATER AND PEOPLE ARE ACTUALLY

2    SHOT AS THERE IS A BATTLE BETWEEN AL-SHABAAB MEMBERS AND OTHER

3    FORCES TRYING TO RID THEM FROM THAT PART OF THE NEIGHBORHOOD.

4            AND I THINK THAT -- I CERTAINLY MR. DRATEL FROM THE

5    STANDPOINT THAT PEOPLE SHOULD NOT BE PUNISHED FOR WANTING TO

6    GO TO TRIAL, PER SE.  AND THAT'S NOT THE INTENT OF ANY COMMENT

7    I AM MAKING.  BUT THE TRIAL HAS HAPPENED, THERE IS STILL NO

8    ACCEPTANCE OF RESPONSIBILITY, SO THE ISSUE REALLY IS

9    ACCEPTANCE OF RESPONSIBILITY.

10           AND I WOULD SUBMIT THAT WHEN YOU HAVE SOMEBODY WHO

11   IS SO WELL-KNOWN IN THE COMMUNITY, SOMEBODY WHO IS -- HAS HAD

12   INFLUENCE, THAT IT IS PARTICULARLY UNFORTUNATE THAT HE HASN'T

13   ACCEPTED RESPONSIBILITY.  BECAUSE NOT ONLY DOES IT

14   UNDERMINE -- NOT ONLY HIS FAILURE TO DO SO SHOW A LACK OF

15   REMORSE AND CALL INTO QUESTION, UNFORTUNATELY, HIS FUTURE

16   CONDUCT, BUT IT ALSO, I THINK, UNDERMINES TRUST IN OUR

17   JUDICIAL SYSTEM.

18           IT IS NOT HIS RESPONSIBLY TO BUILD TRUST IN OUR

19   JUDICIAL SYSTEM, I UNDERSTAND.  HE IS AN INDIVIDUAL AND CAN

20   ASSERT HIS RIGHTS TO THE FULLEST.  BUT TO GO THROUGH THE

21   TRIAL, THE EXTENT OF THE EVIDENCE, AND TO NOT ACCEPT

22   RESPONSIBILITY I THINK DISTINGUISHES HIM FROM MOHAMED YUSUF.

23           SO UNLESS THE GOVERNMENT HAS ANY -- EXCUSE ME -- THE

24   COURT HAS ANY QUESTIONS, THE UNITED STATES SUBMITS ON ITS

25   PAPERS.  THIS IS A SERIOUS OFFENSE INVOLVING TERRORISM,

1   INVOLVING SUPPORT OF A FOREIGN TERRORIST ORGANIZATION THAT HAS

2   GONE ON TO BECOME WORSE AND WORSE AND MORE HEINOUS.  HAD ALL

3   PARTIES WORKED WITH THE UNITED STATES GOVERNMENT AT THE OUTSET

4   TO CUT OFF, DEFUND AND DESTROY AL-SHABAAB, A LOT OF SUFFERING

5   WOULD HAVE BEEN AVOIDED.

6              SO, YOUR HONOR, THE GOVERNMENT SUBMITS.

7              **THE COURT:**  THANK YOU.

8              **MR. DRATEL:**  YOUR HONOR, IF I MIGHT JUST BRIEFLY.

9              **THE COURT:**  OKAY.

10             **MR. DRATEL:**  I DON'T THINK THAT THERE IS REALLY A

11   DISTINGUISH BETWEEN A TRIAL RIGHT AND AN APPELLATE RIGHT.

12   MR. MOALIN HAS THE RIGHT TO ASSERT HIS APPELLATE RIGHTS, AND

13   THAT TO SUGGEST THAT BECAUSE OF A GUILTY VERDICT HE NOW HAS TO

14   DO MORE THAN ACKNOWLEDGE, IN THE CONTEXT OF SENTENCING, AND

15   GET SENTENCED HIGHER AS A RESULT I THINK WOULD BE WRONG.

16             **THE COURT:**  I DON'T THINK THAT IS WHAT MR. COLE IS

17   SAYING, MR. DRATEL.  AND I ANTICIPATED THAT YOU WOULD PROBABLY

18   WANT TO RISE AND MAKE THIS COMMENT.

19             BUT MR. COLE IS MERELY SAYING THAT WHERE THERE IS A

20   CASE WHERE ACCEPTANCE OF RESPONSIBILITY EXISTS, THEN THAT IS

21   SOMETHING THAT EVEN THE GUIDELINES PROVIDE FOR, AS YOU WELL

22   KNOW.

23             IF YOU WERE REPRESENTING TWO PEOPLE, ONE OF WHOM

24   WENT TO TRIAL AND WAS FOUND GUILTY AND THE OTHER OF WHOM PLED

25   GUILTY, YOU WOULD BE ON YOUR FEET ARGUING FOR A MITIGATED

1   SENTENCE; NOT BECAUSE THE OTHER INDIVIDUAL IS BEING PUNISHED

2   FOR GOING TO TRIAL BUT BECAUSE THE SECOND INDIVIDUAL HAS

3   ACCEPTED RESPONSIBILITY.

4           AND THIS IS SOMETHING THE GUIDELINES TAKE INTO

5   ACCOUNT, AS YOU WELL KNOW, UNDER CHAPTER THREE, AND COURTS

6   TRADITIONALLY TAKE INTO ACCOUNT.  I DON'T THINK JUDGES

7   PENALIZE PEOPLE FOR EXERCISING THEIR CONSTITUTIONAL RIGHT TO

8   GO TO TRIAL.

9           **MR. DRATEL:**  I UNDERSTAND, YOUR HONOR.  BUT PUT IT

10  INTO A FULLER CONTEXT, WHICH IS -- AND ANOTHER THING THE

11  GOVERNMENT TALKED ABOUT IN TERMS OF COMPARING IT TO MR. YUSUF

12  WAS THE AMOUNT OF MONEY.  I DON'T THINK THERE IS A MATERIAL

13  DIFFERENCE BETWEEN 5,000 AND 8,000 AND EVEN 15,000.  THAT IS

14  NOT A MATERIAL DIFFERENCE.  I DON'T THINK THAT IS A

15  DISTINCTION THAT WOULD REQUIRE A GREATER SENTENCE FOR

16  MR. MOALIN.

17          ALSO WE HAVE NO EVIDENCE, ZERO EVIDENCE -- AND FROM

18  WHAT I KNOW ABOUT THE CASE AND MR. YUSUF THERE IS NO

19  COMPARISON IN TERMS OF THE BALANCE OF THEIR WORK FOR THE

20  COMMUNITY IN SOMALIA AND HERE.  THERE IS NO COMPARISON TO THE

21  WORK THAT MR. MOALIN HAS DONE -- WHICH, I THINK, IN THE

22  BALANCING OF ALL OF THE COMPONENTS OF SENTENCING, VASTLY

23  OUTWEIGHS THE DISCOUNT, FOR WANT OF A BETTER TERM, FOR

24  ACCEPTANCE.  I THINK ALL OF THAT IS A HUGE FACTOR.

25          AND, YOU KNOW, I KNOW WHAT THE VERDICT MEANS.  THE

1  VERDICT MEANS THAT THIS WAS A BAD AND ILLEGAL DECISION BY

2  MR. MOALIN TO PUT THAT MONEY IN THAT DIRECTION.

3  NOTWITHSTANDING ALL OF THE OTHER MONEY THAT WENT IN THE RIGHT

4  DIRECTION, VASTLY OUT DISTANCING THIS 5 OR 8 OR 15,000,

5  WHATEVER IT IS.

6         HISTORY MAY JUDGE -- MAY HAVE ALREADY JUDGED THAT

7  THE UNITED STATES BACKED THE WRONG HORSE IN AFGHANISTAN,

8  BACKED THE WRONG HORSE IN EGYPT.  MAYBE IN SYRIA, HISTORY WILL

9  JUDGE THAT.  THESE ARE HARD DECISIONS AND PEOPLE -- HE IS

10 PAYING THE PRICE FOR THAT DECISION ON HIS PART.  HE IS GOING

11 TO CONTINUE TO PAY IT FOR HOWEVER LONG THE COURT SEES FIT TO

12 DO IT.

13         I JUST ASK THAT THE COURT RECOGNIZE THAT THIS

14 SIX-MONTH WINDOW OF CONDUCT WE ARE TALKING -- AND WE KNOW THAT

15 IS ALL IT IS BECAUSE HE IS OVERHEARD AFTERWARDS AND HE IS

16 INVESTIGATED BEFORE.  WE KNOW IT IS A SIX-MONTH WINDOW,

17 BALANCED AGAINST THE REST OF HIS LIFE FOR GOOD.

18         THAT IS ALL HE ASKS THE COURT TO RECOGNIZE IN

19 SENTENCING, IN DETERMINING WHAT IS SUFFICIENT BUT NOT GREATER

20 THAN NECESSARY.

21         THANK YOU.

22         **THE COURT:**  THANK YOU AGAIN, MR. DRATEL.

23         LET ME START OUT BY SAYING THAT WE HAVE FIVE COUNTS

24 OF CONVICTION FOR MR. MOALIN:  THE FIRST BEING CONSPIRACY TO

25 PROVIDE MATERIAL SUPPORT TO TERRORISTS; THE SECOND BEING

1    CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO A FOREIGN TERRORIST

2    ORGANIZATION, THAT BEING AL-SHABAAB; THE THIRD BEING

3    CONSPIRACY TO LAUNDER MONETARY INSTRUMENTS, MONEY LAUNDERING;

4    THE FOURTH BEING PROVIDING MATERIAL SUPPORT TO TERRORISTS,

5    THAT BEING THE COUNT RELATED TO MR. MOALIN OFFERING AND

6    PROVIDING HIS HOME IN SOMALIA TO AL-SHABAAB; AND THE FIFTH

7    COUNT BEING PROVIDING MATERIAL SUPPORT TO A FOREIGN TERRORIST

8    ORGANIZATION.

9            I HAVE READ EVERYTHING THAT HAS BEEN SUBMITTED TO

10   ME.  I HAVE READ AND CONSIDERED THE PROBATION REPORT,

11   MR. MOALIN'S OBJECTIONS TO THE PROBATION REPORT, THE ADDENDUM

12   TO THE PROBATION REPORT.  I CONSIDERED THE SENTENCING

13   MEMORANDA FILED ON BEHALF OF MR. MOALIN, THE EXHIBITS AND THE

14   VOLUMES OF LETTERS.  I HAVE CONSIDERED THE SENTENCING CHARTS.

15   THE GOVERNMENT'S SENTENCING MEMORANDUM, OBVIOUSLY.  THE NATURE

16   AND CIRCUMSTANCES OF THE OFFENSES, AND HISTORY AND

17   CHARACTERISTICS OF MR. MOALIN, AS WELL AS THE ADVISORY

18   GUIDELINES AND THE STATUTORY PURPOSES OF SENTENCING.

19            I THINK, PERHAPS, I NEED TO START WITH SOME OF THE

20   OBJECTIONS TO THE PROBATION REPORT.  I SHOULD BE RESPONDING TO

21   THOSE.

22            SO, COUNSEL, IF YOU WISH TO TURN TO THOSE YOU

23   CERTAINLY MAY.  I WILL GIVE YOU A MOMENT SO THAT YOU CAN

24   FOLLOW ALONG.

25            OBVIOUSLY, THE GOVERNMENT PROVIDED AN OBJECTION TO

NOVEMBER 18, 2013

1    THE GUIDELINES.  WHAT I AM GOING TO DO IS DEAL WITH ALL OF THE

2    GUIDELINES, THAT IS THE OBJECTIONS TO GUIDELINES, IN MY OWN

3    ALLOCUTION IN A BIT.  BUT WITH RESPECT TO THE FACTUAL

4    DISPUTES, THE FIRST I THINK IS MOOT.  THAT RELATES TO THE

5    SENTENCING DATE.  I THINK THAT -- WASN'T THAT THE FIRST

6    OBJECTION THAT WAS FILED?  YES, THE SENTENCING DATE.

7              THE SECOND IS A CLARIFICATION THAT IS NOTED.

8              THE THIRD RELATES TO PARAGRAPHS 3 THROUGH 54 IN

9    WHICH MR. MOALIN IS MAINTAINING INNOCENCE AND OBJECTING TO THE

10   OFFENSE CONDUCT SECTION GENERALLY.

11             I WOULD OVERRULE THOSE OBJECTIONS WITH CERTAIN

12   EXCEPTIONS.  AND THE FOLLOWING PARAGRAPHS ARE SPECIFIC

13   OBJECTIONS WITHIN THAT PARAGRAPH 3-TO-54 PORTION OF THE

14   PROBATION REPORT.

15             THE FOURTH OBJECTION RELATING TO PARAGRAPH 6 I WOULD

16   OVERRULE.  I UNDERSTAND THAT'S DEFENDANT'S INTERPRETATION OF

17   OFFENSE CONDUCT.

18             THE FIFTH WOULD BE THE SAME RULING.

19             THE SIXTH WOULD BE THE SAME RULING, AS WELL.

20             THE SEVENTH WOULD BE SUSTAINED.  I THINK FARE YARE'S

21   STATUS HAS BEEN CLARIFIED.

22             THE EIGHTH IS -- THE EIGHTH PARAGRAPH OR THE EIGHTH

23   OBJECTION RELATING TO PARAGRAPH 52 WOULD BE OVERRULED.  I

24   UNDERSTAND THAT IS MR. MOALIN'S INTERPRETATION.

25             THE NINTH OBJECTION RELATING TO PARAGRAPH 95 WOULD

 1   BE SUSTAINED.  AND I THINK THAT SHOULD BE NOTED AND CLARIFIED

 2   CAREFULLY.  THE REASON FOR THE FAILURE TO APPEAR WAS BECAUSE

 3   MR. MOALIN WAS IN CUSTODY.

 4          THE 10TH OBJECTION RELATING TO PARAGRAPH 109 IS

 5   SUSTAINED.  AND THAT CLARIFICATION SHOULD BE NOTED, AS WELL AS

 6   THE 11TH OBJECTION THAT RELATES TO PAGE 22 WITH THE HEADING

 7   EMPLOYMENT RECORD.

 8          AND FINALLY, WITH RESPECT TO THE FACTUAL OBJECTIONS,

 9   NO. 12, I WOULD DENY THE REQUEST.  I DON'T THINK IT IS THE

10   APPROPRIATE FUNCTION OF THE COURT, THIS COURT, TO GET INVOLVED

11   IN THE GOVERNMENT'S SEIZURE OF PROPERTY IN SOMALIA.

12          AND I THINK THAT ENDS THE FACTUAL OBJECTIONS.

13          WITH RESPECT TO THE FACTUAL OBJECTIONS, I WANTED TO

14   STATE SOMETHING HERE AT THE OUTSET.

15          I THINK MR. COLE MENTIONED THAT THIS IS A VERY

16   UNUSUAL CASE.  WE DON'T SEE TOO MANY OF THESE, ACTUALLY,

17   ANYWHERE IN THE COUNTRY PROCEEDING TO THIS PARTICULAR POINT IN

18   THE PROCEEDINGS.

19          AS TO THE GUIDELINE DISPUTES, THEY WILL BE

20   ADDRESSED.  BUT AT THE OUTSET I OFFER, RESPECTFULLY, THE

21   OBSERVATION THAT BOTH PROBATION AND THE PARTIES ULTIMATELY

22   PROVIDED VERY LITTLE ASSISTANCE TO THE COURT REGARDING A

23   PROPER ADVISORY GUIDELINE ANALYSIS FROM A FUNDAMENTAL AND

24   STRUCTURAL PERSPECTIVE.

25          THE SUBMISSIONS, ONCE AGAIN RESPECTFULLY, IN MY

1  VIEW, THE SUBMISSIONS WERE FUNDAMENTALLY LACKING IN THIS AREA.

2  AND I WILL ATTEMPT TO ADDRESS THESE CONCERNS.

3  　　　　TO START WITH, THE ORIGINAL PROBATION REPORT SET

4  FORTH THREE SEPARATE GROUPINGS FOR THE COUNTS OF CONVICTION,

5  ENGAGED IN A MULTIPLE GROUP ANALYSIS AND CONCLUDED DEFENDANT'S

6  GUIDELINE RANGE FOR EACH COUNT WAS LIFE, LIFE IN CUSTODY FOR

7  EACH COUNT OF CONVICTION.

8  　　　　THE GOVERNMENT FILED AN OBJECTION TO THE ANALYSIS

9  ARGUING THAT COUNTS 1, 2 AND 5 SHOULD BE GROUPED TOGETHER AND

10  THAT THE ADVISORY GUIDELINE RANGE SHOULD BE 80 YEARS OR 960

11  MONTHS.

12  　　　　THE ONLY GUIDELINE SUBMISSION FROM THE DEFENSE WAS,

13  IN EFFECT, AN ARGUMENT THAT THE PLUS-12 ENHANCEMENT SHOULD NOT

14  APPLY UNDER 3A1.4.  AND I SHOULD SAY ENHANCEMENTS, PLURAL.

15  THAT WOULD BE THE 12-LEVEL UPWARD ADJUSTMENT AS WELL AS THE

16  INCREASE ON THE CRIMINAL HISTORY CATEGORY FROM I TO VI.  AND

17  THAT THE RESULTING TOTAL OFFENSE LEVEL OF 34 YIELDS A

18  GUIDELINE RANGE OF 151 TO 188 MONTHS WITHOUT THESE

19  ENHANCEMENTS.

20  　　　　THE PROBATION OFFICER THEN FILED AN ADDENDUM

21  ADOPTING THE GOVERNMENT'S ANALYSIS REGARDING GROUPING, AND

22  RECOMMENDED THAT ALL COUNTS BE STACKED FOR 80 YEARS CUSTODY.

23  THE GOVERNMENT HAS RECOMMENDED 26 YEARS.  AND THE DEFENSE

24  MAKES NO SPECIFIC RECOMMENDATION, OTHER THAN TO DEFER TO THE

25  ADVISORY GUIDELINE RANGE THAT IT MADE REFERENCE TO IN THE

1    OBJECTIONS.

2           I DON'T FAULT THE PARTIES FOR, IN A SENSE, ESCHEWING

3    A PROPER GUIDELINE ANALYSIS HERE, BUT IT IS THE COURT'S

4    FUNCTION TO DO THAT.  AND I KNOW THAT THIS BECOMES SOMEWHAT

5    OVERWROUGHT AND ANALYTICAL BUT, AS THE PARTIES KNOW,

6    PARTICULARLY IN THIS CIRCUIT, IT IS VERY, VERY IMPORTANT TO

7    ENGAGE IN A STRUCTURALLY CORRECT ADVISORY GUIDELINE ANALYSIS.

8           I THINK THE PARTIES BASICALLY WENT RIGHT TO THE

9    ANALYSIS UNDER 3553(E) WITHOUT REALLY CLEAVING TO THE

10   PROCEDURAL STRUCTURE OF WHAT IS REQUIRED IN THIS CIRCUIT, AND

11   I WOULD ASSUME ACROSS THE COUNTRY.

12          SO ULTIMATELY, TO BEGIN WITH -- AND I KNOW THAT SOME

13   OF THIS IS JUST ABSOLUTELY GOING TO BORE PEOPLE BEYOND BELIEF.

14          BUT TO BEGIN WITH, WITH ALL FIVE OF THESE COUNTS, IT

15   APPEARS TO ME THAT THEY SHOULD BE GROUPED UNDER 2X1.1, WHICH

16   RELATES TO CONSPIRACY.  AND SOME OF THE SUBSTANTIVE SECTIONS

17   THAT APPLY THAT HAVE BEEN REFERRED TO BY THE PARTIES, 2A1.5

18   AND 2S1.1, THAT IS THE MONEY LAUNDERING, BECAUSE THE OFFENSE

19   BEHAVIOR WAS ONGOING OR CONTINUOUS IN NATURE.

20          PUT ANOTHER WAY, THESE VARIOUS COUNTS OF CONVICTION

21   WERE RELATED FOR A COMMON PURPOSE; THAT IS, SUPPORTING

22   TERRORISM.  AND I DON'T UNDERSTAND WHY NEITHER PROBATION OR

23   THE GOVERNMENT NOR THE DEFENSE GROUPED THESE COUNTS AS THEY

24   SHOULD BE GROUPED.  AND NO ONE GROUPED COUNT 3, THE MONEY

25   LAUNDERING COUNT, WITH OTHER COUNTS.

1          I REALIZE THERE WAS AN ARGUMENT BY THE GOVERNMENT

2    THAT THESE COUNTS SHOULD BE GROUPED.  YOU BROKE THE GROUPS

3    DOWN INTO SMALLER GROUPS, OR A LESSER NUMBER OF GROUPS,

4    MR. COLE.

5          **MR. COLE:**  WE THOUGHT THEY ALL SHOULD BE GROUPED

6    EXCEPT MONEY LAUNDERING.  BUT THE MONEY LAUNDERING, WE

7    RECOGNIZE, WASN'T GOING TO HAVE AN IMPACT ON THE SENTENCING --

8    THE ULTIMATE GUIDELINE RANGE ANYWAY, FROM OUR PERSPECTIVE.

9          **THE COURT:**  IT STILL HAS TO BE DEALT WITH.

10          **MR. COLE:**  RIGHT.

11          **THE COURT:**  AS A MATTER OF FACT, THE MONEY

12    LAUNDERING COUNT HAS A GREATER STATUTORY MAXIMUM THAN THE

13    OTHERS.

14          **MR. COLE:**  WE JUST -- WHEN WE LOOKED AT THE

15    GUIDELINES -- YOUR HONOR, I APOLOGIZE IF OUR PAPERS WEREN'T

16    PROVIDING THE ASSISTANCE YOU WANTED.

17          WE THOUGHT THAT WE HAD LOOKED AT THE P.S.R., HAD

18    CORRECTED WHAT WE VIEWED THE VARIOUS MISTAKES.  WE THOUGHT --

19    IN FACT, ALL OF THE CORRECTIONS WE MADE WERE TO THE DEFENSE'S

20    BENEFIT, DRIVING DOWN.  AND WE THOUGHT THEY ALL SHOULD

21    GROUP -- I DON'T REMEMBER OFFHAND RIGHT NOW WHY THE ANALYSIS

22    WAS -- UNDER OUR GUIDELINES ANALYSIS WE FELT THAT THE MONEY

23    LAUNDERING DID NOT TECHNICALLY GROUP, WE FELT, WHEN WE LOOKED

24    AT THE GUIDELINES.  BUT WE COULD HAVE BEEN WRONG ABOUT THAT.

25    AND WE ALSO RECOGNIZE IT WASN'T GOING TO INCREASE.

NOVEMBER 18, 2013

```
 1            THE COURT:  AT LEAST I AM GLAD YOU ARE NOT PROVIDING
 2    ME WITH AUTHORITY THAT THE MONEY LAUNDERING COUNT SHOULD BE
 3    SEPARATELY GROUPED, BECAUSE THAT WAS MY THOUGHT GOING THROUGH
 4    ALL OF THIS.  NOT THAT IT SHOULD BE SEPARATELY GROUPED BUT
 5    THAT IT SHOULD BE GROUPED WITH THE OTHER COUNTS.
 6            MR. COLE:  THAT IS FINE.
 7            THE COURT:  AND NO ONE DID THAT.  SO OBVIOUSLY WE
 8    HAVE GOT VERY EXPERIENCED COUNSEL ON BOTH SIDES OF THE LEDGER
 9    HERE.  WE HAVE GOT PROBATION, AS WELL.  AND NO ONE DID THAT.
10            SO ONE BEGINS TO DOUBT ONESELF AS A SENTENCING JUDGE
11    WHEN, FIRST OF ALL, YOU REALIZE THAT THERE IS AN ABSOLUTE
12    MANDATE TO PERFORM A STRUCTURALLY SOUND GUIDELINE ANALYSIS.
13    AND SECONDLY, NO ONE, EVEN IN THE REGROUPING SUGGESTED BY THE
14    GOVERNMENT AND READILY ACCEPTED BY PROBATION, THERE WAS NO
15    INCLUSION OF THE MONEY LAUNDERING COUNT UNDER 2S1.1 IN THE
16    PRIMARY GROUP.
17            I WOULD ONLY ASK COUNSEL AND PROBATION TO TAKE A
18    LOOK AT APPLICATION NOTE 6 OF 2S1.1, WHICH READS AS FOLLOWS --
19    AND IT DEALS WITH GROUPING OF MULTIPLE COUNTS.  UNLESS I AM
20    REALLY MISSING SOMETHING, I THINK THAT THE MONEY LAUNDERING
21    COUNT IS SOMETHING THAT SHOULD BE INCLUDED.
22            IT READS AS FOLLOWS:  IN A CASE IN WHICH THE
23    DEFENDANT IS CONVICTED OF A COUNT OF LAUNDERING FUNDS AND A
24    COUNT FOR THE UNDERLYING OFFENSE FROM WHICH THE LAUNDERED
25    FUNDS WERE DERIVED, THE COUNTS SHALL BE GROUPED PURSUANT TO
```

1    SUBSECTION C OF 3D1.2, GROUPS OF CLOSELY-RELATED COUNTS.

2            SO THAT WAS MY READING OF WHAT SHOULD HAVE BEEN DONE

3    HERE.  AND SO, GETTING BACK TO THE POINT I WAS MAKING EARLIER,

4    I BELIEVE THAT ALL OF THESE -- ALL OF THESE GROUPS ARE

5    ULTIMATELY -- EXCUSE ME -- ALL OF THESE COUNTS SHOULD BE

6    GROUPED.

7            AND SO THE GUIDELINE ANALYSIS, THEN, THAT I AM GOING

8    TO ENTER INTO HERE IS FOR ALL OF THE COUNTS OF CONVICTION.

9    AND THE BASE OFFENSE LEVEL IS A 33.  THERE IS A 12-LEVEL

10   UPWARD ADJUSTMENT, IN MY VIEW, UNDER 3A1.4.

11           THE RELEVANT SECTIONS READ AS FOLLOWS:  IF THE

12   OFFENSE IS A FELONY THAT INVOLVED, OR WAS INTENDED TO PROMOTE,

13   A FEDERAL CRIME OF TERRORISM, INCREASE BY 12 LEVELS.

14           THAT'S THE RELEVANT PORTION OF 3A1.4 SUBDIVISION A.

15           AND THEN SUBDIVISION B READS:  IN EACH SUCH CASE,

16   THE DEFENDANT'S CRIMINAL HISTORY CATEGORY FROM CHAPTER FOUR

17   SHALL BE CATEGORY VI.

18           THAT IS EVEN IF IT WAS A CATEGORY I.  AND OBVIOUSLY

19   THESE ARE FAIRLY DRACONIAN ENHANCEMENTS, ESPECIALLY AT THE

20   HIGHER LEVELS OF THE SENTENCING TABLE.

21           SO I AGREE WITH PROBATION AND THE GOVERNMENT THAT

22   THESE ENHANCEMENTS APPLY.  BEYOND A REASONABLE DOUBT I WOULD

23   FIND THAT THESE OFFENSES WERE CALCULATED TO INFLUENCE OR

24   AFFECT GOVERNMENTAL ACTION BY INTIMIDATION OR COERCION.

25           AL-SHABAAB IS A BRUTAL TERRORIST ORGANIZATION, AND

1    EVERYONE AGREES THERE, ENGAGED IN BOMBINGS, INCLUDING THE

2    BOMBING OF THE PRESIDENTIAL PALACE, ASSASSINATIONS, AMBUSHES,

3    USING EXPLOSIVE DEVICES AND FIREARMS OF ALL KINDS IN A

4    CAMPAIGN TO TERRORIZE AND DETER AND ULTIMATELY DEFEAT THE

5    TRANSITIONAL FEDERAL GOVERNMENT IN SOMALIA, INCLUDING ITS

6    ASSOCIATED FORCES FROM ETHIOPIA AND AFRICAN UNION MEMBERS.

7            I WOULD ADOPT THE COMPREHENSIVE DETAILS OF THE

8    ATTACKS AS SET FORTH BY THE GOVERNMENT IN ITS SENTENCING

9    MEMORANDUM, PARTICULARLY AT PAGES 9 AND 10.

10           THE ARGUMENT THAT THE TRANSITIONAL FEDERAL

11   GOVERNMENT WAS NOT A FUNCTIONING GOVERNMENT AND THEREFORE THE

12   ENHANCEMENTS DON'T APPLY IS A BIT LIKE THE ADULT CHILD WHO

13   KILLS HIS PARENTS AND THEN ASKS FOR MERCY ON ACCOUNT OF HE IS

14   AN ORPHAN.  I THINK THAT -- I THINK THERE IS A PARODY OF

15   REASONING BETWEEN THAT OLD STORY AND WHAT HAPPENED HERE.

16           ULTIMATELY, THE TOTAL OFFENSE LEVEL, CONTINUING ON

17   WITH A GUIDELINE ANALYSIS, IS A 43, AND THE CRIMINAL HISTORY

18   CATEGORY IS A VI.

19           NOW, THE INITIAL GUIDELINE RANGE OF LIFE MUST YIELD

20   TO THE STATUTORY MAXIMUM FOR EACH COUNT OF CONVICTION PURSUANT

21   TO SECTION 5G1.1 OF THE ADVISORY GUIDELINES.  I DIDN'T SEE

22   5G1.1 REFERRED TO ANYWHERE IN THE SENTENCING MEMORANDA

23   SUBMITTED BY THE PARTIES OR IN THE PROBATION REPORT AND THE

24   ADDENDUM TO THE PROBATION REPORT.  BUT IN MY VIEW, AND ONCE

25   AGAIN RESPECTFULLY, IT IS AT THIS POINT OF THE GUIDELINE

1   ANALYSIS WHERE THE PARTIES AND PROBATION HAVE FALTERED.

2          AT THIS JUNCTURE I DO NEED TO DISCUSS THE INTERPLAY

3   BETWEEN GUIDELINE SECTION 5G1.1 AND 5G1.2, AND THE DEFINITION

4   OF THE TERM TOTAL PUNISHMENT AS USED IN 5G1.2 AND THE

5   DEFINITION OF THAT TERM IN THE APPLICATION NOTE.

6          NOW, ONCE AGAIN I APOLOGIZE FOR THE HIGHLY TECHNICAL

7   NATURE OF THIS, BUT THIS IS SOMETHING THE COURT IS MANDATED TO

8   DO.  PERHAPS THE PARTIES ARE NOT MANDATED, ALTHOUGH IT IS

9   ALWAYS HELPFUL.  IT WAS NOT DONE.  BUT THIS IS, IN MY VIEW, A

10  REQUIRED PART OF A SENTENCING ANALYSIS.

11          5G1.1, PARTICULARLY SUBDIVISION A, READS AS FOLLOWS:

