1              United States District Court

2            Southern District of California

3

4  UNITED STATES OF AMERICA,       )
                                   )
5                  Plaintiff,      )
                                   )
6     vs.                          ) Case No. 10-CR-4246 JM
                                   )
7  BASAALY SAEED MOALIN,           ) Thursday, January 10, 2013
   MOHAMAD MOHAMAD MOHAMUD         ) Motion Hearing
8  ISSA DOREH,                     ) Motions in Limine
   AHMED NASIR TAALIL MOHAMUD,     )
9                                  )
                   Defendants.     )
10 _____)

11

12          Before the Honorable Jeffrey T. Miller
               United States District Judge

13

14

15

16

17

18

19

20 Official Interpreters:   Ayderus Ali, CCI

21 Official Court Reporter: Debra M. Henson, CSR, RPR
                            U.S. Courthouse
22                          333 W. Broadway, Suite 420
                            San Diego, CA  92101
23                          (619) 238-4583

24

25          Record produced by stenographic reporter

```
 1   Appearances

 2   For the Government:      Laura E. Duffy
                             UNITED STATES ATTORNEY
 3                           William P. Cole
                             Caroline P. Han
 4                           ASSISTANT U.S. ATTORNEYS
                             Steven P. Ward, Trial Attorney
 5                           U.S. DEPARTMENT OF JUSTICE
                             880 Front Street, Suite 6293
 6                           San Diego, CA  92101

 7   For the Defendants:
     (Mr. Moalin)            Joshua L. Dratel, Esq.
 8                           Alice Fontier, Esq.
                             OFFICE OF JOSHUA L. DRATEL
 9                           2 Wall Street, Third Floor
                             New York, NY  10005
10
     (Mr. M. Mohamud)        Linda Moreno, Esq.
11                           LINDA MORENO, P.A.
                             P.O. Box 10985
12                           Tampa, FL  33679

13   (Mr. Doreh)             Ahmed Ghappour, Esq.
                             LAW OFFICES OF AHMED GHAPPOUR
14                           P.O. Box 20367
                             Seattle, WA  98102
15
     (Mr. A. Mohamud)        Thomas A. Durkin, Esq.
16                           DURKIN & ROBERTS
                             2446 N. Clark Street
17                           Chicago, IL  60614

18

19

20

21

22

23

24

25
```

```
 1          San Diego, California - Thursday, January 10, 2013
 2          (Defendant A. Mohamud is being assisted by a Somali
 3     interpreter.)
 4          THE CLERK:  Calling matter 1 on calendar,
 5     10-CR-4246, USA versus Basaaly Saeed Moalin, Mohamad Mohamad
 6     Mohamud, Issa Doreh, Ahmed Nasir Taalil Mohamud, set for
 7     motion in limine hearing.
 8          MR. COLE:  Good morning, your Honor.  William Cole,
 9     Caroline Han, Steven Ward for the United States.
10          THE COURT:  Thank you.
11          MR. DRATEL:  Good morning, your Honor.  Joshua
12     Dratel with Alice Fontier for Mr. Moalin.
13          MS. FONTIER:  Good morning, your Honor.
14          MS. MORENO:  Good morning, your Honor.  Linda
15     Moreno on behalf of Mr. Mohamad Mohamud.
16          THE COURT:  Good morning.  Thank you.
17          MR. GHAPPOUR:  Good morning, your Honor.  Ahmed
18     Ghappour on behalf of Mr. Issa Doreh.
19          THE COURT:  Good morning.
20          MR. DURKIN:  Morning, Judge.  Tom Durkin on behalf
21     of Ahmed Nasir Taalil Mohamud.
22          THE COURT:  Thank you.  Again, good morning to
23     everyone, including all of our ladies and gentlemen who are
24     here observing in the back.  We're set for a number of
25     different things.  I think --
```

 1          MS. MORENO:  Your Honor, I'm sorry.  Mr. Moalin is

 2   not out yet.

 3          THE COURT:  Okay.  All defendants are present.

 4   Thank you.  Good morning, gentlemen.  We're good to go?

 5   We're here to address several matters today.  We have motions

 6   in limine we'll get to in a little bit.  I did want to start

 7   by picking up where we left off last time with discovery

 8   related matters and just seeing where we are in terms of

 9   preparation for trial.  And so, assuming that's acceptable to

10   everyone, let me start out by asking where we are in the

11   preparation of deposition transcripts.

12          The reason I'm going to express a certain level of

13   concern right now is that the last time we were here, I think

14   everyone fully anticipated that the deposition transcripts

15   would be prepared by this point, they'd be color-coded by

16   this time and submitted to me so that I at least could have

17   begun the process of reviewing that testimony which may be

18   subject to objection.  I haven't received anything thus far;

19   hence, I'm concerned about what the status is of deposition

20   testimony.  So who would like to begin at this point?  Mr.

21   Cole, Mr. Dratel?

22          MR. DRATEL:  I can begin, your Honor.

23          THE COURT:  Sure.

24          MR. DRATEL:  The -- they've all been transcribed.

25   And I think in our last phone conversation, we set today as

1   the date that we would actually submit them to the Court; I

2   don't think that they were expected before today.  And we did

3   express some -- well, that -- they've all been transcribed.

4   There was at some point a problem that the transcribers had

5   missed one of the disks, and so we had to go back and get it

6   from them, but that's all been taken care of.

7            The government has done its coding; we have that.

8   I think it will take us another two days to finish our

9   version.  We obviously have multiple counsel going through it

10  to -- for the purpose of just determining -- in fact, we're

11  trying to make it easier on the Court in this sense.  What

12  we're trying to do is not just simply identify the objections

13  that we made; what we really want to identify are the ones

14  that we wish the Court to rule on.  So there may be some that

15  we withdraw because in the context of the examination, they

16  either become cured by a follow-up question or less material,

17  so we --

18            THE COURT:  Right, you mentioned that last time.

19            MR. DRATEL:  So we're narrowing it to what we want

20  the Court to decide on.  So I think by Monday we will be able

21  to get the Court what we anticipated -- what we hoped we'd be

22  able to get to the Court today.

23            THE COURT:  By Monday?

24            MR. DRATEL:  Yes.

25            THE COURT:  And so you're envisioning by Monday I

 1    will receive, for example, a transcript of a deponent that

 2    will be fully colored-coded, and it will be obvious based on

 3    what you're submitting by way of any objections that the

 4    objected-to testimony will be highlighted or identified in

 5    some way so that if a ruling is necessary, then I'll be able

 6    to do that.

 7                  MR. DRATEL:  Correct.

 8                  THE COURT:  Okay.

 9                  MR. DRATEL:  And I've also had a conversation with

10    Mr. Cole about sort of the dynamic of how -- of the rulings

11    in this sense, which is relevance objections may be premature

12    to decide at all based on the fact that we don't have any

13    evidence in the case yet; there may be some others that -- I

14    don't know how self-evident they will be to the Court in

15    terms of the basis for admission as opposed to the basis for

16    objection.  So I don't know how the Court wants to handle

17    that.  Perhaps we should schedule some time -- you know, this

18    may not be an issue until the defense case -- but to go

19    through.  In other words, we may have something where we say

20    admissible for a particular reason or that we have satisfied

21    a certain evidentiary threshold for it that may not

22    necessarily be apparent now, may not be apparent until we get

23    to a certain point in trial where it becomes relevant.

24                  THE COURT:  Well, context is always important

25    anytime the Court needs to rule on an objection, especially

1    an objection based on relevance or some other substantive

2    grounds, so you're absolutely correct; to the extent that

3    objections would be more apparent and placed in context in a

4    better light after some evidence has come in, then obviously

5    the ruling should be deferred until that point.  So I imagine

6    there are probably a good many objections that fall into that

7    category; is that correct?

8              MR. COLE:  Yeah.  The United States doesn't

9    disagree with that, probably anticipating perhaps after our

10   case-in-chief, there might be an hour where we could go over

11   some of those relevancy objections in the depositions.  Your

12   Honor by then will have heard our case, have heard opening

13   statements, or we can wait until after their opening

14   statements if they reserve, and we'll have a better idea

15   because in that regard, we've given -- as mentioned, we've

16   given all our color-coding to the defense.  And the good news

17   is that in 16 transcripts that there are, sometimes there's

18   entire transcripts with no objection interposed by us at all

19   that were --

20             THE COURT:  How many transcripts did you --

21             MR. COLE:  There are 16 transcripts.  What happened

22   is --

23             THE COURT:  Sixteen?

24             MR. COLE:  Yeah, 16 transcripts.  Every time we

25   changed the tape out, we would create a new transcript.

1              THE COURT:  How many pages of deposition are there

2     all together -- that might be a bit more helpful -- in terms

3     of what you're anticipating introducing?  Do you have any

4     rough estimate of --

5              MR. DRATEL:  Well, actually that's another issue in

6     terms of -- when you say about admission because the pages of

7     transcript do include some colloquy that we're going to try

8     to scrub out in terms of what -- and then that would have to

9     be corresponding on the video in terms of editing it out so

10    that the jury would only see that which is relevant in that

11    sense or we're going to put what's admissible and what a jury

12    would see if the witness were appearing in court.  And so I

13    think my estimate would be that it would probably be that the

14    -- what probably a jury would get is somewhere between -- I

15    don't know -- about 600 to 900 pages would you say?  I'm

16    guessing because we haven't finished that process.

17             MS. FONTIER:  Yeah.  Well, your Honor, you'll see

18    when we give you the transcripts that the length of it -- it

19    looks a lot more daunting than it is because the way that the

20    transcriber did is they would put the witness's name and then

21    write "foreign language" and then skip a space, write

22    "interpreter" and then write like "no," and then skip a

23    space.  So there's very little testimony on every single

24    page.  But there were only six witnesses, and there were two

25    that were of any real substantial length.  One witness's

1   testimony's probably about four hours long, the other is

2   maybe two -- Sheikalow -- yeah, maybe about two, two and a

3   half, and the other witnesses ranged from half an hour to an

4   hour.  So it's not a substantial amount of testimony that

5   we're talking about.

6          MR. DRATEL:  Also, your Honor, also if I may just

7   add to that that since the transcripts -- well, I mean it's

8   just also transcripts won't have the -- obviously the Somali

9   part is sort of less than what's on the video, the

10  translation, the actual active translation.

11         MR. COLE:  I would agree with counsel that it

12  really isn't as much as it seems.  And one thing -- two

13  things I want to point to your Honor in this process are your

14  Honor had requested a -- in addition to the color-coding,

15  your Honor suggested -- I'm not sure if it was a requirement

16  or not -- but suggested we prepare a two-column document with

17  page and line number stating like the page and line number

18  and the basis of the objection.  I don't know if we needed

19  that in addition to the color-coding or not.  If we need that

20  two-column document, these particular transcripts might

21  not --

22         THE COURT:  Before you go on to that, Mr. Cole, it

23  would be helpful for this reason.  It would be nice to be

24  able to go through all of the deposition testimony, let's

25  say, once on a read-through so that I have some context when

1    I'm ruling on objections, not just from evidence that's come

2    in but from whatever the deposition testimony might be.  So

3    it would be nice for me to be able to go through all the

4    deposition testimony first on a dry run, I get some kind of

5    impression as to the totality of that individual's testimony.

6    Then I go back and I look at what's being objected to.  And

7    you're right, page and line number cites in pleading format,

8    objection -- you can entitle it "objections to deposition

9    transcript" or whatever -- and then just indicate what the

10   objected -- the objected-to testimony is and then a basis or

11   bases for the objection.  And that will assist me in getting

12   through this process expeditiously.

13          MR. COLE:  Agreed.  And the reason I raise it is

14   only is we're prepared to do that.  These particular -- the

15   transcribing service that was used did not put line numbers

16   on any of the transcripts, so we let defense counsel know

17   that as soon as we get line-numbered versions, we'll turn

18   that around right away and we'll provide that.

19          The final comment I want to make is -- it goes to

20   this issue of difficulty ruling on relevancy objections

21   perhaps until there's more context.  We -- it is hard to tell

22   at times whether a particular witness -- maybe half of their

23   testimony or maybe even their entire testimony, whether it

24   would be relevant at all unless it's linked up somehow by the

25   defense.  And so we did want to -- we have color-coded

1    specific objections, but we wanted to reserve the chance when

2    we're into the defense case to argue to the Court that

3    perhaps a large block of the witness's testimony, perhaps

4    most of the witness's testimony, would not be relevant at all

5    depending on what the defense is and what -- and what the

6    evidence has been in the case.  So I just wanted to raise

7    that factor.  I don't think that -- that may not come up at

8    all, but it was something that was difficult to address with

9    color-coding unless you color-code -- like on a provisionally

10   preserve -- a color-coding of an entire tape.

11            THE COURT:  I understand that it's more in the

12   nature of a motion in limine, although motions in limine like

13   that are really broadly based are difficult to rule upon too

14   for the exact same reason; certainly we have several motions

15   in limine of that type here before me today, and I think

16   you'll see that, generally speaking, it's really difficult to

17   rule in advance on these motions.  I can hopefully assist the

18   parties by providing some guidelines and some rules of the

19   road that are not set in stone and certainly not conveyed

20   with any sense of finality, always with the ability of the

21   Court to reconsider certain issues later on as we get into

22   the trial and then more deeply into the trial.

23            MR. COLE:  Yes, your Honor.  And the last thing, I

24   wanted to ask about this two-column document.  I assume your

25   Honor wants -- did not want speaking objections, just wants

1   us to state the basis for the objection, and if you want more

2   argument, you'll ask for it.  Or do you want it to be sort of

3   speaking objection to that document?  Maybe that's a --

4   there's a spectrum there perhaps.

5           THE COURT:  Yeah, it would be.  If you feel that

6   if -- one side or the other feels that a particular objection

7   might be more easily understood with a little bit of context

8   or a little bit of argument, then feel free to do that, okay,

9   that's fine, but, you know, it's a matter of degree.  You

10  don't need to -- to submit all kinds of copious argument in

11  connection with these objections.  So basically what you're

12  saying is I'm going to be getting these by next Monday.  For

13  all the deponents?

14          MR. DRATEL:  Yes, your Honor.

15          THE COURT:  Okay.  One question I neglected to ask

16  the last time we were together -- we were going through the

17  process of how the depositions were taken.  You had two

18  videographers as I recall.  There was a problem with one of

19  the videographers or one of the machines at some point --

20          MR. DRATEL:  It was a -- usual when the lawyers get

21  involved in trying to run technology.  I think -- I think we

22  turned one camera off and didn't turn it back on when it

23  resumed and then realized it.  There was about 20 minutes

24  there --

25          THE COURT:  There was no stenographer present,

 1  however --

 2          MR. DRATEL:  No.

 3          THE COURT:  -- with -- so this was -- these

 4  depositions went forward only with a videographer or

 5  videographers present?

 6          MR. COLE:  That's right.  And the video -- the good

 7  news is -- I think defense would agree on it -- the good news

 8  is the video is very clear, the audio is very clear, and the

 9  government suspects that, generally speaking, these

10  transcripts are really for the Court's benefit for ruling on

11  objections because I believe the testimony is going to

12  consist of just playing the video.

13          THE COURT:  True.

14          MR. DRATEL:  And, your Honor, yes, there are two --

15  I always give -- my greatest experience with Rule 15 is that

16  there are two purposes for the transcript.  One is that, as

17  Mr. Cole just said, which is obviously to get them in shape

18  for the jury so that the Court can -- you know, the Court

19  gets to make a ruling so now we know what's in there; but

20  also the second is then to create a record of what is played

21  for the jury because my experience is that the court reporter

22  will not be taking down --

23          THE COURT:  Correct.

24          MR. DRATEL:  -- while the video is playing, so we

25  need to know what the jury sees in a written form for any

1   kind of record that might be necessary beyond that.

2           THE COURT:  And you're clear that the quality of

3   the sound is very good so that a transcript may not be

4   necessary?

5           MR. COLE:  It's quite good.  It was -- the camera

6   was sitting just a few feet away from the witness, and we

7   were all I think anxious to see how good it would be, and I

8   was very pleased to see that you can hear the witness very

9   well and the questions very well.

10          THE COURT:  Okay.  And there's no -- there's no

11  rolling script with any of this as I --

12          MR. COLE:  No.

13          THE COURT:  -- understand, it's just of the

14  videotaped deposition.  All right.  All right.

15          MR. DRATEL:  Your Honor, may I have just one second

16  to confer with Mr. Cole?

17          THE COURT:  Sure.

18          MR. DRATEL:  Just trying to get the mechanics of

19  how we'd get the final version to the Court before I forget

20  that.

21          THE COURT:  Now, are you going to be submitting the

22  objections too?  Will each side be submitting its objections

23  to the video testimony proffered by the other side?

24          MR. DRATEL:  I think what we just discussed, your

25  Honor, is that we will get our objections to the government,

1    and they -- since their obviously direct examinations were

2    longer than the cross-examinations, it's less work to put

3    ours.  And we will send ours to the government.  They will

4    color-code it so you get one document.  And since they're

5    here and they can get it to you Monday, we don't have to

6    worry about, you know, color scanning or things like that, so

7    that way, trying to do that is -- that's what I was talking

8    about, mechanics of how to -- the Court gets one document

9    that has, you know, the government's in a certain color, the

10   defense in a certain color.

11             THE COURT:  Okay.  That's fine.  How about the

12   objections, the pleadings themselves?

13             MR. COLE:  The column document?

14             THE COURT:  Yeah.

15             MR. COLE:  Yeah.  Well --

16             THE COURT:  They're going to come in as well?

17             MR. COLE:  They will, although we need these

18   transcripts in line number format.  They're Word documents.

19   I think the defense -- I'll talk to defense afterwards

20   about --

21             MR. DRATEL:  See about the format.

22             MR. COLE:  -- getting it onto pleading paper, the

23   transcripts.  We'll -- see, the thing right now, your Honor,

24   is that the transcripts right now have no line numbers on

25   them --

1            THE COURT:  That I understand.

2            MR. COLE:  -- and so --

3            THE COURT:  So you can't prepare the objections

4    until you get --

5            MR. COLE:  Well, right.  And I've been -- I can't

6    -- I've been hoping to get the defense to do all that for

7    these transcripts, but I think that we'll work out how that's

8    all going to happen after this hearing.

9            THE COURT:  Okay.  All right.  Okay.  Then what

10   about the wire intercepts now -- that's another topic we were

11   discussing last time -- and the progress of exchanging the --

12   or identifying the wire transcripts to be utilized by each

13   side and transcripts and all of that.  Mr. Cole?

14           MR. COLE:  Yes, your Honor.  We sent -- last week

15   we sent -- might have been this weekend or early this week --

16   but anyways -- last week -- last week we sent the defense a

17   further reduced list of calls we're going to continue to use

18   in our case-in-chief.  They have those, that specific list

19   now.  Today they will be able to pick up, after this hearing,

20   the actual clips from those specific calls that we're going

21   to play in our case-in-chief.

22           They have exchanged -- counsel have -- each of the

23   various counsel have provided us with one or more transcripts

24   that they think -- they have disputes with our translation,

25   and so we have been conferring, to some extent, on a small

1    number of transcripts they raised to our attention, with them

2    to see if there's any agreement on the translation.  I think

3    it's safe to say that we probably will reach agreement in

4    some areas and some areas we won't, and there will be --

5    there will be some portions of transcripts that I think are

6    just -- there just may be disagreement on the translation,

7    and both sides will have to call their linguist to testify.

8    But it doesn't look right now -- counsel may have a different

9    view, but it doesn't look right now that that's an epidemic

10   problem.  It seems fairly focused on the handful of

11   transcripts that we've been receiving.

12        THE COURT:  How many intercepts or pertinent

13   intercepts are you -- have you whittled down to?

14        MR. COLE:  I believe it's 82 that we'll be playing

15   some portion of, and we -- I did a little sort of

16   back-of-the-envelope check, and if you added up all clip

17   time, it's less than -- I think it's between three to four

18   hours of total audio time.

19        THE COURT:  And do you have your transcripts -- I

20   assume you have your transcripts of those excerpts already

21   prepared.