12  WHERE THE STATUTORILY AUTHORIZED MAXIMUM SENTENCE IS LESS THAN

13  THE MINIMUM OF APPLICABLE GUIDELINE RANGE, THE STATUTORILY

14  AUTHORIZED MAXIMUM SENTENCE SHALL BE THE GUIDELINE SENTENCE.

15          IGNORED BY THE PARTIES AND PROBATION IS 5G1.1 --

16  RATHER THE PARTIES, I SHOULD SAY.  WELL, THE DEFENSE DIDN'T

17  REALLY GET INTO THIS PORTION OF THE ANALYSIS.  BUT THE

18  GOVERNMENT AND PROBATION MERELY STACKED, THAT IS APPLIED

19  CONSECUTIVELY, THE STATUTORY MAXIMUMS FOR THE COUNTS OF

20  CONVICTION, ASSUMING THAT IT WAS APPROPRIATE TO RUN ALL COUNTS

21  CONSECUTIVELY AND DESIGNATED THE TOTAL -- IN THIS CASE 80

22  YEARS -- AS THE COMBINED ADVISORY GUIDELINE RANGE.  AND I

23  THINK THIS IS WHERE I DISAGREE GREATLY WITH THE ANALYSIS.

24          IF WE LOOK TO 5G1.2 -- AND ONCE AGAIN PLEASE INDULGE

25  ME, LADIES AND GENTLEMEN -- PARTICULARLY D, BECAUSE THIS IS

1    WHERE THE TERM TOTAL PUNISHMENT IS REFERRED TO.  IT READS:

2    IF THE SENTENCE IMPOSED ON THE COUNT CARRYING THE HIGHEST

3    STATUTORY MAXIMUM IS LESS THAN THE TOTAL PUNISHMENT, THEN THE

4    SENTENCE IMPOSED ON ONE OR MORE OF THE OTHER COUNTS SHALL RUN

5    CONSECUTIVELY, BUT ONLY TO THE EXTENT NECESSARY TO PRODUCE A

6    COMBINED SENTENCE EQUAL TO THE TOTAL PUNISHMENT.  IN ALL OTHER

7    RESPECTS SENTENCE ON ALL COUNTS SHALL RUN CONCURRENTLY, EXCEPT

8    TO THE EXTENT OTHERWISE REQUIRED BY LAW.

9         I BELIEVE THAT PROBATION AND THE GOVERNMENT GOT

10   TRIPPED UP IN TRYING TO DEFINE THE TERM TOTAL PUNISHMENT FOR

11   PURPOSES OF THIS CASE.  A TOTAL PUNISHMENT, BASICALLY, IS

12   DEFINED IN THE COMMENTARY.  AND IF YOU LOOK AT APPLICATION

13   NOTE 1 TO 5G1.1 YOU WILL SEE THAT TOTAL PUNISHMENT ESSENTIALLY

14   IS DEFINED AS THAT WHICH IS DETERMINED BY THE COURT AFTER

15   DETERMINING THE COMBINED OFFENSE LEVEL AND THE CRIMINAL

16   HISTORY CATEGORY AND DETERMINING THE DEFENDANT'S ADVISORY

17   GUIDELINE RANGE.  IT IS TO BE DETERMINED AFTER THE GUIDELINE

18   ANALYSIS BUT OBVIOUSLY BEFORE SENTENCING, WHICH IS WHEN TOTAL

19   PUNISHMENT COMES INTO PLAY.

20        NO COMBINED GUIDELINE RANGE EQUALS 80 YEARS IN THIS

21   CASE, OR FOR THAT MATTER LIFE, FOR THESE COUNTS.  80 YEARS IS

22   JUST A MECHANICAL ADDING OF ALL STATUTORY MAXIMUMS

23   CONSECUTIVELY, WITHOUT DETERMINING WHAT THE ADJUSTED COMBINED

24   OFFENSE LEVEL IS FOR ALL OF THESE COUNTS.

25        ALL THIS MEANS, ESSENTIALLY, IS WHERE THERE ARE

1    MULTIPLE COUNTS, IF THE HIGHEST STATUTORY MAXIMUM IS GOING TO

2    BE LESS THAN TOTAL PUNISHMENT, THEN THE COURT IS TO RUN THE

3    OTHER COUNT OR COUNTS CONSECUTIVELY TO THE HIGHEST STATUTORY

4    MAXIMUM TO A POINT EQUAL TO THE TOTAL SENTENCE, AND THEN

5    CONCURRENT AFTER THAT.

6            LET ME GIVE YOU AN EXAMPLE THAT WE DEAL WITH SO

7    OFTEN IN THIS DISTRICT.

8            LET'S ASSUME THAT WE ARE DEALING WITH TRANSPORTATION

9    OF ILLEGAL ALIENS IN THIS HYPOTHETICAL, OR THIS EXAMPLE, AND

10   THE STATUTORY MAXIMUM FOR THAT IS FIVE YEARS OR 60 MONTHS.

11           WE ARE ALSO DEALING WITH AN OFFENSE OF CONVICTION

12   CONSISTING OF MAKING A FALSE STATEMENT TO A FEDERAL OFFICER.

13   LET'S SAY THE STATUTORY MAXIMUM FOR THAT IS FIVE YEARS.

14           FURTHER IN THIS HYPOTHETICAL CIRCUMSTANCE THE

15   GUIDELINE RANGE FOR THESE TWO OFFENSES, AND DRIVEN BY AN

16   ELEVATED CRIMINAL HISTORY CATEGORY, LET US SAY, IS 70 TO 87

17   MONTHS.

18           IN WHOLE THAT EXCEEDS THE FIVE-YEAR STATUTORY

19   MAXIMUM FOR EACH COUNT OF CONVICTION.  LET US SAY THE COURT

20   DETERMINES THAT A 70-MONTH CUSTODIAL SENTENCE WOULD BE THE

21   PROPER SENTENCE.  THEN WHAT THE COURT WOULD DO, WITH RESPECT

22   TO COUNT 1, WOULD BE TO IMPOSE THE 60 MONTHS, THE STATUTORY

23   MAXIMUM FOR COUNT 1.  AND THEN WITH RESPECT TO COUNT 2, 10

24   MONTHS CONSECUTIVE TO COUNT 1 FOR A TOTAL OF 70 MONTHS, AND

25   THEN THE REMAINDER OF THAT CONCURRENT.

1          SO THAT IS ALL THAT THESE SECTIONS STATE.  BUT IN

2     THAT SENSE -- THAT IS IN THE HYPOTHETICAL USED SPECIFICALLY IN

3     5G1.1 OR IN MY HYPOTHETICAL -- YOU ARE DEALING WITH A TOTAL

4     PUNISHMENT OF 70 MONTHS, AND WORKING WITH MULTIPLE COUNTS

5     WHERE YOU SIMPLY CAN'T JUSTIFIABLY AND MECHANICALLY STACK THE

6     STATUTORY MAXIMUMS TO ARRIVE AT AN ADVISORY GUIDELINE RANGE OR

7     TOTAL PUNISHMENT.  THEREFORE, BEFORE DEPARTURE REQUESTS OF

8     MR. MOALIN ARE CONSIDERED, THE APPROPRIATE ADVISORY GUIDELINE

9     RANGE WOULD BE THE STATUTORY MAXIMUMS FOR EACH OF THESE COUNTS

10    OF CONVICTION, SPECIFICALLY FOR COUNTS 1, 2, 4 AND 5 15 YEARS

11    EACH, AND FOR COUNT 3 IT WOULD BE 20 YEARS.

12         THE DEFENSE HAS REQUESTED TWO DEPARTURES, WITH A

13    FALSE ASSUMPTION THAT THE DEFENDANT'S ADJUSTED GUIDELINE RANGE

14    IS LIFE.  THAT WAS REFERRED TO IN THE SENTENCING MEMORANDUM IN

15    A COUPLE OF DIFFERENT PLACES.  BUT I WOULD REFER THE PARTIES,

16    AND OBVIOUSLY THE REVIEWING COURT, A CIRCUIT COURT, TO PAGE

17    DOUBLE I OF THE DEFENDANT'S SENTENCING MEMORANDUM AND ALSO

18    PAGE 8 OF THE SENTENCING MEMORANDUM.

19         A REFERENCE IS MADE TO REDUCING THE CRIMINAL HISTORY

20    CATEGORY FROM A VI TO A I.  A REFERENCE IS MADE, ALSO ANOTHER

21    DEPARTURE REQUEST, TO REDUCE THE RANGE DUE TO A COMBINATION OF

22    CIRCUMSTANCES, BASICALLY CHARITABLE AND COMMUNITY ENDEAVORS AS

23    WELL AS OTHER EQUITABLE CIRCUMSTANCES.

24         YOU KNOW, GIVEN THE EXTREME DISSONANCE BETWEEN THE

25    ADVISORY GUIDELINES BEFORE APPLICATION OF 5G1.1, BEFORE

APPLICATION OF 5G1.1 AND THE STATUTORY MAXIMUM CAPS, A PROPER

SENTENCING ANALYSIS, OF NECESSITY, MUST RELY, IN MY VIEW,

PRINCIPALLY ON A 3553(A) ANALYSIS.

      FOR EXAMPLE, GETTING BACK TO THE REQUESTED

DEPARTURES HERE.  EVEN IF THE COURT GRANTED DEFENDANT'S

REQUEST TO DEPART ON CRIMINAL HISTORY CATEGORY VI TO A I,

UNDER THE TABLE, ASSUMING A TOTAL OFFENSE LEVEL OF 43, THE

SENTENCING RANGE WOULD STILL CALL FOR LIFE AND THE STATUTORY

MAXIMUMS WOULD BE UNAFFECTED.

      PERHAPS I CAN SAY, IN THIS CASE, THAT NO OTHER CASE

I HAVE HAD EXPERIENCE WITH HAS BEEN LESS INFORMED BY A

GUIDELINE ANALYSIS THAN THIS ONE, EXCEPT INSOFAR AS THE

BEDROCK PRINCIPLE OR PRINCIPLES OF 5G1.1 ARE CONCERNED.  AND

SO REALLY THIS IS A CASE THAT HAS TO LOOK TO 3553(A),

PRINCIPALLY.

      I DON'T KNOW IF THE DEFENSE IS EVEN STILL REQUESTING

DEPARTURES ON CRIMINAL HISTORY AND A COMBINATION OF

CIRCUMSTANCES WITHIN THE CONTEXT OF A GUIDELINE ANALYSIS WHERE

5G1.1 COMES INTO PLAY, AND WHERE THE STATUTORY MAXIMUMS ARE

LEAGUES SHORT OF THE UNMITIGATED AND DRACONIAN ADVISORY

GUIDELINE RANGE OF LIFE BEFORE THE BREAKING POWER OF 5G1.1.

      BUT IF THESE DEPARTURE REQUESTS ARE BEING ADVANCED,

EVEN WITH THIS ANALYSIS AND THAT BREAKING POWER UNDER 5G1.1, I

WOULD DENY THE DEPARTURE REQUESTS IN THE DISCRETION OF THE

COURT.

1    AS I HAVE SAID, IT IS FAR MORE APPROPRIATE FOR ME TO

2    PROCEED UNDER 3553(A) FACTORS THAN COMPLETELY EVISCERATING THE

3    GUIDELINES, AND OBVIOUSLY 5G1.1 MITIGATES EVISCERATION IN THAT

4    SENSE.

5    **MR. COLE:** YOUR HONOR --

6    **THE COURT:** ULTIMATELY -- GO AHEAD, MR. COLE.

7    **MR. COLE:** JUST MORE FOR PURPOSES OF THE RECORD THAN

8    ANYTHING ELSE, I JUST WANT TO NOTE THAT THE UNITED STATES DOES

9    DISAGREE WITH THE COURT'S, I GUESS, APPLICATION AND

10   INTERPRETATION OF 5G1.1, 5G1.2.

11    WE DON'T THINK -- 5G1.1 ONLY APPLIES IN CASES OF A

12   SINGLE COUNT OF CONVICTION, WE BELIEVE. SO I DON'T THINK IT

13   IS NECESSARY TO BELABOR THE POINT, JUST WANT TO NOTE FOR THE

14   RECORD WE BELIEVE WE DID PROPERLY CALCULATE THE GUIDELINE

15   RANGES.

16    OBVIOUSLY, BASED ON OUR OWN PRESENTATION AT

17   SENTENCING AND OUR SENTENCING PAPERS, WE OURSELVES WERE NOT

18   VIEWING OUR RECOMMENDATION AS WEDDED TO THE GUIDELINES IN THIS

19   CASE BECAUSE, REASONS YOUR HONOR STATED, THIS MAY BE AN

20   UNUSUAL CASE FOR APPLICATION OF THE GUIDELINES. BUT WE DO

21   BELIEVE THAT OUR CALCULATION WAS CORRECT UNDER 5G1.2 AND

22   APPLICATION NOTE 1, AND THAT 5G1.1 ONLY APPLIES IN A CASE OF A

23   SINGLE COUNT OF CONVICTION.

24    WITH THAT WE WILL SUBMIT. I APOLOGIZE FOR

25   INTERRUPTING YOUR LINE OF THOUGHT THERE, YOUR HONOR.

1          **THE COURT:**   IF YOU TAKE A LOOK AT 5G, 5G1.1, 5G1.2,

2     THEY SPEAK TO MULTIPLE COUNTS OF CONVICTION.   THERE IS NO

3     QUESTION ABOUT THAT, IN MY VIEW.   HOWEVER, THE MOST IMPORTANT

4     SENTENCING DECISION I AM MAKING AT THIS TIME MUST CONSIST OF

5     WHETHER THE CUSTODIAL SENTENCES FOR THE VARIOUS COUNTS OF

6     CONVICTION WOULD BE IMPOSED CONCURRENTLY, CONSECUTIVELY, OR

7     PART CONCURRENT AND CONSECUTIVELY.

8          THAT IS A VERY, VERY IMPORTANT CONSIDERATION FOR

9     THIS CASE FOR ALL DEFENDANTS.   AND I CERTAINLY INTEND MY

10    REMARKS RELATED TO WHAT I VIEW TO BE A PROPER GUIDELINE

11    ANALYSIS TO THE OTHER TWO DEFENDANTS WHO WILL BE SENTENCED

12    THIS MORNING, BOTH OF WHOM ARE HERE.   COUNSEL ARE HERE,

13    OBVIOUSLY, LISTENING TO ALL OF THIS.   I WOULD HOPE THAT I

14    WOULDN'T HAVE TO REPEAT CHAPTER AND VERSE OF WHAT I SAID THUS

15    FAR ABOUT WHAT I BELIEVE TO BE A PROPER GUIDELINE ANALYSIS

16    HERE.

17         AGAIN, THE WRITTEN SUBMISSIONS OF THE PARTIES AND

18    PROBATION DON'T REALLY COME TO EXPRESS GRIPS WITH THE

19    IMPORTANT CONSIDERATIONS RELATING TO CONCURRENT VERSUS

20    CONSECUTIVELY.   THERE MIGHT BE AN IMPLIED ARGUMENT THERE

21    BECAUSE THE GOVERNMENT IS REQUESTING A FRACTION OF WHAT IT

22    BELIEVES TO BE THE ADVISORY GUIDELINE RANGE OF 80 YEARS.   THE

23    GOVERNMENT IS REQUESTING, OR RECOMMENDING, 26 YEARS, AND

24    OBVIOUSLY THE DEFENSE SOMETHING LIKE THIS.

25         BUT I DIGRESS A BIT BY EVEN MENTIONING 3553(A) HERE.

1   ONCE AGAIN, GETTING BACK TO THE GUIDELINE ANALYSIS AND

2   BUTTONING THAT UP, I WOULD DENY, IN THE COURT'S DISCRETION,

3   THE DEPARTURE REQUESTS MADE.  AND I WOULD FIND THAT THE

4   ADVISORY GUIDELINE RANGE WOULD BE AS FOLLOWS FOR EACH COUNT OF

5   CONVICTION, AS I STATED PREVIOUSLY:  15 YEARS FOR EACH OF THE

6   FOLLOWING COUNTS, 1, 2, 4 AND 5, AND 20 YEARS FOR COUNT 3.

7           WITH RESPECT TO THE 3553(A) ANALYSIS.  THE NATURE

8   AND CIRCUMSTANCES OF THE OFFENSES ARE VERY SERIOUS AS THEY

9   CONSISTED OF THE PROVIDING OF SUPPORT FOR AND THE BUTTRESSING

10  A CAMPAIGN OF TERROR BY AL-SHABAAB, CONSISTING OF TARGETED

11  BOMBINGS, ASSASSINATIONS, MURDER AND MAYHEM, ALL FOR THE

12  PURPOSE OF DISRUPTING AND DETERRING, DEFEATING THE LEGITIMATE

13  TRANSITIONAL FEDERAL GOVERNMENT FORCES AND EFFORTS TO BRING

14  ORDER TO SOMALIA AT THAT PARTICULAR POINT IN TIME.

15          MR. MOALIN'S ACTIONS WERE PARTICULARLY AGGRAVATED,

16  IN MY VIEW, BECAUSE HE NOT ONLY COMMITTED THESE OFFENSES, HE

17  MAINTAINED DIRECT AND CONTINUING CONTACT WITH ADEN AYROW, THE

18  INFAMOUS AND HIGH RANKING MEMBER, TERRORIST LEADER OF

19  AL-SHABAAB WHO WAS ULTIMATELY TAKEN OUT BY A U.S. CRUISE

20  MISSILE IN MID 2008.

21          I THINK MR. MOALIN'S PERSONAL INVOLVEMENT WITH

22  AL-SHABAAB WENT SO FAR AS CONSPIRING DIRECTLY WITH AYROW FOR

23  THE USE OF MR. MOALIN'S HOME IN MOGADISHU AS A HAVEN FOR

24  AL-SHABAAB FIGHTERS AND THE PLACE WHERE BOMBS AND OTHER

25  WEAPONS COULD BE HIDDEN.

1          MR. MOALIN PLOTTED AND PLANNED FOR FINANCIAL SUPPORT

2     OF AL-SHABAAB BY REACHING OUT TO OTHERS TO RAISE FUNDS FOR

3     AL-SHABAAB.  AND HE WAS CERTAINLY THE LINK FOR TRANSMISSION OF

4     FUNDS ULTIMATELY TO AL-SHABAAB THROUGH THE SHIDAAL EXPRESS.

5     IN SHORT, HE WAS AN OPERATIONS OFFICER.  HE WAS FUNCTIONING ON

6     SEVERAL DIFFERENT LEVELS AND WAS AL-SHABAAB'S CONTACT AND

7     ADVOCATE FOR THIS PARTICULAR AREA, THIS REGION HERE, FOR THE

8     ENTERPRISE OF FINANCIAL SUPPORT FOR SOMALIA TERRORISTS, AND

9     AL-SHABAAB IN PARTICULAR, DURING THE TIME CHARGED AND THE

10    COUNTS WITH WHICH HE HAS BEEN CONVICTED.  I THINK HIS OVERALL

11    ROLE WAS CLEARLY AGGRAVATED.

12          IT IS IN THE AREA OF HISTORY AND CHARACTERISTICS,

13    HOWEVER, WHERE THERE ARE SUBSTANTIAL EQUITIES FOR MR. MOALIN.

14    AS I SAID, I REVIEWED ALL OF THE MANY, MANY LETTERS OF SUPPORT

15    FOR MR. MOALIN.

16          BEFORE WE GET TO THAT I DO RECOGNIZE THAT MR. MOALIN

17    IS A 36-YEAR-OLD MAN.  HE MAY BE 37 AT THIS POINT, BUT I STILL

18    THINK 36 AT THIS TIME.  BORN AND SPENDING HIS EARLY LIFE IN

19    MOGADISHU, EXPERIENCING THE RAVAGES OF WAR-TORN SOMALIA.

20    THOSE EXPERIENCES HAVE BEEN DESCRIBED IN THE WRITTEN MATERIALS

21    SUBMITTED TO ME, ALSO MENTIONED BY MR. MOALIN HERE TODAY

22    PERSONALLY.

23          HE IS A NATURALIZED CITIZEN OF THE UNITED STATES.

24    MODEST EDUCATION, FROM WHAT I COULD DETERMINE.  VOCATIONAL,

25    SOME VOCATIONAL EDUCATION.  AND AS A CAB DRIVER FOR MANY YEARS

1    IN THIS AREA.

2            GETTING BACK TO THE FAMILY AND COMMUNITY.

3    OBVIOUSLY, MR. MOALIN IS A FAMILY MAN, DEDICATED FAMILY MAN,

4    WITH MUCH SUPPORT, MUCH SUPPORT BY HIS COMMUNITY HERE.  HE HAS

5    A GREAT DEAL OF FRIENDS, OBVIOUSLY, BOTH HERE AND IN SOMALIA,

6    AS THESE LETTERS ATTEST TO.

7            I AM AWARE OF THE CHARITABLE -- THE EXTENSIVE

8    CHARITABLE ACTIVITIES ON THE PART OF MR. MOALIN, SEPARATE AND

9    APART FROM HIS HAVING SUPPORTED AL-SHABAAB DURING THIS PERIOD

10   OF TIME.

11           THESE ACTIVITIES HAVE BEEN EXTENSIVE IN NATURE, FROM

12   PROVIDING SUPPORT, FINANCIAL SUPPORT, FOR DROUGHT RELIEF AND

13   EDUCATION IN SOMALIA TO SUPPORTING INDIVIDUALS HERE WITH HIS

14   GENEROSITY.

15           THE EDUCATION OF YOUTH WAS RAISED TODAY, AND

16   SPECIFICALLY THE EDUCATION OF YOUNG WOMEN.  AND THAT CERTAINLY

17   CANNOT BE GAINSAID.

18           ACTUALLY, AS I RECALL, I THINK THE EQUITIES FOR

19   MR. MOALIN WERE SUMMED UP PRETTY NICELY IN PARAGRAPHS 165

20   THROUGH 171.  AND I THINK THAT -- I THINK I COVERED JUST ABOUT

21   ALL OF THOSE MATTERS.

22           I AM AWARE OF THE HEALTH ISSUES THAT MR. MOALIN HAD.

23   I KNOW THAT THERE IS SOME RESIDUAL ISSUE OR ISSUES RELATIVE TO

24   THE WOUNDS, THE WAR WOUNDS THAT HE SUFFERED.  THE HEART

25   CIRCUMSTANCES ARE MATTERS OF RECORD, AND I THINK LARGELY

1  RESOLVED.

2          OF COURSE, I AM AWARE OF HIS WIFE'S CIRCUMSTANCES,

3  HIS WIFE AND CHILDREN.  I THINK ALL CHILDREN IN SOMALIA --

4  WIFE AND CHILDREN ALL IN SOMALIA, BUT MR. MOALIN DOES SEE THEM

5  FROM TIME TO TIME, OR DID SEE THEM FROM TIME TO TIME.

6  CERTAINLY MORE OFTEN BEFORE THIS CASE WAS FILED, AND THEN

7  AFTER.

8          I THINK TRULY THIS IS A MAN -- I SAY THIS

9  RESPECTFULLY, THIS IS A MAN CAPABLE OF BOTH HUMANITARIAN

10  VIRTUE AND COLLABORATION WITH AN ORGANIZATION AND INDIVIDUALS

11  THAT WERE INVOLVED IN TERRORISM.

12          I THINK THE SUBTEXT OF A GOOD DEAL OF WHAT HAS BEEN

13  SAID, WHAT HAS BEEN ARGUED ON BEHALF OF MR. MOALIN TODAY --

14  AND I DON'T MEAN TO DIMINISH IT IN ANY WAY BY REDUCING IT.

15  BUT I THINK THE SUBTEXT OF WHAT HAS BEEN ARGUED HAS BEEN UNTIL

16  WE HAVE WALKED A MILE IN MR. MOALIN'S SHOES WE SIMPLY CANNOT

17  UNDERSTAND WHAT HE HAS BEEN THROUGH PERSONALLY AND WHAT HIS

18  COUNTRY HAS BEEN THROUGH ON A NATIONAL SCALE FOR THE LAST

19  DECADES.  THAT WE CANNOT APPRECIATE THE HORROR, NOR CAN WE

20  UNDERSTAND THE INSTINCTS THAT MAY HAVE LED MR. MOALIN,

21  ULTIMATELY, TO MAKE THE CHOICES HE HAS MADE.  AND I UNDERSTAND

22  THAT, I UNDERSTAND THE ARGUMENTS THAT HAVE BEEN MADE IN THAT

23  REGARD.

24          ANOTHER CONSIDERATION THAT MITIGATES HERE, SLIGHTLY,

25  I SAY -- I EMPHASIZE SLIGHTLY, IS EVIDENCE OF SUPPORT FOR

1   AL-SHABAAB EVEN BEFORE ITS CLASSIFICATION, ITS FEBRUARY OF '08

2   CLASSIFICATION AS A FOREIGN TERRORIST ORGANIZATION WHICH

3   BECAME PUBLIC, AS MR. COLE REMINDED US, IN MARCH OF '08.

4          THERE IS EVIDENCE OF THAT FINANCIAL SUPPORT BEFORE,

5   SO IN A SENSE THE HABIT -- THE HABIT WAS ALREADY FORMED, IF

6   YOU WILL, BEFORE THE TERRORIST ORGANIZATION AND CERTIFICATION

7   WERE ISSUED.

8          I HAVE NO DOUBT THAT MR. MOALIN HAS BEEN TRAGICALLY

9   SCARRED BY THE CONSTANT CIVIL WAR OF HIS COUNTRY AND THE

10  INCESSANT INTERMITTING CONFLICT THAT HAS RIDDEN THAT COUNTRY

11  FOR SUCH A LONG PERIOD OF TIME BETWEEN CLANS, GOVERNMENT

12  FORCES AND THE LIKE.

13         BUT ULTIMATELY THESE EXPERIENCES, WHETHER PERSONAL

14  TO MR. MOALIN OR ENDEMIC IN SOMALI GOVERNANCE, CANNOT JUSTIFY

15  SUPPORTING TERRORISTS AND TERRORIST ORGANIZATIONS FROM THIS

16  COUNTRY, THE UNITED STATES.

17         THE PERSONAL EQUITIES OF WHICH I SPEAK, AS WELL AS

18  MR. MOALIN'S PERSONALLY PRODUCTIVE HISTORY IN TERMS OF

19  EMPLOYMENT, FAMILY INVOLVEMENT AND SUPPORT ARE, UNFORTUNATELY,

20  IN LARGE MEASURE -- NOT COMPLETE MEASURE BUT LARGE MEASURE --

21  SUBSTANTIALLY OFFSET BY THE AGGRAVATING NATURE OF MR. MOALIN'S

22  INVOLVEMENT IN THESE OFFENSES.

23         OBVIOUSLY, THE SENTENCING PURPOSES, THE MOST

24  RELEVANT SENTENCING PURPOSES OF PROMOTING RESPECT FOR U.S.

25  LAWS, PROSCRIBING TERRORISM AND THE SUPPORTING OF FOREIGN

1    TERRORISTS AND FOREIGN TERRORIST ORGANIZATIONS, AS WELL AS

2    PROTECTION OF THE PUBLIC FROM THIS KIND OF ACTIVITY, AND

3    DETERRENCE, BOTH SPECIFIC AND GENERAL, ARE PRIMARY IN THIS

4    ANALYSIS.

5            SENTENCING CHOICES IN THIS CASE MUST SUPPORT THESE

6    HIGHLY RELEVANT CONSIDERATIONS, AND ULTIMATELY WILL.  THERE

7    ARE NO ALTERNATIVES TO CUSTODY, IN MY VIEW, THAT WOULD

8    BUTTRESS THESE MOST RELEVANT SENTENCING PURPOSES; AND MOREOVER

9    ANY OTHER OPTION, OTHER THAN CUSTODY, IN MY VIEW.

10           I REALIZE PEOPLE AREN'T ARGUING FOR ANYTHING OTHER

11   THAN CUSTODY, BUT IN MY VIEW THERE ARE NO OPTIONS OTHER THAN

12   CUSTODY.  IN THIS CASE THOSE OPTIONS WOULD BE UNWARRANTED.

13           FOR ALL OF THESE REASONS STATUTORILY -- STATUTORY

14   CUSTODIAL MAXIMUM OF EACH OF THE CRIMES OF CONVICTION FOR

15   COUNTS 1, 2, 4 AND 5 OF 15 YEARS, IN MY VIEW, WOULD BE FAIR,

16   JUST AND REASONABLE, WOULD BUTTRESS THE RELEVANT SENTENCING

17   PURPOSES I HAVE BEEN DISCUSSING, AND WOULD BE THE LEAST AMOUNT

18   OF TIME TO BE NECESSARY FOR THE OTHER TO SUBSERVE THE PURPOSES

19   I HAVE BEEN DISCUSSING.  FOR THESE REASONS A CUSTODIAL

20   SENTENCE OF 15 YEARS -- 15 YEARS FOR EACH OF THOSE COUNTS

21   WOULD ULTIMATELY BE APPLIED.

22           I WOULD ALSO, LOOKING AT THE COUNT 3, IMPOSE A

23   CUSTODIAL SENTENCE OF 15 YEARS, THAT BEING THE MONEY

24   LAUNDERING COUNT.  THAT WOULD BE FAIR, JUST AND REASONABLE FOR

25   THE SAME REASONS.  I UNDERSTAND THAT THAT REPRESENTS A

1   DOWNWARD VARIANCE OF FIVE YEARS FROM THE SENTENCING MEMORANDUM

2   AND GUIDELINE RANGE OF -- THE STATUTORY MAXIMUM GUIDELINE

3   RANGE OF 20 YEARS, I SHOULD SAY.

4          ULTIMATELY, THESE SENTENCES FOR THESE COUNTS SHOULD

5   BE IMPOSED CONCURRENTLY, WITH THE EXCEPTION THAT I AM GOING TO

6   DISCUSS WITH RESPECT TO COUNT 4.  THEY SHOULD BE IMPOSED

7   CONCURRENTLY BECAUSE THEY REPRESENT, ESSENTIALLY, THE SAME

8   HARM, AND WERE A CONTINUING COURSE OF CRIMINAL CONDUCT.  AND

9   IN THE CASE OF COUNT 3 THE MEANS BY WHICH THE OTHER COUNTS

10  WERE EXECUTED, THE MEANS TO SECURE A COMMON GOAL OF THE

11  CONTINUING COURSE OF CONDUCT.

12         ACCORDINGLY, PURSUANT TO THE 1984 SENTENCING REFORM

13  ACT, IT IS THE JUDGMENT AND SENTENCE OF THE COURT THAT AS TO

14  COUNT 1 DEFENDANT MOALIN BE, AND HEREBY IS, COMMITTED TO THE

15  CUSTODY OF THE BUREAU OF PRISONS FOR A TERM OF 15 YEARS

16  CUSTODY.

17         FURTHER, IT IS THE JUDGMENT AND SENTENCE OF THE

18  COURT THAT DEFENDANT MOALIN, AS TO COUNT 2, BE, AND HEREBY IS,

19  COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A TERM

20  OF 15 YEARS, WITH THAT TERM IMPOSED CONCURRENTLY WITH THE TERM

21  OF THE 15 YEARS FOR COUNT 1.

22         WITH RESPECT TO COUNT 3, IT IS THE FURTHER JUDGMENT

23  AND SENTENCE OF THE COURT DEFENDANT MOALIN BE, AND HEREBY IS,

24  COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A TERM

25  OF 15 YEARS ON COUNT 3, RUN CONCURRENTLY WITH THE COUNTS FOR 1

1    AND 2.

2            AND WITH RESPECT TO COUNT 5 IT IS THE JUDGMENT AND

3    SENTENCE OF THE COURT THAT MR. MOALIN BE, AND HEREBY IS,

4    COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS FOR A TERM

5    OF 15 YEARS, WITH THAT TERM IMPOSED CONCURRENTLY TO THE TERMS

6    FOR 1, 2 AND 3.

7            WITH RESPECT TO THE SENTENCE FOR COUNT 4, IT IS THE

8    JUDGMENT AND SENTENCE OF THE COURT THAT MR. MOALIN BE, AND

9    HEREBY IS, COMMITTED TO THE CUSTODY OF THE BUREAU OF PRISONS

10   FOR A TERM OF 15 YEARS WITH THREE YEARS OF THAT TIME IMPOSED

11   CONSECUTIVELY TO THE TERMS FOR 1, 2, 3 AND 5, AND 12 YEARS OF

12   THAT TERM IMPOSED CONCURRENTLY WITH THE 15-YEAR TERMS FOR

13   COUNTS 1, 2, 3 AND 5 FOR A TOTAL OF 18 YEARS IN CUSTODY.

14           COUNT 4, IN MY VIEW, IS AN OFFENSE OF A DIFFERENT

15   MAGNITUDE.  DEFENDANT MOALIN PERSONALLY OFFERED, IN MY VIEW,

16   TO ADEN AYROW HIS HOME, STRATEGIZED AS TO HOW IT COULD BE USED

17   IN THE ONGOING CAMPAIGN OF TERROR BY AL-SHABAAB.

18           MR. MOALIN COUNSELED ADEN AYROW ON HOW TO BURY BOMBS

19   ON THE PROPERTY, AS WELL AS OTHER MUNITIONS.  AND THIS, IN MY

20   VIEW, WENT BEYOND MERE FINANCIAL SUPPORT AND ENTERED INTO THE

21   REALM OF A DIFFERENT TYPE OF SUPPORT, WHICH IS DESERVING OF

22   THIS PARTIALLY-RUN CONSECUTIVE SENTENCE.

23           CONTINUING ON.

24           NO FINE IS IMPOSED FOR ANY COUNT OF CONVICTION.  A

25   SPECIAL ASSESSMENT OF $100 IS ASSESSED WITH RESPECT TO COUNT 1

1    AND WAIVED WITH RESPECT TO THE OTHER COUNTS FOR A TOTAL OF

2    $100 IN SPECIAL ASSESSMENTS.