22        MR. COLE:  Oh, yes.  And that's what -- that's what

23   the defense -- we've had those prepared for a long time, and

24   the defense has had them; but we'll produce them again today

25   to show the specific clips that will be used from those

1   transcripts.

2           THE COURT:  Okay.  And what percentage of them are

3   in dispute would you say --

4           MR. COLE:  Well, we've received --

5           THE COURT:  -- or what percentage of the total

6   material, let's say, of three or four hours of total audio

7   time may be subject to interpretation?

8           MR. COLE:  Well, Mr. Dratel told me today that

9   they're still going to get us a few more, but based on what

10  we've received so far, I would say 1 percent.

11          THE COURT:  Okay.

12          MR. COLE:  But that -- that percent may increase

13  when we get something from Mr. Dratel --

14          THE COURT:  Okay.

15          MR. COLE:  -- because we received a total of about

16  eight or nine transcripts from the defense.

17          THE COURT:  Mr. Dratel or Ms. Fontier?

18          MR. DRATEL:  Well, I'll let Ms. Fontier because I

19  think she's --

20          THE COURT:  Sure.

21          MR. DRATEL:  -- got more specific information about

22  that.

23          THE COURT:  Okay.  Thank you.

24          MS. FONTIER:  Your Honor, as I'm sure you're aware,

25  this has been a lengthy and ongoing process and, you know, I

 1  think I'm probably as frustrated as your Honor, if not more,

 2  about the slow pace at which we are receiving the full

 3  transcribe-and-translates that we're turning over to the

 4  government.  The difficulty is that we're not -- we have had

 5  our linguist go through their transcripts in some regard and

 6  the bigger job that needs to be done transcribing and

 7  translating the entire recording in some instances, which

 8  when the government has provided us verbatim, they may be a

 9  couple of minutes long, and it's out of a 45-minute

10  conversation and we need that entire -- we need that entire

11  transcript, the transcription.  So there are a lot more that

12  we will be providing -- I wouldn't say a lot more, but there

13  are several more calls we'll be providing an entire

14  translation or an entire transcript of.  So that is part of

15  the slow process.  But we are -- we have a call scheduled

16  with our linguist, who just returned to the country I think

17  yesterday.  So we are hoping to get those in a much speedier

18  process and get this done.  Obviously we recognize the very

19  short date.  Hopefully there will not be issues with our

20  translations, but I'm assuming the government will want their

21  linguist to check over the full transcripts when we provide

22  them as well.

23          As far as like disagreements, I wouldn't say that

24  they are necessarily endemic, but there are certainly words

25  that are translated in a specific manner that will come up --

1    that come up over and over again and I think will be an

2    issue.  An example of -- and to all of you in here who speak

3    Somali, I apologize, but the -- there's a Somali word

4    "gallo," which is typically written g-a-l-l-o, which in the

5    government's translation is 100 percent of the time

6    translated as "infidel," and we take issue with that

7    translation, and that is something that comes up in multiple

8    different transcripts and something that will be an issue for

9    either linguist to discuss or for us to decide upon, but I

10   anticipate that that will be a point of contention.  And

11   there are other transcripts that just have specific words

12   that we have issue with and we don't believe was what was

13   correctly said.  And, again, we will confer with the

14   government and try to whittle those down, but I don't know

15   that they're going to be all resolved; I don't anticipate

16   that happening.

17              MR. COLE:  And in that regard, we'll obviously, as

18   we get more -- as we start getting more transcripts, we'll

19   keep looking at them, but this close to trial, it reduces the

20   possibility of really having time to resolve these issues,

21   but -- we'll do our best, but there's a lot to do between now

22   and trial and we're receiving transcripts, you know, a week

23   or two before trial and being asked to see if we can change

24   ours or agree -- we'll do the best we can to work with them,

25   but it becomes more difficult the closer we get to trial.

1  And also we -- because we likely will have some disagreements

2  and assume those will have to be brought in front of the jury

3  through linguists, we have not received any notification of

4  who their expert linguists are going to be that are going to

5  testify at trial, and we would request that notice.

6          THE COURT:  Well, you know, I was going to raise

7  that as an issue a little bit later on.  You've brought it

8  up, and I think you've brought it up in a proper context,

9  we're still talking about discovery here, and I had that

10  question as well, whether the parties have exchanged their

11  lists of expert witnesses.  That's something that wasn't

12  specifically addressed in prior status conferences.  You both

13  talked about having experts, and I think actually even the

14  defense has anticipated one of the experts to be called on

15  history and general matters of geographic, political,

16  cultural, and other concerns as they relate to the case that

17  -- is it Bryden --

18          MR. COLE:  Bryden.

19          THE COURT:  So obviously there's been some

20  communication here.

21          MR. DRATEL:  Right.

22          THE COURT:  Where are you on your exchange of

23  experts?

24          MR. DRATEL:  We just this morning sent -- I don't

25  know if you saw it -- we sent a letter -- it should be in an

1  email -- to Mr. Cole this morning on our experts, Professor

2  Abdi Samatar, S-a-m-a-t-a-r, to essentially cover some of

3  the -- I don't want to say same ground as Mr. Bryden but sort

4  of a counterpoint to Mr. Bryden as necessary.  Obviously

5  after Mr. Bryden testifies and after cross-examination, we'll

6  always evaluate, as we always do, as to whether a defense

7  expert is necessary, but we are planning on calling him, and

8  we provided the --

9          THE COURT:  Well, I assume both sides are going to

10  be in compliance with the Rule 16 requirement here.

11          MR. DRATEL:  Yes.

12          MR. COLE:  Your Honor, I'll take a look at the

13  notice.  I don't want to act like there's an issue if there

14  isn't one -- I have not seen the notice yet -- but, you know

15  three weeks before trial to get this type of expert notice I

16  think's a little short in a case that's been pending this

17  long.

18          THE COURT:  When did you give notice, Mr. Cole?

19          MR. COLE:  Months ago, months ago.  And that said,

20  I don't want to -- I don't -- I just want to lodge that.  I

21  don't make a real complaint because I may look at the notice,

22  it may be fine, I may have no complaints at all on this

23  point, but I haven't seen it.

24          THE COURT:  And this hasn't been raised as an issue

25  before, but really, truly it is an issue and it must be --

1    this must be done.  You're apparently -- you've got to know

2    who your experts are, including linguists --

3            MR. DRATEL:  Well, I think that's the only expert

4    aside from the witnesses, your Honor, as far as I know.

5            THE COURT:  Well, so be it, but --

6            MR. DRATEL:  That's it.  So I think --

7            THE COURT:  -- provide to the government, Mr.

8    Dratel -- today's Thursday, the 10th -- you can do this by

9    tomorrow it sounds like in compliance with Rule 16.

10           MR. DRATEL:  For the linguist, yes, your Honor.

11   The other one we've already done.

12           THE COURT:  With the linguist and with Samatar, so

13   I think -- but let the government know what they need --

14           MR. DRATEL:  Yes.

15           THE COURT:  -- to know with respect to Samatar.

16           MR. DRATEL:  Your Honor, we have -- obviously the

17   linguist information in terms of a bilateral disclosure,

18   that's one of the issues we have with respect to motions in

19   limine, so we haven't gotten that from the government to a

20   certain extent in terms of --

21           THE REPORTER:  Mr. Dratel, I'm having trouble

22   hearing you.

23           THE COURT:  Yeah, why don't you use the microphone.

24   Might make it a little easier --

25           MR. DRATEL:  It's just that in terms --

1                    THE COURT:  -- for the court reporter.

2                    MR. DRATEL:  -- of the government's linguist, we

3        have not gotten any information that would be useful for us

4        in terms of preparation; again, that's one of the subjects of

5        the motions in limine.

6                    Also just with respect to the telephone

7        conversations, I just wanted to identify three aspects of it

8        just to categorize them for the Court so that I think it's

9        clearer as to what can be anticipated as to the potential

10       areas of contest.  One is that -- differences in translation.

11       In other words, the government translator has it -- has one;

12       we have it differently.  That's a particular type.  The

13       second type is the --

14                   THE COURT:  Would you repeat that, please.

15                   MR. DRATEL:  Sure.  That whether a translation is

16       different from the government's version versus the defense

17       version, an actual translation of Somali words into English.

18                   The second would be now that the government has

19       identified more precisely that portion of a call that it's

20       going to play, the defense may want to introduce other parts

21       of the same call; that's the second issue.

22                   And a third issue is essentially calls that the

23       government has not designated at all that the defense may

24       want to admit from the ground up, so to speak, you know, that

25       we have to create the transcript entirely.  And obviously we

1    recognize this as a priority either that will get resolved in

2    sufficient time so that Court has a chance to rule on it or

3    the government has a chance to consider it and put only that

4    which is necessary for the Court to decide obviously before

5    the Court.

6            THE COURT:  Well, this is what my expectations

7    would be.  With respect to the first category you mentioned,

8    that you'd be able to get together and whittle down

9    whatever -- whatever disagreements there are, and you've

10   already indicated that, so to absolutely minimize those.

11   Second, you're talking about the rule of completeness as I

12   understand --

13           MR. DRATEL:  That's correct.

14           THE COURT:  -- what you were saying and Rule 106.

15   And the case law is pretty clear on what the standard is for

16   the rule of completeness to trigger the ability of the

17   defense to have admitted another part of a recorded

18   statement.

19           And then the third thing is, you know, raises

20   obviously at the threshold hearsay issues that need to be

21   addressed.  And so it's really incumbent upon the defense I

22   think to get that information, those intercepts that the

23   government does not intend to utilize but you're intending to

24   utilize to the government as soon as possible so that perhaps

25   if the government has no objection, then we can move ahead

1   seamlessly with those; if there are objections, then I need

2   to know about those as well.  That's probably another

3   category of objections or another category of evidence that

4   can be dealt with in advance so that you can have some

5   predictability as to what is and what is not going to be

6   allowed going forward.

7            MR. DRATEL:  And, your Honor, sometimes -- some of

8   those transcripts have been turned over to the government,

9   and I understand that the government has reviewed some of

10  them and gotten back to counsel, that -- at least as far as

11  the translation is concerned -- that some of them are --

12  there's no controversy as to the translations themselves.  I

13  don't know about the rest of them.  They still obviously look

14  different and I think at this stage today premature simply

15  because there's a certain contextual aspect to that as well

16  even on the hearsay grounds.  But I'll leave that for a time

17  when it's in front of the Court.

18           MR. COLE:  Your Honor, we do intend to include in

19  our trial brief briefing on this rule of completeness versus

20  hearsay problem.  The Ninth Circuit case law providing the

21  rule of completeness does not allow for admission of hearsay.

22  And so we'll include a section in our trial brief about that,

23  and we'll stand by for transcripts.  As soon as we get one,

24  we do our best to quickly turn it around, but we've received

25  very few.

1              THE COURT:  Well, I think it's safe to say what

2      Ninth Circuit controlling law is, that an exception to

3      hearsay would be, under the rule of completeness, a part of a

4      statement that has not been played by the proffering party

5      that is inextricably intertwined with that part that was

6      played.  I think that's how 106 has been interpreted.  Last

7      case I saw on it is U.S. v. Ortega, which is a Ninth Circuit

8      case.  I believe it was out of the Eastern District of

9      California.  It's a 2003 case.  I think it set forth some

10     pretty comprehensive standards there, at least one case that

11     comes to mind.

12             MR. COLE:  And, your Honor, and I -- I think that

13     the Ortega case is in the trial brief that we'll be

14     submitting, and others, but actually I think the Ortega and

15     these other cases stand for the proposition that what is an

16     out-of-court statement by the defendant himself is hearsay,

17     it's hearsay, and the rule of completeness doesn't allow for

18     its admission unless I suppose in a very unusual circumstance

19     where somebody literally garbles -- you know, the portion we

20     took out was literally sort of Hollywood edited to make it

21     sound different than what was said.  I don't think there's a

22     provision that says because we played this part of a call,

23     they get to play this entirely separate part of the same

24     phone call just because it's in the same phone call.  That's

25     hearsay, and Ortega and a series of other cases since Ortega

1    I think have repeatedly said that that is not permissible.

2    They have to show that's not hearsay.  And if it's not

3    hearsay and then for some ground it's admissible in its own

4    right, they ought to do it in their case; they shouldn't be

5    trying to put it in in our case.

6           THE COURT:  Well, we'll look at the cases and we'll

7    look at what kinds of statements you're talking about.  As I

8    recall, Ortega, for example, dealt with a confession, and

9    part of the confession came in, and the part of the

10   confession that came in through the government created a

11   certain impression, and then what was left out was that part

12   of the statement or that part of the confession that ran

13   counter to what was admitted by or through the government's

14   case-in-chief, if I have the case or the facts of the case

15   correctly recalled; and the Court said well, because that

16   second statement was inextricably intertwined with the part

17   the government admitted, then in fairness to the defense, it

18   should come in.  Wasn't that Ortega?

19          MR. COLE:  I have to go back and read what Ortega

20   is -- I have to go back and read what the final holding was,

21   whether it affirmed the district court for not admitting it

22   or admitting it.  But I know that Ortega says that the rule

23   of completeness does not allow for the admission of hearsay,

24   and so I have to -- I have to apologize.  I don't know right

25   now.

1          THE COURT:  No, it doesn't open up the door --

2          MR. COLE:  Yeah.

3          THE COURT:  -- to hearsay simply because one part

4     of a confession --

5          MR. COLE:  Right.

6          THE COURT:  -- may be played.  It doesn't open the

7     door, for example, to everything that was said within the

8     context of that interview.

9          MR. COLE:  Right.

10         THE COURT:  But where something is -- has been

11    skewed or where it would be fundamentally unfair to keep out

12    another part of that statement because it is -- I think the

13    case used the terminology "inextricably intertwined," then it

14    can be done under 106.  But as I say --

15         MR. COLE:  I'll look back at that, your Honor.

16         THE COURT:  -- we'll take a look at those cases and

17    issues as they arise.  And, you know, this was another issue

18    I was going to bring up, that is, trial briefs, the filing of

19    trial briefs and jury instructions as well.  We can deal with

20    that a little later on, but to the extent we're going to be

21    dealing with these issues, these legal issues and evidentiary

22    problems, better that those trial briefs come in just as soon

23    as possible.

24         MR. DRATEL:  Your Honor, not to argue the rule of

25    completeness, just to make a point so that the government --

1    the rule of completeness is not a hypertechnical rule because

2    the --

3              THE REPORTER:  Mr. Dratel, I'm really having

4    trouble hearing you.

5              MR. DRATEL:  Okay.  The rule of completeness is not

6    a hypertechnical rule, and -- because the rule itself

7    states -- I'll leave out the first part but just -- it says

8    "which ought, in fairness, to be considered contemporaneously

9    with it," it being the part that one party seeks to -- but

10   we'll -- we'll have all that briefed and discussed.  I don't

11   want to detain the Court with that today.

12             THE COURT:  Okay.  So we were talking about experts

13   I think when we went down into the rabbit hole here on the

14   rule of completeness.  We're done with experts --

15             MR. COLE:  We just need to know I guess when we're

16   going to receive the notice regarding the -- who, which

17   linguist they're going to actually call to testify.

18             THE COURT:  All right.  Well, you're going to get

19   that tomorrow.  I assume you'll --

20             MR. DRATEL:  Well, we -- the government should go

21   first on that.  We haven't received anything in terms of --

22   other than the fact that they want us to assume --

23             MR. COLE:  Well, we've given them the transcript of

24   his prior testimony, which sets forth extensively his

25   expertise and qualifications and background and experience.

 1    And the only thing they don't have is his actual name, which

 2    we're ready to give to them today after we discuss that issue

 3    with respect to protective order and -- or get the Court's

 4    ruling on that.  But they have his prior --

 5                THE COURT:  The Court's ruling on what now?

 6                MR. COLE:  This is the motion that had to do with

 7    we wanted the linguist to be able to testify, as he has done

 8    in prior federal court cases, under an assumed name, and we

 9    briefed that.  The opposing counsel said they had no problem

10    with that as long as they got his real name under protective

11    order.

12                THE COURT:  Right, right.

13                MR. COLE:  And so -- but we've already given over

14    his prior federal court testimony that sets out at length his

15    qualifications and experience.

16                THE COURT:  Okay.  That's fine.  So you ought to be

17    able to do that tomorrow -- Mr. Ghappour, we'll get to you in

18    just a moment here -- you ought to be able to do that by

19    tomorrow, all right?  Just have a mutual exchange tomorrow,

20    rule -- just comply with Rule 16 by tomorrow --

21                MR. DRATEL:  Thank you, your Honor.

22                THE COURT:  -- all right, both sides.  All right.

23    Mr. Ghappour?

24                MR. GHAPPOUR:  Your Honor, on the issue of

25    experts --

1          THE COURT:  You want to use the lectern there?

2    Might be easier for the court reporter and the others to hear

3    you.

4          MR. GHAPPOUR:  Just on the issue of experts, it's a

5    bit unclear to the defense whether or not Mr. Bryden -- the

6    plan for Mr. Bryden is to use him as an expert on Islam and

7    sharia.  And to the extent that -- and in part that turns on

8    your ruling on the motions in limine.  And so to the extent

9    that they are intending to use him as an expert on Islam, we

10   may have to introduce a counterpoint expert.

11         THE COURT:  Okay.  Well, I assume that that's what

12   Mr. Dratel was talking about when he mentioned Mr. Samatar,

13   that Mr. Samatar would cover that area.

14         MR. GHAPPOUR:  I think that the -- there were

15   letters that were given to defense -- I think the latest one

16   was November 30 -- that in my opinion somewhat expanded the

17   scope of the expert's testimony, and that is when we made a

18   formal decision to pursue an expert such as Mr. Samatar.  But

19   then the briefing, especially in response to Mr. Durkin's

20   motion in limine on sharia and sharia being used to identify

21   callers, we then -- depending on your ruling, in addition to

22   whether or not Mr. Bryden's going to be used as an expert on

23   Islam, we may have to introduce an additional expert for that

24   very purpose.

25         THE COURT:  Mr. Cole?

 1            MR. COLE:  I think this issue got blown out of

 2   proportion, frankly, in the pleadings.  The type of testimony

 3   Mr. Bryden would give that relates to Islam would be so

 4   rudimentary and basic and not controversial, I don't believe

 5   anyone here is going to disagree with it.  He's not going to

 6   come and testify of all the ins and outs of Islam whatsoever;

 7   he's simply going to talk to very basic things about --

 8   which, frankly, were discussed by defense's own witnesses in

 9   their deposition in Somalia -- about the general -- the

10   general type of Islam that was typically practiced Somalia,

11   al-Shabaab's extreme offshoot, which their own witnesses said

12   was completely extreme and out of bounds compared to other

13   practices in their country.  That's really basically it.

14   There's not going to be a big discussion of the fine points

15   of sharia law unless the defense wants there to be one, and

16   so -- but the opinions that are going to be expressed by Mr.

17   Bryden have been provided in notices and our pleadings.

18            THE COURT:  Okay.

19            MR. GHAPPOUR:  Your Honor, just to note, I've read

20   Mr. Bryden's testimony in a Minnesota case.  I disagree with

21   it, just on the record --

22            THE COURT:  Well --

23            MR. GHAPPOUR:  -- as to sharia law.

24            MR. COLE:  Well, he might have testified to

25   whatever he testified to in Minnesota.  We just gave him a

1   prior transcript because that's his prior transcript.  We're

2   not planning to have him say everything here that he said in

3   some prior courtroom.

4           THE COURT:  Okay.  Well, it might be helpful if you

5   can identify those areas of testimony that he'll be delving

6   into generally, in a general way, so that Mr. Ghappour knows

7   whether or not he'll need to consider an expert himself.  And

8   that should be done -- once again, I'm envisioning this will

9   be done, Mr. Cole, by tomorrow.

10          MR. COLE:  Okay.

11          THE COURT:  And then the defense exchange is going

12  to come in -- or notice is going to come in tomorrow as well.

13  Mr. Ghappour, if you need to augment that, then you -- you

14  should do so just as quickly as possible or right after you

15  have a chance to see what the government is going to be

16  delving into with Mr. Bryden.