3              FOLLOWING COMPLETION OF A CUSTODIAL SENTENCE IN THIS

4    CASE MR. MOALIN IS TO BE PLACED UPON A THREE-YEAR PERIOD OF

5    SUPERVISED RELEASE, WITH THE STANDARD CONDITIONS OF

6    SUPERVISION APPLYING AS WELL AS THE FOLLOWING SPECIAL

7    CONDITIONS:  HE SUBMIT TO A SEARCH OF HIS PERSON, PROPERTY,

8    VEHICLE, ABODE OR RESIDENCE AT A REASONABLE TIME, UNDER

9    REASONABLE CIRCUMSTANCES BY A PROBATION OFFICER.

10             JUST TO BE SURE.  I DIDN'T SEE ANY CONDITIONS OF

11   SUPERVISED RELEASE SET FORTH IN THE ORIGINAL P.S.R.  AM I

12   CORRECT?

13             **THE PROBATION OFFICER:**  YOU ARE CORRECT, YOUR HONOR,

14   RIGHT.  THEY ARE IN THE ADDENDUM, NOT IN THE ORIGINAL P.S.R.

15             **THE COURT:**  OKAY.

16             SO THE FIRST SPECIAL CONDITION WOULD BE SEARCH.

17             FURTHER, THAT MR. MOALIN REPORT ALL VEHICLES OWNED

18   OR OPERATED OR IN WHICH HE HAS AN INTEREST TO PROBATION;

19   FURTHER, THAT HE PROVIDE COMPLETE DISCLOSURE OF PERSONAL AND

20   BUSINESS FINANCIAL RECORDS TO PROBATION AS REQUESTED; FOURTH,

21   THAT HE RESOLVE ALL OUTSTANDING WARRANTS WITHIN 60 DAYS, IF

22   THAT WARRANT OF WHICH I SPOKE EARLIER IS STILL EXTANT AT THE

23   TIME HE IS RELEASED; AND FINALLY, THAT HE NOT KNOWINGLY

24   ASSOCIATE WITH TERRORIST OR NONTERRORIST ORGANIZATIONS.

25             MR. MOALIN, YOU HAVE AN ABSOLUTE RIGHT TO APPEAL

1    FROM THE CONVICTIONS ON THESE COUNTS, AS WELL AS THE SENTENCE

2    IMPOSED FOR THEM.  IF YOU WISH TO FILE AN APPEAL, A NOTICE OF

3    APPEAL MUST BE FILED BY YOU WITHIN 14 DAYS OF TODAY.  YOU MUST

4    SPECIFY WHAT IT IS YOU ARE APPEALING FROM.  THAT NOTICE OF

5    APPEAL MUST BE FILED WITH THE CLERK OF THIS COURT, THAT IS THE

6    U.S. DISTRICT COURT FROM THE SOUTHERN DISTRICT OF CALIFORNIA,

7    RATHER THAN WITH THE NINTH CIRCUIT COURT OF APPEALS.  YOU

8    SHOULD KEEP THE APPELLATE AUTHORITIES ADVISED OF YOUR

9    WHEREABOUTS AT ALL TIMES WHILE YOUR CASE IS ON APPEAL SO THAT

10   IF THEY NEED TO BE IN TOUCH WITH YOU THEY MAY BE IN TOUCH WITH

11   YOU.

12           IF YOU CANNOT AFFORD THE SERVICES OF LEGAL

13   REPRESENTATION WHILE YOUR CASE IS ON APPEAL THEN THOSE

14   SERVICES WILL CONTINUE, THEY WILL BE PROVIDED TO YOU AT NO

15   COST TO YOU.

16           SIR, DO YOU UNDERSTAND WHAT I TOLD YOU ABOUT YOUR

17   APPELLATE RIGHTS IN THIS CASE?

18           **DEFENDANT MOALIN:**  YES.  YES, YOUR HONOR.

19           **THE COURT:**  I WANT TO EMPHASIZE A COUPLE THINGS FOR

20   COUNSEL, JUST TO MAKE SURE.

21           THE TOTAL CUSTODIAL TIME IN THIS CASE IS A TERM OF

22   18 YEARS COMMITMENT TO THE BUREAU OF PRISONS.  THERE IS A

23   THREE-YEAR PERIOD OF SUPERVISED RELEASE WITH RESPECT TO EACH

24   OF THESE COUNTS IMPOSED CONCURRENTLY.  A $100 SPECIAL

25   ASSESSMENT, IN TOTAL.  NO FINES.

1        AND IF YOU COME FORWARD, MR. DRATEL, I WILL HAVE YOU

2   PROVIDED WITH A COPY OF THE TERMS AND CONDITIONS OF SUPERVISED

3   RELEASE.  AND IF YOU WOULD KINDLY PROVIDE THOSE TO YOUR CLIENT

4   AT THIS TIME.

5        **MR. DRATEL:**  I WILL.  THANK YOU, YOUR HONOR.

6        **THE COURT:**  ANYTHING FURTHER FROM YOU, MR. DRATEL?

7        **MR. DRATEL:**  YES, YOUR HONOR.  ONE -- AND I

8   UNDERSTAND THE COURT'S INTENTION FULLY, BUT I THINK JUST IN

9   TERMS OF THE LANGUAGE.  ON COUNT 5, 15 YEARS CONCURRENTLY WITH

10  1, 2 AND 3, BUT IT IS ALSO CONCURRENT WITH COUNT 4 TO THE

11  EXTENT --

12       **THE COURT:**  YES.

13       **MR. DRATEL:**  I DON'T THINK THE COURT SAID THAT.

14       **THE COURT:**  IF I DIDN'T SAY IT, THEN I APPRECIATE

15  THE CORRECTION.  OBVIOUSLY ALL OF THE COUNTS ARE TO BE RUN

16  CONCURRENT WITH ALL OTHER COUNTS.  AND THEN WITH RESPECT TO

17  COUNT 4, 12 YEARS OF THAT COUNT IS TO BE RUN CONCURRENT WITH

18  THE OTHER COUNTS AND THREE YEARS CONSECUTIVELY TO THE OTHER

19  COUNTS.

20       **MR. DRATEL:**  THANK YOU, YOUR HONOR.

21       **THE COURT:**  ANY PARTICULAR REQUEST FOR A REGION?

22       **MR. DRATEL:**  YES, YOUR HONOR.  A DESIGNATION TO AN

23  AREA AS CLOSE AS POSSIBLE TO SAN DIEGO.

24       **THE COURT:**  TO THE WESTERN REGION?

25       **MR. DRATEL:**  YES.

1          **THE COURT:**  THAT RECOMMENDATION WILL BE MADE.

2          MR. COLE.

3          **MR. COLE:**  NOTHING FURTHER, YOUR HONOR.

4          **THE COURT:**  ANYTHING FURTHER?

5          **MR. COLE:**  NO, THANK YOU.

6          **THE COURT:**  I NOTICED THAT YOU WERE -- PERHAPS YOU

7     WERE COMMUNICATING ON THIS 5G1.1 ISSUE.  I DON'T KNOW.  BUT IF

8     THERE IS ANYTHING FURTHER, WE ARE GOING TO TAKE A RECESS FOR

9     15 MINUTES OR SO, GIVE THE REPORTER A BREAK AND OTHERS AS

10    WELL.  IF THERE IS ANYTHING FURTHER YOU WOULD LIKE TO ADD I

11    WOULD BE HAPPY TO HEAR YOU WITH RESPECT TO THE OTHER MATTERS

12    WE HAVE SET THIS MORNING.

13         **MR. COLE:**  OKAY.  THAT IS FINE.  WE MAY BRIEFLY

14    ADDRESS IT THEN, AFTER THE BREAK AND THE OTHER MATTERS.  WE

15    COULD ADDRESS IT NOW, IF YOU WANT.

16         **THE COURT:**  NO, THAT IS FINE.  YOU CAN ADDRESS IT --

17    YOU CAN ADDRESS IT AT THE TIME OF ALLOCUTION IF YOU WISH.

18         **MR. COLE:**  THANK YOU, YOUR HONOR.

19         **THE COURT:**  VERY GOOD.  WE ARE IN RECESS FOR 15

20    MINUTES AT THIS TIME.  THANK YOU.

21         (RECESS)

22         **THE COURT:**  OKAY.  MS. MORENO, ARE YOU READY TO

23    PROCEED?

24         LET THE RECORD SHOW THAT MR. MOALIN HAS RETURNED.  I

25    THOUGHT MR. MOALIN WAS REQUESTING TO LEAVE.  SOMETHING WAS

1    LOST IN TRANSLATION.  SO LET THE RECORD REFLECT MR. MOALIN,

2    MR. MOHAMUD, AND MR. ISSA DOREH ARE ALL PRESENT HERE.

3            AND WE ARE HAPPY TO HAVE YOU HERE, MR. MOALIN.

4        **MR. DRATEL:**  YOUR HONOR, IF I MAY.  I AM INFORMED

5    THAT I SHOULD, JUST FOR THE RECORD, OBJECT TO THE SENTENCE AS

6    UNREASONABLE, JUST FOR THE RECORD, TO PRESERVE APPELLATE

7    RIGHTS.

8        **THE COURT:**  SURE.

9            DO YOU WISH TO OBJECT, MR. COLE?  AN EQUAL

10   OPPORTUNITY.

11       **MR. COLE:**  YOUR HONOR, WE PERSIST IN OUR VIEW OF THE

12   GUIDELINE CALCULATIONS.  BUT, AGAIN, WE HAVE ALREADY MADE THAT

13   STATEMENT BRIEFLY.  IF YOUR HONOR WANTS TO DISCUSS IT ANY

14   FURTHER.

15       **THE COURT:**  NO, I DON'T THINK SO.  IT IS RATHER

16   MOOT, ISN'T IT?

17       **MR. COLE:**  I DON'T THINK IT IS DRIVING A LOT HERE AT

18   THIS POINT.  I DO KNOW THAT JUST -- AGAIN, JUST FOR PURPOSES

19   OF THE RECORD.

20           IF THERE IS AN OBJECTION TO THE RECORD, I JUST WANT

21   TO MAKE CLEAR IF IT IS PROCEDURAL OR SUBSTANTIVE OR BOTH.  IF

22   IT WAS A PROCEDURAL OBJECTION I JUST WANT TO MAKE SURE THAT

23   STATUS -- YOUR HONOR COULD CORRECT IT, IF NECESSARY.

24       **MR. DRATEL:**  SUBSTANTIVE.

25       **THE COURT:**  I ASSUMED IT WAS SUBSTANTIVE.  I THINK

1   TO THE EXTENT YOU HAVE A CONCERN, MR. COLE, IT MAY BE

2   PROCEDURAL.

3          **MR. COLE:**  YES.

4          **THE COURT:**  BUT ALL WITH THE UNDERSTANDING THAT THE

5   GUIDELINE ANALYSIS HERE IN THIS CASE, OR THE GUIDELINES, JUST

6   DON'T PROVIDE AN AWFUL LOT IN TERMS OF ULTIMATELY DETERMINING

7   WHAT AN APPROPRIATE SENTENCE IS.  I MEAN, YOU NEED TO GO

8   THROUGH THE STEPS AND ALL THAT IS REQUIRED.  BUT AS I

9   INDICATED PREVIOUSLY, THIS IS A 3553(A) CASE MORE THAN

10  ANYTHING ELSE.  AND ALL PARTIES AGREE WITH THAT.  YOU ARE

11  CERTAINLY FREE TO DISAGREE IF THAT BE THE CASE.

12         SO NOW WE ARE ON TO MR. MOHAMUD.

13         MS. MORENO, ARE YOU READY TO PROCEED WITH

14  SENTENCING?

15         **MS. MORENO:**  YES, YOUR HONOR.

16         **THE COURT:**  MR. MOHAMUD, ARE YOU READY TO PROCEED

17  WITH SENTENCING, SIR?

18         **DEFENDANT MOHAMUD:**  YES, YOUR HONOR.

19         **THE COURT:**  ALL RIGHT.  VERY GOOD.

20         MR. MOHAMUD, HAVE YOU READ THE PROBATION REPORT AND

21  THE ADDENDUM TO THE PROBATION REPORT?

22         **DEFENDANT MOHAMUD:**  YES, YOUR HONOR.

23         **THE COURT:**  ALL RIGHT.  VERY GOOD.

24         COUNSEL, BEFORE YOU GET GOING WITH THE ALLOCUTIONS

25  AND ALL, I HAVE READ EVERYTHING.

```
 1          MR. MOHAMUD, YOU CAN CERTAINLY BE SEATED AT THIS

 2    TIME.

 3          I READ AND CONSIDERED CAREFULLY THE PROBATION

 4    REPORT, THE OBJECTIONS TO THE P.S.R. FILED BY BOTH SIDES, ONCE

 5    AGAIN, THE ADDENDUM TO THE P.S.R.  THE SENTENCING MEMORANDUM

 6    AND EXHIBITS AND LETTERS SUBMITTED ON THE DEFENDANT'S BEHALF,

 7    THE GOVERNMENT'S SENTENCING MEMORANDUM, THE SENTENCING SUMMARY

 8    CHARTS.  I HAVE CONSIDERED THE NATURE AND CIRCUMSTANCES OF THE

 9    OFFENSES AND HISTORY AND CHARACTERISTICS OF MR. MOHAMUD, AS

10    WELL AS THE ADVISORY GUIDELINES AND THE STATUTORY PURPOSES OF

11    SENTENCING.

12          YOU KNOW, BEFORE WE GET STARTED I, UNFORTUNATELY,

13    SPENT A SIGNIFICANT AMOUNT OF TIME ON THE GUIDELINE ANALYSIS

14    AND IDENTIFYING WHERE I COULD HAVE RECEIVED MORE HELP FROM

15    PROBATION AND THE PARTIES.  AND I WENT TO SOME LENGTHS TO DO

16    THAT AND TO COME UP WITH WHAT I BELIEVE TO BE THE PROCEDURALLY

17    CORRECT GUIDELINE ANALYSIS.

18          I WOULD RATHER NOT GO THROUGH ALL OF THAT AGAIN, MS.

19    MORENO, MR. GHAPPOUR, MR. COLE, IF THERE BE AN UNDERSTANDING

20    THAT THE GENERAL REMARKS I HAD ABOUT HOW THE GUIDELINES IMPACT

21    THIS CASE ARE INCORPORATED INTO THE SENTENCINGS AND MY

22    ALLOCUTIONS FOR MR. MOHAMUD AND MR. DOREH AS WELL.

23          **MS. MORENO:**  YES, YOUR HONOR.  I WAS GOING TO SAY,

24    WORKING BACK, I AGREE WITH THE COURT.  THE COURT DOES NOT NEED

25    TO REPEAT YOUR ANALYSIS WITH RESPECT TO WHATEVER SENTENCE IS
```

1   IMPOSED ON MR. MOHAMUD.

2           I WOULD ALSO AGREE WITH THE COURT THAT THE

3   GUIDELINES HERE --

4           **THE COURT:**  LET ME JUST GET EVERYONE'S ASSENT BEFORE

5   WE PROCEED FURTHER.

6           MR. GHAPPOUR.

7           **MR. GHAPPOUR:**  NO OBJECTION.

8           **THE COURT:**  IS THAT AGREEABLE TO YOU?

9           **MR. GHAPPOUR:**  YES, YOUR HONOR.

10          **THE COURT:**  MR. COLE?

11          **MR. COLE:**  SURE, YOUR HONOR.

12          **THE COURT:**  I JUST DON'T WANT TO ENGAGE IN ANOTHER

13  EXERCISE OF TOTAL TEDIUM HERE, BUT I WILL HIGHLIGHT WHAT I

14  NEED TO HIGHLIGHT FOR THIS SPECIFIC CASE AND ALSO FOR MR.

15  DOREH'S CASE.

16          MS. MORENO.

17          **MS. MORENO:**  THANK YOU, YOUR HONOR.

18          AND AS A FINAL NOTE ON THE GUIDELINES DISCUSSION, WE

19  AGREE WITH THE COURT THAT IT DOES NOT HELP OR INFORM THE COURT

20  IN THE LAWFUL AND JUST SENTENCE SUFFICIENT BUT NOT GREATER

21  THAN THAT THE COURT NEEDS TO IMPOSE WITH RESPECT TO MY CLIENT,

22  MR. MOHAMUD.

23          I WOULD SAY TO THE COURT THAT THE FEW ISSUES --

24  BEFORE I GET INTO THE PERSONAL HISTORY OF MR. MOHAMUD, THAT

25  THIS IS NOT A CHALLENGE TO THE VERDICT, THAT I AM NOT

1    REARGUING THE MERITS.  BUT I DO BELIEVE THAT I AM ENTITLED TO

2    TALK ABOUT RELATIVE CULPABILITY IN SOME FASHION.  BUT I WILL

3    NOT BE TALKING ABOUT REVISITING THE TRIAL RECORD IN THIS CASE,

4    YOUR HONOR.

5            AND SO WITH THAT SAID, THE COURT -- AND I WOULD ALSO

6    ADOPT MR. DRATEL'S COMMENTS WITH RESPECT TO HIS INITIAL

7    COMMENTS WHEN HE FIRST ADDRESSED THE COURT ABOUT DETERRENCE.

8    I HAVE SOME OTHER ISSUES WITH RESPECT TO DETERRENCE THAT ARE

9    UNIQUE TO MR. MOHAMUD THAT I WILL ADDRESS.

10           BUT I THINK THAT, AGAIN, SOMETIMES IT IS EASIER,

11   SOMETIMES IT IS MORE DIFFICULT TO GO AFTER SOMEONE IN THIS

12   PARTICULAR SETTING.  I AM HOPING I CAN REFOCUS THE COURT ON

13   MR. MOHAMUD, WHAT HE DID, WHAT HE IS RESPONSIBLE FOR.  AND I

14   AM NOT GOING TO REPEAT THE COMMENTS THAT MR. DRATEL MADE WITH

15   RESPECT TO MY CLIENT EXERCISING HIS RIGHT TO A TRIAL.  I DON'T

16   THINK I NEED TO DO THAT WITH YOUR HONOR.

17           BUT CLEARLY YOUR HONOR HAS SEEN, AS WAS POINTED OUT,

18   THAT EVERY SINGLE DAY THAT THIS COURT HAS BEEN IN SESSION,

19   EITHER IN HEARINGS OR IN THE TRIAL SETTING, THAT THE SUPPORT

20   FROM THE COMMUNITY HAS BEEN PERSISTENT, PERVASIVE AND

21   CONSISTENT.

22           MR. MOHAMUD OCCUPIES A DIFFERENT POSITION IN THIS

23   CASE BECAUSE, AS THIS COURT KNOWS, AND AS THE GOVERNMENT

24   ARGUES, THAT HIS POSITION AS AN IMAM SUBJECTS HIM TO SOME

25   UNIQUE CHARACTERISTICS.  WE ARE GOING TO TALK ABOUT THAT.

THE COURT HAS READ ALL THE PAPERS, THE PLETHORA OF
LETTERS THAT WERE SUBMITTED ON HIS BEHALF.  AND I THINK IF THE
COURT NOTED, SOME OF THE LETTERS WERE FORMAL AND TYPEWRITTEN,
SOME OF THE LETTERS WERE IN THE HANDWRITING OF SOME MEMBERS OF
THE COMMUNITY.  SOME OF THEM WERE NOT SIGNED, SOME OF THEM THE
WORDS WERE MISSPELLED.  WE COULD HAVE SUBMITTED 100 MORE.

I WILL TELL THE COURT, WHEN I FIRST ENTERED THIS
CASE, WHICH WAS AFTER ANY BAIL DETERMINATIONS, I INHERITED
FROM PREVIOUS COUNSEL A BOOK, AND THE BOOK WAS ENORMOUS.  AND
IN THE BOOK WERE THE APPLICATIONS OF ALMOST 200 MEMBERS OF THE
COMMUNITY, NOT JUST HERE BUT ACROSS THE COUNTRY, OF PEOPLE WHO
WERE WILLING TO PUT UP THEIR HOUSES FOR BAIL FOR MR. MOHAMUD.

I KNEW WHEN I SAW THAT THAT THIS WAS GOING TO BE A
VERY DIFFERENT KIND OF CASE FOR ME.  AND I WILL TELL THIS
COURT THAT I HAVE BEEN INVOLVED IN A NUMBER OF THESE CASES
AROUND THE COUNTRY, AND I TOO HAVE HAD THE PRIVILEGE AND HONOR
OF REPRESENTING MR. MOHAMUD.  AND HE IS A UNIQUE PERSON IN THE
PANOPLY OF PERSONS I HAVE REPRESENTED.

HE, AS THE COURT KNOWS, IS A DEVOTED FATHER AND
HUSBAND.  HIS WIFE, DEAKA, IS IN THE AUDIENCE.  TWO OF HIS
SONS ARE IN THE AUDIENCE.  HIS OLDEST SON, ABDULAHI, IS IN THE
AUDIENCE, AND HIS OTHER SON.

WOULD YOU LIKE TO STAND UP.

AND HIS WIFE, DEAKA.  AND DEAKA HAS BEEN HERE EVERY
SINGLE --

1          YOU CAN SIT.  THANK YOU.

2          HAS BEEN HERE EVERY SINGLE TIME THAT WE HAVE BEEN IN

3    SESSION.

4          AS WE KNOW FROM NOT ONLY THE PAPERS BUT ALSO IN THE

5    TRIAL EVIDENCE, THAT MR. MOHAMUD WAS BORN IN SOMALIA, WHICH IS

6    A COUNTRY THAT REALLY HAS NEVER BEEN IN PEACE IN HIS LIFETIME.

7    HE LEFT WHEN HE WAS 20 YEARS OLD TO ESCAPE THE VIOLENCE.  HE

8    MADE A DECISION AT THAT TIME THAT HE WASN'T GOING TO STAY AND

9    PICK UP ARMS.  HE WANTED A BETTER LIFE, A SAFER LIFE.  AND HIS

10   JOURNEY LED HIM THROUGH REFUGEE CAMPS, AS THE COURT KNOWS, AND

11   FINALLY BROUGHT HIM TO AMERICA 13 YEARS AGO THIS MONTH WHERE

12   HE WAS GRANTED REFUGEE STATUS.  AND IT IS A STATUS THAT HE

13   CURRENTLY MAINTAINS, YOUR HONOR.

14         HIS FAMILY SITUATION IS -- IT IS -- WHAT I WANT TO

15   SAY, YOUR HONOR, BECAUSE I HAVE THOUGHT ABOUT HIS FAMILY AND I

16   MET HIS FAMILY, IT IS EXTRAORDINARY.  HE HAS 11 CHILDREN.  I

17   THINK THE LETTERS -- SOME OF THE LETTERS THAT THE COURT READ

18   REFER TO ONE OF THE CHILDREN, A DAUGHTER, THAT IS SEVERELY

19   AUTISTIC TO THE EXTENT, YOUR HONOR, SHE DOES NOT SPEAK AND

20   REQUIRES 24-HOUR CARE AND SUPERVISION.

21         THIS RESPONSIBILITY HAD BEEN SHARED BETWEEN DEAKA,

22   HER MOTHER, AND MR. MOHAMUD, HER FATHER.  AND I THINK THAT A

23   LOT OF THE LETTERS REFER TO THE EXTRAORDINARY RELATIONSHIP

24   THAT A FATHER HAD WITH HIS DAUGHTER.

25         HIS CHILDREN ARE -- AS ANY PARENT WOULD WANT, HIS

1   CHILDREN ARE THE BEST TESTAMENT OF WHO THE MAN IS.  I OFTEN

2   SAY THAT TOO.  I HAVE ONE CHILD AND I OFTEN SAY TO HER WHEN

3   YOU GO OUT IN THE WORLD YOU REPRESENT ME SO YOU NEED TO DRESS

4   APPROPRIATELY, AND WHAT HAVE YOU.  AND PERHAPS WASH SOME OF

5   THAT MAKEUP OFF OF YOUR FACE.

6            BUT ANYWAY, HERE MR. MOHAMUD'S CHILDREN ARE A

7   WONDERFUL TESTAMENT TO HIM.  FROM HIS OLDEST CHILD ABDULAHA,

8   WHO WORKS AND IS IN COLLEGE, TO THE YOUNGEST WHO WAS FOUR

9   MONTHS OLD, ONLY, WHEN MR. MOHAMUD WAS ARRESTED.  ALL OF THE

10  CHILDREN, BESIDES THE LITTLE ONES, ARE IN SCHOOL AND ARE

11  PRODUCTIVE.

12           WHAT HAS HAPPENED HERE TO MR. MOHAMUD AND TO HIS

13  FAMILY, I THINK THIS COURT KNOWS, HAS BEEN TOTAL DEVASTATION,

14  COMPLETE DEVASTATION FOR THEM.  THE LOSS -- NOT ONLY THE LOSS

15  OF MR. MOHAMUD AS A HUSBAND BUT THE LOVE OF A FATHER TO ONE'S

16  CHILDREN.  THE UNCONDITIONAL LOVE AND PROTECTION THAT ONE

17  EXPECTS FROM ONE'S FATHER IS NOW DELIVERED PIECEMEAL,

18  DELIVERED PIECEMEAL THROUGH THE BARS OF THE PRISON WINDOW, AND

19  IS ALSO REGULATED IN TERMS OF HOW OFTEN THEY CAN SEE EACH

20  OTHER.  THIS IS A DEVASTATING BLOW TO A FAMILY THAT, ABOVE

21  ALL, IS VERY TIGHT-KNIT AND SUPPORTED EACH OTHER, IN WHICH

22  MR. MOHAMUD PLAYED AN ABSOLUTELY CENTRAL ROLE.

23           THE GOVERNMENT, IN ITS PAPERS, TALKED ABOUT

24  MR. MOHAMUD'S INFLUENCE.  AND I THINK THAT WHAT I WANT TO SAY

25  ABOUT THAT IS THAT MR. MOHAMUD'S INFLUENCE IS REAL, IT IS

1    ENDEARING AND IT IS EXEMPLIFIED IN THE VARIOUS LETTERS THAT

2    WERE SUBMITTED ON HIS BEHALF.

3              THE KIND OF INFLUENCE THAT, AS THE COURT KNOWS,

4    MOTHERS WROTE ABOUT TEENAGERS BEING COUNSELED AWAY FROM DRUGS

5    AND ALCOHOL.  ABOVE ALL ELSE, ABOUT THE IMPORTANCE AND

6    ENCOURAGEMENT OF EDUCATION.  AND THE EDUCATION IS ACTUALLY,

7    FOR MR. MOHAMUD, A VERY HEARTFELT AND SPECIAL AREA.

8              AS THE COURT KNOWS, IN THE P.S.R. REPORT THERE IS

9    MENTION OF MR. MOHAMUD'S INVOLVEMENT IFTIN CHARTER SCHOOL.

10   AND IFTIN CHARTER SCHOOL IS A SCHOOL THAT HE CO-FOUNDED,

11   RAISED THE FUNDS FOR.  THE SCHOOL OPENED IN 2006.  IT IS A

12   CHARTER SCHOOL.  IT IS OPEN FOR ALL CHILDREN FROM SAN DIEGO

13   COUNTY.  IT IS ABOUT A 10-MINUTE RIDE FROM HERE.  AND THEY

14   HAVE ALMOST 500 CHILDREN IN THE SCHOOL NOW, GRADES K THROUGH

15   8.