17          MR. GHAPPOUR:  Absolutely.

18          THE COURT:  Okay.  Mr. Durkin?

19          MR. DURKIN:  Judge, I just wondered, but -- I had

20  something to say about sharia, but if we're going to address

21  that later --

22          THE COURT:  I don't think we need to get into that

23  at this point.  Thank you.  All right.  Okay.  Any other

24  issues relative to discovery that we can address at this

25  point?

MS. FONTIER: Your Honor, I -- just going back to the calls and the transcripts that we're producing, I just wanted to mention that there are additional calls that the government has not translated that they provided to us in the 1800, just -- and with just a brief general summary. I think with -- by Monday I can provide them a list of the calls and the call number that we're intending to introduce or have translated, and then they will have that list, but -- on that I can't get them a transcript of those by Monday, but I can give them like a list of the actual calls so that they have the same information that we have at that point.

THE COURT: They're already translated?

MS. FONTIER: They are not.

THE COURT: Well, how do you know --

MS. FONTIER: There's a general summary.

THE COURT: Just from a general summary. I see.

MS. FONTIER: Yes.

THE COURT: These are summaries that the government's already provided to you?

MS. FONTIER: Correct. There were 18 -- there were 1800 calls that came with like anywhere from one line to two pages describing what the call is about, and some of those we think are very important to provide like context and background for what is being said on the translated calls, the verbatim calls that the government intends to use. And

1   to the extent we think those are relevant and admissible, we

2   can identify those calls and say to the government these are

3   the calls that we're having translated.  They have the same

4   information or more about those calls than we do, and we will

5   provide a transcript as quickly as we can.  But I can do that

6   portion by Monday so that they know which call we're talking

7   about.

8            THE COURT:  Okay.  This is what I'm going to ask

9   you to do then, Ms. Fontier.  For every intercept that you

10  identify to the government as what you will be using or where

11  there's the prospect of you using it, I'd like a copy of that

12  plus the translation -- plus the translation -- no later than

13  ten days before trial.

14           MS. FONTIER:  Yes, your Honor.

15           THE COURT:  Okay.  That will be important to me

16  going forward.  Now, the reason I'm asking this is as

17  follows.  I liken this to the deposition transcripts, which

18  I'll be able to review before trial and make rulings as

19  necessary.  I would anticipate with what you're now

20  proposing, Ms. Fontier, there will be a significant number of

21  objections from the government to anticipated transcripts,

22  the additional transcripts of additional intercepts, and

23  that's why I'm asking you to furnish to me a separate

24  document entitled Proposed intercepts from the defense,

25  identify them by call number, and then attach the transcripts

1    that you'll be providing to the government no later than ten

2    days before trial.  That will give me a pretty good running

3    start at it.  And we're getting close.  Okay?  All right.

4    Anything else on discovery?  Mr. Cole, anything that comes to

5    mind?

6              MR. DRATEL:  I should -- I'm sorry, your Honor.

7    I'll let Mr. Cole --

8              THE COURT:  Mr. Cole, anything that comes to mind?

9              MR. COLE:  No, your Honor.  Thank you.

10             THE COURT:  Mr. Dratel?

11             MR. DRATEL:  The classified information that the

12   Court ordered released to the defense was disclosed to us, to

13   me, by the Court -- your -- the court officer --

14             THE COURT:  Would you use the lectern if you could.

15             MR. DRATEL:  Oh, I'm sorry.

16             THE COURT:  You're very soft-spoken, and so -- I

17   know it helps the court reporter.  Thank you.

18             MR. DRATEL:  Just following your lead, your Honor.

19   I don't have a microphone.  The classified information that

20   the Court ordered disclosed to the defense has been disclosed

21   now to me alone because it was brought to New York, the

22   materials.  The rest of defense counsel will review them

23   today after court.  We may have a Section 5 -- I think it's

24   likely that we will have a Section 5 CIPA application to the

25   Court as soon as we can produce one because -- obviously we

1    can't do it in a public context, we have to do it in a SCIF,

2    so it's going to be a little bit of a -- it's going to be

3    cumbersome logistically, but we'll get it done, so that the

4    Court has a chance to review this, as quickly as possible.

5    But this was -- I saw that the -- last Thursday I guess, so

6    it's a week ago today that I saw the materials, and obviously

7    I haven't been able to discuss it with counsel on the

8    telephone or in an email or any other kind of communication.

9    So we'll do this as quickly as we can.  It won't be

10   complicated, but I think it may be necessary.

11              THE COURT:  Anything else on discovery?  Okay.

12              MR. DRATEL:  No, your Honor.

13              THE COURT:  All right.  I think I've covered the

14   issues I need to cover that are purely discovery related.  I

15   may need to discuss with the government something related to

16   Jencks.

17              MR. DRATEL:  Your Honor, may I -- may I just add

18   something?  I'll be going back to the classified part.  I

19   know that the government has recently, within I think the

20   past week or ten days, filed at least one Section 4

21   application with the Court, and we would just ask the Court

22   -- obviously we object to ex parte, not being permitted to

23   see and not being permitted to interpose argument, but we

24   would ask the Court to perform the same review that the Court

25   did the first time around based on the information that we

 1   provided in terms of relevance and materiality to the defense

 2   and --

 3            THE COURT:  Absolutely.

 4            MR. DRATEL:  -- if the Court has anything -- has

 5   any questions of us as to -- because we have -- now have the

 6   ability to have some more precision and details now that

 7   we're another year into the case, if the Court has any

 8   questions, we'd happy to -- we'd welcome the opportunity to

 9   discuss with the Court in terms of relevance and materiality

10   of any material that the Court is reviewing.

11            THE COURT:  I always do that.  I always undertake

12   any review knowing what your request and your theory is in

13   mind.

14            MR. DRATEL:  Thank you, your Honor.  We appreciate

15   it.

16            THE COURT:  All right.  All right then.  Why don't

17   we move to the motions in limine and begin to address those

18   and start with the government's motions in limine, take them

19   in turn.

20            There's a motion to preclude defense based on

21   duress, coercion, or necessity; that would be the first

22   motion in limine.  And I don't think -- as I read through the

23   papers, I don't think the defense is disputing the

24   government's argument may -- they're arguing the Court should

25   not prematurely preclude the admission of evidence tending to

1   negate allegations that defendants intended to support

2   terrorism.  I see those as two very separate and distinct

3   areas.  I think the government is talking about the classic

4   defense of duress, coercion, or necessity, and I don't see

5   how that's in the case.  This almost seems to be a moot

6   issue.  I don't know who needs to speak on behalf of this any

7   further.  Mr. Ghappour, did you -- looks like you're getting

8   ready to --

9        MR. GHAPPOUR:  Well, I'm not sure this is the time

10  for it, but it's sort of -- the issue is related to what the

11  government's theory of the case is with respect to Count 1,

12  and so if the allegation is that the defendants had the

13  specific intent to kill someone, we're not sure who exactly.

14  We can probably raise a defense such as the defense of

15  necessity if we were apprised as to what conspiracy to kill

16  is being alleged in the indictment.

17       THE COURT:  Well, I'm going to -- I'll grant the

18  motion in limine without prejudice.  And obviously if there

19  is going to be a classic defense of duress, coercion, or

20  necessity, the defense is aware of its obligation to make a

21  prima facie offer of proof before that can be presented in

22  any way, shape, or form going forward in the trial.  Okay.

23  That's granted, as I say, without prejudice.  And I'll leave

24  it to the defense to make that threshold showing of necessity

25  before I would reconsider -- or coercion before I would

1   reconsider that.  All right.  Then there's a motion in limine

2   to exclude all the witnesses except the case agent, and this

3   is being objected to by the defense.

4           MR. COLE:  Your Honor, I think -- I think I

5   realized -- when I saw the response, I don't think I have a

6   problem with their objection, which is -- I think what

7   they're saying is they would want to --

8           THE COURT:  Their experts.

9           MR. COLE:  -- call an expert.

10          THE COURT:  Yeah.

11          MR. COLE:  Because I guess as long as both parties'

12  experts --

13          THE COURT:  It's got to be mutual --

14          MR. COLE:  Right.

15          THE COURT:  Any order that --

16          MR. COLE:  Right.

17          THE COURT:  -- I'm going to make with respect to

18  exclusion of witnesses must be mutual.  If both sides would

19  prefer to have their expert sit in on the opposing expert,

20  that's perfectly appropriate --

21          MR. COLE:  Sure.

22          THE COURT:  -- and that would relate to your

23  substantive experts, if we can put it in -- Bryden versus the

24  defense expert and your linguist as well.

25          MR. COLE:  That's fine.  Thank you.

1          THE COURT:  All right.

2          MR. DRATEL:  Yes.

3          THE COURT:  Acceptable?

4          MR. DRATEL:  Yes, your Honor.

5          MR. COLE:  Yes.

6          THE COURT:  Then I see this motion as moot.  I

7    think the parties are in agreement here.  There's a third

8    motion, to preclude evidence of punishment.  That's granted;

9    it's not opposed.

10          There's a fourth motion in limine from the

11   government to admit certified public records; that's

12   unopposed as well, and, assuming that the evidence is

13   otherwise admissible obviously, it comes in.  There's no

14   opposition, so the motion would be granted conditioned upon

15   admissibility, relevance, for example.

16          Okay.  The fifth motion by the government is to

17   preclude evidence of prior good acts as it's framed.  I

18   don't -- I don't need any argument on this.  Certainly if

19   counsel want to highlight anything or bring anything

20   additional to my attention, you certainly may, but I'm ready

21   to rule preliminarily on this.  Mr. Cole, anything further?

22   This is your motion.

23          MR. WARD:  Your Honor, I don't think we have

24   anything further on that.

25          THE COURT:  All right, Mr. Ward.  Thank you.

1    Anything further from the defense?

2              MS. FONTIER:  No, your Honor.  We addressed it in

3    our papers.

4              THE COURT:  Okay.  This is basically a motion where

5    the government is seeking to preclude defendants from arguing

6    or soliciting testimony or evidence concerning specific good

7    works or conduct in the community.  And generally evidence of

8    good conduct is not admissible to negate criminal intent, but

9    those are boilerplate principles that we're aware of here.

10             The government is basically taking the position

11   that the defendants may present evidence that they thought

12   the money was going to charity but may not prove up specific

13   instances of charitable or other good works in other

14   respects.  What the defendants are arguing here is that they

15   will seek to offer evidence of specific charitable donations

16   and that their -- they would be proffering evidence of

17   specific charitable donations or humanitarian donations as a

18   factual rebuttal of allegations and specifically allegations

19   relating to intent.

20             I think -- I think generally evidence of good works

21   or conduct is not admissible to negate criminal intent.

22   However, if other evidence is limited to specific charitable

23   donations which would support the inference that donations

24   are intended for charitable, nonterrorist purposes, the

25   probative value might outweigh concerns that general

1   character evidence based on conduct is generally

2   inadmissible.

3          It looks to me, Mr. Ward, like this motion may have

4   conflated two different principles here.  You're looking --

5   the motion is brought as a motion to preclude evidence of

6   prior good works where we know, generally speaking, prior

7   good works cannot serve as a basis for character testimony.

8   Then we have 404 (b), and that raises an interesting issue

9   here.  If you look at 404 (b), evidence of prior acts, it

10  allows -- I think it's worded in a criminal case the

11  prosecution may introduce evidence of prior acts to prove

12  knowledge, intent, absence of mistake, et cetera.  And it all

13  goes to intent, it all goes to knowledge.

14         If that be permitted for the prosecution -- and

15  this is where I have -- I may have a question for you, Mr.

16  Ward; you seem to have the laboring oar on this motion in any

17  event -- if that be permitted for the prosecution, then why

18  can't the defense offer specific acts of -- specific prior

19  acts under 404 (b) -- which I think is what the intent here

20  is -- of charitable contributions not as character evidence,

21  not to show they're good guys, but to negate intent?  In

22  other words, why can't there be the rule that what's sauce

23  for the goose is sauce for the gander, especially if the

24  Court provides a limiting instruction to the jury that they

25  may only consider it on the issue of intent?

1           MR. WARD:  Certainly, your Honor.  I think all

2    we're really talking about here is evidence of specific

3    character of -- let's say it's charitable works that are not

4    relevant to the transactions that are alleged in the

5    indictment.

6           THE COURT:  Well, I think the defense is taking the

7    position that -- that evidence of charitable donations,

8    regardless of where these -- where the money is headed -- but

9    let's just assume legitimate charitable works is relevant,

10   that it doesn't have to be limited for legitimate political

11   purposes or purposes -- or legitimate Somali organizations,

12   but if one has -- if one has a history of charitable

13   donations to -- you know, you name it -- I mean the Red

14   Cross, the Somali Red Cross, down the line and those types of

15   donations, regardless of the type of organizations, are

16   targeted for legitimate charitable institutions that serve

17   legitimate purposes, why can't that be?

18          MR. WARD:  I think it's simply because of the

19   character -- the limitations on proving character under 405,

20   your Honor.

21          THE COURT:  It's not character.  But this is not

22   character evidence.  In other words, this wouldn't be

23   permitted as a basis for character evidence, and the jury

24   wouldn't be advised that they may consider this evidence as

25   evidence of good character, they could consider it only on

1    the issue of intent or knowledge, more specifically intent.

2           MR. WARD:  I think, frankly, it comes to a point

3    that it's too remote in consideration of -- in relationship

4    to the transactions that are alleged in the indictment.  I

5    mean if, you know, the Mafia don gives to, you know, the

6    local church or the local soup kitchen, it still doesn't mean

7    that he might not have been doing other things that are

8    actually against the law.  Then the defendant shouldn't be

9    allowed to take specific instances of good works --

10          THE COURT:  But is the charge against the Mafia don

11   for providing material support in the form of money to a

12   terrorist organization?  Is that what the charge against the

13   Mafia don is?  Because if it is, then we have the same

14   situation that we have here.

15          MR. WARD:  I understand, your Honor.  I still think

16   that the way -- the way the rule is drafted is that you can't

17   take a specific example of good works and then argue from

18   that that you lacked the intent to commit the crime that's

19   charged in the indictment unless of course you're focusing on

20   transfers or organizations that they're dealing with in the

21   country -- in Somalia I mean.

22          THE COURT:  Well, what if it's not Somalia?  What

23   if it's Ethiopia as well?  What if donations are going to

24   Ethiopia for charitable purposes?  Where do you draw the

25   line?

 1           MR. WARD:  I think all we're really trying to say,

 2    your Honor, is that specific charitable good works here in

 3    the United States are just not relevant to what's charged in

 4    the indictment so that, you know, the -- you know, what's at

 5    issue here, there's a drought relief committee as I

 6    understand it, and I think all of those are fair game.

 7           THE COURT:  Excuse me for interrupting, Mr. Ward.

 8    Let's say there's a drought relief committee here and -- you

 9    say there's a Somali drought relief committee organized here

10    in the United States that addresses drought relief in

11    Somalia; is that what you're saying?

12           MR. WARD:  That's not what's going on here, your

13    Honor.  There's an organization over in Somalia itself --

14           THE COURT:  Okay.  And it's -- what's the name of

15    the organization?  You know, once again, I'm dealing with a

16    vacuum here.  I don't know -- in other words, I don't know if

17    there's specific charitable donations that have been made by

18    any of the defendants, or all of them, to a legitimate

19    organization here in Somalia -- in Somalia or, for that

20    matter, here in the United States but related to activities

21    in Somalia that would be completely legitimate and then would

22    place this -- this question in issue.  Who wants to address

23    that from the defense?  This is all theoretical at this

24    point.

25           MS. MORENO:  Well, there is an organization that's

1    in evidence in the case; it's called ILYAS (sic).

2              THE COURT:  Would you spell that, please, and would

3    you use that -- the microphone.  Thank you, Ms. Moreno.

4              MS. MORENO:  Usually I have a pretty loud voice,

5    but I don't want to get yelled at by the court reporter.

6    ILYAS, I-L-Y-A-S.  It is an organization that does address

7    the humanitarian crisis in Somalia, including -- excuse me --

8    the drought and the famine situation there.  It is in this

9    case; there is evidence of it in this case.  So it's highly

10   relevant, if that helps the Court.

11             THE COURT:  Is that what we're talking about here?

12             MS. MORENO:  That's one --

13             THE COURT:  I know you can't anticipate why the

14   government filed this motion in limine, but is that the

15   organization we're talking about and are there donations that

16   were made?

17             MS. MORENO:  It's one.  It's one of the --

18             THE COURT:  And where is that organization?

19             MS. MORENO:  It's in Somalia, your Honor.

20             THE COURT:  It's based in Somalia?

21             MS. MORENO:  Correct.

22             THE COURT:  And it's ILIA or --

23             MS. MORENO:  It's ILYAS.

24             THE COURT:  ILYAS.  Is the government familiar with

25   this?

1            MR. WARD:  Exactly, your Honor.  And that's the

2     point we're trying to make.  If that's what the defense is,

3     evidence like that is tied up with what's actually alleged in

4     the indictment, we don't have any problem with that.  We just

5     think if you -- if one of the defendants helps little old

6     ladies cross the street and they call some witness to say

7     that, it makes it no more or less --

8            THE COURT:  Well, I don't exactly -- you brought up

9     exactly, as I was going through this motion, the kind of

10    thing I was thinking about myself and trying to place a wedge

11    between the principles related to admissible evidence proving

12    good conduct and 404 (b); and I was thinking well, does that

13    open up the door if these individuals help old ladies across

14    the street or they're coaching Little League teams or they're

15    doing, you know, they're members of service organizations

16    here, they're Rotary members?  No, that doesn't, but I don't

17    think that's what was being referred to by the defense in

18    their opposition; they weren't talking about specific

19    instances of charitable donations, which seems to me, to get

20    to that 404 (b) question, not good character evidence.

21           MR. WARD:  I understand that, your Honor, and I

22    think we're much closer -- the defense and the government are

23    much closer in agreement than maybe all the pleadings made it

24    sound.  But certainly if it has to do with charitable works

25    that relate to the disposition or the intent with which money

1    was forwarded, as is alleged in the indictment, I think

2    that's all fair game.

3            THE COURT:  Okay.  Does that assist the defense

4    here?  If you're -- if these are the activities, if this is

5    the evidence that you're referring to, donations to ILYAS, a

6    Somali drought organization, then I think evidence of that

7    type would be otherwise admissible under 404 (b) as it

8    relates to intent.

9            MS. FONTIER:  Yeah, I think that covers everything

10   then, your Honor.  Obviously we understand the rule of

11   evidence.  And I think the government's motion papers were

12   just overly broad in what they were seeking to preclude.  So

13   to that extent, obviously, our opposition was more pointed.

14           THE COURT:  That's a malady that both sides suffer

15   from I think, overly broad motions.  All right.  So this is

16   going to be denied insofar as the types of donations that

17   have been discussed here today.

18           Okay.  That brings up the sixth motion in limine

19   brought by the government, to preclude pity or sympathy

20   evidence, once again, a broad-based motion and difficult to

21   rule upon in a vacuum.  Basically the government is seeking

22   to exclude evidence of defendants' health and upbringing,

23   family circumstances, financial hardships, et cetera on the

24   ground of relevance.  And I think the government's trying to

25   sweep into their concern or their limitation any evidence

1   relating to the lives, families, or circumstances of

2   defendants in Somalia, arguing that this simply isn't

3   relevant.

4          The defense has taken the position that it will not

5   seek to offer irrelevant evidence that is merely offered to

6   create pity or sympathy, but they'd like to introduce the

7   historical perspective of the background of the defendants,

8   their families, and the like as that would be critical to

9   providing a jury with perspective in relation to defendants'

10  motivations and conduct.