16             THIS IS AN ENDEARING LEGACY THAT WILL CONTINUE NO

17   MATTER WHAT HAPPENS TO MR. MOHAMUD.  AND I SUSPECT, BESIDES

18   HIS FAMILY, IT IS HIS VERY PROUDEST ACHIEVEMENT.

19             REGARDLESS OF THE VERDICTS, YOUR HONOR, EVERYONE IN

20   THE COMMUNITY WHO WROTE, WHO KNOWS MR. MOHAMUD, KNOWS HIM NOT

21   TO SUPPORT EXTREMIST IDEOLOGY.  WHAT HIS WORK HAS SHOWN IN THE

22   COMMUNITY WAS HOW TO IMPROVE THE LIVES OF HIS PEOPLE, HOW TO

23   BE A BETTER CITIZEN, HOW TO COME TOGETHER.

24             THERE IS, RESPECTFULLY, NO EVIDENCE THAT HE

25   ENCOURAGED DIVISION, THAT HE ENCOURAGED SUPPORT OF AN

1   EXTREMIST IDEOLOGY, RESPECTFULLY, AND THAT HE SUPPORTED

2   VIOLENCE.

3          LET ME JUST SAY SOMETHING ABOUT THE CALLS IN THIS

4   CASE, VERY BRIEFLY.

5          THERE ARE -- THERE WERE 11 CALLS THAT WERE SUBMITTED

6   IN THE RECORD THAT INVOLVED MY CLIENT.  WHAT WE KNOW IS THAT

7   THE PLETHORA OF PHONE CALLS IN THIS CASE INVOLVED MR. MOALIN

8   TALKING TO A NUMBER OF PEOPLE.  MY CLIENT WAS DISCUSSED MORE

9   THAN HE WAS HEARD IN THIS CASE.  AND THE UNIVERSE OF CALLS

10  THAT DEALT WITH MR. MOHAMUD, WHERE HE IS ON THE PHONE AND

11  SPEAKING, BEGAN, IF THE COURT REMEMBERS, IN DECEMBER OF 2007

12  AND ENDED SOME TIME IN MAY OF 2008.

13         AND I JUST WANT TO REFER BACK TO THE INITIAL CALL,

14  WHICH I HAD READ TO THE JURY, WHICH I BELIEVE SPEAKS TO WHO

15  MR. MOHAMUD WAS AND WHAT HE BELIEVED ABOUT WHAT WAS HAPPENING

16  IN HIS COUNTRY.

17         AND IN THAT CALL HE CONDEMNED THE CONDUCT OF THE

18  YOUTH.  WE KNOW THAT THE YOUTH, ACCORDING TO THE GOVERNMENT'S

19  EXPERT, WAS AL-SHABAAB.  HE CONDEMNED THEM BECAUSE HE SAID

20  THEY SLAUGHTER ANYONE THEY CAPTURE AND THAT IS NOT GOOD.  AND

21  HE SAID HE BELIEVED IN UNITY.  AND THAT ONE COULD BE WITH

22  ANYONE WITHOUT TAKING THEIR BELIEFS.

23         AND HE THEN HE SAID THE COUNTRY IS FOR ALL OF US,

24  THE SCHOLARS, THE UNEDUCATED AND THE GENERAL PUBLIC.

25         NOW, WITHOUT BELABORING THESE POINTS, AND MINDFUL OF

1   THE VERDICTS, THESE AND OTHER CALLS PRESENTED BY THE

2   GOVERNMENT SHOW THAT WE BELIEVE THAT MR. MOHAMUD DID NOT

3   SUPPORT THE EXTREME IDEOLOGY OF AL-SHABAAB.

4            I WILL SAY THIS ABOUT MR. MOALIN.  WHAT WE KNOW IS

5   THAT MR. MOHAMUD NEVER SPOKE TO SHEIKALOW.  WHAT WE KNOW FROM

6   THE EVIDENCE AT TRIAL IS THAT MR. MOHAMUD NEVER SPOKE TO AN

7   ADEN AYROW.  THERE IS NO EVIDENCE THAT HE KNEW THEM.  BUT

8   THERE IS DISCUSSION ABOUT MR. MOHAMUD.  AND WE ARE ASKING,

9   WHEN THE COURT IS LOOKING AT THAT IN DETERMINING AND

10  FASHIONING A JUST SENTENCE, THAT THAT NOT BE HELD AGAINST HIM.

11           I WANT TO TALK A BIT ABOUT DEPORTATION.  I THINK

12  THAT -- I KNOW THAT MR. MOHAMUD IS SUBJECT TO I.N.S. DETAINER,

13  THAT HE HAS REFUGEE STATUS, AND THAT HE MOST SURELY WILL BE

14  DEPORTED WHEN HE FINISHES WHATEVER SENTENCE IS IMPOSED ON HIM.

15           I DON'T THINK IT IS HYPERBOLE, YOUR HONOR, TO SAY

16  THAT WHEN THAT HAPPENS, HIS LIFE WOULD BE IN DANGER.  DEFENSE

17  COUNSEL WAS INFORMED THAT FARAH YARE WAS MURDERED ON THE

18  STREETS OF MOGADISHU BY MEMBERS OF AL-SHABAAB.

19           AS YOUR HONOR PREVIOUSLY OBSERVED, SOMALI DOES NOT

20  HAVE ANY SIGNIFICANT, FUNCTIONING EXECUTIVE OR JUDICIAL

21  PROCESS.  THIS IS A COUNTRY THAT SETS NEW STANDARDS FOR

22  DECLINE, AND THIS IS A PLACE WHERE MR. MOHAMUD MAY GO BACK TO.

23           BUT BESIDES THAT, A DEPORTATION WOULD PROBABLY

24  RESULT IN A PERMANENT EXILE OF MR. MOHAMUD FROM HIS FAMILY,

25  YOUR HONOR, FROM THIS COUNTRY THAT I BELIEVE HIS 10 YEARS IN

THIS COUNTRY EXEMPLIFIED THAT ALL OF HIS WORK AND ALL OF HIS

GOOD WORKS AND HIS MESSAGE, MOST IMPORTANTLY, WAS TO BE

PRODUCTIVE, LAW ABIDING, PEACEFUL AND EDUCATED MEMBERS OF THE

SOCIETY.

ONE ONLY HAS TO LOOK AT THE WEBSITE OF THE IFTIN

CHARTER SCHOOL TO SEE THAT IT IS NONDENOMINATIONAL, IT IS

PUBLIC AND IT ENCOURAGES TOLERANCE BUT EMPHASIZES ACADEMIC

RIGOR.  THAT IS MR. MOHAMUD'S LEGACY.

I CAN ANTICIPATE WHAT THE PUSH-BACK OF THE

GOVERNMENT WILL BE WITH RESPECT TO MR. MOHAMUD'S INFLUENCE AND

CLOUT, AND WE RESPECTFULLY DISAGREE ABOUT THAT INFLUENCE, AND

ASK THE COURT TO CONSIDER THE INFLUENCE THAT MEMBERS OF THE

COMMUNITY HAVE TOLD YOU ABOUT.

I AM NOT GOING TO ADDRESS THE GUIDELINES ISSUE WITH

THE COURT BECAUSE I AGREE WITH THE COURT, IT DOES NOT INFORM

THE CASE.

I, TOO, COME FROM A JURISDICTION WHERE RECOMMENDED

SENTENCES ARE USUALLY NOT WITHIN OUR PURVIEW, SO I, TOO, DID

NOT RECOMMEND A SENTENCE.  I WILL APOLOGIZE FOR MY PAPERS

LACKING IN WHAT OBVIOUSLY WAS AN IMPORTANT AND NECESSARY

GUIDELINES ANALYSIS THAT THE COURT HAS POINTED OUT.

**THE COURT:**  I APPRECIATE THAT.  I DON'T THINK I

UNDERSTOOD THAT, ACTUALLY.  MR. DRATEL TOUCHED UPON THAT, YOU

TOUCHED UPON THAT.  AND PERHAPS IT IS JUST THE NATURE OF THE

CASE THAT HAD JUST ABOUT EVERYONE NOT PUTTING THE EMPHASIS SO

```
 1    MUCH ON A TRADITIONAL GUIDELINE ANALYSIS, AND FOR REASONS I
 2    CERTAINLY UNDERSTAND.
 3              MS. MORENO:  I GUESS I WOULD -- MY CLIENT DOES WANT
 4    TO ADDRESS THE COURT.
 5              THE COURT:  SURE.
 6              MS. MORENO:  AND BEFORE I END I WOULD REFOCUS YOUR
 7    HONOR WITH RESPECT TO THE RELATIVE CULPABILITY, WHAT
 8    MR. MOHAMUD ACTUALLY DID IN THIS CASE AND DIDN'T DO.  AND I
 9    WOULD ASK THE COURT TO IMPOSE A SENTENCE IN CONFORMANCE WITH
10    THE PARSIMONY CLAUSE, SUFFICIENT BUT NOT GREATER.  AND A
11    SENTENCE THAT IS JUST.
12              DOES THE COURT HAVE ANY QUESTIONS?
13              THE COURT:  NO.  THANK YOU, MS. MORENO.
14              MR. MOHAMUD, YOU MAY REMAIN SEATED IF YOU WISH.  AND
15    YOU DO HAVE AN OPPORTUNITY AT THIS TIME TO MAKE ANY STATEMENT
16    YOU WISH TO MAKE.  MY ONLY REQUEST WOULD BE FOR COUNSEL TO
17    PULL A MICROPHONE CLOSER TO MR. MOHAMUD SO THAT HE CAN BE
18    EASILY HEARD BY EVERYONE IN THE COURTROOM, AND PARTICULARLY
19    THE COURT REPORTER.
20              DEFENDANT MOHAMUD:  GOOD MORNING, YOUR HONOR.  I AM
21    HERE TODAY TO BE SENTENCED.  AND AFTER I FINISH MY TIME, I
22    WANT TO GO BACK TO SOCIETY AND REUNITE WITH MY FAMILY, RAISE
23    AND EDUCATE MY CHILDREN, WHOM I MISS A LOT, ESPECIALLY
24    SASABEL, WHO IS AUTISTIC.
25              YOUR HONOR, MY FAMILY AND I CAME TO THIS GREAT
```

1    COUNTRY IN NOVEMBER 2000.  THE REASON I CAME HERE WAS NOT TO

2    COMMIT CRIME, IT WAS JUST TO HAVE A BETTER LIFE.  AND I GOT A

3    LOT OF GOOD THINGS FROM THIS COUNTRY.  THE MAJORITY OF MY

4    CHILDREN WERE BORN IN U.S.A., AND ALL ARE AMERICAN CITIZENS.

5    I WILL NEVER EVER FORGET THE GOOD THINGS AND THE SUPPORT THAT

6    I GET FROM THIS COUNTRY.  IF I TRIED TO COUNT, I CANNOT COUNT

7    THEM BECAUSE IT IS A LOT.  HOWEVER, ONE DAY I HOPE I CAN PAY

8    BACK IN A POSITIVE WAY SOMETHING TO THIS COUNTRY WHICH HELPED

9    ME A LOT.

10             I BELIEVE THAT REWARD FOR GOOD SHOULD BE GOOD.  AS

11   THE LAW SAID IN THE QURAN, IS THERE ANY REWARD FOR GOOD OTHER

12   THAN GOOD.

13             YOUR HONOR, THERE IS NO DOUBT THAT I WAS CONVICTED,

14   BUT PLEASE NEVER FORGET MY COMMENTS.  IN MY HEART I BELIEVE I

15   AM NOT A BAD PERSON, OR A BAD GUY.  I AM NOT A DANGER TO

16   SOCIETY, NOR A THREAT TO ANYONE.  WHEN I WAS ON OUTSIDE I

17   DENOUNCED THE VIOLENCE AND THE BRUTALITY OF AL-SHABAAB IN MY

18   LECTURE, SOMALI COMMUNITY AS WELL AS IN MY DECLARATIONS WITH

19   OTHER FELLOW SOMALIS.

20             TODAY I AM CONDEMNING THE VIOLENCE AND IDEOLOGY OF

21   TERRORISTS THAT AL-SHABAAB REPRESENT.  IN MY HEART I DO NOT

22   BELIEVE IN THAT KIND OF IDEOLOGY, AND I WILL NEVER, EVER

23   SUPPORT IT.

24             YOUR HONOR, PLEASE CONSIDER THAT MY CONDUCT AND

25   SERVICES THAT I HAD PERFORMED FOR MY COMMUNITY FROM 2000 TO

1   2010 DEFINE WHO I AM.  AND MY GOOD ACTS THAT I DID FOR MY

2   COMMUNITY, IT WILL BE REMEMBERED FOREVER.

3           YOUR HONOR, I PROMISE TODAY, WHEN I AM RELEASED I

4   WILL BE A LAW ABIDING CITIZEN, AND PRODUCTIVE MEMBER OF

5   SOCIETY.  AND I WILL NEVER, EVER BE IN A SITUATION LIKE THIS,

6   FOR IT IS A NIGHTMARE.  I NEVER DREAM IN MY LIFE THAT I AGAIN

7   FACE SOMETHING LIKE THAT.  REGARDLESS OF THE OUTCOME OF YOUR

8   HONOR'S DECISION, YOU HAVE MY COMPLETE RESPECT.

9           THANK YOU, YOUR HONOR.

10          **THE COURT:**  THANK YOU, MR. MOHAMUD.

11          MS. HAN.

12          **MS. HAN:**  YOUR HONOR, I JUST WANT TO BEGIN WITH

13  SOMETHING THAT CAME FROM THIS DEFENDANT'S SENTENCING PAPERS,

14  AND THAT IS A STATEMENT TO THE EFFECT OF THAT ESSENTIALLY A

15  MESSAGE HAD BEEN SENT THAT ACTIONS BELIEVED TO BE HUMANITARIAN

16  IN NATURE MAY BE VIEWED IN A CRIMINAL LIGHT AND SUBJECT TO

17  CRIMINAL PENALTIES.

18          YOUR HONOR, I WANT TO BEGIN THERE, BECAUSE I THINK

19  THAT THAT TRULY MINIMIZES WHAT THIS DEFENDANT DID.  THIS

20  DEFENDANT WAS A PERSON WHO SUPPORTED -- AS THE EVIDENCE SHOWED

21  AT TRIAL SUPPORTED AL-SHABAAB, AN ENTITY WHO SENT THREATENING

22  LETTERS TO PEOPLE WHO TRIED TO SUPPORT THE ETHIOPIANS, SHOT

23  PEOPLE OUTSIDE OF THE MOSQUE, AND CONDUCTED SUICIDE BOMBINGS.

24  AS MS. MORENO STATED, HE WAS WELL AWARE OF WHAT THE YOUTH WERE

25  ABOUT.

1          AND CERTAINLY THERE WERE INDIVIDUALS WHO WERE

2     AGAINST ETHIOPIA, BUT THEY WERE NOT ONE AND THE SAME WITH

3     AL-SHABAAB.  SO ANY ATTEMPT TO JUSTIFY JUST MERELY TRYING TO

4     SUPPORT ANY ENTITY THAT WAS AGAINST ETHIOPIANS IT IS NOT ONE

5     AND THE SAME TO SUPPORT AL-SHABAAB AND BE AGAINST THE

6     ETHIOPIANS, WHICH IS ESSENTIALLY I THINK WHAT HAS BEEN TRYING

7     TO BE STATED IN SOME OF THIS DEFENDANT'S PAPERS.

8          YOUR HONOR, THIS DEFENDANT IS SOMEBODY WHO LEFT

9     SOMALIA, WAS ABLE TO MAKE IT OUT.  WAS ABLE TO MAKE AN

10    EDUCATION AND CAME HERE TO THE UNITED STATES.  AND HERE HE

11    BECAME A LEADER HERE IN SAN DIEGO, HE BECAME A RELIGIOUS

12    LEADER AT A MOSQUE HERE IN SAN DIEGO.

13         AND THAT IS SIGNIFICANT IN THE SOMALI COMMUNITY HERE

14    IN THE UNITED STATES BECAUSE THE SOMALI COMMUNITY HERE IN SAN

15    DIEGO IS THE SECOND LARGEST SOMALI COMMUNITY HERE IN THE

16    UNITED STATES, SECOND ONLY TO MINNEAPOLIS.

17         AND HERE IN SAN DIEGO HE BECAME AN IMAM, A RELIGIOUS

18    LEADER, AS INDICATED BY THE MULTIPLE LETTERS THAT WERE

19    PRESENTED BY THE DEFENDANT; BUT HE ALSO BECAME A DUPLICITOUS

20    PERSON.

21         ON THE ONE HAND HE BECAME THE PERSON WHO WAS THE

22    FAMILY MAN, WHO WAS THE IMAM AND HE WAS INVOLVED IN THE

23    COMMUNITY.  ON THE OTHER HAND, AS THE EVIDENCE AT TRIAL

24    DEMONSTRATED, HE WAS THE PERSON WHO WAS VERY SECURITY

25    CONSCIOUS AND SAID THAT PHONES WERE PROBLEMATIC.

1          HE WAS ALSO THAT SAME PERSON WHO HAD THE

2     RELATIONSHIP WITH ABU ZUBEYR, THE EMIR OF AL-SHABAAB THAT WAS

3     SUCH TOUTED BY HIS CO-DEFENDANT.  AND LASTLY, HE WAS THE

4     PERSON WHO ADEN AYROW KNEW TO CALL OUT TO THROUGH BASAALY

5     MOALIN TO HAVE SOME ACCOUNTABILITY FOR WHAT WAS HAPPENING IN

6     SAN DIEGO, AND FOR THE MONEY THAT WAS COMING FROM SAN DIEGO TO

7     AL-SHABAAB.

8          YOUR HONOR, MS. MORENO HAS TALKED ABOUT THE

9     CONSEQUENCES FOR THIS DEFENDANT AFTER HIS CONVICTION AND THAT

10    DEPORTATION MAY BE A CONSEQUENCE FOR HIM.

11         YOUR HONOR, IN THIS DISTRICT IN PARTICULAR YOU ARE

12    VERY FAMILIAR WITH DEPORTATION BEING A POSSIBLE CONSEQUENCE,

13    SO WE WOULD ASK THAT WHILE WE UNDERSTAND THAT SOMALIA IS

14    COMPLETELY WAR-RAVAGED, CERTAINLY YOU SEE DEFENDANTS ON A

15    WEEKLY BASIS WHO ARE AFRAID OF THE DRUG CARTELS IN MEXICO OR

16    FOR VARIOUS REASONS ARE TERRIFIED TO GO BACK TO THEIR HOME

17    COUNTRY.  SO WE BELIEVE THAT IT WOULD BE -- IT WOULD BRING

18    SOME SENTENCING DISPARITY FOR YOU TO OVER-ACCOUNT FOR THAT

19    POSSIBLE CONSEQUENCE THAT HE WOULD BE DEPORTED FROM THE UNITED

20    STATES.

21         **THE COURT:**  MAY I ASK YOU A POINT OF CLARIFICATION

22    ABOUT YOUR ARGUMENT, MS. HAN?

23         **MS. HAN:**  YES, YOUR HONOR.

24         **THE COURT:**  ARE YOU EQUATING, IN TERMS OF THE

25    COLLATERAL CONSEQUENCES ISSUE, PEOPLE WHO ENTER OR ATTEMPT TO

1  ENTER THIS COUNTRY WITHOUT AUTHORIZATION, SO-CALLED ILLEGALS,

2  WHO ARE THEN RETURNED TO, ALMOST IN ALL CASES MEXICO, DEPORTED

3  OR REMOVED TO MEXICO?

4        **MS. HAN:**  NO, YOUR HONOR.  I AM ACTUALLY TALKING

5  ABOUT A MORE CLASSIC DEFENDANT HERE IN SAN DIEGO, WHICH IS A

6  DEFENDANT WHO IS A LAWFUL PERMANENT RESIDENT OR -- NOT EVEN A

7  LAWFUL PERMANENT RESIDENT, EVEN A CITIZEN OF MEXICO WHO COMES

8  HERE, DRIVING A CAR, USUALLY, WITH DRUGS.  AND FOR VARIOUS

9  REASONS SAYS, YOU KNOW, THERE ARE GOING TO BE COLLATERAL

10  CONSEQUENCES FOR ME AND I AM TERRIFIED TO GO BACK TO MEXICO.

11        **THE COURT:**  MORE IMPORTANTLY, YOU ARE DRAWING A

12  PARALLEL, THEN, BETWEEN THIS DEFENDANT AND CASES WHERE

13  DEFENDANTS HAVE LEGAL PERMANENT RESIDENCE, I.E. GREEN CARDS,

14  AND WHERE THEY HAVE ESTABLISHED A LIFE, AND LEAVING OR BEING

15  REMOVED CREATES, OBVIOUSLY, GREAT DISRUPTION FOR THEM

16  PERSONALLY AND FOR THEIR FAMILIES.

17        **MS. HAN:**  YES, YOUR HONOR.

18        ADDITIONALLY, YOUR HONOR, WHILE I REALIZE THAT MS.

19  MORENO HAD TALKED ABOUT THE DEFENDANT BEING ORIGINALLY FROM

20  SOMALIA, MY UNDERSTANDING IS THAT HE ACTUALLY WAS ETHIOPIAN

21  AND IS FROM THAT PART OF SOMALIA THAT IS ACTUALLY NOW JIG-JIGA

22  WHICH IS REALLY -- HE WAS BORN IN ETHIOPIA, SO WERE HE TO BE

23  RETURNED TO SOMEPLACE IT WOULD BE TO ETHIOPIA, NOT NECESSARILY

24  SOMALIA, JUST AS A MINOR POINT OF CLARIFICATION.

25        **THE COURT:**  I THOUGHT ABOUT THAT AS MS. MORENO WAS

1    SPEAKING, THAT MOST OF THESE GENTLEMEN -- AND I BELIEVE

2    INCLUDING MR. MOHAMUD -- LIVED IN OTHER COUNTRIES OR SOUGHT

3    REFUGEE STATUS IN OTHER COUNTRIES BEFORE COMING TO THE UNITED

4    STATES, NOT JUST SOMALIA.  OKAY.

5              **MS. HAN:**  YOUR HONOR, JUST SHORTLY, JUST TO WRAP UP.

6              MS. MORENO TALKED ABOUT THAT THE GOVERNMENT WAS OVER

7    EMPHASIZING THE INFLUENCE THAT THE DEFENDANT HAD ON THE

8    COMMUNITY.  YOUR HONOR, I DON'T THINK THAT WE CAN OVER

9    EMPHASIZE THAT AT ALL.  THAT IS CERTAINLY TO BE SAID FOR,

10   AGAIN, THE NUMBERS OF PEOPLE WHO ARE IN THE AUDIENCE TODAY,

11   THE NUMBERS OF PEOPLE WHO HAVE BEEN IN THE OVERFLOW COURTROOMS

12   IN THE PAST.  I DON'T THINK WE CAN OVERSTATE AT ALL THE

13   INFLUENCE THAT HE HAD.  HE CAN'T HAVE IT BOTH WAYS.  HE

14   CERTAINLY HAD POSITIVE INFLUENCE BUT HE CERTAINLY HAD NEGATIVE

15   INFLUENCE.

16             AND CERTAINLY IN THIS CASE THAT WAS DEMONSTRATED,

17   FOR EXAMPLE, BY THE CALL IN WHICH HE AND BASAALY MOALIN TALKED

18   ABOUT HOLDING THE 20 TO 30 MOST TRUSTED INDIVIDUALS AT THE

19   MOSQUE.

20             SO WITH THAT INFLUENCE AND FOR ALL OF THE OTHER

21   REASONS WE DISCUSSED, WE WOULD SUBMIT ON OUR RECOMMENDATION.

22             **THE COURT:**  THANK YOU.

23             MS. MORENO, DID YOU HAVE ANYTHING FURTHER?

24             **MS. MORENO:**  THIS CALL, YOUR HONOR, I DIDN'T WANT TO

25   ADDRESS THAT.  I JUST BRIEFLY WILL SAY, YOUR HONOR --

```
 1              THE COURT:  WOULD YOU LIKE TO STAND BY THE LECTERN,
 2   MAYBE EASIER TO HEAR YOU.
 3              MS. MORENO:  THIS APRIL 17TH, 2008 CALL THAT THE
 4   GOVERNMENT HAS RELIED ON IS A CALL BETWEEN MR. MOALIN AND MY
 5   CLIENT.  IT IS A CALL WHERE MR. MOALIN SAYS TO MY CLIENT, IF
 6   YOU SHOULD HOLD BACK 20 OR 30 TRUSTED PEOPLE AT THE MOSQUE, NO
 7   ONE COULD REFUSE YOU.
 8              THEY BASE THEIR RECOMMENDATIONS ON -- AND
 9   CHARACTERIZE HIS APPARENTLY INSIDIOUS INFLUENCE ON THAT CALL.
10   THE PROBLEM IS THAT THERE IS NO EVIDENCE THAT ANYBODY WAS HELD
11   BACK, OR THAT ANYBODY THAT MR. MOHAMUD SPOKE TO DONATED FUNDS.
12              SO I JUST WANTED TO SAY THAT FOR THE RECORD, YOUR
13   HONOR.  I WOULD SUBMIT IT ON MY PAPERS.
14              THE COURT:  HOW OLD IS YOUR CLIENT AT THIS TIME?
15              MS. MORENO:  HE IS 41.
16              THE COURT:  AND I KNOW THE PROBATION REPORT HAD HIM
17   AS BEING BORN IN SOMALIA.  BUT APPARENTLY THE PROBATION REPORT
18   NEEDS TO BE CORRECTED IN THAT REGARD.
19              MS. MORENO:  I AM NOT SURE ABOUT THAT, YOUR HONOR.
20   I THINK WHERE HE WAS BORN AND WHEN HE WAS BORN AT THE TIME WAS
21   SOMALIA.
22              THE COURT:  ALL RIGHT.  DID YOU WANT TO BE -- NOT
23   THAT IT IS PARTICULARLY MATERIAL AT THIS POINT, MS. HAN, BUT
24   THERE DID SEEM TO BE A LITTLE BIT OF A DISCREPANCY THERE.
25              MS. HAN:  YOUR HONOR, THAT WAS AN OVERSIGHT ON OUR
```

1    PART THAT WE DIDN'T INCLUDE THAT.  JUST OUR INFORMATION FROM

2    HIS IMMIGRATION APPLICATION STATED THAT HE WAS BORN IN

3    JIG-JIGA, WHICH IS IN ETHIOPIA.

4            **THE COURT:**  LET ME BEGIN, FIRST OF ALL -- WELL,

5    OBVIOUSLY WE ARE DEALING WITH FOUR COUNTS OF CONVICTION HERE,

6    COUNTS 1, 2, 3 AND 5:  FIRST BEING CONSPIRACY TO PROVIDE

7    MATERIAL SUPPORT TO FOREIGN TERRORISTS; THE SECOND BEING A

8    CONSPIRACY TO PROVIDE MATERIALS TO A FOREIGN TERRORIST

9    ORGANIZATION; THE THIRD MONEY LAUNDERING; AND THE FIFTH

10   PROVIDING MATERIAL SUPPORT TO A FOREIGN TERRORIST

11   ORGANIZATION.

12           THERE ARE OBJECTIONS, ONCE AGAIN THERE ARE

13   OBJECTIONS FROM BOTH PARTIES TO THE ORIGINAL PROBATION REPORT.

14   AND SO, AS I DID WITH MR. MOALIN, LET ME START OUT BY

15   RESPONDING TO THOSE OBJECTIONS, WHICH I MUST, EVEN THOUGH THEY

16   MAY NOT BE OF GREAT MOMENT, PARTICULARLY, THOSE DEALING WITH

17   FACTUAL OBJECTIONS.

18           FIRST, WITH RESPECT TO -- NOW I AM USING AS A POINT

19   OF REFERENCE DEFENDANT'S OBJECTIONS TO DRAFT PRESENTENCE

20   REPORT, AS IT IS ENTITLED.

21           WITH RESPECT TO THE OFFENSE CONDUCT, PARAGRAPHS 3 TO

22   55, THERE IS AN OBJECTION TO THE ENTIRETY OF THE OFFENSE

23   CONDUCT.  I WOULD NOTE THE OBJECTION, OVERRULE IT, AND

24   INDICATE, OBVIOUSLY, THAT THE DEFENDANT DOES NOT AGREE WITH

25   THE CHARACTERIZATION OF THE OFFENSE CONDUCT AS SET FORTH IN

```
 1   THE PROBATION REPORT.
 2              WITH RESPECT TO THE NEXT OBJECTION, AT PARAGRAPH 6
 3   OF THE PROBATION REPORT.  I WOULD NOTE THAT AND INDICATE THAT
 4   IT IS NOT MATERIAL TO ANY SENTENCING CHOICE I WOULD MAKE WITH
 5   RESPECT TO THE OBJECTION AT PARAGRAPH 11 OF THE P.S.R.  I
 6   WOULD NOTE THAT AND OVERRULE IT.
 7              WITH RESPECT TO THE OBJECTIONS AT PARAGRAPHS 33
 8   THROUGH 35, 41 THROUGH 43 AND 46 THROUGH 47, I WOULD NOTE THEM
 9   AND OVERRULE THEM.  I REALIZE THAT THEY ARE OBJECTING TO
10   EITHER A CHARACTERIZATION OR REQUESTING A FACTUAL
11   CLARIFICATION.
12              WITH RESPECT TO THE OBJECTION TO PARAGRAPH 48, I
13   WOULD NOTE THAT AND OVERRULE IT.  THAT WOULD BE THE FIRST
14   SENTENCE.
15              WITH RESPECT TO THE SECOND SENTENCE, I BELIEVE THAT
16   THE SECOND SENTENCE OF THE OBJECTION TO PARAGRAPH 48, AS THAT
17   OBJECTION IS SET FORTH ON PAGE 4 OF THE OBJECTIONS, WOULD BE A
18   CORRECT STATEMENT, THAT IS AS TO WHAT THE GOVERNMENT
19   STIPULATION WAS.
20              WITH RESPECT TO THE OBJECTION IN PARAGRAPH 49, I
21   WOULD NOTE THAT AND WOULD OVERRULE THE OBJECTION.
22              AND THE SAME WOULD BE WITH RESPECT TO THE OBJECTION
23   AT PARAGRAPH 52 TO THE DEFENDANT'S CHARACTERIZATION OF THAT
24   PARTICULAR REFERENCE IN THE P.S.R.
25              WITH RESPECT TO THE OBJECTION AT PARAGRAPH 54, I
```