11         Generally I'm going to defer ruling on this to the

12  time of trial, but this is one of those areas where I think

13  it might be helpful if I could give just a little bit of

14  guidance here.  And, once again, we're dealing with a

15  principle that I think applies for both sides.  Both sides

16  should be allowed to try their case with some context.  The

17  government shouldn't be required to put on its case-in-chief

18  devoid of any of the social, political, and other related

19  history of Somalia; it's got to provide some context for the

20  country and these organizations.  Likewise, I think that the

21  defense should be allowed to humanize the defendants through

22  properly admissible evidence, and this would include some

23  evidence of the defendants' backgrounds so as to place their

24  activities, their donations, their support for groups,

25  terrorist or otherwise, in context.  So I would not grant

1   this in whole; I would just defer and rule individually if in

2   fact evidence proffered by the defense on the personal

3   history of any of the defendants begins to go too far and

4   does get into areas of pity or sympathy or inappropriate or

5   unduly protracted historical perspective for any of these

6   individuals.  But as I say, you're allowed to get into that

7   through admissible evidence.  I don't know how that's going

8   to be done.  I don't know whether the defense is intending to

9   call family members in for some of these limited areas or

10  not.  Anything you'd like to share with the Court and with

11  the government at this point would be -- might be helpful,

12  but I'm not -- I'm not requiring you to make any kind of a

13  showing at this point.  Ms. Fontier?

14         MS. FONTIER:  No, we don't have anything at this

15  point, your Honor.  We just did not want to be absolutely

16  precluded should it be -- come up and be relevant.

17         THE COURT:  Okay.  Well, you're not absolutely

18  precluded.  As I say, there would be an opportunity for you

19  to provide some context for these individuals.  Mr. Cole?

20         MR. COLE:  Your Honor, I think we understand your

21  ruling and are not questioning it at all, but we just want to

22  flag this issue primarily because just as the defense did not

23  proffer a necessity defense, we see -- the United States sees

24  a real risk that there could be an effort to do almost an

25  imperfect -- sort of an imperfect necessity, which is more

1   along the lines of a jury nullification, sort of argument

2   that perhaps yeah, we were supporting terrorists, but what's

3   the big deal, or it wasn't so bad, or it was the right thing

4   to do, and none of that would be relevant to a legal defense

5   to the charges.

6           So the defense -- I'm not -- sounds like we're

7   putting words in their mouth -- they haven't done that, and

8   we've heard Ms. Fontier.  But there was a reason I think in

9   this case in particular that to highlight at least for the

10  Court that whatever the evidence is that's brought in about

11  their personal histories or backgrounds, their families'

12  personal history or backgrounds, be in fact tied to either

13  rebutting an element of a charge or sustaining a legal

14  defense and not just going towards nullification.

15          THE COURT:  Okay.  Thank you.  The seventh motion

16  in limine is to permit the government linguist to testify

17  under a pseudonym.  That will be granted upon the conditions

18  that I think were reasonably requested by the defense or

19  offered by the government, that is, that the defense receive

20  the linguist's true name and that they can freely

21  cross-examine the linguist; obviously they'll be permitted to

22  do so at the time of trial, but otherwise the name of the

23  linguist, the true name of the linguist, will be protected.

24          MR. WARD:  Your Honor, may I --

25          THE COURT:  Mr. Ward?

 1              MR. WARD:  -- I have an order that addresses that

 2      if I could hand it forward to the Court.  I provided

 3      copies -- I provided some additional copies for counsel.

 4              THE COURT:  Have counsel seen --

 5              MR. DRATEL:  I received one copy this morning that

 6      I -- before we started earlier, and I haven't had a chance to

 7      review it and certainly not to discuss it with my colleagues,

 8      so we're not in a position to take a position on it other

 9      than obviously we will try to -- if it needs to be amended,

10      try to focus on that and not as a whole.  I mean just from my

11      quick review of it, it obviously incorporates some of the

12      things that we talked about.  I'm not sure the language

13      itself is -- right now is the kind of statement where we

14      would want it to be, but I'll have to discuss it with my

15      colleagues.

16              THE COURT:  Okay.  I realize there's some urgency

17      here because the Rule 16 notice is to go over.  I don't know

18      that it would have to be in the Rule 16 notice, but in any

19      event, I know you probably want this as soon as possible.

20              MR. DRATEL:  I think it's conceivable -- I doubt if

21      the word's "conceivable" -- I think it's possible we can

22      resolve by the end of the day.

23              THE COURT:  Okay.

24              MR. DRATEL:  It's that much --

25              THE COURT:  That's separate and apart from the

 1    motion in limine though.  The motion in limine is granted.

 2              MR. DRATEL:  Right.

 3              THE COURT:  Okay.  All right.  You can work on your

 4    order, but it's granted with the conditions that have been

 5    suggested.  Do we need to address anything further along

 6    those lines at this point, Mr. Ward?

 7              MR. WARD:  Nothing, your Honor.

 8              THE COURT:  All right.  The motion in limine is

 9    granted with the conditions that the true name will be

10    provided to the defense and that full cross-examination will

11    be allowed.

12              The eighth motion to -- motion in limine brought by

13    the government is a motion to permit the government to recall

14    witnesses.  I would -- I don't know that there's an issue

15    here.  Obviously the Court controls the mode and manner of

16    interrogation and witnesses being called.  Upon good cause

17    any party can recall a witness for a legitimate purpose.

18    What are you concerned about on this one, Mr. Cole?

19              MR. COLE:  Your Honor, actually the concern has

20    almost flip-flopped a little bit since we filed this motion.

21    Mr. Bryden, the expert witness, resides in Africa, and

22    therefore our ability to have -- we want to recall him -- in

23    other words, have him give some testimony, let some other

24    evidence come in to the jury, and then recall him.  It winds

25    up that because of his family situation and the distance he

 1   is away from home, he's not probably going to stay around

 2   long enough to be recalled, and we're actually now going to

 3   have a reverse problem, which is needing to probably request

 4   the Court's permission to provisionally admit certain things

 5   so he can testify about them subject to us linking it up and

 6   getting it admitted into evidence.

 7              THE COURT:  And subject to a motion to strike if

 8   it's not linked up.

 9              MR. COLE:  Right.  And so we were hoping to avoid

10   that -- that latter scenario by having him just be recalled,

11   but his schedule's not going to permit that, so we're going

12   to have to just have him testify once.

13              THE COURT:  Okay.  Well, you want to withdraw this

14   motion then?

15              MR. COLE:  Yes.

16              THE COURT:  Okay.  It seems to be moot at this

17   point, but you raised the issue, so --

18              MR. COLE:  If we -- your Honor, if we recall

19   anybody else, it will be so routine that it doesn't require a

20   motion in limine before the Court.

21              THE COURT:  Okay.  Very good.  Then I'll mark that

22   one as moot; that's the eighth motion in limine.  The ninth

23   motion in limine is to permit references to al-Qaeda.  And do

24   you want to be heard further with respect to that?

25              MR. COLE:  I think it's fairly well set out, your

 1   Honor.  This is another one that probably through the
 2   briefing became a bigger issue than we believe it's going to
 3   be.  We tried to set out in the brief the very limited
 4   information that would be provided about the link between
 5   Aden Ayrow and al-Qaeda and al-Shabaab and al-Qaeda. If the
 6   Court had any questions about that, we can respond.
 7            THE COURT:  Okay.  I've been through the papers,
 8   I've been through the cases that have been mentioned by the
 9   parties on this.  Is there anything further from the defense
10   on this?
11            MR. DRATEL:  Your Honor, just one thing, which
12   is --
13            THE COURT:  Certainly.
14            MR. DRATEL:  -- big; one mention is big for us.
15            THE COURT:  One mention --
16            MR. DRATEL:  You know, any -- bigger than what?
17   Bigger than -- you know, for us it's a game changer once that
18   word is mentioned.
19            THE COURT:  Okay.  Initially let me -- let me say
20   this.  The suggestion by the defendants in their opposition
21   that the Court has already ruled upon this issue is incorrect
22   if that was what was attempted to be conveyed.  The Court at
23   an earlier point in time, approximately -- it must have been
24   about a year ago -- accepted the government's offer to strike
25   the reference to al-Qaeda in the indictment as unnecessary at

1   the time.  This is something the government was willing to

2   do, and Mr. Cole, however, emphasized that he was reserving

3   the option to address the point of introducing evidence of

4   al-Qaeda upon a proper showing pretrial.

5           My concern at that particular point in time, at the

6   time of that earlier status conference, was to eliminate the

7   possibility of a reference to al-Qaeda, without the Court

8   having a chance to address the issue in advance, of that

9   organization being named in front of a jury in any way,

10  shape, or form.  And I think that the -- I think that if you

11  look to the following pages of the transcript of that

12  particular hearing that we had, you'll see that that was

13  clearly understood by the Court and the parties, that the

14  purpose at that time to have the government drop the

15  reference to al-Qaeda was one of expediency and that we would

16  reserve this issue for a later time.  So apparently we're at

17  that point.

18          So turning to the merits of the motion, once again,

19  I start with a couple of preliminary observations.  It's

20  difficult to rule in an evidentiary vacuum, and any ruling

21  now is preliminary in nature without prejudice to further

22  consideration at a later time; and as important as a

23  preliminary ruling might be on this particular question, I

24  would like to be as helpful as I can to the parties at this

25  juncture and provide some guidelines.

1              First:  I think under a 403 analysis, it is proper

2     to consider what stipulation, if any, the defendants are

3     willing to enter into; I think the cases support that, and,

4     as I say, that is a matter that is relevant for consideration

5     under a 403 balancing.

6              Second:  The government should be able to prove its

7     case through the evidence it desires to use, assuming it is

8     admissible and not unduly prejudicial.  Both sides have cited

9     the case of Old Chief, and Old Chief is still authority for

10    that important principle.

11             Third:  The government in my view should not be

12    unduly restricted in its presentation of the case by forcing

13    the case to be tried in an evidentiary vacuum.  It should be

14    able to present appropriate context for the charges,

15    including a clear picture of al-Shabaab structure,

16    organization, and the general nature of its activity.

17             In the absence of defendants stipulating that they

18    knew al-Shabaab engaged in terrorist activity during the

19    relevant time or times mentioned in the operative indictment,

20    the government should be able to introduce evidence of the

21    relationship, if any, of al-Qaeda and al-Shabaab.  Any such

22    evidence would -- and obviously it's assumed that Mr. Bryden

23    would be the one through whom this type of evidence would

24    come in -- but any such evidence would support an inference

25    that al-Shabaab engaged in terrorism, that inference would in

1   turn tend to support an inference that any particular

2   defendant knew that al-Shabaab engaged in terrorist activity,

3   and that certainly is relevant for one or more of the counts

4   in the case.

5          Next -- and I think this is very important -- any

6   mention of al-Qaeda must be accompanied by two cautionary

7   measures.  The jury must be informed that no specific acts of

8   terror committed or sponsored by al-Qaeda will be presented

9   in any detailed or other unduly prejudicial manner.  In other

10  words, only the structure or the nature of the relationship

11  between al-Qaeda and al-Shabaab, if any, would be permitted,

12  and, importantly, no inordinate amount of time should be

13  devoted to al-Qaeda.

14         Next:  There should be cautionary instructions that

15  would be given from the beginning to the end of this case

16  with respect to the jury along the lines that the defendants

17  are not charged with being members of or affiliated with

18  al-Qaeda; and that there will be no evidence that any of them

19  are members of al-Qaeda or affiliated with al-Qaeda or

20  support al-Qaeda; and further, that any reference in the

21  evidence to al-Qaeda may only be considered by the jury for

22  its understanding of al-Shabaab and its activities.  And if

23  any juror, any prospective juror, has any difficulty with

24  accepting those cautionary principles, then they're not going

25  to be on this jury.  It's that simple.  So as I say, that's

1    preliminary, I hope it's helpful, but that's all I can do at

2    this particular point in time.  Mr. Cole?

3            MR. COLE:  That's very helpful.  And I only have

4    two questions about the latter part, the cautionary

5    instructions.  One, you mentioned there will not be anything

6    about -- I think it was anything about any -- any evidence of

7    al-Qaeda attacks will not be presented in any prejudicial way

8    I think is what your Honor said, something to that --

9            THE COURT:  Right.  If you read the cases that both

10   sides have submitted, there was one case -- I don't --

11           MR. COLE:  I know the one you're talking about, bus

12   bombing in -- Hamas bus bombing.

13           THE COURT:  Yes.  And there Hamas and al-Qaeda were

14   the organizations that were in play, and the charge was a

15   similar charge to the charge we have here.  And the evidence

16   came in; the evidence apparently -- I don't know --

17   photographs were introduced.  I know you make something of

18   that, Mr. Cole; you were saying no photographs of any -- no

19   graphic photos will be used, introduced -- but there are

20   other ways to put graphic evidence before the jury that can

21   be very unsettling and unduly prejudicial.

22           MR. COLE:  Yes.

23           THE COURT:  And the Court listened to all of the

24   evidence, that is, the appellate court listened to all the

25   evidence that had gone on describing the horror of that

 1 | particular incident, that particular bombing, and they said
 2 | this was over the line.  So I think there is a line there,
 3 | and the issue is what evidence is admissible to allow the
 4 | government to try its case in context, allow the government
 5 | to provide evidence of the named terrorist organization,
 6 | al-Shabaab in this case, and the nature of it, general nature
 7 | of its activity, which includes affiliation of -- with
 8 | al-Qaeda, if that be the evidence -- I mean we've all read
 9 | the newspaper accounts, we've seen the reports on television
10 | and elsewhere that al-Shabaab is an al-Qaeda affiliate.  True
11 | or not, I don't know, but that will be dealt with by the
12 | evidence and only in a very general way and in a way that
13 | doesn't unduly prejudice the defendants.
14 |          MR. COLE:  And that's no problem.  That's a line I
15 | believe that we will stay far away from.
16 |          THE COURT:  And it's a line that relates not just
17 | to the mention of al-Qaeda but also to the -- to any evidence
18 | related to specific incidents --
19 |          MR. COLE:  Yes.
20 |          THE COURT:  -- of terrorism in Somalia.
21 |          MR. COLE:  Understood.  Understood.  The only other
22 | question I had about what you said, your Honor, was the
23 | cautionary instruction will be given about the defendants not
24 | having -- no evidence that they're being charged with being
25 | affiliated with al-Qaeda.  That's all of course true.  There

1   was one phrase in there though -- I guess we'll craft the

2   cautionary instruction, we'll have a further chance to see

3   the instruction itself because I was worried about one

4   element of it that there will be no evidence that any

5   defendant here supports al-Qaeda.  We're not trying to prove

6   they support al-Qaeda; but I don't want that, a statement

7   like that, to suggest that they don't support because they

8   very well may, and one could conclude from their behavior

9   that they just might.  It's not what they're charged with,

10  but I just want --

11              THE COURT:  That's not what they're charged with

12  and there will be no evidence of that.

13              MR. COLE:  Well, if they're --

14              THE COURT:  They can support al-Qaeda in their

15  heart or materially --

16              MR. COLE:  -- but if they --

17              THE COURT:  -- that's not the charge in this case.

18              MR. COLE:  But if you support Aden Ayrow, knowing

19  his links to al-Qaeda, I don't want there to be -- the jury

20  restricted in the inferences it can draw from the evidence if

21  they hear about Aden Ayrow, who he was, who he was connected

22  to, and they hear the close connection of support that was

23  coming from Mr. Moalin, for example, to Aden Ayrow, to

24  somehow have to parse in their mind well, but wait, I guess

25  the judge told me though that this -- what I'm hearing here

1   is not evidence of X.  So what is it evidence of?  They

2   shouldn't be put in that position.

3            THE COURT:  No, I don't think they would be.

4            MR. COLE:  Okay.

5            THE COURT:  I don't think they would be.  The

6   mention of al-Qaeda is so they can draw the inference -- I

7   assume this is what the evidence will be; I'm --

8            MR. COLE:  Yes.

9            THE COURT:  -- not prejudging what the evidence

10  will be, but the association of al-Qaeda with al-Shabaab

11  allows the inference that al-Shabaab is a terrorist

12  organization that engages in acts of terrorism.

13           MR. COLE:  And if they draw that inference -- I

14  didn't mean to interrupt you, your Honor.

15           THE COURT:  That's all right.  Go ahead.

16           MR. COLE:  If they draw that inference, it would

17  then be confusing.  Okay, there's an association with

18  al-Qaeda to Aden Ayrow, they're giving money to Aden Ayrow,

19  the inference is they're aware -- or the inference they could

20  draw is that they're aware Aden Ayrow's involved in

21  terrorism.  If that's the inference they're allowed to draw,

22  then at the same time to come back and say there will be no

23  evidence that they support al-Qaeda, that would be confusing

24  because they'd think well, they must be giving money to Aden

25  Ayrow for some other reason.

1              THE COURT:  You're into jury instructions already,

2    and I'm not --

3              MR. COLE:  Sorry.

4              THE COURT:  -- I'm not there.  All I'm saying is --

5              MR. COLE:  Okay.

6              THE COURT:  -- that the mention, the reference to

7    al-Qaeda should be permitted at this point as far as I'm

8    concerned, knowing what I know about the case, because it

9    provides context for the type of organization and the type of

10   activity engaged in by al-Shabaab; there's an inferential

11   chain here, and so that's affirmative.  What they must be

12   advised of -- what the prospective jurors must be advised of

13   early on is that these individuals are not being charged --

14             MR. COLE:  Right.

15             THE COURT:  -- with being members of al-Qaeda, not

16   being charged with supporting al-Qaeda per se, that there'll

17   be no evidence of any of that.  And ultimately the jury will

18   be instructed if the mention of al-Qaeda is made during the

19   course of trial in an evidentiary context, how they may

20   consider that evidence affirmatively, which I think may bear

21   on your concern.

22             MR. COLE:  That's all, because the -- then I don't

23   want to belabor it.  The (a) charge is not tied to

24   al-Shabaab.  The (a) charge applies to any individual, any

25   organization, if you give money to that person, just that

1    individual, with the intent to do certain things; and so the

2    jury ought to be able to infer whatever they want about why

3    money was being given to Aden Ayrow, because it's not tied to

4    al-Shabaab, that charge.  He happens to be an al-Shabaab

5    member, but that's all I'm trying to say.

6                 THE COURT:  That's fair.

7                 MR. DRATEL:  Your Honor, I disagree.  It's not the

8    statute.  The statute does not proscribe -- the (a) statute

9    does not proscribe giving money or any material support to an

10   organization; it's to a conspiracy.  Al-Qaeda is not a

11   conspiracy.  The law is clear on this.  It's a backdoor way

12   of trying to do what the Court is trying to prevent, which is

13   to get them to make the leap that because al-Qaeda is

14   involved, that somehow these defendants are guilty regardless

15   of whether or not the government's proved its case.  I don't

16   want to belabor it now.  I think that Court -- the Court's

17   analysis is clear for now, and I think -- but I don't want to

18   make it seem like silence is assent.  I disagree with

19   virtually everything Mr. Cole said with respect to the uses

20   of what the Court is permitting, which obviously we object to

21   but we obviously are bound by the ruling, I'm just saying;

22   but we're going forward in the context of the Court's ruling,

23   we want to keep it as narrow as possible and as narrow as

24   permissible and not permit it to leach elsewhere, which is

25   what we're trying to prevent through responding to the

1   motion.

2           THE COURT:  Well, I have this challenge I think

3   from both sides of the case, both sides, permitting

4   evidence -- there's a line for each side in the case,

5   allowing each side to try its case, providing appropriate

6   context or explanatory evidence but not crossing the line

7   where it becomes unduly prejudicial to either side.  So

8   hopefully those remarks are helpful going forward.

9           MR. DURKIN:  There's something I'd like to be heard

10  on.

11          THE COURT:  Would you like to use the lectern Mr.

12  Durkin?  Thank you.

13          MR. DURKIN:  We might have gotten to this later.  I

14  think we sent you a letter about some --

15          THE COURT:  Is this related to --

16          MR. DURKIN:  It's related to the motion.  What I'd

17  like to do, in light of your anticipated ruling here and

18  especially what Mr. Cole just said about the connection

19  between Ayrow and al-Qaeda and whatever inferences might be

20  drawn, I want to reraise -- I don't think my motion for

21  prejudicial -- severance on prejudicial joinder under Rule

22  14's been ruled upon, but I think I address or come close to

23  addressing that very issue here when I talk in the motion --

24  I don't want to belabor it now, but I'd like to reraise it.

25  My client has no conversations with people in Somalia.  His

1   only connection to this case is with Mr. Moalin, who I'm

2   assuming they're saying is the one who's got the connection

3   to Ayrow and therefore al-Qaeda.  My client only talked to

4   Moalin.  He met the other two defendants at the MCC when he

5   was arrested.  That's his only connection to this case.  And

6   for him to run the risk of getting smeared by that issue with

7   respect to al-Qaeda is just wrong.