1  WOULD NOTE THAT AND INDICATE IT IS NOT MATERIAL TO ANY

2  SENTENCING CHOICE I WOULD MAKE.

3          WITH RESPECT TO THE OFFENSE LEVEL COMPUTATIONS, ALL

4  OF THE OBJECTIONS THAT FOLLOW, FROM THE BOTTOM OF PAGE 4

5  THROUGH ALL OF PAGE 5 AND THE FIRST FEW LINES OF PAGE 6, I

6  WILL ADDRESS THOSE IN MY OWN ALLOCUTION, RATHER THAN DOING

7  THEM INDIVIDUALLY HERE.

8          WITH RESPECT TO OBJECTIONS TO PERSONAL AND FAMILY

9  DATA, I WOULD NOTE THOSE AND NOTE THAT THESE ARE ACCEPTABLE

10 CLARIFICATIONS, OBVIOUSLY, OR CORRECTIONS.

11         WITH RESPECT TO THE NEXT SECTION DEALING WITH

12 FACTORS WARRANTING A DEPARTURE, I WILL ADDRESS THOSE IN MY

13 ALLOCUTION, AS WELL AS FACTORS WARRANTING A SENTENCE OUTSIDE

14 THE ADVISORY GUIDELINE SYSTEM, AND OBJECTIONS TO THE PROBATION

15 OFFICER'S ANALYSIS.

16         FINALLY, ON PAGE 7, THE OBJECTIONS TO THE SENTENCING

17 RECOMMENDATIONS AND CALCULATIONS, I WOULD ADDRESS IN MY

18 ALLOCUTION.

19         WITH RESPECT TO THE GOVERNMENT'S OBJECTIONS, LARGELY

20 TO THE GROUPING ISSUES ONCE AGAIN.  AND TO THE EXTENT THERE

21 WERE ERRORS IN THE MAXIMUM STATUTORY PENALTIES IDENTIFIED IN

22 ONE OR MORE OF THE COUNTS OF CONVICTION, I WILL DEAL WITH

23 THOSE IN MY OWN ALLOCUTION.

24         SO WHAT I WOULD LIKE TO DO IS BEGIN WITH THE SAME

25 GENERAL REMARKS INDICATING THAT, AS WAS THE CASE WITH

1   MR. MOALIN, THE ORIGINAL PROBATION REPORT HAS SET FORTH

2   MULTIPLE GROUP ANALYSIS AND CONCLUDED THE ADVISORY GUIDELINE

3   RANGE WAS LIFE IN CUSTODY, CONCURRENT WITH THE OTHER COUNTS.

4           AND THE GOVERNMENT APPROPRIATELY FILED AN OBJECTION

5   ARGUING THAT THE 20 YEARS OF STATUTORY MAXIMUM FOR COUNT 3 IS

6   WHAT SHOULD HAVE BEEN IDENTIFIED, AND THAT THE TOTAL

7   PUNISHMENT OR ADJUSTED GUIDELINE RANGE FOR ALL COUNTS OF

8   CONVICTION IS 65 YEARS OR 780 MONTHS.  I WILL DEAL WITH THOSE

9   ISSUES WHEN I GET INTO THE NUTS AND BOLTS OF A GUIDELINE

10  ANALYSIS.

11          AN ADDENDUM WAS FILED BASICALLY AGAINST STACKING THE

12  COUNTS FOR 65 YEARS OF CUSTODY, AND THE GOVERNMENT IS

13  RECOMMENDING NO LESS THAN 22 YEARS CUSTODY.

14          AND SO THERE IS NO SPECIFIC RECOMMENDATION FROM MS.

15  MORENO FOR THE REASONS SHE INDICATED, AND I CERTAINLY RESPECT

16  THAT, HER PRACTICE IN ANOTHER DISTRICT.

17          TO BEGIN WITH, ONCE AGAIN, IN MY VIEW ALL FOUR OF

18  THESE COUNTS ARE GROUPED UNDER THE GUIDELINE SECTIONS THAT I

19  ENUMERATED EARLIER:  2X1.12 AND 1.5; 2S1.1.  AND SPECIFICALLY

20  THE MONEY LAUNDERING COUNT OF COUNT 3 WOULD ALSO BE GROUPED

21  UNDER -- SPECIFICALLY GIVEN THE GUIDANCE OF APPLICATION NOTE 6

22  TO 2S1.1, AND I WON'T GO ANY FURTHER ON THAT.

23          SO PROCEEDING, THEN, WITH THE GUIDELINES AND THE

24  GUIDELINE ANALYSIS.  THE BASE OFFENSE LEVEL WOULD BE 33 UNDER

25  THESE -- FOR THESE GROUPED COUNTS, WITH A 12-LEVEL UPWARD

1   ADJUSTMENT UNDER 3A1.4 AS WELL AS AN INCREASE FROM THE

2   CATEGORY I CRIMINAL HISTORY TO CATEGORY VI CRIMINAL HISTORY.

3            AS STATED EARLIER AND WITH RESPECT TO MR. MOALIN, I

4   DO FIND THAT 3A1.4 APPLIES SPECIFICALLY, PARAGRAPHS A AND B,

5   BECAUSE I WOULD FIND THAT THE EVIDENCE DURING THE TRIAL

6   DISCLOSED BEYOND A REASONABLE DOUBT THAT THESE OFFENSES WERE

7   CALCULATED TO INFLUENCE OR AFFECT GOVERNMENTAL ACTIONS OR

8   INTIMIDATION, COERCION BY AL-SHABAAB, A BRUTAL TERRORIST

9   ORGANIZATION.  I ALREADY ENUMERATED THE REASONS FOR THAT IN

10  THE EARLIER SENTENCING, I CERTAINLY ADOPT THEM HERE.  NO ONE

11  DENIES THAT AL-SHABAAB WAS A PARTICULARLY VIOLENT AND BRUTAL

12  ORGANIZATION.  BUT OBVIOUSLY WHAT WAS DONE BY AL-SHABAAB IN

13  SOMALIA IS A MATTER OF RECORD THAT WAS DETAILED IN THE

14  TESTIMONY DURING THE COURSE OF THE TRIAL.  AND AGAIN THE

15  GOVERNMENT HAS SALIENTLY POINTED OUT THE DETAILS AT PAGES 9

16  AND 10 OF ITS SENTENCING MEMORANDUM, WHICH I WOULD ADOPT AT

17  THIS POINT IN MY ANALYSIS.

18           I REJECTED THE NOTION THAT THE TRANSITIONAL FEDERAL

19  GOVERNMENT WAS NOT A FUNCTIONING GOVERNMENT.  OBVIOUSLY IT WAS

20  OR ATTEMPTING TO FUNCTION AT THE TIME WITH SUPPORT FROM LARGE

21  PORTIONS OF THE SOMALI POPULACE, OTHER COUNTRIES IN THE AREA,

22  CONSTITUENT ELEMENTS OF THE AFRICAN UNION, OF COURSE, WITH THE

23  SUPPORT OF THE UNITED STATES AS WELL.

24           SO THE TOTAL OFFENSE LEVEL OF 43 AND THE CRIMINAL

25  HISTORY CATEGORY OF VI, WITH THE GUIDELINE RANGE OF LIFE IN

 1    CUSTODY AT THAT POINT, MUST ONCE AGAIN GIVE WAY TO THE MAXIMUM

 2    STATUTORY PENALTIES THAT APPLY FOR THESE OFFENSES OF

 3    CONVICTION UNDER 5G1.1, 5G1.2 AND GIVEN THE DEFINITION OF THE

 4    STATUTORY MAXIMUMS, MULTIPLE PUNISHMENT.  AND I WILL NOT

 5    REPEAT WHAT I SAID EARLIER WITH RESPECT TO THOSE PARTICULAR

 6    REFERENCES OR PHRASES.

 7            THE 65-YEAR TOTAL HERE, REALIZING THAT IS NOT WHAT

 8    IS RECOMMENDED CERTAINLY BY PROBATION, BUT THE REFERENCES TO

 9    65 YEARS EITHER AS THE ADVISORY GUIDELINE RANGE OR AS A FIGURE

10    OF TOTAL PUNISHMENT IS ONCE AGAIN A MECHANICAL ADDING UP ALL

11    OF THE STATUTORY MAXIMUMS FOR THESE FOUR COUNTS OF CONVICTION

12    WITHOUT DETERMINING THE ADJUSTED OFFENSE LEVEL THAT I FIND IT

13    TO BE NECESSARY TO ENTERTAIN AS THE ADJUSTED COMBINED OFFENSE

14    LEVEL ANALYSIS IN THIS CASE.

15            SO BEFORE ADDRESSING ANY PARTICULAR DEPARTURE

16    REQUEST, WHETHER EXPRESS OR IMPLIED, THE STATUTORY MAXIMUMS,

17    THE ADVISORY GUIDELINE RANGE FOR EACH OF THE COUNTS OF

18    CONVICTION WOULD BE, FOR COUNTS 1, 2 AND 5, 15 YEARS, AND FOR

19    COUNT 3 IT WOULD BE 20 YEARS.

20            I BELIEVE THERE HAS BEEN AN IMPLICIT REQUEST FOR A

21    COMBINATION OF CIRCUMSTANCES DEPARTURE, ONCE AGAIN WITH THE

22    FALSE PREMISE THAT THE COMBINED ADJUSTED GUIDELINE RANGE IS 65

23    YEARS.

24            AM I CORRECT IN THAT REGARD?

25            **MS. MORENO:**  YES, YOUR HONOR.

1          THE COURT:  I WOULD NOT FIND THAT TO BE THE ADJUSTED

2     GUIDELINE RANGE, THAT BEING 65 YEARS.

3          I THINK AT PAGES 2 AND 3 OF MR. MOHAMUD'S SENTENCING

4     MEMORANDUM THAT IMPLIED OR IMPLICIT REQUEST IS MADE FOR A

5     COMBINATION OF CIRCUMSTANCES DEPARTURE.  AND THE REASONS THAT

6     ARE SPECIFIED ARE ESSENTIALLY THE HISTORICAL BACKDROP OF

7     SOMALIA, THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITY

8     AND THE COLLATERAL CONSEQUENCES FOR MR. MOHAMUD.  AND

9     ALTERNATIVELY THE ARGUMENT IS FOR A SENTENCE OUTSIDE THE

10    ADVISORY GUIDELINE RANGE.  AND UNDER A 3553(A) ANALYSIS ONCE

11    AGAIN I THINK BOTH SIDES ARE GENERALLY IN AGREEMENT THAT THE

12    PRIMARY CONTEXT WITHIN WHICH THIS SENTENCING IS TO TAKE PLACE

13    SHOULD BE UNDER THE 3553(A) ANALYSIS.

14         AND I DO QUESTION THE RELEVANCE OF THE ADVISORY

15    GUIDELINES AND THE ADVISORY GUIDELINE ANALYSIS IN THIS

16    PARTICULAR CASE.

17         SO ARE YOU STILL -- LET ME JUST ASK YOU FOR

18    CLARIFICATION, MS. MORENO.  ARE YOU STILL PURSUING EXPRESS

19    DEPARTURES UNDER THE GUIDELINE ANALYSIS HERE OR --

20         MS. MORENO:  UNDER YOUR HONOR'S GUIDELINE ANALYSIS

21    OR UNDER THE --

22         THE COURT:  WELL, I THINK FROM HOW I READ YOUR

23    SENTENCING MEMORANDUM YOUR REQUEST FOR MITIGATION IN THE FORM

24    OF DEPARTURES IN A GUIDELINE ANALYSIS IS CONVERTED TO A

25    3553(A) --

1              MS. MORENO:  THAT'S CORRECT.

2              THE COURT:  -- REQUEST FOR LENIENCY OR MITIGATION IN

3    LIGHT OF THE EQUITABLE CONSIDERATIONS FOR YOUR CLIENT.

4              MS. MORENO:  THAT IS CORRECT.

5              THE COURT:  IS THAT CORRECT?

6              MS. MORENO:  THAT IS CORRECT, YOUR HONOR.

7              THE COURT:  ALL RIGHT.  WELL, ULTIMATELY, AS WAS THE

8    CASE WITH MR. MOALIN, I THINK THE MOST IMPORTANT SENTENCING

9    DECISION I MUST MAKE HERE IS WHETHER THE CUSTODIAL SENTENCES

10   FOR THE VARIOUS COUNTS OF CONVICTION WILL BE IMPOSED

11   CONCURRENTLY, CONSECUTIVELY OR A COMBINATION OF CONCURRENT AND

12   CONSECUTIVE SENTENCES.

13             BEFORE I GET TO THAT, CONCLUDING WITH THE ADVISORY

14   GUIDELINE ANALYSIS, I WOULD FIND THAT THE ADVISORY GUIDELINE

15   RANGE WOULD BE AS FOLLOWS:  FOR EACH OF THE COUNTS OF

16   CONVICTION 15 YEARS CUSTODY FOR COUNTS 1, 2 AND 5, AND THEN 20

17   YEARS OF CUSTODY FOR COUNT 3.

18             WITH RESPECT TO THE 3553(A) ANALYSIS.  THE NATURE

19   AND CIRCUMSTANCES OF THE OFFENSE OR OFFENSES NEED TO BE

20   ADDRESSED, OBVIOUSLY.  AS I SAID BEFORE, THESE OFFENSES WERE

21   VERY SERIOUS, AS THEY PROVIDED SUPPORT FOR AN ORGANIZATION AND

22   BUTTRESSED A CAMPAIGN OF TERROR BY AL-SHABAAB.  EVERYONE

23   AGREES THIS WAS A BRUTAL AND PRETTY HORRIFIC ORGANIZATION IN

24   TERMS OF THE THINGS THAT WERE DONE; TARGETED BOMBINGS,

25   ASSASSINATIONS, AS I SAID EARLIER, MURDER, MAYHEM, INCLUDING

1    ATTACKS ON THE PRESIDENTIAL PALACE AND ULTIMATELY WITH THE

2    PURPOSE TO DEFEAT THE TRANSITIONAL FEDERAL GOVERNMENTAL FORCES

3    THAT WERE ATTEMPTING, AT THAT POINT, TO BRING ORDER TO THE

4    COUNTRY.

5              THE ACTIONS OF MR. MOHAMUD WERE SOMEWHAT AGGRAVATED

6    BECAUSE OF HIS STANDING IN THE COMMUNITY.  I DON'T THINK THAT

7    THIS IS SOMETHING THAT CAN BE IGNORED, AND I THINK ULTIMATELY

8    IT CUTS BOTH WAYS.

9              THIS WAS AN IMAM OF A LARGE MOSQUE HERE IN THE SAN

10   DIEGO AREA, AND ABLE TO SECURE -- WELL, TO APPROACH MEMBERS,

11   CERTAIN NUMBERS OF MEMBERS, AND PROCURE SUPPORT FROM THEM.

12             I THINK IT CAN BE FAIRLY SAID THAT HIS STANDING IN

13   THAT REGARD LENT LEGITIMACY TO HIS REQUEST.  ALSO, ARGUABLY,

14   TO THE EFFORT OF SUPPORTING THIS TERRORIST ORGANIZATION WHICH,

15   IN TURN -- I UNDERSTAND THE ARGUMENT OF THE GOVERNMENT HERE,

16   IN TURN SOWS THE SEEDS OF THE NOTION THAT TERRORISM IN SUPPORT

17   OF A WORTHY CAUSE AND DEFENSE OF A WORTHY CAUSE IS ACCEPTABLE

18   GIVEN THE RELATIVE WORTHINESS OF THE CAUSE.

19             OBVIOUSLY, WE KNOW THIS NOT TO BE TRUE, AND I ACCEPT

20   WHAT MR. MOHAMUD HAS SAID HERE TODAY.  AND IT HAS BEEN A

21   STATEMENT OF SINCERITY AND CONTRITION, TO THE EXTENT HE CAN

22   AFFORD TO BE CONTRITE AT THIS PARTICULAR POINT WITHOUT

23   ACCEPTING RESPONSIBILITY FOR WHAT TOOK PLACE.  I UNDERSTAND

24   THAT.

25             I KNOW THERE WAS A REFERENCE --

1              AND THIS WAS SOMETHING WHAT WAS OBJECTED TO BY YOU,

2      MS. MORENO.

3              A REFERENCE IN THE P.S.R. -- I BELIEVE IT WAS THE

4      P.S.R. -- THAT MR. MOHAMUD WAS THE MOST DANGEROUS INDIVIDUAL

5      OF ALL OF THESE DEFENDANTS.  AND I WOULD NOT AGREE WITH THAT

6      CHARACTERIZATION.  AND, FRANKLY, I THINK, LOOKING AT THE

7      COMPARABLE PARTICIPATORY ROLES OF MR. MOALIN -- AND I SAY THIS

8      WITH RESPECT TO MR. MOALIN, WHO IS STILL HERE TODAY -- AND

9      THAT OF MR. MOHAMUD, I DON'T THINK THERE IS TOO MUCH OF A

10     COMPARISON THERE.

11             MR. MOHAMUD DID NOT HAVE NEARLY THE SAME ROLE,

12     FUNCTIONING, FUNCTIONING ON MULTIPLE LEVELS AS DID MR. MOALIN,

13     AND I THINK THAT IS SOMETHING THAT NEEDS TO BE TAKEN INTO

14     ACCOUNT.  ALTHOUGH, AS I SAY, THERE IS AN AGGRAVATING

15     COMPONENT HERE WITH MR. MOHAMUD'S ELEVATED STATUS IN THIS

16     COMMUNITY.

17             IT IS IN THE AREA OF HISTORY AND CHARACTERISTICS OF

18     MR. MOHAMUD WHERE HIS SUBSTANTIAL EQUITIES DO EXIST.

19     MR. MOHAMUD IS A 41-YEAR-OLD SELF-MADE MAN.  I WAS QUITE

20     IMPRESSED WITH HIS BACKGROUND.  AN IMAM OF SAN DIEGO.  HE IS

21     HIGHLY EDUCATED IN SEVERAL AREAS, I NOTED THAT AS WELL, WITH

22     ADVANCED DEGREES IN DIFFERENT AREAS.

23             HE SURVIVED THE RAVAGES OF WAR IN SOMALIA AND

24     DISPLACEMENT TO KENYA, PAKISTAN, AND THEN ULTIMATELY HERE TO

25     THE UNITED STATES WITH REFUGEE STATUS.

NOVEMBER 18, 2013

1          HE HAS ENORMOUS SUPPORT AND RESPECT FROM HIS MOSQUE,

2     FROM THE COMMUNITY, FROM HIS FAMILY.  HE HAS 11 CHILDREN, I

3     UNDERSTAND ALL OF THAT.  A VERY LARGE FAMILY.  ONE OF HIS

4     CHILDREN, OBVIOUSLY, AFFLICTED WITH AUTISM.  AUTISM IS A

5     CONTINUUM, AS WE ALL KNOW, IT IS A SCALE.  I DON'T KNOW

6     EXACTLY HOW AGGRAVATED THE CIRCUMSTANCES ARE, BUT IT IS --

7     AUTISM IS A VERY, VERY SERIOUS AND POTENTIALLY DISABLING

8     CONDITION FOR MANY WHO HAVE IT.

9          I AM NOT UNMINDFUL OF THE -- LET ME WRAP UP

10     EQUITABLE CONSIDERATIONS AS THEY RELATE TO MR. MOHAMUD'S

11     BACKGROUND.

12          I AM AWARE THAT EVEN AT THE TIME OF HIS ARREST HERE

13     IN THIS CASE HE WAS CONTINUING ON WITH EDUCATION, SEEKING A

14     DEGREE IN YET ANOTHER AREA, SEPARATE AND APART FROM THEOLOGY.

15          COLLATERAL CONSEQUENCES.  I AM NOT UNMINDFUL OF THE

16     COLLATERAL CONSEQUENCES IN THIS CASE IN PARTICULAR THAT MAY

17     NOT BE VISITED UPON SOME OF MR. MOHAMUD'S CO-DEFENDANTS, AND

18     THIS IS PARTICULARLY TOUGH.

19          MS. HAN, AS YOU POINTED OUT, THE COURT OFTEN SEES

20     THIS IN THIS PARTICULAR DISTRICT WITHIN THE CONTEXT OF OTHER

21     OFFENSES.  I DARE SAY, THOUGH, I CAN'T -- I CAN RECALL A

22     COUPLE OF CASES WHERE DEPORTATION OF A NON-U.S. CITIZEN WORKED

23     UNBELIEVABLE HARDSHIP, THAT BEING -- I AM THINKING OF ONE CASE

24     IN PARTICULAR WHERE A CANADIAN CITIZEN WHO WAS HEAD OF THE

25     DEPARTMENT OF PEDIATRIC NEPHROLOGY AT UCSD, GIVEN THE

1    CONVICTION HE SUSTAINED, LOST HIS RIGHT TO BE HERE.  HE WAS A

2    LEGAL PERMANENT RESIDENT.  LOST HIS JOB AS HEAD OF AN

3    IMPORTANT DEPARTMENT OF MEDICINE AT THE UNIVERSITY OF

4    CALIFORNIA AT SAN DIEGO.  LOST HIS HOME, HIS PROFESSION, HIS

5    LIVELIHOOD AND WAS REMOVED TO CANADA.

6            THERE ARE A FEW CASES WHERE COLLATERAL CONSEQUENCES

7    ARE VERY, VERY DIFFICULT, AND I THINK THIS IS ONE OF THE CASES

8    THAT FALL INTO THE DIFFICULT CATEGORY OF CASES WHERE THERE ARE

9    COLLATERAL CONSEQUENCES; AS MR. MOHAMUD IS FACING A

10   DEPORTATION, THE LOSS OF HIS HOME HERE, THE LOSS OF HIS

11   COMMUNITY, AND OBVIOUSLY SOME VERY, VERY GRAVE DIFFICULTIES

12   FOR HIS FAMILY.

13           I AM AWARE OF THE EQUITABLE AND GOOD WORKS

14   MR. MOHAMUD HAS DONE, AS WELL AS HIS SPIRITUAL GUIDANCE FOR

15   MANY.  ALL OF THOSE HAVE BEEN MENTIONED IN THE P.S.R.

16           MS. MORENO, YOU MADE REFERENCE TO MANY OF THOSE IN

17   YOUR ALLOCUTION, AND I AM NOT UNMINDFUL OF THOSE.

18           AS FAR AS THE HARSHNESS OF THE GUIDELINES AND

19   SPECIFICALLY SECTION 3A1.4, THEY ARE COMPLETELY ELIMINATED, IN

20   MY VIEW, BY THE COURT'S DECISION TO GROUP THESE OFFENSES AND

21   RUN CONCURRENT CUSTODIAL SENTENCES WITH RESPECT TO THESE

22   COUNTS.

23           ULTIMATELY, THE MOST RELEVANT SENTENCING

24   CONSIDERATION HERE WOULD BE, ASIDE FROM NATURE AND

25   CIRCUMSTANCES OF THE OFFENSES AND THE PERSONAL EQUITIES,

1  GENERAL CONSIDERATIONS SUCH AS THE NEED TO PROMOTE RESPECT FOR
2  U.S. LAWS THAT GOVERN TERRORISM, INCLUDING FOREIGN TERRORISM.
3  THE NEED TO DETER, BOTH SPECIFICALLY AND GENERALLY.  I HAVE NO
4  THOUGHT THAT MR. MOHAMUD WOULD IN ANY WAY REOFFEND IN THE
5  FUTURE, EVEN IF HE WERE IN A POSITION TO DO SO, BUT THERE IS A
6  GENERAL DETERRENT MESSAGE TO BE VINDICATED HERE IN THIS
7  ANALYSIS.  AND PROTECTION OF THE PUBLIC, OBVIOUSLY, FROM THESE
8  THINGS.

9          THERE IS A MESSAGE TO BE SENT THAT THE SEEDS OF THIS
10 KIND OF THINKING CAN'T BE SOWN OR TOLERATED HERE IN THE UNITED
11 STATES, WHETHER THE TARGET IS FOREIGN TERRORISM OR OTHERWISE.

12         SO THE CUSTODIAL SENTENCE NEEDS TO REFLECT THE
13 SERIOUSNESS OF WHAT WAS DONE.  IT NEEDS TO AVOID UNWARRANTED
14 SENTENCING DISPARITY, AND I AM VERY MINDFUL OF THAT.  AND
15 IMPORTANTLY IT NEEDS TO BE SUFFICIENT BUT NO GREATER THAN
16 NECESSARY TO BUTTRESS ALL OF THESE SENTENCING PURPOSES.

17         OBVIOUSLY, ALTERNATIVES TO CUSTODY WOULD NOT BE
18 APPROPRIATE IN THIS CASE.  AND ANY OTHER OPTION AVAILABLE TO
19 THE COURT, AND INTERESTINGLY ENOUGH THERE ARE OTHER OPTIONS
20 THAT ARE LEGALLY AVAILABLE TO THE COURT OTHER THAN CUSTODY,
21 BUT THOSE OPTIONS WOULD NOT BE APPROPRIATE IN THIS PARTICULAR
22 CASE.

23         SO FOR ALL OF THESE REASONS, AND MOST IMPORTANTLY
24 TAKING INTO ACCOUNT THE SERIOUSNESS OF THE OFFENSES AND THE
25 SUBSTANTIAL EQUITIES OF DEFENDANT MOHAMUD, I WOULD FIND THAT A

1   PERIOD OF 13 YEARS CUSTODY FOR COUNTS 1, 2, 3 AND 5, IMPOSED

2   CONCURRENTLY FOR EACH COUNT OF CONVICTION FOR A TOTAL OF 13

3   YEARS IN CUSTODY, WOULD BE FAIR, JUST AND REASONABLE.

4          ULTIMATELY, FOR THESE COUNTS, THEY SHOULD BE IMPOSED

5   CONCURRENTLY AS THEY ALL REPRESENT RELATED OFFENSES WHERE A

6   CONTINUING COURSE OF CRIMINAL CONDUCT AND, AS I SAID EARLIER

7   IN THE CASE OF COUNT 3, THE MEANS BY WHICH THE OTHER COUNTS

8   WERE EXECUTED, THAT IS SECURING THE COMMON GOAL OF FINANCING

9   AL-SHABAAB AND THE TERRORIST ACTIVITY.

10         I WILL SAY THIS.  AS I VIEW MR. MOHAMUD HERE, I SEE,

11  ON THE POSITIVE SIDE, TWO THINGS HERE.  I SEE HIM AS AN IMAM,

12  A SPIRITUAL LEADER.  THIS IS SEPARATE AND APART FROM THE

13  NATURE AND CIRCUMSTANCES OF THE OFFENSES AND SOME OF THE

14  AGGRAVATING FACTORS HERE.  I SEE HIM AS AN IMAM.

15         I ALSO SEE HIM AS A MAN WHO DID SUBSTANTIAL WORKS IN

16  TERMS OF CHARITY, EDUCATIONAL SUPPORT, SPIRITUAL GUIDANCE AND

17  OTHER THINGS, THINGS ON THE GROUND THAT COUNTED FOR MANY, MANY

18  PEOPLE.  I WOULD SAY THIS, THAT WITHOUT THOSE EQUITIES, WHICH

19  I WEIGHED VERY HEAVILY IN MR. MOHAMUD'S ANALYSIS HERE, AND

20  ULTIMATELY IN THE CUSTODIAL DECISION, MR. MOHAMUD WOULD HAVE

21  BEEN FACING SUBSTANTIALLY MORE TIME.

22         SO I WANT TO EMPHASIZE THAT IT WAS IN THE AREA OF

23  PERSONAL EQUITIES FOR MR. MOHAMUD THAT THIS SENTENCE HAS BEEN

24  ARRIVED AT.

25         ACCORDINGLY, PURSUANT TO THE 1984 SENTENCING REFORM

1    ACT, IT IS THE JUDGMENT AND SENTENCE OF THE COURT THAT AS TO

2    EACH OF THE COUNTS OF CONVICTION, 1, 2, 3 AND 5, MR. MOHAMUD

3    BE, AND HEREBY IS, COMMITTED TO THE CUSTODY OF THE BUREAU OF

4    PRISONS FOR A TERM OF 13 YEARS, WITH EACH OF THOSE COUNTS

5    IMPOSED CONCURRENTLY TO ONE ANOTHER FOR A TOTAL OF 13 YEARS IN

6    CUSTODY.

7           NO FINE IS IMPOSED IN CONNECTION WITH ANY OF THE

8    COUNTS.  A $100 SPECIAL ASSESSMENT IS ASSESSED IN CONNECTION

9    WITH COUNT 1 AND WAIVED FOR THE OTHER COUNTS FOR A TOTAL OF

10   $100 IN SPECIAL ASSESSMENTS.