8        I think -- I want to reraise it.  I think I address

9   it clearly enough in here.  I didn't specifically include

10  al-Qaeda in the motion, but I -- and I don't think it's been

11  ruled upon, but I'd like you to reconsider -- consider it or

12  reconsider it.

13       THE COURT:  Well, I'll make a note of that.  Thank

14  you, Mr. Durkin.  Appreciate it.

15       MR. DURKIN:  Okay.

16       THE COURT:  Okay.  Let's move then if we can to the

17  defense motions in limine.  We've been at it for about an

18  hour and a half now.  Perhaps we can take a 15-minute recess,

19  and then we'll resume with the defense motions in limine at

20  that time.

21       (There was a break in the proceedings.)

22       THE COURT:  Okay.  Is everyone ready to proceed?

23       MR. COLE:  Yes, your Honor.

24       THE COURT:  All right.  Getting to the defense

25  motions in limine, the first motion is to permit foreign

1   depositions, and by this motion the defendants are moving to

2   admit the six depositions taken in Djibouti; the government's

3   not directly opposing this, and I know that in the motions

4   the government made references to the transcripts being sent

5   over to the government by -- I should say the defense made

6   reference to the transcript being available by December 17.

7   We are beyond that point.  Obviously deposition testimony is

8   coming in subject to individual rulings on individual issues.

9        MR. DRATEL:  Just thought we should make a formal

10   motion just to make sure that that was covered.  It was more

11   a formality, your Honor.

12        THE COURT:  Okay.  I think this is almost a moot

13   motion in light of the agreements between the parties and

14   everyone's understanding as to how the case will proceed with

15   respect to depositions.

16        Okay.  Next is a motion for a bill of particulars,

17   and the defense is taking the position that a bill of

18   particulars is necessary to ensure that they can adequately

19   prepare for trial, arguing that the second superseding

20   indictment does not identify or describe victims of terrorist

21   attacks and therefore they cannot properly prepare, citing no

22   identity of victims in Counts 1, 3, and 4.  Government's

23   opposing on the basis that the indictment need only state the

24   essential facts necessary to apprise the defense of the crime

25   alleged, and the government's representing that the second

1   superseding indictment alleges all of the essential elements

2   of the offense and that the discovery as provided with all

3   radio or audio recordings provides the defense with adequate

4   information.

5           In light of the second superseding indictment and

6   the discovery produced by the government, I'm going to deny

7   the motion.  There's no -- there's no requirement that

8   individual victims of any particular terrorist attack be

9   identified in Counts 1, 3, or 4.

10          With respect to the third motion in limine from the

11  defense, that's to preclude evidence prior to February 26 of

12  '08, the defense basically is arguing that the evidence

13  regarding al-Shabaab prior to February 26 of '08, the date it

14  was designated as a foreign terrorist organization, is not

15  relevant and points out that about one-half of the telephone

16  calls at issue and some money transfers predate February 26

17  or -- yeah, 26 of '08.

18          In the alternative, the defense is requesting a

19  limiting instruction, and they also provide the text of that

20  limiting instruction.  Perhaps it would be appropriate to

21  read it into the record at this time.  It's as follows:  You

22  have heard evidence of events and conversations and donations

23  that occurred prior to February 26, 2008.  This evidence has

24  been admitted for a limited purpose.  It is only relevant to

25  Counts 1 and 4.  Evidence of events/conversations/donations

1    that occurred prior to February 26 of '08 may not be

2    considered with respect to the allegation of whether the

3    defendants individually provided knowing and intentional

4    material support to al-Shabaab as is charged in Counts 2 and

5    5.

6          The government responds that whether defendants

7    provided material support to al-Shabaab, regardless of the

8    date, vis-a-vis the FTO designation date, such evidence would

9    be relevant because it bears on the knowledge and intent of a

10   defendant, and it emphasizes that both before and after the

11   designation date, al-Shabaab was an organization engaged in

12   assassinations, bombings, and other acts of violence.  The

13   government's also arguing that certain relevant events

14   occurred over a period spanning the designation date.

15         I am inclined to deny this motion, but at the same

16   time, once again, this being one of those motions where we're

17   dealing with lines and where to draw the line, what's

18   properly admitted for allowing one side to try its case is

19   again before us.  I think that certainly an instruction at an

20   appropriate time or at appropriate times would be in order

21   here, essentially advising the jury that the jury may

22   consider evidence of events or conversations or donations,

23   i.e., activity prior to the designation date of February 26

24   of '08 on the question of knowledge and intent of a

25   defendant.  However, the jury may not base any finding of

1    guilt as to either Counts 2 or 5 solely on events,

2    conversations, donations that may have occurred before

3    February 26 of '08.  An instruction along those lines in my

4    view would be appropriate.  And was there anything more that

5    anyone had on that?

6            MR. COLE:  No, your Honor.

7            THE COURT:  I can't craft the instruction right

8    now, but I think that generally provides a helpful guideline.

9    I think it allows for continuity of the evidence before and

10   after, but it cabins the relevance of that evidence in

11   appropriate ways.  Mr. Dratel?

12           MR. DRATEL:  Yes, we have nothing further, your

13   Honor, on that.

14           THE COURT:  Okay.  Then the next motion in limine

15   is the fourth motion by the defense, and this is to limit

16   evidence of violence and terrorism.  I'm going to deny this

17   broad-based motion, and as previously stated, this is a flip

18   side of the government's earlier motion in limine.  Obviously

19   evidence relating to context, history, general activity, and

20   somewhat sanitized events, if in fact certain events are

21   going to be referred to, without graphic details, without

22   graphic depictions of violence or other matters such as what

23   were discouraged in the case we had earlier -- let me get the

24   name of that --

25           MR. DRATEL:  Al-Moayad.

1              THE COURT:  Yes, that's it, that was the case,

2      Al-Moayad, U.S. v. Al-Moayad, at 545 F.3d 139 and

3      specifically at pages 159 and following.  I think that -- I

4      think there is some pretty good principles that are

5      articulated in Al-Moayad that -- that could serve as a guide

6      for us in this case.

7              Okay.  The next motion in limine by the defense is

8      to exclude testimony as to the reasons for al-Shabaab's

9      designation as a foreign terrorist organization.  I don't see

10     the issue here, quite frankly.  Defendants are representing

11     they will stipulate that al-Shabaab is designated as an FTO

12     and that therefore testimony about the reasons for the

13     designation is not relevant; and the government has taken the

14     position that it does not intend to offer evidence about the

15     specific reasons for the designation.  That doesn't preclude

16     evidence about the nature and extent of the structural

17     integrity or lack thereof, I mean the --

18             MR. COLE:  Right.

19             THE COURT:  -- organization of it.

20             MR. COLE:  Yes, your Honor.  And reading the

21     defense's motion, we just want to make clear that if they

22     thought we would sort of bring in the administrative record

23     that led to the State Department doing the designation or

24     talk about the deliberative process that the U.S. government

25     relied upon in designating, we're not going to do that.

1              THE COURT:  Okay.  I didn't think there was an

2     issue.

3              MR. DRATEL:  The only -- I guess when I read

4     Bryden's -- one of the letters describing Bryden's testimony,

5     there was something in there about the designation itself and

6     the process and, you know, questions of policy or importance

7     to the United States or -- what the purposes are in that

8     context is not relevant, and that's what we wanted to make

9     sure was not on the table.

10             THE COURT:  Okay.  I think we've got that

11    clarified.  I don't see that this -- I think this motion is

12    moot at this point in light of the representations of

13    counsel.

14             MR. DRATEL:  Thank you, your Honor.

15             THE COURT:  The sixth motion in limine is a motion

16    to suppress statements of nontestifying co-defendants.  And

17    this is defendant Issa Doreh's motion, and it's a motion to

18    suppress statements of co-defendants, identifying a potential

19    Bruton problem, but the government's saying it has no

20    intention of introducing such evidence, correct?

21             MR. COLE:  That's right.  Postarrest statements

22    we're not going to introduce.

23             THE COURT:  Okay.  So this is moot.  This is on

24    your case-in-chief I assume, Mr. Cole.

25             MR. COLE:  Yes.

1              THE COURT:  Okay.  The seventh motion in limine is

2    a motion to exclude references to sharia law and other

3    irrelevant evidence.  And this is where there was a reference

4    to Mr. Bryden that I saw.  The objected-to areas are Bryden's

5    proposed testimony about al-Shabaab goals and to impose

6    sharia law and testimony about the murders of Analina Tonelli

7    and Abdul Katar Yahya, or Yahey, which it is represented were

8    each killed during Ayrow's tenure as an al-Shabaab leader.  I

9    think we've already handled the first part of this in your

10   prior statements, Mr. Cole; you're indicating that the

11   government has no intention of getting into any detailed

12   explanation or mention of sharia law, that that's not --

13             MR. COLE:  The only -- the only way we see this as

14   coming up is the fact that al-Shabaab is -- I mean it is a

15   radical Islamist organization, so we really can't talk about

16   it without to some extent talking about its objectives.  But

17   I think what triggered the defense motion I think is the

18   transcript from Minnesota.  We are not -- many of the

19   references to sharia law were actually brought about by the

20   district court in that case asking questions of the witness

21   during trial that weren't even brought up by the government.

22   We're not planning on introducing all that evidence in our

23   case.

24             THE COURT:  Right.

25             MR. COLE:  It's going to be limited to explaining,

1    as necessary, what al-Shabaab is, what its objectives are,

2    how it's far outside --

3            THE COURT:  One of the objectives being to impose

4    sharia law.

5            MR. COLE:  Yeah, but not even -- I think the

6    concern is sharia law is commonly used in Somalia anyways.

7    It's its extreme version of Islam that is out of step with

8    the mainstream.

9            THE COURT:  I think both sides have reached some

10   kind of an understanding as to what the government's evidence

11   is going to be here, and if in fact the evidence delves more

12   deeply into sharia law, Mr. Dratel -- it seems like you're

13   getting ready to speak -- then we'll deal with those issues

14   at the appropriate time.

15           MR. DRATEL:  Okay.  Because I just wanted to make

16   sure that we understand and so that the Court understands,

17   one is that we don't see the relevance of sharia law as an

18   objective of al-Shabaab any more than any other organization

19   in the context of this case.  As to why it is relevant, we

20   think it's purely prejudicial and designed that way.

21           Second thing is that while there may be one

22   reference, even one reference, if it's fundamental and it's

23   wrong, it's still something that needs to be either corrected

24   or precluded.  So I don't want to just say just because they

25   ask one question and get one answer, if it's a fundamentally

1  incorrect answer from a witness who's not an expert in Islam

2  but yet is taking this on, we have a problem.  So we will

3  address it at the appropriate time because we don't know the

4  precise nature.

5          THE COURT:  Anything further, Mr. Cole, in response

6  to Mr. Dratel's --

7          MR. COLE:  No, your Honor.

8          THE COURT:  -- concern?  Mr. Durkin?

9          MR. DURKIN:  Judge, I agree, we can address it as

10  we go on, and -- which is fine, but the only comment I want

11  to make is that I don't think it's appropriate to interject

12  here that sharia law somehow accepts a version where

13  amputations are okay or whatever.  That's a -- that would get

14  into such a debate.

15          THE COURT:  I don't know -- from what I've read

16  from the government, that's not their intention, and I'm

17  assuming there will be no references to those kinds of -- Mr.

18  Cole?

19          MR. COLE:  If to the extent -- to the extent that

20  Mr. Bryden is -- testifies at all about that kind of violent

21  behavior, it would be to say that that was al-Shabaab doing

22  that, not that it is sharia law generally or that it is the

23  other Somali culture or the culture of sharia law across the

24  board; it would be talking about al-Shabaab.

25          THE COURT:  And terrorist activities --

1          MR. COLE:  Yes.

2          THE COURT:  -- without getting into references to

3    sharia or what sharia requires.

4          MR. COLE:  Yeah, I mean unless -- I don't even

5    know -- yes, that's right, your Honor.

6          THE COURT:  Okay.

7          MR. DURKIN:  And that's exactly what we were

8    asking.  It's one thing to say a group does A, B, C, and D.

9    It's a whole 'nother thing to say they do it because they

10   believe in a certain religious principle.  It's the "certain

11   religious principle" part of it that we're -- that this

12   specific motion deals with.  And the whole concept of sharia

13   is far more complicated than simply sharia law; sharia is a

14   whole cultural issue I mean.

15         THE COURT:  Okay.

16         MR. COLE:  Your Honor, I just want to say I think

17   we're going to be on the same page here.  The only thing is

18   is the calls themselves, in order to understand who's

19   talking, what they're talking about, there is going to be

20   distinctions between groups in Somalia and their versions of

21   Islam.  That distinction was raised by the defense's own

22   witnesses in Djibouti.  They're going to, for instance, bring

23   in testimony about al-Suhna --

24         THE COURT:  You need to clarify that for the

25   reporter.

1          MR. DRATEL:  A-l, new word S-u-h-n-a.

2          THE COURT:  Okay.  We'll just defer ruling on this;

3     I think that's all we can do, and I think you've made your

4     points clear on this.  And as issues develop, if they do,

5     then we'll have to address them at that time.

6          MR. GHAPPOUR:  Your Honor, just one more point.

7     I'm sorry.  When you said that the government intends to

8     introduce Mr. Bryden's testimony to distinguish between

9     different types of sharia law -- and that is evidenced in the

10    briefing -- he's not qualified to do that, and --

11         THE COURT:  Well, I think that point has already

12    been made though earlier today, and I think the government

13    indicated it's not going there.

14         MR. GHAPPOUR:  Well, in that case I can't

15    understand what they're going to use him for based on my

16    review of his prior testimony in addition to the briefing and

17    what they just said they're not going to use him for.

18         THE COURT:  Well, I don't know that the

19    government's required to provide that information to you.

20    But, you know, if the government doesn't prove its case, it

21    doesn't prove its case.  If the government's expert is

22    ineffectual because nothing of any value has come out, then

23    so be it, but -- I don't know how to respond to your

24    statement that then if in fact sharia law is not going to be

25    discussed by Mr. Bryden, you don't see the utility of

1    Mr. Bryden's testimony.

2           MR. GHAPPOUR:  I guess the issue is I'm not

3    entirely sure what is going to be introduced, and to the

4    extent anything is going to be introduced about sharia law, I

5    would contest his expertise, and at this juncture, two and a

6    half weeks before trial, we're not really afforded an

7    opportunity to do that.  We weren't given notice that he was

8    going to be used as an expert on Islam.

9           MR. COLE:  Your Honor, we are confident that

10   anything Mr. Bryden talks about, his expertise will be very

11   apparent.  And if Mr. Ghappour would like to voir dire him

12   outside the presence of the jury on any point, we'd have no

13   problem with that because his opinion's been turned over in

14   letters and in his prior transcripts, and we're not concerned

15   at all about his qualifications; he's extensively qualified

16   for what we're going to call him for, and then Mr. Ghappour

17   can voir dire him.  There's been no Kumho motion filed or

18   motion --

19          THE COURT:  We're not proceeding with a Kumho

20   hearing, but we can certainly -- anytime you want to take a

21   witness on voir dire, not -- during the direct examination,

22   you certainly may.  It's not cross-examination, it's voir

23   dire, and --

24          MR. GHAPPOUR:  Thank you, your Honor.

25          THE COURT:  -- that certainly is something that's

1   available to you.  Okay.  And then the government did not

2   respond to the second part of this motion dealing with the --

3   with these alleged murders.  Did you want to -- what is the

4   government's position on that?

5          MR. COLE:  These are the -- oh, okay.  The Tonelli

6   and Yahya murders are only relevant and being offered -- I

7   don't know why this came under the heading of religious

8   violence.  This one just goes back to the general motions

9   that were briefed and discussed already today about

10  al-Shabaab's activities.  These were two of the most widely

11  publicized events about al-Shabaab and Aden Ayrow leading up

12  to the time frame at issue here, and so it's simply passing

13  over those events by Mr. Bryden and explaining again these

14  inferences that could be drawn by the jury as to what you'd

15  be supporting if you're providing money to Aden Ayrow.

16         THE COURT:  Okay.  So it has no relevance to the

17  religious component, the sharia motion.

18         MR. COLE:  No.

19         THE COURT:  All right.  Okay.  All right.  I

20  would --

21         MR. DURKIN:  Could we have one second?  Excuse me.

22         THE COURT:  Sure.  Go ahead.

23         MR. DURKIN:  Judge, can Ms. Moreno address just one

24  issue on that?

25         MS. MORENO:  Just very briefly, your Honor.  In

1    looking at the proffer letters that the government has given
2    us with respect to what Mr. Bryden will testify to and in
3    listening to Mr. Cole today, we have two different aspects.
4    The murder of a nun and the murder of a nurse, which are
5    these two examples, are tied to sharia, are tied to the
6    violent form of sharia that the government claims al-Shabaab
7    practices, and it's a particular virulent form of violent
8    Islam, and that is the connection that their expert is going
9    to make.  So when Mr. Cole says well, it's not really under
10   religious violence, it absolutely is.  That is the context
11   they gave it to us in.  So it's not divorced.  It's not just
12   that this is some conduct, some murderous illegal conduct by
13   al-Shabaab; it is fueled, in fact, given context and meaning
14   of the violent form of sharia that Mr. Bryden's going to talk
15   about.  So what they've told us Mr. Bryden is going to talk
16   about and what Mr. Cole tells us today is diluted.  I mean
17   d-i-l-u-t-e-d, not d-e-l-u-d-e-d.
18             THE COURT:  There is a difference, yes.
19             THE REPORTER:  Thank you.
20             MS. MORENO:  Thank you.
21             THE COURT:  Okay.  Well, Mr. Cole can certainly
22   speak for himself, but the impression I get is that evidence
23   of these -- of these alleged murders are coming in
24   generically as illustrative of the kind of activity, the kind
25   of terrorist activity engaged in by al-Shabaab.  I didn't get

1   the impression that it was going to be tied to a

2   sharia-extremist-driven view of al-Shabaab, but you may

3   correct and -- I'm not --

4           MR. DURKIN:  I understand.

5           THE COURT:  -- making a ruling here that there can

6   be no mention of sharia --

7           MR. DURKIN:  Right, not --

8           THE COURT:  -- during the government's

9   case-in-chief, but, once again, we're more in a line-drawing

10  process.

11          MR. COLE:  It's -- yeah, and it's an odd thing in a

12  way to be talking about because al-Shabaab, what is it?  It's

13  an extreme Islamist organization, and so you can't talk about

14  it without, to some extent, talking about extreme Islam.

15  There's just no way to separate that entirely, so Ms.

16  Moreno's right about that.  But the point of bringing in

17  those instances of violence is not to lead us down a rabbit

18  hole on extensive discussions as to different types of Islam

19  in the world; it's to talk about al-Shabaab and what it does

20  and what it has done, and what it's famous for.  That's the

21  point of that evidence.