11          FOLLOWING COMPLETION OF THE CUSTODIAL SENTENCE IN

12   THIS CASE, MR. MOHAMUD IS TO BE PLACED UPON A THREE-YEAR

13   PERIOD OF SUPERVISED RELEASE, WITH THE STANDARD CONDITIONS

14   APPLYING AS WELL AS THE FOLLOWING SPECIAL CONDITIONS IF HE IS

15   PERMITTED TO RESIDE IN THE UNITED STATES WITH LEGAL STATUS:

16   FIRST, THAT HE SUBMIT TO A SEARCH HIS PERSON, PROPERTY,

17   VEHICLE, ABODE OR RESIDENCE AT A REASONABLE TIME UNDER

18   REASONABLE CIRCUMSTANCES BY A PROBATION OFFICER BASED ON

19   REASONABLE SUSPICION.

20          I WOULD ORDER THAT YOU ADVISE THE OTHER RESIDENTS OF

21   THE PREMISES THAT THE PREMISES ARE SUBJECT TO SEARCH PURSUANT

22   TO THIS CONDITION, SIR.

23          SECOND, THAT YOU REPORT ALL VEHICLES OWNED OR

24   OPERATED OR IN WHICH YOU HAVE AN INTEREST TO PROBATION; AND

25   THIRD, THAT YOU NOT KNOWINGLY ASSOCIATE WITH KNOWN TERRORISTS

1    OR TERRORIST ORGANIZATIONS.  AND WITH RESPECT TO THE

2    RECOMMENDATION THAT YOU NOT HAVE ANY TIES TO FOREIGN COUNTRIES

3    INVOLVED IN TERRORISM ACTIVITIES, I THINK THAT IS TOO BROAD.

4    SO I AM LIMITING THAT TO KNOWN ASSOCIATION WITH ANY

5    INDIVIDUALS WHO ARE INVOLVED WITH TERRORIST ACTIVITY OR WITH

6    TERRORIST ORGANIZATIONS.

7              IF YOU ARE DEPORTED AND/OR REMOVED FROM THE UNITED

8    STATES, DEPORTED, EXCLUDED OR REMOVED OR ALLOWED TO

9    VOLUNTARILY RETURN TO SOME OTHER COUNTRY, THEN YOU ARE TO

10   NEITHER ATTEMPT UNLAWFUL ENTRY INTO THE UNITED STATES NOR

11   ENTER THE UNITED STATES UNLAWFULLY.  AND YOU ARE TO REPORT TO

12   PROBATION WITHIN 24 HOURS OF ANY LAWFUL ENTRY INTO THE UNITED

13   STATES DURING THAT THREE-YEAR PERIOD OF TIME.

14             SUPERVISION WOULD BE WAIVED UPON DEPORTATION,

15   EXCLUSION, REMOVAL OR VOLUNTARY DEPARTURE.

16             MR. MOHAMUD, YOU HAVE AN ABSOLUTE RIGHT TO APPEAL

17   FROM THE CONVICTIONS ON THESE COUNTS OF CONVICTION, AS WELL AS

18   FROM THE SENTENCE IMPOSED TODAY.  IF YOU DO WISH TO APPEAL YOU

19   MUST FILE A WRITTEN NOTICE OF APPEAL WITHIN 14 DAYS OF TODAY

20   WITH THE CLERK OF THIS COURT.  YOU MUST SPECIFY WHAT IT IS YOU

21   ARE APPEALING FROM.  YOU SHOULD KEEP THE APPELLATE AUTHORITIES

22   ADVISED OF YOUR WHEREABOUTS AT ALL TIMES WHILE YOUR CASE IS ON

23   APPEAL SO THAT IF THEY NEED TO NOTIFY YOU, THEY BE ABLE TO DO

24   SO.

25             IF YOU CANNOT AFFORD THE SERVICES OF LEGAL

NOVEMBER 18, 2013

1    REPRESENTATION WHILE YOUR CASE IS ON APPEAL, THOSE SERVICES

2    WILL BE PROVIDED TO YOU AT NO COST TO YOU.

3            SIR, DO YOU UNDERSTAND WHAT I HAVE EXPLAINED TO YOU

4    WITH RESPECT TO YOUR APPELLATE RIGHTS?

5            **DEFENDANT MOHAMUD:**  YES, YOUR HONOR.

6            **THE COURT:**  DO YOU UNDERSTAND WHAT I EXPLAINED TO

7    YOU WITH RESPECT TO THE CONDITIONS OF SUPERVISED RELEASE,

8    WHETHER YOU ARE PERMITTED TO REMAIN IN THE UNITED STATES OR

9    NOT?

10           **DEFENDANT MOHAMUD:**  YES, YOUR HONOR.

11           **THE COURT:**  DO YOU HAVE ANY QUESTIONS ABOUT ANY OF

12   THOSE MATTERS?

13           **DEFENDANT MOHAMUD:**  YES, YOUR HONOR.

14           **THE COURT:**  DO YOU HAVE ANY QUESTIONS ABOUT ANY OF

15   THOSE THINGS?

16           **DEFENDANT MOHAMUD:**  NO.  NO, YOUR HONOR.

17           **THE COURT:**  MS. MORENO, IF YOU WOULD COME FORWARD WE

18   WILL HAVE YOU PROVIDED WITH A COPY OF THE TERMS AND CONDITIONS

19   OF SUPERVISED RELEASE.  IF YOU WOULD KINDLY PROVIDE THOSE TO

20   YOUR CLIENT IT WOULD BE APPRECIATED.

21           I WILL RECOMMEND THE WESTERN REGION FOR PLACEMENT OF

22   MR. MOHAMUD.

23           DID YOU HAVE ANOTHER REQUEST, MS. MORENO?

24           **MS. MORENO:**  YES.  I ALSO, FOR THE RECORD, OBJECT TO

25   THE SENTENCE.  THIS WOULD BE A SUBSTANTIVE OBJECTION, FOR THE

NOVEMBER 18, 2013

1    RECORD, ON BEHALF OF MR. MOHAMUD.

2         **THE COURT:**  A SUBSTANTIVE OBJECTION TO THE SENTENCE,

3    TO THE GUIDELINE ANALYSIS.

4         **MS. MORENO:**  RIGHT.

5         AND I WAS TOLD THAT CERTAIN DEFENDANTS CAN BE

6    DESIGNATED TO THE M.C.C.  IF THAT'S POSSIBLE, I WOULD REQUEST

7    THAT, MERELY GIVEN HIS FAMILY'S DIRE CIRCUMSTANCES.

8         **THE COURT:**  THAT'S NOT TYPICALLY DONE, I WAS

9    INFORMED.  I DON'T KNOW WHAT YOUR SOURCE OF INFORMATION IS, I

10   WILL NOT EVEN SEEK TO DETERMINE THAT.  BUT, NO, I THINK THAT

11   MAY BE SOME HIGHLY QUESTIONABLE INTEL THAT YOU HAVE RECEIVED

12   ON THIS CASE.

13        **MS. MORENO:**  CERTAINLY TO THE WESTERN REGION, YOUR

14   HONOR.

15        **THE COURT:**  AS TO THE WESTERN REGION.  THANK YOU.

16        **MS. MORENO:**  THANK YOU.

17        **THE COURT:**  MR. COLE -- I AM SORRY.  MS. HAN, ANY

18   QUESTIONS OR ADDITIONS, CORRECTIONS, CONCERNS OR OTHERWISE?

19        **MS. HAN:**  NO, YOUR HONOR.

20        **THE COURT:**  IF YOU WOULD COME FORWARD WE WILL HAVE

21   YOU PROVIDED WITH THE TERMS AND CONDITIONS.  THANK YOU.  IF

22   YOU COULD PROVIDE THOSE TO MR. MOHAMUD.

23        I THINK WE NEED TO BREAK AT THIS TIME FOR LUNCH.

24   AND SO WE WILL PROCEED WITH MR. DOREH'S SENTENCING AFTER

25   LUNCH, LET US SAY 2:00 P.M., IF THAT IS ACCEPTABLE TO

1    EVERYONE.

2          **MS. MORENO:**  YES.  I HAVE A REQUEST THAT MY CLIENT

3    NOT BE BROUGHT BACK TO THE M.C.C., IF HE IS ALLOWED TO ALSO

4    COME BACK AS WELL, IT WOULD ALSO GIVE ME AN OPPORTUNITY TO

5    SPEAK WITH HIM FURTHER.

6          **THE COURT:**  THAT IS NOT UP TO ME, THAT IS WITHIN THE

7    PURVIEW OF THE MARSHALS.  THESE GENTLEMEN NEED TO HAVE LUNCH.

8    AND SO I THINK ANY PARTICULAR REQUEST YOU HAVE YOU MIGHT WANT

9    TO REGISTER THAT WITH THE MARSHALS.  MAYBE THEY WILL BE ABLE

10   TO PROVIDE SOME ASSISTANCE FOR YOU IN THAT REGARD.

11          WE ARE IN RECESS, THEN, UNTIL 2:00 P.M.

12                         *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25

1  SAN DIEGO, CALIFORNIA – MONDAY, NOVEMBER 18, 2013 – 2:20 P.M.

2              *   *   *

3        **THE CLERK:**  RE-CALLING MATTER 1 ON THE CALENDAR,

4  10CR4246.

5        **THE COURT:**  ALL RIGHT.  ALL COUNSEL ARE PRESENT, AS

6  WELL AS ALL DEFENDANTS SET FOR TODAY.

7        WE HAVE MR. DOREH NEXT.

8        MR. GHAPPOUR, ARE YOU READY TO PROCEED WITH

9  SENTENCING THIS AFTERNOON?

10        **MR. GHAPPOUR:**  YES, YOUR HONOR.

11        **THE COURT:**  MR. DOREH, ARE YOU READY TO PROCEED WITH

12  SENTENCING THIS AFTERNOON?

13        **DEFENDANT DOREH:**  YES, YOUR HONOR.

14        **THE COURT:**  MR. DOREH, HAVE YOU READ THE PROBATION

15  REPORT AND THE ADDENDUM TO THE PROBATION REPORT?

16        **DEFENDANT DOREH:**  YES, SIR.

17        **THE COURT:**  IN ENGLISH, OBVIOUSLY.

18        **DEFENDANT DOREH:**  YES, SIR.

19        **THE COURT:**  THANK YOU, SIR.

20        I HAVE PREVIOUSLY READ AND CONSIDERED THE PROBATION

21  REPORT, THE OBJECTIONS TO THE PROBATION REPORT FILED BY BOTH

22  SIDES, THE ADDENDUM TO THE P.S.R., ALL OF THE SENTENCING

23  MATERIALS.  THE SENTENCING MEMORANDUM SUBMITTED BY YOU,

24  MR. GHAPPOUR, TOGETHER WITH EXHIBITS, LETTERS.  THE

25  GOVERNMENT'S SENTENCING MEMORANDUM, THE SENTENCING SUMMARY

1   CHARTS.  I CONSIDERED THE NATURE AND CIRCUMSTANCES OF THE

2   OFFENSES AND HISTORY AND CHARACTERISTICS OF MR. DOREH, AS WELL

3   AS THE ADVISORY GUIDELINES AND THE STATUTORY PURPOSES OF

4   SENTENCING.

5           MR. GHAPPOUR, PLEASE.

6           **MR. GHAPPOUR:**  THANK YOU, YOUR HONOR.

7           IT IS CLEAR THAT THE COURT HAS GIVEN THE FACTORS A

8   GREAT DEAL OF CONSIDERATION, AND THAT YOUR HONOR HAS

9   THOROUGHLY GONE THROUGH THE MATERIALS.  I JUST WANT TO POINT

10  OUT A COUPLE OF QUICK POINTS, AND CONCLUDE WITH THE

11  RECOMMENDATION THAT I MADE, WHICH WAS FOR EIGHT YEARS.

12          I BELIEVE THAT THIS RECOMMENDATION CONFORMS WITH THE

13  STRUCTURE THAT YOU HAVE APPLIED TODAY, PARTICULARLY WITH

14  RESPECT TO THE 3553(A) FACTORS.  AND ON THAT, SPECIFICALLY,

15  BASED -- OR DUE TO HIS RELATIVE ROLE IN THE OFFENSE AND THE

16  HISTORY AND CHARACTERISTICS OF MY CLIENT, MR. DOREH.

17          MR. DOREH'S RELATIVE ROLE IS SIGNIFICANTLY REDUCED

18  IN TERMS OF HIS CULPABILITY AND PARTICIPATION, AT LEAST AS

19  COMPARED TO THE OTHER DEFENDANTS THAT WERE SENTENCED TODAY.  I

20  THINK I WOULD ONLY ADD THAT IN MAKING YOUR DETERMINATION THAT

21  YOU -- THAT I DRAW YOUR ATTENTION TO THE INDICTMENT OF

22  ABDIAZIZ HUSSEIN, AND THAT IS CASE NO. 13CR1514.  I BELIEVE

23  THAT CASE IS BEFORE YOUR HONOR.

24          AND THAT INDICTMENT ACTUALLY ALLEGES THAT MR.

25  ABDIAZIZ HUSSEIN STRUCTURED AND CONDUCTED MR. MOALIN'S

1   TRANSACTIONS, AND SPECIFICALLY THOSE THAT OCCURRED AFTER THE

2   DESIGNATION OF AL-SHABAAB AS A FOREIGN TERRORIST ORGANIZATION.

3           AS FOR THE EQUITABLE FACTORS, I WON'T BELABOR MR.

4   DOREH'S GOOD WORKS, THE LOVE THAT HE HAS FOR HIS FAMILY OR

5   VICE VERSA.  I BELIEVE THAT THE PAPERS, AND SPECIFICALLY THE

6   EXHIBITS, SPEAK TO THE FACTORS TO A GREAT EXTENT.  BUT I WOULD

7   LIKE TO EMPHASIZE A COUPLE OF POINTS.

8           MR. DOREH IS 56 YEARS OLD.  HE SPENT NEARLY THE PAST

9   30 YEARS IN THE UNITED STATES.  HE IS A CITIZEN WHO HAS PAID

10  TAXES AND IS LAW ABIDING, AND HAS BEEN LAW ABIDING THE WHOLE

11  TIME WITH THE EXCEPTION OF THE COURSE OF CONDUCT HERE.

12          HIS VOLUNTEER RECORD REFLECTS A RESPECT FOR LAW

13  ENFORCEMENT, INCLUDING HIS WORK WITH PRISONERS AT THE M.C.C.

14  RIGHT HERE IN SAN DIEGO AND OTHER LOCAL STATE AND CITY

15  PRISONS, INCLUDING HIS WORK WITH NEW REFUGEES IN THE

16  COMMUNITY.  I THINK IT IS SAFE TO SAY THAT HE IS INSTRUMENTAL

17  TO THE ASSIMILATION AND INTEGRATION OF THE SOMALI REFUGEE

18  COMMUNITY INTO THE MAIN STREAM IN SAN DIEGO.  AND IN FACT MANY

19  OF THE LETTERS THAT WERE SUBMITTED TO YOUR HONOR ATTEST TO

20  THAT.

21          HE HAS ALSO DONE A GREAT DEAL OF WORK WITH THE YOUTH

22  COMMUNITY HERE IN SAN DIEGO, AND HAS CHANGED MANY LIVES

23  OUTSIDE OF THOSE AND HIS FAMILY.

24          I WOULD DRAW YOUR ATTENTION TO THE EXAMPLE OF

25  MR. ABDULMALIK BUUL WHO WRITES THAT HE WAS HEADED FOR A LIFE

1   OF CRIME AND WAS INCREDIBLY DISILLUSIONED, AND THAT IT WAS MR.

2   DOREH THAT CHANGED HIS LIFE.  IT WAS MR. DOREH THAT TOLD HIM

3   THAT HE SHOULD EMBRACE WESTERN VALUES, AND THAT THERE WAS NO

4   CONTRADICTION WITH BEING A SOMALI AND BEING AN AMERICAN.

5          AND IT WAS THAT MENTORSHIP AND CONTINUED MENTORSHIP

6   THAT CHANGED MR. BUUL'S LIFE.  HE IS NOW A PROFESSOR AT MESA

7   COLLEGE, AND HE IS FEATURED ON THE COVER OF THE LOCAL SAN

8   DIEGO UNION TRIBUNE, SUBMITTED TO YOUR HONOR AS AN EXHIBIT.

9          MR. DOREH'S RESPECT FOR THE CRIMINAL JUSTICE SYSTEM

10  IS ALSO REFLECTED IN OTHER COMMUNITY WORK THAT I WON'T GET

11  INTO.  BUT I SAY THIS TO EMPHASIZE THAT THE OFFENSE CONDUCT

12  HERE IS NOT TYPICAL OF HIS CHARACTER, AND THAT I WOULD URGE

13  YOUR HONOR TO TAKE HIS CHILDREN AND THEIR ACCOMPLISHMENTS AS

14  MORE REFLECTIVE OF HIS CHARACTER ON A DAY-TO-DAY.

15         MR. DOREH HAS EIGHT CHILDREN AND A WIFE THAT HE

16  DEARLY LOVES.  HE HAS RAISED EDUCATED AND PROGRESSIVE YOUNG

17  MEN AND WOMEN.

18         HIS ELDEST CHILD, FOR INSTANCE, HAFSA, HOLDS A

19  MASTER'S DEGREE AND IS CURRENTLY PURSUING OR APPLYING FOR A

20  PH.D. PROGRAM.  SHE SAYS THAT HER FATHER WAS INSTRUMENTAL TO

21  HER SUCCESS.  AND THAT HE WAS THE ONE THAT ENCOURAGED HER,

22  EVEN WHEN IT MEANT DEFYING COMMUNITY NORMS SUCH AS TRAVEL

23  WITHOUT CHAPERONE.  HE NEVER ONCE TOLD HER -- HE NEVER ONCE

24  STOOD IN HER WAY BASED ON ANY COMMUNITY OR RELIGIOUS STANDARDS

25  THAT MIGHT BE THOUGHT AS NOT TYPICAL IN THE UNITED STATES.

1    AND DESPITE THE STIGMA THAT THIS MIGHT HAVE CAUSED FOR BOTH

2    HIS DAUGHTER AND HIMSELF AND HIS FAMILY, HE DEFENDED HER AND

3    WAS 100 PERCENT SUPPORTIVE.

4           MR. DOREH'S SON, HIS ELDEST, IS AN ASPIRING

5    BIOMEDICAL ENGINEER AT MESA COLLEGE.  HE PLAYS ON THE

6    BASKETBALL TEAM FOR MESA AND TRAVELS ALL OVER THE COUNTRY.  HE

7    HOPES TO ONE DAY BE ABLE TO DEVELOP TECHNOLOGIES THAT

8    HELPED -- SORT OF LIKE THE TECHNOLOGIES THAT HELPED HIS LITTLE

9    BROTHER WHO HAS A MOTOR DISABILITY, BECAUSE MR. DOREH'S -- ONE

10   OF HIS YOUNGER SONS WAS BORN -- SORRY -- SUFFERED A STROKE AT

11   THREE YEARS OLD AND WAS -- HAD THE RIGHT SIDE OF HIS BODY

12   COMPLETELY PARALYZED.  AND THROUGH THE TECHNOLOGIES IN THE

13   UNITED STATES THEY WERE ABLE TO PERFORM A NUMBER OF SURGERIES

14   AND BEGIN A PROCESS, A SLOW PROCESS OF RECOVERY THAT HAS HIM

15   WITH LIMITED MOBILITY BUT CERTAINLY MUCH BETTER THAN

16   CIRCUMSTANCES YEARS AGO.

17          MR. DOREH IS THANKFUL FOR THESE AND OTHER PRIVILEGES

18   THAT THE UNITED STATES HAS AFFORDED HIS FAMILY, AS A REFUGEE

19   WHO FLED THE VIOLENCE AND COMMUNISM THAT PLAGUED SOMALIA

20   NEARLY 30 YEARS AGO, AND FOR PROVIDING THE FREEDOMS OF

21   EDUCATION, MULTICULTURALISM AND DIVERSITY THAT HIS FAMILY HAS

22   SO ELOQUENTLY PROSPERED IN.

23          THE MOST IMPORTANT THING TO MR. DOREH IS THAT HIS

24   CHILDREN ARE TAKEN CARE OF.  HIS YOUNGEST IS SIX YEARS OLD,

25   AND SHE WAS THREE WHEN HE WAS FIRST INITIALLY DETAINED.  HE

NOVEMBER 18, 2013

1    WANTS HER TO END UP LIKE THE ELDEST.  HE FEARS THAT WITHOUT

2    HIS PRESENCE HIS WIFE WILL NOT BE ABLE TO HANDLE EIGHT

3    CHILDREN.  THE EIGHT CHILDREN GO TO FOUR DIFFERENT SCHOOLS.

4    SHE DOESN'T DRIVE.  SHE IS ILL AND DIABETIC.

5         YOUR HONOR, IT IS FOR THESE AND OTHER REASONS WHICH

6    MR. DOREH WOULD LIKE TO EXPLAIN TO YOU HIMSELF THAT I BELIEVE

7    A SENTENCE OF NO MORE THAN EIGHT YEARS IS A JUST SENTENCE THAT

8    PROMOTES THE RESPECT FOR THE RULE OF LAW.

9         THANK YOU.

10        **THE COURT:**  THANK YOU, MR. GHAPPOUR.

11        MR. DOREH, YOU DO HAVE AN OPPORTUNITY AT THIS TIME

12   TO MAKE ANY STATEMENT YOU WISH TO MAKE.  YOU MAY CERTAINLY

13   REMAIN SEATED.  IF YOU WOULD, PLEASE, PULL THAT MICROPHONE

14   OVER TO YOU, PRETTY CLOSE, SO THAT EVERYONE CAN HEAR YOU.

15   THANK YOU.

16        **DEFENDANT DOREH:**  THANK YOU, YOUR HONOR.

17        GOOD AFTERNOON, YOUR HONOR, JUDGE MILLER.  AND I AM

18   GRATEFUL FOR THE CHANCE TO ADDRESS YOU.  I UNDERSTAND AND

19   RESPECT THE JURY'S VERDICT, AND I ALSO RESPECT YOUR HONOR'S

20   PERSPECTIVE, JUDGMENT AND SENSE.

21        YOUR HONOR, I WOULD LIKE TO ADDRESS YOU TO ASK YOU

22   FOR YOUR MERCY AND COMPASSION.  YOUR HONOR, I AM FATHER OF

23   EIGHT CHILDREN WHO DESPERATELY NEED MY HELP.  THESE CHILDREN

24   GO FOUR DIFFERENT SCHOOLS.  MY WIFE DOES NOT DRIVE AT ALL,

25   THAT IS BECAUSE SHE HAS BEEN SICK FOR YEARS NOW.  YOUR HONOR,

1    MY CHILDREN NEED ME TO HELP WITH THEIR HOMEWORK, DOCTOR'S

2    APPOINTMENT, TAKING TO SCHOOL AND BRINGING BACK TO HOME.  MY

3    SON ABBIRAHMAN IS DISABLED AND NEEDS SPECIAL CARE AND

4    SUPERVISION, YOUR HONOR, INCLUDING HIS APPOINTMENTS, THERAPY,

5    HELPING WITH HIS SCHOOL AND HOMEWORK.

6            YOUR HONOR, I AM SO PROUD OF MY CHILDREN.  MY ELDEST

7    DAUGHTER, HAFSA, COMPLETED, AS MY LAWYER JUST BRIEFLY SAID,

8    HER MASTER'S DEGREE AND IS STARTING HER PH.D. DEGREE.  ZEINAB,

9    THE SECOND ELDEST DAUGHTER, IS GOING TO BECOME NURSE

10   PRACTITIONER, IN SAN DIEGO CITY COLLEGE.  ABDULLAHI, AS YOU

11   ALREADY HEAR,THE THIRD OLDEST BOY, IS A FULL-TIME STUDENT IN

12   MESA COLLEGE, MAJORING BIOMEDICAL ENGINEERING.  HE PLAYS ALSO

13   AND A MEMBER OF MESA COLLEGE BASKETBALL TEAM.

14           YOUR HONOR, I WANT THE YOUNG ONES TO HAVE A BRIGHT

15   FUTURE AS OLD ONES HAVE.

16           YOUR HONOR, I HAVE ALWAYS THANKFUL FOR THE

17   OPPORTUNITY THE UNITED STATES HAS GIVEN ME, INCLUDING FREEDOM

18   OF THINKING, FREEDOM OF CHOICE TO PURSUE MY EDUCATION.  AT

19   THAT POINT, YOUR HONOR, IT WAS MY PARADIGM, YOU KNOW, AND

20   HONOR TO COMPLETE DIFFERENT LEVEL OF EDUCATION IN THE U.S.  IT

21   IS MY PLEASURE ALSO TO SEE MY CHILDREN HAVING A GREAT

22   OPPORTUNITY OF LEARNING AND IMAGINING DIFFERENT SUBJECTS.

23   YOUR HONOR, MY WHOLE PURPOSE OF COMING HERE TO THE U.S. WAS TO

24   GET A BETTER LIFE AND A BETTER FUTURE, AND I AM THANKFUL FOR

25   THAT.

```
1           YOUR HONOR, I ALSO VALUE THE JUSTICE SYSTEM HERE.
2   YOUR HONOR, I WOULD LIKE TO ASK YOU FOR YOUR MERCY AND YOUR
3   JUDGMENT TO PLACE ME SOMEWHERE NEARBY MY FAMILY BECAUSE OF MY
4   WIFE'S HEALTH.  I DON'T WANT MY FAMILY TO SUFFER MORE THAN
5   THEY HAVE TO.
6           FINALLY, YOUR HONOR, WHAT IS MORE IMPORTANT TO ME IS
7   TO ATTENDING MY DAUGHTER'S PH.D. GRADUATION AS A FREE MAN FOR
8   THE YEARS TO COME.  THE DAY SHE GETS HER DOCTORATE DEGREE,
9   THAT DAY, YOUR HONOR, WOULD REPRESENT EVERYTHING THAT I WANT
10  TO PASS ON.
11          YOUR HONOR, AS I SAID, IT IS THE TIME WHEN I LEFT MY
12  COUNTRY AND IT WAS COMMUNISM, AND MY LIFE BECAME A RISK.  I
13  WAS HIGH SCHOOL TEACHER, AND WHEN THAT KIND OF PROBLEM
14  HAPPENS, YOU KNOW, IT IS POLITICS.  AND ALL THE SCHOLARS THEY
15  WERE AGAINST COMMUNISTS AND I JUST FLED NEXT COUNTRY IN KENYA
16  WHERE I WAS ACCEPTED THREE DIFFERENT COUNTRY:  AUSTRALIA,
17  CANADA AND UNITED STATES.
18          I HAVE CHOSEN THE UNITED STATES BECAUSE OF MY
19  TEACHERS IN THE MIDDLE SCHOOL AND THE COLLEGE, YOU KNOW.  AT
20  THAT POINT, YOUR HONOR, I DON'T BELIEVE MY INTENTION OR THE
21  PURPOSE I CAME UNITED STATES TO MISLEAD ANYBODY ELSE OR TO
22  HARM OR THREAT TO ANYBODY ELSE.  I CAME HERE TO CONTINUE MY
23  EDUCATION, WHICH IS THE REFLECTION YOU SEE TODAY.  I COMPLETED
24  IN SAN DIEGO STATE COMPUTER SCIENCE, I WENT TO PHOENIX AND I
25  COMPLETED MASTER IN COMPUTER AND TECHNOLOGY.  AND I WAS SIX
```

1    MONTHS AWAY TO GET MY DOCTORAL DEGREE.

2           **THE COURT:**  YOU ARE TALKING ABOUT THE UNIVERSITY OF

3    PHOENIX RATHER THAN PHOENIX, ARIZONA.  RIGHT?

4           **DEFENDANT DOREH:**  YEAH, UNIVERSITY OF PHOENIX.  I AM

5    SORRY.  THEN I WAS SIX MONTHS AWAY TO GRADUATE, GET MY

6    DOCTORAL DEGREE, SPECIALIZING IN ORGANIZATION OF MANAGEMENT IN

7    THE SAME OF UNIVERSITY, UNIVERSITY OF PHOENIX.  THAT, YOUR

8    HONOR, TELLS YOU MY VISION CAME TO THE UNITED STATES.

9           ANOTHER POINT, YOUR HONOR, IN MY CHILDREN I WANT TO

10   BE A ROLE MODEL FOR MY CHILDREN.  WHEN THEY COME FROM SCHOOL,

11   I HAVE TO WORK WITH THEM, THEIR HOMEWORK.  I HAVE TO TAKE TO

12   LIBRARY, I HAVE TO TAKE EVERYWHERE THEY NEED TO MAKE SURE THEY

13   BENEFIT FROM THIS KIND OF OPPORTUNITY.

14          FINALLY, YOUR HONOR, I LIKE TO ASK YOU TO LOOK MY

15   REFLECTION AS A PERSON, AND VALUE MY EDUCATIONAL BACKGROUND

16   AND THE ACTIVITY THAT I HAVE DONE FOR YEARS IN SOMALI

17   COMMUNITY IN SAN DIEGO.  I CREATED THREE DIFFERENT

18   ORGANIZATIONS.  AMANA FOUNDATION, IT IS KNOWN IN SOMALI

19   COMMUNITY, IT IS A VALUABLE CHARITABLE ORGANIZATION.  I WAS

20   THE FIRST THREE PEOPLE CREATED THAT ORGANIZATION.  A NUMBER OF

21   ORGANIZATION, YOUR HONOR.  I CREATED SOMALI COMMUNITY, WE WERE

22   SEVEN PEOPLE WHEN WE CAME HERE 1992.  YOUR HONOR, ALSO I

23   CREATED RIGHT NOW THE SOMALI BURIAL FUND, BURIAL FUND IS

24   THAT -- THOSE THREE ORGANIZATIONS ARE ACTIVE AND VALUABLE TO

25   THE COMMUNITY.  IF YOU ASK ANYONE IN SOMALI COMMUNITY IN SAN

1    DIEGO THEY CAN BE WITNESS FOR THAT.

2             SECOND THING, YOUR HONOR, IN SOMALI COMMUNITY SAN

3    DIEGO I SPENT MY TIME VOLUNTEERING.  NOT PAID, NOBODY PAYS ME,

4    YEARS OF VOLUNTARY.  TEACHING THEM, YOU KNOW, THE CHILDREN

5    FROM DRUGS AND WRONG WAY TO BRING THEM THEIR FUTURE.  AS MY

6    LAWYER TELLS YOU, HE TELLS YOU ONE PERSON, BUT THERE IS SO

7    MANY STUDENTS IN SAN DIEGO NOW HAPPY AND GRATEFULLY IN THE

8    COMMUNITY, THAT I WAS THE REASON FOR THEM TO BECOME AND TAKE

9    CARE OF THEIR LIFE.

10             IN ADDITION, YOUR HONOR, 1996 UNTIL 2000, EVEN

11   THOUGH I HAD THE BACK SURGERY TWO TIMES, I WAS DOING VOLUNTEER

12   WORK IN M.C.C. RIGHT HERE, CITY JAIL AND STATE PRISON IN OTAY.

13             ALL THIS TELLS YOU WHO I AM.  I DON'T WANT TO TAKE

14   YOUR TIME, YOUR HONOR.  I THINK YOU HAVE ALREADY MY

15   BACKGROUND, MY EDUCATION AND EVERYTHING.  I REALLY ASKING YOU

16   AT LEAST TO PLACE ME WHERE MY CHILDREN CAN SEE ME BECAUSE MY

17   WIFE CANNOT DRIVE.  AND MY CHILD ABBIRAHMAN, ESPECIALLY, IS

18   DISABLED AND NEED MORE HELP FROM ME.

19             I UNDERSTAND I AM ONE OF THE CO-DEFENDANTS IN HERE,

20   MY INMATES, MY FRIENDS, BUT ALL I AM ASKING YOU, YOU KNOW,

21   YOUR MERCY AND YOUR COMPASSION TO LOOK MY SITUATION.  AND I DO

22   APPRECIATE FOR YOU HAVING US FOR TWO YEARS NOW THIS CASE, YOU

23   KNOW, I DO APPRECIATE FOR YOUR JUDGMENT.  AND I DO APPRECIATE

24   FOR YOUR DECISIONS.

25             THANK YOU VERY MUCH, YOUR HONOR.

NOVEMBER 18, 2013

1          **THE COURT:**  THANK YOU, MR. DOREH.