22          THE COURT:  Okay.

23          MR. DRATEL:  And, your Honor, I'd just say if the

24  Court is -- there is a line over which you cross where it

25  becomes a 403 problem.

```
 1              THE COURT:  Okay.  I am alerted.  Thank you.
 2              MR. DRATEL:  Good luck.  Just stating the obvious.
 3              THE COURT:  Well, okay.  That takes care of the
 4    seventh motion in limine, basically deferring individual
 5    rulings and hopefully with the statements of counsel and the
 6    guidance of the Court here being able to head off future
 7    issues or at least being able to give some thought to these
 8    issues arising ahead of time.
 9              That raises the use of a questionnaire; there's a
10    motion to utilize a jury questionnaire and for attorney voir
11    dire, and I think we've reached that point in these
12    proceedings and the motions where I can address that.
13    Anything further on any of the matters we've been discussing
14    up to this point?
15         (No response)
16              THE COURT:  Okay.  Now, with respect to a
17    questionnaire, I know the government is opposing the use of a
18    questionnaire and taking the position that this is, if not a
19    routine case, something that falls within the general
20    category of routine cases and there's no need to engage in
21    any more of a jury selection process than we would typically
22    have.  I think it's beyond routine, and I think it is one of
23    those cases where a jury questionnaire would be helpful.
24              I've gone through the questionnaire you've looked
25    at, Ms. Moreno.  Let me say that I've come to this conclusion
```

1   with several reservations, and you need to know what they

2   are; there are practical -- real, practical concerns, and

3   there are logistical concerns and substantive concerns.

4        With respect to a questionnaire, I think if we're

5   going to use one -- and I'm inclined to do so -- that you

6   should know some of the following.  First of all, we've sent

7   out approximately 500 summonses for a time-qualified pool; we

8   will have a time-qualified pool here.  I don't know how many

9   jurors will be here.  My hope would be to ultimately yield 75

10   to 100 prospective jurors after sending out 500 summonses.

11   They're time-qualified for up to a month.

12        I'm getting a little bit ahead of myself right now,

13   but any questions relating to hardship, for example -- and

14   you had a couple of pages relative to hardship -- are out.

15   Everybody would be claiming hardship, or nearly everyone, if

16   in fact questions such as "Will this be inconvenient for

17   you," "Would you rather not be on this jury" are posed to

18   prospective jurors.  So that portion of the proposed

19   questionnaire is not going to be utilized.

20        MS. MORENO:  Mr. Dratel wanted to know if that

21   included the lawyers.

22        THE COURT:  The original jury selection process, of

23   necessity, that is, the first couple of days, will have to

24   take place in another courtroom.  Obviously we don't have the

25   necessary seating for that, so what we're going to be doing

1   is using the courtroom just below us on the fourth floor,

2   which is Courtroom 1, that's Judge Gonzalez's courtroom.

3   That was the ceremonial courtroom up until the construction

4   of the annex, the new courthouse, and so we'll be utilizing

5   that; it has much more seating capacity, and I've used that

6   courtroom before for similar purposes.

7           What would happen would be the people, the

8   prospective jurors who are time-qualified and who appear,

9   would be given some preliminary instructions -- obviously the

10  nature of the case would be introduced to them, they'd be

11  given some preliminary instructions -- and I'm speaking in

12  very broad -- very broad-based strokes right now -- they

13  would be given a questionnaire.  It would be an anonymous

14  questionnaire; in other words, it would not have their name

15  on it because there's so much personal information that's

16  being requested, so the questionnaires would be numbered.

17  They would be -- and only the questionnaires would be

18  numbered -- and then there would be a key to that process,

19  and then they would fill out the questionnaires in the

20  courtroom and then submit those, hopefully, still in the

21  morning, and then we would have the original questionnaires.

22          Having gone through this process before, rather

23  than tasking limited resources here in the courthouse, what

24  would be necessary in my view would be for those

25  questionnaires to be, in all probability, given to the

1  government so that the government could reproduce the

2  requisite number of questionnaires.  So for each

3  questionnaire you're going to be creating, I don't know, five

4  or six copies, perhaps a -- it may not be five or six, but a

5  copy for the government, maybe two copies for the defense, a

6  working copy for me, so at least four copies.  And assuming

7  that the questionnaire is somewhere between 10, 15 pages and

8  you're talking about 75 to 100 people, you're talking about

9  thousands of pages of photocopying.  It's really a

10 significant task, and I see no way around it.

11         So hopefully that would be done while there's still

12 time in the day, time in the afternoon for the Court and

13 counsel to get together so that we could review the

14 questionnaires and eliminate those individuals who are

15 clearly inappropriate for serving -- potentially serving on

16 the jury -- and I assume that we'd have a certain number of

17 those -- and that ultimately we would yield -- we would

18 reduce the pool to, once again, a workable number, and just

19 picking 50 to 75 individuals, let us say.  And then we'd

20 probably, depending on how many people we have, go forward

21 that second day with traditional voir dire where my part of

22 it is going to be some hours, even though we have a

23 questionnaire, but limited -- limited -- voir dire on the

24 part of counsel.

25         And this is the other part of it; these are some of

 1   my practical concerns.  You're already delving into areas

 2   here where you want to disqualify -- not disqualify but

 3   basically identify people you don't want on the jury, and I'm

 4   referring to you, Ms. Moreno.  So that's essentially your

 5   purpose.  Also it's a purpose of the government but more -- I

 6   think more appropriately a legitimate defense purpose.  So

 7   there's no need to go into any protracted voir dire of

 8   individuals, you know, because of how they've answered a

 9   particular question; that's kind of beyond the beyond, you

10   know, and they haven't been summarily let go for cause.

11   There's no need for you to go into any kind of a protracted

12   examination.  Just key on -- just key on the people for whom

13   you have problems or -- not problems but issues and real

14   concerns, you just want additional information.

15          Part of the problem using a questionnaire is, in my

16   view, it cuts down on the amount of voir dire by counsel

17   because a lot of that's been handled, and my own experience

18   has been -- and I don't know how true this is across the

19   board -- but my experience has been and I know the experience

20   of other judges has been that when you use a questionnaire

21   where jurors, prospective jurors, don't hear the stories, the

22   full stories of other individuals, don't go through this rite

23   of passage together, they don't bond quite as well, and

24   sometimes they don't deliberate quite as well as if they've

25   gone through this whole process together.  It's just a

 1   personal observation on my part.  It's idiosyncratic; it may

 2   have nothing to do with any kind of a trend or a general

 3   concern, but I think that the use of questionnaires has some

 4   limitations, and I've tried to identify what those

 5   limitations are for you, certainly practical, logistical

 6   concerns, but I also had the impression that as jurors are

 7   not sharing what they typically would in a routine case,

 8   hearing one another's story and being able to speak to one

 9   another about some of what they've heard on routine matters

10   having nothing to do with the case, I question how well they

11   come together as a cohesive group.

12            That being said, I'm inclined to use a

13   questionnaire.  There are certain -- if I use what you've

14   proposed as a template here, then there's going to be a need

15   for some substantial -- not substantial but some significant

16   modifications and eliminations.

17            Mr. Cole, did you have any -- you've been sitting

18   quietly here.  I know the government is generally opposed to

19   a questionnaire.  I've already enlisted your office into

20   engaging in an activity you're objecting to.

21            MR. COLE:  That's okay.  All we would ask is that

22   -- our motion response was really directed at not having a

23   questionnaire.  We would just ask for a -- how are we going

24   to settle on the actual questions to be used in the

25   questionnaire?  Because although we highlighted some of the

1   ones we found the most problematic in our response, but we

2   would just want to know how that will play out, exactly what

3   the questionnaire will ask, if the Court's going to prepare

4   its draft, and that's one issue.

5          The other issue is just for scheduling reasons,

6   does the Court have an estimation of -- this is for

7   scheduling, particularly our witness in Africa -- does the

8   Court have an estimation of how long the entire jury

9   selection process may likely take in this case so we know

10  when we could anticipate bringing a witness?  If we start on

11  Monday, for example, and you have -- I think that Friday you

12  said would normally be a calendar day for you -- and it would

13  be great if it wasn't, but --

14         THE COURT:  Yes, unfortunately it is.

15         MR. COLE:  Okay.  Then with that in mind, do you

16  think that this would be no more than a two-day process

17  getting the jury?

18         THE COURT:  No more than a two-day process is what

19  I'm planning for, so I think counsel should plan for that as

20  well.  So, frankly, I'm looking at being ready to go with a

21  reduced pool on the second day.  My part of it will take

22  between two to three hours; I think you'll see it's going to

23  be fairly exhaustive even after the utilization of a

24  questionnaire because there are some principles that I

25  want -- and some cautionary instructions that I want these

1    prospective jurors to truly appreciate and not just read on

2    paper and respond to on paper.

3          MR. COLE:  Then how will the -- what does your

4    Honor propose?

5          THE COURT:  So my part -- I'm going to go first --

6    it's going to be two to three hours.  I'm going to -- we're

7    going to go with a jury of 12 with two or three alternates.

8    Each side will have the number of peremptories they typically

9    have; it's going to be six for the government, ten for the

10   defense to be shared, plus an additional peremptory challenge

11   if there are two alternates, and if we're going to utilize

12   three alternates, then each side will have an additional

13   extra challenge.  So under that scenario it's either going to

14   be 7 and 11 or 8 and 12 total peremptory challenges to what

15   will probably be either a 32-pack or a 34-pack.  So you're

16   going to have that jury list randomized numerically ahead of

17   time, and so you're going to know who the first 32 or 35 will

18   be based on the -- on the number of alternates we're going

19   with and what the order of jurors will be after that, having

20   been randomly placed in some order on the sheet.  And then if

21   we end up excusing people from the original pack, then we'll

22   be bringing in other pool members, prospective jurors, to

23   fill.

24         MR. COLE:  Will the Court then be proposing its own

25   questionnaire or should we assume that we'd argue over the

1    one that was submitted by --

2                 THE COURT:  Well --

3                 MS. MORENO:  If I may address that.

4                 THE COURT:  Ms. Moreno?

5                 MS. MORENO:  Thank you, your Honor.  And I thank

6    you on behalf of all the defendants that the Court is

7    granting the questionnaire.  Usually -- quite honestly, your

8    Honor, in my experience, usually the defense and the

9    government both collaborate on a questionnaire.  This was not

10   the case here unfortunately.  I am happy to talk to Mr. Cole

11   and to the government about those questions that they

12   strongly object to.  I will say to the Court, however, that

13   all the questions that we have in the questionnaire that deal

14   with obvious bias and prejudices about religion, about

15   Somalia, about terrorism, now that we know, especially in

16   light of your Honor's rulings that al-Qaeda is coming in to

17   the case, the murders of the nun and the nurse, some aspects

18   of Islam are coming into the case, that it makes it all the

19   more relevant to -- just to know if a juror, just hearing --

20   a prospective juror just hearing that that's going to be part

21   of the case, can they still be fair.  That's really -- that's

22   the goal here.  I appreciate the Court doing anonymous

23   questionnaires because I believe it promotes candor, quite

24   frankly, your Honor.

25                 And finally, I'm happy to go through this

1     questionnaire with Mr. Cole and add questions or delete them

2     and submit it to the Court within the next couple of days.  I

3     think we can do that very successfully.  It's usually been my

4     experience to do that.

5             So -- and with respect to the voir dire, the

6     attorney voir dire, I agree with your Honor that it does cut

7     down and that it focuses -- if the government and the defense

8     can't agree on the cause challenges that I think often are

9     obvious in the questionnaires; but if we can't agree, those

10    seem to be the places where the lawyers spend the most time

11    is to develop that cause record.  So I agree with your Honor

12    that the -- that really the questionnaire saves court time

13    because we have a lot of information.

14            THE COURT:  Okay.  Thank you.  I appreciate your

15    comments.  I know I would certainly welcome both sides

16    meeting and conferring on a questionnaire.  Ultimately either

17    it will be jointly prepared and, you know, physically created

18    by one side or the other, but I also had some concerns myself

19    going through what was proposed.  So what I'd like to do at

20    this point is just take a few minutes and go through what

21    was -- what was proffered by you, Ms. Moreno, on behalf of

22    the defense community here and eliminate some of the

23    questions and also giving you my reasons why I'm concerned

24    about eliminating some of these references.

25            Perhaps importantly to you, I think those questions

1    relating to fundamental biases, prejudices, and the rest are

2    questions that should remain.  I think I agree with a good

3    deal of what you said about the propriety of those questions,

4    but let's get started.  And if you can turn to your

5    questionnaire.  Mr. Cole, do you have yours in front of you?

6              MR. COLE:  Yes, your Honor.  Thank you.

7              THE COURT:  Okay.  You'll see that -- well,

8    starting with the questions themselves, in terms of the

9    introductory paragraph, I assume -- I assume that's

10   appropriate.  It's an admonition or an explanation I'd be

11   giving anyway verbally to the pool.  But all of the

12   questions, as I say, under this hardship part would be out.

13   So strike the whole hardship section on page 2 and going over

14   onto page 6 through page -- page 2, question 6.

15             Then you start on page 3, description of the case.

16   This is a criminal case, and I think jurors need to know

17   that.  This is a little too sanitized.  I would -- if I were

18   writing this, it would be "this is a criminal case" -- add

19   the word "criminal" in front of "case" -- "in which the

20   United States has charged four" -- strike "gentlemen" and put

21   "individuals" down there -- "four individuals with providing

22   material support, principally in the form of money, to a

23   terrorist organization in Somalia, and of conspiracy to

24   commit violence against persons in Somalia, a country in the

25   horn of Africa."  I would add that.

1              Now, you poll, you know, average people on the

2     street about Somalia and I dare say very few of them would be

3     able to tell you it's even a country, and you get a smaller

4     percentage being able to identify where it is.  So I would,

5     just for informational purposes add, "a country in the horn

6     of Africa."  Well, maybe strike "horn."  I mean --

7              MR. COLE:  Your Honor, I was wondering if based on

8     what you said earlier that you were going to bring them in,

9     give them a description of the case before you --

10             THE COURT:  That's --

11             MR. COLE:  Can you strike the description out of

12    this and let your Honor --

13             THE COURT:  That's fine too.

14             MR. COLE:  -- do it?  I think you will have already

15    read the -- told them the charges in the indictment.

16             THE COURT:  I will.

17             MR. COLE:  Okay.

18             THE COURT:  I will, yeah, which raises another

19    issue; I'm glad you brought that up.  I always ask the

20    parties to prepare a joint nonargumentative statement of what

21    the case is about, and, if you want, to include a theory of

22    defense.  I am going to read the indictment at some point,

23    but if you want to give just a quick, you know, summary of

24    the case and the nature of the charges and a theory of

25    defense so that the jurors, prospective jurors, are generally

1   acquainted with what is before them -- and it's a criminal

2   matter; it's not a civil matter, it's a criminal matter -- I

3   think that would be helpful.  I would just at that point

4   eliminate this introductory statement; it's not necessary.

5   But if you're going to utilize something describing the case,

6   I'm telling you and suggesting to you what might be included

7   in there.

8           MS. MORENO:  I appreciate that, your Honor.

9           THE COURT:  All right.  And then continuing on,

10  "They are charged in multiple counts," that's fine.  "They

11  each deny all allegations" -- put "each" in there -- "they

12  each deny all allegations and are presumed to be innocent."

13  Might as well add that at the very beginning.  Okay.

14          Continuing on, background information, 7, 8, and 9,

15  no problem.  I don't have any issue with general gender/age

16  questions nor in what area of the district they live in;

17  that's fine.

18          Are you a registered voter and if what, what is

19  your party affiliation?  You can strike 11.  I think that's

20  unduly -- that's just intruding into private affairs and

21  status; that would be out.  However, I think it is

22  appropriate to ask them if they identify politically with

23  certain groups.  So you have Christian fundamentalists,

24  traditional conservatives, libertarians, moderates, liberals.

25  But in my view you've left off two of the most important

1  categories:  Independents -- because most people identify

2  themselves as independents today -- and none of the above.

3        MS. MORENO:  By the way, your Honor, I'm

4  incorporating all the Court's comments; I will have it in

5  Word and send it to the government as well.

6        THE COURT:  Well, I'd like it to be compatible

7  with -- you know, if you want to send us a disk, ultimately

8  we can print out our own copies, but just make sure it's

9  compatible with what we have, okay?

10        MS. MORENO:  Thank you.

11        THE COURT:  All right.  Thanks.  Okay.  The rest of

12  page 4 seems to be appropriate.  Just a general reaction to

13  what's here.  I mean if you all agree on something along

14  these lines on status, that's a little different, fine, but

15  I'm just saying what's here is generally fine; I don't see

16  any issues here.  Mr. Cole, I'm going to give you a chance to

17  register any additional concerns after I go through this the

18  first time.

19        Then the next page, I guess it would be page 5, no,

20  I don't see any issues there; I mean I think it's all

21  pertinent.  Military experience basically or close to people

22  with recent military experience.  Residence in the horn of

23  Africa.

24        MS. MORENO:  Do you want me to strike "horn of,"

25  your Honor?

1            THE COURT:  No, I think once we identify it or

2      explain it -- you know, I don't think a large percentage of

3      people would admit to knowing what the horn of Africa is or

4      where it is.  I know -- you know, they've probably heard the

5      term, but they probably couldn't locate it, you know.

6            MS. FONTIER:  Let's assume though that the answer

7      is yes, they would though if they can find it on the map.

8            THE COURT:  We don't want them looking at maps.

9      No, let's not encourage them to go to alternative sources of

10     information on the case.  Okay.  So page 5 looks okay.

11           Page 6 I didn't have any issues with, you know,

12     asking for general experience and to law enforcement, family

13     or close friends in law enforcement, pretty standard.

14           Personal beliefs, down there at the bottom, I

15     would -- under page 25 -- excuse me -- question 25 -- I

16     would -- this is important; this is going to be relevant for

17     other questions as well -- I think you need to put "if any,"

18     the words "if any."  "What is your view, if any, of the

19     Muslim or Islamic faith?"  Most people probably don't have a

20     view of it or, if they have a view, it's just not more than a

21     very generalized view that it's one of the basic faiths of

22     the world.  Mr. Cole?

23           MR. COLE:  I wanted to dwell on question 24 for a

24     minute; I think it's a real problematic question.  I think

25     it's too broad.  I don't know how someone with -- would even

1  in truth actually answer that question without going back to

2  every -- well, one, it goes back to being a member of a

3  political party as well, and every social, political,

4  religious, recreational organization?  That list could go on

5  and on and on.  You'd have jurors sitting here wondering if

6  they're truthfully going to answer that question.  And it's

7  also very personal.

8          THE COURT:  I looked at that.  I think it is broad.

9  I would tend to -- I would tend to knock that down into any

10 organizations that they're active in at the present time.

11 They're already being asked if they identify politically with

12 religious -- any religious -- see how that question went --

13 they're being asked if they politically identify with groups,

14 including Christian fundamentalists; that's the only earlier

15 reference to religion.  I would agree that this should be

16 limited to current organizations.  Strike "religious

17 organizations."

18         MS. MORENO:  Your Honor, if I may?

19         THE COURT:  Yes.

20         MS. MORENO:  I'd rather strike the others before I

21 strike the "religious organizations" given the --

22         THE COURT:  But we're going to get into --

23         MS. MORENO:  Okay.

24         THE COURT:  -- other questions relating to any

25 religious beliefs --

1          MS. MORENO:  Okay.

2          THE COURT:  -- or affiliations that would in any

3    way affect their ability to fairly judge the evidence in this

4    case and to render a fair and impartial verdict; we're going

5    to get to those questions.  But asking people to identify

6    their religion, you know, on this kind of a questionnaire, I

7    would tend to agree with Mr. Cole.

8          MS. MORENO:  So would the Court then like number 24

9    to read "what current organizations"?

10         THE COURT:  I think that's -- I think that's --

11         MR. COLE:  I think that would -- I'm sorry.

12         THE COURT:  Go ahead.

13         MR. COLE:  That's a much better question, although

14   I would say that since we're going to get into viewpoints

15   quite extensively in the question if they have a view about

16   this subject or about that subject, I'm not sure why this

17   question is even really needed.  If the point is to get out

18   someone who might be prejudiced against or biased against the

19   defense, the extensive questions about all those possible

20   grounds and biases seem more pointed than just generally what

21   like are you maybe a member of the Little League, Little

22   League board, a homeowners association --

23         THE COURT:  It puts a little flesh on the bones.

24   Once again, we keep getting back to the same -- to the same

25   issue; you've had the issue, the defense has had the issue.