2          MS. HAN.

3          **MS. HAN:**  YOUR HONOR, THIS DEFENDANT CONTENDS THAT

4    HE HAS A MITIGATING ROLE.  3B1.2 OF THE GUIDELINES SAYS THAT

5    MITIGATING ROLE IS APPROPRIATE IN CASES WHERE DEFENDANTS ARE

6    SUBSTANTIALLY LESS CULPABLE THAN THE AVERAGE PARTICIPANTS.  SO

7    JUST BRIEFLY I JUST WANT TO GO OVER THE HIGHLIGHTS OF WHAT THE

8    EVIDENCE AT TRIAL SHOWED ABOUT WHAT THE DEFENDANT DID.

9          YOUR HONOR, THE EVIDENCE AT TRIAL SHOWED THAT AFTER

10   DEFENDANT BASAALY MOALIN SPOKE WITH ADEN AYROW ABOUT THE NEED

11   TO GET MONEY TO AYROW, AND AYROW URGED HIM, SUGGESTING, EVEN,

12   HE COULD GET A LOAN, IF NECESSARY, TO SEND MONEY; DEFENDANT

13   ISSA DOREH IS THE VERY FIRST PERSON THAT BASAALY CALLED

14   THEREAFTER BECAUSE HE KNEW THAT HE WAS A CONNECTION TO

15   FUNDRAISING HERE IN SAN DIEGO.

16         ADDITIONALLY, DEFENDANT ISSA DOREH WAS EMPLOYED AT

17   THE SHIDAAL EXPRESS, AND THAT IS NOT A MINOR THING.  THE

18   SHIDAAL EXPRESS WAS A LICENSED MONEY SERVICE BUSINESS, AND AT

19   THE SHIDAAL EXPRESS -- BECAUSE OF HIS ROLE AT THE SHIDAAL

20   EXPRESS THE DEFENDANT AND HIS CO-DEFENDANTS WERE ABLE TO HAVE

21   THE FEES FOR THE MONEY THAT WAS SENT TO AL-SHABAAB'S WAIVED,

22   WHICH WAS SIGNIFICANT.  IT WAS SIGNIFICANT SO MUCH SO THAT HIS

23   CO-DEFENDANT, BASAALY MOALIN, BRAGGED ABOUT IT TO OTHER PEOPLE

24   THAT ESSENTIALLY MR. DOREH WAS HIS IN IN THE SHIDAAL EXPRESS

25   AND THAT WAS THE WAY THAT THEY WERE ABLE TO GET FUNDS TO

1   AL-SHABAAB.

2          ADDITIONALLY, YOUR HONOR, DEFENDANT DOREH COULD BE

3   HEARD ON THE PHONE TALKING TO SHEIKH HASSAN, THE

4   CO-CONSPIRATOR IN MISSOURI, TALKING TO HIM ABOUT HOW TO GET

5   MONEY TO SAN DIEGO AND HOW THEY WERE ULTIMATELY GETTING THAT

6   MONEY TO SOMALIA.

7          AND FINALLY HE COULD ALSO BE HEARD ON THE CALLS WITH

8   BASAALY MOALIN IN JULY OF 2008 CHECKING ON WHETHER OR NOT

9   MONEY HAD ACTUALLY BEEN SENT.

10          SO I DON'T THINK IT IS A MINIMAL ROLE, OR EVEN A

11   MINOR ROLE, AT ALL, THAT HE PLAYED IN THIS CONSPIRACY AND

12   CERTAINLY IN HIS SUBSTANTIVE ACTS.

13          ADDITIONALLY, YOUR HONOR, A GREAT DEAL HAS BEEN SAID

14   ABOUT HIS EDUCATION.  OF COURSE, HE HAS TWO BACHELOR'S

15   DEGREES, A MASTER'S DEGREE AND STARTED OUT ON A PH.D. PROGRAM

16   AS WELL.  AND THOSE ARE SIGNIFICANT ACCOMPLISHMENTS, FOR SURE.

17   BUT I THINK IT CANNOT BE SAID ENOUGH THAT HE VERY MUCH SAW

18   HIMSELF ALLIED WITH AND BEING THE SAME AS THOSE PEOPLE WHO

19   WERE FIGHTING IN SOMALIA; THOSE PEOPLE BEING AL-SHABAAB.

20          THAT CAN'T BE OVERSAID TO THE EXTENT THAT THERE IS A

21   CALL THAT WE PLAYED AT TRIAL WHERE HIS CO-DEFENDANT,

22   MR. MOALIN, SAID:  WE ARE NOT LESS WORTHY THAN THE GUYS

23   FIGHTING.

24          AND THIS DEFENDANT RESPONDED:  YES, THAT'S IT.  IT

25   IS SAID THAT IT TAKES AN EQUAL EFFORT TO MAKE A KNIFE, WHETHER

1    ONE MAKES THE HANDLE, HAMMERS THE IRON OR BAKES IT IN THE

2    FIRE.

3            I THINK THAT IS SIGNIFICANT BECAUSE ALTHOUGH THE

4    DEFENDANT NOW TRIES TO MINIMIZE HIS ROLE IN COMPARISON TO HIS

5    CO-DEFENDANTS, HE VERY MUCH PLAYED AN INSTRUMENTAL ROLE IN

6    THIS CONSPIRACY, AND WAS VERY PROUD OF THE ROLE THAT HE

7    PLAYED.

8            ADDITIONALLY, YOUR HONOR, I DO THINK IT IS

9    SIGNIFICANT THAT THIS DEFENDANT HAS BEEN A ROLE MODEL IN THIS

10   COMMUNITY.  HE HAS BEEN HERE SINCE APPROXIMATELY THE 1980'S,

11   AND SO HE TOO TOOK ON A LEADERSHIP ROLE IN THIS COMMUNITY.

12   AND HIS PARTICIPATION IN THESE CRIMES ALSO GAVE A LEGITIMACY

13   TO WHAT THE DEFENDANTS WERE DOING.

14           WITH THAT WE WOULD SUBMIT ON OUR RECOMMENDATION.

15   THANK YOU, YOUR HONOR.

16           **THE COURT:**  MS. HAN, HOW WOULD YOU ANALYZE THE ROLE

17   OF MR. DOREH ON A COMPARATIVE BASIS, LOOKING AT HIS TWO

18   CO-DEFENDANTS TODAY?

19           **MS. HAN:**  YOUR HONOR, I GUESS I WOULD SAY WE

20   CONDUCTED THAT ANALYSIS WHEN WE CONDUCTED OUR 3553(A) ANALYSIS

21   AND CAME UP WITH OUR RECOMMENDATIONS, SO WE ARE ON THE RECORD

22   FOR RECOMMENDING, FOR THIS DEFENDANT, 17 YEARS.

23           CERTAINLY WE FIND HIM TO BE -- IN LIGHT OF HIS

24   VARIOUS FACTORS WE FIND HIM TO BE A SLIGHT BIT LESS CULPABLE

25   TO THE EXTENT THAT HE WAS NOT THE RELIGIOUS LEADER FOR THIS

1    SIGNIFICANT COMMUNITY HERE IN SAN DIEGO; HOWEVER, HE IS

2    CERTAINLY NOT SOMEBODY THAT JUST DESERVES ANY MINOR ROLE

3    REDUCTION.  HE CERTAINLY IS NOT SOMEBODY THAT IS SUBSTANTIALLY

4    LESS CULPABLE THAN HIS CO-DEFENDANTS, PARTICULARLY BECAUSE

5    OBVIOUSLY MR. MOALIN WAS AN ORGANIZER, A DIRECT CONNECT TO

6    ADEN AYROW; MR. MOHAMUD WAS A RELIGIOUS LEADER WHO HAD THE

7    ABILITY TO GIVE A LEGITIMACY AND TO CALL TO PEOPLE AT THE

8    MOSQUE TO GIVE MONEY.  AND MR. DOREH WAS ESSENTIAL.  HE WAS AT

9    THE PLACE THAT WAS REMITTING THE MONEY TO AL-SHABAAB, AND

10   BECAUSE OF HIS STATUS THERE HE WAS ALLOWED TO HAVE THE FEES

11   WAIVED SO THAT IT WAS MUCH EASIER TO GET MONEY.

12          **THE COURT:**  WHAT WAS THE TOTAL AMOUNT OF FEES

13   WAIVED?

14          **MS. HAN:**  THE TOTAL AMOUNT OF FEES WAIVED?

15          **THE COURT:**  YES.

16          **MS. HAN:**  YOUR HONOR, THAT IS UNCERTAIN BECAUSE, AS

17   IS DISPLAYED IN THE PHONE CALLS, THERE WERE SORT OF VARYING

18   DISCUSSIONS ABOUT WHAT FEES WOULD BE, SO THERE WAS NOT EXACTLY

19   ONE FEE PER TRANSACTION.  SO I CAN'T EXACTLY GIVE YOU THAT

20   FIGURE.

21          **THE COURT:**  I KNOW YOU SET FORTH IN YOUR SENTENCING

22   MEMORANDUM THAT MR. DOREH'S INVOLVEMENT WAS CONSISTING OF A

23   COUPLE OF PHONE CALLS, THE REFERENCES YOU MADE, AND HIS

24   POSITION AT SHIDAAL EXPRESS WHICH ALLOWED HIM TO HAVE THE

25   FUNDS TRANSMITTED.  AND YOU MADE REFERENCE TO A WAIVER OF SOME

```
 1   FEES.  AND I DON'T KNOW THAT I EVER HEARD WHAT THAT WAIVER

 2   WOULD CONSIST OF, WHETHER IT WAS DE MINIMUS, WHETHER IT WAS

 3   SUBSTANTIAL.  AND IF YOU DON'T KNOW THAT IS FINE.

 4          MS. HAN:  YOUR HONOR, I GUESS WHAT -- I DIDN'T WANT

 5   TO GO ON THE RECORD THAT IT WAS A PARTICULAR PERCENTAGE, BUT

 6   GENERALLY SPEAKING IT WAS THOUGHT TO BE 3 PERCENT.  CERTAINLY

 7   IN THE PHONE CALLS THERE WERE INSTANCES WHERE THERE WERE

 8   DISCUSSIONS OF HIGHER NUMBERS OR LOWER NUMBERS SO I DIDN'T --

 9   BUT THAT, JUST GENERALLY, WAS 3 PERCENT.

10          ADDITIONALLY, YOUR HONOR, THIS DEFENDANT IS A

11   DEFENDANT THAT BASAALY MOALIN TALKED ABOUT WITH ADEN AYROW BY

12   NAME.  HE REFERRED TO HIM AS THE SALEBAN CLERIC THAT THEY HAD

13   SPOKEN TO.  SO IN AT LEAST IN TWO PHONE CALLS HE IS REFERRED

14   TO SOMEBODY WHO HAD DIRECT CONTACT WITH ADEN AYROW.

15          MOREOVER, YOUR HONOR, AS IS CLEAR FROM THE PHONE

16   CALLS, HE WAS THE PERSON WHO WAS ABLE TO FACILITATE THE

17   RELATIONSHIP BETWEEN DEFENDANT MOALIN AND DEFENDANT MOHAMUD

18   AND SO THAT IS NOT AN INSIGNIFICANT RELATIONSHIP, BECAUSE

19   CERTAINLY DEFENDANT MOALIN WAS A DIRECT CONNECTION TO SOMALIA

20   AND DEFENDANT MOHAMUD WAS THE CONNECTION TO THE REST OF THE

21   SOMALI COMMUNITY FROM WHOM -- FROM WHICH THEY FUNDRAISED.

22          THE COURT:  THANK YOU, MS. HAN.  I APPRECIATE YOUR

23   REMARKS.

24          MR. GHAPPOUR, DID YOU WANT TO BE HEARD FURTHER?

25          MR. GHAPPOUR:  YES, YOUR HONOR, REALLY QUICKLY ON A
```

 1   COUPLE OF BRIEF POINTS.

 2           I AM JUST GOING TO GO IN SEQUENCE.

 3           MS. HAN SAID THAT HIS CULPABILITY IN PART WAS BASED

 4   ON THE FACT THAT MR. MOALIN CALLED MR. DOREH; NOT THAT MR.

 5   DOREH CALLED MR. MOALIN.  I AM CONFUSED ABOUT HOW THAT RELATES

 6   TO CULPABILITY.

 7           SECONDLY, THE WAIVER OF FEES.  TO THE EXTENT THAT HE

 8   WAS RESPONSIBLE, HYPOTHETICALLY, FOR THE WAIVER OF FEES, THAT

 9   WOULD NOT HAVE BEEN MATERIAL SUPPORT TO A TERRORIST GROUP, IT

10   WOULD HAVE BEEN SUPPORTING A COMMUNITY FOR A NUMBER OF PEOPLE

11   TRYING TO SEND MONEY FOR WHATEVER PURPOSES.  THAT IS THE

12   DISTINCTION.

13           THIRD OF ALL, THE 3 PERCENT COMES OUT TO, ON THE

14   CHARGED CONDUCT, $255, WHICH I WOULD SAY IS DE MINIMUS AND NOT

15   PROHIBITIVE OF SENDING UPWARDS OF 8,000 OR 10,000 OR $15,000.

16           HIS EMPLOYMENT AT THE SHIDAAL.  THERE WAS NO

17   EVIDENCE AT TRIAL THAT HE HAD ANY SORT OF MANAGEMENT ROLE; IN

18   FACT THE EVIDENCE WAS TO THE CONTRARY.  THERE WAS NO EVIDENCE

19   THAT HE HAD ANY CONTROL OF THE MANAGER OF THE SHIDAAL THAT

20   ACTUALLY CONDUCTED THE TRANSACTIONS OR THE OWNER OF THE

21   SHIDAAL THAT WAS LATER INDICTED FOR ENGAGING IN A PONZI

22   SCHEME.

23           AS FOR CHECKING ON HOW THE MONEY WAS SENT, THAT IS

24   CORRECT, THAT IS THE ONE THING THAT I SEE THAT CAME OUT OF THE

25   CALLS IS THAT THERE WERE OFTENTIMES CALLS TO MR. DOREH WHO

1    WOULD REPORT ON THE STATUS OF A PARTICULAR TRANSACTION.  BUT

2    WHEN THERE WAS A CALL ABOUT MAKING A TRANSACTION IT WAS

3    ACTUALLY MR. ABDI RAZAK OR THE SHIDAAL OWNER THAT MADE THE

4    TRANSACTION.

5              IN TERMS OF SEEING HIMSELF AS ALLIED WITH

6    AL-SHABAAB, I AM NOT CLEAR HOW THE EIGHT CALLS THAT THE

7    GOVERNMENT USED IN THEIR CASE-IN-CHIEF ESTABLISHED THAT;

8    PARTICULARLY BECAUSE AL-SHABAAB WASN'T MENTIONED ON THOSE

9    CALLS.  AND IF WE ARE GOING TO INFER THAT ALLIANCE FROM

10   MR. MOALIN'S CALLS WITH OTHERS, THAT WOULD BE A DIFFERENT

11   STORY.  BUT I WOULD URGE YOUR HONOR NOT TO DO THAT.

12             AND AS FAR AS THE EQUAL EFFORT TO BAKE A KNIFE, THAT

13   IS A PARABLE, IT IS AN IDIOM, I GUESS.  I BELIEVE AN IDIOM IS

14   A PARABLE -- FORGIVE ME.  I MYSELF AM FROM AN IMMIGRANT

15   COMMUNITY, SO THAT PARTICULAR PARABLE MEANS IT IS ALL ABOUT

16   TEAMWORK AND IT WOULD DISTINGUISH WHAT HE SEES HIS ROLE AS AND

17   THE ROLE OF THE FIGHTERS -- THE QUOTE, UNQUOTE, FIGHTERS.

18             IN TERMS OF FACILITATING ANY COMMUNICATION BETWEEN

19   MR. MOALIN AND MR. MOHAMUD, THAT IS BASED ON ONE CALL IN

20   DECEMBER, THREE OR FOUR MONTHS BEFORE THE DESIGNATION OF

21   AL-SHABAAB.  IN THE CONVERSATION, BASICALLY, MR. MOALIN ASKED

22   MR. DOREH IF ON HIS WAY TO THE MOSQUE THE NEXT DAY -- IT WAS

23   KNOWN THAT MR. DOREH GOES TO THE MOSQUE EVERY MORNING FOR

24   PRAYER AND IT IS KNOWN THAT MR. MOHAMUD IS THE IMAM -- TO

25   BASICALLY TELL HIM THAT BASAALY -- SORRY -- MR. MOALIN WANTED

NOVEMBER 18, 2013

1    TO SPEAK TO HIM.  THAT IS THE FACILITATION.

2              THANK YOU, YOUR HONOR.

3              **THE COURT:**  THANK YOU, MR. GHAPPOUR.  ALL RIGHT.

4              I WILL START ON THIS MATTER AS I DID THE OTHER TWO

5    MATTERS EARLIER THIS MORNING.  LET ME START WITH THE

6    OBJECTIONS AND TRY TO GET THOSE RESOLVED BECAUSE THEY -- WELL,

7    IT NEEDS TO BE DONE.

8              BOTH SIDES HAVE FILED GUIDELINE OBJECTIONS.  THE

9    GUIDELINE OBJECTIONS ARE OF A SIMILAR SORT THAT WERE FILED

10   WITH RESPECT TO DEFENDANTS MOALIN AND MOHAMUD.  AND I WILL

11   ADDRESS ALL OF THE GUIDELINE ISSUES IN MY ALLOCUTION.

12             I DO WANT TO ADDRESS THE FACTUAL DISPUTES OR

13   OBJECTIONS FILED ON BEHALF OF MR. DOREH.  AND WITH RESPECT TO

14   THE FIRST OBJECTION RELATING TO THE CURRENT SENTENCING DATE,

15   ORIGINALLY SENTENCING WAS SET FOR SEPTEMBER 16, AND IT IS

16   NOTED THIS IS NOVEMBER 18.  AND I DON'T KNOW THAT IS

17   PARTICULARLY MATERIAL, BUT I DO NOTE THAT.

18             THE NEXT OBJECTION RELATES TO PAGE 3 OF THE P.S.R.

19   UNDER HEADING CURRENT ADDRESS, THERE IS A CORRECTION THERE.  I

20   WOULD NOTE THAT AND HAVE THAT CLARIFIED.

21             WITH RESPECT TO THE OBJECTIONS, THEN, TO THE

22   PARAGRAPHS 3 THROUGH 56, I UNDERSTAND WHAT THE ARGUMENTS ARE.

23   THERE IS A GENERAL OBJECTION TO THE CHARACTERIZATION OF

24   OFFENSE CONDUCT, AND I WOULD IDENTIFY THOSE AS ARGUMENTS AND

25   CHARACTERIZATIONS.  THEY ARE NOTED, BUT ALSO OVERRULED.

1          WITH RESPECT TO THE OBJECTION TO PARAGRAPH 4, NOW WE

2    GET INTO SOME SPECIFIC OBJECTIONS.  THE OBJECTION IS

3    OVERRULED.  IT MAY BE RELEVANT BUT IT IS NOT MATERIAL FOR ANY

4    SENTENCING CHOICE I AM GOING TO MAKE.

5          THE SPECIFIC OBJECTION WITH RESPECT TO PARAGRAPH 6

6    IS OVERRULED.

7          THE SPECIFIC OBJECTION TO PARAGRAPH 34 IS NOTED AND

8    CLARIFIED.

9          THE SPECIFIC OBJECTION TO PARAGRAPH 40 IS NOTED.

10         THE SPECIFIC OBJECTION TO PARAGRAPH 48, THE REQUEST

11   FOR CLARIFICATION IS NOTED.

12         WITH RESPECT TO THE SPECIFIC OBJECTION TO

13   PARAGRAPH 51, THAT CLARIFICATION IS NOTED.

14         WITH RESPECT TO THE 54TH PARAGRAPH OF THE P.S.R.,

15   THAT OBJECTION IS OVERRULED.  MR. DOREH DID FACILITATE THE

16   TRANSFER OF FUNDS THROUGH SHIDAAL.

17         THE OBJECTION TO PARAGRAPH 55 IS ALSO NOTED AND

18   CLARIFIED.

19         WITH RESPECT TO THE GUIDELINE DISPUTES, I WANT TO

20   GET TO THOSE AS WELL, BUT I DO NOTE ONE THING.  EVEN IN THE

21   ADDENDUM -- NOW I AM AT THE ADDENDUM PAGE 4, THE THIRD

22   PARAGRAPH UNDER GOVERNMENT'S GUIDELINE DISPUTES IT IS STATED:

23   BASED ON THE RESPONSE ABOVE, THE UNDERSIGNED IS IN AGREEMENT

24   WITH THIS OBJECTION.  THE ADVISORY GUIDELINE RANGE BECOMES 80

25   YEARS CUSTODY, THE MAXIMUM OF ALL COUNTS, RUN CONSECUTIVELY

1    PER 5G1.2 SUBDIVISION D.

2              THAT FIGURE IS NOT 80 YEARS, IT IS 65 YEARS.  THOSE

3    COUNTS DON'T TOTAL 80 YEARS, SO THAT WAS ANOTHER CONTINUING

4    ISSUE WITH RESPECT TO THE GUIDELINES AS PROVIDED BY PROBATION.

5              SO BASICALLY, GETTING TO THE ANALYSIS ITSELF, THE

6    SUBJECT OF GROUPINGS COMES UP.  AND I DON'T WANT TO UNDULY

7    BELABOR THIS, BUT AS WITH THE ANALYSES FOR MR. MOALIN AND

8    MR. MOHAMUD, WE DO NEED TO GROUP THESE THREE -- THESE FOUR

9    COUNTS OF CONVICTION.

10             AND, BY THE WAY, WE ARE DEALING, WITH MR. DOREH,

11   CONVICTIONS ON COUNTS 1, 2, 3 AND 5.  THAT NEEDS TO BE

12   CLARIFIED:  1 BEING CONSPIRACY TO PROVIDE MATERIAL SUPPORT TO

13   FOREIGN TERRORISTS; 2, CONSPIRACY TO PROVIDE MATERIAL SUPPORT

14   FOR A FOREIGN TERRORIST ORGANIZATION; 3, MONEY LAUNDERING; AND

15   THEN 5, PROVIDING MATERIAL SUPPORT TO A FOREIGN TERRORIST

16   ORGANIZATION.

17             AS PREVIOUSLY STATED, ALL OF THESE COUNTS, IN MY

18   VIEW, SHOULD BE GROUPED.  AND THAT GROUPING SHOULD TAKE PLACE

19   PURSUANT TO 2S1.1, PARTICULARLY APPLICATION NOTE 8 -- EXCUSE

20   ME -- 6 AS IT WOULD APPLY IN THIS CASE, 2A1.5, 2X1.1 AND

21   ULTIMATELY UNDER 3D1.2, SUBDIVISION D, BECAUSE THE OFFENSES OF

22   CONVICTION WERE ONGOING AND CONTINUOUS IN NATURE.  PUT ANOTHER

23   WAY, THEY WERE CLOSELY RELATED WITH A COMMON PURPOSE OF

24   SUPPORTING TERRORISM.

25             THE GUIDELINE CALCULATIONS FOR THESE GROUPED COUNTS

1   WOULD BE THE BASE OFFENSE LEVEL OF 33, WITH A 12-LEVEL UPWARD

2   ADJUSTMENT UNDER 3A1.1.  I SAID IT BEFORE, BUT IT BEARS

3   INDIVIDUAL REPEATING FOR MR. DOREH'S CASE, THAT BOTH

4   PARAGRAPHS A AND B OF 3A1.4 WOULD APPLY.  THE 12-LEVEL UPWARD

5   ENHANCEMENT APPLIES IF THE OFFENSE OR OFFENSES INVOLVED WERE

6   INTENDED TO PROMOTE A FEDERAL CRIME OF TERRORISM.  AND WITH

7   RESPECT TO CRIMINAL HISTORY CATEGORY, IT IS ELEVATED FROM A

8   LEVEL I TO A LEVEL VI UNDER SUBDIVISION B OF THAT SECTION.

9           I INDICATED PREVIOUSLY, AND WOULD ONCE AGAIN

10  CONFIRM, THAT IN MY VIEW, AND BEYOND A REASONABLE DOUBT, THE

11  EVIDENCE DEMONSTRATED THAT THESE OFFENSES WERE CALCULATED TO

12  INFLUENCE OR AFFECT GOVERNMENTAL ACTION THROUGH INTIMIDATION,

13  COERCION, VIOLENCE.  AL-SHABAAB BEING A BRUTAL TERRORIST

14  ORGANIZATION THAT ENGAGED IN BOMBINGS, ASSASSINATIONS, SUICIDE

15  BOMBINGS, BOMBINGS OF THE PRESIDENTIAL PALACE, AMBUSHES, USING

16  EXPLOSIVE DEVICES AND FIREARMS OF ALL KINDS IN A CAMPAIGN TO

17  TERRORIZE AND ULTIMATELY AFFECT THE TRANSITIONAL FEDERAL

18  GOVERNMENT OF SOMALIA, INCLUDING ASSOCIATED FORCES FROM

19  ETHIOPIA AND AFRICAN UNION MEMBERS.  IT MAY NOT HAVE BEEN MUCH

20  OF A FUNCTIONING GOVERNMENT AT THE TIME BUT IT WAS FUNCTIONING

21  PURSUANT TO THE SUPPORT OF THE SURROUNDING GOVERNMENTS AND A

22  UNITED GOVERNMENTAL EFFORT TO BRING LAW AND ORDER TO SOMALIA.

23          I DID MENTION SUICIDE BOMBINGS.  I DON'T RECALL,

24  QUITE FRANKLY, NOW, WHETHER THERE WERE SUICIDE BOMBINGS AT

25  THAT PARTICULAR POINT IN TIME.  I KNOW THE GOVERNMENT'S EXPERT

NOVEMBER 18, 2013

1   IN GENERAL MADE REFERENCE TO SUICIDE BOMBINGS BUT I DO NOT

2   KNOW AT THE TIME -- I CANNOT RECALL AT THE TIME THESE OFFENSES

3   WERE BEING COMMITTED WHETHER AL-SHABAAB WAS ACTIVE IN SUICIDE

4   BOMBINGS.  BUT THAT DOESN'T TAKE AWAY FROM THE APPLICATION OF

5   3A1.4.