 1    How far can you go in defining al-Shabaab?  How much context

 2    is appropriate?  You want the jury to get a feel for the

 3    organization.  You know, the defense wants the jury to get a

 4    feel for the individual defendants and -- through their own

 5    personal history and context and all so they can better --

 6    perhaps better understand what was done in this case.  And

 7    everyone wants to get a little bit of a better feel about

 8    jurors.  I'm not one to allow questions about what are your

 9    favorite television programs, what's the last book you read,

10    what bumper stickers do you have on your car, if any; but I

11    think organizational associations, as long as they don't

12    unduly intrude into religious or political affiliation or

13    registration, are appropriate, especially when we're going to

14    be asking some questions dealing with religious beliefs in

15    other contexts.  So you can limit it -- you can limit it to

16    current -- membership in current organizations but

17    striking --

18            MS. MORENO:  The descriptions.

19            THE COURT:  Well, I'd strike political -- well,

20    political organizations, excluding party affiliation.

21            MS. MORENO:  Your Honor, I'm --

22            THE COURT:  Yes.

23            MS. MORENO:  -- confused.

24            THE COURT:  Strike "political."

25            MS. MORENO:  Yes.

1          THE COURT:  Strike "religious," leave the others.

2          MS. MORENO:  Okay.

3          THE COURT:  Okay?  That gives you some -- it puts

4   some flesh on the bones and I think eliminates the concern

5   that I have.  So just strike those two.

6          MS. MORENO:  "Political" and "religious."

7          THE COURT:  Yeah.

8          MS. MORENO:  Thank you.

9          THE COURT:  Okay.  Is there anything else you

10  wanted to mention, Mr. Cole?

11         MR. COLE:  No, your Honor.  That was my question.

12         THE COURT:  So then on question 25 we're adding the

13  words "if any," not requiring them to -- it's not a test.  I

14  don't want it to sound as if they're taking a test, you know.

15         MS. MORENO:  It's a test on fairness; that's how

16  the defense sees it.  Your Honor, would you like it "What is

17  your view, if any, of the Muslim" --

18         THE COURT:  That's fine, yeah.

19         MS. MORENO:  Thank you.

20         THE COURT:  Okay.  And then along the same lines,

21  page 7, question 26, question 26, page 7, I would add the

22  words "that you are aware of" after "doctrine."

23         MS. MORENO:  Okay.

24         THE COURT:  "Is there anything about Islamic

25  teaching or doctrine that you are aware of that is personally

1   offensive to you?"  This gets away from imposing a test

2   question, and if they're not aware of any specific teachings

3   or doctrine, then they can so state.  Did you have any

4   concern about that, Mr. Cole?

5           MR. COLE:  Well, I guess not, your Honor.  I mean I

6   think it's -- I don't think it's a particularly useful

7   question because they've just been talking up till now about

8   how they don't want this case to be about Islamic teachings.

9           THE COURT:  It should be in another area of

10  questioning.  Make you can work on that.  I think the

11  question itself is okay, but maybe you move it to another

12  area.  Or if it's covered by another question or other

13  questions, then maybe you don't need it.  But if you're going

14  to ask it, all I'm suggesting is that you impose or you put

15  the qualifier in there "that you are aware of."

16          MS. MORENO:  Okay.

17          THE COURT:  Okay.  Question 28, I would add "if

18  any" again.  It reads now, "What is your opinion of people of

19  Somali descent?"  I would add "if any" either in the middle

20  of the sentence or at the end.

21          MS. MORENO:  Yes.

22          THE COURT:  Question 29, I would add "if any" after

23  the word "contact."

24          MS. MORENO:  Yes.

25          THE COURT:  Okay.  Page 8, question 33, strike

1    "gentlemen," strike "charged"; put "defendants" there.

2    "Defendants in this case are from Somalia and are Muslim."

3            MS. MORENO:  Yes.

4            THE COURT:  Page 9, strike 37 and 38.  In terms of

5    news sources, you know, what are their primary sources of

6    local news and national news, that's all fine, and even

7    subscribing to newspapers, magazines, fine.

8            MS. MORENO:  Just 37 and 38?

9            THE COURT:  Just 37 and 38 because that just gets

10   into irrelevant areas and takes up a lot of time --

11           MS. MORENO:  I understand.

12           THE COURT:  -- if anyone -- and I would make the

13   same suggestion with respect to voir dire, once the attorneys

14   are engaged in voir dire, what stories are of interest to

15   you, what are your hobbies.  So 37 and 38 are out.

16           Then we begin with knowledge of the trial

17   participants in the case, and this is where I have a little

18   bit of a question here.  The introductory paragraph, "Because

19   of the publicity surrounding this case, some jurors may have

20   heard and/or read something about the case at some point."

21   Nothing wrong, et cetera, with having heard.  And then

22   question 40, "The case for which you were summoned involves,"

23   well, that's a little too generic, "involves."  I mean, first

24   of all, I don't even think that's necessary.  They're already

25   going to be advised that this case is a case brought against

1    these individuals, these defendants, so the case does more

2    than involve them, and so I don't think 40 is necessary as a

3    lead-in.

4            And then with respect to -- with respect to

5    publicity, you know, Ms. Moreno, I read through your papers

6    here, and you spent quite a bit of time tracking what your

7    research had turned up on this case.  I've seen some -- let

8    me tell you what my exposure has been to this case vis-a-vis

9    public reporting of it.  And, admittedly, I haven't done an

10   Internet search of my own, but anytime there's a case

11   involving a case assigned of one our judges, we are informed

12   of it, that is, a case in the newspaper -- not on television,

13   but in local newspapers; we have somebody who actually does

14   that because we need to be aware in publicity cases of what

15   is being published so if we need to address that with the

16   jury during a case ongoing, we can do that.  I'm only aware

17   of a couple of newspaper articles that have been published

18   locally on this case.

19           Now, in your papers you indicate that you've gone

20   on the Internet, you've Googled the case, and you see

21   hundreds of links or -- well, and thousands of related to one

22   of the defendants, the lead defendant.  But that may just

23   be -- those links may just be outlets, media outlets,

24   individual newspapers picking up the exact same story and

25   reprinting it.  I don't really -- you seem to feel this case

1    has gotten a lot more publicity than I've been exposed to.

2         MS. MORENO:  Well, certainly from a defense

3    perspective we would like no publicity at all, and these

4    cases always have publicity though.  I don't -- I don't know

5    personally the reporters, but every time we've been in the

6    courtroom, reporters have been in the courtroom.

7         The Internet broadens everyone's world, your Honor,

8    and that's why I put it in the papers because what we know

9    for sure is that jurors get on their computers and they

10   Google the stories.  And we know that there has been some

11   local television press about this case.  It hasn't reached

12   the level that we see some of the publicity that attends some

13   of these other cases which actually I've been involved in,

14   no, but from my point of view, I'd rather have no publicity

15   about my client, have a juror not heard or seen anything.  I

16   don't think -- I think that you have to ask -- and whatever

17   way the Court wishes to do that, if you're going to that in

18   your general voir dire --

19        THE COURT:  I do that.

20        MS. MORENO:  -- I'm happy to not even speak any

21   more about this, your Honor --

22        THE COURT:  Well --

23        MS. MORENO:  -- but I think you have to do it.

24        THE COURT:  -- what I've done previously in the

25   context of a questionnaire and what I always do in any kind

1   of a case that has any kind of a profile to it is I mention

2   it in a softer way than what you have here:  "Because of the

3   publicity surrounding this case" -- I mean all of a sudden

4   that creates images and all kinds of musings on the part of

5   prospective jurors or jurors that may not be appropriate; it

6   may be too much.

7           I would -- I've always taken the position look,

8   because of the nature of the case, there may be some coverage

9   of it, there may be some publicity about it, there may have

10  already been publicity about it to which you might have been

11  exposed.  I just use that as an entrée into the more

12  important admonition, and that is telling them that during

13  the course of the trial, they cannot access not only any

14  stories about the case, any stories about the subject matter

15  of the trial, they can't access any -- that they can't listen

16  to any television or news accounts, they can't go on the

17  Internet, they can't perform their own -- I mean I cover all

18  of that.  But in terms of introducing the subject, I don't

19  like to raise the flag in such a stentorian way and then try

20  to lower it.  I try to just suggest that there might be some

21  publicity about the case, it may be reported, and how

22  important it is for them to avoid all of that.

23          MS. MORENO:  I have a suggestion, your Honor.  I

24  would be happy to reword that introductory paragraph to not

25  say anything about publicity and just ask the jurors if

1    they've heard anything about this case and these gentlemen

2    because the following questions then ask "and if you have

3    heard" -- I don't care where you heard it from, but if you

4    have heard -- "about it, what's your reaction?"

5              THE COURT:  That's fine.  That's better.

6              MS. MORENO:  And basically --

7              MR. COLE:  Just go to question 40; just go straight

8    to question 40.

9              THE COURT:  Well, yeah.

10             MS. MORENO:  We are on question -- correct.

11             THE COURT:  Strike (a) and it becomes question 40.

12   What -- well, have you -- you can do that; you can work on

13   the language of that.  But there's no need for the

14   introductory paragraph; it raises the flag I think

15   unnecessarily, but we can just move into the area in a more

16   nuanced way so that if they remember that they've seen

17   something about this case --

18             MS. MORENO:  Okay.

19             THE COURT:  And, you know, they may well be

20   confusing this case with other articles they've read or heard

21   about Somalia, other activities or -- those of us who follow

22   the news pretty carefully are pretty familiar with what's

23   been going on in Somalia, and certainly we knew that because

24   of the current status of Somalia, you couldn't even take

25   depositions there.  So I think there's been general sporadic

1   reporting on Somalia, the question of how secure it is and

2   the related subjects.  So make it as generic as you can, but

3   also include in this -- somewhere in this questionnaire

4   publicity for the larger issue, Somalia and what the problems

5   in Somalia, current state of affairs.  Things may be --

6   things may be improving there.  I know Ms. Fontier is a

7   regular visitor; perhaps --

8           MS. FONTIER:  Beaches, I love 'em --

9           THE COURT:  Well, okay.  So I think you get the

10  gist.  Go through pages 9 and 10 and make the necessary

11  corrections there.  Page 11 I didn't have any questions with

12  except when you get down to --

13          MS. MORENO:  Forty-seven?

14          THE COURT:  -- 47, yeah.  And see, this is what --

15  I've already interlineated it.  I've changed the first

16  sentence from "This case is likely to receive ongoing media

17  attention" to "This case may receive some media attention."

18  And you could -- I think the rest of it is okay.

19          MS. MORENO:  Okay.

20          THE COURT:  If you want to come up with something

21  better working with Mr. Cole, you certainly are able to do

22  that.  Page 12, prior jury service; once again, I get into

23  this pretty carefully myself, and it is intruding into

24  areas -- I mean this questionnaires gets into so many areas I

25  would typically cover, but that's okay.  I would strike the

1  question as to whether they were the foreperson.  It's not a

2  separate question, but that part of 48 asking whether they

3  were the foreperson.

4          MS. MORENO:  Okay.

5          THE COURT:  Next, page 13, feelings about the

6  criminal justice system, 55; you can eliminate that.

7          MS. MORENO:  But they come up with such great

8  answers, your Honor.

9          THE COURT:  I know.  That's what I'm concerned

10 about.

11         MR. COLE:  Your Honor, if we can back up just for a

12 second.  On 49, question 49, what does that -- that seems

13 sort of far afield.  Seems to me we're getting beyond issues

14 relevant to this particular case.  This case isn't involving

15 efforts to change the law in any way, it's not talking about

16 the legislative process, and we already have had a lot of

17 questions in this questionnaire about leanings politically or

18 views on Islam.

19         THE COURT:  I don't think it's particularly

20 germane.

21         MS. MORENO:  I'm happy to withdraw it, your Honor.

22         THE COURT:  Then with respect to opinions on the

23 trial is where I have quite a few changes.  Questions 56 and

24 57 I get into very thoroughly, and what I want to do is I

25 want to instruct them, I want to instruct them before these

1    questions are asked.

2              MS. MORENO:  Well, if I may -- if I may engage the

3    Court on that issue.  I can appreciate that, but what

4    we're -- what we're trying to find out is how they really

5    believe before any instructions are given.  Now, the Court

6    can instruct afterwards, I have no problem with that, but

7    this is a test of what prejudices and opinions do they

8    harbor.  And honestly, your Honor, even though jurors will

9    often say to the Court yes, I can put the fact that I have

10   negative feelings about Muslims because of 9/11, they can't

11   because that aside place doesn't really exist; although they

12   will tell the Court yes, I can put it aside, we know that's

13   almost unnatural, that that's really -- that really doesn't

14   happen.  These questions are designed before the Court starts

15   instructing them about how they really feel about these

16   matters that are central in this particular case --

17             THE COURT:  Well --

18             MS. MORENO:  -- so I would fight for those two

19   questions, your Honor, because what we see in questionnaires

20   is jurors, even though they understand of course the Fifth

21   Amendment, they have big problems with defendants not

22   testifying --

23             THE COURT:  I'm aware of that, and that's why --

24             MS. MORENO:  -- and I'm not --

25             THE COURT:  -- I spend so much time on it, and even

1   after I spend time on it, there are those who say you know, I

2   just -- I just, I have trouble with the defendant not taking

3   the stand or I can't say I wouldn't hold it against them if

4   I -- if a defendant didn't take the stand and tell his side

5   of, I just don't know how I feel about it.  They're gone.

6   But rather than having to rehabilitate an entire group or a

7   majority of a group because most people "no, I would want to

8   hear the story," I want a shot at it.

9           It's been my view that based on my approach that I

10  encourage them after it's driven home how important these

11  bedrock principles are, that they, if they have a doubt, to

12  express that doubt.  And it's been my experience that that's

13  the best way to handle it.  And beyond that, you're certainly

14  not precluded from following up if you have questions

15  yourself with respect to any individuals given how those

16  individuals may have responded to the questions I had for

17  them after I instructed them.  So, Mr. Cole?

18          MR. COLE:  With that with -- I think I understand

19  the ruling then on 56 and 57.  But backing up to 54, we

20  wouldn't ask unless I missed something.

21          THE COURT:  I'm sorry?

22          MR. COLE:  Question 54, says "Have you or anyone

23  close to you ever been falsely accused of a crime?"  That's a

24  loaded question.  I don't know why it's phrased that way.  It

25  ought to just say accused of a crime.  That's implying that

1    there's an issue in this case about someone being falsely

2    accused, and there is an issue about -- there's an accusation

3    and there's a presumption of innocence, but there's no --

4    there's no -- there shouldn't be a loaded question up front

5    raising the issues of false accusations.

6            THE COURT:  Okay.  I'm going to leave it in.  I

7    think it's okay to ask.

8            MS. MORENO:  Your Honor, what is exactly the

9    Court's ruling on --

10           THE COURT:  Yeah, I'm going to -- 56 and 57 should

11   be out; I'll handle those.  Fifty-eight, are there informants

12   in the case?

13           MR. COLE:  There's -- well, there's a

14   cooperating -- a cooperating witness -- I don't know if he's

15   an informant or not, but he's a cooperating defendant.

16           THE COURT:  Okay.  Well, does 58 even apply, Mr.

17   Cole, based on your knowledge of what -- I mean are we going

18   to need the special instruction on credibility that deals

19   with informants, CIs, cooperating --

20           MR. COLE:  Yes, we're going to have a -- we will

21   likely have testimony from a witness who's receiving

22   benefits; but that being said, we're not sure why it's

23   couched in the framework of a case involving allegations of

24   terror.  It should be -- it should just be the normal

25   question about that.

1                   THE COURT:  Yeah, this is another area where you're

2         kind of mixing and matching here.  I get into -- another area

3         I feel very strongly about in voir dire and cover very

4         thoroughly is credibility of witnesses and the importance of

5         not elevating the testimony of someone in law enforcement or

6         affiliated with the government over non law enforcement

7         personnel, that they must be -- credibility must be judged by

8         the same criteria, the same standards.  And this is an area

9         that I get into carefully.  And I would think we could

10        eliminate 58.  I have 58 (a) and all of 59 is areas that I

11        cover.

12                  In addition to that, even if you were going to

13        proceed with these, the question "What would be important to

14        you in considering that testimony" is a -- with respect, an

15        awkward way of asking that, but that gets to another area; it

16        gets to an area of voir dire that I'm always concerned about,

17        that is, an attorney, you know, flipping out a piece of

18        evidence "how do you feel about that?" or "will that cause

19        you to" --

20                  MS. MORENO:  I'm sorry, your Honor.

21                  THE COURT:  -- "be inclined" --

22                  MS. MORENO:  I'm confused.

23                  THE COURT:  Well, sometimes in voir dire -- look,

24        the ultimate -- if you need to diffuse something, a negative,

25        if there's a bit of evidence you want to bring up and just

1    diffuse within the context of voir dire, in my view, the

2    appropriate way to do that is mention it, then ask the juror,

3    prospective juror, if he or she can fairly consider that

4    evidence in connection with all the other evidence in the

5    case; that's the way to handle it.  But to ask -- I know this

6    question doesn't really get to that; you're talking more

7    about credibility here, but to -- but it's closely associated

8    with it, and I wanted to make sure I didn't forget it.  To

9    ask a juror how they feel about a particular piece of

10   evidence or how they feel about the -- what weight they would

11   give to the testimony of an informant is asking them to

12   prejudge the evidence.

13          MS. MORENO:  Well, your Honor, what I'm getting at

14   here -- and these are pretty -- and I agree with the Court

15   about 58 (a), what would be important, in one sense.  But

16   really, if a panel member believes that an FBI special agent

17   who's on the stand, he's entitled, because of his status as a

18   special agent, to more credibility, that he probably knows

19   what he's talking about, all those things that people assume,

20   that juror can't serve, and the way we're going to find that

21   out is by asking these questions.

22          THE COURT:  Well, first of all, I don't necessarily

23   agree with your statement because your statement was very

24   broad.  You need to define "status" because there are an

25   awful lot of things that go into status, including

1   experience, including expertise, training, skill.  And that's

2   why I say you can't really get into this area other than to

3   drive home the point how important it is to judge all people,

4   to judge all witnesses -- law enforcement/non law

5   enforcement, expert witnesses/nonexpert witnesses, people

6   affiliated with one side of the case or the other side or not

7   affiliated at all -- by the same standards.  They can weight

8   those standards differently, but they -- what they cannot do

9   is just assume that a law enforcement agent, an FBI agent, is

10  inherently more truthful than someone that is not in the FBI.

11          MS. MORENO:  I'm happy to --

12          THE COURT:  And that's the way -- that's the way I

13  handle it, and I've handled it that way for many years.  It's

14  important the way you ask these questions --

15          MS. MORENO:  I agree, your Honor.

16          THE COURT:  -- and "status," the way you point to

17  status may, to the extent it includes a great number of

18  things I already talked about, may well be considered by the

19  jury as they're -- as they're assessing the credibility of

20  witnesses.  They will be looking at the level of education

21  and expertise and the manner in which that witness has

22  testified and all the --

23          MS. MORENO:  I don't disagree with the Court at

24  all.  All I'm asking the Court to consider with respect to

25  these couple of questions is that what we're looking for are

1  the candid answers of jurors, preliminary opinions before

2  they hear the law because notwithstanding the compelling,

3  perhaps opinion-changing effect that his Honor will have on a

4  juror to dismiss a prejudicial opinion, in my experience it

5  rarely happens.  So I'm entitled on behalf of Mr. Mohamud to

6  know if there are panel members who feel that just because

7  someone is an FBI agent and that alone, without knowing

8  anything else, that that person is probably far more

9  reliable.

10        THE COURT:  I think 59 is worded okay.

11        MS. MORENO:  Okay.

12        THE COURT:  And I think -- I think the question

13  before that, although it's unnumbered -- I guess it's 58

14  (a)--

15        MS. MORENO:  Yes, your Honor.

16        THE COURT:  -- the Court will instruct you on

17  whatever weight you choose -- you choose? -- to the testimony

18  of an informant, what would be important to you considering

19  that testimony?  That should be stricken; that's -- I don't

20  think that adds anything, and, quite frankly, I don't really

21  understand it.

22        MS. MORENO:  Yes, your Honor.

23        THE COURT:  But 58 --

24        MS. MORENO:  Your Honor, usually this kind of a

25  question is asked from the government's side.