6           I KNOW THE GOVERNMENT HAS REALLY DETAILED THE

7   EFFORTS AND THE TACTICS UTILIZED BY AL-SHABAAB IN THEIR

8   SENTENCING MEMORANDUM.  I THINK THE GOVERNMENT DID A VERY GOOD

9   JOB WITH THAT AT PAGES 9 AND 10.  I WOULD CERTAINLY ADOPT AS A

10  SUMMARY WHAT THE GOVERNMENT HAS SET FORTH IN ITS SENTENCING

11  MEMORANDUM AT THAT PARTICULAR POINT.

12          SO THE TOTAL OFFENSE LEVEL BEFORE CONSIDERATION OF

13  5G1.1 AND 5G1.2 WOULD BE 43, AND THE CRIMINAL HISTORY CATEGORY

14  WOULD BE A VI FOR THESE OFFENSES OF CONVICTION, GROUPED.

15          AND NOW WE LOOK AT 5G1.1 AND 5G1.2, SUBDIVISION D.

16  AND WE LOOK AT THE INTERPLAY BETWEEN THESE SECTIONS, THE

17  DEFINITION OF TOTAL PUNISHMENT.  I INCORPORATE WITH THE

18  AGREEMENT OF ALL COUNSEL MY REMARKS EARLIER TODAY,

19  PARTICULARLY WITHIN THE CONTEXT OF THE SENTENCING FOR

20  MR. MOALIN, ON HOW THESE SECTIONS RELATE TO ONE ANOTHER AND

21  THE DEFINITION OF TOTAL PUNISHMENT.  BUT, IN ANY EVENT, THE

22  ADVISORY GUIDELINE RANGE FOR THESE PARTICULAR COUNTS OF

23  CONVICTION BECOME THE STATUTORY MAXIMUMS.  AND FOR COUNTS 1

24  AND 2 AND 5 THEY WOULD EACH BE 15 YEARS.  FOR COUNT 3, THE

25  MONEY LAUNDERING COUNT, THE MAXIMUM WOULD BE 20 YEARS.

1          AGAIN, THE FIGURE OF 65 YEARS, IN MY VIEW, IS NOT AN

2     ADVISORY GUIDELINE RANGE, PER SE, THAT IS WITHIN THE MEANING

3     OF CHAPTER 5 AND SPECIFICALLY 5G1.1 AND 2.  65 YEARS

4     REPRESENTS, AGAIN, A MECHANICAL STACKING OF ALL COUNTS OF

5     CONVICTION AND CONSECUTIVELY TO THE MAX.  I DON'T THINK THAT

6     WOULD BE APPROPRIATE IN THIS CASE.

7          BEFORE WE CONCLUDE WITH THE GUIDELINE ANALYSIS WE

8     GET TO ANY FORMAL DEPARTURE REQUESTS.  AND THE DEPARTURE

9     REQUESTS MADE BY MR. DOREH, AS I INTERPRET IT, THE PAPERS YOU

10    SUBMITTED, MR. GAPPOUR, REALLY RELATED TO THE ISSUE OF ROLE.

11    YOU WERE ARGUING FOR WHAT YOU CALLED A MITIGATED ROLE

12    DEPARTURE.  UNDER THE GUIDELINES REDUCTIONS FOR ROLE, MINOR OR

13    MINIMAL, ARE ADJUSTMENTS RATHER THAN DEPARTURES.

14          AND I DON'T KNOW -- I DON'T KNOW, GIVEN MY PREVIOUS

15    ANALYSIS RELATING TO STATUTORY MAXIMUMS, HOW THE GUIDELINES

16    WORK TO THIS POINT, WHETHER YOU ARE REALLY MAKING A REQUEST

17    FROM THE STATUTORY MAXIMUMS FOR THIS -- FOR THESE OFFENSES ON

18    THE BASIS OF A DEPARTURE FOR ROLE, OR WHETHER YOU ARE MAKING A

19    REQUEST FOR A MITIGATED SENTENCE TAKING INTO ACCOUNT AS ONE OF

20    THE EQUITABLE CONSIDERATIONS WHAT YOU CHARACTERIZE AS A MINOR

21    ROLE OR A MITIGATED ROLE.

22          **MR. GHAPPOUR:**  BOTH, YOUR HONOR, ONE AS THE

23    ALTERNATIVE OF THE OTHER.  IN OTHER WORDS, IF YOU WOULD NOT

24    FIND THE DEPARTURE THEN I WOULD ASK --

25          **THE COURT:**  HOW MANY LEVELS, THEN, WOULD YOU BE

NOVEMBER 18, 2013

1    REQUESTING?  THERE WASN'T ANY -- THERE WASN'T ANY QUANTITATIVE

2    SUBMISSION BY YOU IN THAT REGARD, SO WHAT WOULD THAT BE?

3          **MR. GHAPPOUR:**  I THINK IN MY OBJECTIONS TO THE

4    P.S.R. I ASKED FOR FOUR POINTS DOWNWARD DEPARTURE.

5          **THE COURT:**  A FOUR-LEVEL DOWNWARD REDUCTION.  LET'S

6    CALL IT A REDUCTION.

7          WOULD THAT COME FROM THE TOTAL OF THE STACKED

8    OFFENSES CONSECUTIVELY?  WOULD IT COME FROM STATUTORY MAXIMUMS

9    CONCURRENTLY?  WHAT WOULD BE THE STARTING POINT FOR THAT?

10         **MR. GHAPPOUR:**  QUITE FRANKLY, WHATEVER GETS MY

11   CLIENT THE LESSER SENTENCE.  FORGIVE ME, MY UNDERSTANDING --

12   AND I WILL RAISE THIS OBJECTION TO THE EXTENT THE ENHANCEMENTS

13   ARE APPLIED, AN INDIVIDUALIZED FINDING OF THE 3A1.4

14   ENHANCEMENT HAS TO APPLY; IN OTHER WORDS, THERE IS MATERIAL

15   SUPPORT OF THE TERRORIST GROUP.  INHERENTLY ALL TERRORIST

16   GROUPS ARE HORRIBLE AND SEEK TO COERCE A GOVERNMENT OR APPLY

17   SOME SORT OF POLITICAL END.  BUT THE PURPOSE OF THE

18   ENHANCEMENT, THEN, IS TO LOOK AT THE INTENT OF THE INDIVIDUAL

19   AND SEE IF HIS ACTIONS -- IF THERE WAS PROOF DURING TRIAL THAT

20   HIS ACTIONS CONSTITUTED THE FORMATION OF AN INTENT TO COERCE

21   THE GOVERNMENT.

22         I APOLOGIZE, I THOUGHT THIS WAS IN A FOOTNOTE.  BUT

23   MY CALCULATIONS WERE NOT APPLYING ENHANCEMENT, 20 YEAR MAX, I

24   GUESS, PUT US AT 33, THEN THE FOUR-LEVEL REDUCTION.

25         **THE COURT:**  I THINK WE ARE LOSING GROUND HERE.

1          **MR. GHAPPOUR:**  I AM JUST TRYING TO EXPLAIN MYSELF,

2     YOUR HONOR.  I APOLOGIZE.

3          **THE COURT:**  I WAS ASKING YOU TO FOCUS ON THE ROLE

4     DEPARTURE.  YOU BASICALLY INCORPORATED THE ARGUMENTS OF YOUR

5     CO-DEFENDANTS WHEN IT CAME TO THE 3A1.4 UPWARD 12-LEVEL

6     ENHANCEMENT.  AND BASICALLY THE ARGUMENT, OR ARGUMENTS, OF

7     YOUR CO-DEFENDANTS WERE -- AND I THINK PROBABLY BEST AMPLIFIED

8     BY OR IN THE SENTENCING MEMORANDUM FOR MR. MOALIN -- THIS

9     WASN'T A FUNCTIONING GOVERNMENT.  AND BECAUSE IT WASN'T A

10    FUNCTIONING GOVERNMENT THE ACTIVITY COULDN'T HAVE BEEN

11    DIRECTED TO DETER, DEFEAT, INTIMIDATE OR COERCE A FUNCTIONING

12    GOVERNMENT.  THAT WAS THE ARGUMENT.  NOT THAT THERE WASN'T AN

13    INDIVIDUALIZED FINDING OF ACTION OR INTENT ON THE PART OF

14    INDIVIDUAL DEFENDANTS.  I DON'T BELIEVE THAT IS THE TEST, AND

15    NO ONE HAS CITED ANY AUTHORITY FOR THAT.

16         **MR. GHAPPOUR:**  FORGIVE ME, YOUR HONOR, BUT I GUESS

17    IT WOULD -- IN MY EYES, IT WOULD RENDER THE ENHANCEMENT

18    MEANINGLESS IF THERE IS NO INDIVIDUALIZED FINDING AND IF THE

19    ENHANCEMENT APPLIES JUST FOR THE CONDUCT, OR MORE SPECIFICALLY

20    TO THE STATUTE, THEN EVERY CONVICTION -- EVERY CONVICTION FOR

21    2339(A) OR (B) WOULD NECESSARILY RESULT IN AN ENHANCEMENT

22    BECAUSE ALL FOREIGN TERRORIST ORGANIZATIONS.

23         **THE COURT:**  WELL, THE JURY MADE THE NECESSARY

24    FINDINGS IN THIS CASE, MR. GHAPPOUR.

25         **MR. GHAPPOUR:**  I AGREE.

1          THE COURT:  I KNOW YOU AGREE WITH THAT, YOU STATED

2     YOU AGREE.  AND THEN YOU HAVE THE COMPLICIT NATURE OF WHAT WAS

3     INVOLVED IN THIS CASE BY THE DIFFERENT DEFENDANTS, AND SO IN A

4     SENSE THEY ARE CHARGED WITH THAT -- WITH THAT ACTIVITY, EACH

5     AND EVERY ONE OF THEM.  CLEARLY THERE WAS THE INTENT ON THE

6     PART OF ALL DEFENDANTS, AS FOUND BY THE JURY, TO PROMOTE

7     INDIVIDUALLY, TO INTEND TO HAVE THESE FUNDS SUPPORT A CRIME OF

8     TERRORISM, SUCH AS IT IS DEFINED.

9          AND I WILL BE HAPPY TO GO THROUGH IT FOR YOU ONCE

10    AGAIN IF YOU WOULD LIKE ME TO, BUT IT IS DEFINED BASICALLY AS

11    ACTIVITY THAT IS INTENDED TO INFLUENCE, INTIMIDATE, COERCE A

12    FEDERAL GOVERNMENT.  AND THAT'S -- THAT WAS FOUND BY VIRTUE OF

13    THE VERDICTS IN THIS CASE AND HOW THE EVIDENCE WAS PRESENTED

14    TO THE JURY AND WHAT THEIR SPECIFIC FINDINGS WERE, THE

15    PREDICATES FOR THEIR VERDICTS.

16         SO I THINK WE HAVE REALLY BACKED UP QUITE A BIT.  I

17    WANTED TO EXPLORE WHAT YOUR -- AND FURTHERMORE, I WOULD ASSUME

18    YOU WOULD AGREE A GUIDELINE ANALYSIS IS RATHER IRRELEVANT

19    HERE.  WE ARE TALKING ABOUT SENTENCING UNDER 3553(A).  THE

20    GUIDELINES ARE VERY UNHELPFUL.  THE STATUTORY MAXIMUMS BECOME,

21    ULTIMATELY, THE STARTING POINT, IN MY VIEW, FOR FURTHER

22    ANALYSIS.  IF YOU DISAGREE WITH THAT, LET ME KNOW NOW.

23         MR. GHAPPOUR:  I AGREE.  AND I, IN THAT CASE, WOULD

24    LIKE TO APPLY MY ANALYSIS TO THE OTHER FACTORS.

25         THE COURT:  AS A MITIGATING FACTOR UNDER, WHAT, A

```
 1   3553(A) ANALYSIS?

 2             MR. GHAPPOUR:  YES, YOUR HONOR.

 3             THE COURT:  I AM JUST LOOKING FOR A LITTLE HELP AT

 4   THIS POINT FROM YOU.

 5             MR. GHAPPOUR:  YES, YOUR HONOR.

 6             THE COURT:  BECAUSE THE WAY THE ROLE -- THE

 7   MITIGATED ROLE WAS REQUESTED IT WAS UNCLEAR TO ME AS TO HOW

 8   THAT WAS TO BE APPLIED; WAS IT TO BE APPLIED WITHIN A

 9   GUIDELINE ANALYSIS, WAS IT TO BE APPLIED WITHIN A 3553(A)

10   ANALYSIS, AND WHAT THE QUANTITATIVE VALUE OF THAT WOULD BE.

11             MR. GHAPPOUR:  3553(A), YOUR HONOR.

12             THE COURT:  ALL RIGHT.  ALL RIGHT.

13             AS I SAID BEFORE, THE MOST SIGNIFICANT ISSUE HERE IS

14   WHETHER THE SENTENCING DECISION WILL BE DRIVEN BY CONCURRENT

15   SENTENCES ON THESE COUNTS OF CONVICTION, OBVIOUSLY COMBINED

16   WITH THE 3553(A) ANALYSIS.  SO LET ME JUST BUTTON UP THE

17   GUIDELINE ANALYSIS BEFORE GETTING TO 3553(A).

18             THE GUIDELINE RANGES, UNDER THE ADVISORY GUIDELINES,

19   WOULD BE THE STATUTORY MAXIMUMS FOR EACH OF THE OFFENSES OF

20   CONVICTION.

21             WITH RESPECT TO THE NATURE AND CIRCUMSTANCES OF THE

22   OFFENSES, I SAID IT BEFORE, I WILL SAY IT AGAIN.  IN MY VIEW

23   THESE OFFENSES WERE VERY SERIOUS.  PROVIDING SUPPORT FOR A

24   BRUTAL TERRORIST ORGANIZATION WITH TARGETED VIOLENCE,

25   ASSASSINATIONS BOMBINGS AND OTHER TYPES OF ACTIVITY, ALL TO
```

```
1    DISRUPT, DETER, DEFEAT, ULTIMATELY, THE TRANSITIONAL FEDERAL

2    GOVERNMENT, THE AFRICAN UNION FORCES AND OTHER ASSOCIATED

3    EFFORTS TO BRING WAR-TORN SOMALIA SOME SEMBLANCE OF ORDER AND

4    PEACE.

5           DEFENDANT DOREH HELPED IMPLEMENT THE TRANSMISSION OF

6    FUNDS THROUGH THE SHIDAAL EXPRESS FOR THE PURPOSE OF ADVANCING

7    THESE PURPOSES.  THAT HE WAS NOT THE OWNER OF SHIDAAL EXPRESS

8    AT THE MOMENT HE ASSISTED IN THE TRANSMISSIONS, IN MY VIEW, IS

9    OF NO MOMENT.  HE ASSISTED IN THE TRANSMISSION OF THOSE FUNDS.

10   HE KEPT MR. MOALIN ADVISED OF THE ROUTING.  HE WAS CLEARLY

11   AWARE OF WHAT THE FUNDS WERE BEING PROVIDED FOR, THROUGH THESE

12   STRUCTURED TRANSACTIONS, USING CODED TERMS AND DIFFERENT NAMES

13   AND ALL OF THE EFFORTS UNDERTAKEN TO MASK SOME OF THE ACTUAL

14   DETAILS OF THESE TRANSMISSIONS.

15          THAT BEING SAID, I THINK THE ROLE OF MR. DOREH WAS

16   LESSER THAN THE ROLES -- THIS IS WHERE THE MITIGATED NATURE OF

17   ROLE COMES IN.

18          I DO NOT ACCEPT THE PROPOSITION FROM THE GOVERNMENT,

19   WITH DUE RESPECT TO MS. HAN, THAT MR. DOREH'S ROLE WAS

20   COMPARABLE TO MR. MOALIN'S OR MR. MOHAMUD'S.  HIS ROLE WAS

21   LESSER THAN THE ROLES PLAYED BY THOSE TWO GENTLEMEN.  HE WAS

22   NOT INVOLVED IN THE RECRUITING OF FINANCIAL SUPPORT AS HIS

23   CO-DEFENDANTS WERE, NOR WAS HE A COG IN THE WHEEL OF SUPPORT

24   AS MR. MOALIN WAS.  AND I THINK THAT THE MITIGATED NATURE OF

25   MR. DOREH'S PARTICIPATION IS AN EQUITABLE CONSIDERATION THAT
```

1    CAN BE ADDRESSED AND APPLIED UNDER 3553(A).

2            WITH RESPECT ON THE HISTORY AND CHARACTERISTICS OF

3    MR. DOREH.  ONCE AGAIN THAT IS WHERE WE FIND MOST OF THE

4    EQUITIES HERE.  AGAIN, WE ARE DEALING WITH A HIGHLY EDUCATED

5    MAN, A MAN OF 56, HAVING LEFT WAR-TORN SOMALIA FOR REASONS

6    THAT ARE PERFECTLY UNDERSTANDABLE.  MULTIPLE COLLEGE DEGREES,

7    VARIOUS EMPLOYMENT CAPACITIES, AND BASICALLY A HISTORY OF

8    PRODUCTIVE EMPLOYMENT.  AND A LAW ABIDING HISTORY, WITH THE

9    EXCEPTION OF WHAT WAS DONE IN THIS CASE.

10           SOMEONE WHO APPARENTLY WAS AN UPSTANDING MEMBER OF

11   THE SOMALI COMMUNITY, AS I READ THROUGH ALL OF THE LETTERS.

12   AND I AM AWARE OF THE FOUNDATIONS WITH WHICH MR. DOREH HAS

13   ASSOCIATED HIMSELF.  AND OF PARTICULAR NOTE TO ME WAS HIS

14   INVOLVEMENT WITH PROVIDING SPIRITUAL GUIDANCE FOR INDIVIDUALS

15   IN CUSTODY.  I THINK THAT IS A LAUDATORY CREDENTIAL AND IS

16   CERTAINLY SOMETHING THAT I THINK IS QUITE DESERVING OF

17   CONSIDERATION HERE.  YOU KNOW, MR. DOREH BEING A BIT OLDER

18   THAN HIS CO-DEFENDANTS AND HAVING 11 CHILDREN -- OR EIGHT.

19           **MR. GHAPPOUR:**  EIGHT.

20           **THE COURT:**  EIGHT CHILDREN, HAVING EIGHT CHILDREN.

21   THEY SPAN A SPECTRUM OF AGES, AND SO IT COMES AS NO SURPRISE

22   TO ME THAT MR. DOREH HAS A LARGE FAMILY WITH CHILDREN AT ALL

23   DIFFERENT LEVELS OF EDUCATION AND ACHIEVING HIGHLY AS THEY

24   ARE.

25           AND I DO NOTE THAT MR. DOREH IS A NATURALIZED

1     CITIZEN.  HE DOESN'T HAVE COLLATERAL CONSEQUENCES IN THAT

2     REGARD AS MR. MOHAMUD HAS IN THIS CASE.

3            OBVIOUSLY, THE SENTENCING PURPOSES THAT I ENUMERATED

4     EARLIER, PROMOTING RESPECT FOR U.S. LAWS THAT PROSCRIBE

5     TERRORISM IN ALL FORMS BUT ESSENTIALLY PROSCRIBE TERRORISM IN

6     THE FORM OF AIDING, PROMOTING FOREIGN TERRORISTS AND FOREIGN

7     TERRORIST ORGANIZATIONS, MUST BE BUTTRESSED IN A CASE LIKE

8     THIS.  AND PROTECTING THE PUBLIC FROM FURTHER CRIMES OF THIS

9     TYPE IS, OBVIOUSLY, VERY IMPORTANT.  DETERRENCE IS PROBABLY

10    THE GREATEST OF ALL OF THESE ASSOCIATED SENTENCING PURPOSES AT

11    THIS POINT.  THEY ARE ALL RELATED, BUT DETERRENCE IS SO

12    IMPORTANT.

13           OBVIOUSLY, WHEN IT COMES TO SPECIFIC DETERRENCE I

14    DON'T THINK WE NEED WORRY ABOUT ANY OF THESE THREE GENTLEMEN.

15    BUT WHEN IT COMES TO GENERAL DETERRENCE THOSE WHO WOULD THINK

16    THE SUPPORT FOREIGN TERRORISTS AND FOREIGN TERRORIST

17    ORGANIZATIONS, DESIGNATED AS SUCH BY THE SECRETARY OF STATE BY

18    THE UNITED STATES GOVERNMENT, MUST BE DETERRED FROM THIS KIND

19    OF ACTIVITY.

20           THERE IS NO ALTERNATIVE TO CUSTODY, IN MY VIEW, IN A

21    CASE SUCH AS THIS THAT WOULD VALIDATE, BUTTRESS THE MOST

22    RELEVANT SENTENCING PURPOSES I HAVE BEEN DISCUSSING.  AND I AM

23    MINDFUL THAT A CUSTODIAL SENTENCE MUST BE FAIR, JUST AND

24    REASONABLE, AND BE SUFFICIENT BUT THE LEAST AMOUNT OF TIME

25    THAT WOULD BE NECESSARY TO SERVE THE SENTENCING PURPOSES THAT

1   I HAVE REFERRED TO.

2           FOR ALL OF THESE REASONS I WOULD FIND THAT A TERM OF

3   CUSTODY OF 10 YEARS FOR EACH OF THESE COUNTS, IMPOSED

4   CONCURRENTLY TO ONE ANOTHER FOR A TOTAL OF 10 YEARS, WOULD BE

5   A FAIR, JUST AND REASONABLE SENTENCE AND SERVE, IN MY MIND,

6   THE SENTENCING PURPOSES AS I HAVE OUTLINED THEM.

7           I REALIZE THAT A 10-YEAR SENTENCE, IN TOTAL, FOR

8   THESE COUNTS OF CONVICTION REPRESENTS A SIGNIFICANT VARIANCE

9   FROM THE STATUTORY MAXIMUMS OF EITHER 15 OR 20 YEARS ON THESE

10  COUNTS OF CONVICTION.  BUT I THINK -- I THINK IT IS WARRANTED,

11  THE OVERALL VARIANCE IS WARRANTED.

12          ULTIMATELY, THESE CUSTODIAL SENTENCES FOR THESE

13  COUNTS SHOULD BE IMPOSED CONCURRENTLY, AS I SAID BEFORE, AND I

14  WILL REPEAT FOR MR. DOREH.  BECAUSE THE COUNTS REPRESENT

15  RELATED OFFENSES THEY HAVE BEEN GROUPED.  THEY CONSIST OF THE

16  SAME CONTINUING HARM FOR THE SAME COMMON PURPOSE OF ULTIMATELY

17  PROVIDING SUPPORT, FINANCIAL SUPPORT, TO FOREIGN TERRORISTS

18  AND A FOREIGN TERRORIST ORGANIZATION.

19          ACCORDINGLY, PURSUANT TO THE 1984 SENTENCING REFORM

20  ACT, IT IS THE JUDGMENT AND SENTENCE OF THE COURT THAT MR.

21  DOREH BE, AND HEREBY IS, COMMITTED TO THE CUSTODY OF THE

22  BUREAU OF PRISONS ON EACH OF THE COUNTS OF CONVICTION, COUNTS

23  1, 2, 3 AND 5, FOR A PERIOD OF 10 YEARS CUSTODY ON EACH OF

24  THOSE COUNTS, EACH CONCURRENT WITH THE OTHER, FOR A TOTAL OF

25  10 YEARS OF CUSTODY.

NOVEMBER 18, 2013

1          NO FINE IS IMPOSED IN CONNECTION WITH ANY OF THESE

2     COUNTS.  A $100 SPECIAL ASSESSMENT IS ASSESSED WITH RESPECT TO

3     COUNT 1 AND WAIVED WITH RESPECT TO THE REMAINING COUNTS.

4          FOLLOWING COMPLETION OF THE CUSTODIAL SENTENCE IN

5     THIS CASE, MR. DOREH IS TO BE PLACED UPON A THREE-YEAR PERIOD

6     OF SUPERVISED RELEASE, WITH THE STANDARD CONDITIONS OF

7     SUPERVISION APPLYING AS WELL AS THE FOLLOWING SPECIAL

8     CONDITIONS:  THAT HE SUBMIT TO A SEARCH OF HIS PERSON,

9     PROPERTY, VEHICLE, ABODE OR RESIDENCE AT A REASONABLE TIME,

10    UNDER REASONABLE CIRCUMSTANCES BY A PROBATION OFFICER BASED ON

11    REASONABLE SUSPICION.

12         MR. DOREH, I WOULD ORDER THAT YOU ADVISE THE OTHER

13    RESIDENTS OF THE PREMISES THAT THE PREMISES ARE SUBJECT TO

14    SEARCH PURSUANT TO THIS CONDITION.

15         THAT YOU REPORT ALL VEHICLES, OWNED OR OPERATED, OR

16    IN WHICH YOU HAVE AN INTEREST TO PROBATION; THAT YOU NOT

17    KNOWINGLY ASSOCIATE WITH FOREIGN TERRORISTS OR -- WITH FOREIGN

18    TERRORISTS, TERRORISTS OR TERRORIST ORGANIZATIONS, WHETHER

19    THEY BE FOREIGN OR DOMESTIC; AND THAT YOU PROVIDE COMPLETE

20    DISCLOSURE OF PERSONAL AND BUSINESS FINANCIAL RECORDS TO

21    PROBATION AS REQUESTED.

22         SIR, DO YOU UNDERSTAND THESE CONDITIONS OF

23    SUPERVISED RELEASE, THESE SPECIAL CONDITIONS, AS I HAVE

24    OUTLINED THEM, MR. DOREH?

25         **DEFENDANT DOREH:**  YES, YOUR HONOR.

1          **THE COURT:**  DO YOU HAVE ANY QUESTIONS ABOUT ANY OF

2   THEM?

3          **DEFENDANT DOREH:**  NO, YOUR HONOR.

4          **THE COURT:**  I WOULD FURTHER ADVISE YOU THAT YOU HAVE

5   AN ABSOLUTE RIGHT TO APPEAL FROM THE CONVICTIONS ON THESE

6   COUNTS, AND FOR THE SENTENCE IMPOSED FOR THEM.  IF YOU DO WISH

7   TO APPEAL -- I KNOW THAT YOU DO -- YOU MUST FILE A WRITTEN

8   NOTICE OF APPEAL WITHIN 14 DAYS FROM TODAY WITH THE CLERK OF

9   THIS COURT RATHER THAN WITH THE CLERK OF THE NINTH CIRCUIT

10  COURT OF APPEALS.  YOU MUST SPECIFY WHAT IT IS YOU ARE

11  APPEALING FROM.  YOU MUST KEEP THE APPELLATE AUTHORITIES

12  ADVISED OF YOUR WHEREABOUTS AT ALL TIMES WHILE YOUR CASE IS ON

13  APPEAL SO THAT IF THEY DO NEED TO CONTACT YOU THEY CAN CONTACT

14  YOU.

15         IF YOU CANNOT AFFORD THE SERVICES OF LEGAL

16  REPRESENTATION WHILE YOUR CASE IS ON APPEAL, THOSE SERVICES

17  WILL BE PROVIDED TO YOU AT NO COST TO YOU.

18         DO YOU UNDERSTAND WHAT I HAVE TOLD YOU ABOUT YOUR

19  APPELLATE RIGHTS, MR. DOREH?

20         **DEFENDANT DOREH:**  YES, YOUR HONOR.

21         **THE COURT:**  I AM GOING TO RECOMMEND THE WESTERN

22  REGION FOR MR. DOREH'S PLACEMENT, AND AS CLOSE TO THE SOUTHERN

23  DISTRICT OF CALIFORNIA AS PRACTICABLE.

24         DID YOU HAVE ANY QUESTIONS, MR. GHAPPOUR, AT THIS

25  POINT?

1          **MR. GHAPPOUR:**  NO, YOUR HONOR.

2          **THE COURT:**  IF YOU COME FORWARD, I WOULD LIKE TO

3    HAVE YOU PROVIDED WITH A COPY OF THE TERMS AND CONDITIONS OF

4    SUPERVISED RELEASE, WHICH I AM GOING TO HAVE HANDED TO YOU.  I

5    WOULD LIKE YOU TO PROVIDE THOSE TO YOUR CLIENT AT THIS TIME.

6    THAT IS APPRECIATED.

7          MS. HAN, MR. COLE, ANYTHING FURTHER FROM THE

8    GOVERNMENT WITH RESPECT TO MR. DOREH, ANY OBJECTIONS?

9          **MS. HAN:**  YOUR HONOR, JUST ON THE PROCEDURAL ISSUE

10   WITH REGARD TO YOUR CALCULATION AND THE IMPLICATION OF 5G1.1

11   AND 1.2.  WE JUST HAVE AN OBJECTION FOR MR. DOREH AS WELL AS

12   MR. MOHAMUD, WHICH WE NOTED EARLIER.

13         **THE COURT:**  WOULD YOU LIKE TO STATE WHAT THE

14   OBJECTION IS?

15         **MS. HAN:**  WE BELIEVE THAT -- JUST UNDER OUR READING

16   OF THE GUIDELINES WE BELIEVE THAT THE ACTUAL GUIDELINE RANGE

17   IS WHAT WE STATED, WHICH WAS 780 MONTHS TO 780 MONTHS FOR MR.

18   DOREH AND MR. MOHAMUD, AND 960 MONTHS FOR MR. MOALIN -- 960 TO

19   960 MONTHS FOR MR. MOALIN.

20         **MR. COLE:**  JUST STATED FOR THE RECORD.

21         **THE COURT:**  YES.  YOU KNOW, THAT COULD CONCEIVABLY

22   BE.  I MEAN, HERE WE ARE MORE OR LESS SHOOTING OFF THE TOP

23   HERE.  WHAT THAT COULD CONCEIVABLY REPRESENT WOULD BE TOTAL

24   PUNISHMENT.  TOTAL PUNISHMENT COULD BE 65 YEARS OR 80 YEARS IN

25   THE CASE OF ONE DEFENDANT OR ANOTHER.  THE COURT COULD DO

```
 1   THAT, CONSEC'ING ALL OF THESE COUNTS OF CONVICTION, THAT IS
 2   TOTAL PUNISHMENT.  THAT IS NOT THE ADJUSTED COMBINED GUIDELINE
 3   RANGE, IN MY VIEW.  THE GUIDELINE RANGES FOR THE VARIOUS
 4   COUNTS OF CONVICTION ARE THE STATUTORY CAPS BECAUSE EVEN
 5   THOUGH 5G1.1 TALKS ABOUT A SINGULAR COUNT, AS MR. COLE POINTED
 6   OUT, WHERE THE GUIDELINE RANGE EXCEEDS THE STATUTORY MAXIMUM
 7   FOR THAT COUNT, THE GUIDELINE RANGE IS THE STATUTORY MAXIMUM.
 8   IT CAN BE NO GREATER THAN THE STATUTORY MAXIMUM.  THEN WHEN
 9   YOU ARE DEALING WITH MULTIPLE COUNTS, THAT'S WHEN YOU ARE
10   DEALING WITH A DYNAMIC OF WHETHER YOU RUN THE COUNTS
11   CONSECUTIVELY OR CONCURRENTLY.  THAT IS WHEN THE QUESTION OF
12   TOTAL PUNISHMENT COMES IN.  YOU HAVE TO FIGURE OUT WHAT TOTAL
13   PUNISHMENT IS IF IT IS GOING TO BE MORE THAN THE HIGHEST
14   STATUTORY MAXIMUM FOR ANY OF THE COUNTS OF CONVICTION SO THAT
15   YOU CAN STRUCTURE IT SUCH THAT YOU DON'T IMPOSE MORE THAN THE
16   STATUTORY MAXIMUM ON THE HIGHEST COUNT BEFORE CONSEC'ING
17   PORTIONS OF OTHER COUNTS FOR THE TOTAL PUNISHMENT.  I THINK
18   THAT WAS THE ONLY POINT I WAS TRYING TO MAKE.
19            I HAVE A FEELING THAT THE DIFFERENCE -- THE
20   OBJECTION THAT YOU ARE MAKING IS ONE OF LEXICON MORE THAN
21   ANYTHING ELSE AS IT RESULTS -- AS IT AFFECTS SOME OF THESE
22   TERMS.  BUT, LOOK, THAT IS THE BEST READING I COULD GIVE IT.
23   I KNOW THAT IT GETS A LITTLE BIT TECHNICAL AND A LITTLE BIT
24   CHALLENGING, BUT AS I SPENT LITERALLY HOURS PORING OVER THIS
25   STUFF, THAT IS ABOUT THE BEST I COULD MAKE OF IT.  AND THEN
```

1   LOOKING AT THAT HYPOTHETICAL IN THE APPLICATION NOTE WAS OF

2   ASSISTANCE TOO.  ULTIMATELY, GIVEN THE DISPOSITIONS IN THIS

3   CASE, I THINK THAT THESE POINTS ARE SOMEWHAT MOOT.

4          IF THERE IS NOTHING ELSE, THEN WE WILL ADJOURN IN

5   THIS MATTER.

6          **MR. COLE:**  THANK YOU, YOUR HONOR.

7          **MR. DRATEL:**  THANK YOU.

8

9                          *   *   *

10          I CERTIFY THAT THE FOREGOING IS A CORRECT
            TRANSCRIPT FROM THE RECORD OF PROCEEDINGS
11          IN THE ABOVE-ENTITLED MATTER.

12          S/LEEANN PENCE                        2/3/2014

13          LEEANN PENCE, OFFICIAL COURT REPORTER    DATE

14

15

16

17

18

19

20

21

22

23

24

25

NOVEMBER 18, 2013