1            MR. COLE:  Yes, but it's not how you feel.  The

2      question ought to be Do you have a view about the use of

3      informants that would make you unable to serve as a fair and

4      impartial juror.

5            MS. MORENO:  I'm fine with that.

6            THE COURT:  Okay.  Why don't you change it if you

7      agree as to that.  My question on 58 was one I already asked,

8      whether there were going to be informants, which I think you

9      answered a few minutes ago.  Okay.  Question 60 -- so 59 is

10     okay.  Question 60 -- I know we're getting toward the end

11     here -- I have it "as modified."  "There may be evidence in

12     this case consisting of telephone conversations tape recorded

13     through the use of electronic devices" where I -- what I did

14     was I struck "How do you feel about the use of recorded

15     conversations" -- and, once again, getting back to an earlier

16     suggestion -- "can you fairly consider that evidence along

17     with all the other evidence in the case?"

18            MR. COLE:  That's fine, your Honor.

19            THE COURT:  Okay.

20            MS. MORENO:  Yes, your Honor.

21            THE COURT:  Okay.  Then on to page 15, just

22     striking the last question.

23            MS. MORENO:  Yes.

24            THE COURT:  Okay.

25            MS. MORENO:  I'm so sorry, your Honor.  Which one

1    are you --

2            THE COURT:  Sixty-one -- 65, I'm sorry, on page 15.

3            MS. MORENO:  Striking --

4            THE COURT:  Striking 65.

5            MS. MORENO:  Okay.

6            THE COURT:  And you can strike the oath there at

7    the end.  They'll be advised that they're -- orally that

8    they're answering the -- they're giving these -- and they'll

9    answer these questionnaires after they've taken the oath.

10   They'll be advised that they're responding to these

11   questionnaires as if they're under oath.

12           MS. MORENO:  Okay.  So strike the whole juror oath

13   at the end?

14           THE COURT:  Yes, at the end there.

15           MS. MORENO:  Thank you.

16           THE COURT:  Those were the suggestions I had and a

17   few limitations.

18           MS. MORENO:  And, your Honor, I'll have those

19   revisions --

20           THE COURT:  Just work with Mr. Cole on it.  If you

21   can get it back to me as quickly as you can and we can get

22   that settled, I'm sure.

23           MR. COLE:  Your Honor, we couldn't tell, did you --

24   was 61 in or out?

25           THE COURT:  Fifty-one?

1          MR. COLE:  Sixty-one.

2          THE COURT:  Sixty-one is --

3          MS. MORENO:  In.

4          THE COURT:  -- in I think but modified.  Yeah, 61,

5    I don't -- I haven't -- I don't have -- I don't have an issue

6    with that.  If you have an objection to it -- I know it's --

7    it may be somewhat inartful.  It's not a complete explication

8    of the reasonable doubt instruction, but it raises the

9    general subject of reasonable doubt and essentially asking

10   them where the defendants are Muslim men or Somali, can you

11   still apply that standard.  Another way of saying can you be

12   fair.

13         MR. COLE:  It just seems that by this point in the

14   questionnaire, these jurors have been asked now six ways to

15   Sunday about their views of Muslims and Somalis, and it just

16   seems to be overemphasizing those elements over and over and

17   over again, but that's our only problem with the question.

18   Not trying to get the subject of will they follow the

19   standard, proof beyond a reasonable doubt.  I don't know why

20   it needs to be repeatedly emphasized.  They've already been

21   asked a whole series of questions about their views of

22   Somalis and Muslims.

23         THE COURT:  I understand that.  I don't have any

24   strong -- I don't have any objection to that, either to the

25   wording of it or to its placement in the questionnaire.  And

1    I will tell you, Mr. Cole, that I consistently remind jurors

2    of the presumption of innocence from the beginning to the

3    very end in jury selection because so many of the other

4    instructions I will give them as to the constitutional right

5    not to testify, to not put on a case, to the presumption

6    of -- to reasonable doubt all read on or follow the

7    presumption of innocence; so they hear that so many times --

8    especially in a case like this, I think it's so important to

9    keep reminding them of that -- that even though it may have

10   been asked in different ways, six ways to Sunday, as you put

11   it, in the questionnaire, I don't have any objection to it.

12          MR. COLE:  Okay.  Then I think that the only thing

13   we wanted to say is there are probably just a few questions

14   that we would want to add that -- about our side of the case.

15          THE COURT:  Sure.

16          MR. COLE:  And so we can -- when Ms. Moreno

17   prepares her draft, we can consult with her on the few

18   questions we want to add --

19          THE COURT:  Absolutely.

20          MR. COLE:  And then we'll submit them to your

21   Honor.

22          THE COURT:  Okay.  Ms. Moreno?

23          MS. MORENO:  Yes, your Honor.

24          THE COURT:  As I went through your papers on

25   this -- on this issue -- if you'd turn to page 6 of your

```
 1    joint defense motion for jury questionnaire and attorney
 2    conducted voir dire, there's a reference to Mr. Wrangel.
 3              MS. MORENO:  This was a mistake, your Honor.  This
 4    was Ms. Moreno cutting and pasting from all her
 5    questionnaires and motions that she had.
 6              THE COURT:  Okay.  Thank you.  I thought maybe I
 7    had missed someone in this case.  Okay.  And
 8    attorney-conducted voir dire will be -- will be permitted.
 9    I'm going to ask something in that regard.  I always ask
10    counsel in all cases to indicate what their proposed voir
11    dire is, by them, by themselves, so that if there are any
12    issues or any additional problems, that we address those up
13    front.  And so no later than the 18th, next Friday, I'd like
14    attorney -- proposed attorney voir dire, that is, questions
15    you'll be asking.  They may not have been included in here --
16    I mean I would hope they would have been included in here,
17    general areas, but if there are any additional questions or
18    areas of questions, please put those in written form and get
19    those to me; file and serve them.  And then if there are any
20    additional issues, we can discuss those.
21              MS. FONTIER:  Your Honor, so I'm clear, you're not
22    asking for a complete list of specific questions; it would
23    just be topics, and if we have specific questions, then to
24    propose though as well?  Or do you want an actual written-out
25    list of questions?
```

 1          THE COURT:  Pretty close to be written out, I mean,
 2   you know, topics and then any subtopics okay, but I just want
 3   to be able to foreclose inappropriate inquiry or objections I
 4   would have.  I don't want -- I don't necessarily appreciate
 5   one side objecting to the voir dire of another side -- that's
 6   not the way you want to get off -- so that if there are going
 7   to be issues, then we can address them ahead of time before
 8   we ever get to that point.
 9          MS. MORENO:  Your Honor -- and so given the Court's
10   ruling on the -- on the issues of al-Qaeda and some of the
11   other aspects of the case that we now know may be coming into
12   evidence and was not included in the questionnaire, so for
13   instance, that particular subject matter.
14          THE COURT:  What you're going to be asking, yes,
15   what you'll -- the questions you'll be asking the proposed --
16   the jurors.
17          MS. MORENO:  Okay.
18          THE COURT:  Yes.
19          MS. MORENO:  Thank you.
20          MR. DRATEL:  Your Honor, would we need to
21   include -- I mean I guess it's almost self-evident; I just
22   want to be clear about that.  You're not asking us to, again,
23   list the stuff from the questionnaire because it's a direct
24   follow-up to that I assume's sort of covered in terms of you
25   want other topics that are not necessarily direct follow-ups

1  to questions in the questionnaire.

2           THE COURT:  Yeah.

3           MR. DRATEL:  Okay.

4           THE COURT:  Yeah, pretty much.  Just put it in

5  pleading form, get it to me by the 18th so that I can address

6  it at some other point in time.

7           MR. DRATEL:  Okay.

8           THE COURT:  Anything else on voir dire?  Look,

9  we're going to go the first day just on the questionnaires

10 because you've requested them and your request has been

11 granted.  That burns an entire day.  And hopefully -- well,

12 of necessity it limits what happens on the second day.  My

13 part of this is going to be about two to three hours, I told

14 you, even after all of this comes in, so I'm going to limit

15 the sides to attorney-conducted voir dire; I think that you

16 can do what you need to do in an hour or less per side.

17 That's all the time we're going to have that second day, so

18 that's all the time I can provide to you.  And then on the

19 third day we're going to start with the opening statements

20 and the case itself.  But just adding up the time, that's

21 what you're looking at in terms of voir dire.  Anything else

22 on voir dire?  Anything else on any of the subjects we've

23 talked about?  Trial briefs.  I do have a few others things I

24 wanted to discuss with you.  Mr. Durkin?

25           MR. DURKIN:  Judge, can we just revisit the issue

1  of peremptory challenges just to put it on the record?

2            THE COURT:  Yes.

3            MR. DURKIN:  I'd like to make a request --

4            THE COURT:  Can you use the lectern?  Thank you.

5            MR. DURKIN:  In light of the fact that there's four

6  of us and you've already ruled that it's not your ordinary

7  case -- I certainly don't think it is -- I would ask for

8  additional peremptory challenges for each side.

9            THE COURT:  What would your request be?

10           MS. MORENO:  I would ask for, on behalf of

11 Mr. Mohamud, one additional strike.

12           MR. DURKIN:  I was thinking maybe 14 and 8, if we

13 could each have one additional.

14           THE COURT:  Mr. Cole?

15           MR. COLE:  Well, we'll defer to the Court on what's

16 appropriate.  I think we'd prefer to stick with 10 and 6.

17 There's going to be a lot of jurors coming through and with

18 this extensive questionnaire, this focuses the inquiry and

19 should make our strikes more useful than they normally would

20 be, so we shouldn't need more strikes with all this

21 additional information about the jurors.

22           MR. DURKIN:  Well, I don't want to trade the

23 questionnaire.

24           THE COURT:  Pardon?

25           MR. DURKIN:  I said I don't want to trade off on

 1   the questionnaire, so I'll defer to you.  I think the rule

 2   provides for it, and I think it's reasonable.  I'll defer to

 3   the Court, but --

 4           THE COURT:  Well, it would be seven -- it would be

 5   7 and 11, 6 and 10, 7 and 11 with two alternates.  Well, I

 6   don't know if we're even going to do two alternates.  I'll do

 7   this:  I'll give the defense two -- it'll be 8 and 12.  Eight

 8   and 12 maintains the same general ratio, so the defense will

 9   have two extra, which would include alternates.

10           MR. DURKIN:  Thank you.

11           THE COURT:  Okay.  Two extra, one extra, 8 and 12,

12   8 and 12.  Okay?

13           MR. DURKIN:  Thank you.

14           MR. WARD:  Your Honor, I apologize for not having

15   raised this earlier, but --

16           THE COURT:  Is that acceptable?

17           MR. WARD:  -- it's a discovery matter.

18           THE COURT:  Is that acceptable?

19           MS. MORENO:  Mathematically, your Honor, it does

20   improve the government's position actually.

21           THE COURT:  It does improve --

22           MR. DRATEL:  Thirteen and eight would be somewhat

23   better proportions.

24           MR. COLE:  Twelve and seven, your Honor.

25           MR. DRATEL:  Twelve and seven, your Honor.

1          THE COURT:  Twelve and seven?  All right.

2     Everybody's in agreement that peremptories will be 12 and 7,

3     7 for the government, 12 defense.

4          MR. WARD:  May I, your Honor --

5          THE COURT:  Yeah.

6          MR. WARD:  -- one discovery matter.  In light of

7     the Court's ruling that expert disclosure be concluded

8     tomorrow, we have an additional -- I think it's five or six

9     documents that Mr. Bryden authored at a time when he was a

10    contractor to the USAID, part of the Department of State.

11    And we've taken a look through those and they each contain

12    statements that would be relevant to his testimony on direct;

13    it's a lot of background information.  And the agency that he

14    wrote those for has asserted an interest in those documents

15    not being disclosed outside of the trial, their not being --

16    becoming public.  And I haven't had a chance to talk to each

17    of the defense counsel about this, but the Court did enter a

18    protective order for sensitive discovery back in February of

19    2011, and I think it would work to treat these five or six

20    documents, which I will call the USAID documents, as

21    sensitive discovery under the protective order from February

22    of 2011.  That way the defense counsel would have the ability

23    to review them, use them on cross-examination of Mr. Bryden

24    if it were appropriate, and at the conclusion of the

25    proceedings, they'd be returned to the government and they

1    would not be disclosed outside the proceedings.

2           THE COURT:  Okay.  It's all right with me if it's

3    okay with the other side.  When you meet and confer, you want

4    to discuss that?

5           MR. DRATEL:  We'll do that, your Honor.

6           MS. MORENO:  We'll discuss that.

7           THE COURT:  Okay.  Thank you, Mr. Ward.  I

8    appreciate you raising that.  Trial briefs.  I assume you're

9    already working on your trial briefs, you've got all the law

10   together that you want, so I'd like to get those by the 18th,

11   a week from -- yeah, like to get those by the 18th.  Is that

12   going to pose a problem for anyone?

13          MR. DRATEL:  If we can get those the 21st, your

14   Honor?  We have a lot due on the 18th that we set up today in

15   terms of a Friday --

16          THE COURT:  Okay.  File and serve by the 21st.

17   Actually the 21st is a court holiday, but let's say the 22nd.

18          MR. DRATEL:  Okay.  Thank you, your Honor.

19          MS. MORENO:  Thank you.

20          THE COURT:  All right.  I'd like your proposed jury

21   instructions too by -- let's say the trial briefs by the

22   22nd.  Jury instructions I'd like to have ahead of time; I'd

23   like to have those by the 25th.

24          MS. FONTIER:  Your Honor, are you expecting us to

25   confer with the government and submit a joint or are those

1  defense and government?

2          THE COURT:  Any chance of having the two sides meet

3  and confer on jury instructions?  If not, you can make your

4  submissions individually.

5          MS. FONTIER:  Certainly easier to submit them

6  individually.

7          MR. COLE:  There's just a lot -- there's just a lot

8  to do between now and then.  We'll confer if we can, but I'd

9  like to submit our own set.

10          THE COURT:  All right.  So jury instructions then

11  by the 25th, trial briefs by the 22nd.  Mr. Durkin, I'm going

12  to ask you to do something with respect to your severance

13  motion.  I'd like you to file -- I'd like to give both sides

14  an opportunity to file a short supplemental memorandum of

15  points and authorities on the severance motion in light of

16  how the case has developed and what representations you've

17  heard in court today.  Could you do that?

18          MR. DURKIN:  Sure.

19          THE COURT:  When do you think you could comfortably

20  do that by?

21          MR. DURKIN:  Probably have it by Thursday, Friday.

22          THE COURT:  Friday, the 18th?

23          MR. DURKIN:  Yes.

24          THE COURT:  Okay.  Mr. Cole, can you get something

25  in by the 23rd?

 1          MR. COLE:  Yes.

 2          THE COURT:  Okay.  Response by the 23rd.  Thank

 3   you.  Now, this is the last scheduled hearing we have until

 4   the trial goes forward on the 28th.  We've done a lot of work

 5   today.  Quite frankly, if all counsel were local, I'd have

 6   you back here one more time, probably on the -- well,

 7   sometime during next week -- not next week, it would be

 8   either the 18th or the 22nd.  I'm willing to schedule another

 9   meeting if you'd like to have a status conference, but if

10   not, then come the 28th, we're going to be picking and

11   kicking.

12          MR. DURKIN:  Would you consider doing one by phone,

13   Judge?

14          THE COURT:  I'd really be reluctant to do that.  I

15   think we get so much more done in person.  If there's -- let

16   me put it this way:  If there's a need for a telephonic

17   conference, if there's a true need for a telephonic

18   conference, then we can schedule one.  But if there are

19   issues that come up that you can work on together -- just

20   meet, confer, and resolve -- I'd appreciate that taking

21   place.  At the same time, I don't want to be -- none of us

22   should be -- and I say this with respect -- ambushed at the

23   very end here with issues, with problems that would in any

24   way delay proceedings or throw a monkey wrench into the

25   works.  We've got all these people coming, potentially a

1  hundred or more people coming, and everybody's scheduled this

2  to begin on the 28th.  I just want to make sure that we begin

3  on the 28th and we proceed seamlessly through without wasting

4  any time with issues that could have been resolved ahead of

5  time.

6          MS. MORENO:  Your Honor, I know I and Mr. Dratel

7  and perhaps other counsel, we will -- we're coming in on the

8  24th.  Perhaps the 25th, the Friday before, we could have a

9  conference with your Honor.  I think that's sort of the best

10 we could do.

11         MR. COLE:  I think that would be great.  I'd prefer

12 that over --

13         THE COURT:  Okay.

14         MR. COLE:  -- waiting until the morning of.

15         THE COURT:  Okay.  Then we'll set a status -- we'll

16 set a status for January 25.

17         MR. DRATEL:  Could we do it midday, your Honor; is

18 that a --

19         THE COURT:  Midday?  How about 10:00 rather than --

20         MR. DRATEL:  I don't want to make 10:00 because I

21 have some --

22         THE COURT:  When you say midday, what do you mean

23 midday?

24         MR. DRATEL:  I will take the earliest flight out

25 here on the 25th -- I think I'm coming the morning of the

1   25th, and don't know if I can --

2          THE COURT:  What's the earliest -- what's the

3   earliest you could be here, Mr. Dratel, coming in, flying

4   that day?

5          MR. DRATEL:  My guess is -- it's sometimes hard to

6   get direct flights nowadays, really it's --

7          THE COURT:  You mean nonstops?

8          MR. DRATEL:  Yeah, that's been -- it's been

9   difficult just in terms of just what's available.  I think

10  any time after probably 11 a.m. is probably pretty good given

11  that they usually start about 6:00, again, and if I get a

12  6:00 6:30 flight.

13         THE COURT:  Yeah, the flights out are -- they got 6

14  a.m. flights out, and --

15         MR. DRATEL:  Right and then I'd be here by 9:00,

16  9:30 even with that, you know, assuming a delay in the

17  airport --

18         THE COURT:  Eleven a.m.?

19         MR. DRATEL:  Eleven a.m. is good, your Honor.

20         THE COURT:  If you're not here, we're going to wait

21  for you, okay?  So we'll say 11 a.m. on the 25th.  Okay.

22  Your pending motions --

23         MR. DURKIN:  I'm sorry, your Honor.  I have a

24  sentencing that day.  It may get moved, but --

25         THE COURT:  You want to appear telephonically?

1          MR. DURKIN:  As a last resort.  I think I can make

2    it.

3          THE COURT:  If you can't, you can appear

4    telephonically.  I just want to -- it's better if we have

5    people here.

6          MR. DURKIN:  That's fine.

7          THE COURT:  And if it's impossible for you, Mr.

8    Durkin, we'll -- we can have you appear by phone.

9          MR. DURKIN:  I originally planned on coming on the

10   26th because of that, so I may have --

11         THE COURT:  Okay.  It's up to you.  If you have

12   another matter --

13         MR. DURKIN:  Thank you.

14         THE COURT:  I know it's on short -- short notice

15   here.  Okay.  Pending motions are continued until the 25th of

16   January.  Let me just make sure that I've been through my own

17   checklists here, everything's been covered.  Okay.  I think

18   I've got everything.  So we'll see you on the 25th, but

19   before then, I'm going to be receiving a lot of paper, yeah,

20   trial briefs, supplemental Ps and As on severance, be looking

21   at a jury questionnaire, proposed voir dire.  Okay.  I think

22   that does it.

23         MR. COLE:  Thank you.

24         THE COURT:  Thank you for your patience.

25      (The proceedings were concluded.)

1                       Certificate of Reporter

2

3    I hereby certify that I am a duly appointed, qualified, and

4    acting Official Court Reporter for the United States District

5    Court; that the foregoing is a true and correct transcript of

6    the proceedings had in the mentioned cause on the date or

7    dates listed on the title page of the transcript; and that

8    the format used herein complies with the rules and

9    requirements of the United States Judicial Conference.

10

11   Dated February 27, 2014 at San Diego, California.

12

13                          /s/ Debra M. Henson  (electronic)
                            Debra M. Henson
14                          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25